**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

MAY 2 5 2021

JAMES W. McCORMACK, CLERK
By:_____
DEP. CLERK

## IN THE UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF ARKANSAS
### CENTRAL DIVISION

**DYLAN BRANDT, by and through his mother, Joanna Brandt; JOANNA BRANDT; SABRINA JENNEN, by and through her parents, Lacey and Aaron Jennen; LACEY JENNEN; AARON JENNEN; BROOKE DENNIS, by and through her parents, Amanda and Shayne Dennis; AMANDA DENNIS; SHAYNE DENNIS; PARKER SAXTON, by and through his father, DONNIE SAXTON; DONNIE SAXTON; MICHELE HUTCHISON, on behalf of herself and her patients; and KATHRYN STAMBOUGH, on behalf of herself and her patients**                    **PLAINTIFFS**

v.                    Case No. *4:21CV 450-JM*

**LESLIE RUTLEDGE, in her official capacity as the Arkansas Attorney General; AMY E. EMBRY, in her official capacity as the Executive Director of The Arkansas State Medical Board; and SYLVIA D. SIMON, ROBERT BREVING JR., VERYL D. HODGES, JOHN H. SCRIBNER, ELIZABETH ANDERSON, RHYS L. BRANMAN, EDWARD "WARD" GARDNER, RODNEY GRIFFIN, BETTY GUHMAN, BRIAN T. HYATT, TIMOTHY C. PADEN, DON R. PHILIPS, WILLIAM L. RUTLEDGE, and DAVID L. STAGGS, in their official capacity as members of the Arkansas State Medical Board**                    **DEFENDANTS**

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs, by and through their attorneys, bring this Complaint against the above-named Defendants, their employees, agents, and successors in office, and in support thereof state the following:

This case assigned to District Judge *Moody*
and to Magistrate Judge *Kearney*

## I.   PRELIMINARY STATEMENT

1.     On April 6, 2021, the Arkansas General Assembly passed HB 1570, enacted as Act 626 (hereafter the "Health Care Ban"), overriding Governor Asa Hutchinson's veto of the bill within 24 hours and banning the provision of medically necessary and potentially lifesaving

healthcare to transgender adolescents.   The law was passed over the sustained and robust opposition of medical experts in Arkansas and across the country.   The law could be enforced as soon as July 28, 2021.[1]

2.      Since long before the adoption of the Health Care Ban, there has been a well-established medical consensus that certain medical treatments are necessary to treat some adolescents diagnosed with gender dysphoria—a medical and mental health condition characterized by clinically significant distress caused by an incongruence between a person's gender identity and the sex they were assigned at birth.   Medical guidelines recognized by all the major medical associations provide a framework for the safe and effective treatment of this condition.   For some adolescent patients with gender dysphoria, puberty-delaying treatment and hormone therapy are medically indicated to alleviate severe distress.   Chest reconstruction surgery may be medically necessary for some older adolescents.

3.      The Health Care Ban, by prohibiting any medical treatment "related to gender transition," denies adolescents medically necessary treatment and prevents parents from obtaining medically necessary care for their children.   It further prohibits doctors from treating their patients in accordance with the well-established standards of care or from referring patients to other doctors to receive the appropriate care.

---

[1]     Under the Arkansas Constitution, Acts of the General Assembly without an emergency clause or specified effective date, like HB 1570, become effective ninety (90) days after adjournment of the session where enacted.   The General Assembly did not adjourn the 2021 session; instead, the legislature took extended recess under HCR 1015, stating, "should the General Assembly remain in extended recess for longer than ninety (90) days, all acts that do not contain an emergency clause or a specific effective date shall become effective on the 91st day following April 30, 2021."   On May 20, 2021, Attorney General Leslie Rutledge issued Opinion No. 2021-029, which opines that "unless the General Assembly reconvenes on or before July 27, 2021, acts with no emergency clause or specified effective date become effective on July 28, 2021."

4.      While the Health Care Ban purports to protect young people from alleged risks associated with the prohibited care, all of the medical care prohibited by the Health Care Ban is permitted for *any* reason *except* to affirm a gender identity that differs from a patient's sex assigned at birth.

5.      After the General Assembly first passed the Health Care Ban on March 29, 2021, Governor Hutchinson vetoed the bill, calling it "overbroad," "extreme," and "a vast government overreach." He said the legislation interfered with "the guiding hand" of both parents and the healthcare professionals they have chosen to care for their children. He also expressed concern that, if passed, the bill would lead to significant harm to transgender youth as cautioned by healthcare experts.

6.      If the Health Care Ban goes into effect, it will have devastating consequences for transgender youth in Arkansas. These young people will be unable to obtain medical care that their doctors and parents agree they need—and those already receiving care will have their treatment abruptly halted—which could have serious and potentially life-threatening consequences. For some transgender youth, the prospect of losing this critical medical care, even before the legislation is in effect, is unbearable. In the weeks after the bill passed, at least six transgender adolescents in Arkansas attempted suicide.

7.      Some parents of transgender children are making plans to move out of state should the law take effect out of fear for their children's health and safety if they are unable to get necessary medical treatment. They may have to leave their jobs, businesses, extended families, and communities to get the treatment their children need. These families have already lived through the impact of untreated gender dysphoria on their children and have seen how treatment has enabled them to thrive. As one father put it, "We can't go back." But many families do not

have the resources to uproot their lives and they are terrified about what will happen to their children if the law takes effect.

8.     The Health Care Ban not only threatens the health and well-being of transgender youth in Arkansas, it is also unconstitutional.  It violates the Equal Protection Clause of the Fourteenth Amendment because it discriminates on the basis of sex and transgender status by prohibiting certain medical treatments only for transgender patients and only when the care is "related to gender transition."  This discrimination cannot be justified under heightened scrutiny or any level of equal protection scrutiny.   In addition, by preventing parents from seeking appropriate medical care for their children when the course of treatment is supported by the child and their doctor, the Health Care Ban interferes with the right to parental autonomy guaranteed by the Due Process Clause of the Fourteenth Amendment.  Lastly, the Health Care Ban violates the First Amendment by prohibiting healthcare providers from referring their patients for medical treatments that are in accordance with the accepted medical standards of care to treat gender dysphoria.

## II.     THE PARTIES

### A.     The Minor Plaintiffs and Their Families[2]

#### 1.     *The Brandt Family*

9.     Plaintiffs Dylan Brandt and Joanna Brandt live in Greenwood, Arkansas.  Joanna is the mother of Dylan, who is 15.  Dylan is transgender and is currently receiving medically

---

[2]     The Minor Plaintiffs sue by and through their parents, pursuant to Federal Rule of Civil Procedure 17(c).

necessary care that would be prohibited by the Health Care Ban.  The Brandts are pictured here.



### 2.    *The Jennen Family*

10.    Plaintiffs Sabrina Jennen, Lacey Jennen, and Aaron Jennen live in Fayetteville, Arkansas.  Lacey and Aaron are the parents of Sabrina, who is 15.  Sabrina is transgender and is currently receiving medically necessary care that would be prohibited by the Health Care Ban. The Jennens are pictured here.  Sabrina is second from left.



### 3.     The Dennis Family

11.     Plaintiffs Brooke Dennis, Amanda Dennis, and Shayne Dennis live in Bentonville, Arkansas. Amanda and Shayne are the parents of Brooke, who is 9. Brooke is transgender. Once she begins puberty, which could be at any time, Brooke's parents, with the advice of her doctors, intend to have her begin receiving medical care that would be prohibited by the Health Care Ban. The Dennises are pictured here. Brooke is on the far right.



### 4.     The Saxton Family

12.     Plaintiffs Parker Saxton and Donnie Saxton live in Conway, Arkansas. Donnie is the father of Parker, who is 16. Parker is transgender and this month will begin receiving medically necessary care that would be prohibited by the Health Care Ban. The Saxtons are pictured here.



**B.    Doctor Plaintiffs**

*1.    Dr. Michele Hutchison*

13.    Plaintiff Dr. Michele Hutchison is a pediatric endocrinologist and Associate Professor in the Department of Pediatrics, College of Medicine at the University of Arkansas for Medical Sciences.  She has been working at the Gender Spectrum Clinic at Arkansas Children's Hospital (the "Clinic") since its inception in February, 2018.  Dr. Hutchison provides gender-affirming care that would be prohibited by the Health Care Ban.  She is bringing her claims in her individual capacity on behalf of herself and her patients.

*2.    Dr. Kathryn Stambough*

14.    Plaintiff Dr. Kathryn Stambough is a doctor in the Division of Pediatric and Adolescent Gynecology in the Department of Obstetrics and Gynecology at the University of Arkansas for Medical Sciences.  Her clinic is part of Arkansas Children's Hospital.  Dr. Stambough refers patients at her clinic to other doctors who provide gender-affirming care, which would be prohibited by the Health Care Ban.  In addition, Dr. Stambough works at the Gender Spectrum

Clinic one day each month. When she is at the Clinic, Dr. Stambough provides gender-affirming care that would be prohibited by the Health Care Ban. She is bringing her claims in her individual capacity on behalf of herself and her patients.

### C. Defendants

15. Defendant Leslie Rutledge is the Attorney General of the State of Arkansas. The Attorney General's offices are located at 323 Center Street, Suite 200, Little Rock, Arkansas. Under the Health Care Ban, Defendant Rutledge is tasked with bringing legal actions to enforce compliance with that law. Defendant Rutledge is sued in her official capacity.

16. Defendant Amy E. Embry is the Executive Director of The Arkansas State Medical Board (the "Medical Board"). The Medical Board is an agency of the State of Arkansas with the power to license physicians and revoke physicians' licenses, among other things. Under the Health Care Ban, the Medical Board is charged with disciplining individuals within its licensing jurisdiction who violate the provisions of that law. The Medical Board is located at 1401 West Capitol Avenue, Suite 340, Little Rock, Arkansas. Defendant Embry is sued in her official capacity.

17. Defendants Sylvia D. Simon, Robert Breving Jr., Veryl D. Hodges, John H. Scribner, Elizabeth Anderson, Rhys L. Branman, Edward "Ward" Gardner, Rodney Griffin, Betty Guhman, Brian T. Hyatt, Timothy C. Paden, Don R. Philips, William L. Rutledge, and David L. Staggs (all, together with Defendant Embry, the "Medical Board Defendants") are members of the Medical Board. The Medical Board Defendants are sued in their official capacity.

### III. JURISDICTION AND VENUE

18. This action arises in part under the United States Constitution, 42 U.S.C. § 1983.

19. This Court has subject matter jurisdiction pursuant to Article III of the United States Constitution and 28 U.S.C. §§ 1331, 1343, and 1367.

20.     This Court is authorized to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

21.     Venue in this district is proper pursuant to 28 U.S.C. § 1391(b)(1)(2), because one or more of the defendants resides in this district and because a substantial part of the events giving rise to the claims occurred in this district.

## IV.     FACTUAL BACKGROUND

### A.     Standards of Care for Treating Adolescents with Gender Dysphoria

22.     Doctors in Arkansas use well-established guidelines to diagnose and treat youth with gender dysphoria.

23.     "Gender identity" refers to a person's internal, innate, and immutable sense of belonging to a particular gender.

24.     Although the precise origin of gender identity is unknown, a person's gender identity is a fundamental aspect of human development.  There is a general medical consensus that there is a significant biological component to gender identity.

25.     Everyone has a gender identity.  A person's gender identity is durable and cannot be altered through medical intervention.

26.     A person's gender identity usually matches the sex they were designated at birth based on their external genitalia.  The terms "sex designated at birth" or "sex assigned at birth" are more precise than the term "biological sex" because there are many biological sex characteristics and they may not align with each other in a single direction.  For example, some people with intersex characteristics may have a chromosomal configuration typically associated with a male sex designation but genital characteristics typically associated with a female sex designation.  For these reasons, the Endocrine Society, an international medical organization of over 18,000

endocrinology researchers and clinicians, warns practitioners that the terms "biological sex" and "biological male or female" are imprecise and should be avoided.

27.     Most boys were designated male at birth based on their external genital anatomy, and most girls were designated female at birth based on their external genital anatomy.  But transgender children have a gender identity that differs from the sex assigned to them at birth.  A transgender boy is someone who was assigned a female sex at birth but persistently, consistently, and insistently identifies as male.  A transgender girl is someone who was assigned a male sex at birth but persistently, consistently, and insistently identifies as female.

28.     Gender identity is deeply rooted in early life.  Some transgender people become aware of having a gender identity that does not match their assigned sex early in childhood.  For others, the onset of puberty, and the resulting physical changes in their bodies, leads them to recognize that their gender identity is not aligned with their sex assigned at birth.

29.     The lack of alignment between one's gender identity and their sex assigned at birth can cause significant distress.

30.     According the American Psychiatric Association's Diagnostic & Statistical Manual of Mental Disorders ("DSM-V"), "gender dysphoria" is the diagnostic term for the condition experienced by some transgender people of clinically significant distress resulting from the lack of congruence between their gender identity and the sex assigned to them at birth.  In order to be diagnosed with gender dysphoria, the incongruence must have persisted for at least six months and be accompanied by clinically significant distress or impairment in social, occupational, or other important areas of functioning.

31.     Being transgender is not itself a medical condition to be cured.  But gender dysphoria is a serious medical condition that, if left untreated, can result in debilitating anxiety, severe depression, self-harm, and suicide.

32.     The World Professional Association for Transgender Health ("WPATH") and the Endocrine Society have published widely accepted standards of care for treating gender dysphoria. The medical treatment for gender dysphoria is to eliminate the clinically significant distress by helping a transgender person live in alignment with their gender identity.  This treatment is sometimes referred to as "gender transition," "transition-related care," or "gender-affirming care."  These standards of care are recognized by the American Academy of Pediatrics, which agrees that this care is safe, effective, and medically necessary treatment for the health and well-being of youth suffering from gender dysphoria.

33.     The precise treatment for gender dysphoria depends upon each person's individualized needs, and the medical standards of care differ depending on whether the treatment is for a pre-pubertal child, an adolescent, or an adult.

34.     Before puberty, gender transition does not include any pharmaceutical or surgical intervention and is limited to "social transition," which means allowing a transgender child to live and be socially recognized in accordance with their gender identity.  Typically, social transition can include allowing children to wear clothing, to cut or grow their hair, to use preferred names and pronouns, and to use restrooms and other sex-separated facilities in line with their gender identity instead of the sex assigned to them at birth.

35.     Under the WPATH Standards of Care and the Endocrine Society Clinical Guidelines, medical interventions may become medically necessary and appropriate as transgender youth reach puberty.  In providing medical treatments to adolescents, pediatric endocrinologists work in close

consultation with qualified mental health professionals experienced in diagnosing and treating gender dysphoria.

36.     For many transgender adolescents, going through puberty in accordance with the sex assigned to them at birth can cause extreme distress.  Puberty-delaying medication allows transgender adolescents to avoid this, therefore minimizing and potentially preventing the heightened gender dysphoria and permanent physical changes that puberty would cause.

37.     Under the Endocrine Society Clinical Guidelines, transgender adolescents may be eligible for puberty-delaying treatment if:

- A qualified mental health professional has confirmed that:
  - the adolescent has demonstrated a long-lasting and intense pattern of gender nonconformity or gender dysphoria (whether suppressed or expressed);
  - gender dysphoria worsened with the onset of puberty;
  - any coexisting psychological, medical, or social problems that could interfere with treatment (e.g., that may compromise treatment adherence) have been addressed, such that the adolescent's situation and functioning are stable enough to start treatment;
  - has sufficient mental capacity to give informed consent to this (reversible) treatment.
- And the adolescent:
  - has been informed of the effects and side effects of treatment (including potential loss of fertility if the individual subsequently continues with sex hormone treatment) and options to preserve fertility;
  - has given informed consent and (particularly when the adolescent has not reached the age of legal medical consent, depending on applicable legislation) the parents or other caretakers or guardians have consented to the treatment and are involved in supporting the adolescent throughout the treatment process.
- And a pediatric endocrinologist or other clinician experienced in pubertal assessment:
  - agrees with the indication for gonadotropin-releasing hormone ("GnRH") agonist treatment;

     o        has confirmed that puberty has started in the adolescent;

     o        has confirmed that there are no medical contraindications to GnRH agonist treatment.

38.     Puberty-delaying treatment is reversible.  If an adolescent discontinues the medication, puberty consistent with their assigned sex will resume.

39.     For some youth, it may be medically necessary and appropriate to initiate puberty consistent with the young person's gender identity through gender-affirming hormone therapy (testosterone for transgender boys, and estrogen and testosterone suppression for transgender girls).

40.     Under Endocrine Society Clinical Guidelines, transgender adolescents may be eligible for gender-affirming hormone therapy if:

- A qualified mental health professional has confirmed:

  - o     the persistence of gender dysphoria;

  - o     any coexisting psychological, medical, or social problems that could interfere with treatment (e.g., that may compromise treatment adherence) have been addressed, such that the adolescent's environment and functioning are stable enough to start sex hormone treatment;

  - o     the adolescent has sufficient mental capacity to estimate the consequences of this (partly) irreversible treatment, weigh the benefits and risks, and give informed consent to this (partly) irreversible treatment.

- And the adolescent:

  - o     has been informed of the partly irreversible effects and side effects of treatment (including potential loss of fertility and options to preserve fertility);

  - o     has given informed consent and (particularly when the adolescent has not reached the age of legal medical consent, depending on applicable legislation) the parents or other caretakers or guardians have consented to the treatment and are involved in supporting the adolescent throughout the treatment process.

- And a pediatric endocrinologist or other clinician experienced in pubertal induction:

     o         agrees with the indication for sex hormone treatment;

     o         has confirmed that there are no medical contraindications to sex hormone treatment.

41.    Adolescents who receive gender-affirming hormones after having received puberty-delaying treatment never go through puberty in accordance with the sex assigned to them at birth and, instead, go through puberty that matches their gender identity.

42.    Pre-pubertal boys and girls are indistinguishable with respect to secondary sex characteristics. If a pre-pubertal child receives puberty-delaying treatment, they will never develop the secondary sex characteristics of the sex assigned to them at birth, and when they are provided hormones in accordance with their gender identity, they will develop only the secondary sex characteristics that match their gender identity.

43.    For example, transgender boys treated with puberty-delaying medication and then gender-affirming hormones, will receive the same amount of testosterone during puberty that non-transgender boys generate with their gonads or testes. They will develop the phenotypic features of non-transgender boys such as muscle mass, fat distribution, facial and body hair, and lower vocal pitch. Likewise, transgender girls treated with puberty-delaying medication and then gender-affirming hormones, will receive the same amount of estrogen during puberty that non-transgender girls generate endogenously. They will develop the same muscle mass, fat distribution, skin and female hair patterns, and breasts typically associated with non-transgender girls.

44.    Adolescents who first receive treatment later in puberty and are only treated with gender-affirming hormone therapy (and not puberty-delaying treatment) also go through a puberty consistent with their gender identity. However, they will have undergone physical changes associated with their endogenous puberty that may not be wholly reversed by hormone therapy.

45.     Under the WPATH standards of care, transgender young people may also receive medically necessary chest reconstructive surgeries before the age of majority, provided the young person has lived in their affirmed gender for a significant period of time.  Genital surgery is not recommended until patients reach the age of majority.

46.     Medical treatment recommended for and provided to transgender adolescents with gender dysphoria can substantially reduce lifelong gender dysphoria and can eliminate the medical need for surgery later in life.

47.     Providing gender-affirming medical care can be lifesaving treatment and can change the short- and long-term health outcomes for transgender youth.

**B.     The General Assembly's Passage of the Health Care Ban**

48.     On March 29, 2021, the Arkansas General Assembly passed the Health Care Ban, prohibiting healthcare professionals from providing "gender transition procedures" to anyone under 18 or "refer[ring]" anyone under 18 to any healthcare professional for such procedures.  The law stipulates that healthcare professionals who provide or refer minor patients for such care are subject to discipline for unprofessional conduct by the appropriate licensing entity or disciplinary review board, and may be sued by the Attorney General or private parties.  The Health Care Ban also prohibits coverage of gender transition procedures for minors by Medicaid or private insurance.

49.     The General Assembly titled the Health Care Ban the "Save Adolescents from Experimentation (SAFE) Act," despite the fact that the banned medical treatment is part of the well-established standards of care for the treatment of gender dysphoria in adolescents.

50.     In passing the law, the General Assembly ignored testimony from Arkansas doctors about the lifesaving benefits of gender-affirming care to their transgender patients and the unavoidable grave harm to the health and well-being of transgender youth if they are prohibited

from receiving this care.  This included testimony in the Senate that after the Health Care Ban passed the House, in just one week, multiple transgender youth were admitted to the emergency room because of an attempted suicide.

51.     Not a single doctor with experience treating transgender youth testified in support of the bill.

52.     The General Assembly ignored the testimony of transgender people who shared their painful experiences of depression and suicide attempts prior to receiving treatment for their gender dysphoria.

53.     The General Assembly ignored the testimony of parents pleading for it not to risk their children's health and survival by stripping them of the medical care that has enabled them to thrive.

54.      Not only did the General Assembly ignore established medical standards by passing the Health Care Ban, the majority of both chambers passed resolutions expressing their view that "gender reassignment medical treatments" are not "natural."  HR 1018, SR 7.

55.     Some members of the General Assembly further expressed their personal beliefs in opposition to gender-affirming care that had nothing to do with the purported medical concerns enumerated in the Health Care Ban's legislative findings.  Rep. Bentley, for example, stated that "Father God, our Creator, has some very important things that he would like to say about [the Health Care Ban]," and that it is "impossible to govern the world without God and the Bible." Rep. Bentley went on to quote Biblical passages in support of the bill, including "a woman shall not wear anything that pertains to a man, nor a man put on a woman's garments, for all who do so are an abomination to the Lord your God."  Rep. Wooten, when addressing the bill, stated that

"God made you like you are," and "this nation is based on God's word." Rep. Wooten compared transgender youth to a child who "comes to you and says, 'I wanna be a cow.'"

56.     On April 5, 2021, Governor Hutchinson vetoed the Health Care Ban "because it creates new standards of legislative interference with physicians and parents as they deal with some of the most complex and sensitive matters concerning our youths." Governor Hutchinson explained that "[the Health Care Ban] puts the state as the definitive oracle of medical care, overriding parents, patients and healthcare experts" which "would be—and is—a vast government overreach." Governor Hutchinson further noted that "[t]he leading Arkansas medical associations, the American Academy of Pediatrics and medical experts across the country all oppose this law" because "denying best practice medical care to transgender youth can lead to significant harm to the young person—from suicidal tendencies and social isolation to increased drug use."

57.     Within 24 hours, with a simple majority vote, the General Assembly overrode the Governor's veto and the Health Care Ban passed into law. Only one senator was allowed to speak in support of the Governor's veto before debate was terminated, over objection, by a motion for immediate consideration, and the Senate voted to override the veto.

58.     The Health Care Ban was part of a barrage of bills in the Arkansas General Assembly targeting transgender people during the 2021 legislative session.

59.     SB 347 would have made it a felony for a healthcare provider to provide "gender transition services" to anyone under 18 years of age.

60.     There were two bills and a proposed constitutional amendment to ban transgender students from participating in school sports. Both bills passed and were signed into law. *See* SB 354 (sports ban which passed and is now Act 461), SB 450 (additional sports ban now Act 953).

61.     Another bill—HB 1749—would have provided that employees of public schools and colleges are not "required to use a pronoun, title, or other word to identify a . . . student as male or female that is inconsistent with the . . . student's biological sex."

62.     There were also bills aimed at shielding students from hearing about transgender people. SB 389, which was enacted as Act 552, provides that parents be given notice and a right to opt their children out of any curriculum or school materials related to sexual orientation or gender identity (as well as sex education). Moreover, SR 7 included a provision that "every child deserves an education . . . free of . . . politicized ideas about sexual orientation and gender identity."

63.     Other bills would have barred transgender people from using restrooms or other facilities that accord with their gender identity in schools and other public buildings. *See* HB 1882, HB 1905, and HB 1951.

64.     The General Assembly's passage of the Health Care Ban had nothing to do with protecting children and everything to do with expressing disapproval of transgender people.

## C.     **The Impact of the Health Care Ban on Plaintiffs**

### 1.     *The Minor Plaintiffs and Their Families*

#### (1)     The Brandt Family

65.     Dylan Brandt is about to finish his freshman year of high school, where his favorite subject is psychology. Outside school, he likes spending time on TikTok, a social media platform, where he makes short videos lip-synching to songs and shares motivational sentiments.

66.     Dylan is transgender. When he was born, he was designated as female on his birth certificate but his gender identity is male.

67.     Dylan knew from a young age that he did not feel comfortable with his gender. In seventh grade he cut his hair short and started exclusively dressing in gender-neutral clothing. By the end of seventh grade, Dylan knew he was a boy and came out to his mother as transgender.

Dylan started his social transition that summer. He chose the name Dylan and started eighth grade with his new name and using male pronouns. Since then, everyone who knows the Brandts in Greenwood recognizes Dylan as the boy he is.

68.     Although Joanna, Dylan's mother, was initially surprised when Dylan told her he is a boy, it made sense to her upon reflection. Dylan had "rejected all things feminine" from the moment he could make decisions about his life. He had also been experiencing depression as well as anxiety in social situations.

69.     Joanna consulted Dylan's pediatrician about his realization that he was transgender and he was referred to the Gender Spectrum Clinic, where he had his first visit in January 2020. During that visit, he was diagnosed with gender dysphoria. Dylan began receiving Depo-Provera to stop menstruation.

70.     In August 2020, Dylan began treatment with testosterone, which has been transformative for him. He has become a happy, confident teenager. He embraces social situations that he would have avoided in the past. Dylan's depression and anxiety substantially decreased. As a result of the hormone therapy, Dylan's voice has dropped, he started growing facial hair, and his body started to change in ways typical of a male puberty. These changes have caused Dylan to feel more comfortable in his own skin. According to Joanna, Dylan's "eyes light up" when people recognize and affirm his male gender. Dylan's social transition and medical treatment have allowed him to be affirmed in all aspects of his life.

71.     Dylan's name was legally changed in August 2020, and his birth certificate was updated to reflect the legal name change.

72.     The prospect of losing access to gender-affirming medical care has caused both Dylan and Joanna tremendous stress. Dylan has been on hormone therapy for over nine months.

The Brandts were informed at the inception of his treatment that abruptly stopping hormone therapy would be detrimental to Dylan's health.

73.     Joanna is also concerned about her son's mental health should his treatment be cut off.  Joanna fears Dylan will lose the happiness and self-confidence that he has experienced because of treatment, and is worried that Dylan's depression will return if his care is cut off and his body begins to undergo permanent changes from the initiation of his endogenous puberty.

74.     The Brandts have deep ties to Greenwood.  They have a community of friends and family there.  Joanna owns her home and a business.  Because she fears for her son's safety and well-being should his healthcare be cut off, to ensure that Dylan can continue his treatment, Joanna is considering moving to another state if the Health Care Ban goes into effect.

(2)     The Jennen Family

75.     Sabrina Jennen is a high school sophomore and a dedicated student who made it to the national championships for Quiz Bowl, an academic trivia competition.  Sabrina plays violin and acoustic guitar, earned a black belt in Taekwondo, and enjoys gaming with her friends.  After high school, Sabrina plans to attend college to study medical or environmental sciences.

76.     Sabrina is transgender.  When she was born, she was designated as male on her birth certificate but her gender identity is female.

77.     Sabrina began to realize her gender identity in late 2019 and came out to her family in July 2020.  Lacey and Aaron, Sabrina's parents, found a therapist for Sabrina, who diagnosed her with gender dysphoria.

78.     Since coming out to her family and friends, Sabrina started using female pronouns, wearing feminine clothing, and growing her hair.  Sabrina plans to legally change her name this summer so that it will appear on her driver's license when she is old enough to get one.

79.     In or around January 2021, with her parents' support, Sabrina began gender-affirming hormone therapy.  She was prescribed a testosterone suppressant and estrogen to initiate puberty consistent with her gender identity.  The treatment has been life-changing for her.  Before treatment, Sabrina could not see a future for herself.  She experienced depression, struggled to sleep, and engaged in self-harm.  There were times her parents were worried about her being left alone.  Since starting hormone therapy, Sabrina has become genuinely happy and confident for the first time since she can remember.  Sabrina's depression has subsided; she has not engaged in self-harm and she has become more engaged with her family.

80.     The prospect of losing access to her medical care causes Sabrina and her parents to feel extremely anxious and terrifies them.  If her treatment is stopped, Sabrina worries that the dysphoria, depression, and anxiety will recur.  Her parents fear for her survival if the medical treatment that has sustained her is cut off.  They cannot bear to lose the happy and thriving daughter that Sabrina has become, nor can they return to constant concern over her safety.  As Aaron put it, "We can't go back."

81.     The Jennens love their Fayetteville community.  Sabrina has a robust network of friends, family, educators, and a church community that supports her that would be difficult, if not impossible, to replace.   Sabrina's sisters are also deeply connected to their school and community—one is on her school cheerleading squad and competes on the track team and in Quiz Bowl competitions; the other takes ice skating lessons and loves school and the friends she has made there.  Lacey and Aaron are lifelong residents of Arkansas, and graduates of the University of Arkansas at Fayetteville.  Lacey is engaged with her local church community and serves on the Urban Forestry Board for the City of Fayetteville.  Aaron's job as a government lawyer is based

in Fayetteville. Lacey's and Aaron's parents and several of their siblings and their families live close by in Northwest Arkansas. All of their extended family live in Arkansas.

82.     Lacey and Aaron want to continue to raise their children in Fayetteville and do not want to leave, but if the Health Care Ban takes effect, they understand that they might have to leave to keep Sabrina healthy and safe.

(3)     The Dennis Family

83.     Brooke Dennis is in third grade and loves to read and write in her virtual diary. She takes gymnastics and wants to be a gymnast when she grows up. Brooke likes jumping on the trampoline in her backyard and can do backward somersaults.

84.     Brooke is transgender. When Brooke was born, she was designated as male on her birth certificate, but her gender identity is female.

85.     Although Amanda and Shayne, Brooke's parents, did not discuss Brooke's female gender with her until last year, as Amanda describes it, "Brooke always knew who she was." From the time she was 2 years old, Brooke gravitated towards all traditionally feminine activities. Brooke would often put a shirt on her head to create long "hair" for herself, and around the holidays, Amanda and Shayne could never keep the Christmas tree skirt on the tree because Brooke would take it off and wear it. Brooke's parents were buying her traditionally boys' clothes, but when she was 4 years old, her grandma bought her colorful sneakers from the girls' section of the store. From then on, Brooke chose to wear only traditionally feminine clothing.

86.     It is confusing for Brooke that others have not always recognized her as she recognizes herself, and it causes her extreme distress. For example, one Halloween, when Brooke was in second grade, Amanda and Shayne took Brooke to the store and told her she could choose a costume, but Brooke was paralyzed by anxiety. Brooke knew what she wanted—the costumes

in the girls' section—but she was fearful of what people would say if she picked one of the costumes designated for girls.  The situation was even more difficult at school.  Brooke felt distressed when the teacher would line up the boys and the girls for bathroom breaks and she would be asked what she was doing in the boys' restroom, and when Brooke's classmates would debate whether she is a boy or a girl.  Brooke frequently came home from school crying and started to act out.  She started seeing the school counselor regularly in the 2019—20 school year.

87.     In April 2020, a photographer came to the house to take family portraits.  During the photoshoot, the photographer used female pronouns with Brooke, and Amanda and Shayne noticed that Brooke did not correct the photographer.  After the photo shoot, Amanda asked Brooke how that made her feel.  Brooke told her that she liked it and would prefer if people used female pronouns.  Her parents told her that would be fine, and Brooke declared, "I am Brooke and I'm a she."  As Shayne put it, "It was as if a cloud lifted and the smile came back."

88.     Since then, she is known as Brooke and is referred to by female pronouns at home, by her grandparents, at school, and in the community.  Brooke has returned to being the happy, bright-eyed child she used to be.  Amanda and Shayne were relieved that Brooke's distress was behind her and their child was once again flourishing.

89.     After the conversation about pronouns last April, Amanda and Shayne had Brooke begin therapy with a counselor experienced with youth experiencing an incongruence between their gender and assigned sex at birth.  The counselor diagnosed Brooke with gender dysphoria in June 2020, and referred the family to the Gender Spectrum Clinic at Arkansas Children's Hospital.

90.     Brooke and her parents went to the Clinic in October 2020.  They were provided information about gender dysphoria and the standards of care for treatment.  The doctor told Amanda and Shayne to closely watch Brooke for signs of puberty, and advised that puberty-

delaying treatment could begin at the onset of puberty.  Brooke and her parents will have regular check-in appointments with the Clinic to monitor her development.

91.    At 9 years of age, puberty could begin for Brooke at any time.  Brooke is already anxious about the prospect of going through a typical male puberty.  Brooke openly worries about how her body is different than the girls at school.  Brooke has observed the changes her older brother is going through and recently cried and told her mom that she didn't want to get an Adam's apple.

92.    Because Brooke is already so anxious about puberty, when Brooke starts puberty Amanda and Shayne plan to start her on puberty-delaying treatment, which her doctors confirm would be medically indicated.  They feel this is critical to prevent the distress of going through a typical male puberty and to give the family time to assess whether gender-affirming hormone therapy will be medically necessary to keep Brooke healthy.

93.    Amanda and Shayne are worried about not being able to obtain puberty-delaying treatment for Brooke when her endogenous puberty begins.  In the short-term, Amanda and Shayne have explored their options for flying out-of-state for treatment.  However, this is not a sustainable option financially.  Further, the Health Care Ban would prevent Brooke's physicians from referring her to a doctor in a state where gender-affirming care is not prohibited.

94.    Amanda and Shayne's only other option is to move out-of-state, and they will do so if necessary to get the treatment Brooke needs.  But moving would impose significant hardship on the Dennis family.  They have all developed close friendships in the community and the children's schools, and Amanda's job in leadership development at Walmart, is in Bentonville.  They would also be moving away from Shayne's elderly parents for whom they provide supportive

care.  Amanda and Shayne will do what is necessary to protect Brooke's health and well-being, but they believe that they should not be forced to leave their state to do so.

(4)      The Saxton Family

95.      Parker Saxton is a sophomore in high school.  Parker sings in the school choir and is learning how to play the guitar.

96.      Parker is transgender.  When he was born, he was designated as female on his birth certificate but his gender identity is male.

97.      When Parker was around 13 years old, he came out to his father as transgender in a letter.  Parker asked his dad to refer to him by male pronouns and to call him by a typically male version of his birth name.  He later chose the name Parker.  Donnie was not surprised when he received the letter.  Parker had already taken steps to change his appearance—he had cut his hair short when he was 11 years old, and, starting in the seventh grade, dressed exclusively in clothes traditionally viewed as masculine.  Donnie could see that Parker was uncomfortable in his body—Parker had been struggling since pre-school when he would tell Donnie he did not want to be a girl, and, for as long as Donnie can remember, Parker experienced debilitating anxiety about having to use public restrooms.  As Parker started puberty, it distressed him seeing his body change in ways that felt even more divergent from his gender identity.

98.      Donnie has not always understood what it means to be transgender and did not always support transgender rights.  But as Donnie watched Parker suffer, and as he started to learn more and understand Parker's feelings, his views shifted.  As Donnie put it, "I wish that I could say that my child has spent their entire life being comfortable in their skin, but that's just not true for Parker."  It took Donnie some time to get used to using male pronouns with Parker.  But now

they flow easily for him as he sees Parker as "my little dude."  Donnie is proud and supportive of his son.

99.      After Parker came out as transgender, he took further steps to socially transition. He started introducing himself with a male name and asked that he be referred to by male pronouns. Parker has gradually come out as transgender to his school choir community.   At a choir performance, he wore a tuxedo.

100.    Though taking steps to socially transition helped Parker feel more like himself, he continued to struggle with gender dysphoria.  Parker began wearing four or five sports bras at a time in an effort to change the physical appearance of his body; he feels uncomfortable getting out of the shower and viewing himself in a mirror, and he refuses to participate in activities that would require him to wear a bathing suit.  As Donnie put it, Parker "just wants to look in the mirror and see the person that he is on the inside staring back at him so that he can go about his day."

101.    Parker asked Donnie to take him to receive medical care to change his physical appearance to match his male gender.  In 2019, Donnie took Parker to the Gender Spectrum Clinic. There, Parker was diagnosed with gender dysphoria.   One of the first steps Parker's doctors recommended was that he be treated with Depo-Provera to stop menstruation.  Parker has been getting that treatment since the fall of 2019.

102.    Parker's mental health greatly improved after he started receiving healthcare to treat his gender dysphoria.  As a result, he was able to stop taking the Zoloft that he had been taking to manage his anxiety and depression.

103.    Because Parker responded so well to receiving this treatment, and because his understanding of his male gender has been persistent and consistent, Parker's doctor agreed with

Parker and Donnie that Parker would benefit from starting testosterone.   Parker is scheduled to

begin receiving testosterone injections at the end of this month.

104.    After making great strides as a result of his treatment, Parker's anxiety worsened

when he learned about the General Assembly's effort to pass the Health Care Ban, and he had to

resume taking medication for anxiety.   The passage of the Health Care Ban was devastating to

him.   Donnie began sleeping on the couch close to Parker's bedroom because Parker's sleep has

been disturbed, and Donnie wants to be available to provide emotional support in the event he

needs it.  Parker and Donnie worry about the physical and mental health consequences of beginning

testosterone and then having to stop.   But not taking testosterone is not an option given Parker's

severe dysphoria.

105.    If the Health Care Ban goes into effect, the Saxtons would explore leaving the state

so that Parker can receive the treatment that he, his father, and his doctors all agree is necessary.

But this would be difficult for the family.   Donnie, who is a plumber, has a business in Conway.

Moving would jeopardize the family's financial stability.   It would also separate the family from

Donnie's parents—with whom they have a close, supportive relationship—and other relatives.

The Saxton family has been part of their community all of their lives.   Donnie feels that because

everyone knows Parker, he is safe there, and Donnie worries about having to go elsewhere.   Donnie

thinks it is wrong that the General Assembly is making it so hard for him to take care of his son.

### 2.    *Doctor Plaintiffs*

#### (1)    Dr. Michele Hutchison

106.    Dr.  Hutchison  graduated  from  medical  school  at  the  University  of  Texas

Southwestern Medical School in 1999.   Following medical school, Dr. Hutchison completed

residency and fellowship programs in Endocrinology at the University of Texas Southwestern Medical School in 2002 and 2004, respectively.

107. Dr. Hutchison is a pediatric endocrinologist and Associate Professor in the Department of Pediatrics, College of Medicine at the University of Arkansas for Medical Sciences, where she treats youth with a variety of endocrine conditions. Since 2018, she has also been treating patients at the Arkansas Children's Hospital's Gender Spectrum Clinic, which provides healthcare to transgender youth with gender dysphoria.

108. The Clinic treats patients in accordance with the standards of care developed by WPATH and the Endocrine Society. The Clinic has an interdisciplinary team, including mental health providers, to ensure each child receives appropriate and necessary care.

109. Dr. Hutchison has treated about 200 youth at the Clinic since its opening. There are around 160 patients currently under the Clinic's care.

110. At the Clinic, Dr. Hutchison provides puberty-delaying treatment for transgender patients with gender dysphoria at the onset of puberty when medically indicated. This treatment pauses puberty and provides the patient and their family more time to determine the long-term course of treatment. Such treatment also prevents patients from suffering the severe emotional and physical consequences of going through puberty that does not match their gender identity.

111. For patients whose gender identity has been persistent and consistent, Dr. Hutchison will explore gender-affirming hormone therapy (estrogen and testosterone suppression for transgender girls; testosterone for transgender boys) with patients and their families, beginning around the age of 14, and initiate such treatment if medically indicated. There are no medical treatments indicated or provided for pre-pubertal children with gender dysphoria.

112.    The same treatments Dr. Hutchison provides to her transgender patients at the Clinic—puberty-delaying medication, testosterone, estrogen, and testosterone suppressants—she also provides to non-transgender patients.  In her general pediatric endocrinology practice, Dr. Hutchison provides puberty-delaying treatment to non-transgender children with precocious puberty.  She provides testosterone to non-transgender boys with delayed puberty or who have insufficient testosterone for a variety of reasons.  Dr. Hutchison provides estrogen to treat non-transgender girls with primary ovarian insufficiency or Turner's Syndrome.  And she provides testosterone suppressants to treat non-transgender girls with polycystic ovarian syndrome.  If the Health Care Ban takes effect, Dr. Hutchison will be prohibited from providing these treatments to her transgender patients because they relate to "gender transition," but she will be able to continue providing the same treatments to her non-transgender patients to help bring their bodies into alignment with their gender.

113.    When Clinic patients inform Dr. Hutchison that they are moving out of state, she will provide them information about clinics in their new state that provide gender-affirming medical care for transgender adolescents.  Dr. Hutchison considers it part of her obligation to care for her patients to help them find the care they need if she is unable to continue providing such care.

114.    Given the administrative and civil penalties attached to the Health Care Ban, if it takes effect, Dr. Hutchison will not be able to treat her transgender patients with gender dysphoria in accordance with the accepted standards of care.  If she were to follow the medically indicated protocols for treating gender dysphoria, she would face adverse licensing action or other judicial or administrative consequences.  Moreover, Dr. Hutchison is concerned that if the Health Care Ban goes into effect, the Gender Spectrum Clinic might have to close.

115.    Dr. Hutchison knows from personal experience in treating hundreds of adolescents with gender dysphoria that the Health Care Ban, if permitted to take effect, will significantly and severely compromise the health of her patients.  As Dr. Hutchison testified before the Senate Public Health and Labor Committee on March 22, 2021, she "had multiple kids in [the] emergency room because of an attempted suicide" after the Health Care Ban passed out of the House.  After the law was passed, her office received calls from numerous families panicking because their children were expressing suicidal thoughts related to the prospect of losing the healthcare they rely on for their well-being.

116.    Being forced to deny her patients medically necessary care that can be lifesaving for some patients violates the tenets of Dr. Hutchison's profession by leaving them to suffer needless pain.

117.    Dr. Hutchison has grave concerns about her patients' ability to survive, much less thrive, if the Health Care Ban takes effect.

118.    Dr. Hutchison is bringing her claims in her individual capacity on behalf of herself and her patients.

(2)    Dr. Kathryn Stambough

119.    Dr. Stambough graduated from medical school in 2011 and completed a residency in Obstetrics and Gynecology in 2015 at Washington University in Saint Louis.  She completed a fellowship at Baylor College of Medicine/Texas Children's Hospital that focused on Pediatric and Adolescent Gynecology.  During her residency and fellowship programs, Dr. Stambough trained in the provision of hormone therapy to treat various conditions, including gender dysphoria.

120.    Dr. Stambough is a pediatric and adolescent gynecologist at the University of Arkansas for Medical Sciences.  For the past year, Dr. Stambough has also been attending one day

per month at the Gender Spectrum Clinic.  As part of her work at the Clinic, Dr. Stambough provides gender-affirming hormone therapy when medically indicated for patients with gender dysphoria diagnoses beginning around the age of 14.

121.    The same treatments Dr. Stambough provides to her transgender patients at the Clinic, she also provides to non-transgender patients.  In her pediatric gynecology practice, Dr. Stambough provides estrogen to non-transgender girls for a range of conditions, such as primary ovarian insufficiency, hypogonadotropic hypogonadism, and Turner's Syndrome.  Dr. Stambough also prescribes puberty-delaying medication for non-transgender patients undergoing precocious puberty.  She uses that same medication—GnRH agonist—to treat other conditions, including endometriosis.  In addition, Dr. Stambough provides other forms of hormone therapy to treat polycystic ovarian syndrome; menstrual issues including painful, irregular or heavy periods; and for menstrual suppression for patients with many conditions including cancer and spinal cord disorders, as well as transgender boys with gender dysphoria.

122.    When Dr. Stambough sees patients in her gynecology practice who present signs of gender dysphoria, she refers them to the Gender Spectrum Clinic.  Her ability to make these referrals is essential for her to connect her patients with appropriate and necessary care.

123.    Given the penalties attached to the Health Care Ban, if it takes effect, Dr. Stambough will not be able to provide gender-affirming medical care to her patients in accordance with the accepted standards of care.  Nor will she be permitted to refer patients in her pediatric gynecology practice for such care.  If she were to do so, she would face adverse licensing action or other judicial or administrative consequences.  Moreover, Dr. Stambough is concerned that if the Health Care Ban goes into effect, the Gender Spectrum Clinic might have to close.

124.     Being forced to withhold referrals from patients at her pediatric gynecology practice, and to deny her patients at the Clinic medically necessary care that can be lifesaving for some patients, violates the tenets of Dr. Stambough's profession by leaving her patients to suffer needless pain.

125.     Dr. Stambough worries greatly about the impact on her patients if they cannot access the medically necessary and lifesaving treatment prohibited by the Health Care Ban.

126.     Dr. Stambough is bringing her claims in her individual capacity on behalf of herself and her patients.

## V.      THERE ARE NO LEGITIMATE JUSTIFICATIONS FOR THE HEALTH CARE BAN

127.     The Health Care Ban establishes a complete ban on well-established medical treatments for minors when, and only when, they are provided to transgender youth for the purpose of "assisting an individual with a gender transition."

128.     In relevant part, the Health Care Ban provides that "[a] physician or other healthcare professional shall not provide gender transition procedures to any individual under eighteen (18) years of age."  HB 1570 § 3, 20-9-1502(a).  The Health Care Ban also prohibits Medicaid or private insurance coverage for minors receiving such care.  HB 1570 § 4, 23-79-164(b).

129.     The Health Care Ban defines "gender transition" as "the process in which a person goes from identifying with and living as a gender that corresponds to his or her biological sex to identifying with and living as a gender different from his or her biological sex, and may involve social, legal, or physical changes."  HB 1570 §3, 20-9-1501(5).

130.     The "gender transition procedures" prohibited by the law are defined as "any medical or surgical service . . . related to gender transition that seeks to . . . [a]lter or remove

physical or anatomical characteristics or features that are typical for the individual's biological sex" or "[i]nstill or create physiological or anatomical characteristics that resemble a sex different from the individual's biological sex, including without limitation medical services that provide puberty-blocking drugs, cross-sex hormones, or other mechanisms to promote the development of feminizing or masculinizing features in the opposite biological sex, or genital or nongenital gender reassignment surgery performed for the purpose of assisting an individual with a gender transition." HB 1570 §3, 20-9-1501(6).

131.    While the Health Care Ban prohibits the use of well-established treatments for gender dysphoria in transgender adolescents—including puberty-delaying drugs, hormone therapy (testosterone for transgender boys, and estrogen and testosterone suppressants for transgender girls), and chest surgery—because these treatments are provided for the purpose of assisting "gender transition," it permits the use of these same treatments for any other purpose.

132.    The puberty-delaying drugs proscribed by the Health Care Ban for the treatment of gender dysphoria because they assist with "gender transition" are the same drugs that are commonly used to treat central precocious puberty.  Central precocious puberty is the premature initiation of puberty—before 8 years of age in people assigned female at birth and before 9 years of age in people assigned male—by the central nervous system.   When untreated, central precocious puberty can lead to impairment of final adult height as well as antisocial behavior and lower academic achievement. The Health Care Ban permits puberty-delaying treatment for central precocious puberty because it is not provided for purposes of assisting with "gender transition"; that is, it is not prescribed to affirm a person's gender identity different from their sex assigned at birth.

133.    The Health Care Ban prohibits hormone therapy when the treatment is used to assist with "gender transition," but the same hormone therapy is permitted when prescribed to non-transgender patients to help bring their bodies into alignment with their gender.  For example, non-transgender boys with delayed puberty may be prescribed testosterone if they have not begun puberty by 14 years of age.  Without testosterone, for most of these patients, puberty would eventually initiate naturally.  However, testosterone is prescribed to avoid some of the social stigma that comes from undergoing puberty later than one's peers and failing to develop the secondary sex characteristics consistent with their gender at the same time as their peers.  Likewise, non-transgender girls with primary ovarian insufficiency, hypogonadotropic hypogonadism (delayed puberty due to lack of estrogen caused by a problem with the pituitary gland or hypothalamus), or Turner's Syndrome (a chromosomal condition that can cause a failure of ovaries to develop) may be treated with estrogen.  And non-transgender girls with polycystic ovarian syndrome (a condition that can cause increased testosterone and, as a result, symptoms including facial hair) may be treated with testosterone suppressants.  The same treatments that are permitted for non-transgender minors—often to affirm their gender—are banned if provided to transgender minors for the same reason.

134.    The Health Care Ban prohibits chest surgery on transgender young men to treat gender dysphoria because it assists with "gender transition," but minors are permitted to undergo comparable surgeries.  For example, non-transgender adolescent boys can have surgery to treat gynecomastia—the proliferation of ductal or glandular breast tissue, as opposed to adipose tissue, in individuals assigned male at birth.  And non-transgender adolescent girls can have breast reconstruction surgery, including to address conditions such as breast hypoplasia: a lack of breast development in people assigned female at birth.  These kinds of surgeries are commonly performed

-34-

to reduce psychosocial distress, often related to the incongruence with one's gender.  Therefore, a transgender boy assigned female at birth cannot receive chest-masculinizing surgery to affirm his gender identity but a non-transgender boy can.  Likewise, a transgender girl cannot receive chest-feminizing surgery to affirm her gender identity but a non-transgender girl can.

135.    The legislative findings in the Health Care Ban cite an alleged lack of sufficient evidence to support the banned treatments.  Specifically, the findings reference a lack of randomized clinical trials on the use of hormone therapy to treat gender dysphoria.  This purported concern about the evidentiary basis for such treatment does not justify prohibiting it only when used to provide gender-affirming care to treat transgender adolescents with gender dysphoria.  The very same evidence is deemed acceptable to provide the same treatments for any other purpose.

136.    The absence of "randomized clinical trials" is no reason to discount the standards of care recommended by major medical associations.  Indeed, much of medicine is developed without "randomized clinical trials."  This criticism of treatment for gender dysphoria could be extended to other essential care, including treatments that the law expressly permits.

137.    There can be many reasons why conducting randomized trials is not necessary or appropriate for evaluating a course of treatment.  Clinical research focusing on children is less likely to use randomized trials than is clinical research for adults and, it may, at times, be unethical to conduct randomized trials.  For randomized trials to be ethical, clinical equipoise must exist; there must be uncertainty about whether the efficacy of the intervention or the control is greater.  That is not the case with respect to the medical protocols for treating adolescents with gender dysphoria, which are known to provide significant relief to patients.  It would be unethical to knowingly expose some trial participants to an inferior intervention or to withhold treatment

altogether.   Accordingly, in the field of pediatrics, parents and their children must often make decisions about medical care without the benefit of randomized trials.

138.    One example of an accepted—and permitted—treatment that has not been tested through randomized clinical trials is the use of puberty-delaying drugs to treat precocious puberty. Even without randomized clinical trials, existing observational evidence is considered sufficiently strong to establish the standard of care for treatment of central precocious puberty.  The very same treatment with the very same evidence permitted to treat central precocious puberty is prohibited when used to assist transgender adolescents with "gender transition."

139.    Similarly, there are no randomized clinical trials of genital surgery on minors with intersex conditions.  The Health Care Ban explicitly permits medical intervention, including surgical intervention, when a minor has an intersex condition (referred to in the law as a "disorder of sexual development"), despite the lack of such evidence and significant ethical concerns raised by performing such procedures on infants too young to participate in the decision-making process. HB 1570 § 3, 20-9-1501(6)(B)(i).

140.    The General Assembly's purported interest in protecting minors from potential risks associated with the prohibited medical care likewise cannot justify the Health Care Ban. Under the Health Care Ban, the risks related to puberty-delaying drugs, hormone therapy, and chest surgeries are acceptable when used to treat non-transgender youth for other purposes, but not when used to treat gender dysphoria in transgender adolescents.

141.    Every medical intervention carries potential risks and potential benefits.  Weighing the potential benefits and risks of the treatment for gender dysphoria is a prudential judgment similar to other judgments made by healthcare providers, adolescent patients, and their parents.

Adolescent patients and their parents often make decisions about treatments with less evidence and/or greater risks than the treatment prohibited by the Health Care Ban.

142. The current standards of care for treating gender dysphoria in minors are consistent with general ethical principles of informed consent. The Endocrine Society clinical practice guidelines extensively discuss the potential benefits, risks, and alternatives to treatment, and its recommendations regarding the timing of interventions are based in part on the treatment's potential risks and the adolescent's decision-making capacity.

143. There is nothing unique about any of the medically accepted treatments for adolescents with gender dysphoria that justify singling out these treatments for prohibition based on concern about adolescents' inabilities to assent or their parents' inabilities to consent.

144. The Health Care Ban subjects medical care for transgender adolescents with gender dysphoria to a double standard. The law singles out such care for sweeping prohibitions while permitting the same medical treatments carrying the same potential risks when prescribed to treat non-transgender patients for any other purpose.

145. The legislative findings claim "that studies consistently demonstrate that the majority [of gender non-conforming children] come to identify with their biological sex in adolescence or adulthood, thereby rendering most physiological interventions unnecessary." But this reflects a complete misunderstanding of the treatment for gender dysphoria. No medical treatments are indicated until adolescence. And the evidence is clear that when gender dysphoria is present in adolescence, patients almost always persist in their gender identity in the long-term.

146. The goal of treatment for gender dysphoria is not to change someone's gender identity; rather, it is to resolve the distress associated with the disconnect between their assigned

sex at birth and their gender identity.  Denying treatment to transgender adolescents will not cause them to stop being transgender, but it will cause them to experience distress from lack of treatment.

## VI.     THE HEALTH CARE BAN WILL CAUSE SEVERE HARM TO TRANSGENDER YOUTH

147.     Withholding gender-affirming medical treatment from adolescents with gender dysphoria when it is medically indicated puts them at risk of extreme harm to their health and well-being.

148.     Adolescents with untreated gender dysphoria suffer significant distress.  Many are on medication for depression and anxiety.  Self-harm and suicidal ideation are exceedingly common.  Suicidality among transgender young people is a crisis.  In one survey, more than half of transgender youths had seriously contemplated suicide.  Studies have found that as many as 40% of transgender people have attempted suicide at some point in their lives.

149.     When adolescents are able to access puberty-delaying drugs and hormone therapy, which prevents them from going through endogenous puberty and allows them to go through puberty consistent with their gender identity, their distress recedes and their mental health improves.  Both clinical experience and medical studies confirm that for many young people, this treatment is transformative, and they go from painful suffering to thriving.

150.     If a healthcare provider is forced to immediately stop puberty-delaying drugs or hormone therapy due to the Health Care Ban, it will cause patients to immediately resume their endogenous puberty.  This could result in extreme distress for patients who have been relying on medical treatments to prevent bodily changes that come with their endogenous puberty.  For a girl who is transgender, this could mean that she would immediately start experiencing genital growth, body hair growth, deepening of her voice and development of a more pronounced Adam's apple. For a boy who is transgender, this could mean the initiation of a menstrual cycle and breast growth.

-38-

These changes can be extremely distressing for a young person who had been experiencing gender dysphoria that was relieved by medical treatments.

151.    Additionally, the effects of undergoing one's endogenous puberty may not be reversible even with subsequent hormone therapy and surgery in adulthood, thus exacerbating lifelong gender dysphoria in patients who have this medically-indicated treatment withheld or cut off.  Bodily changes from puberty as to stature, genital growth, voice, and breast development can be impossible or more difficult to counteract.

152.    For patients who are currently undergoing treatment with gender-affirming hormones like estrogen or testosterone, abruptly withdrawing care can result in a range of serious physiological and mental health consequences.  The body takes about six weeks to ramp up endogenous hormones, so if a healthcare provider is forced to abruptly stop treatment, a patient will be without sufficient circulating hormones at all.  This can result in depressed mood, hot flashes, and headaches.  For patients on spironolactone—a testosterone suppressant—abruptly terminating treatment can cause a patient's blood pressure to spike, increasing a young person's risk of heart attack or stroke.  The abrupt withdrawal of treatment also results in predictable and negative mental health consequences including heightened anxiety and depression.

153.    Prior to the Health Care Ban, none of the more than 200 youth who have been treated by the Gender Spectrum Clinic had attempted suicide.  In the weeks since the Health Care Ban passed, six transgender adolescent patients have attempted suicide.

154.    Gender-affirming medical care can be lifesaving treatment for minors experiencing gender dysphoria.  The major medical and mental health associations support the provision of such care and recognize that the mental and physical health benefits to receiving this care outweigh the

risks.   These groups include the American Academy of Pediatrics,[3] American Medical Association,[4] the Endocrine Society,[5] the Pediatric Endocrine Society,[6] the American Psychological Association,[7] the American Academy of Family Physicians,[8] the American College of Obstetricians and Gynecologists,[9] the National Association of Social Workers,[10] and WPATH.[11]

---

[3]   *See* Policy Statement: Ensuring Comprehensive Care and Support for Transgender and Gender Diverse Children and Adolescents, *available at*: https://pediatrics.aappublications.org/content/142/4/e20182162.

[4]   *See* Resolution 122 (A–08), *available at*: http://www.tgender.net/taw/ama_resolutions.pdf.

[5]   *See* Transgender Health, an Endocrine Society position statement, *available at*: https://www.endocrine.org/advocacy/position-statements/transgender-health.

[6]   *See* The Pediatric Endocrine Society Opposes Bills that Harm Transgender youth, *available at*: https://pedsendo.org/news-announcements/the-pediatric-endocrine-society-opposes-bills-that-harm-transgender-youth-2/.

[7]   *See* Position Statement on Access to Care for Transgender and Gender Diverse Individuals (2018), *available at*: https://www.psychiatry.org/File%20Library/About-APA/Organization-Documents-Policies/Policies/Position-2018-Discrimination-Against-Transgender-and-Gender-Diverse-Individuals.pdf.

[8]   *See* Resolution No. 1004 (2012), *available at*: http://www.aafp.org/dam/AAFP/documents/about_us/special_constituencies/2012RCAR_Advocacy.pdf.

[9]   *See* Committee Opinion No. 823: Health Care for Transgender Individuals, *available at*: https://www.acog.org/clinical/clinical-guidance/committee-opinion/articles/2021/03/health-care-for-transgender-and-gender-diverse-individuals.

[10]   See Transgender and Gender Identity Issues Policy Statement, *available at*: https://www.socialworkers.org/assets/secured/documents/da/da2008/reffered/Transgender.pdf.

[11]   *See* Position Statement on Medical Necessity of Treatment, Sex Reassignment, and Insurance Coverage in the USA (2016), *available at*: https://www.wpath.org/media/cms/Documents/Web%20Transfer/Policies/WPATH-Position-on-Medical-Necessity-12-21-2016.pdf.

## VII.   CAUSES OF ACTION

### COUNT ONE

### THE HEALTH CARE BAN VIOLATES THE FOURTEENTH AMENDMENT'S GUARANTEE OF EQUAL PROTECTION UNDER THE LAW (MINOR AND DOCTOR PLAINTIFFS)

155.    The Equal Protection Clause of the Fourteenth Amendment protects individuals and groups from discrimination by the government.

156.    The Health Care Ban harms transgender youth, including the Minor Plaintiffs and the patients cared for by the Doctor Plaintiffs, by denying them medically necessary care and insurance coverage for such care because of their sex and because of their transgender status.

157.    Under the Equal Protection Clause of the Fourteenth Amendment, government discrimination based on sex, including discrimination based on stereotypes associated with a person's sex assigned at birth, is subject to heightened judicial scrutiny and is therefore presumptively unconstitutional.

158.    Under the Equal Protection Clause, government discrimination based on transgender status is also subject to at least heightened scrutiny and is presumptively unconstitutional.

159.    Transgender people have obvious, immutable, and distinguishing characteristics that define that class as a discrete group.  These characteristics bear no relation to transgender people's abilities to perform in, or contribute to, society.

160.    Transgender people have historically been subject to discrimination, and remain a very small minority of the American population that lacks political power.

161.    The Health Care Ban bars the provision of various forms of medically necessary care, and insurance coverage for such care, only when the care is related to a patient's "gender

transition," which is defined as "the process in which a person goes from identifying with and living as a gender that corresponds to his or her biological sex to identifying with and living as a gender different from his or her biological sex." HB 1570 §3, 20-9-1501(5).

162.    Treatment for gender dysphoria—a condition that only transgender people suffer from—is always aimed at affirming a gender identity that differs from a person's assigned sex at birth.

163.    Under the Health Care Ban, the same medical treatments that are prohibited when provided to transgender adolescents to help align their bodies with their gender identity may be provided to non-transgender patients to help align their bodies with their gender identity, or for any other purpose.

164.    Under the Health Care Ban, the Doctor Plaintiffs are prohibited from providing certain medically necessary care to their transgender adolescent patients that they are permitted to provide to their non-transgender adolescent patients, and that doctors who do not treat transgender adolescent patients are permitted to provide to all of their patients.

165.    Under the terms of the Health Care Ban, whether or not a person can receive certain medical treatments turns on their assigned sex at birth.

166.    Under the terms of the Health Care Ban, whether or not a person can receive certain medical treatments turns on whether they are transgender.

167.    Under the terms of the Health Care Ban, whether or not a person can receive certain medical treatments turns on whether the care tends to reinforce or disrupt stereotypes associated with a person's sex assigned at birth.

168.    The Health Care Ban does nothing to protect the health or well-being of minors. To the contrary, it gravely threatens the health and well-being of adolescents with gender dysphoria by denying them access to lifesaving care.

169.    The Health Care Ban is not substantially related to any important government interest, nor is it rationally related to any legitimate government interest.

170.    The Health Care Ban's targeted ban on medically necessary care provided for transgender youth is based on generalized fears, negative attitudes, stereotypes, and moral disapproval of transgender people that are not legitimate bases for unequal treatment under any level of scrutiny.

171.    Defendants are liable for their violation of the right to equal protection under 42 U.S.C. § 1983, and the Minor Plaintiffs and Doctor Plaintiffs are entitled to a declaratory judgment that the Health Care Ban violates the Equal Protection Clause of the Fourteenth Amendment.

## COUNT TWO

### THE HEALTH CARE BAN VIOLATES THE RIGHT TO PARENTAL AUTONOMY GUARANTEED BY THE FOURTEENTH AMENDMENT'S DUE PROCESS CLAUSE (PARENT PLAINTIFFS)

172.    The Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children.

173.    That fundamental right of parental autonomy includes the right of parents to seek and to follow medical advice to protect the health and well-being of their minor children.

174.    Parents' fundamental right to seek and follow medical advice is at its apogee when the parents, their minor child, and that child's doctor all agree on an appropriate course of medical treatment.

175.    The Health Care Ban's prohibition against well-accepted medical treatments for adolescents with gender dysphoria stands directly at odds with parents' fundamental right to make decisions concerning the care of their children.   The Health Care Ban barges into Arkansas families' living rooms and strips Arkansas parents of the right to provide medical care for their children.

176.    The Health Care Ban does nothing to protect the health or well-being of minors. To the contrary, it gravely threatens the health and well-being of adolescents with gender dysphoria by denying their parents the ability to obtain lifesaving care for them.

177.    The Health Care Ban's prohibition against the provision of medically accepted treatments for adolescents with gender dysphoria is not narrowly tailored to serve a compelling government interest; nor is it rationally related to any legitimate government interest.

178.    Defendants are liable for their violation of the right to due process under 42 U.S.C. § 1983, and the Parent Plaintiffs are entitled to a declaratory judgment that the Health Care Ban violates the Due Process Clause of the Fourteenth Amendment.

## COUNT THREE

### THE HEALTH CARE BAN VIOLATES THE FIRST AMENDMENT'S FREE SPEECH PROTECTIONS (ALL PLAINTIFFS)

179.    The First Amendment's guarantee of the freedom of speech applies to the states through the Fourteenth Amendment.

180.    The speech restricted by the Health Care Ban is fully protected by the Free Speech Clause of the First Amendment.   The Doctor Plaintiffs have a First Amendment right to refer patients for medically accepted treatments for gender dysphoria, and would continue to do so when medically appropriate absent the Health Care Ban.   The Minor Plaintiffs and Parent Plaintiffs have

a First Amendment right to hear their doctors' medical recommendations, including their referrals to other healthcare providers.

181.    The Health Care Ban violates the First Amendment because it impermissibly restricts what physicians and other healthcare providers can say about medically accepted treatment for gender dysphoria.  It prevents a "physician, or other healthcare professional" from "refer[ring] any individual under eighteen (18) years of age to any healthcare professional for gender transition procedures."  HB 1570 § 3, 20-9-1502(b).

182.    The Health Care Ban's referral prohibition prevents healthcare professionals from speaking about medical treatments only in certain instances, specifically with respect to referring transgender patients under 18 years of age for such procedures when they are for the purpose of "gender transition."  Healthcare professionals are permitted to refer non-transgender patients for the same treatments when for purposes other than gender transition.

183.    The Health Care Ban is subject to strict scrutiny because it is neither viewpoint nor content neutral.

184.    The Health Care Ban discriminates on the basis of viewpoint by penalizing speech only when that speech is related to care that would affirm a gender identity when that gender identity is different from a person's assigned sex at birth.  The law does not restrict speech related to care that would affirm a gender identity that matches a person's assigned sex at birth.

185.    The Health Care Ban discriminates on the basis of content because it penalizes speech related to transgender patients, gender transition, and treatment for gender dysphoria, thus penalizing healthcare professionals based on the content of their speech.

186.    The Health Care Ban's referral prohibition cannot satisfy strict scrutiny, or any other level of First Amendment scrutiny.

187.    Defendants are liable for their violation of the right to freedom of speech under 42

U.S.C. § 1983, and the Doctor, Minor, and Parent Plaintiffs are entitled to a declaratory judgment

that the Health Care Ban violates the Free Speech Clause of the First Amendment.

## VIII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that this Court:

i.    Enter a judgment declaring that the Health Care Ban violates the equal
protection clause, the right to parental autonomy guaranteed by the due
process clause, and the right to freedom of speech protected by the First
Amendment, and is therefore unenforceable;

ii.   Issue preliminary and permanent injunctions enjoining Defendants, their
employees, agents, and successors in office from enforcing the Health Care
Ban;

iii.  Award Plaintiffs their costs and expenses, including reasonable attorneys'
fees, pursuant to 42 U.S.C. § 1988; and

iv.   Grant such other relief as the Court deems just and proper.

Dated:  May 25, 2021                              Respectfully submitted,

Beth Echols, Ark. Bar No. 2002203
Christopher Travis, Ark. Bar No. 1997093
Drake Mann, Ark. Bar No. 1987108
Gill Ragon Owen, P.A.
425 W. Capitol Avenue, Suite 3800
Little Rock, AR 72201
Telephone: 501-376-3800
echols@gill-law.com
travis@gill-law.com
mann@gill-law.com
*Attorneys for the Plaintiffs*

Chase Strangio *
Leslie Cooper
American Civil Liberties Union
Foundation
125 Broad St.
New York, NY 10004
Telephone: (917) 345-1742
cstrangio@aclu.org
lcooper@aclu.org
*Attorneys for the Plaintiffs*

Breean Walas, Ark. Bar No. 2006077
Walas Law Firm, PLLC
P.O. Box 4591
Bozeman, MT 59772
Telephone: (501) 246-1067
breean@walaslawfirm.com
*Attorneys for the Plaintiffs*

Sarah Everett, Ark. Bar No. 2017249
Arkansas Civil Liberties Union
Foundation, Inc.
904 W. 2nd Street
Little Rock, AR 72201
Telephone: (501) 374-2842
sarah@acluarkansas.org
*Attorneys for the Plaintiffs*

Garrard R. Beeney*
Jonathan J. Ossip*
Alexander S. Holland*
Sullivan & Cromwell LLP
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000
beeneyg@sullcrom.com
ossipj@sullcrom.com
hollanda@sullcrom.com
*Attorneys for the Plaintiffs*

Laura Kabler Oswell*
Duncan C. Simpson LaGoy*
Sullivan & Cromwell LLP
1870 Embarcadero Road
Palo Alto, CA 94303
Telephone:  (650) 461-5600
oswell@sullcrom.com
simpsond@sullcrom.com
*Attorneys for the Plaintiffs*

*motions to appear pro hac vice pending*