IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF ARKANSAS

---

DYLAN BRANDT, et al.,

        Plaintiffs,

    v.

LESLIE RUTLEDGE, et al.,

        Defendants.

Case No.: 4:21-CV-00450-JM-01

---

**DECLARATION OF KATHRYN STAMBOUGH, M.D.
IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

I, Kathryn Stambough, M.D., hereby declare as follows:

1. I am a Plaintiff in this action. I am bringing my claims on behalf of myself and my patients. I offer this Declaration in support of Plaintiffs' Motion for a Preliminary Injunction. I have personal knowledge of the facts set forth in this Declaration and could and would testify competently to those facts if called as a witness.

2. I graduated from medical school in 2011 and completed a residency in Obstetrics and Gynecology in 2015 at Washington University in Saint Louis. I completed a fellowship at Baylor College of Medicine/Texas Children's Hospital that focused on Pediatric and Adolescent Gynecology. During my residency and fellowship programs, I trained in the provision of hormone therapy to treat various conditions, including gender dysphoria.

3. I am a pediatric and adolescent gynecologist in the Division of Pediatric and Adolescent Gynecology in the Department of Obstetrics and Gynecology at the University of Arkansas for Medical Sciences. My clinic is part of Arkansas Children's Hospital. As part of my

PLAINTIFF'S EXHIBIT 10

pediatric gynecology practice, I refer patients to the Gender Spectrum Clinic at the Arkansas Children's Hospital (the "Clinic"), which provides healthcare to transgender youth with gender dysphoria.

4. For the past year, I have also worked at the Clinic one day each month. The Clinic treats patients in accordance with the standards of care developed by the World Professional Association for Transgender Health ("WPATH") and the Endocrine Society. The Clinic has an interdisciplinary team, including mental health providers, to ensure each child receives appropriate and necessary care. We require all of our patients to be receiving mental health counseling while they are in treatment at the Clinic.

5. When I am at the Clinic, I provide gender-affirming hormone therapy (testosterone suppression and estrogen for transgender girls; testosterone for transgender boys) when medically indicated for transgender patients with gender dysphoria diagnoses, beginning around the age of 14.

6. Many of the same treatments I provide to my transgender patients at the Clinic, I also provide to non-transgender patients. In my pediatric gynecology practice, I provide estrogen to non-transgender girls for a range of conditions, such as primary ovarian insufficiency, hypogonadotropic hypogonadism (delayed puberty due to lack of estrogen caused by a problem with the pituitary gland or hypothalamus), and Turner's Syndrome (a chromosomal condition that can cause a failure of ovaries to develop). I also prescribe puberty-delaying medication for non-transgender patients experiencing precocious puberty. I use that same medication—gonadotropin-releasing hormone agonist—to treat other conditions, including endometriosis. In addition, I provide other forms of hormone therapy to treat polycystic ovarian syndrome; menstrual issues including painful, irregular or heavy periods; and for menstrual suppression for patients with many

conditions including cancer and spinal cord disorders, as well as transgender boys with gender dysphoria.

7. I have had non-transgender patients with macromastia (enlarged breast size), breast hypoplasia (a lack of breast development), and breast asymmetry who I have referred to speak to a plastic surgeon regarding breast reconstruction surgery. As a result of these referrals, some of these patients have received breast reconstruction surgery.

8. If House Bill 1570 (the "Health Care Ban") takes effect, I will be barred from treating my transgender patients with gender dysphoria in accordance with the accepted standards of care. I will thus knowingly be causing harm to my patients by following Arkansas law. If I were to follow the medically indicated protocols for treating gender dysphoria rather than the newly enacted Health Care Ban, I would face adverse licensing action or other judicial or administrative consequences.

9. Additionally, if the Health Care Ban takes effect, I would not be able to refer my patients in my gynecology practice who have gender dysphoria to the Clinic or to any other clinic that might provide gender-affirming care. My ability to make these referrals is essential to connect my patients with appropriate and necessary care, but if I were to do so, I would face adverse licensing action or other judicial or administrative consequences.

10. Moreover, I am concerned that if the Health Care Ban goes into effect, the Clinic might have to close.

11. Based on my personal experience and training, I believe that the Health Care Ban, if permitted to take effect, will significantly and severely compromise the health of my patients. Since public discussion of the Health Care Ban began, four transgender adolescent

patients of the Clinic have been admitted to the emergency room for attempted suicide, in addition to three suicide attempts by transgender adolescents who are not patients of the Clinic.

12. Being forced to withhold referrals from patients at my pediatric gynecology practice, and to deny my patients at the Clinic medically necessary care that can be lifesaving for some patients, violates the tenets of my profession by leaving my patients to suffer needless pain.

13. I worry greatly about the impact on my patients if they cannot access the medically necessary and lifesaving treatment prohibited by the Health Care Ban, and fear for my patients' wellbeing.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Longboat Key, Florida, on this 13th day of June, 2021.

_____
Kathryn Stambough, M.D.