# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
### CENTRAL DIVISION

**DYLAN BRANDT, et al.,**                                        **PLAINTIFFS**

**v.**                          **Case No. 4:21-CV-00450-JM**

**LESLIE RUTLEDGE, et al.,**                                **DEFENDANTS**

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

**Page**

**INTRODUCTION**..................................................................................1

**STATEMENT OF FACTS**.................................................................3

    A.    Medical Protocols for the Treatment of Transgender
Adolescents with Gender Dysphoria........................................3

    B.    The General Assembly's Passage of the Health Care Ban. .................8

    C.    The Health Care Ban Inflicts Substantial Harm on Plaintiffs and
Other Transgender Adolescents, Their Families, and Their
Doctors. ..............................................................................11

        The Brandt Family....................................................................13
        The Jennen Family ...................................................................15
        The Dennis Family ...................................................................16
        The Saxton Family ...................................................................18
        Dr. Michele Hutchison ............................................................19
        Dr. Kathryn Stambough ...........................................................22

**ARGUMENT** ....................................................................................23

**I.**    **Preliminary Injunction Standard.** ............................................23

**II.**    **Plaintiffs Are Likely to Succeed on the Merits of Their Equal
Protection Claim.** ...........................................................24

    A.    Arkansas's Health Care Ban Is Subject to Heightened Scrutiny. .......25

        1.    Arkansas's Health Care Ban is subject to heightened
scrutiny because it discriminates against transgender
youth based on their transgender status. ..................26

        2.    Arkansas's Health Care Ban is also subject to heightened
scrutiny because it discriminates against transgender
youth on the basis of their sex.................................30

    B.    Arkansas's Health Care Ban Cannot Survive Heightened
Scrutiny. ...........................................................................32

1.     The Health Care Ban is not substantially related to a government interest in protecting the health and safety of minors......................................................................34

      a)    There is a mismatch between the General Assembly's purported concerns about the risks of treatment and what the Health Care Ban does................35

      b)    There is sufficient medical evidence supporting the banned medical care, contrary to the General Assembly's claims..........................................40

2.     The Health Care Ban undermines the General Assembly's interest in protecting the health and safety of minors......................................................................43

C.    Arkansas's Health Care Ban Cannot Survive Even Rational Basis Review..................................................................43

III.   **Plaintiffs Are Likely to Succeed on the Merits of the Claim That the Health Care Ban Violates Parents' Fundamental Right to Parental Autonomy**......................................................................47

A.    The Due Process Clause Protects Parents' Fundamental Right to Seek Appropriate Medical Care for Their Children.....................48

B.    The Health Care Ban Fails Strict Scrutiny..........................................50

IV.   **Plaintiffs Are Likely to Succeed on the Merits of Their First Amendment Claim**......................................................................52

A.    The Health Care Ban Is Content-Based and Discriminates Based on Viewpoint..........................................................53

B.    The Health Care Ban Fails Strict Scrutiny..........................................55

V.   **Plaintiffs Will Suffer Irreparable Harm If the Act Takes Effect**..........57

VI.   **The Balance of Equities Tips in Plaintiffs' Favor and Injunction Is in the Public Interest.**..................................................................61

**CONCLUSION**......................................................................62

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*281 Care Comm.* v. *Arneson*,
  766 F.3d 774 (8th Cir. 2014) ..................................................................55, 57

*Adkins* v. *City of New York.*,
  143 F. Supp. 3d 134 (S.D.N.Y. 2015) ...............................................27

*Att'y Gen. of N.Y.* v. *Soto-Lopez*,
  476 U.S. 898 (1986)...........................................................................25

*Bd. of Educ. of the Highland Local Sch. Dist.* v. *U.S. Dep't of Educ.*,
  208 F. Supp. 3d 850 (S.D. Ohio 2016) ..............................................27

*Bd. of Trs. of Univ. of Ala.* v. *Garrett*,
  531 U.S. 356 (2001)...........................................................................44

*Bostock* v. *Clayton County*,
  140 S. Ct. 1731 (2020).................................................................28, 30

*Brown* v. *Ent. Merchants Ass'n*,
  564 U.S. 786 (2011).....................................................................55, 56

*City of Cleburne, Tex.* v. *Cleburne Living Ctr.*,
  473 U.S. 432 (1985).....................................................................29, 44

*Conant* v. *Walters*,
  309 F.3d 629 (9th Circ. 2002).....................................................53, 55

*D.M. by Bao Xiong* v. *Minnesota State High School League*,
  917 F.3d 994 (8th Cir. 2019) ......................................................59, 61

*Dataphase Sys., Inc.* v. *C L Sys., Inc.*,
  640 F.2d 109 (8th Cir. 1981) (en banc) .............................................61

*Eisenstadt* v. *Baird*,
  405 U.S. 438 (1972)...............................................................38, 39, 42

*Elrod* v. *Burns*,
  427 U.S. 347 (1976)...........................................................................60

*Evancho* v. *Pine-Richland Sch. Dist.*,
    237 F. Supp. 3d 267 (W.D. Pa. 2017) .................................................................. 27

*F.V.* v. *Barron*,
    286 F. Supp. 3d 1131 (D. Idaho 2018) ................................................................ 28

*Flack* v. *Wis. Dep't of Health Servs.*,
    328 F. Supp. 3d 931 (W.D. Wis. 2018) ............................................................... 28

*Gen. Motors Corp.* v. *Harry Brown's, LLC*,
    563 F.3d 312 (8th Cir. 2009) ............................................................................... 57

*Gerlich* v. *Leath*,
    861 F.3d 697 (8th Cir. 2017) ............................................................................... 52

*Glenn* v. *Brumby*,
    663 F.3d 1312 (11th Cir. 2011) .................................................................... 28, 31

*Gonzales* v. *Carhart*,
    550 U.S. 124 (2007) ............................................................................................. 33

*Grimm* v. *Gloucester Cty. Sch. Bd.*,
    972 F.3d 586 (4th Cir. 2020) ..................................................................... *passim*

*Hicklin* v. *Precynthe*,
    2018 WL 806764 (E.D. Mo. Feb. 9, 2018) ........................................................ 59

*Jehovah's Witnesses in State of Wash.* v. *King Cnty. Hosp. Unit No. 1*,
    278 F. Supp. 488 (W.D. Wash. 1967), *aff'd* 390 U.S. 598 (1968) ..................... 50

*Jernigan* v. *Crane*,
    64 F. Supp. 3d 1260 (E.D. Ark. 2014), *aff'd*, 796 F.3d 976 (8th Cir. 2015) ..................................................................................................................... 39

*Kadel* v. *Folwell*,
    446 F. Supp. 3d 1 (M.D.N.C. 2020) ................................................................... 31

*Kan. City S. Transp. Co., Inc.* v. *Teamsters Local Union No. 41*,
    126 F.3d 1059 (8th Cir. 1997) ............................................................................ 23

*Kanuszewski* v. *Mich. Dep't of Health & Human Servs.*,
    927 F.3d 396 (6th Cir. 2019) .............................................................................. 48

*Karnoski* v. *Trump*,
　　926 F.3d 1180 (9th Cir. 2019) ............................................................27

*Lindsey* v. *Normet*,
　　405 U.S. 56 (1972)...............................................................................44

*Little Rock Family Planning Servs.* v. *Rutledge*,
　　397 F. Supp. 3d 1213 (E.D. Ark. 2019)...............................................61

*M.A.B.* v. *Bd. of Educ. of Talbot Cty.*,
　　286 F. Supp. 3d 704 (D. Md. 2018)......................................................28

*McCullen* v. *Coakley*,
　　573 U.S. 464 (2014).............................................................................53

*Missouri Broadcasters Association* v. *Lacy*,
　　846 F.3d 295 (8th Cir. 2017) ..............................................................56

*Nat'l Inst. of Fam. & Life Advocs.* v. *Becerra*,
　　138 S. Ct. 2361 (2018).............................................................52, 53, 57

*Nken* v. *Holder*,
　　556 U.S. 418 (2009)......................................................................24, 61

*Norsworthy* v. *Beard*,
　　87 F. Supp. 3d (N.D. Cal. 2015).........................................................28

*Parham* v. *J.R.*,
　　442 U.S. 584 (1979).................................................................48, 49, 51

*Pavek* v. *Simon*,
　　467 F. Supp. 3d 718 (D. Minn. 2020)..................................................60

*Reed* v. *Town of Gilbert*,
　　576 U.S. 155 (2015).................................................................52, 53, 54

*Reid* v. *Kelly*,
　　2013 WL 6231149 (E.D. Ark. Dec. 2, 2013) .....................................59

*Republican Party of Minn.* v. *White*,
　　536 U.S. 765 (2002).............................................................................25

*Rodgers* v. *Bryant*,
    301 F. Supp. 3d 928 (E.D. Ark. 2017), *aff'd*, 942 F.3d 451 (8th Cir.
    2019) ................................................................................................................54

*Rodgers* v. *Bryant*,
    942 F.3d 451 (8th Cir. 2019) ...........................................................................56

*Romer* v. *Evans*,
    517 U.S. 620 (1996)....................................................................................44, 47

*Rosenberger* v. *Rector*,
    515 U.S. 819 (1995).........................................................................................54

*Sanborn Mfg. Co., Inc.* v. *Campbell Hausfeld/Scott Fetzer Co.*,
    997 F.2d 484 (8th Cir. 1993) ...........................................................................24

*Santosky* v. *Kramer*,
    455 U.S. 745 (1982).........................................................................................48

*Sessions* v. *Morales-Santana*,
    137 S. Ct. 1678 (2017)......................................................................................32

*Sorrell* v. *IMS Health, Inc.*,
    564 U.S. 552 (2011).........................................................................................53

*Thompson* v. *W. States Med. Ctr.*,
    535 U.S. 357 (2002)....................................................................................56, 57

*Tinker* v. *Des Moines Indep. Cmty. Sch. Dist.*,
    393 U.S. 503 (1969).........................................................................................49

*Troxel* v. *Granville*,
    530 U.S. 57 (2000)........................................................................47, 48, 49, 50

*U.S. Dep't of Agric.* v. *Moreno*,
    413 U.S. 528 (1973)....................................................................................44, 47

*U.S.* v. *Playboy Ent. Grp., Inc.*,
    529 U.S. 803 (2000).........................................................................................55

*U.S.* v. *Virginia*,
    518 U.S. 515 (1996)........................................................................32, 33, 42, 43

*U.S.* v. *Windsor,*
  570 U.S. 744 (2013)..........................................................................................45

*Washington* v. *Glucksburg,*
  521 U.S. 702 (1997)......................................................................................47, 50

**Statutes**

2021 ARK. ACTS 461 ........................................................................................10

2021 ARK. ACTS 626 ("HB 1570")................................................................*passim*

2021 ARK. ACTS 953 ........................................................................................10

## INTRODUCTION

Absent a preliminary injunction, House Bill 1570 (the "Health Care Ban") could be enforced as soon as July 28, 2021. The Health Care Ban categorically prohibits transgender adolescents with gender dysphoria from receiving gender-affirming medical care. The Health Care Ban prohibits necessary, effective and safe medical treatment for adolescents with gender dysphoria—treatment the minor, the minor's parents, and the minor's medical providers all agree is medically necessary and in the minor's best interest. Ignoring the testimony of doctors and the treatment protocols for gender dysphoria recognized by every major medical association in the United States, the General Assembly chose to deprive Arkansas adolescents, their parents, and their doctors of the right to make important medical decisions and removed access to the only effective treatments for alleviating the severe distress of gender dysphoria. Arkansas's Health Care Ban, which is the only law of its kind in the United States, is not just harmful, it is also unconstitutional, warranting a preliminary injunction until the Court can resolve the case on its merits.

*First,* Plaintiffs are likely to succeed on the merits of their constitutional claims. The Health Care Ban violates the equal protection rights of transgender adolescents and their doctors because it singles out access to and provision of medically necessary gender-affirming care solely because a patient's gender identity does not align with their assigned sex at birth. Indeed, the same health care

treatments the law prohibits when provided to transgender adolescents for the purpose of "gender transition"—puberty-delaying treatment, hormone therapy, and chest surgery—the law allows for non-transgender adolescents for any purpose, including to help align their physical characteristics with their gender identity. The Health Care Ban also violates parents' fundamental right to seek appropriate medical care for their children in consultation with medical professionals. Finally, by prohibiting Arkansas doctors from referring adolescent patients who need the banned care to doctors who can provide it, the Health Care Ban violates the free speech rights of Arkansas's doctors to speak and of Arkansas's patients and their parents to receive information.

*Second*, the Health Care Ban will irreparably harm Plaintiffs and other transgender youth in Arkansas if it goes into effect by depriving them of the gender-affirming care that they rely on to treat gender dysphoria, putting them at heightened risk of depression, anxiety, self-harm, and suicidality. It will also prevent parents of transgender adolescents from accessing medical care that is necessary for their children's well-being. And it will force doctors to deny their patients the medical care they need or information about where to access that care. The devastating harms of the law are already apparent as at least seven transgender youth in Arkansas have been hospitalized as a result of suicide attempts since discussion of the Health Care Ban began.

-2-

*Third*, the balance of equities and the public interest demand that the Court enjoin the enforcement of the Health Care Ban while it decides the constitutionality of the law.  The threat of harm to Plaintiffs is concrete, imminent, and devastating, and far outweighs any conceivable cost to the State of maintaining the status quo while this case proceeds.

Plaintiffs respectfully request that, before the Health Care Ban goes into effect, this Court issue a preliminary injunction prohibiting Defendants from enforcing the Health Care Ban during the pendency of this litigation.

## STATEMENT OF FACTS

### A.     Medical Protocols for the Treatment of Transgender Adolescents with Gender Dysphoria.

"Gender identity" refers to a person's internal, innate, and immutable sense of belonging to a particular gender.  (Exhibit 11 - Declaration of Deanna Adkins, MD ("Adkins Decl.") ¶¶ 15, 16, 21.)  Everyone has a gender identity, and a person's gender identity is durable and cannot be altered through medical intervention.  (*Id*. ¶¶ 17, 21.)  People who have a gender identity that aligns with the sex they were designated at birth based on their external genitalia are cisgender while people who have a gender identity that does not align with their sex assigned at birth are transgender.  (*Id*. ¶¶ 18-19.)  Some transgender people become aware in early childhood that their gender identity does not match their assigned sex.  (*Id.* ¶ 20.)

For others, the onset of puberty, and the resulting physical changes in their bodies, leads them to recognize their gender identity.  (*Id.*)

The lack of alignment between one's gender identity and their sex assigned at birth can cause significant distress.  (*Id.* ¶¶ 24, 31.)  According to the American Psychiatric Association's Diagnostic & Statistical Manual of Mental Disorders, "gender dysphoria" is the diagnostic term for the condition experienced by some transgender people of clinically significant distress resulting from the lack of congruence between their gender identity and the sex assigned to them at birth.  (*Id.* ¶ 22.)  To be diagnosed with gender dysphoria, the incongruence must have persisted for at least six months and be accompanied by clinically significant distress or impairment in social, occupational, or other important areas of functioning.  (*Id.*)

Arkansas doctors use well-established guidelines to diagnose and treat minors with gender dysphoria.  Being transgender is not itself a medical condition to be cured.  (*Id.* ¶ 23.)  Gender dysphoria, however, is a serious medical condition that, if left untreated, can result in debilitating anxiety, severe depression, self-harm, and suicide.  (*Id.*)  The Endocrine Society[1] and the World Professional Association for

---

[1]    Wylie C. Hembree *et al.*, "Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline," *The Journal of Clinical Endocrinology & Metabolism*, Volume 102, Issue 11, 1 November 2017, Pages 3869-3903, https://doi.org/10.1210/jc.2017-01658, ("Endocrine Society Guideline").

-4-

Transgender Health ("WPATH")[2] have published widely accepted medical protocols for treating gender dysphoria. (Adkins Decl. ¶ 27.) Medical treatment for gender dysphoria seeks to eliminate or avoid clinically significant distress by helping a transgender person live in alignment with their gender identity. (*Id.* ¶ 28.) This treatment, sometimes referred to as "gender transition," "transition-related care," or "gender-affirming care," is recognized by the American Academy of Pediatrics and the American Academy of Child and Adolescent Psychiatry as safe, effective, and medically necessary treatment for the health and well-being of adolescents suffering from gender dysphoria.[3] (*Id.*)

The treatment for gender dysphoria differs depending on whether the patient is a pre-pubertal child, an adolescent, or an adult. Before puberty, gender transition does not include any pharmaceutical or surgical intervention and is limited to "social

---

[2] World Professional Association for Transgender Health, *Standards of Care for the Health of Transsexual, Transgender, and Gender-Conforming People* (7th Version) (2012), https://www.wpath.org/publications/soc, ("WPATH Standards of Care").

[3] Rafferty J, AAP *Ensuring Comprehensive Care and Support for Transgender and Gender-Diverse Children and Adolescents,* Pediatrics, 2018 Volume 142 No. 4 https://pediatrics.aappublications.org/content/pediatrics/142/4/e2018 2162.full.pdf; *AACAP Statement Responding to Efforts to Ban Evidence-Based Care for Transgender and Gender Diverse Youth*, American Academy of Child and Adolescent Psychiatry, https://www.aacap.org/ AACAP/Latest_News/AACAP_Statement_Responding_to_Efforts-to_ban_Evidence-Based_Care_for_Transgender_and_Gender_Diverse.aspx.

transition," which means allowing a transgender child to live and be socially recognized in accordance with their gender identity. (*Id.* ¶ 30.) Medical interventions may become medically necessary and appropriate when transgender patients reach puberty. (Adkins Decl. ¶ 42.) In providing medical treatments to adolescents, pediatric endocrinologists work in close consultation with qualified mental-health professionals who are experienced in diagnosing and treating gender dysphoria. (*Id.* ¶ 33.)

For many transgender adolescents, going through puberty in accordance with the sex assigned to them at birth can cause extreme distress. (*Id.* ¶ 31.) To relieve this distress and delay the permanent physical changes that would come with puberty, healthcare providers may prescribe puberty-delaying medication to these patients. (*Id.*) The Endocrine Society Guideline details the pre-requisites for a transgender adolescent patient's eligibility for puberty-delaying treatment, which include that the adolescent's gender dysphoria has been "long-lasting and intense." (*Id.*) Puberty-delaying treatment is reversible, and if an adolescent discontinues the treatment, endogenous puberty will resume. (*Id.*)

For some adolescents, their healthcare provider may determine it is medically necessary and appropriate to initiate puberty consistent with a patient's gender identity through gender-affirming hormone therapy (testosterone for transgender boys and testosterone suppression and estrogen for transgender girls). (*Id.* ¶ 34.)

-6-

The Endocrine Society Guideline details the prerequisites for a transgender adolescent patient's eligibility for hormone therapy, one of which is the adolescent patient's mental capacity to give informed consent. (*Id.* ¶¶ 33, 35; Endocrine Society Guideline, Table 5.)

Transgender adolescents who receive gender-affirming hormones after having received puberty-delaying treatment never go through puberty in accordance with the sex assigned to them at birth and, instead, go through puberty that matches their gender identity. (Adkins Decl. ¶¶ 31, 34.) Transgender boys will develop the phenotypic features of non-transgender boys such as muscle mass, fat distribution, facial and body hair, and lower vocal pitch. (*See* Endocrine Society Guideline, Table 12.) Likewise, transgender girls will develop the same muscle mass, fat distribution, skin, hair patterns, and breasts typically associated with non-transgender girls. (*Id.*, Table 13.) Treatment can drastically minimize dysphoria later in life and may eliminate the need for surgery. (*Id.* ¶ 50.) Adolescents who first receive treatment later in puberty also go through a puberty consistent with their gender identity, however, they will have undergone physical changes associated with their endogenous puberty that may not be wholly reversed by hormone therapy. (*Id.* ¶ 53.)

Under the WPATH Standards of Care and the Endocrine Society Guideline, transgender adolescent young men may also receive medically necessary chest reconstructive surgery before the age of majority, provided the patient has lived in

his affirmed gender for a significant period of time.  (*Id.* ¶ 38.)  Neither the WPATH

Standards of Care nor Endocrine Society Guideline recommend genital surgery until

a patient has reached the age of majority.  (*Id.*)

### B.  The General Assembly's Passage of the Health Care Ban.

On March 29, 2021, the Arkansas General Assembly passed the Health Care

Ban, prohibiting healthcare professionals from providing "gender transition

procedures" to anyone under eighteen or "refer[ring]" anyone under eighteen to any

healthcare professional for such procedures.  HB 1570 § 3, ARK. CODE ANN. § 20-

9-1502(a)-(b).

The Health Care Ban defines "gender transition" as "the process in which a

person goes from identifying with and living as a gender that corresponds to his or

her biological sex to identifying with and living as a gender different from his or her

biological sex, and may involve social, legal, or physical changes."  HB 1570 § 3,

ARK. CODE ANN. § 20-9-1501(5).  The "gender transition procedures" prohibited by

the law are defined as "any medical or surgical service . . . related to gender transition

that seeks to . . . [a]lter or remove physical or anatomical characteristics or features

that are typical for the individual's biological sex; or [i]nstill or create physiological

or anatomical characteristics that resemble a sex different from the individual's

biological sex, including without limitation medical services that provide puberty-

blocking drugs, cross-sex hormones, or other mechanisms to promote the

development of feminizing or masculinizing features in the opposite biological sex, or genital or nongenital gender reassignment surgery performed for the purpose of assisting an individual with a gender transition." HB 1570 § 3, ARK. CODE ANN. § 20-9-1501(6).

The Health Care Ban subjects healthcare professionals who provide care—or refer minor patients for care—related to "gender transition" to discipline for unprofessional conduct by the appropriate licensing entity or disciplinary review board, and the healthcare professional may be sued by the Attorney General or private parties.  HB 1570 § 3, ARK. CODE ANN. § 20-9-1504.  The Health Care Ban also prohibits coverage of the banned medical care through the Arkansas Medicaid Program (HB 1570 § 3, ARK. CODE ANN. § 20-9-1503(d)) or private insurance (HB 1570 § 4, ARK. CODE ANN. § 23-79-164).

On April 5, 2021, Governor Hutchinson vetoed the Health Care Ban because it creates "new standards of legislative interference with physicians and parents as they deal with some of the most complex and sensitive matters concerning our youths."[4]  Governor Hutchinson explained that "[the Health Care Ban] puts the state as the definitive oracle of medical care, overriding parents, patients and healthcare

---

[4]     "Governor Asa Hutchinson Holds Pen and Pad Session with Local Media," April 5, 2021, at 9:16, https://www.youtube.com/watch?v=9Jt7PxWkVbE.

experts," which "would be—and is—a vast government overreach."[5]   Governor

Hutchinson further noted that "[t]he leading Arkansas medical associations, the

American Academy of Pediatrics and medical experts across the country all oppose

this law" because "denying best practice medical care to transgender youth can lead

to significant harm to the young person—from suicidal tendencies and social

isolation to increased drug use."[6]  Within 24 hours, with a simple majority vote, the

Arkansas General Assembly overrode the Governor's veto and passed the Health

Care Ban into law.

 HB 1570 did not specify when the law would take effect, but the Arkansas

Attorney General's position is that it will take effect on July 28, 2021.[7]

 The Health Care Ban was just one of a barrage of bills in the Arkansas General

Assembly targeting transgender people during the 2021 legislative session.  Senate

Bill 347 would have made it a felony for a healthcare provider to provide "gender

reassignment services" to anyone under 18 years of age.  Two bills, which passed

and were signed into law, ban transgender students from participating in school

---

[5]      *Id.* at 9:30.

[6]      *Id.* at 8:58.

[7]      On May 20, 2021, Attorney General Leslie Rutledge issued Opinion
        No. 2021-029, opining that "unless the General Assembly reconvenes on or
        before July 27, 2021, acts with no emergency clause or specified effective
        date become effective on July 28, 2021."  The General Assembly has not
        reconvened and HB 1570 does not have an emergency clause.

sports.  *See* SB 354, 2021 ARK. ACTS 461, SB 450, 2021 ARK. ACTS 953.  Another

bill—HB 1749—would have provided that employees of public schools and colleges

are not "required to use a pronoun, title, or other word to identify a student . . . as

male or female that is inconsistent with the . . . student's biological sex."  There were

bills aimed at shielding students from hearing about transgender people.  Senate Bill

389 requires public schools to give parents notice and a right to opt their children

out of any curriculum or school materials related to sexual orientation or gender

identity.  SR 7 included a provision that "every child deserves an education . . . free

of . . . politicized ideas about sexual orientation and gender identity."  Other bills

would have barred transgender people from using restrooms or other facilities that

accord with their gender identity in schools and other public buildings.  *See* HB

1882, HB 1905, and HB 1951.

> **C.    The Health Care Ban Inflicts Substantial Harm on Plaintiffs and Other Transgender Adolescents, Their Families, and Their Doctors.**

Without gender-affirming medical treatment, many transgender adolescents

with gender dysphoria suffer extreme distress and elevated rates of anxiety,

depression, and suicidal ideation.  (Adkins Decl. ¶ 24.)  In one survey, more than

half of the transgender youth surveyed had seriously contemplated suicide.[8]  When

---

[8]    Trevor Project, National Survey on LGBTQ Youth Mental Health 2020, available at https://www.thetrevorproject.org/survey-2020/.

adolescents are able to access puberty-delaying drugs and hormone therapy, which prevents them from going through endogenous puberty and allows them to go through puberty consistent with their gender identity, they experience significant improvement in mental health.  (Adkins Decl. ¶¶ 31, 34, 50.)  Arkansas's Health Care Ban also requires physicians to discontinue treatment of transgender youth who are already receiving this medically indicated treatment under their care.  Abruptly withdrawing gender-affirming hormones can result in a range of serious physiological and mental health consequences, including anxiety, depression, hot flashes, headache, and increased risk of heart attack and stroke.  (*Id.* ¶ 54.)

Because the Health Care Ban prohibits treatment that is medically necessary for many transgender adolescents, their parents are faced with potentially insurmountable barriers to accessing healthcare for them.  Families with the means to do so can move out of state to be able to continue their children's treatment; however, this may not be a viable option for all.

Arkansas doctors who treat transgender adolescents with gender dysphoria must deny their patients medically necessary care.  Otherwise, they would face significant consequences, including the possibility of losing their license to practice medicine.

The Health Care Ban, if permitted to take effect, will inflict specific harms on the Plaintiffs in this action:

## The Brandt Family

Plaintiff Dylan Brandt is a rising sophomore in high school and is transgender. (Exhibit 1 - Dylan Brandt Decl. ¶¶ 2, 3.)  His sex assigned at birth was female, but his gender identity is male.  (*Id.* ¶ 3.)  From a young age, Dylan did not feel comfortable with his gender and experienced depression and social anxiety.  (*Id.* ¶¶ 4-6.)  He came out to his mother as transgender in seventh grade.  (*Id.* ¶ 8.)

Dylan was diagnosed with gender dysphoria and has been receiving gender-affirming medical care at the Gender Spectrum Clinic at Arkansas Children's Hospital (the "Gender Spectrum Clinic") since January 2020.  (*Id.* ¶ 11.)  He was first given Depo-Provera to stop menstruation, and in August 2020 he began receiving testosterone.  (*Id.* ¶¶ 12, 13.)  After being on testosterone for more than 10 months, Dylan has developed secondary sex characteristics typical of teenage boys including a square jaw, a deepened voice, and facial hair.  (Exhibit 2- Joanna Brandt Decl. ¶ 13.)  Treatment has been transformative for Dylan, and he has become a happy, confident teenager.  (*Id.* ¶ 14.)  The prospect of losing access to gender-affirming medical care has caused both Dylan and his mother, Joanna, tremendous stress.  (Dylan Brandt Decl. ¶ 18; Joanna Brandt Decl. ¶¶ 15-17.)  The Brandts were informed by Dylan's doctors at the inception of his treatment that abruptly stopping hormone therapy would be detrimental to Dylan's health.  (Joanna Brandt Decl. ¶¶ 9, 11.)  Dylan also believes that losing this treatment would cause him to experience

-13-

even more anxiety and depression than he had previously experienced, because he now knows what his life is like when he is receiving the care he needs. (Dylan Brandt Decl. ¶ 18.)

Joanna is also concerned about her son's mental health should his hormone treatment be cut off. (Joanna Brandt Decl. ¶ 17.) She fears Dylan will lose the happiness and self-confidence he has experienced thanks to his treatment and is worried that Dylan's depression will return if his care is taken away and his body undergoes permanent changes from the resumption of his endogenous puberty. (*Id.*) Both Dylan and Joanna fear that his gender dysphoria would greatly intensify, and he may be subject to increased bullying because of the physical changes that would come with halting his medical treatment. (Dylan Brandt Decl. ¶ 18; Joanna Brandt Decl. ¶ 17.)

The Brandts have a community of friends and family in Greenwood, and Joanna owns her home and a small business. (Dylan Brandt Decl. ¶ 19; Joanna Brandt Decl. ¶ 18.) Because she fears for her son's safety and well-being should his healthcare be cut off, Joanna is considering moving to another state to ensure that Dylan can continue his treatment if the Health Care Ban goes into effect. (Joanna Brandt Decl. ¶ 18.)

## **The Jennen Family**

Sabrina Jennen is a sophomore in high school and is transgender. (Exhibit 3 - Sabrina Jennen Decl. ¶ 2.) Her sex assigned at birth was male, but her gender identity is female. (*Id.* ¶ 3.) Sabrina began to realize her gender identity in late 2019 and came out to her friends as transgender. (*Id.* ¶ 5.) She told her parents in July 2020. (*Id.* ¶ 6.) Sabrina was diagnosed with gender dysphoria, and in or around January 2021, with her parents' support, she began hormone therapy. (*Id.* ¶ 9.) She was prescribed a testosterone suppressant and estrogen to initiate puberty consistent with her gender identity. (*Id.* ¶ 9.)

The prospect of losing access to her medical care causes Sabrina and her parents extreme anxiety. (*Id.* ¶ 11; Exhibit 4 - Aaron and Lacey Jennen Decl. ¶ 6.) Prior to treatment, Sabrina saw no future for herself; she was depressed and engaged in self-harm. (Sabrina Jennen Decl. ¶ 4.) If her treatment is stopped, Sabrina worries that her dysphoria, depression, and anxiety will recur, and her parents fear for her survival. (*Id.* ¶ 11; Aaron and Lacey Jennen Decl. ¶ 6.) They cannot bear to lose the happy and thriving daughter that Sabrina has become, nor can they return to a state of fear for her safety. (Aaron and Lacey Jennen Decl. ¶ 6.)

The Jennens love their Fayetteville community. (*Id.* ¶¶ 9-10.) Sabrina has a robust network of friends, family, educators, and a church community that supports her—connection that would be difficult if not impossible to replace. (Sabrina Jennen

Decl. ¶ 13.)   Sabrina's sisters are also deeply connected to their school and community.  (Aaron and Lacey Jennen Decl. ¶ 10.)  Lacey and Aaron, Sabrina's parents, are lifelong residents of Arkansas and graduates of the University of Arkansas at Fayetteville.  (*Id.* ¶ 9.)  Lacey's and Aaron's professional lives are in Arkansas, their parents and siblings live close by, and all of their extended family live in Arkansas.  (*Id.*)  Despite these strong ties to Arkansas, the Jennens believe they would have to move to another state to ensure that Sabrina can continue her treatment if the Health Care Ban goes into effect.  (*Id.* ¶ 11.)

### The Dennis Family

Brooke Dennis is in the third grade and is transgender.  (Exhibit 5 - Brooke Dennis Decl. ¶¶ 2-3; Exhibit 6 - Amanda and Shayne Dennis Decl. ¶ 2.)   Her assigned sex at birth was male, but her gender identity is female.  (Amanda and Shayne Dennis Decl. ¶ 2.)  Though her parents, Amanda and Shayne, did not discuss Brooke's female gender with her until last year, as Amanda describes it, "Brooke always knew who she was."  (*Id.* ¶ 3.)  From the time she was 2 years old, Brooke gravitated towards all traditionally feminine activities and has chosen to wear traditionally feminine clothing since she was four.  (*Id.* ¶¶ 3-4.)  Brooke began to experience distress related to her gender at school when students were told to line up by boys and girls to go to the restrooms and students would debate whether she was a boy or a girl.  (*Id.* ¶ 6.)

-16-

Brooke was diagnosed with gender dysphoria in June 2020 and was referred to the Gender Spectrum Clinic. (*Id.* ¶ 9.) The doctor there advised Amanda and Shayne that puberty-delaying treatment could begin after the onset of puberty and told them to closely watch Brooke for signs of puberty. (*Id.* ¶ 10.) Brooke and her parents will have regular check-in appointments with the Gender Spectrum Clinic to monitor her development. (*Id.*) At nine years of age, puberty may begin for Brooke at any time. (*Id.* ¶ 11.)

Brooke is already anxious about the prospect of going through a typical male puberty and cried to her mother that she didn't want to get an Adam's apple. (Brooke Dennis Decl. ¶ 8; Amanda and Shayne Dennis Decl. ¶ 1.) After Brooke starts puberty, Amanda and Shayne plan to start her on puberty-delaying treatment, but they are worried the Health Care Ban will prevent that. (Amanda and Shayne Dennis Decl. ¶¶ 12-13.) They have explored their options for flying out-of-state for treatment, but this is not a financially-sustainable option. (*Id.*) Their only other option is to move out-of-state, and they will do so if necessary to get Brooke the treatment she needs. (*Id.* ¶ 14.) But moving would impose significant hardship on the Dennis family. (*Id.*) They have all developed close friendships in the community and at their children's schools, and Amanda's job in leadership development at Walmart is in Arkansas. (*Id.*) They would also be moving away from Shayne's elderly parents for whom they provide supportive care. (*Id.*)

**The Saxton Family**

Parker Saxton is a sophomore in high school and is transgender. (Exhibit 7 - Parker Saxton Decl. ¶¶ 2-3.) His assigned sex at birth was female, but his gender identity is male. (*Id.* ¶ 3.)

When Parker was around 13 years old, he came out to his father, Donnie, as transgender in a letter. (*Id.* ¶ 7; Exhibit 8 - Donnie Saxton Decl. ¶ 3.) Donnie was not surprised when he received the letter. (Donnie Saxton Decl. ¶ 4.) Parker cut his hair short when he was 11 and, starting in the seventh grade, dressed exclusively in clothes traditionally viewed as masculine. (*Id.*) Donnie could see that Parker was uncomfortable in his body—Parker had been telling Donnie he did not want to be a girl since he was in pre-school, and, for as long as Donnie can remember, Parker experienced anxiety about having to use public restrooms. (*Id.*; *see also* Parker Saxton Decl. ¶¶ 4-5.) As Parker started puberty, he began wearing four or five sports bras at a time to conceal his body. (Donnie Saxton Decl. ¶ 8; Parker Saxton Decl. ¶ 6.)

In 2019, Donnie took Parker to the Gender Spectrum Clinic. (Donnie Saxton Decl. ¶ 9.) There, Parker was diagnosed with gender dysphoria. (*Id.*) One of the first steps Parker's doctors recommended was that he be treated with Depo-Provera to stop menstruation. (*Id.*) Parker has been getting that treatment since the fall of 2019. (*Id.*) Parker's doctor agreed with Parker and Donnie that Parker would benefit

from starting testosterone.  (Donnie Saxton Decl. ¶ 11.)  Parker began receiving testosterone on May 27, 2021.  (*Id.* ¶ 12.)  Donnie says that since starting testosterone shots, he thinks his son "has been the most himself and in the best mood since he was seven years old."  (*Id.*)  Similarly, Parker describes receiving his first testosterone shot as "the start of something I have wanted for a long time . . . I have had happy moments throughout my life, but this was better—this felt like a huge milestone."  (Parker Saxton Decl. ¶ 14.)

If the Health Care Ban goes into effect, the Saxtons would explore leaving the state so that Parker can receive the treatment that he, his father, and his doctors all agree is necessary.  (Donnie Saxton Decl. ¶ 14.)  But this would be difficult for the family.  (*Id.* ¶ 15.)  Donnie, who is a plumber, has a business in Conway.  (*Id.*)  Moving would jeopardize the family's financial stability.  (*Id.*)  It would also separate the family from Donnie's parents—with whom they have a close, supportive relationship—and other relatives.  (*Id.*)  The Saxton family has been part of their community all of their lives.  (*Id.* ¶ 16.)  Donnie feels that because everyone knows Parker, he is safe there, and Donnie worries about having to move somewhere else.  (*Id.*)

### Dr. Michele Hutchison

Dr. Hutchison is a pediatric endocrinologist and Associate Professor in the Department of Pediatrics, College of Medicine at the University of Arkansas for

Medical Sciences, where she treats youth with a variety of endocrine conditions. (Exhibit 9 - Dr. Michele Hutchison Decl. ¶ 3.) Since 2018, she has also been treating patients at the Gender Spectrum Clinic, which provides healthcare to transgender youth with gender dysphoria. (*Id.*) There are around 160 patients currently under the Gender Spectrum Clinic's care. (*Id.* ¶ 5.)

At the Gender Spectrum Clinic, Dr. Hutchison provides puberty-delaying treatment and hormone therapy (testosterone for transgender boys, testosterone suppressants and estrogen for transgender girls) for transgender adolescents with gender dysphoria when medically indicated. (*Id.* ¶ 6.) The same treatments Dr. Hutchison provides to her transgender patients at the Gender Spectrum Clinic she also provides to non-transgender patients. (*Id.* ¶ 10.) In her general pediatric endocrinology practice, Dr. Hutchison provides puberty-delaying treatment to non-transgender children with precocious puberty. (*Id.*) She provides testosterone to non-transgender boys with delayed puberty or who have insufficient testosterone for a variety of reasons. (*Id.*) Dr. Hutchison provides estrogen to treat non-transgender girls with primary ovarian insufficiency or Turner's Syndrome (a chromosomal condition that can cause a failure of ovaries to develop). (*Id.*) And she provides testosterone suppressants to treat non-transgender girls with polycystic ovarian syndrome, which can cause facial hair growth. (*Id.*)

-20-

If the Health Care Ban takes effect, Dr. Hutchison will be prohibited from providing these treatments to her transgender patients because they relate to "gender transition"; but she will be able to continue providing the same treatments to her non-transgender patients, in some cases to help bring their bodies into alignment with their gender identity. (*Id.*) Given the administrative and civil penalties attached to the Health Care Ban, if it takes effect, Dr. Hutchison will not be able to treat her transgender patients with gender dysphoria in accordance with the accepted medical protocols. (*Id.* ¶ 11.) If she were to follow those protocols for treating gender dysphoria or even tell her patients where they might receive such care, she would face adverse licensing action or other judicial or administrative consequences. (*Id.*) Moreover, Dr. Hutchison is concerned that if the Health Care Ban goes into effect, the Gender Spectrum Clinic might have to close. (*Id.* ¶ 12.)

Dr. Hutchison knows from personal experience in treating hundreds of adolescents with gender dysphoria that the Health Care Ban, if permitted to take effect, will significantly and severely compromise the health of her patients. (*Id.* ¶ 13.) In addition to seven transgender youth hospitalized after suicide attempts since public discussion of the law, her office received calls from numerous families, panicking because their children were expressing suicidal thoughts related to the prospect of losing the healthcare they rely on for their well-being. (*Id.*)

Being forced to deny her patients medically necessary care that can be lifesaving for some patients violates the tenets of Dr. Hutchison's profession by leaving them to suffer needless pain. (*Id.* ¶ 16.) Dr. Hutchison has grave concerns about her patients' ability to survive, much less thrive, if the Health Care Ban takes effect. (*Id.* ¶ 17.)

### Dr. Kathryn Stambough

Dr. Stambough is a pediatric and adolescent gynecologist at the University of Arkansas for Medical Sciences. (Exhibit 10 - Dr. Kathryn Stambough Decl. ¶ 3.) When Dr. Stambough sees patients in her gynecology practice who present signs of gender dysphoria, she refers them to the Gender Spectrum Clinic. (*Id.*) Her ability to make these referrals is essential for her to connect her patients with appropriate and necessary care. (*Id.* ¶ 9.) Dr. Stambough also works at the Gender Spectrum Clinic one day each month. (*Id.* ¶ 4.)

As part of her work at the Gender Spectrum Clinic, Dr. Stambough provides gender-affirming hormone therapy when medically indicated for patients with gender dysphoria diagnoses. (*Id.* ¶ 5.) Many of the same treatments Dr. Stambough provides to her transgender patients at the Gender Spectrum Clinic, she also provides to non-transgender patients. For example, in her pediatric gynecology practice, Dr. Stambough provides estrogen to non-transgender girls for a range of conditions, such as primary ovarian insufficiency, hypogonadotropic hypogonadism (delayed

-22-

puberty due to lack of estrogen caused by a problem with the pituitary gland or hypothalamus), and Turner's Syndrome.  (*Id.* ¶ 6.)

Given the penalties attached to the Health Care Ban, if it takes effect, Dr. Stambough will not be able to provide gender-affirming medical care to her patients in accordance with the accepted medical protocols.  (*Id.* ¶ 8.)  Nor will she be permitted to refer patients in her pediatric gynecology practice for such care.  (*Id.* ¶ 9.)  If she were to do so, she would face adverse licensing action or other judicial or administrative consequences.  (*Id.*)  Moreover, Dr. Stambough is concerned that if the Health Care Ban goes into effect, the Gender Spectrum Clinic might have to close.  (*Id.* ¶ 10.)

Being forced to withhold referrals from patients at her pediatric gynecology practice, and to deny her patients at the Gender Spectrum Clinic medically necessary care that can be lifesaving for some patients, violates the tenets of Dr. Stambough's profession by leaving her patients to suffer needless pain.  (*Id.* ¶ 12.)  Dr. Stambough worries greatly about the impact on her patients if they cannot access the medically necessary and lifesaving treatment prohibited by the Health Care Ban.  (*Id.* ¶ 13.)

## ARGUMENT

### I.    Preliminary Injunction Standard.

"The primary function of a preliminary injunction is to preserve the status quo until, upon final hearing, a court may grant full, effective relief."  *Kan. City S.*

*Transp. Co., Inc.* v. *Teamsters Local Union No. 41*, 126 F.3d 1059, 1066-67 (8th Cir. 1997) (quoting *Ferry-Morse Seed Co.* v. *Food Corn, Inc.*, 729 F.2d 589, 593 (8th Cir. 1984)).  In deciding a preliminary injunction motion, the Court considers four factors:  "(1) the probability of success on the merits; (2) the threat of irreparable harm to the movant; (3) the balance between this harm and the injury that granting the injunction will inflict on other interested parties; and (4) whether the issuance of an injunction is in the public interest."  *Sanborn Mfg. Co., Inc.* v. *Campbell Hausfeld/Scott Fetzer Co.*, 997 F.2d 484, 485-86 (8th Cir. 1993) (citing *Dataphase Sys., Inc.* v. *C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc)).  The balance-of-harms and public-interest factors "merge when the Government is the opposing party."  *Nken* v. *Holder*, 556 U.S. 418, 435 (2009).

## II.    Plaintiffs Are Likely to Succeed on the Merits of Their Equal Protection Claim.

Arkansas's Health Care Ban violates the Equal Protection Clause by singling out for prohibition "gender transition"-related medical care for transgender adolescents, overriding the well-established medical protocols for the treatment of gender dysphoria.  No other medically accepted care is subject to such treatment. Moreover, the same medical treatments that are banned under the statute when provided to transgender adolescents for "gender transition" are permitted when provided to non-transgender adolescents for any other purpose, including to help bring their bodies into alignment with their gender.

-24-

The Health Care Ban is subject to heightened scrutiny because it conditions access to medical treatment on a person's transgender status and sex. None of the asserted government interests cited in the statute's legislative findings justifies singling out gender-affirming care for transgender adolescents for prohibition. Indeed, because the statute permits these exact same treatments for non-transgender minors, the statute is "so woefully underinclusive" with respect to its purported interest in protecting the health and safety of minors, "as to render belief in [that] purpose a challenge to the credulous" under any standard of review. *Republican Party of Minn.* v. *White*, 536 U.S. 765, 780 (2002). Ultimately, the Health Care Ban fails any level of scrutiny because it is arbitrary and the Arkansas General Assembly passed it for the impermissible purpose of expressing disapproval of transgender people.

> **A.     Arkansas's Health Care Ban Is Subject to Heightened Scrutiny.**

"The logical first question to ask when presented with an equal protection claim, and the one [courts] usually ask first, is what level of review is appropriate." *Att'y Gen. of N.Y.* v. *Soto-Lopez*, 476 U.S. 898, 906 n.6 (1986). The Health Care Ban must be reviewed under heightened scrutiny because it discriminates based on transgender status and sex.

1.   <u>Arkansas's Health Care Ban is subject to heightened
     scrutiny because it discriminates against transgender
     youth based on their transgender status</u>.

The Health Care Ban facially discriminates based on transgender status.  By

definition, a transgender person is someone whose gender identity is different from

their sex assigned at birth.  (*See* Adkins Decl. ¶ 19.)  When a transgender person

experiences distress due to the incongruence between their gender identity and their

sex assigned at birth, the accepted medical protocols are to treat the patient to help

them live in accordance with their gender identity.  (*Id.* ¶ 28.)  But under the terms

of the statute, any medical care related to "gender transition" is banned for patients

under eighteen years old.  HB 1570 § 3, ARK. CODE ANN. § 20-9-1502(a).  By

facially targeting "gender transition"—a process and set of medical treatments that

only transgender people undergo—the statute discriminates on the basis of

transgender status.

Not only does the law single out for a unique prohibition only "gender

transition"-related medical care, it permits non-transgender adolescents to receive

the exact same medical care it bans for transgender adolescents.  *Id.* at § 20-9-

1502(b).  For example, as discussed more fully in Section II.B., *infra*, under accepted

standards of care, a cisgender adolescent and a transgender adolescent could both be

prescribed hormone therapy to help align their body or appearance with their gender.

(*See* Adkins Decl. ¶ 44.)   But under the Health Care Ban, while cisgender

-26-

adolescents can continue to receive such treatment, the exact same medical interventions are banned when provided to transgender youth because they relate to "gender transition."

Because Arkansas's Health Care Ban singles out and discriminates against transgender people, the statute triggers heightened scrutiny. The Fourth and Ninth Circuits have both recognized that transgender people are a quasi-suspect class under the Equal Protection Clause, and that discrimination based on transgender status is subject to heightened scrutiny. *Grimm* v. *Gloucester Cty. Sch. Bd.*, 972 F.3d 586, 611-13 (4th Cir. 2020); *Karnoski* v. *Trump*, 926 F.3d 1180, 1200 (9th Cir. 2019). In the absence of binding authority from the Eighth Circuit, this Court should follow those courts' well-reasoned analysis that transgender people meet all the considerations triggering heightened scrutiny under Supreme Court precedent: (1) they have historically been subject to discrimination; (2) they have a defining characteristic that bears no relation to a person's ability to contribute to society; (3) they may be defined as a discrete group by obvious, immutable, or distinguishing characteristics; and (4) they are a minority group lacking political power. *See, e.g.*, *Grimm*, 972 F.3d at 611-13; *Karnoski*, 926 F.3d at 1200-01; *Evancho* v. *Pine-Richland Sch. Dist.*, 237 F. Supp. 3d 267, 288 (W.D. Pa. 2017); *Adkins* v. *City of New York*, 143 F. Supp. 3d 134, 139 (S.D.N.Y. 2015); *Bd. of Educ. of the Highland Local Sch. Dist.* v. *U.S. Dep't of Educ.*, 208 F. Supp. 3d 850, 873-74 (S.D. Ohio

2016); *M.A.B.* v. *Bd. of Educ. of Talbot Cty.*, 286 F. Supp. 3d 704, 718-22 (D. Md. 2018); *Norsworthy* v. *Beard*, 87 F. Supp. 3d, 1104, 1119 (N.D. Cal. 2015); *F.V.* v. *Barron*, 286 F. Supp. 3d 1131, 1145 (D. Idaho 2018); *Flack* v. *Wis. Dep't of Health Servs.*, 328 F. Supp. 3d 931, 951-53 (W.D. Wis. 2018).[9]

*First*, "[t]here is no doubt that transgender individuals historically have been subjected to discrimination on the basis of their gender identity, including high rates of violence and discrimination in education, employment, housing, and healthcare access." *Grimm*, 972 F.3d at 611 (quoting *Grimm* v. *Gloucester Cty. Sch. Bd.*, 302 F. Supp. 3d 730, 749 (E.D. Va. 2018) (collecting cases)). According to the National Transgender Discrimination Survey, transgender individuals "are twice as likely as the general population to have experienced unemployment" and 97% "report[] experiencing some form of mistreatment at work" or having to "hid[e] their gender transition to avoid such treatment." *Id.* at 611-12 (internal quotation marks and citation omitted). "Transgender people frequently experience harassment in places

---

[9]     As explained below, even if this Court declines to hold that transgender status viewed on its own triggers heightened scrutiny, discrimination based on transgender status would still trigger heightened scrutiny because discrimination based on whether someone is transgender amounts to discrimination on the basis of sex. *See Bostock* v. *Clayton County*, 140 S. Ct. 1731, 1747-48 (2020); *Glenn* v. *Brumby*, 663 F.3d 1312, 1319 (11th Cir. 2011).

such as schools (78%), medical settings (28%), and retail stores (37%), and they also experience physical assault in places such as schools (35%) and places of public accommodation (8%)," and "are more likely to be the victim of violent crimes." *Id.* at 612. For all these reasons, "one would be hard-pressed to identify a class of people more discriminated against historically . . . than transgender people." *Id.* at 610 (quoting *Flack*, 328 F. Supp. 3d at 953).

*Second*, there is no question that transgender individuals have a defining characteristic that "bears no relation to ability to perform or contribute to society." *See City of Cleburne, Tex.* v. *Cleburne Living Ctr.*, 473 U.S. 432, 441 (1985). "Seventeen of our foremost medical, mental health, and public health organizations agree that being transgender implies no impairment on judgment, stability, reliability, or general social or vocational abilities." *Grimm*, 972 F.3d at 612 (internal quotation marks omitted).

*Third*, "transgender people constitute a discrete group with immutable characteristics." *Id.* at 612-13 (explaining "that gender identity is formulated for most people at a very early age," and that "being transgender is not a choice," but "is as natural and immutable as being cisgender").

*Finally*, "transgender people constitute a minority lacking political power." *See Id.* at 613. Transgender individuals comprise less than 1% of the adult population in the United States and "are underrepresented in every branch of

-29-

government." *Id.* As the patterns of discrimination described above make plain, "[t]ransgender people constitute a minority that has not yet been able to meaningfully vindicate their rights through the political process." *Id.* Because transgender people "are at least a quasi-suspect class," heightened scrutiny applies. *Id.* at 610.

2.  <u>Arkansas's Health Care Ban is also subject to heightened scrutiny because it discriminates against transgender youth on the basis of their sex.</u>

Arkansas's Health Care Ban also triggers heightened scrutiny because it treats similarly situated people differently based on their sex assigned at birth. For example, the Health Care Ban would permit a girl to receive testosterone suppressants to help align her physical characteristics with her gender identity if her assigned sex at birth was female (*e.g.*, to reduce facial hair that can result from polycystic ovarian syndrome (*see* Adkins Decl. ¶ 44)), but not if her assigned sex at birth was male. HB 1570 ARK. CODE ANN. § 3, 20-9-1502(a)-(b). This is because Arkansas deems those treatments to be inconsistent with her male sex assigned at birth, thereby making them prohibited "gender transition" services. Although both girls seek treatment to affirm their gender and feminize their appearance, Arkansas's Health Care Ban requires that they be treated differently, because each girl had a different sex assigned at birth. That is sex discrimination. *See Bostock*, 140 S. Ct. at 1741-42 (explaining that when an "employer intentionally penalizes a person

-30-

identified as male at birth for traits or actions that it tolerates in an employee identified as female at birth . . . sex plays an unmistakable and impermissible role in the [employer's] decision"); *Grimm*, 972 F.3d at 608 (holding that the challenged policy "cannot be stated without referencing sex," and "[o]n that ground alone, heightened scrutiny should apply").[10]

Arkansas's Health Care Ban further discriminates based on sex by penalizing transgender minors for not conforming to sex stereotypes that "presume that men and women's appearance and behavior will be determined by their sex" assigned at birth.  *See Glenn*, 663 F.3d at 1320; *see also Grimm*, 972 F.3d at 608.  The statute bans medical treatment based on whether the treatment changes the body in ways that are not "typical for the individual's biological sex" in the eyes of Arkansas's lawmakers.  HB 1570 ARK. CODE ANN. § 3, 20-9-1501(4).  Like other governmental policies prohibiting insurance coverage for gender-confirming treatment, the statute "tethers Plaintiffs to sex stereotypes which, as a matter of medical necessity, they seek to reject."  *See Kadel* v. *Folwell*, 446 F. Supp. 3d 1, 14 (M.D.N.C. 2020).

Arkansas's discrimination based on a person's departure from stereotypes associated with their sex is particularly obvious in the statute's special carve-out for

---

[10]     As in *Grimm*, this Court need not resolve whether the Equal Protection Clause's protections for sex and gender discrimination extend more broadly than discrimination based on a person's sex assigned at birth.  *Grimm*, 972 F.3d at 608 n.8.

surgery on minors with intersex conditions (called "disorder[s] of sexual development" in the statute).  *See* HB 1570 ARK. CODE ANN. § 3, 20-9-1502(c)(2). The statute allows doctors to perform—and allows parents to consent to—genital surgeries on these children even when the children are too young to meaningfully participate in the decision-making process.  *See* HB 1570 ARK. CODE ANN. § 3, 20-9-1502(c)(1); (*See* Exhibit 12 - Expert Declaration of Armand H. Matheny Antommaria, MD, PhD, FAAP, HEC-C ("Antommaria Decl.") ¶¶ 47-49).   The surgeries performed on these children are irreversible.  (Antommaria Decl. ¶ 49.) But Arkansas explicitly allows these surgeries to continue to be performed, because the purpose of the surgery is to conform the child's appearance to expectations associated with their sex assigned at birth, making plain that the law discriminates based on sex stereotypes.

### B.  Arkansas's Health Care Ban Cannot Survive Heightened Scrutiny.

To survive heightened scrutiny, Arkansas would need to show that the Health Care Ban serves an important governmental interest and "that the discriminatory means employed are substantially related to the achievement of those objectives." *Sessions* v. *Morales-Santana*, 137 S. Ct. 1678, 1690 (2017).  "The burden of justification is demanding and it rests entirely on the [government]."  *U.S.* v. *Virginia*, 518 U.S. 515, 533 (1996).  As discussed below, none of Arkansas's

rationales for the Health Care Ban stated in the legislative findings are likely, on the merits, to satisfy that "demanding" standard. *See id.*

In evaluating whether Arkansas's Health Care Ban is substantially related to its asserted goals, the Court may not defer to bare assertions in the statute's legislative findings; instead, "[t]he Court retains an independent constitutional duty to review [legislative] factual findings where constitutional rights are at stake." *Gonzales* v. *Carhart*, 550 U.S. 124, 165 (2007).

The legislative findings claim that the law serves the compelling government interest of protecting the health and safety of vulnerable minors. *See* HB 1570 § 2(1). The findings focus on purported concerns about the risks of the banned medical care and an alleged lack of medical evidence demonstrating its safety and efficacy. *See, e.g.*, *id.* at § 2(6). But these assertions cannot survive heightened scrutiny or any level of equal protection scrutiny.

As discussed below, the medical care prohibited by the law is part of well-established medical protocols for the treatment of adolescents with gender dysphoria, which is recognized as safe and effective by the medical community. (Adkins Decl. ¶¶ 27-28, 39, 41.) Moreover, the same treatments that are banned by the statute when provided to transgender adolescents for "gender transition" purposes are permitted when provided to non-transgender adolescents for any other purpose, including to affirm their gender, despite having the same potential risks.

-33-

*See* HB 1570 § 3, ARK. CODE ANN. § 20-9-1502(c); (Adkins Decl. ¶ 46).  And the asserted deficiencies in the medical evidence supporting gender-affirming medical care for transgender adolescents apply to many medical treatments available to adolescents. (Adkins Decl. ¶ 40.)  Far from fulfilling its stated purpose of protecting the health and safety of vulnerable minors, Arkansas's Health Care Ban endangers the health and safety of vulnerable minors by denying transgender adolescents access to medically necessary care.

1.    <u>The Health Care Ban is not substantially related to a government interest in protecting the health and safety of minors</u>.

The Health Care Ban prohibits doctors from treating transgender adolescents with gender dysphoria in accordance with well-established medical standards (*see id.* ¶ 28) based on a stated interest in protecting minors from harm.  *See* HB 1570 § 2(1).  In passing the law, the General Assembly overrode the accepted medical protocols that are recognized by the major medical professional groups in the United States as safe, effective, and medically necessary treatments for adolescents with gender dysphoria. (Adkins Decl. ¶ 28.)  These groups include the American Medical Association, the American Academy of Pediatrics, the Endocrine Society, and the American Academy of Child and Adolescent Psychiatry.  (*Id.* ¶¶ 27-28.)

-34-

a)   There is a mismatch between the General Assembly's purported concerns about the risks of treatment and what the Health Care Ban does.

The Health Care Ban's legislative findings cite a purported concern about risks associated with the banned medical care. *See* HB 1570 § 2(11). But while the law prohibits certain medical care—puberty-delaying treatments, gender-affirming hormone therapy (testosterone suppressants and estrogen for transgender girls, and testosterone for transgender boys), and chest surgery—when those treatments are provided to transgender adolescents for the purpose of "gender transition," it permits the very same treatments to be provided to cisgender adolescents for any other purpose, including to align their body with their gender identity. *See* HB 1570 § 3, ARK. CODE ANN. § 20-9-1502(c)(1).

For example, the puberty-delaying drugs proscribed by the Health Care Ban for the treatment of transgender adolescents with gender dysphoria because they assist with "gender transition" are also used to delay puberty in children who have central precocious puberty (puberty starting prior to age 8 in children assigned female at birth and prior to age 9 in children assigned male at birth). (Antommaria Decl. ¶ 39.)

The Health Care Ban likewise prohibits hormone therapy for transgender adolescents with gender dysphoria because the treatment is used to assist with "gender transition"; but the very the same hormone therapy is permitted when

prescribed to cisgender patients for any purpose.  (Adkins Decl. ¶¶ 43-44.)  For example, cisgender boys with delayed puberty may be prescribed testosterone if they have not begun puberty by 14 years of age. (*Id.* ¶ 44.)  Testosterone is prescribed to avoid some of the social stigma that comes from undergoing puberty later than one's peers leading to delayed development of the secondary sex characteristics consistent with their gender.  (*Id.*)  But transgender boys are barred from receiving the same treatment.

Similarly, non-transgender girls with primary ovarian insufficiency, hypogonadotropic hypogonadism (delayed puberty due to lack of estrogen caused by a problem with the pituitary gland or hypothalamus), or Turner's Syndrome (a chromosomal condition that can cause a failure of ovaries to develop) may be treated with estrogen. (*Id.* ¶¶ 43-44.)  And cisgender girls with polycystic ovarian syndrome (a condition that can cause increased testosterone and, as a result, symptoms including facial hair growth) may be treated with testosterone suppressants. (*Id.* ¶ 44.)

Finally, the Health Care Ban prohibits chest surgery[11] to treat gender dysphoria in transgender adolescent men, because it assists with "gender transition"; but cisgender minors are permitted to undergo comparable surgeries such as

---

[11]    The legislative findings focus on the potential harms of genital surgery, but genital surgery is not provided until after age eighteen. (Adkins Decl. ¶ 38.)

treatment of gynecomastia (proliferation of breast tissue in individuals assigned male at birth).  (Antommaria Decl. ¶¶ 47-49.)  And while a transgender girl cannot receive chest-feminizing surgery to affirm her gender identity under the terms of the law, a cisgender girl can.  (*Id.* ¶ 47.)  These kinds of surgeries are commonly performed to reduce psychosocial distress, often related to the incongruence with one's gender. (*Id.*)

The same treatments that are permitted for cisgender minors—often to affirm their gender—are banned if provided to transgender minors for the very same reason. (Adkins Decl. ¶ 44.)  In addition to permitting all of the banned treatment when it is provided to cisgender adolescents, the Health Care Ban expressly permits the banned treatment to be provided to minors with intersex conditions, despite having the same potential risks as well as being highly controversial.  *See* HB 1570 § 3, ARK. CODE ANN. § 20-9-1502(c)(1); (Antommaria Decl. ¶ 49).

Given that the treatments banned under the law are permitted to treat non-transgender adolescents for any purpose, including to align an individual's physical characteristics with their gender, and carry the same potential risks, HB 1570 § 3, ARK. CODE ANN. § 20-9-1502(a); (Adkins Decl. ¶ 46),[12] the asserted interest in

---

[12]   The legislative findings include a long list of potential risks of hormone therapy.  HB 1570 § 2(8).  The incidence of such medical issues is extremely rare for patients—whether transgender or not—when doctors manage their treatment. (Adkins Decl. ¶ 46.)  However, if the Health Care Ban takes effect

protecting minors from the risks of the banned medical care does not satisfy heightened scrutiny.  *See Eisenstadt* v. *Baird*, 405 U.S. 438, 453 (1972) (striking down contraception ban for single people where stated health-related rationales applied equally to married people).  While the Health Care Ban has "superficial earmarks as a health measure," protecting health cannot "reasonably be regarded as its purpose." *Id.* at 452.

Moreover, every medical intervention carries potential risks and potential benefits.  (Antommaria Decl. ¶¶ 18-20.)  Weighing the potential benefits and risks of the treatment for gender dysphoria is a prudential judgment similar to other judgments made by healthcare providers, adolescent patients, and their parents.[13] (*Id.*)  There is nothing unique about the risks associated with puberty-delaying treatment, hormone therapy, and chest surgery for transgender adolescents to justify singling out these medical treatments for a wholesale prohibition based on concern for adolescents' inability to assent or parents' inability to consent.  (*Id.* ¶ 43.) Minors

---

and doctors are barred from providing treatment, there is a danger that some transgender adolescents will resort to self-treatment with black market hormones, which would put them at risk.  (*Id.*)

[13]   The Endocrine Society Guideline extensively discusses the potential benefits, risks, and recommendations regarding the timing of interventions and are based in part on the treatment's potential risks and the adolescent's decision-making capacity.  (Adkins Decl. ¶¶ 33, 35.)  The Guideline recommends that informed consent for pubertal blockers and sex hormones include a discussion of the implications for fertility and options for fertility preservation.  (*Id.*)

are permitted to undergo many comparable or riskier treatments, including surgeries, such as those for gynecomastia, pectus excavatum or carinatum (chest wall anomalies in which the sternum is depressed or protrudes), and breast reconstruction, which carry risks of bleeding, infection, scarring, loss of sensation, and impaired nursing. (*Id.* ¶ 47.) Moreover, the statute expressly allows doctors to perform irreversible genital surgeries on infants and children with intersex conditions at ages when they are unable to meaningfully participate in medical decision making. (*Id.* ¶ 49.)

A purported interest in protecting minors against the risks associated with treatment does not justify singling out only gender-affirming medical care when provided to transgender adolescents for prohibition, while allowing the decision regarding all other medical care—including treatments of comparable or greater risks—to be made by adolescents, their parents, and their doctors. *See Eisenstadt*, 405 U.S. at 447 ("A classification 'must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike.'") (quoting *Royster Guano Co.* v. *Virginia*, 253 U.S. 412, 415 (1920)); *see also Jernigan* v. *Crane*, 64 F. Supp. 3d 1260, 1283 (E.D. Ark. 2014), *aff'd*, 796 F.3d 976 (8th Cir. 2015) (rejecting argument that inability to procreate justified preventing same-sex couples from marrying because law allowed others who cannot procreate

to marry and "[s]uch a mismatch between the class identified by a challenged law and the characteristic allegedly relevant to the state's interest is precisely the type of imprecision prohibited by heightened scrutiny.") (quoting *Kitchen* v. *Herbert*, 755 F.3d 1193, 1219 (10th Cir. 2014)).

> b) There is sufficient medical evidence supporting the banned medical care, contrary to the General Assembly's claims.

The Health Care Ban's legislative findings claim that the banned medical care lacks sufficient evidentiary support.  HB 1570 § 2(6).  But this claim conflicts with the positions of the major medical professional groups in the United States, which recognize the safety and effectiveness of the banned care based on medical research and clinical experience.  (Adkins Decl. ¶ 28); *see, e.g.*, WPATH Standards of Care (collecting studies); (Adkins Decl. ¶¶ 39-43); (Antommaria Decl. ¶¶ 29-41).

The legislative findings suggest that medical treatments should not be provided to patients unless and until there are "long-term longitudinal studies" and "randomized clinical trials" assessing their safety or efficacy.[14]  (Antommaria Decl. ¶ 30.)  But there are many other research methods that also provide reliable data that

---

[14] The State is simply wrong in its claim that there are no appropriate "long-term longitudinal studies" on puberty-delaying treatment or "randomized clinical trials" on hormone therapy when used to treat gender dysphoria. (Antommaria Decl. ¶ 3.)  But as discussed, medical treatments can be supported by other kinds of evidence.  (*Id.* ¶ 30.)

the medical profession relies on in determining the safety and efficacy of medical treatments. (*Id.*)  Indeed, the type of medical evidence the State claims is needed does not exist for much of pediatric medicine. (*Id.* ¶ 41.)  For example, there are no randomized clinical trials regarding the use of puberty-delaying treatment for cisgender children with precocious puberty, (*id.* ¶ 39), but Arkansas permits this treatment, because it is not performed for the purpose of affirming a gender identity different from a minor's sex assigned at birth.  *See* HB 1570 § 3, ARK. CODE ANN. § 20-9-1502(c)(1).

Clinical research focusing on children is less likely to use randomized trials than is clinical research for adults, and, at times, it is unethical to do so. (Antommaria Decl. ¶ 22.)  For randomized trials to be ethical, clinical equipoise must exist—*i.e.*, there must be uncertainty about whether the efficacy of the intervention or the control is greater. (*Id.*)  That is not the case with respect to the medical protocols for treating adolescents with gender dysphoria, which are known to provide significant relief to patients. (*Id.* ¶ 37.)  It would be unethical to knowingly expose some trial participants to an inferior intervention or to withhold treatment altogether. (*Id.* ¶ 22.)

If Arkansas truly had an important governmental interest in limiting medical care to those treatments that are supported by certain kinds of medical research such

as randomized clinical trials,[15] then Arkansas would require that standard to be met in more settings than just gender-affirming care for transgender adolescents. *See Eisenstadt*, 405 U.S. at 452 (striking down a contraception ban for single people where stated health-related rationales applied equally to married people). "[A] law cannot be regarded as protecting an interest of the highest order . . . when it leaves appreciable damage to that supposedly vital interest unprohibited." *Church of the Lukumi Babalu Aye, Inc.* v. *City of Hialeah*, 508 U.S. 520, 547 (1993) (quotations and citations omitted). Instead of setting a generally applicable requirement that all medical treatment for minors satisfy some state-defined level of scientific study, Arkansas has singled out gender-affirming care for transgender adolescents—and only that care—for a uniquely stringent level of scientific proof. Arkansas cannot provide any rational explanation—much less an "exceedingly persuasive" one, for why gender-affirming care for transgender adolescents is singled out for this unique burden. *Virginia*, 518 U.S. at 533.[16]

---

[15]   And such an interest would be preposterous, because it would require doctors to disregard substantial evidence demonstrating the safety and efficacy of medical treatments and deny patients treatments that are known to provide relief for their medical conditions. But the Health Care Ban would require doctors who treat adolescents with gender dysphoria to do just that.

[16]   The General Assembly also claims "most physiological interventions" for minors with gender dysphoria are "unnecessary," because "the majority come to identify with their biological sex in adolescence or adulthood." HB 1570 § 2(3). But there are no medical treatments for gender dysphoria prior to

2.    The Health Care Ban undermines the General Assembly's
       interest in protecting the health and safety of minors.

Not only does the Health Care Ban fail to prevent harm to minors, if the law

takes effect, it will actively cause harm to minors who would be denied urgently

needed health care.   Without treatment to affirm their gender identity, many

adolescents with gender dysphoria suffer extreme distress and elevated rates of

anxiety, depression, and suicidality.  (Adkins Decl. ¶¶ 23-24.)  At a bare minimum,

heightened scrutiny requires that a law *advance* an important governmental interest,

not impede it.  *Virginia*, 518 U.S. at 523 ("[The State] must show at least that the

[challenged] classification serves important governmental objectives.") (quotations

and citation omitted).  Arkansas's health care ban fails this test.

### C.    Arkansas's Health Care Ban Cannot Survive Even Rational Basis Review.

Arkansas's Health Care Ban fails under any level of equal protection scrutiny.

As discussed above, the legislative findings' stated justifications for banning gender-

affirming medical care for transgender adolescents make "no sense in light of how

[Arkansas] treat[s]" cisgender adolescents in need of the same treatments, as well as

---

adolescence. (Adkins Decl. ¶ 30.)  It is not until after the onset of puberty that
any medical treatments would be indicated.  (*Id.*)   And studies have
consistently found that where young people have a consistent and persistent
identification with a gender different from their assigned sex at birth at the
start of puberty, they almost never revert to identifying with their assigned sex
at birth.  (*Id.* ¶ 47.)

-43-

other types of medical care that have similar or greater risks than the banned care and similar or lesser medical evidence to support them.  *See Bd. of Trs. of Univ. of Ala.* v. *Garrett*, 531 U.S. 356, 366 n.4 (2001).  There is no rational basis to conclude that allowing transgender adolescents to receive—and their doctors to perform— gender-affirming care "would threaten legitimate interests of [Arkansas] in a way that," allowing the same treatments for cisgender youth, and other types of care, "would not."  *See City of Cleburne*, 473 U.S. at 448 (invalidating a zoning law barring homes for disabled adults, because all of the asserted rationales—such as concerns about traffic—applied to other types of multiple-resident dwellings that were not prohibited); *U.S. Dep't of Agric.* v. *Moreno*, 413 U.S. 528, 533 (1973) (irrationally excluding one type of household from access to food stamps violated Equal Protection Clause); *Lindsey* v. *Normet*, 405 U.S. 56, 77 (1972) (when a right is granted "it cannot be granted to some [] and capriciously or arbitrarily denied to others without violating the Equal Protection Clause").

Moreover, when considered in the context of how Arkansas regulates all other forms of pediatric medicine, "[t]he breadth of the [statute] is so far removed from [the] particular justifications" advanced by Arkansas, that it is "impossible to credit them."  *See Romer* v. *Evans*, 517 U.S. 620, 635 (1996).

Rather, "[t]he history of [the statute's] enactment" demonstrates that the purpose of Arkansas's Health Care Ban was to express moral and social disapproval

of transgender people. *See U.S.* v. *Windsor*, 570 U.S. 744, 770 (2013). Throughout the 2021 Legislative Session, the General Assembly focused its efforts on expressing its disapproval of transgender people through a number of bills and resolutions. (*See supra,* Statement of Facts, Section B.) Majorities in both chambers passed resolutions expressing their view that "gender reassignment medical treatments" are not "natural." HR 1018, 2021 Gen. Assemb., Reg. Sess. (Ark. 2021); SR 7, 2021 Gen. Assemb., Reg. Sess. (Ark. 2021). Some members of the General Assembly further expressed their personal beliefs related to the bill, including religious opposition to being transgender.[17] One member compared transgender youth to a child who "comes to you and says, 'I wanna be a cow.'"[18]

The General Assembly passed the Health Care Ban—the only law of its kind to ever be passed in the United States—over the Governor's veto and the sustained and robust objections of the medical community. In adopting the Health Care Ban, the General Assembly ignored testimony from Arkansas doctors about the lifesaving

---

[17] For example, Rep. Mary Bentley read numerous verses from the Bible in her speech in support of the bill. *S. Floor Debate*, 2021 Gen. Assemb. 93rd Sess., Mar. 10, 2021 at 2:19:12 ("A woman shall not wear anything that pertains to a man, nor a man put on a woman's garments. For all who do so are an abomination to the Lord your God."), https://sg001-harmony.sliq.net/00284/Harmony/en/PowerBrowser/PowerBrowserV2/20210310/-1/21305?viewMode=1#agenda_.

[18] *Id.* at 2:24:59.

benefits of the medical care banned by the law and warnings that, if the State prohibits this medical care, the health and well-being of Arkansas's transgender youth will suffer unavoidable, grave harm.[19]  In the Senate, testimony included that following the passage of the Health Care Ban in the House, multiple transgender youth were admitted to the emergency room because of an attempted suicide.[20]

This context, combined with the law's laser focus on banning only treatment provided to transgender people, reveals that the law was "drawn for the purpose of

---

[19]  *See H. Comm. on Public Health, Welfare, and Labor*, 2021 Gen. Assemb. 93rd Sess., Mar. 9, 2021 at 4:54:47-5:37:38 (statements of people who are transgender, parents, and healthcare providers against HB 1570), https://sg001-harmony.sliq.net/00284/Harmony/en/PowerBrowser/ PowerBrowserV2/20210309/-1/21303?viewMode=1#agenda_ ; *S. Comm. on Public Health, Welfare, and Labor*, 2021 Gen. Assemb. 93rd Sess., Mar. 22, 2021 at 4:23:08-5:07:42 (statements of transgender people, parents, and healthcare providers against HB 1570), https://sg001-harmony.sliq.net/00284/Harmony/en/PowerBrowser/PowerBrowserV2/2021 0322/-1/21395?viewMode=1#agenda_.

[20]  Plaintiffs alleged in the Complaint that "six transgender adolescent patients" attempted suicide "[i]n the weeks since the Health Care Ban passed[.]"  In preparation of this Motion, it was determined that some of these incidents occurred after public discussion of the bill began, but before the bill's final passage, and that since public discussion of the Health Care Ban first began, there have been seven transgender youth in Arkansas admitted to the emergency room for attempted suicide, four of whom are patients of the Gender Spectrum Clinic. (Dr. Michele Hutchison Decl. ¶ 13.)  In contrast, in preparation of this motion it was determined two transgender adolescent patients of the Gender Spectrum Clinic attempted suicide in the more than three years between the inception of the Clinic in 2018 and the time at which discussion over the Health Care Ban began.  (*Id.* ¶ 14.)

-46-

disadvantaging the group burdened by the law," something the Equal Protection

Clause does not permit. *Romer*, 517 U.S. at 633 (invalidating state constitutional

amendment barring non-discrimination protections for LGBTQ people); *Moreno*,

413 U.S. at 534 (invalidating food stamp regulation aimed at excluding hippies from

eligibility).

For the foregoing reasons, Plaintiffs are likely to succeed on their Equal

Protection claim and are entitled to relief.

### III.   Plaintiffs Are Likely to Succeed on the Merits of the Claim That the Health Care Ban Violates Parents' Fundamental Right to Parental Autonomy.

The Health Care Ban also violates the Fourteenth Amendment's Due Process

Clause by stripping parents of their right to seek out medical care for their children.

The Health Care Ban is subject to strict scrutiny under the Due Process Clause

because it intrudes upon parents' fundamental right to the care, custody, and control

of their children. *See Washington* v. *Glucksburg*, 521 U.S. 702, 719-21 (1997) (A

governmental infringement of a fundamental liberty interest, such as "direct[ing] the

. . . upbringing of one's children" must be "narrowly tailored to serve a compelling

state interest." (citation omitted)); *Troxel* v. *Granville*, 530 U.S. 57, 80 (2000)

(Thomas, J., concurring) (strict scrutiny is the appropriate standard of review for

infringements of a fundamental parental right).   The State cannot meet this

demanding standard, and Plaintiffs are therefore likely to succeed on the merits of their Due Process claim.

> **A.    The Due Process Clause Protects Parents' Fundamental Right to Seek Appropriate Medical Care for Their Children.**

The Due Process Clause protects the right of parents to make decisions regarding the "care, custody, and control" of their children and "does not permit a State to infringe on the fundamental right of parents to make child rearing decisions simply because a state [authority] believes a 'better' decision could be made." *Troxel*, 530 U.S. at 68, 72-73; *see also id.* at 80 (Thomas, J., concurring) ("[T]he State lacks even a legitimate governmental interest—to say nothing of a compelling one—in second-guessing a fit parent's decision . . . ."); *Santosky* v. *Kramer*, 455 U.S. 745, 758-59 (1982) ("[Parents'] desire for and right to the companionship, care, custody, and management of [their] children is an interest far more precious than any property right." (internal quotation marks and citation omitted)).

The right of parents to care for their children includes the right to make decisions regarding their children's medical care. *Parham* v. *J.R.*, 442 U.S. 584, 602 (1979) (this right encompasses the ability of parents to "to seek and follow medical advice" for their children); *see also Kanuszewski* v. *Mich. Dep't of Health & Human Servs.*, 927 F.3d 396, 419 (6th Cir. 2019) (quoting *Troxel*, 530 U.S. at 72) (holding that "parents' substantive due process right 'to make decisions concerning the care, custody, and control' of their children includes the right to direct their children's

medical care," and that strict scrutiny is the appropriate standard to apply to such claims). Ultimately, the law presumes "that natural bonds of affection lead parents to act in the best interests of their children." *Parham*, 442 U.S. at 602. As children reach a certain age and maturity, they have their own constitutional rights—*see, e.g.*, *Tinker* v. *Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 511 (1969) ("[Teenagers] are 'persons' under our Constitution. They are possessed of fundamental rights . . . .")—but when a parent's decision on a course of medical treatment for their child is in accord with their child's wishes and the advice of the child's doctor, the Constitution does not give the state the right to override a parental decision unless it can satisfy strict scrutiny.

Here, Arkansas has categorically prohibited the well-accepted treatment protocols for adolescent patients with gender dysphoria, thereby intruding upon the fundamental right of the Parent Plaintiffs ("Parent Plaintiffs" includes Joanna Brandt, Aaron Jennen, Lacey Jennen, Amanda Dennis, Shayne Dennis, and Donnie Saxton) to access medical care for their children. The State is "inject[ing] itself into the private realm of the family to . . . question the ability of [fit] parent[s] to make the best decisions" regarding the care to provide to their children who are suffering from gender dysphoria. *See Troxel*, 530 U.S. at 68-69.

## B.   The Health Care Ban Fails Strict Scrutiny.

Defendants have the burden to show that Arkansas has a compelling state interest in infringing parents' fundamental right to seek medical care for their children, and that the Health Care Ban is narrowly tailored to serve that interest. *See Glucksburg*, 521 U.S. at 719-21.

Courts have held that the state may only intervene in parents' medical decisions for their children in extreme circumstances, such as where a parent refuses to permit life-saving medical care for a child. *See, e.g.*, *Jehovah's Witnesses in State of Wash.* v. *King Cnty. Hosp. Unit No. 1*, 278 F. Supp. 488, 504 (W.D. Wash. 1967) (holding that a state may intervene in a parent's decision to withhold medically necessary blood transfusions for children), *aff'd* 390 U.S. 598 (1968).  But absent such extreme circumstances, the Constitution does not permit the government to substitute its judgment over the decision of a parent to seek medically accepted care for their child when the parent, the child, and the child's doctor all agree that the medical care is appropriate. *See Troxel*, 530 U.S. at 68-69.

The Health Care Ban's interference with parents' decisions about the care of their children is unprecedented.  The only time an intrusion on parents' authority to make medical decisions for their children would be warranted under strict scrutiny is where the state's actions are necessary to *preserve* the health of a minor.  But here, the Health Care Ban bans treatments for gender dysphoria that are recognized as

-50-

safe, effective and necessary by every major medical association and by doing so endangers the health of the minors the law is purportedly meant to protect. (Adkins Decl. ¶¶ 27-28; Antommaria Decl. ¶¶ 31-32, 42-46.) The State cannot show any compelling interest in prohibiting these parents, who are presumed to be acting in the best interests of their children—*see Parham*, 442 U.S. at 602—from making the decision to seek gender-affirming medical care for their children, care that has already proven to greatly improve their children's health and well-being. The Parent Plaintiffs have seen their children suffer the pain of gender dysphoria, consulted with experts, and concluded, consistent with prevailing medical standards, that gender-affirming medical care was in their children's best interests. (Joanna Brandt Decl. ¶¶ 9, 11; Aaron and Lacey Jennen Decl. ¶¶ 3-5, 7; Donnie Saxton Decl. ¶¶ 5, 9, 11.) The Jennens, Joanna Brandt, and Donnie Saxton have witnessed marked improvement in their children's health when they were able to access the care barred by the new law. (Joanna Brandt Decl. ¶¶ 13-14; Aaron and Lacey Jennen Decl. ¶ 5; Donnie Saxton Decl. ¶¶ 10-13.) As discussed in Sections II.B. and II.C., *supra*, the rationales for the law found in the legislative findings cannot survive intermediate scrutiny or even rational basis review. Therefore, they *a fortiori* would fail strict scrutiny. The Parent Plaintiffs are thus likely to succeed on their Due Process claim and are entitled to relief.

### IV.    Plaintiffs Are Likely to Succeed on the Merits of Their First Amendment Claim.

The Health Care Ban also violates the First Amendment by prohibiting physicians and other healthcare professionals from "refer[ring] any individual under eighteen (18) years of age to any healthcare professional for gender transition procedures."  HB 1570 § 3, ARK. CODE ANN. § 20-9-1502(b).  By barring such referrals, the Health Care Ban prevents healthcare professionals from speaking, and their patients and their parents from hearing, about medically accepted treatments for gender dysphoria.  As a content-based and viewpoint discriminatory regulation of speech, the Health Care Ban is subject to strict scrutiny, *Gerlich* v. *Leath*, 861 F.3d 697, 705 (8th Cir. 2017), and cannot meet this standard.

The First Amendment protects against government infringement on speech by prohibiting a state from "restrict[ing] expression because of its message, its ideas, its subject matter, or its content."  *Reed* v. *Town of Gilbert*, 576 U.S. 155, 163 (2015) (citation omitted).  In regulating the referrals that healthcare professionals may communicate to their patients, the Health Care Ban clearly implicates the First Amendment, and the First Amendment provides no less protection because the speech in question is uttered by a doctor.  *See Nat'l Inst. of Fam. & Life Advocs. ("NIFLA")* v. *Becerra*, 138 S. Ct. 2361, 2371-72, (2018) ("[T]his Court has not recognized 'professional speech' as a separate category of speech.  Speech is not unprotected merely because it is uttered by 'professionals.'").

-52-

Indeed, the First Amendment's protections have "great relevance in the fields of medicine and public health, where information can save lives." *See Sorrell* v. *IMS Health, Inc*., 564 U.S. 552, 566 (2011).  Courts have recognized that physicians "must be able to speak frankly and openly to patients," because "[a]n integral component of the practice of medicine is the communication between a doctor and a patient." *Conant* v. *Walters*, 309 F.3d 629, 636 (9th Circ. 2002); *see also NIFLA*, 138 S. Ct. at 2374 ("Doctors help patients make deeply personal decisions, and their candor is crucial." (citation omitted)).  If the Health Care Ban goes into effect, its referral prohibition would prevent doctors from providing transgender patients and their parents information about accessing gender-affirming medical care.  *See* HB 1570 § 3, ARK. CODE ANN. § 20-9-1502(b), ARK. CODE ANN. § 20-9-1504.

### A.   The Health Care Ban Is Content-Based and Discriminates Based on Viewpoint.

When reviewing a First Amendment challenge to a restriction on speech, the Court must first assess whether the state law is "content-based" or "content-neutral" to determine the appropriate standard of review.  *Reed*, 576 U.S. at 163.  Content-based laws "target speech based on its communicative content." *Id.*  If enforcement authorities must "examine the content of the message that is conveyed" to know whether the law has been violated, a restriction is content-based.  *McCullen* v. *Coakley*, 573 U.S. 464, 479 (2014) (quoting *FCC* v. *League of Women Voters of Cal.*, 468 U.S. 364, 383 (1984)).  Regulations of speech that are content-based are

"presumptively unconstitutional" and are subject to strict scrutiny.  *Reed*, 576 U.S. at 163.

The Health Care Ban is a content-based regulation because it restricts healthcare professionals only from making a referral for "gender transition procedures," not for other purposes.  *See Reed*, 576 U.S. at 163 (holding that a content-based ban is "obvious" where a law defines speech "by particular subject matter"); *see also Rodgers* v. *Bryant*, 301 F. Supp. 3d 928, 933-34 (E.D. Ark. 2017) ("The governing test is straightforward:  if the statute describes speech by content, then it is content based.  On the other hand, if the regulation bans all speech, regardless of content, then it is content neutral."  (citations omitted)), *aff'd*, 942 F.3d 451 (8th Cir. 2019).  Indeed, the Health Care Ban is an "egregious form of content discrimination," because it targets not only the content of speech—gender-affirming care—but a specific viewpoint—that gender-affirming care is medically indicated and appropriate.  *Rosenberger* v. *Rector*, 515 U.S. 819, 829 (1995).  Here, the Health Care Ban prohibits healthcare professionals from making referrals for transgender patients with gender dysphoria to receive gender-affirming medical care.  *See* HB 1570 § 3, ARK. CODE ANN. § 20-9-1502(b), ARK. CODE ANN. § 20-9-1504.  By contrast, if a healthcare professional refers a patient with gender dysphoria for some other type of care, the Health Care Ban does not apply.  Thus, the Health Care Ban "condemns expression of a particular viewpoint, i.e., that [treatment] would likely

help a specific patient. Such condemnation of particular views is especially troubling in the First Amendment context." *See Conant*, 309 F.3d at 637.

### B. The Health Care Ban Fails Strict Scrutiny.

To meet the strict scrutiny standard, the State would need to show that the regulation "actually advances the state's interest (is necessary), does not sweep too broadly (is not overinclusive), does not leave significant influences bearing on the interest unregulated (is not underinclusive), and could be replaced by no other regulation that could advance the interest as well with less infringement of speech (is the least-restrictive alternative)." *281 Care Comm.* v. *Arneson*, 766 F.3d 774, 787 (8th Cir. 2014) (quoting *Republican Party* v. *White*, 416 F.3d 738, 751 (8th Cir. 2005)). It is "rare that a regulation restricting speech because of its content will ever be permissible." *U.S.* v. *Playboy Ent. Grp., Inc.*, 529 U.S. 803, 818 (2000).

As discussed above with respect to the other claims, the State is unlikely to meet this burden on the merits. (*See supra*, Sections I, II.)

*First*, it does not advance a compelling governmental interest. While states have the power to protect children from harm, that "does not include a free-floating power to restrict the ideas to which children may be exposed." *Brown* v. *Ent. Merchants Ass'n*, 564 U.S. 786, 794 (2011); *see also Conant*, 309 F.3d at 637 (rejecting argument as acceptable governmental interest that "a doctor-patient discussion about marijuana might lead the patient to make a bad decision") (citations

omitted)); *Thompson* v. *W. States Med. Ctr.*, 535 U.S. 357, 374 (2002) (rejecting governmental interest in protecting against "fear that people would make bad decisions if given truthful information about compounded drugs").

*Second*, preventing doctors from speaking and patients from hearing about medically indicated, potentially lifesaving care does not even advance the General Assembly's own stated interest in health and safety. *See Missouri Broadcasters Association* v. *Lacy*, 846 F.3d 295, 301 (8th Cir. 2017) (finding that a restriction on advertising violated the First Amendment and failed strict scrutiny, because "[t]he multiple inconsistencies within the regulations poke obvious holes in any potential advancement of the interest in promoting responsible drinking, to the point the regulations do not advance the interest at all").

*Third*, because the Health Care Ban prohibits treatments only when provided to transgender adolescents with gender dysphoria, but allows the same treatments to be provided to non-transgender adolescents for any purpose, it is underinclusive with respect to the individuals supposedly being protected from harm, which "raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint." *Brown*, 564 U.S. at  802 (2011); *see also Rodgers* v. *Bryant*, 942 F.3d 451, 457 (8th Cir. 2019) (law limiting begging violated the First Amendment, because supposed justifications for the ban could have applied to other, unregulated speech).

And, *fourth,* the State cannot show that the referral provision "could be replaced by no other regulation that could advance the interest as well with less infringement of speech" and is the least restrictive alternative. *See 281 Care Comm.*, 766 F.3d at 787 (citations omitted); *see also NIFLA*, 138 S. Ct. at 2376 (finding that, as a less-restrictive alternative to the notice requirement at-issue in the case, the State "could inform the women itself" of their rights and healthcare options "with a public-information campaign"). Banning an entire category of speech—speech widely accepted to be medically appropriate—is not a constitutionally permissible option. *See Thompson*, 535 U.S. at 373 ("If the First Amendment means anything, it means that regulating speech must be a last—not first—resort.").

For the foregoing reasons, the Health Care Ban violates the First Amendment and cannot survive the strict scrutiny to which it must be held. Plaintiffs are thus likely to succeed on their First Amendment claims and are entitled to relief.

## V.  Plaintiffs Will Suffer Irreparable Harm If the Act Takes Effect.

If the Health Care Ban is allowed to take effect, Plaintiffs will suffer serious and irreparable harm for which there is no adequate remedy at law. *See Gen. Motors Corp.* v. *Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009). The Health Care Ban denies patients access to life-saving medical care, prevents parents from making critical decisions about the health of their children, and threatens the medical

-57-

licenses of doctors who treat their patients according to accepted medical standards or refer their patients to other doctors for care prohibited by the law.

The Health Care Ban will cause irreparable physical and psychological harms on the minor Plaintiffs by cutting off their access to necessary medical care. Without an injunction, Dylan will be forced to stop the hormone treatment he has been receiving for over ten months, and Sabrina will be forced to stop receiving testosterone suppressant and estrogen, which she has been on since January. (Dylan Brandt Decl. ¶ 13; Sabrina Jennen Decl. ¶¶ 9, 11.) Ending treatment will cause them to undergo endogenous puberty, triggering severe distress. (Adkins Decl. ¶ 31; Dylan Brandt Decl. ¶¶ 17-18; Sabrina Jennen Decl. ¶ 11.)

For Brooke, who will soon enter puberty, losing access to puberty blockers means that the physical characteristics that develop with puberty will stay with her for the rest of her life. (Brooke Dennis Decl. ¶ 8; *see* Antommaria Decl. ¶ 46 ("delaying gender-affirming treatment . . . results in partly irreversible physical changes"); Adkins Decl. ¶ 31.) As a result, Brooke will have to live with physical characteristics that do not conform to her gender identity, putting her at a high risk of gender dysphoria and lifelong physical and emotional pain that cannot be undone. (Adkins ¶ 31; Amanda and Shayne Dennis Decl. ¶¶ 11-12; Brooke Dennis Decl. ¶ 8.) "These sorts of injuries, i.e., deprivations of temporally isolated opportunities,

are exactly what preliminary injunctions are intended to relieve." *D.M. by Bao Xiong* v. *Minnesota State High School League*, 917 F.3d 994, 1003 (8th Cir. 2019).

Furthermore, the psychological harm of untreated gender dysphoria is severe. (Adkins Decl. ¶ 31.)  Transgender adolescents who do not receive gender-affirming healthcare die from suicide at far greater rates than those who can receive such care. (*Id*. ¶ 41.)  Indeed, in the few months since public discussion of the bill began, at least seven transgender adolescents in Arkansas attempted suicide.  (Dr. Michele Hutchison Decl. ¶ 13.)  Such "[e]motional distress, anxiety, depression and other psychological problems can constitute irreparable injury."  *Hicklin* v. *Precynthe*, 2018 WL 806764, at *9 (E.D. Mo. Feb. 9, 2018) (quoting *Norsworthy* v. *Beard*, 87 F. Supp. 3d 1164, 1192 (N.D. Cal. 2015)) (holding that risk of self-harm and suicidal ideation as a result of gender dysphoria constitutes risk of irreparable injury); *see also Reid* v. *Kelly*, 2013 WL 6231149, at *2 (E.D. Ark. Dec. 2, 2013) (suggesting self-harm could demonstrate a risk of irreparable harm).  In addition, for Dylan, Sabrina, Parker, and other transgender adolescents currently receiving hormone therapy in Arkansas, abruptly cutting off treatment can cause blood pressure spikes, increasing a young person's risk of a potentially fatal heart attack or stroke.  (Adkins Decl. ¶ 54.)

The Parent Plaintiffs face the irreparable harm of having to either watch their children deteriorate, because their medical care is cut off, or leave their homes,

communities, and jobs to go to another state where their children can be treated. (Amanda and Shayne Dennis Decl. ¶¶ 14-16; Aaron and Lacey Jennen Decl. ¶¶ 6-12; Donnie Saxton Decl. ¶¶ 14-16; Joanna Brandt Decl. ¶ 18.)

And the Health Care Ban irreparably harms Dr. Hutchison and Dr. Stambough by putting them in an impossible position:  they can either follow the Health Care Ban and sacrifice the health of their patients in violation of the principles of their profession, or they can provide potentially life-saving care and risk losing their medical licenses and practices.  (Dr. Michele Hutchison Decl. ¶¶ 11, 16; Dr. Kathryn Stambough Decl. ¶¶ 8-13.)  The law also bans the doctors' protected speech by prohibiting them from making referrals for gender-affirming care for their transgender patients.  HB 1570 § 3, ARK. CODE ANN. § 20-9-1502(b).

In addition, "the harm to Plaintiffs' constitutional rights under the First and Fourteenth Amendment are themselves routinely recognized as irreparable injuries for the purposes of a preliminary injunction motion."  *Pavek* v. *Simon*, 467 F. Supp. 3d 718, 754 (D. Minn. 2020); *see also Elrod* v. *Burns*, 427 U.S. 347, 373 (1976) (the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury").

In light of the severe and irreparable harms the Plaintiffs face under the Health Care Ban, a preliminary injunction is necessary.

## VI.    The Balance of Equities Tips in Plaintiffs' Favor and Injunction Is in the Public Interest.

The threat of harm to Plaintiffs far outweighs Defendants' interests in immediately enforcing the Health Care Ban, and preserving Plaintiffs' constitutional rights is in the public interest. A preliminary injunction is warranted where, as here, the balance of equities decidedly favors the moving party, in which case the court should preserve the status quo until the case can be decided on the merits. *Dataphase Syst.*, 640 F.2d at 113; *see also Nken*, 556 U.S. at 435 (noting that when suit is brought against the government, the balance-of-equities and public-interest factors are synonymous).

As described above, the harm to Plaintiffs from allowing the Health Care Ban to go into effect would be tangible, immediate, and irreparable. Whatever interest the State may have in enforcing the Health Care Ban during the pendency of this case pales in comparison to the certain and severe harm faced by Plaintiffs. And because the "State has no interest in enforcing laws that are unconstitutional . . . , an injunction preventing the State from enforcing [the challenged statute] does not irreparably harm the state." *Little Rock Family Planning Servs.* v. *Rutledge*, 397 F. Supp. 3d 1213, 1322 (E.D. Ark. 2019). "The public is served by the preservation of constitutional rights." *D.M. by Bao Xiong*, 917 F.3d at 1004.

The balance of equities favors injunctive relief to preserve the status quo until a final decision in this case.

## CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that the Court grant their motion for a preliminary injunction and enjoin Defendants from enforcing the Health Care Ban during the pendency of this litigation.

Plaintiffs request a hearing on this motion on an expedited basis. Defendants are being served with the motion papers immediately.

Dated: June 15, 2021                              Respectfully submitted,

*/s/ Leslie Cooper*
Leslie Cooper                                     Beth Echols, Ark. Bar No. 2002203
Chase Strangio*                                   Christopher Travis, Ark. Bar No. 97093
American Civil Liberties Union                    Drake Mann, Ark. Bar No. 87108
Foundation                                        Gill Ragon Owen, P.A.
125 Broad St.                                     425 W. Capitol Avenue, Suite 3800
New York, NY 10004                                Little Rock, AR 72201
Telephone: (917) 345-1742                         Telephone: (501) 376-3800
lcooper@aclu.org                                  echols@gill-law.com
cstrangio@aclu.org                                travis@gill-law.com
*Attorneys for the Plaintiffs*                    mann@gill-law.com
                                                  *Attorneys for the Plaintiffs*


Breean Walas, Ark. Bar No. 2006077                Sarah Everett, Ark. Bar No. 2017249
Walas Law Firm, PLLC                              Arkansas Civil Liberties Union
P.O. Box 4591                                     Foundation, Inc.
Bozeman, MT 59772                                 904 W. 2nd Street
Telephone: (501) 246-1067                         Little Rock, AR 72201
breean@walaslawfirm.com                           Telephone: (501) 374-2842
*Attorneys for the Plaintiffs*                    sarah@acluarkansas.org
                                                  *Attorneys for the Plaintiffs*

Garrard R. Beeney*
Jonathan J. Ossip*
Alexander S. Holland*
Sullivan & Cromwell LLP
125 Broad Street
New York, NY 10004
Telephone:  (212) 558-4000
beeneyg@sullcrom.com
ossipj@sullcrom.com
hollanda@sullcrom.com
*Attorneys for the Plaintiffs*

Laura Kabler Oswell*
Duncan C. Simpson LaGoy*
Sullivan & Cromwell LLP
1870 Embarcadero Road
Palo Alto, CA 94303
Telephone:  (650) 461-5600
oswell@sullcrom.com
simpsond@sullcrom.com
*Attorneys for the Plaintiffs*

*\*Admitted pro hac vice*