## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## CENTRAL DIVISION

DYLAN BRANDT, by and through his mother,
Joanna Brandt, *et al.*,

                                                                    PLAINTIFFS,


v.                                No. 4:21-CV-00450-JM


LESLIE RUTLEDGE, in her official capacity as
the Arkansas Attorney General, *et al.*,

                                                                    DEFENDANTS.


### BRIEF IN SUPPORT OF MOTION TO DISMISS

TABLE OF CONTENTS

Table of Contents ........................................................................................................... i

Table of Authorities ...................................................................................................... ii

Introduction .................................................................................................................. 1

Background ................................................................................................................... 3

    A.  The *Tavistock* decision explains why children usually cannot consent
        to irreversible experimentation using puberty-blocking drugs. .................... 4

    B.  The Arkansas General Assembly reacts by prohibiting these
        experimental procedures. ............................................................................... 7

Legal Standard ........................................................................................................... 10

Argument ................................................................................................................... 11

  I.  Plaintiffs lack standing ......................................................................................... 11

    A.  All Plaintiffs lack standing to challenge the SAFE Act's prohibition of
        gender-reassignment surgery, and its private right of action. ..................... 11

    B.  The parents and children lack standing ........................................................ 13

    C.  The practitioners lack standing. ................................................................... 14

        1.  Practitioners do not have third-party standing to assert claims on
            behalf of children or their parents. .......................................................14

        2.  The practitioners lack first-party standing. ...........................................18

  II.  Plaintiffs fail to state an equal-protection claim. ................................................ 19

    A.  The SAFE Act is subject to only rational-basis review. ............................. 19

        1.  The SAFE Act's classifications follow from its goal of protecting
            children, not from targeting transgender status or sex. ..........................20

        2.  Even if the SAFE Act classified based on transgender status,
            rational-basis review would apply. ........................................................26

    B.  The SAFE Act would survive heightened scrutiny and, by extension,
        rational-basis review. ................................................................................... 28

    C.  The SAFE Act is not motivated by disapproval of transgender people...................... 31

  III.  The parents fail to state a substantive-due-process claim. ................................. 32

    A.  There is no right of affirmative access to experimental gender-
        transition procedures. ................................................................................... 33

    B.  Parents have no right to access experimental gender-transition
        procedures for their children. ....................................................................... 36

  IV.  Plaintiffs fail to state a free-speech claim. ........................................................ 39

Conclusion ................................................................................................................. 42

TABLE OF AUTHORITIES

**Cases**

*Abigail All. for Better Access to Developmental Drugs v. von Eschenbach*,
    495 F.3d 695 (D.C. Cir. 2007) (en banc) .............................................................. 34

*Advantage Media, L.L.C. v. City of Eden Prairie*,
    456 F.3d 793 (8th Cir. 2006) ............................................................................... 15

*Andrews v. Neer*,
    253 F.3d 1052 (8th Cir. 2001) ............................................................................. 15

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ...................................................................................... 11, 24

*Att'y Gen. of N.Y. v. Soto-Lopez*,
    476 U.S. 898 (1986) ............................................................................................. 20

*Barsky v. Bd. of Regents of Univ.*,
    347 U.S. 442 (1954) ...................................................................................... 19, 41

*Bell v. Tavistock & Portman Nat'l Health Serv. Found. Trust*,
    [2020] EWHC (Admin) 3274 ............................................................... 3, 4, 5, 6, 7, 30

*Birchansky v. Clabaugh*,
    955 F.3d 751 (8th Cir. 2020) ............................................................................... 19

*Birth Control Centers, Inc. v. Reizen*,
    743 F.2d 352 (6th Cir. 1984) ............................................................................... 20

*Bostock v. Clayton County, Georgia*,
    140 S. Ct. 1731 (2020) .................................................................................... 24, 28

*Bray v. Alexandria Women's Health Clinic*,
    506 U.S. 263 (1993) ...................................................................................... 20, 22

*Canfield Aviation, Inc. v. Nat'l Transp. Safety Bd.*,
    854 F.2d 745 (5th Cir. 1988) ............................................................................... 16

*City of Akron v. Akron Ctr. for Reprod. Health, Inc.*,
    462 U.S. 416 (1992) ............................................................................................. 24

*City of Cleburne, Tex. v. Cleburne Living Ctr.*,
    473 U.S. 432 (1985) ............................................................................................. 27

*City of New Orleans v. Dukes*,
    427 U.S. 297 (1976) ............................................................................................. 20

*Clark v. Jeter*,
    486 U.S. 456 (1988) ............................................................................................. 20

*Doe 2 v. Shanahan*,
    917 F.3d 694 (D.C. Cir. 2019) ............................................................................. 22

*Duke Power Co. v. Carolina Env't Study Grp., Inc.*,
    438 U.S. 59 (1978) ............................................................................................... 17

*Elk Grove Unified Sch. Dist. v. Newdow*,
   542 U.S. 1 (2004) ............................................................................................ 16

*England v. La. State Bd. of Med. Examiners*,
   263 F.2d 661 (5th Cir. 1959) .......................................................................... 29

*FCC v. Beach Communications, Inc.*,
   508 U.S. 307 (1993)................................................................................... 29, 35

*Friends of the Earth, Inc. v. Laidlaw Env't. Servs., Inc.*,
   528 U.S. 167 (2000) ........................................................................................ 14

*Gallagher v. City of Clayton*,
   699 F.3d 1013 (8th Cir. 2012) ................................................................... 26, 27

*Garrett v. Clarke*,
   147 F.3d 745 (8th Cir. 1998) .......................................................................... 15

*Geduldig v. Aiello*,
   417 U.S. 484 (1974)........................................................................................ 21

*Gibson v. Collier*,
   920 F.3d 212 (5th Cir. 2019) .......................................................................... 24

*Ginsberg v. New York*,
   390 U.S. 629 (1968)................................................................................... 37, 41

*Gonzales v. Carhart*,
   550 U.S. 124 (2007)................................................................................... 29, 40

*Gregory v. Ashcroft*,
   501 U.S. 452 (1991)........................................................................................ 20

*Heller v. Doe*,
   509 U.S. 312 (1993)........................................................................................ 19

*Henne v. Wright*,
   904 F.2d 1208 (8th Cir. 1990) ........................................................................ 36

*Hennessy-Waller v. Snyder*, No. CV-20-00335-TUC-SHR,
   2021 WL 1192842 (D. Ariz. Mar. 30, 2021) .................................. 3, 24, 25, 28, 30

*Hodgson v. Minnesota*,
   497 U.S. 417 (1990)........................................................................................ 29

*Hope Clinic v. Ryan*,
   249 F.3d 603 (7th Cir. 2001) (en banc) .......................................................... 13

*Hunter v. Underwood*,
   471 U.S. 222 (1985)........................................................................................ 31

*Kosilek v. Spencer*,
   774 F.3d 63 (1st Cir. 2014) (en banc).............................................................. 24

*Kowalski v. Tesmer*,
   543 U.S. 125 (2004)............................................................................. 14, 16, 18

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992).................................................................................... 12

*McGowan v. Maryland*,
    366 U.S. 420 (1961).................................................................................... 19

*McKeiver v. Pennsylvania*,
    403 U.S. 528 (1971)............................................................................. 35, 36

*Meyer v. Nebraska*,
    262 U.S. 390 (1923).................................................................................... 36

*Morrissey v. United States*,
    871 F.3d 1260 (11th Cir. 2017) ................................................................ 35

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
    138 S. Ct. 2361 (2018) .............................................................................. 40

*Ohralik v. Ohio State Bar Ass'n*,
    436 U.S. 447 (1978).................................................................................... 40

*Okpalobi v. Foster*,
    244 F.3d 405 (5th Cir. 2001) (en banc) ................................................... 13

*Parham v. J. R.*,
    442 U.S. 584 (1979).................................................................................... 36

*Pers. Adm'r of Mass. v. Feeney*,
    442 U.S. 256 (1979)....................................................................... 21, 25, 28

*Pierce v. Society of Sisters*,
    268 U.S. 510 (1925).................................................................................... 36

*Planned Parenthood of Cent. Mo. v. Danforth*,
    428 U.S. 52 (1976)..................................................................................... 29

*Planned Parenthood of Greater Tex. Surgical Health Servs. v. City of Lubbock, Tex.*,
    — F. Supp. 3d —, No. 5:21-CV-114-H,
    2021 WL 2385110 (N.D. Tex. June 1, 2021) ......................................... 12

*Planned Parenthood of Hous. & Se. Tex. v. Sanchez*,
    403 F.3d 324 (5th Cir. 2005) .................................................................... 15

*Planned Parenthood of Hous. & Se. Tex. v. Sanchez*,
    480 F.3d 734 (5th Cir. 2007) .................................................................... 15

*Planned Parenthood of Mid-Missouri & E. Kansas, Inc. v. Dempsey*,
    167 F.3d 458 (8th Cir. 1999) .................................................................... 19

*Planned Parenthood of Se. Pa. v. Casey*,
    505 U.S. 833 (1992).................................................................................... 41

*Prince v. Massachusetts*,
    321 U.S. 158 (1944)....................................................................... 36, 37, 38

*Raich v. Gonzales*,
    500 F.3d 850 (9th Cir. 2007) ........................................................ 32, 33, 34

*Reno v. ACLU*,
  521 U.S. 844 (1997) ................................................................................... 28, 29, 41

*Reno v. Flores*,
  507 U.S. 292 (1993) ............................................................................................... 33

*Rizzo v. Goode*,
  423 U.S. 362 (1976) ............................................................................................... 15

*Romer v. Evans*,
  517 U.S. 620 (1996) ............................................................................................... 32

*Rust v. Sullivan*,
  500 U.S. 173 (1991) ......................................................................................... 40, 41

*Rutherford v. United States*,
  616 F.2d 455 (10th Cir. 1980) ........................................................................ 34, 35

*San Antonio Indep. Sch. Dist. v. Rodriguez*,
  411 U.S. 1 (1973) ................................................................................................... 27

*Stanley v. Finnegan*,
  899 F.3d 623 (8th Cir. 2018) ................................................................................ 36

*Stanley v. Georgia*,
  394 U.S. 557 (1969) ............................................................................................... 41

*Stiles v. Blunt*,
  912 F.2d 260 (8th Cir. 1990) ................................................................................ 21

*United States v. Carolene Products Co.*,
  304 U.S. 144 (1938) ............................................................................................... 21

*United States v. Virginia*,
  518 U.S. 515 (1996) ............................................................................................... 28

*Vacco v. Quill*,
  521 U.S. 793 (1997) ................................................................................... 19, 20, 32

*Washington v. Davis*,
  426 U.S. 229 (1976) ............................................................................................... 28

*Washington v. Glucksberg*,
  521 U.S. 702 (1997) ................................................................................... 29, 32, 33, 39

*Watson v. Maryland*,
  218 U.S. 173 (1910) ......................................................................................... 35, 40

*Webb as next friend of K. S. v. Smith*,
  936 F.3d 808 (8th Cir. 2019) ................................................................................ 12

*Whalen v. Roe*,
  429 U.S. 589 (1977) ................................................................................... 19, 33, 36

*Williams v. City of Sherwood, Ark.*,
  No. 4:18-CV-00097, 2018 WL 9708622 (E.D. Ark. Aug. 17, 2018) .............................. 11, 23

**Statutes & Court Rules**

Save Adolescents from Experimentation Act, 2021 Ark. Act 626 (2021)
(to be codified at Ark. Code 20-9-1501-1504) ............................................................... *passim*

Ark. Code Ann. 3-3-203 ...................................................................................................... 37

Ark. Code Ann. 3-3-204 ...................................................................................................... 37

Ark. Code Ann. 5-64-1103 .................................................................................................. 37

Ark. Code Ann. 5-78-102 .................................................................................................... 37

Ark. Code Ann. 7-9-103 ...................................................................................................... 38

Ark. Code Ann. 18-27-204 .................................................................................................. 38

Ark. Code Ann. 18-27-305 .................................................................................................. 38

Ark. Code Ann. 20-6-103 .................................................................................................... 37

Ark. Code Ann. 20-16-508 .................................................................................................. 37

Ark. Code Ann. 20-17-202 .................................................................................................. 37

Ark. Code Ann. 20-27-1502 ................................................................................................ 37

Ark. Code Ann. 20-27-2403 ................................................................................................ 38

Ark. Code Ann. 23-110-405 ................................................................................................ 38

Ark. Code Ann. 23-111-308 ................................................................................................ 38

Ark. Code Ann. 23-111-508 ................................................................................................ 38

Ark. Code Ann. 23-114-404 ................................................................................................ 38

Ark. Code Ann. 23-115-402 ................................................................................................ 38

Ark. Code Ann. 27-101-604 ................................................................................................ 38

Ark. Code Ann. 27-51-1603 ................................................................................................ 38

**Other Authorities**

David P. Currie,
*Misunderstanding Standing*, 1981 Sup. Ct. Rev. 41 ............................................................ 15

Frank H. Easterbrook,
*Criminal Procedure as a Market System*, 12 J. Legal Stud. 289 (1983) ................................ 17

## INTRODUCTION

The SAFE Act responds to widespread, growing international concerns about performing experimental, life-altering gender-transition procedures on children in the absence of evidence that those procedures actually lead to better health outcomes.  Even when those procedures don't involve invasive surgery, giving children puberty-blocking drugs and cross-sex hormones can have irreversible physical consequences—for instance, permanent infertility and destroying the ability of previously healthy sex organs to function.  And as a result, courts and public health officials have considered whether children can ever truly consent to such permanent and life-altering procedures.  Indeed, how can a child whose body has not yet developed these functions understand the impact on his or her adult life of never developing them?

This issue has arisen in judicial proceedings around the world.  In December 2020, the U.K. High Court of Justice of England and Wales determined that children likely cannot ever understand the irreversible consequences of using puberty-blocking drugs as a gender-transition procedure.  Thus, the High Court said, children usually cannot give informed consent to the experimental use of these drugs for gender transition.  And in March 2021, the U.S. District Court for the District of Arizona confronted a similar question about the use of double mastectomies on children as a gender-transition procedure.  Relying on the High Court's decision, the Arizona court came to a similar conclusion regarding the experimental nature of such gender-reassignment surgeries.

Responding to these international developments, the Arkansas General Assembly enacted the Save Adolescents from Experimentation (SAFE) Act.  Finding a lack of credible scientific evidence that gender-transition procedures improve children's health and echoing those internationally recognized concerns, the General Assembly determined that the irreversible, long-term

consequences of performing these procedures on Arkansas children were too great to allow practitioners to continue performing them.  The SAFE Act therefore prohibited them.  Yet reflecting the General Assembly's concern, the SAFE Act did not prohibit the use of counseling or therapy for children—but only those procedures that alter children physiologically or anatomically.  Nor did the SAFE Act prohibit the use of any procedure whatsoever on adults.  Adults remain free to choose the covered gender-transition procedures.

Plaintiffs have sued to block the SAFE Act.  Granting relief on any of Plaintiffs' claims would require this Court to extend current precedent in unsupportable ways.  Their claim under the Equal Protection Clause rests on the unfounded assumption that a prohibition on gender-transition procedures for minors is unconstitutional discrimination.  But such a prohibition discriminates, if at all, only on the basis of a person's age.  And the Supreme Court has made clear that the Equal Protection Clause does not require heightened scrutiny for age-based distinctions.  Plaintiffs' substantive-due-process claim fares no better.  Children themselves have no substantive-due-process right to access the procedures covered by the SAFE Act and, as a corollary, neither do parents have a right to subject their children to those same procedures.  Finally, Plaintiffs' free-speech claim ignores Supreme Court precedent that makes clear that the government's power to regulate the practice of medicine includes the power to limit the types of procedures for which practitioners may refer patients.

None of these deficiencies in Plaintiffs' claim can be cured through repleading.  Therefore, as more fully explained below, this Court should dismiss the Complaint with prejudice.

## BACKGROUND

Last December, the Administrative Court of the United Kingdom's High Court of Justice of England and Wales issued its decision in *Bell v. Tavistock and Portman National Health Service Foundation Trust*, [2020] EWHC (Admin) 3274.[1]  In that proceeding, the claimants sought judicial review of practices of the U.K. National Health Service's Tavistock Gender Identity Development Service (the "Tavistock clinic")—in particular, its practice of prescribing puberty-blocking drugs to children under 18 suffering from gender dysphoria.  *Id.* ¶ 2.  At the heart of the case was whether children ever are competent to consent to that experimental use of puberty-blocking drugs.  *Id.* ¶ 6.  The High Court decided that children usually cannot give informed consent to puberty-blocking drugs.  *See id.* ¶¶ 151-53.

The *Tavistock* decision made international headlines and focused attention on the scientifically unsupported, politically driven nature of the push for experimental gender-transition procedures for children suffering from gender dysphoria.  *Tavistock* has also impacted court decisions in the United States.  In March 2021, a federal court relied on that decision in denying a motion to enjoin the Arizona Medicaid program's exclusion of gender-reassignment surgery.  *Hennessy-Waller v. Snyder*, No. CV-20-00335-TUC-SHR, 2021 WL 1192842, at *1 (D. Ariz. Mar. 30, 2021).  The court noted that the *Tavistock* "decision regarding puberty-suppressing medication being experimental suggests the irreversible surgery Plaintiffs seek here is also experimental."  *Id.* at *6.

---

[1] https://www.judiciary.uk/judgments/r-on-the-application-of-quincy-bell-and-a-v-tavistock-and-portman-nhs-trust-and-others/

Given the international attention received by the High Court's holding and related find-ings in *Tavistock*—and its close proximity to the General Assembly's enactment of the SAFE Act—a somewhat detailed summary of that decision helps put the SAFE Act in context.

> **A.    The *Tavistock* decision explains why children usually cannot consent to irre-versible experimentation using puberty-blocking drugs.**

The *Tavistock* claimants were a young woman whom the Tavistock clinic had put on a regimen of puberty blockers and testosterone and who eventually underwent a double mastec-tomy, *id.* ¶¶ 78-83, and a mother concerned that the Tavistock clinic would place her own daugh-ter on a similar course, *id.* ¶ 89.  They argued that children could not consent and that, in any case, the information being provided to them was misleading and insufficient.  *Id.* ¶ 7.  As part of the proceedings, the High Court heard testimony from many experts, including a member of the World Professional Association for Transgender Health (WPATH).  *Id.* ¶ 57.  The defendant and others maintained that the practice of prescribing puberty-blocking drugs to children under 18 was "in accordance with the international frameworks of WPATH and the Endocrine Society," *id.* ¶ 97, which suggest that puberty blockers are "fully reversible," *id.* ¶ 60.  *See* Compl. ¶¶ 37-45 (discussing at some length these same WPATH and Endocrine Society frameworks).

Examining the evidence, however, the High Court recognized that "the history of the use of puberty blockers relied upon" by WPATH and the Endocrine Society was misleading.  *Id.* ¶ 60.  Those organizations relied only on history pertaining to "the treatment of *precocious pu-berty*."  *Id.* (emphasis altered).  And precocious puberty "is a different condition from gender dysphoria, and where puberty blockers are used in a very different way."[2]  *Id.*

---

[2] The *Tavistock* opinion often shortens "gender dysphoria" to "GD", "puberty blockers" to "PBs", and "cross-sex hormones" to "CSH."  *See* ¶¶ 3, 4, 15.  For consistency and clarity, this brief's quotations from *Tavistock* expand those abbreviations.

The High Court examined other evidence undermining the claim that the effects of pu-

berty blockers are fully reversible.  *Cf.* Compl. ¶ 38 (alleging otherwise).  Puberty blockers "stop

the physical changes in the body when going through puberty."  *Tavistock*, [2020] EWHC 3274,

¶ 64.  And because "young people mature through adolescence through both social and personal

experiences . . . . that maturing process is stopped or delayed" for young people on puberty

blockers—"with potential social and psychological impacts which could be described as non-re-

versible."  *Id.*  Thus, the "central point" of the claimants' challenge to the Tavistock clinic's

practices was that, although some of the physical consequences of puberty blockers may be re-

versible if they are stopped, "the child or young person will have missed a period, however long,

of normal biological, psychological and social experience through adolescence; and that missed

development and experience, during adolescence, can never truly be recovered or 'reversed'."

*Id.* ¶ 65; *see id.* ¶ 137 ("[T]he use of puberty blockers is not itself a neutral process by which

time stands still for the child on puberty blockers, whether physically or psychologically.").

Indeed, particularly relevant here, the High Court noted that in June 2020 the National

Health Service removed from its website a statement that puberty blockers are "fully reversible"

and replaced it with a disclaimer that is far more tentative:

> **Little is known about the long-term side effects of hormone or puberty block-
> ers in children with gender dysphoria.**
>
> Although the Gender Identity Development Service (GIDS) advises that [it] is a
> physically reversible treatment if stopped, **it is not known what the psychological
> effects may be.**
>
> **It's also not known whether hormone blockers affect the development of the
> teenage brain or children's bones.**  Side effects may also include hot flushes,
> fatigue and mood alterations.

*Id.* ¶ 67 (emphases in *Tavistock*); *see id.* ¶ 66.

Moving to consider the practice of following puberty blockers with cross-sex hormones, the High Court recognized that "cross-sex hormones are to a very significant degree not reversible. . . . [A] very high proportion of those who start puberty blockers move on to cross-sex hormones and thus in statistical terms once a child or young person starts on puberty blockers, they are on a very clear clinical pathway to cross-sex hormones." *Id.* ¶ 68; *see id.* ¶ 136 (describing puberty blockers and cross-sex hormones as "two stages of one clinical pathway and once on that pathway it is extremely rare for a child to get off it"); *id.* ¶ 137 ("[T]he statistical correlation between the use of puberty blockers and cross-sex hormones supports the case that it is appropriate to view puberty blockers as a stepping stone to cross-sex hormones.").

Given the long-term effects of placing minors on puberty blockers and, mostly likely, eventually cross-sex hormones, the High Court credited evidence that "children of this age cannot understand the implications of matters such as the loss of the ability to orgasm, the potential need to construct a neo-vagina, or the loss of fertility." *Id.* ¶ 93. It also placed importance on the fact that the FDA has not approved puberty blockers for treating gender dysphoria. *See id.* ¶ 70 ("In the USA the treatment of gender dysphoria is not an FDA approved use and as such puberty blockers can only be used 'off-label'."). Worse, "the lack of a firm evidence base for their use is evident from the very limited published material as to the effectiveness of the treatment." *Id.* ¶ 71. And worst of all, "the treatment may be supporting the persistence of gender dysphoria in circumstances in which it is at least possible that without that treatment, the gender dysphoria would resolve itself." *Id.* ¶ 77.

Throughout the decision, the High Court reached a number of sobering conclusions concerning the use of puberty-blocking drugs as a treatment for gender dysphoria. Finding "real uncertainty over the short and long-term consequences of the treatment with very limited evidence

as to its efficacy," the High Court concluded that it is "properly described as experimental treatment." *Id.* ¶ 134.  The treatment "has direct physical consequences," despite the fact that the condition, "gender dysphoria, has no direct physical manifestation." *Id.* ¶ 135.  And the High Court concluded that children cannot appreciate the physical consequences of that treatment. *See id.* ¶ 139 (determining that children are unlikely "to conceptualise what not being able to give birth to children (or conceive children with their own sperm) would mean in adult life," or "the meaning of sexual fulfillment").  It stated unequivocally that "[t]here is no age appropriate way to explain to many of these children what losing their fertility or full sexual function may mean to them in later years." *Id.* ¶ 144.

### B.  The Arkansas General Assembly reacts by prohibiting these experimental procedures.

About two months after the *Tavistock* decision, the Save Adolescents from Experimentation (SAFE) Act was introduced during the Arkansas General Assembly's 2021 session. *See* 2021 Ark. Act 626 (2021) (to be codified at Ark. Code 20-9-1501-1504).  The General Assembly did not deny that there are children who experience psychological distress with their bodies. *See id.*, sec. 2(2), (4).  But it also noted that this distress often has underlying causes and comorbidities, and that experimental endocrine and surgical interventions—such as the use of puberty blockers and cross-sex hormones—leave the underlying issues unaddressed. *Id.*; *see id.*, sec. 2(6)-(7).

There are no data clearly establishing any benefits from these interventions, yet they unquestionably have long-term and mostly irreversible consequences: either preventing a child from ever developing fully functioning sexual and reproductive organs (in the case of puberty blockers), or permanently destroying otherwise functional sexual and reproductive organs (in the cases cross-sex hormones and surgery).  The dangers of using puberty blockers to halt the normal

course of puberty in a child are mostly unknown, given the lack of longitudinal studies evaluating the risks and benefits for treating children's psychological distress. *Id.*, sec. 2(6).  (Contrast this off-label use of puberty blockers with the well-studied use of them to delay puberty in children for whom it begins too early, called "precocious puberty.")  In other words, practitioners do not know the long-term consequences of blocking normal testosterone levels in a boy going through puberty, or estrogen in a girls.  Yet they are placing boys and girls on puberty blockers anyways.  *See id.*

Prescribing cross-sex hormones (*i.e.*, testosterone for biological females and estrogen for biological males) likewise lacks a sound clinical basis and poses serious risks.  *Id.*, sec. 2(7).  These risks are well-known.  For biological females, they include erythrocytosis (an increase in red blood cells), severe liver dysfunction, coronary artery disease (including heart attacks), cerebrovascular disease (including strokes), hypertension, breast and uterine cancer, and irreversible infertility.  *Id.*, sec. 2(8)(A).  For biological males, cross-sex hormones are known to cause thromboembolic diseases (including blood clots), cholelithiasis (including gallstones), coronary artery disease (including heart attacks), macroprolactinoma (a tumor of the pituitary gland), cerebrovascular disease (including strokes), elevated blood triglycerides, breast cancer, and irreversible infertility.  *Id.*, sec. 2(8)(B).

Referrals of children for experimental gender-reassignment surgeries are increasing.  *Id.*, sec. 2(9), 13(B).  These complex, invasive surgeries routinely involve the alteration or destruction of biological functions and frequently require subsequent, lifelong attention.  *Id.*, sec. 2(10)-(12).  For biological males, surgeries may involve mammoplasty, thyroid cartilage reduction (Adam's apple shave), removal of the penis or testicles, gluteal augmentation, and construction

8

of an artificial vagina, clitoris, or vulva.  *Id.*, sec. 2(10)(B), 12(B).  For biological females, sur-

geries may include mastectomy, voice surgery, pectoral implants, hysterectomy, oophorectomy

(removal of the ovaries), vaginectomy (removal of the vagina), reconstruction of the urethra,

construction of an artificial penis or scrotum, and implantation of erection or testicular prosthe-

ses.  *Id.*, sec. 2(10)(A), (12)(C).

It is a grave concern that practitioners are subjecting children to irreversible endocrine

and surgical interventions despite their unknown benefits and well-established long-term conse-

quences—such as the destruction of functional sex organs and permanent loss of fertility.  *Id.*,

sec. 2(14).  Practitioners have chosen this course in the face of studies consistently demonstrating

that the majority of children who suffer from gender dysphoria come to identify with their bio-

logical sex without such interventions.  *Id.*, sec. 2(3).  Indeed, "[t]he risks of gender transition

procedures far outweigh any benefit at this stage of clinical study on these procedures."  *Id.*, sec.

2(15).

The SAFE Act recognizes that "Arkansas has a compelling government interest in pro-

tecting the health and safety of its citizens, especially vulnerable children."  *Id.*, sec. 2(1).  There-

fore, in light of the experimental nature of endocrine and surgical interference with children's

normal biological development and functioning, along with its known dangers, the SAFE Act

prohibits practitioners from performing gender-transition procedures on children or referring

them for such procedures.  *Id.*, sec. 3 (Ark. Code Ann. 20-9-1502(a) through (b)); *see id.* secs. 3-

4 (enacting Ark. Code Ann. 20-9-1503 and 23-79-164) (prohibiting additionally public expendi-

tures on or insurance reimbursements for such procedures on children).  The Act defines "gender

transition procedures" as "any medical or surgical service . . . including puberty-blocking drugs,

cross-sex hormones, . . . or genital or nongenital gender reassignment surgery performed for the

purpose of assisting an individual with a gender transition." *Id.*, sec. 3 (enacting Ark. Code Ann. 20-9-1501(6)(A)).

Crucially, the SAFE Act does *not* prohibit gender-transition procedures for anyone 18 years old or above. *Id.* (enacting Ark. Code Ann. 20-9-1502(a)). The law also does not prohibit services to children who suffer from:

- a disorder of sex development (including children with irresolvably ambiguous external sex characteristics, abnormal chromosome structure, sex steroid hormone production, or sex steroid hormone action);

- a disorder arising from previous gender-transition procedures; or

- a physical disorder that would place a child in imminent danger of death or impairment of a major bodily function.

*Id.* (enacting Ark. Code Ann. 20-9-1502(c)). Finally, the SAFE Act does not prohibit—rather, it encourages—the provision of mental health services to children to address the comorbidities and underlying causes of their distress. *Id.*, sec. 2(4).

Plaintiffs filed suit on May 25, 2021, asking the Court to stop Arkansas from protecting distressed and vulnerable children from being subjected to these experimental procedures, which have irreversible and long-term consequences, including the destruction of functional sex organs, or the prevention of functional sex organs from ever developing—procedures for which the benefits have not been established. Determining that these known risks outweigh the unknown benefits, Arkansas has made the decision that doctors in this State cannot, consistent with established principles of medical ethics, continue performing these procedures on children.

### Legal Standard

To survive a motion to dismiss under Rule 12(b)(6), Plaintiffs' "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Each of their claims does not meet this standard un-less they have "plead[ed] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  Although this analysis requires this Court to "accept as true all the factual allegations contained in the complaint," *Williams v. City of Sherwood, Ark.*, No. 4:18-CV-00097, 2018 WL 9708622, at *1 (E.D. Ark. Aug. 17, 2018), it need not "accept as true a legal conclusion couched as a factual allegation," *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)) (quotation marks omitted).

**ARGUMENT**

I.      **Plaintiffs lack standing.**

      A.      **All Plaintiffs lack standing to challenge the SAFE Act's prohibition of gen-der-reassignment surgery, and its private right of action.**

No Plaintiff has standing to challenge two provisions in the SAFE Act: one, prohibiting gender-reassignment surgery on minors; the other, creating a private right of action.

*1.*  Plaintiffs do not allege that the practitioners perform gender-reassignment surgery—to say nothing of gender-transition surgery *on children*.  *See* Compl. ¶¶ 13, 14; *see also* SAFE Act, sec. 3 (enacting Ark. Code Ann. 20-9-1501(7), (9)) (defining "Genital gender reassignment sur-gery" and "Nongenital gender reassignment surgery").  Further, Plaintiffs do not allege that any of the children seek gender-reassignment surgery or even that they will do so while they remain children.  For one thing, Plaintiffs acknowledge that even WPATH does not recommend genital gender-reassignment surgery for children.  *See* Compl. ¶ 45.  By contrast, WPATH would allow girls under the age of 18 to undergo certain nongenital gender-reassignment surgeries, including double mastectomies.  *See id.*  But Plaintiffs do not allege that any of the children currently seek either genital or nongenital gender-reassignment surgery, nor even that they intend to do while they remain children.

Therefore, they have not met their burden to establish standing to challenge the SAFE Act as it applies to gender-reassignment surgery. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). Plaintiffs must allege facts sufficient to establish standing "for each claim they bring and for each form of relief they seek." *Webb as next friend of K. S. v. Smith*, 936 F.3d 808, 814 (8th Cir. 2019). Taking the allegations in the Complaint as true, they have pleaded no facts sufficient to show that the SAFE Act is preventing them from undergoing or performing gender-reassignment surgery. As a result, they lack standing to challenge the SAFE Act's prohibition of gender-reassignment surgery, and that portion of the Complaint should be dismissed.

   *2.* Plaintiffs also lack standing to challenge the SAFE Act's private right of action. *See* SAFE Act, sec. 3 (enacting Ark. Code Ann. 20-9-1504(b) through (c), which creates a private right of action). Any injury caused by the private right of action is not "fairly traceable" to Defendants, who are exclusively state officials sued in their official capacities. *See* Compl. ¶¶ 15-17 (naming state officials). In fact, it is difficult to conceive of how the private right of action could ever injure the children and parents who are Plaintiffs. None of them could ever be defendants in a lawsuit brought according to the SAFE Act's private right of action. As a result, any injury would not be redressable by an order from this Court.

   Courts have rejected similar challenges to private rights of action in other States. Just this month, the Northern District of Texas dismissed such a challenge against a Texas law providing a private right of action for lack of jurisdiction. *See Planned Parenthood of Greater Tex. Surgical Health Servs. v. City of Lubbock, Tex.*, — F. Supp. 3d —, No. 5:21-CV-114-H, 2021 WL 2385110, at *1 (N.D. Tex. June 1, 2021) ("Because plaintiffs fail to show that any relief provided by this Court is likely to redress the injury at issue—citizen suits brought in state court—the Court lacks jurisdiction."). And both the Fifth and Seventh Circuits have issued en

banc decisions explaining the rationale for such a holding. *See Hope Clinic v. Ryan*, 249 F.3d 603, 605 (7th Cir. 2001) (en banc) ("[P]laintiffs lack standing to contest the statutes authorizing private rights of action, not only because the defendants cannot cause the plaintiffs injury by enforcing the private-action statutes, but also because any potential dispute plaintiffs may have with future private plaintiffs could not be redressed by an injunction running only against public prosecutors."); *Okpalobi v. Foster*, 244 F.3d 405, 427 (5th Cir. 2001) (en banc) (holding that state officials in their official capacity "cannot prevent purely private litigants from filing and prosecuting a cause of action").

Defendants here cannot bring a private right of action against a practitioner, nor do Defendants otherwise have authority to enforce those provisions. Therefore, the Court should hold that Plaintiffs lack standing to challenge the law's private right of action.

### B. The parents and children lack standing.

The Plaintiffs who are parents and children lack standing because they do not allege that any of the children fall outside of the SAFE Act's exemptions. The Act's prohibition does not apply to procedures performed on children "born with a medically verifiable disorder of sex development," including those with irresolvably ambiguous external sex characteristics, abnormal chromosome structure, sex steroid hormone production, or sex steroid hormone action. *See* SAFE Act, sec. 3 (creating Ark. Code Ann. 20-9-1502(c)). The complaint does not allege that any of the children fall outside these exceptions, so they and their parents lack standing.

The Dennis family lacks standing for an additional reason. Their child is only nine years old, has not begun puberty, and is neither undergoing nor about to undergo any kind of gender-transition procedure. *See* Compl. ¶ 11 (although the Dennis family "intend[s] to have [their child] begin receiving" gender-transition procedures at some future time, that has not yet happened). Indeed, Plaintiffs allege that, even if this Court were to create a constitutional right of

access to gender-transition procedures, "[b]efore puberty, gender transition does not include any pharmaceutical or surgical intervention." *Id.* ¶ 34.  Plaintiffs must have standing at the time the complaint is filed, *Friends of the Earth, Inc. v. Laidlaw Env't. Servs., Inc.*, 528 U.S. 167, 180 (2000), but according to the Complaint's own allegations, the SAFE Act has no effect on the Dennis family.  So they lack standing altogether.

### C.    The practitioners lack standing.

#### 1.    Practitioners do not have third-party standing to assert claims on behalf of children or their parents.

All three of Plaintiffs' claims assert facial challenges to the SAFE Act.[3]  The Court should dismiss the third-party claims brought by the practitioners on behalf of their patients, because they lack third-party standing.  *See* Compl. ¶¶ 13-14, 155-71, 179-87.  A litigant "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties."  *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004) (quotation and citation omitted).  The practitioners may not assert the rights of their patients unless: (1) the practitioners have a "'close' relationship" with their patients; and (2) there is a "hindrance" to their patients' ability to protect their own interests.  *Id.* at 130.  Neither requirement is met here.  First, because the practitioners have a conflict of interest with their patients, to whom they allege only a hypothetical relationship, they lack the necessary close relationship.  Second, because three patients[4] (and their parents) are actually named Plaintiffs here, it is indisputable that they can protect their own interests.

---

[3] Defendants are also entitled to immunity under the U.S. Constitution, including the Eleventh Amendment, and under general principles of sovereign immunity to any suit or claim.

[4] As just discussed, the Dennises' child is not currently undergoing any gender-transition procedures and is thus not a patient.

*i.* Before detailing those broader problems with the practitioners' third-party claims, a related point about a statutory problem with them.  The practitioners cannot assert third-party rights under 42 U.S.C. 1983, because Section 1983 extends only to litigants who assert their *own* rights.  *See Rizzo v. Goode*, 423 U.S. 362, 370-71 (1976) ("The plain words of the statute impose liability whether in the form of payment of redressive damages or being placed under an injunction *only for* conduct which 'subjects, or causes to be subjected' *the complainant* to a deprivation of a right secured by the Constitution and laws." (emphasis added) (citation omitted)).  In the words of Professor Currie, section 1983 "plainly authorizes suit by anyone alleging that he has been deprived of rights under the Constitution or federal law, *and by no one else*."  David P. Currie, *Misunderstanding Standing*, 1981 Sup. Ct. Rev. 41, 45 (emphasis added).  Thus, the Eighth Circuit has repeatedly barred litigants from asserting third-party claims under section 1983.[5]

The Court cannot allow the practitioners' third-party claims to proceed under Section 1983 without contradicting the unambiguous language of section 1983.  Their third-party claims may proceed—if at all—only under the implied right of action established by the Supremacy Clause, and they cannot serve as a basis for attorneys' fees.  *See Planned Parenthood of Hous. & Se. Tex. v. Sanchez*, 403 F.3d 324, 333 (5th Cir. 2005); *Planned Parenthood of Hous. & Se. Tex. v. Sanchez*, 480 F.3d 734 (5th Cir. 2007).  Only the rights-holder may sue as a plaintiff under Section 1983; the statutory language does not accommodate lawsuits brought by plaintiffs who seek to vindicate the constitutional rights of third parties.

---

[5] *See, e.g.*, *Garrett v. Clarke*, 147 F.3d 745, 746 (8th Cir. 1998) ("Garrett may not base his Section 1983 action on a violation of the rights of third parties."); *Andrews v. Neer*, 253 F.3d 1052, 1056 (8th Cir. 2001) ("Under § 1983, state actors who infringe the constitutional rights of an individual are liable to the party injured."); *Advantage Media, L.L.C. v. City of Eden Prairie*, 456 F.3d 793, 801 (8th Cir. 2006) ("On an overbreadth challenge [plaintiff] would also be barred from collecting § 1983 damages which are available only for violations of a party's own constitutional rights.").

*ii.*   To be clear, under established third-party standing doctrine, the practitioners' third-party claims should not be allowed to proceed.  First, the practitioners cannot allege a close relationship with their patients, for they have a conflict of interest with those patients.  With the SAFE Act, Arkansas has acted to protect the health and safety of children, and to promote the ethics and integrity of the medical profession.  In such a situation, the interests of the practitioners (freedom to decide which procedures to perform) diverge from those of their patients (freedom not to undergo irreversible procedures that lack clear benefits).  Indeed, the practitioners seek to invalidate laws that provide private rights of action *against them* to those children and others who *do* have close relationships with those patients (such as the children's parents or legal guardian).  This presents a clear conflict of interest between the practitioners and their patients, and third-party standing is forbidden if the interests of the litigant and the third-party rights-holder are even "potentially in conflict."  *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 15 (2004); *see also Kowalski*, 543 U.S. at 135 (Thomas, J., concurring) (noting that third-party standing is disallowed when the litigants "may have very different interests from the individuals whose rights they are raising"); *Canfield Aviation, Inc. v. Nat'l Transp. Safety Bd.*, 854 F.2d 745, 748 (5th Cir. 1988) ("[C]ourts must be sure that the litigant and the person whose rights he asserts have interests which are aligned.").

Practitioners will understandably oppose any law that limits their freedom to ply their trade or that increases their liability exposure.  Practitioners cannot claim to act on behalf of patients when they sue to invalidate laws designed to protect patients *from the practitioners themselves*.  To hold otherwise would be akin to allowing crooked used-car salesmen to challenge a State's lemon law by invoking the constitutional rights of their customers, or allowing employers

to challenge workplace-safety laws by invoking the constitutional rights of their employees. That is not, and should not be, the law.

Allowing the practitioners to challenge the SAFE Act on behalf of their patients would also be at cross-purposes with the limits on third-party standing. Those limits respect patients' autonomy by allowing them to decide whether to invoke their constitutional rights against laws that were enacted for their benefit and protection. *See Duke Power Co. v. Carolina Env't Study Grp., Inc.*, 438 U.S. 59, 80 (1978) (noting that one "reason[] for th[e] prudential limitation on standing when rights of third parties are implicated" is "the avoidance of the adjudication of rights which those not before the Court may not wish to assert"). Patients could decide that the assurance the SAFE Act provides is more valuable than legal claims they could assert against it. Criminal defendants, for example, have a constitutional right to a jury trial, yet they often waive that right in exchange for some non-constitutional entitlement that they value more—such as a reduced charges or a lighter sentence. *See* Frank H. Easterbrook, *Criminal Procedure as a Market System*, 12 J. Legal Stud. 289, 308-09 (1983).

Moreover, empowering practitioners to sue on behalf of children and their parents—and thereby limit the protection of Arkansas law—is even more problematic where, like here, the practitioners do not even claim to sue on behalf of a *known* patient, but only *hypothetical* ones. Although there are three patients and their families in this lawsuit, the practitioners do not purport to sue on their behalf. *See* Compl. ¶¶ 14-15. (Nor do they even allege that the children Plaintiffs are their patients.) They identify no other patients.

In this situation, *Kowalski* requires the conclusion that the practitioners have failed to establish a close relationship sufficient to invoke third-party standing. There, the Supreme Court held that attorneys did not have third-party standing to assert a constitutional challenge on behalf

of hypothetical future clients.  543 U.S. at 134.  In reaching that conclusion, the Court discussed a long line of authorities and observed that third-party standing has been approved only when the litigant asserts the rights of known claimants.  *Id.* at 131, 134.  Third-party standing is not appropriate when the litigant purports to assert the rights of *hypothetical* future claimants because there is "no relationship at all" between them.  *Id.*  Just like in *Kowalski*, the practitioners have "no relationship at all" with these hypothetical future patients, who do not even exist at present. *See id.*

This point raises the second reason the practitioners cannot assert third party standing. Even if the practitioners could identify known patients on whose behalf they wish to sue, such patients would face no "hindrance" preventing them from protecting their own interests in their own lawsuit.  *Kowalski*, 543 U.S. at 130.  Eleven of the named Plaintiffs are children and their parents.  *See* Compl. ¶¶ 9-12.  Two are children undergoing gender-transition procedures.  *Id.* at 72, 79.  And at least one is actually a patient at the very clinic that employs the practitioners.  *See* Compl. ¶¶ 13, 14, 69.  It is, therefore, indisputable that the practitioners' patients—even their patients who are children—can protect their own interests.  Accordingly, the practitioners have not met their burden of showing the sort of hindrance necessary to invoke third-party standing.

Because *neither* of the required elements for third-party standing exist in this case—nor could they, given the nature of the statutes at issue—the Court should dismiss the practitioners' third-party claims.

### 2.    The practitioners lack first-party standing.

The practitioners lack first-party standing to bring their equal-protection claim because there is no Fourteenth Amendment right to perform experimental gender-transition procedures. "The practice of medicine . . . is lawfully prohibited by the State except upon the conditions it imposes.  Such practice is a privilege granted by the State under its substantially plenary power

to fix the terms of admission." *Barsky v. Bd. of Regents of Univ.*, 347 U.S. 442, 451 (1954);

*Birchansky v. Clabaugh*, 955 F.3d 751, 755 (8th Cir. 2020) (rejecting a claim that medical pro-

viders have a "right to provide approved medical services").  Any such claim would necessarily

be "derivative from," and therefore duplicative of, those patients.  *Whalen v. Roe*, 429 U.S. 589,

604 (1977) (holding that doctors' claim was "no stronger than" patients' claim, and "rejection of

[patients'] claim therefore dispose[d] of the doctors' as well").  Therefore, the Court should dis-

miss the practitioners' first-party equal-protection claim.

## II.    Plaintiffs fail to state an equal-protection claim.

### A.    The SAFE Act is subject to only rational-basis review.

Under the Equal Protection Clause, absent special circumstances, the SAFE Act "is ac-

corded a strong presumption of validity."  *Heller v. Doe*, 509 U.S. 312, 319 (1993).  In that case,

it is constitutional "so long as it bears a rational relation to some legitimate end."  *Vacco v. Quill*,

521 U.S. 793, 799 (1997).  "[I]f any state of facts reasonably may be conceived to justify" the

SAFE Act, then it is constitutional.  *McGowan v. Maryland*, 366 U.S. 420, 426 (1961).  The only

exception is for laws that "involv[e] fundamental rights" or "proceed[] along suspect lines."

*Heller*, 509 U.S. at 319.  Because the SAFE Act does neither of those things, only rational-basis

review applies.

As an initial matter, Plaintiffs do not even allege that the SAFE Act involves fundamental

rights of the children seeking to undergo gender-transition procedures, or the practitioners seek-

ing to perform them.  *See* Compl. ¶¶ 155-71.  That is likely because, as explained below, there is

no fundamental right for a practitioner to perform, or for a child to undergo, a gender-transition

procedure.  *Cf. Planned Parenthood of Mid-Missouri & E. Kansas, Inc. v. Dempsey*, 167 F.3d

458, 464 (8th Cir. 1999) (abortion clinics have no fundamental right to perform abortions).  In

any case, the practitioners could not use any right of a child as a means to elevate the standard of

review for their own equal-protection claim.  *See Birth Control Centers, Inc. v. Reizen*, 743 F.2d 352, 358 (6th Cir. 1984) (physicians may not "use their patients' due process rights as a means of elevating the standard of review for their own equal protection rights").  Although they claim a violation of the parents' fundamental rights, they assert this only as a claim under the Due Process Clause.  *See* Compl. ¶¶ 172-78.  The fatal flaws with this claim are also explained below.

Thus, the only question for purposes of the equal-protection analysis is whether the SAFE Act involves a similar suspect classification.  Because it does not, it is subject to only rational-basis review, and it easily survives.

### 1.    The SAFE Act's classifications follow from its goal of protecting children, not from targeting transgender status or sex.

Neither the practitioners seeking to perform, nor the children seeking to undergo, gender-transition procedures are suspect classes under the Equal Protection Clause.  Suspect classifications include race, religion, alienage, and national origin.  *Att'y Gen. of N.Y. v. Soto-Lopez*, 476 U.S. 898, 906 n.6 (1986); *City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976).  In addition, the U.S. Supreme Court has recognized quasi-suspect classifications based on sex and illegitimacy also receive some degree of heightened scrutiny.  *Clark v. Jeter*, 486 U.S. 456, 461 (1988).  But neither the practitioners nor the children fall into any of these classifications.  *Cf. Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 269 (1993) (holding that "'[w]omen seeking abortion' is not a qualifying class" for equal protection purposes).

On its face, the SAFE Act does not "treat anyone differently from anyone else or draw any distinctions between persons."  *Vacco*, 521 U.S. at 800.  If the SAFE Act classifies at all, it does so on the basis of age.  *See Gregory v. Ashcroft*, 501 U.S. 452, 470 (1991) (applying rational-basis review because the Supreme Court "has said repeatedly that age is not a suspect classification under the Equal Protection Clause").  As a child-protection measure, the Act leaves

any *adult* free to undergo the experimental procedures that it prohibits for children.  This fact undermines Plaintiffs' claim that the SAFE Act classifies on the basis of transgender status or sex. *See* Compl. ¶¶ 165-66.  Under the Act, a practitioner cannot perform a gender-transition procedure on a young woman one month *before* her 18th birthday.  But that same practitioner can perform that same gender-transition procedure on that same young woman one month *after* her 18th birthday.  Such a "classification by age does not define a 'discrete and insular' group, in need of 'extraordinary protection from the majoritarian political process.'"  *Stiles v. Blunt*, 912 F.2d 260, 264 (8th Cir. 1990) (quoting *Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 314, 314 (1976)); *see United States v. Carolene Products Co.*, 304 U.S. 144, 152-53 n.4 (1938).

Plaintiffs attempt to avoid that conclusion by claiming the SAFE Act creates a classification based on transgender status since that Act only prohibits procedures that children who identify as transgender are likely to pursue.  *See* Compl. ¶¶ 163, 164.  But the Supreme Court has rejected precisely this sort of argument in the equal-protection context.  *See, e.g.*, *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 271-72 (1979) (recognizing that "many [laws] affect certain groups unevenly, even though the law itself treats them no differently from all other members of the class described by the law").  Thus, for example, a veterans' preference statute was not a sex-based classification even though 98% of veterans were male.  *Id.*  Likewise, the Court has held that a legislative classification concerning pregnancy is not a sex-based classification.  *Geduldig v. Aiello*, 417 U.S. 484, 496-97 (1974).  "'While it is true," [the Court] said, 'that only women can become pregnant, it does not follow that every legislative classification concerning pregnancy is a sex-based classification.'"  *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263,

271 (1993) (quoting *Geduldig*, 417 U.S. at 496 n.20).  Similarly, here, even if only children suffering gender dysphoria sought procedures the SAFE Act prohibits, it does not follow that the law classifies based on transgender status.

Attempting to manufacture a suspect classification, Plaintiffs conflate distinctions between different classes of children.  Essentially, by conflating the category of children-who-identify-as-transgender with the distinct category of children-seeking-gender-transition-procedures, Plaintiffs ask this Court to treat the latter as a proxy for the former.  But "the transgender community is not a monolith in which every person wants to take steps necessary to live in accord with his or her preferred gender (rather than his or her biological sex)."  *Doe 2 v. Shanahan*, 917 F.3d 694, 722 (D.C. Cir. 2019) (Williams, J, concurring in the result); *see id.* at 701 (Wilkins, J., concurring) (noting that the transgender classification "include[s] persons who identify with another gender but who do not wish to live or work in accordance with that preferred gender").

Plaintiffs' monolithic characterization of those identifying as transgender disguises three distinct—albeit somewhat overlapping—categories.  Plaintiffs first conflate children-who-identify-as-transgender with the distinct category of children-with-gender-dysphoria.  *See* Compl. ¶ 162 (alleging that "gender dysphoria" is "a condition that *only* transgender people suffer from" (emphasis added)).  But not all who identify as transgender suffer from gender dysphoria, as Plaintiffs elsewhere concede.  *See id.* ¶ 30 (explaining that the DSM-V defines "gender dysphoria" as a condition "*some* transgender people" experience (emphasis added)).  Plaintiffs then conflate these two categories of children with a third, children-who-would-seek-gender-transition-procedures.  *See, e.g., id.* ¶¶ 161, 162 (alleging that "[t]reatment . . . is *always* aimed at affirming a gender identity that differs" from the child's biological sex and that gender-transition procedures are "medically necessary" for such children (emphasis added)).  But, again, these are not

the same class: many children with gender dysphoria and even many who identify as transgender have no desire to go through the experimental interventions covered by the SAFE Act—or even to pass as members of the opposite sex. *See id.* ¶ 33 (alleging that "[t]he precise treatment for gender dysphoria depends upon each person's individualized needs").

Contrary to Plaintiffs' allegations, knowing whether a child suffers from gender dysphoria or identifies as transgender tells us little about whether he or she would seek experimental gender-transition procedures. Indeed, many of those who remain unaffected by the law will be children who suffer from gender dysphoria or identify as transgender. Therefore, it would be inappropriate to treat the SAFE Act's prohibition on gender-transition procedures as a proxy for a classification based on transgender status.

The SAFE Act does not classify based on transgender status but, if at all, based on age. Under the SAFE Act, *any child*, regardless of gender identity or sex, is permitted to receive—and every qualified physician is entitled to provide—puberty blockers, hormones, or surgeries that foster the normal development of (or preserve) their biological functions. *No child*, regardless of gender identity or sex, is permitted to receive—and no physician is entitled to provide—puberty blockers, hormones, or surgeries that experimentally disrupt the normal development of (or destroy) their biological functions. And that is because, as noted, such gender-transition procedures have long-term health consequences, including the destruction of otherwise healthy sex organs and permanent loss of fertility. And while Plaintiffs euphemistically refer to the SAFE Act's classification based on these effects as mere "stereotypes associated with a person's sex assigned at birth," *see* Compl. ¶ 167, the Court is not bound to accept such conclusory allegations—even at the motion-to-dismiss stage. *See Williams*, 2018 WL 9708622, at *1.

Further, Plaintiffs' repeated allegation that gender-transition procedures are "medically necessary" is a legal conclusion that this Court need not accept. *Iqbal*, 556 U.S. at 678 (a court need not "accept as true a legal conclusion couched as a factual allegation."); *see Kosilek v. Spencer*, 774 F.3d 63, 89 (1st Cir. 2014) (en banc) (rejecting the claim that gender-transition surgery is medically necessary); *Gibson v. Collier*, 920 F.3d 212, 216 (5th Cir. 2019) ("[T]he necessity and efficacy of sex reassignment surgery is a matter of significant disagreement within the medical community."); *cf. City of Akron v. Akron Ctr. for Reprod. Health, Inc.*, 462 U.S. 416, 456 (1992) (O'Connor, J., dissenting) (a determination of "accepted medical practice" is not in need of revision "every time the American College of Obstetricians and Gynecologists (ACOG) or similar group revises its views about what is and what is not appropriate medical procedure").

In the leading decision on gender-transition procedures for minors, the District of Arizona rejected the sort of analysis for which Plaintiffs advocate here. *See Hennessy-Waller v. Snyder*, No. CV-20-00335, 2021 WL 1192842 (D. Ariz. Mar. 30, 2021). The plaintiffs there were 15- and 17-year-old biological girls taking testosterone, whose healthcare providers recommended they receive "'male chest reconstruction surgery'—that is, the permanent removal of their breasts." *Id.* at *1. They challenged Arizona's Medicaid program's exclusion of gender-reassignment surgery under the Equal Protection Clause and moved for a preliminary injunction. *Id.*

Those claims largely mirrored those in the complaint here, and the district court in *Hennessy-Waller* had little trouble rejecting them. Relying on *Bostock v. Clayton County, Georgia*, 140 S. Ct. 1731 (2020), and other federal district court cases, the minors argued that the program facially discriminated on the basis of transgender status and sex because it would cover the surgery "for other medically necessary reasons, such as to treat breast cancer or traumatic injury,

but refused to do so for the treatment of gender dysphoria." *Hennessy-Waller*, 2021 WL
1192842, at *8. But the court found their reliance on *Bostock* unpersuasive, and the other cases
were distinguishable because, among other things, the plaintiffs there were adults, not minors.
*Id.* The minors likewise failed to show that their denial was made on the basis of sex because the
program permitted other healthcare for gender dysphoria and they had failed to show that the de-
nial of coverage was not on the basis of some other, permissible rationale. *Id.* at *9. Finally, the
court thought it important that the minors had failed to show "that the surgery they seek is safe
and effective for treating gender dysphoria in adolescents," or that it was medically necessary.
*Id.* at *6, 8. Ultimately, the *Hennessy-Waller* court found that the *Tavistock* "decision regarding
puberty-suppressing medication being experimental suggests the irreversible surgery [the mi-
nors] seek here is also experimental and perhaps risky, which, in turn, casts doubt on the merits
of their claims." *Id.* at *6.

Like the Arizona program, the SAFE Act prohibits only experimental procedures and
permits other healthcare for gender dysphoria. In fact, the SAFE Act expressly *encourages* the
provision of mental health services to children suffering from gender dysphoria. SAFE Act, sec.
2(4). There is no "invidious" purpose to discriminate. *Feeney*, 442 U.S. at 274. The law cer-
tainly is not what Plaintiffs implausibly allege it to be, namely, a ban on healthcare for children
with gender dysphoria. Like *Hennessy-Waller*, this Court should find that the SAFE Act does
not classify on the basis of transgender status or sex.

The SAFE Act treats no one differently because of their gender identity or sex. The
law's distinction between safe and experimental procedures follows from its goal of protecting
children. It is neither accurate nor helpful to describe it as classifying on the basis of transgender
status or sex.

25

2.      **Even if the SAFE Act classified based on transgender status, rational-basis review would apply.**

Even if the SAFE Act did classify based on transgender status, that is not a classification subject to heightened scrutiny.  Neither the Supreme Court nor the Eighth Circuit has treated transgender status as a suspect classification under the Equal Protection Clause.  And there is no warrant for extending current precedent to impose heightened scrutiny here.

First off, Plaintiffs' own allegations show that there is *not* a class of *children* who stably identify as transgender, thus cutting off that avenue for creating a new suspect classification. *Gallagher v. City of Clayton*, 699 F.3d 1013, 1018 (8th Cir. 2012) (holding that "class may be found suspect" if it "shares 'an immutable characteristic determined solely by the accident of birth'") (quoting *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973)).  Plaintiffs concede, for example, that the "origin of gender identity is unknown," and that "there is a general medical consensus" that biology is, at most, only one "component to gender identity."  Compl. ¶ 24.

Plaintiffs also concede that there are important differences among children diagnosed as suffering from gender dysphoria.  They concede, for example, that there is a difference between early- and late-onset gender dysphoria:  "Some transgender people become aware of having a gender identity that does not match their [biological] sex early in childhood." *Id.* ¶ 28.  But others do not experience gender dysphoria until "the onset of puberty, [with] the resulting physical changes in their bodies." *Id.*; *see id.* ¶ 33 (treatment standards "differ depending on whether the treatment is for a pre-pubertal child, an adolescent, or an adult").  Further, Plaintiffs concede that the Diagnostic & Statistical Manual of Mental Disorders recognizes that gender incongruence that does not persist "for at least six months" cannot qualify as gender dysphoria, *id.* ¶ 30, and that even "when gender dysphoria is present in adolescence," children do *not* "always persist in their gender identity in the long term." *Id.* ¶ 145.

As these allegations show, even taken at face value, Plaintiffs cannot maintain that there is a class of transgender children who are "all cut from the same pattern." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 442 (1985). Therefore, they cannot plausibly maintain the existence of a class of transgender children with "an immutable characteristic determined solely by the accident of birth." *Gallagher*, 699 F.3d at 1018. They have not pleaded allegations sufficient to create a new suspect classification. *See Cleburne Living Ctr.*, 473 U.S. at 442 (withholding protected status from the purported class in part because they were an "amorphous" group).

Compounding their failure to plead a new suspect classification, Plaintiffs' allegations likewise undermine any suggestion that transgender children warrant "extraordinary protection from the majoritarian political process.'" *Gallagher*, 699 F.3d at 1018. Plaintiffs do not allege that transgender children have been subjected to "a history of purposeful unequal treatment," suffered from "political powerlessness," or had such disabilities imposed upon them as to implicate the "traditional indicia of suspectness." *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 28 (1973). Indeed, Plaintiffs trumpet the existence of WPATH and the Endocrine Society and their promotion of gender-transition procedures for minors, Compl. ¶¶ 32-40, as well as alleging that they have the support of "major medical and mental health associations," *id.* ¶ 154. Children who identify as transgender likewise enjoy support from institutions such as Arkansas Children's Hospital, *see id.* ¶ 13, and a plethora of powerful advocacy groups, corporations, major international law firms, and media organizations nationwide. They aren't "politically powerless." *See Cleburne Living Center*, 473 U.S. at 472 n.24 (minors "might be considered politically powerless to an extreme degree" but are not a protected class).

To save their equal-protection claim from their failure to justify creating a new suspect classification, Plaintiffs will likely argue that *Bostock* requires treating transgender status as a

27

suspect classification.  But *Bostock* dealt with a different issue in a different analytical context: whether Title VII prohibits firing an employee "for being homosexual or transgender."  140 S. Ct. at 1744.  That opinion turned on Title VII's specific language that prohibits discrimination "because of . . . sex."  *Id.* at 1738 (quoting 42 U.S.C. 2000e-2(a)(1)).  And Title VII's analysis is not the same as the equal-protection analysis.  Title VII applies even when a protected classification is not "the sole or primary cause" for the challenged action.  *Id.* at 1744.  But the same is not true under the Equal Protection Clause.  Because Plaintiffs seek to establish discrimination on a basis not found on the face of the SAFE Act (*i.e.*, transgender status), the Equal Protection Clause requires them to show that the SAFE Act was *motivated* by an invidious discriminatory purpose against a covert classification.  *Feeney*, 442 U.S. at 274; *Washington v. Davis*, 426 U.S. 229, 239 (1976) ("A purpose to discriminate must be present").  Therefore, it would be error to rely on *Bostock* or any other Title VII case here.  *See Hennessy-Waller*, 2021 WL 1192842, at *8.

In sum, even if the SAFE Act classified on the basis of transgender status, rational-basis review would still apply because transgender children are not a suspect classification under the Equal Protection Clause.

**B.    The SAFE Act would survive heightened scrutiny and, by extension, rational-basis review.**

The SAFE Act is "substantially related" to Arkansas's "important governmental objectives" of protecting children and regulating the medical profession.  *United States v. Virginia*, 518 U.S. 515, 524 (1996); *see Reno v. ACLU*, 521 U.S. 844, 869 (1997) (discussing "compelling interest in protecting the physical and psychological well-being of minors" (quoting *Sable Commc'ns of Cal., Inc. v. F.C.C.*, 492 U.S. 115, 126 (1989)).  It is also thus at the very least rationally related to Arkansas's legitimate interests.  *See FCC v. Beach Communications, Inc.*, 508

U.S. 307, 313 (1993) (holding that laws survive rational basis if "there is any reasonably conceivable state of facts that could provide a rational basis for the classification"). Because the SAFE Act satisfies either tier of scrutiny that Plaintiffs allege would apply, they have failed to state a claim under the Equal Protection Clause.[6]

The Supreme Court has made clear that the States have a compelling interest in protecting the well-being of children. *See Reno*, 521 U.S. at 869. In general, "the State has an interest in protecting vulnerable groups . . . from abuse, neglect, and mistakes." *Washington v. Glucksberg*, 521 U.S. 702, 731 (1997). This includes an interest in ensuring that children "exercise their rights wisely." *Hodgson v. Minnesota*, 497 U.S. 417, 444 (1990). That is why "[t]he State's interest in protecting a young person from harm justifies the imposition of restraints on his or her freedom even though comparable restraints on adults would be constitutionally impermissible." *Planned Parenthood of Cent. Mo. v. Danforth*, 428 U.S. 52, 102 (1976) (Stevens, J., concurring in part and dissenting in part).

In addition to protecting the health and safety of children, "[t]here can be no doubt the government 'has an interest in protecting the integrity and ethics of the medical profession.'" *Gonzales v. Carhart*, 550 U.S. 124, 157 (2007) (quoting *Glucksberg*, 521 U.S. at 731). The State has the "power to regulate, reasonably and rationally, all facets of the medical field, even to excluding certain professions or specialists or schools . . . by expressly outlawing them." *England v. La. State Bd. of Med. Examiners*, 263 F.2d 661, 674 (5th Cir. 1959) (denying rehearing and explaining that the Louisiana state medical board may refuse to issue medical licenses to chiropractors).

---

[6] Plaintiffs do not allege that the SAFE Act is subject to strict scrutiny under the Equal Protection Clause. *See* Compl. ¶ 169.

Here, Arkansas has left open avenues for treatment of gender dysphoria while prohibiting only dangerous and experimental gender-transition procedures.  The prohibited procedures are performed on children's bodies and are, in key respects, irreversible.  *See Tavistock*, [2020] EWHC 3274, ¶ 137 ("[T]he use of puberty blockers is not itself a neutral process by which time stands still for the child on puberty blockers, whether physically or psychologically.").  Add to those grave physical effects the fact that there is "very limited evidence as to its efficacy."  *Id.* ¶ 134.  This combination of profound physical effects and limited evidence of benefit means that gender-transition procedures are "properly described as experimental treatment."  *Id.*; *see Hennessy-Waller*, 2021 WL 1192842, at *6 (noting that the *Tavistock* "decision regarding puberty-suppressing medication being experimental suggests the irreversible surgery Plaintiffs seek here is also experimental").

Plaintiffs allege that there is "nothing unique" about gender-transition procedures that justify prohibiting them.  Compl. ¶ 143.  But there is.  Unlike the endocrine and surgical interventions for the conditions that Plaintiffs mention—precocious puberty, delayed puberty, ovarian insufficiency, gynecomastia, etc., *see id.* ¶¶ 132-134—gender-transition procedures do not attempt to treat a condition that manifests itself physically.  *See Tavistock*, [2020] EWHC 3274, ¶ 135, ("The condition being treated, gender dysphoria, has no direct physical manifestation.").  A child experiencing precocious puberty is—by definition—manifesting physiological symptoms. By contrast, a child experiencing gender dysphoria may manifest no physical symptoms at all, instead presenting as a physiologically normal member of her sex.  Undergoing a gender-transition procedure, then, would destroy the normal functioning of her body.

Arkansas has prohibited the experimental gender-transition procedures that threaten its objectives of protecting children from harm and regulated the medical profession by preventing

practitioners from inflicting harm.  Given the limited nature of this prohibition, the SAFE Act substantially furthers Arkansas's important objectives.  Therefore, Plaintiffs have failed to state a claim under the Equal Protection Clause, and this Court should dismiss.

### C.    The SAFE Act is not motivated by disapproval of transgender people.

Plaintiffs finally resort to alleging that the SAFE Act has "nothing to do with protecting children and everything to do with expressing disapproval of transgender people."  Compl. ¶ 64. They suggest that an improper legislative intent can be inferred from the fact that the General Assembly considered various other bills and that two legislators "expressed their personal beliefs in opposition to" gender-transition procedures that differed from the Act's safety concerns.  *Id.* ¶ 55.  But the Supreme Court has specifically rejected reliance on matters like this to discern legislative intent.

In *Hunter v. Underwood*, 471 U.S. 222 (1985), the Court explained that, because inquiries into legislative motives or purposes are "hazardous," a court must consider whether a plaintiff is asking it to interpret the legislation or to void it.  "When the issue is simply the interpretation of legislation," it explained, "the Court will look to statements by legislators for guidance as to the purpose of the legislature, because the benefit to sound decision-making in this circumstance is thought sufficient to risk the possibility of misreading Congress' purpose."  *Id.* at 228 (quoting *United States v. O'Brien*, 391 U.S. 367, 383-84 (1968)).  But "[i]t is entirely a different matter when we are asked to void a statute that is, under well-settled criteria, constitutional on its face, on the basis of what fewer than a handful of Congressmen said about it."  *Id.*  That is because "[w]hat motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for us to eschew guesswork."  *Id.*  The same is true here.  Because Plaintiffs are not asking this Court to interpret the SAFE Act but to void it, reliance on purported stray statements is inappropriate.

Further, this case is far from *Romer v. Evans*, 517 U.S. 620 (1996), where the Court struck down a Colorado constitutional provision that not only repealed all provisions prohibiting discrimination on the basis of sexual orientation but also "prohibit[ed] all legislative, executive or judicial action at any level of state or local government designed to protect . . . gays and lesbians." *Id.* at 624.  That law "inflict[ed] . . . immediate, continuing, and real injuries that outr[a]n and belie[d]" the asserted interest in "freedom of association" and in "conserving resources to fight discrimination against other groups." *Id.* at 635.  In "making a general announcement that gays and lesbians shall not have any particular protections from the law," it "raise[d] the inevitable inference that the disadvantage imposed [wa]s born of animosity toward the class of persons affected." *Id.*

The SAFE Act does nothing of the sort.  To the contrary, it *protects* all children, including those who suffer from gender dysphoria, from harmful experimentation.  As a law that "appl[ies] evenhandedly to all," the SAFE Act will "'unquestionably comply' with the Equal Protection Clause.  *Vacco*, 521 U.S. at 800 (quoting *New York City Transit Authority v. Beazer*, 440 U.S. 568, 587 (1979)).

## III.    The parents fail to state a substantive-due-process claim.

Plaintiffs allege that there is a "fundamental right of parental autonomy[,] [which] includes the right of parents to seek and to follow medical advice to protect the health and well-being of their minor children."  Compl. ¶ 173.  But Plaintiffs' "careful statement does not narrowly and accurately reflect the right that [they] seek[] to vindicate." *Raich v. Gonzales*, 500 F.3d 850, 864 (9th Cir. 2007).  They cannot state a substantive-due-process claim by alleging it only in generic terminology.  Instead they must plead "a careful description of the asserted fundamental liberty interest." *Glucksberg*, 521 U.S. at 721 (quotation marks omitted).  Yet "conspicuously missing from [Plaintiffs'] asserted fundamental right is its centerpiece," *Raich*, 500

F.3d at 864—namely, the purported right to subject their children to experimental gender-transition procedures.  Because such a right is not "deeply rooted in this Nation's history and tradition," nor "implicit in the concept of ordered liberty," the parents cannot state a substantive-due-process claim.  *Glucksberg*, 521 U.S. at 720-21 (quotation marks omitted).

The parents' failure to state this claim can be viewed in two ways:  first, just as their children would have no substantive-due-process right of access to experimental gender-transition procedures, *a fortiori*, the parents cannot themselves have a right to access those same procedures on behalf of their children; and second, the right to direct a child's upbringing does not include a right to choose a particular experimental medical procedure for that child.

A. **There is no right of affirmative access to experimental gender-transition procedures.**

The parents assert a novel fundamental right to access experimental gender-transition procedures for their children.  *See* Compl. ¶ 175.  But such a right on the parent's part could exist only if a child herself has a substantive-due-process right to experimental gender-transition procedures for him or herself.  The parents' parental-rights claim is thus "derivative from, and therefore no stronger than" their child's claim, just as a doctor's claim is derivative from a patient's claim.  *Whalen*, 429 U.S. at 604.

Plaintiffs do not allege that there is an individual right of affirmative access to experimental gender-transition procedures, and for good reason:  There is no such right.  "The mere novelty of such a claim is reason enough to doubt that 'substantive due process' sustains it; the alleged right certainly cannot be considered so rooted in the traditions and conscience of our people as to be ranked as fundamental."  *Reno v. Flores*, 507 U.S. 292, 303 (1993) (quotation and citation omitted).

Federal courts of appeal have spoken with one voice in rejecting such affirmative-access claims. *Abigail All. for Better Access to Developmental Drugs v. von Eschenbach*, 495 F.3d 695, 710 n.18 (D.C. Cir. 2007) (en banc) ("No circuit court has acceded to an affirmative access claim."). The en banc D.C. Circuit has held that there is not "a right to procure and use experimental drugs that is deeply rooted in our Nation's history and traditions." *Id.* at 711. American history in fact demonstrates the opposite: "increasing regulation of drugs as both the ability of government to address these risks has increased and the risks associated with drugs have become apparent." *Id.* Thus, the Constitution does not afford even "terminally ill patients a right of access to experimental drugs that have passed limited safety trials but have not been proven safe and effective." *Id.* at 697. The Tenth Circuit ruled likewise in a case brought by terminally ill cancer patients suing for the right "to take whatever treatment they wished regardless of whether the FDA regarded the medication as 'effective' or 'safe.'" *Rutherford v. United States*, 616 F.2d 455, 456 (10th Cir. 1980).

Numerous other federal courts of appeals concur. *See Abigail All*, 495 F.3d at 710 n.18 (collecting authorities). In *Raich*, for instance, the Ninth Circuit considered and rejected a claim that "the liberty interest specially protected by the Due Process Clause embraces a right to make a life-shaping decision on a physician's advice to use medical marijuana to preserve bodily integrity, avoid intolerable pain, and preserve life, when all other prescribed medications and remedies have failed." 500 F.3d at 864. The Court held that, despite its undeniably long history, medical marijuana had not yet obtained the requisite degree of recognition necessary to constitute a fundamental right. *Id.* at 865. It is no surprise, then that modern medical procedures also lack the sort of widespread acceptance that fundamental rights must have.

To take one final example, in *Morrissey v. United States*, the Eleventh Circuit declined to recognize a fundamental right to [in vitro fertilization], egg donation, and gestational surrogacy," which it described as "decidedly modern phenomena" because "[t]he first IVF-assisted human birth didn't occur until 1978, and it wasn't until the mid to late 1980s that doctors began to use gestational surrogates in conjunction with IVF procedures."  871 F.3d 1260, 1269 (11th Cir. 2017).  The lack of a fundamental right was supported not only by those procedures' lack of a "deep rooting" in "this Nation's history and tradition," *id.* (alterations omitted), but also as a result of the "moral and ethical issues" and "ongoing political dialogue" surrounding them, *id.* at 1270.

It follows from the absence of a fundamental right that the "claim of a right of access to experimental drugs is subject only to rational basis scrutiny."  *Id.* (quoting *Glucksberg*, 521 U.S. at 722 ("a challenged state action [must] implicate a fundamental right" to avoid rational basis review)).  And the SAFE Act easily survives.  The Supreme Court has long made clear that the State may regulate the practice of medicine.  *See Watson v. Maryland*, 218 U.S. 173, 176 (1910) ("There is perhaps no profession more properly open to such regulation than that which embraces the practitioners of medicine.").  And lower courts have applied that principle to the "selection of a particular treatment, or at least a medication"—a choice that "is within the area of governmental interest in protecting public health."  *Rutherford*, 616 F.2d at 457.

The SAFE Act protects children's health and safety by prohibiting dangerous and experimental gender-transition procedures.  "Where there are "plausible reasons" for [the State's] action . . . inquiry is at an end."  *Beach Commc'ns*, 508 U.S. at 313-14.  This Court should not prevent States' opportunity "to seek in new and different ways the elusive answers to the problems of the young."  *McKeiver v. Pennsylvania*, 403 U.S. 528, 547 (1971); *see Whalen*, 429 U.S. at

597 ("[W]e have frequently recognized that individual States have broad latitude in experiment-

ing with possible solutions to problems of vital local concern.").  In a case like this, "judicial in-

tervention" is "unwarranted" and concerns ought to be directed to "the democratic process."

*McKeiver*, 403 U.S. at 547 (quoting *Vance v. Bradley,* 440 U.S. 93, 97 (1979)).

### B.     Parents have no right to access experimental gender-transition procedures for their children.

Because there is no right of affirmative access to experimental gender-transition proce-

dures in the first place, parents have no right to access experimental gender-transition procedures

for their children.  But setting that difficulty to the side, the parents' purported substantive-due-

process parental-rights claim fails on the independent ground that "parents cannot always have

absolute and unreviewable discretion" to decide whether to seek specific medical care for their

children.  *Parham v. J. R.*, 442 U.S. 584, 604 (1979) (holding that Georgia's procedures for ad-

mitting a child for treatment in a state mental hospital did not violate parents' rights).

Parents have fundamental rights, for example, to instruct a child in a foreign language,

*Meyer v. Nebraska*, 262 U.S. 390 (1923), or send a child to a nonpublic school, *Pierce v. Society*

*of Sisters*, 268 U.S. 510 (1925).  But the Supreme Court has made clear that "rights of

parenthood" are "not beyond regulation in the public interest."  *Prince v. Massachusetts*, 321

U.S. 158, 166 (1944); *see Henne v. Wright*, 904 F.2d 1208, 1214 (8th Cir. 1990) (there is no

"fundamental right to give a child a surname with which the child has no legally established pa-

rental connection").  Indeed, parents' "liberty interest in the care, custody, and management of

their children . . . is limited by the state's compelling interest in protecting a child."  *Stanley v.*

*Finnegan*, 899 F.3d 623, 627 (8th Cir. 2018) (quotation omitted).

But the limitations on the right to parent are many, and the right to make parenting decisions does not negate the state's power to legislate to protect children.  Thus, even though parental consent "may lessen the likelihood that some evils the legislation seeks to avert will occur," consent "cannot forestall all of them.  *Prince*, 321 U.S. at 169.  So States may proscribe activities for children—even without including exceptions for parental consent—that they could not proscribe for adults.  *See id.* ("What may be wholly permissible for adults therefore may not be so for children, either with or without their parents' presence."); *see also, e.g.*, *Ginsberg v. New York*, 390 U.S. 629, 645 (1968) (allowing state to prohibit the sale of pornography to minors).

Along these lines, Arkansas prohibits minors from participating in many potentially harmful activities that not even parental consent can render legally permissible.  Among many others, these include the ability of a minor to:

- Make healthcare decisions or execute a durable power of attorney for healthcare decisions (Ark. Code Ann. 20-6-103);

- Execute a declaration governing the withholding or withdrawal of life-sustaining treatment (Ark. Code Ann. 20-17-202(a)(1));

- Object to a physician informing a parent or guardian of treatment given or needed for a sexually transmitted disease (Ark. Code Ann. 20-16-508(b));

- Buy or receive any product containing ephedrine, pseudoephedrine, or phenylpropanolamine (Ark. Code Ann. 5-64-1103(d)(4)(A));

- Get body art on the nipple or genitalia (Ark. Code Ann. 20-27-1502(c));

- Get a brand (Ark. Code Ann. 20-27-1502(d));

- Purchase or possess any intoxicating liquor, wine, or beer (Ark. Code Ann. 3-3-203(a)(1));

- Sell, transport, or handle an alcoholic beverage for a wholesaler, retailer, or transporter of them, including at a restaurant, private club, hotel, or motel (Ark. Code Ann. 3-3-204);

- Possess a cigarette, tobacco product, vapor product, alternative nicotine product, or e-liquid product (Ark. Code Ann. 5-78-102);

37

- Buy herbal snuff (Ark. Code Ann. 20-27-2403(a));

- Use a wireless telecommunications device or a hands-free wireless telephone while driving (Ark. Code Ann. 27-51-1603);

- Rent a personal watercraft (Ark. Code Ann. 27-101-604(e));

- Bet on horse races (Ark. Code Ann. 23-110-405(c));

- Bet on dog races (Ark. Code Ann. 23-111-308(a), 23-111-508(c));

- Play a game of bingo or purchase raffle tickets (Ark. Code Ann. 23-114-404(b));

- Buy a lottery ticket (Ark. Code Ann. 23-115-402(e));

- Act as a canvasser (Ark. Code Ann. 7-9-103(a)(3));

- Sell or give personal property as security to a pawnbroker (Ark. Code Ann. 18-27-204(b)); and

- Sell or give personal property as security to a dealer in second-hand goods (Ark. Code Ann. 18-27-305(1)).

Even a parent who thinks it would be better for children to do some of these things has no legal right to decide that the child can do them.

Indeed, "the state has a wide range of power for limiting parental freedom and authority in things affecting the child's welfare." *Prince*, 321 U.S. at 167. "Acting to guard the general interest in youth's well being, the state as parens patriae may restrict the parent's control by requiring school attendance, regulating or prohibiting the child's labor, and in many other ways." *Id.* at 166 (footnotes omitted). "A democratic society rests, for its continuance, upon the healthy, well-rounded growth of young people into full maturity as citizens, with all that implies. It may secure this against impeding restraints and dangers, within a broad range of selection." *Id.* at 168. That includes the power to prohibit experimental gender-transition procedures on children.

The Supreme Court has cautioned against "expand[ing] the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce

38

and open-ended," and "[b]y extending constitutional protection to an asserted right or liberty in-terest, we, to a great extent, place the matter outside the arena of public debate and legislative ac-tion." *Glucksberg*, 521 U.S. at 720 (quoting *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 125 (1992)).  A parental right to approve experimental gender-transition procedures on their children is not "deeply rooted in this Nation's history and tradition"; nor is "liberty [and] justice" extinguished by its absence.  *Id.* at 721.  Therefore, Plaintiffs fail to state a substantive-due-pro-cess parental-rights claim, and the Court should dismiss the Complaint.

## IV.    Plaintiffs fail to state a free-speech claim.

The SAFE Act creates a new section in the Arkansas Code entitled "Prohibition of gender transition procedures for minors."  SAFE Act, sec. 3 (creating Ark. Code Ann. 20-9-1502).  Sub-section (a) provides that a practitioner "shall not provide gender transition procedures" to a child. *Id.*  Subsection (b) provides that a practitioner "shall not refer" a child "to any healthcare profes-sional for gender transition procedures."  *Id.*

Plaintiffs claim that subsection (b) violates the First Amendment rights of practitioners, as well as children and parents, by preventing practitioners from speaking about gender-transi-tion procedures.  But the law does nothing of the sort.  Rather, having prohibited experimental gender-transition procedures on children, the law likewise prohibits practitioners from sending children to another practitioner for the procedures.  This is plainly not a regulation of *speech* but of *professional conduct*:  It prohibits not the expression of ideas *about* the procedures but the re-ferral of a child to another practitioner *for* the procedures—which even Plaintiffs implicitly rec-ognize by their tendentious description of the provision as a "[h]ealth [c]are [b]an."  Compl. ¶¶ 180-86.  Because the SAFE Act regulates pure conduct of the licensed practitioners by prohibit-ing referrals for experimental gender-transition procedures, Plaintiffs fail to plausibly allege that it violates the First Amendment.

"[T]he State bears a special responsibility for maintaining standards among members of the licensed professions." *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 460 (1978). "[T]he State does not lose its power to regulate commercial activity deemed harmful to the public whenever speech is a component of that activity." *Id.* at 456. Arkansas may "regulate professional conduct, even though that conduct incidentally involves speech," without infringing First Amendment rights because that speech is "afforded less protection." *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2372 (2018). Indeed, "it has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *Ohralik*, 436 U.S. at 456 (quoting *Giboney v. Empire Storage & Ice Co.,* 336 U.S. 490, 502 (1949)). In the context here—provision of experimental medical and surgical procedures—Arkansas's power is at an apex. For "it is clear the State has a significant role to play in regulating the medical profession," in particular. *Gonzales*, 550 U.S. at 157; *see Watson*, 218 U.S. at 176 ("There is perhaps no profession more properly open to such regulation than that which embraces the practitioners of medicine.").

In this light, Arkansas may regulate practitioners' referrals for experimental gender-transition procedures on children even if those referrals did incidentally involve speech. In fact, the SAFE Act's referral provision is narrower than the regulation that the Supreme Court upheld against a First Amendment challenge in *Rust v. Sullivan*, 500 U.S. 173 (1991). That regulation prohibited doctors participating in Title X projects not only from making referrals for abortion but also from counseling patients concerning abortion. *Id.* at 179. The Court held that requiring doctors to "perform their duties in accordance with the regulation's restrictions on abortion counseling and referral" did not violate their First Amendment rights. *Id.* at 198. The limitation on

the doctors' "freedom of expression . . . is a consequence of their decision to accept employment in a project." *Id.* at 199.

Like the doctors in *Rust*, any limitation on the rights of the practitioners here is a consequence of their decision to take advantage of the State of Arkansas's physician-licensing regime. *Barsky*, 347 U.S. at 451 ("The practice of medicine . . . is a privilege granted by the State under its substantially plenary power to fix the terms of admission."). If a practitioner's rights are implicated by the SAFE Act at all, it is "only as part of the practice of medicine, subject to reasonable licensing and regulation by the State." *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 884 (1992) (plurality) (citing *Whalen*, 429 U.S. at 603). Although, like the Title X regulation, Arkansas could have reasonably prohibited counseling concerning experimental gender-transition procedures consistent with the First Amendment, it has not done so. Rather, Arkansas has more narrowly chosen to regulate by prohibiting only referrals. Therefore, the practitioners fail to state a claim that the Safe Act violates their First Amendment rights.[7]

Finally, the SAFE Act does not burden any purported right of children and parents to "hear" a practitioners' referral—whatever that might mean. The law simply does not restrict any right "to receive information and ideas," *Stanley v. Georgia*, 394 U.S. 557, 564 (1969), which in any case can be restricted in the case of children, *Ginsberg*, 390 U.S. at 645. Because Plaintiffs fail to state a claim, the Court should grant Defendants' motion and dismiss the Complaint.

---

[7] The SAFE Act's referral provision is not a content- or viewpoint-based speech regulation, so strict scrutiny does not apply. But, given Arkansas's "compelling interest in protecting the physical and psychological well-being of minors." *Reno*, 521 U.S. at 869 (quoting *Sable Commc'ns*, 492 U.S. at 126, it would survive even that level of review because it is narrowly tailored to protecting Arkansas children from dangerous experimental procedures.

## CONCLUSION

In light of the numerous fatal deficiencies of Plaintiffs' claims, Defendants respectfully request that the Court dismiss the Complaint with prejudice.

Dated:  June 16, 2021                          Respectfully submitted,

LESLIE RUTLEDGE
  Arkansas Attorney General

NICHOLAS J. BRONNI (2016097)
  Arkansas Solicitor General
VINCENT M. WAGNER (2019071)
  Deputy Solicitor General
MICHAEL A. CANTRELL (2012287)
  Assistant Solicitor General
Ka Tina R. Guest (2003100)
  Assistant Attorney General
EMILY YU (2020155)
  Attorney
OFFICE OF THE ARKANSAS
  ATTORNEY GENERAL
323 Center Street, Suite 200
Little Rock, Arkansas  72201
(501) 682-8090
vincent.wagner@arkansasag.gov

*Counsel for Defendants*