IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

JUN 17 2021

JAMES W. McCORMACK, CLERK
By:_____ DEP CLERK

| | | |
|---|---|---|
| DYLAN BRANDT, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Case No. 4:21-cv-450-JM |
| | ) | |
| LESLIE RUTLEDGE, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## STATEMENT OF INTEREST OF THE UNITED STATES

The United States respectfully submits this Statement of Interest, under 28 U.S.C. § 517,[1]

to advise the Court of its view that the Equal Protection Clause of the Fourteenth Amendment

bars the State of Arkansas from discriminating against transgender[2] minors by enacting

legislation that wholesale prohibits healthcare providers from providing them with certain

categories of medically necessary care, or referring them to another provider for such care.

House Bill 1570 (H.B. 1570), passed into law on April 6, 2021 and enacted as Act 626, prohibits

the provision of or referral for "gender transition procedures" for any individual under eighteen

(18) years of age. Act 626 § 3, 93rd Gen. Assemb., Reg. Sess. (Ark. 2021) (to be codified at Ark.

Code Ann. § 20-9-1502(a)-(b)). Plaintiffs have filed a private action challenging the law on

---

[1] Under 28 U.S.C. § 517, "[t]he Solicitor General, or any officer of the Department of Justice, may be sent by the Attorney General to any State or district in the United States to attend to the interests of the United States in a suit pending in a court of the United States, or in a court of a State, or to attend to any other interest of the United States." *Id.*; *see also Jones Truck Lines, Inc. v. AFCO Steel, Inc.*, 849 F. Supp. 1296, 1305 n.4 (E.D. Ark. 1994) (recognizing that the United States may "assert to a court its position . . . in matters of significant interest").

[2] The term "transgender" refers to a person whose gender identity differs from the person's assigned sex at birth, whereas the term "cisgender" refers to a person whose gender identity is the same as the person's assigned sex at birth. For example, a transgender girl is a person who identifies as a girl but whose sex assigned at birth was male.

multiple grounds, including the Equal Protection Clause. The United States files this Statement

of Interest in support of Plaintiffs' Motion for Preliminary Injunction, as Act 626 cannot survive

the heightened scrutiny to which it must be subjected and therefore would violate the Equal

Protection Clause if allowed to go into effect.

   This case implicates important federal interests. The United States is charged with

protecting the civil rights of individuals seeking nondiscriminatory access to healthcare in a

range of health programs and activities under Section 1557 of the Affordable Care Act, 42

U.S.C. § 18116. The Department of Justice is further charged with the coordination and

implementation of federal nondiscrimination laws that protect individuals against discrimination

on the basis of sex in a wide range of federally-funded programs and activities, including, but not

limited to, the provision of healthcare. Exec. Order No. 12250, § 1-201, 45 Fed. Reg. 72,995

(Nov. 4, 1980).

   The United States has a strong interest in protecting the rights of lesbian, gay, bisexual,

and transgender individuals. To that end, the President has issued an Executive Order that

recognizes the right of all persons to "be treated with respect and dignity," "to access healthcare

. . . without being subjected to sex discrimination," and to "receive equal treatment under the

law, no matter their gender identity or sexual orientation." Exec. Order No. 13,988, 86 Fed. Reg.

7,023 (Jan. 25, 2021). The United States also recently filed a Statement of Interest in *Diamond v.*

*Ward*, No. 5:20-cv-00453-MTT (M.D. Ga., Apr. 22, 2021), regarding the inadequacy, under the

Eighth Amendment to the U.S. Constitution, of medical treatment for gender dysphoria that was

provided to a transgender woman while in the custody of the Georgia Department of Corrections.

   Act 626 specifically and discriminatorily denies transgender minors, and only

transgender minors, the ability to receive medically necessary care based solely on their sex

4:21-cv-450-JM

assigned at birth. Discriminating against transgender minors in this manner violates the Equal

Protection Clause. Such discrimination would be justified only if Arkansas could show that it is

substantially related to achieving an important governmental interest. Arkansas cannot make that

showing. For this reason, the United States believes that Plaintiffs' Equal Protection challenge to

Act 626 is likely to succeed on the merits.

## BACKGROUND

Act 626 was passed into law on April 6, 2021 by a simple majority of the General

Assembly, overcoming a Governor's veto less than 24 hours prior. The Act states that "a

physician or other healthcare professional shall not provide gender transition procedures to any

individual under eighteen (18) years of age," nor refer any individual to another healthcare

professional for the same. Act 626 § 3 (to be codified at Ark. Code Ann. 20-9-1502(a)-(b)). The

legislature's proffered justification for this Act is that "the risks of gender transition procedures

far outweigh the benefits at this stage of clinical study on these procedures." *Id.* § 2(15). For

purposes of Act 626, "gender transition procedures" include any:

> medical or surgical service, including without limitation physician's services,
> inpatient and outpatient hospital services, or prescribed drugs related to gender
> transition that seeks to: (i) Alter or remove physical or anatomical characteristics
> or features that are typical for the individual's biological sex; or (ii) Instill or
> create physiological or anatomical characteristics that resemble a sex different
> from the individual's biological sex . . .

*Id.* § 3 (to be codified at Ark. Code Ann. 20-9-1501(6)). Act 626 defines "biological sex" to

mean:

> the biological indication of male and female in the context of reproductive
> potential or capacity, such as sex chromosomes, naturally occurring sex
> hormones, gonads, and nonambiguous internal and external genitalia present at
> birth, without regard to an individual's psychological, chosen, or subjective
> experience of gender.

*Id.* (to be codified at Ark. Code Ann. 20-9-1501(1)).[3] Act 626's definition of "gender transition" surgeries does not include procedures provided to individuals under eighteen years of age who have a medically verified or diagnosed "disorder of sex development."[4] *Id.* (to be codified at Ark. Code Ann. 20-9-1502(c)(1), (2)). Under the law, any healthcare professional who provides a gender transition procedure to a minor, or makes a referral for such a procedure, is subject to discipline by a licensing entity or disciplinary review board. *Id.* (to be codified at Ark. Code Ann. 20-9-1504(a)). Further, they face legal liability in a judicial or administrative proceeding for any "actual or threatened violation" of the Act. *Id.* (to be codified at Ark. Code Ann. 20-9-1504(b)).

On May 25, 2021, Plaintiffs filed this action against Leslie Rutledge, Arkansas Attorney General; Amy Embry, Executive Director of the Arkansas State Medical Board; and fourteen

---

[3] The United States does not concede the accuracy of this definition. The binary of "male" or "female" (here "the biological indication of male and female") does not account for full scientific understanding of biological sex. And scientific literature suggests that the concept of "biological sex" is more complicated than "biological indication[s]" of "reproductive potential or capacity." For example, there is significant evidence of variations in brain development and brain anatomy that are not accounted for in defendant's definition. *See generally, e.g.*, Sarah S. Richardson, SEX ITSELF: THE SEARCH FOR MALE & FEMALE IN THE HUMAN GENOME (2013); Ivanka Savic & Stefan Arver, *Sex Dimorphism of the Brain in Male-to-Female Transsexuals*, 21 CEREBRAL CORTEX 2525 (2011); Bonnie Auyeung, et al., *Fetal Testosterone Predicts Sexually Differentiated Childhood Behavior in Girls and in Boys*, 20 PSYCHOL. SCI. 144 (2009); Eileen Luders, et al., *Regional Gray Matter Variation In Male-To-Female Transsexualism*, 46 NEUROIMAGE 904 (2009); Dick F. Swaab, *Sexual Differentiation Of The Brain And Behavior*, 21 BEST PRAC. & RCHS.: CLINICAL ENDOCRIN. & METABOLISM 431 (2007); Han Berglund, et al., *Brain Response to Putative Pheromones In Lesbian Women*, 103 PROC. NAT'L ACAD. SCI. 8269 (Jan-Åke Gustafsson, et al. eds., 2006); Stephanie H.M. Van Goozen, et al., *Organizing and Activating Effects of Sex Hormones in Homosexual Transsexuals*, 116 BEHAV. NEUROSCI. 982 (2002); Richard Green & E.B. Keverne, *The Disparate Maternal Aunt–Uncle Ratio in Male Transsexuals: An Explanation Invoking Genomic Imprinting*, 202 J. THEO. BIOLOGY 55 (2000); Frank P.M. Kruijver, et al., *Male-to-Female Transsexuals Have Female Neuron Numbers in a Limbic Nucleus*, 85 J. CLINICAL ENDOCRIN. & METABOLISM 2034 (2000); Jay N. Giedd, et al., *Sexual Dimorphism Of The Developing Human Brain*, 21 PROGRESS NEURO-PSYCHOPHARMACOLOGY & BIOL. PSYCHIATRY 1185 (1997).

[4] The law's reference to "disorders of sex development" is a carve-out for the approximately 1.7% of people who are born intersex. *See* Anne Fausto-Sterling, THE FIVE SEXES, REVISITED, SCIS., July-Aug. 2000, at 18, 20. "Intersex" is an umbrella term for the many possible differences in sex traits or reproductive anatomy compared to the usual two ways that human bodies develop. These can include differences in genitalia, hormones, internal anatomy, brain anatomy, brain development, or chromosomes. Because there are multiple factors that influence sex, those factors may provide different outcomes for different people.

4

members of the Arkansas State Medical Board, all in their official capacities. Compl. For

Declaratory and Injunctive Relief 1, ECF No. 1. Plaintiffs include transgender minors and their

families, as well as two medical doctors who bring their claims in their individual capacities on

behalf of themselves and their patients. *Id.* at 1, 4-8. The complaint seeks declaratory and

injunctive relief, alleging the law violates the Equal Protection Clause of the Fourteenth

Amendment (minor and doctor plaintiffs), the Due Process Clause of the Fourteenth Amendment

(parent plaintiffs), and the First Amendment (all plaintiffs). *Id.* at 46. Plaintiffs filed a motion for

preliminary injunction and a memorandum in support of that motion on June 15, 2021.

## ARGUMENT

In determining whether to grant a motion for a preliminary injunction, the court reviews:

"(1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm

and the injury that granting the injunction will inflict on other parties litigant; (3) the probability

that movant will succeed on the merits; and (4) the public interest." *Home Instead, Inc. v.

Florance*, 721 F.3d 494, 497 (8th Cir. 2013) (quoting *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640

F.2d 109, 113 (8th Cir. 1981) (en banc)). In this Statement of Interest, the United States argues

that the plaintiffs are likely to succeed on the merits on their Equal Protection claim. This

Statement does not address the other preliminary injunction factors, or plaintiffs' claims under

the Due Process Clause or the First Amendment. [1]

A state law that specifically denies a limited class of people the ability to receive

medically necessary care from their healthcare providers solely on the basis of their sex assigned

at birth violates the Equal Protection Clause. And yet, this is exactly what Arkansas's Act 626

would do. Act 626 makes physicians and other healthcare professionals liable legally and for

5

professional misconduct if they provide or refer a transgender minor for gender-affirming care – i.e., procedures that affirm the gender with which one identifies. For transgender individuals, gender-affirming care includes procedures that support the process by which a person transitions from living as a gender that corresponds to their sex assigned at birth to living as a different gender. Act 626 limits only transgender minors from receiving gender-affirming care as prescribed by a healthcare provider, and no one else. Indeed, cisgender minors are able to receive gender-affirming care that involves the exact same treatment denied to transgender minors, simply because for one minor the care affirms their "biological sex" as defined in Act 626 and for the other it does not. These restrictions explicitly target transgender people.

That the law references treatments for "gender transition" instead of explicitly referencing "transgender minors" is of no legal consequence: by limiting the treatments available based on adherence to the law's definition of "biological sex," transgender minors are the only group denied care because of their "biological sex" as it relates to their gender identity. *See Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 270 (1993) ("Some activities may be such an irrational object of disfavor that, if they are targeted, and if they also happen to be engaged in exclusively or predominantly by a particular class of people, an intent to disfavor that class can readily be presumed."); *see also Bostock v. Clayton Cnty., Ga.*, 140 S. Ct. 1731, 1742 (2020) (when an employer discriminates against an employee based on the employee's sexual orientation or gender identity, the employer "inescapably *intends* to rely on sex in its decisionmaking") (emphasis added).

As discussed below, Act 626 discriminates against transgender people and violates the Equal Protection Clause under the requisite heightened scrutiny analysis. Discriminatory treatment against transgender people should be evaluated under a heightened scrutiny analysis,

as it constitutes both sex discrimination and discrimination against transgender people as an independently protected class. Under this analysis, Act 626 fails. Arkansas cannot demonstrate that prohibiting certain medically necessary healthcare only for transgender people is substantially related to achieving a legitimate government interest.

**I.   Act 626 is subject to heightened scrutiny under the Equal Protection Clause.**

The threshold inquiry in evaluating any Equal Protection claim is whether the classification at issue warrants heightened review because it jeopardizes a fundamental right or categorizes on the basis of an inherently suspect characteristic. *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992) (citations omitted). As discussed below, Act 626 is subject to heightened scrutiny because it discriminates based on sex and transgender status.

**A.   Act 626 is subject to heightened scrutiny under the Equal Protection Clause because it discriminates on the basis of sex.**

Prohibiting medically necessary care in the manner proscribed by Act 626 amounts to intentional discrimination against transgender minors on the basis of sex.

Recently, the Supreme Court has explained that one cannot "discriminate against a person for being . . . transgender without discriminating against that individual based on sex." *Bostock*, 140 S. Ct. at 1741. The Supreme Court has long held that the Equal Protection Clause prevents states from discriminating against individuals on the basis of sex, absent "an exceedingly persuasive" justification. *See United States v. Virginia*, 518 U.S. 515, 532-33 (1996) ("VMI"). Three courts of appeals – the Fourth, the Seventh, and the Eleventh Circuits—have held that classifications based on gender identity or transgender status warrant heightened scrutiny as a constitutional matter because they are classifications "on the basis of sex." *See Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 610-13 (4th Cir. 2020), *as amended* (Aug. 28, 2020), *reh'g en banc denied*, 976 F.3d 399 (4th Cir. 2020), *petition for cert. filed*, No. 20-

1163 (Feb. 19, 2021); *Adams ex. rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 968 F.3d 1286, 1296

(11th Cir. 2020) ("discrimination against a transgender individual because of [his or] her gender-

nonconformity is sex discrimination, whether it's described as being on the basis of sex or

gender.") (quoting *Glenn v. Brumby*, 663 F.3d 1312, 1317 (11th Cir. 2011)), *petition for reh'g en*

*banc pending*, No. 18-13592 (11th Cir. Aug. 28, 2020); *Whitaker By Whitaker ex rel. v. Kenosha*

*Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1051 (7th Cir. 2017).

Act 626 on its face discriminates on the basis of sex. Under the Act, transgender minors

are singled out for different treatment based on the law's definition of sex, which is limited to

what the State terms "biological sex." This classification alone, which "draw[s] distinctions

using sex or gender . . . for differential treatment" triggers heightened scrutiny. *See Adams*, 968

F.3d at 1295 (citing *Cleburne*, 473 U.S. at 440). The Act uses the sex a person is assigned at

birth to prohibit certain medical procedures. This is, by definition, sex discrimination.  *See*

*Bostock*, 140 S Ct. at 1741 (explaining that "if changing the employee's sex would have yielded

a different choice by the employer . . . a statutory violation has occurred").

Act 626 forbids providing certain forms of care to minors based on sex alone when it

permits a minor who was assigned the female sex at birth and identifies as female to receive care

that would be denied to a minor who was assigned the male sex at birth but identifies as female

(that is, who is transgender). A minor may not directly receive or be referred for care that

includes any "gender transition procedure," that would "alter or remove physical characteristics

or features" associated with the individual's "biological sex," as defined by the law, or those that

"seek to . . . instill or create physiological or anatomical characteristics that resemble a sex

different from the individual's biological sex." Act 626 § 3 (to be codified at Ark. Code Ann. 20-

9-1501(6)(A)). This restriction applies only to minors who have a gender identity different than

8

their sex assigned at birth, i.e., transgender minors. However, minors can receive those same medical treatments if the treatments do not "alter . . . characteristics or features" associated with their "biological sex" as defined by the law. *Id.* For example, a minor whose assigned sex at birth was *male* can receive puberty-blocking medication to treat precocious puberty so that the minor can live as a boy, rather than prematurely experiencing sexual development. But a minor whose assigned sex at birth was *female* cannot receive puberty-blocking medication so that the minor can live as a boy, rather than developing the secondary sex characteristics of a woman. This difference in outcome is based solely on a difference in their sex assigned at birth.

When Arkansas differentiates in this way, it necessarily classifies these minors on the basis of sex. *See Flack v. Wis. Dep't of Health Servs.*, 328 F. Supp. 3d 931, 948 (W.D. Wis. 2018) (holding that insurer's denial of coverage for medically necessary care based on plaintiffs' sex assigned at birth was a "straightforward case of sex discrimination"); *see also Bostock*, 140 S. Ct. at 1746 ("By discriminating against transgender persons, the employer unavoidably discriminates against persons with one sex identified at birth and another today."); *Whitaker*, 858 F.3d at 1051 (school district's policy requiring students to use bathroom in accordance with the sex on the student's birth certificate "cannot be stated without referencing sex" and, therefore, "is inherently based upon a sex-classification and heightened review applies").

The State also discriminates against transgender minors for failing to conform to the sex- and gender-based stereotypes associated with the sex they were assigned at birth. As the Eleventh Circuit has explained, "discrimination against a transgender individual because of her gender-nonconformity is sex discrimination, whether it's described as being on the basis of sex or gender." *Glenn*, 663 F.3d at 1317. The law permits gender-affirming care when such care

4:21-cv-450-JM

reinforces the gender-based stereotypes associated with the individual's sex assigned at birth, but prohibits it when the gender-affirming care does not reinforce those gender-based stereotypes.

For example, the law would permit a minor whose sex assigned at birth was female to undergo a voluntary cosmetic breast augmentation procedure, but not allow a minor whose sex assigned at birth was male to undergo the same procedure – even when recommended as medically appropriate by a physician – simply because on the first minor, the procedure aligns with stereotypical notions of the minor's sex assigned at birth, while on the second minor, the same procedure does not. Similarly, the law would permit a doctor to prescribe testosterone to a minor whose sex assigned at birth was male for male hypogonadism, where the body produces insufficient testosterone, because that prescription aligns with gender-based stereotypes about what is considered "masculine." But a doctor would face professional reprimand and legal action for prescribing medically necessary testosterone to a minor whose sex assigned at birth was female because that prescription would undermine the gender-based stereotypes associated with his sex assigned at birth (or "femininity"). By deciding who receives medically prescribed care based on the State's definition of "biological sex," Arkansas's lawmakers are supplanting the medical judgment and expertise of the minors' treating healthcare providers with stereotypical beliefs about appropriate gender expression.

Relatedly, Act 626's carve-out for intersex[5] minors further confirms the law's reliance on gender-based stereotypes related to a minor's sex assigned at birth, and in fact undermines the law's underinclusive definition of "biological sex." Specifically, the law excludes from its prohibition any "services" to intersex minors, presumably when those procedures are intended to conform the minor's physical appearance to stereotypical expectations associated with the sex

_____

[5] *See supra* n.4.

the minor was assigned at birth. Act 626 § 3 (to be codified at Ark. Code Ann. 20-9-1502(c)).

There is no explanation or justification why these "services," explicitly deemed "not gender

transition procedures," are permissible when considered to be medically necessary for intersex

minors, but grounds for professional misconduct and civil litigation when provided to

transgender minors. *See id.* Allowing these procedures for an intersex minor, but disallowing the

same procedures prescribed by a medical professional to affirm a transgender minor's gender

identity, constitutes a distinction based on impermissible gender and sex-based stereotypes.

### B. Act 626 is subject to heightened scrutiny under the Equal Protection Clause because it discriminates on the basis of transgender status.

Prohibiting medically necessary care in the manner proscribed by Act 626 also

discriminates against transgender minors on the basis of transgender status.

The text of Act 626 explicitly classifies transgender people for different treatment. The

law's legislative findings make clear that the law specifically addresses "children who are

gender-nonconforming" and who "experience distress at identifying with their biological sex."

*Id.* § 2(3). It prohibits any healthcare professional from "provid[ing] gender transition

procedures," or making a referral for the same, to any individual under eighteen years of age.

*Id.*§ 3 (to be codified at Ark. Code Ann. 20-9-1502(a), (b)). These "procedures" are defined as

medical or surgical services that support a "gender transition," defined by the act as "the process

in which a person goes from identifying with and living as a gender that corresponds to his or her

biological sex to identifying with and living as a gender different from his or her biological sex."

*Id.* (to be codified at Ark. Code Ann. 20-9-1501(5)). By definition, a transgender person is

someone whose gender identity is inconsistent with their sex assigned at birth, and thus

transgender people are the only class of people who would seek "gender transition" services. Act

626 requires that transgender minors, as a group, be treated differently from cisgender minors –
and imposes significant penalties for violations of its provisions.

For example, similar to the example provided prior, *supra* Section I.A., if a medical
doctor determines that two young people with the same sex assigned at birth should each be
prescribed the same puberty-blocking medication, the doctor is permitted to prescribe such
medication to the cisgender minor to suppress precocious puberty, but faces professional
reprimand and legal liability for prescribing the *exact same* medication to a transgender minor
even when the medication is necessary as a gender-affirming treatment.

The Supreme Court has analyzed four factors to determine whether a classification
warrants heightened scrutiny: (1) whether the class has historically been subjected to
discrimination, *see Lyng v. Castillo*, 477 U.S. 635, 638 (1986); (2) whether the class has a
defining characteristic that "frequently bears no relation to ability to perform or contribute to
society," *Cleburne*, 473 U.S. at 440-41 (quoting *Frontiero v. Richardson*, 411 U.S. 677, 686
(1973) (plurality opinion)); (3) whether the class has "obvious, immutable, or distinguishing
characteristics that define them as a discrete group," *Lyng*, 477 U.S. at 638; and (4) whether the
class is a minority lacking political power, *Bowen v. Gilliard*, 483 U.S. 587, 602 (1987).
After evaluating the four factors as they relate to transgender people, both the Fourth and Ninth
Circuits – the only circuits to have addressed this question to date – recognized transgender
people as a quasi-suspect class under the Equal Protection Clause. *See Grimm*, 972 F.3d at 611
(finding "[e]ach factor readily satisfied" with regards to transgender people); *Karnoski v. Trump*,
926 F.3d 1180, 1200 (9th Cir. 2019) (upholding the district court's application of strict scrutiny
after applying the factors to determine transgender people are a quasi-suspect class); *but cf.
Brown v. Zavaras*, 63 F.3d 967, 971 (10th Cir. 1995) (recognizing that "sexual identity" may be

immutable but unable to evaluate the factors because of pro se plaintiff's conclusory allegations and following the since overruled holding in *Holloway v. Arthur Andersen & Co.*, 566 F.2d 659 (9th Cir. 1977), that transgender plaintiff not entitled to heightened scrutiny). Several district courts have concluded the same. *See, e.g.*, *F.V. v. Barron*, 286 F. Supp. 3d 1131, 1145 (D. Idaho 2018), decision clarified sub nom. *F.V. v. Jeppesen*, 466 F. Supp. 3d 1110 (D. Idaho 2020), and decision clarified sub nom. *F.V. v. Jeppesen*, 477 F. Supp. 3d 1144 (D. Idaho 2020); *Flack*, 328 F. Supp. 3d at 951–53; *M.A.B. v. Bd. of Educ. of Talbot Cnty.*, 286 F. Supp. 3d 704, 719-21 (D. Md. 2018); *Evancho v. Pine–Richland Sch. Dist.*, 237 F. Supp. 3d 267, 288 (W.D. Pa. 2017); *Bd. of Educ. of the Highland Loc. Sch. Dist. v. United States Dep't of Educ.*, 208 F. Supp. 3d 850, 873-74 (S.D. Ohio 2016); *Adkins v. City of New York*, 143 F. Supp. 3d 134, 139-140 (S.D.N.Y. 2015); *Norsworthy v. Beard*, 87 F. Supp. 3d 1104, 1119 (N.D. Cal. 2015). Although no Court within the Eighth Circuit has yet examined this question, each of the four factors supports a finding that transgender status warrants heightened scrutiny.

### 1. *The class has been subjected to historical discrimination.*

Even the most cursory study of the treatment of transgender individuals in the United States reveals that such individuals, as a class, have historically been subject to discrimination. *See Grimm*, 972 F.3d at 611-12; *Flack*, 328 F. Supp. 3d at 952-53; *M.A.B.*, 286 F. Supp. 3d at 720; *Evancho*, 237 F. Supp. 3d at 288; *Highland*, 208 F. Supp. 3d at 874; *Adkins*, 143 F. Supp. 3d at 139. As the court in *Whitaker* observed, "[t]here is no denying that transgender individuals face discrimination, harassment, and violence because of their gender identity." 858 F.3d at 1051. Transgender people experience higher levels of physical and sexual violence, harassment, and discrimination in the workplace, housing, healthcare, and school than their non-transgender counterparts. *See Karnoski v. Trump*, No. C-17-1297-MJP, 2018 WL 1784464 at *10 (W.D.

Wash. Apr. 13, 2018) (citing Sandy E. James et al., Nat'l Ctr. for Transgender Equal., *The Report of the 2015 U.S. Transgender Survey*, 132-34 (Dec. 2016), *available at* https://perma.cc/FC9M-4QZJ (hereinafter USTS Report)), *vacated on other grounds and remanded*, 926 F.3d 1180 (9th Cir. 2019). For example, nearly half (47%) of respondents to the 2015 USTS Report disclosed being sexually assaulted in their lifetime. USTS Report at 205. Rates of sexual assault of transgender people of color is even more pronounced, as this number increases to 65% for American Indian and Alaskan Native respondents, 59% for multiracial respondents, 58% for Middle Eastern respondents, and 53% for Black respondents. *Id*. In the healthcare setting, nearly one in four (23%) respondents reported delaying healthcare in the past year for fear of being mistreated, and one in three (33%) respondents who had seen a healthcare provider in the previous year reported at least one negative experience because of their real or perceived gender identity, including being verbally harassed, physically attacked, or sexually assaulted. *Id.* at 96-98.

Transgender people are not spared experiences of discrimination, harassment, and violence during childhood and adolescence. Seventy-seven percent (77%) of respondents to the USTS Report who had come out as transgender or were perceived as transgender in kindergarten through twelfth grade (K-12) reported at least one experience of "being verbally harassed, prohibited from dressing according to their gender identity, or physically or sexually assaulted" because of their real or perceived gender identity. USTS Report at 131; *see also Grimm*, 972 F.3d at 597. Nearly one in four (24%) of these respondents reported being physically attacked in K-12 because people thought they were transgender. USTS Report at 132. Experiences of discrimination among transgender minors are not limited to the education setting, as a recent study found 61% of transgender respondents ages thirteen to twenty-four who were employed

14

had experienced discrimination in the workplace. The Trevor Project, *Research Brief: LGBTQ Youth in the Workplace* 1 (Mar. 30, 2021), *available at* https://perma.cc/P73U-HSUB. Further, Arkansas is not the only state seeking to restrict the rights of transgender youth. Twenty states have introduced bills limiting the ability of transgender minors to access gender-affirming medical care; thirty-one states have introduced bills restricting the ability of transgender student athletes to compete on sports teams in accordance with their gender identity. *See* Priya Krishnakumar, *This Record-Breaking Year for Anti-Transgender Legislation Would Affect Minors the Most*, CNN (Apr. 15, 2021), *available at* https://perma.cc/AN6W-DF6F.

> ### 2.   *The class's defining characteristic has no relation to ability to contribute to society.*

The second factor in assessing whether a classification warrants heightened scrutiny is whether the class has a defining characteristic that "bears [a] relation to ability to perform or contribute to society." *Cleburne*, 473 U.S. at 440-41 (internal quotation omitted). Transgender status bears no such relation. As the court in *Adkins* noted, there is no "data or argument suggesting that a transgender person, simply by virtue of transgender status, is any less productive than any other member of society." 143 F. Supp. 3d at 139. *Accord Grimm*, 972 F.3d at 612; *M.A.B.*, 286 F. Supp. 3d at 720; *Evancho*, 237 F. Supp. 3d at 288; *Highland*, 208 F. Supp. 3d at 874; *Norsworthy*, 87 F. Supp. 3d at 1119 n.8. The American Psychiatric Association (APA) has stated that "[b]eing transgender or gender diverse implies no impairment in judgment, stability, reliability, or general social or vocational capabilities." APA Assembly and Board of Trustees, *Position Statement on Discrimination Against Transgender and Gender Diverse Individuals* (2012, 2018). Indeed, the court in *M.A.B.* was unaware of any "argument suggesting that a transgender person or person experiencing gender dysphoria is any less productive than any other member of society." 286 F. Supp. 3d at 720. To the contrary, any impairment is likely

"the product of a long history of persecution forcing transgender people to live as those who they are not." *Adkins*, 143 F. Supp. 3d at 139.

### 3.   *The class shares characteristics that define them as a discrete group.*

The third factor to consider is whether the class in question shares "obvious, immutable, or distinguishing characteristics that define them as a discrete group." *Bowen,* 483 U.S. at 602 (quoting *Lyng*, 477 U.S. at 638). Multiple courts have held that transgender status is immutable, and "being transgender is not a choice[,] [r]ather, it is as natural and immutable as being cisgender." *Grimm*, 972 F.3d at 612-13; *see also*, *M.A.B.*, 286 F. Supp. 3d at 720 ("transgender status is immutable"); *Evancho*, 237 F. Supp. 3d at 288 (plaintiffs' "transgender characteristics are inherent in who they are as people"); *Norsworthy*, 87 F. Supp. 3d at 1119 n.8 (finding transgender identity "equally immutable" as sexual orientation). Further, transgender people share a distinguishing characteristic – that their sex assigned at birth does not align with their gender identity. *M.A.B.*, 286 F. Supp. 3d at 721; *see also Highland*, 208 F. Supp. 3d at 874 ("transgender people have 'immutable [and] distinguishing characteristics that define them as a discrete group,' or as the Second Circuit put it in *Windsor*, 'the characteristic of the class calls down discrimination when it is manifest'") (quoting *Lyng*, 477 U.S. at 638; *Windsor v. United States*, 699 F.3d 169, 183 (2d Cir. 2012) (internal citations omitted), *aff'd*, 570 U.S. 744 (2013)); *Adkins*, 143 F. Supp. 3d at 139-140 ("mismatch between the gender indicated on the document and the gender of the holder calls down discrimination, among other problems").

### 4.   *The class is a minority lacking political power.*

The final consideration is whether transgender people are a minority or lack political power. *Bowen*, 483 U.S. at 602 (quoting *Lyng*, 477 U.S. at 638). Transgender people meet both these criteria. *See Grimm*, 972 F.3d at 613 ("transgender people constitute a minority lacking

political power"). There is no question that transgender people comprise a small percentage of the United States population, with recent estimates that transgender individuals make up at 0.6% of the U.S. adult population. *Id.* This percentage is the same for Arkansas where an estimated 0.6% (13,400) of the population identify as transgender. Andrew R. Flores et al., *How Many Adults Identify as Transgender in the United States?* UCLA, Williams Inst., June 2016, at 3, *available at* https://perma.cc/ATR5-DKG5. In addition, while the number of openly transgender elected officials is growing, they still represent a fraction of public office holders. *Grimm*, 972 F.3d at 613 ("Even considering the low percentage of the population that is transgender, transgender persons are underrepresented in every branch of government."). There are over 500,000 elected positions at the federal, state, and local level. Jennifer Lawless, *Becoming a Candidate: Political Ambition and the Decision to Run for Office* 2 (2012). Openly transgender people hold thirty-nine (<0.008%) of these offices. Victory Institute, *Out for America*, *available at* https://perma.cc/E5H3-FJP6 (last visited June 16, 2021). Across the country, states are introducing and passing legislation aimed at restricting the rights of transgender individuals, particularly transgender minors. *See* discussion *supra* Part I.B.1. The limited political power and the resulting political vulnerability of the transgender community is undeniable.

Upon consideration of these factors, the court should conclude that transgender people are a quasi-suspect class entitled to heightened scrutiny.

## II. Act 626 cannot survive heightened scrutiny because it is not substantially related to achieving Arkansas's articulated governmental interests.

Act 626 cannot survive heightened scrutiny. To survive a heightened scrutiny analysis, the government actor must show that the action in question "serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." *See VMI*, 518 U.S. at 533 (quoting *Miss. Univ. for Women v.*

17

*Hogan*, 458 U.S. 718, 724 (1982)) (internal quotation marks omitted). "The burden of justification is demanding and it rests entirely on the State." *VMI*, 518 at 533 (citing *Miss. Univ. for Women,* 458 U.S. at 724). Heightened scrutiny requires that the justification proffered be "exceedingly persuasive." *Id*. at 531. The required inquiry provides an enhanced measure of protection in circumstances where there is a greater danger that the legal classification results from impermissible prejudice or stereotypes, *see, e.g.*, *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493 (1989) (plurality opinion), or those that reflect "a bare . . . desire to harm a politically unpopular group," *United States Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973). Act 626 cannot survive the rigorous analysis that heightened scrutiny demands.

 Arkansas proffers the protection of the "health and safety of its citizens, especially vulnerable children" as its important governmental interest. Act 626 § 2(1). This justification is mere pretext for animus against transgender minors. When evaluating an articulated governmental interest, the "justification must be genuine, not hypothesized," and "must not rely on overbroad generalizations." *VMI*, 518 U.S. at 533; *see also Grimm*, 972 F.3d at 615 (holding that policy restricting access to restroom by "biological sex" is "marked by misconception and prejudice" against transgender plaintiff) (citation omitted); *Adams*, 968 F.3d at 1297 (holding that no substantial relationship existed between defendants' articulated justification and its policy because the concerns articulated by defendants were merely hypothesized, and because the policy treated transgender plaintiff differently "simply because he defies gender stereotypes"); *SmithKline Beecham Corp. v. Abbott Lab'ys*, 740 F.3d 471, 483 (9th Cir. 2014) (noting that the court must examine the law's "actual purposes and carefully consider the resulting inequality to ensure that our most fundamental institutions neither send nor reinforce messages of stigma or second-class status.") (citing *Windsor*, 570 U.S. 744)). A classification does not withstand

heightened scrutiny when "the alleged objective" of the classification differs from the "actual purpose." *Miss. Univ. for Women,* 458 U.S. at 730.

The State argues that this law is necessary to protect vulnerable children because the "risks of gender transition procedures far outweigh any benefit at this stage of clinical study." Act 626 § 2(15). This contention is both pretextual and factually incorrect, contradicted by the text of the law itself, by the lawmakers' statements, by the medical consensus around such care, and by the demonstrated negative impacts of denying gender-affirming, medically necessary care to vulnerable transgender minors.

First, this stated justification is pretextual. If the State's purported health-driven concerns regarding the medical risks of the procedures undertaken as part of gender-affirming care were genuine, the State would prohibit these procedures for all minors, whether they are transgender, cisgender, or intersex. But instead of adopting an across-the-board standard, the State has prohibited those treatments only when provided to a specific class of people – transgender minors. As discussed in the example above, testosterone may be prescribed to a cisgender boy for male hypogonadism, even though studies indicate that such treatment could also have a negative effect on fertility, yet a transgender boy may not be prescribed the same. *See* Jordan Cohen et al., *Low Testosterone in Adolescents & Young Adults*, 10 Frontiers in Endocrinology, Jan. 10, 2020, *available at* https://perma.cc/J7DD-AR3R. This singling out of transgender minors reveals that the purported neutral health-related justification is pretextual. *See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 547 (1993) (observing that a state undermines its stated interest "when it leaves appreciable damage to that supposedly vital interest unprohibited") (internal quotation marks and citation omitted).

Further, legislative hearings on H.B. 1570 (now Act 626) demonstrate the legislature's bias. Across multiple days, the Arkansas House and Senate heard testimony from opponents of the bill – limited to two minutes per witness – ranging from medical professionals to transgender people themselves, discussing the detailed treatment protocols in place for transgender minors as well as the life-threatening effects of making gender-affirming care inaccessible. *See, e.g., Hearing on H.B. 1570 Before the H. Pub. Health, Welfare, & Lab. Comm.*, 2021 Leg. 93rd Sess., March 9, 2021 at 4:54:55- 5:37:48 (Ark. 2021) (hereinafter Mar. 9 Hearing) (statements of Courtney Friarson, Gary Wheeler, Kristen Sowell, Lance Lavar, MD Hunter, Dr. Michele Hutchinson, Willow Bashirs, Chris Attig, Carmen Angelica), *available at* https://perma.cc/9MMK-B8QQ; *Hearing on H.B. 1570 Before the S. Pub. Health, Welfare, & Lab. Comm.*, 2021 Leg. 93rd Sess., Mar. 22, 2021 at 4:20:51-5:07:35 (Ark. 2021) (hereinafter Mar. 22 Hearing) (statements of Lance Lavar, Cash Ashley, Chris Attig, Courtney Friarson, Dr. Natalie Burr, Jennifer Steel, Joanna Brandt, Dr. Kathryn Stambough, Kristen Sowell, Genevieve Bergman, Stacy O'Brien, Willow Bashirs, MD Hunter, Elizabeth Barger, Dr. Michele Hutchinson), *available at* https://perma.cc/84UQ-MV5N. The two-minute time restriction reportedly resulted in multiple people with first-hand experience on the topic being cut-off mid-testimony. Yet, according to reports, such restrictions did not appear to apply to those witnesses presenting in favor of the bill. *See, e.g.*, Mar. 22 Hearing at 4:15:03 (Chair Sen. Cecile Bledsoe informing a witness speaking in favor of the bill that the two-minute restriction did not apply to him and that she would "love for [him] to go on."); Katie Eyer, *Why the Arkansas Ban on Medical Care for Transgender Kids Is Unconstitutional*, The Regulatory Review, May 4, 2021, *available at* https://perma.cc/UL94-ZW7V.

Statements of H.B. 1570 (now Act 626) co-sponsors also reveal that the true motivation driving this law is anti-transgender bias. For example, Representative Jim Wooten, when addressing concerns of transgender people, stated "what if your child comes to you and says I want to be a cow?" Andrew DeMillo, *Arkansas Lawmakers OK Transgender Sports, Treatment Limits*, Associated Press (Mar. 10, 2021), *available at* https://perma.cc/5CD8-MTWV. Representative Marcus Richmond has shared anti-transgender social media posts. *See* "Richmond 4 State Rep District 21," *Is that lunch he is holding?*, Facebook (Jan. 31, 2021), https://perma.cc/9FAX-WL6R (reposting image and comment regarding Dr. Rachel Levine, the current Assistant Secretary for Health at the U.S. Department of Health and Human Services, and a transgender woman, in which Dr. Levine is referred to by her previous name and male pronouns); Facebook (March 2, 2021), https://perma.cc/9G67-BELW (reposting cartoon denigrating gender-affirming care for minors, originally posted by Representative Alan Clark). The biases and moral disapproval articulated by the law and its sponsors are not justifiable reasons to legislate.[6] *See Lawrence v. Texas*, 539 U.S. 558, 577-78 (2003) (holding moral disapproval of same-sex sexual conduct and identity was impermissible basis for legislation); *see also Palmore v. Sidoti,* 466 U.S. 429, 433 (1984) (noting in the race context that "[t]he Constitution cannot control such prejudices but neither can it tolerate them. Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect.").

Second, this justification lacks a scientific or other factual basis. Gender-affirming treatment is supported by medical evidence that has been subject to rigorous study. Indeed, every major expert medical association recognizes that gender-affirming care for transgender minors,

---

[6] Intermediate scrutiny is the appropriate level of review in this case. But even under rationality review, this statute would fail because bare dislike of an unpopular social group is never a legitimate legislative motive. *See Cleburne*, 473 U.S. at 446-47; *Moreno*, 413 U.S. at 534.

4:21-cv-450-JM

including forms of care prohibited by Act 626, may be medically appropriate and necessary to improve the physical and mental health of transgender people. Kellan E. Baker, *The Future of Transgender Coverage*, 376 New Eng. J. Med., 1801 (2017), *available at* https://perma.cc/DLU7-DA6V. The American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (2013),[7] has also formally recognized that transgender people may experience gender dysphoria, a medical condition defined by "a marked incongruence between one's experienced/expressed gender and their assigned gender" that is "associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning." Gender-affirming health services for minors, such as puberty blockers and hormone therapies with testosterone or estrogen, can reduce dysphoria and improve other markers of well-being, such as quality of life, interpersonal and psychological functioning, and self-esteem. *See* National Academies of Sciences, Engineering, and Medicine, *Understanding the Well-Being of LGBTQI+ Populations* 363-64 (2020), *available at* https://perma.cc/77TP-L6DU. Additionally, studies show that suppressing development of secondary sex characteristics reduces the need for future surgery by preventing physical changes that are otherwise irreversible and allowing youth more time to explore their gender identity. *Id.*; Jason Raftery, et al., *Ensuring Comprehensive Care and Support for Transgender and Gender-Diverse Children and Adolescents*, 142 Pediatrics No. 4 (Oct. 2018), *available at* https://perma.cc/L9X6-ALEP. By contrast, transgender minors who do not receive gender-affirming care face increased rates of victimization, suicide, substance abuse, and other potentially risky behavior. *See*, *e.g.*, U.S. Dep't Health & Human Servs. Weekly Morbidity and

---

[7] The Diagnostic and Statistical Manual of Mental Disorders is issued by the American Psychiatric Association and is a widely utilized and recognized resource for clinical practice used by mental health clinicians and researchers.

Mortality Rep. Vol. 68, *Transgender Identity and Experiences of Violence Victimization,*
*Substance Use, Suicide Risk, and Sexual Risk Behaviors Among High School Students — 19*
*States and Large Urban School Districts*, 2017, 67-71 (Jan. 25, 2019), *available at*
https://perma.cc/N7TR-X6Q9. In short, the medical community is in overwhelming accord that
gender-affirming care is clinically indicated.

   Further, rather than being experimental, the care prohibited by Act 626 has been
recognized as part of the standards of care by major medical associations. For example, the
American Medical Association (AMA) recognizes that "standards of care and accepted
medically necessary services that affirm gender or treat gender dysphoria may include mental
health counseling, non-medical social transition, gender-affirming hormone therapy, and/or
gender-affirming surgeries," and that "[e]very major medical association in the United States
recognizes the medical necessity of transition-related care for improving the physical and mental
health of transgender people." Letter from J. Madara, CEO, Am. Med. Ass'n to Bill McBride,
Exec. Dir., Nat'l Governors Ass'n, Apr. 26, 2021 (hereinafter AMA Letter), *available at*
https://perma.cc/3DG8-KXCE.[8]

   Focusing on surgical treatments for minors like "genital or nongenital gender
reassignment surgery" that are prohibited by Act 626 is a red herring. Act 626 § 3 (to be codified
at Ark. Code Ann. 20-9-1501(6)(A)(ii)). In reality, those treatments are very rarely prescribed for
transgender minors. In fact, treatment guidelines for children and adolescents require a

---

[8] *See also* "Frontline Physicians Call on Politicians to End Political Interference in the Delivery of Evidence Based
Medicine," May 15, 2019 (statement issued on behalf of American Academy of Family Physicians, American
Academy of Pediatrics, American College of Obstetricians and Gynecologists, American College of Physicians,
American Osteopathic Association, and American Psychiatric Association regarding state laws that "inappropriately
interfere with the patient-physician relationship, unnecessarily regulate the evidence-based practice of medicine and,
in some cases, even criminalize physicians who deliver safe, legal, and necessary medical care"), *available at*
https://perma.cc/TR52-77XB (last visited June 16, 2021).

4:21-cv-450-JM

methodical, step-by-step treatment regimen that infrequently leads to surgery for minors. For example, the Endocrine Society sets specific, evidence-based clinical practice guidelines for gender dysphoric/gender-incongruent people, including specific recommendations for treatment of adolescents. Generally recommended treatment begins with hormone-suppression when a minor starts puberty. And the addition of gender-affirming hormones is only recommended "after a multidisciplinary team has confirmed the persistence of gender dysphoria/gender incongruence and [the transgender individual has] sufficient mental capacity to give informed consent" (which is estimated to be present by age 16). *See Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline*, 102 J. of Clinical Endocrinology & Metabolism, 3869 (2017), as amended. Additionally, the current treatment guidelines, as found in the Standards of Care issued by the World Professional Association for Transgender Health (WPATH),[9] recommend against gender-affirming genital surgery until someone has reached the legal age of majority to give consent for medical procedures. *See* World Pro. Ass'n for Transgender Health, *Standards of Care for the Health of Transsexual, Transgender, and Gender-Conforming People*, 7th ed. (2012). Indeed, Arkansas' officials' own words undermine the "grave concern" apparently prompting this law, instead showing Act 626 is a "solution" in search of a problem. Representative Robin Lundstrum, originator of the law, admitted she in fact does not know of a single genital reassignment surgery having been performed on a minor in the State. March 9 Hearing; 4:51:22 (statement of Rep. Lundstrum); *see also* Asa Hutchinson, Governor, State of Arkansas, Press Conf. Vetoing House

---

[9] WPATH is a professional association that develops "best practices and supportive policies" related to the health and treatment of transsexual, transgender, and gender nonconforming people.

Bill 1570 (Apr. 5, 2021) (hereinafter Hutchinson Press Conf.) ("In Arkansas, gender
reassignment surgery is not performed on anyone under 18.").

Rather than rely on the judgment of medical professionals and evidence-based treatment
guidelines, Arkansas has inserted itself within one of the most confidential and personal of
relationships: the physician-patient relationship. The AMA calls state laws such as this one "a
dangerous governmental intrusion into the practice of medicine." AMA Letter. In his statement
vetoing the bill, Governor Hutchinson stated that should H.B. 1570 become law, it would create
"new standards of legislative interference with physicians and parents . . . put[ting] the state as
the definitive oracle of medical care, overriding parents, patients, and healthcare experts."
Hutchinson Press Conf. Indeed, multiple healthcare professionals testified against H.B. 1570
when it was under consideration, highlighting the existing treatment guidelines and the potential
of increased suicide rates among transgender minors should they be denied access to medically
necessary care as a result of the bill's passage. Mar. 9 Hearing at 5:11:12 – 5:13:24 (statement of
Dr. Michele Hutchinson); Mar. 22 Hearing at 4:30:19 – 4:32:36, 4:41:35 – 4:43:57, 5:01:25 –
5:05:53 (statements of Dr. Natalie Burr, Dr. Kathryn Stambough, Dr. Michele Hutchinson). The
Arkansas chapter of the Academy of Pediatrics even organized a rally against passage of H.B.
1570. *See* Tristan Hill, *Arkansas Pediatricians Rally Against HB 1570*, KNWA FOX 24 (Apr. 3,
2021), *available at* https://perma.cc/3P9L-RDPY. Indeed, in response to a question from
Representative Tippi McCullough, Representative Lundstrum admitted that she did not produce
even one "Arkansas health care professional with experience and expertise in this issue" to speak
in support of H.B. 1570. *H. Floor Sess. on H.B. 1570*, 2021 Leg. 93rd Sess., March 10, 2021 at
2:09:56, *available at* https://perma.cc/8XDL-X4PF.

25

Act 626 cannot survive heightened scrutiny because the State's articulated objectives are merely pretextual justifications lacking any scientific or factual basis. The law, which prohibits widely-accepted treatment protocols, would deny transgender minors medically necessary care solely based on their sex assigned at birth and their transgender status. If the State truly intended to protect "vulnerable" minors, it would not insert itself into the physician-patient relationship for purposes of depriving these minors' necessary and appropriate treatment.

## CONCLUSION

Federal law bars the State of Arkansas from singling out transgender minors for specifically and discriminatorily denying their access to medically necessary care based solely on their sex assigned at birth. Such action would violate the Equal Protection Clause. By denying only transgender minors' access to medically necessary care, and penalizing the healthcare providers who would provide it, the State does not further its purported goal of protecting the "health and safety" of Arkansan minors but rather thwarts it by denying the most vulnerable among them life-saving care.

4:21-cv-450-JM

Respectfully submitted, this Seventeenth day of June, 2021.

KRISTEN CLARKE
Assistant Attorney General
Civil Rights Division

PAMELA S. KARLAN
Principal Deputy Assistant Attorney General
Civil Rights Division

SHAHEENA A. SIMONS
Acting Deputy Assistant Attorney General
Civil Rights Division

CHRISTINE STONEMAN
Principal Deputy Chief performing duties of chief
Civil Rights Division
Federal Coordination and Compliance Section

ANNA MEDINA
Acting Deputy Chief
Civil Rights Division
Federal Coordination and Compliance Section

DYLAN NICOLE de KERVOR
CA Bar No. 269169
ALYSSA C. LAREAU
NY Bar No. 4265328
Trial Attorneys
Civil Rights Division
Federal Coordination and Compliance Section
950 Pennsylvania Ave. NW - 4CON, 7th Floor
Washington, DC 20530
Telephone: (202) 616-2271
Dylan.deKervor@usdoj.gov
*Attorneys for the United States of America*

4:21-cv-450-JM

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS

DYLAN BRANDT, *et al.*,              )
                                     )
Plaintiffs,                          )
                                     )
vs.                                  ) Case No. 4:21-cv-450-JM
                                     )
LESLIE RUTLEDGE, *et al.*,           )
                                     )
Defendants.                          )

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on June 17, 2021, I submitted a paper copy of the attached Statement

of Interest on behalf of the United States of America to the Clerk of the Court, and when it is

entered into the CM/ECF system it will be served to all parties.

Respectfully submitted,

_____
DYLAN NICOLE de KERVOR
CA Bar No. 269169
Trial Attorney
Civil Rights Division
Federal Coordination and Compliance Section
950 Pennsylvania Ave. NW - 4CON, 7th Floor
Washington, DC 20530
Telephone: (202) 616-2271
Dylan.deKervor@usdoj.gov

1

4:21-cv-450-JM