**FILED**
U. S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

JUN 2 3 2021

JAMES W. McCORMACK, CLERK
By:_____
                              DEP CLERK

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**CENTRAL DIVISION**

**DYLAN BRANDT et al.,**                 )
                                          )
Plaintiffs,                               )
                                          )
                    v.                    )        CASE NO. 4:21-CV-00450-JM
                                          )
**LESLIE RUTLEDGE, et al.,**              )
                                          )
Defendants.                               )
                                          )
                                          )

<u>**MOTION OF AMERICAN ACADEMY OF PEDIATRICS AND ADDITIONAL**
**NATIONAL AND STATE MEDICAL, MENTAL HEALTH, AND EDUCATIONAL**
**ORGANIZATIONS FOR LEAVE TO FILE BRIEF OF AMICI CURIAE**</u>

*Amici curiae* are:  the American Academy of Pediatrics ("AAP"), the Academic Pediatric

Association, the American Academy of Child and Adolescent Psychiatry ("AACAP"), the

American Association of Physicians for Human Rights, Inc. d/b/a GLMA: Health Professionals

Advancing LGBTQ Equality ("GLMA"), the American College of Osteopathic Pediatricians

("ACOP"), the American Medical Association ("AMA"), the American Pediatric Society

("APS"), the American Psychiatric Association ("APA"), the Arkansas Chapter of the American

Academy of Pediatrics ("ARAAP"), the Arkansas Council on Child and Adolescent Psychiatry

("ACCAP"), the Arkansas Psychiatric Society, the Association of Medical School Pediatric

Department Chairs ("AMSPDC"), the Endocrine Society, the National Association of Pediatric

Nurse Practitioners ("NAPNAP"), the Pediatric Endocrine Society, the Society for Adolescent

Health and Medicine ("SAHM"), the Society for Pediatric Research ("SPR"), the Society of

Pediatric Nurses ("SPN"), and the World Professional Association for Transgender Health

("WPATH") (collectively, "*amici*").  *Amici* respectfully move for leave to file the attached

*amicus* brief in support of Plaintiffs' Motion for a Preliminary Injunction.  *Amici* have been

informed that Plaintiffs consent to the filing of this motion and Defendants take no position on the motion.

As a group of well-respected medical, mental health, and educational organizations, *amici* seek to offer this Court their scientific views and insights regarding: the serious medical condition known as gender dysphoria; the accepted standard of care—known as gender affirming care—for treating adolescents at risk of or suffering from gender dysphoria; and the consequences of denying gender affirming care to such adolescents as would be required by Arkansas House Bill 1570 (enacted as Act 626 and hereinafter referred to as the "Health Care Ban").

## INTERESTS OF *AMICI CURIAE*

*Amici* are a group of 19 professional medical, mental health, and educational organizations seeking to ensure that all children and adolescents, including transgender youth, receive the optimal medical and mental health care they need to thrive both physically and emotionally. *Amici* include both national and state organizations and represent thousands of health care providers who have specific expertise with the issues raised in the *amicus* brief. Individual statements of interest for each organization can be found in the Appendix to the proposed *amicus* brief, which is attached hereto.

## *AMICI* MEDICAL, MENTAL HEALTH, AND EDUCATIONAL ORGANIZATIONS FULFILL THE CLASSIC ROLE OF *AMICI CURIAE*

By submitting an amicus brief in this matter, *amici* seek to assist this Court on an issue of great importance to many transgender adolescents, their families, and the medical professionals who treat them—the prevention and treatment of gender dysphoria. *Amici* intend to provide this Court with an empirically grounded view of (i) gender dysphoria; (ii) gender-affirming care, which is the accepted standard of care for treating adolescents at risk of or suffering from gender

dysphoria; and (iii) the irreparable harm that would be caused to both adolescent patients and their health care providers if the Health Care Ban is not enjoined. *Amici* thus fulfill the quintessential role for amici curiae, and courts routinely authorize the filing of amicus briefs in such circumstances. *See, e.g.*, *Shoemaker v. City of Howell*, 795 F.3d 553, 562 (6th Cir. 2015) (describing the "traditional function of an amicus curiae" as "assist[ing] in cases of general public interest by supplementing the efforts of private counsel and by drawing the court's attention to [matters] that might otherwise escape consideration") (internal quotations omitted).

The Plaintiffs in this case seek to enjoin the enforcement of the Health Care Ban, which prohibits Arkansas healthcare providers from providing gender affirming care to adolescents who are at risk of or suffering from gender dysphoria, and similarly prohibits medical providers from even referring these patients for gender affirming treatment of gender dysphoria. Gender dysphoria is a serious medical condition characterized by clinically significant distress and/or impairment in relationships, school performance, or other important areas of functioning caused by the incongruence between a patient's gender identity and sex assigned at birth. Gender-affirming medical care is the well-recognized, accepted standard of care for adolescents at risk of or suffering from gender dysphoria. This standard of care is roundly endorsed by the medical community and empirically proven to effectively treat adolescents at risk of or suffering from gender dysphoria.

Because the Health Care Ban would prevent health care providers in Arkansas from providing crucial medical care, it is antithetical to the mission and values of *amici*, all of whom are committed to ensuring that all patients, including transgender adolescents, receive the best possible medical care and the opportunity to thrive both physically and emotionally. Drawing on empirical research and *amici's* extensive experience and expertise in their respective fields, the

3

proposed *amicus* brief explains that the Health Care Ban (i) rests on incorrect facts and outdated and discredited theories about how to treat gender dysphoria; (ii) prohibits health care providers from treating patients in accord with the accepted standard of care when they are at risk for or suffering from gender dysphoria; (iii) needlessly prolongs these patients' distress and materially heightens the risk of adverse outcomes—including suicide—by denying patients such care; and (iv) significantly restrains the free flow of information that is critical to the patient-health care provider relationship.

Courts regularly permit *amici* to file *amicus curiae* briefs to offer their unique expertise and insight on issues of physical and mental health and welfare, including with respect to transgender youth. *See, e.g.*, *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 594 n.1 (4th Cir. 2020) (crediting "leading medical, public health, and mental health organization[]" amici, including AAP, AACAP, AMA, APA  AMSPDC, GLMA: PES, SAHM, and WPATH, with helping the court to "develop[] a fact-based understanding of what it means to be transgender"); *Adams by Kasper v. Sch. Bd. of St. Johns Cnty.*, 318 F. Supp. 3d 1293, 1298 n.14 (M.D. Fla. 2018) (granting AAP, AACAP, AMA, AMSPDC, GLMA, Endocrine Society and PES leave to file an amicus brief in support of a transgender male student, and noting that "the position of [amici] as to the appropriate standard of care for gender dysphoria is useful to understanding that diagnosis").

Moreover, there is no downside to granting *amici*'s motion for leave to file the *amicus* brief.  Courts have recognized that "it is preferable to err on the side of" permitting *amicus* briefs. *Neonatology Assocs., P.A. v. Comm'r*, 293 F.3d 128, 133 (3d Cir. 2002) (Alito, J.); *Duronslet v. Cty. of Los Angeles*, No. 2:16-cv-08933, 2017 WL 5643144, at *1 (C.D. Cal. Jan. 23, 2017).  This is so because "[i]f an amicus brief that turns out to be unhelpful is filed, the

[court], after studying the case, will often be able to make that determination without much trouble and can then simply disregard the amicus brief." *Neonatology Assocs.*, 293 F.3d at 133. "On the other hand, if a good brief is rejected, the [court] will be deprived of a resource that might have been of assistance." *Id.*

## CONCLUSION

For the foregoing reasons, *amici* respectfully request that this Court grant their motion for leave to file their proposed amicus curiae brief (attached hereto) in support of Plaintiffs' Motion for a Preliminary Injunction.

Dated: June 23, 2021

Respectfully submitted,

D. Jean Veta  (admission pending)
William Isasi  (admission pending)
Elizabeth Baia (*pro hac vice* forthcoming)
COVINGTON & BURLING, LLP
One CityCenter
850 Tenth St., N.W.
Washington, D.C. 20001
Phone: (202) 662-6000
jveta@cov.com
wisasi@cov.com
ebaia@cov.com

Michael Lanosa  (admission pending)
COVINGTON & BURLING LLP
1999 Avenue of the Stars
Los Angeles, CA 90067
Phone: (424) 332-4800
mlanosa@cov.com

Jess Askew III, Ark. Bar No. 86005
Andrew King, Ark. Bar No. 2007176
KUTAK ROCK LLP
124 W. Capitol Ave., Suite 2000
Little Rock, AR 72201
Phone: (501) 975-3000
jess.askew@kutakrock.com
andrew.king@kutakrock.com

Cortlin Lannin (*pro hac vice* forthcoming)
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission St., Suite 5400,
San Francisco, CA 94105
Phone: (415) 591-6000

*Counsel for Amici Curiae*

CERTIFICATE OF SERVICE

I hereby certify that on June 23, 2021, I served a true and correct copy of the foregoing upon all counsel of record by electronic mail as follows:

- Alexander S. Holland, hollanda@sullcrom.com
- Breean Walas, breann@walaslawfirm.com
- Chase Strangio, cstrangio@aclu.org
- Christopher L. Travis, travis@gill-law.com
- Duncan C. Simpson LaGoy, simpsond@sullcrom.com
- Garrard Russ Beeney, beeneyg@sullcrom.com
- Jonathan Joseph Ossip, ossipj@sullcrom.com
- Laura Kabler Oswell, oswelll@sullcrom.com
- Leslie Cooper, lcooper@aclu.org
- Peter Drake Mann, mann@gill-law.com
- Sarah Everett, sarah@acluarkansas.org
- Sharon Elizabeth Echols, echols@gill-law.com
- Michael Cantrell, michael.cantrell@arkansasag.gov
- Nicholas J. Bronni, nicholas.bronni@arkansasag.gov
- Emily Yu, emily.yu@arkansasag.gov
- Ka Tina Rena Guest, katina.guest@arkansasag.gov
- Vincent Moore Wagner, vincent.wagner@arkansasag.gov
- Dylan Nicole de Kervor, dylan.dekervor@usdoj.gov

Jess Askew III

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**CENTRAL DIVISION**

| | | |
|---|---|---|
| **DYLAN BRANDT et al.,** | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CASE NO. 4:21-CV-00450-JM |
| | ) | |
| **LESLIE RUTLEDGE, et al.,** | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

**BRIEF OF *AMICI CURIAE* AMERICAN ACADEMY OF PEDIATRICS AND ADDITIONAL NATIONAL AND STATE MEDICAL, MENTAL HEALTH, AND EDUCATIONAL ORGANIZATIONS IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

## FEDERAL RULE OF CIVIL PROCEDURE 7.1 DISCLOSURE STATEMENT

Pursuant to Federal Rule of Civil Procedure 7.1, the undersigned counsel for the American Academy of Pediatrics ("AAP"), the Academic Pediatric Association, the American Academy of Child and Adolescent Psychiatry ("AACAP"), the American Association of Physicians for Human Rights, Inc. d/b/a GLMA: Health Professionals Advancing LGBTQ Equality ("GLMA"), the American College of Osteopathic Pediatricians ("ACOP"),  the American Medical Association ("AMA"), the American Pediatric Society ("APS"), the American Psychiatric Association ("APA"), the Arkansas Chapter of the American Academy of Pediatrics ("ARAAP"), the Arkansas Council on Child and Adolescent Psychiatry ("ACCAP"), the Arkansas Psychiatric Society, the Association of Medical School Pediatric Department Chairs ("AMSPDC"), the Endocrine Society, the National Association of Pediatric Nurse Practitioners ("NAPNAP"), the Pediatric Endocrine Society ("PES"), the Society for Adolescent Health and Medicine ("SAHM"), the Society for Pediatric Research ("SPR"), the Society of Pediatric Nurses ("SPN"), and the World Professional Association for Transgender Health ("WPATH") certify that:

1.      AAP, the Academic Pediatric Association, AACAP, GLMA, ACOP, AMA, APS, APA, ARAAP, ACCAP, the Arkansas Psychiatric Society, AMSPDC, the Endocrine Society, NAPNAP, PES, SAHM, SPR, SPN, and WPATH, respectively, have no parent corporation.

2.      No corporations hold any stock in AAP, the Academic Pediatric Association, AACAP, GLMA, ACOP, AMA, APS, APA, ARAAP, ACCAP, the Arkansas Psychiatric Society, AMSPDC, the Endocrine Society, NAPNAP, PES, SAHM, SPR, SPN, or WPATH,

## TABLE OF CONTENTS

FEDERAL RULE OF CIVIL PROCEDURE 7.1 DISCLOSURE STATEMENT ........................ i

STATEMENT OF INTEREST OF *AMICI CURIAE* ................................... 1

INTRODUCTION ................................................................ 2

ARGUMENT ................................................................... 5

I.    Unsupported Transgender Individuals Are At Heightened Risk of Suffering
Mental and Physical Distress During Adolescence. ........................... 5

    A.    Transgender Gender Identities Are Normal Variations of Human Identity
and Expression. ..................................................... 5

    B.    Transgender Youth Are Frequently Targeted for Discrimination and
Harassment on Account of Their Gender Identity Which, In Turn, Results
in Physical and Mental Health Consequences. ........................... 7

II.    The Medical Profession's Consensus Recommendation Is That Transgender
Adolescents At Risk For or Suffering From Gender Dysphoria Should Receive
Gender-Affirming Care ...................................................... 8

    A.    The Accepted Standard of Care for Gender Dysphoria Is Gender-
Affirming Treatment. ................................................. 9

    B.    The Gender-Affirming Standard of Care Produces Positive Health
Outcomes. .......................................................... 12

    C.    The Health Care Ban Is Premised On Demonstrably Incorrect Findings
Regarding Gender Dysphoria and the Accepted Standard of Care ...... 14

III.    The Health Care Ban Will Irreparably Harm Transgender Adolescents At Risk
For or Suffering From Gender Dysphoria and the Health Care Providers Who
Treat Them ................................................................. 15

    A.    Denying Adolescents At Risk For or With Gender Dysphoria the
Treatment They Need Will Cause Needless Suffering. ................... 16

    B.    The Health Care Ban Significantly Restrains the Free Flow of Information
That Is Critical to the Patient-Health Care Provider Relationship ...... 18

CONCLUSION ................................................................ 20

APPENDIX: *AMICI* STATEMENTS OF INTEREST ............................... 22

ii

## TABLE OF AUTHORITIES

**Page(s)**

**Statutes**

HB 1750 § 2(3) ................................................................................................15

HB 1570 § 2(6)(B) ...........................................................................................14

HB 1570 § 2(9) ................................................................................................15

HB 1570 § 3, Ark. Code Ann. § 20-9-1502(a) ...............................................16

HB 1570 § 3, Ark. Code Ann. § 20-9-1502(b) ...............................................19

HB 1570 § 3, Ark. Code Ann. § 20-9-1504(a) ...............................................19

**Other Authorities**

Am. Med. Ass'n, *Issue Brief: Health Insurance Coverage for Gender-Affirming Care of Transgender Patients* 4 (2019), https://www.ama-assn.org/system/files/2019-03/transgender-coverage-issue-brief.pdf ..........................4, 14, 18

Am. Psychological Ass'n, *APA Resolution on Gender Identity Change Efforts* 2 (2021), https://www.apa.org/about/policy/resolution-gender-identity-change-efforts.pdf .................................................................................................7

Am. Psychological Ass'n, *Guidelines for Psychological Practice with Transgender and Gender Nonconforming People*, 70 Am. Psychologist 832, 832 (Dec. 2015), https://www.apa.org/practice/guidelines/transgender.pdf ........................6, 7

Am. Pyschological Ass'n, *Position Statement on Treatment of Transgender (Trans) and Gender Diverse Youth* (2020) ...........................................24

Amit Paley, The Trevor Project 2020 National Survey, https://www.thetrevorproject.org/survey-2020/ ("Discrimination and Harm" section) .......................................................................................................8

Anna Van der Miesen et al., *Psychological Functioning in Transgender Adolescents Before and After Gender-Affirmative Care Compared With Cisgender General Population Peers*, 66(6) J. Adolescent Health. 699 (June 2020) ...........................................................................................................14

Annelou L.C. de Vries et al., *Young adult psychological outcome after puberty suppression and gender reassignment*, 134(4) Pediatrics 696 (2014), http://www.hbrs.no/wp-content/uploads/2017/05/young-adult-outcome-after-puberty-suppression-2014-de-Vries.pdf .........................................................14

Aviva L. Katz et. al., *Informed Consent in Decision-Making in Pediatric Practice*,
138(2) Pediatrics (Aug. 2016),
https://pediatrics.aappublications.org/content/pediatrics/138/2/e20161484.full.
pdf .................................................................................................................................12

Christal Achille et al. *Longitudinal impact of gender-affirming endocrine
intervention on the mental health and well-being of transgender youths:
preliminary results*, 8 Int'l J. Pediatric Endocrinology (2020),
https://ijpeonline.biomedcentral.com/articles/10.1186/s13633-020-00078-2 .........................13

Eli Coleman et al., *The World Professional Association for Transgender Health.
Standards of Care for the Health of Transsexual, Transgender, and Gender
Nonconforming People* 13, 19 (7th ed. 2012),
https://www.wpath.org/media/cms/Documents/SOC%20v7/SOC%20V7_Engl
ish2012.pdf?_t=1613669341 ..................................................................................................10

*Endocrine Society condemns efforts to block access to medical care for
transgender youth*, Endocrine Soc'y (Apr. 2021),
https://www.endocrine.org/news-and-advocacy/news-room/2021/endocrine-
society-condemns-efforts-to-block-access-to-medical-care-for-transgender-
youth .................................................................................................................................14

Endocrine Soc'y, *Transgender Health: An Endocrine Society Position Statement*
(2020), https://www.endocrine.org/advocacy/position-statements/transgender-
health..............................................................................................................................6, 10

Jack Drescher et al., *Position Statement on Discrimination Against Transgender
and Gender Variant Individuals*, Am. Pysch. Ass'n (2018),
https://www.psychiatry.org/File%20Library/About-APA/Organization-
Documents-Policies/Policies/Position-2018-Discrimination-Against-
Transgender-and-Gender-Diverse-Individuals.pdf.....................................................................7

Jack Turban, *What Is Gender Dysphoria?*, Am. Psychiatric Ass'n (Nov. 2020),
https://www.psychiatry.org/patients-families/gender-dysphoria/what-is-
gender-dysphoria.......................................................................................................................7, 9

Jack K. Turban et al., *Pubertal Suppression for Transgender Youth and Risk of
Suicidal Ideation*, 145(2) Pediatrics e20191725 (Feb. 2020),
https://pediatrics.aappublications.org/content/145/2/e20191725 ................................4, 14, 17

James L. Madara, *AMA to states: Stop interfering in health care of transgender
children*, Am. Med. Ass'n (Apr. 26, 2021), https://www.ama-assn.org/press-
center/press-releases/ama-states-stop-interfering-health-care-transgender-
children .................................................................................................................................7

Jason Rafferty, *Ensuring Comprehensive Care and Support for Transgender and Gender-Diverse Children and Adolescents*, 142(4) American Academy of Pediatrics 1 (Oct. 2018), https://pediatrics.aappublications.org/content/pediatrics/142/4/e20182162.full. pdf?eType=EmailBlastContent&eId=02884fcc-3768-4603-82b8-5e4d7fbe34d5 .................................................................3, 6, 9, 12, 17, 18

Jody L. Herman et al., *Ages of Individuals Who Identify as Transgender* 2 (Jan. 2017), http://williamsinstitute.law.ucla.edu/wp-content/uploads/Age-Trans-Individuals-Jan-2017.pdf ..........................................................................6

Joint Letter to Senate in Support of the Equality Act (May 13, 2021), https://downloads.aap.org/DOFA/Equality%20Act%20Sign%20On%20Letter %20Final.pdf ........................................................................................................13

Joseph G. Kosciw et al., *2017 National School Climate Survey*, GLSEN, at 94 (2018), https://www.glsen.org/sites/default/files/2019-10/GLSEN-2017-National-School-Climate-Survey-NSCS-Full-Report.pdf ..........................................7

K. R. Olson, et al., *Mental health of transgender children who are supported in their identities*, 137(3) Pediatrics e20153223 (Mar. 2016), https://pediatrics.aappublications.org/content/137/3/e20153223 ...........................8

David A. Levine, *Office-Based Care for Lesbian, Gay, Bisexual, Transgender, and Questioning Youth*, Committee on Adolescence, 132(1) Pediatrics e297 (July 2013), https://pediatrics.aappublications.org/content/132/1/e297 ...................18

*Major Health, Education, and Child Welfare Organizations Oppose Anti-LGBTQ State-Based Legislation*, Am. Acad. of Pediatrics (Mar. 5, 2021), https://services.aap.org/en/news-room/news-releases/aap/2021/major-health-education-and-child-welfare-organizations-oppose-anti-lgbtq-state-based-legislation/ .............................................................................................................13

M. Hassan Murad, et al., Hormonal Therapy and Sex Reassignment: A Systematic Review and Meta-Analysis of Quality of Life and Psychosocial Outcomes, 72 Clinical Endocrinology 214 (Feb. 2010) ...............................................................17

Michelle M. Johns et al., *Transgender identity and experiences of violence victimization, substance use, suicide risk, and sexual risk behaviors among high school students–19 states and large urban school districts, 2017*, US Dep't of Health and Human Servs., Centers for Disease Control & Prevention, 68(3) MMWR 67 (Jan. 25, 2019), https://www.cdc.gov/mmwr/volumes/68/wr/pdfs/mm6803a3-H.pdf.......................8

Rebekah Hall Scott, *"Kids feel like they're being erased": Inside the clinic
    targeted by Arkansas's new anti-trans law*, Arkansas Times (June 9, 2021),
    https://arktimes.com/arkansas-blog/2021/06/09/kids-feel-like-theyre-being-
    erased-inside-the-clinic-targeted-by-arkansass-new-anti-trans-law (explaining
    that genital surgeries are not performed on patients under the age of 18 in
    Arkansas) .............................................................................................................................12

Simona Martin et al., *Criminalization of Gender-Affirming Care—Interfering with
    Essential Treatment for Transgender Children and Adolescents*, New Eng. J.
    Med. (2021), https://www.nejm.org/doi/full/10.1056/NEJMp2106314) ..............11, 12, 13, 14

Stewart L. Andelson, *Practice parameter on gay, lesbian, or bisexual sexual
    orientation, gender non-conformity, and gender discordance in children and
    adolescents*, 51 J. Am. Acad. of Child & Adolescent Psychiatry 957 (2020),
    https://doi.org/10.1016/j.jaac.2012.07.004 .............................................................................15

*The Pediatric Endocrine Society Opposes Bills that Harm Transgender Youth*,
    Pediatric Endocrine Soc'y (Apr. 2021), https://pedsendo.org/news-
    announcements/the-pediatric-endocrine-society-opposes-bills-that-harm-
    transgender-youth-2/ ...............................................................................................................14

*What does transgender mean?* Am. Psychological Ass'n (2014),
    https://www.apa.org/topics/lgbtq/transgender .........................................................................2

*What does the scholarly research say about the effect of gender transition on
    transgender well-being?*, Cornell University,
    https://whatweknow.inequality.cornell.edu/topics/lgbt-equality/what-does-the-
    scholarly-research-say-about-the-well-being-of-transgender-people/ .....................................14

Wylie C. Hembree et al., *Endocrine Treatment of Gender-Dysphoric/Gender-
    Incongruent Persons: An Endocrine Society Clinical Practice Guideline*,
    102(11) J. Clinical Endocrinology & Metabolism 3869 (Nov. 2017),
    https://academic.oup.com/jcem/article/102/11/3869/4157558#99603280 ..............2, 10, 11, 17

## STATEMENT OF INTEREST OF *AMICI CURIAE*

*Amici curiae* are the American Academy of Pediatrics ("AAP"), the Academic Pediatric Association, the American Academy of Child and Adolescent Psychiatry ("AACAP"), the American Association of Physicians for Human Rights, Inc. d/b/a GLMA: Health Professionals Advancing LGBTQ Equality ("GLMA"), the American College of Osteopathic Pediatricians ("ACOP"), the American Medical Association ("AMA"), the American Pediatric Society ("APS"), the American Psychiatric Association ("APA"), the Arkansas Chapter of the American Academy of Pediatrics ("ARAAP"), the Arkansas Council on Child and Adolescent Psychiatry ("ACCAP"), the Arkansas Psychiatric Society, the Association of Medical School Pediatric Department Chairs ("AMSPDC"), the Endocrine Society, the National Association of Pediatric Nurse Practitioners ("NAPNAP"), the Pediatric Endocrine Society ("PES"), the Society for Adolescent Health and Medicine ("SAHM"), the Society for Pediatric Research ("SPR"), the Society of Pediatric Nurses, and the World Professional Association for Transgender Health ("WPATH").  Individual statements of interest for each organization can be found in the attached Appendix.

*Amici* are professional medical, mental health, and educational organizations seeking to ensure that all children and adolescents, including transgender youth, receive the optimal medical and mental health care they need and deserve to thrive both physically and emotionally.  *Amici* include both national and state organizations and represent thousands of health care providers who have specific expertise with the issues raised in this brief.  As explained in the Motion for Leave to File Brief of *Amici Curiae*, *amici*'s brief will provide important expertise not otherwise provided by the parties to this case, and thus should be considered.

## INTRODUCTION

House Bill 1570 (also known as "Act 626" and hereinafter, the "Health Care Ban") prohibits health care providers in Arkansas from performing or referring patients for medical treatments that have been roundly endorsed by the medical community and empirically proven to reduce the distress of transgender[1] adolescents at risk for or suffering from a clinical medical condition known as gender dysphoria. As such, the Health Care Ban is antithetical to the mission and values of *amici* medical organizations, which are committed to ensuring that all patients, including transgender adolescents, receive the best possible medical care and the opportunity to thrive both physically and emotionally. Drawing on their experience and expertise in their respective fields, *amici* assert that the Health Care Ban: (i) rests on incorrect facts and outdated and discredited theories about how to treat gender dysphoria, (ii) prohibits health care providers from treating patients in accord with the accepted standard of care when they are at risk for or suffering from gender dysphoria, and (iii) in denying patients such care, needlessly prolongs these patients' distress and materially heightens the risk of adverse outcomes, including suicide. To say such patients risk "irreparable harm" from the Health Care Ban is to understate their situation: for many such patients, whether the Health Care Ban takes effect is a matter of life and death.

---

[1] "Transgender" is an umbrella term used to describe many identities in which the person's "gender identity, gender expression, or behavior does not conform to that typically associated with the sex to which they were assigned at birth." *What does transgender mean?* Am. Psychological Ass'n (2014), https://www.apa.org/topics/lgbtq/transgender. Sex assigned at birth is usually based on genital anatomy. *See* Wylie C. Hembree et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline*, 102(11) J. Clinical Endocrinology & Metabolism 3869 (Nov. 2017) (hereinafter "Endocrine Soc'y Clinical Guidelines"), https://academic.oup.com/jcem/article/ 102/11/3869/4157558#99603280. Although the term "transgender" can be further subcategorized and also may not encompass all people who are gender non-conforming, for simplicity, this brief uses the term "transgender" to refer to all people who experience a discordance between their gender identity and their sex assigned at birth.

Individuals may be diagnosed with the clinical condition known as gender dysphoria, which reflects an incongruence between the patient's gender identity (*i.e.*, the innate sense of oneself as being a particular gender) and the patient's sex assigned at birth. This incongruence leads to clinically significant distress and impairment in relationships, school performance, or other aspects of their life.[2] If not treated, or treated improperly, gender dysphoria can result in debilitating anxiety and depression, self-harm, and suicide. As such, the effective treatment of gender dysphoria can constitute life-saving treatment.

The consensus recommendation of the medical community, including that of the professional organizations participating here as *amici*, is that the standard of care for patients at risk of or with gender dysphoria is "gender-affirming care."[3] The goals of gender-affirming care include mitigating distress associated with gender dysphoria and giving individuals who suffer from that condition support. Gender-affirming care includes both mental health care and medical interventions. In some circumstances, and always in consultation with the patient and the patient's family, it may include the use of medication to delay puberty and, later, to develop secondary sex characteristics consistent with the patient's gender identity. A robust body of empirical evidence demonstrates that proper gender-affirming care can mitigate a patient's clinical distress and lead to significant improvements in the overall well-being of youth and adolescents who are at risk of or have been diagnosed with gender dysphoria.

---

[2] *See* Jason Rafferty, *Ensuring Comprehensive Care and Support for Transgender and Gender-Diverse Children and Adolescents*, 142(4) American Academy of Pediatrics 1 (Oct. 2018), https://pediatrics.aappublications.org/content/pediatrics/142/4/e20182162.full.pdf?eType=Email BlastContent&eId=02884fcc-3768-4603-82b8-5e4d7fbe34d5 (Committee on Psychosocial Aspects of Child and Family Health, Committee on Adolescence and Section on Gay, Lesbian, Bisexual and Transgender Health and Wellness) (hereinafter "AAP Policy Statement").
[3] *Id.* at 4, 10.

The Health Care Ban disregards this medical consensus by prohibiting health care providers from treating patients in accordance with the accepted standard of care when they are at risk of or suffering from gender dysphoria. Instead, it touts outdated and now discredited theories, including the proposition that in most instances a patient's gender dysphoria is transient and will resolve on its own, thus obviating the need for any medical intervention. This "treatment" represents a deliberate choice to let patients suffer notwithstanding the availability of treatments that have been *proven* to mitigate distress.

The evidence shows that denying patients proper gender-affirming care (or abruptly discontinuing such care) when they are at risk for or suffering from gender dysphoria will cause irreparable harm. For example, studies show that transgender adults who received appropriate treatment during adolescence had a lower incidence of lifetime suicidal ideation than those who wanted but could not obtain such treatment. In fact, approximately *nine in ten* transgender adults who wanted such treatment but did not receive it reported experiencing suicidal ideation.[4] Moreover, evidence suggests that the denial of medically-supervised care will increase the likelihood that patients with gender dysphoria will seek out dangerous, non-medically supervised treatments.[5] It is for these reasons, among others, that pediatricians and child and adolescent psychiatrists practicing in Arkansas recognize that the Health Care Ban would put their patients' lives at risk.[6]

---

[4] Jack K. Turban et al., *Pubertal Suppression for Transgender Youth and Risk of Suicidal Ideation*, 145(2) Pediatrics e20191725 (Feb. 2020), https://pediatrics.aappublications.org/content/145/2/e20191725 (discussion section).

[5] *See* Am. Med. Ass'n, *Issue Brief: Health Insurance Coverage for Gender-Affirming Care of Transgender Patients* 4 (2019), https://www.ama-assn.org/system/files/2019-03/transgender-coverage-issue-brief.pdf.

[6] *See* Ex. 1 (Letter from Arkansas Chapter of American Academy of Pediatrics to A. Hutchinson (Mar. 30, 2021)) (hereinafter "ARAAP Letter"); Ex. 2 (Letter from Arkansas Council on Child (continued…)

In addition, the Health Care Ban prevents health care providers from exercising their medical expertise and profoundly intrudes on the patient-health care provider relationship by completely banning referrals for gender-affirming care.[7]  By banning potentially life-saving care and banning even referrals for such care, the Health Care Ban will irreparably harm adolescents in Arkansas at risk for or suffering from gender dysphoria.  Accordingly, *amici* unequivocally support plaintiffs' motion for a preliminary injunction to enjoin the law from taking effect.

## **ARGUMENT**

**I.**     **Unsupported Transgender Individuals Are At Heightened Risk of Suffering Mental and Physical Distress During Adolescence.**

A person's sex assigned at birth is distinct from the person's gender identity, which is a person's innate sense of oneself as being a particular gender.  For transgender people, their sex assigned at birth is incongruent with their gender identity.  Many transgender individuals start to experience that incongruence during childhood or adolescence.  Even though there is now a robust scientific consensus that transgender identities are a normal variation of human identity, evidence shows that transgender adolescents are frequently the targets of discrimination, harassment, and violence, and are far more likely than their non-transgender peers to experience self-harm and suicidality.  Far from alleviating this grave public health crisis, the Health Care Ban will only exacerbate it, seriously endangering the lives of transgender adolescents across Arkansas.

**A.**     **Transgender Gender Identities Are Normal Variations of Human Identity and Expression.**

---

and Adolescent Psychiatry and American Academy of Child and Adolescent Psychiatry to A. Hutchinson (Mar. 31, 2021)) (hereinafter "AACAP and ACCAP Letter").

[7] *See* Ex. 1 (ARAAP Letter, *supra* note 6).

As discussed above, gender identity is a person's "deep internal sense of being female, male, a combination of both, somewhere in between, or neither."[8]  Most people have a gender identity that aligns with their sex assigned at birth.[9]  However, transgender people have a gender identity that is not fully aligned with their sex assigned at birth.[10]  In the United States, approximately 1.4 million individuals identify as transgender. [11]  Of these individuals, approximately 10 percent are teenagers aged 13 to 17.[12]  Individuals often start to understand their gender identity during childhood and adolescence.  One study of self-identified transgender individuals between the age of 12 and 24, for example, established that those individuals first recognized their gender as being "different" at an average age of 8.5 years.[13]

Transgender people pursue different avenues to affirm their gender identity, including social affirmation (*e.g.*, changing the name and pronouns one uses with friends or family), legal affirmation (*e.g.*, changing the name or gender on one's government-issued documents), and/or medical affirmation (*e.g.*, hormonal and/or surgical processes).[14]  Not all transgender people will have the need for "all domains of gender affirmation, as these are highly personal and individual decisions."[15]

---

[8] AAP Policy Statement, *supra* note 2, at 2 tbl.1; Endocrine Soc'y, *Transgender Health: An Endocrine Society Position Statement* (2020) (hereinafter "Endocrine Soc'y Position Statement"), https://www.endocrine.org/advocacy/position-statements/transgender-health.
[9] *See* Am. Psychological Ass'n, *Guidelines for Psychological Practice with Transgender and Gender Nonconforming People*, 70 Am. Psychologist 832, 832 (Dec. 2015) (hereinafter "Am. Psychological Ass'n Guidelines"), https://www.apa.org/practice/guidelines/transgender.pdf.
[10] *See id.*
[11] Jody L. Herman et al., *Ages of Individuals Who Identify as Transgender* 2 (Jan. 2017), http://williamsinstitute.law.ucla.edu/wp-content/uploads/Age-Trans-Individuals-Jan-2017.pdf.
[12] *Id.* at 3.
[13] AAP Policy Statement, *supra* note 2, at 3.
[14] Jack Turban, *What Is Gender Dysphoria?*, Am. Psychiatric Ass'n (Nov. 2020), https://www.psychiatry.org/patients-families/gender-dysphoria/what-is-gender-dysphoria.
[15] *Id.*

The medical community's understanding of transgender people and gender identity has become more sophisticated over the past two decades.[16] There is now a robust consensus that being transgender "implies no impairment in judgment, stability, reliability, or general social or vocational capabilities."[17] The consensus of the medical community is that transgender identities are "normal variations of human identity and expression."[18]

**B.      Transgender Youth Are Frequently Targeted for Discrimination and Harassment on Account of Their Gender Identity Which, In Turn, Results in Physical and Mental Health Consequences.**

Notwithstanding the scientific consensus that transgender identities are a normal aspect of the human experience, transgender youth and adolescents often experience discrimination, harassment, and violence on account of their gender identity.  Approximately four in five (78 percent) transgender students report having experienced discrimination at school.[19] Similarly, 40 percent of transgender students say they have been physically threatened or harmed due to their gender identity.[20]

Furthermore, due to the challenges they encounter, transgender youth are more at risk for depression, anxiety, and self-harm than their non-transgender peers.  Indeed, in one study,

---

[16] Am. Psychological Ass'n Guidelines, *supra* note 9, at 835.

[17] *See, e.g.*, Jack Drescher et al., *Position Statement on Discrimination Against Transgender and Gender Variant Individuals*, Am. Pyshc. Ass'n (2018), https://www.psychiatry.org/File%20 Library/About-APA/Organization-Documents-Policies/Policies/Position-2018-Discrimination-Against-Transgender-and-Gender-Diverse-Individuals.pdf.

[18] James L. Madara, *AMA to states: Stop interfering in health care of transgender children*, Am. Med. Ass'n (Apr. 26, 2021), https://www.ama-assn.org/press-center/press-releases/ama-states-stop-interfering-health-care-transgender-children; *see also* Am. Psychological Ass'n, *APA Resolution on Gender Identity Change Efforts* 2 (2021), https://www.apa.org/about/policy/resolution-gender-identity-change-efforts.pdf.

[19] *See* Joseph G. Kosciw et al., *2017 National School Climate Survey*, GLSEN, at 94 (2018), https://www.glsen.org/sites/default/files/2019-10/GLSEN-2017-National-School-Climate-Survey-NSCS-Full-Report.pdf.

[20] *See* Amit Paley, The Trevor Project 2020 National Survey, https://www.thetrevorproject.org/survey-2020/ ("Discrimination and Harm" section).

60 percent of transgender youth reported having engaged in self-harm during the preceding 12 months, and over 75 percent of transgender youth reported symptoms of generalized anxiety disorder in the preceding two weeks.[21]

Suicide rates among transgender youth are a grave public health crisis. More than 50 percent of transgender youth have seriously considered attempting suicide,[22] and more than one in three transgender youth (35 percent) reported having attempted suicide in the preceding 12 months.[23] Transgender youth experience all of these traumas—bullying, violence, and suicidality—at higher rates than their non-transgender peers.[24] However, the evidence shows that these emotional and psychiatric challenges are not inevitable and can be reduced to baseline levels when transgender youth receive support in their identities.[25]

## II.   The Medical Profession's Consensus Recommendation Is That Transgender Adolescents At Risk For or Suffering From Gender Dysphoria Should Receive Gender-Affirming Care.

As discussed above, some transgender adolescents suffer from a serious medical condition known as gender dysphoria.[26] Gender dysphoria refers to a specific diagnosis given to those individuals for whom the incongruence between their gender identity and their sex

---

[21] *Id.* ("Introduction" section).

[22] *Id.* ("Suicide & Mental Health" section)

[23] *See* Michelle M. Johns et al., *Transgender identity and experiences of violence victimization, substance use, suicide risk, and sexual risk behaviors among high school students–19 states and large urban school districts, 2017*, US Dep't of Health and Human Servs., Centers for Disease Control & Prevention, 68(3) MMWR 67 (Jan. 25, 2019), https://www.cdc.gov/mmwr/volumes/68/wr/pdfs/mm6803a3-H.pdf.

[24] *See id.*

[25] *See* K. R. Olson, et al., *Mental health of transgender children who are supported in their identities*, 137(3) Pediatrics e20153223 (Mar. 2016), https://pediatrics.aappublications.org/content/137/3/e20153223.

[26] *See* AAP Policy Statement, *supra* note 2, at 3.

assigned at birth leads to "impairment in peer and/or family relationships, school performance, or

other aspects of their life."[27]  Gender dysphoria can cause clinically significant harm.[28]

The consensus among the medical community is that gender-affirming care is the only

effective treatment for gender dysphoria.  Gender-affirming care can include non-medical

interventions (such as mental health care) as well as medication to delay a patient's puberty and,

later, to prompt the patient's development of secondary sex characteristics consistent with their

gender identity.  Empirical research shows that youth with gender dysphoria who receive gender-

affirming care experience improvements in their overall well-being.  The Health Care Ban

squarely prohibits such care.  It also distorts the facts around gender dysphoria and the treatment

options currently available to youth in Arkansas.

A.     **The Accepted Standard of Care for Gender Dysphoria Is Gender-Affirming Treatment.**

The consensus recommendation of medical organizations, including *amici*, is that the

only effective treatment for individuals at risk of or suffering from gender dysphoria is to

provide gender-affirming care.[29]  The goal of gender-affirming care is to provide patients who

struggle with their sense of gender identity the time and support they need to resolve that

struggle, and to mitigate the distress that can be associated with that condition.  Gender-affirming

care seeks to minimize the incongruence between a transgender person's gender identity and

their sex assigned at birth, thereby minimizing or eliminating gender dysphoria.[30]  Gender-

---

[27] *Id.*

[28] *See* Turban, *What Is Gender Dysphoria?*, *supra* note 14.

[29] *See, e.g.*,  AAP Policy Statement, *supra* note 2, at 4 (explaining that gender-affirming care "results in young people having fewer mental health concerns," whereas "treatment models [that] are used to prevent children and adolescents from identifying as transgender or to dissuade them from exhibiting gender-diverse expressions . . . have been proven to be not only unsuccessful but also deleterious and are considered outside the mainstream of traditional medical practice").

[30] *See* Endocrine Soc'y Position Statement, *supra* note 8.

affirming care encompasses a variety of health care treatments, including the medical treatments discussed below, connecting patients and families to resources, improving family communication, and helping individuals develop healthy, helpful ways of coping with stress.

To start, current guidelines hold that before an adolescent suffering from gender dysphoria can receive *any* medical treatments for that condition that are not fully reversible, a qualified mental health professional must confirm that the patient has demonstrated a long-lasting and intense pattern of gender dysphoria, that the gender dysphoria worsened with the onset of puberty, and that the patient has sufficient mental capacity to give informed consent to the treatment.[31]  Additionally, a pediatric endocrinologist, adolescent subspecialist, or other clinician experienced in gender assessment must agree with the indication for treatment; the patient and their parents must be informed of the potential effects and side effects of treatment; and the patient and their parents must give their informed consent.[32]

If these criteria have been met, the current guidelines on the treatment of gender dysphoria state that gonadotropin-releasing hormone (GnRH) analogues, or "puberty blockers," may be used when a patient has reached the onset of puberty, which typically occurs anywhere between the ages of eight and 15.[33]  The goal is to delay further pubertal development until adolescents are old enough and have enough time to make more informed decisions about their

---

[31] Endocrine Soc'y Clinical Guidelines, *supra* note 1, at tbl. 5 (discussing adolescent eligibility criteria for GnRH agonists); Eli Coleman et al., *The World Professional Association for Transgender Health. Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People* 13, 19 (7th ed. 2012), https://www.wpath.org/media/cms/Documents/SOC%20v7/SOC%20V7_English 2012.pdf?_t=1613669341 (hereinafter "WPATH Standards of Care").

[32] Endocrine Soc'y Clinical Guidelines, *supra* note 1; *see also* WPATH Standards of Care, *supra* note 31.

[33] Simona Martin et al., *Criminalization of Gender-Affirming Care—Interfering with Essential Treatment for Transgender Children and Adolescents*, New Eng. J. Med. (2021), https://www.nejm.org/doi/full/10.1056/NEJMp2106314.

gender identity.[34]  GnRH analogues have well known efficacy and side-effect profiles.[35]  In

addition, their effects are reversible.[36]  In fact, GnRH analogues have been used by pediatric

endocrinologists for more than 30 years for the treatment of various medical conditions,

including gender dysphoria.[37]

Later in adolescence—and if the patient, parents, and medical team all agree—hormone

therapy may be used to treat gender dysphoria.[38]  Again, this treatment is only prescribed when a

qualified mental health professional has confirmed the persistence of the patient's gender

dysphoria and the patient's mental capacity to consent to the treatment.[39]  A pediatric

endocrinologist or other clinician experienced in pubertal induction must also agree with the

indication for the treatment, the patient must be informed of the potential effects and side effects,

and the patient and the patient's parents must give their informed consent.[40]  Hormone therapy

involves using cross-sex hormones to allow adolescents who have initiated puberty to develop

secondary sex characteristics consistent with their gender identity.[41]  Although some of these

changes become irreversible after those secondary sex characteristics are fully developed, others

are partially reversible if the patient discontinues use of the hormones.[42]

The accepted standard of care contemplates that the prescription of puberty blockers

and/or hormone therapy be coupled with education on the safe use of such medications and close

---

[34] *See* Ex. 1 (ARAAP Letter, *supra* note 6).

[35] Martin, *supra* note 33.

[36] *Id.*

[37] *Id.*

[38] *Id.*

[39] Endocrine Soc'y Clinical Guidelines, *supra* note 1, at tbl 5 (discussing adolescent eligibility criteria for "subsequent sex hormone treatment").

[40] *Id.*

[41] AAP Policy Statement, *supra* note 2, at 6.

[42] *Id.* at 5–6.

surveillance for any potential risks, which can be mitigated.[43]  Decisions regarding the

appropriate treatment for each patient with gender dysphoria are made in consultation with the

patient, the parents, and the health care team.[44]  There is "no one-size-fits-all approach to this

kind of care."[45]

## B.    The Gender-Affirming Standard of Care Produces Positive Health Outcomes.

A robust body of scientific evidence supports the efficacy of this accepted standard of

care.  That evidence shows that young people suffering from gender dysphoria who receive the

gender-affirming standard of care experience improvements in their overall well-being, to the

point that their level of well-being is generally consistent with that of their non-transgender

peers.[46]  Furthermore, research has linked gender-affirming care to a significantly lowered risk of

depression, anxiety, and other negative mental health outcomes.[47]  For instance, a study of 50

---

[43] *See* Martin, *supra* note 33, at 2.

[44] Protocols for the treatment of gender dysphoria in adults can include surgical interventions, such as non-genital surgeries to feminize or masculinize features (*e.g.*, chest surgery), or genital surgeries involving, for example, the removal of ovaries or the uterus. *See* AAP Policy Statement, *supra* note 2, at 7.  For some adolescent patients being treated for gender dysphoria, preferably after ample time of living in the desired gender role and after one year of hormone treatment, chest reconstruction surgery may be performed under certain circumstances before the patient reaches the age of adulthood. *See* WPATH Standards of Care, *supra* note 31, at 21.  However, genital surgeries on youth under 18 are not recommended and are not performed in Arkansas. *See id.* (indicating that genital surgery should not be carried out until the legal age of majority); Rebekah Hall Scott, *"Kids feel like they're being erased": Inside the clinic targeted by Arkansas's new anti-trans law*, Arkansas Times (June 9, 2021),
https://arktimes.com/arkansas-blog/2021/06/09/kids-feel-like-theyre-being-erased-inside-the-clinic-targeted-by-arkansass-new-anti-trans-law (explaining that genital surgeries are not performed on patients under the age of 18 in Arkansas).

[45] *See* Martin, *supra* note 33; *see also* Aviva L. Katz et. al., *Informed Consent in Decision-Making in Pediatric Practice*, 138(2) Pediatrics (Aug. 2016),
https://pediatrics.aappublications.org/content/pediatrics/138/2/e20161484.full.pdf.

[46] *See* Martin, *supra* note 33, at 2.

[47] *See* *Major Health, Education, and Child Welfare Organizations Oppose Anti-LGBTQ State-Based Legislation*, Am. Acad. of Pediatrics (Mar. 5, 2021), https://services.aap.org/en/newsroom/news-releases/aap/2021/major-health-education-and-child-welfare-organizations-oppose-anti-lgbtq-state-based-legislation/.

transgender youth undergoing puberty suppression treatment found that the treatment was associated with decreased depression and improved quality of life over time.[48]  Gender-affirming care has also been linked to dramatically reduced rates of substance abuse and suicide attempts.[49] A systemic analysis of 25 years of peer-reviewed articles found a robust consensus that gender-affirming treatments, including treatments such as hormone therapy, improve the overall well-being of transgender individuals, and that greater availability of medical and social support for transgender people contributes to a better quality of life.[50]

It is for these reasons that "[e]vidence-based medical treatment for transgender youth and patients with gender dysphoria is supported by all mainstream pediatric organizations, representing thousands of physicians across multiple disciplines."[51]  The Pediatric Endocrine Society has stated that gender-affirming care, including puberty suppression and hormone therapy, is "potentially lifesaving."[52]

---

[48] *See* Christal Achille et al. *Longitudinal impact of gender-affirming endocrine intervention on the mental health and well-being of transgender youths: preliminary results*, 8 Int'l J. Pediatric Endocrinology (2020), https://ijpeonline.biomedcentral.com/articles/10.1186/s13633-020-00078-2.

[49] Joint Letter to Senate in Support of the Equality Act (May 13, 2021), https://downloads.aap.org/DOFA/Equality%20Act%20Sign%20On%20Letter%20Final.pdf.

[50] *What does the scholarly research say about the effect of gender transition on transgender well-being?*, Cornell University, https://whatweknow.inequality.cornell.edu/topics/lgbt-equality/what-does-the-scholarly-research-say-about-the-well-being-of-transgender-people/. Rates of self-reported feelings of regret following gender-affirming care among adolescents are extremely low.  Am. Med. Ass'n, *supra* note 5, at 4.

[51] Ex. 2 at 1 (AACAP and ACCAP Letter, *supra* note 6).

[52] *The Pediatric Endocrine Society Opposes Bills that Harm Transgender Youth*, Pediatric Endocrine Soc'y (Apr. 2021), https://pedsendo.org/news-announcements/the-pediatric-endocrine-society-opposes-bills-that-harm-transgender-youth-2/; *see also Endocrine Society condemns efforts to block access to medical care for transgender youth*, Endocrine Soc'y (Apr. 2021), https://www.endocrine.org/news-and-advocacy/news-room/2021/endocrine-society-condemns-efforts-to-block-access-to-medical-care-for-transgender-youth.

C.    **The Health Care Ban Is Premised On Demonstrably Incorrect Findings Regarding Gender Dysphoria and the Accepted Standard of Care.**

The Health Care Ban reflects inaccuracies about gender dysphoria and in fact endorses an outdated "treatment"—which is in effect an intentional decision *not* to treat—that the medical community has long since repudiated.

First, the law states that there are no long-term data on the use of puberty blockers for the treatment of gender dysphoria.[53]  In fact, "multiple studies have revealed long-term positive outcomes for transgender people who have undergone puberty suppression."[54]

Second, the Health Care Ban asserts that clinicians are increasingly recommending genital surgeries for people younger than 18.[55]  In reality, the Heath Care Ban is a purported response to an issue that does not exist: genital surgical procedures related to gender dysphoria "are not performed on youth in Arkansas."[56]

Third, the law suggests that many young people experiencing gender nonconformity will eventually come to identify with their sex assigned at birth, thus rendering "most physiological interventions unnecessary"—and, of course, the law bans such interventions.[57]  In fact, there are no studies to support the view that people whose gender nonconformity persists into adolescence

[53] HB 1570 § 2(6)(B).

[54] Martin, *supra* note 33, at 2 (citing, *inter alia*, Turban et al., *supra* note 4); *see also* Anna Van der Miesen et al., *Psychological Functioning in Transgender Adolescents Before and After Gender-Affirmative Care Compared With Cisgender General Population Peers*, 66(6) J. Adolescent Health. 699 (June 2020); Annelou L.C. de Vries et al., *Young adult psychological outcome after puberty suppression and gender reassignment*, 134(4) Pediatrics 696 (2014), http://www.hbrs.no/wp-content/uploads/2017/05/young-adult-outcome-after-puberty-suppression-2014-de-Vries.pdf.

[55] HB 1570 § 2(9).

[56] Ex. 1 at 2 (ARAAP Letter, *supra* note 6).

[57] HB 1750 § 2(3).

will revert to their sex assigned at birth whether they receive treatment or not.[58]  Rather, this

theory is premised on the demonstrably false assumption that an individual's gender dysphoria

will naturally cease in the absence of affirming medical care, and therefore endorses the refusal

to provide timely and efficacious medical interventions for adolescents who are in clinical

distress.

### III.    The Health Care Ban Will Irreparably Harm Transgender Adolescents At Risk For or Suffering From Gender Dysphoria and the Health Care Providers Who Treat Them.

If allowed to take effect, the Health Care Ban will cause irreparable harm to transgender

adolescents who are at risk of or experiencing gender dysphoria by prohibiting health care

providers from treating them in accordance with the accepted standard of care.  Preventing a

patient from receiving the care that the patient needs, and that the medical community has

endorsed, needlessly endangers the patient's life and well-being.  The Health Care Ban also will

irreparably harm both health care providers and patients by hobbling the free flow of information

between health care providers and patient, including by banning referrals for gender-affirming

care.  The Health Care Ban thereby encroaches on health care providers' medical expertise and

infringes on their ability to provide accurate, medically-sound counsel to their patients.  Simply

put, by bringing the government into the examination room, the Health Care Ban seriously

impairs the patient-health care provider relationship to the detriment of both, ultimately

endangering the lives of transgender adolescents.

---

[58] *See, e.g.*, Stewart L. Andelson, *Practice parameter on gay, lesbian, or bisexual sexual orientation, gender non-conformity, and gender discordance in children and adolescents*, 51 J. Am. Acad. of Child & Adolescent Psychiatry 957 (2020), https://doi.org/10.1016/j.jaac.2012.07.004 ("In contrast, when gender variance with the desire to be the other sex is present in adolescence, this desire usually does persist through adulthood").

A.     **Denying Adolescents At Risk For or With Gender Dysphoria the Treatment They Need Will Cause Needless Suffering.**

The Health Care Ban denies adolescents at risk for or with gender dysphoria the gender-affirming care that mitigates harm, is grounded in science, and that the medical community has endorsed.  A body of empirical evidence establishes that denying patients that care will have severe and harmful implications.

The Health Care Ban would prohibit health care providers in Arkansas from providing gender-affirming care to their adolescent patients.  Specifically, the Health Care Ban prohibits health care professionals from providing "gender transition" procedures, including puberty blockers and hormone therapy, to any individual under 18 years of age, or referring any individual under 18 years of age for such care.[59]

The gender-affirming care prohibited by the Health Care Ban is crucial to the health of transgender adolescents in Arkansas.  Several studies have found that hormone therapy consistent with the accepted standard of care is associated with reductions in the rate of suicide attempts and significant improvement in quality of life for transgender individuals.[60]  A 2015 study of over 3,400 transgender adults found that those who received puberty blocking hormone treatment had lower odds of lifetime suicidal ideation than those who wanted puberty blocking treatment but did not receive it, even after adjusting for demographic variables and level of family support.[61]  Approximately *nine in ten* transgender adults who wanted puberty blocking treatment but did not receive it reported lifetime suicidal ideation.[62]  In light of these findings, it

---

[59] HB 1570 § 3, Ark. Code Ann. § 20-9-1502(a).
[60] M. Hassan Murad, et al., Hormonal Therapy and Sex Reassignment: A Systematic Review and Meta-Analysis of Quality of Life and Psychosocial Outcomes, 72 Clinical Endocrinology 214 (Feb. 2010).
[61] Turban et al., *supra* note 4.
[62] *See id.*

is not surprising that child and adolescent psychiatrists have attested that, should the Health Care Ban take effect, "the lives of some of our patients will be put at risk."[63]

The deprivation of gender-affirming care can also lead to irreversible physical changes that may negatively impact health outcomes for adolescents with gender dysphoria. For such individuals, the onset of uncontrolled puberty often produces physical changes that can greatly aggravate the incongruence between an adolescent's sex assigned at birth and their gender identity, significantly increasing their gender dysphoria and psychological distress.[64] The experience of full endogenous puberty is an "undesirable condition for [transgender] individual[s] and may seriously interfere with healthy psychological functioning and well-being."[65] Puberty blocking treatment consistent with the accepted standard of care makes transitioning to one's gender identity later in life less difficult, because this treatment prevents irreversible physical changes such as protrusion of the Adam's apple or breast growth.[66] By contrast, puberty blocking treatment is fully reversible; if the treatment is suspended, endogenous puberty will resume.[67]

Finally, the Health Care Ban increases the likelihood that patients with gender dysphoria will seek out dangerous, non-medically supervised treatments. When medically-supervised care is available, patients are less likely to seek out "harmful self-prescribed hormones, use of construction grade silicone injections and other interventions that have potential to cause adverse

---

[63] Ex. 2 (AACAP and ACCAP Letter, *supra* note 6, at 2).
[64] AAP Policy Statement, *supra* note 2, at 5.
[65] Endocrine Soc'y Clinical Guidelines, *supra* note 1.
[66] AAP Policy Statement, *supra* note 2, at 5.
[67] *See id.*

events."[68]  The use of hormones purchased on the street or over the Internet "may cause

significant health problems if used improperly, even if they are pure."[69]

In sum, the Health Care ban would prohibit health care providers from providing gender-

affirming care, notwithstanding that overwhelming empirical evidence shows that treating

adolescents with gender dysphoria in accordance with the accepted standard of care significantly

mitigates suffering and maximizes the potential for positive outcomes.  Denying that care, in

contrast, needlessly prolongs a patient's distress and materially increases the likelihood of

serious, potentially life-threatening harm to transgender adolescents.

**B.      The Health Care Ban Significantly Restrains the Free Flow of Information
         That Is Critical to the Patient-Health Care Provider Relationship.**

Successful medical care depends on the free flow of information between health care

providers and their patients.  A candid and bilateral dialogue ensures that health care providers

can accurately and completely describe the full range of available treatment options, patients can

have all their questions about those options answered, and health care providers and patients can

decide together on the right path forward.  In this regard, health care providers must also be

unencumbered from referring a patient to another provider where, for example, the patient

requires a provider with specialized expertise or skills.  The need for this free flow of

information, including the ability to refer patients to other providers, is particularly important for

a condition such as gender dysphoria, for which there are a relatively limited number of

providers with the requisite expertise.  The Health Care Ban, however, interferes in this aspect of

the patient-health care provider relationship by circumscribing what health care providers can tell

---

[68] Am. Med. Ass'n, *supra* note 5, at 4.

[69] David A. Levine, *Office-Based Care for Lesbian, Gay, Bisexual, Transgender, and Questioning Youth*, Committee on Adolescence, 132(1) Pediatrics e297 (July 2013), https://pediatrics.aappublications.org/content/132/1/e297.

their patients—specifically, by prohibiting health care providers from referring patients to experts who could provide potentially life-saving medical care.

The Health Care Ban includes an explicit prohibition on referrals for gender-affirming care for adolescents,[70] and provides that any such referral is "unprofessional conduct . . . subject to discipline by the appropriate licensing entity or disciplinary review board with competent jurisdiction in this state."[71]  Given the relatively limited number of providers experienced in providing gender-affirming care and the highly specialized nature of some of the treatment options, it is critical that a health care provider have the ability to provide adolescents and their parents with information about specialists who could provide needed care.  The Health Care Ban places health care providers in the untenable position of violating state law and subjecting themselves to disciplinary action if they provide their patients with information they believe to be in the patient's best medical interest; or remaining silent about treatments that could mitigate a patient's profound distress.

In sum, the Health Care Ban represents a broad legislative encroachment into the patient-health care provider relationship.  As medical organizations have recognized, the Health Care Ban would "force[] pediatric providers to make the difficult choice between breaking the law and providing appropriate guidance and interventions for transgender patients."[72]  By putting health care providers in that impossible position and denying patients the candid and medically-accepted advice to which they are entitled, the Health Care Ban works irreparable harm on health care providers and patients alike.

---

[70] *See* HB 1570 § 3, Ark. Code Ann. § 20-9-1502(b) (prohibiting referrals for gender transition procedures).
[71] *See* HB 1570 § 3, Ark. Code Ann. § 20-9-1504(a) (providing that any referral for gender transition procedures constitutes unprofessional conduct).
[72] Ex. 1 at 1 (ARAAP Letter, *supra* note 6).

## CONCLUSION

*Amici*, all of which are leading medical, mental health, and educational organizations, recognize and endorse the scientific and medical consensus that gender-affirming care improves mental and physical health outcomes for transgender youth, particularly those at risk of or suffering from gender dysphoria.  By prohibiting health care providers from treating their patients in accord with this accepted standard of care, the Health Care Ban would result in needless and irreparable harm to these transgender adolescents.  Accordingly, *amici* support plaintiffs' motion for a preliminary injunction.

Dated: _____          Respectfully submitted,

                                _____

D. Jean Veta  (admission pending)          Jess Askew III, Ark. Bar No. 86005
William Isasi  (admission pending)         Andrew King, Ark. Bar No. 2007176
Elizabeth Baia (*pro hac vice* forthcoming)   KUTAK ROCK LLP
COVINGTON & BURLING, LLP                   124 W. Capitol Ave., Suite 2000
One CityCenter                             Little Rock, AR 72201
850 Tenth St., N.W.                        Phone: (501) 975-3000
Washington, D.C. 20001                     jess.askew@kutakrock.com
Phone: (202) 662-6000                      andrew.king@kutakrock.com
jveta@cov.com
wisasi@cov.com                             Cortlin Lannin (*pro hac vice* forthcoming)
ebaia@cov.com                              COVINGTON & BURLING LLP
                                           Salesforce Tower
Michael Lanosa  (admission pending)        415 Mission St., Suite 5400
COVINGTON & BURLING LLP                     San Francisco, CA 94105
1999 Avenue of the Stars                   Phone: (415) 591-6000
Los Angeles, CA 90067
Phone: (424) 332-4800                      *Counsel for Amici Curiae*
mlanosa@cov.com

## APPENDIX: *AMICI* STATEMENTS OF INTEREST

1.      American Academy of Pediatrics.  Founded in 1930, AAP is a national, not-for-profit professional organization dedicated to furthering the interests of child and adolescent health.  Since AAP's inception, its membership has grown to 67,000 primary care pediatricians, pediatric medical subspecialists, and pediatric surgical specialists who are committed to the attainment of optimal physical, mental, and social health and well-being for infants, children, adolescents, and young adults.  Over the past 91 years, AAP has become a powerful voice for child and adolescent health through education, research, advocacy, and the provision of expert advice.  Research has shown that transgender adolescents face significantly higher rates of depression, anxiety, self-harm, and suicide.  Such challenges are often more intense for youth who do not receive gender-affirming medical care.  AAP thus strives to support laws and policies that ensure that transgender youth receive the best possible medical care.

2.      Academic Pediatric Association.  The Academic Pediatric Association nurtures the academic success and career development of child health professionals engaged in research, advocacy, improvement science and educational scholarship in order to enhance the health and well-being of all children.

3.      American Academy of Child and Adolescent Psychiatry.  AACAP promotes the healthy development of children, adolescents, and families through advocacy, education, and research.  Child and adolescent psychiatrists are the leading physician authority on children's mental health.  For more information, please visit www.aacap.org.

4.      American Association of Physicians for Human Rights, Inc. d/b/a GLMA: Health Professionals Advancing LGBTQ Equality.  GLMA is the largest and oldest association of lesbian, gay, bisexual, transgender and queer (LGBTQ) health professionals and their allies.  GLMA's mission is to ensure health equity for LGBTQ and all sexual and gender minority

22

(SGM) individuals, and equality for LGBTQ/SGM health professionals in their work and learning environments by utilizing the scientific expertise of its diverse multidisciplinary membership to inform and drive advocacy, education, and research. GLMA's network of members and supporters includes health professionals of all disciplines who serve and provide care to LGBTQ individuals, including individuals experiencing gender dysphoria. Previously known as the Gay and Lesbian Medical Association, GLMA is a national leader in addressing the full range of health concerns and issues affecting LGBTQ people, including by ensuring that sound science and research informs health policy and practices for the LGBTQ community.

5.     American College of Osteopathic Pediatricians.  ACOP is a non-profit organization which represents and supports Osteopathic Pediatricians throughout the United States.  As osteopathic physicians, ACOP's members believe strongly in the bio-psycho-social model of healthcare, that a child is more than a collection of symptoms and that true health is found when all aspects of that child's health are in balance.  As an organization focused on serving as advocates for our profession and patients, the recent legislation passed in Arkansas regarding the ban of gender-affirming care for transgender youth directly contradicts ACOP's mission to care for the entire child.  By limiting the pediatrician's ability to address and treat a vital component of the transgender patient population, the Arkansas government has placed an extraordinary burden on the pediatrician, the patient, and the patient's family by banning the osteopathic pediatrician from fulfilling their osteopathic oath.

6.     American Medical Association.  The AMA is the nation's largest professional association of physicians, residents, and medical students.  Through state and specialty medical societies and other physician groups seated in its House of Delegates, substantially all physicians, residents, and medical students in the United States are represented in the AMA's

policy-making process.  The AMA's core purposes are to promote the art and science of medicine and the betterment of public health.  The AMA joins this brief on its own behalf and as a representative of the Litigation Center of the American Medical Association and the State Medical Societies.  The Litigation Center is a coalition among the AMA and the medical societies of each state and the District of Columbia representing the viewpoint of organized medicine in the courts.

7.   American Pediatric Society.  APS is comprised of distinguished pediatric leaders shaping the future of academic pediatrics.  Assembling an engaged, diverse, inclusive and impactful community of academic pediatric thought leaders, APS's strategic priorities are to exercise thought leadership to shape the field, advocate for academic pediatrics and support career development of academic pediatrics to improve child health.

8.   American Psychiatric Association.  The APA, with more than 37,400 members, is the nation's leading organization of physicians who specialize in psychiatry.  The APA has participated in numerous cases in the Supreme Court and the United States Courts of Appeals. The American Psychiatric Association opposes all public and private discrimination against transgender and gender-diverse individuals, including in gender-affirming care.[73]

9.   Arkansas Chapter of the American Academy of Pediatrics.  ARAAP's mission is to attain optimal physical, mental, and social health and well-being for all children in Arkansas through advocacy, service, and professional support of its members.  Representing more than 440 members, ARAAP voiced concerns about and advocated against passage of House Bill 1570 during the Arkansas Legislature's 93rd general assembly.  This position was based on serious

---

[73] *See* Am. Pysch. Ass'n, *Position Statement on Treatment of Transgender (Trans) and Gender Diverse Youth* (2020).

24

concerns about the impact this legislation could have on Arkansas's transgender youth, their families, and the pediatricians and other providers who seek to provide evidence-based care to their patients.

10.     Arkansas Council on Child and Adolescent Psychiatry.  ACCAP is a regional chapter of the national parent organization, the American Academy of Child and Adolescent Psychiatry.  ACCAP is a not-for-profit professional organization made up of approximately 50 Child and Adolescent Psychiatrists in the state of Arkansas.  Formed in the late 1980's, the Council's goal has been to stay connected, proactive, and effective in dealing with state and national issues related to child and adolescent mental health.  ACCAP's aim is to advocate on behalf of the youth in Arkansas, as well as support policies that allow ACCAP's members, as physicians, to perform their duty of providing compassionate, evidence-based care to the children and adolescents in Arkansas.

11.     Arkansas Psychiatric Society.  The Arkansas Psychiatric Society is the district branch of the American Psychiatric Association, which was found in 1951.  Throughout the decades, the Arkansas Psychiatric Society has been active in furthering the field of psychiatry in the state of Arkansas and now claims approximately 175 members statewide.  In addition to its role as a social and educational organization for Arkansas psychiatrists, the society has become quite active in resolving ethical complaints and providing a voice for psychiatry in state legislation.  The Arkansas Psychiatric Society is a society that advocates not only for its professional members but for the patient population that they serve, including the transgender youth in Arkansas who have increased rates of mental health issues compared to the general population.

12.     Association of Medical School Pediatric Department Chairs. AMSPDC seeks to improve the health and well-being of children through the development of the chairs of academic pediatric departments and support of their clinical, research, education, and advocacy missions. The AMSPDC lead in care delivery, research, training, and advocacy in their communities and throughout the world.

13.     Endocrine Society. The Endocrine Society is the oldest and largest global professional membership organization representing the field of endocrinology. With more than 18,000 members who provide care for patients, the Endocrine Society is dedicated to advancing hormone research and excellence in the clinical practice of endocrinology, focusing on diabetes, obesity, osteoporosis, infertility, rare cancers, thyroid conditions, and transgender care. The Society also published evidence-based guidelines on treatment of gender dysphoria/gender incongruence that are used worldwide.

14.     National Association of Pediatric Nurse Practitioners. NAPNAP has been advocating for children's health since its founding in 1973. NAPNAP is the nation's only professional association for pediatric-focused advanced practice registered nurses (APRNs) dedicated to improving the quality of health care for infants, children, adolescents and young adults. Representing more than 8,000 health care practitioners with 18 special interest groups and 53 chapters, NAPNAP is a community of experts in pediatrics and advocates for children with a mission to empower pediatric-focused advanced practice registered nurses and key partners to optimize child and family health. NAPNAP opposes all forms of discrimination against individuals based on sexual orientation, gender conformity and gender identity. NAPNAP believes health care providers and the health care environment should support and

26

promote an LGBTQ-safe space for all youth and an atmosphere of acceptance to facilitate health care interactions based on evidence-based practice.

15.     <u>Pediatric Endocrine Society</u>.  PES is the leading professional society for pediatric endocrinology in the United States.  PES, with more than 1,500 members, is dedicated to promoting the endocrine health of all children and adolescents, including those who are transgender.  PES is a co-sponsor of the Endocrine Society's clinical practice guidelines for transgender individuals, which promote a gender-affirmative model of care including puberty suppression and gender-affirming hormone therapy in youth.

16.     <u>Society for Adolescent Health and Medicine</u>.  Founded in 1968, SAHM is a multidisciplinary organization committed to promoting the optimal health and well-being of all adolescents and young adults by supporting adolescent health and medicine professionals through the advancement of clinical practice, care delivery, research, advocacy, and professional development.  Providers of health care to adolescents and young adults need to ensure patient-centered, culturally effective practices when treating transgender and gender-diverse (TGD) youth.  SAHM recognizes that variation in gender identity and expression is normal, recognizes that incongruence between gender identity and genotypic/phenotypic sex is one of many developmental trajectories that individuals may take, and asserts that individuals should not be pathologized on this basis.

17.     <u>Society for Pediatric Research</u>.  SPR seeks to create a multi-disciplinary network of diverse researchers to improve child health.  SPR provides and promotes activities that strengthen the pediatric research community, with a strong focus on supporting the pediatric researcher pipeline and connecting researchers to catalyze the collaborative pediatric research essential to advance the science that improves child health.

18.  <u>Society of Pediatric Nurses</u>.  Founded in the mid-1980s, SPN represents a professional network of over 3,600 pediatric nurses across 28 specializations.  The society seeks to advance the specialty of pediatric nursing through excellence, education, research and practice in order to improve child health.  SPN believes in the development, dissemination, and diffusion of knowledge and evidence-informed standards of care that supports diversity, equity and inclusion to ensure the best care for all children and families.

19.  <u>World Professional Association for Transgender Health</u>.  WPATH is an international interdisciplinary professional and educational organization.  Founded in 1979, and with over 2650 professionally qualified members devoted to the understanding and treatment of gender dysphoria, WPATH's mission is to promote evidence-based care, education, research, advocacy, public policy, and respect in transgender health worldwide.  As an educational professional organization, WPATH aims to further the understanding and treatment of gender dysphoria by professionals in medicine, psychology, law, social work, counseling, psychotherapy, sociology, speech and voice therapy, and other related fields.  Among other educational projects, WPATH publishes the leading clinical guidance on gender dysphoria treatment.[74]  Currently in its seventh edition, WPATH's Standards of Care is the most widespread peer reviewed treatment protocol for treating gender dysphoria and related conditions.  WPATH has been recognized by the AAP, the American Medical Association, the American Psychological Association, and many other medical specialty groups as the home of the world's leading experts in these conditions.  Federal Courts of Appeal and federal and state administrative agencies regularly cite the WPATH Standards of Care in cases challenging access barriers to healthcare.

---

[74] WPATH Standards of Care, *supra* note 31.

## Arkansas Chapter

American Academy of Pediatrics
DEDICATED TO THE HEALTH OF ALL CHILDREN®

Arkansas Chapter,
American Academy of
Pediatrics
P.O. Box 251182
Little Rock, AR 72225
Phone: 501-626-5777
http://arkansasaap.org/

Arkansas Chapter
Board of Directors, 2019 -
2021

President
J. Gary Wheeler, MD, FAAP

Vice President
Susan Averitt, MD, FAAP

Treasurer
Maya Lopez, MD, FAAP

Secretary
Sarah Bone, MD, FAAP

Past-President
Chad Rodgers, MD, FAAP

Rick Barr, MD, FAAP

Missy Graham, MD. FAAP

Alan Mease, MD, FAAP

Michele Moss, MD, FAAP

Greg Sharp, MD, FAAP

Keri Read, MD, Resident
Physician Representative

March 30, 2021

Governor Asa Hutchinson
State Capitol Room 250
500 Woodlane Ave.
Little Rock, AR 72201

Dear Governor Hutchinson,

On behalf of more than 430 pediatricians in Arkansas, we ask for your veto of House Bill 1570.  We have serious concerns about the impact this bill could have on Arkansas youth, their families, and the pediatricians and other providers who care for them.  We request an opportunity to discuss this bill with you prior to taking action on it and have included references to the most recent scientific evidence that supports our comments.

HB1570, should it become law, forces pediatric providers to make the difficult choice between breaking the law and providing appropriate guidance and interventions for transgender patients. This evidence-based medical care is recommended by the American Academy of Pediatrics (AAP) and many other mainstream medical groups. Physicians understand the complexity of medical decision-making for transgender youth and are best able to determine the level of care for patients and families that is appropriate at a given time. HB1570 limits what pediatricians can discuss during health care visits, which undermines the patient–parent–physician relationship in concerning ways. We do not want to be the first state in the nation to mandate this type of obstruction between the medical community and their patients.

HB1570 also limits the role of parental judgment in care for their children. **Parents of transgender youth, like most parents, simply want to do what is best for their child—and that includes working with physicians to ensure that their child has access to a continuum of necessary medical care.** The bill also disproportionately harms lower-income families who may not have the resources to travel out-of-state for needed medical care, should access be eliminated in Arkansas through this bill.

This bill harms young people. Nearly 3.5% of youth are transgender or question their gender. Of these youth, a third attempt suicide. When youth are provided gender-affirming care, the risk of suicide falls dramatically, and transgender people have every opportunity to achieve good physical and mental health.[1] Denying best practice medical care to transgender youth can be life-threatening, contributing to depression, social isolation, drug use[2], self-hatred, risk of self-harm and suicidal behavior.

The type of care transgender youth need is called gender-affirming care. The American Academy of Pediatrics recommends that transgender youth have access to comprehensive, gender-affirming, and developmentally-appropriate health care that is provided in a safe and inclusive clinical environment. Gender-affirming care starts simply, with letting youth select clothing they prefer, getting a new haircut, or using a different name. Primary care providers ensure the youth and family are connected to mental



EXHIBIT
1

health care services and refer the youth for a comprehensive evaluation by a multi-disciplinary team of experts that includes pediatric endocrinologists, psychiatrists, social workers, chaplains, attorneys, and other supports. **HB1570 prohibits that referral.**

Best practice medical care for transgender youth simply delays puberty until young people are old enough to make their own decisions about their lived gender. Only after the onset of puberty are medical or hormonal treatments used, and only in some patients. These puberty-suppressing medications are commonly used for other conditions as well, such as early puberty in children and prostate conditions in men, and their safety is well-established. Later, teenagers can elect to receive hormonal therapy if it is indicated, generally after the age of 16 and after living in their authentic gender for some time. Fewer than one quarter of transgender patients ever have surgical procedures. **Surgical procedures related to gender dysphoria are not performed on youth in Arkansas.** Ongoing, intensive mental health treatment is a required component of any treatment plan. **This continuum of care is prohibited by HB1570.**

We are gravely concerned about the impact this bill would have on transgender youth already receiving medical treatment. **This bill would penalize medical providers for prescribing, with parental consent, current medications and following care plans.** This will cause immediate and irreversible harm for patients under treatment in Arkansas.

As pediatricians, it is our duty to provide comprehensive and compassionate patient care. We believe this bill prevents us from upholding the Hippocratic oath we have all taken. HB1570 a rejection of thoughtfully-developed, evidence-based medical treatment for a vulnerable group of youth, and allowing it to become law will result in devastating outcomes and lives lost.  We beg of you, please veto HB1570.

Respectfully,

J. Gary Wheeler, MD, FAAP
President, Arkansas Chapter, American Academy of Pediatrics

*For more information on the importance of providing transgender and gender-diverse youth the medical care they need, read the AAP policy statement, Ensuring Comprehensive Care and Support for Transgender and Gender-Diverse Children and Adolescents and Supporting and Caring for Transgender Children, a resource the AAP co-developed. You can also read more about the organizations that support gender-affirming care for youth and the AAP's recent statement on this topic.*

[1] Achille C, Taggart T, Eaton NR, et al. Longitudinal impact of gender-affirming endocrine intervention on the mental health and well-being of transgender youths: preliminary results. *Int J Pediatr Endocrinol.* 2020; 2020:8. doi:10.1186/s13633-020-00078-2
[2] De Pedro K, et al. Substance Use Among Transgender Students in California Public Middle and High Schools. *Journal of School Health.* 2017; 87:5. doi.org/10.1111/josh.12499. https://onlinelibrary.wiley.com/doi/full/10.1111/josh.12499.



**AMERICAN ACADEMY OF CHILD & ADOLESCENT PSYCHIATRY**

W W W . A A C A P . O R G

March 31, 2021

The Honorable Governor Asa Hutchinson
Arkansas State Capitol
Suite 250
500 Woodlane Street
Little Rock, AR 72201

Dear Governor Hutchinson:

**To protect the lives of vulnerable youth, the 50 physician members of the Arkansas Council on Child and Adolescent Psychiatry, and the nearly 10,000 members of the American Academy of Child and Adolescent Psychiatry write in strong opposition to HB1570, and we ask that you veto the legislation.** We believe that this bill reflects a gross misunderstanding of what gender-affirming treatment entails for Arkansas' youth and will make it increasingly difficult to retain and recruit child and adolescent psychiatrists, further reducing access to specialized mental health care for all children in Arkansas.

Banning access to evidence-based treatments for youth creates a concerning precedent by allowing legislation to overstep into the physician-patient relationship by interfering with personal medical decisions and individualized treatment plans best left developed between treating physician, patient, and family. The optimal way to provide treatment for transgender patients and those with gender dysphoria is through a variety of possible interventions based on current medical evidence, which is individualized and methodical.

**Evidence-based medical treatment for transgender youth and patients with gender dysphoria is supported by all mainstream pediatric organizations, representing thousands of physicians across multiple disciplines.** The American Academy of Child and Adolescent Psychiatry, American Academy of Pediatrics, Pediatric Endocrine Society, American Psychological Association, and the Society for Adolescent Health and Medicine all support appropriately assessing the mental health *and* medical treatments for these youth. There are also increasingly well-evidenced, recognized medical guidelines and standards of care which make clear that an assessment to determine the decision-making capacity for a given young person is crucial before anything irreversible is started.

Child and adolescent psychiatrists are physicians who have completed four years of medical school, followed by three to four years of additional residency training in general adult psychiatry and two years of subspecialty fellowship training in child and adolescent psychiatry. We treat children and adolescents with mental health needs throughout the state of Arkansas, including gender diverse and transgender patients and their families, and refer these patients to one of the few gender clinics in the country.



EXHIBIT

2

Disallowing physicians to refer patients to gender-affirming care will make it more difficult to recruit additional, and much needed, child and adolescent psychiatrists to practice medicine in Arkansas. We have a severe shortage of child and adolescent psychiatrists. Sixty-six counties in our state have no practicing child and adolescent psychiatrist. Included below is a map indicating the shortage of the subspecialty in Arkansas, for your reference.

**Should HB1570 become law, the lives of some of our patients will be put at risk.** Gender diverse youth, as well as adults, who identify as transgender have high rates of mental health disorders including depression, anxiety, eating disorders, self-harm, and suicide in large part due to adverse experiences and stigma resulting from their gender identity. **Suicide is the second leading cause of death of all adolescents in the U.S., and rates of suicidal ideation and suicide attempts among youth who identify as transgender are approximately three times that of their cisgender (or not transgender) peers.** When targeted by seriously misguided legislation such as HB1570, transgender youth in Arkansas are likely to internalize the harmful rhetoric surrounding the bill, as well as face a disruption of affirming health care, and have additional or more severe mental health disorders, as well as shame and guilt, as a result.

Gender nonconforming children and adolescents experience unique developmental challenges and need supportive adults in their lives who can create affirming, caring environments to help them become healthy adults. **As professionals who care for the youth of Arkansas and their families, we ask that you do not undermine our ability to combat the damage of depression, anxiety, and suicidality among a targeted segment of our population.**

**We ask that you consider the mental and physical health of Arkansas youth and their families by vetoing HB1570.**

Sincerely,

Kathryn Panek, MD
President, Arkansas Council on Child and Adolescent Psychiatry

Gabrielle A. Carlson, MD
President, American Academy of Child and Adolescent Psychiatry

# ARKANSAS
## Child and Adolescent Psychiatrist (CAP) Workforce Distribution Map

Practicing Child and Adolescent Psychiatrists by State 2017
Rate per 100,000 children age 0-17

Practicing Child and Adolescent Psychiatrists by County 2017
Rate per 100,000 children age 0-17







CAPs Per 100K Children

- Mostly Sufficient Supply (>=47)
- High Shortage (18-46)*
- Severe Shortage (1-17)*
- No CAPs

*Council on Graduate Medical Education. Re-examination of the Academy of Physician Supply made in 1980 by the Graduate Medical Education National Advisory Committee for selected specialties, Bureau of Health Professions in support of activities of the Council on Graduate Medical Education. 1990. Cambridge, ABT Associates.

**Kim WJ, American Academy of Child and Adolescent Psychiatry Task Force on Workforce Needs. Child and adolescent psychiatry workforce: A critical shortage and national challenge. Acad Psychiatry, 2003;27:277–82.

Last Updated: March 2018

State CAPs per 100,000 children age 0-17



Mostly Sufficient Supply (47 CAPs per 100K)

| | |
|---|---|
| Population of Children Under 18 | 703,794 |
| Total CAPs in Arkansas | 57 |
| Number of CAPs/100,000 Children | 8 |
| Average Age of CAPs | 48 |

| County | Total CAPs | Population, Children Under 18 |
|---|---|---|
| Arkansas | 0 | 4,292 |
| Ashley | 0 | 4,925 |
| Baxter | 0 | 7,250 |
| Benton | 3 | 66,505 |
| Boone | 0 | 8,275 |
| Bradley | 0 | 2,607 |
| Calhoun | 0 | 1,020 |
| Carroll | 0 | 6,132 |
| Chicot | 0 | 2,567 |
| Clark | 0 | 4,425 |
| Clay | 0 | 3,208 |
| Cleburne | 0 | 5,043 |
| Cleveland | 0 | 1,940 |
| Columbia | 0 | 5,179 |
| Conway | 0 | 4,862 |
| Craighead | 4 | 25,564 |
| Crawford | 0 | 15,550 |
| Crittenden | 0 | 13,890 |
| Cross | 0 | 4,263 |
| Dallas | 0 | 1,810 |
| Desha | 0 | 3,139 |
| Drew | 0 | 4,187 |
| Faulkner | 2 | 28,575 |
| Franklin | 0 | 4,228 |
| Fulton | 0 | 2,462 |
| Garland | 1 | 20,202 |
| Grant | 0 | 4,221 |
| Greene | 0 | 10,722 |
| Hempstead | 0 | 5,858 |
| Hot Spring | 0 | 7,133 |
| Howard | 0 | 3,493 |
| Independence | 1 | 8,884 |
| Izard | 0 | 2,499 |
| Jackson | 0 | 3,546 |
| Jefferson | 0 | 16,770 |
| Johnson | 0 | 6,336 |
| Lafayette | 1 | 1,462 |
| Lawrence | 0 | 3,762 |
| Lee | 0 | 1,929 |
| Lincoln | 0 | 2,496 |
| Little River | 0 | 2,861 |
| Logan | 0 | 4,912 |
| Lonoke | 0 | 18,869 |
| Madison | 0 | 3,710 |
| Marion | 0 | 2,898 |
| Miller | 0 | 10,561 |
| Mississippi | 0 | 11,937 |
| Monroe | 0 | 1,596 |
| Montgomery | 0 | 1,789 |
| Nevada | 0 | 1,971 |
| Newton | 0 | 1,590 |
| Ouachita | 0 | 5,634 |
| Perry | 0 | 2,252 |
| Phillips | 0 | 5,374 |
| Pike | 0 | 2,543 |
| Poinsett | 0 | 5,745 |
| Polk | 0 | 4,758 |
| Pope | 0 | 14,371 |
| Prairie | 0 | 1,727 |
| Pulaski | 33 | 93,085 |
| Randolph | 0 | 3,966 |
| St. Francis | 0 | 6,157 |
| Saline | 0 | 27,503 |
| Scott | 0 | 2,576 |
| Searcy | 0 | 1,583 |
| Sebastian | 1 | 31,254 |
| Sevier | 0 | 4,981 |
| Sharp | 0 | 3,589 |
| Stone | 0 | 2,509 |
| Union | 0 | 9,690 |
| Van Buren | 0 | 3,387 |
| Washington | 10 | 55,120 |
| White | 2 | 18,613 |
| Woodruff | 0 | 1,498 |
| Yell | 0 | 5,414 |