**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION**

**DYLAN BRANDT, et al.,**                                                    **PLAINTIFFS**

**v.**                                  **Case No. 4:21-CV-00450-JM**

**LESLIE RUTLEDGE, et al.,**                                              **DEFENDANTS**


**OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................................... 1

BACKGROUND ...................................................................................................... 3

    A.    The Health Care Ban ......................................................................... 3

    B.    The Plaintiffs ..................................................................................... 5

    C.    Plaintiffs' Claims ............................................................................. 5

LEGAL STANDARD .............................................................................................. 6

ARGUMENT ........................................................................................................... 7

I.    **The Complaint Pleads Facts Sufficient to Establish Standing for All Claims.** ........................................................................................... 7

    A.    The Complaint Pleads Facts Sufficient to Establish Standing to Challenge the Ban on "Gender Transition Procedures." ...................... 7

    B.    The Complaint Pleads Facts Sufficient to Establish Standing to Challenge the Private Right of Action. ................................................ 9

    C.    The Complaint Pleads Facts Sufficient to Establish Standing for the Doctor Plaintiffs' Equal Protection Claims ................................. 10

        1.    The Doctor Plaintiffs have third-party standing to bring equal protection claims on behalf of their patients. ................. 10

        2.    The Doctor Plaintiffs have standing to bring equal protection claims on their own behalf ...................................... 14

II.    **The Complaint States an Equal Protection Claim.** ................................. 15

    A.    The Complaint Adequately Alleges Discrimination Based on Transgender Status and Sex. ............................................................. 16

        1.    The Health Care Ban discriminates on the basis of transgender status. ..................................................................... 16

2.     The Health Care Ban discriminates on the basis of sex............23

B.    The Complaint Adequately Alleges that the Health Care Ban Cannot Survive Heightened Scrutiny..................................24

    1.     The Complaint alleges sufficient facts showing that the Health Care Ban does not substantially further an important government interest...................................25

    2.     Defendants' reliance on courts' discussions of factual records in other cases is misplaced. ..........................27

C.    The Complaint Adequately Alleges that the Health Care Ban Cannot Survive Rational Basis Review. ...............................30

**III.   The Complaint States a Claim for Violation of the Parent Plaintiffs' Fundamental Right to Parental Autonomy.**...........................34

A.    The Fundamental Right to Parental Autonomy Is Separate from a Child's Fundamental Right................................35

B.    The Complaint Adequately Alleges that the Health Care Ban Violates the Parent Plaintiffs' Fundamental Right to Seek Out Medical Care for their Children. ..........................37

**IV.   The Complaint States a Claim for Violation of the First Amendment.** ........................................................38

A.    The Referral Prohibition Restricts Speech, Not Conduct. .................39

B.    The Referral Prohibition's Speech Limitations Are Not Incidental to Conduct. ........................................41

C.    The Referral Prohibition Implicates the Patients' and Their Parents' First Amendment Rights. .....................................45

**CONCLUSION**...................................................................46

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Adkins* v. *City of N.Y.*,
  143 F. Supp. 3d 134 (S.D.N.Y. 2015) ...............................................................18

*Am. Coll. of Obstetricians & Gynecologists* v. *U.S. Food & Drug Admin.*,
  472 F. Supp. 3d 183 (D. Md. 2020) ...................................................................14

*AMA* v. *Stenehjem*,
  412 F. Supp. 3d 1134 (D.N.D. 2019)..................................................................44

*Ashcroft* v. *Iqbal*,
  556 U.S. 662 (2009)...........................................................................................7

*B.P.J.* v. *W. Va.State Bd. of Educ.*,
  No. 21-cv-00316 (S.D. W. Va. 2021)..................................................................22

*Barsky* v. *Bd. of Regents of University*,
  347 U.S. 442 (1954)..........................................................................................43

*Bartnicki* v. *Vopper*,
  532 U.S. 514 (2001)..........................................................................................40

*Bd. of Educ. of the Highland Sch. Dist.* v. *U.S. Dep't of Educ.*,
  208 F. Supp. 3d 850 (S.D. Ohio 2016) ..............................................................18

*Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26* v. *Pico*,
  457 U.S. 853 (1982)..........................................................................................45

*Bd. of Trs. of Univ. of Ala.* v. *Garrett*,
  531 U.S. 356 (2001)..........................................................................................31

*Bell Atlantic Corp.* v. *Twombly*,
  550 U.S. 544 (2007)....................................................................................28, 29

*Bell* v. *Tavistock and Portman National Health Service Foundation Trust*,
  [2020] EWHC (Admin) 3274 ............................................................................27

*Bostock* v. *Clayton Cty., Georgia*,
140 S. Ct. 1731 (2020)...................................................................22, 23

*Brown* v. *Ent. Merchants Ass'n*,
564 U.S. 786 (2011)...............................................................................46

*Cap. Associated Indus., Inc.* v. *Stein*,
922 F.3d 198 (4th Cir.) .........................................................................44

*Carson* v. *Simon*,
978 F.3d 1051 (8th Cir. 2020) ................................................................8

*Church of the Lukumi Babalu Aye, Inc.* v. *City of Hialeah*,
508 U.S. 520 (1993)................................................................................27

*Citizens for Equal Protection* v. *Bruning*,
455 F.3d 859 (8th Cir. 2006) ..................................................................9

*City of Cleburne* v. *Cleburne Living Ctr.*,
473 U.S. 432 (1985)................................................................................31

*Clark* v. *Sw. Energy Co.*,
No. 4:20-CV-00475-KGB, 2021 WL 711437 (E.D. Ark. Feb. 23,
2021) .......................................................................................................28

*Conant* v. *Walters*,
309 F.3d 629 (9th Circ. 2002)...........................................................41, 45

*DeLaurier* v. *San Diego Unified Sch. Dist.*,
588 F.2d 674 (9th Cir. 1978) .................................................................21

*Doe 2* v. *Shanahan*,
917 F.3d 694 (D.C. Cir. 2019)..........................................................16, 17

*Edenfield* v. *Fane*,
507 U.S. 761 (1993)................................................................................42

*Eisenstadt* v. *Baird*,
405 U.S. 438 (1972)...........................................................................26, 27

*Evancho* v. *Pine-Richland Sch. Dist.*,
237 F. Supp. 3d 267 (W.D. Pa. 2017)....................................................18

*F.V.* v. *Barron*,
    286 F. Supp. 3d 1131 (D. Idaho 2018) ...............................................18

*Flack* v. *Wis. Dep't of Health Servs*.,
    328 F. Supp. 3d 931 (W.D. Wis. 2018) ..............................................18

*Geduldig* v. *Aiello*,
    417 U.S. 484 (1974)..............................................................................20, 21

*Gibson* v. *Collier*,
    920 F.3d 212 (5th Cir. 2019) .............................................................22

*Ginsberg* v. *New York*,
    390 U.S. 629 (1968) ........................................................................45, 46

*Glenn* v. *Brumby*,
    663 F.3d 1312 (11th Cir. 2011) .........................................................24

*Grimm* v. *Gloucester Cty. Sch. Bd.*,
    972 F.3d 586 (4th Cir. 2020), *as amended* (Aug. 28, 2020) ......................*passim*

*Hecox* v. *Little*,
    479 F. Supp. 3d 930 (D. Idaho 2020) ................................................20

*Hennessy-Waller* v. *Snyder*,
    No. CV-20-00335, 2021 WL 1192842 (D. Ariz. 2021) ........................21, 22, 29

*Hopkins* v. *Jegley*,
    No. 17-CV-00404, 2021 WL 41927 (E.D. Ark. Jan. 5, 2021) ..............10, 11, 12

*Webb ex rel. K. S.* v. *Smith*,
    936 F.3d 808 (8th Cir. 2019) ..............................................................8

*Kadel* v. *Folwell*,
    446 F. Supp. 3d 1 (M.D.N.C. 2020) ..................................................24

*Kanuszewski* v. *Mich. Dep't of Health and Human Servs*,
    927 F.3d 396 (6th Cir. 2019) .............................................................34

*Karnoski* v. *Trump*,
    926 F.3d 1180 (9th Cir. 2019) .......................................................16, 18

*King* v. *Governor of the State of N.J.*,
  767 F.3d 216 (3d Cir. 2014) ...............................................................39

*Kowalski* v. *Tesmer*,
  543 U.S. 125 (2004)...........................................................................11

*Lawrence* v. *Texas*,
  539 U.S. 558 (2003)......................................................................34, 35

*Liss* v. *Sch. Dist. of City of Ladue*,
  548 F.2d 751 (8th Cir. 1977) ............................................................21

*Little Rock Fam. Plan. Servs.* v. *Rutledge*,
  397 F. Supp. 3d 1213 (E.D. Ark. 2019)........................................10, 13

*M.A.B.* v. *Bd. of Educ. of Talbot City*,
  286 F. Supp. 3d 704 (D. Md. 2018)...................................................18

*Mathews* v. *Lucas*,
  427 U.S. 495 (1976)...........................................................................20

*Michael H.* v. *Gerald D.*,
  491 U.S. 110 (1989)...........................................................................36

*Nat'l Ass'n for Advancement of Colored People* v. *Button*,
  371 U.S. 415 (1963)...........................................................................41

*Nat'l Inst. of Fam. & Life Advocs. ("NIFLA")* v. *Becerra*,
  138 S. Ct. 2361 (2018).............................................39, 41, 43, 44

*Norsworthy* v. *Beard*,
  87 F. Supp. 3d (N.D. Cal. 2015).......................................................18

*Nyquist* v. *Mauclet*,
  432 U.S. 1 (1977)...............................................................................20

*Obergefell* v. *Hodges*,
  576 U.S. 644 (2015).............................................................................9

*Ohralik* v. *Ohio State Bar Ass'n*,
  436 U.S. 447 (1978)...........................................................................42

*Parham* v. *J.R.*,
    442 U.S. 584 (1979)................................................................35, 37

*Phillips* v. *Martin Marietta Corp.*,
    400 U.S. 542 (1971)......................................................................19

*Pierce* v. *Soc'y of the Sisters of the Holy Names of Jesus & Mary*,
    268 U.S. 510 (1925)......................................................................36

*Planned Parenthood of Greater Tex. Surgical Health Servs.* v. *Abbott*,
    748 F.3d 583 (5th Cir. 2014) ......................................................12

*Planned Parenthood of Se. Pa.* v. *Casey*,
    505 U.S. 833 (1992)..................................................................9, 44

*Reed* v. *Town of Gilbert*,
    576 U.S. 155 (2015)......................................................................39

*Rice* v. *Cayetano*,
    528 U.S. 495 (2000)......................................................................19

*Romer* v. *Evans*,
    517 U.S. 620 (1996)................................................................31, 33

*Rumsfeld* v. *F. for Acad. & Institutional Rts., Inc.*,
    547 U.S. 47 (2006)........................................................................40

*Rust* v. *Sullivan*,
    500 U.S. 173 (1991)......................................................................43

*Santosky* v. *Kramer*,
    455 U.S. 745 (1982)......................................................................34

*Singleton* v. *Wulff*,
    428 U.S. 106 (1976)......................................................................11

*Sorrell* v. *IMS Health Inc.*,
    564 U.S. 552 (2011)..........................................................40, 41, 42

*Tri State Advanced Surgery Ctr., LLC* v. *Health Choice, LLC*,
    112 F. Supp. 3d 809 (E.D. Ark. 2015)....................................7, 23, 27

*Troxel* v. *Granville*,
530 U.S. 57 (2000)............................................................................................34

*U.S. Dep't of Agric.* v. *Moreno*,
413 U.S. 528 (1973)......................................................................................31, 33

*U.S.* v. *Virginia*,
518 U.S. 515 (1996)..........................................................................23, 24, 25, 27

*U.S.* v. *Windsor*,
570 U.S. 744 (2013)............................................................................................32

*Vill. of Arlington Heights*, *et.al.,* v. *Metro. Hous. Dev. Corp., et.al.*,
429 U.S. 252 (1977)............................................................................................32

*Watson* v. *State of Md.*,
218 U.S. 173 (1910)............................................................................................40

*Whalen* v. *Roe*,
429 U.S. 589, 604 (1977)...................................................................................36

*Wollschlaeger* v. *Governor, Fla.*,
848 F.3d 1293 (11th Cir. 2017) .........................................................................44

**Statutes**

2021 ARK. ACTS 626 ("HB 1570") .................................................................*passim*

## INTRODUCTION

Aside from its title, Defendants' brief bears no resemblance to a Motion to Dismiss.  Defendants do not attempt to challenge the sufficiency of allegations and claims in the Complaint, but instead contest Plaintiffs' factual allegations—which must be accepted as true on a motion to dismiss—and assert their own alternative facts regarding the safety and efficacy of gender-affirming care for adolescents.

Defendants' standing arguments lack merit because they misconstrue the Complaint and applicable law.  Defendants' argument that Plaintiffs lack standing to challenge HB 1570's (the "Health Care Ban") prohibition of "gender-reassignment surgery" misconstrues Plaintiffs' equal protection claim, which challenges the Health Care Ban's prohibition of "gender transition procedures," not the prohibition of individual treatments that fall within the definition of "gender transition procedures."  Further, Defendants argue that Plaintiffs lack standing to challenge the Health Care Ban's private right of action, but they omit reference to established law holding that where, as here, a law provides both a private right of action and official enforcement, a plaintiff has standing to challenge both. Defendants' argument that the doctor Plaintiffs lack third-party standing similarly relies on arguments that have already been rejected by federal courts in Arkansas. There is accordingly no basis to dismiss any of Plaintiffs' claims for lack of standing.

Defendants' equal protection argument fails to accept Plaintiffs' allegations as true and ignores established equal protection law.  Defendants' attempt to recast the Health Care Ban as an age classification cannot be squared with the well-pleaded facts in the Complaint and prevailing law that make clear that where a law singles out a class based on "gender transition" it discriminates on the basis of transgender status and sex, thus triggering heightened scrutiny, whether or not *everyone* in the class is subject to the unequal treatment.  (Compl. ¶¶ 8, 127-34, 155-71.)  In arguing that the State has an important government interest in prohibiting gender-affirming care only for transgender minors, Defendants ignore Plaintiffs' allegations showing that the Health Care Ban fails to advance, and actually undermines, the State's asserted interest in protecting children by harming transgender minors.  (Compl. ¶¶ 127-54.)  Defendants have not established grounds for dismissal of Plaintiffs' equal protection claims; they have simply shown they disagree with the factual allegations in the Complaint.

Defendants dedicate the bulk of their argument concerning Plaintiffs' parental autonomy claim to arguing that children do not have a fundamental right to receive "experimental" care.  (Mot. at 33-36.)  This is a non-sequitur because there is no support for Defendants' assertion that a parent's fundamental right to parental autonomy is "derivative from" their children's fundamental right.  Parents' right to parental autonomy includes the right to seek and follow medical advice for their

children.  Defendants' only argument that the Health Care Ban serves a compelling interest is to repeat their alternate factual allegations that the banned healthcare is experimental and harmful, which conflict with the allegations in the Complaint. (Compl. ¶¶ 2, 32.)  Defendants have therefore failed to meet their burden of showing Plaintiffs failed to state a parental autonomy claim.

Lastly, Defendants argue the State may prohibit doctors from referring their patients to receive gender-affirming care because it is "professional conduct," and the Health Care Ban is a regulation that limits speech that is only incidental to a regulation of conduct.  This argument mischaracterizes the case law and the nature of the Health Care Ban's prohibition on referrals, which limits not conduct, but the Doctor Plaintiffs' ability to communicate to their patients that gender-affirming care is recommended.  (Compl. ¶ 182.)  This is a facial, content-based limitation on speech and cannot survive any level of scrutiny.  (Compl. ¶¶ 182, 184, 185.)

## BACKGROUND

### A.    The Health Care Ban

The Health Care Ban prohibits medical care to assist individuals under the age of eighteen with "gender transition"—"identifying with and living as a gender different from [one's] biological sex."  HB 1570 § 3, ARK. CODE ANN. §§ 20-9-1502(a), 1501(5); (Compl. ¶ 48).  The law further bars healthcare professionals from referring their patients to other doctors who can provide this care.  HB 1570 § 3,

ARK. CODE ANN. § 20-9-1502(b); (Compl. ¶ 48).   Under the Health Care Ban, healthcare professionals who provide such treatment or refer their patients for this care are subject to discipline for unprofessional conduct and suit by the Attorney General and private parties.   HB 1570 § 3, ARK. CODE ANN. § 20-9-1504(a)-(f); (Compl. ¶ 48).

The Health Care Ban targets well-established medical care for the treatment of gender dysphoria in adolescents.  (Compl. ¶¶ 31-49.)  Gender dysphoria is the diagnostic term for the condition experienced by some transgender individuals where the incongruence between their gender identity and their sex assigned at birth results in clinically significant distress.  (*Id.* ¶ 30.)  There is medical consensus that gender dysphoria is a serious medical condition that, if left untreated, can result in debilitating anxiety, severe depression, self-harm, and suicide.  (*Id.* ¶¶ 31-32, 35-36.)   According to widely accepted medical standards, treatment for gender dysphoria  minimizes the clinically significant distress by helping a transgender person live in alignment with their gender identity.  (*Id.* ¶¶ 32, 154.)

The Health Care Ban allows the *exact same treatments* that are prohibited for transgender minors to be provided to cisgender minors—those whose gender identity aligns with their sex assigned at birth—for any reason, including to help align their body or appearance with their gender.  (Compl. ¶ 133; *see also* Mot. at 7-10.)  And

the Health Care Ban expressly allows these treatments to be provided to minors with intersex conditions.  HB 1570 § 3, ARK. CODE ANN. § 20-9-1501(6)(B).

### B.    The Plaintiffs

Dylan Brandt, Sabrina Jennen, Parker Saxton, and Brooke Dennis (the "Minor Plaintiffs") are all transgender minors who have been diagnosed with gender dysphoria and are either already receiving, or imminently will receive, gender-affirming medical treatment that the Health Care Ban prohibits.  (Compl. ¶¶ 9-12.) Their parents—Joanna Brandt, Lacey and Aaron Jennen, Donnie Saxton, and Amanda and Shayne Dennis (the "Parent Plaintiffs")—bring claims on their own behalf and on behalf of their children.  (*Id.*)  Dr. Michele Hutchison, a pediatric endocrinologist and Associate Professor of Pediatrics at the University of Arkansas College of Medicines, and Dr. Kathryn Stambough, a pediatric and adolescent gynecologist at the University of Arkansas for Medical Services  (*Id.* ¶¶ 13-14, the "Doctor Plaintiffs"), bring claims on behalf of themselves and their patients.

### C.    Plaintiffs' Claims

Plaintiffs bring equal protection, substantive due process, and free speech claims under the First and Fourteenth Amendment of the U.S. Constitution.  (*Id.* ¶¶ 171, 178, 187.)  The Health Care Ban violates the equal protection rights of transgender adolescents and their doctors by singling out gender-affirming healthcare for transgender adolescents for prohibition while allowing all other

medically accepted care—including the treatments that are banned for transgender adolescents when provided to non-transgender minors for any purpose. (*Id.* ¶¶ 162-63.) The Health Care Ban is subject to heightened scrutiny because it classifies based on transgender status and sex, since whether or not gender-affirming treatment is a banned "gender transition procedure" under the law depends entirely on the patient's sex assigned at birth. (*Id.* ¶ 167.) The Health Care Ban fails any level of equal protection scrutiny because it does nothing to protect children (*Id.* ¶¶ 127, 131-46)—indeed, it undermines the government's interest in protecting children (*Id.* ¶¶ 147-54)—and it was enacted based on an impermissible purpose of disadvantaging the group burdened by the law. (*Id.* ¶¶ 49-64.) The Health Care Ban also violates parents' fundamental right to seek and to follow medical advice to protect the health and well-being of their minor children. (*Id.* ¶¶ 172-74.) And, finally, by prohibiting Arkansas doctors from referring transgender adolescent patients who need gender-affirming care to doctors who can provide it, the Health Care Ban violates the free speech rights of Arkansas's doctors and the rights of their patients (and their parents) to receive this information. (*Id.* ¶ 181.)

## LEGAL STANDARD

When a defendant "challenges [a plaintiff's] standing to bring [their] claims and also challenges the sufficiency of the allegations" in a complaint, the Court "must accept as true all of the factual allegations contained in the complaint and

draw all reasonable inferences in favor of the nonmoving party." *Tri State Advanced Surgery Ctr., LLC* v. *Health Choice, LLC*, 112 F. Supp. 3d 809, 812-13 (E.D. Ark. 2015) (citing *Cole* v. *Homier Distributing Co., Inc.*, 599 F.3d 856, 861 (8th Cir. 2010)). A complaint's allegations are sufficient if it "'state[s] a claim to relief that is plausible on its face." *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

## ARGUMENT

I. **The Complaint Pleads Facts Sufficient to Establish Standing for All Claims.**

A. **The Complaint Pleads Facts Sufficient to Establish Standing to Challenge the Ban on "Gender Transition Procedures."**

Defendants argue that Plaintiffs lack standing to challenge the Health Care Ban's prohibition of "gender reassignment surgery." (Mot. at 11.) But the Health Care Ban contains no provision that prohibits "gender reassignment surgery" in and of itself—instead, it prohibits "gender transition procedures," HB 1570 § 3, Ark. Code Ann. §§ 20-9-1502(a)-(b), which are defined as "any medical or surgical services . . . related to gender transition . . . including without limitation . . . puberty-blocking drugs, cross-sex hormones, or other mechanisms to promote the development of feminizing or masculinizing features in the opposite biological sex, or genital or nongenital gender reassignment surgery." HB 1570 § 3, Ark. Code

ANN. § 20-9-1501(6)(A).  Plaintiffs' equal protection claim alleges that the Health
Care Ban's prohibition on "gender transition procedures" violates the Constitution.
(Compl. ¶¶ 3-4, 6-14, 130, 155-87.)   That the definition of "gender transition
procedures" prohibited by the Health Care Ban includes treatments that Plaintiffs
are not alleged to be receiving is irrelevant.  There is no question that Plaintiffs have
alleged an injury sufficient to establish standing to challenge the prohibition on
"gender transition procedures" because each Minor Plaintiff alleges that he or she
"is currently receiving" or will "begin receiving medical care that would be
prohibited by the Health Care Ban."[1]  (Compl. ¶¶ 9-14; *see also id*. ¶¶ 69, 79, 93,
103 (Plaintiffs are receiving or will receive cross-sex hormones or puberty-blocking
drugs)); *Webb ex rel. K. S.* v. *Smith*, 936 F.3d 808, 814 (8th Cir. 2019) ("Plaintiffs
must demonstrate that they have standing for each *claim* they bring and for each

---

[1]     Defendants' argument that Brooke Dennis lacks standing because she is
"neither undergoing nor about to undergo any kind of gender-transition
procedure" ignores the allegations in the Complaint.  (Mot. at 13-14.)  The
Complaint alleges that "puberty could begin for Brooke at any time" and that
"when Brooke starts puberty Amanda and Shayne plan to start her on puberty-
delaying treatment."  (Compl. ¶¶ 91-92.)  This is sufficient to allege that "the
threatened injury is 'certainly impending,' or there is a 'substantial risk' that
the harm will occur."  *Carson* v. *Simon*, 978 F.3d 1051, 1058 (8th Cir. 2020)
(citation omitted).  Defendants' argument that Plaintiffs "do[] not allege that
any of the children fall outside of the [Health Care Ban's] exemptions" (Mot.
at 13) is also illogical because Plaintiffs allege that they are receiving or will
receive medical care that will be prohibited—and therefore they do not fall
under one of the exemptions to the Health Care Ban.  (Compl. ¶¶ 9-12.)

form of relief they seek." (emphasis added)) (citing *Town of Chester* v. *Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017)).[2]

     **B.**     **The Complaint Pleads Facts Sufficient to Establish Standing to Challenge the Private Right of Action.**

Plaintiffs likewise have standing to challenge the Health Care Ban's authorization of private lawsuits "assert[ing] an actual or threatened violation" of the statute, HB 1570 § 3, ARK. CODE ANN. § 20-9-1504(b), because the Health Care Ban also provides for enforcement through Defendants' official acts, *see* HB 1570 § 3, ARK. CODE ANN. § 20-9-1504(f)(1). Where an unconstitutional statute provides for enforcement both through official acts and private suits, Plaintiffs with standing to seek an injunction against the official acts may also challenge the constitutionality of private suits. *See Planned Parenthood of Se. Pa.* v. *Casey*, 505 U.S. 833, 887-88 (1992) (striking down, in suit against state officers, statute providing that "[a] physician who performs an abortion" for a married woman without spousal notice "will have his or her license revoked [by state action], and [be] liable to the husband for damages [in a private suit.]"). Federal courts in Arkansas have squarely rejected

---

[2]     In a footnote, Defendants also claim to have sovereign immunity. (Mot. at 14.) Contrary to this suggestion, sovereign immunity does not bar Plaintiffs' claim, as they seek injunctive relief against the officials charged with enforcing a statute that would violate Plaintiffs' constitutional rights if it took effect. *See Citizens for Equal Protection* v. *Bruning*, 455 F.3d 859, 864 (8th Cir. 2006) (citing *Ex parte Young*, 209 U.S. 123, 157 (1908)), *abrogated on other grounds by Obergefell* v. *Hodges*, 576 U.S. 644 (2015).

Defendants' argument to the contrary. *See Hopkins* v. *Jegley*, No. 17-CV-00404, 2021 WL 41927, at *50 (E.D. Ark. Jan. 5, 2021) (rejecting the argument that plaintiff "lack[ed] standing to challenge . . . private rights of action" where "[e]ach of the [laws] provide[d] for criminal prosecution and/or civil licensing enforcement by [state officer] defendants."); *Little Rock Fam. Plan. Servs.* v. *Rutledge*, 397 F. Supp. 3d 1213, 1264 (E.D. Ark. 2019*), aff'd in part, dismissed in part and remanded*, 984 F.3d 682 (8th Cir. 2021) (internal quotation marks and citation omitted) (rejecting the argument that the "plaintiffs lack standing to challenge the Acts' private rights of action . . . because each of the challenged Acts provide for criminal prosecution, civil penalties, and professional sanctions enforceable by the State.").

## C.   The Complaint Pleads Facts Sufficient to Establish Standing for the Doctor Plaintiffs' Equal Protection Claims.

### 1.   The Doctor Plaintiffs have third-party standing to bring equal protection claims on behalf of their patients.

Defendants argue that the Doctor Plaintiffs lack third-party standing to bring claims on behalf of their patients for two reasons:  (1) "because Section 1983" purportedly "extends only to litigants who assert their own rights" (Mot. at 15); and (2) because they have "failed to establish a close relationship" and "patients would face no 'hindrance' preventing them from protecting their own interests in their own lawsuit." (Mot. at 18.)  Both arguments fail.

-10-

*First*, Defendants' argument that Section 1983's "language does not accommodate lawsuits brought by plaintiffs who seek to vindicate the constitutional rights of third parties" (Mot. at 15) was just rejected by this Court in *Hopkins*. *See* 2021 WL 41927, at *50. This Court made clear that "[t]here is no language in the statute that supports this argument" and the "Supreme Court has repeatedly allowed abortion providers to raise the rights of their patients in cases brought under § 1983." *Id.* Here, too, the Doctor Plaintiffs may bring third-party claims under Section 1983.

*Second*, the Doctor Plaintiffs meet the two requirements to assert third-party standing on behalf of their patients:  they have "a 'close' relationship with the person[s] who possess[]the right," and "there is a 'hindrance' to the possessor[s'] ability to protect [their] own interests." *Kowalski* v. *Tesmer*, 543 U.S. 125, 130 (2004) (quoting *Powers* v. *Ohio*, 499 U.S. 400, 411 (1991)). It is well-established that doctors have a sufficiently close relationship with their patients to challenge laws that interfere with their patients' rights. *See Singleton* v. *Wulff*, 428 U.S. 106, 118 (1976) ("[I]t generally is appropriate to allow a physician to assert the rights of women patients as against governmental interference with the abortion decision . . . .").

Defendants nonetheless argue that the Doctor Plaintiffs lack third-party standing because, they assert: (1) there is a conflict of interest between the Doctor Plaintiffs and their patients; (2) the Doctor Plaintiffs' patients are "hypothetical";

and (3) there is no "hindrance" to the patients' asserting their own rights.  (Mot. at 14.)  Again, these arguments do not have merit.

*First*, Defendants' suggestion that the doctors "have a conflict of interest with those patients" because they will "oppose any law that limits their freedom to ply their trade" (Mot. at 16) ascribes grotesque motivations to the Doctor Plaintiffs that contradict the allegations in the Complaint.  As the Complaint alleges, there were multiple suicide attempts in the months since the Health Care Ban was announced, and the Doctor Plaintiffs alleged that they are gravely concerned about their patients' survival if the Health Care Ban goes into effect and they are unable to treat their patients with the care they need.  (Compl. ¶¶ 115-17, 125.)  Defendants' "conflict of interest argument" has also been repeatedly rejected in the abortion context because, as here, there is no plausible conflict between a patient and a doctor that brings a lawsuit to prevent unconstitutional infringement on that patient's rights.  *See Hopkins*, 2021 WL 41927, at *49 ("The Supreme Court has never found that, in the abortion context, physicians who challenge laws restricting abortion have interests that conflict with those of their patients . . . ."); *see also Planned Parenthood of Greater Tex. Surgical Health Servs.* v. *Abbott*, 748 F.3d 583, 589 (5th Cir. 2014).  Here too, there is no conflict between the Doctor Plaintiffs and their patients.

*Second*, contrary to Defendants' argument that the Doctor Plaintiffs purport to assert claims on behalf of "hypothetical future clients" (Mot. at 17-18), the

Complaint alleges "[t]here are around 160 patients currently under the [Arkansas Children's Hospital's Gender Spectrum] Clinic's care." (Compl. ¶¶ 109-11.)

*Lastly*, Defendants' argument that the Doctor Plaintiffs' patients face no hindrance in bringing their own claims because at least one Minor Plaintiff is a patient at the Doctor Plaintiffs' clinic (Mot. at 18) ignores that the Doctor Plaintiffs currently have around 160 patients, virtually all of whom did not bring their own claims. (Compl. ¶ 109.) Many of the Doctor Plaintiffs' patients at the Gender Spectrum Clinic are hindered in their ability to assert claims on their own behalf due to the highly sensitive and private nature of their healthcare decisions and because of their legitimate fear of becoming the targets of anti-transgender hostility. *See Little Rock Fam. Plan. Servs.*, 397 F. Supp. 3d at 1261 (citation omitted) (abortion clinic third-party standing cases emphasize "the confidential nature of the physician-patient relationship and the difficulty for patients of directly vindicating their rights without compromising their privacy."); *Grimm* v. *Gloucester Cty. Sch. Bd.*, 972 F.3d 586, 611 (4th Cir. 2020), *as amended* (Aug. 28, 2020) (alteration in original) ("[T]here is no doubt that transgender individuals historically have been subjected to discrimination on the basis of their gender identity, including high rates of violence and discrimination in education, employment, housing, and healthcare access." (quoting *Grimm* v. *Gloucester Cty. Sch. Bd.*, 302 F. Supp. 3d 730, 749 (E.D. Va. 2018))), *cert. denied*, No. 20-1163, 2021 WL 2637992 (U.S. June 28, 2021). In

-13-

addition, should the law go into effect even for a short period of time, many patients will have no choice but to leave Arkansas.  (*See* Compl. ¶ 74 (Brandt family noting that they will have to consider leaving Arkansas if the Health Care Ban goes into effect); *id.* ¶ 82 (same for Jennen family); *id.* ¶ 94 (same for Dennis family); *id.* ¶ 105 (same for Saxton family).)  The very purpose of third-party standing is to ensure that in situations where it would be difficult for affected parties to litigate, others are able to vindicate their rights in court.  Here, the Doctor Plaintiffs are stepping in on behalf of their patients who are unable to assert their own claims, and this Court should hold that the Doctor Plaintiffs have third-party standing.

2.    The Doctor Plaintiffs have standing to bring equal protection claims on their own behalf.

Defendants further argue that the Doctor Plaintiffs do not have standing to bring their equal protection claims.  (Mot. at 18-19.)  But, contrary to this unsupported suggestion, the Doctor Plaintiffs do have standing in their own right to challenge the Health Care Ban's unequal treatment between doctors who provide gender-affirming care to transgender patients, which would be prohibited by the Health Care Ban, and other doctors, who provide all other medically accepted care, including gender-affirming care to non-transgender patients, which is not prohibited.  *See Am. Coll. of Obstetricians & Gynecologists* v. *U.S. Food & Drug Admin.*, 472 F. Supp. 3d 183, 206 (D. Md. 2020) ("Because physicians prescribing mifepristone have an equal protection right to be free from unequal treatment as compared to other

doctors [prescribing other drugs subject to more favorable rules], the imminent injury to physicians . . . is sufficient alone to establish standing to assert this claim."), *order clarified on other grounds*, No. CV TDC-20-1320, 2020 WL 8167535 (D. Md. 2020).

## II.    The Complaint States an Equal Protection Claim.

The Complaint alleges that the Health Care Ban singles out for prohibition well-accepted medical protocols for the treatment of transgender adolescents with gender dysphoria—a proscription that does not apply to any other medically accepted care, or even to the exact same care when provided to a minor who is not transgender.  (Compl. ¶¶ 32-40, 131-34.)  The Complaint also alleges that denying the banned healthcare puts the Minor Plaintiffs and other transgender adolescents with gender dysphoria at risk of serious harm.  (Compl. ¶¶ 65-105; 147-54.)  As explained in Plaintiffs' brief in support of their Motion for a Preliminary Injunction (Dkt. 12 at 24-32), incorporated herein by reference, because the Health Care Ban discriminates on the basis of both transgender status and sex, it must be tested under heightened equal protection scrutiny.  The Complaint adequately alleges facts showing that the rationales for the Health Care Ban contained in the legislative findings do not substantially further any important governmental interest and that, to the contrary, the law undermines any purported interest in protecting the health

and safety of minors.  (Compl. ¶¶ 135-46.)  These allegations are sufficient to state an equal protection claim.

### A. The Complaint Adequately Alleges Discrimination Based on Transgender Status and Sex.

#### 1. The Health Care Ban discriminates on the basis of transgender status.

The Health Care Ban facially discriminates based on transgender status.  By definition, a transgender person is someone whose gender identity is different from their sex assigned at birth.  (Compl. ¶ 27.)  When a transgender person experiences distress due to the incongruence between their gender identity and their sex assigned at birth, the accepted medical protocols are to treat the patient to help them live in accordance with their gender identity.  (Compl. ¶¶ 32-34.)  But under the terms of the statute, any medical care related to "gender transition" is banned for patients under eighteen years old.  HB 1570 § 3, ARK. CODE ANN. § 20-9-1502(a).  By facially targeting "gender transition"—a process and set of medical treatments that *only* transgender people undergo—the statute discriminates on the basis of transgender status.  *See Karnoski* v. *Trump*, 926 F.3d 1180, 1201 (9th Cir. 2019) (holding that a policy banning individuals who have undergone "gender transition" from open military service discriminates on the basis of transgender status).[3]

---

[3]      Defendants cite *Doe 2* v. *Shanahan*, 917 F.3d 694 (D.C. Cir. 2019), in support of their argument that because not all transgender minors have the same

The Complaint adequately alleges that transgender status meets all the indicia of a suspect or quasi-suspect classification triggering heightened scrutiny under the Equal Protection Clause: (1) transgender people have historically been subject to discrimination; (2) they have a defining characteristic that bears no relation to a person's ability to contribute to society; (3) they may be defined as a discrete group by obvious, immutable, or distinguishing characteristics; and (4) they are a minority group lacking political power.  (Compl. ¶¶ 158-60.)  As discussed in Plaintiffs' brief in support of their Motion for a Preliminary Injunction (Dkt. 12 at 27-30), both the Fourth and Ninth Circuits have recognized that transgender people are a quasi-suspect class, discrimination against whom is subject to heightened scrutiny.  *Grimm* v. *Gloucester Cty. Sch. Bd*., 972 F.3d 586, 611-13 (4th Cir. 2020), cert. denied, No.

---

experience of gender transition, the law does not discriminate on the basis of transgender status.  *Doe 2* involved a motion to dissolve the district court's preliminary injunction enjoining President Trump's transgender military service ban based on changed circumstances.  The Court did not resolve as a general matter whether the ban was a transgender status classification.  Instead, as Judge Wilkens explained, the decision is not "dispositive of whether the Mattis Plan targets *only* transgender persons or is instead facially neutral.  But it does mean that the Mattis Plan does not target *all* transgender persons, at least on this record, and it was therefore error to conclude that the Mattis Plan was not a substantive change from the 2017 Presidential Memorandum."  *Doe 2*, 917 F.3d at 702 (emphasis in original).  The decision does not stand for the proposition that all transgender individuals need to be affected to establish a transgender status classification triggering heightened equal protection scrutiny.

20-1163, 2021 WL 2637992 (U.S. June 28, 2021); *Karnoski*, 926 F.3d at 1200.[4]
Based on these well-reasoned decisions, this Court should reach the same
conclusion.

Defendants claim that transgender people cannot be defined as a discrete
group, that they have not historically been subject to discrimination, and that they
are not a minority lacking political power.  (*See* Mot. at 26-27.)  These claims—in
addition to being factual disputes that are not properly raised on a motion to
dismiss—stretch the bounds of credulity, and were expressly addressed and rejected
by the Court in *Grimm*.  "[T]here is no doubt that transgender individuals historically
have been subjected to discrimination," and "[e]ven considering the low percentage
of the population that is transgender, transgender persons are underrepresented in
every branch of government."  *Grimm*, 972 F.3d at 611, 613 (quoting *Grimm* v.
*Gloucester Cty. Sch. Bd.*, 302 F. Supp. 3d 730, 749 (E.D. Va. 2018)); *see also id.* at
613 ("Transgender people constitute a minority that has not yet been able to

---

[4]     An overwhelming majority of courts have held that transgender status triggers
heightened scrutiny under the Equal Protection Clause. *See, e.g.*, *Grimm*, 972
F.3d at 611-13; *Karnoski*, 926 F.3d at 1200-01; *Evancho* v. *Pine-Richland
Sch. Dist.*, 237 F. Supp. 3d 267, 288 (W.D. Pa. 2017); *Adkins* v. *City of N.Y.*,
143 F. Supp. 3d 134, 139 (S.D.N.Y. 2015); *Bd. of Educ. of the Highland Sch.
Dist.* v. *U.S. Dep't of Educ.*, 208 F. Supp. 3d 850, 873-74 (S.D. Ohio 2016);
*M.A.B.* v. *Bd. of Educ. of Talbot City*, 286 F. Supp. 3d 704, 718-22 (D. Md.
2018); *Norsworthy* v. *Beard*, 87 F. Supp. 3d, 1104, 1119 (N.D. Cal. 2015);
*F.V.* v. *Barron*, 286 F. Supp. 3d 1131, 1145 (D. Idaho 2018); *Flack* v. *Wis.
Dep't of Health Servs.*, 328 F. Supp. 3d 931, 951-53 (W.D. Wis. 2018).

meaningfully vindicate their rights through the political process."). And transgender people are also "a discrete group with immutable characteristics": "gender identity is formulated for most people at a very early age, and . . . being transgender is not a choice. Rather, it is as natural and immutable as being cisgender." *Id.* at 612-13.

Defendants make four additional arguments to attempt to show that the Health Care Ban does not discriminate based on transgender status, none of which has merit. *First*, Defendants argue that "it would be inappropriate to treat the [Health Care Ban's] prohibition on gender-transition procedures as a proxy for a classification based on transgender status" because not all transgender minors in Arkansas seek gender-affirming care. (Mot. at 22-23.) But where a law draws a line based on a protected status, the fact that not all members of the class are targeted by the discrimination does not insulate the law from heightened scrutiny. *See Phillips* v. *Martin Marietta Corp.*, 400 U.S. 542, 543-44 (1971) (per curiam) (discriminating against women with children is sex discrimination even if women without children were not discriminated against); *Rice* v. *Cayetano*, 528 U.S. 495, 516-17 (2000) ("Simply because a class . . . does not include all members of [a] race does not suffice

to make the classification race neutral."); *Nyquist* v. *Mauclet*, 432 U.S. 1, 7-9 (1977); *Mathews* v. *Lucas*, 427 U.S. 495, 504 n.11 (1976).[5]

*Second*, Defendants contend that the law does not discriminate on the basis of transgender status because it prohibits all children from undergoing "gender transition." (Mot. at 23.) But the definition of "gender transition" is based on living in accordance with one's gender where that gender does not align with a person's sex assigned at birth—the definition of being transgender. HB 1570 § 3, ARK. CODE ANN. § 20-9-1501(5). By definition, then, the law targets transgender minors. And while Defendants assert that "gender transition procedures" disrupt or destroy biological functions and have negative health consequences (Mot. at 23), this is an asserted justification for the discriminatory treatment that cannot be resolved on a motion to dismiss and does not change "the inescapable conclusion that the Act discriminates on the basis of transgender status," meaning that the State's proffered justification must be examined under heightened scrutiny. *Hecox* v. *Little*, 479 F. Supp. 3d 930, 975 (D. Idaho 2020).

*Third*, Defendants cite *Geduldig* to argue that not all pregnancy classifications are sex-based classifications and, likewise, not all "gender transition" classifications

---

[5]    For this reason, Defendants' attempt to characterize the Health Care Ban as an age classification does not change the fact that the law classifies based on transgender status.

are transgender status classifications.  (Mot. at 21-22, citing *Geduldig* v. *Aiello*, 417 U.S. 484, 496-97 (1974).)  But under *Geduldig*, if a pregnancy classification is "pretext" for "invidious discrimination against the members of one sex," it is sex discrimination.  *Geduldig*, 417 U.S. at 496 n.20.  In other words, it may be sex-discrimination even if not all women are affected, so long as "discrimination has occurred." *DeLaurier* v. *San Diego Unified Sch. Dist.*, 588 F.2d 674, 677 (9th Cir. 1978) (holding that sex discrimination occurred when an employer required teachers to take mandatory leave in their ninth month of pregnancy and thus "restrict[ed] . . . pregnant women's employment opportunities."); *see also Liss* v. *Sch. Dist. of City of Ladue*, 548 F.2d 751, 752 (8th Cir. 1977) (per curiam) (applying *Geduldig*'s invidious-discrimination test).  Here, the Health Care Ban draws a "gender transition" line for the sole purpose of restricting gender-affirming care for transgender people.  The fact that not all transgender people are affected does not erase that discriminatory classification.

*Fourth*, Defendants cite *Hennessy-Waller* to argue that the Health Care Ban does not discriminate based on transgender status because it "prohibits only experimental procedures and permits other healthcare for gender dysphoria." (Mot. at 24-25, citing *Hennessy-Waller* v. *Snyder*, No. CV-20-00335, 2021 WL 1192842 (D. Ariz. 2021).)  But Defendants' reliance on *Hennessy-Waller* is misplaced.  In that case, the Arizona District Court denied a preliminary injunction to two

-21-

individuals challenging the categorical denial of insurance coverage for "gender reassignment surgery" under the state's Medicaid program. 2021 WL 1192842, at *3. Because all treatments for gender dysphoria were available under the state's Medicaid program except for surgical treatment for minors, the Court reasoned that at the preliminary injunction stage, based on the record evidence, it was possible the classification was based on something other than transgender status. *Hennessy-Waller*, 2021 WL 1192842, at *9.[6] By contrast here, there is no record on a motion to dismiss, and the Health Care Ban covers *all* recommended gender-affirming care for minors.[7]

---

[6]   In addition, the Court in *Hennessy-Waller* reasoned, without explanation, that the Supreme Court's holding and reasoning in *Bostock* v. *Clayton Cty., Georgia*, 140 S. Ct. 1731 (2020), was limited to Title VII of the Civil Rights Act, 2021 WL 1192842, at *8, despite multiple appellate courts and the United States having rejected that analysis. *See Grimm*, 972 F.3d at 616 (4th Cir. 2020) (holding that *Bostock* applies to Title IX); *see also* Statement of Interest of the U.S. at 8, *B.P.J.* v. *W. Va. State Bd. of Educ.*, No. 21-cv-00316 (S.D. W. Va. 2021), ECF No. 42 (citing *Bostock* in support of the argument that discrimination against transgender girls in girls' athletics violates Title IX).

[7]   Contrary to Defendants' argument that whether gender-affirming care can be "medically-necessary" is a "legal conclusion" (Mot. at 24), it is instead a factual allegation based on the consensus of the major U.S. medical associations. (Compl. ¶ 2.) Defendants' reference to cases in which the Court considered evidence to determine whether certain gender-affirming care was appropriate is misplaced. (Mot. at 24, citing *Kosilek* v. *Spencer*, 774 F.3d 63, 89 (1st Cir. 2014) (en banc) and *Gibson* v. *Collier*, 920 F.3d 212, 216 (5th Cir. 2019).) To the extent there is any factual dispute here, at the motion to dismiss stage, the Court must accept the well-pleaded allegations in the Complaint as true. *Tri State*, 112 F. Supp. 3d at 813 (citing *Cole*, 599 F.3d at 861).

The State of Arkansas passed a sweeping law categorically banning for minors all medical treatment related to gender transition—care that only transgender people need. This is a classification based on transgender status triggering heightened scrutiny under the Equal Protection Clause.

### 2.     The Health Care Ban discriminates on the basis of sex.

The Complaint also adequately alleges that the Health Care Ban triggers heightened scrutiny because the law treats similarly situated people differently based on their sex assigned at birth. (Compl. ¶¶ 2, 4, 8, 129-30, 132, 156-57, 161-62, 165, 167); *see U.S.* v. *Virginia*, 518 U.S. 515, 555 (1996) ("[A]ll gender-based classifications today warrant heightened scrutiny."). For example, the Health Care Ban would permit a girl to receive testosterone suppressants to help align her physical characteristics with her gender identity if her assigned sex at birth was female but not if her assigned sex at birth was male. HB 1570 § 3, ARK. CODE ANN. §§ 20-9-1502(a)-(c). Although both girls seek treatment to affirm their gender and feminize their appearance, Arkansas's Health Care Ban requires that they be treated differently, because each girl had a different sex assigned at birth. That is sex discrimination. *See Bostock*, 140 S. Ct. at 1741-42 (explaining that when an "employer intentionally penalizes a person identified as male at birth for traits or actions that it tolerates in an employee identified as female at birth . . . sex plays an unmistakable and impermissible role in the [employer's] decision."); *Grimm*, 972

F.3d at 608 (holding that the challenged policy "cannot be stated without referencing sex," and "[o]n that ground alone, heightened scrutiny should apply.").

Arkansas's Health Care Ban further discriminates based on sex by penalizing transgender minors for not conforming to sex stereotypes. *See Glenn* v. *Brumby*, 663 F.3d 1312, 1319–20 (11th Cir. 2011); *see also Grimm*, 972 F.3d at 608. The statute bans medical treatment based not on medical need but rather on whether the treatment changes the body in ways that are not "typical for the individual's biological sex." HB 1570 § 3, ARK. CODE ANN. § 20-9-1501(4). The statute "tethers Plaintiffs to sex stereotypes which, as a matter of medical necessity, they seek to reject." *See Kadel* v. *Folwell*, 446 F. Supp. 3d 1, 14 (M.D.N.C. 2020).

**B.    The Complaint Adequately Alleges that the Health Care Ban Cannot Survive Heightened Scrutiny.**

Plaintiffs have adequately alleged facts showing that Defendants cannot meet their "demanding" burden of showing that the Health Care Ban substantially advances an important governmental interest. *Virginia*, 518 U.S. at 533. Under heightened scrutiny, the burden "rests entirely on the State" to demonstrate an "exceedingly persuasive" justification for its differential treatment. *Id.* Defendants argue that the law serves the purpose of protecting children.[8] While this is certainly

---

[8]    Defendants' only other asserted rationale for the Health Care Ban is its interest in regulating the medical profession. (*See* Mot. at 28.) But this rationale is derivative of its asserted interest in protecting children from harm. (*See* Mot.

an important governmental interest, the facts alleged by Plaintiffs establish that "the discriminatory means employed" are not "substantially related to the achievement of [that] objective[]." *Id.* at 524 (internal quotation marks and citation omitted).

     1. <u>The Complaint alleges sufficient facts showing that the Health Care Ban does not substantially further an important government interest</u>.

Defendants assert that the Health Care Ban protects children because the banned treatments are "dangerous and experimental." (Mot. at 30); HB 1570 § 2(6)(B). But the Complaint makes extensive factual allegations—which the Court must accept as true on a motion to dismiss—that demonstrate the Health Care Ban does not substantially further the State's claimed interest in protecting children from dangerous or experimental medical treatment.

*First*, the Complaint alleges that the medical care prohibited by the law is prescribed in accordance with widely accepted medical protocols for the treatment of adolescents with gender dysphoria, protocols that are recognized and supported by the major medical associations in the United States. (Compl. ¶¶ 32, 35-40, 154.) These groups recognize that the benefits of this care outweigh the risks for many adolescent patients, as it substantially reduces lifelong gender dysphoria and can eliminate the medical need for surgery later in life. (Compl. ¶¶ 46, 154.)

———————————

at 30-31 ("Arkansas has . . . regulated the medical profession by preventing practitioners from inflicting harm.").)

*Second*, the Complaint alleges the same treatments banned for transgender minors are permitted if provided to cisgender minors for the very same reason. (Compl. ¶¶ 131-34.)  For example, the Health Care Ban prohibits hormone therapy when the treatment is used to assist with "gender transition," but the same hormone therapy is permitted when prescribed to non-transgender patients to help bring their bodies into alignment with their gender identity.  (Compl. ¶ 133.)  The Health Care Ban also expressly permits the banned treatments to be provided to minors with intersex conditions, despite carrying the same potential risks they carry for transgender minors.  (Compl. ¶¶ 139, 144); *see also* HB 1570 § 3, ARK. CODE ANN. § 20-9-1502(c)(1).  Given that the banned treatments are permitted to treat non-transgender adolescents for any purpose and carry the same potential risks, the asserted interest in protecting minors from the risks of the banned medical care does not satisfy heightened scrutiny.  *See Eisenstadt* v. *Baird*, 405 U.S. 438, 453 (1972) (striking down contraception ban for single people where stated health-related rationales applied equally to married people).

*Third*, the Complaint alleges that every medical intervention carries potential risks and potential benefits, and adolescent patients and their parents often make decisions about treatments with less evidence and/or greater risks than the treatment prohibited by the Health Care Ban.  (Compl. ¶¶ 142-43.)  While the Health Care Ban has "superficial earmarks as a health measure," protecting health cannot "reasonably

be regarded as its purpose." *Eisenstadt*, 405 U.S. at 452. "[A] law cannot be regarded as protecting an interest of the highest order . . . when it leaves appreciable damage to that supposedly vital interest unprohibited." *Church of the Lukumi Babalu Aye, Inc.* v. *City of Hialeah*, 508 U.S. 520, 547 (1993) (internal quotation marks and citation omitted). Instead of setting requirements that all medical treatment for minors must satisfy, Arkansas has singled out gender-affirming care for transgender adolescents—and only that care—for a unique burden.

The allegations in the Complaint thus show there is no rational explanation—much less an "exceedingly persuasive" one—for why gender-affirming care for transgender adolescents is singled out. *See Virginia*, 518 U.S. at 533.

   2. <u>Defendants' reliance on courts' discussions of factual records in other cases is misplaced.</u>

Defendants hinge much of their argument that the Health Care Ban serves an important government interest on *Bell* v. *Tavistock and Portman National Health Service Foundation Trust*, [2020] EWHC (Admin) 3274. But as discussed above, on a motion to dismiss, Defendants may not contest facts alleged in the Complaint or offer their own alternative facts, *State Advanced Surgery Ctr., LLC*, 112 F. Supp. 3d at 812-13 (citing *Cole*, 599 F.3d at 861), which is precisely what they attempt to

do here by pointing to a different factual record.[9]  *Clark* v. *Sw. Energy Co.*, No. 4:20-CV-00475-KGB, 2021 WL 711437, at \*4 (E.D. Ark. Feb. 23, 2021).

Even if properly considered on a Motion to Dismiss—which it is plainly not—*Bell* does little to advance Defendants' cause since it involved a limited factual record in a case that addresses a very different issue.  *Bell* was a judicial review (review of an administrative policy or practice) case based on a limited record by a court of first instance in the United Kingdom.  The Court considered whether a child under age 16 could consent to treatment with puberty blockers without parental consent under United Kingdom's consent regime, holding that a minor can consent "where he or she is competent to understand the nature of the treatment."  *Bell*, at ¶ 151.  The decision is currently on appeal before the Court of Appeal.[10]

Defendants nevertheless make much of the *Bell* decision's use of the word "experimental" to describe the treatments at issue, repeating it more than 40 times in their brief.  But the Court explicitly stated that it was "not deciding on the benefits

---

[9]  *See*, *e.g.*, Mot. at. 5 ("The High Court examined other evidence undermining the claim that the effects of puberty blockers are fully reversible.  *Cf.* Compl. ¶ 38 (alleging otherwise).").

[10]  The hearings were held on June 23 and 24, 2021.  Case Tracker for Civil Appeals, http://casetracker.justice.gov.uk/getDetail.do?case_id=20202142 (last visited June 30, 2021).  For reference, links to video recordings of the hearings are available at https://www.judiciary.uk/publications/bell-anr-claimant-resp-v-the-tavistock-and-portman-nhs-trust-def-appellant/.

or disbenefits of treating children with [gender dysphoria] with [puberty blockers], whether in the long or short term." *Id.* at ¶ 9; *see also id.* (writing that whether "treatments . . . may or may not be appropriate" is "not a matter for us. The sole legal issue in the case is the circumstances in which a child or young person may be competent to give valid consent to treatment in law and the process by which consent to the treatment is obtained.").[11]  Indeed, in a decision several months after *Bell*, Justice Lieven—one of the judges who also sat on *Bell*—made it clear that gender-affirming care continues to be provided in the United Kingdom. *AB* v. *CD and others* [2021] EWHC 741 (Fam). Noting the "unanimity between the clinicians, the parents and [the daughter] that she should continue to be prescribed [puberty blockers]," and that clinical professionals were in the best position "to produce guidance as to clinical best practice," Justice Lieven in *AB* held that the parents have the right to consent to gender-affirming care on behalf of their child. *Id.* at ¶¶ 25, 108, 114, 119, 120.

Defendants' reliance on a federal district court's assessment of the factual record on a motion for a preliminary injunction in *Hennessy-Waller* (Mot. at 25) is,

---

[11]    The Court explicitly stated that it was not its role, on judicial review, to "judge the weight to be given to various different experts" nor to "resolve any factual dispute." *Bell*, at ¶¶ 70, 78.

likewise, an improper attempt to offer alternative facts that conflict with the alleged facts in the Complaint.

*     *     *

Plaintiffs have made extensive allegations about the medically accepted treatment protocols for gender dysphoria in adolescents, their safety and efficacy, and the severe harms that would flow from denying such treatment. (*See* Section II.B.1., *supra*.) These allegations show that far from advancing an interest in protecting Arkansas's youth, the Health Care Ban would spell disaster for the Minor Plaintiffs and other transgender adolescents experiencing gender dysphoria. These allegations, if accepted as true, establish that the Health Care Ban cannot satisfy heightened equal protection scrutiny. There is no legitimate state interest in causing this kind of suffering.

### C.   The Complaint Adequately Alleges that the Health Care Ban Cannot Survive Rational Basis Review.

The Complaint alleges facts showing that Arkansas's Health Care Ban fails under any level of equal protection scrutiny. *First*, as discussed above, Plaintiffs have alleged facts showing that Defendants' stated justifications for banning gender-affirming medical care for transgender adolescents make "no sense in light of how [Arkansas] treat[s]" cisgender adolescents in need of the same treatments, as well as other types of medical care that have similar or greater risks than the banned care

-30-

and similar or lesser medical evidence to support them.  *Bd. of Trs. of Univ. of Ala.*
v. *Garrett*, 531 U.S. 356, 366 n.4 (2001).  There is no rational basis to conclude that
allowing transgender adolescents to receive gender-affirming care "would threaten
legitimate interests of [Arkansas] in a way that" allowing the same treatments for
cisgender youth, or allowing other types of care that are unaffected by the law,
"would not."  *City of Cleburne* v. *Cleburne Living Ctr.*, 473 U.S. 432, 448 (1985)
(invalidating a zoning law barring homes for disabled adults, because all of the
asserted rationales—such as concerns about traffic—applied to other types of
multiple-resident dwellings that were not prohibited).  Even when the government
offers an ostensibly legitimate purpose for a law, "[t]he State may not rely on a
classification whose relationship to an asserted goal is so attenuated as to render the
distinction arbitrary or irrational."  *See id.*; *see also Romer* v. *Evans*, 517 U.S. 620,
635 (1996) ("The breadth of the [statute] is so far removed from [the] particular
justifications" advanced by Arkansas that it is "impossible to credit them.").

Second, Plaintiffs alleged facts showing that the Health Care Ban fails under
any level of equal protection scrutiny because it was enacted for an impermissible
purpose.  *See*, *e.g.*, *U.S. Dep't of Agric.* v. *Moreno*, 413 U.S. 528, 534 (1973)
(emphasis added) ("[A] bare . . . desire to harm a politically unpopular group cannot
constitute a *legitimate* governmental interest.").  Defendants argue that a court may
not rely on the remarks of legislators to discern legislative intent. (Mot. at 31.)  But

-31-

the Complaint does not rely exclusively on the referenced remarks.  To assess intent, the Supreme Court instructs courts to undertake a "sensitive inquiry into such circumstantial and direct evidence . . . as may be available."  *Vill. of Arlington Heights*, *et.al.,* v. *Metro. Hous. Dev. Corp., et.al.*, 429 U.S. 252, 266 (1977). Relevant factors include the "impact of the official action," whether it is felt more heavily by particular groups, the "historical background of the decision," the "specific sequence of events leading up to the challenged decision," "[d]epartures from the normal procedural sequence," and any "legislative or administrative history."  *Id*. at 266-68.  Plaintiffs have alleged here that the context surrounding the Health Care Ban's passage, the law's impact, and the legislative history all make clear that it was enacted with the impermissible purpose of singling out and targeting transgender people for unequal treatment.

"The history of [the statute's] enactment" demonstrates that the purpose of Arkansas's Health Care Ban was to express moral and social disapproval of transgender people.  *U.S.* v. *Windsor*, 570 U.S. 744, 770 (2013).  As the Complaint alleges, throughout the 2021 Legislative Session, the General Assembly focused its efforts on expressing its disapproval of transgender people through a number of bills and resolutions.  (Compl. ¶¶ 58-64.)  Majorities in both chambers passed resolutions expressing their view that "gender reassignment medical treatments" are not "natural."  HR 1018, 2021 Gen. Assemb., Reg. Sess. (Ark. 2021); SR 7, 2021 Gen.

Assemb., Reg. Sess. (Ark. 2021).  Some members of the General Assembly further expressed their personal beliefs related to the bill, including religious opposition to being transgender.  One member compared transgender youth to a child who "comes to you and says, 'I wanna be a cow.'"  (Compl. ¶ 55.)

As further alleged, the General Assembly passed the Health Care Ban—the only law of its kind to ever be passed in the United States—over the Governor's veto and the sustained and robust objections of the medical community, the result of a rushed and anomalous legislative process.  (Compl. ¶¶ 5, 56.)  In adopting the Health Care Ban, the General Assembly ignored testimony from Arkansas doctors about the lifesaving benefits of the care banned by the law and warnings that, if the State prohibits this medical care, the health and well-being of Arkansas's transgender youth will suffer unavoidable, grave harm.  (Compl. ¶¶ 50, 115.)

This context, combined with the Health Care Ban's purpose of banning only treatment provided to transgender people, reveals that the law was "drawn for the purpose of disadvantaging the group burdened by the law," something the Equal Protection Clause does not permit.  *See Romer,* 517 U.S. at 633 (invalidating state constitutional amendment barring non-discrimination protections for LGBTQ people);  *Moreno*, 413 U.S. at 534 (invalidating food stamp regulation aimed at excluding hippies from eligibility).

-33-

Based on these allegations, Plaintiffs have adequately pleaded a claim that the Health Care Ban violates their right to equal protection on any level of scrutiny.

### III. The Complaint States a Claim for Violation of the Parent Plaintiffs' Fundamental Right to Parental Autonomy.

The Complaint alleges that the Health Care Ban violates the Due Process Clause of the Fourteenth Amendment by infringing the Parent Plaintiffs' fundamental right to make decisions regarding the "care, custody, and control" of their children, which includes the right to seek and to follow medical advice to protect the health and well-being of their minor children. (Compl. ¶¶ 172-73); *see Troxel* v. *Granville*, 530 U.S. 57, 65-66 (2000) ("[T]he interest of parents in the care, custody, and control of their children . . . is perhaps the oldest of the fundamental liberty interests recognized by this Court."); *Santosky* v. *Kramer*, 455 U.S. 745, 758-59 (1982) (Parents' "desire for and right to the companionship, care, custody, and management of [their] children is an interest far more precious than any property right.") (citation omitted); *Kanuszewski* v. *Mich. Dep't of Health and Human Servs*, 927 F.3d 396, 419 (6th Cir. 2019) ("[P]arents' substantive due process right to make decisions concerning the care, custody, and control of their children includes the right to direct their children's medical care.") (citation omitted).

Defendants' attempt to re-define the fundamental right at issue as being the "right to choose a particular experimental medical procedure for [a] child" is unavailing. (Mot. at 33.) As the Supreme Court explained in *Lawrence* v. *Texas*,

the Court in *Bowers* v. *Hardwick* had "misapprehended the claim of liberty there presented to it" by improperly narrowing the fundamental right at issue as the right to "engage in consensual sodomy."  539 U.S. 558 (2003).  "To say that the issue in *Bowers* was simply the right to engage in certain sexual conduct demeans the claim the individual put forward, just as it would demean a married couple were it to be said marriage is simply about the right to have sexual intercourse."  *Id*.  Similarly here, contrary to the well-pleaded allegations, Defendants improperly assert that the treatment at issue is "experimental" (*See* Section II.B.2., *supra*), and attempt to narrow the right at issue to whether parents have a right to seek "experimental" treatment for their children.  Instead, the Parent Plaintiffs' claim is grounded in the long-established right to the care, custody and control of their children, which includes the right to "seek and follow medical advice."  *Parham* v. *J.R.*, 442 U.S. 584, 602 (1979) ("Our jurisprudence historically has reflected Western civilization concepts of the family as a unit with broad parental authority over minor children . . . Surely, this includes a 'high duty' to . . . seek and follow medical advice.").

### A.    The Fundamental Right to Parental Autonomy Is Separate from a Child's Fundamental Right.

Defendants wrongly assert that the fundamental right of parents to seek and follow medical advice for their minor children "could exist only if a child herself has a substantive-due-process right" to access the medical treatment at issue.  (Mot. at 33.)  But the Due Process Clause protects parents' right to the care, custody, and

control of their children; it is its own right and not merely a right to assert one's child's rights.  *See, e.g.*, *Michael H.* v. *Gerald D.*, 491 U.S. 110, 130 (1989) (comparing legal and biological parents' fundamental liberty interest in a relationship with their child while noting that "[w]e have never had occasion to decide whether a child has a liberty interest, symmetrical with that of her parent, in maintaining her filial relationship"); *Pierce* v. *Soc'y of the Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510, 532, 534–35 (1925) (holding that a ban on private schools violated the "liberty of parents and guardians to direct the upbringing and education of children under their control," without reaching the plaintiff's claimed "right of the child to influence the parents' choice of a school.").

Defendants' reliance on *Whalen* v. *Roe* (Mot. at 33.) is misplaced because *Whalen* has nothing to do with the right to parental autonomy.  429 U.S. 589, 604 (1977).  In *Whalen*, patient and doctor plaintiffs brought privacy claims under the Fourteenth Amendment.  After rejecting the patients' claim, the Court rejected the doctors' claim, stating:  "To the extent that their claim has reference to the possibility that the patients' concern about disclosure may induce them to refuse needed medication, the doctors' claim is derivative from, and therefore no stronger than, the patients."  *Id*.  This passage relied upon by Defendants merely refers to a specific claim advanced by the doctors in *Whalen*, and is irrelevant to the Parent Plaintiffs' due process claim.  Since a parent's fundamental right to parental autonomy is not

"derivative" of a child's right, the cases cited by Defendants in their Motion to support an assertion that patients do not have a right to access "experimental"[12] treatments (*see* Mot. at 34-36) are also irrelevant to the Parent Plaintiffs' claim.

> **B.   The Complaint Adequately Alleges that the Health Care Ban Violates the Parent Plaintiffs' Fundamental Right to Seek Out Medical Care for their Children.**

Defendants concede that infringement on the fundamental right to parental autonomy is subject to strict scrutiny, arguing, in the alternative, that the "parents' 'liberty interest in the care, custody, and management of their children . . . is limited by the state's compelling interest in protecting a child.'" (Mot. at 36, quoting *Stanley* v. *Finnegan*, 899 F.3d 623, 627 (8th Cir. 2018) (quotation omitted).) But Defendants make no attempt to respond to the allegations in the Complaint that describe how the Health Care Ban strips parents of their ability to access safe, effective, and potentially lifesaving medical care for their children. (Compl. ¶¶ 32, 47, 49.); *see* Section II.B.1., *supra*. Instead, Defendants cite generic language from other parental autonomy cases[13] and reference 19 other Arkansas laws that prohibit minors from

---

[12]   And, again, Defendants' argument improperly relies on contesting Plaintiffs' factual allegations about the safety and efficacy of the banned treatments.

[13]   The only relevant case cited by the Defendants explicitly recognizes a parent's right to "seek and follow medical advice" for their children. *Parham*, 442 U.S. at 602. None of the other cases cited by the Defendants involves a parent's right to make medical decisions for their children or supports the argument that the Health Care Ban serves a compelling state interest. (Mot. at 36-38.)

doing a variety of activities from "[p]urchas[ing] or possess[ing] any intoxicating liquor, wine, or beer" to "[b]et[ting] on dog races."  (*See* Mot. at 37-38.)  These arguments are irrelevant to whether the Complaint adequately alleges that the Health Care Ban fails strict scrutiny.[14]  That minors' rights are limited under other laws tells us nothing about whether a ban on certain medical treatment for minors is narrowly tailored to serve an interest in protecting minors' health and safety.

Accordingly, the Complaint adequately alleges that the Health Care Ban violates the Parent Plaintiffs' fundamental right to seek out and to follow medical advice to protect the health and well-being of their minor children.

## IV.  The Complaint States a Claim for Violation of the First Amendment.

The Complaint alleges that, by prohibiting Arkansas doctors from referring transgender adolescent patients who need gender-affirming care to doctors who can provide it (the "Referral Prohibition"), the Health Care Ban violates the First Amendment.  Defendants make three arguments in an attempt to dismiss this claim: (1) the Referral Prohibition targets conduct, not speech; (2) to the extent the Referral Prohibition does prohibit speech, that speech is incidental to conduct; and (3) the Referral Prohibition does not implicate patients and their parents' rights to hear their

---

[14]    For the reasons stated in Section II.B.1., *supra*, and in Plaintiffs' Motion for Preliminary Injunction, the Health Care Ban does not survive strict (or any level) of scrutiny.  (See Dkt. 12 at 50-51.)

doctors' referrals.  (Mot. at 39–41.)  Each fails because a ban on a doctor's referral of a patient to receive care clearly regulates speech, not conduct, and by targeting and completely prohibiting that speech, the Health Care Ban infringes the doctors', patients', and parents' First Amendment rights.

### A.      The Referral Prohibition Restricts Speech, Not Conduct.

The First Amendment prohibits states from "restrict[ing] expression because of its message, its ideas, its subject matter, or its content."  *Reed* v. *Town of Gilbert*, 576 U.S. 155, 163 (2015) (citation omitted).  "Speech is not unprotected merely because it is uttered by 'professionals'" such as doctors.  *See Nat'l Inst. of Fam. & Life Advocs. ("NIFLA")* v. *Becerra*, 138 S. Ct. 2361, 2371–72 (2018); *King* v. *Governor of the State of N.J.*, 767 F.3d 216, 228-29 (3d Cir. 2014) ("Simply put, speech is speech[.]"), *abrogated on other grounds by NIFLA*, 138 S. Ct. 2361. Speech is only afforded less protection "in two circumstances—neither of which turn[] on the fact that professionals [are] speaking":  (1) when laws "require professionals to disclose factual, noncontroversial information in their 'commercial speech[,]'" an exception Defendants do not contend applies here; and (2) when the state regulates "conduct that incidentally involves speech," which for the reasons discussed in Section IV.B., *infra*, is not the nature of the Referral Prohibition. *NIFLA,* 138 S. Ct. at 2372.

Without citing a single case, Defendants contend that the Referral Prohibition is not a regulation of speech because "[i]t prohibits not the expression of ideas *about* the procedures but the referral of a child to another practitioner *for* the procedures." (Mot. at 39 (emphasis in original).)  This distinction is irrelevant:  a referral is a recommendation by a doctor that is communicated to a patient.  (Compl. ¶ 180.)  It expresses a physician's ideas, and provides to the patient information, about a step in the patient's course of treatment, and therefore constitutes speech.  *See Sorrell* v. *IMS Health Inc.*, 564 U.S. 552, 570 (2011) ("[D]issemination of information [is] speech within the meaning of the First Amendment."); *Bartnicki* v. *Vopper*, 532 U.S. 514, 527 (2001) ("[I]f the act[] of 'disclosing' . . . information do[es] not constitute speech, it is hard to imagine what does fall within that category.") (citation omitted). The Referral Prohibition is a limitation on speech because it limits what doctors are permitted to tell their patients, not what they can or cannot do.  *Cf. Rumsfeld* v. *F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 60 (2006) (finding regulation of conduct not speech, where the law "affect[ed] what law schools must *do*—afford equal access to military recruiters—not what they may or may not *say*.") (emphasis in original).

Defendants attempt to cast the First Amendment aside by pointing to the State's power to regulate doctors.  (Mot. at 40, citing *Gonzales* v. *Carhart*, 550 U.S. 124 (2007) and *Watson* v. *State of Md.*, 218 U.S. 173 (1910).)  But "a State may not,

under the guise of prohibiting professional misconduct, ignore constitutional rights."
*See Nat'l Ass'n for Advancement of Colored People* v. *Button*, 371 U.S. 415, 439
(1963); *see also Sorrell*, 564 U.S. at 566; *NIFLA*, 138 S. Ct. at 2374 ("Doctors help
patients make deeply personal decisions, and their candor is crucial." (citation
omitted)); *Conant* v. *Walters*, 309 F.3d 629, 636 (9th Circ. 2002) ("[P]hysicians
must be able to speak frankly and openly to patients," because "[a]n integral
component of the practice of medicine is the communication between a doctor and
a patient").[15]

### B. The Referral Prohibition's Speech Limitations Are Not Incidental to Conduct.

Defendants contend, in the alternative, that the Referral Prohibition's
infringements on speech are merely incidental to the State's regulation of conduct.
(Mot. at 40-41.)   This argument fails because the Referral Prohibition targets
referrals directly, not simply conduct to which referrals may be a part.  *See Sorrell*,
564 U.S. at 567 (finding that law "imposed[] more than an incidental burden on
protected expression" because "[b]oth on its face and in its practical operation, [it]

---

[15]   In a footnote, Defendants state that even if the Referral Prohibition is found
to constitute a content- or viewpoint-based speech, it would still survive strict
scrutiny.  (Mot. at 41 n. 7.)  For the reasons stated in Section II.B.1., *supra*,
and in Plaintiffs' Motion for Preliminary Injunction—including because it
does not advance a compelling governmental interest, it does not advance
even the State's stated interest, it is not narrowly tailored, and there are less
restrictive alternatives available—that is not the case.  (*See* Dkt. 12 at 55-57.)

impose[d] a burden based on the content of speech and the identity of the speaker"). Defendants' claim to the contrary misapplies clear precedent. *See Sorrell*, 564 U.S. at 567 (explaining that incidental burdens include regulations such as "a ban on race-based hiring [that] require[s] employers to remove 'White Applicants Only' signs" or "an ordinance against outdoor fires [that] forbid[s] burning a flag") (internal quotations and citations omitted). The Health Care Ban does contain a restriction on conduct: the ban on providing gender-affirming care. But that ban is independent of the Referral Prohibition, which separately and specifically targets speech.

The case law Defendants cite does not suggest a different conclusion. *Ohralik* v. *Ohio State Bar Ass'n* involved a rule preventing in-person solicitation of prospective clients by lawyers. 436 U.S. 447 (1978). In upholding the rule, the Court focused on the in-person nature of the conduct, not on the content of the solicitation, explaining that "[u]nlike a public advertisement . . . in-person solicitation may exert pressure and often demands an immediate response, without providing an opportunity for comparison or reflection." *Id.* at 457; *see also Edenfield* v. *Fane*, 507 U.S. 761, 774 (1993) (recognizing *Ohralik*'s holding as "narrow" and "depend[ing] upon certain 'unique features of in-person solicitation by lawyers' that were present in the circumstances of that case." (citation omitted)). The Referral Prohibition, in contrast, is aimed at the content of the doctors' communication, not the context or manner in which that speech is delivered.

Defendants also invoke *Rust* v. *Sullivan*, 500 U.S. 173 (1991), to argue that the Referral Prohibition is narrower than restrictions the Supreme Court has let stand. (Mot. at 40-41.) But *Rust* too is inapplicable. *Rust* did not concern whether the government could prohibit certain speech, but rather whether it could "make a value judgment favoring childbirth over abortion and implement that judgment by the allocation of public funds." 500 U.S. at 174. In holding it could, the Court explained: "There is a basic difference between direct state interference with a protected activity and state encouragement of an alternative activity consonant with legislative policy." *Id.* at 193 (quoting *Maher* v. *Roe*, 432 U.S. 464 (1977)). The Referral Prohibition plainly falls into the former, impermissible, category—it prohibits a category of speech. It does not encourage alternative speech.

Contrary to Defendants' suggestion—that the Doctor Plaintiffs have "tak[en] advantage of the State of Arkansas's physician-licensing regime" (Mot. at 41)—does not eliminate their First Amendment rights. Indeed, the Supreme Court has rejected this very argument. *See NIFLA*, 138 S. Ct., at 2375 (States do not have "unfettered power to reduce a group's First Amendment rights by simply imposing a licensing requirement. States cannot choose the protection that speech receives under the First Amendment, as that would give them a powerful tool to impose invidious discrimination of disfavored subjects." (internal citations and quotations omitted)). *Barsky* v. *Bd. of Regents of University*, cited by Defendants, provides no support for

this argument, as it held only that a physician's license could be suspended after a criminal conviction.  347 U.S. 442 (1954).[16]

Lastly, even if the Referral Prohibition was found to be a regulation of conduct that incidentally burdens speech, it would still require justification that Plaintiffs allege Defendants cannot meet.  *See*, *e.g.*, *Cap. Associated Indus., Inc.* v. *Stein*, 922 F.3d 198, 209 (4th Cir.), *cert. denied*, 140 S. Ct. 666 (2019) ("[I]intermediate scrutiny is the appropriate standard for reviewing conduct regulations that incidentally impact speech); *AMA* v. *Stenehjem*, 412 F. Supp. 3d 1134, 1149 (D.N.D. 2019) ("[A]ssuming [the law] regulates professional conduct that incidentally burdens speech—intermediate review is the more appropriate standard of review to apply.").  And facts alleged in the Complaint show that the Referral Prohibition

---

[16]    Defendants also cite to *Planned Parenthood of Se. Pennsylvania* v. *Casey*, 505 U.S. 833 (1992), in which the plurality upheld a law requiring abortion providers to inform their patients of "the nature of the procedure, the health risks of the abortion and childbirth, and the 'probable gestational age of the unborn child.'"  *Id*. at 882.  As the Court later explained in *NIFLA*, *Casey* concerned an informed consent requirement, and the "requirement that a doctor obtain informed consent to perform an operation is 'firmly entrenched in American tort law.'"  138 S. Ct., at 2373 (quoting *Cruzan* v. *Director, Mo. Dept. of Health*, 497 U.S. 261, 269 (1990)).  An informed consent requirement is not at issue here, and, as other circuits have recognized, "the *Casey* 'plurality did not hold sweepingly that all regulation of speech in the medical context merely receives rational basis review.'"  *Wollschlaeger* v. *Governor, Fla*., 848 F.3d 1293, 1311 (11th Cir. 2017) (quoting *Stuart* v. *Camnitz*, 774 F.3d 238, 249 (4th Cir. 2014)).

cannot satisfy strict scrutiny, or any other level of First Amendment scrutiny.  (*See* Section II.B.1., *supra*.)

## C.   The Referral Prohibition Implicates the Patients' and Their Parents' First Amendment Rights.

Finally, Defendants argue that the Referral Prohibition does not implicate the Minor Plaintiffs  and the Parent Plaintiffs' First Amendment rights because the law "does not restrict any right to receive information and ideas."  (Mot. at 41 (citations omitted).)  But, by prohibiting referrals, the law restricts patients' and their parents' access to information, specifically their doctor's medical recommendations about a step in the patient's course of treatment, and therefore violates patients' and their parents' First Amendment rights.  *See Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26* v. *Pico*, 457 U.S. 853, 866 (1982) (removal of books from the shelves of a school library implicated First Amendment rights of students because First Amendment protects "not only . . . individual self-expression but also . . . the public access to discussion, debate, and the dissemination of information and ideas." (citations omitted)); *see also Conant*, 309 F.3d at 636 (law prohibiting doctors from recommending the medical use of marijuana to patients "str[uck] at core First Amendment interests of . . . patients.").[17]

---

[17]   Defendants also argue that laws may permissibly restrict the information and ideas to which children are exposed, citing *Ginsberg* v. *New York*, 390 U.S. 629 (1968).  (Mot. at 41.)  But *Ginsberg* involved a law prohibiting the sale

## CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that the Court

deny Defendants' Motion to Dismiss.


Dated:  June 30, 2021                              Respectfully submitted,

*/s/ Leslie Cooper*
Leslie Cooper                                      Beth Echols, Ark. Bar No. 2002203
Chase Strangio*                                    Christopher Travis, Ark. Bar No. 97093
American Civil Liberties Union                     Drake Mann, Ark. Bar No. 87108
Foundation                                         Gill Ragon Owen, P.A.
125 Broad St.                                      425 W. Capitol Avenue, Suite 3800
New York, NY 10004                                 Little Rock, AR 72201
Telephone:  (917) 345-1742                         Telephone:  (501) 376-3800
lcooper@aclu.org                                   echols@gill-law.com
cstrangio@aclu.org                                 travis@gill-law.com
*Attorneys for the Plaintiffs*                     mann@gill-law.com
                                                   *Attorneys for the Plaintiffs*


Breean Walas, Ark. Bar No. 2006077                 Sarah Everett, Ark. Bar No. 2017249
Walas Law Firm, PLLC                               Arkansas Civil Liberties Union
P.O. Box 4591                                      Foundation, Inc.
Bozeman, MT 59772                                  904 W. 2nd Street
Telephone:  (501) 246-1067                         Little Rock, AR 72201
breean@walaslawfirm.com                            Telephone:  (501) 374-2842
*Attorneys for the Plaintiffs*                     sarah@acluarkansas.org
                                                   *Attorneys for the Plaintiffs*

---

of obscene materials to minors, and "[o]bscenity is not within the area of
protected speech or press." *Id*. at 635.  Instead, the Supreme Court has held
that while states have the power to protect children from harm, that "does not
include a free-floating power to restrict the ideas to which children may be
exposed." *Brown* v. *Ent. Merchants Ass'n*, 564 U.S. 786, 794 (2011).

Garrard R. Beeney*
Jonathan J. Ossip*
Alexander S. Holland*
Sullivan & Cromwell LLP
125 Broad Street
New York, NY 10004
Telephone:  (212) 558-4000
beeneyg@sullcrom.com
ossipj@sullcrom.com
hollanda@sullcrom.com
*Attorneys for the Plaintiffs*

Laura Kabler Oswell*
Duncan C. Simpson LaGoy*
Sullivan & Cromwell LLP
1870 Embarcadero Road
Palo Alto, CA 94303
Telephone:  (650) 461-5600
oswell@sullcrom.com
simpsond@sullcrom.com
*Attorneys for the Plaintiffs*

*Admitted pro hac vice*