

**21 December 2016**

**Position Statement on Medical Necessity of Treatment, Sex Reassignment, and Insurance Coverage in the U.S.A.**

The World Professional Association for Transgender Health (WPATH) is an international, interdisciplinary, professional association devoted to the understanding and treatment of individuals with Gender Dysphoria (GD). Founded in 1979, and currently with over 1500 medical, mental health, social scientist, and legal professional members, all of whom are engaged in clinical practice and/or research that affects the lives of transgender and transsexual people, WPATH is the oldest professional association in the world that continuously has been concerned with this clinical specialty.

Gender Dysphoria (GD), often associated with transsexualism, is a condition recognized in the Diagnostic and Statistical Manual of Mental Disorders, (DSM-5, 2013), published by the American Psychiatric Association. Previous nomenclature for gender dysphoria includes transsexualism and gender identity disorder (GID), conditions which are also recognized in the International Statistical Classification of Diseases and Related Health Problems, Tenth Revision, published by the World Health Organization, of which the United States is a member. Nomenclature is subject to changes, and new terminology and classifications may be arrived at by various medical organizations or administrative bodies, but these events shall not in themselves change the meaning or intent of this WPATH statement.

The criteria currently listed for GD are descriptive of many people who experience dissonance between their sex as assigned at birth and their gender identity. Gender identity is common to all human beings, is developed in early childhood, and is thought to be firmly established in most people—transgender or not—by age 4,[1] though for some transgender individuals, gender identity may remain somewhat fluid for many years,[2] while for others, conditions specific to individual lives may constrain a person from acknowledging or even recognizing any gender dysphoria they may experience until they



---

[1] American Academy of Pediatrics, 1999.

[2] Fraser L and De Cuypere G, 2016.

are well into adulthood. The various The DSM-5 descriptive criteria for gender dysphoria were developed to aid in diagnosis and treatment to alleviate the clinically significant distress and impairment that is frequently, though not universally, associated with transsexual and transgender conditions.

The WPATH Standards of Care for the Health of Transsexual, Transgender, and Gender-Nonconforming People (SOC) were first issued in 1979, and articulate the "professional consensus about the psychiatric, psychological, medical and surgical management of GD." Periodically revised to reflect evolution in evidence-based clinical practice and scientific research, the Standards also unequivocally reflect this Association's conclusion that treatment is medically necessary. The most recent version of the SOC (Version 7) was published in 2012.[3] WPATH recommends that medical and mental health providers and administrators check www.wpath.org regularly to ensure they are working with the most up-to-date revision of the SOC.

**MEDICAL NECESSITY** is a term common to health care coverage and insurance policies in the United States. A common definition of medical necessity as used by insurers is:

> "[H]ealth care services that a Physician, exercising prudent clinical judgment, would provide to a patient for the purpose of preventing, evaluating, diagnosing or treating an illness, injury, disease or its symptoms, and that are: (a) in accordance with generally accepted standards of medical practice; (b) clinically appropriate, in terms of type, frequency, extent, site and duration, and considered effective for the patient's illness, injury, or disease; and (c) not primarily for the convenience of the patient, physician, or other health care provider, and not more costly than an alternative service or sequence of services at least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of that patient's illness, injury or disease.
>
> "Generally accepted standards of medical practice means standards that are based on credible scientific evidence published in peer-reviewed medical literature generally recognized by the relevant medical community, Physician Specialty Society recommendations and the views of Physicians practicing in relevant clinical areas and any other relevant factors."[4]

The current Board of Directors of the WPATH herewith expresses its considered opinion based on clinical and peer reviewed evidence that gender affirming/confirming treatments and surgical procedures, properly indicated and performed as provided by the Standards of Care, have proven to be beneficial and effective in the treatment of individuals with transsexualism or gender dysphoria. Gender affirming/confirming surgery, also known as sex reassignment surgery, plays an undisputed role in contributing toward favorable outcomes. Treatment includes legal name and sex or gender change on identity

---

[3] Coleman E, Bockting W, Botzer M, et al. 2012.

[4] Definition from Blue Cross Blue Shield Settlement (Section 7.16(a)) available at www.hmosettlements.com

documents, as well as medically necessary hormone treatment, counseling, psychotherapy, and other medical procedures required to effectively treat an individual's gender dysphoria. Neither genital appearance nor reconstruction is required for social gender recognition, and so no surgery should be a prerequisite for identity document or record changes; changes to documentation so that identity documents reflect the individual's current lived expression and experience are crucial aids to social functioning, and can be a necessary component of the social transition and/or pre-surgical process. Delay of document changes may have a deleterious impact on a patient's social integration and personal safety.

In addition to hormonal balancing, medically necessary gender affirming/confirming surgical procedures are described in section XI of the SOC. These procedures include complete hysterectomy, bilateral mastectomy, chest reconstruction or augmentation as appropriate to each patient, including nipple resizing or placement of breast prostheses, as necessary; genital reconstruction by various techniques which must be appropriate to each patient, including, for example, skin flap hair removal, scrotoplasty, and penile and testicular prostheses, as necessary; facial hair removal, certain facial plastic reconstruction, voice therapy and/or surgery, and gender affirming counseling or psychotherapeutic treatment, as appropriate to the patient.

> "Non-genital surgical procedures are routinely performed… notably, subcutaneous mastectomy in female-to-male transsexuals, and facial feminization surgery, and/or breast augmentation in male-to-female transsexuals. These surgical interventions are often of greater practical significance in the patient's daily life than reconstruction of the genitals."[5]

It is important to understand that every patient will not have a medical need for identical procedures. Clinically appropriate treatments must be determined on an individualized and contextual basis, in consultation with the patient's medical providers.

The medical procedures attendant to gender affirming/confirming surgeries are not "cosmetic" or "elective" or "for the mere convenience of the patient." These reconstructive procedures are not optional in any meaningful sense, but are understood to be medically necessary for the treatment of the diagnosed condition.[6] In some cases, such surgery is the **only** effective treatment for the condition, and for some people genital surgery is essential and life-saving.

These medical procedures and treatment protocols are not experimental: Decades of both clinical experience and medical research show they are essential to achieving well-being for the transsexual patient. For example, a recent study of female-to-male transsexuals

---

[5] Monstrey S, De Cuypere G, Ettner R (eds). (2007).

[6] Victoria L. Davidson v. Aetna Insurance. (1979). Judicial finding that "…the treatment and surgery…is of a medical nature and is feasible and required for the health and well-being of the patient."

found significantly improved quality of life following cross-gender hormonal therapy.[7] Moreover, those who had also undergone chest reconstruction had significantly higher scores for general health, social functioning, as well as mental health.[8]

> "[Hormone therapy and surgical] SRS [sex reassignment surgery] is an effective treatment for transsexualism and the only treatment that has been evaluated empirically with large clinical case series."[9]

Available routinely in the United States and in many other countries, these treatments are cost effective rather than cost prohibitive. In the United States, numerous large employers (e.g., City and County of San Francisco, University of California, Emory University, University of Michigan, IBM, Johnson & Johnson, Bank of America, Apple, and hundreds more[10]) have negotiated contracts with their insurance carriers to enable medically necessary treatment for transsexualism and/or GD to be provided to covered individuals. As more carriers realize the validity and effectiveness of treatment (Aetna, Cigna, United Healthcare, and many others now have medical guidelines for transgender care), coverage is being offered, often at very low or no additional premium cost.[11] More than 15 states currently have regulations in place prohibiting insurance carriers from offering policies that contain exclusions restricting transgender people from accessing needed healthcare.[12] Further, in a decision rendered 30 May 2014, the US Department of Health and Human Services Departmental Appeals Board found that "transsexual surgery" should not be considered experimental or dangerous as it has been proven to be an effective treatment for gender dysphoria when properly diagnosed and administered, lifting a longstanding Medicare program ban on this treatment.[13] More recently, in June, 2016, the Department of Defense lifted its ban on transgender military service, and will offer medically necessary hormone and surgical therapies for transgender active duty and reserve servicemen and women.[14]

---

[7] Keo-Meier C L, et al. (2014).

[8] Newfield E, et al. (2006).

[9] Gijs L & Brewaeys A. (2007).

[10] See the latest Corporate Equality Index, maintained by the Human Rights Campaign Workplace Project at www.hrc.org for the list of companies that have scored 100% in current and past years (since 2002).

[11] Herman JL. (2013).

[12] See http://www.transequality.org/blog/pennsylvania-makes-17-states-dc-banning-trans-health-exclusions-hawaii-likely-next-0 for further information.

[13] www.hhs.gov/dab/decisions/dabdecisions/dab2576.pdf; last accessed 11-03-2016.

[14] Department of Defense Instruction (DoDI) 1300.28, "In-Service Transition for Transgender Service Members," June 30, 2016, and Directive-Type Memorandum (DTM) 16-005, "Military Service of Transgender Service Members," June 30, 2016.

> "Professionals who provide services to patients with gender conditions understand the necessity of SRS, and concur that it is reconstructive, and as such should be reimbursed, as would any other medically necessary treatment."[15]

Professional associations that have issued statements in support of the WPATH Standards of Care include the American Medical Association, the Endocrine Society, the American Psychiatric Association, the American Psychological Association, the American Academy of Family Physicians, the National Commission of Correctional Health Care, the American Public Health Association, the National Association of Social Workers, the American College of Obstetrics and Gynecology, the American Society of Plastic Surgeons, and the World Health Organization.

The WPATH Board of Directors urges health insurance carriers and healthcare providers in the United States to eliminate transgender or transsexual exclusions from their policy documents and medical guidelines, and to provide coverage for transgender patients; also to include in their policy documents and medical guidelines the medically prescribed sex reassignment or gender affirming/confirming services necessary for subscribers' treatment and well-being; and to ensure that ongoing healthcare, both routine and specialized, is readily accessible and affordable to all their subscribers on an equal basis.

---

[15] Monstrey S, De Cuypere G, Ettner R (eds). (2007).

This position statement constitutes the professional and clinical opinions of the signers below, comprising all members of the WPATH Board of Directors and Executive Officers as of this date, 21 December 2016.

Gail Knudson, M.D. (Canada) President
Vin Tangpricha, M.D., Ph.D. (USA) President Elect
Jamison Green, Ph.D., M.F.A. (USA) Past President
Walter Pierre Bouman, M.D. (UK) Treasurer
Randi Ettner, Ph.D. (USA) Secretary
Tamara Adrian, J.D. (Venezuela)
Luke Allen M.A. (USA) Student Representative
Griet DeCuypere, M.D., Ph.D. (Belgium) EPATH Representative
Tone Maria Hansen (Norway)
Dan Karasic, M.D. (USA)
Baudewijntje Kreukels, Ph.D. (Netherlands)
Katherine Rachlin, Ph.D. (USA)
Loren Schechter, M.D. (USA)
Sam Winter, Ph.D. (Australia)

**References:**

American Psychiatric Association. (2013). *Diagnostic and statistical manual of mental disorders (DSM-5).* Washington, DC:author.

Coleman E, Bockting W, Botzer M, Cohen-Kettenis, P, et al. (2012). Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People, 7th Version. *International Journal of Transgenderism*, 11(1), 1-7.

Ettner R. and Guillamon A. (2016). Theories of the Etiology of Transgender Identity. In Ettner R et al. (eds.) *Principles of Transgender Medicine and Surgery: Second Edition.* New York: Haworth Press; pp3-15.

Ettner R, Monstrey S, Eyler A (eds.). (2007). *Principles of Transgender Medicine and Surgery.* New York: Haworth Press.

Ettner R, Monstrey S, Coleman E (eds.). (2016). *Principles of Transgender Medicine and Surgery: Second Edition.* New York: Haworth Press.

Fraser L and De Cuypere G. (2016). Psychotherapy with Transgender People. In Ettner R et al (eds.) *Principles of Transgender Medicine and Surgery*. New York: Haworth Press; pp120-136.

Gijs L and Brewaeys A. (2007). Surgical Treatment of Gender Dysphoria in Adults and Adolescence: Recent Developments, Effectiveness, and Challenges, Annual Review of Sex Research, 18:1, 178-224. doi:10.1037/a0037599

Herman JL. (2013). Costs and Benefits of Providing Transition-related Health Care Coverage in Employee Health B3enefit Plans: Findings from a Survey of Employers. The Williams Institute, UCLA School of Law. Available at http://williamsinstitute.law.ucla.edu/category/research/transgender-issues/page/2/; last accessed 11-03-2016.

Keo-Meier C L, et al. (2014). Testosterone Treatment and MMPI-2 Improvement in Transgender Men: A Prospective Controlled Study. Journal of Consulting and Clinical Psychology 2015, Vol. 83, No. 1, 143-156.

Monstrey S, De Cuypere G, Ettner R. (2007). Surgery: General Principles. In Ettner R et al (eds.) *Principles of Transgender Medicine and Surgery*. New York: Haworth Press; pp89-104.

Newfield E, Hart, S, Dibble S, Kohler L. (2006). Female-to-male transgender quality of life. *Quality of Life Research,* 15(9): 1447-57; November, 2006.

Schor, EL (ed.). (1999). *Caring for your school age child: Ages 5-12*. [American Academy of Pediatrics] New York: Bantam Books.

Victoria L. Davidson v. Aetna Life & Casualty Insurance Co. 101 Misc.2d 1, 420 N.Y.S. 2d 450 (Sup. Ct., 1979).