# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
### CENTRAL DIVISION

**DYLAN BRANDT, et al.,**                                      **PLAINTIFFS**

**v.**                          **CASE NO. 4:21-CV-00450-JM**

**LESLIE RUTLEDGE, et al.,**                                   **DEFENDANTS**

**REPLY MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................... 1

**I.**   **Response to Defendants' Proffered Evidence** ................................... 5

    A.   The Treatment Protocols for Gender Dysphoria Accepted by the American Medical Community Are Supported by Substantial Evidence. ................................................................................ 5

    B.   The Science is Clear that Adolescents Do Not "Outgrow" Gender Dysphoria and Gender-Affirming Care Does Not Cause Youth to be Transgender. ...................................................... 11

    C.   Treatment Protocols Require Thorough Patient Assessment And Informed Consent Before Gender-Affirming Care Is Provided. ............................................................................... 15

    D.   There Is Nothing About Gender-Affirming Medical Care for Adolescents that Warrants the Conclusion that Parents Are Incapable of Consenting and Adolescents, Assenting, to Such Treatment After Being Informed of the Risks and Benefits. .............. 20

    E.   Defendants' Experts Offer Duplicative and Non-credible Testimony. ............................................................................ 21

LEGAL STANDARD ...................................................................................... 24

ARGUMENT ................................................................................................... 25

**I.**   **Plaintiffs Have Established Standing to Bring All of Their Claims** ....... 25

    A.   Plaintiffs Have Established Standing to Challenge the Ban on "Gender Transition Procedures." ....................................... 25

    B.   Plaintiffs have Established Standing to Challenge the Private Right of Action. ............................................................ 26

    C.   Plaintiffs Have Established Standing for the Doctor Plaintiffs' Equal Protection Claim. ...................................... 27

**II.**   **Plaintiffs Are Likely to Succeed on the Merits of Their Equal Protection Claim** .......................................................................... 30

A.   The Health Care Ban Triggers Heightened Equal Protection Scrutiny Because It Discriminates on the Basis of Transgender Status and Sex. ...................................................................31

1.   The Health Care Ban Discriminates Based on Transgender Status. .....................................................31

2.   The Health Care Ban Discriminates Based on Sex. .................35

B.   Classifications Based on Transgender Status Trigger Heightened Scrutiny. ..........................................................37

C.   The Health Care Ban Fails Heightened Scrutiny. ...............43

D.   The Health Care Ban Fails Any Level of Scrutiny. ............49

III.   **The Parent Plaintiffs Are Likely to Succeed on the Merits of Their Due Process Claim** ...................................................................50

IV.   **Plaintiffs Are Likely to Succeed on the Merits of Their First Amendment Claim** ......................................................................54

A.   The Referral Prohibition Prohibits Speech. .......................54

B.   The Referral Prohibition Does Not Fall Within An Exception to Regulations of Speech. ..................................................56

C.   The Referral Prohibition Fails Strict Scrutiny. ..................58

V.   **Plaintiffs Will Suffer Irreparable Harm If the Act Takes Effect** ...........60

VI.   **The Balance of Equities Tips in Plaintiffs' Favor, and an Injunction Serves the Public Interest** .......................................62

VII.   **A Facial Injunction Is Required to Effectively Protect Plaintiffs from Harm** .................................................................................64

**CONCLUSION** ..................................................................................66

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*281 Care Comm*. v. *Arneson*,
766 F.3d 774 (8th Cir. 2014) ..............................................................................60

*AB* v. *CD and others* [2021]
EWHC 741, at ¶¶ 68-70 (Fam) ............................................................................9

*B.K.B.* v. *Maui Police Dep't*,
276 F.3d 1091 (9th Cir. 2002), *as amended* (Feb. 20, 2002) .............................32

*D.M. ex rel. Bao Xiong* v. *Minn. State High Sch. League*,
917 F.3d 994 (8th Cir. 2019) ...............................................................................64

*Bartnicki* v. *Vopper*,
532 U.S. 514 (2001)..............................................................................................56

*Baskin* v. *Bogan*,
12 F. Supp. 3d 1144 (S.D. Ind. 2014), *aff'd*, 766 F.3d 648 (7th Cir.
2014) ................................................................................................................33, 34

*Bd. of Educ. of the Highland Local Sch. Dist.* v. *U.S. Dep't of Educ.*,
208 F. Supp. 3d 850 (S.D. Ohio 2016) ...............................................................43

*Bd. of Trustees of Univ. of Ala.* v. *Garrett*,
531 U.S. 356 (2001)..............................................................................................49

*Bell* v. *Tavistock and Portman National Health Service Foundation
Trust*,
[2020] EWHC (Admin) 3274 ................................................................................9

*Bostock. Bostock* v. *Clayton Cty., Georgia*,
140 S. Ct. 1731 (2020)..............................................................................32, 35, 36

*Brown* v. *Ent. Merchants Ass'n*,
564 U.S. 786 (2011)..............................................................................................59

*City of Cleburne, Tex.* v. *Cleburne Living Ctr.*,
473 U.S. 432 (1985)..............................................................................................42

*Conant* v. *Walters*,
  309 F.3d 629 (9th Cir. 2002) ...............................................................................58

*Craig* v. *Boren*,
  429 U.S. 190 (1976) ...............................................................................................28

*DaimlerChrysler Corp.* v. *Cuno*,
  547 U.S. 332 (2006) ...............................................................................................26

*Dataphase Sys., Inc.* v. *C L Sys., Inc.*,
  640 F.2d 109 (8th Cir. 1981) ...............................................................................63

*DeBoer* v. *Snyder*,
  973 F. Supp. 2d 757 (E.D. Mich. 2014), *rev'd on other grounds*,
  772 F.3d 388 (6th Cir. 2014), *rev'd sub nom. Obergefell* v.
  *Hodges*, 576 U.S. 644 (2015) ...............................................................................22

*Doe* v. *Bolton*,
  410 U.S. 179 (1973) ...............................................................................................29

*Edmo* v. *Corizon, Inc.*,
  935 F.3d 757 (9th Cir. 2019) ...............................................................................22

*Edmo* v. *Idaho Dep't of Corr.*,
  358 F. Supp. 3d 1103 (D. Idaho 2018), *order clarified*, No. 1:17-
  CV-00151-BLW, 2019 WL 2319527 (D. Idaho May 31, 2019)......................22

*Evancho* v. *Pine–Richland Sch. Dist.*,
  237 F. Supp. 3d 267 (W.D. Pa. 2017)...................................................................43

*G. G.* v. *Gloucester Cty. Sch. Bd.*,
  853 F.3d 729 (4th Cir. 2017) ...............................................................................38

*Gen. Motors Corp.* v. *Harry Brown's, LLC*,
  563 F.3d 312 (8th Cir. 2009) ...............................................................................60

*Gloucester Cty. Sch. Bd.* v. *G.G. ex rel. Grimm*,
  137 S. Ct. 1239 (2017)......................................................................................24, 41

*Gonzalez* v. *Carhart*,
  550 U.S. 124 (2007)................................................................................................43

*Grimm* v. *Gloucester Cty. Sch. Bd*.,
  972 F.3d 586 (4th Cir. 2020), *as amended* (Aug. 28, 2020), *cert.
  denied,* No. 20-1163, 2021 WL 2637992 (U.S. June 28, 2021)................*passim*

*Hecox* v. *Little*,
  479 F. Supp. 3d 930 (D. Idaho. 2020) ...............................................23

*Hennessy-Waller* v. *Snyder*,
  2021 WL 1192842, *appeal filed sub nom. D. H.* v. *Snyder*, No. 21-
  15668 (9th Cir. Apr. 19, 2021) .........................................................35

*Hodgson* v. *Minnesota*,
  497 U.S. 417 (1990).........................................................................29

*Hope Clinic* v. *Ryan*,
  249 F.3d 603 (7th Cir. 2001) ...........................................................27

*Hopkins* v. *Jegley*,
  2021 WL 41927 (E.D. Ark., 2021) ....................................................27

*Jehovah's Witnesses in State of Wash.* v. *King Cnty. Hosp. Unit No. 1*,
  278 F. Supp. 488 (W.D. Wash. 1967) ................................................52

*June Medical Services L. L. C.* v. *Russo*,
  140 S. Ct. 2103 (2020)......................................................................28

*Webb ex rel. K.S.* v. *Smith*,
  936 F.3d 808 (8th Cir. 2019) ...........................................................26

*Kadel* v. *Folwell*,
  446 F. Supp. 3d 1 (M.D.N.C. 2020) ..................................................37

*Kanuszewski* v. *Mich. Dep't of Health and Human Servs*,
  927 F.3d 396 (6th Cir. 2019) .......................................................51, 52

*Karnoski* v. *Trump*,
  926 F.3d 1180 (9th Cir. 2019) .............................................33, 35, 38

*Kowalski* v. *Tesmer*,
  543 U.S. 125 (2004).........................................................................28

*Latta* v. *Otter*,
  771 F.3d 456 (9th Cir. 2014) ...................................................34, 39

*Little Rock Family Planning Servs.* v. *Rutledge*,
   397 F. Supp. 3d 1213 (E.D. Ark. 2019)................................................................64

*Love* v. *Beshear*,
   989 F. Supp. 2d 536 (W.D. Ky. 2014)..................................................................40

*Meyer* v. *Nebraska*,
   262 U.S. 390 (1923)..............................................................................................52

*Milliken* v. *Bradley*,
   418 U.S. 717 (1974)..............................................................................................66

*Nat'l Inst. of Fam. & Life Advocs.* ("*NIFLA*") v. *Becerra*,
   138 S. Ct. 2361, 2373, (2018).)   ...................................................................57, 60

*Nken* v. *Holder*,
   556 U.S. 418 (2009)..............................................................................................63

*Norsworthy* v. *Beard*,
   87 F. Supp. 3d 1164 (N.D. Cal. 2015)..................................................................22

*Okpalobi* v. *Foster*,
   244 F.3d 405 (5th Cir. 2001) ...............................................................................27

*Parham* v. *J.R.*,
   442 U.S. 584 (1979)........................................................................................51, 52

*Pers. Adm'r of Mass.* v. *Feeney*,
   (Defs. Br. at 53, citing 442 U.S. 256, 271-72 (1979) .........................................34

*Phillips* v. *Martin Marietta Corp.*,
   400 U.S. 542 (1971) (per curiam)........................................................................32

*Pierce* v. *Society of Sisters*,
   268 U.S. 510 (1925)..............................................................................................52

*Planned Parenthood of Cent. Mo.* v. *Danforth*,
   428 U.S. 52 (1976)................................................................................................53

*Planned Parenthood of Greater Texas Surgical Health Services* v.
   *City of Lubbock, Texas*,
   2021 WL 2385110 (N.D. Tex., 2021) ..................................................................27

*Planned Parenthood of Heartland* v. *Heineman*,
  724 F. Supp. 2d 1025 (D. Neb. 2010)..................................................27

*Planned Parenthood of Mid-Missouri & E. Kansas, Inc.* v. *Dempsey*,
  167 F.3d 458 (8th Cir. 1999) ............................................................58

*Planned Parenthood Minn., N.D., S.D.* v. *Rounds*,
  530 F.3d 724 (8th Cir. 2008) ............................................................25

*Planned Parenthood of Southeastern Pennsylvania* v. *Casey*,
  505 U.S. 833 (1992)...........................................................................27

*Plyler* v. *Doe*,
  457 U.S. 202 (1982)......................................................................29, 39

*Reed* v. *Town of Gilbert*,
  576 U.S. 155 (2015)...........................................................................59

*Reprod. Health Servs. of Planned Parenthood of St. Louis Region,
  Inc.* v. *Parson*,
  1 F.4th 552 (8th Cir. 2021), *reh'g en banc granted* (July 13, 2021)..................28

*Republican Party of Minnesota* v. *White*,
  536 U.S. 765 (2002)...........................................................................46

*Romer* v. *Evans*,
  517 U.S. 620 (1996)...............................................................2, 49, 50

*Rust* v. *Sullivan*,
  500 U.S. 173 (1991)....................................................................58, 59

*Sessions* v. *Morales-Santana*,
  137 S. Ct. 1678 (2017)......................................................................44

*Sewell* v. *Monroe City Sch. Bd.*,
  974 F.3d 577 (5th Cir. 2020) ............................................................32

*Singleton* v. *Wulff*,
  428 U.S. 106 (1976)......................................................................29, 30

*SmithKline Beecham Corp.* v. *Abbott Lab'ys*,
  740 F.3d 471 (9th Cir. 2014) ............................................................43

*Sorrell* v. *IMS Health Inc.*,
    564 U.S. 552 (2011)...............................................................55, 56, 58

*Thompson* v. *W. States Med. Ctr.*,
    535 U.S. 357 ...............................................................................59

*Troxel* v. *Granville*,
    530 U.S. 57 (2000)...........................................................................51

*Tuan Anh Nguyen* v. *INS*,
    533 U.S. 53 (2001)...........................................................................37

*Turtle Island Foods, SPC* v. *Thompson*,
    992 F.3d 694 (8th Cir. 2021) ....................................................24, 60

*U.S.* v. *Virginia (VMI)*,
    518 U.S. ...................................................................................35, 43

*United States* v. *Salerno*,
    481 U.S. 739 (1987).........................................................................65

*Waters* v. *Ricketts*,
    48 F. Supp. 3d 1271 (D. Neb.), *aff'd,* 798 F.3d 682 (8th Cir. 2015).................36

*Windsor* v. U.S.,
    699 F.3d 169, 185 (2d Cir. 2012), *aff'd sub nom. United States* v.
    *Windsor*, 570 U.S. 744, 770 (2013). ...............................................41

*Wolf* v. *Walker*,
    986 F. Supp. 2d 982 ...................................................................40

**Statutes**

2021 ARK. ACTS 626 ("HB 1570") ...............................................*passim*

## INTRODUCTION

Absent a preliminary injunction, transgender adolescents in Arkansas currently receiving gender-affirming medical care will have that care stripped away from them on July 28, 2021, when the Health Care Ban is set to take effect.  These young people, including plaintiffs Dylan Brandt, Sabrina Jennen, and Parker Saxton, will suffer significant physical and psychological harm if they have to stop the treatment that has enabled them to manage their gender dysphoria, eliminated their debilitating distress, and ultimately, allowed them to thrive.  Their parents will have to witness their children suffer and will, in many cases, be forced to consider leaving the homes and communities they love in order to take care of their children.  And medical providers like Dr. Hutchison and Dr. Stambough will be placed in the untenable position of leaving their patients to suffer or risking their medical licenses.

The Health Care Ban is an unprecedented and sweeping prohibition on one, and only one, type of health care—care related to gender transition for minors. Defendants claim an interest in protecting the well-being of minors, citing purported concerns about the sufficiency of the evidence supporting the banned care and the risks associated with such care.  But as explained in Plaintiffs' Opening Brief and below, all of the treatments prohibited by the Health Care Ban when provided to transgender adolescents for purposes of gender transition are explicitly permitted by the statute when provided to minors with intersex conditions for purposes of

conforming the minor's body to their sex assigned at birth.  ARK. CODE ANN. § 20-9-1501(6)(A)(ii), (B).

Arkansas has not banned other medical care supported by similar or less evidence and involving similar or greater risks.  (*See* Plaintiffs' Opening Brief (ECF No. 12, *"*Pls. Op. Br.") at 34-40.)  It has banned health care that is related to "gender transition."  This disconnect between the law and the asserted rationales fails any level of constitutional scrutiny, let alone the heightened scrutiny required of laws that discriminate based on sex and transgender status, burden parental autonomy rights, and restrict speech.  *See Romer* v. *Evans*, 517 U.S. 620, 635 (1996) (invalidating state constitutional amendment under rational basis review because "[t]he breadth of the amendment is so far removed from these particular justifications that we find it impossible to credit them").

Not only does the Health Care Ban fail to align with or advance Defendants' claimed interests, it ultimately undermines Arkansas's interest in protecting children by denying access to medically necessary care for adolescents with gender dysphoria.  And despite their repeated attempts to cast the prohibited treatment as "risky," "experimental," and "dangerous," the banned care is recognized as an appropriate and effective treatment for adolescents with gender dysphoria by every major medical and mental health professional organization in the United States.  (*See generally* Brief of *Amici Curiae* American Academy of Pediatrics, *et. al.* (ECF

No. 30, "Medical Brief" or "Br. of Amici AAP, *et. al.*") at 8-10 (confirming that the American Academy of Pediatrics, the American Medical Association, the American Psychiatric Association, the American Academy of Child and Adolescent Psychiatry, the Endocrine Society, the Pediatric Endocrine Society, and several other national medical groups, along with Arkansas's pediatric and psychiatric professional groups, recognize that the treatment prohibited by the Health Care Ban is part of the accepted standards of care and the medical profession's consensus recommendation for the treatment of gender dysphoria in adolescents).)

In their response to Plaintiffs' Motion, Defendants argue that all of these medical professional organizations are wholly unreliable, have all been taken over by political forces acting to promote gender "ideology" and were either duped or acted unethically to enrich the "gender-transition industry" in supporting treatment protocols that they claim are ineffective, unnecessary, and harmful to patients. (Defendants' Combined Brief in Opposition (ECF No. 44, "Defs. Br.") at 11-30.) But despite their more than 1000-page filing, Defendants fail to offer evidence that supports their extraordinary narrative. Their arguments rely primarily on four erroneous claims: (1) there is no scientific support for existing treatment protocols; (2) most transgender youth affected by the law will naturally "outgrow" their transgender identity if not affirmed in their gender; (3) patients are treated without meaningful mental health evaluation and informed consent; and (4) gender-

affirming medical treatment is unique in the level of risk it poses to patients, necessitating a State ban on the care.  But as discussed in Plaintiffs' Opening Brief and further explained below, none of these claims is defensible.

Ultimately, the existence of outlier views reflected in Defendants' expert witness declarations does not change the fact that all of the treatment banned by the Health Care Ban is well-accepted and routinely administered by the mainstream medical community in the United States.  These protocols are so widely used and accepted that Defendants are forced to rely on two expert witnesses who have already been discredited by courts.  (*See infra,* at 21-23.)  They offer no evidence in support of the wholly unprecedented idea of removing health care that transgender minors are already relying on, and they minimize or patently deny the known risks that will flow from prohibiting patients from receiving such care.

Defendants have failed to meet their demanding burden of showing how Arkansas's sweeping ban on gender-affirming care for adolescents substantially advances any important governmental interests.  Nor have they offered any evidence to refute Plaintiffs' showing of extraordinary irreparable harm should the law take effect.  They scarcely acknowledge the Plaintiff families and ignore the evidence presented by the Doctor Plaintiffs of the seven transgender youth who have attempted suicide since public discussion of the Health Care Ban began, and the

numerous others expressing suicidal thoughts related to the prospect of losing gender-affirming care.

The preliminary injunction sought by Dylan, Sabrina, Parker, Brooke, and their parents to protect these children's ability to access medically necessary care, and by Drs. Hutchison and Stambough to ensure their ability to continue to provide lifesaving care to their patients, should be granted.

## I.      Response to Defendants' Proffered Evidence.

### A.      The Treatment Protocols for Gender Dysphoria Accepted by the American Medical Community Are Supported by Substantial Evidence.

Defendants claim a lack of evidence demonstrating the efficacy of gender-affirming medical care.  (Defs. Br. at 15-16, 20-30.)  But every major medical association in the United States agrees, "[a] robust body of scientific evidence supports the efficacy of this accepted standard of care."  (Br. of Amici AAP, *et. al.*, at 12; *see also* Endocrine Society Guidelines (referencing studies); Exhibit 13 - Declaration of Jack Turban, MD, MHS ("Turban Decl.") ¶¶ 12-18.)

As Dr. Turban details in his declaration, there is a significant body of medical research demonstrating that transgender adolescents who receive gender-affirming care have improved health outcomes.  (*See* Turban Decl. ¶¶ 13-14 (explaining the findings of eight studies regarding pubertal suppression and six studies regarding hormone therapy).)  As just one example, one study "compared 89 transgender adults

who had accessed pubertal suppression during adolescence to 3405 transgender adults who wanted but were unable to access pubertal suppression during adolescence. After adjusting for confounding variables, the study found that those who accessed pubertal suppression had a statistically significant lower odds of lifetime suicidal ideation." (Turban Decl. ¶ 13.) In addition to this body of research, the clinical experience of doctors in the field also supports the safety and efficacy of this treatment. (*See* Declaration of Deanna Adkins, MD (ECF 11-11, "Adkins Decl.") ¶¶ 26, 36, 50; Declaration of Michele Hutchison, MD (ECF 11-9, "Hutchison Decl.") ¶¶ 6, 13.)[1]

Defendants' experts focus extensively on the limitations of a single study by Bränström and Pachankis to claim that the current treatment protocols in the United States are unsupported by evidence. But as Dr. Turban explains, this study has no relevance to this case because it focused mostly on surgeries that minors do not receive, *e.g.*, genital surgery, hysterectomy, and laryngeal surgery.[2] (Turban Decl.

---

[1]     Unless otherwise defined herein, all capitalized terms have the same meaning as in Plaintiffs' Opening Brief and Plaintiffs' Opposition to Defendants' Motion to Dismiss (ECF No. 33, "Opp. to Mot. to Dismiss").

[2]     In addition, Defendants' experts ignore a follow-up study by Almazan and Keuroghlian, which utilized a more sound methodology and found that those "who accessed gender-affirming surgery had lower odds of past-month severe psychological distress and past-year suicidal ideation than those who desired but never accessed gender-affirming surgery." (Turban Decl. ¶ 35.)

¶ 34; *see also* Hutchison Decl. ¶ 8 ("Genital surgery is not indicated or provided for minors with gender dysphoria.").)  Defendants' experts attack a single study that has no bearing on the care banned by the State while ignoring the substantial body of research relied on by the Endocrine Society in developing its Guidelines.[3] (Antommaria Supp. Decl. ¶¶ 6, 13-15; Turban Decl. ¶ 34.)

---

Defendants' experts also repeatedly cite and mischaracterize another study about surgeries unrelated to this case involving adolescents.  They suggest the study by Dhejne *et al*. demonstrates that gender-affirming surgical interventions worsen mental health because, after surgery, transgender patients still had higher rates of suicide than the control group.  But the control group was non-transgender people rather than transgender people who did not receive treatment, and transgender people face a range of stressors that affect their mental health, most prominently societal rejection.  Thus, even after surgery, many transgender people still suffer elevated rates of mental health problems compared to cisgender people.  (Turban Decl. ¶ 36.)  The study authors themselves explained that "the results should not be interpreted such as sex reassignment *per se* increases morbidity and mortality.  Things might have been even worse without sex reassignment."  *Id*.  Additionally, this particularly study was from 2011 and included participants who received surgery decades ago when the surgical techniques were less advanced and societal discrimination was much worse, and therefore has limited applicability to a more modern context.  *Id*.

[3]   Defendants' experts claim the medical community was influenced by political pressure rather than science in supporting gender-affirming care, noting advocacy work done by WPATH and the fact that some of the medical professional groups use a voting process in deciding policies.  (*See*, *e.g.*, Declaration of Dr. Mark Regnerus (ECF No. 45-2, "Regnerus Decl.") ¶ 66; Declaration of Stephen B. Levine, M.D. (ECF No. 45-1, "Levine Decl.") ¶ 39, 56, 133.)  Advocacy by medical professional groups on behalf of their patient populations is par for the course, as evidenced by the work of groups such as the American Diabetes Association.  (Exhibit 14 - Supplemental Declaration of Deanna Adkins, MD ("Adkins Supp. Decl.") ¶ 9.)  And while there is no

Additionally, Defendants' focus on various reviews of evidence in Finland, Sweden, and the U.K. is likewise misleading. These were not peer-reviewed, and they leave out significant data sets. For example, the Finnish review looked at only three studies and the Swedish review surveyed studies only up to 2019, leaving out significant recent studies. (*See* Turban Decl. ¶¶ 56-57.) Contrary to some of Defendants' experts' claims, these assessments of the literature did not lead several—or any—countries to halt gender-affirming care. (*See* Levine Decl. ¶ 67 (pointing to Sweden, Finland, and the U.K.).) While *one hospital* in Sweden did stop prospectively providing puberty blockers and hormone therapy to individuals under 18—however, the hospital did not discontinue care for those currently receiving treatment—no care has been prohibited in Finland or the U.K. as Defendants suggest. The Finnish policy permits such treatments on a case-by-case basis when medically indicated, which is consistent with how care is provided in the United States. (ECF No. 45-5.) And in the U.K., minors may receive such care with parental consent, which is likewise already required in the United States. *AB* v. *CD*

---

basis to assume that members of professional groups involved in making recommendations about treatment vote based on political views rather than science, the Endocrine Society Guidelines were not the result of a vote. (Exhibit 15 - Supplemental Declaration of Armand H. Matheny Antommaria, MD, PhD, FAAP, HEC-C ("Antommaria Supp. Decl.") ¶ 12 (explaining that the Endocrine Society Guidelines are based on standardized methodology in evaluating the science); *see also* Adkins Decl. ¶ 29.)

*and others* [2021] EWHC 741, at ¶¶ 68-70 (Fam); *Bell* v. *Tavistock and Portman National Health Service Foundation Trust*, [2020] EWHC (Admin) 3274, at ¶ 47.

Defendants' experts also claim that the evidence relied on in the adoption of the treatment protocols is not of adequate quality. (Regnerus Decl. ¶¶ 52-55.) As discussed in Plaintiffs' Opening Brief (at 40-41), this characterization of the evidence is false, and much of pediatric medicine—including medical care the Health Care Ban explicitly permits for non-transgender patients—relies on evidence of similar quality. (*See* Declaration of Armand H. Matheny Antommaria, MD, PhD, FAAP, HEC-C (ECF 11-12, "Antommaria Decl.") ¶¶ 29-41; *see also* Turban Decl. ¶ 40.[4])

Defendants' experts' position appears to be that since the evidence does not meet the standard they claim is necessary, patients should not be provided the care

---

[4]    Prof. Regnerus claims that gender-affirming medical care is "by definition" experimental because puberty blockers and hormone therapy have not been approved by the FDA specifically for the treatment of gender dysphoria. (Regnerus Decl. at ¶ 50.) But off-label use of medication does not make the use "experimental." (Antommaria Supp. Decl. ¶¶ 8-9.) In fact, many widely used standard of care treatments are off-label. *Id.* The reason for the widespread off-label use of drugs is that once a drug has received FDA approval for one indication, there are diminished incentives to get approval for other indications because doctors are free to use it for other purposes. *Id.* Additionally, the American Academy of Pediatrics has explained that "the term 'off-label' does not imply an improper, illegal, contraindicated, or investigational use." (Turban Decl. ¶ 40.)

unless and until such evidence exists, which would leave patients and their families without reasonable options for treatment, thus resulting in significant distress.

On the other hand, Defendants' experts are willing to offer their recommended course of treatment—providing non-gender-affirming psychotherapy (and no medical care)—yet offer no evidence at all demonstrating that this is effective. As Dr. Levine candidly recognizes, there is no such evidence. (Levine Decl. ¶ 35 ("To my knowledge, there is no credible scientific evidence beyond anecdotal reports that psychotherapy can enable a return to male identification for genetically male boys, adolescents, and men, or return to female identification for genetically female girls, adolescents and women."); *see also* Turban Decl. ¶ 46.) So while Defendants critique the protocols recommended by every major medical association in the United States as insufficiently supported by scientific evidence, the alternative they propose has even less evidence to support it.[5]

---

55   While the State's position in this case is that the banned treatments are not effective to treat gender dysphoria, this position is inconsistent with the State's decision to provide hormone therapy to some inmates to treat their gender dysphoria while in the custody of the Department of Corrections. (*See* Defs.. Br. at 73-74.)

-10-

### B. The Science is Clear that Adolescents Do Not "Outgrow" Gender Dysphoria and Gender-Affirming Care Does Not Cause Youth to be Transgender.

Throughout Defendants' submissions they repeat the false claim that a majority of youth who identify as transgender will ultimately abandon their transgender identity and come to identify with their assigned sex at birth. (Defs. Br. at 1, 7-8, 20, 55, 63, 100.) Defendants' experts claim that because most transgender-identified youth will outgrow gender dysphoria and come to identify as the sex they were assigned at birth—what they refer to as "desistance"— gender-affirming care should be prohibited. (Levine Decl. ¶¶ 56-57; Declaration of Paul W. Hruz, M.D., Ph.D (ECF No. 45-3, "Hruz Decl.") ¶ 8; Regnerus Decl. ¶ 77.) Moreover, they assert that affirming minors' gender is harmful because that will cause them to persist in their transgender identity when they otherwise would desist. (Levine Decl. ¶¶ 56-57; Hruz Decl. ¶ 8; Regnerus Decl. ¶ 77.) Neither of these claims is accurate or borne out in the literature.

*First*, Defendants misrepresent a body of literature that suggests that a majority of *children* who express gender non-conforming behavior or transgender identity will ultimately come to identify as their assigned sex at birth. As Dr. Turban explains, Defendants and their experts conflate the terms "children" and "adolescents," which have distinct meanings when it comes to child and adolescent psychiatry. (Turban Decl. ¶ 21 ("'child' and 'children' refers to a child who has not

-11-

yet reached the earliest stages of puberty.  The term 'adolescent' refers to a minor who has begun puberty.").)  All of Defendants' claims about "children" ultimately coming to identify as non-transgender are based on studies with serious methodological limitations, but even putting those methodological limitations aside, those studies relate only to *pre-pubertal children*, none of whom would be receiving any of the prohibited treatment.  (*Id.*; *see also* Hutchison Decl. ¶ 8 ("There are no medical treatments indicated or provided for pre-pubertal children with gender dysphoria.").)  "[O]nce a transgender youth reaches the earliest stages of puberty, it is extremely rare for them to later identify as cisgender."  (Turban Decl. ¶ 22.)

Relatedly, Defendants' experts also misrepresent the "watchful waiting" treatment modality that is followed by some practitioners largely outside of the United States.[6]  They claim that this approach entails not offering gender-affirming medical interventions to transgender adolescents.  But the "watchful waiting" model refers only to the treatment of pre-pubertal youth and is an approach in which one does not implement any interventions to try to push a pre-pubertal child to identify as cisgender, but also does not advise a social transition until puberty.  (Turban Decl.

---

[6]    Dr. Levine cites a paper by Dr. James Cantor that criticized The American Academy of Pediatrics policy statement regarding the treatment of transgender youth.  That criticism focused only on the treatment of pre-pubertal children and primarily defends the watchful waiting approach for these children.  He does not criticize gender-affirming medical care for transgender adolescents.  (Turban Decl. ¶ 23.)

¶¶ 31-32.)  This approach is not relevant to transgender youth who have reached puberty (*i.e.*, adolescents) and in no way suggests any limitation on medical treatment for adolescents.  In fact, the "watchful waiting" approach was developed by the same clinic in Amsterdam that was also the first to develop and recommend pubertal suppression for transgender adolescents.  (*Id.*)  In other words, this is a form of treatment that has no relevancy for the population of minors impacted by the Health Care Ban, but the Defendants nonetheless conflate the experiences of pre-pubertal children with those of adolescents in order to defend the Health Care Ban.[7]

Additionally, there is no data to support Defendants' claim that gender-affirming care for adolescents or social transition for pre-pubertal children increases the likelihood that a minor will be transgender in adulthood.  As Dr. Turban explains, "recent research has shown . . . gender identification is not significantly different before and after a social transition." (Turban Decl. ¶ 24.)  The fact that a significant percentage of pre-pubertal youth who undergo social transition or adolescents who initiate medical treatment ultimately continue to identify as transgender is because

---

[7]  Defendants submitted declarations containing anecdotal experiences of adults who regretted earlier decisions to transition, and their experts suggest that regret and "de-transitioning" is common and a reason to prevent transition among adolescents.  But as Dr. Turban explains, transition regret is exceedingly rare and even in the cases where it does happen it is often "social regret" (*e.g.*, related to discrimination and rejection) rather than "true regret." (Turban Decl. ¶ 25.)

they had a "stronger discordance between their sex assigned at birth and their gender identity to begin with," were properly evaluated, and were treated appropriately. (*Id*.)  There is simply no data to support the contention that treatment makes people transgender.

Ultimately Dr. Levine's views and recommendations about care seem to be informed by his opinion that it is inherently harmful to be transgender because of the medical interventions that may be necessary to treat gender dysphoria over the course of one's lifetime, and his assumption that transgender people will be rejected by their families and unable to "attract a desirable mate."  (Levine Decl. ¶¶ 8, 103 (opining that there is a "material risk" that transgender people "will not be perceived as attractive to either sex").)  As Dr. Turban explains, there is absolutely no data to support Dr. Levine's assertions about transgender people's ability to form romantic relationships.  (Turban Decl. ¶ 19.)  But even if preventing people from growing up to be transgender were an appropriate goal—which it is not—that cannot be achieved by denying youth access to gender-affirming care.  There is no way to make someone "not trans" and any attempts to do so are widely understood to be harmful and unethical.  (Turban Decl. ¶ 46.)

### C.   Treatment Protocols Require Thorough Patient Assessment And Informed Consent Before Gender-Affirming Care Is Provided.

Defendants' experts suggest that gender-affirming medical care should be categorically banned because doctors rush to treat minors without thoroughly evaluating their patients, screening for and addressing other mental health conditions, and adequately informing their patients and their parents of the potential risks and benefits of the treatment.  (*See* Levine Decl. ¶ 36; Hruz Decl. ¶¶ 73-74, 79.)  This description is inconsistent with the protocols for assessing and treating gender dysphoria and the rigorous requirements that must be met before the initiation of gender-affirming medical treatments, recited in full in Plaintiff's Opening Brief. (*See also* Brief of Amici AAP, *et. al.*, at 10-11; Adkins Decl. ¶¶ 33-35, 49; Antommaria Supp. Decl. ¶¶ 16-23; Turban Decl. ¶¶ 38-39 (detailing the extensive requirements for evaluating minor patients for gender dysphoria diagnoses and treatment).)

To be diagnosed with gender dysphoria, the incongruence between a person's gender identity and sex assigned at birth must have persisted for at least six months and be accompanied by clinically significant distress or impairment in social, occupational, or other important areas of functioning.  (Adkins Decl. ¶ 22.)  The Endocrine Society Guidelines have extensive requirements before the initiation of pubertal suppression or hormone therapy to ensure that:  (1) the treatment is needed

(evidenced by long-lasting and intense gender dysphoria that worsened with the onset of puberty); (2) that "any coexisting psychological, medical, or social problems" have been addressed; (3) that the patient and their family is informed of the risks with hormone treatment, "including potential loss of fertility" and options to preserve fertility, and has given informed consent; (4) that puberty has started (verified by a pediatric endocrinologist or similar clinician); and (5) that there are no medical contraindications to treatment. (Adkins Decl. ¶¶ 31-35.) For hormone therapy, the Endocrine Society Guidelines have additional requirements that the adolescent "has sufficient mental capacity to estimate the consequences of this (partly) irreversible treatment, weigh the benefits and risks, and give informed consent to this (partly) irreversible treatment," and that they have been "informed of the (irreversible) effects and side effects of treatment," and they and their parents have given informed consent. (*Id.*)

Defendants' experts' characterization of the work of doctors who treat youth with gender dysphoria is at odds with the accepted protocols and the experience of doctors like Dr. Hutchison and Dr. Adkins. (Adkins Supp. Decl. ¶ 11; Hutchison Decl. ¶ 4.) In Dr. Adkins' clinic, each patient is met first by mental health providers who explore the patient's medical and mental health history and identity. (Adkins Supp. Decl. ¶ 11.) All patients are treated by a multi-disciplinary team that includes a social worker, psychologist, psychiatrist, and endocrinologist. (*Id.*) Patients who

are found to have other mental health diagnoses are treated by the mental health team, and medical treatment for gender dysphoria is not initiated without written confirmation from the team that those conditions are well-managed and the patient is stable. (*Id.*) There is an extensive informed consent process going through every potential side effect and risk verbally, then in writing, then verbally a second time. (*Id.*; *see also* Hutchison Decl. ¶ 4 ("The Clinic has an interdisciplinary team, including mental health providers, to ensure each child receives appropriate and necessary care. We require all of our patients to be receiving mental health counseling while they are in treatment at the Clinic."); Stambough Decl. (ECF No. 11-10) ¶ 4.)[8] As Dr. Turban also explains, the WPATH guidelines have extensive requirements for evaluating patients and require that "before any physical interventions are considered for adolescents, extensive exploration of psychological, family, and social issues should be undertaken." (Turban Decl. ¶ 39.)

Defendants offer no evidence that failure to comply with the protocols for evaluation and informed consent is happening systematically. And even if it were, there are other mechanisms available to the State to address this other than categorically banning treatment and denying patients who need access to care.

---

[8]    Dr. Levine's comparison between the prohibited care and the Tuskegee experiments and "Nazi and Imperial Japanese wartime experimental research on prisoners" (Levine Decl. ¶ 112) is preposterous. (Antommaria Decl. ¶ 25.)

Defendants' experts' asserted concerns about unscrupulous practices by medical providers appear to be related to their focus on so-called "social contagion" or "rapid onset gender dysphoria." (Hruz Decl. ¶¶ 29, 69; Levine Decl. ¶ 14.) They say exposure to social media influencers talking about being transgender causes youth to identify as transgender, and that groups of teenage girls influence one another to identify as transgender. (Hruz Decl. ¶ 29; Levine Decl. ¶ 15.) Dr. Hruz says many girls come out as transgender after seeing YouTube "training" or "following school 'gender training' programs." (Hruz Decl. ¶ 29.) As Dr. Turban explains, the entirety of this discussion is a fringe view without any evidentiary support. (Turban Decl. ¶¶ 41-45.) This concept emerged in an article from Dr. Leah Littman where she discussed both the concept of "social contagion" and what she called "rapid onset gender dysphoria." A formal correction to the paper was issued, and it was explained that "[r]apid-onset gender dysphoria (ROGD) is not a formal mental health diagnosis" and "the term should not be used in any way to imply that it explains the experiences of all gender dysphoric youth." (Turban Decl. ¶ 41.) And the Littman paper that originated the term was based only on interviews of parents (and not adolescents) who reported that their child's transgender identity came on "suddenly." But as Dr. Turban explains, this is more likely explained by adolescents hiding their gender identity for fear of parental rejection, as has been the experience of many lesbian and gay people. (*Id.*) Ultimately, the increase in referrals to gender

clinics and an increase in the number of young people identifying as transgender is not explained by "social contagion" but rather by increased societal acceptance, effective medical treatment and insurance coverage, and general support.  (*See* Turban Decl. ¶¶ 42-43.)[9]

But even if one were to accept Defendants' claim that there is a fad among adolescent girls to identify as transgender, individuals who do not have gender dysphoria and do not meet the requirements for treatment under the Endocrine Society Guidelines will not be provided treatment.  (*See*, *e.g.*, Adkins Supp. Decl. ¶ 12; *see also supra* at 15-17 (discussion regarding the extensive mental health screening required to initiate treatment under existing guidelines).)  And such a phenomenon would certainly not be a basis to deny medically needed care to adolescents who actually are suffering from gender dysphoria.

---

[9]   Defendants also point to changing demographics at gender clinics from majority transgender girls to majority transgender boys, apparently in an attempt to support the "social contagion" concept.  But as Dr. Turban details, there is no data to suggest that changing demographics in gender clinics in any way relate to social contagion but rather reflect the historic ways that transgender women and girls had a more difficult time blending into society than transgender men and boys.  (Turban Decl. ¶ 44.)

**D.      There Is Nothing About Gender-Affirming Medical Care for Adolescents that Warrants the Conclusion that Parents Are Incapable of Consenting, and Adolescents Assenting, to Such Treatment After Being Informed of the Risks and Benefits.**

Defendants' experts suggest that the risks and consequences of gender-affirming medical care are uniquely harmful and should be treated differently than all other areas of pediatric medicine and be banned.  Though minors and their parents are afforded the opportunity to assent, in the case of the minor, and consent, in the case of the parents, to all other medically accepted treatments once they are informed of the risks and benefits, including those that have significant risks, Defendants' position is that no one should have the ability to consent to gender-affirming care for minors.  They specifically focus on the irreversibility of some treatments and the potential that the treatment may result in sterilization.   But many permitted treatments have significant risks, which patients and their parents can consent to if they, with the advice of their doctors, deem the benefits to outweigh the risks.  (Antommaria Decl. ¶¶ 45-46.)  Defendants' experts' quarrel here is due, at least in part, to their failure to appreciate the harms in denying medical treatment for gender dysphoria—severe distress that can result in self-harm and suicidality.  (Adkins Decl. ¶¶ 50-55; Hutchison Decl. ¶¶ 13-17; Sabrina Jennen Decl. ¶¶ 4, 11;  *see* Levine Decl. ¶ 81 (characterizing the pain of gender dysphoria as "relatively minor").)

Though Defendants' experts warn of the risk of infertility related to gender-affirming hormone therapy, all patients are informed of this risk and options for

fertility preservation, and many transgender individuals are still able to conceive children after undergoing hormone therapy.[10]  (Adkins Decl. ¶ 45; Adkins Supp. Decl. ¶ 17.)  More generally, many medical interventions that are necessary to preserve a person's health and well-being can impact an individual's fertility (*e.g.* certain cancer treatments), but treatment is still provided after informed consent. (Adkins Decl. ¶ 45; Antommaria Supp. Decl. ¶ 23.)

As for Defendants' experts' laundry list of potential risks associated with gender-affirming hormones, they are rare when provided under the supervision of a clinician; they become more frequent when individuals are unable to be supervised by doctors and they obtain treatment on the black market.  (Adkins Decl. ¶ 46.)  And these very same risks are present when hormone therapy is used to treat non-transgender individuals (*id.*), which treatment is permitted by the law.

> ### E.     Defendants' Experts Offer Duplicative and Non-credible Testimony.

Defendants submitted expert reports from four expert witnesses who offered largely duplicative testimony repeating the claims discussed above.  Prof. Regnerus

---

[10]     Alexis D. Light et al., *Transgender Men Who Experienced Pregnancy After Female-to-Male Gender Transitioning*, 124 Obstetrics & Gynecology 1120 (2014); Susan Maxwell et al., *Pregnancy Outcomes After Fertility Preservation in Transgender Men*, 129 Obstetrics & Gynecology 1031 (2017); Michael F. Neblett & Heather S. Hipp, *Fertility Considerations in Transgender Persons*, 48 Endocrinology & Metabolism Clinics N. Am. 391 (2019).

is a sociologist who studies sexual relationship behavior and decision-making. (Regnerus Decl. ¶¶ 1-2, Exhibit A (curriculum vitae).)   He has no experience relevant to this case.   The last time he testified on a topic about which he had no experience in a case involving LGBTQ+ issues, he was discredited by the Court. *See DeBoer* v. *Snyder*, 973 F. Supp. 2d 757, 766 (E.D. Mich. 2014) (marriage equality case), *rev'd on other grounds*, 772 F.3d 388 (6th Cir. 2014), *rev'd sub nom. Obergefell* v. *Hodges*, 576 U.S. 644 (2015).   The Court found Prof. Regnerus's testimony "entirely unbelievable and not worthy of serious consideration" because "[t]he evidence adduced at trial demonstrated that his 2012 'study' was hastily concocted" for the purpose of opposing marriage equality litigation approaching the Supreme Court. *Id.*

Dr. Levine's testimony has also been discredited by several courts, all in cases in which he was offering testimony about the treatment for gender dysphoria. *See Norsworthy* v. *Beard*, 87 F. Supp. 3d 1164, 1188–89 (N.D. Cal. 2015) (finding Dr. Levine's testimony "not credible because of illogical inferences, inconsistencies, and inaccuracies," and noting that his report misrepresents the standards of care and "admittedly includes references to a fabricated anecdote"); *Edmo* v. *Idaho Dep't of Corr.*, 358 F. Supp. 3d 1103, 1126 (D. Idaho 2018), *order clarified*, No. 1:17-CV-00151-BLW, 2019 WL 2319527 (D. Idaho May 31, 2019), and *vacated in part on other grounds sub nom. Edmo* v. *Corizon, Inc.*, 935 F.3d 757 (9th Cir. 2019) (giving

Dr. Levine's opinions "virtually no weight"); *see also Hecox* v. *Little*, 479 F. Supp. 3d 930, 977 n.33 (D. Idaho. 2020).

As discussed above, Defendants' experts' declarations include numerous false and misleading claims and mischaracterizations of evidence. The physician experts are all outliers in their fields with respect to their views about treatment for adolescents with gender dysphoria. Drs. Levine and Hruz's departure from the medical consensus extends to even questioning the validity of the Diagnostic and Statistical Manual (DSM)'s gender dysphoria diagnosis. (Levine Decl. ¶ 13; Hruz Decl. ¶ 34.C.) [11] Dr. Lappert compares WPATH to a "cult," (Declaration of Dr. Patrick W. Lappert (ECF No. 45-4, "Lappert Decl.") ¶ 87), and all of the experts refer to widely accepted treatment protocols as part of a "transgender industry" or "transgender treatment enterprise." (*E.g.*, Levine Decl. ¶ 120 ("transgender treatment industry"); Regnerus Decl. ¶ 52 ("gender medicine industry"); Hruz Decl. ¶ 12C ("transgender industry"); Lappert Decl. ¶ 80 ("transgender treatment enterprise").) Dr. Hruz submitted an amicus brief in which he called parents who support gender-affirming care for their children child abusers. *See* Brief of Amici Curiae Dr. Paul R. McHugh, M.D., Dr. Paul Hruz, M.D., PH.D., & Dr. Lawrence S.

---

[11]     Dr. Turban also refutes some of Defendants' experts' claim that Gender Dysphoria is comparable to Body Dysmorphic Disorder, which is a form of Obsessive Compulsive Disorder. (Turban Decl. ¶ 51.)

Mayer, PH.D. in Support of Petitioner at 22, *Gloucester Cty. Sch. Bd.* v. *G.G. ex rel. Grimm*, 137 S. Ct. 1239 (2017) (mem.) (No. 16-273) ("[C]onditioning children into believing that a lifetime of impersonating someone of the opposite sex, achievable only from chemical and surgical interventions, is a form of child abuse.").

Ultimately, all of Defendants' experts are oriented towards ideological opposition to transgender people and recite discredited views that cannot justify an unprecedented intrusion by the State into widely accepted and life-saving medical care.[12]

## LEGAL STANDARD

In issuing a preliminary injunction, the Court assesses: (1) the threat of irreparable harm to the moving party; (2) the balance between this harm and the injury that granting the injunction will inflict on the non-moving party; (3) the probability that the moving party will succeed on the merits; and (4) the public interest. *Turtle Island Foods, SPC* v. *Thompson*, 992 F.3d 694, 699 (8th Cir. 2021). The Court's consideration of these factors is flexible, and no single factor is in itself dispositive. Plaintiffs have put forth substantial evidence showing that they are likely to suffer irreparable harm if the Health Care Ban is allowed to take effect, that

---

[12]   The brief filed by Alabama and other states as *amici curiae* (ECF No. 49) repeats the same erroneous arguments proffered by Arkansas and offers nothing to inform the Court's analysis here.

the balance of equities tips in Plaintiffs' favor, and that they are likely to succeed on the merits. The preliminary injunction standard does not, as Defendants claim, create an additional burden that Plaintiffs must meet to obtain a preliminary injunction. (Defs. Br. at 33.) Instead, as the Eighth Circuit explained in *Rounds*, it means "a party seeking a preliminary injunction of the implementation of a state statute must demonstrate more than just a 'fair chance' that it will succeed on the merits," and the district court must "make a threshold finding that a party is likely to prevail on the merits." *Planned Parenthood Minn., N.D., S.D.* v. *Rounds*, 530 F.3d 724, 731-32 (8th Cir. 2008). Plaintiffs have more than met this standard. (*See* Pls. Op. Br. at Argument, § II-IV and Exhibits 1-12; Sections II-IV, *infra*.)

## ARGUMENT

### I.     Plaintiffs Have Established Standing to Bring All of Their Claims.

#### A.     Plaintiffs Have Established Standing to Challenge the Ban on "Gender Transition Procedures."

Defendants ignore the operative language of the Health Care Ban in arguing that Plaintiffs lack standing to challenge the law's prohibition of gender-reassignment surgery for minors. (Defs. Br. at 36-37.) Defendants acknowledge that the section of the Health Care Ban that Plaintiffs are challenging is its prohibition of "gender transition procedures" (*id*. at 36) which includes "a *variety* of procedures." (*Id*.) Plaintiffs are receiving or imminently will be receiving the health care enumerated under the statute's definition of "gender transition procedures."

(Pls. Op. Br. at 13-19.)  This is sufficient to establish standing to bring Plaintiffs' claims challenging the constitutionality of the Health Care Ban's prohibition of this category of treatment and to seek an injunction prohibiting Defendants from enforcing this section of the Health Care Ban.  *Webb ex rel. K.S.* v. *Smith*, 936 F.3d 808, 814 (8th Cir. 2019).  Defendants' argument that the Health Care Ban could have been drafted differently to "ban[] each of these procedures in separate provisions" (Defs. Br. at 36) is irrelevant.  Plaintiffs are challenging the law that was passed, not a hypothetical law.[13]

## B. Plaintiffs have Established Standing to Challenge the Private Right of Action.

Defendants' argument that Plaintiffs lack standing to challenge the Health Care Ban's private right of action relies solely on out-of-Circuit cases and ignores the in-Circuit cases cited in Plaintiff's Opposition to the Motion to Dismiss (at 9-10) that establish that "private rights of action . . . do not deprive this Court of jurisdiction to address the constitutionality of the laws" because they also "provide for criminal prosecution and/or civil licensing enforcement by defendants."  *Hopkins* v. *Jegley*, 2021 WL 41927, at *50 (E.D. Ark., 2021) (citing *Planned Parenthood of*

---

[13]     *DaimlerChrysler Corp*. v. *Cuno*, is wholly inapposite.  547 U.S. 332 (2006).
In that case, the plaintiffs argued they had standing to challenge a *state* tax
law based on their status as *municipal* taxpayers.  *Id*. at 349 (rejecting
plaintiffs' "claim that their status as municipal taxpayers gives them standing
to challenge the state franchise tax credit at issue here").

*Southeastern Pennsylvania* v. *Casey*, 505 U.S. 833, 887-88 (1992).  Because the Health Care Ban contains a public enforcement mechanism, Plaintiffs have standing to challenge the law, including the private right of action.[14]

### C.  Plaintiffs Have Established Standing for the Doctor Plaintiffs' Equal Protection Claim.

Defendants assert that Plaintiffs ask this court to "expand the holding of decisions granting third-party standing to abortion practitioners so that it covers all doctors." (Defs. Br. at 39.)  But Plaintiffs are not seeking to expand any doctrine; rather, they ask this Court to apply well-established principles under which courts "have generally permitted plaintiffs to assert third-party rights in cases where the 'enforcement of the challenged restriction *against the litigant* would result indirectly in the violation of third parties' rights.'"  *June Medical Services L. L. C.* v. *Russo*, 140 S. Ct. 2103, 2118-19 (2020) (quoting *Kowalski* v. *Tesmer*, 543 U.S. 125, 130

---

[14]    Defendants' reliance on *Okpalobi* v. *Foster*, 244 F.3d 405, 422 (5th Cir. 2001) and *Planned Parenthood of Greater Texas Surgical Health Services* v. *City of Lubbock, Texas*, 2021 WL 2385110, at *4 (N.D. Tex., 2021) is misplaced because both laws, unlike the Health Care Ban, involved only private enforcement.  The holding of *Hope Clinic* v. *Ryan*, 249 F.3d 603, 605 (7th Cir. 2001) has not been adopted by any court in the Eighth Circuit.  *See Planned Parenthood of Heartland* v. *Heineman*, 724 F. Supp. 2d 1025, 1039 (D. Neb. 2010) (distinguishing *Hope Clinic* and holding that "Plaintiffs have demonstrated that the named Defendants are a source of injury-in-fact" because the state "holds the power to impose fines on Planned Parenthood in an amount up to $10,000 per violation, and revoke Planned Parenthood's health care facility license").

(2004)).   The Doctor Plaintiffs meet the third-party standing standard that the Supreme Court recently reaffirmed in *June Medical*.   The Doctor Plaintiffs are "challenging a law that regulates their conduct," and the "'threatened imposition of governmental sanctions' for noncompliance eliminates any risk that their claims are abstract or hypothetical."  *Id*. at 2119; *see also Reprod. Health Servs. of Planned Parenthood of St. Louis Region, Inc.* v. *Parson*,  1 F.4th 552 (8th Cir. 2021) (applying *June Medical* and holding that abortion provider had standing to sue on behalf of its patients), *reh'g en banc granted* (July 13, 2021).   And because the Health Care Ban "imposes 'legal duties and disabilities'" on the Doctor Plaintiffs, they are the "'least awkward' and most 'obvious' claimants here." *June Med*., 140 S. Ct. at 2119 (quoting *Craig* v. *Boren*, 429 U.S. 190, 197 (1976)).

Defendants also incorrectly assert that the Doctor Plaintiffs have failed to show a "close relationship" with their patients or that those patients do not face a "hindrance" to bringing their own claims.  (Defs. Br. at 41.)  The only argument Defendants make in support of their assertion that the Doctors lack a "close relationship" is to repeat the argument that the Doctor Plaintiffs have a conflict of interest with their patients because they wish to expand their "lucrative" business providing gender-affirming care.  (*Id*.)  This argument fails for the reasons discussed in Plaintiffs' Opposition to the Motion to Dismiss (at 12), to which Defendants failed to respond.

Defendants similarly repeat their argument that the Doctor Plaintiffs lack standing because four transgender minors have also brought claims.  (Defs. Br. at 42.)  But it is often the case that both patients and physicians together have standing to challenge the law, and the fact that some transgender patients are plaintiffs does not negate the Doctor Plaintiffs' standing.  For example, in *Doe* v. *Bolton*, a pregnant minor as well as physicians challenged a Georgia law restricting access to abortion. *Doe* v. *Bolton*, 410 U.S. 179, 179-80 (1973).  The Supreme Court held that the minor plaintiff had standing and that the "physician-appellants, who are Georgia-licensed doctors consulted by pregnant women, also present a justiciable controversy and do have standing."  *Id*.; *see also Hodgson* v. *Minnesota*, 497 U.S. 417, 429 (1990) ("[P]laintiffs include two Minnesota doctors . . . , four clinics providing abortion and contraceptive services . . . , six pregnant minors representing a class of pregnant minors, and the mother of a pregnant minor.").

Defendants ignore that transgender plaintiffs face significant hindrances in bringing their own claims, including that their claims will soon be mooted and transgender people have a heightened privacy interest given the longstanding harassment and discrimination they face.  *Singleton* v. *Wulff*, 428 U.S. 106, 117 (1976) (third-party standing appropriate for doctors because patients "may be chilled from such assertion by a desire to protect the very privacy of her decision from the publicity of a court suit" and there is "imminent mootness . . . of any individual

woman's claim."). Defendants incorrectly assert that minors seeking gender-affirming care "do not face the same mootness problem faced by pregnant women." (Defs. Br. at 41 n.99). Each of the Doctor Plaintiffs' minor patients will turn 18 years old within a period of months or years, and therefore no longer be subject to the Health Care Ban. Moreover, the fact that some transgender minors affected by the Health Care Ban are plaintiffs in this case does not negate the significant hindrance for many others who desire to protect the privacy of their medical decisions and transgender status. *See Singleton*, 428 U.S. at 117 (the patients' hindrance need not be "insurmountable").

## II.   Plaintiffs Are Likely to Succeed on the Merits of Their Equal Protection Claim.

As Plaintiffs explain in their Opening Brief, by banning medical care only for "gender transition," thereby singling out for unique prohibition care designed to bring a patient's body into alignment with their gender identity rather than their sex assigned at birth, the Health Care Ban discriminates on the basis of transgender status and sex. (Pls. Op. Br. at 24-30, Opp. to Mot. to Dismiss at 16-24.) None of the interests advanced by Defendants justifies the Health Care Ban under any level of scrutiny.

**A.    The Health Care Ban Triggers Heightened Equal Protection Scrutiny Because It Discriminates on the Basis of Transgender Status and Sex.**

Arkansas's Health Care Ban is subject to heightened scrutiny under the Equal Protection Clause because it discriminates based on transgender status and sex, including non-conformity with sex stereotypes, and because it bars treatment solely based on whether or not the State considers the treatment to be in alignment with a person's "biological sex." (*See generally* Statement of Interest of the United States (ECF No. 19) at 5-17 (arguing that the Health Care Ban is subject to heightened scrutiny because it discriminates on the basis of transgender status and sex).)

1.    The Health Care Ban Discriminates Based on Transgender Status.

Defendants take great pains to argue that the Health Care Ban, which categorically prohibits care related to "gender transition," does not discriminate based on transgender status. Instead, they argue, the Health Care Ban discriminates only based on age and medical treatment because no minors are permitted to undergo "gender transition." (Defs. Br. at 46-52.) Plaintiffs' explain in their Opposition to Defendants' Motion to Dismiss why these arguments fail. (Opp. to Mot. to Dismiss at 19-22.) These arguments fail for the additional reasons outlined below.

*First*, the fact that the law classifies based on age does not mean that it does not also discriminate based on transgender status. A law that discriminates against a subset of people based on a protected characteristic still triggers heightened

scrutiny.  *See, e.g., Phillips* v. *Martin Marietta Corp.*, 400 U.S. 542, 543-44 (1971) (per curiam) (discriminating against women with children is sex discrimination even if women without children were not discriminated against).[15]  The Health Care Ban's disparate treatment of individuals because of their age and transgender status is still transgender status discrimination even if only a subset of transgender individuals are targeted.  (*See* Opp. to Mot. to Dismiss at 19-22.)

*Second*, Defendants' argument that the law involves a classification based on medical procedure fares no better.  Defendants offer a litany of supposed justifications for the ban—that the treatment is provided off-label, that it treats a non-physiologically verifiable condition, that it is "experimental."  (Defs. Br. at 47.)  But how Defendants may attempt to *justify* the law is a separate inquiry from whether the law discriminates against a suspect class and does not change the fact that the law is singularly aimed at the subset of medical care that only transgender people

---

[15]    *See also B.K.B.* v. *Maui Police Dep't*, 276 F.3d 1091, 1101 (9th Cir. 2002) (citation omitted) (describing "the intersectional relationship between discrimination on the basis of" two characteristics such as "race and gender"), *as amended* (Feb. 20, 2002); *Sewell* v. *Monroe City Sch. Bd.*, 974 F.3d 577, 584 (5th Cir. 2020) (holding that Black boys could bring Title VI race discrimination claim based on school's hair policy even though Black girls and white boys were not targeted by the policy); *see also Bostock*, 140 S. Ct. at 1748 (noting that even where the confluence of two factors—in that case sex and sexual orientation and sex and transgender status—may result in a discriminatory decision, it is still discrimination based on the protected characteristic).

undergo.  The Health Care Ban does not establish a generally applicable requirement that all medical treatment for minors satisfy some state-defined test of scientific rigor or physiological verification or FDA label-use.  Rather, the *only* care prohibited by the Health Care Ban is care prescribed, administered, or referred for "gender transition."  *See* ARK. CODE ANN. § 20-9-1502(a)-(b).[16]  Where a law targets "gender transition"—a process that only transgender people undergo—it discriminates based on transgender status.  *Karnoski* v. *Trump*, 926 F.3d 1180, 1201 (9th Cir. 2019) (holding that a policy banning individuals who have undergone "gender transition" from open military service discriminates on the basis of transgender status).

*Third*, Defendants' argument that the Health Care Ban does not discriminate based on transgender status because no child can undergo "gender transition" strains credulity.  (Defs. Br. at 52, 74 (claiming that the Health Care Ban "appl[ies] evenhandedly to all" children).)  It is not unlike arguments raised in defense of unconstitutional bans on marriage for same-sex couples.  Marriage bans restricted civil marriage to one man and one woman.  In defense of the bans, many states argued that they did not discriminate based on sexual orientation because no one, regardless of sexual orientation, could marry a person of the same sex.  *See*, *e.g.*, *Baskin* v. *Bogan*, 12 F. Supp. 3d 1144, 1160 (S.D. Ind. 2014) ("Defendants respond

---

[16]   The Health Care Ban, 2021 ARK. ACTS 626, will be codified at ARK. CODE ANN. 20-9-1501-1504.

-33-

that the marriage laws do not discriminate against same-sex couples because they may marry just like opposite-sex couples may marry."), *aff'd*, 766 F.3d 648 (7th Cir. 2014).  Courts rightfully rejected that argument, noting that by definition gay and lesbian people formed same-sex unions and therefore such bans facially targeted them based on their sexual orientation.  *Id*.; *see also Latta* v. *Otter*, 771 F.3d 456, 476-77 (9th Cir. 2014) (holding that bans on marriage for same-sex couples discriminated on the basis of sexual orientation).[17]

*Finally*, Defendants' argument that the Health Care Ban does not discriminate based on transgender status because psychotherapy and social transition are permitted under the Act again erroneously assumes that all members of a class must be targeted in order to trigger heightened scrutiny.  (Defs. Br. at 55; *see* Opp. to Mot. to Dismiss at 20-22.)  In *Hennessy-Waller* v. *Snyder*, cited by Defendants, the Court's conclusion that the policy at issue did not discriminate based on transgender status turned on it being limited to insurance coverage for surgical treatment for

---

[17]    Defendants' reliance on *Pers. Adm'r of Mass.* v. *Feeney,* is misplaced.  (Defs. Br. at 53, citing 442 U.S. 256, 271-72 (1979).)  In *Feeney*, the Supreme Court held that veterans' preferences, though disproportionately excluding women, did not establish a sex-classification.  *Feeney*, 442 U.S. at 280-81.  One's veteran's status does not by definition correlate with sex, whereas a "gender transition" classification by definition correlates with one's transgender status.  A man is not defined in relation to his veteran status, but a transgender person is defined in relation to gender transition—that is, the process by which one identifies and/or lives in accordance with a sex different from that assigned to the person at birth.  (Adkins Decl. ¶ 19.)

minors, while allowing coverage for other medical treatments for gender dysphoria.[18]  No. CV-20-00335, 2021 WL 1192842 at *9 (D. Ariz. Mar. 30, 2021). In contrast, Arkansas has banned all medical care related to "gender transition," thereby discriminating against transgender people as a class.  *Karnoski,* 926 F.3d at 1201.

### 2.    The Health Care Ban Discriminates Based on Sex.

In addition to triggering heightened scrutiny because it discriminates based on transgender status, the Health Care Ban triggers heightened scrutiny because it discriminates on the basis of sex.  (*See* Pls. Op. Br. at 30-32; Opp. to Mot. to Dismiss at 23-24); *see also U.S.* v. *Virginia (VMI)*, 518 U.S. at 555 ("[A]ll gender-based classifications today warrant heightened scrutiny.") (internal quotation marks omitted).  Defendants' argument that sex discrimination only occurs where one sex is disadvantaged as compared to another sex (Defs. Br. at 69-70) was explicitly rejected by the Supreme Court in *Bostock.  Bostock* v. *Clayton Cty., Georgia*, 140 S. Ct. 1731, 1742 (2020) ("[L]iability is not limited to employers who, through the sum of all of their employment actions, treat the class of men differently than the class of women . . . the law makes each instance of discriminating against an

---

[18]    In addition, *Hennessy-Waller* is not binding on this Court and is currently on appeal.  *Hennessy-Waller* v. *Snyder*, 2021 WL 1192842, *appeal filed sub nom. D. H.* v. *Snyder*, No. 21-15668 (9th Cir. Apr. 19, 2021).

individual employee because of that individual's sex an independent violation."); *see also Waters* v. *Ricketts*, 48 F. Supp. 3d 1271, 1282 (D. Neb.) ("The 'equal application' of [marriage] laws to men and women as a class does not remove them from intermediate scrutiny."), *aff'd,* 798 F.3d 682 (8th Cir. 2015).

Where the state "intentionally penalizes a person identified as male at birth for traits or actions that it tolerates in [someone] identified as female at birth . . . sex plays an unmistakable and impermissible role." *Bostock*, 140 S. Ct. at 1741-42. Under the Health Care Ban, care is prohibited based solely on whether or not the person receiving the care was assigned male or female at birth. (Pls. Op. Br. at 30-32.) Defendants' only response is that the care that people assigned male at birth receive is different from the care that people assigned female at birth receive. Even if that were true, it is beside the point. The Health Care Ban permits a person assigned male at birth to affirm his male gender identity through medical interventions but a person assigned female at birth is prohibited from affirming his male gender identity; likewise, a person assigned female at birth is permitted to obtain medical interventions to affirm her female gender identity but a person assigned male is not. *See* ARK. CODE ANN. § 20-9-1501(5). The Health Care Ban is triggered when the care facilitates the "process in which a person goes from identifying with and living as a gender that corresponds to his or her biological sex to identifying with and living as a gender different from his or her biological sex,

and may involve social, legal, or physical changes." *Id*. Accordingly, what the Health Care Ban prohibits is based exclusively on a person's "biological sex," and is therefore sex discrimination.[19]

That the Health Care Ban also discriminates based on one's non-conformity with stereotypes related to sex is made crystal clear by the law's exemption for care for individuals with intersex conditions, including surgery on intersex infants. ARK. CODE ANN. § 20-9-1502(c). The permissibility of care is dependent on whether it brings the body into alignment with what is considered to be "typical" for one's sex assigned at birth. ARK. CODE ANN. § 20-9-1501(4). "Tether[ing] Plaintiffs to sex stereotypes which . . . they seek to reject" is sex discrimination. *Kadel* v. *Folwell*, 446 F. Supp. 3d 1, 14 (M.D.N.C. 2020); (*See* Pls. Op. Br. at 31-32).

### B.   Classifications Based on Transgender Status Trigger Heightened Scrutiny.

As Plaintiffs explain in their Opening Brief, transgender people meet all of the indicia of a suspect class under the considerations utilized by the Supreme Court. (Pls. Op. Br. at 27-30); *see Grimm* v. *Gloucester Cty. Sch. Bd.*, 972 F.3d 586, 611-13 (4th Cir. 2020), *as amended* (Aug. 28, 2020), *cert. denied,* No. 20-1163, 2021 WL

---

[19]   There is no exception to heightened scrutiny for gender discrimination based on physiological or biological characteristics. *See Tuan Anh Nguyen* v. *INS*, 533 U.S. 53, 70, 73 (2001) (applying heightened scrutiny and upholding policy because it imposed only a "minimal" burden and was not "marked by misconception and prejudice" or "disrespect").

2637992 (U.S. June 28, 2021); *Karnoski*, 926 F.3d at 1200.  Defendants devote ten

pages to arguing that transgender people have not faced a history of discrimination,

do not share any defining characteristics, and do not lack political power.  (Defs. Br.

at 57-67.)   But their arguments distort both the test for a suspect class and the

historical and contemporary realities facing transgender people.

The last century of American law and history is replete with examples of

intentional and ongoing discrimination against transgender people.  *See G. G.* v.

*Gloucester Cty. Sch. Bd.*, 853 F.3d 729, 730 (4th Cir. 2017), as amended (Apr. 18,

2017) (Davis., J., concurring) (recognizing that discrimination against transgender

people is part of our country's "long and ignominious history of discriminating

against our most vulnerable and powerless.").   "[O]ne would be hard-pressed to

identify a class of people more discriminated against historically . . . than

transgender people."   *Grimm*, 972 F.3d at 610 (internal quotations omitted).

Defendants disagree with this conclusion but do not—and cannot—offer any

counterargument or evidence that transgender people have not been subject to a

range of government-mandated and private discrimination throughout history.  *See*,

*e.g.*, *Transgender History: The Roots of Today's Revolution* (Berkeley: Seal Press,

2017) at 46-48 (identifying history of anti-cross dressing law that typically included

language like: "If any person shall appear in a public place . . .  in a dress not

belonging to his or her sex . . . he should be guilty of a misdemeanor."); Joanne

Meyerowitz, *How Sex Changed: A History of Transsexuality in the United States,*
Harvard Univ. Press 2002, at 246-53 (tracing history of anti-transgender laws and
policies in the United States).

The fact that not all transgender people share the same experience does not
change the fact that, for purposes of the Court's heightened scrutiny analysis,
transgender people share "distinguishing characteristics." *Grimm*, 972 F.3d at
611-13. Transgender people are those who have a "gender identity and/or gender
expression that differs from what is typically associated with their sex designated at
birth." Endocrine Society Guidelines at Table 1; (Br. of Amici AAP *et al.* at 5). The
relevant question is not whether every person in the class is the same or shares the
same experience of identity; rather, the relevant question is whether they share a
characteristic that "tend[s] to be irrelevant to any proper legislative goal." *Plyler* v.
*Doe*, 457 U.S. 202, 216 n.14 (1982). And transgender people—who are simply
trying to live their lives consistent with who they are—do share such a characteristic,
and government action targeting them warrants judicial skepticism. (Pls. Br. at
28-29.)

Courts have explained that the "immutability" consideration is not about
whether the trait is strictly immutable but rather whether it is a characteristic one
could or should have to change. *See Latta* v. *Otter*, 771 F.3d 456, 464 n.4 (9th Cir.
2014) ("We have recognized that '[s]exual orientation and sexual identity are

immutable; they are so fundamental to one's identity that a person should not be required to abandon them.'"); *Love* v. *Beshear*, 989 F. Supp. 2d 536, 546 (W.D. Ky. 2014) ("As to immutability, the relevant inquiry is not whether a person *could*, in fact, change a characteristic, but rather whether the characteristic is so integral to a person's identity that it would be inappropriate to require her to change it to avoid discrimination."). As courts have recognized, the question is whether the trait is one a person should have to change in order to secure one's rights as an individual— even if such a choice could be made. *See Wolf* v. *Walker*, 986 F. Supp. 2d 982, 1013 ("[R]egardless whether sexual orientation is immutable, it is fundamental to a person's identity, which is sufficient to meet this factor.") (internal quotation marks and citations omitted). As Dr. Adkins explains, "[A] person's gender identity (regardless of whether that identity matches other sex-related characteristics) is fixed, is not subject to voluntary control, [and] cannot be voluntarily changed." (Adkins Decl. ¶ 21.)[20] Being transgender is not something that one could or should have to change in order to be protected from legal discrimination.[21] As Judge Wynn

---

[20]   *See also* American Psychological Association (2015) Guidelines for Psychological Practice with Transgender and Gender Nonconforming People. American Psychologist, 70 (9), 832-864. doi: 10.1037/a0039906 (explaining that gender identity is "deeply felt" and "inherent").

[21]   Defendants' citations to various sources explaining people's experience of gender identity and their expression of it does not undermine this suspect classification consideration. (*See* Defs. Br. at 64.) As Dr. Adkins explains,

explained in *Grimm*, "[a] transgender person's awareness of themselves as male or female is no less foundational to their essential personhood and sense of self than it is for those [who are not transgender].  History demonstrates that this self-conception is unshakeable indeed."  *Grimm*, 972 F.3d at 624 (Wynn, J., concurring).

The "political powerlessness" question is not, as Defendants argue (Defs. Br. at 65), solely about representation among elected officials, but rather about whether transgender people are "in a position to adequately protect themselves from the discriminatory wishes of the majoritarian public."  *Windsor* v. *U.S.*, 699 F.3d 169, 185 (2d Cir. 2012), *aff'd sub nom. United States* v. *Windsor*, 570 U.S. 744, 770 (2013).  As this legislative session in Arkansas alone demonstrates, they are not. This year Arkansas considered at least 8 bills aimed at limiting rights for transgender people, four of which became law.  (Compl. ¶¶ 58-63.)  In 2021, lawmakers across the country introduced over 100 bills restricting rights for transgender people and at least 13 became law,[22] despite the fact that transgender people already face staggeringly high rates of discrimination in employment, health care, education, and

---

the fact that some people's understanding of their gender identity changes over time or have non-binary identities does not mean that someone's gender identity can be changed by external forces.  (*See* Adkins Supp. Decl. ¶ 4.)

[22]  Sam Levin, *In an extraordinary attack on trans rights, conservative state lawmakers proposed more than 110 anti-trans bills this year*, GUARDIAN (June 14, 2021), https://www.theguardian.com/society/2021/jun/14/anti-trans-laws-us-map.

housing.  (*See* Brief of Amici AAP *et al.* at 7); *see also Grimm*, 972 F.3d at 611 ("The transgender community also suffers from high rates of employment discrimination, economic instability, and homelessness.").  Transgender people are not in a position to protect themselves from discrimination even if some people are willing to support their rights.

As many courts have concluded, transgender people clearly meet all of the indicia of a suspect class.  (*See* Pls. Op. Br. at 27-28 (citing cases).)  Defendants rely heavily on the Supreme Court's decision not to extend suspect-class status to "disability" classifications in *City of Cleburne, Tex.* v. *Cleburne Living Ctr.*, 473 U.S. 432 (1985), (Def. Br. at 62-67), but "no hard-and-fast rule prevents this Court from concluding that a quasi-suspect class exists, nor have *Cleburne's* dicta prevented many other courts from so concluding." *Grimm*, 972 F.3d at 613.[23]

---

[23]    Defendants also argue that because the Supreme Court and the Eighth Circuit have not explicitly recognized sexual orientation as a suspect classification, this Court should not find that transgender status meets the suspect classification test.  (Defs. Br. at 57-58.)  But many courts have held that transgender status classifications trigger heightened scrutiny including in circuits that have held that sexual orientation does not*.  See, e.g.*, *Evancho* v. *Pine–Richland Sch. Dist.*, 237 F. Supp. 3d 267, 288 (W.D. Pa. 2017) (holding that transgender people constitute a quasi-suspect class); *Bd. of Educ. of the Highland Local Sch. Dist.* v. *U.S. Dep't of Educ.*, 208 F. Supp. 3d 850, 873 (S.D. Ohio 2016) (same); *M.A.B.*, 286 F. Supp. 3d at 718–19 (same).

## C.     The Health Care Ban Fails Heightened Scrutiny.

Heightened scrutiny imposes a "demanding" standard on the government to demonstrate an "exceedingly persuasive" justification for its differential treatment. *VMI*, 518 U.S. at 533.  The government "must show at least that the [challenged] classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." *Id.* (internal quotation marks and citations omitted).  A court must assess the law's "actual purposes and carefully consider the resulting inequality to ensure that our most fundamental institutions neither send nor reinforce messages of stigma or second-class status." *SmithKline Beecham Corp.* v. *Abbott Lab'ys*, 740 F.3d 471, 483 (9th Cir. 2014).  And in so doing, the court "retains an independent constitutional duty to review factual findings where constitutional rights are at stake." *Gonzalez* v. *Carhart*, 550 U.S. 124, 165 (2007).

As Plaintiffs extensively detail in their Opening Brief (at 32-43), the Health Care Ban's targeted and categorical prohibition on health care related to "gender transition" is not substantially related to any important governmental objectives. The relevant test under the Equal Protection Clause is whether "the discriminatory means employed" by the government "are substantially related to the achievement of those objectives." *Sessions* v. *Morales-Santana*, 137 S. Ct. 1678, 1690 (2017). Here, the claimed objectives of the ban are to (1) protect minors and (2) safeguard

the medical profession.[24]   But the means that the government has employed—categorically banning medical treatment for gender transition in minors—do not substantially advance those objectives.

In defense of the Health Care Ban, Defendants raise a series of purported concerns about medical treatment for gender transition, but none of the concerns raised are unique to the care banned by the law and many of the concerns are based on a mischaracterization of the science.   *See supra,* Section I (summarizing Defendants' mischaracterization of the scientific evidence supporting treatment guidelines for transgender minors).

*First*, Defendants argue that the Health Care Ban is justified because of a lack of evidence of the treatment's efficacy.  (Defs. Br. at 78-82.)  This argument ignores significant data about gender-affirming medical treatment.  As Dr. Antommaria and Dr. Turban detail, there is a substantial body of research that has tested the efficacy and safety of treatment for transgender minors, which has formed the basis for the Endocrine Society Guidelines as well as the consensus within the American medical community about the recommended use of this care.  (*See* Antommaria Decl. ¶¶ 32-36 (detailing studies); Turban Decl. ¶¶ 12-14 ; *see also* Br. of Amici AAP *et. al.* at

---

[24]   Though Defendants separately enumerate these two governmental interests, the analysis they offer combines them, and Plaintiffs respond to the asserted justifications together.

12-15 (noting, among other things, that "multiple studies have revealed long-term positive outcomes for transgender people who have undergone puberty suppression") (internal citation omitted).) Defendants' argument also ignores the clinical experience of doctors who see the positive effects of treatment in their patients. (*See* Turban Decl. ¶ 18 (noting clinical experience from around the world showing the effectiveness of gender-affirming treatments for adolescents).) As Dr. Adkins explained of her experience treating over 400 transgender patients:  "My patients who receive medically appropriate hormone therapy and who are treated consistent with their gender identity in all aspects of life experience significant improvement in their health." (Adkins Decl. ¶ 50.) Dr. Adkins' experience mirrors that of Dr. Hutchison in Arkansas who explained that for her 160 patients, gender-affirming treatments prevent them "from suffering the severe emotional and physical consequences of going through puberty that does not match their gender identity." (Hutchison Decl. ¶ 6.)

As for Defendants' assertion that the evidence showing the benefits of gender-affirming medical care is not of sufficient quality, as Dr. Antommaria explains, many treatments accepted within pediatric medicine are utilized with equal or lower quality evidence than what is available for the treatment of gender dysphoria. (*See* Antommaria Decl. ¶¶ 21, 39-40.) If Defendants' concern is about harm to minors through the administration of medication and treatment that has not been validated

by what they consider "high quality" evidence, banning *only* gender-affirming care is wildly underinclusive. *Republican Party of Minnesota* v. *White*, 536 U.S. 765, 780 (2002) (a law did not serve a government interest where it was "woefully underinclusive as to render belief in that purpose a challenge to the credulous").

And while Defendants critique the data supporting the accepted treatment paradigm for gender dysphoria in adolescents, the alternatives they propose— "watchful waiting" and psychotherapy alone—have not proven effective for adolescents by *any* scientific study. (Levine Decl. ¶ 35; Antommaria Supp. Decl. ¶ 15; Turban Decl. ¶¶ 31-32, 46.)

*Second*, Defendants claim that the Health Care Ban is justified because the prohibited treatment has "irreversible consequences." (Defs. Br. at 76.) As Dr. Adkins explains, claims of irreversibility are not true as to pubertal suppression, which only pauses puberty until a patient either initiates endogenous puberty or puberty through cross-sex hormones. (Adkins Decl. ¶¶ 31-32.) In any event, there are many treatments that minors undergo that are irreversible, and it therefore cannot be categorically true that medical treatment that is irreversible is inherently harmful. Indeed, the law explicitly contemplates that irreversible genital surgery may be performed on intersex infants. ARK. CODE ANN. § 20-9-1502(c). These interventions on intersex minors are permitted because they are seen to align with a person's "biological sex."

*Third*, many of the claimed risks of gender-affirming care that Defendants use to justify the ban are inaccurate and apply to other non-banned treatments. Regarding Defendants' claims that gender-affirming treatment is sterilizing, Dr. Adkins explains: "Many people undergo fertility preservation before any treatment that would compromise fertility. Many more transgender people may be treated with gender-affirming surgery that has no impact on fertility such as chest reconstruction. Many transgender individuals conceive children after undergoing hormone therapy." (Adkins Decl. ¶ 45.) Additionally, many other forms of treatment provided to minors can result in sterilization and are still provided with informed consent. (*Id.*; *see also* Antommaria Supp. Decl. ¶ 24.) Similarly, while Defendants' experts point to risks of loss of sensation and ability to breast feed due to chest surgery for transgender males, those risks apply equally to other types of chest surgeries for adolescents permitted under the law, including breast augmentation or reduction. (Antommaria Decl. ¶ 47.) As to other claims of health risks related to pubertal suppression and hormone therapy, Dr. Adkins explains that these are rare and well-managed except in cases where patients are unable to obtain care through clinicians and resort to the black market. (*See* Adkins Decl. ¶ 46; Adkins Supp. Decl. ¶ 16.)

As discussed by Dr. Antommaria, many medical interventions have significant risks, but patients and their parents, with the advice of their doctors, are permitted to weigh the risks and benefits and determine if treatment is appropriate.

(Antommaria Decl. ¶¶ 45-46.)   And treatment protocols for gender-affirming medical care follow established principles of informed consent.  (Antommaria Supp. Decl. ¶¶ 16-24.)   Moreover, the Health Care Ban permits all of the banned treatments, including genital surgery, if provided to intersex minors, which carry all of the risks cautioned by Defendants they claim justify the Health Care Ban.  (*See* Antommaria Decl. ¶ 49.)

*Fourth*, Defendants' experts erroneously suggest that most young people affected by the law will "outgrow" their transgender identity absent treatment. (Levine Decl. ¶ 8(e).)  As stated above, Defendants and their experts conflate the terms "children" and "adolescents," which have distinct meanings.  No medical treatment is provided under the accepted protocols until after the onset of puberty. While some practitioners, largely outside of the United States, follow the approach of "watchful waiting" for pre-pubertal *children*, there is no such approach applied to transgender adolescents because there is no evidence of a likelihood of "desistance" once individuals reach adolescence.  (Turban Decl. ¶¶ 21-23, 31.)

Ultimately, throughout their defense of the Health Care Ban, Defendants either ignore or misleadingly dispute the body of evidence showing the significant harms of withholding or terminating treatment for minors with gender dysphoria. There is substantial scientific evidence that withholding gender-affirming treatment

for minors with gender dysphoria results in predictable and dire harms. (*See* Pls.

Op. Br. at 43; Turban Decl. ¶¶ 12-14.)

### D.   The Health Care Ban Fails Any Level of Scrutiny.

Though the Health Care Ban's discrimination based on transgender status and

sex triggers heightened scrutiny, the law fails under any level of scrutiny.   As

discussed above and in Plaintiffs' Opening Brief, the stated justifications for banning

gender-affirming care for minors "ma[k]e no sense in light of how" Arkansas treats

other types of care. *Bd. of Trustees of Univ. of Ala.* v. *Garrett*, 531 U.S. 356, 366

n.4 (2001) (citation omitted).   But beyond that, "[t]he history of [the statute's]

enactment and its own text demonstrate that" the purpose of the Health Care Ban

was to express Arkansas's moral and social disapproval of transgender people.

*Windsor*, 570 U.S. at 770.   Under any standard of review, laws that have the

"peculiar property of imposing a broad and undifferentiated disability on a single

named group" are "invalid." *Romer* v. *Evans*, 517 U.S. 620, 632 (1996).   And that

is precisely what Arkansas's Health Care Ban does to transgender minors.

The Health Care Ban is "at once too narrow and too broad." *Id.* at 633.   If the

object of the law, as Defendants suggest, is to ban care that does not meet certain

standards of evidentiary support, has potential side-effects or risk, or is in some way

"irreversible," then the law is entirely too narrow, only covering a tiny subset of care

that might fall into one of those categories. *See supra*, Section I.   It is likewise too

broad as it reaches all gender-affirming care regardless of whether it falls into one of those categories. Ultimately, the purpose of the law is not to protect minors by limiting care that may cause particular harms, but rather to limit care that tends to affirm one's gender identity when it differs from that individual's assigned sex at birth. Indeed, this is spelled out in the text of the law itself. ARK. CODE ANN. § 20-9-1501(5). Given that every criticism that Defendants levy against gender-affirming care for transgender minors could be applied to a range of other pediatric medical treatments, there is no rational basis to single out this treatment.

Plaintiffs are therefore likely to succeed on the merits of their Equal Protection claims.

### III.   The Parent Plaintiffs Are Likely to Succeed on the Merits of Their Due Process Claim.

Defendants' Opposition ignores the parental autonomy claims that Plaintiffs have actually brought, as well as the factual evidence supporting those claims, and instead argue that "[w]hat Plaintiffs assert is a right to choose particular experimental medical procedures for their children, notwithstanding Arkansas's reasoned judgment, based on medical evidence, that these particular procedures should not be carried out on minors." (Defs. Br. at 89.) This mischaracterizes Plaintiffs' claim that the Health Care Ban infringes parents' long-standing right to direct the "care, custody, and control" of their children, *see, e.g.*, *Troxel* v. *Granville*, 530 U.S. 57, 65–66 (2000), a right which "includes a 'high duty' to recognize symptoms of illness

and to seek and follow medical advice." *Parham* v. *J.R.*, 442 U.S. 584, 602 (1979).[25]

Defendants' assertion that Plaintiffs seek a "significant expansion of current

substantive-due-process doctrine" (Defs. Br. at 90) is simply incorrect: the

fundamental right of parents to direct their children's medical care is well-established.

*Kanuszewski* v. *Mich. Dep't of Health and Human Servs*, 927 F.3d 396, 419 (6th Cir.

2019) ("[P]arents' substantive due process right to make decisions concerning the care,

custody, and control of their children includes the right to direct their children's

medical care.") (citation and internal quotation marks omitted).

Defendants also assert that Plaintiffs claim a right to parental autonomy that

"empowers parents to make any choice whatsoever for their children." (Defs. Br.

at 89.) But Plaintiffs have nowhere argued that the right to parental autonomy is

without limit, and, to the contrary, have acknowledged that a state may limit a

parent's right to seek medical care for their children if the law passes strict scrutiny.

(*See* Pls. Op. Br. at 50 (citing *Jehovah's Witnesses in State of Wash.* v. *King Cnty.*

*Hosp. Unit No. 1*, 278 F. Supp. 488, 504 (W.D. Wash. 1967)); *see also Parham*, 442

U.S. at 603 ("[A] state is not without constitutional control over parental discretion

---

[25]   Defendants' argument that "[i]t will not suffice to say that parents have a right
to make decisions regarding the care, custody, and control of their children,
or even a right to seek and follow medical advice" (Defs. Br. at 89 (internal
quotation marks omitted)) is puzzling, since that is the exact phrasing used by
the Supreme Court.

in dealing with children when their physical or mental health is jeopardized."). Defendants' attempt to distinguish *Kanuszewski*, 927 F.3d at 419, on the basis that it held that "[t]his does not mean that parents' control over their children is without limit" is misplaced.  (Defs. Br. at 92.)  *Kanuszewski* recognized that a "parents' substantive due process right . . . to direct their children's medical care" was subject to a limitation:  it can be limited by a law that survives strict scrutiny.  *Id*. at 419.[26]

This is a burden Defendants cannot meet on the merits.  Defendants make no showing that they will be likely to prove that the Health Care Ban serves a compelling state interest.  (*See supra*, Sections II.C. and II.D.)[27]  And Defendants

---

[26]   Defendants are incorrect in arguing that that *Parham* only involved procedural due process (Defs. Br. at 91)—it also discussed substantive due process, including in the sections quoted in Plaintiffs' briefs.  *Parham*, 442 U.S. at 602 ("[P]arents generally 'have the right,' coupled with the high duty, to recognize and prepare [their children] for additional obligations" including "a 'high duty' to recognize symptoms of illness and to seek and follow medical advice.") (citing *Pierce* v. *Society of Sisters*, 268 U.S. 510, 535 (1925); *Meyer* v. *Nebraska*, 262 U.S. 390, 400 (1923)).

[27]   Defendants' attempt to counter this conclusion by comparing the case at bar to *Planned Parenthood of Cent. Mo.* v. *Danforth*, 428 U.S. 52 (1976) is misplaced.  (Op. Br. at 92.)  In *Danforth*, the Court dealt with a statute that would have made it mandatory for a minor to obtain their parent's consent before receiving an abortion.  The Court held that "the State does not have the constitutional authority to give a third party an absolute, and possibly arbitrary, veto over the decision of the physician and his patient to terminate the patient's pregnancy[.]"  *Id*., at 74-75.  Unlike *Danforth*, the Health Care Ban does not attempt to impose mandatory parental consent.  Instead, it contains a categorical prohibition, despite parents, their children, and the children's health care providers all agreeing on the best course of action.

offer no support for their argument that the Health Care Ban "comes close to perfect" tailoring to the State's interest. (Defs. Br. at 94.)  This could not be further from the truth.  If the Health Care Ban takes effect, all transgender adolescents with gender dysphoria in Arkansas will be categorically prohibited from receiving gender-affirming care, irrespective of the individual patients' circumstances and regardless of whether it is medically indicated, medically necessary, or in that patient's best interest.  Moreover, adolescents who are currently receiving such care will be immediately required to stop treatments, with no regard as to their safety or well-being.  Such a tactic—which ignores an individualized approach to care and the best interests of the adolescent—not only belies Defendants' naked assertion that they have an interest in protecting minors, but also belies Defendants' assertion that the law is narrowly tailored.  And the Health Care Ban leaves untouched numerous forms of medical care that raise the same concerns proffered by Defendants and, in fact, expressly allows treatments that raise those same concerns when provided to intersex children to conform their bodies to their "biological sex."  ARK. CODE ANN. § 20-9-1501(6)(B).  This is not merely imperfect tailoring; it is a complete disconnect between the stated concerns and law.

In Governor Hutchinson's words, the Health Care Ban creates "new standards of legislative interference with physicians and parents as they deal with some of the

most complex and sensitive matters concerning our youths."[28]  (*See* Pls. Op. Br. at

9-10.)  Rather than the State making these choices, legally-competent parents should

be empowered to seek and follow these well-accepted medical treatments.  By

prohibiting them from doing so, thus exposing their children to unnecessary harm,

the Health Care Ban violates the Due Process Clause.

Plaintiffs are therefore likely to succeed on the merits of their due process

claim.

## IV.   Plaintiffs Are Likely to Succeed on the Merits of Their First Amendment Claim.

Defendants attempt to avoid the First Amendment's application to the law's

ban on referring individuals under the age of 18 for gender-affirming care (the

"Referral Prohibition") by ignoring the plain language of the Referral Prohibition,

binding case law cited in Plaintiffs' briefs, and Plaintiffs' arguments in Plaintiffs'

Opening Brief and in Plaintiffs opposition to Defendants' Motion to Dismiss (at 52-

57 and 38-45, respectively).

### A.   The Referral Prohibition Prohibits Speech.

Defendants argue that the Referral Prohibition is not subject to the First

Amendment because it "regulates conduct and not speech."  (Defs. Br. at 95.)  This

is a false distinction because the "conduct" that is prohibited *is speech*.  A referral is

---

[28]   "Governor Asa Hutchinson Holds Pen and Pad Session with Local Media," April 5, 2021, at 9:16, http://www.youtube.com/watch?v=9Jt7PxWkVbE.

the act of providing information to assist a patient in seeing another health care provider for care, and it therefore is speech within the meaning of the First Amendment.   *See Sorrell* v. *IMS Health Inc.*, 564 U.S. 552, 570 (2011) ("[D]issemination of information [is] speech within the meaning of the First Amendment.").

To support their argument that the Referral Prohibition does not regulate speech, Defendants turn to a discussion of "referrals" in the WPATH Guidelines. (Defs. Br. at 95.)  After reading that source, Defendants say "referring" means to "provide documentation—in the chart and/or referral letter—of the patient's personal treatment history, progress, and eligibility" for a requested procedure. (Defs. Br. at 95.)  But this still constitutes disseminating information, activity that the Supreme Court has found to fall within the core of the First Amendment's protections.  *See Sorrell*, 564 U.S. at 570 (finding the "sales, transfer, and use of prescriber-identifying information" to be speech); *Bartnicki* v. *Vopper*, 532 U.S. 514, 527 (2001) ("[I]f the act[] of 'disclosing' . . . information do[es] not constitute speech, it is hard to imagine what does fall within that category.") (citation omitted).[29]  Indeed, the very next sentence of the WPATH Guidelines notes that

---

[29]   Plaintiffs cited *Sorrell* and *Bartnicki* in their Opposition to Defendants' Motion to Dismiss (at 40), but Defendants have not attempted to distinguish these binding precedents that establish that the Referral Prohibition targets speech.

"[h]ealth professionals who recommend hormone therapy share the ethical and legal responsibility for that decision with the physician who provides the service," demonstrating that a referral constitutes more than just a ministerial transfer of documents.  (ECF No. 45-19 at 26.)  *See Bartnicki*, 532 U.S. at 514 ("It is true that the delivery of a tape recording might be regarded as conduct, but given that the purpose of such a delivery is to provide the recipient with the text of recorded statements, it is . . . 'speech' that the First Amendment protects . . . .").

### B.   The Referral Prohibition Does Not Fall Within An Exception to Regulations of Speech.

Defendants next argue that the Referral Prohibition is valid because even if it prohibits speech, states are permitted to regulate such professional speech so long as the practice sought to be regulated is "tied to a procedure."  (Defs. Br. at 96 (citing *Nat'l Inst. of Fam. & Life Advocs.* ("*NIFLA*") v. *Becerra*, 138 S. Ct. 2361, 2373, (2018).)

This argument misreads *NIFLA*'s clear holding.  *NIFLA* holds that speech is only afforded less protection "in two circumstances—neither of which turn[] on the fact that professionals [are] speaking":  (1) when laws "require professionals to disclose factual, noncontroversial information in their 'commercial speech'"; and (2) when the state regulates "conduct that incidentally involves speech." *NIFLA,* 138 S. Ct. at 2372.  *NIFLA* simply does not hold that states are permitted to infringe the First Amendment when the speech in question is "tied to a procedure."  In *NIFLA*,

the Court only discussed whether the speech at issue in the case was "tied to a procedure" in differentiating the regulation considered from informed consent requirements, which fall within the first exception outlined in *NIFLA*: "The notice does not facilitate informed consent to a medical procedure. In fact, it is not tied to a procedure at all." 138 S. Ct. at 2373.

Further, the Referral Prohibition does not fall within either of the two exceptions outlined in *NIFLA*. Defendants claim that it falls within the first exception—that it requires disclosure of factual, noncontroversial information— because it requires that "Practitioners in Arkansas must simply disclose that state law prohibits them from sending a child to another practitioner—presumably outside of Arkansas—to undergo a gender-transition procedure." (Defs. Br. at 96.) But the Health Care Ban does not require doctors to disclose anything, and the Referral Prohibition cannot be upheld on this basis. Nor does the Referral Prohibition regulate "conduct that incidentally involves speech"—it regulates speech itself. *See Sorrell*, 564 U.S. at 567 (explaining that incidental burdens include regulations such as "a ban on race-based hiring [that] require[s] employers to remove 'White Applicants Only' signs" or "an ordinance against outdoor fires [that] forbid[s] burning a flag") (internal quotations and citations omitted).

Defendants also argue that Plaintiffs have "misunderstood the relevance of *Rust* v. *Sullivan*, 500 U.S. 173 (1991)." (Defs. Br. at 97.) But *Rust* simply does not

hold, as Defendants suggest, that a law may forbid speech so long as a plaintiff is able to practice other procedures.  As explained further in Plaintiffs' Opposition to Defendants' Motion to Dismiss, *Rust* did not concern whether the government could prohibit certain speech, but whether it could fund only certain speech.  (Opp. to Mot. to Dismiss at 43.)  *See also Planned Parenthood of Mid-Missouri & E. Kansas, Inc.* v. *Dempsey*, 167 F.3d 458, 461 (8th Cir. 1999) (explaining that *Rust* is about government funding of projects); *Conant* v. *Walters*, 309 F.3d 629, 638 (9th Cir. 2002) (*Rust* "did not uphold restrictions on speech itself.  *Rust* upheld restrictions on federal funding for certain types of activity, including abortion counseling, referral, or advocacy").  Moreover, the Court in *Rust* found that the doctors could still engage in the same speech outside the context of the program.  500 U.S. at 176.  Under the Referral Prohibition, there is no similar outlet for the doctors.

### C.   The Referral Prohibition Fails Strict Scrutiny.

As explained in Plaintiffs' Opening Brief, because the Referral Prohibition is a content-based regulation of speech, it is "presumptively unconstitutional" and is subject to strict scrutiny.  *Reed* v. *Town of Gilbert*, 576 U.S. 155, 163 (2015).  Defendants argue that the Referral Prohibition survives strict scrutiny for the same reasons that the Health Care Ban's prohibition of gender-affirming care for minors survives intermediate scrutiny.  (Defs. Br. at 97.)  For the reasons discussed above, these arguments fail, and they fail for two additional reasons.

*First*, Defendants assert that Arkansas's compelling interest here is to "protect[] children from experimental gender-transition procedures and safeguarding medical ethics." (Defs. Br. at 98.) But the Referral Prohibition purports to achieve this interest by limiting the information that is available to patients and their parents. As explained in Plaintiffs' Opening Brief, the Supreme Court has already held that the government does not have a legitimate interest in protecting against the "fear that people [will] make bad decisions if given truthful information," in this instance that gender-affirming care is available elsewhere. *See Thompson* v. *W. States Med. Ctr.*, 535 U.S. 357, 374; *see also Brown* v. *Ent. Merchants Ass'n*, 564 U.S. 786, 794 (2011) (while states can protect children from harm, that "does not include a free-floating power to restrict the ideas to which children may be exposed").

*Second*, Defendants also cannot show, as they are required, that the Referral Prohibition "could be replaced by no other regulation that could advance the interest as well with less infringement of speech" and is the least restrictive alternative. *See 281 Care Comm.* v. *Arneson*, 766 F.3d 774, 787 (8th Cir. 2014). Defendants argue that if Arkansas allowed doctors to refer patients for gender-affirming care, the Health Care Ban's "protections for children would be much less effective." (Defs' Br. at 98.) But, the First Amendment requires that speech restrictions be a "last—not first—resort." *Thompson*, 535 U.S. 373. Defendants do not explain why less

restrictive alternatives are unavailable.  *See*, *e.g.*, *NIFLA*, 138 S. Ct. at 2376 (finding

that, as a less-restrictive alternative to the notice requirement at issue in the case, the

State "could inform the women itself" of their rights and health care options "with a

public-information campaign").

Plaintiffs are therefore likely to succeed on the merits of their First

Amendment claims.

### V.    Plaintiffs Will Suffer Irreparable Harm If the Act Takes Effect.

If the Health Care Ban is allowed to take effect, Plaintiffs will suffer serious

and irreparable harm for which there is no adequate remedy at law.  *See Gen. Motors*

*Corp.* v. *Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009).  The Health Care

Ban denies all transgender minors access to life-saving medical care, prevents

parents from seeking out potentially life-saving health care for their children, and

threatens the medical licenses of doctors who treat their patients according to

accepted medical standards or refer their patients to other doctors for care prohibited

by the law.

The harm of untreated gender dysphoria is severe.  (Adkins Decl. ¶ 31.)  But

Defendants claim there is "no evidence" that denying gender-affirming care will

cause irreparable harm to young transgender Arkansans, and say that Plaintiffs have

cited "no authority" for the fact that the Health Care Ban will cause harm, or that

gender-affirming care relieves the distress caused by gender dysphoria.  (Defs. Br. at 99-100.)

These claims by Defendants are meritless.  They ignore the established consensus of medical associations in the United States on these issues.  They ignore the facts discussed by Plaintiffs' experts, including those discussed at length in Plaintiffs' Opening Brief.  They ignore the clinical experience of Dr. Adkins, Dr. Hutchison, and Dr. Stambough.  (Adkins Decl. ¶¶ 23, 51-55; Hutchison Decl. ¶¶ 13-16; Stambough Decl. ¶¶ 11-13.)  They ignore declarations from the minor and parent Plaintiffs specifying the benefits they have received from their care and the concrete and imminent harms each will face if the Health Care Ban goes into effect, causing all of them to consider leaving Arkansas and their extended families and communities in order to access medical care for their children if the law takes effect. (*See* Dylan Brandt Decl. ¶ 18 (ECF No. 11-1); Sabrina Jennen Decl. (ECF No. 11-3) ¶¶ 10-11; Parker Saxton Decl. (ECF No. 11-7) ¶¶ 10-15; Joanna Brandt Decl. (ECF No. 11-2) ¶¶ 17-18; Aaron and Lacey Jennen Decl. (ECF No. 11-4) ¶¶ 5-6, 12; Donnie Saxton Decl. (ECF No. 11-8) ¶¶ 12-14, 16.)  And perhaps most troublingly, they ignore the fact that, since the legislature began discussing banning gender-affirming care, at least seven transgender youth in Arkansas have been hospitalized for an attempted suicide—a stark increase from before the Health Care Ban was first presented—and the fact that Dr. Hutchison has received distressing calls from

parents whose children have been expressing suicidal thoughts directly related to the prospect of losing their gender-affirming care.  (Hutchison Decl. ¶ 13.)

Considering all of the psychological and potential physical harm in addition to the harm to Plaintiffs' constitutional rights under the First and Fourteenth Amendments, it is undeniable that allowing this law to go into effect will cause real and lasting harm to Plaintiffs and to many young transgender people and their families throughout Arkansas.  In light of the severe and irreparable harms the Plaintiffs face under the Health Care Ban, a preliminary injunction is necessary.

### VI.   The Balance of Equities Tips in Plaintiffs' Favor, and an Injunction Serves the Public Interest.

The threat of harm to Plaintiffs far outweighs Defendants' interests in immediately enforcing the Health Care Ban, and preserving Plaintiffs' constitutional rights is in the public interest.  A preliminary injunction is warranted where, as here, the balance of equities decidedly favors the moving party, in which case the court should preserve the status quo until the case can be decided on the merits.  *Dataphase Sys., Inc.* v. *C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981); *see also Nken* v. *Holder*, 556 U.S. 418, 435 (2009) (noting that when suit is brought against the government, the balance-of-equities and public-interest factors are synonymous).

In their brief, Defendants insinuate that granting a preliminary injunction would somehow disrupt the status quo, recasting the Health Care Ban's looming prohibition of gender-affirming care as the maintenance of the parties' pre-suit

posture.  (*See* Defs. Br. at 99-102.)  This recharacterization is not only illogical, it also disregards the law's denial of care that several of the minor Plaintiffs (and numerous other Arkansans) have already been receiving for months or years and ignores the long-standing availability in Arkansas of the exact same care that the State only now attempts to ban.  A change from allowing such medically necessary care to prohibiting it does not maintain the status quo; it upends it.  A preliminary injunction is necessary to maintain the current posture and prevent irreparable harm during the pendency of this case.

Even setting aside that a preliminary injunction would work only to preserve the status quo, Defendants have presented no evidence, nor did legislators ever point to a single example, of a young person in Arkansas being harmed by the lack of a ban on gender-affirming care for transgender youth.  As described above, the harm to Plaintiffs from allowing the Health Care Ban to go into effect would be tangible, immediate, and irreparable.  Whatever interest the State may have in enforcing the Health Care Ban during the pendency of this case pales in comparison to the certain and severe harm faced by Plaintiffs.   And despite Defendants' unsupported assertions to the contrary, the "State has no interest in enforcing laws that are unconstitutional," meaning that "an injunction preventing the State from enforcing [the challenged statute] does not irreparably harm the state." *Little Rock Family Planning Servs.* v. *Rutledge*, 397 F. Supp. 3d 1213, 1322 (E.D. Ark. 2019).

Because Plaintiffs are likely to succeed in demonstrating that the Health Care Ban is unconstitutional, a preliminary injunction would best serve the public interest. *D.M. ex rel. Bao Xiong* v. *Minn. State High Sch. League*, 917 F.3d 994, 1004 (8th Cir. 2019) ("The public is served by the preservation of constitutional rights.") (citations omitted). The balance of equities favors injunctive relief to preserve the status quo until a final decision in this case.

## VII.   A Facial Injunction Is Required to Effectively Protect Plaintiffs from Harm.

Despite stating the correct standard to justify a facial injunction—that there is "no set of circumstances exists under which the Act would be valid," Defendants ask the Court to misapply that standard, arguing that it requires Plaintiffs to provide evidence that every transgender young person seeking gender-affirming care in Arkansas would be harmed by the Health Care Ban. (Defs. Br. at 103, citing *United States* v. *Salerno*, 481 U.S. 739, 745 (1987).) Here, there is "no set of circumstances" in which the Health Care Ban's prohibition of gender-affirming care "would be valid" because any application of the law would violate the Equal Protection rights of the affected transgender minor, their parent's fundamental right to parental autonomy, and their doctor's First Amendment rights.

Defendants are not arguing that the Health Care Ban is valid in any particular circumstance, but instead argue that Plaintiffs have failed to present evidence showing that all children who seek gender-affirming care would be irreparably

harmed by the Health Care Ban. This too is incorrect: Plaintiffs have presented expert evidence showing that the Health Care Ban facially prohibits the provision of gender-affirming care to all transgender minors in Arkansas, in turn causing irreparable harm in every such case in which such care is needed, and so a facial injunction is the only appropriate relief. (*See supra*, Section V (discussing irreparable harms).)

Undeterred, Defendants suggest that because the precise treatment offered might vary from person to person, the injunction standard requires a declaration from every single transgender Arkansan under 18 who might seek gender-affirming care. (Defs. Op. Br. at 103.) Such a requirement would create insurmountable hurdles to anyone seeking to enjoin a statute. The Supreme Court has repeatedly held that the scope of relief is determined by the scope of the violation. *See*, *e.g.*, *Milliken* v. *Bradley*, 418 U.S. 717, 744 (1974). In this case, the constitutional violation and the harm it causes extends to every transgender Arkansan under 18 who seeks gender-affirming care, since that care would be prohibited in every such case along the same unconstitutional grounds.[30]

---

[30]     Defendants also argue that it would be an abuse of discretion to enjoin enforcement of the Health Care Ban's prohibition of gender-reassignment surgery and private right of action. But, as discussed above (*supra* Sections I.A. and I.B.), Plaintiffs' claims properly challenge those provisions because gender-reassignment surgery is included under the Health Care Ban's

## CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that the Court grant their Motion for a Preliminary Injunction and deny Defendants' Motion to Dismiss.

Dated:  July 16, 2021

Respectfully submitted,

*/s/ Leslie Cooper*
Leslie Cooper
Chase Strangio*
American Civil Liberties Union
Foundation
125 Broad St.
New York, NY 10004
Telephone:  (917) 345-1742
lcooper@aclu.org
cstrangio@aclu.org
*Attorneys for the Plaintiffs*

Beth Echols, Ark. Bar No. 2002203
Christopher Travis, Ark. Bar No. 97093
Drake Mann, Ark. Bar No. 87108
Gill Ragon Owen, P.A.
425 W. Capitol Avenue, Suite 3800
Little Rock, AR 72201
Telephone:  (501) 376-3800
echols@gill-law.com
travis@gill-law.com
mann@gill-law.com
*On behalf of the Arkansas Civil Liberties*
*Union Foundation, Inc.*
*Attorneys for the Plaintiffs*

Breean Walas, Ark. Bar No. 2006077
Walas Law Firm, PLLC
P.O. Box 4591
Bozeman, MT 59772
Telephone:  (501) 246-1067
breean@walaslawfirm.com
*On behalf of the Arkansas Civil*
*Liberties Union Foundation, Inc.*

Sarah Everett, Ark. Bar No. 2017249
Arkansas Civil Liberties Union
Foundation, Inc.
904 W. 2nd Street
Little Rock, AR 72201
Telephone:  (501) 374-2842
sarah@acluarkansas.org
*Attorneys for the Plaintiffs*

---

unconstitutional prohibition of "gender transition procedures" and because the Health Care Ban includes both public and private enforcement provisions.

*Attorneys for the Plaintiffs*

Garrard R. Beeney*
Jonathan J. Ossip*
Alexander S. Holland*
Sullivan & Cromwell LLP
125 Broad Street
New York, NY 10004
Telephone:  (212) 558-4000
beeneyg@sullcrom.com
ossipj@sullcrom.com
hollanda@sullcrom.com
*Attorneys for the Plaintiffs*

Laura Kabler Oswell*
Duncan C. Simpson LaGoy*
Sullivan & Cromwell LLP
1870 Embarcadero Road
Palo Alto, CA 94303
Telephone:  (650) 461-5600
oswell@sullcrom.com
simpsond@sullcrom.com
*Attorneys for the Plaintiffs*

*Admitted pro hac vice