IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

DYLAN BRANDT, et al.,

                                                                                      PLAINTIFFS,

v.                      No. 4:21-CV-00450-JM

LESLIE RUTLEDGE, et al.,

                                                                                       DEFENDANTS.

SUPPLEMENTAL DECLARATION OF DR. MARK REGNERUS

Pursuant to 28 U.S.C. 1746, I declare:

       1.       My credentials, research, and professional qualification are detailed in my declaration in this matter dated July 7, 2021. Here, as there, my opinions are based upon my knowledge and research in the matters discussed. The materials I have used to research and write this report are the standard sources used by other experts in my field. I have actual knowledge of the matters stated in this declaration. This declaration does not exhaust my opinions.

      2.       I have reviewed the newly submitted supplemental declarations by Dr. Deanna Adkins (dated July 15, 2021) and Dr. Armand Antommaria (dated July 15, 2021), as well as the declaration submitted by the plaintiffs' new witness, Dr. Jack Turban (dated July 16, 2021). As I detail below, these new declarations contain numerous errors and mistakes.

      3.       As stated in my original report, I make no claims about the most prudent course of treatment for any particular patient. Rather, my assessment concerns the unscientific process by which "affirmative" treatment of transgender-identifying adolescents has come to be the default position advocated by various professionals and organizations. Dr. Turban makes a variety of criticisms of my report, but very few of them touch upon the primary concerns in my original report.

EXHIBIT
31

4. Dr. Turban accuses me (and other state's experts, as well as the Swedish and Finnish reports' authors) of misrepresenting and omitting "key research" on a variety of outcomes here, listing eight studies about pubertal suppression and six on gender-affirming hormonal treatment. My intention from the outset was not to offer a comprehensive literature review of the entire field of research in transgender science—especially but not exclusively that which focused on minors. That is a task unsuited to this document. Rather, one of the central purposes of my report was to describe how any supposition that there is a legitimate scientific consensus about treatment for adolescents is unmerited, and why. The research I cited and discussed is compelling evidence favoring a proper interpretation of this field as "in development" rather than as "settled science."

5. Dr. Turban offers the unsubstantiated claim that "[a]ll existing published data…points to the fact that gender-affirming medical interventions improve mental health for transgender adolescents." Such a categorical claim is simply untrue, as my original report already documented.

6. As an example of this erroneous categorical claim, Dr. Turban immediately highlights on the very same page an example of how "research has shown that sexual functioning (along with romantic development) improves" after gender-affirming medical interventions on adolescents.[1] The study he cites, however, reveals no such thing. "Improvement" cannot even be measured here, since the study was a cross-sectional one, not longitudinal. The study, rather, asked transgender youth a series of questions about sexual and romantic experiences and satisfaction (at a mean age of 14, no less). The results revealed that, in comparison to the general

---

[1] Bungener, S. L., Steensma, T. D., Cohen-Kettenis, P. T., & De Vries, A. L. (2017). Sexual and romantic experiences of transgender youth before gender-affirmative treatment. *Pediatrics*, *139*(3) e20162283. https://doi.org/10.1542/peds.2016-2283

population, transgender youth displayed less sexual and romantic experience.  It is an odd study to reference in support of his (ironic) claim about state's experts' purported mischaracterizations.

7. Dr. Turban's attempt at explaining both the surge in gender dysphoria and the reversal in the sex ratio of presenting patients is weak and speculative, demonstrating my original claim that some researchers and clinicians are indeed uninterested in understanding a pair of important social developments that may shape how practitioners and their professional societies approach treatments.  His disregard for Professor Littman's inquiry about the social cues of adolescent-onset gender dysphoria is obvious: her work is dismissed because "the scientific current understanding…does not focus on 'social contagion.'"  Perhaps the problem is less with Littman than with purveyors of a "science" that is more interested in safeguarding particular answers than it is with asking questions.

8. A similar cavalier manner characterizes how Dr. Turban brushes off three European judicial and medical decision-making bodies, as if admitting any weakness undergirding the "consensus" of American professional societies is fatal.  Instead, he simply claims that these too are "outlier views" not supported by the list of organizations that, as I demonstrated in the original report, themselves do not agree on definitions, terms, and even their own historical shift in understanding (e.g., minors' ability to consent).  There's no trust in science here—only in patron professional associations and their client scholars.

9. My primary point in discussing Professor Littman's study is to highlight how rare it is for social and medical scientists today to be exploring the surge in adolescent gender dysphoria cases.  Simply because Littman's is an opt-in sample is no cause for implying it is without value.  Moreover, the "correction" of which Dr. Turban speaks (on page 31) is hardly of

the sort to compare with the correction the Bränström and Pachankis study yielded.[2]  Whereas the latter study's primary narrative—that "affirmative" surgeries contributed to patient's subsequent mental health—evaporated, Littman's correction merely concerned the language she used and did not change the results of her study.

10.     It is nevertheless ironic for Dr. Turban to criticize Littman's use of an opt-in, recruited "anonymous online survey," when he has published extensively—including citations in his own report—from the 2015 United States Transgender Study.  The USTS recruited networked, self-identified transgender or nonbinary participants by advertising their survey among "active transgender, LGBTQ, and allied organizations."[3]  Now, there's nothing inherently wrong with collecting data using a nonrandom approach like this, and it is common in this domain.[4]  The problem, in this case, is when the conclusions based on such data are delivered to the reader in a way that suggests they are consonant with everyone who has identified as transgender or experienced gender identity disorder or dysphoria.  Hence, to impugn Littman's strategy is to impugn Dr. Turban's own extensive use of the same method of collecting data from "some anonymous people recruited from the Internet…" (page 32).[5]

---

[2] Bränström, R., & Pachankis, J. E. (2020). Reduction in mental health treatment utilization among transgender individuals after gender-affirming surgeries: a total population study. *American journal of psychiatry*, *177*(8), 727-734. https://doi.org/10.1176/appi.ajp.2019.19010080

[3] James, S. E., Herman, J. L., Rankin, S., Keisling, M., Mottet, L., & Anafi, M. (2016). The Report of the 2015 U.S. Transgender Survey. Washington, DC: National Center for Transgender Equality.

[4] Littman, L. (2020). The use of methodologies in Littman (2018) is consistent with the use of methodologies in other studies contributing to the field of gender dysphoria research: Response to Restar (2019). *Archives of sexual behavior*, *49*(1), 67-77. https://doi.org/10.1007/s10508-020-01631-z

[5] See, for example: Turban, J. L., King, D., Li, J. J., & Keuroghlian, A. S. (2021). Timing of social transition for transgender and gender diverse youth, K-12 harassment, and adult mental health outcomes. *Journal of adolescent health*. https://doi.org/10.1016/j.jadohealth.2021.06.001; Turban, J. L., Loo, S. S., Almazan, A. N., & Keuroghlian, A. S. (2021). Factors leading to "detransition" among transgender and gender diverse people in the United States: A mixed-methods analysis. *LGBT health*, *8*(4), 273-280. https://doi.org/10.1089/lgbt.2020.0437; Turban, J. L., King, D., Carswell, J. M., & Keuroghlian, A. S. (2020). Pubertal suppression for transgender youth and risk of suicidal ideation. *Pediatrics*, *145*(2), e20191725. https://doi.org/10.1542/peds.2019-1725; Turban, J. L., Beckwith, N., Reisner, S. L., & Keuroghlian, A. S. (2020). Association between recalled exposure to gender identity conversion efforts and psychological distress and suicide attempts among transgender adults. *JAMA Psychiatry*, *77*(1), 68-76. doi:10.1001/jamapsychiatry.2019.2285; Turban, J. L., King, D., Reisner, S. L., &

11. That Dr. Turban should commend the Almazan and Keuroghlian study (on page 25) is another irony, since it too is based on the USTS. Talk of a "control group" in medical research connotes a clinical trial, randomization, and/or some sort of multi-wave analysis in order to establish an obvious time order to events. The USTS, however, offers none of these values.

12. Moreover, the USTS creates the impression that the data collection effort was a population-based random sample, like the US Census. It is not. Indeed, the USTS yields information about the transgender population that is decidedly different from that which can be learned from the 2014 CDC's Behavioral Risk Factor Surveillance System (BRFSS) data, the product of a probability sample from 19 states (and Guam).[6] When the two are compared, stark differences are revealed, further suggesting that the empirical "truth" about the transgender population is simply difficult to discern—a fact of life in this domain of research. For example:

   a. Unemployment: 15% in the USTS vs. 8% in the BRFSS

   b. Sexual orientation: 47% of male-to-female identify as LGB in the USTS vs. 15% in the BRFSS; 24% of female-to-male identify as LGB in the USTS vs. 10% in the BRFSS

   c. Currently married: 18% in the USTS vs. 50% in the BRFSS

   d. Child in the household under 18: 14% in the USTS vs. 32% in the BRFSS

   e. General health rated as fair or poor: 22% in the USTS vs. 26% in the BRFSS

---

Keuroghlian, A. S. (2019). Psychological attempts to change a person's gender identity from transgender to cisgender: Estimated prevalence across US States, 2015. *American journal of public health*, *109*(10), 1452-1454. https://doi.org/10.2105/AJPH.2019.305237

[6] Meyer, I. H., Brown, T. N., Herman, J. L., Reisner, S. L., & Bockting, W. O. (2017). Demographic characteristics and health status of transgender adults in select US regions: Behavioral Risk Factor Surveillance System, 2014. *American journal of public health*, *107*(4), 582-589. https://doi.org/10.2105/AJPH.2016.303648

5

13. On page 7 of his report, Dr. Turban favorably cites a study published in a 2015 issue of *Psychoendocrinology* that measured Child Behavior Checklist scores based on parental self-report. Thus, Dr. Turban, who criticizes (on page 32) Littman's reliance on a parental questionnaire, has no trouble with parental self-reports as a measurement technique so long as they support his position.

14. There are two conclusions to draw from this comparison of the USTS and BRFSS samples. First, opt-in samples like the USTS are for understanding processes and possibilities, not populations (as in the BRFSS). Second, Littman's use of an opt-in sample was hardly inappropriate. She sought to understand a process (that of rapid-onset gender dysphoria, or as others call it, late-onset or adolescent-onset gender dysphoria), one that curiously few scholars seem interested in understanding.

15. Dr. Turban seems far less curious about understanding surging gender dysphoria and the reversal in sex ratio than one would expect a purported expert about transgender identity to be. This matters. Professor Littman's exploratory research was lambasted because it introduced the possibility that transgender identity is—at an unknown rate—not innate but developmentally responsive to social cues for an unknown but significant number of cases. If she's right, it means greater attention to the diverse origins of gender dysphoria is in order, with possible ramifications for treatment options. This is not, however, in accord with claims of those advocating for "affirmative" treatment. Hence, her research is disparaged. This isn't how science is supposed to work.

16. While Dr. Turban is correct to note that the Bränström and Pachankis study concerns adults rather than minors, my discussion of it is intended to highlight the unsettledness of the science here, and to suggest that the line between activists and academics is a rather thin

one, provoking contests over the meaning of a study's results. Given that it is arguably the largest longitudinal dataset capable of tracking the long-term effects of hormones and surgery, its lack of findings (following the editor's requested correction) has ramifications for the treatment of adult and adolescent patients alike.

17. Dr. Turban's own attempt (beginning on page 33) to explain the surge in gender dysphoria and self-identified transgender cases is odd and under-documented, suggesting that he too—like most researchers in this domain—gives this important matter little thought. He claims that the "increase in referrals" is due to several causes.

18. Among these, Dr. Turban suggests that "parents in the past may have had limited literacy regarding gender diversity," something that has been ameliorated today. In other words, the level of true transgender identity may well have been stable in the past, but parents neither had the language nor the interest in aiding their children to live as their authentic selves, except perhaps in "extreme types" of gender dysphoria. Today, "owing to media attention and the internet, it is easier to access information…making the threshold lower to search for help" (page 34). But at the same time Dr. Turban maintains that Professor Littman's interest in understanding the role of "social" forces and "transgender-related content" on the internet in adolescent-onset gender dysphoria "is a fringe view not supported by evidence" (page 32). This is an obvious double standard.

19. Additionally, Dr. Turban seems to suggest that the rate of transgender "middle-aged adults" (about which I surmised in my report) would be comparable to that of adolescents today were it not for "decades of stigma" and "internalized transphobia," factors that "make it less likely for middle-aged transgender adults to come out, despite an increase in social acceptance" (page 34). This is pure speculation at best.

20.     Finally, Dr. Turban attempts to explain why clinics are "seeing more birth-assigned females than males in recent years"—which is a rather mild way of describing what is not a mere uptick but a radical reversal and surge, as I previously described. Dr. Turban begins with the observation that "tomboys" were much more likely to be "accepted in society, whereas feminine boys are ridiculed." Perhaps so. But then he speculates that this phenomenon "likely led to more transgender males being satisfied with pushing gender expression toward more male without seeking support from a gender clinic…" In asserting this, Dr. Turban categorically and anachronistically redefines tomboys as transgender males who simply had no access to a gender clinic. Where are they today? Still hidden, having suppressed their true identity? This explanation beggars belief. Perhaps instead, yesterday's tomboys are largely content to have avoided medical dependency, living without health implications or impairments from lifelong treatments that were, at the time, unavailable. Their gender non-conformity fostered their own resilience.

21.     Dr. Turban claims that "sex ratios that favor birth-assigned females" among the population of transgender patients is not unprecedented. While I can appreciate the subsequent international citations and consideration of international data, the sample sizes are simply too small (24 total cases of "female-to-male transsexuals" who "came from different parts of Poland" over four years in the study Dr. Turban cites[7]) to suggest anything about the sex ratio of transgender Poles in the 1970s. The rate of the much larger number seeking "sexologic" treatment from which this small pool is drawn, however, revealed the standard male-dominated pattern.

---

[7] Godlewski, J. (1988). Transsexualism and anatomic sex ratio reversal in Poland. *Archives of sexual behavior*, *17*(6), 547-548.

22. On page 36, Dr. Turban contests my claim that "there is no defined psychotherapeutic method for treating gender dysphoria that can be widely characterized and consistently identified as 'conversion therapy' in order to be banned." He misrepresents my claim. I did not state that there are no definitions. Rather, I assert that there are no "widely" and "consistently" agreed-upon definitions, like there is with the vast majority of clinical conditions, practices, and treatments. Only his reference to American Academy of Child and Adolescent Psychiatry (AACAP) offers a definition for conversion therapy. The subsequent citations each refer to conversion therapy but do not define it.

23. Following the AACAP's policy on conversion therapy, Dr. Turban employs a "frame alignment"[8] move to suggest efforts at conversion therapy for same-sex attraction and gender expression are equivalent, since both—he claims—specifically "aim to promote heterosexuality" (page 36). That is, he links interpretive orientations between two distinctive movements—the one to suppress gay conversion therapy and the one, noted above, on gender identity "conversion" efforts—in the hopes that overlapping interests, values, beliefs, and goals are complementary. But I am not talking about heterosexuality. I concur with another critic who has observed, "Studies of conversion therapy have been limited to *sexual orientation*, and, moreover, to the sexual orientation of *adults*, not to gender identity and not of children in any case."[9] Here again is evidence that a central framework for understanding the treatment of adolescent transgender patients is not that of mental and physical flourishing, but rather has become that of securing bodily autonomy and choice, as I explained in my original report.

---

[8] Snow, D. A., Rochford Jr., E. B., Worden, S. K., & Benford, R. D. (1986). Frame alignment processes, micromobilization, and movement participation. *American sociological review*, 464-481.

[9] Cantor, J. M. (2020). Transgender and gender diverse children and adolescents: Fact-checking of AAP policy. *Journal of sex & marital therapy 46*(4): 307-313. The quote is from page 308.

24. In published studies, Dr. Turban leans on the USTS's "definition" of conversion therapy, which—when posed to survey participants—was stated as follows: "Did any professional (such as a psychologist, counselor, or religious advisor) try to make you identify only with your sex assigned at birth (in other words, try to stop you being trans)?" Given the hundreds of questions and items the USTS posed to its respondents six years ago, the fact that it lumps any scenario that does not involve unqualified affirmation (including "watchful waiting") into one imprecise, binary measure is psychometrically irresponsible. In other words, it is foisting on people a one-size-fits-all definition. What one can learn from a poor-quality question posed to an opt-in sample of respondents motivated—even recruited—to participate is limited by definition. That such studies seem easily publishable today highlights the extent to which certain medical journals—officially sponsored by the same associations that have claimed a stake in the outcome here—have been "ideologically captured," a theme about which I wrote extensively in my original report. They seem uninterested in holding transgender research to standards comparable to other divisions of medicine.

25. Beginning on page 41, Dr. Turban makes much of the fact that the reports from the U.K., Sweden, and Finland "were not peer-reviewed" on his way to suggesting that each report "omits key studies," and/or were "poorly researched," before asserting that he would not recommend relying on their conclusions. Meanwhile, the NICE (UK) reports concluded that claims of benefit for medical gender interventions in children are based on "low quality evidence."[10] The same claim characterizes the Swedish report: "No studies explaining the increase of children and adolescents seeking [treatment] for gender dysphoria were identified….

---

[10] Society for Evidence Based Gender Medicine. (2021, May 5). Sweden's Karolinska ends all use of puberty blockers and cross-sex hormones for minors outside of clinical studies. https://segm.org/Sweden_ends_use_of_Dutch_protocol

10

All identified studies are observational, and few are controlled or followed-up over time."[11]  Dr. Turban laments how "the NICE report also erroneously excluded" his own 2020 USTS-based *Pediatrics* study.  But it is plausible—given the NICE reports' quality standards—that the decision to exclude his study was not erroneous or accidental, but quite intentional.

26.  One conclusion is increasingly obvious in this interminable dispute over which published studies to include and which to ignore.  We have rapidly reached a stage in the study of transgender medicine where the phrase "peer review" no longer guarantees quality analyses, apt measures, appropriate samples, thoughtful interpretations, and measured conclusions.

27.  Referring to the UK, Swedish, and Finnish reports, Dr. Turban concludes that, together with the other (state's) experts, I "have inflated the importance of these reports…" (page 45).  I see nothing to substantiate this.  Rather, my modest original intention is to highlight how, despite advocates' rhetoric, there is both individual and organizational dissent to any purported "consensus" about "affirmative" gender treatment for minors.

28.  My original assertion (in response to Dr. Antommaria's report) that there is "no obstacle to randomized trials *without* placebo groups to 'compare different types, dosages and methods of administration of active treatments'" is not, as Dr. Turban states, irrelevant.[12]  It is yet another piece of evidence demonstrating the many ways in which randomized clinical trials research can be conducted here—but are not.  Dr. Turban is correct that such a study "would not answer the question regarding the efficacy or effectiveness of the class of medications in

---

[11] Swedish Agency for Health Technology Assessment and Assessment of Social Services (SBU). (2019). Gender dysphoria in children and adolescents: An overview of the literature. *SBU*. Report No. 307: SBU 2019/427. https://www.sbu.se/en/publications/sbu-bereder/gender-dysphoria-in-children-and-adolescents-an-inventory-of-the-literature/

[12] Haupt, C., Henke, M., Kutschmar, A., Hauser, B., Baldinger, S., Saenz, S. R., & Schreiber, G. (2020). Antiandrogen or estradiol treatment or both during hormone therapy in transitioning transgender women. *Cochrane database of systematic reviews,* p. 10. https://doi.org/10.1002/14651858.CD013138.pub2

general," but the lack of even dosage studies with control groups highlights the near lawlessness that this field of medicine seems to operate with, and provides further evidence of the "ideological capture" that I have thoroughly documented.

29.     In his own response on this topic, Dr. Antommaria continues his appeal to clinical equipoise, adding a pitch for off-label drug use, which "may be well-supported by evidence" and "does not mean that the use is experimental, untested, or unsafe."[13]  In the abstract, that is true. But there's a significant gap between "may be" and "is" in particular circumstances.  Perhaps a test is in order.

30.     In the end, the field of transgender medicine—especially but hardly exclusively that branch that concerns adolescents—has gotten away with research conduct seldom tolerated in other branches of medicine.  The field lacks randomized clinical trials, courtesy of a persistent appeal to clinical equipoise—which seems based more on popular demand than good judgment—and the wide use of off-label drugs.  It is as if social media has functioned for this industry similar to the way that television advertising has functioned for pharmaceutical companies—by appealing to viewers to ask their doctors for what they want.  If (1) the long-term physical and mental health results from "affirmative" treatments were demonstrably better— based on sensible methods and samples—or (2) the risks and invasiveness (and irreversibility of some) of the treatments were in turn modest, I would not be writing this response or the original report.

31.     Dr. Turban signals little caution about the process of "affirmative" transitioning, and seems to disregard the losses incurred when patients regret walking through doorways that advocates enthusiastically open for them.  He claims, "Although gender affirming hormones can

---

[13] Antommaria, A. H. M. (2021), p. 4.

cause some irreversible changes, such as body fat redistribution and vocal changes, these effects are primarily cosmetic."[14] Fat redistribution is hardly a more significant irreversible change than infertility. But for Dr. Turban, infertility seems largely irrelevant. He misrepresents a 2019 study, claiming that "fertility was similar between transgender men who had been on testosterone treatment and cisgender women."[15] In reality, the study is about comparing the pregnancy success rate of assisted reproductive technology—an expensive, demanding process with modest success rates—between self-identified transgender males (natal females) and a parallel group of women.[16] Given that over 98 percent of live births in the United States do not employ assisted reproductive technology[17] and involve no "fertility preservation" of the sort that WPATH recommends to counseled patients, the reference to "similar" fertility is apt to mislead.

32.     Supporters of "affirmative" treatment approaches tend to formally endorse the Dutch protocol. Yet at the same time, that protocol is far more rigorous and exclusive in its selection than the majority of patients who make up published American transgender research samples.[18] In the Dutch protocol, baseline health and high functioning are *required* for adolescent patients to proceed through treatment. Psychiatric co-morbidities and the absence of

---

[14] Turban, J. L., & Keuroghlian, A. S. (2018). Dynamic gender presentations: Understanding transition and "de-transition" among transgender youth. *Journal of the American academy of child & adolescent psychiatry, 57*(7), 451–453. https://doi.org/10.1016/j.jaac.2018.03.016.  The quote is from page 453.

[15] Turban, J. L. (2021), p. 12.

[16] Leung, A., Sakkas, D., Pang, S., Thornton, K. & Resetkova, N. (2019). Assisted reproductive technology outcomes in female-to-male transgender patients compared with cisgender patients: a new frontier in reproductive medicine. *Fertility and sterility 112*(5), 858-865.  The quote is from page 859.
 "To be included in this study, the patient had to identify as a transgender man and have completed an ovarian stimulation cycle for oocyte cryopreservation, embryo cryopreservation, or intended uterine transfer. Most couples who desired to conceive did so through reciprocal IVF, whereby the transgender patient provided the oocytes and their cisgender partner carried the pregnancy. The few transgender men who opted to carry the pregnancy themselves underwent several failed intrauterine insemination cycles before proceeding to IVF."

[17] Centers for Disease Control and Prevention. (2018). ART success rates. https://www.cdc.gov/art/artdata/index.html

[18] For a description of the protocol, see: Delemarre-van de Waal, H. A., Cohen-Kettenis, P. T. (2006). Clinical management of gender identity disorder in adolescents: A protocol on psychological and paediatric endocrinology aspects. *European journal of endocrinology*, *155*(suppl 1):S131–S137.

childhood gender dysphoria (i.e., adolescent-onset only) are grounds for exclusion from subsequent treatment.  This is inconsistent with the contemporary practice in American gender clinics, which offer "affirmative" gender treatment largely on-demand and with a much lower threshold for medical intervention.  Hence, when Dr. Turban appeals to the results of studies employing the Dutch protocol—including much of Dr. de Vries's work—to support this practice, this is sleight of hand, since the panoply of American medical professional organizations to which he, Dr. Adkins, and Dr. Antommaria continue to appeal now disregard the Dutch protocol's rigor.

33.     Drs. Adkins, Antommaria, and Turban are endorsing "affirmative" gender treatment based on research conclusions from a literature whose criteria for inclusion has long been quite different—more selective and rigorous—than it is today.  To say, as does Thomas Steensma of the Dutch Center of Expertise on Gender Dysphoria, that "more research is really necessary, and very much needed" is an understatement.[19]

34.     Finnish physicians confirm this: "During the past ten years the number of adolescents contacting gender identity services in order to seek for medical gender reassignment has increased across Western countries.  The reasons for this are not known."[20]  Moreover, researchers have noticed a difference in outcomes: "Those who did well in terms of psychiatric symptoms and functioning before cross-sex hormones mainly did well during real-life."  This is the Dutch protocol, now disregarded in favor of "affirmative" treatment for all.  How do adolescents fare when they are not screened?  "Those who had psychiatric treatment needs or

---

[19] Tetelepta, B. (2021, February 27). More research is urgently needed into transgender care for young people. Where does the large increase of children come from? *Voorzij*.https://www.voorzij.nl/more-research-is-urgently-needed-into-transgender-care-for-young-people-where-does-the-large-increase-of-children-come-from/

[20] Kaltiala-Heino, R., Sumia, M., Työläjärvi, M., & Lindberg, N. (2015). Two years of gender identity service for minors: overrepresentation of natal girls with severe problems in adolescent development. *Child and Adolescent Psychiatry and Mental Health*, *9*(1), 1-9.

problems in school, peer relationships and managing everyday matters outside of home continued to have problems…" Indeed, "[p]sychiatric comorbidities, particularly depression, anxiety disorders and autism spectrum disorders as well as suicidality and self-harming behaviors are common among adolescents seeking gender reassignment." Can "affirmative" treatment help them? We would have to suspend attention to any study conclusions employing the Dutch protocol in order to make this assessment. Steensma concludes with uncertainty: "We don't know whether studies we have done in the past can still be applied to this time."

35. As I concluded my original report, so here: Talk of a "consensus" among certain professionals in the field of transgender medicine is contrived and premature. The pace and extent of the ideological capture of professional organizations, researchers, and even patients demanding access to affirmative treatment is staggering. Protocols are in turn becoming more permissive, which leave practitioners in a position to only guess at what may result based on research conducted under quite different conditions. Given the state of disarray in the science, states have compelling reasons to protect their young people by requiring that they reach adulthood before submitting to experimental, life-altering gender transition treatments.

**I declare under penalty of perjury that the foregoing is true and correct.
Executed on July 19, 2021.**

_[signature]_

Dr. Mark Regnerus