```
 1            IN THE UNITED STATES DISTRICT COURT
                 EASTERN DISTRICT OF ARKANSAS
 2                    CENTRAL DIVISION

 3   DYLAN BRANDT, et al.,

 4                    Plaintiffs,

 5     v.                          No. 4:21CV00450 JM

 6                                 July 21, 2021
                                   Little Rock, Arkansas
 7                                 9:01 AM
     LESLIE RUTLEDGE, et al.,
 8
                      Defendants.
 9

10              TRANSCRIPT OF MOTION HEARING
        BEFORE THE HONORABLE JAMES M. MOODY, JR.,
11              UNITED STATES DISTRICT JUDGE
                  _____
12

13   APPEARANCES:

14   On Behalf of the Plaintiffs:

15       MR. CHASE STRANGIO, Attorney at Law
         MS. LESLIE COOPER, Attorney at Law
16         American Civil Liberties Union
           125 Broad Street, Suite 1800
17         New York, New York  10004-2400

18       MS. BREEAN WALAS, Attorney at Law
           Walas Law Firm, PLLC
19         Post Office Box 4591
           Bozeman, Montana  59772
20
         MR. DUNCAN SIMPSON LAGOY, Attorney at Law
21         Sullivan & Cromwell, LLP
           1870 Embarcadero Road
22         Palo Alto, California  94303

23

24

25   APPEARANCES CONTINUED ON NEXT PAGE:
```

```
1    APPEARANCES CONTINUED:

2    On Behalf of the Defendants:

3        MR. VINCENT WAGNER, Attorney at Law
         MR. MICHAEL CANTRELL, Attorney at Law
4        MR. NICHOLAS BRONNI, Attorney at Law
         MS. KA TINA GUEST, Attorney at Law
5        MS. EMILY YU, Attorney at Law
           Arkansas Attorney General's Office
6          323 Center Street, Suite 200
           Little Rock, Arkansas  72201

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24       Proceedings reported by machine stenography.  Transcript
     prepared utilizing computer-aided transcription.
25
```

1          (Proceedings commencing in open court at 9:01 AM.)

2          THE COURT:  I thank everybody for their patience.

3   We've, as expected, had some technical issues that we had to

4   work out.  We had to ramp up another courtroom to take care of

5   some overflow, but I hope we have all those issues worked out.

6   In any event, we're going to have to move forward.  For whoever

7   might be in the audience that's part of the press, I hope

8   you've made yourself familiar with our local rules and I'll

9   just leave it at that.

10          With regard to the lawyers in these proceedings,

11   especially with masks and whatnot, Karen may or may not be

12   familiar with who you are so I ask every time that you stand

13   up, you please identify yourself for the record and who you're

14   speaking for and that will help us greatly in attributing

15   comments to who said them.  Some may want to adopt other

16   comments or not, but that will allow us to keep our record

17   straight.  So are we ready to proceed and I'll get us rolling?

18          MS. WALAS:  Yes, Your Honor.

19          MR. WAGNER:  Yes, Your Honor.

20          THE COURT:  So we are on the record in Dylan Brandt,

21   et al. versus Amy Embry, et al. Case 4:21CV450.  We are here on

22   two motions before the Court.  The first motion is Plaintiffs'

23   motion for preliminary injunction, and the second is

24   Defendants' motion to dismiss under 12(b)(1) and 12(b)(6).  The

25   parties have graciously worked out how we're going to argue the

1  facts that are actually not the facts, but the legal arguments,

2  and the plaintiffs are going to go first and argue both the

3  motion for injunction and the motion to dismiss.  Defendants

4  will respond and then we'll have another round between the two.

5       I need to give you the benefit of what I have reviewed.

6  In brief, essentially everything.  I have reviewed the

7  plaintiffs' motion for a preliminary injunction and brief,

8  which is docket number 12; I've reviewed Defendants' motion to

9  dismiss in brief, which essentially is docket 18; the response

10  to the motion to dismiss, docket 33; Amicus brief from the

11  medical organizations, which is docket 30; statements of

12  interest to the United States, which is docket 19; other Amicus

13  briefs from business organizations which I have listed as 35-1;

14  the Act itself, which is Act 626; the response to the

15  preliminary injunction and reply to the motion to dismiss,

16  which is docket 44; Amicus briefs of the states which didn't

17  have a docket number in my notebook, but I think we're clear on

18  what that is; and then the reply in support of a preliminary

19  injunction, which is docket 51.

20       As to docket 11, which is the actual motion for a

21  preliminary injunction, there were 12 exhibits and I've

22  reviewed those.  Docket 30, the medical association Amicus

23  brief had two exhibits, I've reviewed those.  Docket 45, which

24  is Defendants' addendum to response to the preliminary

25  injunction had 29 exhibits, and I've reviewed all of those.  As

1   to docket 51, Plaintiffs' reply to the preliminary injunction,

2   there were three exhibits, and I've reviewed those.  And

3   perhaps finally, at least this is what I have listed, docket 55

4   is Defendants' addendum to the response to the preliminary

5   injunction, and there are four exhibits which I reviewed.

6         So I've read in pretty substantially on y'all's

7   situation.  I appreciate you agreeing to how this

8   presentation's going to set forth.  Are there any questions

9   from counsel about what I've reviewed or how we need to proceed

10  or are we ready to jump in?

11              MS. WALAS:  No, Your Honor.

12              THE COURT:  Then who will speak first for the

13  plaintiffs?

14              MS. WALAS:  Your Honor, Plaintiffs -- Chase Strangio

15  will be speaking on behalf of the plaintiffs.

16              THE COURT:  I only ask that you be next to a mic

17  whether you're standing or seated or whatever.  I just need

18  your mouth next to a mic.  And the mic at the ELMO works, the

19  mic at the podium works, and I have no preference, it's your

20  presentation and you do what suits you.  So with that, let's

21  get started.

22              MR. STRANGIO:  Good morning, Your Honor.  Chase

23  Strangio from the ACLU on behalf of the plaintiffs.  With me at

24  counsel table is Leslie Cooper also from the ACLU, Duncan

25  Simpson LaGoy from Sullivan & Cromwell, Breean Walas, and then

1    with us also in the courtroom today are all of our clients who

2    are seated behind counsel's table.  Thank you for the

3    opportunity to argue these motions on this expedited timeline.

4         We're here today because the state's ban on healthcare

5    for transgender minors is set to go into effect next week.  And

6    if it does, it will cause severe harm to all of the plaintiffs.

7    These harms will be particularly immediate and devastating for

8    our teenage clients Dylan, Parker, and Sabrina who are

9    currently relying on treatments for gender dysphoria that will

10   be terminated if the law goes into effect.  Prior to treatment,

11   Sabrina was depressed, she engaged in self-harm, and she saw no

12   future for herself.  Her parents feared for her safety at times

13   being worried about her being left alone.  Gender-affirming

14   medical care has transformed her into a happy, confident

15   teenager who is excited about and planning for her future.

16        Dylan, Parker, and countless other transgender young

17   people across the state have likewise had their lives

18   transformed by gender-affirming treatment and are currently

19   thriving as a result of their care.  The consequences of this

20   law will also be devastating for Brooke, who is 9, and has

21   known that she is a girl since she was 2 years old.  Her

22   doctors have informed her parents that puberty could begin at

23   any time and they plan to start puberty delaying medication

24   when that time comes.  Sabrina, Brooke, Dylan, and Parker's

25   parents are all fearful for their children's well-being if

1   they're unable to continue, or in Brooke's case, start,

2   gender-affirming medical treatment.

3        These families, like hundreds of others across the state,

4   are terrified about what will happen if their loved ones are

5   unable to access the medical care that they need.  There's

6   already been a spike in suicide attempts since this healthcare

7   ban was introduced, and Dr. Hutchison's office is being flooded

8   with calls of parents who are panicking that their children are

9   expressing suicidal thoughts at the prospect of their

10  gender-affirming treatments being cut off.  Though Defendants

11  have argued that this measure is necessary to protect the

12  health and well-being of minors, it does nothing of the sort.

13  As our plaintiffs have explained in detail, if they are cut off

14  from the medical care that has enabled them to thrive, they

15  will face devastating health consequences and many will be

16  forced to try to leave their homes and communities here in

17  Arkansas in order to continue to access the care that they

18  need.

19       Defendants' attacks on this care, on this

20  gender-affirming care, require this court to accept their

21  narrative that every major medical association in the United

22  States has been taken over by a pro-transgender political

23  conspiracy and is acting unethically, every single one of them.

24  These arguments represent such extreme and outlier views that

25  the defendants are left to rely upon experts that have

1    previously been discredited by federal courts.  But,

2    ultimately, the constitutionality of this law does not depend

3    on the specifics of particular studies, because even if the

4    Court accepts all of Defendants' criticisms of this care as

5    true, and we urge that the Court reject these arguments, but

6    even if the Court were to accept them as true, the fact remains

7    that the state does not apply the same criticism to any other

8    type of medical treatment.

9        The very treatments banned by the law are permitted when

10   they are prescribed for any other purpose including when they

11   are supported by similar or less evidence and even when they

12   carry similar or greater risks.  This would be a totally

13   different case if Arkansas had a generally applicable law

14   requiring proof of health outcomes through randomized trials or

15   a generally applicable law prohibiting off-label uses of

16   medication, just as *Cleburne* would have been a totally

17   different case if the town had a generally applicable policy

18   prohibiting group housing arrangements.  But Arkansas has

19   decided to single out treatment for gender dysphoria and only

20   treatment for gender dysphoria for a uniquely onerous standard

21   of medical certainty that does not apply to any other form of

22   treatment.  And none of the state's experts dispute that fact.

23       Nowhere do Defendants dispute that our clients have

24   gender dysphoria and are benefiting from the treatment that the

25   state plans to cut off next week.  They, like hundreds of other

1    people across Arkansas, have a medical need for treatment that

2    they will soon lose if this law goes into effect.  All of the

3    plaintiffs have shown that they have standing, that they have

4    stated and are likely to succeed on the merits of their claims,

5    that they will face irreparable harm absent an injunction, the

6    balance of equities weighs in their favor, and it is in the

7    public interest to enjoin this law before it takes effect.

8         We respectfully ask the Court to deny Defendants' motion

9    to dismiss and preliminarily enjoin this ban to prevent the

10   imminent and devastating harms and maintain the status quo

11   while this case proceeds.  As we've shown in our briefing, I

12   think quite extensively on the two motions, Plaintiffs will

13   face immediate and concrete harms when the ban goes into effect

14   next week and have standing to bring their claims.

15        Unless the Court has specific questions about Plaintiffs'

16   standing, I'll move on to the merits of Plaintiffs' equal

17   protection claims and discuss why they are likely to succeed.

18             THE COURT:  I may have questions later, but I don't

19   at this point so you can continue.

20             MR. STRANGIO:  Thank you, Your Honor.  I want to

21   first address the state's argument that the law does not

22   discriminate on the basis of trans status and sex, because I

23   think their arguments are impossible to square with the text of

24   the law and controlling Supreme Court precedent.  The

25   healthcare ban only prohibits medical care when it is related

1  to gender transition.  What is prohibited is not the type of

2  treatment but its purpose, and I think if we look at the

3  definition section of the law, this is incredibly clear.  In

4  20-9-1501, section 5, the law defines gender transition as the

5  process in which a person goes from identifying with and living

6  as a gender that corresponds to his or her biological sex to

7  identifying with and living as a gender different from his or

8  her biological sex.  And that may involve social, legal or

9  physical changes.

10       The difference between identifying with one's assigned

11 sex at birth and living in accordance with it and not

12 identifying with one's assigned sex at birth and living in a

13 gender not in accordance with it is the very definition of

14 being transgender.  And as such, right on the face of the

15 statute, it bans treatment for people who are transgender.  It

16 also conditions treatment based on a person's sex assigned at

17 birth.  And I think an example might be helpful in this regard.

18       Let's say there are two people who go into a doctor's

19 office.  One -- and they both identify as female.  One is

20 assigned female at birth, so is non-transgender.  One is

21 assigned male at birth and is transgender.  They both ask the

22 doctor for medical care to affirm their female gender.  Under

23 the terms of the law, only the person assigned female at birth

24 is able to receive that medical care.  What's different is

25 their sex.  One is able to receive care, one is not.  And as

1   the Supreme Court explained in *Bostock* last year, where an

2   actor intentionally penalizes the person identified as male at

3   birth for traits or actions, in this case medical treatment to

4   affirm one's gender that it tolerates in someone identified

5   female at birth, sex plays an unmistakable and impermissible

6   role.

7           The fact that not all trans people are affected by the

8   law or that the law also creates an age classification does not

9   make it any less of a trans status or sex classification.  I

10  think maybe one of the most instructive cases on this point is

11  the seminal sex discrimination case, *Craig v. Boren*, and that's

12  the case that involved an Oklahoma law that prohibited the sale

13  of alcohol to boys and men under 21, but to women and girls

14  under 18.  And, of course, that could be understood as an age

15  classification because a male could buy alcohol at 21 but not

16  at 18 or 20, and the Court recognized the law as a sex

17  classification and applied heightened scrutiny.

18          There's also a long line of Supreme Court cases that have

19  made clear that not all members of a class need to be targeted

20  by a law for it to still be discrimination on the basis of that

21  classification.  Under *VMI* and *Morales-Santana* and a host of

22  Supreme Court cases, all sex-based classifications get

23  heightened scrutiny under the Equal Protection Clause.  And

24  though the Eighth Circuit has not considered the question of

25  whether trans status independently triggers heightened scrutiny

1    under the Equal Protection Clause, every circuit to have

2    considered the question has held that it does.  And there's no

3    barrier to this court finding that in addition to triggering

4    heightened scrutiny as sex discrimination, that this law

5    triggers heightened scrutiny as a trans status classification.

6          And as we've detailed in our briefing and as other courts

7    have found and explained including the Fourth Circuit in *Grimm*

8    and the Ninth Circuit in *Karnoski*, trans people and trans

9    status trigger all or meet all of the indicia of a suspect

10   classification identified by the Supreme Court.  And that

11   includes a history of discrimination, a distinguishing

12   characteristic that bears no relationship to one's ability to

13   contribute to society, immutability, and what courts have

14   recognized this to be is a characteristic so integral to

15   someone that they should not have to change it in order to

16   obtain their rights, and political powerlessness.  And I think

17   it's quite clear that we meet those factors, and that trans

18   status in addition to sex cause this law to be tested under

19   heightened scrutiny.

20         So we know the statute discriminates on the basis of

21   transgender status and sex.  And what that means under

22   *Morales-Santana*, under *VMI*, is that the state has to come

23   forward and show how the law that they passed is substantially

24   related to an important governmental interest.  And, Your

25   Honor, I do not think the state can carry that burden here.

```
1   And I will ultimately also address that the law is so
2   disconnected from the interest asserted by the defendants that
3   it fails any level of constitutional review.  The defendants
4   claim that the law is related to a governmental interest in
5   protecting minors, and the plaintiffs do not contest that
6   that's an important governmental interest, but the problem with
7   the law is the tailoring.
8       This law does not advance that interest.  Defendants
9   raise a series of purported concerns about medical treatment
10  related to gender transition, but none of the concerns raised
11  is unique to the care that the state has banned and many are
12  based on a mischaracterization of the science.  I want to walk
13  through each of the arguments raised by Defendants and
14  highlight how it fails to meet the state's demanding burden
15  under heightened scrutiny and ultimately how it fails under any
16  standard of review.
17      So, first, the defendants claim that the ban is justified
18  because of a lack of evidence of the medical treatment's
19  efficacy, but this argument suffers from both factual and legal
20  problems.  As Plaintiffs' experts have detailed, there is a
21  substantial body of research that has tested the efficacy of
22  treatment for transgender minors that has shown that when
23  transgender minors are able to access the very medical care
24  that is banned, that their mental health improves.  This
25  research has shown the care to be effective and has formed the
```

1    basis of the Endocrine Society guidelines as well as the

2    prevailing view within the American medical community that this

3    care is safe, effective, and necessary for many people.

4         In his declaration, Dr. Turban details multiple studies

5    that have confirmed the efficacy of his care.  Those are in

6    paragraphs 12 to 18 in his declaration.  And Dr. Adkins has

7    explained that in her clinical experience of treating over 400

8    transgender young people, that she has seen marked improvements

9    in their mental health as a result of this care, as has

10   Dr. Hutchison who has treated 200 transgender people here in

11   Arkansas and has similarly found that the care was safe and

12   effective.

13        Defendants quarrel with this evidence including in their

14   most recent filings, but in addition to being misleading on the

15   science, they also demand a standard of medical certainty that

16   the law imposes on no other form of medical treatment.

17   Meanwhile, the course that they propose upending the status quo

18   and doing nothing, providing no medical treatment, is supported

19   by no evidence.  No randomized controlled trials, no

20   observational studies.  So in defense of this unprecedented ban

21   on treatment that would withdraw care from hundreds of young

22   people across the state, they ask this court to hold

23   gender-affirming treatment to a standard that they do not

24   impose on the alternative that they suggest.

25        But in addition to being wrong about the science,

 1    Defendants' argument suffers from being extremely

 2    under-inclusive.  As Dr. Antommaria explains, there are many

 3    commonly utilized forms of care particularly in pediatric

 4    medicine that are supported by equal or lower quality evidence

 5    than the evidence that supports the efficacy of the

 6    gender-affirming treatments that are banned under the law.

 7    Much of pediatric medicine cannot be tested by the type of

 8    randomized trials that the defendants claim are necessary here,

 9    and of course the state seems to know that as they do not ban

10    all forms of treatment that fail to meet this test.  This is a

11    unique test and a uniquely onerous test that is applied only to

12    gender-affirming care.

13         Though the defendants repeatedly in their briefing and in

14    their experts' declaration, characterize treatment for gender

15    dysphoria as experimental, as Dr. Antommaria explains in his

16    declaration, it is neither experimental in the colloquial sense

17    nor in the technical medical sense.  In support of this claim,

18    the defendants mention at least 15 times in their brief that

19    the treatments are being prescribed off-label.  But even their

20    experts in their most recent filings seem to agree that this is

21    not generally a problem, as many medications are provided

22    off-label once a drug is approved by the FDA for any purpose.

23    And as Dr. Antommaria highlights, in some context, including in

24    pediatric intensive care units, for example, 75 percent of

25    medications are prescribed off-label.

1          The AAP, the American Academy of Pediatrics, has
2     explicitly cautioned that the fact that a drug is being
3     prescribed off-label does not make it experimental, and of
4     course, the law does not generally prohibit off-label use of
5     medication.  It doesn't even generally prohibit medication or
6     treatment that might be considered experimental.  It only and
7     singularly prohibits treatment for gender dysphoria, treatment
8     for transgender people.  The law does not ban treatment that
9     does not meet a particular evidentiary standard whether that
10    standard be based on randomized controlled trials, whether that
11    standard be based on years of proven efficacy, whether that
12    standard be based on whether or not off-label medication are
13    used.  They only ban this care.
14          And for that reason, the law is both extremely
15    over-inclusive in that it targets treatment and bans it that is
16    known to be effective, and under-inclusive insofar as it fails
17    to prohibit many forms of medication that would meet their
18    critiques that they offer of gender-affirming care.  The second
19    justification that Defendants repeatedly rely on is the claim
20    that the risks related to gender-affirming care are so
21    different than the risks of any other form of care that it
22    needs to be banned.  But no other treatment is banned due to
23    concerns about risk, only gender-affirming care.  And here,
24    once again, the defendants both mischaracterize the risks
25    associated with gender-affirming treatment, ignore the risks of

1    denying this treatment, and subject this care alone to a

2    uniquely burdensome standard that no other treatment is held

3    to.

4         They focus on the potential impact on the treatments on a

5    patient's fertility, but again, this is both severely under and

6    over-inclusive.  There are many forms of pediatric medicine

7    that can result in impaired fertility and none of those are

8    banned under the law, only this type of care.  And as the

9    experts explain, Dr. Adkins in particular, has made clear that

10   many forms of the banned care do not impair fertility.  And

11   many of the other risks that they have identified in their

12   papers and in their expert declarations are greatly overstated.

13   And no other medication, no other treatment is banned because

14   of potential risks.

15        All medicine carries risks, and the way that that is

16   handled in every other context but this one is that the doctor,

17   the patient, and the patient's parents assess the risks and

18   benefits of the treatment and make a decision about what is

19   best for their child.  But starting next week if this law goes

20   into effect, these families and families across Arkansas will

21   not be able to do that.  Importantly, Defendants ignore the

22   substantial body of medical evidence that shows that there is a

23   significant risk to denying this treatment to transgender young

24   people.

25        That when young people need this care and do not have

1    access to it, they experience severely negative mental health

2    consequences, and the prospect of withdrawing treatment from

3    people who are already undergoing that treatment is so

4    unprecedented that we don't even really know the risks.  Even

5    in every study cited by the defendants in support of their

6    claim that this ban benefits minors, not one recommends pulling

7    people off the care that they are relying on.  And that will

8    result in unprecedented harms that the defendants ignore and

9    that their experts do not respond to.

10        The third argument that the defendants raise in their

11   concern about in defense of the ban is the erroneous claim that

12   the majority of transgender people will, quote, outgrow being

13   transgender, and that treatment is therefore unnecessary and

14   potentially harmful because they will regret it.  But

15   critically in support of this argument, defendants rely on a

16   data set that conflates information about prepubertal children

17   and adolescents once they reach their earliest stages of

18   puberty.  And the healthcare ban only targets and bans medical

19   treatment that is given to adolescents once they reach puberty.

20   And for this population, the science is clear that people do

21   not quote, unquote, outgrow their transgender identity in any

22   significant degree and that there is very little evidence of

23   regret of this treatment, and this is extensively detailed in

24   the expert declarations.

25        Providing a person with medical treatment does not make

1    them transgender but taking medical treatment away from someone

2    who is transgender who has been evaluated by medical

3    professionals who are following well-established protocols for

4    the screening and assessment of care for this condition and

5    carefully prescribing medication and overseeing that medication

6    through appropriate clinical follow-up, and taking that away,

7    that is incredibly harmful and we know that to be true.

8         Defendants suggest repeatedly in their briefing and in

9    their expert declarations that care for minors with gender

10   dysphoria is being offered without any meaningful oversight,

11   without appropriate mental health evaluation, but those claims

12   contradict both the well thought out and established guidelines

13   of both the Endocrine Society and the World Professional

14   Association of Transgender Health that require multiple mental

15   health evaluations.  They require that any comorbid underlying

16   mental health conditions are managed before treatment is

17   provided.  There is no evidence that those standards are not

18   being followed.  As Dr. Adkins in her expert declaration

19   explains, in her clinic, every person receiving medical care

20   has to have ongoing psychological treatment and multiple rounds

21   of understanding the risks and benefits of the treatment that

22   they are prescribed.  That is also true here in Arkansas as

23   Dr. Hutchison has explained in her declaration.

24         Ultimately this ban does not advance a state interest in

25   protecting minors.  It undermines that interest.  And because

1   the sheer breadth of the law is so far removed from the

2   justifications advanced by the state in defense of it, it's

3   impossible to credit them under any standard of review.  Under

4   *Romer v. Evans*, the Supreme Court made clear that even under

5   rational basis, laws that have the, quote, peculiar property of

6   imposing a broad and undifferentiated disability on a single

7   named group are invalid.  And that is what Arkansas's ban does.

8   The justifications offered by the state are so far removed from

9   what the ban does that they fail under any standard of review.

10          Many forms of medical treatment are supported by the

11   exact same type of evidence that supports the banned care, but

12   they are not banned by this law.  Many other forms of treatment

13   carry equal or greater risks, but they are not banned by this

14   law.  This law uniquely burdens, targets, and bans

15   gender-affirming care.

16          Unless Your Honor has any questions on the equal

17   protection claims and the likelihood of success on the merits,

18   I'll turn briefly to our due process and First Amendment

19   claims, although I think in large part we have covered those

20   well in the briefing.

21          THE COURT:  You may continue.  Go ahead.

22          MR. STRANGIO:  Thank you, Your Honor.  In addition

23   to violating the rights of the minor plaintiffs to equal

24   protection, the parent plaintiffs are likely to succeed on

25   their claim that this ban violates their well-established

1  fundamental right to direct the care, custody, and control of

2  their children.  This longstanding fundamental right includes

3  the ability of parents to seek and follow medical advice for

4  their children.  Defendants attempt to reframe the right here

5  as a right to demand experimental treatment for one's child.

6  But as the Supreme Court cautioned in *Lawrence v. Texas* when it

7  overruled its prior decision in *Bowers*, narrowly construing a

8  fundamental right is to misapprehend the claim of liberty

9  they're presented, which I think is exactly what's going on

10  here.

11      As I previously discussed, the care is not experimental

12  as a factual matter, but in terms of the law, I think the

13  proper inquiry is whether this ban on healthcare for

14  transgender minors impermissibly intrudes upon the fundamental

15  rights of parents to direct the custody and care of their

16  children.  And we think it clearly does, Your Honor.  For

17  example, Aaron and Lacey Jennen, they know their daughter, they

18  worried for her.  They were afraid to leave her alone, they

19  prayed for her, and thankfully with the support of their

20  doctor, they found a course of treatment that transformed her

21  life and her health.

22      But this law infringes upon their fundamental rights as

23  parents to follow that medical advice, to continue that

24  treatment for their daughter.  And as Governor Hutchinson

25  explained, when he vetoed this bill before it was overwritten

by the legislature, that it represented a vast government
overreach overriding parents and denying best medical practice
to transgender youth.

This infringement into the fundamental right of parents
triggers strict scrutiny, and as I previously discussed, the
law cannot survive any standard of review.  And as to the final
claim, our First Amendment claim on behalf of all the
plaintiffs, the plaintiffs are also likely to succeed on the
merits of its stated claims, and again, I believe this has
largely been covered in the briefing, but just briefly, the
healthcare bans referral prohibition violates the First
Amendment rights of all the plaintiffs, the rights of the
doctor plaintiffs to speak, to give information to their
patients, and the rights of the minor plaintiffs and their
parents to receive such information.

By only banning speech that refers patients to
gender-affirming care, the ban is both content and viewpoint
based and, therefore, presumptively unconstitutional.  Unless
Your Honor has any questions about the First Amendment claim,
I'll go on to address the remaining preliminary injunction
factors.

THE COURT:  Go ahead.

MR. STRANGIO:  In addition to showing that they are
likely to prevail on the merits of their claims, the plaintiffs
have more than met their burden of showing both irreparable

1   harm and that the balance of equities weighs in their favor.
2   If the ban goes into effect one week from today, the plaintiffs
3   and transgender minors across the state will lose the treatment
4   that has enabled them to thrive, has enabled them to survive.
5   As Dylan Brandt explains, going back to life as it was before
6   treatment is an unbearable thought.  Aaron Jennen similarly
7   said, "We cannot go back."  Not only will the plaintiffs suffer
8   physical and psychological harms that are irreparable, many
9   families will be uprooted, they will have to leave their homes
10  and their communities that some of them have lived in for
11  generations.  Those are irreparable harms.
12         And in addition to these severe and irreparable harms, of
13  course the denial of their Fourteenth and First Amendment
14  rights are irreparable injuries that we likewise respectfully
15  ask this court to prevent.  And on the other side of the
16  equation, we're simply asking to maintain the status quo while
17  this case proceeds.  The state has never had a law like this.
18  No state in the country has a law like this.  The harms to the
19  state of not enforcing this law temporarily while this case
20  proceeds pale in comparison to the severe and irreparable harms
21  of our clients.  It's also in the public interest to prevent
22  the denial of constitutional rights and to prevent the
23  uprooting and chaos that would flow from cutting off medical
24  care from our clients and the hundreds of transgender people
25  and their families should this law take effect.

1     We think that the plaintiffs have met their standard --

2     their burden of showing that they're likely to succeed on the

3     merits of their claim, that they will face irreparable harms,

4     that the balance of equities face strongly in their favor, and

5     that the issuance of a preliminary injunction is in the public

6     interest.  Unless Your Honor has any specific questions, I'll

7     save the remainder of my points for rebuttal time.

8          THE COURT:  Thank you, sir.  And I'll likely circle

9     back, but I'm going to hear some more before I set you on a

10    task of answering questions, but thank you.

11          MR. STRANGIO:  Thank you, Your Honor.

12          MR. WAGNER:  Good morning, Your Honor.  And may it

13    please the Court.  Vincent Wagner for the defendants.

14          THE COURT:  Good morning, Mr. Wagner.

15          MR. WAGNER:  With me at counsel table are Nicholas

16    Bronni, Michael Cantrell, Emily Yu, and Kat Guest.  Although

17    gender transition procedures have existed for decades, there's

18    no scientifically valid evidence that they lead to long-term

19    benefits.  That was the conclusion recently reached by the

20    national healthcare systems of Sweden, Finland, and the United

21    Kingdom.  By contrast, the irreversible consequences are

22    obvious of indefinitely halting puberty with permanent

23    infertility and the permanent destruction of healthy breast

24    tissue among other consequences.  But this case, and we agree

25    with Plaintiffs, isn't really about whether those long-term

1   consequences are outweighed by hypothetical unproven benefits.

2   Instead this case is about whether the constitution prohibits

3   Arkansas from determining which experimental procedures are

4   appropriate for minors solely because the plaintiffs can point

5   to some doctors that disagree with Arkansas's determination.

6        At its heart then, the plaintiffs' claim is that the

7   constitution guarantees parents and doctors the right to choose

8   experimental medical procedures for children, but there is no

9   constitutional right to an experimental medical procedure,

10  which is why the plaintiffs try to frame their claim in terms

11  of discrimination or parental rights or free speech which is

12  anything but the true substance of the constitutional claim

13  here.  Creating the new constitutional right that the

14  plaintiffs seek in this case would seriously undermine the

15  state's ability, which is long established, to regulate the

16  medical profession because there's no legal reason for this

17  result.  The defendants ask the Court to deny the motion for

18  preliminary injunction and to grant the defendants' motion to

19  dismiss the complaint with prejudice.

20       As I move through my presentation, I'd like to start

21  where the plaintiffs ended on irreparable harm and then I'd

22  like to say a word about the plaintiffs' standing and then move

23  on to their likelihood of success on the merits.  First

24  regarding irreparable harm, a key argument that the plaintiffs

25  make is related to the irreparable harm that they say would

result from withdrawing treatment that is currently ongoing.
But their own expert, Dr. Adkins, acknowledges that to safely
ramp down even cross sex hormones takes about six weeks, and
there's nothing in the SAFE Act that prevents a safe ramping
down even after the law takes effect, because continuing to
prescribe something like cross sex hormones for the purpose of
safely ramping down the procedure would not fall within the
definition of a gender transition procedure in the Act.

        And in addition to that point, the Act has an express
exemption for procedures that are undertaken to undo the
effects of a gender transition procedure.  And this is in
Section 20-9-1502(c)(3).  So if a plaintiff here or another
child in Arkansas were to continue to receive one of these
procedures for the purpose of safely ramping down a currently
ongoing procedure, that would not fall within the Act's core
prohibition.

        THE COURT:  Mr. Wagner, don't you make the
plaintiffs' point that depending on what you're doing it for,
it's safe to do this as long as you're not doing it to cross
over, so to speak?  You just said that we're not going to let
anybody do this, but we're going to let them do it for six more
weeks if they're trying to go the other direction with it.  So
I'm confused.

        MR. WAGNER:  Your Honor, it's related to the point
we've made that the purpose of the procedure makes it a

1    different procedure.  So here, it will have a different outcome

2    depending on the purpose for its use.

3            THE COURT:  That's what I'm trying to get at.  Is it

4    the care that you're banning or is it the outcome?  Because it

5    appears that you just made the point as long as we're headed

6    toward a different outcome, that care is allowed by the Act.

7            MR. WAGNER:  The point is that it is a different

8    procedure based on the outcome.

9            THE COURT:  How so?

10           MR. WAGNER:  It's as in -- so if you look at the use

11   of cross sex hormones, for instance, and I'll take one in

12   particular to help the discussion.  So if you talk about, say,

13   testosterone being used in a boy leads to the development of

14   that boy's sexual and reproductive systems, so the outcome

15   makes it a certain procedure and it's FDA approved for that

16   procedure.  It is not approved for a different procedure.

17           THE COURT:  It's the same treatment though,

18   Mr. Wagner, it's just for a different purpose.  That's what I'm

19   trying to get at.  It's not the drug that you're prescribing,

20   it's not the dose that you're prescribing or the manner in

21   which you're administering it.  It's the end result that causes

22   it to be unlawful as opposed to the giving of the drug itself.

23   And that's all based on whether or not you're transitioning or

24   trying to move in a direction of gender identity that was

25   assigned at birth.

1    And if that's what your plan is and that's what the law's

2    about, that's fine, but I thought you just made the point that

3    we'll let these doctors continue these drugs if we're headed

4    the other direction for six weeks or otherwise.  Or if it's to

5    maintain the identity that was assigned at birth with somebody,

6    that's okay too, it's all the same treatment, but it's just the

7    purpose or the outcome that makes it illegal, and I think

8    that's the point I understood that you just made.  But if I'm

9    wrong, correct me.

10             MR. WAGNER:  You're right that it's the outcome that

11    makes a difference, Your Honor, but that is -- the outcome is

12    what determines what the procedure is in this case.

13             THE COURT:  How does the outcome determine what's

14    safe and not safe if the treatment is the same?

15             MR. WAGNER:  It's the same drug, Your Honor, but

16    this is why the FDA approval point is relevant here because the

17    FDA has approved these for a certain outcome and not for a

18    different outcome.

19             THE COURT:  That's the off-label argument?

20             MR. WAGNER:  That's right, Your Honor.

21             THE COURT:  So all off-label drugs given to children

22    should be banned?  Or where do you draw the line?  Where do you

23    intend to draw the line?

24             MR. WAGNER:  The point here, this is where we relate

25    to the specific harms caused by these treatments, Your Honor.

1    This is the focus on the irreversible long-term consequences

2    for these children who are undergoing these treatments.  So

3    puberty blockers when they're used as a gender transition

4    procedure will halt indefinitely the maturation of the child's

5    reproductive system and cross sex hormones likely lead to

6    permanent infertility.  So these sorts of long-term

7    consequences are what set these procedures apart from other

8    procedures and why Arkansas has decided in this instance to

9    regulate these procedures as opposed to other procedures.  And

10   the plaintiffs --

11          THE COURT:  What do you do about hysterectomies?

12          MR. WAGNER:  In what sense, Your Honor?

13          THE COURT:  You just made the argument that this

14   treatment prohibits reproductive future basically.  What does a

15   hysterectomy do or what does a vasectomy do and how is that any

16   different than your argument about everyone should be able to

17   have children?

18          MR. WAGNER:  Your Honor, I think the difference

19   there is the population in which it's being performed.  So here

20   we're talking about children, and in that case we're talking

21   about adults.  So Arkansas has a specific compelling interest

22   that the plaintiffs don't dispute in protecting children, and

23   combined with Arkansas's interest, compelling interest in

24   regulating the medical profession.  So it's the difference in

25   the age there.  So that's why Arkansas wouldn't -- the same

1    interest wouldn't justify a ban on vasectomies in adults or

2    hysterectomies in adults because Arkansas has a particular and

3    compelling interest in protecting children.  And in this case

4    that comes to light because of the lack of evidence of

5    long-term benefits to support these procedures.

6              THE COURT:  So here's where I'm having the

7    disconnect.  It's okay at 18 to change your potential child

8    bearing situations, but you want to allow minors to have

9    children?  What is it?  Once you're 18, you can do any of this,

10   I guess.  And so I'm having trouble following this deal because

11   I suspect that the legislators that pass this law aren't big on

12   minors having kids either.

13             MR. WAGNER:  It's not about minors having children,

14   Your Honor.  It's about preserving their capacity to make that

15   choice until adulthood.  So when somebody turns 18, it's just

16   well established in American law that the states have less of a

17   compelling interest when we're talking about adults versus

18   minors.  So that line is just drawn in the law.  And so if

19   we're talking there about an age classification, the Supreme

20   Court has said age classifications can be made.  And in

21   particular, age classifications related to protecting minors.

22        So that's why the line would be drawn at 18 is that the

23   interest in preserving the -- it's about ensuring that minors

24   have that choice to make when they become adults rather than

25   the choice being made pre-emptively while they're still

1   children.

2            THE COURT:  And the legislature wants to do that on

3   behalf of them and their parents; is that correct?

4            MR. WAGNER:  Yes, Your Honor.  And that's related to

5   the legislature's compelling interest that's well established

6   in protecting children.  So the legislature has determined that

7   the lack of valid scientific evidence of long-term benefits

8   here combined with the particular reproductive harms we've been

9   discussing means that they have an acute interest in

10  intervening with these particular procedures which are unique

11  in this respect.

12           The plaintiffs talk in general terms about other

13  procedures, but this morning they're not pointing to any other

14  procedures that raise these same risks without any correlative

15  long-term benefit to justify the significant risks that result

16  from these procedures.  And that's what sets these procedures

17  apart from other procedures.  And that's, for instance, going

18  back to a particular example why it's not the same to say a boy

19  gets testosterone, a girl gets testosterone.  In the girl, it

20  raises particular risks, it has particular consequences and it

21  doesn't have a validly established long-term benefit for the

22  girl like it would for the boy.

23           So this distinction on the basis of procedure is the true

24  distinction that's at the heart of the SAFE Act.  It's not a

25  distinction on the basis of transgender status or a distinction

1   on the basis of sex.  And because it's a distinction on the

2   basis of procedure, it only receives rational basis review,

3   which it passes.  The legislature heard testimony from doctors

4   including psychiatrists with experience treating children with

5   gender dysphoria and it also heard testimony from other doctors

6   like the plaintiffs here that disagreed with the SAFE Act's

7   goals, and the legislature credited the testimony supporting

8   the SAFE Act and not the testimony against the SAFE Act.

9        That's not evidence of any animosity toward a particular

10  population.  That's at most evidence of medical uncertainty.

11  And the Supreme Court has made clear, most particularly in

12  *Gonzales v. Carhart* when there's medical uncertainty, the

13  states have wide discretion to pass legislation.

14       So moving on, the plaintiffs try to take that

15  procedure-based classification and treat it as a sex-based

16  classification, which is an issue you and I have been

17  discussing a little bit so far.  But it is not a sex-based

18  classification because it doesn't -- it's a distinction on the

19  basis of procedure so you look at what procedure is being

20  performed, not the identity of the person who's receiving the

21  procedure.  And at some level, sex is relevant to that

22  determination, but the Supreme Court hasn't said in the equal

23  protection context that any law that at some level refers to

24  sex receives heightened scrutiny.  The plaintiffs' argument on

25  this point is based on a misreading of *Bostock*.  *Bostock* was

1   very clear that it was interpreting the particular language of

2   Title VII.  The Court said expressly that it was not deciding

3   the standard for sex discrimination under the constitution or

4   even under any other statutory ban on sex discrimination.

5       So it would be a misreading of *Bostock* to apply it here.

6   In the Supreme Court's constitutional sex discrimination cases,

7   you've always got a situation where you have a member of one

8   sex who's similarly situated with a member of another sex and

9   is suffering some sort of disadvantage as compared to the

10  member of the other sex.  That's what was at issue in *United*

11  *States v. Virginia*.  It was very clear there.  You had a woman

12  who was not allowed to go to the all-male school because she

13  was a woman.  That's not the same situation that we have here

14  because these are different procedures that boys and girls are

15  receiving.

16          THE COURT:  Let's go back to the testosterone.  Boy

17  wants testosterone, girl wants testosterone.  Boy can have it;

18  girl cannot.  Why is that not based on sex?

19          MR. WAGNER:  So the place I'd start is the boy

20  wanting testosterone, what is it being used for.

21          THE COURT:  No, it's the same exact treatment or

22  modality.  I'm assuming for purposes of this argument that

23  we're talking about a tablet of testosterone or a hundred

24  tablets, it doesn't matter, it's the same treatment in purposes

25  of my question to you.  That they both want it.  Boy wants it,

1    girl wants it.  Boy can have it, but girl cannot.  Why is that

2    not sex-based?  Because you want to talk about the reason they

3    want it, but why is that not discriminatory based on sex when

4    you have the same treatment and you say but it's for a

5    different purpose?  I get that part.  I'm not arguing that

6    part.  I think that's the whole point.  But how do you justify

7    giving it to one sex and not the other and not call that sex

8    discrimination?

9            MR. WAGNER:  Your Honor, you're right.  We've talked

10   about this and I do think the point is that while it is still

11   testosterone, whether you're giving it to the boy or the girl,

12   it's not the same procedure and sex is relevant to determining

13   that.

14           THE COURT:  It's the same treatment, Mr. Wagner.

15   I've said for purposes of this argument, we're going to give

16   the exact same medicine, same dose, and in the same manner or

17   that's what they're both asking for, to each of these.  But you

18   want to say it's a different procedure because of the perceived

19   desire or why they want it.  Why does that make it a different

20   procedure just because you want it for one reason and I want it

21   for another?  You want it to make you taller.  I want it to

22   make me bigger.  Why is that procedure different just because

23   we want different outcomes?

24           MR. WAGNER:  Your Honor, I don't think it's

25   different because of why they want it.  It's different because

1    of what it will do in the child's body.  In the boy, the

2    testosterone will lead to development of his sexual and

3    reproductive systems.  In the girl, it will not do that.  So

4    it's a different procedure because they're taking the same drug

5    and it causes a different outcome in their body.

6            THE COURT:  Perhaps that's something we're never

7    going to agree on.  I think it's the exact same procedure that

8    has a different outcome.  And maybe we agree on that.  But you

9    want to call it a different procedure because of the outcome,

10   and I see it as the same modality or treatment.

11           MR. WAGNER:  I understand your point, Your Honor,

12   and we can move on to discuss -- I don't think it's sex

13   discrimination, but even if it is, then we get to the standard

14   of intermediate scrutiny here and the SAFE Act would pass

15   intermediate scrutiny for many of the same reasons you and I

16   have been discussing.  So it's substantially related to

17   Arkansas's compelling interest in protecting children and

18   regulating the medical profession.  And my understanding of the

19   plaintiffs' argument is that they don't dispute Arkansas's

20   interest there in protecting children and regulating the

21   medical profession.

22           THE COURT:  That's my understanding too.

23           MR. WAGNER:  Whatever distinctions the SAFE Act

24   draws then, they're based on the enduring physical differences

25   between men and women, which that's a quote from *United States*

1   *v. Virginia*.   The Supreme Court has said the state can draw

2   distinctions as long as they're based on real physical

3   differences between men and woman.   And it is those physical

4   differences between boys and girls that lead to the different

5   outcomes we've been discussing.   So to go back to the

6   testosterone example, it develops the boy's reproductive

7   system, it does not develop the girl's reproductive system.

8   Those are different outcomes and different long-term

9   consequences of the procedure.

10          Arkansas has an interest in ensuring that those sorts of

11   consequences, those sorts of outcomes in a medical procedure

12   performed on children are only performed if they're justified

13   by appropriate benefits.   And there is no valid scientific

14   evidence of long-term benefits of these procedures.   This is --

15   the most common one that the plaintiffs discuss has to do with

16   suicide risk, but the best evidence that we have on suicide

17   risk is that -- now, this is a study, as Plaintiffs point out,

18   that was performed on adults who even received surgical

19   treatment, but this data showed that long-term suicide outcomes

20   are actually worsened after full gender transition.

21          And the plaintiffs don't point to any contrary long-term

22   scientific evidence to show that it lowers suicide risk.   And

23   as we've explained, they attempted to fill some of this

24   evidentiary gap with their supplemental declaration from

25   Dr. Turban filed last Friday, but each of our experts who filed

1   supplemental declarations here have explained the problems with

2   Dr. Turban's analysis.  That Dr. Hruz, in his supplemental

3   declaration, systematically demonstrates the evidentiary

4   problems with the studies that Dr. Turban cites.  And

5   Dr. Regnerus similarly explains how nothing in Dr. Turban's

6   analysis materially improves the scientific evidence of

7   benefit.  And these sorts of evidentiary problems are why

8   Sweden, Finland, and the United Kingdom have reviewed the

9   evidence of benefit and said that they found the evidence

10  lacking to support, to justify, continuing these procedures

11  just as a blanket rule.

12       Now, it's not necessarily a total ban in those countries,

13  but they found considerable lack of valid scientific evidence

14  to justify, to support the benefits that Plaintiffs claim here.

15  And Dr. Levine in his supplemental declaration also points out

16  how the plaintiffs and their experts keep moving the goalpost

17  on what benefits matter here.  There's at some level a claim

18  that these procedures will improve gender dysphoria, but that's

19  not what the studies that Dr. Turban sites demonstrate.

20  They're short-term follow-up surveys about various other mental

21  health outcomes, but they don't actually establish a lowered

22  amount of gender dysphoria after transition procedures.

23       And I would like to make one more point about the

24  fertility issue.  The plaintiffs dispute this, but a key piece

25  of evidence that they and Dr. Adkins cite on this is related to

1   the fertility preservation counseling that patients receive

2   prior to undergoing gender transition procedures.  This is

3   like, for example, egg freezing.  So if the medical profession

4   is advising these patients before undergoing these procedures

5   to consider fertility preservation treatments, that seriously

6   undermines Plaintiffs' claim that there aren't serious concerns

7   about fertility raised by these treatments.

8          THE COURT:  Well, don't they do the same thing with

9   chemo?

10         MR. WAGNER:  Yes, Your Honor, that's right.  And the

11  distinction there, I think, goes back to the benefit point that

12  if a child's facing life threatening cancer, the risk-benefit

13  analysis is a different sort of analysis.

14         THE COURT:  What if a doctor, and let's just say

15  we're talking about a good doctor, a doctor that's

16  conscientious and he determines that the risk-benefit favors

17  this treatment to a given patient, I don't care how you dial it

18  in, similar to I know that this child may never have kids

19  again, but the chemo will save their lives.  Let's say that a

20  doctor makes that conclusion on this particular patient A.  How

21  do you justify the chemo but not this treatment?

22         MR. WAGNER:  The justification here is that Arkansas

23  is allowed to look at these things in the aggregate and

24  legislate about them.  Arkansas is not required by the

25  constitution to defer to an individual doctor's determination.

1          THE COURT:  Let's say we got a hundred doctors that
2     got this same patient.  I think the testimony was they treated
3     200 patients in Arkansas alone.  And we can do the numbers, we
4     can play with statistics like the experts in this deal did and
5     said, well, if we count this, it's different.  And big
6     surprise, experts in other sides of this case don't agree, and
7     I get that.  That's part of the deal.  I'm not being critical
8     to either side about that.  But the points you bring up keep
9     circling back, and I can't understand the state's interest in
10    one particular procedure but not the other based either on
11    reproductive rights or survival of the child or things of this
12    nature, preserving eggs, all of which can be done.

13         And you say the fact that the doctor's even telling these
14    patients to preserve their eggs for whatever reason is
15    different for this procedure than it would be for chemotherapy
16    or maybe others that I'm not aware of.  I don't know if you do
17    it for dialysis or any other affliction that would cause you to
18    go through treatment that would stress your reproductive
19    system, but y'all aren't banning any of those.  And it's
20    because they want to do it for a different reason, and I think
21    we agree on that proposal or that statement.  Is that fair?

22          MR. WAGNER:  I don't know if I would quite agree
23    with the way you framed it there at the very end.  Again, I
24    don't think it's because of the reason the child wants the
25    procedure.  I do think it's because of the particular outcome

1    of the procedure.

2              THE COURT:  I think we can agree that the people

3    want that outcome.  I mean, that's my point is it's not like

4    they're asking to do this and realizing that this outcome might

5    happen.  That's the whole point, they're asking for this

6    outcome, and it's that asking for that outcome that is the

7    basis for the ban as I understand the law.  And I think we can

8    agree on that.  And if we can't, we can just move on and I'll

9    make a decision about what I think, but I don't think I'm

10   putting words in your mouth or interpreting the law any

11   differently that it's the fact that the patient in this

12   particular instance wants this outcome and because that's the

13   outcome that's being worked toward, this treatment will be

14   banned.

15             MR. WAGNER:  I think I understand your point, Your

16   Honor.  And I'd say, I think, two things in response.  First,

17   that would implicate, say, a constitutional right to a

18   particular procedure which isn't how the plaintiffs have framed

19   this case.  They framed it as a --

20             THE COURT:  I'm saying that you're denying it

21   because of the transgender nature of these people, because only

22   transgender people want this outcome.

23             MR. WAGNER:  Then framing it that way, Your Honor,

24   implicates the pregnancy discrimination cases that we've cited

25   in our briefing which the Supreme Court says that even though

1    only women can get pregnant, it is not necessarily

2    constitutional sex discrimination to draw a classification on

3    the basis of pregnancy.  This is in *Bray* versus I think it's

4    Virginia Women's, or I've forgotten the exact.  *Bray* is the

5    first party.

6              THE COURT:  That'll get us there, I hope.  But go

7    ahead.

8              MR. WAGNER:  But so that framing of only this class

9    of people wants this thing, or it's like discrimination by

10   proxy which is the sort of theory that the Supreme Court has

11   rejected in other equal protection contexts like we've just

12   discussed, the sex discrimination context.  So that won't get

13   Plaintiffs all the way to their Equal Protection Clause claim

14   here.  So it's really about the procedure itself.  And the

15   other point I wanted to make to double back on your previous

16   question about X number of doctors disagree with Arkansas here.

17   This is related to Plaintiffs' claims about WPATH and the

18   Endocrine Society and other professional organizations.  And

19   this is exactly where the Supreme Court --

20             THE COURT:  Mr. Wagner, for my record, spell out

21   WPATH for my court reporter.

22             MR. WAGNER:  W-P-A-T-H.  So WPATH, the Endocrine

23   Society, other groups that are advocacy groups that are made up

24   of doctors, they disagree with Arkansas's determination here,

25   but the Supreme Court doesn't require Arkansas to defer to

1    their determinations.  The clearest example of this was in the

2    abortion cases.  It's been noted that the American College of

3    Obstetricians and Gynecologists disagreed with the Supreme

4    Court's reasoning in some of those cases and the Supreme Court

5    didn't defer to those groups.

6         But in any event, nothing in those guidelines contradict

7    what Arkansas has done here.  The Endocrine Society guidelines

8    are the place where they've attempted to grade the scientific

9    evidence of benefit, and at each turn, they determined that

10   there's very low quality evidence of benefit or just low

11   quality evidence of benefit.  So not only is Arkansas not

12   legally required to defer to these groups' recommendations, but

13   the groups themselves readily acknowledge that there's a lack

14   of scientifically valid evidence of benefit.  So because of

15   that lack of valid evidence of benefit, Arkansas is allowed to

16   regulate these procedures by the constitution.

17        At the absolute most, Plaintiffs have established medical

18   uncertainty here, and in the face of medical uncertainty,

19   Arkansas and other states have the power to regulate these

20   procedures.  If Your Honor has any further questions about the

21   Equal Protection Clause claim, I'm happy to discuss them, but I

22   can also move on to the other points in the briefing.

23            THE COURT:  I'll let you move on.  Thank you.

24            MR. WAGNER:  So to return to an issue that I

25   bypassed earlier, there's a problem with Plaintiffs' standing

here that we haven't addressed yet this morning.  The doctors who are plaintiffs here do not have third party standing to assert claims on behalf of their patients.  The cases that the plaintiffs cite are all in the abortion context, and the abortion context is factually dissimilar from this one.  The Supreme Court said in *Singleton v. Wulff* that because any particular pregnancy only lasts nine months, any particular woman's claim is likely to become moot before a federal court can review it.  It's factually different here.

Even Plaintiffs point out that the cutoff stops at the age of 18, but that still gives them years to bring their own challenge, which is what the plaintiffs have done in this case. That's why there are families of patients that are plaintiffs here.

THE COURT:  It would give some.

MR. WAGNER:  That's right, Your Honor.  And they haven't pointed to any particular patient that would not have the ability to do that here, so they haven't said here is someone who's about to age out, this person needs as-applied relief.  Instead, they've included their doctors who are seeking a facial injunction of the statute, and there's no basis for allowing them to assert third party standing for a facial injunction of the SAFE Act.

THE COURT:  This may be a rhetorical question, Mr. Wagner, but when do you think this is going to be done?

1              MR. WAGNER:  This litigation, Your Honor?

2              THE COURT:  Yes, sir.

3              MR. WAGNER:  Your Honor may have a better idea of

4      that than I do.

5              THE COURT:  I'm not talking about this step.  I

6      can't imagine a scenario where this case isn't going to be

7      immediately appealed to the Eighth Circuit and then maybe

8      beyond.  So we're talking about your nine-month timeline and

9      how long it takes to get something done and how long people

10     have to resolve this issue.  I'm not sure I see the distinction

11     between the analysis in the abortion cases on third party

12     standing in this case or cases like this.  And the notion that

13     a pregnancy lasts nine months isn't helping me around that.

14             That's why I asked the question.  This is an expedited

15     hearing, but only because -- perhaps not only, y'all are

16     important and I would get you in as soon as possible, but the

17     notion that this law may go into effect on the 28th is driving

18     the timeline.  Everybody knows that.  But when the final

19     hearing if it's granted, is allowed, may be in the spring, I

20     don't know.  I don't know how quickly y'all can get all that

21     together.  And then it gets appealed to the Eighth Circuit and

22     then, meantime, these people are getting older or the gestation

23     period is moving on.

24             So I'm just asking you is there any other thing other

25     than this nine-month distinction that would cause me to analyze

1    the third party standing issue from the doctors' perspective

2    differently than the abortion courts did?

3            MR. WAGNER:  That's the only possible hindrance that

4    the plaintiffs have suggested here.  And the plaintiffs

5    themselves, like I've said, include families of patients, so

6    that is -- that would be an extension of current doctrine to

7    say that doctors necessarily have standing to assert claims on

8    behalf of their patients.  But the primary distinction is the

9    different timelines, that this doesn't moot itself after nine

10    months, that's right, Your Honor.

11            THE COURT:  Okay.  Because I'm not -- obviously not

12    a doctor, didn't get through medical school, but really the

13    question is not until they turn 18, but how long do they have

14    until they reach puberty.  That's the date they're pushing up

15    against.  It's not they're 9, they've got nine years to file

16    this litigation.  It's really however old they are until they

17    reach puberty, because we're talking about these puberty

18    blockers and whatnot, which my understanding of the science is

19    is to delay certain development so they can make decisions

20    about what to do on a permanent basis.

21            And we may disagree as to whether or not these permanent

22    blockers have permanent effects, but that's all for a bigger

23    hearing and not for what I'm here to decide.  But with regard

24    to the standing issue and your motion to dismiss on the

25    12(b)(1) stuff, I've struggled with the notion being a devil's

1  advocate how I would analyze that standing issue any

2  differently than the abortion courts did from a similar

3  perspective.

4           MR. WAGNER:  The only other point I'd make, Your

5  Honor, is your discussion there of the onset of puberty.  The

6  onset of puberty wouldn't moot an individual's claim in the

7  same way that the end of a pregnancy would moot an individual

8  woman's claim.

9           THE COURT:  Completely agree on that.

10          MR. WAGNER:  Okay.

11          THE COURT:  But it still pushes them beyond any

12  meaningful recovery as a result of the litigation.

13          MR. WAGNER:  I'm not sure that that's quite right,

14  Your Honor.

15          THE COURT:  It would affect it to some degree, I

16  think we can agree on that.  That's really the date we're

17  talking about is puberty, not majority.  Because that's the

18  race against time for these patients, as I understand, to

19  figure out what we're going to do because you can't reverse

20  puberty.  And I may be wrong in that statement, but that's kind

21  of my understanding that once you get down that road, you might

22  be able to, like adults might do, to surgically change things,

23  but you're still developed much further along because of

24  puberty.

25          And so I'm only making the point that it's not years,

1    meaning people who are 9 have nine years to get the litigation

2    through the pipeline.  It's really a much shorter term.  And we

3    don't have to argue the science about it, but I think you and I

4    can agree that time is not on these litigants' side, whether

5    it's majority, puberty or some other date that we pick.  And

6    you offered that nine-month period as the distinction of about

7    why I wouldn't treat the doctors' standing in this context

8    differently than the abortion cases do.  And that was my only

9    point.  We either labor it or we don't, it's your record, but I

10   wanted to explain where I was headed with that in case I got

11   the science completely wrong.

12           MR. WAGNER:  Yes, Your Honor.  And I think the only

13   other thing I would say is that puberty is a significant point,

14   the onset of puberty, but it's a gradual thing.  So it's not

15   that they can't get any relief after that point, it's that the

16   relief will be somewhat different after that point.  Which I

17   believe you said that it's not moot in the same way a pregnant

18   woman's claim becomes moot, but the relief does change.

19           THE COURT:  We can agree on that.

20           MR. WAGNER:  I would like to move on to the

21   likelihood of success on the merits of the other two claims.

22   First, regarding the parental rights claim, the constitutional

23   right to raise children doesn't include a right of access to a

24   particular experimental procedure.  So the plaintiffs aren't

25   likely to succeed on this claim.  They don't claim that

1    children have a right of access to particular experimental

2    procedures.  That's because courts have rejected similar claims

3    fairly consistently.  But they claim that the parents have a

4    free-standing right of access to these procedures even when the

5    child would have no right to the procedure, but the Supreme

6    Court hasn't said that.

7        And one of the citations they rely on quite a bit is

8    *Kanuszewski v. Michigan Department of Human Services*.  And

9    there the Sixth Circuit said that the Supreme Court's parental

10   rights precedent, quote, does not address the issue of parents'

11   right to control their children's medical care.  That's at page

12   415.  So granting relief on their parental rights claim here

13   would extend the precedent on the right to raise children under

14   principles of substantive due process, and it would extend the

15   precedent in the way that would undermine the state's ability

16   to regulate the practice of medicine.  So all it would take

17   under their theory is a single doctor who disagrees with the

18   state's determination of whether or not this procedure is

19   appropriate, and under that theory, the state would then have

20   to justify any regulation of that procedure under strict

21   scrutiny.

22       That doctor's opinion would be enough to guarantee the

23   parents a right of access to an experimental procedure, but

24   none of their cited authorities create such a sweeping parental

25   rights theory.  And in any event, the SAFE Act would also

1  satisfy strict scrutiny, which is what they argue would apply

2  under their parental rights theory.  So we've talked a lot

3  about the procedures and the particular concerns raised by

4  these procedures.  And the SAFE Act prohibits only the

5  particular procedures that raise these concerns about fertility

6  and other developmental issues.  And the SAFE Act prohibits

7  these procedures only for minors.  It doesn't prohibit them

8  across the entire population.

9      Because Arkansas has a particular and compelling interest

10  in protecting children, and is compounded by Arkansas's

11  interest in regulating the medical profession.  So because it's

12  narrowly tailored by only prohibiting particular procedures and

13  only prohibiting those procedures for minors, the SAFE Act

14  would even satisfy strict scrutiny, and the plaintiffs aren't

15  likely to succeed on their parental rights claim.

16      And then finally is their free speech claim.  So in

17  addition to prohibiting gender transition procedures for

18  minors, Arkansas also prohibits practitioners from sending a

19  minor to another practitioner for a gender transition procedure

20  that is prohibited.  So practitioners remain free to advocate

21  for these procedures and remain free to counsel the children

22  about these procedures.  They simply must not actually send a

23  minor to another practitioner to receive a prohibited

24  procedure.  That's why this what Plaintiffs call the referral

25  prohibition, it regulates practitioners' conduct and doesn't

1   regulate practitioners' speech.  But regardless, even if it did

2   somehow touch on practitioners' speech, the referral

3   prohibition would also satisfy strict scrutiny because we've

4   gone over why this law is narrowly tailored in that it

5   prohibits particular procedures that raise particular concerns

6   and prohibits those procedures only on minors.

7         If it allowed doctors then to send minors elsewhere and

8   if the law were to go into effect, you'd presume that it would

9   be sending them out of state to Memphis or Tulsa or something

10  like that, for these procedures, that would create a

11  significant loophole in the law that would do ongoing damage to

12  the compelling interests that Arkansas has asserted here.  So

13  by closing that loophole in the law, the referral prohibition

14  is also narrowly tailored to serving the interests that justify

15  the SAFE Act here.  So Plaintiffs aren't likely to succeed on

16  their free speech claim because this governs only conduct, and

17  regardless it would satisfy strict scrutiny.

18        Which comes back again to the question of the balance of

19  the harms here and the other preliminary injunction factors.

20  So as I discussed at the outset, the SAFE Act doesn't require

21  an immediate termination of these procedures because it has an

22  exception for remedying the effects of gender transition

23  procedures whether or not they were performed in compliance

24  with the law.  So if this court grants an injunction, there

25  will be more gender transition procedures performed, and

1   children will undergo these irreversible procedures in

2   Arkansas.  And if the Court doesn't grant an injunction, then

3   these children will proceed through puberty according to

4   biology, and on balance of those two options, the defendants

5   submit that a preliminary injunction would do more harm than

6   good.

7          So we ask the Court to deny the motion for a preliminary

8   injunction and to grant the motion to dismiss the complaint

9   with prejudice.

10          THE COURT:  Thank you, Mr. Wagner.

11          MR. WAGNER:  Thank you, Your Honor.

12          THE COURT:  We're going to take a brief recess

13   before we go into round two and let my court reporter stretch

14   her fingers for a minute.  There's nothing magic about the time

15   I'm going to take.  We'll come back roughly around 10:30.

16   We'll be in recess for a little while.

17          (Recess from 10:22 AM until 10:32 AM.)

18          MR. STRANGIO:  Thank you, Your Honor.  Chase

19   Strangio again on behalf of the plaintiffs.  So I want to just

20   quickly address the question of the nature of the

21   classification, though I think it has been largely well

22   covered, but I think the testosterone example is one that

23   perfectly shows exactly how this is sex discrimination, and all

24   of the defendants' responses about risks, about other concerns,

25   ultimately go to the tailoring.  But it's really difficult to

see how this is anything other than a trans status and a sex classification.

So going to the heightened scrutiny analysis, which again, I think applies because of the nature of the classification at issue, the question is whether the law that Arkansas actually passed substantially advances any important governmental interest. And I do want to clarify that the plaintiffs agree that protecting minors is an important governmental interest for these purposes. We did not say anything in the briefing about the regulation of the medical profession. Just want to clarify that briefly. But while the state can, of course, regulate medicine, they cannot do so in such a way that violates the equal protection rights of individuals.

And all of the defendants' arguments again suffer from the problem that Your Honor identified which is that each concern applies to other form of treatment, but it is only this treatment that is categorically banned. And that's true both in terms of the efficacy and in terms of the risks. And the state, nor the state's experts -- they do not dispute that this treatment is being held to a uniquely burdensome standard. And I think the hysterectomy example is a good one. For example, if there is a interest or concern about fertility, under the law, a minor who has cancer, for example, or some other concern, could have a hysterectomy.

1        It's not banned under the law, even though that would

2   significantly impact fertility.  But a transgender minor could

3   not have chest surgery despite the fact that that has no impact

4   on fertility, so again, I think we see the mismatch between the

5   asserted interest and what the law actually does.  Additionally

6   the law permits all of the banned care expressly in the terms

7   of the statute when that care is being performed on intersex

8   minors including surgical intervention on intersex minors that

9   can be sterilizing.

10        Just one -- two quick points on the science.  Although,

11   again, I think that because of the legal issues that we've

12   identified about the differential burden, that nothing turns on

13   an individual study, but the defendants said that all of the

14   major medical groups agree that there's no valid evidence of

15   the efficacy of this care.  That is not accurate.  Every major

16   medical group in the United States weighed in as Amici here,

17   and the Endocrine Society guidelines explicitly state that what

18   is considered, quote, low quality evidence in medicine does not

19   mean that there's no valid evidence.  And that I think is

20   important too because as Dr. Antommaria explains in his

21   declaration, many forms of care are supported particularly in

22   pediatrics by what might be considered low quality but is still

23   deemed to be effective and widely used.

24        I think the only other point I just want to briefly

25   respond to is on the due process claim.  The Supreme Court in,

1   *Parham* did say that parents generally have the right coupled

2   with the high duty to recognize and prepare their children for

3   additional obligations including a duty to recognize symptoms

4   of illness and to seek and follow medical advice.  And here,

5   just to highlight what's at stake, we're dealing with the

6   prevailing medical view of every major group in the United

7   States' recommended treatment to parents that they are

8   providing to their children that the state is now proposing to

9   ban.

10        Unless Your Honor has any other questions, I don't know

11   that I have any other responsive points beyond what was in our

12   briefing to what we've heard today.

13             THE COURT:  Thank you.

14             MR. STRANGIO:  Just a quick final point that I would

15   like to make though.  Because we're here today and our

16   plaintiffs are here, I do want to close by reiterating Aaron

17   and Lacey Jennen's words about their daughter.  They said that

18   if the healthcare ban takes effect, Sabrina's hormone therapy

19   will be cut off.  "If this occurs, we fear for her survival.

20   Sabrina is an amazing, smart, and beautiful person and an

21   incredible daughter.  We love her.  We cannot bear to lose the

22   thriving young woman that Sabrina has become.  We can't go

23   back."

24        If the healthcare ban goes into effect next week, the

25   harm that Sabrina, Aaron, Lacey, and all of the plaintiffs will

1   face is severe and irreparable.  They will lose their

2   healthcare, they may have to leave their homes, their

3   communities, their families here in Arkansas.  We respectfully

4   urge that the Court deny Defendants' motion to dismiss and

5   grant Plaintiffs' motion for a preliminary injunction.  Thank

6   you so much again for the time to argue these on this expedited

7   timeline before the law goes into effect.

8            THE COURT:  Mr. Wagner, are you the last word?

9            MR. WAGNER:  I am, Your Honor.

10           THE COURT:  It's all you.

11           MR. WAGNER:  Thank you, Your Honor.  Vincent Wagner

12   for the defendants again.

13           THE COURT:  Thank you again.

14           MR. WAGNER:  First I'd like to return briefly to

15   this issue of the different procedures that we were discussing

16   earlier.  And the issue here is that the outcome of a

17   procedure -- I'm sorry, the purpose of a procedure defines what

18   the treatment is.  And in our evidence, this is made most clear

19   in Dr. Lappert's discussion of how plastic surgery works where

20   the purpose of a plastic surgery determines whether or not that

21   surgery is medically necessary or cosmetic, so it's the purpose

22   that actually determines what the procedure is in a given case.

23       So here, it's the purpose of the procedures that makes

24   these different procedures, and the outcome is wrapped up in

25   that purpose.  Where are we going with this procedure?  So

 1   these are different procedures we're talking about depending on

 2   the outcome that we're aiming for.  That brings me to the other

 3   issue of the fit.  We've talked a lot about essentially how

 4   narrowly tailored is Arkansas's law to the interest that it's

 5   asserted, and particularly under intermediate scrutiny.  We

 6   don't need a perfect fit between the interests and the law

 7   itself, it just has to be substantially related to them.  And

 8   so the other treatments that the plaintiffs have identified

 9   where they say Arkansas's law is under-inclusive by not

10   regulating, for instance, counsel has just discussed

11   hysterectomies.

12        Hysterectomy is performed for cancer.  They might raise

13   similar fertility issues, but they don't raise the same

14   problems when it comes to evidence of long-term benefit if it

15   is to treat the cancer that is a well-established benefit

16   established by valid scientific evidence of long-term benefit,

17   which is lacking for the gender transition procedures at issue

18   here.  Another one that is discussed a lot is intersex children

19   or children born with disorders of sexual development, and

20   these procedures are just not comparable to the procedures that

21   Arkansas has regulated here which is why the legislature

22   expressly carved them out from the statute.

23        This is most clearly explained toward the end of

24   Dr. Hruz's supplemental declaration.  It talks about what sorts

25   of procedures are actually performed on children with disorders

1    of sexual development.  And a couple of the most common ones

2    that he discusses are these children are often born with

3    obstructions of the urinary tract that lead to chronic urinary

4    tract infections, so they might perform a surgery on a child to

5    ensure that that child doesn't suffer chronic urinary tract

6    infections or there might be other -- there can be physical

7    disorders of the reproductive anatomy that lead to lifetime

8    increases of cancer risk for the child, so that kind of goes

9    back to the hysterectomy example again where these are

10   different because we're treating something that we know this

11   treatment will lead to certain particular benefits in this

12   child's life.  And there's no comparable evidence for the

13   procedures that Arkansas has regulated in this case.

14        The final point is the plaintiffs have raised *Parham* to

15   say that there is a constitutional right for parents to choose

16   particular medical procedures, but regardless of that

17   particular quote there, that wasn't *Parham*'s holding, and in

18   fact, the issue in *Parham* had to do with whether the state had

19   given parents too much power to direct a child's medical care.

20   The issue there was whether the parents could involuntarily

21   commit a child.  And the Supreme Court was addressing a

22   different sort of issue, and it was addressing it primarily in

23   the context of the procedures that are needed before someone is

24   involuntarily committed.

25        So this also doesn't establish that there's a substantive

1    due process right to a particular experimental procedure,

2    whether the child him or herself or the child's parents access

3    it on behalf of the child.  So none of Plaintiffs' claims are

4    likely to succeed on the merits, and, in fact, they failed to

5    state a claim.  For the reasons we discussed this morning and

6    in our briefing, we ask that this court would deny their motion

7    for a preliminary injunction and grant our motion to dismiss.

8              THE COURT:  Thank you, Mr. Wagner.

9              MR. WAGNER:  Thank you, Your Honor.

10             THE COURT:  A little bit of commentary.  I want to

11    commend both sides on the manner in which this was presented to

12    the Court.  As to the briefing, if you can't be brief, be

13    relevant, and you were not brief but you were relevant in your

14    written presentations to the Court.  Both sides clearly knew

15    their subject and it was presented to me in an efficient and

16    brief -- considering my worst case scenario in my mind went

17    well beyond lunch, so I want to commend both sides for the way

18    it was presented to me, and I appreciate the work y'all put

19    into it.

20        This is a serious case that's going to go beyond me, so I

21    wanted to thank both sides for that.  I'm going to take about a

22    20 to 30 minute recess to collect my thoughts and I'm going to

23    rule from the bench when I do that, which may be a surprise to

24    some and not to others, so that's what you'll get from me in a

25    little while.  Don't hold me to 30 because I may not be as

1    efficient as I think I might be, but I'll leave it at that and

2    court will be in recess for a while.

3         (Recess from 10:44 AM until 11:30 AM.)

4              THE COURT:  We are back on the record.  It is not

5    lost on me that ruling from the bench on an issue like this is

6    unusual.  Based on the lawyers' reactions, like, surely not.

7    So I have a war story to tell that will put in context my

8    preparation and sometimes people's misunderstanding of how much

9    we do before we get to a hearing.  When I was on the state

10   court bench, I had an issue on an injunction about drinking

11   beer in Burns Park.  And there was an ordinance that said that

12   there will be no drinking in Burns Park.  Well, Burns Park

13   hosted the national softball tournament which apparently is big

14   on drinking beer, and the concession on the beer was worth

15   about $250,000 to Burns Park.  So we had a day and a half

16   hearing on whether or not it was appropriate to drink beer at

17   Burns Park.  So I studied the briefs and I went over stuff and

18   listened to about nine or ten hours of argument on this issue.

19        And one whole side of the courtroom was full of Mothers

20   Against Drunk Driving who was against drinking at Burns Park,

21   and the other side had their baseball caps on backwards.  And

22   so I ruled from the bench about 4:00.  And when I got home to

23   watch the 6:00 news, a reporter, who will go unnamed, Betsy

24   Pilgrim, stated that Judge Moody, with little or no thought or

25   reflection, ruled that drinking would be allowed at Burns Park.

And I'm standing there in my living room going, you -- so that experience is not lost on me in reporting these findings to you at this time.  And I'm not making light of this, but because of the deadlines that we're facing on the 25th or the 28th, I thought it was important and imperative that I come to these findings.

So I'm going to struggle through getting through everything I need to get through.  I ask that y'all be patient, and in certain circumstances, you can ask for clarification. But I've been working on this for about a month.  And my voice sounds like I'm getting emotional, and I may or may not be, but I don't want the fact that I'm ruling from the bench to indicate to either side of this lawsuit that this hasn't been well thought out.  And I listened to everything y'all said today and I read everything you presented.  And it's a big deal and I don't want ruling from the bench or the impression that I'm shooting from the hip to be taken any farther than it needs to, because this is something we've been working hard on.

So to get to it, and I will explain further in detail, but the Court is going to deny the motion to dismiss both on the 12(b)(1) and the 12(b)(6), and I'm going to enter a preliminary injunction on Act 626.  I'm going to start with the motion to dismiss and deal first with the standing issues, or the 12(b)(1) issues, and then I will move on to the 12(b)(6) issues and then we'll get into the analysis on the preliminary

1    injunction.

2         So with regard to the standing of the parents and the

3    minor plaintiffs re the prohibition of services and the

4    12(b)(1) which I'll just call the standing issue one in the

5    motion to dismiss, the defendants contend that the parents and

6    minor plaintiffs lack standing because they did not allege that

7    any of the minors fall outside the Act's exceptions.  In

8    reading 626, and the way the entire act is set up, the

9    exemptions don't apply to anyone seeking transgender care at

10   all.  The exemptions are basically we'll provide this stuff so

11   long as your sexual identity conforms with your sex aligned at

12   birth.  So it's an exception without a meaning because none of

13   these plaintiffs could fall under the exceptions, and

14   therefore, I find that they have standing regarding the

15   prohibition of services.

16        They've all alleged that they have or will request gender

17   transition procedures, and the Act defines gender transition

18   procedures to include medical or surgical services.  With

19   regard to the standing of the minor and parent plaintiffs

20   regarding the private right of action, defendants argue that

21   the minor and parent plaintiffs are not subject to a private

22   right of action and that the Act prohibits the actions of

23   physicians and other healthcare providers or professionals.

24   The minor and patient plaintiffs can have no injury caused by

25   the private right of action.

```
1        Plaintiffs point out that in abortion law cases where an
2   unconstitutional statute provides for enforcement both through
3   official acts and private suits, the plaintiffs may also
4   challenge the constitutionality of these private suits.
5   Mr. Wagner and I had a discussion about whether or not I
6   thought these abortion cases ought to apply and whether or not
7   there was a meaningful distinction when looked at these
8   plaintiffs, and I'm going to decide at least for purposes of
9   the standing and the motion to dismiss that there aren't any
10  meaningful distinctions between the two analysis in those
11  cases.
12       With regard to the first party standing of the
13  practitioners, I move back to Count 1, I guess, of the
14  complaint, that the minor and doctor plaintiffs allege a
15  violation of their equal protection rights.  I'm not sure I'm
16  on the right deal.  The first party standing.  Yes.  The
17  doctors allege and have standing because they are prohibited
18  from providing certain medical care to their transgender
19  patients, but they are permitted to provide that same care to
20  non-transgender patients, and also doctors who do not treat
21  transgender minors are permitted to provide whatever care they
22  want.
23       The minor plaintiffs allege they are denied medical care
24  and insurance coverage for that care because of their sex and
25  because of their transgender status, and I believe because of
```

1   what's alleged in the comments and conversations we've had

2   during this hearing that they also have standing.

3        Third party standing of the practitioners.  Again, we go

4   through an analysis of the abortion cases, primarily *June*

5   *Medical Services*, which is a Supreme Court case, 140 Supreme

6   Court at 2118 through 19.  The Court lists examples of case

7   types where they have allowed a party to invoke a third party's

8   rights, and in such cases, the Court explains the obvious

9   claimant and the least awkward challenger is the party upon

10  whom the challenged status imposes legal duties and

11  disabilities.  In this case, that clearly falls on the

12  practitioners.

13       Do the parties believe that that covers the waterfront on

14  the standing issues or have I left one out?  I just don't want

15  to miss something and get it remanded.

16            MR. WAGNER:  No, Your Honor, I think that covers

17  everything.

18            MR. STRANGIO:  We agree, Your Honor.

19            THE COURT:  With regard to the Rule 65 analysis on

20  the equal protection claim, I think it makes sense before I

21  determine whether or not there's a likelihood of success on the

22  merits I determine what level of scrutiny will be applied to

23  these claims.  I basically have three choices.  One is strict

24  scrutiny, another would be intermediate scrutiny based on a

25  quasi suspect group of people or class, and then last would be

1   rational basis.  I need to state at the outset that I believe

2   that there would be a likelihood of success under any of those

3   standards of review.

4        But with regard to the equal protection claim, I go

5   through a four point factor test to determine whether or not

6   there's heightened scrutiny.  And I think, if I read carefully,

7   that's probably the *Bowen v. Gilliard* case, but potentially

8   also we're going to get into *Grimm* and some *Cleburne* issues as

9   well.  But under a rational basis review, if the state

10  classification of a group of people is rationally related to a

11  legitimate state interest, courts will uphold that

12  classification.  However, when the state classifies a suspect

13  or quasi suspect group of people, I'll use a heightened

14  scrutiny.

15       So the four factors we're talking about about heightened

16  scrutiny, and I'm going to refer to this as intermediate

17  scrutiny as opposed to strict scrutiny, is whether the class

18  has historically been subjected to discrimination.  And it

19  wasn't clear to me whether or not the state was arguing that

20  transgender people have not been discriminated against or not.

21  I kind of read that they were objecting to everything they

22  needed to to preserve their record, but I don't think it's

23  subject to debate whether or not the transgender community,

24  minors or otherwise, have been subjected to discrimination.

25       So I'm making a factual finding for purposes of

determining my level of review that they have.  Two, whether
the class has defining characteristics that bear no
relationship to their ability to perform or contribute to
society.  Their identifying characteristic is simply put, that
their sexual or gender identity does not conform with that
assigned at birth.  I can't think of any more distinct or I
don't want to say unique characteristic that would define them.
So I also find that that factor's been met.

The third factor, I'm not even sure I can say this word,
whether the class has obvious immutable or distinguishing
characteristics that define them as a discrete group.  I don't
really find that as a separate characteristic, but for some
reason, they list it, and for the reasons I've already stated,
I think they qualify as that as well.  I looked up immutable
and I understand what the word is, but I have trouble
pronouncing it.

Whether the class is a minority lacking political power.
The government made the argument that because Biden has
appointed or put people of transgender status in particular
offices means that they are not powerless.  I can't swallow
that argument and I don't believe that they have any one that
they're clearly a minority, and I believe that perhaps due to
that minority or otherwise, they lack political power.  So
based on all of these, I think I could find on this analysis
that strict scrutiny should be applied.

1          Out of an abundance of caution, I'm probably going to

2     apply the intermediate scrutiny as opposed to the rational

3     basis, but as I mentioned before, I think the plaintiffs likely

4     would succeed on any of those standards of review.  The *Grimm*

5     case says multiple courts have held that transgender status is

6     immutable.  Being transgender is not a choice.  Rather it is as

7     natural and immutable as being cisgender.  Further, transgender

8     people share a distinguishing characteristic, that their sex

9     assigned at birth does not align with their gender identity.

10    Cites other cases that most was picked up in the briefing.

11         As a class, transgender people are a minority or

12    politically powerless.  Some district courts have already ruled

13    because of that.  Because of a sex-based classification or

14    quasi suspect, they are subject to a form of heightened

15    scrutiny, and that goes into the *Cleburne* case.  Regarding the

16    Rule 65 analysis of the due process claim, I likewise find that

17    the plaintiffs are likely to succeed on the merits again under

18    any form of review.  With regard to the 12(b)(6) arguments on

19    all of the substantive claims, I review the plaintiffs, unlike

20    in the 12(b)(1), I rule -- or I'm supposed to view the

21    allegations in the complaint made as true.

22         Suffice it to say that review of that complaint does

23    state a claim for purposes of a motion to dismiss.  I have some

24    comments here that I'm not sure that are particularly

25    enlightening so I'm trying to wade through my notes to stick

1    with what is relevant.  With regard to the First Amendment

2    claim, it's well settled law that a loss of First Amendment

3    freedoms for even minimal periods of time constitute

4    irreparable injury.

5         I'm going to get into in a minute about irreparable harm,

6    the weighing of the equities, and how I deal with combining

7    certain factors in a moment.  But the notion that telling a

8    doctor he cannot refer a patient to another doctor in state or

9    out of state is only regulation of conduct and not speech is

10   something that I just can't process in my mind.  Since I

11   believe it is clearly speech, there's also a likelihood of

12   success on the First Amendment.  I'm not sure that based on

13   that finding that there wouldn't be strict scrutiny on the

14   First Amendment thing, but I'll work those out before the final

15   hearing on what actual level of scrutiny will be applied.

16        For purposes of this hearing, I'm going to say that

17   intermediate scrutiny would happen, but again, that they would

18   likely succeed on any standard review, rational basis or

19   otherwise.  Plaintiffs argue that the Act is content-based and

20   viewpoint discriminatory because it bars a practitioner from

21   referring gender-affirming medical care.  And I agree with that

22   contention as well as the fact that, for purposes of 12(b)(6),

23   I'm to consider it as true.  We've had a lot of discussion

24   about irreparable harm.

25        Mr. Wagner, I meant no disrespect by challenging you on

1   some of the things we talked about.  You have done an excellent

2   job representing the state with what you had.  But I think it's

3   clear even by the statements that you made that while the Act

4   probably doesn't allow it, we're still going to allow them to

5   step down or step away from this care by allowing them six more

6   weeks or whatever of this care.  To pull this care midstream

7   from these patients or minors would cause irreparable harm.

8       The status quo for a very long time has been that there's

9   been no ban.  The notion that the legislature woke up as soon

10  as the United Kingdom issued a deal or a paper saying this was

11  experimental medicine and that they needed to rush in and

12  protect these children is not credible to me.  So the balancing

13  of the interest, the public interest and the equities while in

14  favor of these plaintiffs, the notion that they could be

15  suffering any mental health effects because of their lack of

16  this care is also irreparable in my opinion.  And so for these

17  reasons, I'm going to grant the preliminary injunction.

18      Does anybody need any further explanation or

19  clarification from me?  I'll look to the plaintiffs first.

20              MR. STRANGIO:  No, Your Honor.  Thank you.

21              THE COURT:  Mr. Wagner?

22              MR. WAGNER:  No, Your Honor.

23              THE COURT:  I'm not sure if there will be an

24  interlocutory appeal, but how long would y'all need to prepare

25  for a final hearing?  Or do you need to talk about that?

1        MR. WAGNER:  Your Honor, we need to discuss that.

2        THE COURT:  That's fair enough.  I'm just trying to

3   anticipate in light of the pandemic waves and all of that, what

4   rush on the judiciary's resources are going to be coming down

5   the pike.  So as soon as y'all can get an idea and let me know,

6   the sooner I'll be able to block off time for you guys and not

7   have to push you back because of -- my point is it's already

8   getting crowded, and the sooner y'all get in line, the easier

9   it is I'll be able to find time for you.  And I'm going to make

10  it a priority to find time for you, but it's easier to give you

11  a day than a week and it's easier to give you a week when you

12  ask sooner than later.

13        And I don't know what y'all anticipate needing to get

14  ready or how long it would take to argue this case on merits.

15  So I would appreciate y'all letting me know as soon as you

16  figure it out.  Fair enough?  I'm not going to give you a time

17  deadline, it's up to y'all to figure that out, but it's about

18  to get ugly for us, I'm afraid.

19        MR. WAGNER:  Certainly, Your Honor.

20        THE COURT:  Anything else?  Did everybody have an

21  opportunity to fully make their record?  Either writing or

22  verbally?

23        MR. STRANGIO:  Yes, Your Honor.  Thank you.

24        MR. WAGNER:  I think the only question we have, Your

25  Honor, is when to expect a final order reflecting your findings

1  and your order here on the record this morning.

2          THE COURT:  You just got it.  No further order will

3  be forthcoming.

4          MR. WAGNER:  Thank you, Your Honor.

5          MR. STRANGIO:  Your Honor, so does that mean there

6  will be no written opinion corresponding?  This is the final

7  order and written opinion?

8          THE COURT:  Exactly.

9          MR. STRANGIO:  Thank you.

10          THE COURT:  Is that it?  We're in recess.  Thank

11  y'all.

12      (Proceedings adjourned at 11:53 AM.)

13

14                   REPORTER'S CERTIFICATE

15    I certify that the foregoing is a correct transcript of

16  proceedings in the above-entitled matter.

17

18  /s/ Karen Dellinger, RMR, CRR, CCR
    ----------------------------------        Date: July 26, 2021
19  United States Court Reporter

20

21

22

23

24

25