## IN THE UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF ARKANSAS
### CENTRAL DIVISION

DYLAN BRANDT, *et al.*,

                                        PLAINTIFFS,

v.                  No. 4:21-CV-00450-JM

LESLIE RUTLEDGE, *et al.*,

                                        DEFENDANTS.

### CONSOLIDATED RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR ORDER TO SHOW CAUSE AND TO COMPEL PRODUCTION OF DOCUMENTS

This case concerns the SAFE Act, an Arkansas law designed to protect children from experimental medical procedures. It is not about the religious beliefs of individual legislators. Indeed, contrary to Plaintiffs' claims, this is case isn't about and doesn't turn on whether individual legislators voted for the SAFE Act based on their religious convictions or because of the overwhelming scientific evidence that the experimental procedures at issue here harm children. Nevertheless, Plaintiffs have served State Rep. Mary Bentley, Sen. Alan Clark, and Reps. Robin Lundstrum, Marcus Richmond, and Jim Wooten (collectively, the "Legislators") with subpoenas containing document requests broad enough to cover every document each has had possession of since October, 2020 and designed—by Plaintiffs own admission—to probe their religious beliefs. It is a fishing expedition the size of an ocean, designed to do little more than intimidate people of faith. After multiple conferences, Plaintiffs refused to back down from their unreasonable request and now seek an order from the Court requiring production of an overwhelming number of documents that will ultimately bear no relevance to their case.

For the reasons explained below, their motion should be denied. Requests for contempt of a non-party are only proper *after* an order compelling production, so that portion of Plaintiffs'

motion should be dismissed out of hand. Plaintiffs' motion to compel should also be denied because the documents they seek are irrelevant, and the requests are so overbroad as to render them disproportionate to the needs of the case. Moreover, the core category of documents Plaintiffs appear to seek would be protected from disclosure by legislative privilege. At most, the Court should direct Plaintiffs to significantly narrow their discovery requests to alleviate the significant burden they would impose on the Legislators.

## BACKGROUND

On November 8, 2021, Plaintiffs served the Legislators with a subpoena seeking an incredibly broad swath of documents and communications that have no potential to move the needle as to Plaintiffs' ability to prove their case. The specific requests at issue seek:

> 1. All documents and communications concerning the SAFE Act, including, but not limited to: video and audio recordings concerning any state legislative hearings and committee meetings at which the SAFE Act was discussed; documents concerning the proposal, enactment and ratification of the SAFE Act; and documents concerning meetings and correspondence with any individual or organization regarding the SAFE Act, including, but not limited to, the Heritage Foundation and the Alliance Defending Freedom.
>
> 2. All documents and communications concerning gender dysphoria, gender transition, gender transition procedures, transgender people, and medical policies and guidelines related to the treatment of gender dysphoria by professional medical groups, including, but not limited to, the World Professional Association for Transgender Health and the Endocrine Society.
>
> 3. All documents and communications concerning the impact of the SAFE Act on the well-being of minors.[1]

*E.g.*, Doc. 84-1 at 8-9. The subpoenas define "documents and communications" as broadly as imaginable, and then some. "Communications" as defined by Plaintiffs means:

---

[1] As the Legislators read Request 3, it is entirely within the scope of Request 1. Any document that "concerns" the SAFE Act necessarily "concerns" the "impact of the SAFE Act on the well-being of minors."

> the transmittal of facts, ideas, thoughts, opinions, data, inquiries or otherwise and includes, but is not limited to, correspondence, memoranda, reports, presentations, face-to-face conversations, telephone conversations, text messages, instant messages, voice messages, negotiations, agreements, inquiries, understandings, meetings, letters, notes, telegrams, mail, email, and postings of any type.

*Id.* at 5. The 152-word definition of "Documents" is:

> the original (or, if the information requested cannot be provided as to the original, each and every copy, duplicate or reproduction) of any medium upon which information can be recorded or retrieved, and includes any written, recorded or graphic matter, in any language, whether produced or reproduced or stored on paper, cards, tape, film, computer, electronic storage devices or any other media and includes papers, trade letters, envelopes, telegrams, cables, messages, correspondence, memoranda, notes, email, text messages, instant messages, reports, studies, press releases, comparisons, books, accounts, checks, audio and video recordings, pleadings, testimony, articles, bulletins, pamphlets, brochures, magazines, questionnaires, surveys, charts, newspapers, calendars, lists, logs, publications, notices, diagrams, instructions, diaries, meeting minutes, orders, resolutions, agendas and memorials or notes of oral Communications, together with all notations on any of the foregoing, all originals, file copies or other unique copies of the foregoing and all versions of drafts thereof, whether used or not.

*Id.* at 6. Thus, the scope of the request implicates every type of electronic or hard copy of any kind of document that any person could possibly possess, starting in October, 2020.

As far as the substance of the request, documents "concerning" the SAFE Act or the list of transgender-related terms in Request 2 may not seem all that expansive at first blush. But Plaintiffs make clear just how unreasonably broad their documents requests are:

> "Concern" or "concerning" means constituting, pertaining to, making reference to, comprising, evidencing, alluding to, responding to, connected with, commenting on, with respect to, about, regarding, resulting from, embodying, explaining, supporting, contradicting, discussing, showing, describing, reflecting, analyzing, setting forth, in respect of, having a relationship to, or in any way being factually, legally or logically connected to, in whole or in part, the stated subject matter.

*Id.* at 5-6. Lest a reader get the impression that there exists some relational language that falls outside the scope of that definition, Plaintiffs later specify that "in construing the

> the transmittal of facts, ideas, thoughts, opinions, data, inquiries or otherwise and includes, but is not limited to, correspondence, memoranda, reports, presentations, face-to-face conversations, telephone conversations, text messages, instant messages, voice messages, negotiations, agreements, inquiries, understandings, meetings, letters, notes, telegrams, mail, email, and postings of any type.

*Id.* at 5. The 152-word definition of "Documents" is:

> the original (or, if the information requested cannot be provided as to the original, each and every copy, duplicate or reproduction) of any medium upon which information can be recorded or retrieved, and includes any written, recorded or graphic matter, in any language, whether produced or reproduced or stored on paper, cards, tape, film, computer, electronic storage devices or any other media and includes papers, trade letters, envelopes, telegrams, cables, messages, correspondence, memoranda, notes, email, text messages, instant messages, reports, studies, press releases, comparisons, books, accounts, checks, audio and video recordings, pleadings, testimony, articles, bulletins, pamphlets, brochures, magazines, questionnaires, surveys, charts, newspapers, calendars, lists, logs, publications, notices, diagrams, instructions, diaries, meeting minutes, orders, resolutions, agendas and memorials or notes of oral Communications, together with all notations on any of the foregoing, all originals, file copies or other unique copies of the foregoing and all versions of drafts thereof, whether used or not.

*Id.* at 6. Thus, the scope of the request implicates every type of electronic or hard copy of any kind of document that any person could possibly possess, starting in October, 2020.

As far as the substance of the request, documents "concerning" the SAFE Act or the list of transgender-related terms in Request 2 may not seem all that expansive at first blush. But Plaintiffs make clear just how unreasonably broad their documents requests are:

> "Concern" or "concerning" means constituting, pertaining to, making reference to, comprising, evidencing, alluding to, responding to, connected with, commenting on, with respect to, about, regarding, resulting from, embodying, explaining, supporting, contradicting, discussing, showing, describing, reflecting, analyzing, setting forth, in respect of, having a relationship to, or in any way being factually, legally or logically connected to, in whole or in part, the stated subject matter.

*Id.* at 5-6. Lest a reader get the impression that there exists some relational language that falls outside the scope of that definition, Plaintiffs later specify that "in construing the

> the transmittal of facts, ideas, thoughts, opinions, data, inquiries or otherwise and includes, but is not limited to, correspondence, memoranda, reports, presentations, face-to-face conversations, telephone conversations, text messages, instant messages, voice messages, negotiations, agreements, inquiries, understandings, meetings, letters, notes, telegrams, mail, email, and postings of any type.

*Id.* at 5. The 152-word definition of "Documents" is:

> the original (or, if the information requested cannot be provided as to the original, each and every copy, duplicate or reproduction) of any medium upon which information can be recorded or retrieved, and includes any written, recorded or graphic matter, in any language, whether produced or reproduced or stored on paper, cards, tape, film, computer, electronic storage devices or any other media and includes papers, trade letters, envelopes, telegrams, cables, messages, correspondence, memoranda, notes, email, text messages, instant messages, reports, studies, press releases, comparisons, books, accounts, checks, audio and video recordings, pleadings, testimony, articles, bulletins, pamphlets, brochures, magazines, questionnaires, surveys, charts, newspapers, calendars, lists, logs, publications, notices, diagrams, instructions, diaries, meeting minutes, orders, resolutions, agendas and memorials or notes of oral Communications, together with all notations on any of the foregoing, all originals, file copies or other unique copies of the foregoing and all versions of drafts thereof, whether used or not.

*Id.* at 6. Thus, the scope of the request implicates every type of electronic or hard copy of any kind of document that any person could possibly possess, starting in October, 2020.

As far as the substance of the request, documents "concerning" the SAFE Act or the list of transgender-related terms in Request 2 may not seem all that expansive at first blush. But Plaintiffs make clear just how unreasonably broad their documents requests are:

> "Concern" or "concerning" means constituting, pertaining to, making reference to, comprising, evidencing, alluding to, responding to, connected with, commenting on, with respect to, about, regarding, resulting from, embodying, explaining, supporting, contradicting, discussing, showing, describing, reflecting, analyzing, setting forth, in respect of, having a relationship to, or in any way being factually, legally or logically connected to, in whole or in part, the stated subject matter.

*Id.* at 5-6. Lest a reader get the impression that there exists some relational language that falls outside the scope of that definition, Plaintiffs later specify that "in construing the

scope" of their document requests, "the terms used shall be given their most expansive and inclusive interpretation." *Id.* at 7.

One need not think long nor hard on the breadth of the document requests to realize just how expansive they are. Indeed, given Plaintiffs' unmoored definition of "concerning," it is hard to think of a topic or subject matter that does not "concern" the subject matter of "gender dysphoria" or "transgender people." *Id.* at 9. Masculine and feminine (or gender-neutral, for that matter) pronouns, for example, are certainly a topic of discussion related to both of these items. Reading the document requests in the most "expansive and inclusive manner," as Plaintiffs' have instructed, it is hard to see how any document containing the words "he," "she," or "they" do not fall within the scope of Request 2. The same goes for "male" and "female." Indeed, given that "transgender people" are a logical subset of "people," Request 2 arguably covers any document in any way connected to a "person." One could go on *ad infinitum*. Following the definitions and instructions given by Plaintiffs, there is virtually no document that would fall outside of the scope of Request 2.

The scope of Request 1 is no less burdensome. Indeed, given Plaintiffs' expansive definition of "concerning," every piece of legislation proposed by the General Assembly would arguably "concern" the SAFE Act. Every bill introduced is, in some way, "factually, legally or logically connected to" every other bill. Bills and Acts are numbered sequentially, after all, and are thus "connected" in some way all of the other Bills and Acts that precede or follow them. Thus, Request 1 would cover documents and communications of the Legislators relating to any legislation. And while that may be outside

4

a natural reading of the word "concerning," it is well within the scope of Plaintiffs' definition of the term, coupled with their instruction that these terms "shall be given their most expansive and inclusive interpretation." Doc. 84-1 at 7.

The Legislators unsurprisingly objected to Plaintiffs' document requests, explaining that they seek information not relevant to the legal claims in this case, are disproportionate to the needs of the case, and would in any event be barred by legislative privilege. *See* Doc. 84-7–84-11. Counsel for the Legislators conferred with counsel for Plaintiffs, hoping that the scope of the discovery could be narrowed so as to address the Legislators' proportionality objection. Instead, Plaintiffs produced a list of 93 search terms that do nothing to reduce the astronomical scope of Plaintiffs' document requests. *See* Doc. 84-12 at 4-5. Indeed, two of the search terms are the last names of two of the Legislators (though one is an apparent misspelling). *Id.* And the search terms do nothing to alleviate the burden of searching physical documents and communication.

More fundamentally, as the Legislators pointed out, the list of search terms contains search operators, which are not usable in all of the electronic mediums covered by the broad scope of Plaintiffs' requests. For example, one of Plaintiffs' search terms, "cancer w/10 (breast OR uterine)," Doc. 84-12 at 4, would search for the word "cancer" within ten words of "breast" or "uterine." While this may work when searching for cases on Westlaw or a large corporate database, it does not work when searching for text messages on a smartphone,[2] or on personal email platforms.[3] When the Legislators explained

---

[2] An iPhone, for example, will only accept keyword searches.

[3] *E.g.*, https://support.google.com/mail/answer/7190?hl=en. (detailing the limited operators that are compatible with Gmail).

this issue and suggested the parties create an agreed upon list of search locations and mediums, Plaintiffs suggested that the Legislators were simply "confused" about how to run searches and insisted that all searches be run on the sources identified in Plaintiffs original document requests—*i.e.*, everything that exists, no matter whether those sources can actually be searched using operators. Plaintiffs indicated that if the Legislators did not comply with this impossible request by January 3, they would seek relief from the Court.

## ARGUMENT

Plaintiffs have served extraordinarily broad document requests in an effort to engage in a fishing expedition as to members of the legislature whose religious beliefs they disagree with. This intrusion into the legislative process is overbroad and burdensome to the point of harassment, and Plaintiffs' motion should therefore be denied.

### I. Contempt is not proper at this stage of a discovery dispute.

Plaintiffs' motion is styled as a request for both an order to show cause why the Legislators should not be held in contempt and an order compelling production of the documents they seek. But the only proper request at this juncture is for an order compelling production of documents, so Plaintiffs' request for an order to show cause should be denied.

Rule 45(g) provides that a court "may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it." Fed. R. Civ. P. 45(g). "Adequate excuse" is not defined, but it necessarily includes following the procedures that Rule 45 provides for objecting to a subpoena. The Rule states that that if an objection is made to a subpoena, "the serving party may move the court for the district where compliance is required for an order compelling production or inspection," and such production or inspection "may be required only as directed in the order." Fed. R. Civ. P. 45(d)(2)(B). In other words,

once objections are validly served, compliance with the subpoena is only required upon an order by the court.

Accordingly, "the prevailing view is that a timely objection to a subpoena duces tecum is itself an 'adequate excuse,' precluding a finding of contempt for failure to obey the subpoena." *Bariteau v. Krane*, 206 F.R.D. 129, 131 (W.D. Ky. 2001); *see* also *Cubellis, Inc v. Lift (Louisiana Inst. of Film Tech.), LLC*, No. CV 07-7959, 2009 WL 10680091, at *2 (E.D. La. Jan. 22, 2009) (same); *In re Rum Mktg. Int'l, Ltd.*, No. 07-21466-MC, 2007 WL 2702206, at *3 (S.D. Fla. Sept. 14, 2007) (noting that the "normal procedure[]" is for a witness to "simply serve objections to the subpoena and be excused from compliance pending disposition of a motion to compel").

Generally, "before sanctions can be imposed on a nonparty there must be a violation of a court order in addition to noncompliance with a subpoena." *Hanwha Azdel, Inc. v. C&D Zodiac, Inc.*, No. 6:12-CV-00023, 2013 WL 12314518, at *2 (W.D. Va. Nov. 14, 2013) (quoting *In re Rule 45 Subpoena Issued to Robert K. Kochan*, No. 5:07-MC-44-BR, 2007 WL 4208555, at *3 (E.D.N.C. Nov. 26, 2007)); *see also In re Denture Cream Prod. Liab. Litig.*, 292 F.R.D. 120, 128 (D.D.C. 2013) ("[M]any courts have noted that before sanctions can be imposed under [Rule 45], there must be a court order compelling discovery.") (cleaned up); *Bender v. DelValle*, No. 05CV6459, 2007 WL 1686322, at *2 (S.D.N.Y. June 6, 2007) (noting that "in order to impose sanctions on the nonparty, violation of a court order is generally required in addition to the failure to comply with the subpoena" and collecting cases). Indeed, the 2013 Advisory Committee notes state that "[i]n civil litigation, it would be rare for a court to use contempt sanctions without first ordering compliance with a subpoena." Fed. R. Civ. P. 45(g) advisory committee's note to the 2013 amendment. *See also Martinez v. City of Pittsburg*, No. C 11–01017 SBA (LB),

2012 WL 699462, at *3 (C.D. Cal. Mar. 1, 2012) ("A civil contempt order must be accompanied by a "purge" condition, meaning, it must give the contemnor an opportunity to comply with the order before payment of the fine or other sanction becomes due.").

Here, there has been no order compelling compliance with the subpoenas at issue. The Legislators validly served objections to the subpoenas as expressly allowed under Rule 45. Any consideration of contempt is thus premature, and the Court should treat Plaintiffs' request only as a motion to compel production.

**II.     Plaintiffs' motion to compel should be denied.**

As the Legislators explain above, the Court should treat Plaintiffs' motion solely as a request for an ordering compelling production of documents. That motion should be denied because Plaintiffs' subpoenas seek documents that are irrelevant. Moreover, Plaintiffs' subpoenas are nearly unlimited in scope, seek to probe personal matters of faith, and seek materials that squarely fall within the scope of legislative privilege. At most, the Court should instruct Plaintiffs to significantly limit the scope of their document requests and order the parties to confer regarding any further disputes.

> **A.     The subpoenas seek production of documents that are not relevant to the issues in this case.**

Rule 26 limits discovery to "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case . . . ." Fed. R. Civ. P. 26(b)(1). As explained in Arkansas's briefing, rational-basis review is the appropriate level of scrutiny to apply in this case. Doc. 44 at 71. However, the motivations of individual legislators in proposing and voting for the SAFE Act are not relevant to Plaintiffs' claims under any level of scrutiny.

Plaintiffs point to two paragraphs in their Complaint from which they assert that the documents are relevant. Br. at 5 (citing Compl. ¶¶ 55, 170). They appear to take issue with certain

8

religious views expressed by Reps. Bentley and Wooten. *See* Compl. ¶ 55. From this they posit that the SAFE Act is "based on generalized fears, negative attitudes, stereotypes, and moral disapproval of transgender people." *Id.* at ¶ 170. But the religious beliefs of the members of the General Assembly are irrelevant as to the legislative intent behind the SAFE Act. That intent can be found on the face of the Act discussing the recognized risks of the experimental interventions at issue in this case. *See* 2021 Ark. Act 626, Sec. 2 (legislative findings). The fact that some of the legislators who were concerned about this and thus voted in favor of the SAFE Act were also Christians does not give Plaintiffs free reign to conduct a fishing expedition into their religious beliefs and other areas that will have no bearing on the outcome of their claims. It is certainly not enough to counter "the presumption of legislative good faith" on the part of the General Assembly. *Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018)

Because Plaintiffs' document requests are irrelevant to their claims, along with being overbroad and unduly burdensome, Plaintiffs' motion should be denied.

### B. The subpoenas' massive document request is disproportionate to the needs of the case.

Plaintiffs' motion should be denied because the incredibly broad nature of the document requests is disproportionate to the needs of the case, and the expense outweighs any likely benefit of the discovery. *See* Fed. R. Civ. P. 26(b)(1).

As noted above, the requests—particularly Request 2—are written so expansively that they could plausibly cover any document in the Legislators' possession. And Plaintiffs' own instructions make clear that if such an expansive interpretation is possible, then it is mandatory. *See* Doc. 84-1 at 7. It goes without saying that Plaintiffs do not need every document in the Legislators' possession since October, 2020. And even if ultimate scope of the requests is something

short of every document the Legislators have in their possession, the burden and expense of determining that far outweigh any marginal benefit Plaintiffs might receive.

Plaintiffs' agreement to limit the scope of the requests with the 93 search terms and strings they provided does not lessen that burden. As explained above, physical documents can't be electronically searched in the first place. Moreover, many types of information sources covered by Plaintiffs' requests cannot be searched in the manner specified, *i.e.*, using operators. Should the Court overrule the Legislators' relevance objection and reach the proportionality issue, it should narrow the scope of Plaintiffs' requests to a simple list of search terms designed to actually ferret out documents related to the SAFE Act. Searching for a Legislators' last name, or any document in their possession containing the word "sex," does not remotely alleviate the burden of their requests.

Plaintiffs complain that the Legislators have not provided data or reports indicating just how burdensome complying with their requests would be. First, it is self-evident that requiring the Legislators to produce every document in their possession since October, 2020 is unduly burdensome. Second, as Defendants have explained, using search terms with operators is not possible for many, if not most of the relevant information sources covered by Plaintiffs' requests. Third, many of Plaintiffs' search terms expand, rather than narrow the scope of discovery. Attempting to estimate the burden of complying with these requests would in itself unduly burden the Legislators.

**C.    Legislative privilege bars compelled production of documents requested by the subpoenas.**

Much of Plaintiffs' document requests will be barred by legislative privilege. The Legislators raised this privilege in their objections to Plaintiffs subpoenas. *See* Doc. 84-7–84-11. Given the incredibly broad nature of Plaintiffs' request, it is possible that there are responsive

documents that are not privileged. However, the core of Plaintiffs' requests—documents concerning the SAFE Act—are covered by the privilege and protected from disclosure.[4]

"State legislative privilege in federal question cases protects state legislators and their staffs from compelled disclosure of documentary and testimonial evidence with respect to actions within the scope of legitimate legislative activity." *Favors v. Cuomo*, 285 F.R.D. 187, 209 (E.D.N.Y. 2012). Legislative activity includes preliminary fact-finding and drafting activity. *See id.* (citing *Rodriguez v. Pataki*, 280 F. Supp. 2d 89, 101 (S.D.N.Y.) (magistrate's order), *aff'd*, 293 F. Supp. 2d 302 (S.D.N.Y. 2003))). The privilege protects the legislative process, "encompasses legislative work product and confidential deliberations (including communications even as between political adversaries), extends to staffs (and retained experts), and, where the balance weighs in favor of nondisclosure, protects against both compelled document discovery and testimony." *Favors*, 285 F.R.D. at 210.

Courts have generally settled on a five-factor test when analyzing claims of legislative privilege:

> (i) the relevance of the evidence sought to be protected; (ii) the availability of other evidence; (iii) the "seriousness" of the litigation and the issues involved; (iv) the role of the government in the litigation; and (v) the possibility of future timidity by government employees who will be forced to recognize that their secrets are violable.

*Rodriguez*, 280 F. Supp. 2d at 101.[5] Given the Legislators' objections on relevance and proportionality grounds, they have not yet identified responsive documents which would be covered by

---

[4] The Legislators also raised the possibility of documents being protected by the attorney work product doctrine and attorney-client privilege.

[5] The Legislators agree with Plaintiffs that, given the current posture of the parties' dispute, "it would be purely academic to provide an in-depth analysis of" the privilege issues "at this time." Br. at 7 n.9.

privilege.  The Legislators, of course, agreed that in the event the Court overruled those objections and ordered compliance with Plaintiffs' subpoena, they would provide a privilege log as appropriate.  *E.g.*, 84-7 at 3.  At that time, the Court could assess any specific challenges by Plaintiffs to the Legislators' assertion of privilege.

Plaintiffs now argue that this assertion of privilege is "invalid and inadequate" due to fact that the Legislators have not incurred the extraordinary burden of producing a privilege log.  Br. at 6.  Not so.  Rule 26 requires a party to produce a privilege log only when it "withholds information" on the basis of privilege.  Fed. R. Civ. P. 26(b)(5).  The Legislators have not yet withheld any documents on the basis of privilege; they have instead objected to the requests on relevance on proportionality grounds and have thus not identified responsive documents in order to even begin assessing privilege claims.  Requiring a privilege log at this juncture would subject the Legislators to the very burden they are seeking to avoid.  *See McSweeney v. Kahn*, No. 4:05-CV-0132-HLM, 2010 WL 11507210, at *3 (N.D. Ga. Feb. 4, 2010) (noting that the advisory committee notes to Rule 26 state that "[a] person served a subpoena that is too broad may be faced with a burdensome task to provide full information regarding all that person's claims to privilege or work product protection. Such a person is entitled to protection that may be secured through an objection"); *see also Selective Ins. Co. of Se. v. RLI Ins. Co.*, No. 5:12CV2126, 2017 WL 1206036, at *8 (N.D. Ohio Mar. 31, 2017).

The Legislators have not waived any privileges by complying with the procedures for a non-party to assert them in response to a subpoena.  A privilege log is not required until the Legislators have withheld responsive documents on the basis of privilege.  Thus, Plaintiffs' attack on the Legislators' privilege assertions is premature at this time.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion should be denied.

                                  Respectfully submitted,

                                  LESLIE RUTLEDGE
                                    Arkansas Attorney General

                                DYLAN L. JACOBS (2016167)
                                  Deputy Solicitor General

                              OFFICE OF THE ARKANSAS
                              ATTORNEY GENERAL
                              323 Center Street, Suite 200
                              Little Rock, Arkansas 72201
                              (501) 682-8090
                              Dylan.Jacobs@arkansasag.gov

                              *Counsel for Respondent Legislators*