# IN THE UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF ARKANSAS
# CENTRAL DIVISION

**DYLAN BRANDT ET AL.**                                                                  **PLAINTIFFS**

**vs.**                                      **NO. 4:21-CV-00450-JM**

**LESLIE RUTLEDGE ET AL.**                                                              **DEFENDANTS**

## BRIEF IN SUPPORT OF MOTION TO QUASH AND FOR PROTECTIVE ORDER

Pursuant to Rule 26(c) of the Federal Rules of Civil Procedure, Representative Robin Lundstrum[1] ("Rep. Lundstrum") respectfully submits this brief in support of her Motion to Quash and for Protective Order (the "Motion"), which asks the Court to enter an order quashing a subpoena seeking to take her deposition. Rep. Lundstrum enjoys protection from compelled testimony under the legislative privilege afforded under federal common law as formulated through settled interpretation of federal and state speech or debate clauses.

## I. INTRODUCTION

During the 2021 regular session of the General Assembly, Rep. Lundstrum—along with sixty-four of her colleagues—co-sponsored legislation entitled, "The Save Adolescents from Experimentation (SAFE) Act" (the "Act"). Plaintiffs now challenge the constitutionality of the Act. And in doing so, Plaintiffs have sought mountains of third-party discovery from Rep. Lundstrum and other members of the state legislature. Rep. Lundstrum has cooperated with Plaintiffs' demands for this discovery, having produced more than 6,000 pages of e-mails and other documents to date.

---

[1] A fourth-term incumbent, Rep. Lundstrum currently represents District 87 in the House of Representatives, which includes portions of Benton and Washington Counties. She is the only member of the General Assembly Plaintiffs have targeted for deposition at this point in the litigation.

While Rep. Lundstrum has provided these documents, she has also asserted privilege as to other documents—her legislative communications and draft legislation. This assertion of privilege is not novel; rather, it rests upon the settled rule that a legislator like Rep. Lundstrum cannot be compelled to disclose anything "within the 'legitimate legislative sphere.'" Plaintiffs now seek to force Rep. Lundstrum to sit for deposition. But this demand for testimony will invade the legislative privilege, a privilege recognized by courts across the country for hundreds of years. This privilege arises from a settled principle found in both our state and federal constitutions—that an elected representative "shall not be questioned in any other place." Plaintiffs seek to upend these rules, which courts in Arkansas and across the country have found to be a categorical bar to the discovery Plaintiffs seek from Rep. Lundstrum through her forced deposition. Accordingly, Rep. Lundstrum respectfully asks the Court to enter a protective order and quash the subpoena compelling her attendance at a deposition noticed by Plaintiffs in this case.

## II.   BACKGROUND

The Act prohibits healthcare providers in Arkansas from "provid[ing] gender transition procedures to any individual under eighteen (18) years of age." *See* Act 626 of 2021, § 3 (codified at Ark. Code Ann. § 20-9-1502(a)). Rep. Lundstrum co-sponsored the legislation, originally House Bill 1570, along with forty-two other members of the state House of Representatives. After two amendments and a hearing, the Committee on Public Health, Welfare and Labor returned the bill with a "do-pass" recommendation. Seventy out of 100 state representatives voted in favor of the legislation, sending it to the State Senate for consideration. There, twenty-eight of thirty-five members voted to send the legislation to the Governor for signature. Governor Hutchinson ultimately vetoed the bill, which both chambers in turn voted to override.

Approximately two months before the Act's effective date, Plaintiffs sued the Attorney General and members of the State Medical Board to enjoin its enforcement. *See* ECF No. 1, ¶ 1, n.1. Plaintiffs allege in the Complaint that the Act violates (1) the Fourteenth Amendment's equal protection clause "because it discriminates on the basis of sex and transgender status by prohibiting certain medical treatments only for transgender patients"; (2) the Fourteenth Amendment's due process clause by "interfer[ing] with the right to parental autonomy"; and (3) the First Amendment "by prohibiting healthcare providers from referring their patients for medical treatments that are in accordance with the accepted medical standards of care." *Id.*, ¶ 8.

On November 8, 2021, Plaintiffs began their quest for discovery from five non-party state legislators, including Rep. Lundstrum, by serving subpoenas for the following documents:

1. All documents and communications concerning the SAFE Act, including, but not limited to: video and audio recordings concerning any state legislative hearings and committee meetings at which the SAFE Act was discussed; documents concerning the proposal, enactment and ratification of the SAFE Act; and documents concerning meetings and correspondence with any individual or organization regarding the SAFE Act, including, but not limited to, the Heritage Foundation and the Alliance Defending Freedom.

2. All documents and communications concerning gender dysphoria, gender transition, gender transition procedures, transgender people, and medical policies and guidelines related to the treatment of gender dysphoria by professional medical groups, including, but not limited to, the World Professional Association for Transgender Health and the Endocrine Society.

3. All documents and communications concerning the impact of the SAFE Act on the well-being of minors.

*See* ECF No. 84-3, at 4-5. The parties litigated issues involving the subpoenas, which culminated in an order overruling the legislators' relevance objections and directing Rep. Lundstrum and her colleagues to file a privilege log. ECF No. 98, at 1.

Rep. Lundstrum complied with the Court's order. On March 24, 2022, Rep. Lundstrum and the other legislators produced 6,381 pages of documents responsive to the subpoenas. *See* ECF No. 109, at 1. Because the documents were not privileged, the legislators produced them. *See, e.g.*, Ex. 1, Email from Rep. Lundstrum to Jerry Cox, et al., Apr. 5, 2021, at 1 (announcing a press conference related to the Act); Ex. 2, Email from Rep. Lundstrum to Rep. Lundstrum, Apr. 9, 2021 (inviting other state legislators to a meeting held after the override so legislators could "better prepare [to] answer[] questions . . . constituents may ask"); *see also United States v. Brewster*, 408 U.S. 501, 512 (1972) (no protection under the speech or debate clause for materials involving mere "political matters").

The same day responsive documents were produced, Rep. Lundstrum and the others filed a thirty-nine-page privilege log, which included information (*i.e.*, the Bates range, sender, recipient, timestamp, and subject) concerning all documents withheld on privilege grounds. *See* ECF No. 109-1, at 1. Rep. Lundstrum also provided Plaintiffs with a justification for each privilege call. With respect to the legislative privilege, Rep. Lundstrum withheld documents for reasons including "Privileged draft bill," "Privileged discussion of bill drafts and research emails concerning same," and "Privileged discussion regarding legislative strategy concerning potential support for SB 354." *See id.* at 1, 5. While not all-encompassing, the documents withheld pursuant to the legislative privilege generally fall into one of three categories:

   1. **Communications Between Members of the General Assembly:** For example, Rep. Lundstrum asserted legislative privilege over an e-mail sent to Senator Alan Clark ("Sen. Clark") on April 6, 2021, during which the pair discussed support for the Act in advance of the vote to override the Governor's veto. *See* ECF No. 109-1, at 1. Such communications between legislators are unquestionably privileged. *See, e.g.*, *Edwards v. Vesilind*, 790 S.E.2d 469, 481 (Va. 2016) (holding that "legislators' communications with other legislators are cloaked with constitutional legislative privilege").

2.  **Communication Between Members of the General Assembly or Their Representatives and Employees of the Bureau of Legislative Research ("BLR"):** Rep. Lundstrum withheld an e-mail sent to BLR employee Jessica Beel, with Sen. Clark copied, on January 19, 2021, which discussed draft legislation. *See* ECF No. 109-1, at 5. Such communications with legislative staffers are privileged, especially so where the parties to the communication discuss the drafting or revision of proposed legislation. *See, e.g.*, *Gravel v. United States*, 408 U.S. 606, 616 (1972) (holding that "for the purpose of construing the privilege a [legislator] and his aide are to be treated as one"); *see also* Ark. Code Ann § 10-2-129(b)(1) (affording protection to any "drafting request or information request made to a legislative employee by or on behalf of a legislator").

3.  **Communications Between Members of the General Assembly and Third-Party Advocacy Groups Concerning Draft Legislation or Legislative Strategy:** Finally, for example, Rep. Lundstrum withheld e-mail communication in which draft legislation, legislative strategy, and potential support were discussed with outside interest groups. *See, e.g.*, ECF No. 109-1, at 23 (noting the withholding of an e-mail between Rep. Lundstrum and a representative of the Family Council concerning "revisions" to the Act). Despite the involvement of third parties, these communications also receive protection under the privilege. *See, e.g.*, *Almonte v. City of Long Beach*, 478 F.3d 100, 107 (2d Cir. 2007) (affording protection to communications involving "persons outside the legislature—such as executive officers, partisans, political interest groups, or constituents—to discuss issues that bear on potential legislation, and participating in party caucuses to form a united position on matters of legislative policy").

To date, Plaintiffs *have not challenged a single privilege call* made by Rep. Lundstrum and her four colleagues—each of the 2,557 pages of documents withheld by the legislators on privilege grounds[2] remain uncontested.

Rather than attack the well-founded withholding of documents, Plaintiffs requested to take the deposition of Rep. Lundstrum, informed Plaintiffs that she intended to invoke legislative

---

[2] A handful of documents listed on the privilege log were withheld pursuant to the attorney-client privilege and the work product doctrine.

privilege during the deposition. The parties then conferred, professional and in good faith.[3] During these discussions, Plaintiffs' counsel took the position that the legislative privilege does not "apply," so Rep. Lundstrum must testify without restriction. The parties were ultimately unable to reach agreement on the issue, forcing Rep. Lundstrum to file the Motion.

### III.   ARGUMENT

Plaintiffs' demand to depose Rep. Lundstrum runs afoul of courts' settled interpretation of constitutional speech or debate clauses. Both our state and federal constitution include the same language—"for any speech or debate in either house," members of the General Assembly "shall not be questioned in any other place." U.S. Const. art. I, § 6; Ark. Const. art. V, § 15. Throughout our nation's history, courts have held that these speech or debate clauses must be read "'broadly,'" for their purpose is to shield legislative communications, draft legislation, and motivation evidence and ensure "that the legislative function . . . may be performed independently." *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 502 (1975) (interpreting the privilege as applied to federal elected officials). Plaintiffs wish to upend the law here. This is true regardless of whether an absolute or qualified testimonial privilege is applied. And if permitted to depose Rep. Lundstrum, future litigants will almost assuredly treat this Court's denial of the Motion as tantamount to a judicial endorsement of requests to depose members of the General Assembly in all cases. This prospect threatens to radically alter the way our elected officials conduct their business; it will have a chilling effect on the legislative process and force members of the General Assembly— regardless of party affiliation—to work in fear of being hauled into deposition on a potentially never-ending basis.

---

[3] Plaintiffs served a subpoena on Rep. Lundstrum by agreement. *See* Ex. 3, Subp. Rep. Robin Lundstrum, Apr. 29, 2022, at 1. After Plaintiffs informed Rep. Lundstrum of their position on the legislative privilege (that it does not "apply"), the parties amicably agreed to a process for putting the issue before the Court.

**A.      Legislative Privilege Absolutely Prevents Plaintiffs from Taking the Deposition of Rep. Lundstrum.**

The speech or debate clause is unambiguous—legislators like Rep. Lundstrum "shall not be questioned in any other place." Ark. Const. art. V, § 15; *see also* U.S. Const. art. I, § 6 (identical federal provision). Construing this language, courts have held that far from merely barring questions and compelled disclosure concerning floor statements, the speech or debate clause bars courts from requiring legislators to disclose anything "within the 'legitimate legislative sphere.'" *Eastland*, 421 U.S. at 502-03. The rule make sense; "judicial inquiries into legislative or executive motivation represent a substantial intrusion into the workings of other branches of government," so "[p]lacing a decisionmaker on the stand is therefore 'usually to be avoided.'" *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 268 (1977) (quoting *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 420 (1971)).

As applied to state legislators like Rep. Lundstrum, there exists little or no precedent within the Eighth Circuit. Because this Court's jurisdiction rests with a federal question, federal common law privileges apply. When confronted with this issue, federal courts have distinguished between the assertion of legislative privilege to avoid the production of documents, *see Small v. Hunt*, 152 F.R.D. 509, 513 (E.D.N.C. 1994), as opposed to an absolute testimonial privilege that prevents a state legislator from testifying. *Doe v. Nebraska*, 788 F. Supp. 2d 975, 984 (D. Neb. 2011) ("That is, state and local officials may be protected from testifying, but are not necessarily exempted from producing documents."). The only issue presently before the Court is the latter—should the Court adopt an absolute *testimonial* privilege to prevent Plaintiffs from deposing Rep. Lundstrum?

It should. Many federal courts apply such an absolute privilege[4] to all testimony within "the sphere of legitimate legislative activity." *Cunningham v. Chapel Hill, ISD*, 438 F. Supp. 2d 718, 722 (E.D. Tex. 2006) ("[I]t is reasonable to conclude that the rationales for applying the testimonial privilege to federal, state, and regional legislators apply with equal force to local legislators. Accordingly, local legislators are protected by the testimonial privilege from having to testify about actions taken in the sphere of legitimate legislative activity."); *see also Schlitz v. Commonwealth of Virginia*, 854 F.2d 43, 46 (4th Cir. 1988) ("The purpose of the doctrine is to prevent legislators from having to testify regarding matters of legislative conduct, whether or not they are testifying to defend themselves"); *Miles-Un-Ltd., Inc. v. Town of New Shoreham, R.I.*, 917 F. Supp. 91, 98 (D.N.H. 1996) ("Effectuating the intentions of the legislative immunity doctrine, legislators acting within the realm of legitimate legislative activity, should not be required to be a party to a civil action concerning legislative activities, nor should they be required to testify regarding those actions"); *Simpson v. City of Hampton, Va.*, 166 F.R.D. 16, 19 (E.D. Va. 1996) (holding that "the plaintiffs in the case at bar may undertake to prove the [legislative body] intended to discriminate, but their undertaking may not include the use of the [the legislative body's] personal notes and files"); *2BD Assocs. Ltd. Partnership v. County Commissioners of Queen Anne's County*, 896 F. Supp. 528, 531 (D. Md. 1995) ("[T]he effect of the doctrine is twofold; it protects legislators from civil liability, and it also functions as an evidentiary and testimonial privilege.").

Application of the absolute rule in the present case is further supported by the only Arkansas Supreme Court decision on point. In *Protect Fayetteville v. City of Fayetteville*, the

---

[4] The Supreme Court has ruled that state legislative privileges "yield" only where "important federal interests are at stake, as in the enforcement of federal criminal statutes." *United States v. Gillock*, 445 U.S. 360, 373 (1980).

plaintiffs lodged a constitutional challenge to a new law involving issues of local control passed by the General Assembly, and in doing so, demanded the depositions of two sitting state legislators. *See* 2019 Ark. 28, at 2, 566 S.W.3d 105, 107. The trial court denied a motion to quash, finding that "the legislative privilege provides 'no additional protections for legislators in relation to discovery requests beyond the protection from being questioned about any speech or debate in either house.'" *Id.* at 2, 566 S.W.3d at 107-08. The Arkansas Supreme Court reversed, relying on the federal constitution in holding that the legislators enjoyed a legislative "privilege [that] extends beyond statements and acts made on the literal floor of the House." *Id.* at 6, 566 S.W.3d at 109. The legislators were not forced to testify. Plaintiffs make the same run at oral discovery that the Arkansas Supreme Court rejected in *Protect Fayetteville*. And this Court should reach the same conclusion—that the legislative privilege, especially in light of its purpose, should prevent Plaintiffs from taking the deposition of a sitting member of the General Assembly. *See Spallone v. United States*, 493 U.S. 265, 300 (1990) ("Private lawsuits threaten to chill robust representation by encouraging legislators to avoid controversial issues or stances in order to protect themselves."); *Eastland*, 421 U.S. at 503 ("That interference exists not only when legislators are sued, but also when they are called to defend a lawsuit, because this creates a distraction and forces Members to divert their time, energy, and attention from their legislative tasks to defend the litigation.").

**B.      Should the Court Apply a Qualified Privilege, Plaintiffs Still Cannot Compel the Deposition of Rep. Lundstrum.**

Though downgrading the privilege provided by our speech or debate clause to the status of a mere qualified privilege would be inconsistent with the plain language that legislators "shall not be questioned in any other place," Ark. Const. art. V, § 15, some federal courts have endorsed a qualified legislative privilege for state legislators in federal court. *Doe*, 788 F. Supp. 2d at 984

9

(applying a qualified privilege to a discovery request for "the production of documents"). "These cases generally hold that a deliberative process privilege is qualified and protects only documents which are pre-decisional, deliberative and reflect the subjective intent of the legislators." *Id.* at 985.

Application of this qualified privilege shields Rep. Lundstrum (and the documents she has withheld) because the discovery Plaintiffs seek involves purely "pre-decisional, deliberative [testimony that] reflect[s] the subjective intent of" Rep. Lundstrum. *See Missouri Coalition for Environment Foundation v. U.S. Army Corps of Engineers*, 542 F.3d 1204, 1211 (8th Cir. 2008) (protecting information that was pre-decisional and deliberative). But in any event, a qualified privilege still insulates Rep. Lundstrum from testifying, as the qualified privileged requires courts to apply a four-factor balancing test to assess discoverability: "(1) the relevance of the evidence; (2) the availability of other evidence; (3) the government's role in the litigation; and (4) the extent to which disclosure would hinder frank and independent discussion regarding contemplated policies and decisions." *Doe*, 788 F. Supp. 2d at 985 (quoting *Qamhiyah v. Iowa State Univ. of Sci. & Tech.*, 245 F.R.D. 393, 396 (S.D. Iowa 2007)). Application of these four factors all weigh in favor of Rep. Lundstrum here.

***Relevance.*** The best evidence of legislative intent comes from the text of the statute, as it is the legislative text—and not what any particular legislator may have said about a law—that demonstrates legislative intent and purpose. *See Yamaha Motor Corp., U.S.A. v. Richard's Honda Yamaha*, 344 Ark. 44, 54, 38 S.W.3d 356, 362 (2001); *see also S.W. Ark. Comm., Inc. v. Arrington*, 296 Ark. 141, 146, 753 S.W.2d 267, 269 (1988) (Glaze, J., concurring) (extraneous materials that "merely encompass[] individual views regarding legislative intent" are not relevant). Rep. Lundstrum is but one of many co-sponsors of the legislation. And nearly 100 members of the 135-

10

member legislature voted for the Act, both initially and in order to override the veto.  Thus, to ascertain the body's subjective intent (beyond the Act's explicitly stated purpose) would require full depositions of more than two-thirds of Arkansas's elected representatives, Rep. Lundstrum among them.  To say that such an endeavor would be a wild "fishing expedition" (and waste of time) would be an understatement.

*Other Evidence.*  The plain language of the Act includes nearly four pages of detailed "legislative findings."  *See* Act 626 of 2021, at 1-5.  Moreover, Plaintiffs already have public comments of Rep. Lundstrum and other legislators who voted in favor of the Act, as well as thousands of e-mails and other communications produced many weeks ago.  Plaintiffs have also taken the depositions of some private individuals who testified during committee hearings.  *Cano v. Davis*, 193 F. Supp. 2d 1177, 1179 (C.D. Cal. 2002) ("The legislative privilege does not bar ... a third party non-legislator, from testifying to conversations with legislators and their staffs.").  In light of this potential evidence, Plaintiffs cannot credibly claim that the deposition of Rep. Lundstrum will reveal more.

*Rep. Lundstrum's Role.*  Rep. Lundstrum is a non-party to the case.  She co-sponsored the Act along with *dozens* of other legislators and was just one of nearly 100 votes in favor of the bill.  *Citizens Union of City of New York v. Att'y Gen. of New York*, 269 F. Supp. 3d 124, 169 (S.D.N.Y. 2017) ("[M]erely voting for a law or signing a bill does not render a legislator's role 'direct.'").  Forcing Rep. Lundstrum to testify on these facts provides little, or no, value to the ultimate dispensation of the case.

*Policy.*  The final factor—"the extent to which disclosure would hinder frank and independent discussion regarding contemplated policies and decisions"—weighs strongly in favor of quashing the subpoena.  The purpose of the legislative privilege is to protect legislators from

unwarranted interference with their legislative activity. And to compel the disclosure of communications involving legislators can all too easily be distorted to undermine the democratic process. *See United States v. Rayburn House Off. Bldg., Room 2113, Washington, D.C. 20515*, 497 F.3d 654, 661 (D.C. Cir. 2007) ("[T]he possibility of compelled disclosure may therefore chill the exchange of views with respect to legislative activity. This chill runs counter to the [speech or debate clause's] purpose of protecting against disruption of the legislative process."); *see also McCambridge v. City of Little Rock*, 298 Ark. 219, 228, 766 S.W.2d 909, 913 (1989) (recognizing that Arkansas law's exemption for legislators' unpublished memoranda, working papers, and correspondence "promotes and encourages free exchange of thought"). The Court should not facilitate such a result here. Forcing Rep. Lundstrum to testify will embolden future litigants to demand that our elected officials give deposition or trial testimony in any case involving a constitutional challenge. Such an end runs contrary to the plain language of constitutional speech or debate clauses, the purpose underlying the legislative privilege, and good common sense. So, on balance, the deposition of Rep. Lundstrum is not appropriate even if only a qualified privilege is afforded.

## IV.     CONCLUSION

The Court should grant the Motion and enter an order quashing the deposition subpoena served on Rep. Lundstrum.[5]

---

[5] Rep. Lundstrum recognizes that the legislative privilege, regardless of its contours, does not automatically prevent the discovery of certain non-legislative acts. But Plaintiffs seemingly have no desire to obtain such information in this case, such as Rep. Lundstrum's "acts unrelated to the drafting and passage of the" Act, *Miles-Un-Ltd., Inc.*, 917 F. Supp. at 102, or "questions related to comments [Rep. Lundstrum] might have made to members of the public or the press prior to or after the session in question." *Cunningham*, 438 F. Supp. 2d at 723-24. In light of Plaintiffs' disinterest here, the proper remedy is the outright quashing of the subpoena. But should the Court find some limited basis upon which Rep. Lundstrum could testify, a protective order limiting the subjects of inquiry is appropriate.

Respectfully submitted,

Anton L. Janik, Jr. (Ark. Bar No. 2007271)
Graham Talley (Ark. Bar No. 2015159)
**MITCHELL, WILLIAMS, SELIG,
GATES & WOODYARD, PLLC**
425 West Capitol Avenue, Suite 1800
Little Rock, Arkansas 72201
Phone:  501-688-8800
Fax:  501-688-8807
ajanik@mwlaw.com
gtalley@mwlaw.com