# Exhibit 2

Page 31

1      Q.   What is the reference addendum in that
2   letter -- or I'm sorry, in that e-mail?
3      A.   So there's a list of scholarly documents
4   that support the assertions made in the letter.
5      Q.   And if I can, I'm going to hand you what
6   I've marked as Exhibit 2.  And this is what has
7   been Bates stamped Brandt Plaintiffs 1815 through
8   1822.
9           (WHEREUPON, THE DOCUMENT WAS MARKED AS
10   EXHIBIT NO. 2 TO THE TESTIMONY OF THE WITNESS AND
11   IS HERETO ATTACHED.)
12   BY ATTORNEY WALAS:
13      Q.   Are these all the text message
14   communications you had with Vincent Wagner
15   regarding the SAFE Act?
16      A.   Yes.
17      Q.   Did you have any communications or
18   documents regarding the SAFE Act that you
19   received from any of the Arkansas House of
20   Representatives Members?
21      A.   Could you please repeat that?
22      Q.   Do you have any communications or
23   documents that were between you and an Arkansas
24   House of Representative Member?
25

Page 32

1   A.   Relevant to the document disclosure?
2   Q.   Yes.  We're talking about Topic 1 still.
3   A.   Okay.  Yes.
4   Q.   And what communications -- well, first,
5   who did you communicate with, that you had
6   documents with?
7   A.   Senator Clark and a liaison with
8   Representative Lundstrum.
9   Q.   Who is Representative Lundstrum's
10  liaison?
11  A.   Jerry Cox.
12  Q.   Who's Jerry Cox?
13  A.   Jerry Cox is the president of Family
14  Council in Arkansas.
15  Q.   What is Family Council?
16  A.   It's a citizen-based organization and --
17  and advocacy group.
18  Q.   What does Family Council advocate for?
19  A.   A variety of issues.
20  Q.   Can you identify any of the issues that
21  they advocate for?
22  A.   They were in support of act -- the SAFE
23  Act.
24  Q.   Did you say they were in support of the
25  SAFE Act?

1    A.   Yes.
2    Q.   So you spoke with Robin Lundstrum's
3  liaison Jerry Cox about the SAFE Act?
4         ATTORNEY LAND:  Object to form.
5         You can answer it.
6         THE WITNESS:  Yes.
7  BY ATTORNEY WALAS:
8    Q.   And did you produce all those
9  communications?
10   A.   Yes.
11   Q.   And you said earlier you had
12 communications with Senator Clark.
13        Did you produce all those
14 communications?
15   A.   Yes.
16   Q.   I'm going to hand you what's been marked
17 as Exhibit 3, Brandt Plaintiffs 1572.
18        (WHEREUPON, THE DOCUMENT WAS MARKED AS
19 EXHIBIT NO. 3 TO THE TESTIMONY OF THE WITNESS AND
20 IS HERETO ATTACHED.)
21 BY ATTORNEY WALAS:
22   Q.   And are those all your communications
23 with Senator Clark about the SAFE Act?
24   A.   Yes.
25   Q.   Did you have any e-mails or any other

1   documents that you received from Senator Clark
2   regarding the SAFE Act?
3          A.   No.
4          Q.   Did you have any communications or
5   documents with the Arkansas Medical Board?
6          A.   No.
7          Q.   I'm going to hand you a packet, Brandt
8   1699 to 1723, and if you'll take a look at these.
9               Are these -- and you can undo those.
10  They're stapled together within that.  It's just
11  so I kept them together.
12              Are these all the e-mail communications
13  that you had that were responsive to Topic Number
14  1?
15         A.   Yes.
16         Q.   Okay.  I'll go ahead and take that back
17  from you for now.  We will go through those in a
18  little bit, rather than mark that as a whole
19  exhibit.
20              So have we gone through all of the
21  communications and documents that you have that
22  were responsive to Topic Number 1 regarding the
23  SAFE Act?
24         A.   So I provided a document set, and then I
25  provided a second document set that included

1   prohibited from accessing?
2        A.   Yes.
3        Q.   What are those?
4        A.   Abortion.
5        Q.   Do you have concerns about the
6   well-being of adolescents with gender dysphoria
7   who are currently receiving hormone therapy if
8   they had to stop that care?
9        A.   Yes.
10       Q.   What are those concerns?
11       A.   That they would -- that they've been
12  on -- on a certain path, and they're no longer
13  going to be on that path, and that's uncertainty.
14       Q.   Could an adolescent who's receiving
15  hormone therapy be harmed if their -- that care
16  was stopped?
17       A.   We're referring again to short term
18  versus long term, so it is conceivable that an
19  adolescent temporarily experience worries, but I
20  don't see a long term problem with that.
21       Q.   Does it best serve the health and
22  well-being of youth with gender dysphoria to ban
23  gender-affirming medical care, regardless of the
24  circumstances?
25       A.   Yes.

Page 206

1       Q.   How does it serve them?
2       A.   Gives them an opportunity to figure out
3  their life.
4       Q.   And are you familiar with the group
5  called the Family Research Council?
6       A.   Yes.
7       Q.   Would you consider yourself a member of
8  that group?
9       A.   No.
10      Q.   Do you know if the Family Research
11 Council opposes gender transition?
12      A.   They do.
13      Q.   Was Family Research Council involved in
14 developing the SAFE Act?
15      A.   I don't know.  I wasn't aware of the
16 SAFE Act until the 12th of March, 2021.
17      Q.   Do you know if Family Research Council
18 was involved in passing the SAFE Act?
19           ATTORNEY LAND:  Objection.
20           THE WITNESS:  Yes.
21           ATTORNEY LAND:  Asked and answered.
22 BY ATTORNEY WALAS:
23      Q.   So how was Family Research Council
24 involved in passing the SAFE Act?
25      A.   Lobbying, contacting witnesses, things

Page 207

1    of that nature.
2         Q.   Were you contacted by Family Research
3    Council to give your testimony about the SAFE
4    Act?
5         A.   Yes.
6         Q.   And who from Family Research Council
7    contacted you?
8         A.   Jerry Cox.
9         Q.   Now, is Family Council --
10        A.   Are we talking about Family Council?
11        Q.   Were you talking about Family Council --
12        A.   Yes.
13        Q.   -- when I said Family Research Council,
14   were you thinking I was talking about Family
15   Council of Arkansas?
16        A.   I'm sorry.
17        Q.   Okay.  So all those questions that you
18   just answered had to do with Family Council of
19   Arkansas?
20        A.   Yes.
21        Q.   Okay.  And your understanding is that
22   Family Council of Arkansas was involved in
23   passing the SAFE Act?
24        A.   Correct.
25        Q.   Okay.  And so, Family Research Council

Page 208

1    is a separate organization.
2             Are you aware of them?
3         A.   I believe that's the national umbrella.
4         Q.   Okay.  And does the national Family
5    Research Council, do they oppose gender
6    transition?
7         A.   I -- I assume so.
8         Q.   Are you a member of that, or do you
9    attend --
10        A.   No.
11        Q.   -- their functions?
12        A.   No.
13        Q.   You didn't have any role in drafting the
14   SAFE Act, correct?
15        A.   Didn't know about it until March 12th.
16        Q.   Okay.  And so, March 12th seems to be a
17   key date.  What happened on March 12th?
18        A.   Jerry Cox contacted me to see if I could
19   testify for the Senate.
20        Q.   And did he -- and he contacted you, was
21   that by e-mail or over phone?
22        A.   To be clear, it was a Facebook instant
23   message, which given that it didn't mention why
24   he was contacting me, I didn't know -- or I
25   didn't think that it was discoverable, but that's