# Exhibit 3

Page 1

1        IN THE UNITED STATES DISTRICT COURT
            EASTERN DISTRICT OF ARKANSAS
2                  CENTRAL DIVISION
_____
3

4    DYLAN BRANDT, et al.,      )
                                )
5                               )
                                )
        Plaintiffs,             )
6                               )Case No.:
     VS.                        )4:21-cv-00450-JM
7                               )
                                )
8    LESLIE RUTLEDGE, et al.,   )
                                )
9                               )
        Defendants.             )
10   _____
11
              AUDIOVISUAL DEPOSITION
12
                        OF
13
              ROGER HIATT, JR., M.D.
14
                 April 26, 2022
15
16
17
18
19
20
21
22
23
24
25

Page 2

1          The audiovisual deposition of ROGER

2     HIATT, JR., M.D. is taken on this, the 26th day

3     of April 2022, on behalf of the Plaintiffs,

4     pursuant to notice and consent of counsel,

5     beginning at approximately 10:00 a.m. in the

6     offices of Alpha Reporting Corporation, a

7     Veritext Company, 236 Adams Avenue, Memphis,

8     Tennessee.

9          This deposition is taken pursuant to the

10    terms and provisions of the Federal Rules of

11    Civil Procedure.

12         All forms and formalities are waived.

13    Objections are reserved, except as to form of the

14    question, to be disposed of at or before the

15    hearing.

16         The signature of the witness was not

17    discussed.

18

19

20

21

22

23

24

25

```
                                    Page 30
 1        Q.   And did you produce all those e-mail
 2   communications?
 3        A.   Yes.
 4        Q.   And did you have text message
 5   communications with him?
 6        A.   Yes.
 7        Q.   And did you produce all those
 8   communications?
 9        A.   Yes.
10        Q.   Did Mr. Wagner provide you with any
11   other documents related to the SAFE Act, HB 1570,
12   that you have not produced in this case?
13        A.   No.
14        Q.   Have you had any other communications or
15   documents with anybody in the Solicitor General's
16   Office?
17        A.   No.
18        Q.   Did you produce all communications and
19   documents with the Arkansas Attorney -- the
20   Arkansas Governor?
21        A.   Yes.
22        Q.   And what did you produce responsive --
23   regarding your communications with the Governor?
24        A.   I provided a letter and a references
25   addendum for the letter.
```

```
                                                    Page 31
```

 1          Q.   What is the reference addendum in that

 2     letter -- or I'm sorry, in that e-mail?

 3          A.   So there's a list of scholarly documents

 4     that support the assertions made in the letter.

 5          Q.   And if I can, I'm going to hand you what

 6     I've marked as Exhibit 2.  And this is what has

 7     been Bates stamped Brandt Plaintiffs 1815 through

 8     1822.

 9               (WHEREUPON, THE DOCUMENT WAS MARKED AS

10     EXHIBIT NO. 2 TO THE TESTIMONY OF THE WITNESS AND

11     IS HERETO ATTACHED.)

12     BY ATTORNEY WALAS:

13          Q.   Are these all the text message

14     communications you had with Vincent Wagner

15     regarding the SAFE Act?

16          A.   Yes.

17          Q.   Did you have any communications or

18     documents regarding the SAFE Act that you

19     received from any of the Arkansas House of

20     Representatives Members?

21          A.   Could you please repeat that?

22          Q.   Do you have any communications or

23     documents that were between you and an Arkansas

24     House of Representative Member?

25

```
                                              Page 32
 1          A.    Relevant to the document disclosure?
 2          Q.    Yes.  We're talking about Topic 1 still.
 3          A.    Okay.  Yes.
 4          Q.    And what communications -- well, first,
 5     who did you communicate with, that you had
 6     documents with?
 7          A.    Senator Clark and a liaison with
 8     Representative Lundstrum.
 9          Q.    Who is Representative Lundstrum's
10     liaison?
11          A.    Jerry Cox.
12          Q.    Who's Jerry Cox?
13          A.    Jerry Cox is the president of Family
14     Council in Arkansas.
15          Q.    What is Family Council?
16          A.    It's a citizen-based organization and --
17     and advocacy group.
18          Q.    What does Family Council advocate for?
19          A.    A variety of issues.
20          Q.    Can you identify any of the issues that
21     they advocate for?
22          A.    They were in support of act -- the SAFE
23     Act.
24          Q.    Did you say they were in support of the
25     SAFE Act?
```

```
                                            Page 33

 1        A.   Yes.

 2        Q.   So you spoke with Robin Lundstrum's

 3   liaison Jerry Cox about the SAFE Act?

 4             ATTORNEY LAND:   Object to form.

 5             You can answer it.

 6             THE WITNESS:   Yes.

 7   BY ATTORNEY WALAS:

 8        Q.   And did you produce all those

 9   communications?

10        A.   Yes.

11        Q.   And you said earlier you had

12   communications with Senator Clark.

13             Did you produce all those

14   communications?

15        A.   Yes.

16        Q.   I'm going to hand you what's been marked

17   as Exhibit 3, Brandt Plaintiffs 1572.

18             (WHEREUPON, THE DOCUMENT WAS MARKED AS

19   EXHIBIT NO. 3 TO THE TESTIMONY OF THE WITNESS AND

20   IS HERETO ATTACHED.)

21   BY ATTORNEY WALAS:

22        Q.   And are those all your communications

23   with Senator Clark about the SAFE Act?

24        A.   Yes.

25        Q.   Did you have any e-mails or any other
```

1   documents that you received from Senator Clark

2   regarding the SAFE Act?

3        A.   No.

4        Q.   Did you have any communications or

5   documents with the Arkansas Medical Board?

6        A.   No.

7        Q.   I'm going to hand you a packet, Brandt

8   1699 to 1723, and if you'll take a look at these.

9             Are these -- and you can undo those.

10  They're stapled together within that.  It's just

11  so I kept them together.

12            Are these all the e-mail communications

13  that you had that were responsive to Topic Number

14  1?

15       A.   Yes.

16       Q.   Okay.  I'll go ahead and take that back

17  from you for now.  We will go through those in a

18  little bit, rather than mark that as a whole

19  exhibit.

20            So have we gone through all of the

21  communications and documents that you have that

22  were responsive to Topic Number 1 regarding the

23  SAFE Act?

24       A.   So I provided a document set, and then I

25  provided a second document set that included

1    communication with the Attorney General's Office.
2    There's a couple things, now that you mention it,
3    I didn't see from that second document set.
4         Q.   Were any of the documents that you
5    haven't seen yet a e-mail or text message
6    communication that you produced between you and
7    any of the individuals listed in Topic 1?
8         A.   Yes.
9         Q.   What communications have you not seen
10   yet that you produced?
11        A.   Drafts.
12        Q.   Did you receive draft communication --
13   did you receive drafts via e-mail communication?
14        A.   Yes.
15        Q.   Did you produce the e-mails that were
16   associated with those drafts?
17        A.   I believe so.  I -- I provided the
18   drafts.
19        Q.   I'm going to hand you what I've marked
20   as Exhibit 4.
21             (WHEREUPON, THE DOCUMENT WAS MARKED AS
22   EXHIBIT NO. 4 TO THE TESTIMONY OF THE WITNESS AND
23   IS HERETO ATTACHED.)
24   BY ATTORNEY WALAS:
25        Q.   And this is Brandt Plaintiff 1698.

1    AND IS HERETO ATTACHED.)

2    BY ATTORNEY WALAS:

3        Q.   And this is -- is this another of the

4    draft declarations you produced in response to

5    the subpoena?

6        A.   It appears to be my final product.

7        Q.   Okay.  So Exhibit 18 appears to be the

8    final product?  I'm going to make a note of that.

9    I'll hand you Brandt 1787 to 1794 and mark that

10   as Exhibit 19.

11            (WHEREUPON, THE DOCUMENT WAS MARKED AS

12   EXHIBIT NO. 19 TO THE TESTIMONY OF THE WITNESS

13   AND IS HERETO ATTACHED.)

14   BY ATTORNEY WALAS:

15       Q.   Now, is that another draft for your

16   declaration in this case?

17            ATTORNEY LAND:  You already gave this.

18   You gave me two copies.

19            ATTORNEY WALAS:  I gave you two.

20            ATTORNEY LAND:  Yeah.

21            ATTORNEY WALAS:  Sorry.

22            THE WITNESS:  Yes.  Yes.

23   BY ATTORNEY WALAS:

24       Q.   All right.  Have we gone through all the

25   draft declarations that you produced in this

```
                                             Page 56
 1    case?
 2         A.    I believe so, yes.
 3         Q.    So Exhibit 14 through 19 are all of your
 4    drafts for your declaration in this case,
 5    correct?
 6         A.    I think 18's the finished product.
 7         Q.    You had not signed 18 yet --
 8         A.    Oh.
 9         Q.    -- though, correct?
10         A.    Correct.
11         Q.    Okay.
12         A.    Yes.
13         Q.    With the caveat that 18 is your final
14    product, you produced six drafts of your report?
15         A.    Okay.
16         Q.    Okay.  And you agree with that?
17         A.    Yes.
18         Q.    Have we exhausted everything that you
19    produced in this case?
20         A.    Yes.
21         Q.    To confirm, you have no other documents
22    or anything else that would be responsive to any
23    of the topics identified in Schedule A that
24    you're aware of?
25         A.    Yes.
```

1         Q.    Okay.   You produced some text messages

2    with former Solicitor General Vincent Wagner,

3    correct?   Earlier, we discussed those things.

4              And you recall those text communications

5    with Vincent Wagner?

6         A.    Yes.

7         Q.    And when we were talking about the

8    communications with members of the Arkansas

9    General Assembly, did you say that you had other

10   communications with them?

11             ATTORNEY LAND:   Object to form.

12             You can answer.

13             THE WITNESS:   I believe the question you

14   asked me was more specific than that.

15   BY ATTORNEY WALAS:

16        Q.    So have you had any text messages with

17   Robin Lundstrum?

18        A.    Could you repeat that question?

19        Q.    Sure.   Have you had any text messages

20   with Robin Lundstrum?

21        A.    Yes.

22        Q.    Have you had any text messages with

23   Robin Lundstrum about the SAFE Act?

24        A.    My text message base -- bank goes back

25   12 months, and I've provided everything I was

 1    able to provide.

 2         Q.   I'm going to hand you what I'll mark as

 3    Exhibit 20, and these are documents that have

 4    been produced by the legislators in relation to

 5    this case.  If you'll go ahead and take a look at

 6    that.

 7              (WHEREUPON, THE DOCUMENT WAS MARKED AS

 8    EXHIBIT NO 20 TO THE TESTIMONY OF THE WITNESS AND

 9    IS HERETO ATTACHED.)

10    BY ATTORNEY WALAS:

11         Q.   Have you had a chance to take a look at

12    Exhibit 20?

13         A.   Yes.

14         Q.   Does that look familiar?

15         A.   It does.

16         Q.   And can you identify what Exhibit 20 is?

17         A.   Text messages.

18         Q.   Who are they text messages between?

19         A.   From me to, I gather -- yeah,

20    Representative Lundstrum.

21         Q.   And if you'll go to -- there's a July

22    22nd text message about -- I don't know.  It's

23    two?

24         A.   Uh-huh.

25         Q.   All right.  And do you see that text

```
                                       Page 59
 1    message from July 22nd?
 2         A.   I do.
 3         Q.   Okay.  And what's that -- what's that a
 4    picture of there?
 5         A.   So that's a picture of me on a -- on an
 6    AV screen.
 7         Q.   And what were you -- what were you doing
 8    on the AV screen there, that they sent you this
 9    picture?
10         A.   I addressed the issue of gender
11    dysphoria, not specific to the SAFE Act and did
12    not believe that to be something required by the
13    Schedule A.
14         Q.   So when you were on the AV screen in the
15    picture, you had been speaking at some sort of
16    event?
17         A.   Yes.
18         Q.   And what was that event?
19         A.   It was a grass roots organization.
20         Q.   Do you recall --
21         A.   I don't recall --
22         Q.   -- the name of it?
23         A.   -- specifically which organization, who
24    asked me to speak about the issue globally, but
25    not specific to the SAFE Act.
```

```
 1          Q.   Who else is in that picture with you?
 2          A.   Representative Lundstrum and Jerry Cox.
 3          Q.   Okay.  Now in these text messages
 4     between you and Robin Lundstrum, do you discuss
 5     your views on the SAFE Act with her?
 6          A.   Yes.
 7          Q.   And let's -- look at the May 29th text
 8     message.  And is that a text message from you to
 9     her?
10          A.   Yes.
11          Q.   And in that message, did you give her
12     your opinions on HB 1570?
13          A.   I did.
14          Q.   And is there a reason you didn't produce
15     these text messages in response to the subpoena?
16          A.   I did not understand the -- the document
17     requested to include this information.  Had I
18     understood that it included this, I certainly
19     would have provided it.
20          Q.   Let's go over that understanding.
21               You -- you understand that
22     Robin Lundstrum is a member of the Arkansas House
23     of Representatives?
24          A.   Yes.
25          Q.   And you produced text messages between
```

```
                                          Page 61
 1    you and Senator Clark?

 2         A.    Yes.

 3         Q.    And the text message on May 29th

 4    specifically references HB 1570?

 5         A.    It does.

 6         Q.    And so, would that be responsive as a

 7    communication concerning HB 1570 between you and

 8    any Arkansas House of Representatives member?

 9         A.    Retrospectively, yes.

10         Q.    Okay.  And is there a reason you send

11    Robin Lundstrum so many articles about

12    transgender people?

13              ATTORNEY LAND:  Object to form.

14              ATTORNEY WALAS:  I'll rephrase it.

15    BY ATTORNEY WALAS:

16         Q.    Is there a reason that you send articles

17    to Robin Lundstrum?

18         A.    As I mentioned before, this is an issue

19    of great concern and -- I choose to follow the

20    advice that not to speak is to speak.  And so, I

21    choose to speak.

22         Q.    Are you friends with Robin Lundstrum?

23         A.    No.  We're acquaintances.

24         Q.    So are you sending these in a

25    professional way?
```

```
                                             Page 62
 1              ATTORNEY LAND:  Object to the form.
 2              ATTORNEY WALAS:  That was a horrible
 3     question.
 4     BY ATTORNEY WALAS:
 5         Q.   What is -- do you have a reason to send
 6     these to her if she's not your friend?
 7         A.   Depends on what the definition of the
 8     word "friend" is.  So now that -- now that --
 9     I'll retract that and say, yes, we are friends.
10         Q.   Okay.  So this is kind of a friendly
11     conversation, not a "here's the reason
12     professionally you should do something"?
13         A.   Correct.
14         Q.   Do you also have conversations with
15     other people about the SAFE Act and your
16     concerns?
17         A.   Yes.
18         Q.   And do you do that over text message?
19         A.   Sometimes.
20         Q.   Okay.  Are you on any group chats?  Let
21     me rephrase that because that could be a lot of
22     things.
23              Are you in any group text message
24     conversations?
25         A.   Yes.
```

1      Q.   Okay.  Who are you in group message

2   conversations with about the SAFE Act?

3      A.   I -- again, I see it as two separate

4   issues.  There's the issue of the SAFE Act, and

5   there's the issue of gender dysphoria.  So I -- I

6   stand by everything I've said to anyone, did not

7   intend to withhold anything.  Perhaps, I didn't

8   interpret this correctly.  But, yes, there have

9   been some text message groups discussing the

10   issue generally.

11      Q.   Did you consult with your attorney --

12   and I'm not asking what he told you.  But did you

13   consult with your attorney about your response to

14   this subpoena request?

15      A.   So from the time the Attorney General's

16   Office reached out to me until, I'm going to say,

17   within the past month, I was under the impression

18   that there was attorney/client privilege.

19           As you'll see, some of the documents are

20   stamped, not by me, but by the office as attorney

21   work product, privileged and confidential, such

22   as Exhibit 19.  I'm a physician.  I'm not an

23   attorney.  I don't live in this environment.  I

24   took no money to participate and take no money to

25   be here today.  I was under the impression that

Page 64

```
 1    they would help me make sure I submitted the
 2    correct documents.
 3              When I late in the game became aware, in
 4    fact, I wasn't represented by Attorney General's
 5    Office, that's when I retained an attorney.  We
 6    worked together about a week.  So I've made
 7    mistakes, and I'm sorry.
 8         Q.   Well, and you're saying that you did
 9    your best to respond.  And I'm just asking if you
10    consulted with anybody in --
11         A.   Yes.
12         Q.   -- trying to respond?  Okay.
13              And looking back at Exhibit 20, your
14    text messages, why do you believe Robin Lundstrum
15    is the handmaid of the Lord?
16              ATTORNEY GREENBERG:  I'm going to
17    object, generally, when you start asking about
18    religious beliefs.
19              THE WITNESS:  So I -- I make no
20    apologies for being a person of faith, but that
21    doesn't invalidate my scientific and medical
22    opinions.
23    BY ATTORNEY WALAS:
24         Q.   Why do you believe Robin Lundstrum is
25    the handmaid of the Lord?
```

```
                                                    Page 65
 1              ATTORNEY GREENBERG:  I'm going to object
 2    again.  You know, if you -- if you want him to
 3    talk about something that's material to this
 4    action, that's fine.  If you want him to talk
 5    about his religious belief, that's improper.
 6    BY ATTORNEY WALAS:
 7        Q.   Did you make the statement on Exhibit 20
 8    that says, I firmly believe you are a handmaid of
 9    the Lord?
10        A.   Yes, I did.
11        Q.   What did you mean when you called
12    Robin Lundstrum a handmaid of the Lord?
13              ATTORNEY LAND:  Object to form and
14    relevance.
15              THE WITNESS:  As I mentioned earlier, I
16    got involved in this issue out of concern for the
17    kids that I treat in the community and generally.
18    I'm concerned that what's being done is harmful
19    to the kids in the long run and, as a person of
20    faith, felt obliged to -- to speak up for kids.
21    BY ATTORNEY WALAS:
22        Q.   So you believe that about her because
23    she sponsored and helped pass the SAFE Act?
24        A.   Yes.
25        Q.   Okay.  I'm going to hand you what I'll
```

```
                                            Page 66
 1    mark as Exhibit 21.
 2              (WHEREUPON, THE DOCUMENT WAS MARKED AS
 3    EXHIBIT NO. 21 TO THE TESTIMONY OF THE WITNESS
 4    AND IS HERETO ATTACHED.)
 5    BY ATTORNEY WALAS:
 6         Q.   And do you -- can you identify what
 7    Exhibit 21 is?
 8         A.   It looks like a group text.
 9         Q.   And are you a member of that group text
10    message?
11         A.   Yes.
12         Q.   Who are the other members of that group?
13         A.   I don't know.  They have initials, but I
14    don't know.
15         Q.   Is it common for you to be in group text
16    messages where you don't know who all the other
17    people are on that message group?
18              ATTORNEY LAND:  Object to form.
19              You can answer.
20              THE WITNESS:  So I'll have a group text
21    and then I'll -- and then sometimes it will go on
22    some.  It looks like JC is probably Jerry Cox,
23    but I -- I don't know offhand who the others are.
24    BY ATTORNEY WALAS:
25         Q.   Do you share your views about medical
```

Page 67

1   care for people diagnosed with gender dysphoria

2   with people that you don't know?

3               ATTORNEY GREENBERG:  I'm sorry.  Could

4   you repeat that question, please?

5               ATTORNEY WALAS:  I'll rephrase it, Dan.

6   BY ATTORNEY WALAS:

7       Q.   Do you share your views about

8   transgender people or gender-affirming medical

9   care in group texts if you don't know who the

10  recipients are?

11              ATTORNEY LAND:  Object to form.

12              You can answer.

13              ATTORNEY GREENBERG:  I'm going to -- I'm

14  going to object to that if you're asking about

15  specific cases that might implicate a

16  patient-doctor privilege.  I think you're asking

17  a more general question, which I think is

18  probably -- which -- which -- which I'm not sure

19  that's what the objection is to.  But it's --

20  it's -- it's something of a vague question.

21              THE WITNESS:  Are we talking about this

22  text group in particular?

23              ATTORNEY WALAS:  First, I want to make a

24  note for the record of the speaking objections

25  are beyond the rules of Federal Rules of

1    Procedure, so please cut them down a little bit.

2    BY ATTORNEY WALAS:

3         Q.   Second, I'm asking if it's common for

4    you to be in group texts?

5         A.   I am in group texts from time to time.

6         Q.   And do you usually know who the people

7    that you are texting are?

8         A.   Yes.

9         Q.   And so, is it common for you to send

10   your views out about transgender people to people

11   that you don't know in a group text?

12        A.   No.  So if -- if the names were here, I

13   could help, but I --

14        Q.   So you can't identify who is in this

15   text message group with you?

16        A.   VW is probably Vincent Wagner.

17        Q.   And do you believe that Texas Republican

18   lawmakers intentionally derailed a bill to ban

19   child sex procedures?

20        A.   I shared an article that I thought would

21   be of interest to the people in the group.

22        Q.   Do you believe the information that you

23   shared?

24        A.   Candidly, in a text message situation,

25   my recollection is that I basically was focused

```
 1    on the title here.  So, I -- but your question
 2    was, do I believe -- could you tell me the
 3    question again?
 4         Q.   Do you believe that Texas Republican
 5    lawmakers intentionally derailed a bill to ban
 6    child sex change procedures?
 7         A.   My recollection is that at the time,
 8    that's what occurred.
 9         Q.   Do you know what it means for parents to
10    have veto power in a transgender child's medical
11    decisions?
12         A.   Yes.
13         Q.   Did you believe parents should have veto
14    power in their child's medical decisions?
15              ATTORNEY LAND:  Object to form.
16              THE WITNESS:  I'm not sure how that's
17    relevant, what I believe.  There are a number of
18    decisions being made in a variety of different
19    directions.  Do I believe that parents of minors
20    should be able to help their kids make good
21    decisions on their medical care?  Yes.
22    BY ATTORNEY WALAS:
23         Q.   What does it mean for a parent to have
24    veto power?
25         A.   So as a general principle, if a child
```

1    wants to do something and the parent doesn't want

2    them to do that, they'd be able to prevent that

3    from occurring.

4         Q.   I'm going to hand you what I'll mark as

5    Exhibit 22.

6              (WHEREUPON, THE DOCUMENT WAS MARKED AS

7    EXHIBIT NO. 22 TO THE TESTIMONY OF THE WITNESS

8    AND IS HERETO ATTACHED.)

9    BY ATTORNEY WALAS:

10        Q.   And is this another set of text messages

11   that you're a part of?

12        A.   Yes.

13        Q.   Do you know who the 12 people are that

14   are in this group text?

15        A.   Some by name.  All are -- let's see.

16   Here's Dr. Melanie Conway, Billy Burleigh, Grady

17   Crosland.  Those who posted, their names appear,

18   Charisse Dean.  Yeah.

19        Q.   So who are all these people that are a

20   member of this group?

21        A.   Concerned citizens who care about this

22   issue.

23        Q.   Are any members of the Arkansas General

24   Assembly a member of this group text?

25        A.   I mean -- I'm assuming that AC must be

Page 71

```
1    Alan Clark, given the -- that this was disclosed,
2    so -- so I assume, yes.
3         Q.   And this set of group texts was not part
4    of your production, correct?
5         A.   Right.  For reasons that I explained
6    earlier.
7         Q.   Okay.  What did you do to prepare for
8    your deposition today?
9         A.   I read over the documents that I
10   submitted.  I talked to my attorney.  I had
11   breakfast with my son this morning, things like
12   that.
13        Q.   Did you have something good?
14        A.   Omelet.
15        Q.   Good.  Did you talk to your son about
16   the case or your testimony today?
17        A.   In general terms, yes.
18        Q.   Did you tell him anything you were going
19   to say?
20             ATTORNEY LAND:  Object to form and
21   relevance.
22             THE WITNESS:  So -- I assume since you
23   asked me the question, you want me to answer it.
24   So I'll answer your question.  I was interested
25   in knowing how he felt about the issue.  I was
```

```
                                      Page 72
```

1    interested in him knowing that I was about to go

2    through something that's difficult, and I was

3    interested in feeling his support.

4    BY ATTORNEY WALAS:

5        Q.    That makes sense.  And did anything he

6    tell you about his views on the issue, is that

7    going to influence the testimony you're giving

8    today?

9        A.    No.

10        Q.    Okay.  And you said you spoke with your

11    attorney.

12              How many times did you meet with him to

13    prepare for your deposition?

14        A.    We had one long intervention, and we had

15    a few short ones.

16        Q.    Okay.  About how long do you think?

17        A.    It was an hour and a half.

18        Q.    Okay.  Did you review any documents

19    during that meeting?

20        A.    I want to say that's privileged

21    information, but since my attorney's not speaking

22    up, I'll say yes, we did.

23              ATTORNEY GREENBERG:  Yeah.  I think

24    that's -- probably not.  Same thing.

25    BY ATTORNEY WALAS:

 1        Q.    Yeah.  And what documents did you

 2   review?

 3        A.    We reviewed several of the documents

 4   that I submitted to -- on Friday.

 5        Q.    And not from your attorney, but did you

 6   glean any new information from those documents

 7   during your review?

 8        A.    From the documents, no.

 9        Q.    Okay.  Did you meet with any of Attorney

10   General Rutledge's or the Medical Board

11   defendants' attorneys to prepare for your

12   deposition?

13        A.    No.

14        Q.    Did you meet with any members of the

15   Arkansas General Assembly to prepare for your

16   deposition today?

17        A.    No.

18        Q.    Did you meet with Jerry Cox to prepare

19   for your deposition today?

20        A.    No.

21        Q.    Anyone with Family Council?

22        A.    No.

23        Q.    So no one else to prepare for your

24   deposition today?

25        A.    I had a conversation with

Page 74

1    Dr. Melanie Conway.
2         Q.    Tell me about your conversation with
3    Dr. Conway.
4         A.    She was aware that I was being deposed.
5    She spoke to me in general terms about deposition
6    generally and the issue specifically.
7         Q.    Did she tell you anything that you
8    intend to repeat here today?
9         A.    No.
10        Q.    Did she tell you anything that you
11   think's going to influence what your testimony is
12   today?
13        A.    I mean, everything that I hear or am
14   exposed to helps inform me, which is why on this
15   Item 8, I just -- I just didn't attempt -- I just
16   -- there's just so many things.  So in some
17   subconscious way, maybe, but -- but nothing --
18   nothing specific.
19        Q.    Did you meet with any of your colleagues
20   to discuss your testimony today?
21        A.    So she's a colleague.  She's a
22   psychiatrist, but that's it.
23        Q.    Okay.
24        A.    I -- I had to get coverage because I had
25   to turn off the phone.  So I spoke to an advanced

1    practice nurse to cover for me, and I told her

2    that I was doing this.

3         Q.   Did she give you any information that's

4    going to influence your testimony today?

5         A.   No.

6         Q.   Okay.  Now we talked about you reviewed

7    some of your documents that you produced already

8    to prepare for today.  Any other documents or

9    anything you reviewed to prepare?

10        A.   I've looked at lots of stuff.  I've

11   looked at lots of stuff.  I suspect that I did

12   look at some documents that -- that, you know,

13   it's -- it's an -- stuff that happened over the

14   weekend, on the issue, I've looked at.

15        Q.   Okay.  Did you go back and listen to

16   your testimony before the senate to prepare for

17   today?

18        A.   No.

19        Q.   Did you make notes on any of the

20   documents that you reviewed in preparation for

21   your deposition today, not that I gave you today?

22        A.   Oh, like handwritten notes?

23        Q.   Uh-huh.

24        A.   No.

25        Q.   And earlier you had -- you had a