# Exhibit A

Page 1

1  IN THE UNITED STATES DISTRICT COURT

2  EASTERN DISTRICT OF ARKANSAS

3  CENTRAL DIVISION

4  CASE NO. 4:21-CV-00450-JM

5  ----------------------------------X

6  DYLAN BRANDT, by and through his

7  Mother, JOANNA BRANDT, et al.,

8        Plaintiffs,

9    V.

10 LESLIE RUTLEDGE, et al.,

11        Defendants.

12 ----------------------------------X

13

14

15    REMOTE/ORAL/WEB VIDEOCONFERENCE

16  VIDEOTAPED DEPOSITION OF AMY E. EMBRY

17   (Sitting in Little Rock, Arkansas)

18           May 10, 2022

19            10:00 a.m.

20

21

22

23

24 Reported by:

25 Maureen Ratto, RPR, CCR

Page 2

1                       * * *

2

3         Videotape deposition of Amy E.

4    Embry, held virtually via Zoom

5    Teleconference, hosted from Veritext

6    Legal Solutions, pursuant to notice,

7    before Maureen Ratto, Certified Court

8    Reporter, License No. XI01165,

9    Registered Professional Reporter,

10   License No. 817125, and Notary Public.

11

12                      * * *

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

```
 1   A P P E A R A N C E S :

 2

 3   Counsel for the Plaintiffs:

 4       SULLIVAN & CROMWELL, LLP

 5       125 Broad Street

 6       New York, New York 10004

 7       BY:  JONATHAN G. LESTER, ESQ.

 8            DANIEL RICHARDSON, ESQ.

 9

10       AMERICAN CIVIL LIBERTIES UNION

11       125 Broad Street

12       New York, New York 10004

13       BY:  LESLIE COOPER, ESQ.

14

15       AMERICAN CIVIL LIBERTIES UNION

16       OF ARKANSAS

17       904 West 2nd Street

18       Little Rock, Arkansas 72201

19       BY:  GARY SULLIVAN, ESQ.

20

21       GILL RAGON OWEN, PA

22       425 West Capitol Avenue

23       Little Rock, Arkansas 72201

24       BY: DRAKE MANN, ESQ.

25            BETH ECHOLS, ESQ.
```

Page 4

1   A P P E A R A N C E S, continued:

2

3   Counsel for the Defendants:

4       SENIOR ASSISTANT ATTORNEY

5       GENERAL, PUBLIC PROTECTION DIVISION

6       OFFICE OF ARKANSAS ATTORNEY GENERAL

7       323 Center Street

8       Little Rock, Arkansas 72201

9       BY:  AMANDA LAND, ESQ.

10

11  ALSO PRESENT:

12  Randy Schoening, Legal Video Specialist

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 5

1            VIDEOGRAPHER:  We are on

2        the audio and video record. It is

3        10:05 a.m.  The date is May 10th,

4        2022.

5            This is the videotape recorded

6        deposition of Amy Embry, taken by

7        counsel for the Plaintiff in the

8        matter of Dylan Brandt, et al

9        versus Leslie Rutledge et al, filed

10       in the United States District Court

11       Eastern, District of Arkansas,

12       Central Division, Case No.

13       4:21-CV-00450-JM.

14           This deposition is being held

15       at Gill Ragon & Owen, PA, 425 West

16       Capitol, Suite 3800, Little Rock,

17       Arkansas.

18           My name is Randy Schoening

19       from the firm of Veritext, I'm the

20       videographer.  The court reporter

21       is Maureen Ratto, from the firm

22       Veritext.

23           Will counsel please introduce

24       themselves for the record.

25           MS. COOPER:  Yes.  Thank you.

Page 6

1       Leslie Cooper from the ACLU for
2       Plaintiffs.
3               MR. LESTER:  John Lester from
4       Sullivan & Cromwell for the
5       Plaintiffs.
6               MR. RICHARDSON:  Daniel
7       Richardson from Sullivan & Cromwell
8       for the Plaintiffs.
9               MR. SULLIVAN:  Gary Sullivan,
10      ACLU of Arkansas for the
11      Plaintiffs, in person.
12              MR. MANN:  Drake Mann, Gill
13      Ragon Owen for the Plaintiffs.
14              MS. LAND:  Amanda Land of the
15      Arkansas Attorney General on behalf
16      of the Defendants.
17              VIDEOGRAPHER:  Will the
18      witness please be sworn?
19                  * * *
20  A M Y  E.  E M B R Y, having been duly
21  sworn by an authorized Notary of the
22  State of Arkansas, testifies as
23  follows:
24  DIRECT EXAMINATION BY MS. COOPER:
25              VIDEOGRAPHER:  You may

```
 1                    AMY E. EMBRY
 2        proceed.
 3        Q.     Thanks so much.  Good morning,
 4   Ms. Embry. I'm Leslie Cooper.  I'm with
 5   the ACLU, counsel for Plaintiffs and I'll
 6   be taking your deposition today.
 7               Before we get started, can I
 8   just ask you to state your full name for
 9   the record?
10        A.     My name is Amy Elizabeth
11   Embry.
12        Q.     Thank you. And have you ever
13   had your deposition taken before?
14        A.     Yes.
15        Q.     Okay. How many times?
16        A.     Once.
17        Q.     Was that in your capacity as
18   an employee of the Board?
19        A.     Yes.
20        Q.     Okay. Can you tell me what
21   that case was about?
22        A.     It was a lawsuit basically for
23   a license action or action against a
24   license, I guess I should say.
25        Q.     So a medical provider
```

```
 1                AMY E. EMBRY
 2   challenging a decision concerning a
 3   licensing --
 4        A.    Correct.
 5        Q.    -- issue?
 6        A.    Correct.
 7        Q.    So you have been deposed once
 8   before, so what I'm about to say may
 9   sound familiar, but just to make sure so
10   we get a clean record I'm going to go
11   over some of the groundrules for
12   deposition taking so the transcript is
13   clear.
14             First thing is, the best we
15   can, to the best we can we should really
16   try to avoid speaking over one another.
17   So if you could give me a chance to
18   finish my question, even if you
19   anticipate what I'm asking, before
20   answering it will prevent the court
21   reporter from having to try to hear two
22   things at once. Does that sound okay?
23        A.    Yes.
24        Q.    Okay. And I similarly will try
25   to wait until you complete your answer to
```

```
 1                 AMY E. EMBRY
 2   ask a new question.
 3              Also, unlike regular
 4   conversations, we have to always answer
 5   verbally. We can't nod or even say a-hum
 6   because that's kind of hard to understand
 7   in -- typed out what that means. So I'm
 8   just going to ask you to do your best to
 9   answer verbally each time. Okay?
10        A.    Okay.
11        Q.    It may be that I'll ask
12   questions that you don't fully understand
13   or are confusing. If that happens, just
14   let me know that the question wasn't
15   clear to you and I can try to ask the
16   question in a different way to clarify
17   it. So please make sure to do that if a
18   question is not clear.  Okay?
19        A.    Okay.
20        Q.    Because if you do answer a
21   question we will assume that means you
22   understood it. Okay?
23              We will take breaks as we go
24   through. I will take them periodically,
25   but if you feel you need to break at any
```

```
 1              AMY E. EMBRY
 2   time before I bring it up just let me
 3   know and we can find a breaking point to
 4   do that. We will just need to make sure
 5   we get completed answers to any questions
 6   pending and then I'll find a time to take
 7   a break. So no problem if you need to
 8   take a break.  Okay?
 9        A.    Okay.
10        Q.    Is there anything that would
11   prevent you from giving complete and
12   accurate testimony today?
13        A.    No.
14        Q.    Okay. Is there any material
15   you're consulting today in connection
16   with your deposition, any notes or
17   written materials?
18        A.    I do not have any notes or
19   anything with me.
20        Q.    Okay. Did you do anything to
21   prepare for your deposition today?
22        A.    Just -- I reviewed the
23   documents received for the deposition, I
24   reviewed that, and spoke with Amanda
25   Land.
```

1              AMY E. EMBRY
2      Q.    And when you say the documents
3  received, what documents are you
4  referring to?
5      A.    That was the document stating
6  that I was going to be deposed today.
7      Q.    Okay. We'll look at that just
8  to confirm. I understand you to be
9  referring to the notice of your
10  deposition; is that your understanding?
11     A.    Yes.
12     Q.    And that included topics for
13  the deposition?
14     A.    Yes.
15     Q.    Okay. You didn't review
16  anything else?
17     A.    No.
18     Q.    Okay. And you said you met
19  with Ms. Land; is that correct?
20     A.    Yes.
21     Q.    And without sharing any
22  content of your conversation, how long
23  did you meet with her?
24     A.    Maybe an hour, maybe an hour.
25  I didn't write down the beginning time or

```
                                              Page 12
  1                    AMY E. EMBRY
  2   ending time, but maybe an hour.
  3        Q.    When was that?
  4        A.    Yesterday.
  5        Q.    And just the one time?
  6        A.    Yes.
  7        Q.    Okay. Did you review any
  8   documents with counsel?
  9             MS. LAND:  Objection.
 10             MS. COOPER:  I'm sorry. I
 11        didn't hear.
 12             MS. LAND:  I made an
 13        objection.
 14        A.    Again, it was the document
 15   that I received for my deposition and
 16   what I would be responsible for answering
 17   today.
 18        Q.    And I probably should have
 19   mentioned this before, that your counsel
 20   may from time to time object to some of
 21   my questions. Some of them may be
 22   objections about the form of my question,
 23   in which case she's making the record and
 24   I can either correct the question or you
 25   can -- or leave it as is and you can
```

Page 13

                    AMY E. EMBRY
1
2    answer.  Unless she makes a privilege
3    objection and instructs you not to
4    answer, otherwise you can continue
5    answering.  Okay?
6         A.    Okay.
7         Q.    Have you spoken with anyone
8    besides Ms. Land about your deposition
9    today?
10        A.    I spoke with higher-ups at the
11   Department of Health to let them know I
12   would be in a deposition today. I also
13   informed the Board that they were being
14   sued and that I would be deposed.
15        Q.    Okay. And when you say you
16   informed the Board, I know that's a lot
17   of people, how did you inform them?
18        A.    I believe it was at a meeting
19   and I just told them that we had received
20   documents that we were being sued because
21   of the legislation that was passed and
22   the question from them was; why are they
23   suing us? And I said I don't know.
24        Q.    And when did this happen?
25        A.    I believe the lawsuit was

```
                                    Page 14
 1                AMY E. EMBRY
 2   filed last fall, so I don't have a date,
 3   a specific date, but it would have been
 4   in the fall or shortly after the lawsuit
 5   was filed.
 6        Q.    So that was a meeting you --
 7   that occurred some time shortly after the
 8   lawsuit was filed in this case; is that
 9   right?
10        A.    It could be. And again, I have
11   to say this was months ago. So it may be
12   that I only spoke with one Board member.
13   I just don't recall. I do know that I did
14   tell a Board member that we're being
15   sued.
16        Q.    Okay. Did you notify the Board
17   at any time in writing that they were
18   being sued?
19        A.    Not to my knowledge.
20        Q.    Okay. And did anybody else
21   notify the Board in writing, besides you,
22   that the Board was being sued?
23        A.    No, just the documents that
24   came.
25        Q.    Okay. And then so that was at
```

Page 15

```
 1                    AMY E.  EMBRY
 2   least several months ago that
 3   communication with at least one Board
 4   member about being sued. But more
 5   recently, since you've been notified
 6   about your deposition, did you speak to
 7   anyone in the Board about that?
 8        A.    No.
 9        Q.    Okay. And I'd like to mark as
10   Exhibit 1 the 30(b)(6) notice of the
11   Board. That will be posted on Exhibit
12   Share in a moment.
13             (Exhibit 1, 30(b)(6) notice
14        for Defendant Arkansas State
15        Medical Board was received and
16        marked on this date for
17        identification.)
18             MS.  LAND:   This is my first
19        time using Exhibit Share, so I'm
20        just making sure I find it as well.
21        Leslie, has it been uploaded to
22        Exhibit Share yet? I am not seeing
23        it.
24             MS.  COOPER:   I think it's
25        still uploading. Sorry about that.
```

```
 1                    AMY E. EMBRY
 2         Let's give it another minute before
 3         we abandon Exhibit Share.
 4              MR. SULLIVAN:  I'm going to
 5         try and reload the exhibit. I
 6         apologize.
 7              MS. COOPER:  Thank you.
 8              MR. RICHARDSON:  If you reload
 9         the folder named Marked Exhibits
10         you should see Exhibit 1, Notice of
11         30(b)(6) deposition.
12              VIDEOGRAPHER:  This is the
13         court reporter, we're going to need
14         someone to share that to a screen
15         share because the witness is not
16         able, I mean, I'm not able to go
17         out of the feed into the share. So
18         can you actually share it on the
19         screen?
20              MS. COOPER:  I think given
21         that tech issue that we didn't
22         realize would be an issue, we
23         should resort to the hardcopies.
24         Can we go off the record for just a
25         moment?
```

```
                                    Page 17
 1                    AMY E. EMBRY
 2              VIDEOGRAPHER:  Yes. We are off
 3        the record at 10:18 a.m.
 4              (Discussion is held off the
 5        record.)
 6              VIDEOGRAPHER:  We are back on
 7        the record at 10:20 a.m.
 8        Q.    Thank you. Ms. Embry, you've
 9   been shown a document that we'd like to
10   mark as as Exhibit 1. Do you recognize
11   this document?
12        A.    Yes.
13        Q.    Is this the Notice of
14   Deposition that you referred to earlier?
15        A.    Yes.
16        Q.    Okay. And you've reviewed this
17   entire document?
18        A.    Yes.
19        Q.    Okay. And do you understand
20   that you have been designated by the
21   Defendant Arkansas State Medical Board to
22   testify on its behalf concerning a number
23   of topics listed in this notice?
24        A.    Yes.
25        Q.    And are you prepared to
```

```
 1                    AMY E. EMBRY
 2    testify on behalf of the Board regarding
 3    the topics listed in this notice?
 4         A.    Yes.
 5         Q.    You can put that aside for
 6    now. Are you currently employed by the
 7    Arkansas State Medical Board?
 8         A.    I am.
 9         Q.    And if I say "the Board" will
10    you understand that I mean the Arkansas
11    State Board?
12         A.    Yes.
13         Q.    And are you currently the
14    Executive Director of the Board?
15         A.    Yes.
16         Q.    Okay. Since when?
17         A.    2018.
18         Q.    And did you hold any position
19    with the Board before 2018?
20         A.    Yes.
21         Q.    What position was that?
22         A.    It was the Administrative
23    Services Manager.
24         Q.    And what were your
25    responsibilities in that position?
```

Page 19

1               AMY E. EMBRY

2        A.    I was responsible for the

3   human resources, accounting, budget,

4   general office management of the Board.

5        Q.    When did you start that

6   position?

7        A.    2014.

8        Q.    Prior to that did you hold any

9   employment with the Board?

10       A.    No.

11       Q.    What did you do before that?

12       A.    I worked at the Department of

13  Finance and Administration for the State

14  of Arkansas.

15       Q.    Do you have any medical

16  training?

17       A.    No.

18       Q.    Any training at all related to

19  healthcare?

20       A.    No.

21       Q.    Can you tell me what your

22  responsibilities are as the Executive

23  Director of the Board?

24       A.    I manage the day-to-day

25  functions of the Board, I have managers

```
1                   AMY E. EMBRY
2    that manage certain sections, I also work
3    closely with the Board for Board meetings
4    and each section within the Board works
5    with the Board in their own way.  In a
6    nutshell, that's what I do.
7          Q.    Now, you mention sections.
8    Could you tell me what the sections are?
9          A.    We have a regulatory section,
10   licensure, we have IT and we have a
11   credentialing section.
12         Q.    And those are all of the
13   sections?
14         A.    Yes.
15         Q.    And you have someone who is a
16   manager for each of those sections; is
17   that right?
18         A.    Yes.
19         Q.    And are there other employees
20   of the Board besides you and those
21   managers?
22         A.    Yes. Those --
23         Q.    I'm sorry.
24         A.    Those managers do have
25   employees and we have right now I would
```

1             AMY E. EMBRY

2    say 25, between 25 and 30 total

3    employees, including the managers and

4    myself.

5         Q.    Okay. And can you tell me

6    within the regulatory section who the

7    employees are or what their positions are

8    and what they do?

9         A.    There are three employees, one

10   of those is a manager.  The manager's

11   name is Juli Carlson and she had two

12   employees who are fairly new, one is

13   Penny Henderson and the other is

14   Elizabeth Jones.

15        Q.    And what are their jobs?

16        A.    They handle all the complaints

17   that come in that need to be processed to

18   the Board, they also handle any letters

19   or communication from the Board to the

20   licensees. They handle continuing medical

21   education audits, any questions that come

22   in as far as how to file a complaint.

23        Q.    And do I assume correctly that

24   the licensing or licensure section has to

25   do with doctors and other healthcare

```
                                      Page 22
 1                AMY E. EMBRY
 2   providers getting their license to
 3   practice in Arkansas; is that correct?
 4        A.    It is the healthcare providers
 5   that we license, that is what they deal
 6   with.
 7        Q.    But any complaints regarding
 8   any licensed healthcare providers go to
 9   the regulation section; is that right?
10        A.    Correct.
11        Q.    Or regulatory, is that what
12   you called it?
13        A.    Yes, ma'am.
14        Q.    Okay. Thank you. The employees
15   in the regulatory section, do any of
16   those employees have medical or
17   healthcare training?
18        A.    Not to my knowledge.
19        Q.    Okay. I want to ask you a few
20   questions about the current Board members
21   of the Board. You have at this point, I'm
22   going to count here.  Maybe you can just
23   tell me how many because you probably
24   know it, how many Board members you have?
25        A.    In all we have 14 Board
```

Page 23

1                    AMY E. EMBRY

2    members.

3         Q.    And of those Board members

4    that are currently on the Board, are all

5    -- have they all been on the Board since,

6    say, the beginning of 2021?

7         A.    With the exception of one. I

8    would have to go back and check my

9    records to see when they came in. I only

10   know of one that was not on the Board as

11   of 2021.

12        Q.    And who was that?

13        A.    Dr. Brian McGee. He was just

14   appointed within the past two months.

15        Q.    And any of the members who

16   were on the Board in January 2021, if you

17   look at that list of people, are any of

18   those members no longer on the Board?

19        A.    Yes.

20        Q.    Who is that?

21        A.    You have Dr. Rutledge,

22   Dr. Staggs. Bear with me, I have to think

23   about this. I think that's it. We've lost

24   two.

25        Q.    So you've lost two and you

Page 24

```
 1                AMY E. EMBRY
 2  gained one?
 3       A.    Correct.
 4       Q.    Okay.
 5             MS. COOPER:  Can we mark as
 6       Exhibit 2, tab 2, please, the
 7       Arkansas Medical Practices Act and
 8       Regulations.
 9             (Exhibit 2, Arkansas Medical
10       Practices Act and Regulations,
11       revised as of December 2, 2020 was
12       received and marked on this date
13       for identification.)
14       Q.    Do you have that in front of
15  you, Ms. Embry?
16             MS. LAND:  I'm showing her my
17       Exhibit Share.
18             MS. COOPER:  I'm sorry. Is
19       there someone speaking that I can't
20       hear on the record?
21             MS. LAND:  That was Amanda
22       Land.  I asked if I could have a
23       copy because I don't believe you
24       are uploading these to --
25             MS. COOPER:  Yeah. We can
```

26

```
                                          Page 25
 1                    AMY E. EMBRY
 2        upload to Exhibit Share
 3        simultaneously. You're able to
 4        review that, Amanda?
 5              MS. LAND:  I'm on Exhibit
 6        Share. It seems to be working
 7        because I can see the first exhibit
 8        that you did upload, but if --
 9        whether it's in paper or Exhibit
10        Share, I don't have a preference.
11              MS. COOPER:  Okay. We will
12        upload all of the exhibits on
13        Exhibit Share for counsel to be
14        able to review while giving
15        hardcopies to the witness. Okay. So
16        we're in the process of uploading
17        Exhibit 2.
18              And Amanda, if you can let me
19        know when you're able to see that.
20              MS. LAND:  It has popped up
21        for me.
22              MS. COOPER:  Amanda, I can't
23        hear you so well. If you can speak
24        a little louder or adjust the mic.
25              MS. LAND:  I can see the
```

```
 1                    AMY E. EMBRY
 2        exhibit.
 3               MS. COOPER:  Great. Thank you.
 4        Q.    Ms. Embry, do you recognize
 5   the document placed in front of you
 6   that's been marked as Exhibit 2?
 7        A.    Yes.
 8        Q.    Okay. And that is the, for the
 9   record, the title page is Arkansas State
10   Medical Board, Arkansas Medical Practices
11   Act and Regulations; is that correct?
12        A.    Yes.
13        Q.    And is this set of -- is this
14   act and set of regulations what governs
15   the Board?
16        A.    Yes.
17        Q.    And I take it you've seen this
18   document before?
19        A.    Yes.
20        Q.    Okay. If you can turn to
21   Section 17-95-301?
22        A.    Let me go to the table of
23   contents to get the page.
24        Q.    I believe it's 21. Is this the
25   provision that dictates the membership of
```

```
                                            Page 27
 1                    AMY E. EMBRY
 2    the Board?
 3          A.     Yes.
 4          Q.     And do I understand correctly
 5    that there are 14 members appointed by
 6    the Governor?
 7          A.     Yes.
 8          Q.     And 10 must be active medical
 9    practitioners?
10          A.     Yes.
11          Q.     And one must be a practicing
12    physician; did I say that right? If you
13    look at Subsection 3 --
14          A.     Yes. That is the one that --
15    yes. There are physicians but this is the
16    one that is appointed by that specific
17    organization. That's what was throwing me
18    on your question.
19          Q.     Understood. Thank you. So
20    there are other physicians on the Board
21    as well?
22          A.     Yes.
23          Q.     Okay. And I understand -- do I
24    understand correctly that two members
25    must not be medical providers; is that
```

```
                                    Page 28
 1                    AMY E. EMBRY
 2    correct?
 3          A.     Yes.
 4          Q.     And one must be an osteopathic
 5    physician?
 6          A.     Correct.
 7          Q.     Now, I'd like to go through
 8    the current members of the Board and ask
 9    you to tell me what their designated
10    position is on the Board? In other words,
11    are they a medical practitioner, are they
12    a non-medical provider, and what their
13    area of practice is, if they are medical
14    providers.
15                 So we can start with -- and if
16    I read a name and that person is no
17    longer on the Board just let me know.
18    Sylvia Simon, is she still on the Board?
19          A.     Yes.
20          Q.     And what is her designated
21    position on the Board?
22          A.     She is the Chairman of the
23    Board, Chairperson of the Board.
24          Q.     And she is a physician?
25          A.     Yes.
```

```
                                             Page 29
  1                    AMY E. EMBRY
  2        Q.     What is her practice area?
  3        A.     I'm going to say family
  4   practice.
  5        Q.     How about Brian Hyatt, is he
  6   still on the Board?
  7        A.     Yes.
  8        Q.     And what is his designated
  9   position?
 10        A.     He is the vice-chair.
 11        Q.     And he's a physician as well?
 12        A.     Yes.
 13        Q.     What is his area of practice?
 14        A.     Psychiatry.
 15        Q.     How about Veryl Hodges?
 16        A.     Yes.
 17        Q.     They're on the Board?
 18        A.     Yes.
 19        Q.     And what is their designated
 20   position?
 21        A.     He is the secretary of the
 22   Board.
 23        Q.     Is he a physician?
 24        A.     Yes.
 25        Q.     I see his title says DO, is
```

```
                                            Page 30
 1                   AMY E. EMBRY
 2   that a doctor of osteopathy, am I saying
 3   that correctly?
 4        A.     Yes.
 5        Q.     Is John Scribber still on the
 6   Board?
 7        A.     That's John Scribner.
 8        Q.     Thank you. Is he still on the
 9   Board?
10        A.     Yes.
11        Q.     And what is his designated
12   position on the Board?
13        A.     He is the treasurer.
14        Q.     And he's a physician?
15        A.     Yes.
16        Q.     What is his area of practice?
17        A.     Family practice.
18        Q.     Okay. Elizabeth Anderson, is
19   she still on the Board?
20        A.     Yes.
21        Q.     Is she a physician?
22        A.     No.
23        Q.     So she's one of the designated
24   non-physicians on the Board?
25        A.     Correct.
```

```
 1                    AMY E. EMBRY
 2        Q.    Okay. Does she have a title
 3   within the Board, such as secretary or
 4   treasurer?
 5        A.    No.
 6        Q.    Rhys Branman still on the
 7   Board?
 8        A.    Yes.
 9        Q.    And what is -- does he have a
10   designated position or title?
11        A.    All the designated were the
12   four officers we've already mentioned.
13        Q.    Okay.  Is Rhys Branman a
14   physician?
15        A.    Yes.
16        Q.    What is his area of practice?
17        A.    Plastic surgery.
18        Q.    Is Robert Breving still on the
19   Board?
20        A.    Yes.
21        Q.    And he's a physician as well?
22        A.    Yes.
23        Q.    What area of practice?
24        A.    Surgery.
25        Q.    Is Edward Gardner still on the
```

```
                                        Page 32
 1                  AMY E. EMBRY
 2    Board?
 3         A.    Yes.
 4         Q.    Is he a physician?
 5         A.    Yes.
 6         Q.    And his area of practice is?
 7         A.    He's an ENT doctor, ENT
 8    physician.
 9         Q.    Is Rodney Griffin still on the
10    Board?
11         A.    Yes.
12         Q.    Is he a physician?
13         A.    Yes.
14         Q.    And is his area of practice?
15         A.    Family medicine, as far as I
16    can recall.
17         Q.    Is Betty Guhman -- am I saying
18    that right?
19         A.    Guhman.
20         Q.    Is Betty Guhman still on the
21    Board?
22         A.    Yes.
23         Q.    Is she a physician?
24         A.    No.
25         Q.    Okay.  Is Timothy Paden still
```

```
                                        Page 33
 1                 AMY E. EMBRY
 2   on the Board?
 3        A.     Yes.
 4        Q.     Is he a physician?
 5        A.     Yes.
 6        Q.     What area of practice?
 7        A.     Family medicine.
 8        Q.     Is Don Philips still on the
 9   Board?
10        A.     Yes.
11        Q.     And he's a physician?
12        A.     Yes.
13        Q.     And what is his area of
14   practice?
15        A.     OBGYN.
16        Q.     Okay. And I believe you said
17   William Rutledge and David Staggs are no
18   longer on the Board?
19        A.     That is correct.
20        Q.     Okay. Are they both
21   physicians?
22        A.     Yes.
23        Q.     And can you tell me what their
24   areas of practice are?
25        A.     Dr. Rutledge was a surgeon and
```

```
                                              Page 34
 1                    AMY E. EMBRY
 2   Dr. Staggs was family practice.
 3        Q.    Okay. Thank you. We were
 4   looking at the Arkansas Medical Practices
 5   Act. If we can go to Section 17-95-303(5)
 6   and I understand that Section 303(5) are
 7   the duties of the Board and it says, "The
 8   Arkansas State Medical Board shall:", and
 9   list a number of items. And number (5)
10   says "have the authority to employ a
11   Medical Director who shall hold a valid
12   license to practice medicine in this
13   State to evaluate medical issues and to
14   assist in investigations pending before
15   its Board."  Did I read that right?
16        A.    Yes.
17        Q.    Does the Board employ a
18   Medical Director?
19        A.    No.
20        Q.    No. Since you've been with the
21   Board have they ever employed a Medical
22   Director?
23        A.    No.
24        Q.    Do you know why that is?
25        A.    No, I do not.
```

```
                                            Page 35

 1                  AMY E. EMBRY
 2        Q.     Okay. Staying in that same
 3   part of the statute, Section 303, under
 4   subsection (7) it says, that the Medical
 5   Board shall "have the power and authority
 6   to employ one or more inspectors as may
 7   be necessary to carry out the provisions
 8   of the Arkansas Medical Practices Act."
 9              Does the Board employ
10   inspectors?
11        A.     We employed one inspector.
12        Q.     Is that in the past?
13        A.     Yes.
14        Q.     When was that?
15        A.     Within the past year. I don't
16   have exact dates.
17        Q.     But you don't currently have
18   any employed inspectors?
19        A.     Not employed by the Board, no.
20        Q.     Do you work with inspectors
21   who are not employed by the Board?
22        A.     Yes.
23        Q.     What is that arrangement? Can
24   you explain that to me?
25        A.     It is in the Arkansas code
```

Page 36

1                    AMY E. EMBRY
2    that we are to use Pharmacy Services at
3    the Arkansas Department of Health for
4    inspections, investigations -- not
5    inspections, investigations.
6         Q.    Is that only for
7    investigations concerning issues relating
8    to prescription of drugs?
9         A.    Yes, and other things, we use
10   it also for others besides just the
11   prescription of drugs.
12        Q.    So these are inspectors that
13   are employed by Pharmacy Services at the
14   Department of Health?
15        A.    Correct, but it's
16   investigators not inspectors.  I believe
17   they're investigators.
18        Q.    So just I want to make sure I
19   understand how this works. If there is a
20   complaint against a physician, for
21   example, and the Board feels the need to
22   do an investigation it would work with an
23   investigator from Pharmacy Services; is
24   that right?
25        A.    Yes.

```
 1               AMY E. EMBRY
 2       Q.    How many investigators do they
 3   have at Pharmacy Services that you work
 4   with?
 5       A.    That I know of, we have worked
 6   with three.
 7       Q.    But are there others there
 8   besides the ones you've worked with?
 9       A.    That is my understanding but
10   that's not my staff, so I can't answer
11   truthfully on that.
12       Q.    Okay. You know of three; is
13   that right?
14       A.    Yes. That is correct.
15       Q.    And what is the role of these
16   investigators?
17              I sort of tried to lay out
18   what I understood but I'm sure that was
19   not a full description.
20              What do these investigators do
21   when you work with them?
22       A.    Well, if the Board votes that
23   there needs to be an investigation on a
24   complaint that comes in a subpoena will
25   be issued that I sign and those
```

1                    AMY E. EMBRY

2    investigators serve that subpoena for

3    whatever is listed in the subpoena.

4         Q.    Do they do anything else?

5         A.    They gather that information,

6    they do -- they evaluate it and they

7    present a report back to the Board

8    offices to present to the Board members.

9         Q.    When you say they gather

10   information, is that information that

11   they gather documents that are requested

12   by a subpoena that they then deliver; is

13   that what you mean?

14        A.    That is correct.

15        Q.    That might be some of their

16   medical records, that kind of thing?

17        A.    It could be, yes.

18        Q.    So the investigator serves the

19   subpoena that asks for documents and then

20   collects those materials and then writes

21   a report about the materials; did I get

22   that right?

23        A.    Yes, they take them back. They

24   will look through them and try to gather

25   what information they can, and then

```
                                          Page 39
 1                  AMY E. EMBRY
 2   present a report to the Board office.
 3        Q.    And who identifies the
 4   documents that are being requested in the
 5   subpoena? Is that an employee of the
 6   Board?
 7        A.    I need you to clarify that
 8   question.
 9        Q.    Sure. So you mention that the
10   investigators from Pharmacy Services will
11   serve the subpoena. Who writes the
12   subpoena?
13        A.    The Board office does, staff
14   at the office writes the subpoena.
15        Q.    Which staff? Let's say it's in
16   -- presumably it's always in a regulatory
17   context, right?
18        A.    Yes, regulatory section.
19        Q.    So that would be the manager
20   or the other employees in the regulatory
21   section would write that subpoena?
22        A.    Correct.
23        Q.    Presumably with counsel is
24   that involved or no?
25        A.    Yes. It's a very generic
```

```
                                         Page 40
 1                AMY E. EMBRY
 2   subpoena listing exactly what we need,
 3   so...
 4        Q.    And then the report is
 5   provided to those within the regulatory
 6   section when it's done?
 7        A.    Yes.
 8        Q.    And then what happens after
 9   that in the investigation process?
10        A.    It is prepared, that report is
11   prepared to be presented to the Board
12   members, it's discussed at the next
13   meeting or if they feel they have enough
14   information from that investigation to
15   present it to the Board.  If not, there
16   may be other things that need to be done
17   and then the Board discusses it and they
18   make a decision on what needs to be done
19   next.
20        Q.    Thank you. While we're in this
21   part of the Arkansas Medical Practices
22   Act, if you can look at 17-95-303
23   subsection (9), bottom of the same page
24   and it's again, "The Arkansas State
25   Medical Board shall consider and give
```

1               AMY E. EMBRY

2    deference to data, studies consensus

3    documents and conclusions issued by the

4    Center For Disease Control and Prevention

5    or the National Institute of Health

6    whenever their data, studies consensus

7    documents and conclusions are relevant to

8    any decision made pursuant to the Board's

9    powers and duties under the Arkansas

10   Medical Practices Act."

11             Is that something the Board

12   does?

13      A.    I have not seen it in my

14   tenure at Director. I don't know if a

15   situation has come up that they have to

16   do that. So during the time that I've

17   been the Board Director, I can't say that

18   I've seen that --

19      Q.    Okay.

20      A.    -- from these organizations

21   listed in this section.

22      Q.    Okay. Have you seen data,

23   studies, consensus documents or

24   conclusions issued by other organizations

25   that were considered by the Board in

```
                                    Page 42
 1                 AMY E. EMBRY
 2   making any decisions concerning
 3   regulation of medical professionals?
 4        A.    I do not recall that. I would
 5   have to go back and look at documents to
 6   see.
 7        Q.    Okay. Is it fair to say the
 8   Board is the State entity in Arkansas
 9   charged with regulating the practice of
10   medicine; is that correct?
11        A.    Yes.
12        Q.    And what does that mean, to
13   regulate the practice of medicine to the
14   Board?
15             MS. LAND:  Object to form. You
16        may answer.
17        A.    Well, they put it in the code
18   that the State Medical Board is -- is --
19   let me start that over.
20             We are responsible for
21   regulating those healthcare professionals
22   that we license. If someone is practicing
23   medicine without a license it is usually
24   referred to our Board. So if someone has
25   another license with another healthcare
```

```
                                    Page 43
 1                  AMY E. EMBRY
 2   licensing board, but it does not fall
 3   within their scope of practice what the
 4   complaint is being made against that
 5   individual, then it will probably be
 6   referred to the Medical Board as
 7   practicing medicine, this individual is
 8   practicing medicine.
 9        Q.    And for those who are licensed
10   by the Board, those medical professionals
11   licensed by the Board, you said you're
12   responsible for regulating those
13   healthcare professionals. What do you
14   mean by "regulating" them?
15        A.    Well, maybe that wasn't the
16   best term but we are responsible for
17   those individuals that are licensed by
18   us, but we work on a complaint basis.
19            So we have between 19 and 20
20   thousand liscensees at the Board right
21   now in various practice and various types
22   of licenses.  And if a complaint comes in
23   every single complaint is reviewed by the
24   Board, every single complaint is reviewed
25   by the Board, and from there it is
```

1                AMY E. EMBRY

2     determined what needs to be done. We do

3     get complaints that it may be, for

4     example, on a nurse, we do not regulate

5     nurses, we forward it onto the Nursing

6     Board.

7          Q.     Thank you.

8          A.     And we work on a complaint

9     basis.

10              MS. COOPER:  Can we see tab 3

11         and mark that as Exhibit 3?

12              (Exhibit 3, printout of the

13         homepage of the Arkansas State

14         Medical Board website was received

15         and marked on this date for

16         identification.)

17              MS. COOPER:  Amanda, if you

18         can let me know if that's available

19         to you.

20              MS. LAND:  Yes, it is. I'll

21         let you know each time going

22         forward.

23         Q.     Thank you.  Ms. Embry, do you

24     recognize what's been marked as Exhibit

25     3?

Page 45

1                        AMY E. EMBRY

2        A.      Yes.

3        Q.      And can you tell me what that

4    is?

5        A.      This is -- it is the homepage

6    or a page from our website.

7        Q.      So I'd like you to read along

8    with me the box to the section in the

9    middle that says, "The Medical Board's

10   mission is to protect the public" --

11   excuse me, I'll start that again. "The

12   Medical Board's mission is to protect the

13   public and act as their advocate by

14   effectively regulating the practices of

15   medical doctors, osteopathic medical

16   directors, physician assistants, medical

17   corporations, respiratory therapists,

18   occupational therapists, occupational

19   therapy assistants, radiology

20   practitioner assistants and radiologist

21   assistants." Did I read that right?

22       A.      Yes, ma'am.

23       Q.      Is this an accurate statement

24   of the Board's mission?

25       A.      Yes.

```
                                          Page 46
 1                    AMY E. EMBRY
 2        Q.     And I understand the Board has
 3   authority to enact regulations to carry
 4   out the purposes and intentions of the
 5   Medical Practices Act; is that right?
 6        A.     Yes.
 7        Q.     So under what circumstances
 8   can the Board enact regulations?
 9        A.     If it is in the law where it
10   says that a licensing board shall or will
11   promulgate a rule or if we are requested
12   by the legislature to do so.
13        Q.     Okay. So I want to unpack that
14   a little bit.
15             So the first scenario is if a
16   statute says the Board shall enact a
17   regulation concerning a particular topic,
18   you will -- the Board will enact a
19   regulation; is that correct?
20        A.     Yes.
21        Q.     Okay. And then a separate
22   scenario is if the legislature requests
23   the Board to enact a regulation; did I
24   understand that right?
25        A.     Yes.
```

Page 47

1                    AMY E. EMBRY

2        Q.     And that's outside of the

3    context of a statute?

4        A.     Yes. That is very rare.

5        Q.     Has that ever happened since

6    you've been with the Board?

7        A.     Yes. It finished up when I

8    became Director. It started with a

9    previous Director and even though we were

10   requested by the legislature to come up

11   with a rule, the rule did not pass and it

12   was not enacted.

13       Q.     What was the issue that the

14   legislature asked you to come up with a

15   rule about?

16       A.     It was basically about

17   cosmetic procedures, as far as what was

18   happening at medical spas, what can be

19   considered the practice of medicine, what

20   cannot be considered the practice of

21   medicine.

22       Q.     And how was that communicated

23   to the Board by the legislature that they

24   wanted you to to come up with a

25   regulation?

Page 48

                    AMY E. EMBRY

1

2        A.     They can either make a request

3    to the Board, themselves, through

4    attorneys, they can ask a Board member,

5    say we're interested in a rule about

6    this. But again, that is very rare and

7    since I've been with the Board since 2014

8    that's only happened once, which the rule

9    did not pass.

10       Q.     Okay. And given that the

11   legislature includes a lot of people,

12   does it have to be that the legislature

13   as a body has voted by majority vote to

14   request that regulation or could an

15   individual legislator ask the Board to

16   enact a regulation?

17       A.     I can only speak to my

18   understanding. I do not have any

19   knowledge of how the legislature would

20   handle that, but to my knowledge and my

21   understanding is that anybody can ask.

22       Q.     Anybody within the

23   legislature?

24       A.     Yes.

25       Q.     Can ask -- let me make sure I

Page 49

                        AMY E. EMBRY

1

2    asked that question that's not broken up

3    for the record.

4              So anybody who is a member of

5    the legislature can ask the Board to

6    enact a regulation; that's your

7    understanding?

8        A.    That is my understanding, but

9    that would be a question for the

10   legislature.

11       Q.    And in the example that you

12   mention, the one time that happened since

13   you've been with the Board, the cosmetic

14   procedure issue, was that a single member

15   of the Board asked for that or how did

16   that come to you?

17       A.    That I do not know because I

18   was not on the front end of that when it

19   began, so I cannot answer to that.

20       Q.    Okay. Can anyone outside of

21   the legislature, who is not a member of

22   the legislature, ask the Board to enact a

23   regulation on a topic?

24       A.    I suppose. I suppose. It has

25   not happened but there is a whole process

Page 50

1                    AMY E. EMBRY
2    that the legislature must approve all the
3    rules. So even if we draft a rule, it has
4    to be approved by the legislature before
5    it can be considered an active rule.
6          Q.    And that's true of all of the
7    rules that have been passed by the Board
8    so far?
9          A.    Correct. Correct.
10         Q.    And I believe there's
11   something like 30-something rules; is
12   that right?
13         A.    That's right.
14         Q.    They've all been approved by
15   the legislature?
16         A.    Yes.
17         Q.    Okay. Has, to your knowledge,
18   any other government official, outside of
19   the legislature, let's say within the
20   executive branch of government, ever
21   asked the Board to enact a regulation?
22         A.    Not to my knowledge, not that
23   I know of.
24         Q.    That would include the
25   Governor's Office has never asked?

1                    AMY E. EMBRY

2        A.    Since I've been Director, I

3   have not received that request.

4        Q.    And are you aware if that's

5   ever happened before?

6        A.    I am not aware if it's

7   happened before.

8        Q.    Okay. Can the Board enact a

9   regulation on its own without being

10  requested to do so by somebody else?

11       A.    It could but, again, it's

12  usually never done. I don't know if it

13  has been done.

14       Q.    So I looked through the

15  regulations that you have and I see that

16  there are lots of different topics about

17  which the Board has passed regulations.

18  I'm just going to list some and ask if

19  you're familiar.

20            I saw one about precautions

21  concerning HIV. And this is not a test.

22  Let me back it up. I'm happy to have you

23  look through.

24            Do I understand correctly that

25  Regulation 16, which is in Exhibit 2 --

Page 52

1                   AMY E. EMBRY

2          A.     That's correct.

3          Q.     -- is about precautions

4    related to HIV and some other

5    communicable diseases; is that correct?

6          A.     Yes.

7          Q.     And then I understand that

8    Regulation 22 has some guidelines

9    concerning laser surgery; is that

10   correct?

11         A.     Yes.

12         Q.     And there are guidelines, or I

13   should say regulations concerning

14   abortion in Regulation 36?

15         A.     Yes.

16         Q.     And there is a Regulation 27

17   concerns informed consent for gastric

18   bypass surgeries; is that right?

19         A.     Yes.

20         Q.     And then Provision 21 relates

21   to -- is a regulation concerning

22   anorexiant drugs. Am I saying that right,

23   anorexiant?

24         A.     Anorexiant.

25         Q.     Now, were you on the Board or

```
                                       Page 53
 1                  AMY E. EMBRY
 2  not on the Board -- excuse me.
 3             Were you employed by the Board
 4  when any of those provisions were
 5  enacted?
 6       A.    The ones that you mentioned?
 7       Q.    Yes.
 8       A.    No, I was not at the Board.
 9       Q.    Okay. And do you know if all
10  of these provisions were prompted by a
11  statutory directive by the legislature?
12       A.    I would need to go back and
13  research but nearly every rule is
14  prompted by legislation.
15       Q.    But some are not?
16       A.    I would have to go back and
17  read the history of each one. So I can't
18  answer that honestly.
19       Q.    Okay. Can we look at
20  Regulation 21 concerning anorexiants?
21             Would looking at this rule, or
22  I should say regulation, provide you with
23  the information about whether it was
24  prompted by a statute?
25       A.    It may.
```

```
 1              AMY E. EMBRY
 2      Q.    Okay.
 3      A.    Again, I could not answer
 4  completely honestly without going back
 5  and looking how this began.
 6      Q.    So from the regulation,
 7  itself, where it says at the end, if you
 8  look along with me, "history adopted
 9  March 13, 1998 amended August 6, 2015
10  effective December 14, 2015", that
11  doesn't tell you what prompted it?
12      A.    It would not tell me because I
13  was not at the Board. If I was there I
14  may remember.
15      Q.    Okay. If the Board had a
16  concern about how medical care was being
17  provided in a particular field, could the
18  Board get together and put together a
19  regulation?
20      A.    They could.
21      Q.    They could. But you don't know
22  if they've ever done that?
23      A.    Not to my knowledge.
24      Q.    They have not done that, to
25  your knowledge, is that what you're
```

```
 1                 AMY E. EMBRY
 2   saying?
 3        A.    I have no memory of them doing
 4   that in my time at the Board.
 5        Q.    And do you know whether prior
 6   to your time at the Board that was ever
 7   done?
 8        A.    I do not know.
 9        Q.    I want to ask some of the
10   process about enacting regulations. Who
11   within the Board, or is it someone within
12   the Board who drafts these regulations?
13        A.    They're usually drafted either
14   by staff or with the assistance of an
15   attorney.
16        Q.    And who decides on the
17   content?
18        A.    The Board votes on the final
19   draft. They approve what will be the rule
20   that will begin -- that will be sent for
21   the promulgation process.
22        Q.    So if it's a draft that
23   relates to let's say -- I guess they're
24   all within the regulatory context, right,
25   all of these regulations?  So if there's
```

Page 56

1                    AMY E. EMBRY
2    -- if somebody were to draft a regulation
3    relating to orthopedics, for example,
4    would the staff who are drafting that
5    regulation look to expertise within the
6    field of orthopedics to draft the
7    regulation?
8          A.    Yes. That would be -- yes.
9                MS. LAND:   Objection to form
10        on that previous question.
11         Q.    Okay. How would they -- how
12   would they do that?
13         A.    They would work with the Board
14   members and the Board members would have
15   their input. The Board members would then
16   say if they did not -- for example, if it
17   was orthopedics, if there is an
18   orthopedic society or association to get
19   some expertise, if they did not have that
20   expertise. And then changes would be made
21   to that and then the Board would vote yay
22   or nay on the draft.
23         Q.    If they were to reach out to
24   an orthopedic society or an organization
25   with expertise, would that mean to then

```
 1                    AMY E. EMBRY
 2   speak with orthopedists who could offer
 3   expertise; is that what you mean?
 4        A.     It could be, yes.
 5        Q.     Could it also be to look at
 6   any best practices guidelines they have?
 7        A.     Could be, yes.
 8        Q.     Have any regulations been
 9   enacted by the Board since you've been
10   employed by the Board?
11        A.     Yes.
12        Q.     Can you tell me which ones?
13        A.     I may not have been the
14   Director, but these are the ones that
15   were -- let me get back to the table of
16   contents. It will be the ones towards the
17   end. 39 was amended, 40 was created, 41,
18   42, 43 and 44 and 45.
19        Q.     Thank you. So let's take, for
20   example, Regulation 40, Arkansas Surgical
21   Technologists. Did the Board reach out to
22   any surgical professional groups in
23   developing that regulation?
24        A.     Let me flip to that. I believe
25   this was taken directly from the code,
```

Page 58

1                      AMY E. EMBRY
2   which is on our rules, it's just cut and
3   paste and put in there what it is.
4        Q.    And by "code" do you mean
5   Arkansas statutes?
6        A.    Yes.
7        Q.    Okay. And let's look at number
8   43, Genetic Counselor Licensure, was that
9   taken directly from the code?
10       A.    Yes.
11       Q.    All of it?
12       A.    To my knowledge, yes.  Without
13   having documents in front of me, to my
14   knowledge yes.
15       Q.    Okay. Is it your understanding
16   that all of the regulations are language
17   from the legislature or -- let me ask it
18   differently. Strike that.
19            Does the Board ever develop
20   language for regulations, itself?
21       A.    Yes.
22       Q.    And is there ever a case where
23   the statute mandates a regulation and
24   certain requirements but the Board may
25   fill that out with additional details in

```
                                    Page 59
 1               AMY E. EMBRY
 2   the regulation?
 3       A.    Yes.
 4       Q.    And is that where the
 5   expertise of professional associations
 6   may come in; is that correct?
 7       A.    Yes.
 8       Q.    Okay. Which professional
 9   associations do you recall the Board
10   having relied on?
11       A.    The ones that we work closest
12   with, the ones that we have the most
13   contact with and I would say, okay, the
14   Medical Society, the Hospital
15   Association, Physician Assistant, and
16   these are all within Arkansas, these are
17   all Arkansas organizations. Let's see who
18   else? Occupational Therapy and
19   Respiratory.
20       Q.    So when you say the Medical
21   Society, is that an association called
22   the Arkansas Medical Society, is that its
23   name?
24       A.    Yes.
25       Q.    And is that a professional
```

```
 1                    AMY E. EMBRY
 2   association of doctors within Arkansas?
 3        A.    Yes, it is.
 4        Q.    Okay. And when you mentioned,
 5   say, the Occupational Therapy, you said
 6   Occupational Therapy, is that an
 7   association, a professional association
 8   of occupational therapists in Arkansas?
 9        A.    Yes, ma'am. I can't remember
10   the exact name off the top of my head.
11        Q.    Okay. And when you've worked
12   with these groups did they -- again, did
13   members of those groups provide expertise
14   as professionals within the field?
15        A.    Sometimes, yes.
16        Q.    And when you've worked with
17   these groups did you ever review -- and
18   by "you" I mean the Board -- best
19   practices guidelines of those
20   organizations?
21        A.    Yes.
22        Q.    And does the Board, when it
23   enacts regulations, attempt to try to
24   enact regulations that are consistent
25   with best practices in a particular
```

```
                                          Page 61
 1                    AMY E. EMBRY
 2    field?
 3         A.     They do try, yes.
 4         Q.     Are you familiar with the
 5    regulation about opioid prescriptions?
 6         A.     Yes.
 7         Q.     Was that a regulation that was
 8    passed based on a statutory mandate?
 9         A.     That was before I was the
10    Director. My understanding is that it was
11    drafted and put through the promulgation
12    process at the request of the legislature
13    because of the opioid epidemic.
14         Q.     So your understanding is
15    that's in that category of a request of
16    the legislature but not a statutory
17    provision?
18         A.     Correct.
19         Q.     That's correct?
20         A.     Yes. That's my understanding.
21         Q.     I may not have heard part of
22    your answer. I understood you to say it
23    was drafted at the request of the
24    legislature because of a concern; is that
25    what I heard?
```

```
                                   Page 62
 1                AMY E. EMBRY
 2        A.     It was because of the opioid
 3   epidemic.
 4        Q.     Okay. That was before your
 5   time on the Board; is that right?
 6        A.     Yes.  Before I was Director,
 7   yes.
 8        Q.     You were employed at the Board
 9   at that time?
10        A.     Yes.  But in my previous job I
11   had nothing to do with the rules or
12   anything.
13        Q.     Understood. Okay. Thank you.
14               You mentioned that the
15   legislature needs to approve any
16   regulations that the Board enacts. Did I
17   understand that correctly?
18        A.     Yes.
19        Q.     Has that always been a
20   requirement since you're aware?
21        A.     Yes.
22        Q.     Since you've been employed by
23   the Board?
24        A.     Yes.
25        Q.     And the process to get the
```

Page 63

```
 1                    AMY E. EMBRY
 2    legislature approval after you enact a
 3    regulation, or I guess you would call it
 4    a proposed regulation at that point, does
 5    it actually have to get voted on by the
 6    State Legislature?
 7         A.    It must be voted on by
 8    committees and subcommittees.
 9         Q.    So it's not the full
10    legislature that has to approve it but
11    the relevant committee; is that correct?
12         A.    That's my understanding, yes.
13         Q.    Is it a particular committee
14    or subcommittee that generally has to
15    approve your regulations?
16         A.    I do know it's -- it's the
17    Rules Subcommittee and I'm sorry, I can't
18    remember the name of the actual committee
19    that it's the subcommittee of.
20         Q.    You mentioned various Arkansas
21    professional medical or related
22    organizations that the Board will
23    sometimes look to for guidance in
24    developing regulations. Does the Board
25    ever look to national professional
```

```
                                        Page 64
 1                AMY E. EMBRY
 2   medical groups like the American Medical
 3   Association?
 4       A.    Since I have been Director I
 5   think it's more for information, data
 6   collection, things of that nature.
 7       Q.    And the Board will look to
 8   those national groups for information and
 9   data collection; is that correct?
10       A.    If needed, yes.
11       Q.    Can you tell me in what
12   context?
13       A.    An example may be that if they
14   need to know what the national average is
15   for a particular prescription of a drug,
16   the AMA, for example, may have that
17   information. They would go to the website
18   and see what information is there, so
19   just basically on an informational scale.
20       Q.    Got it. And when the Board
21   passes a regulation, that's by a majority
22   vote; is that right?
23       A.    Yes.
24       Q.    So it's not a consensus
25   requirement?
```

```
                                        Page 65
 1                AMY E. EMBRY
 2       A.     No, but it does require a
 3   vote.
 4       Q.     Is there a public comment
 5   period for regulations?
 6       A.     Yes.
 7       Q.     Is that before or after it
 8   goes to the legislature?
 9       A.     Before.
10       Q.     So do I understand right, the
11   Board will write the regulation, vote to
12   approve it, then put it out for public
13   comment or do I have that backwards?
14       A.     You are correct.
15       Q.     Okay. And then the Board
16   considers the comments that were made by
17   the public?
18       A.     Absolutely.
19       Q.     And potentially change the
20   regulation as a result?
21       A.     Could be. Could be. That is an
22   option.
23       Q.     And then they would have a
24   perhaps a revised version that they would
25   vote on again; is that right?
```

Page 66

1                    AMY E. EMBRY

2          A.     That is correct.

3          Q.     And at that point it would get

4    sent to the legislature for approval?

5          A.     At that point any changes that

6    are made it has to go through the whole

7    promulgation process again, so it would

8    have the public comment period again and

9    then begin the legislative process.

10         Q.     Okay. Has the legislature ever

11   rejected a proposed regulation?

12         A.     Yes.

13         Q.     Do you know what about?

14         A.     It was the one we discussed

15   earlier, the one about the cosmetic

16   procedures.   That's the only one that I

17   know of.

18         Q.     Oh, I misunderstood. So the

19   Board actually did adopt a regulation but

20   the legislature rejected it; is that

21   right?

22         A.     Correct.

23         Q.     Do you know why?

24         A.     During the committee meeting

25   they thought the Medical Board did not

Page 67

1                    AMY E. EMBRY

2   have the authority to -- to regulate

3   those procedures when they were not their

4   licensees and it was also a scope of

5   practice issue.  So it was voted down in

6   the legislature -- in the committee, in

7   the committee.

8         Q.    And what do you mean by "a

9   scope of practice issue"?

10        A.    Scope of practice basically

11  means was it in the Board's scope to say

12  this -- this person can or cannot do this

13  procedure; was it in the law?

14        Q.    And by "the law" you mean the

15  law that gives the Board authority to

16  regulate various healthcare providers?

17        A.    Yes.

18        Q.    The Arkansas Medical Practices

19  Act?

20        A.    Yes.

21        Q.    Okay. You mention the public

22  comment period. Do public comments ever

23  get submitted on proposed regulations by

24  professional medical groups?

25        A.    Yes.

Page 68

                    AMY E. EMBRY

1

2       Q.      Would those be Arkansas

3    professional medical groups or national

4    groups or both?

5       A.      Usually they are Arkansas.

6       Q.      Would that include the same

7    groups that you mentioned earlier, the

8    Arkansas Medical Society and similar

9    organizations for occupational therapists

10    and physician assistants, I think you

11    said?

12       A.      Yes.

13       Q.      Any others?

14       A.      Not that I can think of but

15    public comments can come from anyone,

16    anywhere on the planet.

17       Q.      Okay. And are those comments

18    from the medical groups given weight by

19    the Board in making a decision?

20       A.      Sometimes.

21       Q.      I want to talk a little bit

22    about licensing.

23             I understand the Board

24    licenses certain kind of medical

25    providers, correct?

Page 69

                    AMY E. EMBRY

1

2       A.      Yes.

3       Q.      And that includes medical

4  doctors, right?

5       A.      Yes.

6       Q.      Where would I find the

7  requirements for licensure of a medical

8  doctor in Arkansas? Where are those

9  contained?

10      A.      They're contained in the

11  Medical Practices Act but they're also on

12  our applications on our website.

13      Q.      Okay. But no other places

14  besides that?

15      A.      Not that I'm aware of.

16      Q.      Okay.

17              MS. COOPER:  Can we look at

18         tab 4 and post that, please, and

19         mark that as Exhibit 4?

20              (Exhibit 4, printout from the

21         Medical Board re: Regulatory and

22         Discipline was received and marked

23         on this date for identification.)

24              MS. LAND:  I have it.

25              MS. COOPER:  Thank you.

1              AMY E. EMBRY

2       Q.     Do you recognize this page?

3       A.     Yes.

4       Q.     Do I understand correctly this

5   is from the Arkansas State Medical

6   Board's website?

7       A.     Yes.

8       Q.     And if you'll read with me the

9   box that says Regulatory/Discipline, it

10  says, "The Arkansas State Medical Board's

11  mission is to protect the health, safety

12  and welfare of the people of the State of

13  Arkansas with the goal that all citizens

14  are provided with the highest quality

15  healthcare. The Medical Board receives

16  and reviews complaints against each type

17  of medical profession it licenses. All

18  complaints received are reviewed by the

19  Medical Board to determine if there have

20  been any violations of the Medical

21  Practices Act. If the Medical Board

22  determines that violations have occurred

23  disciplinary actions are taken."  Did I

24  read that correctly?

25      A.     Yes.

```
                                        Page 71
  1                 AMY E. EMBRY
  2        Q.     Is this an accurate statement
  3   of the Board's mission concerning
  4   regulatory work?
  5        A.     Yes.
  6        Q.     Okay. I'd like to go back to
  7   what we marked as Exhibit 2, the Medical
  8   Practices Act and Regulations.
  9               Before I turn to a particular
 10   provision, I just have a more open
 11   general question.
 12               Can the Board, is it right,
 13   can investigate allegations of wrongdoing
 14   by doctors; is that correct?
 15        A.     Yes.
 16        Q.     And if you can turn to Section
 17   17-80-106. I understand this is the
 18   provision that says, "Investigations and
 19   inspections of alleged wrongdoing",
 20   correct?
 21        A.     Yes.
 22        Q.     If you look down to Section C
 23   it has some subsections there and if you
 24   would like to take the time to read (c),
 25   and then the (2), I have a question about
```

Page 72

                          AMY E. EMBRY

1
2    that. So why don't you take a moment.
3              (Deponent reviews the
4    document.)
5         A.    Okay.
6         Q.    So do I understand correctly
7    from this provision or perhaps somewhere
8    else that the Board can investigate to
9    determine if doctors are practicing their
10   profession in a way as to endanger the
11   general health and welfare of the public?
12        A.    Yes.
13        Q.    So if somebody brings a
14   complaint that there is a doctor engaging
15   in some conduct that they say is harmful,
16   you would investigate that?  You, the
17   Board, will investigate that complaint?
18        A.    Yes.
19        Q.    You mentioned you're a
20   complaint-based -- it's a complaint-based
21   process. If it comes to the attention of
22   the Board that a doctor is practicing in
23   a way that is endangering the public, but
24   nobody has brought a formal complaint,
25   can the Board investigate?

Page 73

1                    AMY E. EMBRY

2        A.     Yes.

3        Q.     Has that ever happened?

4        A.     Oh, yes.

5        Q.     Can you tell me about those

6   times?

7        A.     Well, I don't -- I could not

8   tell you specifically which ones without

9   documents in front of me but other ways

10  that we can be notified is if someone is

11  arrested, if they make the news, if a

12  Board member finds out about it, if it

13  happens in front of a Board member.

14       Q.     And this is something that's

15  happened -- when I say "this" let me

16  rephrase that.

17              Investigations that were done

18  in the absence of a formal complaint, is

19  that something that's happened since

20  you've been with the Board?

21       A.     Yes.

22       Q.     Can you estimate how many

23  times?

24       A.     If I had to guess, if I had to

25  guess in the four years since I've been

Page 74

AMY E. EMBRY

1

2    there, I would say a dozen, maybe a

3    little less. But that's my best guess

4    without documents in front of me.

5         Q.    Understood. And you said you

6    gave some examples of potential ways an

7    issue could come to the Board's attention

8    and in one example you mention was if it

9    made the news.

10         Are there particular examples

11   you can think of where something was in

12   the news that prompted the Board to act?

13         A.    Usually what happens is if we

14   hear on the news that a doctor or a

15   licensee, it doesn't have to be a doctor,

16   just one of our licensees is arrested, if

17   they are actually arrested that sends up

18   red flags. If they are just suspected but

19   no arrest has been made, that still sends

20   up red flags.  But usually an arrest

21   means they have something, some sort of

22   proof that they could justify an arrest.

23   And then we would usually have what's

24   called a "called meeting", which means a

25   meeting outside of our regular scheduled

```
                                      Page 75
 1                    AMY E. EMBRY
 2   board meetings, if that individual is an
 3   immediate threat to the public, and we
 4   could -- the Board could decide; does
 5   this need to be an Emergency Order of
 6   Suspension or what needs to be done?
 7        Q.    And just to understand this
 8   type of circumstance better, I imagine a
 9   doctor or other licensed provider could
10   be arrested for something that has
11   nothing to do with their practice of
12   medicine, say, you know, really bad
13   speeding violations, would that be
14   something that would prompt the Board's
15   attention and investigation?
16        A.    Every situation is different.
17   They look at it; does it put the public
18   in danger? Speeding is one thing, two
19   DUIs is something else. So it just really
20   depends.  That's just examples, it's just
21   an example. So every situation is
22   different and the Board must address that
23   situation and decide what needs to be
24   done.
25        Q.    Have there been times when a
```

Page 76

1                    AMY E. EMBRY
2    licensee was arrested for something
3    related to how they were providing care?
4         A.    Yes.
5         Q.    Can you give me examples?
6         A.    We had a physician who was
7    arrested on suspicion of rape with
8    patients and the Board took actions to
9    protect the public.
10              It was later, once it made it
11   to court, they could not have any
12   witnesses, no witnesses would testify, so
13   all the charges were dropped but the
14   Board had to take action to protect the
15   public.
16        Q.    Any other examples of somebody
17   arrested in relation to the practice of
18   medicine?
19        A.    Not that I can recall. And
20   again, if I had documents in front of me
21   I may have more information.
22        Q.    Could it be a substance abuse
23   issue, arrest for that would be something
24   that could prompt the Board's attention?
25        A.    Yes, absolutely.

1          AMY E. EMBRY

2      Q.    What if, for example, somebody

3  was arrested for writing improper

4  prescriptions, you know, for friends to

5  get painkillers or something like that,

6  would that be something that could prompt

7  the Board's investigation?

8      A.    Yes.

9      Q.    And that would be whether or

10 not somebody brought a formal complaint

11 against the Board, is that right, against

12 the doctor?

13     A.    Not necessarily. There does

14 not have to be a formal complaint if

15 there is an arrest or something that

16 shows substance abuse or that could

17 affect their ability to practice medicine

18 safely.

19     Q.    Okay. Understood. I think I

20 asked the question awkwardly.

21          So there does not need to be a

22 complaint for the Board to investigate?

23     A.    No.

24     Q.    Understood. Have there been

25 any investigations of doctors or other

1                    AMY E. EMBRY

2   licensees for providing care that is

3   considered harmful to patients?

4        A.     Yes.

5        Q.     Can you tell me about those

6   examples?

7        A.     We've had complaints, for

8   example, most recently we've had

9   complaints that a doctor was prescribing

10   a drug to county inmates that they felt

11   was inappropriate. And that's the most

12   recent one.

13        Q.     What drug was that?

14        A.     Ivermectin.

15        Q.     So that was a formal complaint

16   made to the Board?

17        A.     Several formal complaints made

18   to the Board and it also made the news.

19        Q.     That's something that the

20   Board was going to address and did

21   address?

22        A.     Yes. They are currently

23   addressing it and I can't say much more

24   on open investigations.

25        Q.     So the investigation is open

Page 79

1                    AMY E. EMBRY
2      now?
3            A.      Yes.
4            Q.      How many complaints did the
5      Board receive about that Ivermectin use
6      in the jail?
7            A.      Written complaints, if I had
8      to give a ballpark number, around ten.
9            Q.      And what about unwritten?
10           A.      Well, that would be from
11     media, social media and I could not tell
12     you how many there were. There were quite
13     a few but I could not give you an exact
14     number.
15           Q.      Has the Board received any
16     complaints or otherwise chosen to
17     investigate doctors that provided care
18     that departed from accepted standards in
19     the field?
20           A.      Yes.
21           Q.      Can you tell me some of those?
22           A.      I couldn't tell you exactly
23     but it is very common to receive a
24     complaint that the Board reviews in
25     which, for example we'll use surgery,

```
 1              AMY E. EMBRY
 2    somebody writes a complaint that the
 3    surgery did not go well, that they're not
 4    healing well or they're suffering from
 5    that and it is very common when the Board
 6    reviews that complaint they may ask the
 7    surgeons on the Board; is this common?
 8    They will say; yes, this is a common
 9    occurrence in surgery; or no, it is not a
10    common occurrence, and we need to do an
11    investigation.
12         Q.    In the surgery example you
13    gave, that's a real life example that has
14    happened at least once that someone
15    complained about a surgery that they felt
16    went wrong; is that correct?
17         A.    Yes.
18         Q.    And then so the surgeons on
19    the Board would be consulted about
20    whether what was described is a common
21    occurrence or not?
22         A.    That's just my example, but
23    usually during the board meeting all the
24    Board members review that complaint, but
25    some of them may have, you know, may say;
```

```
 1                    AMY E. EMBRY
 2   surgeons, what do you think about this,
 3   and get their expertise.
 4        Q.     And then if there's concern
 5   that it may be inappropriate treatment,
 6   then it would be investigated?
 7        A.     Usually, yes.
 8        Q.     And when you say they may ask
 9   the surgeons about what do you think, is
10   the question; is this conduct by the
11   surgeon at issue consistent with accepted
12   medical practice or something else? I
13   just want to make sure I understand.
14        A.     Yes, it is usually accepted
15   medical practice.
16        Q.     So failure to follow accepted
17   medical practice could be a reason for
18   investigation?
19        A.     Could be.
20        Q.     And to determine the accepted
21   medical practice, does that involve
22   looking to some of these medical
23   professional groups that you talked
24   about?
25        A.     That would be a question for a
```

Page 82

```
 1              AMY E. EMBRY
 2   physician. I can't answer that as an
 3   unphysician, as far as use.
 4        Q.    But for the Board to determine
 5   whether this is something that should be
 6   investigated for failing to comply with
 7   accepted medical practices, how do they
 8   determine that?
 9        A.    There are 14 Board members, so
10   each one determines that individually. I
11   think what I was trying to get to is that
12   if they ask the surgeons their expertise
13   and the surgeon says; this never should
14   have happened, they would have been
15   taught in medical school, or something
16   like that.  So it could be from medical
17   education, it could be from continuing
18   education, it could be from
19   certifications.
20        Q.    When you say "it could be from
21   medical education" and these other
22   things, what is the "it" you mean?
23        A.    Their decision.
24        Q.    Oh, what they might base it
25   on?
```

```
                           AMY E. EMBRY
 1
 2        A.      A-hum.
 3        Q.      I see. But would it be a
 4   violation of the Arkansas State Medical
 5   Practices Act for doctors to provide care
 6   that departs from accepted standards in
 7   the field?
 8                MS. LAND:  Objection to form.
 9        A.      Could you repeat the question?
10        Q.      Sure. Would it be a violation
11   of the Arkansas Medical Practices Act for
12   doctors to provide care in a way that
13   departs from accepted standards in the
14   field?
15        A.      Not necessarily. I think it
16   would just depend on the situation.
17        Q.      But the accepted standards in
18   the field are relevant to assessing
19   whether there was a violation; is that
20   right?
21        A.      If I had to answer on how the
22   Board makes their decision, I would say
23   yes, that is part of their consideration.
24                MS. COOPER:  Okay. I'm mindful
25        of the time, we've been going for
```

Page 84

1                    AMY E. EMBRY
2           close to an hour and a half.  Are
3           folks, including the court
4           reporter, okay going a few more
5           minutes until a break to wrap up a
6           line of questions?
7                    (Discussion is held off the
8           record.)
9           Q.    Just to explore a little bit
10   more this process the Board goes through
11   when it's considering whether to
12   investigate a complaint, and I should
13   back up and ask, am I even describing
14   that right, that there is a process that
15   happens before a decision is made whether
16   to investigate; is that correct?
17           A.    Yes. Yes.
18           Q.    So in the case of a complaint,
19   a complaint is filed with the Board and I
20   understand you spoke earlier about
21   potentially hiring or not hiring, I guess
22   working with investigators to collect
23   subpoenaed information from the licensee
24   and then issuing the report, but before
25   you get to that stage does something

Page 85

1                    AMY E. EMBRY
2     happen at the Board before investigators
3     are called to assist?
4          A.    Yes. And again, every
5     situation is different, but we do have a
6     process within the office that is
7     followed before it's presented to the
8     Board.
9          Q.    And what is that process
10    before the investigation would be
11    launched?
12         A.    Okay. So when a complaint
13    comes in the complaint is processed, a
14    letter is sent to the complainant saying
15    we have received your complaint; a copy
16    of that complaint is also sent to the
17    licensee and that licensee needs to
18    respond to that complaint.
19              At that point when we receive
20    that response both the complaint and the
21    response from the licensee is presented
22    to the Board and they determine if there
23    has been a violation of the Medical
24    Practices Act and then from there that is
25    -- they determine; are we going to do an

Page 86

```
 1                    AMY E. EMBRY
 2   investigation; does the licensee need to
 3   come and talk to us more before we decide
 4   what we need to do?  There could be a
 5   variety of situations of how this could
 6   work out.
 7                    It could also be that the
 8   Board reads it, reads the response and
 9   they take it as information only, meaning
10   that we understand we've received the
11   complaint, we've reviewed the complaint,
12   there has been no violation of the
13   Medical Practices Act and that's the end.
14   And then once it is concluded a letter is
15   sent to the complainant and also the
16   physician to let them know the outcome.
17        Q.     Thank you. Very helpful.
18                    So in the event that they
19   determine there is a violation, that's
20   when they would then investigate? Or do
21   they need the investigation to determine
22   if there is a violation?
23        A.     Again, it all depends on the
24   complaint. There are some complaints that
25   we receive that are so severe that we may
```

```
                                    Page 87
 1              AMY E. EMBRY
 2  call the Chairman of the Board saying; do
 3  you want us to start an investigation now
 4  to at least gather some medical records,
 5  description records, whatever they did?
 6  Or it could be that it's a standard
 7  complaint, it's presented to the Board
 8  and the Board says; yes, we need to open
 9  an investigation and we would like to see
10  these medical records for these patients.
11  And this is just an example, just to give
12  you an idea, that they could say we want
13  the medical records, we also want the
14  PDMP report, which is the Prescription
15  Drug Monitoring Program in Arkansas, for
16  opioids and so forth and they can
17  determine from there. So, again, it
18  really depends on the complaint.
19      Q.    So there are some complaints
20  where -- tell me if this is correct --
21  that when the complaint and the response
22  are presented to the Board, on the face
23  of it the Board can determine that a
24  violation has or has not occurred; is
25  that correct?
```

Page 88

                        AMY E. EMBRY

1

2      A.     Yes.

3      Q.     Do they ever review, the Board

4  ever review the complaint and response

5  and determine they need an investigation

6  to determine if a violation has occurred?

7      A.     Yes.

8      Q.     And then in terms of where

9  they look to determine what constitutes a

10  violation, would that be the provisions

11  that we looked at -- actually, let me ask

12  you generally because I don't want to

13  limit your answer if there is more.

14          Where does the Board look to

15  determine what standards they're applying

16  to determine what constitutes a violation

17  of the Medical Practices Act by a doctor

18  or other licensee?

19      A.     They look at the Medical

20  Practices Act and the rules that are a

21  part of it.

22          MS. COOPER:  Okay. I think

23      this would be a good time to take a

24      break. How is ten minutes.

25          VIDEOGRAPHER:  We are off the

Page 89

```
 1              AMY E. EMBRY
 2       record at 11:36 a.m.
 3             (Recess is taken.)
 4             VIDEOGRAPHER:  We are back on
 5       the record at 11:48 a.m.
 6       Q.    Thank you. When we were
 7  speaking before we were talking about the
 8  process the Board follows when there is a
 9  complaint against a licensee and I just
10  have a couple of additional questions
11  about that.
12             Is there ever a hearing
13  involving a complaint against a licensee?
14       A.    A hearing occurs whenever
15  there is any action against a licensee,
16  against their license. Usually that's an
17  Emergency Order of Suspension.
18       Q.    So if the Board decides to
19  suspend a license there would be a
20  hearing first?
21       A.    Yes -- no.  Let me -- you can
22  do an Emergency Order of Suspension if
23  you feel there is an immediate threat to
24  the public and then there will be a
25  hearing at the next scheduled board
```

```
                                    Page 90
 1                AMY E. EMBRY
 2   meeting.
 3        Q.    If the Board does not believe
 4   there is an immediate threat would there
 5   be a meeting before the suspended
 6   license?
 7        A.    Yes.
 8        Q.    So if there is an emergency
 9   suspension of the license it's followed
10   up by a hearing to allow the person to
11   contest it; is that correct?
12        A.    Correct.
13        Q.    So a licensee could have their
14   license suspended without any hearing?
15        A.    Yes.  If there is -- if there
16   is a perceived threat to the public.
17        Q.    I'm sorry. Let me -- let me
18   try to ask it differently.
19              If there is a complaint about
20   some wrongdoing by a licensee, and the
21   Board determines that a violation has
22   occurred, it would make that
23   determination before there would be any
24   hearing for the licensee?
25        A.    That is correct. Action can be
```

```
                                      Page 91
 1                  AMY E. EMBRY
 2   taken on a license without a licensee
 3   being present, but they must be given a
 4   hearing and that is actually part of the
 5   administrative rules in Arkansas.
 6        Q.    So they get a hearing if
 7   action is taken to rescind or suspend
 8   their license?
 9        A.    Correct. Any action on a
10   license, if they feel that it needs to be
11   a revocation, which is very rare, and
12   EOS, Emergency Order of Suspension is
13   usually the most common done by our
14   Board.
15        Q.    In that case there would be an
16   emergency order of suspension but it
17   would be followed up by a hearing?
18        A.    Correct.
19        Q.    But if it's not an emergency
20   order of suspension, but the Board would
21   like to suspend, would there be a hearing
22   and then a decision whether to suspend?
23        A.    No, they can suspend at a
24   meeting. For example, if a complaint
25   comes in, they review that complaint,
```

Page 92

1                    AMY E. EMBRY
2    they vote that there has been a violation
3    of the Medical Practices Act, they can
4    suspend the license then.
5         Q.    And then there is no hearing?
6         A.    And then there is a hearing,
7    the licensee is given notice that their
8    hearing will be at the next board
9    meeting.
10         Q.    And they give -- are given an
11    opportunity to convince the Board to
12    change their mind, is that the idea?
13         A.    Correct.
14         Q.    And when there is a hearing --
15    so there's always a hearing when action
16    is taken to suspend or revoke a license;
17    is that correct?
18         A.    Yes.
19         Q.    Does the Board make a case at
20    the hearing for why it is suspending the
21    license?
22         A.    Yes. That falls on the
23    attorneys.
24         Q.    The attorneys for the Board
25    would do that?

Page 93

1                    AMY E. EMBRY

2        A.     Correct.

3        Q.     Would the attorneys for the

4    Board present experts?

5        A.     Yes, they could.

6        Q.     And those would be experts in

7    the relevant field at issue?

8        A.     Usually, yes.

9        Q.     Okay. And how does the Board

10   find those experts?

11       A.     There really is no official

12   way that we find them. We could use

13   recommendations of somebody in a

14   particular field.

15              For example, if a complaint

16   was against an ENT doctor, we may ask our

17   Board member who is an ENT; do you know

18   of anybody that would be a good expert to

19   review this.

20       Q.     So we've kind of been talking

21   about this but I haven't asked this

22   question; can the Board discipline a

23   doctor who is licensed by the Board?

24       A.     Oh, absolutely, yes.

25       Q.     And under what circumstances

AMY E. EMBRY

1
2    can a Board discipline a doctor?
3        A.    It could be that they're -- I
4    will give an example, that a complaint
5    comes in and it's more about boundaries,
6    that they feel they overstep their
7    bounds, they've become too close to
8    patients, they could have a relationship
9    with the patient. It could be numerous
10   things.
11            So part of the discipline can
12   be you need to take a boundaries course
13   and you need to take that documentation
14   to the Board and report back to the Board
15   to let us know what's going on.
16   Discipline, if there is substance abuse
17   involved they could say; you need to meet
18   with the Foundation, which is the
19   organization that handles licensees in
20   distress. So they can administer
21   discipline that way. Very rarely do we
22   issue a reprimand, but reprimands can be
23   issued.
24       Q.    If we can go back to Exhibit
25   2, the Medical Practices Act, and turn to

Page 95

```
 1                    AMY E. EMBRY
 2    Section 17-95-409, page 28.
 3         A.    28?
 4         Q.    Got that?  If you'll read with
 5    me (a)(1) says, "The Arkansas State
 6    Medical Board may revoke an existing
 7    license, impose penalties as listed in
 8    17-95-410 or refuse to issue a license in
 9    the event the holder or -- in the event
10    that holder or complainant, as the case
11    may be, has committed any of the acts or
12    defenses defined in this section to be
13    unprofessional conduct."
14                My first question is, is this
15    the provision that defines the scope of
16    when the Board can discipline or the
17    circumstances under which the Board can
18    discipline a licensee?
19         A.    Well, this is when it may
20    revoke. This says when it may revoke.
21         Q.    Well, it says -- I'm sorry. Go
22    ahead.
23         A.    This section specifically
24    relates to revocation and refusal to
25    issue a license.
```

Page 96

1                    AMY E. EMBRY
2        Q.    And they impose penalties as
3    listed in Section 95-410, that's also
4    limited to, I see denial, suspension or
5    revocation. Okay.
6                So these are -- Section
7    17-95-409 are the circumstances under
8    which a license may be revoked or not
9    issued; is that correct?
10       A.    Correct.
11       Q.    And other types of discipline
12   for other -- excuse me. Sorry. Strike
13   that.
14               You talked about other kinds
15   of discipline, like requiring a doctor to
16   take a particular kind of course about
17   boundaries.  Where in the act, if
18   anywhere, are those kinds of discipline
19   options enumerated?
20       A.    That's going to be in the
21   code. I don't know exactly where in the
22   code. I would have to do some research to
23   find it.
24       Q.    Okay. Then let me ask a
25   different way.

1                        AMY E. EMBRY

2                    So the Board has the ability

3    to deny, suspend or revoke a license

4    based on the grounds listed in Section

5    17-95-409, correct?

6         A.    Yes.

7         Q.    And is it correct that the

8    Board has the authority to take other

9    action, like suspension of a license?

10        A.    Within this section, is that

11   what you're asking?

12        Q.    Well, let me ask it

13   differently.

14                   You've talked about suspension

15   and emergency suspension. Is that

16   something -- I'm sorry.  Strike that. I

17   read it wrong.

18                   Apart from denial, suspension

19   and revocation, are there other types of

20   discipline a Board can impose?

21        A.    Just off the top of my head,

22   the ones I've already mentioned.  Usually

23   it is, you know, we want you to report

24   back, check in, you need to take these

25   courses just as a refresher. That's, off

```
                                        Page 98
  1                 AMY E. EMBRY
  2    the top of my head, without having other
  3    things in front of me, that's what I can
  4    think of.
  5         Q.    Thank you. And focusing then
  6    on suspension and revocation, it is
  7    correct then that 17-95-409 are all of
  8    the grounds for suspension or revocation
  9    or denial of license?
 10         A.    In the code, yes. I'm going to
 11    have to read through each one of these
 12    individually. There may be other issues
 13    but I need to see if it's included in
 14    there.
 15         Q.    Well, let's look at subsection
 16    (2) of 17-95-409.  It says -- and
 17    actually, before we look at that, just
 18    because we've skipped around a little
 19    bit, going back to section (a)(1), it
 20    says, "The Arkansas State Medical Board
 21    may revoke an existing license, impose
 22    penalties as listed in Section 17-95-410
 23    or refuse to issue a license in the event
 24    that the holder or applicant, as the case
 25    may be, has committed any of the actions
```

```
                                          Page 99
 1                    AMY E. EMBRY
 2    or offenses defined in this section to be
 3    unprofessional conduct." And if we look
 4    at subsection Unprofessional Conduct, as
 5    used in the Arkansas Medical Practices
 6    Act, what the citations mean, and it
 7    lists sections (A) through (S), correct?
 8         A.     Yes.
 9         Q.     So those are all practices or
10    conduct deemed to be unprofessional
11    conduct under the Act; is that correct?
12         A.     Correct.
13         Q.     And are there other places
14    where conduct may be deemed
15    unprofessional conduct, besides what's in
16    this statute?
17         A.     To my knowledge, yes,
18    everything is listed here.
19         Q.     Okay. I have a few questions
20    about just a couple of these provisions.
21              If you could look at
22    subsection (G), "grossly negligent or
23    ignorant malpractice", does the Board
24    have a standard for determining grossly
25    negligent or ignorant malpractice?
```

```
 1                    AMY E. EMBRY
 2        A.     They do have a definition of
 3    grossly negligent that they have as part
 4    of their Board packet when considering
 5    this. I do not have it in front of me,
 6    though.
 7        Q.     When you say "part of their
 8    Board packet when considering this", what
 9    do you mean by that?
10        A.     We give them a list of
11    definitions so they'll understand what
12    suspension means; grossly negligent
13    they'll understand that; if we say
14    revoke, what does revoke mean. It's just
15    a reference sheet, the reference sheets
16    of commonly used words.
17        Q.     And does "grossly negligent"
18    include departing from accepting
19    standards of medical care?
20        A.     I would have to look at the
21    definition that they use. Again, I don't
22    have that with me.
23        Q.     Okay.  Is it based on
24    community standards of care?
25        A.     I do not know.
```

```
 1                    AMY E. EMBRY
 2        Q.     Okay. Can you give examples of
 3   some -- well, let me ask it differently.
 4              Since you've been with the
 5   Board has anyone faced discipline based
 6   on gross and ignorant -- grossly
 7   negligent or ignorant malpractice?
 8        A.     Not that I can recall.
 9        Q.     Could you look down to
10   subsection (S), the last one, it says,
11   "committing an ethical violation as
12   determined by the Board by rule." Did I
13   read that right?
14        A.     Yes.
15        Q.     Okay. So I understand from
16   this the Board has authority under this
17   provision to determine ethical violations
18   or to enact rules to identify what are
19   ethical violations; is that correct?
20        A.     Yes.
21        Q.     Has the Board done that?
22        A.     Yes.
23        Q.     Can you tell me where they've
24   done that?
25        A.     It is Rule -- I don't want to
```

```
 1              AMY E. EMBRY
 2  say it wrong, I'm thinking it is 17 but I
 3  need to make sure.
 4       Q.    Okay.
 5       A.    No. It is Rule 32, Rule 32.
 6       Q.    Do I understand from previous
 7  testimony that this was a rule that was
 8  enacted prior to you joining or becoming
 9  employed by the Board?
10       A.    That is correct.
11       Q.    Okay. Is this the only rule
12  the Board has identifying ethical
13  violations?
14       A.    To my knowledge, yes.
15       Q.    By the way, I see sometimes
16  the terminology in these -- in the
17  regulations calls it a regulation and
18  sometimes it calls it a rule. Is there
19  any difference?
20       A.    It was in 2019 the legislature
21  said we had to change everything that
22  says "regulation" to "rule", that was
23  statewide, all agencies. So we are in the
24  process of updating everything. So
25  anything that says "regulation" would be
```

```
 1                 AMY E. EMBRY
 2   changed to "rule". That is the only
 3   difference.
 4        Q.    Okay. But the content won't be
 5   changed, just the name --
 6        A.    Just the name.
 7        Q.    -- that they would be all
 8   rules. Okay.
 9              Let's look at Regulation 32
10   that I suppose will soon be referred to
11   as Rule 32; is that correct?
12        A.    Yes.
13        Q.    It says, "Pursuant to Act 1178
14   of the 87th General Assembly the Arkansas
15   State Medical Board determines that the
16   following conduct is an ethical
17   violation."  And in that regulation it
18   lists subsections (a) through (e),
19   correct?
20        A.    Yes.
21        Q.    So these are enumerated
22   examples of -- strike that.
23              The conduct listed in
24   subsections (a) through (e) are the only
25   things that are deemed unethical or
```

```
 1                    AMY E. EMBRY
 2   ethical violations by the Board; is that
 3   correct?
 4        A.    That is correct for this rule,
 5   yes.
 6        Q.    Are there other rules that
 7   address ethical violations that the Board
 8   has promulgated?
 9        A.    Not to my knowledge.
10        Q.    So to your knowledge, this is
11   the universe of ethical violations for
12   physicians?
13        A.    Yes.
14        Q.    Okay. If we can just fairly
15   briefly go through them, subsection (a)
16   is about improper sexual contact or
17   relationship with patients; is that
18   correct?
19        A.    Yes.
20        Q.    Section (b) is about physician
21   disclosing confidential information about
22   a patient, correct?
23        A.    Yes.
24        Q.    Section (c) is about failing
25   to notify a patient that they have an
```

Page 105

1                   AMY E. EMBRY

2    ownership in a facility or service?

3         A.    Yes.

4         Q.    And (d) is sexual harassment

5    by the physician; is that correct?

6         A.    Yes.

7         Q.    And (e) is a licensed

8    physician grossly overutilizing or

9    ordering or performing tests or

10   procedures on a patient when that may

11   result in harm to the patient; is that

12   correct?

13        A.    Yes.

14        Q.    So that's the universe of

15   ethical violations for physicians; is

16   that correct?

17        A.    Yes.

18             MS. COOPER:  I'd like to mark

19        as Exhibit -- sorry -- 5 what is

20        tab 5.

21             (Exhibit 5, Arkansas State

22        House Bill 1718 was received and

23        marked on this date for

24        identification.)

25             MS. LAND:  It has pulled up on

                        AMY E. EMBRY
1
2        my screen.
3                MS. COOPER:  Thank you.
4        Q.    Just for the record, I'm going
5    to say this is Section 20-6-201 of
6    Arkansas Statutes.
7                Are you familiar with this
8    statute?
9        A.    I am.  It's been a while since
10   I've read it.
11       Q.    I would like to call your
12   attention to a particular part of this
13   statute but if you need to read more we
14   can take time to do that.
15               I'm going to, instead of
16   taking your time, why don't I look for
17   the relevant provision.  Let's put that
18   to the side and we'll come back to that.
19               So we talked earlier about the
20   provision in the Medical Practices Act
21   about unprofessional conduct. And that
22   one of the examples of unprofessional
23   conduct was an ethical violation as
24   determined by the Board by rule, correct?
25       A.    Could you repeat that?

```
 1                    AMY E. EMBRY
 2        Q.     Right. That one of the -- we
 3   talked earlier about the definition of
 4   unprofessional conduct with subsections
 5   (A) through (S) in the Arkansas Medical
 6   Practices Act; do you remember that?
 7        A.     Yes.
 8        Q.     And then one of those
 9   provisions for unprofessional conduct was
10   defined as unethical conduct or
11   violations as determined by the Board by
12   rule; is that correct?
13        A.     Yes.
14        Q.     So what I'm trying to
15   understand is if there were a complaint
16   about a doctor engaging in conduct that
17   was considered harmful by the complainant
18   but it didn't fall under any of the
19   categories in the unprofessional conduct
20   statute (A) through (S), and wasn't
21   considered an ethical violation under
22   Regulation 32, is that something the
23   Board could investigate and potentially
24   address?
25                    MS. LAND:  Objection to form.
```

```
 1                AMY E. EMBRY
 2        A.    Yes. Yes, they could.
 3        Q.    So anything that involves a
 4  complaint by someone in the public
 5  alleging that a doctor is engaging in
 6  harmful conduct could be investigated by
 7  the Board?
 8        A.    Yes. It could be, yes.
 9        Q.    And would the Board need to
10  determine that the doctor violated any of
11  those provisions that were defined as
12  unprofessional conduct subsections (A)
13  through (S) or an ethical violation under
14  Regulation 32 to take action against a
15  licensee?
16        A.    They would need to determine
17  if there had been any violation in any
18  part of the Medical Practices Act,
19  whether it's in code or in the rule.
20        Q.    And to revoke -- let me ask it
21  differently.
22              To revoke or suspend a license
23  would it have to be "unprofessional
24  conduct" under the statute we discussed?
25        A.    I don't know if it's limited
```

```
 1                    AMY E. EMBRY
 2    just to that, a revocation. I would have
 3    to do some research on that one.
 4         Q.     Okay.
 5         A.     But if -- I can't -- I can't
 6    answer truthfully to that.
 7         Q.     I'm just trying to think of --
 8    for example, somebody says; I went to a
 9    surgeon and the surgeon did this
10    treatment that left me disfigured, would
11    that potentially be a basis to suspend a
12    license?
13         A.     They would have to research,
14    they would have to do an investigation,
15    unless there was an immediate threat to
16    the public.
17         Q.     If we can look at the Medical
18    Practices Act, Exhibit 2, Section
19    17-95-410. Can we look at subsection
20    (e)(1), and when you have that let me
21    know, it's on page 29.
22         A.     What subsection?
23         Q.     (e)(1).
24         A.     Okay.
25         Q.     So it says here, "At the
```

Page 110

1              AMY E. EMBRY

2    conclusion of the hearing the Board shall

3    first decide whether the accused is

4    guilty of the charges against him or her

5    and then decide on the appropriate

6    disciplinary action; subsection (2), If

7    the accused is not guilty the Board shall

8    dismiss the charges; subsection (3), If

9    the accused is found guilty the Board may

10   do one or more of the following; (a)

11   revoke his or her license; (b) suspend

12   his or her license not to exceed one

13   year; (c) issue a reprimand; (d) issue a

14   probation allowing the licensee to

15   continue practicing under terms and

16   conditions found to be in the best

17   interests of the accused and the general

18   public; or (e) levy a fine up to $1,000

19   under the Arkansas Medical Practices Act

20   and collect out-of-pocket costs of

21   investigation incurred by the Board to

22   conduct the disciplinary hearing."

23              Those are all forms of

24   discipline that the Board can impose if a

25   doctor is found to be in violation of the

Page 111

```
 1              AMY E. EMBRY
 2   Medical Practices Act?
 3        A.    Yes.
 4        Q.    Are there other discipline
 5   options besides those?
 6        A.    As we discussed earlier, you
 7   know, if there's no action taken against
 8   the license they can say prescribing
 9   courses, they need you to meet with
10   so-and-so or whatever.  But if this is --
11   if there is an actual -- an actual -- I'm
12   sorry -- an actual action against the
13   license.
14        Q.    Okay. And focusing in on
15   subsection (3)(d) that we looked at it
16   says, "The Board can impose a probation
17   allowing the licensee to continue
18   practicing under terms and conditions
19   found to be in the best interests of the
20   accused and the general public".  Is what
21   you just described an example of that,
22   you know, a course on anything that you
23   thought the doctor needed?
24        A.    Imposing a probation, I'm
25   wondering if this can refer to what we
```

1                    AMY E. EMBRY

2   call consent orders, meaning you're

3   allowed to practice as long as you do A,

4   B and C.

5        Q.    That's called a consent order?

6        A.    Yes. That's a legal document.

7   As far as impose a probation, I'm

8   thinking that's what that is.

9        Q.    And can you tell me examples

10  of some of those?  You called it a

11  consent order?

12       A.    Yes.

13       Q.    What kinds of conditions are

14  required? You can continue practicing if

15  you do A, B or C, what kinds of

16  conditions?

17       A.    Just some off the top of my

18  head, if it is a substance abuse issue,

19  they're allowed to practice as long as

20  they're in compliance with their contract

21  with the Arkansas Medical Foundation who

22  monitors distressed physicians licensed

23  by our Board. It could also be that they

24  have to complete these courses in a

25  certain timeframe and present it to the

```
 1              AMY E. EMBRY
 2   Board member, the Board as a whole, and
 3   -- I mean, that gives you some ideas,
 4   that there are certain stipulations that
 5   they must adhere to in order to continue
 6   practicing.
 7        Q.    Is there something called a
 8   restricted license?
 9        A.    No. We do not have a
10   restricted license.
11        Q.    You just have the consent
12   order that says you need to do X, Y or Z
13   to continue practicing?
14        A.    Right.
15        Q.    But even with, say, issues
16   concerning, you know, prescription of
17   drugs improperly there couldn't be a
18   consent order that says you can continue
19   practicing but you can't prescribe drugs?
20   Could that be something?
21        A.    Sure.  It could be in the
22   consent order, yes.
23        Q.    Has the Board ever done that?
24        A.    I can't recall. We've had a
25   lot of consent orders, so I would have to
```

Page 114

                         AMY E. EMBRY
1
2   look at that.
3        Q.    So one example you gave was
4   involving substance abuse. Have there
5   ever been consent orders that do relate
6   to prescription practices?
7        A.    Yes.
8        Q.    What kinds of consent orders?
9        A.    It could be, for example, if
10  the complaint was the physician or
11  whomever was overprescribing, that part
12  of the consent orders, if the Board chose
13  to do so, they could say, you know,
14  continue practicing but you must
15  surrender your DEA license.
16       Q.    And what is a DEA license?
17       A.    Drug enforcement, so you can
18  prescribe controlled substances.
19       Q.    So the doctor could continue
20  practicing but couldn't prescribe
21  controlled substances?
22       A.    Correct.
23       Q.    Is there ever monitoring as
24  part of the consent order, monitoring by
25  the Board?

1                AMY E. EMBRY

2       A.      There is monitoring, but we

3   would gather that information from other

4   sections.  For example, as I discussed

5   earlier, the PDMP is the Prescription

6   Drug Monitoring Program, we can request a

7   report from that program to show what

8   physician or licensee prescribed to

9   whomever whenever. So we could use that

10  as -- to give you an example.

11      Q.      And when the decision is made

12  to impose discipline, whether suspension

13  or revocation or something else, is that

14  a majority vote by the Board?

15      A.      Yes.

16      Q.      If the Board learned that a

17  doctor were using a treatment that is

18  unsafe, could the Board issue a rule

19  prohibiting the use of that treatment?

20      A.      They could. They could draft a

21  rule and put it through the promulgation

22  process.

23      Q.      Has it ever done that?

24      A.      Yes.

25      Q.      Tell me about that.

1                    AMY E. EMBRY

2          A.    It was discussed earlier, it

3     was the rule about the cosmetic

4     procedures and that's the one that I have

5     since I have been at the Board that I

6     know about.

7          Q.    And that was a rule to ban

8     certain procedures across the board or

9     prohibit them from being provided at all?

10         A.    It was to say who could

11    provide those services, not prohibit.

12         Q.    So let me ask it differently.

13               Has the Board ever promulgated

14    a rule that prohibits anyone from

15    performing a particular service or

16    medical treatment?

17         A.    Not to my knowledge, no.

18         Q.    But it could if that came to

19    its attention that there was a harmful

20    treatment going around?

21         A.    Yes.

22         Q.    Has the Board ever considered

23    prohibiting a treatment across the board?

24         A.    Not to my knowledge, no.

25         Q.    I want to switch gears away

1              AMY E. EMBRY

2   from the process, the Board's process.

3              When the legislature passes

4   laws concerning the regulation of

5   medicine, is the Board consulted about

6   legislation of that nature?

7        A.    Sometimes.

8        Q.    Can you tell me examples of

9   when it has been consulted?

10       A.    Most recently they were

11  considering licensing another healthcare

12  provider and they consulted with the

13  Board. They had a bill that was

14  introduced and they said if we went

15  forward with this bill what would need to

16  be done. We went with them and went

17  through that process.

18       Q.    I'm sorry. I may not have

19  understood.  You said "they" meaning the

20  legislature were considering licensing a

21  healthcare provider?

22       A.    Correct.

23       Q.    I didn't realize the

24  legislature licenses healthcare

25  providers.  What do you mean by that?

AMY E. EMBRY

1

2          A.      They put forward a bill to

3      license naturopathic physicians.

4          Q.      I see.  Not a particular

5      provider but a category of providers?

6          A.      Correct. Correct.

7          Q.      So there was a bill to license

8      -- I'm sorry, what did you call the

9      category?

10         A.      Naturopathic.

11         Q.      Naturopathic physicians.  And

12     the legislature consulted with the Board

13     about what sorts of issues the --

14         A.      They would say if we decided

15     to license, how would your office handle

16     this if we put it underneath your Board?

17     And we told them when you're drafting the

18     bill this is how our licensure process is

19     set up now, so if you do move forward

20     with this bill we would ask you to

21     consider X, Y or Z.

22         Q.      Was the Board asked its view

23     on whether that was a good idea to

24     license naturopathic physicians?

25         A.      In that instance, no.

```
 1              AMY E. EMBRY
 2      Q.    Are there any other examples
 3  where you think that the legislature
 4  consulted with the Board about a bill?
 5      A.    There may have been. The one
 6  that I gave earlier, that's the one that
 7  actually required a sit-down meeting but
 8  it's very common for the legislature to
 9  ask for statistics or information before
10  they draft a bill.
11            It is -- to my knowledge, it
12  is not required for the legislature to do
13  that and it has not done on any -- any
14  and all bills that would affect our
15  licensees.
16      Q.    Since you've been with the
17  Board or since you've been Executive
18  Director, are there other examples
19  besides the naturopathic physician
20  licensing measure that the legislature
21  consulted with the Board about?
22      A.    Let me think on that for a
23  minute. There may have been.  I just
24  can't think of any off the top of my
25  head. I just remember that one about the
```

```
 1              AMY E. EMBRY
 2   naturopaths, that stuck out in my mind.
 3        Q.    And since you've been the
 4   Executive Director have there been any
 5   bills that actually were passed
 6   concerning the regulation of medicine?
 7        A.    Yes.
 8        Q.    Which ones?
 9        A.    Well, I don't have the
10   documents in front of me, but 2021 was a
11   very active session and I do know that
12   the Act 626 that we're here about today,
13   that was passed, that would affect the
14   Medical Practices Act. There was also,
15   that affected the Board directly, is that
16   they changed that physicians could renew
17   for two years rather than one year, they
18   put that into law.
19              I don't have my list in front
20   of me. That's a couple of them.
21        Q.    Did the legislature consult
22   with the Board about the rule or bill
23   about physicians renewing for two years?
24        A.    No.
25        Q.    And when you said before that,
```

1              AMY E. EMBRY
2    referring to the naturopathic physician
3    bill, that the legislature consulted with
4    the Board, who in the legislature did
5    that?
6         A.    I don't have my notes in front
7    of me but it was one representative and I
8    believe one senator and I believe they
9    were the sponsor and co-sponsors of the
10   bill so they met -- it was during the
11   pandemic, so it was via Zoom.
12        Q.    So is that something that has
13   happened in other situations that the
14   sponsors of a bill would consult with the
15   Board about a bill?
16        A.    It could happen, yes, that
17   could happen.
18        Q.    Have there been any
19   significant bills concerning the
20   regulation of medicine where the
21   legislature did not consult with the
22   Board?
23             MS. LAND:  Object to form.
24        A.    I would have to say yes. I
25   don't know what they are, but at some

```
 1                  AMY E. EMBRY
 2   point, yes.
 3        Q.    That there are times that the
 4   legislature does not consult with the
 5   Board?
 6        A.    Correct.
 7        Q.    Is it typical that they do
 8   consult with the Board when it's a matter
 9   of medical regulation?
10        A.    In my opinion, I wouldn't say
11   typical.
12        Q.    Sometimes yes, sometimes no?
13        A.    Correct.
14        Q.    And when they consult with the
15   Board, who on the Board do they consult
16   with?
17        A.    It would come through the
18   office. So they could speak to me, they
19   could speak to a member of my staff. They
20   could also reach out because we're under
21   the Department of Health, it may come
22   through the Department of Health. It
23   would be direct contact or it could be
24   indirect contact.
25        Q.    So in the example you gave
```

Page 123

1              AMY E. EMBRY

2  about the naturopathic physicians, did

3  that come through you?

4       A.    Yes, it did, yes.

5       Q.    And you said it was the

6  sponsors of the bill that reached out?

7       A.    From what I can recollect,

8  without anything in front of me, yes.

9       Q.    And then do you then connect

10 the legislators with members of the Board

11 or do you just talk to them yourself?

12      A.    No. We do not do that at the

13 Board. We do not connect them unless it's

14 specifically requested by the legislator

15 or Department of Health or anything like

16 that, no.

17      Q.    So when the Board gave input

18 to the legislature -- legislators, I

19 should say, in what format did that come?

20      A.    For?

21      Q.    Let me ask it differently.

22             I understood you to be saying

23 that these legislators asked for the view

24 of the Board with respect to some

25 questions related to the bill. Were you

1                    AMY E. EMBRY
2   the one who answered those questions to
3   provide the information they were
4   seeking?
5        A.    Yes. Because in that instance
6   for the naturopathic it was specifically
7   licensing questions and that would come
8   from the Board staff.
9        Q.    So the Board staff would
10  typically provide the information that
11  the legislators are seeking regarding a
12  bill?
13       A.    Yes.
14       Q.    It would not go to the Board
15  members?
16       A.    Only if it is something that
17  the Board needs to consider before
18  returning that. For example, as I used in
19  that example, the licensing practices,
20  the Board would -- the licensing
21  practices are what they are, the staff
22  could answer that. But if they are
23  asking; we want your input from a
24  physician point of view, or something
25  like that, we would either ask them to

Page 125

```
 1                    AMY E. EMBRY
 2   draft something that we would present to
 3   the Board or they could come and address
 4   the Board at the next board meeting.
 5        Q.    And have legislators ever come
 6   to address the Board on questions about
 7   which they wanted input?
 8        A.    I'm trying to recall. Since
 9   I've been Director, no.
10        Q.    But do you know if that's been
11   done in the past?
12        A.    I'm not sure. I'm not sure.
13        Q.    And you said they could put,
14   the legislators could put questions in
15   writing for the Board; is that correct?
16        A.    Yes.
17        Q.    Has that ever been done?
18        A.    Not since I've been Director.
19        Q.    Before that?
20        A.    I don't know.
21        Q.    Okay. But I understand you to
22   be saying that if it were a question
23   about wanting input from the Board on a
24   matter of practice of medicine, that you
25   would take that to the Board, not answer
```

Page 126

```
                              AMY E. EMBRY
 1
 2    it by staff alone?
 3         A.     Correct.
 4         Q.     Okay.
 5         A.     The staff handles what the
 6    staff can handle. The rest goes to the
 7    Board.
 8         Q.     Okay. We talked earlier about
 9    prescription of opioids and I'd like to
10    look at Section 17-95-701 of the Medical
11    Practices Act.  And this is titled  --
12    subchapter (7) is titled Chronic
13    Intractable -- Chronic Intractable Pain
14    Treatment Act, correct?
15         A.     Yes.
16         Q.     And is this the provision of
17    the Medical Practices Act that governs
18    prescriptions for painkillers?
19         A.     Yes.
20         Q.     And I think you touched on it
21    in the past.  Has overprescription of
22    opioids been a problem in Arkansas?
23         A.     Yes.
24         Q.     Has it caused harm to the
25    public?
```

Page 127

1                    AMY E. EMBRY

2       A.     Yes.

3       Q.     What kind of harms?

4       A.     Addiction.

5       Q.     And there have been complaints

6   to the Board about doctors

7   overprescribing opioids; is that correct?

8       A.     Yes.

9       Q.     Did the Board enact

10  regulations to address overprescription

11  of opioids?

12      A.     Yes, 2.8.

13      Q.     Okay. And that one is which

14  one, I think we talked about it, but --

15      A.     It's Rule 2.8.

16      Q.     Thank you. You said 2.8?

17      A.     No. I'm wrong about that. I'm

18  sorry.

19      Q.     I'm not finding it there.

20      A.     It is -- it's in Regulation 2,

21  Regulation 2 has quite a bit to it, and

22  if you look at 6 (a) and (b).

23      Q.     You said subsection 6 of

24  Regulation 2?

25      A.     Correct.

```
 1              AMY E. EMBRY
 2        Q.    "The treatment of pain with
 3   dangerous drugs and controlled substances
 4   is a legitimate medical practice when
 5   done in the usual course of medical
 6   practice", that provision? I'm reading
 7   just a portion of it just to make sure
 8   we're on the same page; is that correct?
 9        A.    Yes.
10        Q.    And this regulation, was this
11   all dictated by statute or did the Board
12   develop any of this?
13        A.    This was before my time, but
14   from what I understand, this was at the
15   request of the legislature.
16        Q.    Not by a statute but
17   legislators requesting it?
18        A.    Correct. That is my
19   understanding.
20        Q.    If we can go back to
21   subchapter 7 of the Medical Practices Act
22   that's on page 34, and if we look at
23   subsection (c)(1) it says, "In lieu of a
24   finding of gross and ignorant malpractice
25   the Board after a hearing may
```

1                    AMY E. EMBRY

2     incrementally impose sanctions as

3     follows:  (a) monitor prescribing habits

4     of the physician not to exceed six

5     months; (b) require that the decision to

6     voluntarily surrender his or her United

7     States Drug Enforcement Agency license to

8     the Board for a specified period of time

9     not to exceed three months; (c) suspend

10    the physician's license, stay the

11    suspension and require monitoring of

12    prescribing habits; (d) revoke the

13    physician's license, stay revocation and

14    require monitoring of the physician's

15    prescribing habits for a specified time;

16    and (e) revoke the physician's license

17    for serious violations of statutes and

18    regulations."

19             Are these all steps the Board

20    can take if a doctor is found to violate

21    the provisions regarding prescription of

22    pain medication?

23        A.    Yes.

24        Q.    And the Board has a Pain

25    Management Review Committee to review

```
 1                AMY E. EMBRY
 2   complaints of overprescription of main
 3   medications; is that right?
 4        A.    Yes.
 5        Q.    And have doctors faced
 6   discipline due to improper prescription
 7   of opioids?
 8        A.    Yes.
 9        Q.    Can you say approximately how
10   many, since you've been ED?
11        A.    Not truthfully. I honestly
12   could not give an honest number on that.
13   It has occurred.
14        Q.    Do you know if it's more than
15   20?
16        A.    Since I've been Director, no,
17   it's not more than 20.
18        Q.    Okay. But it's happened?
19        A.    Yes.
20        Q.    Did any of them have
21   monitoring or surrender of DEA license as
22   a discipline that was imposed?
23        A.    Describe "monitoring"?
24        Q.    Well, I'm just reading what it
25   says there; "monitoring prescribing
```

AMY E. EMBRY

1

2  habits up to six months."

3       A.    Yes. They can be referred to

4  the Pain Management Review Committee and

5  it could be that we want an MP run every

6  month for the next six months.

7       Q.    And some doctors have had

8  their DEA license revoked or they've had

9  to surrender it, I should say?

10       A.    We cannot revoke a DEA

11  license.

12       Q.    But you can require them to

13  surrender it as a condition to continuing

14  to practice?

15       A.    Yes, if that's what the Board

16  decides.

17       Q.    And has that happened?

18       A.    Yes.

19       Q.    Did these actions serve to

20  protect the public from harmful conduct

21  by these doctors?

22       A.    Yes.

23       Q.    Did the Board consider just

24  prohibiting the use of opioids

25  altogether, given the harm they were

```
 1                    AMY E. EMBRY
 2   causing to the public?
 3         A.    I do not know.
 4         Q.    You do not know. Okay.
 5               That's never been proposed as
 6   a regulation by the Board?
 7         A.    Not since I've been Director,
 8   no.
 9         Q.    Do you know why they did not
10   do that?
11         A.    I have no knowledge about
12   that. This was before I was there.
13         Q.    Okay. Can we look at
14   Regulation 27? This is the provision,
15   "Informed consent for gastric bypass
16   surgery." Okay?
17         A.    A-hum.
18         Q.    Do I understand correctly from
19   this that the Board has established
20   requirements for the informed consent
21   process before a doctor can perform
22   gastric bypass surgery?
23         A.    Yes.
24         Q.    And is this a regulation that
25   was mandated by statute?
```

```
 1              AMY E. EMBRY
 2        A.    Yes.  Actually, by Act 1356.
 3        Q.    Okay. And did the Board
 4   develop any part of the regulation or was
 5   it all specified by statute?
 6        A.    I do not know. I would have to
 7   look at the document.
 8        Q.    And in looking at this I see
 9   it says here, "Pursuant to Act 1356 of
10   the 84th General Assembly of 2003 all
11   physicians of the State prior to
12   performing gastric bypass surgery, also
13   known as open or laparoscopic Roux-en-Y,
14   will have the patient signs an informed
15   patient consent form acknowledging they
16   have been told information about the
17   various complications that can result
18   from the surgery.  The complications and
19   information the patient must be informed
20   of are as follows:" Did I read that
21   correctly?
22        A.    Yes.
23        Q.    And then it lists (a) through
24   (i) as complications that patients must
25   be informed of, correct?
```

1                    AMY E. EMBRY

2        A.     It's actually A through M.

3        Q.     Oh, sorry. It is A through M.

4   And then some of those provisions have

5   subsections, correct?

6        A.     Yes.

7        Q.     Okay. So, for example,

8   subsection I says, "The following

9   surgical complications may arise", and it

10  lists 33 potential complications,

11  correct?

12       A.     Yes.

13       Q.     And then there are a series of

14  nutritional complications, four of those,

15  correct, under J?

16       A.     Yes.

17       Q.     And psychiatric complications

18  under K include 4, psychiatric

19  complication, correct?

20       A.     Yes.

21       Q.     And then L lists items 1

22  through 22 as additional complications,

23  correct?

24       A.     Yes.

25       Q.     And then M identifies

1                    AMY E. EMBRY

2  pregnancy complications, correct?

3        A.    Yes.

4        Q.    And then going back to Section

5  E says, "There is no guarantee of weight

6  loss or long-term weight management as a

7  result of getting surgery." Did I read

8  that right?

9        A.    Yes.

10       Q.    Okay. And then F, a lifetime

11 of followup medical care is required; is

12 that correct?

13       A.    Yes.

14       Q.    So these are all provisions

15 that doctors have to inform patients

16 about, complications and risks that the

17 doctors have to inform patients about

18 before performing gastric bypass surgery,

19 correct?

20       A.    Yes.

21       Q.    Now, how did the Board

22 identify all of these complications?

23       A.    I do not know. I was not at

24 the Board when this was created and

25 promulgated. So I would have to look at

Page 136

                          AMY E. EMBRY
1
2    that documentation.
3         Q.    Okay.
4         A.    But it is possible it came
5    directly from the Act.
6         Q.    Okay. And do these provisions
7    that lay out requirements for informed
8    consent for gastric bypass protect the
9    public from harm?
10        A.    My belief is yes.
11        Q.    And how is that?
12        A.    Well, it's information to the
13   patient, they need to be made aware of
14   these complications.
15        Q.    Did the Board ever discuss
16   prohibiting gastric bypass surgery?
17        A.    I do not know.
18        Q.    Okay. Does the Board prohibit
19   any -- I think I asked a version of this
20   question before but I want to make sure I
21   understand. Does the Board prohibit any
22   medical treatment across the Board?
23        A.    No.
24        Q.    And has the Board ever
25   considered, to your knowledge, a proposal

```
 1                    AMY E. EMBRY
 2    to prohibit a particular medical
 3    treatment across the Board?
 4         A.    Not to my knowledge, no.
 5         Q.    Has any member of the Board
 6    proposed a regulation that would prohibit
 7    a particular medical treatment across the
 8    Board?
 9         A.    Not since I've been the
10    Director, no.
11         Q.    Okay. Are you aware of, as the
12    Director of the Board, of any State
13    statutes that prohibit a particular
14    medical treatment?
15         A.    The only one that I am aware
16    of is the one that we're here today to
17    discuss, Act 626.
18         Q.    You're not aware of any
19    others?
20         A.    No, I am not.
21         Q.    Now, is off-label use of drugs
22    permitted in Arkansas?
23         A.    Yes.
24         Q.    Is it common?
25         A.    Yes.  I would say so, yes.
```

Page 138

```
1                    AMY E. EMBRY
2        Q.     And I understand that the
3    State allows off-label use of
4    hydroxychloroquine to treat COVID; is
5    that correct?
6              MS. LAND:  Objection to
7         relevance. You can answer.
8         A.    It does not prohibit it.
9              MS. COOPER:  Can we mark as
10        Exhibit 6, tab 8?
11              (Exhibit 6, Guidance For the
12        Use of Hydroxychloroquine and
13        Chloroquine For the Treatment of
14        COVID 19 was received and marked on
15        this date for identification.)
16              MS. COOPER:  Amanda, do you
17        have it up?
18              MS. LAND:  Leslie, it is not
19        loading for me.
20              MR. RICHARDSON:  One moment.
21        That should be available to you
22        now.
23              MS. LAND:  Yes, I have it.
24              MS. COOPER:  Great.
25        Q.    For the record, I'll just
```

1          AMY E. EMBRY

2    state that the document is called

3    Guidance For the Use of

4    Hydroxychloroquine and Chloroquine For

5    the Treatment of COVID 19, dated July 29,

6    2020 from the Arkansas Department of

7    Health.

8          Have you ever seen this

9    before, Ms. Embry?

10        A.    Yes.

11        Q.    When did you see it?

12        A.    When it was released back in

13   2020.

14        Q.    And why was this -- why did

15   you see it? How did you come to see it?

16        A.    It was sent out by the

17   Department of Health to all of its

18   sub-agencies and sections. It was also on

19   their website.

20        Q.    Did the Board have any role in

21   the creation of this guidance?

22        A.    No.

23        Q.    That was done by the

24   Department of Health?

25        A.    To my knowledge, yes.

1        AMY E. EMBRY
2     Q.    And just stepping back, I
3   understand that you're -- well, let me
4   ask you differently.
5            What is the relationship
6   between the Arkansas State Medical Board
7   and the Department of Health?
8     A.    We are within the Department
9   of Health. The State Medical Board is an
10  agency or subsection or whatever you want
11  to call it of the Department of Health.
12    Q.    Okay. Thank you.
13           And if we can just read along
14  together, since it's pretty short, it
15  says, "On June 15, 2020 the Food and Drug
16  Administration, FDA, revoked the
17  emergency use authorization, EUA, for the
18  use of chloroquine, CQ, and
19  hydroxychloroquine, HCQ, to treat COVID
20  19 after concluding it was 'no longer
21  reasonable to believe that oral
22  formulations of HCQ and CQ may be
23  effective in treating COVID 19, nor is it
24  reasonable to believe that the known and
25  potential benefits of these products

1               AMY E. EMBRY

2    outweigh their known and potential

3    risks.' The latter included serious

4    adverse events. Based on this

5    information, the Arkansas Department of

6    Health, ADH, updated its guidance related

7    to HCQ and CQ indicating that their use

8    for treatment of COVID 19 should be

9    avoided in both outpatient and

10   hospitalized settings, but could be

11   administered prescribed and dispensed for

12   FDA medical supervision of a patient's

13   healthcare provider.  Unapproved use,

14   i.e., off-label use, of these medications

15   is left to the discretion of individual

16   clinicians and their patients. However,

17   the ADH wants clinicians to be aware that

18   coadministration of HCQ or CQ with

19   remdesivir and MEUA, approved medication

20   for treatment of COVID 19, is not

21   recommended based on data showing an

22   antagonistic effect of these medications

23   on the antiviral activity of remdesivir."

24            Did I read that reasonably

25   okay?

```
 1                    AMY E. EMBRY
 2        A.    Yes.
 3        Q.    Despite some of the big words.
 4              So you said you were familiar
 5   with this guidance, correct?
 6        A.    Yes.
 7        Q.    Was the Board consulted in any
 8   way about this guidance?
 9        A.    This was nearly two years ago
10   but my recollection right now is no, they
11   were not consulted.
12        Q.    Okay. Did the Board have any
13   conversations about this guidance?
14        A.    Not that I can recall. I would
15   need to go back and look at meetings.
16   It's been years.
17        Q.    Did you have any conversation
18   with Board members or Board have about
19   this guidance?
20        A.    No.
21        Q.    Did you hear any conversations
22   from Board staff or Board members about
23   it?
24        A.    No.
25        Q.    So I understand here that the
```

1                     AMY E. EMBRY
2    Department of Health is allowing
3    off-label use of hydroxychloroquine to
4    treatment COVID despite the State's
5    awareness of the lack of evidence of
6    effectiveness plus serious risks of use,
7    correct?
8         A.    Repeat that question.
9         Q.    Yes. I understand from here
10   the State is -- the Department of Health
11   is allowing the off-label use of
12   hydroxychloroquine to treat COVID despite
13   the State's awareness of the lack of
14   evidence of effectiveness for this
15   purpose and the serious risks of using
16   it; is that correct?
17        A.    According to this document, it
18   says it's allowing the decision to be
19   left to the individual clinicians and
20   their patients.
21        Q.    Okay. And this is not
22   something the Board considered weighing
23   in on?
24        A.    Not that I can recall.
25             VIDEOGRAPHER:  Is there a

Page 144

```
 1              AMY E. EMBRY
 2      chance we can take a break?  I've
 3      got to change a card and I'm
 4      getting pretty close.
 5              MS. COOPER:  Sure. We can take
 6      a break now. How much time do you
 7      need?
 8              VIDEOGRAPHER:  We are off the
 9      record at 12:56 p.m.
10              (Recess is taken.)
11              VIDEOGRAPHER:  We are back on
12      the record at 1:50 p.m.
13      Q.    Thank you. Welcome back.
14              You mentioned earlier an issue
15  with some doctors or a doctor at a jail
16  prescribing Ivermectin for COVID. Did I
17  say that right?
18      A.    Yes.
19      Q.    Okay. And I think you
20  mentioned there were a number of
21  complaints about that use of Ivermectin;
22  is that right?
23      A.    Yes.
24      Q.    And was it all against the
25  same doctor or multiple doctors?
```

1                  AMY E. EMBRY

2        A.    In that instance it was the

3   same doctor.

4        Q.    And so I understand that there

5   were multiple complaints against this

6   doctor and am I right that there was a

7   determination that no action was taken at

8   some point by the Board with respect to

9   the complaint against this doctor for

10  prescribing Ivermectin for COVID?

11       A.    This one is still open, so I

12  cannot say that nothing has been done.

13       Q.    Okay. So when you say "this

14  one is still open" and maybe I may be

15  misspeaking here, but if there is

16  multiple complaints about one doctor,

17  then they get joined together as one

18  investigation or are they separate

19  investigations?

20       A.    It could. It depends on the

21  nature of the complaint as well.

22       Q.    And in this case with the

23  doctor prescribing Ivermectin, is there

24  one process only or have there been more

25  than one process in investigating these

Page 146

1                    AMY E. EMBRY

2    complaints?

3         A.    I think we did group this one

4    into one investigation.

5         Q.    So the Board never reached any

6    conclusion with respect to this -- any

7    complaint against this doctor?

8         A.    It is still ongoing.

9         Q.    And it never took a complaint

10   for "information only" at any stage?

11        A.    They may have taken some for

12   "information only".

13        Q.    When you say "some", some

14   complaints against this doctor?

15        A.    Yes. So, for example, let's

16   say ten complaints were received. All ten

17   complaints would be presented to the

18   Board individually as separate

19   complaints. Some complaints may say we

20   need to look into this one further, we

21   need to do an investigation, whatever

22   they decide. There may be another

23   complaint to say, no, there was no

24   violation, from what we have found there

25   is no violation of the Medical Practices

Page 147

                    AMY E. EMBRY

1

2    Act and this one is closed.

3        Q.    So with these Ivermectin

4    complaints, some of them have been

5    closed?

6        A.    Yes.

7        Q.    And was that based on a

8    determination in those complaints there

9    wasn't a violation of the Medical

10   Practices Act?

11       A.    Yes.

12       Q.    And does that mean in those

13   situations the Board determined that

14   Ivermectin had not been prescribed to

15   treat COVID in those cases?

16       A.    It would depend on what that

17   particular complaint was. If it was a

18   complaint about Ivermectin and they took

19   it as no violation, then that's it but I

20   would have to go back and review every

21   single one of those to see if it was

22   specifically Ivermectin.

23       Q.    Was there ever a complaint --

24   and I know I could go review all the

25   board meetings and look at this myself,

```
 1              AMY E. EMBRY
 2   but maybe you can help me cut to the
 3   chase here.
 4              Was there ever one where the
 5   Board heard the complaint, had a hearing
 6   and determined that even though the
 7   doctor was found to have prescribed
 8   Ivermectin to treat COVID, that it was
 9   not a violation of the Medical Practices
10   Act?
11        A.    No. There has not been
12   anything like that.
13        Q.    Okay. Has the Board considered
14   passing any regulation prohibiting the
15   use of Ivermectin for COVID?
16        A.    No.
17        Q.    It's not been proposed by
18   anybody?
19        A.    I'm sorry. Could you repeat
20   that?
21        Q.    It hasn't been proposed by
22   anybody?
23        A.    Not to my knowledge.
24        Q.    Okay. Is informed consent a
25   requirement for medical treatments
```

```
 1                    AMY E. EMBRY
 2    generally in Arkansas?
 3         A.    Could you repeat that?
 4         Q.    Let me repeat that. Are you
 5    having trouble hearing me?
 6         A.    I think you were just breaking
 7    up on that question.
 8         Q.    Okay. I'll repeat it.
 9               Is informed consent a
10    requirement for medical treatment in
11    Arkansas?
12         A.    I would have to check the code
13    but I do know we have some regulations
14    for informed consent, abortion, gastric
15    bypass and I do know on certain instances
16    you do have to have a consent form to
17    treat certain patients. For all of them,
18    I'm not sure about.
19         Q.    Is the Board aware of the
20    Gender Spectrum Clinic at Arkansas
21    Children's Hospital?
22         A.    I can't answer for all the
23    Board members, so I don't know if they're
24    aware of it or not.
25         Q.    But the Board, itself, has the
```

```
 1            AMY E. EMBRY
 2  Board had any information provided to the
 3  Board that made it aware of the Arkansas
 4  Children's Hospital Gender Spectrum
 5  Clinic?
 6       A.   Not to my knowledge, no.
 7       Q.   Did the Board ever have any
 8  discussions about the Gender Spectrum
 9  Clinic at Arkansas Children's Hospital?
10       A.   Not to my knowledge no.
11       Q.   Did any members of the Board
12  have any discussion about the Gender
13  Spectrum Clinic at Arkansas Children's
14  Hospital?
15       A.   Not to my knowledge.
16       Q.   What about Board staff?
17       A.   No.  Not to my knowledge, no.
18       Q.   So you've not been part of any
19  conversations about the Gender Spectrum
20  Clinic?
21       A.   No.
22       Q.   Do you know what I refer to
23  when I refer to Gender Spectrum Clinic?
24       A.   No. I just figure it's a
25  section of that hospital.
```

1                  AMY E. EMBRY
2        Q.    Has the Board ever received
3    any complaints concerning
4    gender-affirming medical care for minors?
5        A.    No.
6        Q.    And by the way, do you know
7    what I mean by "gender-affirming medical
8    care" or do you have an understanding of
9    that term?
10        A.    Yes.  It was the definition
11    provided in the document to me.
12        Q.    Okay. And just to be clear, in
13    case there is any confusion, by
14    "gender-affirming medical care", I'm
15    referring to medical interventions for
16    adolescents with gender dysphoria,
17    including hormone therapy or puberty
18    blocker or surgery to treat their gender
19    dysphoria.  Are we having a common
20    understanding there?
21        A.    Yes.
22        Q.    So I will use the term
23    gender-affirming medical care as
24    shorthand rather than say that every
25    time, okay?

Page 152

1                    AMY E. EMBRY

2        A.      Okay.

3        Q.      So going back to my question,

4   has the Board ever received any

5   complaints regarding doctors providing

6   gender-affirming medical care?

7        A.      No.

8        Q.      Never? And that's including

9   before the introduction of what became

10  Act 626 and since?

11       A.      To my knowledge, it has never

12  received a complaint regarding

13  gender-affirming medical care.

14       Q.      And is that for minors or

15  adults?

16       A.      Correct.

17       Q.      Has the Board ever had any

18  discussions about gender-affirming

19  medical care?

20       A.      Not to my knowledge, no.

21       Q.      Well, so does that -- you are

22  testifying on behalf of the Board, and

23  you have been designated by the Defendant

24  Board to testify on this topic.

25               So have you been prepared --

```
 1              AMY E. EMBRY
 2   can you answer on behalf of the Board
 3   that the Board has not had discussions
 4   about this topic, let's say, since you've
 5   been Executive Director?
 6        A.    There has not been discussion
 7   at any of the board meetings. I cannot
 8   speak for every single Board member to
 9   see if they ever discussed it.
10        Q.    Are you aware of any
11   conversations with any -- with or between
12   any Board members concerning
13   gender-affirming medical care?
14        A.    No.
15        Q.    And are you aware of any
16   conversations that included any Board
17   staff about gender-affirming medical
18   care?
19        A.    No.
20        Q.    Okay. So when the bill that
21   became Act 626 was being debated and
22   ultimately passed, nobody at the Board
23   staff or at board meetings discussed it
24   at all?
25        A.    No.
```

Page 154

1                       AMY E. EMBRY

2        Q.     Has the Board ever considered

3    are passing a regulation concerning

4    gender-affirming medical care?

5        A.     No.  Not as I've been

6    Director, no.

7        Q.     Did the Board ever see a need

8    for a regulation concerning

9    gender-affirming medical care?

10       A.     It was not communicated to me

11   if they did.

12       Q.     And so I asked you about

13   whether there were complaints about

14   gender-affirming medical care and you

15   said there weren't, but I understand from

16   your testimony earlier sometimes things

17   come to the Board's attention apart from

18   complaints.

19              Did any problems related to

20   gender-affirming medical care for minors

21   ever come to the Board's attention

22   outside of complaints?

23              MS. LAND:  Object to form.

24       A.     No.

25       Q.     Okay.

```
 1                    AMY E. EMBRY
 2              MS. COOPER:  Beth, if you can
 3        take tab 9 and we'll have that
 4        marked as Exhibit 7? Thank you.
 5                 (Exhibit 7, May 5, 2021 email
 6        re: Public Health Grand Rounds was
 7        received and marked on this date
 8        for identification.)
 9              MR. RICHARDSON:  Exhibit 7 has
10        been introduced.
11              MS. LAND:  I have it.
12              MS. COOPER:  Thank you.
13        Q.    Ms. Embry, you have Exhibit 7
14   in front of you?
15        A.    Yes.
16        Q.    Have you seen this document
17   before?
18        A.    I cannot recall seeing this
19   specific one.
20        Q.    Have you seen any documents
21   representing grand rounds regarding
22   gender-affirming medical care?
23        A.    I have to grand rounds.  I
24   can't say that I have seen it for
25   gender-affirming but I have seen grand
```

1                    AMY E. EMBRY

2    rounds.

3        Q.    And just to be clear the

4    document marked as Exhibit 7 is an email

5    including a document that has in large

6    text Public Health Grand Rounds,

7    Announcing a Session on Gender-Affirming

8    Care Services in Arkansas. I'm just

9    stating that for the record, not as part

10   of the question.

11             So you were not aware of a

12   grand rounds --public health grand rounds

13   on gender-affirming care services in

14   Arkansas?

15       A.    Well, I may have received this

16   email but we receive these normally

17   weekly, so I do not recall this one in

18   particular.

19       Q.    And so sitting here now is the

20   first time that you think you have been

21   aware of this grand round?

22       A.    Correct.

23       Q.    Just so I understand the email

24   at the top, it says from Matt Gilmore

25   ADH, is that the Arkansas Department of

```
 1                    AMY E. EMBRY
 2   Health?
 3        A.    Yes.
 4        Q.    And it's sent to Heather Owen
 5   cc: Sarah Morris. Who is Heather Owen?
 6        A.    Heather Owen is an employee of
 7   the Board.
 8        Q.    What is her position on the
 9   Board?
10        A.    She is one of the licensing
11   managers.
12        Q.    Okay. And Sarah Morris?
13        A.    I have no idea who Sarah
14   Morris is.
15        Q.    Okay. Below that there is a --
16   it looks like it was forwarding an
17   earlier email from Sarah Morris to ADH
18   All. Is ADH All, do I take it, an email
19   list of all ADH employees?
20        A.    Correct.
21        Q.    Okay. So you would have
22   received this but you don't recall that
23   particular grand rounds?
24        A.    Correct.
25        Q.    Okay. Did anyone at the Board
```

                        AMY E. EMBRY
1
2    discuss the fact that there was going to
3    be a grand rounds on gender-affirming
4    care in Arkansas?
5         A.    Not to my knowledge.
6         Q.    And just for the record, I'm
7    noting that it's dated, the event was
8    dated to occur May 6th, 2021.
9              Does that help refresh your
10   recollection about whether there was any
11   conversation about this?
12        A.    There was no conversation with
13   me about this.
14        Q.    And you're not aware of others
15   discussing it?
16        A.    No.
17        Q.    Okay. When Act 626 was first
18   introduced in the legislature as HB 1570,
19   during that period when it was being
20   considered, did anyone at the Board
21   discuss the bill?
22        A.    No, not to my knowledge.
23        Q.    Okay so no official board
24   meeting discussion of the bill?
25        A.    No.

1                    AMY E. EMBRY
2        Q.    And you're not aware of any
3    conversations among the Board members
4    about the bill?
5        A.    No.
6        Q.    And you're not aware -- well,
7    let me ask you a different question.
8              Are you aware of any
9    conversation involving any Board staff or
10   employees about the bill?
11       A.    No.
12       Q.    Sorry if I'm -- I'm finding it
13   surprising that a bill that obviously had
14   a lot of public attention involving
15   medical regulation, nobody at the Board
16   talked about it at all?
17             MS. LAND:  Object to form.
18       Q.    Is that right? Really, nobody
19   discussed it?
20       A.    I found out about the bill it
21   was either on social media or the news.
22       Q.    Back at the time it was being
23   considered?
24       A.    Correct.
25       Q.    So just to be clear, you are

                    AMY E. EMBRY

1

2    not aware of any conversations had among

3    any Board members or involving any Board

4    members or any staff about this bill that

5    became Act 626?

6         A.    No.

7         Q.    Now, we talked earlier about

8    other areas of regulations by the Board

9    that were -- where the regulations after

10   statutes were passed on the particular

11   topic like gastric bypass procedures.

12             Is the Board expected to pass

13   regulations relating to Act 626?

14        A.    I do not have the act in front

15   of me, but I do not recall that act

16   requiring any Licensing Board to

17   promulgate a rule. If it is specifically

18   in there that they will promulgate a rule

19   then it will be promulgated.

20        Q.    But at this point so far has

21   there been any discussion about a

22   possibility of promulgating a rule?

23        A.    No.

24        Q.    Has any government official in

25   the executive branch or the legislature

Page 161

                    AMY E. EMBRY

1                   AMY E. EMBRY

2    communicated with the Board about Act

3    626?

4         A.    No, not to my knowledge, no.

5         Q.    Okay. And when the bill was

6    introduced and being considered did

7    anyone from the legislature consult with

8    the Board regarding this bill?

9         A.    No.

10        Q.    And just to be clear, "this

11   bill" I'm referring to the bill that

12   became Act 626.

13        A.    No.  No one contacted, no.

14        Q.    So the Board's input was not

15   sought by any member of the legislature?

16        A.    No.

17        Q.    Okay. And since the law Act

18   626 was enacted has any government

19   official communicated with the Board

20   about enacting regulations regarding the

21   Act?

22        A.    No.

23        Q.    So your understanding is that

24   the Act 626 does not require any

25   regulations or rules to be promulgated by

```
 1                 AMY E. EMBRY
 2   the Board?
 3        A.    Yes, from my recollection. I
 4   don't have it in front of me, I would
 5   have to read through it again, but I do
 6   not recall a requirement for rules in
 7   that Act.
 8        Q.    So there is no plan on the
 9   part of the Board to pass a regulation
10   relating to Act 626?
11        A.    No.
12        Q.    Has the Board consulted with
13   any experts on the topic of
14   gender-affirming medical care?
15        A.    No.
16        Q.    So prior to the introduction
17   of HB 1570, the bill that became Act 626,
18   was the Board ever approached by any
19   government official or their
20   representatives about enacting
21   regulations concerning gender transition
22   procedures?
23        A.    As long as I've been Director,
24   no. Before that, I can't answer that.
25        Q.    And was the Board or any Board
```

```
 1                    AMY E. EMBRY
 2   member or Board staff contacted by
 3   anybody from the Governor's Office
 4   related to HB 1570 or Act 626, which it
 5   later became?
 6        A.    I was not, and I don't recall
 7   anybody else in the office, being
 8   contacted by the Governor's Office.
 9        Q.    Are you aware of any Board
10   member being contacted by anyone from the
11   Governor's Office?
12        A.    I am not aware of anything.
13        Q.    So the way I had asked the
14   questions before about legislators, is
15   whether any of the legislators contacted
16   the Board. Do you know if anybody from
17   the Board contacted any legislators
18   concerning HB 1570?
19        A.    Not to my knowledge, no.
20        Q.    Do you know if anybody from
21   the Board staff contacted any legislator
22   regarding Act 626 or HB 1570?
23        A.    Not to my knowledge.
24        Q.    Okay. Did anyone from the
25   Board or the Board staff reach out to any
```

```
                                    Page 164
 1                  AMY  E.  EMBRY
 2   government  official,  executive  or
 3   legislative  branches  regarding  HB  1570,
 4   which  later  became  Act  626?
 5        A.    Did  you  say  executive
 6   branches?
 7        Q.    Yes,  from  the  executive  or
 8   legislative  branches.
 9        A.    No.
10        Q.    Okay.  Did  the  Board  ever  take
11   a  position  on  HB  1570?
12        A.    No.
13        Q.    Why  not?
14        A.    The  Board  does  not  lobby.
15        Q.    Did  the  Board  ever  discuss  the
16   possibility  of  taking  a  position  about
17   the  bill?
18        A.    No.
19        Q.    Was  the  Board  ever  asked  its
20   position  by  anyone?
21        A.    Not  to  my  knowledge.
22        Q.    But  it  was  asked  by  press
23   reporters,  right?
24        A.    I  don't  recall  being  contacted
25   by  the  press  on  this.
```

Page 165

```
 1                    AMY E. EMBRY
 2              MS. COOPER:   Okay. Can we,
 3        Beth, take tab 10 and let's mark
 4        that as Exhibit 8.
 5                  (Exhibit 8, email dated May
 6        25, 2021, re: CNN Inquiry was
 7        received and marked on this date
 8        for identification.)
 9              MR. RICHARDSON:   Exhibit 8 has
10        been introduced.
11              MS. LAND:   I've got it pulled
12        up.
13        Q.    I'll give you a moment to just
14   take a look at that.
15              A moment ago I asked whether
16   the Board was ever asked its position on
17   HB 1570 or after it became law Act 626.
18   I'll ask a slightly different question
19   now.
20              Was the Board ever asked its
21   view on the lawsuit challenging Act 626?
22        A.    Yes.
23        Q.    And so the exhibit marked
24   Exhibit 8, which I have handed to you, is
25   a -- I'll describe for the record, an
```

```
 1                    AMY E. EMBRY
 2    email from Chance Pagan sent Tuesday, May
 3    25th, 2021 to Juli Carlson, cc:  Ann
 4    Embry ASMB Regulatory/Disciplinary
 5    Department, subject:  Forward CNN
 6    Inquiry. That's just for the record.
 7               Do you recognize this email?
 8         A.    Yes, I do.
 9         Q.    You were copied on it? You saw
10    it at the time?
11         A.    I was. This was a year ago.
12         Q.    Okay. And is this -- I do read
13    right that CNN was asking for comment
14    from the Board on the ACLU lawsuit
15    against Act 626?
16         A.    Yes.
17         Q.    And so tell me if I'm getting
18    this right, it looks like the initial
19    email is from someone named Jamiel Lynch
20    from Warner Media at, according to their
21    email address, to ASMB Support
22    Department, copying Kodwyer,
23    K-o-d-w-y-e-r, @HDLlaw.com, subject: CNN
24    Interview.
25               What is ASMB Support
```

Page 167

```
 1                    AMY E. EMBRY
 2   Department, do you know?
 3        A.    That's just an email, email
 4   that can go to Support Department, which
 5   means more than one person has access to
 6   that email. Anything that they need
 7   assistance with they send it to that, and
 8   so one of three or four people will be
 9   able to help out.
10        Q.    Okay. So then it looks like
11   someone named Chance Pagan listed as
12   Systems Administrator sent this,
13   forwarded this email to Juli Carlson and
14   you; is that correct?
15        A.    Correct.
16        Q.    And who is Chance Pagan?
17        A.    He is in our IT department.
18        Q.    It says here in the email, "I
19   believe this would be for you."  I assume
20   he meant Juli Carlson; is that correct?
21        A.    That's why he sent it to Juli
22   and this was sent to the Support
23   department, which goes to IT. He
24   forwarded it onto the Regulatory
25   department.
```

1                    AMY E. EMBRY

2        Q.    Thank you. Did you talk with

3   Juli Carlson about this request?

4        A.    I'm sure I did but this was a

5   year ago, and I don't remember. We would

6   have responded but I'd have to go back

7   and look at my emails and notes on this.

8        Q.    Did the Board take a position

9   on the ACLU lawsuit?

10       A.    No.  We would not have taken a

11  position.

12       Q.    Did it make a statement?

13       A.    I can't remember. I would have

14  to go back and look in my emails and look

15  at in my notes.

16       Q.    Okay. Was the Board asked for

17  comment or statements about Act 626 or

18  the ACLU lawsuit challenging Act 626,

19  apart from this CNN inquiry?

20       A.    It's possible. It is possible.

21       Q.    And what responses would the

22  Board have made?

23       A.    I would have to go back and

24  look at my notes but it would be a

25  generic response.

Page 169

1                    AMY E. EMBRY
2        Q.     A generic response to the
3    effect of what?
4        A.     We would not take a stance in
5    the lawsuit, it would be somewhere along
6    the lines -- and again, this is not what
7    the response would have said -- is that
8    we would have followed the process; we
9    have a lawsuit filed against us, we'll
10   follow the process.
11       Q.     Are you aware that the
12   Governor vetoed HB 1570 before it
13   ultimately became law?
14       A.     I think I do recall that, yes.
15       Q.     And were you aware that --
16   well, let me ask a different question.
17              Have you seen the Governor's
18   veto statement or heard him speak about
19   his veto?
20       A.     No.
21       Q.     You never saw it?
22       A.     Not that I can recall.
23       Q.     Do you know why the Governor
24   vetoed the law?
25       A.     No.

1                    AMY E. EMBRY
2        Q.     Does the Board have a view
3    about the appropriate course of treatment
4    for adolescents with gender dysphoria?
5        A.     No.
6        Q.     Does the Board recognize that
7    gender-affirming hormones can be a help
8    to some adolescents?
9        A.     Not to my knowledge.
10        Q.     "Not to my knowledge" that the
11    Board knows, or the Board recognizes
12    this, rather?
13        A.     You're going to have 14
14    different Board members with 14 different
15    opinions, so you can have 14 different
16    answers.
17        Q.     Do you know the views of any
18    individual Board member?
19        A.     No.
20        Q.     Is the Board taking the
21    position in this case that no adolescent
22    can benefit from gender-affirming hormone
23    therapy?
24        A.     I don't feel I can answer that
25    question. The Board has not discussed it,

```
 1                    AMY E. EMBRY
 2   so I don't know the answer to that.
 3        Q.    So the Board doesn't -- the
 4   Board doesn't have a position on that?
 5        A.    No.
 6        Q.    And is it also true the Board
 7   does not have -- does not take the
 8   position that gender-affirming medical
 9   treatments can never be helpful to
10   alleviate gender dysphoria in
11   adolescents?
12        A.    Can you repeat that?
13        Q.    I'm realizing that was a
14   terrible question with a double negative.
15   I'm going to rephrase it.
16            Is it the Board's position
17   that gender-affirming medical treatments
18   can never alleviate gender dysphoria in
19   adolescents?
20        A.    It's never been discussed, so
21   they do not have an opinion on this at
22   the Board.
23        Q.    Is it the Board's position
24   that the risks of gender transition
25   procedures always outweigh the benefits
```

Page 172

1                    AMY E. EMBRY
2  for every minor patient with gender
3  dysphoria?
4        A.    Again, they haven't discussed
5  this, so there is no position that I'm
6  aware of.
7        Q.    Does the Board recognize that
8  for adolescents who are currently
9  receiving gender-affirming medical
10  treatments that withdrawing that
11  treatment from them could put them at
12  risk of harm?
13        A.    Again, they haven't discussed
14  this, so I do not know the Board's
15  position on this.
16        Q.    So does the Board have a
17  position on this?
18        A.    No, they have never discussed
19  it.
20        Q.    So it's not just that you
21  don't know the Board's position, is it
22  your testimony that the Board doesn't
23  have a position on this?
24        A.    They have not discussed
25  anything to have a position on this. This

```
 1                   AMY E. EMBRY
 2  issue has not come up.  The Board did not
 3  know about the bill or anything until it
 4  hit the media, same as us.
 5       Q.    So is it fair to assume that
 6  nobody from the Board lobbied legislators
 7  to support the bill?
 8       A.    No.
 9       Q.    Nobody lobbied -- nobody from
10  the Board lobbied legislators one way or
11  the other related to the bill?
12       A.    The Board does not lobby.
13       Q.    The Board doesn't lobby about
14  any bills; is that right?
15       A.    That is correct.
16       Q.    So members of the Board, have
17  they ever individually taken positions on
18  any bill related to medical care?
19       A.    Not at the Board meeting.
20       Q.    But outside of the board
21  meeting?
22       A.    I wouldn't know that.
23       Q.    Are you aware of any times
24  that happened?
25       A.    No. I don't know, no.
```

1          AMY E. EMBRY
2          Q.     In Arkansas do parents have to
3     consent to medical treatment for their
4     children, for their minor children?
5          A.     Usually yes. That's between
6     the physician and the parent and the
7     patient.
8          Q.     And what do you mean by it's
9     "between the physician and the parent and
10    the patient"?
11         A.     Well, any care on any patient,
12    whether it's a minor or an adult, that is
13    between the physician and the patient. If
14    a minor is involved, then the parent is
15    involved.
16         Q.     When you say any care between
17    the patient and the physician and if it's
18    a minor the parent, do you mean the
19    decision about whether to undergo care?
20         A.     I would think it -- yes. Yes.
21         Q.     But I think you testified that
22    generally parents do have to consent for
23    medical treatment for their children, if
24    they want them to have that care? Excuse
25    me. Let me do that again because that was

```
 1                    AMY E. EMBRY
 2     my fault. I spoke over you. I just want
 3     to get a clear record.
 4               Do you understand your
 5     testimony that in Arkansas generally
 6     before minors can have medical care their
 7     parents need to consent?
 8          A.    Yes.
 9          Q.    Okay. Are there exceptions
10     where the minor could consent on their
11     own without parents?
12          A.    I don't know.
13               MS. COOPER:  Beth, if we can
14          take tab 12 and mark that as
15          Exhibit 9.
16               (Exhibit 9, copy of House Bill
17          1570 was received and marked on
18          this date for identification.)
19               MS. LAND:  Okay. It's pulled
20          up for me.
21          Q.    For the record, I'm going to
22     identify Exhibit 9 as House Bill 1570.
23               Have you seen this bill
24     before?
25          A.    Yes.
```

Page 176

1              AMY E. EMBRY

2       Q.     When did you see it for the

3  first time?

4       A.     For the first time it would be

5  after it was put on the news or social

6  media, however I heard of it, I pulled it

7  up.

8       Q.     Why did you -- sorry. Go

9  ahead.

10      A.     I pulled it up on the

11  legislative website.

12      Q.     Why did you do that?

13      A.     Because I knew that it would

14  probably affect the Board in some form or

15  fashion, so I was just looking at it.

16      Q.     Why did you think it would

17  affect the Board in some form or fashion?

18      A.     Because it involved

19  physicians.

20      Q.     And now that you've looked at

21  it, does it involve the Board in some

22  form or fashion?

23      A.     One section.

24      Q.     Which section is that?

25      A.     It's going to be from page 9

```
 1                    AMY E. EMBRY
 2    line 27, and the Code is 20-9-1504, it's
 3    the enforcement.  And it says, "Any
 4    referral for or provision of gender
 5    transition procedures to an individual
 6    under 18 years of age is unprofessional
 7    conduct and is subject to discipline by
 8    the appropriate licensing entity or
 9    Disciplinary Review Board with competent
10    jurisdiction in this State."
11         Q.    And that's the one provision
12    within HB 1570 that you understand to
13    involve the Board --
14         A.    Yes.
15         Q.    -- is that right? Is that
16    because the Board is the appropriate
17    licensing entity at issue?
18         A.    Well, it is the appropriate --
19         Q.    Excuse me. I have to -- I
20    asked my question terrible. I'll redo it.
21              Is it because the Board is the
22    appropriate licensing entity or
23    Disciplinary Review Board with
24    jurisdiction in this State?
25                   MS. LAND:  I'll object to the
```

Page 178

1                    AMY E. EMBRY

2         form. You can answer that.

3         A.    It is the licensing entity for

4    some healthcare professionals in the

5    State of Arkansas.

6         Q.    And is it also the

7    Disciplinary Review Board for some

8    healthcare professionals in Arkansas?

9         A.    We've always just been called

10   a Licensing Board. I've never heard us

11   called a Disciplinary Review Board.

12        Q.    Okay. So I have a few

13   questions about this provision, which is

14   20-9-1504, subsection (a).

15             As you read it says, "Any

16   referral for or provision of gender

17   transition procedures to an individual

18   under 18 years of age is unprofessional

19   conduct."

20             I'm trying to understand what

21   that means for your enforcement as you,

22   the Board, because there's a whole other

23   provision in the Medical Practices Act

24   laying out unprofessional conduct.

25             Is it your understanding that

                    AMY E. EMBRY
1    this is an additional type of conduct
2    that now constitutes unprofessional
3    conduct, in addition to what we discussed
4    in the other statute defining that term?
5         A.    Yes.
6         Q.    Okay. So I believe that one
7    had subpoints A through S defining
8    unprofessional conduct, so this is just
9    one more?
10        A.    Yes.
11        Q.    Okay. And you testified that
12   the Board is the licensing entity for
13   some medical providers.
14             Is there any other entity that
15   enforces or that is a licensing entity or
16   Disciplinary Review Board that would be
17   relevant with respect to enforcing Act
18   626?
19        A.    It depends on what healthcare
20   professionals would be providing these
21   services.
22        Q.    Okay. So let's break that
23   down. That's helpful.
24             So for physicians who are

AMY E. EMBRY

1
2  providing procedures that are prohibited
3  by HB 1570, the Board would be the
4  appropriate licensing entity; is that
5  correct?
6        A.    Yes.
7        Q.    Okay. Is there any other
8  entity in Arkansas that would be a
9  licensing entity for physicians?
10       A.    No, not for physicians.
11       Q.    Is there any other entity in
12 Arkansas that would be responsible for
13 discipline of physicians in Arkansas?
14       A.    No.
15       Q.    Does the Board have discretion
16 in deciding how to enforce Act 626,
17 should it take effect?
18       A.    It would -- it would work, as
19 the same as any other enforcement, if the
20 complaint came, that they would read the
21 law and see what needs to be done because
22 that's just how it works on a complaint
23 basis.
24       Q.    Well, I think you also said
25 while it's on a complaint basis, things

```
 1                    AMY E. EMBRY
 2   can come to the Board's attention apart
 3   from complaints that the Board could then
 4   act on; is that right?
 5        A.    Yes.
 6        Q.    Like if it's in the news, for
 7   example, I think you said?
 8        A.    Correct.
 9        Q.    Okay. Has the Board been
10   provided any direction from any
11   government official or entity about how
12   to enforce Act 626 if it takes effect?
13        A.    No.
14        Q.    Has the Board had any
15   conversations or any Board members or
16   Board staff about how the Board would
17   enforce Act 626 should it take effect?
18        A.    No.
19        Q.    Are you aware that the law Act
20   626 was preliminarily enjoined by Federal
21   Court in Arkansas and is not currently in
22   effect?
23        A.    Yes.
24        Q.    Okay. And prior to that,
25   before the court ruled, I believe --
```

```
 1                    AMY E. EMBRY
 2    well, let's find this. I'm going to just
 3    strike that and ask it differently.
 4                 If the law were to take effect
 5    would there be a process the Board would
 6    need to undergo to determine how to
 7    enforce Act 626?
 8         A.    No. It would go through the
 9    usual process of any complaint received,
10    it would be addressed by the entire Board
11    and they would determine if there has
12    been a violation.
13         Q.    So if tomorrow Act 626 went
14    into effect the Board would be ready to
15    field any complaints should they arise?
16         A.    Yes.
17         Q.    Okay. It doesn't have anything
18    it needs to do to get ready for that?
19         A.    No.
20         Q.    Okay. So if Act 626 took
21    effect and a complaint came to the Board
22    saying that there is a doctor who is
23    providing gender-affirming medical care
24    to an adolescent, what would happen? What
25    would the Board do?
```

1              AMY E. EMBRY

2          A.    It would be the same as any

3    other complaint. The physician would be

4    provided a copy of the complaint and

5    asked to respond and once that is

6    received by the complaint and the

7    response is presented to the Board and

8    then they will move forward from there;

9    if there needs to be an investigation;

10   does action need to be brought against

11   the license; it could be a variety of

12   situations, but the whole thing will go

13   before the full Board and it will be

14   discussed.

15         Q.    And so if they got a

16   complaint, the Board got a complaint

17   about this and the physician responded

18   and admitted providing that care, would a

19   violation be determined?

20         A.    I can't answer that question.

21   That would go before the Board, they

22   would look at all situations, all

23   circumstances surrounding it. So I can't

24   answer how the Board would vote.

25         Q.    So there could be

```
 1                AMY E. EMBRY
 2   circumstances under which it might not
 3   constitute a violation?
 4        A.    No. I can't think of anything
 5   off the top of my head.
 6        Q.    So the Board would not have
 7   any discretion not to find a violation if
 8   the person admitted to providing care
 9   prohibited by Act 626?
10        A.    Could you repeat?
11              MS. LAND:  Object to form.
12        Q.    Sure. Would the Board have no
13   discretion, it would have to find a
14   violation if a doctor admitted providing
15   care prohibited by Act 626?
16        A.    That is possible, that is a
17   possible outcome.
18        Q.    Possible? Let me ask the
19   question differently because I'm not sure
20   I understand your answer.
21              Would the Board be required to
22   make a finding of a violation of Act 626
23   -- let me ask that differently. I didn't
24   ask that right.
25              Would the Board have to make a
```

```
 1                    AMY E. EMBRY
 2    finding of unprofessional conduct as
 3    directed by Act 626 if a doctor admitted
 4    to providing prohibited care under the
 5    statute?
 6         A.    Yes.
 7         Q.    Okay. Would the doctor be
 8    subject to discipline by the Board?
 9         A.    Yes.
10         Q.    And what would happen? What
11    would be the discipline?
12         A.    That is strictly up to the
13    Board. You are looking at different
14    scenarios every single time.  Every
15    single case is different. It could be
16    that they find that they may have to
17    suspend the license, it could be that
18    they say; okay, you need to go back and
19    take these courses and make sure you
20    understand the law. It just depends.
21    Every situation is different.
22         Q.    Could the Board revoke the
23    license of the doctor?
24         A.    If their legal counsel says
25    they do have enough and that's what the
```

```
 1                  AMY E. EMBRY
 2   Board votes to do, yes, they can.
 3        Q.    When you say if their legal
 4   counsel says they do have enough, if the
 5   Board's legal counsel says they do have
 6   enough, is that what you mean?
 7        A.    Correct. Yes.
 8        Q.    And have enough what?
 9        A.    Evidence to either suspend or
10   revoke a license.
11        Q.    Would admission or proof of
12   providing gender-affirming medical care
13   to a minor be enough to suspend or revoke
14   a license?
15        A.    That would actually be a
16   question for the Board's legal counsel,
17   not me. It is very common for the Board
18   to ask the legal counsel in the room; do
19   we have enough for a suspension or
20   revocation before they make any decision.
21        Q.    But it's a possible outcome?
22        A.    Yes.
23        Q.    When we talked earlier about
24   the definition of unprofessional conduct
25   in 17-95-409 of the Medical Practices Act
```

AMY E. EMBRY

1

2  and they had subsection A through S as

3  conduct that's deemed unprofessional

4  conduct, were those all determined by the

5  legislature, those categories of

6  unprofessional conduct or the Board?

7      A.    Let me go back to that 17-95

8  --

9      Q.    Actually, withdraw the

10  question. I answered it myself. I

11  withdraw it.

12           If there were a complaint

13  against a doctor for violating Act 626

14  and the doctor responded by saying

15  withdrawing treatment from a patient

16  would cause severe harm to the patient,

17  would that be a defense to the complaint

18  for unprofessional conduct based on 626?

19      A.    Yes, it could be a defense.

20      Q.    It could be a defense. And

21  there would be a hearing on that?

22      A.    I hearing is usually held only

23  if a license is going to be -- action is

24  going to be taken against a license. A

25  hearing is not held just because a

Page 188

                    AMY E. EMBRY

1

2    complaint is received.

3         Q.    So you're saying even before

4    the need for a hearing, the Board could

5    potentially deem a doctor's defense or I

6    should say the doctor's statement that

7    withdrawing the care a patient could

8    cause harm to the patient as a defense to

9    a complaint of unprofessional conduct

10   based on Act 626?

11              MS. LAND:   Object to form.

12        A.    So I want to make sure I

13   understand your question. The original

14   question was, you can do all this without

15   a hearing. So if a complaint comes in on

16   a physician, they gather the complaint,

17   the response from the physician, the

18   Board reviews it, they can decide then

19   there's been no violation and it's done.

20   They can also decide we want to see this

21   doctor at the next board meeting. They

22   can also determine just from the response

23   or from the complaint; has there been a

24   violation that rises to the level of a

25   suspension or a revocation?  If they do

```
 1                     AMY E. EMBRY
 2    that, then the hearing will be at the
 3    next meeting.
 4                 So I'm getting confused as far
 5    as what you're asking as far as a hearing
 6    and a defense because a hearing is only
 7    held if action is brought against a
 8    license. Asking a doctor to appear is not
 9    an action against a license. Asking a
10    doctor to respond is not an action
11    against a license. So I'm confused as to
12    what you're asking.
13        Q.    Thank you. That's helpful.
14    I'll break it down into smaller bits and
15    try to focus better.
16                 If there is a complaint
17    against a doctor on the basis that the
18    doctor is providing gender-affirming
19    medical care and the doctor's response is
20    to say withdrawing treatment for this
21    particular patient would cause severe
22    harm to the patient, so I could not do
23    that, is it possible that the Board could
24    determine that the doctor's conduct was
25    not a violation?
```

```
 1                AMY E. EMBRY
 2      A.     It's possible. They could
 3  choose to do that.
 4      Q.     So the Board would not be
 5  required to discipline a doctor for
 6  providing gender-affirming medical care
 7  in all cases?
 8      A.     Again, it depends on the
 9  situation. They would have to look at all
10  the evidence before them.
11             If I had to speculate, if a
12  complaint came in of this nature they
13  would want to speak with the physician.
14  So more than likely the physician would
15  be likely to appear to discuss this.
16      Q.     And then if the Board were
17  convinced that the doctor's concern about
18  harm to patient in the event of
19  withdrawing treatment was valid, the
20  Board would not have to find a violation
21  and discipline the doctor?
22      A.     That is possible.
23      Q.     Okay. One of the topics on our
24  30(b)(6) deposition notice had to do with
25  two doctor plaintiffs in this case and
```

```
 1                    AMY E. EMBRY
 2    their -- let me pull up the notice. The
 3    medical license of Dr. Michelle Hutchison
 4    and the medical license of Dr. Katherine
 5    Stambough.
 6             Do those doctors have any
 7    pending complaints against them?
 8         A.    No.
 9         Q.    Have there been any complaints
10    against either doctor?
11         A.    No.
12         Q.    Okay. Another topic on our
13    notice was what the Board did to search
14    for documents in response to our
15    subpoena. I believe that was the last
16    item on the list.
17             Can you tell me what was done
18    to search for documents?
19             MS. LAND:  I'm going to object
20         to that question to the extent it
21         elicits any attorney-client
22         privilege information. So to the
23         extent she can answer that without
24         revealing any of that, I'll assert
25         that objection.
```

1              AMY E. EMBRY

2      Q.    Right. So without revealing

3  any attorney-client communications, what

4  was searched or how did the search

5  happen?

6      A.    We received the request and

7  then we gave it to our IT department and

8  I don't have the original request in

9  front of me but I think it was along the

10  lines any information we had on HB 1570

11  or 626.  So we researched our entire

12  email system for those terms.

13          And then the second request

14  came in and we did it again and because

15  the Board hadn't any involvement with

16  this legislation there was not anything

17  in there.

18          When the third request came it

19  came with two or three pages of search

20  terms or search items and that is when

21  they put that through the system and all

22  these documents came out, whether they

23  were relevant to this act or not.

24      Q.    And when you say "through the

25  system" does that mean all employees of

Page 193

1                    AMY E. EMBRY
2    the Board?
3         A.    Yes, the entire email system.
4         Q.    For Board employees, though;
5    is that right?
6         A.    Yes.
7         Q.    Or is it beyond Board
8    employee?
9         A.    No. It is only Board employee
10   employees.
11        Q.    And what about Board members?
12        A.    No, we do not have email
13   addresses for Board members.
14        Q.    So you didn't search files of
15   any Board members?
16        A.    We don't have files on Board
17   members as far as communications. They
18   don't use any of our systems to
19   communicate.
20        Q.    Okay. So the Board members
21   don't have an official email that they
22   use in their business as Board members?
23        A.    No.
24        Q.    They just use their personal
25   email?

1                    AMY E. EMBRY

2        A.     Correct.

3        Q.     So when the Board members are

4   conducting Board business is it ever done

5   through email?

6        A.     No. Well, that is if we have

7   to send out some attachments that were

8   not part of the, you know, original Board

9   package, things of that nature, or if we

10   have to say; here is the Zoom link for

11   the board meeting or something like that.

12        Q.     And in those cases you'll

13   email to their personal email?

14        A.     Correct.

15        Q.     Or might it be their workplace

16   email?

17        A.     It might it depends on what

18   email address they choose to use.

19        Q.     For these Board members this

20   is just a part-time activity for them, is

21   that right, it's not their full-time?

22        A.     No. No. The majority of them

23   are full-time physicians.

24        Q.     Okay. And when you talked

25   about giving a packet to members of the

1                    AMY E. EMBRY
2    Board, I assume that relates to different
3    complaints against medical providers; is
4    that right?
5         A.    Yes. It is what is provided
6    that they review at every single board
7    meeting. They are sent out on disks and
8    they are loaded into their computer and
9    into the Board system and that is
10   everything that they will discuss or that
11   any appearances for that board meeting.
12        Q.    So it's based on what's on the
13   agenda at the next board meeting, they
14   will get a packet of materials; is that
15   right?
16        A.    Correct.
17        Q.    And that could be related to a
18   complaint against a physician; is that
19   right?
20        A.    Yes.
21        Q.    And that could include
22   something related to a regulation being
23   considered; is that right?
24        A.    A-hum.
25        Q.    And all of those kinds of

```
 1                  AMY E. EMBRY
 2   materials are sent on a disk in the U.S.
 3   mail or how do they get them?
 4        A.    No.  They are sent FedEx with
 5   signature required.
 6        Q.    Wow. Okay.
 7              MS. COOPER:  Why don't we take
 8        a break, maybe about ten minutes.
 9        Okay?
10              VIDEOGRAPHER:  We are off the
11        record at 2:53 p.m.
12              (Recess is taken.)
13              VIDEOGRAPHER:  We are back on
14        the record at 3:06 p.m.
15              MS. COOPER:  Thank you. I just
16        want to put on the record that Beth
17        Echols, who is on the Plaintiff's
18        counsel team joined the deposition
19        some time ago but we have not
20        mentioned that until now.
21              Beth, can you grab tab 5?
22        Actually, I'm sorry, did we already
23        mark tab 5? We did, didn't we?
24              MR. RICHARDSON:  We marked it
25        as Exhibit 5.
```

```
 1                AMY E. EMBRY
 2       Q.    So let's turn to Exhibit 5.
 3       A.    I'm afraid, Leslie, that the
 4  ones before 6 were not marked, so if you
 5  could identify them?
 6       Q.    I'm sorry, yes.  We'll do that
 7  after but it is the document that says on
 8  the top A Bill and it's House Bill 1718.
 9            Do you see that?
10       A.    Yes.
11       Q.    Okay. Ms. Embry, are you
12  familiar with this law?
13       A.    I know of it. I've read it.
14       Q.    Well, I want to call your
15  attention to a particular part of it and
16  if you want to read more, that will be
17  fine but I specifically want to point to
18  the beginning where it says, it's called
19  Subsector 2, Patient Right-to-Know Act
20  and it says 20-6-201 is the title and if
21  you look right below that 20-6-202
22  Legislative Findings and Purpose.  You
23  got that?
24       A.    Yes.
25       Q.    And it says, "(a) the General
```

```
 1                  AMY E. EMBRY
 2   assembly finds that; (1) is patients are
 3   entitled to continuity of care with their
 4   healthcare providers; (2) healthcare
 5   providers are prohibited legally and
 6   ethically from abandoning a patient
 7   before treatment has concluded." We can
 8   stop reading there.
 9              Does that refresh your
10   recollection about this statute?
11        A.    Yes.  This was done before I
12   was Director.
13        Q.    Okay.
14        A.    So I would not have been as
15   involved with this.
16        Q.    Okay. And so I wanted to ask
17   you, focusing in on subsection (a)(2) it
18   says, "Healthcare providers are
19   prohibited legally and ethically from
20   abandoning a patient before treatment has
21   concluded."
22              So is this another source of
23   ethical obligations of doctors in
24   Arkansas?
25        A.    Ethical I don't know, but it
```

```
 1                 AMY E. EMBRY
 2   is an obligation that the Board would
 3   look at.
 4        Q.    Okay. Well, I ask because it
 5   says, "The healthcare providers are
 6   prohibited legally and ethically from
 7   abandoning a patient."
 8             So is that your
 9   understanding, that it would be an
10   ethical violation to abandon a patient
11   before treatment has concluded?
12        A.    Yes.
13        Q.    Okay. And so under this
14   provision if a doctor is treating a
15   patient and has to stop care for any
16   reason before treatment is concluded,
17   they have -- is it an ethical obligation
18   to help them find care from another
19   doctor?
20        A.    Yes.
21        Q.    Is that right? I'm sorry?
22        A.    Yes.
23        Q.    Yes, okay. And can complaints
24   be filed with the Board for doctors
25   abandoning patients in violation of this
```

1                    AMY E. EMBRY

2    section?

3          A.     Yes.

4          Q.     Has that ever happened?

5          A.     Yes.

6          Q.     Under your watch?

7          A.     Yes.

8          Q.     Can you tell me about those

9    kinds of circumstances?

10         A.     It would be a letter of

11   complaint saying that either they were

12   fired or they were abandoned by the

13   physician without providing another

14   physician or a referral to another

15   physician and it would go through the

16   complaint process.

17         Q.     Have any doctors been

18   disciplined for abandoning patients?

19         A.     I can't recall if they were

20   disciplined. I know some were called

21   before the Board to explain what

22   happened, but without looking at

23   documents, I can't recall if they were

24   disciplined.

25         Q.     But under the Board's

```
 1                   AMY E. EMBRY
 2   authority that could be something that
 3   would happen?
 4        A.    Yes.
 5        Q.    And just to be clear, the
 6   Board could discipline a doctor for
 7   abandoning a patient in violation of
 8   20-6-202?
 9        A.    Yes, they could.
10        Q.    We talked about the ethical
11   obligations for doctors contained in
12   Regulation 32. And now we've talked about
13   an ethical requirement in Section
14   20-6-202.
15              Are there other sources of
16   ethical obligations for doctors in
17   Arkansas besides those?
18        A.    Not that I'm aware of. You
19   know, anything in the code that is law we
20   adhere to that as well. Just because it's
21   in the law doesn't necessarily mean there
22   is a rule.
23        Q.    I'm sorry. I didn't hear you.
24        A.    So if there could be a law
25   that we're not required to have a rule on
```

1                    AMY E. EMBRY
2    that we must adhere to that law as well.
3         Q.    So if there were other
4    statutes that identified ethical duties
5    of doctors, that would be an ethical
6    obligation of doctors even if there is no
7    corresponding rule; is that what you're
8    saying?
9         A.    Correct.
10        Q.    Are you aware of any besides
11   this ethical obligation contained in
12   Section 20-6-202?
13        A.    Without looking at all my
14   documents, no, I can't answer that
15   truthfully. I can't say that with all,
16   through the Arkansas -- all Arkansas
17   statutes there aren't any others. I can't
18   say that honestly.
19        Q.    Okay. We talked a few minutes
20   before the break about parents being
21   required generally, I think you said, to
22   provide informed consent for treatment of
23   their minor children. Do you recall that?
24        A.    Yes.
25                    MS. LAND:  I objected to the

```
 1                    AMY E. EMBRY
 2        form of that previous question.
 3              MS. COOPER:  Okay.
 4        Q.     Is that correct, that as a
 5   general matter, minors cannot undergo
 6   medical treatment without their parents
 7   providing informed consent?
 8        A.     As far as I know.
 9        Q.     Well, okay.  That's fine.
10              Are there any other medical
11   treatments, besides gender-affirming
12   medical care for minors with gender
13   dysphoria, that parents cannot provide
14   informed consent for their children to
15   undergo?
16        A.     I don't -- I don't think so.
17   This is the only one that I saw that
18   meets those parameters, but no.
19        Q.     Under what circumstances could
20   the Board step in and ban a particular
21   medical treatment?
22        A.     I don't know of any because
23   they have not banned any medical
24   treatment, so that would be new ground,
25   new territory.
```

```
 1                    AMY E. EMBRY
 2        Q.    So because it's not something
 3   they've ever done you can't say under
 4   what circumstances they would do
 5   something like that; is that right?
 6        A.    No.
 7        Q.    Okay. And as the Board being
 8   the entity responsible for regulating the
 9   areas of medicine that you cover, when
10   would banning a particular treatment be
11   an appropriate regulation of the field of
12   medicine?
13        A.    I don't know.
14        Q.    The Board doesn't have a view
15   on that?
16        A.    No.
17        Q.    And when is it appropriate for
18   the State entity that regulates medicine,
19   the Board, to override patients and their
20   doctors' decisions about medical care?
21             MS. LAND:   Objection, form.
22        A.    I do not know the answer to
23   that question.
24        Q.    Does the Board have a view
25   about when it's appropriate to override
```

```
 1                    AMY E. EMBRY
 2   patients and their doctors' decisions
 3   about medical care?
 4        A.     Not to my knowledge.
 5               MS. LAND:  Objection to form.
 6        Q.     Does the Board have any view
 7   about the type of -- excuse me. Let me
 8   rephrase that.
 9               Does the Board have a view
10   about the level of evidence of
11   effectiveness that is required before
12   doctors should be permitted to provide a
13   medical treatment?
14        A.     No.  That has not been
15   addressed since I've been the Director.
16        Q.     So am I right that the Board
17   would not prohibit or restrict a
18   particular medical treatment based on the
19   level of scientific evidence that
20   supports that treatment?
21        A.     They have not, I can say that.
22   They have not prohibited any procedure. I
23   can't say what would be done in the
24   future.
25        Q.     Has it ever come up before the
```

1                    AMY E. EMBRY

2    Board that a particular treatment is

3    harmful because it's not supported by

4    adequate scientific research

5    demonstrating its effectiveness?

6         A.    Not to my knowledge.

7         Q.    So as the representative of

8    the Board here, the Board is not aware of

9    that ever coming up, that has not come

10   up?

11        A.    Not to my knowledge.

12        Q.    Has there ever been any issue

13   raised with the Board whether in the

14   context of a complaint against a doctor

15   or otherwise an investigation against a

16   doctor or a proposed regulation about the

17   appropriate amount of evidence that's

18   required before medical treatment should

19   be allowed?

20        A.    No.

21        Q.    Is it the Board's

22   understanding that only -- sorry.

23             Is it the Board's

24   understanding that all medical treatment

25   that is provided in Arkansas and allowed

1                    AMY E. EMBRY

2    to be provided is supported by randomized

3    control clinical trials?

4         A.    No.

5         Q.    Are there medical treatments

6    that are permitted to be provided in

7    Arkansas that are not supported by

8    randomized controlled clinical trials?

9         A.    I do not know the answer to

10   that.

11        Q.    We talked earlier about the

12   complaints about Ivermectin being used

13   for COVID and I think -- I don't think I

14   asked this question, has anyone proposed,

15   within the Board, to prohibit doctors

16   from prescribing Ivermectin to treat

17   COVID?

18        A.    No.

19              MS. LAND:   Objection to

20        relevance.

21        Q.    Why not?

22        A.    You are asking me? Is that

23   question toward me?

24        Q.    That's for you, Ms. Embry.

25              So you said there have not

```
 1              AMY E. EMBRY
 2   been any proposals to prohibit the use of
 3   Ivermectin to treat COVID and I asked why
 4   not?
 5        A.    Because it is off-label drug
 6   and what is prescribed between a patient
 7   and the physician is between the
 8   physician and the patient, as with any
 9   prescription.
10        Q.    So even if there are known
11   risks for using Ivermectin for COVID and
12   no evidence of its effectiveness, the
13   Board leaves that decision to patients
14   and their physicians?
15        A.    It is left between physicians
16   and patients, yes.
17        Q.    And the Board is in agreement
18   with that position, that that should be
19   between the patients and their
20   physicians?
21        A.    Yes.
22        Q.    Am I right that doctors can't
23   provide treatment to patients in Arkansas
24   without informing the patients of
25   potential risks?  I'm not talking about
```

1                    AMY E. EMBRY

2     Ivermectin specifically, but in general.

3          A.    Do you mean as far as

4     prescription or treatment in general?

5          Q.    We can break that down. Let's

6     start with treatment in general.  Is it

7     correct that doctors can't provide

8     medical treatments to patients without

9     informing them of any potential risks?

10         A.    I believe so. I can't answer

11    completely on that point.

12         Q.    Okay. What about with respect

13    to use of prescriptions, that doctors --

14    is it your understanding that doctors are

15    required to inform patients of risks

16    before prescribing drugs?

17         A.    I'm not -- I don't know of a

18    requirement. I know it is usually done. I

19    don't know of a requirement.

20         Q.    Is it the Board's position

21    that there are some treatments patients

22    should not be permitted to consent to

23    after being fully informed of the risks?

24         A.    Could you repeat that?

25         Q.    Is it the Board's position

1                    AMY E. EMBRY
2    that there are some medical treatments
3    patients should not be permitted to
4    consent to after being fully informed by
5    their doctors of the risks of the
6    treatment?
7          A.    I don't know. That would be a
8    -- the Board members would have to decide
9    that.
10          Q.    Okay. Imagine Act 626 didn't
11    exist, no one ever thought about it and
12    it was just -- imagine times before that
13    law.
14                If there was a doctor that was
15    providing gender-affirming medical care
16    to minors and was not following the
17    accepted standards in that field, could
18    that issue be addressed by the Board?
19          A.    If the complaint is filed,
20    yes.
21          Q.    And would that also be true if
22    it otherwise came to the Board's
23    attention that that was happening?
24          A.    Yes.
25          Q.    If the Board had a broader

```
 1                   AMY E. EMBRY
 2   concern about doctors overprescribing
 3   hormone therapy for adolescents with
 4   gender dysphoria, is that something the
 5   Board could step in and regulate?
 6        A.    Regulate means to form a
 7   regulation?
 8        Q.    Yes.
 9        A.    They can create a rule if they
10   choose to do so. It would go through the
11   promulgation process. It does not mean
12   that it would pass.
13        Q.    I'm just thinking about, we
14   talked about the very detailed
15   regulations about pain medications and
16   regulation in place to govern how
17   prescriptions can be provided, is that a
18   fair description?
19        A.    Could you repeat that?
20        Q.    Yeah. I'll ask it clearer.
21              We talked earlier about the
22   regulations for pain medications. You
23   remember that?
24        A.    Yes.
25        Q.    If there were an issue with,
```

Page 212

```
 1                  AMY E. EMBRY
 2   say, some doctors in the State providing
 3   gender-affirming medical care to minors
 4   and specifically overprescribing hormone
 5   therapy, similar to the way opioids have
 6   been overprescribed, would it be possible
 7   for the Board to enact a regulation to
 8   address that problem?
 9        A.    Yes.  If they found it
10   necessary, yes.
11        Q.    And similarly, if the Board
12   were to learn that some doctors in
13   Arkansas who provide gender-affirming
14   medical care to minors were not providing
15   sufficient information in the informed
16   consent process about the risks and
17   benefits of these treatments, could the
18   Board enact regulations to impose
19   informed consent requirements?
20        A.    The Board can create a
21   regulation on any subject they choose.
22   Whether or not it passes the promulgation
23   process is what determines if it goes
24   into effect.
25        Q.    But I'm just thinking about,
```

1                       AMY E. EMBRY
2    for example, the gastric bypass
3    regulation that we talked about earlier
4    that had, I don't know, dozens, dozens of
5    risks that doctors are required to tell
6    patients about before they can obtain
7    informed consent for the procedure. If
8    there was a concern about inadequate
9    informed consent with gender-affirming
10   medical care for minors, could the Board
11   pass a regulation to spell out informed
12   consent requirements in a similar way?
13        A.    Again, if they feel a need to,
14   for which they have a concern, they can
15   do that.
16             MS. LAND:  I'll object to the
17        form of that previous question as
18        well.
19        Q.    Okay. So that would include
20   enacting a regulation like the gastric
21   bypass informed consent regulation that
22   would impose requirements for informed
23   consent before obtaining -- before
24   providing hormone therapy for minors?
25        A.    Yes. And I believe on that

1                    AMY E. EMBRY
2   one, though, that that was through an Act
3   that was required.
4        Q.    Thank you. But that is
5   something the Board could do if it saw a
6   need; is that right?
7        A.    Yes. It could -- it could
8   attempt. Let me say that, it could
9   attempt to promulgate a rule.
10       Q.    And I want to make sure I
11  understand what you mean by that.
12             Do you mean they could come up
13  with a rule but there is no guarantee the
14  legislature would approve it; is that
15  what you mean?
16       A.    Correct. Right.
17       Q.    But assuming the legislature
18  were onboard, they could pass a rule to
19  establish informed consent requirements
20  for hormone therapy for minors if they
21  felt that that was something that was not
22  being done properly by all doctors in
23  Arkansas?
24       A.    If that's what the Board chose
25  to create a rule on, yes, that's the

```
 1                    AMY E. EMBRY
 2   process.
 3        Q.    There is nothing about that
 4   type of regulation that couldn't be done?
 5        A.    Well, we can't make a
 6   regulation that is against law. Right,
 7   but we can --
 8        Q.    Understood. Assuming Act 626
 9   never existed, you would be able to do
10   that?
11        A.    If that's what the Board voted
12   to do.
13        Q.    Okay. And I think we touched
14   on this before but I want to be sure, if
15   the Board felt that gender-affirming
16   medical care for adolescents were
17   inherently harmful, it could enact a
18   regulation to prohibit that care; is that
19   right?
20        A.    I mean, if that was a concern
21   and that's what the Board felt was
22   necessary it would start the process, go
23   through the appropriate channels to
24   create a rule.
25        Q.    Right. And it could enact a
```

1                    AMY E. EMBRY

2    rule and then it would just be a question

3    of whether the legislature approved it;

4    is that right?

5         A.    Yes. And I mean, there's

6    various steps to this. I mean, it is a

7    lengthy process. It takes at least months

8    to get it done.

9         Q.    It takes how long?

10        A.    At least months. It could go

11   into years.

12        Q.    Okay. But if they felt -- if

13   the Board felt there was a problem and

14   they needed -- let me rephrase that.

15              If the Board felt that

16   gender-affirming medical care for

17   adolescents was inherently harmful it

18   could -- if the Board agreed that was the

19   case, they could pass a regulation

20   banning that care that could take effect

21   as long as the legislature approved it?

22              MS. LAND:  Object to form.

23              THE WITNESS:  Answer it?

24              MS. LAND:  Yes.

25        A.    Yes.

AMY E. EMBRY

1

2     Q.     That issue of gender-affirming

3  medical care for minors has never been

4  raised as an issue at the Board; is that

5  right?

6     A.     That is correct.

7          MS. COOPER:  I'd like to take

8       tab 11. We haven't done that one

9       yet, right? I'm checking with my

10      team. Can we mark that as the next

11      exhibit, which is --

12          MR. RICHARDSON:  This will be

13      -- apologies, uploading -- this

14      will be Exhibit 10.

15          MS. COOPER:  Exhibit 10. Thank

16      you.

17          (Exhibit 10, Opinion article

18      in Washington Post dated April 8,

19      2021 was received and marked on

20      this date for identification.)

21          MR. RICHARDSON:  Exhibit 10

22      has been produced.

23          MS. LAND:  I've got it.

24      Q.     So we've now marked Exhibit

25  10, and just for identification, it's a

```
                                   Page 218
 1                 AMY E. EMBRY
 2   document from the Washington Post opinion
 3   titled Why I Vetoed My Party's Bill
 4   Restricting Healthcare For Transgender
 5   Youth by Asa Hutchinson, dated April 8th,
 6   2021.
 7                 We talked a few minutes a
 8   while back about the Governor's veto of
 9   HB 1570 before it became law and I can't
10   remember if you said you've seen his veto
11   statement or his reasons for his veto.
12   Have you seen this before?
13        A.    No, I have not.
14        Q.    Could you -- why don't you
15   take a minute to read this and I'll have
16   a couple of questions.
17                 (Deponent reviews the
18   document.)
19        Q.    Have you had a chance to read
20   it? Okay.
21                 Just to make sure I'm covering
22   all bases, did the Board have any
23   discussions about the Governor's veto or
24   his statement about the veto?
25        A.    No.
```

```
 1                    AMY E. EMBRY
 2        Q.    And the staff, the same?
 3        A.    No. There may have been
 4   conversations; hey, did you see he vetoed
 5   it?  But nothing as far as Board
 6   business.
 7        Q.    So you were aware at the time
 8   that he vetoed HB 1570?
 9        A.    Yes.
10        Q.    And that was something that
11   was acknowledged among members of the
12   Board staff?
13        A.    Yes.
14        Q.    Do you remember who?
15        A.    It was me and Juli Carlson.
16        Q.    That was back at the time?
17        A.    Yes.
18        Q.    Roughly around April 8th, '21?
19        A.    Thereabouts. I don't know the
20   date.
21        Q.    Who brought it up; was it you
22   or Juli Carlson?
23        A.    I don't recall and I know we
24   both got it on our phone that's how we
25   found out about it.
```

AMY E. EMBRY

1

2     Q.    I didn't hear part of what you
3  said.
4     A.    We saw it on social media or
5  from a news station, social media and
6  that's how we found out about it.  That's
7  what started the conversation, that's it.
8     Q.    And what did you say to one
9  another about it?
10    A.    Nothing. It was not a long
11 drawn out conversation.  It was just;
12 hey, the Governor vetoed this bill.
13    Q.    Okay. Did anybody -- did
14 either you or Juli Carlson express
15 agreement or disagreement with the
16 Governor's decision?
17    A.    No.
18    Q.    Neither one?
19    A.    Not that I recall. This was
20 well over a year ago, so not that I
21 recall.
22    Q.    Okay. In part of the message
23 the Governor talks about concerns about
24 youth accessing treatment on the black
25 market. Do you recall seeing that part?

```
 1                    AMY E. EMBRY
 2       A.     Yes.
 3       Q.     Well, do you agree in general
 4  that it is harmful for people to access
 5  medical treatment on the black market?
 6       A.     Are you asking as a personal
 7  opinion or as my opinion as Executive
 8  Director?
 9       Q.     Let's start with the Board, as
10  the Executive Director of the Board.
11       A.     Yes.  It is dangerous to
12  receive it on the black market.
13       Q.     Do you have a different
14  personal opinion about it?
15            MS. LAND:  I'll object to any
16       questions about her personal
17       opinions, that would be outside the
18       scope of the notice for her
19       30(b)(6) witness.
20            MS. COOPER:  Okay.
21       Q.     Did you have a different
22  personal opinion? You can answer, she
23  objected.
24       A.     No.  I don't have a different
25  personal opinion.
```

Page 222

1                AMY E. EMBRY

2        Q.    Does the Board recognize, as
3   the Governor mentioned, that the
4   procedures banned by the Law 626 are
5   considered best practice medical care for
6   youth with gender dysphoria?

7        A.    I'm sorry. Repeat that
8   question.

9        Q.    Yeah. Does the Board
10  recognize, as the Governor does, that the
11  gender transition procedures banned by
12  Act 626 are part of best practice medical
13  care for youth with gender dysphoria?

14       A.    The Board has never discussed
15  that, so I don't know what their stand is
16  on that.

17            MS. LAND:  Object to the form
18       of that previous question.

19       Q.    And does the Board agree with
20  the Governor that the decision about
21  providing gender-affirming medical care
22  to minors is best left to parents and
23  doctors?

24       A.    Again, the Board has never
25  discussed this, so I do not know the

Page 223

1                    AMY E. EMBRY

2   Board's stance.

3        Q.    Okay. And does that mean the

4   Board doesn't have a stance, since you're

5   testifying on behalf of the Board?

6        A.    I don't know how to answer

7   that. They've never discussed it. It's

8   never been brought up to discuss. So I

9   don't -- as of right now they don't have

10  a stance because it's not been discussed.

11  It has not been an issue.

12       Q.    Understood. I want to go back

13  to few more questions about the Board's

14  enforcement of 626, if it should take

15  effect and to understand a little bit

16  more about that.

17             You mentioned a little while

18  ago we talked about Arkansas Stat

19  20-6-202 which says, "Healthcare

20  providers are legally and ethically

21  prohibited from abandoning a patient

22  before treatment has been concluded." Do

23  you recall that?

24       A.    Yes.

25       Q.    So if doctors are currently

```
 1                    AMY E. EMBRY
 2    treating adolescents with
 3    gender-affirming hormones, would the
 4    doctor be violating their ethical duty to
 5    discontinue treatment for a patient
 6    without referring them to an alternative
 7    provider?
 8         A.    According to this law, yes.
 9         Q.    And by "this law" you mean
10    20-6-202?
11         A.    Yes.
12         Q.    Okay. So that would be
13    unprofessional conduct on the part of a
14    doctor to discontinue gender-affirming
15    hormones without providing a referral to
16    another doctor to continue that care; is
17    that correct?
18         A.    Yes, that is my understanding.
19         Q.    So what is the Board to do if
20    that situation arises and a complaint is
21    filed or the Board otherwise comes to
22    learn about a doctor who is providing
23    care to a patient, an adolescent patient,
24    specifically gender-affirming medical
25    care, and was providing that care before
```

AMY E. EMBRY

1   
2   Act 626 took effect and then after 626
3   takes effect feels the doctor cannot
4   discontinue that care because it would be
5   abandoning their patient?  So on the one
6   hand, there's the issue of abandonment
7   and on the other hand, Act 626 says the
8   doctor can't provide that care; how are
9   doctors supposed to navigate that
10  conflict?
11          MS. LAND:  Objection to form.
12      A.    If that were to occur, then
13  what would happen is the Board would let
14  their legal counsel know there is a
15  conflict of these two rules and we need
16  to know how to proceed. That attorney may
17  go further and it may require an AG
18  opinion. When two laws conflict they have
19  to ask for legal assistance.
20      Q.    Has the Board raised the
21  concern about Act 626 putting it in this
22  bind?
23      A.    No.  The Board has not
24  addressed Act 626 at all.
25      Q.    Okay. Does the Board have any

```
 1                    AMY E. EMBRY
 2   concerns about the impact of enforcing
 3   Act 626 on adolescents who are receiving
 4   gender-affirming medical care?
 5        A.    The Board has not addressed
 6   this.  Nothing has been discussed at the
 7   Board level of Act 626, so nothing has
 8   been addressed.
 9        Q.    So if the Board were put in
10   that situation where Act 626 took effect,
11   a complaint was brought to the Board
12   because a doctor is continuing to provide
13   care to a patient that they had been
14   treating beforehand, I'm trying to
15   understand, would the Board tell that
16   doctor they have to stop providing that
17   care?
18        A.    So are you asking if 626 was
19   in effect and it conflicts with 20-6-202,
20   the Board would ask for legal assistance
21   on this; what do they need to do.
22        Q.    Does the Board view Act 626
23   promoting the well being of minors?
24        A.    Again, the Board has not
25   addressed Act 626 so this has not been
```

```
 1              AMY E. EMBRY
 2   discussed.
 3        Q.    So the Board has no position?
 4        A.    No position.
 5        Q.    So then just to make sure I
 6   understand, does the Board not have any
 7   knowledge of ways Act 626 to benefit
 8   minors?
 9        A.    It has not been provided by
10   the Board Office to the Board members
11   anything about Act 626.
12        Q.    So the -- what I'm trying to
13   learn is whether the Board, itself, has
14   any evidence or knowledge that Act 626
15   would benefit minors in some way?
16        A.    To my knowledge, no.
17        Q.    Okay. Is the Board aware of
18   any minors in Arkansas who have been
19   harmed by gender-affirming medical care?
20        A.    The Board has not received any
21   complaints and that's how they would
22   learn about that.  So, no.
23        Q.    So again, I can be confident
24   that the Board will not be presenting any
25   evidence based on its own experiences of
```

```
 1                    AMY E. EMBRY
 2   any minors being harmed by
 3   gender-affirming medical care?
 4        A.    We have not received any
 5   information or any complaints to that
 6   nature.
 7             MS. LAND:  Objection to form
 8        on that previous question.
 9        Q.    So I think you testified
10   earlier that the Board is the State
11   entity charged with regulating medicine
12   in Arkansas with respect to the
13   categories of medical professionals that
14   you license; is that correct?
15        A.    Correct.
16        Q.    And that includes doctors; is
17   that correct?
18        A.    I'm sorry? What was that?
19        Q.    And that includes doctors?
20        A.    Yes.
21        Q.    Is it the Board's view that
22   Act -- sorry.  Is it the Board's view
23   that Act 626 is an appropriate regulation
24   of medicine?
25        A.    The Board has not addressed
```

Page 229

```
1                   AMY E. EMBRY
2    Act 626.
3         Q.    So it has no view?
4         A.    It has no view.
5         Q.    Okay.
6              MS. COOPER:  Can we mark tab
7         13 as Exhibit 11?
8              (Exhibit, 11, email dated
9         March 22, 2021, from Sarah Vestal
10        to ASMB was received and marked on
11        this date for identification.)
12             MR. RICHARDSON:  Exhibit 11
13        has been introduced.
14             MS. LAND:  I've got it.
15        Q.    Okay. Thank you. Ms. Embry,
16   have you seen Exhibit 11?
17        A.    Yes, I have.
18        Q.    For the record, I'll identify
19   it as an email marked "Confidential" from
20   Sarah Vestal sent Monday, 22 March, 2021.
21             I understand this to be
22   referencing a complaint against a surgeon
23   based on the complainant being
24   transgender; do I read that right?
25        A.    That is correct.
```

1              AMY E. EMBRY
2        Q.    Okay.  Now, we didn't get the
3   complaint that this was about. Was there
4   ever a complaint filed?
5        A.    I believe that I would have to
6   go back and look at the files again.  I
7   do not have the files with me and we get
8   an average of 400 complaints a year. So I
9   would have to actually have documents to
10   answer anything about this.
11             However, when this came in I
12   think this was the complaint because this
13   was asking, it was not filing a complaint
14   against a physician, no physician is
15   named.  It asks if there was a statute of
16   limitations for filing an ethics
17   complaint.
18        Q.    I see. So and this could
19   satisfy your requirements for a
20   complaint, they just have to notify the
21   Board that they are making a complaint,
22   there is no form they have to use?
23        A.    No, but it must be in writing.
24   It can be email, it can be handwritten,
25   U.S. mail, whatever, but it must be in

                          AMY E. EMBRY
1

2    writing and must include the doctor's

3    name or licensee's name.

4         Q.    Okay. And what -- did this

5    complaint get taken up by the Board?

6         A.    I would have to see if an

7    actual complaint came in after this. This

8    cannot be considered a complaint because

9    it does not mention a licensee's name.

10   This was specifically a question as to

11   the statute of limitations for filing an

12   ethics complaint.

13        Q.    So you don't know whether

14   Sarah Vestal subsequently filed a

15   complaint?

16        A.    She may have because I do

17   remember this name but, again, it could

18   be that I'm remembering her name from

19   this document.

20        Q.    So sitting here now, you have

21   no recollection of the outcome of that.

22   Okay.

23             Now, assuming what she alleged

24   here is correct, understanding that we

25   don't know, but would the refusal to

```
 1                    AMY E. EMBRY
 2   treat a patient because they're
 3   transgender be something that would be an
 4   appropriate issue for the Board to
 5   address?
 6         A.    Again, that depends on the
 7   situation.  If it's a new patient, the
 8   doctor can refuse new patients. So I
 9   mean, you would have to get into more
10   detail to determine if there had been a
11   violation.
12         Q.    So if it was discrimination by
13   a doctor based on any of the protected
14   characteristics, that would not be
15   something the Board would be involved
16   with?
17         A.    If the investigation can be
18   proven, then that is something the Board
19   would take up.
20         Q.    Oh, sorry. Let me clarify my
21   question.
22               Assuming she were able to
23   prove discrimination by her doctor
24   because she's transgender, is that
25   something the Board would -- could find
```

```
 1                AMY E. EMBRY
 2   in violation?
 3        A.    Yes.
 4             MS. COOPER:  Can we take a
 5        short break? Let's take ten minutes
 6        and I think we're getting close.
 7             VIDEOGRAPHER:  We are off the
 8        record at 3:56 p.m.
 9             (Recess is taken.)
10             VIDEOGRAPHER:  We are back on
11        the record at 4:15 p.m.
12        Q.    Ms. Embry, is Act 626 an
13   appropriate regulation of medicine?
14        A.    I do not have an opinion on
15   that.
16        Q.    And does that mean the Board
17   doesn't have an opinion about that?
18        A.    The Board, that would be a
19   question for the Board. Also, I'm not a
20   physician.
21        Q.    Okay. Now, this is one of our
22   topics on the notice about regulation of
23   medicine and so -- and you're testifying
24   on behalf of the Board and you should
25   have been prepared on these. So I'm
```

AMY E. EMBRY

1

2    looking at the, you know, much of the

3    notice is about regulating the medical

4    profession. So is this -- is Act 626 an

5    appropriate regulation of medicine?

6              MS. LAND:  I'll object to the

7         form of that question and it is

8         also vague. You can answer.

9         A.    I would need more detail, such

10   as who drafted the legislation, who did

11   they consult with, did they consult with

12   anybody in the medical field? I don't

13   have enough information as to how this

14   was drafted to say if this is a good form

15   of medicine.

16        Q.    And I hear you and I think

17   that your answer is telling me maybe my

18   question could have been clearer because

19   I wasn't -- I wasn't asking about what

20   medical experts would say about

21   appropriate medical care for youth with

22   gender dysphoria, so let me ask the

23   question a little bit differently because

24   I see how it was heard by you.

25              Is prohibiting treatment that

Page 235

                    AMY E. EMBRY

1
2   is -- well, let me just ask it this way;
3   you're aware that gender-affirming
4   medical care is recognized as best
5   practices in the medical field by many
6   professional medical professional
7   associations?
8            MS. LAND:  Objection to form.
9       A.    Could you repeat that question
10  again?
11      Q.    Are you aware that
12  gender-affirming medical care is
13  recognized as best practice in the -- for
14  the treatment of gender dysphoria by many
15  medical associations, medical
16  professional associations?
17      A.    No, I was not aware of that.
18      Q.    Okay. Is prohibiting a
19  particular medical treatment, blanket
20  ban, typical of how medicine is -- the
21  field of medicine is normally regulated?
22           MS. LAND:  Objection to form.
23      A.    It is not typical as to how
24  Arkansas regulates medicine at the
25  moment.

1                    AMY E. EMBRY

2        Q.    And I think you said earlier

3    this is the only -- strike that.

4              I believe you said earlier Act

5    626 is the only ban on a particular

6    medical treatment in Arkansas that you're

7    aware of; is that correct?

8        A.    That I am aware of.

9        Q.    Okay. And that the Board is

10   aware of; is that correct?

11       A.    Yes, it is.

12       Q.    Okay. So do you have any

13   concerns about the government intruding

14   on the medical decisions families make

15   with their doctors?

16             MS. LAND:  Objection to form.

17       A.    I believe the Board would have

18   concern with some of the issues in 626.

19   If they were to address this issue they

20   may have concerns.

21       Q.    And which concerns or what

22   concerns?

23       A.    If I had to speculate to

24   answer for 14 individuals, it would be

25   about cutting off care to patients that

```
 1                AMY E. EMBRY
 2   are already undergoing treatment. It
 3   would also be a conflict with another
 4   law, as we've already discussed earlier.
 5        Q.    And what is your basis for
 6   thinking that might be -- those may be
 7   concerns? And let's start with the
 8   cutting off care to patients already
 9   receiving treatment.
10        A.    That is strictly from
11   witnessing the Board at board meetings.
12   What is -- issues that may not be exactly
13   like this but similar to it and how they
14   have addressed those issues.
15        Q.    So are you speaking of other
16   issues unrelated to gender-affirming
17   medical care where there were concerns
18   expressed by the Board about physicians
19   cutting off care for patients; is that
20   correct?
21        A.    Yes. It's called patient
22   abandonment.
23        Q.    And the Board, some of the
24   Board members have expressed concerns
25   about when that happens, when patients
```

1                    AMY E. EMBRY
2    are abandoned by doctors; is that right?
3          A.    Yes.
4          Q.    What concerns were raised by
5    the Board members about that?
6          A.    Just, in general, just the
7    fact that patient abandonment happened,
8    that they abandoned a patient with
9    nowhere else to go and a complaint was
10   filed against the Board and they
11   addressed it as would any other
12   complaint.
13         Q.    Did the Board express concerns
14   that that's harmful to patients when that
15   happens?
16         A.    Yes.  At times they have said
17   it is harmful to the patient.
18         Q.    And why? Why did they say it
19   was harmful?
20         A.    They did not give a reason
21   why.  When they spoke of that it was just
22   a statement that it was harmful to
23   patients when you abandon them.
24         Q.    Which Board member said that?
25         A.    Oh, there's been -- I don't

1              AMY E. EMBRY
2    know. I don't know, but there have been
3    issues of patient abandonment that have
4    been brought before the Board.
5         Q.    I'm sorry. I can't recall if I
6    asked you this question. Do you have
7    concerns about the government intruding
8    on the medical decisions families make
9    with their doctors?
10             MS. LAND:  Objection to form
11        and to the scope of that question.
12        You can answer.
13        A.    I do believe upon any
14   legislation that comes before the Board
15   if they discuss, if they do have concerns
16   they do discuss it and they would ask
17   their legal counsel what would be the
18   best way to proceed.
19        Q.    And are you speaking -- I
20   asked the question a little bit generally
21   but I didn't probably ask it as
22   specifically as I should have and that
23   may help clarify your answer.
24             Do you have concerns about,
25   with respect to Act 626, the government

1                   AMY E. EMBRY

2    intruding on the medical decisions

3    families make with their doctors?

4              MS. LAND:  Objection to form

5         and scope.

6         A.    There is a possibility, yes.

7    It's all I can say on that is that there

8    is a possibility. Until it is addressed

9    by the Board, I can't give a definite

10   answer.

11        Q.    And there is a possibility

12   that you would have concerns or there is

13   a possibility that if Act 626 takes

14   effect that the government would be

15   intruding on medical decisions families

16   make with their doctors? I'm not sure I

17   understood your answer.

18        A.    I would say yes to both.

19        Q.    So does that mean there is a

20   possibility that the Board, if faced with

21   complaints about doctors providing care

22   that is prohibited by Act 626, that the

23   Board may not enforce Act 626 and

24   prohibit doctors from or discipline

25   doctors for engaging in such care?

```
 1                AMY E. EMBRY
 2      A.    Again, every situation is
 3  different, but if Act 626 went into
 4  effect, as your question is based on, if
 5  it were to go into effect, it would be in
 6  conflict with another law and the Board
 7  would need to ask for legal assistance on
 8  what to do.
 9           MS. LAND:  I'll object to the
10      form of that previous question.
11      Q.    And that conflict would only
12  be, if I understand correctly, in the
13  case of individuals who are already
14  receiving care from a doctor; is that
15  right?
16           MS. LAND:  Object to form.
17      A.    Yes. According to 20-6-202
18  it's legally and ethically prohibited
19  from abandoning a patient before
20  treatment has been concluded. So that
21  means they are already within treatment.
22      Q.    Right. So understanding that
23  the Board would need to ask for legal
24  advice from counsel about what to do in
25  the event of a complaint that raises this
```

```
 1               AMY E. EMBRY
 2   conflict between two statutes, if you
 3   had, you know, putting aside patients who
 4   are already receiving care and just
 5   somebody who their doctor recommends or
 6   would recommend that they initiate care
 7   that would violate Act 626, do you have
 8   concerns about the government intruding
 9   into that decision made by families with
10   their doctor?
11               MS. LAND:  Objection to form.
12      A.    I don't understand the
13   question. I don't understand exactly --
14      Q.    Let me ask it differently.
15               If Act 626 were in effect and
16   a patient, minor patient and their parent
17   saw a doctor and after assessment the
18   doctor's recommendation would be
19   gender-affirming medical treatment, and
20   the parents and minor agree that that's
21   in the best interests of that patient,
22   but that Act 626 would not permit the
23   child or minor to receive that care that
24   the parent and doctor believe is in the
25   child's best interests, do you have
```

1                    AMY E. EMBRY

2    concerns about the law intruding into

3    this medical decision that families make

4    with their doctors?

5                    MS. LAND:  Objection to form

6          and scope.

7          A.    I would say that the Board, it

8    is possible that they would have

9    concerns.  But, again, if it were in

10   effect and it's in conflict with another

11   law, they would not do anything until

12   they advised their legal counsel.

13         Q.    And in your view it's possible

14   the Board would have concerns even if

15   there's an individual minor who is not

16   currently receiving care but is --

17   parents and doctors believe care would be

18   in their best interest?

19         A.    It is possible, it is a

20   possibility that the Board would voice

21   concerns.

22         Q.    But you have not heard

23   specific concerns voiced by anybody at

24   this point?

25         A.    No.

Page 244

1              AMY E. EMBRY

2     Q.    Okay. Do you have concerns?

3            MS. LAND:  I'll object to the

4        form of that question to the extent

5        it's asking for any personal views

6        that would be outside the scope of

7        this notice. So I will object to

8        any question that's going to elicit

9        personal views of this witness.

10            MS. COOPER:  Okay.

11            MS. LAND:  And if we're going

12        to continue to ask her personal

13        views, that might need to be a

14        discussion we need to have further.

15            MS. COOPER:  Yeah. I just have

16        this question.

17     Q.    Do you remember the question?

18            MS. LAND:  You can answer.

19     A.    Okay. So I have concerns that

20   the law that was passed, Act 626, is in

21   violation of other laws.  That is my

22   concern.

23     Q.    And which other laws?

24     A.    The 20-6-202.

25     Q.    Any others?

Page 245

1                    AMY E. EMBRY

2        A.    Not that I'm aware of right

3    now.

4        Q.    Okay. So that's a concern

5    about people who are currently receiving

6    care not being able to have the doctor

7    continue to provide or refer them for

8    continuation of that care?

9        A.    Correct.

10       Q.    Okay. But not about the people

11   who haven't started care yet, there are

12   no concerns about that?

13       A.    I don't know -- at this point,

14   no. If the law were enacted, then more

15   research would need to be done.

16       Q.    And have you talked with any

17   families who will be directly affected by

18   Act 626 if it takes effect?

19       A.    Have I spoken to anyone? No.

20       Q.    Do you know any?

21       A.    No, I do not.

22       Q.    Okay. Do you know any

23   transgender adolescents who are receiving

24   gender-affirming medical care?

25       A.    The only ones that I am aware

Page 246

                    AMY E. EMBRY

1

2    of are the ones that were listed in the

3    lawsuit.

4        Q.    So you don't personally know

5    or the Board doesn't have interaction

6    with any minors who are receiving

7    gender-affirming medical care?

8        A.    Not to my knowledge.

9             MS. COOPER:  Just a minute.

10       That's all I've got.

11            MS. LAND:  I don't have any

12       questions.

13            VIDEOGRAPHER:  We are off the

14       record at 4:35 p.m.

15            MS. LAND:  We would like to

16       read and sign.

17            (The proceedings were

18    adjourned at 4:35 p.m.)

19

20

21

22

23

24

25

Page 247

1              C E R T I F I C A T E

2          I, MAUREEN M. RATTO, a

3    Registered Professional Reporter, do

4    hereby certify that prior to the

5    commencement of the examination, AMY E.

6    EMBRY was sworn by me to testify the

7    truth, the whole truth and nothing but

8    the truth.

9              I DO FURTHER CERTIFY that the

10   foregoing is a true and accurate

11   transcript of the proceedings as taken

12   stenographically by and before me at

13   the time, place and on the date

14   hereinbefore set forth.

15             I DO FURTHER CERTIFY that I am

16   neither a relative nor employee nor

17   attorney nor counsel of any of the

18   parties to this action, and that I am

19   neither a relative nor employee of such

20   attorney or counsel, and that I am not

21   financially interested in this action.

22

23

24   _____

     MAUREEN M. RATTO, RPR

25   License No. 817125

Page 248

1           I N D E X

2   WITNESS: AMY E. EMBRY                6

3   DIRECT EXAMINATION BY MS. COOPER  6

4

5           E X H I B I T S

6   Exhibit 1, 30(b)(6) notice for    15

7   Defendant Arkansas State Medical

8   Board

9   Exhibit 2, Arkansas Medical       24

10  Practices Act and Regulations,

11  revised as of December 2, 2020

12  Exhibit 3, printout of the        44

13  homepage of the Arkansas State

14  Medical Board website

15  Exhibit 4, printout from the      69

16  Medical Board re: Regulatory and

17  Discipline

18  Exhibit 5, Arkansas State House  105

19  Bill 1718

20  Exhibit 6, Guidance For the Use  138

21  of Hydroxychloroquine and

22  Chloroquine For the Treatment of

23  COVID 19

24  Exhibit 7, May 5, 2021 email re: 155

25  Public Health Grand Rounds

**Page 249**

1    Exhibit 8, email dated May 25,    165

2    2021, re: CNN Inquiry

3    Exhibit 9, copy of House Bill    175

4    1570

5    Exhibit 10, Opinion article in    217

6    Washington Post dated April 8,

7    2021

8    Exhibit 11, email dated March    229

9    22, 2021, from Sarah Vestal to

10   ASMB

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 250

1    AMANDA LAND, ESQ.

2    aland@arkansasag.gov

3                              May 24, 2022

4    RE: BRANDT, et al. vs. RUTLEDGE, et al.

5        5/10/2022, Amy E. Embry (#5219516)

6        The above-referenced transcript is available for

7    review.

8        Within the applicable timeframe, the witness should

9    read the testimony to verify its accuracy. If there are

10   any changes, the witness should note those with the

11   reason, on the attached Errata Sheet.

12       The witness should sign the Acknowledgment of

13   Deponent and Errata and return to the deposing attorney.

14   Copies should be sent to all counsel, and to Veritext at

15   erratas-cs@veritext.com.

16

17       Return completed errata within 30 days from

18   receipt of testimony.

19       If the witness fails to do so within the time

20   allotted, the transcript may be used as if signed.

21

22                   Yours,

23                   Veritext Legal Solutions

24

25

Page 251

1   BRANDT, et al. vs. RUTLEDGE, et al.

2   5/10/2022 - Amy E. Embry (#5219516)

3                    E R R A T A   S H E E T

4   PAGE_____ LINE_____ CHANGE_____

5   _____

6   REASON_____

7   PAGE_____ LINE_____ CHANGE_____

8   _____

9   REASON_____

10  PAGE_____ LINE_____ CHANGE_____

11  _____

12  REASON_____

13  PAGE_____ LINE_____ CHANGE_____

14  _____

15  REASON_____

16  PAGE_____ LINE_____ CHANGE_____

17  _____

18  REASON_____

19  PAGE_____ LINE_____ CHANGE_____

20  _____

21  REASON_____

22

23  _____     _____

24  Amy E. Embry                       Date

25

Page 252

1    BRANDT, et al. vs. RUTLEDGE, et al.

2    5/10/2022 - Amy E. Embry (#5219516)

3                    ACKNOWLEDGEMENT OF DEPONENT

4        I, Amy E. Embry, do hereby declare that I

5    have read the foregoing transcript, I have made any

6    corrections, additions, or changes I deemed necessary as

7    noted above to be appended hereto, and that the same is

8    a true, correct and complete transcript of the testimony

9    given by me.

10

11   _____    _____

12   Amy E. Embry                       Date

13   *If notary is required

14                       SUBSCRIBED AND SWORN TO BEFORE ME THIS

15                       _____ DAY OF _____, 20___.

16

17

18                       _____

19                       NOTARY PUBLIC

20

21

22

23

24

25

**[& - 5]** Page 1

| **&** |
| --- |
| **&**   3:4 5:15 6:4,7 |

| **0** |
| --- |
| **00450**   1:4 5:13 |

| **1** |
| --- |
| **1**   15:10,13 16:10 17:10 95:5 98:19 109:20,23 128:23 134:21 198:2 248:6 |
| **1,000**   110:18 |
| **10**   1:18 27:8 165:3 217:14,15,17,21 217:25 249:5 |
| **10004**   3:6,12 |
| **105**   248:18 |
| **10:00**   1:19 |
| **10:05**   5:3 |
| **10:18**   17:3 |
| **10:20**   17:7 |
| **10th**   5:3 |
| **11**   217:8 229:7,8 229:12,16 249:8 |
| **1178**   103:13 |
| **11:36**   89:2 |
| **11:48**   89:5 |
| **12**   175:14 |
| **125**   3:5,11 |
| **12:56**   144:9 |
| **13**   54:9 229:7 |
| **1356**   133:2,9 |
| **138**   248:20 |
| **14**   22:25 27:5 54:10 82:9 170:13 170:14,15 236:24 |
| **15**   140:15 248:6 |
| **155**   248:24 |
| **1570**   158:18 162:17 163:4,18 163:22 164:3,11 |
| 165:17 169:12 175:17,22 177:12 180:3 192:10 218:9 219:8 249:4 |
| **16**   51:25 |
| **165**   249:1 |
| **17**   102:2 |
| **17-80-106**   71:17 |
| **17-95**   187:7 |
| **17-95-301**   26:21 |
| **17-95-303**   34:5 40:22 |
| **17-95-409**   95:2 96:7 97:5 98:7,16 186:25 |
| **17-95-410**   95:8 98:22 109:19 |
| **17-95-701**   126:10 |
| **1718**   105:22 197:8 248:19 |
| **17425**   247:23 |
| **175**   249:3 |
| **18**   177:6 178:18 |
| **19**   43:19 138:14 139:5 140:20,23 141:8,20 248:23 |
| **1998**   54:9 |
| **1:50**   144:12 |

| **2** |
| --- |
| **2**   24:6,6,9,11 25:17 26:6 51:25 71:7 71:25 94:25 98:16 109:18 110:6 127:20,21,24 197:19 198:4,17 248:9,11 |
| **2.8**   127:16 |
| **2.8.**   127:12,15 |
| **20**   43:19 130:15,17 252:15 |
| **20-6-201**   106:5 197:20 |
| **20-6-202**   197:21 201:8,14 202:12 223:19 224:10 226:19 241:17 244:24 |
| **20-9-1504**   177:2 178:14 |
| **2003**   133:10 |
| **2014**   19:7 48:7 |
| **2015**   54:9,10 |
| **2018**   18:17,19 |
| **2019**   102:20 |
| **2020**   24:11 139:6 139:13 140:15 248:11 |
| **2021**   23:6,11,16 120:10 155:5 158:8 165:6 166:3 217:19 218:6 229:9,20 248:24 249:2,7,9 |
| **2022**   1:18 5:4 250:3 |
| **21**   26:24 52:20 53:20 219:18 |
| **217**   249:5 |
| **22**   52:8 134:22 229:9,20 249:9 |
| **229**   249:8 |
| **24**   248:9 250:3 |
| **25**   21:2,2 165:6 249:1 |
| **25th**   166:3 |
| **27**   52:16 132:14 177:2 |
| **28**   95:2,3 |
| **29**   109:21 139:5 |
| **2:53**   196:11 |

| **2nd**   3:17 |
| --- |

| **3** |
| --- |
| **3**   27:13 44:10,11 44:12,25 110:8 111:15 248:12 |
| **30**   15:10,13 16:11 21:2 50:11 190:24 221:19 248:6 250:17 |
| **303**   34:6 35:3 |
| **32**   102:5,5 103:9 103:11 107:22 108:14 201:12 |
| **323**   4:7 |
| **33**   134:10 |
| **34**   128:22 |
| **36**   52:14 |
| **3800**   5:16 |
| **39**   57:17 |
| **3:06**   196:14 |
| **3:56**   233:8 |

| **4** |
| --- |
| **4**   69:18,19,20 134:18 248:15 |
| **40**   57:17,20 |
| **400**   230:8 |
| **41**   57:17 |
| **42**   57:18 |
| **425**   3:22 5:15 |
| **43**   57:18 58:8 |
| **44**   57:18 248:12 |
| **45**   57:18 |
| **4:15**   233:11 |
| **4:21**   1:4 5:13 |
| **4:35**   246:14,18 |

| **5** |
| --- |
| **5**   34:5,6,9 105:19 105:20,21 155:5 196:21,23,25 197:2 248:18,24 |

**[5/10/2022 - actions]**

**5/10/2022**   250:5
251:2 252:2
**5219516**   250:5
251:2 252:2

### 6

**6**   15:10,13 16:11
54:9 127:22,23
138:10,11 190:24
197:4 221:19
248:2,3,6,20
**626**   120:12 137:17
152:10 153:21
158:17 160:5,13
161:3,12,18,24
162:10,17 163:4
163:22 164:4
165:17,21 166:15
168:17,18 179:19
180:16 181:12,17
181:20 182:7,13
182:20 184:9,15
184:22 185:3
187:13,18 188:10
192:11 210:10
215:8 222:4,12
223:14 225:2,2,7
225:21,24 226:3,7
226:10,18,22,25
227:7,11,14
228:23 229:2
233:12 234:4
236:5,18 239:25
240:13,22,23
241:3 242:7,15,22
244:20 245:18
**69**   248:15
**6th**   158:8

### 7

**7**   35:4 126:12
128:21 155:4,5,9

155:13 156:4
248:24
**72201**   3:18,23 4:8

### 8

**8**   138:10 165:4,5,9
165:24 217:18
249:1,6
**817125**   2:10
247:25
**84th**   133:10
**87th**   103:14
**8th**   218:5 219:18

### 9

**9**   40:23 155:3
175:15,16,22
176:25 249:3
**904**   3:17
**95-410**   96:3

### a

**a.m.**   1:19 5:3 17:3
17:7 89:2,5
**abandon**   16:3
199:10 238:23
**abandoned**   200:12
238:2,8
**abandoning**   198:6
198:20 199:7,25
200:18 201:7
223:21 225:5
241:19
**abandonment**
225:6 237:22
238:7 239:3
**ability**   77:17 97:2
**able**   16:16,16 25:3
25:14,19 167:9
215:9 232:22
245:6
**abortion**   52:14
149:14

**absence**   73:18
**absolutely**   65:18
76:25 93:24
**abuse**   76:22 77:16
94:16 112:18
114:4
**accepted**   79:18
81:11,14,16,20
82:7 83:6,13,17
210:17
**accepting**   100:18
**access**   167:5 221:4
**accessing**   220:24
**accounting**   19:3
**accuracy**   250:9
**accurate**   10:12
45:23 71:2 247:10
**accused**   110:3,7,9
110:17 111:20
219:11
**acknowledged**
219:11
**acknowledgement**
252:3
**acknowledging**
133:15
**acknowledgment**
250:12
**aclu**   6:1,10 7:5
166:14 168:9,18
**act**   24:7,10 26:11
26:14 34:5 35:8
40:22 41:10 45:13
46:5 67:19 69:11
70:21 71:8 74:12
83:5,11 85:24
86:13 88:17,20
92:3 94:25 96:17
99:6,11 103:13
106:20 107:6
108:18 109:18
110:19 111:2

120:12,14 126:11
126:14,17 128:21
133:2,9 136:5
137:17 147:2,10
148:10 152:10
153:21 158:17
160:5,13,14,15
161:2,12,17,21,24
162:7,10,17 163:4
163:22 164:4
165:17,21 166:15
168:17,18 178:23
179:18 180:16
181:4,12,17,19
182:7,13,20 184:9
184:15,22 185:3
186:25 187:13
188:10 192:23
197:19 210:10
214:2 215:8
222:12 225:2,7,21
225:24 226:3,7,10
226:22,25 227:7
227:11,14 228:22
228:23 229:2
233:12 234:4
236:4 239:25
240:13,22,23
241:3 242:7,15,22
244:20 245:18
248:10
**action**   7:23,23
76:14 89:15 90:25
91:7,9 92:15 97:9
108:14 110:6
111:7,12 145:7
183:10 187:23
189:7,9,10 247:18
247:21
**actions**   70:23 76:8
98:25 131:19

active   27:8 50:5
    120:11
activity   141:23
    194:20
acts   95:11
actual   63:18
    111:11,11,12
    231:7
addiction   127:4
addition   179:4
additional   58:25
    89:10 134:22
    179:2
additions   252:6
address   75:22
    78:20,21 104:7
    107:24 125:3,6
    127:10 166:21
    194:18 212:8
    232:5 236:19
addressed   182:10
    205:15 210:18
    225:24 226:5,8,25
    228:25 237:14
    238:11 240:8
addresses   193:13
addressing   78:23
adequate   206:4
adh   141:6,17
    156:25 157:17,18
    157:19
adhere   113:5
    201:20 202:2
adjourned   246:18
adjust   25:24
administer   94:20
administered
    141:11
administration
    19:13 140:16

administrative
    18:22 91:5
administrator
    167:12
admission   186:11
admitted   183:18
    184:8,14 185:3
adolescent   170:21
    182:24 224:23
adolescents
    151:16 170:4,8
    171:11,19 172:8
    211:3 215:16
    216:17 224:2
    226:3 245:23
adopt   66:19
adopted   54:8
adult   174:12
adults   152:15
adverse   141:4
advice   241:24
advised   243:12
advocate   45:13
affect   77:17
    119:14 120:13
    176:14,17
affirming   151:4,7
    151:14,23 152:6
    152:13,18 153:13
    153:17 154:4,9,14
    154:20 155:22,25
    156:7,13 158:3
    162:14 170:7,22
    171:8,17 172:9
    182:23 186:12
    189:18 190:6
    203:11 210:15
    212:3,13 213:9
    215:15 216:16
    217:2 222:21
    224:3,14,24 226:4

227:19 228:3
    235:3,12 237:16
    242:19 245:24
    246:7
afraid   197:3
ag   225:17
age   177:6 178:18
agencies   102:23
    139:18
agency   129:7
    140:10
agenda   195:13
ago   14:11 15:2
    142:9 165:15
    166:11 168:5
    196:19 220:20
    223:18
agree   221:3
    222:19 242:20
agreed   216:18
agreement   208:17
    220:15
ahead   95:22 176:9
al   1:7,10 5:8,9
    250:4,4 251:1,1
    252:1,1
aland   250:2
allegations   71:13
alleged   71:19
    231:23
alleging   108:5
alleviate   171:10
    171:18
allotted   250:20
allow   90:10
allowed   112:3,19
    206:19,25
allowing   110:14
    111:17 143:2,11
    143:18

allows   138:3
alternative   224:6
altogether   131:25
ama   64:16
amanda   4:9 6:14
    10:24 24:21 25:4
    25:18,22 44:17
    138:16 250:1
amended   54:9
    57:17
american   3:10,15
    64:2
amount   206:17
amy   1:16 2:3 5:6
    7:1,10 8:1 9:1
    10:1 11:1 12:1
    13:1 14:1 15:1
    16:1 17:1 18:1
    19:1 20:1 21:1
    22:1 23:1 24:1
    25:1 26:1 27:1
    28:1 29:1 30:1
    31:1 32:1 33:1
    34:1 35:1 36:1
    37:1 38:1 39:1
    40:1 41:1 42:1
    43:1 44:1 45:1
    46:1 47:1 48:1
    49:1 50:1 51:1
    52:1 53:1 54:1
    55:1 56:1 57:1
    58:1 59:1 60:1
    61:1 62:1 63:1
    64:1 65:1 66:1
    67:1 68:1 69:1
    70:1 71:1 72:1
    73:1 74:1 75:1
    76:1 77:1 78:1
    79:1 80:1 81:1
    82:1 83:1 84:1
    85:1 86:1 87:1

| | | | |
|---|---|---|---|
| 88:1 89:1 90:1 | 211:1 212:1 213:1 | **answering** 8:20 | **approve** 50:2 |
| 91:1 92:1 93:1 | 214:1 215:1 216:1 | 12:16 13:5 | 55:19 62:15 63:10 |
| 94:1 95:1 96:1 | 217:1 218:1 219:1 | **answers** 10:5 | 63:15 65:12 |
| 97:1 98:1 99:1 | 220:1 221:1 222:1 | 170:16 | 214:14 |
| 100:1 101:1 102:1 | 223:1 224:1 225:1 | **antagonistic** | **approved** 50:4,14 |
| 103:1 104:1 105:1 | 226:1 227:1 228:1 | 141:22 | 141:19 216:3,21 |
| 106:1 107:1 108:1 | 229:1 230:1 231:1 | **anticipate** 8:19 | **approximately** |
| 109:1 110:1 111:1 | 232:1 233:1 234:1 | **antiviral** 141:23 | 130:9 |
| 112:1 113:1 114:1 | 235:1 236:1 237:1 | **anybody** 14:20 | **april** 217:18 218:5 |
| 115:1 116:1 117:1 | 238:1 239:1 240:1 | 48:21,22 49:4 | 219:18 249:6 |
| 118:1 119:1 120:1 | 241:1 242:1 243:1 | 93:18 148:18,22 | **area** 28:13 29:2,13 |
| 121:1 122:1 123:1 | 244:1 245:1 246:1 | 163:3,7,16,20 | 30:16 31:16,23 |
| 124:1 125:1 126:1 | 247:5 248:2 250:5 | 220:13 234:12 | 32:6,14 33:6,13 |
| 127:1 128:1 129:1 | 251:2,24 252:2,4 | 243:23 | **areas** 33:24 160:8 |
| 130:1 131:1 132:1 | 252:12 | **apart** 97:18 | 204:9 |
| 133:1 134:1 135:1 | **anderson** 30:18 | 154:17 168:19 | **arises** 224:20 |
| 136:1 137:1 138:1 | **ann** 166:3 | 181:2 | **arkansas** 1:2,17 |
| 139:1 140:1 141:1 | **announcing** 156:7 | **apologies** 217:13 | 3:16,18,23 4:6,8 |
| 142:1 143:1 144:1 | **anorexiant** 52:22 | **apologize** 16:6 | 5:11,17 6:10,15,22 |
| 145:1 146:1 147:1 | 52:23,24 | **appear** 189:8 | 15:14 17:21 18:7 |
| 148:1 149:1 150:1 | **anorexiants** 53:20 | 190:15 | 18:10 19:14 22:3 |
| 151:1 152:1 153:1 | **answer** 8:25 9:4,9 | **appearances** | 24:7,9 26:9,10 |
| 154:1 155:1 156:1 | 9:20 13:2,4 37:10 | 195:11 | 34:4,8 35:8,25 |
| 157:1 158:1 159:1 | 42:16 49:19 53:18 | **appended** 252:7 | 36:3 40:21,24 |
| 160:1 161:1 162:1 | 54:3 61:22 82:2 | **applicable** 250:8 | 41:9 42:8 44:13 |
| 163:1 164:1 165:1 | 83:21 88:13 109:6 | **applicant** 98:24 | 57:20 58:5 59:16 |
| 166:1 167:1 168:1 | 124:22 125:25 | **applications** 69:12 | 59:17,22 60:2,8 |
| 169:1 170:1 171:1 | 138:7 149:22 | **applying** 88:15 | 63:20 67:18 68:2 |
| 172:1 173:1 174:1 | 153:2 162:24 | **appointed** 23:14 | 68:5,8 69:8 70:5 |
| 175:1 176:1 177:1 | 170:24 171:2 | 27:5,16 | 70:10,13 83:4,11 |
| 178:1 179:1 180:1 | 178:2 183:20,24 | **approached** | 87:15 91:5 95:5 |
| 181:1 182:1 183:1 | 184:20 191:23 | 162:18 | 98:20 99:5 103:14 |
| 184:1 185:1 186:1 | 202:14 204:22 | **appropriate** 110:5 | 105:21 106:6 |
| 187:1 188:1 189:1 | 207:9 209:10 | 170:3 177:8,16,18 | 107:5 110:19 |
| 190:1 191:1 192:1 | 216:23 221:22 | 177:22 180:4 | 112:21 126:22 |
| 193:1 194:1 195:1 | 223:6 230:10 | 204:11,17,25 | 137:22 139:6 |
| 196:1 197:1 198:1 | 234:8,17 236:24 | 206:17 215:23 | 140:6 141:5 149:2 |
| 199:1 200:1 201:1 | 239:12,23 240:10 | 228:23 232:4 | 149:11,20 150:3,9 |
| 202:1 203:1 204:1 | 240:17 244:18 | 233:13 234:5,21 | 150:13 156:8,14 |
| 205:1 206:1 207:1 | **answered** 124:2 | **approval** 63:2 | 156:25 158:4 |
| 208:1 209:1 210:1 | 187:10 | 66:4 | 174:2 175:5 178:5 |

178:8 180:8,12,13
181:21 198:24
201:17 202:16,16
206:25 207:7
208:23 212:13
214:23 223:18
227:18 228:12
235:24 236:6
248:7,9,13,18
**arkansasag.gov**
250:2
**arrangement**
35:23
**arrest** 74:19,20,22
76:23 77:15
**arrested** 73:11
74:16,17 75:10
76:2,7,17 77:3
**article** 217:17
249:5
**asa** 218:5
**aside** 18:5 242:3
**asked** 24:22 47:14
49:2,15 50:21,25
77:20 93:21
118:22 123:23
136:19 154:12
163:13 164:19,22
165:15,16,20
168:16 177:20
183:5 207:14
208:3 239:6,20
**asking** 8:19 97:11
124:23 166:13
189:5,8,9,12
207:22 221:6
226:18 230:13
234:19 244:5
**asks** 38:19 230:15
**asmb** 166:4,21,25
229:10 249:10

**assembly** 103:14
133:10 198:2
**assert** 191:24
**assessing** 83:18
**assessment** 242:17
**assist** 34:14 85:3
**assistance** 55:14
167:7 225:19
226:20 241:7
**assistant** 4:4 59:15
**assistants** 45:16
45:19,20,21 68:10
**association** 56:18
59:15,21 60:2,7,7
64:3
**associations** 59:5
59:9 235:7,15,16
**assume** 9:21 21:23
167:19 173:5
195:2
**assuming** 214:17
215:8 231:23
232:22
**attached** 250:11
**attachments** 194:7
**attempt** 60:23
214:8,9
**attention** 72:21
74:7 75:15 76:24
106:12 116:19
154:17,21 159:14
181:2 197:15
210:23
**attorney** 4:4,6
6:15 55:15 191:21
192:3 225:16
247:17,20 250:13
**attorneys** 48:4
92:23,24 93:3
**audio** 5:2

**audits** 21:21
**august** 54:9
**authority** 34:10
35:5 46:3 67:2,15
97:8 101:16 201:2
**authorization**
140:17
**authorized** 6:21
**available** 44:18
138:21 250:6
**avenue** 3:22
**average** 64:14
230:8
**avoid** 8:16
**avoided** 141:9
**aware** 51:4,6
62:20 69:15
136:13 137:11,15
137:18 141:17
149:19,24 150:3
153:10,15 156:11
156:21 158:14
159:2,6,8 160:2
163:9,12 169:11
169:15 172:6
173:23 181:19
201:18 202:10
206:8 219:7
227:17 235:3,11
235:17 236:7,8,10
245:2,25
**awareness** 143:5
143:13
**awkwardly** 77:20

**b**

**b** 6:20 15:10,13
16:11 104:20
110:11 112:4,15
127:22 129:5
190:24 221:19
248:5,6

**back** 17:6 23:8
38:7,23 42:5
51:22 53:12,16
54:4 57:15 71:6
84:13 89:4 94:14
94:24 97:24 98:19
106:18 128:20
135:4 139:12
140:2 142:15
144:11,13 147:20
152:3 159:22
168:6,14,23
185:18 187:7
196:13 218:8
219:16 223:12
230:6 233:10
**backwards** 65:13
**bad** 75:12
**ballpark** 79:8
**ban** 116:7 203:20
235:20 236:5
**banned** 203:23
222:4,11
**banning** 204:10
216:20
**base** 82:24
**based** 61:8 72:20
72:20 97:4 100:23
101:5 141:4,21
147:7 187:18
188:10 195:12
205:18 227:25
229:23 232:13
241:4
**bases** 218:22
**basically** 7:22
47:16 64:19 67:10
**basis** 43:18 44:9
109:11 180:23,25
189:17 237:5

**bear** 23:22
**becoming** 102:8
**began** 49:19 54:5
**beginning** 11:25
  23:6 197:18
**behalf** 6:15 17:22
  18:2 152:22 153:2
  223:5 233:24
**belief** 136:10
**believe** 13:18,25
  24:23 26:24 33:16
  36:16 50:10 57:24
  90:3 121:8,8
  140:21,24 167:19
  179:7 181:25
  191:15 209:10
  213:25 230:5
  236:4,17 239:13
  242:24 243:17
**benefit** 170:22
  227:7,15
**benefits** 140:25
  171:25 212:17
**best** 8:14,15 9:8
  43:16 57:6 60:18
  60:25 74:3 110:16
  111:19 222:5,12
  222:22 235:4,13
  239:18 242:21,25
  243:18
**beth** 3:25 155:2
  165:3 175:13
  196:16,21
**better** 75:8 189:15
**betty** 32:17,20
**beyond** 193:7
**big** 142:3
**bill** 105:22 117:13
  117:15 118:2,7,18
  118:20 119:4,10
  120:22 121:3,10

121:14,15 123:6
123:25 124:12
153:20 158:21,24
159:4,10,13,20
160:4 161:5,8,11
161:11 162:17
164:17 173:3,7,11
173:18 175:16,22
175:23 197:8,8
218:3 220:12
248:19 249:3
**bills** 119:14 120:5
  121:19 173:14
**bind** 225:22
**bit** 46:14 68:21
  84:9 98:19 127:21
  223:15 234:23
  239:20
**bits** 189:14
**black** 220:24
  221:5,12
**blanket** 235:19
**blocker** 151:18
**board** 7:18 13:13
  13:16 14:12,14,16
  14:21,22 15:3,7,11
  15:15 17:21 18:2
  18:7,9,11,14,19
  19:4,9,23,25 20:3
  20:3,4,5,20 21:18
  21:19 22:20,21,24
  22:25 23:3,4,5,10
  23:16,18 26:10,15
  27:2,20 28:8,10,17
  28:18,21,23,23
  29:6,17,22 30:6,9
  30:12,19,24 31:3,7
  31:19 32:2,10,21
  33:2,9,18 34:7,8
  34:15,17,21 35:5,9
  35:19,21 36:21

37:22 38:7,8 39:2
39:6,13 40:11,15
40:17,25 41:11,17
41:25 42:8,14,18
42:24 43:2,6,10,11
43:20,24,25 44:6
44:14 46:2,8,10,16
46:18,23 47:6,23
48:3,4,7,15 49:5
49:13,15,22 50:7
50:21 51:8,17
52:25 53:2,3,8
54:13,15,18 55:4,6
55:11,12,18 56:13
56:14,15,21 57:9
57:10,21 58:19,24
59:9 60:18,22
62:5,8,16,23 63:22
63:24 64:7,20
65:11,15 66:19,25
67:15 68:19,23
69:21 70:15,19,21
71:12 72:8,17,22
72:25 73:12,13,20
74:12 75:2,4,22
76:8,14 77:11,22
78:16,18,20 79:5
79:15,24 80:5,7,19
80:23,24 82:4,9
83:22 84:10,19
85:2,8,22 86:8
87:2,7,8,22,23
88:3,14 89:8,18,25
90:3,21 91:14,20
92:8,11,19,24 93:4
93:9,17,22,23 94:2
94:14,14 95:6,16
95:17 97:2,8,20
98:20 99:23 100:4
100:8 101:5,12,16
101:21 102:9,12

103:15 104:2,7
106:24 107:11,23
108:7,9 110:2,7,9
110:21,24 111:16
112:23 113:2,2,23
114:12,25 115:14
115:16,18 116:5,8
116:13,22,23
117:5,13 118:12
118:16,22 119:4
119:17,21 120:15
120:22 121:4,15
121:22 122:5,8,15
122:15 123:10,13
123:17,24 124:8,9
124:14,17,20
125:3,4,4,6,15,23
125:25 126:7
127:6,9 128:11,25
129:8,19,24
131:15,23 132:6
132:19 133:3
135:21,24 136:15
136:18,21,22,24
137:3,5,8,12
139:20 140:6,9
142:7,12,18,18,22
142:22 143:22
145:8 146:5,18
147:13,25 148:5
148:13 149:19,23
149:25 150:2,3,7
150:11,16 151:2
152:4,17,22,24
153:2,3,7,8,12,16
153:22,23 154:2,7
157:7,9,25 158:20
158:23 159:3,9,15
160:3,3,8,12,16
161:2,8,19 162:2,9
162:12,18,25,25

163:2,9,16,17,21
163:25,25 164:10
164:14,15,19
165:16,20 166:14
168:8,16,22 170:2
170:6,11,11,14,18
170:20,25 171:3,4
171:6,22 172:7,16
172:22 173:2,6,10
173:12,13,16,19
173:20 176:14,17
176:21 177:9,13
177:16,21,23
178:7,10,11,22
179:13,17 180:3
180:15 181:3,9,14
181:15,16,16
182:5,10,14,21,25
183:7,13,16,21,24
184:6,12,21,25
185:8,13,22 186:2
186:17 187:6
188:4,18,21
189:23 190:4,16
190:20 191:13
192:15 193:2,4,7,9
193:11,13,15,16
193:20,22 194:3,4
194:8,11,19 195:2
195:6,9,11,13
199:2,24 200:21
201:6 203:20
204:7,14,19,24
205:6,9,16 206:2,8
206:8,13 207:15
208:13,17 210:8
210:18,25 211:5
212:7,11,18,20
213:10 214:5,24
215:11,15,21
216:13,15,18

217:4 218:22
219:5,12 221:9,10
222:2,9,14,19,24
223:4,5 224:19,21
225:13,20,23,25
226:5,7,9,11,15,20
226:22,24 227:3,6
227:10,10,13,17
227:20,24 228:10
228:25 230:21
231:5 232:4,15,18
232:25 233:16,18
233:19,24 236:9
236:17 237:11,11
237:18,23,24
238:5,10,13,24
239:4,14 240:9,20
240:23 241:6,23
243:7,14,20 246:5
248:8,14,16
**board's** 41:8 45:9
45:12,24 67:11
70:6,10 71:3 74:7
75:14 76:24 77:7
117:2 154:17,21
161:14 171:16,23
172:14,21 181:2
186:5,16 200:25
206:21,23 209:20
209:25 210:22
223:2,13 228:21
228:22
**body** 48:13
**bottom** 40:23
**boundaries** 94:5
94:12 96:17
**bounds** 94:7
**box** 45:8 70:9
**branch** 50:20
160:25

**branches** 164:3,6
164:8
**brandt** 1:6,7 5:8
250:4 251:1 252:1
**branman** 31:6,13
**break** 9:25 10:7,8
84:5 88:24 144:2
144:6 179:23
189:14 196:8
202:20 209:5
233:5
**breaking** 10:3
149:6
**breaks** 9:23
**breving** 31:18
**brian** 23:13 29:5
**briefly** 104:15
**bring** 10:2
**brings** 72:13
**broad** 3:5,11
**broader** 210:25
**broken** 49:2
**brought** 72:24
77:10 183:10
189:7 219:21
223:8 226:11
239:4
**budget** 19:3
**business** 193:22
194:4 219:6
**bypass** 52:18
132:15,22 133:12
135:18 136:8,16
149:15 160:11
213:2,21

**c**

**c** 3:1 4:1 71:22,24
104:24 110:13
112:4,15 128:23
129:9 247:1,1

**call** 63:3 87:2
106:11 112:2
118:8 140:11
197:14
**called** 22:12 59:21
74:24,24 85:3
112:5,10 113:7
139:2 178:9,11
197:18 200:20
237:21
**calls** 102:17,18
**capacity** 7:17
**capitol** 3:22 5:16
**card** 144:3
**care** 54:16 76:3
78:2 79:17 83:5
83:12 100:19,24
135:11 151:4,8,14
151:23 152:6,13
152:19 153:13,18
154:4,9,14,20
155:22 156:8,13
158:4 162:14
173:18 174:11,16
174:19,24 175:6
182:23 183:18
184:8,15 185:4
186:12 188:7
189:19 190:6
198:3 199:15,18
203:12 204:20
205:3 210:15
212:3,14 213:10
215:16,18 216:16
216:20 217:3
222:5,13,21
224:16,23,25,25
225:4,8 226:4,13
226:17 227:19
228:3 234:21
235:4,12 236:25

237:8,17,19
240:21,25 241:14
242:4,6,23 243:16
243:17 245:6,8,11
245:24 246:7
**carlson** 21:11
166:3 167:13,20
168:3 219:15,22
220:14
**carry** 35:7 46:3
**case** 1:4 5:12 7:21
12:23 14:8 58:22
84:18 91:15 92:19
95:10 98:24
145:22 151:13
170:21 185:15
190:25 216:19
241:13
**cases** 147:15 190:7
194:12
**categories** 107:19
187:5 228:13
**category** 61:15
118:5,9
**cause** 187:16
188:8 189:21
**caused** 126:24
**causing** 132:2
**cc** 157:5 166:3
**ccr** 1:25
**center** 4:7 41:4
**central** 1:3 5:12
**certain** 20:2 58:24
68:24 112:25
113:4 116:8
149:15,17
**certifications**
82:19
**certified** 2:7
**certify** 247:4,9,15

**chair** 29:10
**chairman** 28:22
87:2
**chairperson** 28:23
**challenging** 8:2
165:21 168:18
**chance** 8:17 144:2
166:2 167:11,16
218:19
**change** 65:19
92:12 102:21
144:3 251:4,7,10
251:13,16,19
**changed** 103:2,5
120:16
**changes** 56:20
66:5 250:10 252:6
**channels** 215:23
**characteristics**
232:14
**charged** 42:9
228:11
**charges** 76:13
110:4,8
**chase** 148:3
**check** 23:8 97:24
149:12
**checking** 217:9
**child** 242:23
**child's** 242:25
**children** 174:4,4
174:23 202:23
203:14
**children's** 149:21
150:4,9,13
**chloroquine**
138:13 139:4
140:18 248:22
**choose** 190:3
194:18 211:10
212:21

**chose** 114:12
214:24
**chosen** 79:16
**chronic** 126:12,13
**circumstance** 75:8
**circumstances**
46:7 93:25 95:17
96:7 183:23 184:2
200:9 203:19
204:4
**citations** 99:6
**citizens** 70:13
**civil** 3:10,15
**clarify** 9:16 39:7
232:20 239:23
**clean** 8:10
**clear** 8:13 9:15,18
151:12 156:3
159:25 161:10
175:3 201:5
**clearer** 211:20
234:18
**client** 191:21
192:3
**clinic** 149:20
150:5,9,13,20,23
**clinical** 207:3,8
**clinicians** 141:16
141:17 143:19
**close** 84:2 94:7
144:4 233:6
**closed** 147:2,5
**closely** 20:3
**closest** 59:11
**cnn** 165:6 166:5
166:13,23 168:19
249:2
**coadministration**
141:18
**code** 35:25 42:17
57:25 58:4,9

96:21,22 98:10
108:19 149:12
177:2 201:19
**collect** 84:22
110:20
**collection** 64:6,9
**collects** 38:20
**come** 21:17,21
41:15 47:10,14,24
49:16 59:6 68:15
74:7 86:3 106:18
122:17,21 123:3
123:19 124:7
125:3,5 139:15
154:17,21 173:2
181:2 205:25
206:9 214:12
**comes** 37:24 43:22
72:21 85:13 91:25
94:5 188:15
224:21 239:14
**coming** 206:9
**commencement**
247:5
**comment** 65:4,13
66:8 67:22 166:13
168:17
**comments** 65:16
67:22 68:15,17
**committed** 95:11
98:25
**committee** 63:11
63:13,18 66:24
67:6,7 129:25
131:4
**committees** 63:8
**committing**
101:11
**common** 79:23
80:5,7,8,10,20
91:13 119:8

137:24 151:19
186:17
**commonly** 100:16
**communicable**
52:5
**communicate**
193:19
**communicated**
47:22 154:10
161:2,19
**communication**
15:3 21:19
**communications**
192:3 193:17
**community**
100:24
**competent** 177:9
**complainant**
85:14 86:15 95:10
107:17 229:23
**complained** 80:15
**complaint** 21:22
36:20 37:24 43:4
43:18,22,23,24
44:8 72:14,17,20
72:20,24 73:18
77:10,14,22 78:15
79:24 80:2,6,24
84:12,18,19 85:12
85:13,15,16,18,20
86:11,11,24 87:7
87:18,21 88:4
89:9,13 90:19
91:24,25 93:15
94:4 107:15 108:4
114:10 145:9,21
146:7,9,23 147:17
147:18,23 148:5
152:12 180:20,22
180:25 182:9,21
183:3,4,6,16,16

187:12,17 188:2,9
188:15,16,23
189:16 190:12
195:18 200:11,16
206:14 210:19
224:20 226:11
229:22 230:3,4,12
230:13,17,20,21
231:5,7,8,12,15
238:9,12 241:25
**complaints** 21:16
22:7 44:3 70:16
70:18 78:7,9,17
79:4,7,16 86:24
87:19 127:5 130:2
144:21 145:5,16
146:2,14,16,17,19
146:19 147:4,8
151:3 152:5
154:13,18,22
181:3 182:15
191:7,9 195:3
199:23 207:12
227:21 228:5
230:8 240:21
**complete** 8:25
10:11 112:24
252:8
**completed** 10:5
250:17
**completely** 54:4
209:11
**compliance**
112:20
**complication**
134:19
**complications**
133:17,18,24
134:9,10,14,17,22
135:2,16,22
136:14

**comply** 82:6
**computer** 195:8
**concern** 54:16
61:24 81:4 190:17
211:2 213:8,14
215:20 225:21
236:18 244:22
245:4
**concerning** 8:2
17:22 36:7 42:2
46:17 51:21 52:9
52:13,21 53:20
71:3 113:16 117:4
120:6 121:19
151:3 153:12
154:3,8 162:21
163:18
**concerns** 52:17
220:23 226:2
236:13,20,21,22
237:7,17,24 238:4
238:13 239:7,15
239:24 240:12
242:8 243:2,9,14
243:21,23 244:2
244:19 245:12
**concluded** 86:14
198:7,21 199:11
199:16 223:22
241:20
**concluding** 140:20
**conclusion** 110:2
146:6
**conclusions** 41:3,7
41:24
**condition** 131:13
**conditions** 110:16
111:18 112:13,16
**conduct** 72:15
81:10 95:13 99:3
99:4,10,11,14,15

103:16,23 106:21
106:23 107:4,9,10
107:16,19 108:6
108:12,24 110:22
131:20 177:7
178:19,24 179:2,4
179:9 185:2
186:24 187:3,4,6
187:18 188:9
189:24 224:13
**conducting** 194:4
**confident** 227:23
**confidential**
104:21 229:19
**confirm** 11:8
**conflict** 225:10,15
225:18 237:3
241:6,11 242:2
243:10
**conflicts** 226:19
**confused** 189:4,11
**confusing** 9:13
**confusion** 151:13
**connect** 123:9,13
**connection** 10:15
**consensus** 41:2,6
41:23 64:24
**consent** 52:17
112:2,5,11 113:11
113:18,22,25
114:5,8,12,24
132:15,20 133:15
136:8 148:24
149:9,14,16 174:3
174:22 175:7,10
202:22 203:7,14
209:22 210:4
212:16,19 213:7,9
213:12,21,23
214:19

**consider** 40:25 118:21 124:17 131:23

**consideration** 83:23

**considered** 41:25 47:19,20 50:5 78:3 107:17,21 116:22 136:25 143:22 148:13 154:2 158:20 159:23 161:6 195:23 222:5 231:8

**considering** 84:11 100:4,8 117:11,20

**considers** 65:16

**consistent** 60:24 81:11

**constitute** 184:3

**constitutes** 88:9 88:16 179:3

**consult** 120:21 121:14,21 122:4,8 122:14,15 161:7 234:11,11

**consulted** 80:19 117:5,9,12 118:12 119:4,21 121:3 142:7,11 162:12

**consulting** 10:15

**contact** 59:13 104:16 122:23,24

**contacted** 161:13 163:2,8,10,15,17 163:21 164:24

**contained** 69:9,10 201:11 202:11

**content** 11:22 55:17 103:4

**contents** 26:23 57:16

**contest** 90:11

**context** 39:17 47:3 55:24 64:12 206:14

**continuation** 245:8

**continue** 13:4 110:15 111:17 112:14 113:5,13 113:18 114:14,19 224:16 244:12 245:7

**continued** 4:1

**continuing** 21:20 82:17 131:13 226:12

**continuity** 198:3

**contract** 112:20

**control** 41:4 207:3

**controlled** 114:18 114:21 128:3 207:8

**conversation** 11:22 142:17 158:11,12 159:9 220:7,11

**conversations** 9:4 142:13,21 150:19 153:11,16 159:3 160:2 181:15 219:4

**convince** 92:11

**convinced** 190:17

**cooper** 3:13 5:25 6:1,24 7:4 12:10 15:24 16:7,20 24:5,18,25 25:11 25:22 26:3 44:10 44:17 69:17,25

83:24 88:22 105:18 106:3 138:9,16,24 144:5 155:2,12 165:2 175:13 196:7,15 203:3 217:7,15 221:20 229:6 233:4 244:10,15 246:9 248:3

**copied** 166:9

**copies** 250:14

**copy** 24:23 85:15 175:16 183:4 249:3

**copying** 166:22

**corporations** 45:17

**correct** 8:4,6 11:19 12:24 22:3 22:10 24:3 26:11 28:2,6 30:25 33:19 36:15 37:14 38:14 39:22 42:10 46:19 50:9,9 52:2 52:5,10 59:6 61:18,19 63:11 64:9 65:14 66:2 66:22 68:25 71:14 71:20 80:16 84:16 87:20,25 90:11,12 90:25 91:9,18 92:13,17 93:2 96:9,10 97:5,7 98:7 99:7,11,12 101:19 102:10 103:11,19 104:3,4 104:18,22 105:5 105:12,16 106:24 107:12 114:22 117:22 118:6,6 122:6,13 125:15

126:3,14 127:7,25 128:8,18 133:25 134:5,11,15,19,23 135:2,12,19 138:5 142:5 143:7,16 152:16 156:22 157:20,24 159:24 167:14,15,20 173:15 180:5 181:8 186:7 194:2 194:14 195:16 202:9 203:4 209:7 214:16 217:6 224:17 228:14,15 228:17 229:25 231:24 236:7,10 237:20 245:9 252:8

**corrections** 252:6

**correctly** 21:23 27:4,24 30:3 51:24 62:17 70:4 70:24 72:6 132:18 133:21 241:12

**corresponding** 202:7

**cosmetic** 47:17 49:13 66:15 116:3

**costs** 110:20

**counsel** 3:3 4:3 5:7 5:23 7:5 12:8,19 25:13 39:23 185:24 186:4,5,16 186:18 196:18 225:14 239:17 241:24 243:12 247:17,20 250:14

**counselor** 58:8

**count** 22:22

**county** 78:10

**couple** 89:10
99:20 120:20
218:16
**course** 94:12
96:16 111:22
128:5 170:3
**courses** 97:25
111:9 112:24
185:19
**court** 1:1 2:7 5:10
5:20 8:20 16:13
76:11 84:3 181:21
181:25
**cover** 204:9
**covering** 218:21
**covid** 138:4,14
139:5 140:19,23
141:8,20 143:4,12
144:16 145:10
147:15 148:8,15
207:13,17 208:3
208:11 248:23
**cq** 140:18,22 141:7
141:18
**create** 211:9
212:20 214:25
215:24
**created** 57:17
135:24
**creation** 139:21
**credentialing**
20:11
**cromwell** 3:4 6:4,7
**cs** 250:15
**current** 22:20 28:8
**currently** 18:6,13
23:4 35:17 78:22
172:8 181:21
223:25 243:16
245:5

**cut** 58:2 148:2
**cutting** 236:25
237:8,19
**cv** 1:4 5:13

**d**

**d** 105:4 110:13
111:15 129:12
166:23 248:1
**danger** 75:18
**dangerous** 128:3
221:11
**daniel** 3:8 6:6
**data** 41:2,6,22
64:5,9 141:21
**date** 5:3 14:2,3
15:16 24:12 44:15
69:23 105:23
138:15 155:7
165:7 175:18
217:20 219:20
229:11 247:13
251:24 252:12
**dated** 139:5 158:7
158:8 165:5
217:18 218:5
229:8 249:1,6,8
**dates** 35:16
**david** 33:17
**day** 19:24,24
252:15
**days** 250:17
**dea** 114:15,16
130:21 131:8,10
**deal** 22:5
**debated** 153:21
**december** 24:11
54:10 248:11
**decide** 75:4,23
86:3 110:3,5
146:22 188:18,20
210:8

**decided** 118:14
**decides** 55:16
89:18 131:16
**deciding** 180:16
**decision** 8:2 40:18
41:8 68:19 82:23
83:22 84:15 91:22
115:11 129:5
143:18 174:19
186:20 208:13
220:16 222:20
242:9 243:3
**decisions** 42:2
204:20 205:2
236:14 239:8
240:2,15
**declare** 252:4
**deem** 188:5
**deemed** 99:10,14
103:25 187:3
252:6
**defendant** 15:14
17:21 152:23
248:7
**defendants** 1:11
4:3 6:16
**defense** 187:17,19
187:20 188:5,8
189:6
**defenses** 95:12
**deference** 41:2
**defined** 95:12 99:2
107:10 108:11
**defines** 95:15
**defining** 179:5,8
**definite** 240:9
**definition** 100:2
100:21 107:3
151:10 186:24
**definitions** 100:11

**deliver** 38:12
**demonstrating**
206:5
**denial** 96:4 97:18
98:9
**deny** 97:3
**departed** 79:18
**departing** 100:18
**department** 13:11
19:12 36:3,14
122:21,22 123:15
139:6,17,24 140:7
140:8,11 141:5
143:2,10 156:25
166:5,22 167:2,4
167:17,23,25
192:7
**departs** 83:6,13
**depend** 83:16
147:16
**depends** 75:20
86:23 87:18
145:20 179:20
185:20 190:8
194:17 232:6
**deponent** 72:3
218:17 250:13
252:3
**deposed** 8:7 11:6
13:14
**deposing** 250:13
**deposition** 1:16
2:3 5:6,14 7:6,13
8:12 10:16,21,23
11:10,13 12:15
13:8,12 15:6
16:11 17:14
190:24 196:18
**describe** 130:23
165:25

**described** 80:20
111:21
**describing** 84:13
**description** 37:19
87:5 211:18
**designated** 17:20
28:9,20 29:8,19
30:11,23 31:10,11
152:23
**despite** 142:3
143:4,12
**detail** 232:10
234:9
**detailed** 211:14
**details** 58:25
**determination**
90:23 145:7 147:8
**determine** 70:19
72:9 81:20 82:4,8
85:22,25 86:19,21
87:17,23 88:5,6,9
88:15,16 101:17
108:10,16 182:6
182:11 188:22
189:24 232:10
**determined** 44:2
101:12 106:24
107:11 147:13
148:6 183:19
187:4
**determines** 70:22
82:10 90:21
103:15 212:23
**determining** 99:24
**develop** 58:19
128:12 133:4
**developing** 57:23
63:24
**dictated** 128:11
**dictates** 26:25

**difference** 102:19
103:3
**different** 9:16
51:16 75:16,22
85:5 96:25 159:7
165:18 169:16
170:14,14,15
185:13,15,21
195:2 221:13,21
221:24 241:3
**differently** 58:18
90:18 97:13 101:3
108:21 116:12
123:21 140:4
182:3 184:19,23
234:23 242:14
**direct** 6:24 122:23
248:3
**directed** 185:3
**direction** 181:10
**directive** 53:11
**directly** 57:25
58:9 120:15 136:5
245:17
**director** 18:14
19:23 34:11,18,22
41:14,17 47:8,9
51:2 57:14 61:10
62:6 64:4 119:18
120:4 125:9,18
130:16 132:7
137:10,12 153:5
154:6 162:23
198:12 205:15
221:8,10
**directors** 45:16
**disagreement**
220:15
**disciplinary** 70:23
110:6,22 166:4
177:9,23 178:7,11

179:17
**discipline** 69:22
70:9 93:22 94:2
94:11,16,21 95:16
95:18 96:11,15,18
97:20 101:5
110:24 111:4
115:12 130:6,22
177:7 180:13
185:8,11 190:5,21
201:6 240:24
248:17
**disciplined** 200:18
200:20,24
**disclosing** 104:21
**discontinue** 224:5
224:14 225:4
**discretion** 141:15
180:15 184:7,13
**discrimination**
232:12,23
**discuss** 136:15
137:17 158:2,21
164:15 190:15
195:10 223:8
239:15,16
**discussed** 40:12
66:14 108:24
111:6 115:4 116:2
153:9,23 159:19
170:25 171:20
172:4,13,18,24
179:4 183:14
222:14,25 223:7
223:10 226:6
227:2 237:4
**discusses** 40:17
**discussing** 158:15
**discussion** 17:4
84:7 150:12 153:6
158:24 160:21

244:14
**discussions** 150:8
152:18 153:3
218:23
**disease** 41:4
**diseases** 52:5
**disfigured** 109:10
**disk** 196:2
**disks** 195:7
**dismiss** 110:8
**dispensed** 141:11
**distress** 94:20
**distressed** 112:22
**district** 1:1,2 5:10
5:11
**division** 1:3 4:5
5:12
**doctor** 30:2 32:7
69:8 72:14,22
74:14,15 75:9
77:12 78:9 88:17
93:16,23 94:2
96:15 107:16
108:5,10 110:25
111:23 114:19
115:17 129:20
132:21 144:15,25
145:3,6,9,16,23
146:7,14 148:7
182:22 184:14
185:3,7,23 187:13
187:14 188:21
189:8,10,17,18
190:5,21,25
191:10 199:14,19
201:6 206:14,16
210:14 224:4,14
224:16,22 225:3,8
226:12,16 232:8
232:13,23 241:14
242:5,10,17,24

245:6
**doctor's** 188:5,6
  189:19,24 190:17
  231:2 242:18
**doctors** 21:25
  45:15 60:2 69:4
  71:14 72:9 77:25
  79:17 83:5,12
  127:6 130:5 131:7
  131:21 135:15,17
  144:15,25 152:5
  191:6 198:23
  199:24 200:17
  201:11,16 202:5,6
  204:20 205:2,12
  207:15 208:22
  209:7,13,14 210:5
  211:2 212:2,12
  213:5 214:22
  222:23 223:25
  225:9 228:16,19
  236:15 238:2
  239:9 240:3,16,21
  240:24,25 243:4
  243:17
**document** 11:5
  12:14 17:9,11,17
  26:5,18 72:4
  112:6 133:7 139:2
  143:17 151:11
  155:16 156:4,5
  197:7 218:2,18
  231:19
**documentation**
  94:13 136:2
**documents** 10:23
  11:2,3 12:8 13:20
  14:23 38:11,19
  39:4 41:3,7,23
  42:5 58:13 73:9
  74:4 76:20 120:10

155:20 191:14,18
  192:22 200:23
  202:14 230:9
**doing** 55:3
**don** 33:8
**double** 171:14
**dozen** 74:2
**dozens** 213:4,4
**dr** 23:13,21,22
  33:25 34:2 191:3
  191:4
**draft** 50:3 55:19
  55:22 56:2,6,22
  115:20 119:10
  125:2
**drafted** 55:13
  61:11,23 234:10
  234:14
**drafting** 56:4
  118:17
**drafts** 55:12
**drake** 3:24 6:12
**drawn** 220:11
**dropped** 76:13
**drug** 64:15 78:10
  78:13 87:15
  114:17 115:6
  129:7 140:15
  208:5
**drugs** 36:8,11
  52:22 113:17,19
  128:3 137:21
  209:16
**due** 130:6
**duis** 75:19
**duly** 6:20
**duties** 34:7 41:9
  202:4
**duty** 224:4
**dylan** 1:6 5:8

**dysphoria** 151:16
  151:19 170:4
  171:10,18 172:3
  203:13 211:4
  222:6,13 234:22
  235:14

**e**

**e** 1:16 2:3 3:1,1 4:1
  4:1 6:20,20 7:1
  8:1 9:1 10:1 11:1
  12:1 13:1 14:1
  15:1 16:1 17:1
  18:1 19:1 20:1
  21:1 22:1 23:1
  24:1 25:1 26:1
  27:1 28:1 29:1
  30:1 31:1 32:1
  33:1 34:1 35:1
  36:1 37:1 38:1
  39:1 40:1 41:1
  42:1 43:1 44:1
  45:1 46:1 47:1
  48:1 49:1 50:1
  51:1 52:1 53:1
  54:1 55:1 56:1
  57:1 58:1 59:1
  60:1 61:1 62:1
  63:1 64:1 65:1
  66:1 67:1 68:1
  69:1 70:1 71:1
  72:1 73:1 74:1
  75:1 76:1 77:1
  78:1 79:1 80:1
  81:1 82:1 83:1
  84:1 85:1 86:1
  87:1 88:1 89:1
  90:1 91:1 92:1
  93:1 94:1 95:1
  96:1 97:1 98:1
  99:1 100:1 101:1
  102:1 103:1,18,24

104:1 105:1,7
106:1 107:1 108:1
109:1,20,23 110:1
110:18 111:1
112:1 113:1 114:1
115:1 116:1 117:1
118:1 119:1 120:1
121:1 122:1 123:1
124:1 125:1 126:1
127:1 128:1 129:1
129:16 130:1
131:1 132:1 133:1
134:1 135:1,5
136:1 137:1 138:1
139:1 140:1 141:1
142:1 143:1 144:1
145:1 146:1 147:1
148:1 149:1 150:1
151:1 152:1 153:1
154:1 155:1 156:1
157:1 158:1 159:1
160:1 161:1 162:1
163:1 164:1 165:1
166:1,23 167:1
168:1 169:1 170:1
171:1 172:1 173:1
174:1 175:1 176:1
177:1 178:1 179:1
180:1 181:1 182:1
183:1 184:1 185:1
186:1 187:1 188:1
189:1 190:1 191:1
192:1 193:1 194:1
195:1 196:1 197:1
198:1 199:1 200:1
201:1 202:1 203:1
204:1 205:1 206:1
207:1 208:1 209:1
210:1 211:1 212:1
213:1 214:1 215:1
216:1 217:1 218:1

219:1 220:1 221:1
222:1 223:1 224:1
225:1 226:1 227:1
228:1 229:1 230:1
231:1 232:1 233:1
234:1 235:1 236:1
237:1 238:1 239:1
240:1 241:1 242:1
243:1 244:1 245:1
246:1 247:1,1,5
248:1,2,5 250:5
251:2,3,3,3,24
252:2,4,12
**earlier**  17:14
66:15 68:7 84:20
106:19 107:3
111:6 115:5 116:2
119:6 126:8
144:14 154:16
157:17 160:7
186:23 207:11
211:21 213:3
228:10 236:2,4
237:4
**eastern**  1:2 5:11
**echols**  3:25 196:17
**ed**  130:10
**education**  21:21
82:17,18,21
**edward**  31:25
**effect**  141:22
169:3 180:17
181:12,17,22
182:4,14,21
212:24 216:20
223:15 225:2,3
226:10,19 240:14
241:4,5 242:15
243:10 245:18
**effective**  54:10
140:23

**effectively**  45:14
**effectiveness**
143:6,14 205:11
206:5 208:12
**either**  12:24 48:2
55:13 124:25
159:21 186:9
191:10 200:11
220:14
**elicit**  244:8
**elicits**  191:21
**elizabeth**  7:10
21:14 30:18
**email**  155:5 156:4
156:16,23 157:17
157:18 165:5
166:2,7,19,21
167:3,3,6,13,18
192:12 193:3,12
193:21,25 194:5
194:13,13,16,18
229:8,19 230:24
248:24 249:1,8
**emails**  168:7,14
**embry**  1:16 2:4
5:6 7:1,4,11 8:1
9:1 10:1 11:1 12:1
13:1 14:1 15:1
16:1 17:1,8 18:1
19:1 20:1 21:1
22:1 23:1 24:1,15
25:1 26:1,4 27:1
28:1 29:1 30:1
31:1 32:1 33:1
34:1 35:1 36:1
37:1 38:1 39:1
40:1 41:1 42:1
43:1 44:1,23 45:1
46:1 47:1 48:1
49:1 50:1 51:1
52:1 53:1 54:1

55:1 56:1 57:1
58:1 59:1 60:1
61:1 62:1 63:1
64:1 65:1 66:1
67:1 68:1 69:1
70:1 71:1 72:1
73:1 74:1 75:1
76:1 77:1 78:1
79:1 80:1 81:1
82:1 83:1 84:1
85:1 86:1 87:1
88:1 89:1 90:1
91:1 92:1 93:1
94:1 95:1 96:1
97:1 98:1 99:1
100:1 101:1 102:1
103:1 104:1 105:1
106:1 107:1 108:1
109:1 110:1 111:1
112:1 113:1 114:1
115:1 116:1 117:1
118:1 119:1 120:1
121:1 122:1 123:1
124:1 125:1 126:1
127:1 128:1 129:1
130:1 131:1 132:1
133:1 134:1 135:1
136:1 137:1 138:1
139:1,9 140:1
141:1 142:1 143:1
144:1 145:1 146:1
147:1 148:1 149:1
150:1 151:1 152:1
153:1 154:1 155:1
155:13 156:1
157:1 158:1 159:1
160:1 161:1 162:1
163:1 164:1 165:1
166:1,4 167:1
168:1 169:1 170:1
171:1 172:1 173:1

174:1 175:1 176:1
177:1 178:1 179:1
180:1 181:1 182:1
183:1 184:1 185:1
186:1 187:1 188:1
189:1 190:1 191:1
192:1 193:1 194:1
195:1 196:1 197:1
197:11 198:1
199:1 200:1 201:1
202:1 203:1 204:1
205:1 206:1 207:1
207:24 208:1
209:1 210:1 211:1
212:1 213:1 214:1
215:1 216:1 217:1
218:1 219:1 220:1
221:1 222:1 223:1
224:1 225:1 226:1
227:1 228:1 229:1
229:15 230:1
231:1 232:1 233:1
233:12 234:1
235:1 236:1 237:1
238:1 239:1 240:1
241:1 242:1 243:1
244:1 245:1 246:1
247:6 248:2 250:5
251:2,24 252:2,4
252:12
**emergency**  75:5
89:17,22 90:8
91:12,16,19 97:15
140:17
**employ**  34:10,17
35:6,9
**employed**  18:6
34:21 35:11,18,19
35:21 36:13 53:3
57:10 62:8,22
102:9

**employee** 7:18
39:5 157:6 193:8
193:9 247:16,19
**employees** 20:19
20:25 21:3,7,9,12
22:14,16 39:20
157:19 159:10
192:25 193:4,10
**employment** 19:9
**en** 133:13
**enact** 46:3,8,16,18
46:23 48:16 49:6
49:22 50:21 51:8
60:24 63:2 101:18
127:9 212:7,18
215:17,25
**enacted** 47:12
53:5 57:9 102:8
161:18 245:14
**enacting** 55:10
161:20 162:20
213:20
**enacts** 60:23 62:16
**endanger** 72:10
**endangering**
72:23
**enforce** 180:16
181:12,17 182:7
240:23
**enforcement**
114:17 129:7
177:3 178:21
180:19 223:14
**enforces** 179:16
**enforcing** 179:18
226:2
**engaging** 72:14
107:16 108:5
240:25
**enjoined** 181:20

**ent** 32:7,7 93:16
93:17
**entire** 17:17
182:10 192:11
193:3
**entitled** 198:3
**entity** 42:8 177:8
177:17,22 178:3
179:13,15,16
180:4,8,9,11
181:11 204:8,18
228:11
**enumerated** 96:19
103:21
**eos** 91:12
**epidemic** 61:13
62:3
**errata** 250:11,13
250:17
**erratas** 250:15
**esq** 3:7,8,13,19,24
3:25 4:9 250:1
**establish** 214:19
**established** 132:19
**estimate** 73:22
**et** 1:7,10 5:8,9
250:4,4 251:1,1
252:1,1
**ethical** 101:11,17
101:19 102:12
103:16 104:2,7,11
105:15 106:23
107:21 108:13
198:23,25 199:10
199:17 201:10,13
201:16 202:4,5,11
224:4
**ethically** 198:6,19
199:6 223:20
241:18

**ethics** 230:16
231:12
**eua** 140:17
**evaluate** 34:13
38:6
**event** 86:18 95:9,9
98:23 158:7
190:18 241:25
**events** 141:4
**evidence** 143:5,14
186:9 190:10
205:10,19 206:17
208:12 227:14,25
**exact** 35:16 60:10
79:13
**exactly** 40:2 79:22
96:21 237:12
242:13
**examination** 6:24
247:5 248:3
**example** 36:21
44:4 49:11 56:3
56:16 57:20 64:13
64:16 74:8 75:21
77:2 78:8 79:25
80:12,13,22 87:11
91:24 93:15 94:4
109:8 111:21
114:3,9 115:4,10
122:25 124:18,19
134:7 146:15
181:7 213:2
**examples** 74:6,10
75:20 76:5,16
78:6 101:2 103:22
106:22 112:9
117:8 119:2,18
**exceed** 110:12
129:4,9
**exception** 23:7

**exceptions** 175:9
**excuse** 45:11 53:2
96:12 174:24
177:19 205:7
**executive** 18:14
19:22 50:20
119:17 120:4
153:5 160:25
164:2,5,7 221:7,10
**exhibit** 15:10,11
15:13,19,22 16:3,5
16:10 17:10 24:6
24:9,17 25:2,5,7,9
25:13,17 26:2,6
44:11,12,24 51:25
69:19,20 71:7
94:24 105:19,21
109:18 138:10,11
155:4,5,9,13 156:4
165:4,5,9,23,24
175:15,16,22
196:25 197:2
217:11,14,15,17
217:21,24 229:7,8
229:12,16 248:6,9
248:12,15,18,20
248:24 249:1,3,5,8
**exhibits** 16:9
25:12
**exist** 210:11
**existed** 215:9
**existing** 95:6
98:21
**expected** 160:12
**experiences**
227:25
**expert** 93:18
**expertise** 56:5,19
56:20,25 57:3
59:5 60:13 81:3
82:12

**experts**  93:4,6,10
  162:13 234:20
**explain**  35:24
  200:21
**explore**  84:9
**express**  220:14
  238:13
**expressed**  237:18
  237:24
**extent**  191:20,23
  244:4

**f**

**f**  135:10 247:1
**face**  87:22
**faced**  101:5 130:5
  240:20
**facility**  105:2
**fact**  158:2 238:7
**failing**  82:6 104:24
**fails**  250:19
**failure**  81:16
**fair**  42:7 173:5
  211:18
**fairly**  21:12
  104:14
**fall**  14:2,4 43:2
  107:18
**falls**  92:22
**familiar**  8:9 51:19
  61:4 106:7 142:4
  197:12
**families**  236:14
  239:8 240:3,15
  242:9 243:3
  245:17
**family**  29:3 30:17
  32:15 33:7 34:2
**far**  21:22 32:15
  47:17 50:8 82:3
  112:7 160:20
  189:4,5 193:17

203:8 209:3 219:5
  232:25
**fashion**  176:15,17
  176:22
**fault**  175:2
**fda**  140:16 141:12
**federal**  181:20
**fedex**  196:4
**feed**  16:17
**feel**  9:25 40:13
  89:23 91:10 94:6
  170:24 213:13
**feels**  36:21 225:3
**felt**  78:10 80:15
  214:21 215:15,21
  216:12,13,15
**field**  54:17 56:6
  60:14 61:2 79:19
  83:7,14,18 93:7,14
  182:15 204:11
  210:17 234:12
  235:5,21
**figure**  150:24
**file**  21:22
**filed**  5:9 14:2,5,8
  84:19 169:9
  199:24 210:19
  224:21 230:4
  231:14 238:10
**files**  193:14,16
  230:6,7
**filing**  230:13,16
  231:11
**fill**  58:25
**final**  55:18
**finance**  19:13
**financially**  247:21
**find**  10:3,6 15:20
  69:6 93:10,12
  96:23 182:2 184:7
  184:13 185:16
  190:20 199:18

232:25
**finding**  127:19
  128:24 159:12
  184:22 185:2
**findings**  197:22
**finds**  73:12 198:2
**fine**  110:18 197:17
  203:9
**finish**  8:18
**finished**  47:7
**fired**  200:12
**firm**  5:19,21
**first**  8:14 15:18
  25:7 46:15 89:20
  95:14 110:3
  156:20 158:17
  176:3,4
**flags**  74:18,20
**flip**  57:24
**focus**  189:15
**focusing**  98:5
  111:14 198:17
**folder**  16:9
**folks**  84:3
**follow**  81:16
  169:10
**followed**  85:7 90:9
  91:17 169:8
**following**  103:16
  110:10 134:8
  210:16
**follows**  6:23 89:8
  129:3 133:20
**followup**  135:11
**food**  140:15
**foregoing**  247:10
  252:5
**form**  12:22 42:15
  56:9 83:8 107:25
  121:23 133:15
  149:16 154:23

159:17 176:14,17
  176:22 178:2
  184:11 188:11
  203:2 204:21
  205:5 211:6
  213:17 216:22
  222:17 225:11
  228:7 230:22
  234:7,14 235:8,22
  236:16 239:10
  240:4 241:10,16
  242:11 243:5
  244:4
**formal**  72:24
  73:18 77:10,14
  78:15,17
**format**  123:19
**forms**  110:23
**formulations**
  140:22
**forth**  87:16 247:14
**forward**  44:5,22
  117:15 118:2,19
  166:5 183:8
**forwarded**  167:13
  167:24
**forwarding**
  157:16
**found**  110:9,16,25
  111:19 129:20
  146:24 148:7
  159:20 212:9
  219:25 220:6
**foundation**  94:18
  112:21
**four**  31:12 73:25
  134:14 167:8
**friends**  77:4
**front**  24:14 26:5
  49:18 58:13 73:9
  73:13 74:4 76:20

98:3 100:5 120:10
120:19 121:6
123:8 155:14
160:14 162:4
192:9
**full** 7:8 37:19 63:9
183:13 194:21,23
**fully** 9:12 209:23
210:4
**functions** 19:25
**further** 146:20
225:17 244:14
247:9,15
**future** 205:24

**g**

**g** 3:7 99:22
**gained** 24:2
**gardner** 31:25
**gary** 3:19 6:9
**gastric** 52:17
132:15,22 133:12
135:18 136:8,16
149:14 160:11
213:2,20
**gather** 38:5,9,11
38:24 87:4 115:3
188:16
**gears** 116:25
**gender** 149:20
150:4,8,12,19,23
151:4,7,14,16,18
151:23 152:6,13
152:18 153:13,17
154:4,9,14,20
155:22,25 156:7
156:13 158:3
162:14,21 170:4,7
170:22 171:8,10
171:17,18,24
172:9 177:4
178:16 182:23

186:12 189:18
190:6 203:11,12
210:15 211:4
212:3,13 213:9
215:15 216:16
217:2 222:6,11,13
222:21 224:3,14
224:24 226:4
227:19 228:3
234:22 235:3,12
235:14 237:16
242:19 245:24
246:7
**general** 4:5,6 6:15
19:4 71:11 72:11
103:14 110:17
111:20 133:10
197:25 203:5
209:2,4,6 221:3
238:6
**generally** 63:14
88:12 149:2
174:22 175:5
202:21 239:20
**generic** 39:25
168:25 169:2
**genetic** 58:8
**getting** 22:2 135:7
144:4 166:17
189:4 233:6
**gill** 3:21 5:15 6:12
**gilmore** 156:24
**give** 8:17 16:2
40:25 76:5 79:8
79:13 87:11 92:10
94:4 100:10 101:2
115:10 130:12
165:13 238:20
240:9
**given** 16:20 48:10
68:18 91:3 92:7

92:10 131:25
252:9
**gives** 67:15 113:3
**giving** 10:11 25:14
194:25
**go** 8:10 9:23 16:16
16:24 22:8 23:8
26:22 28:7 34:5
42:5 53:12,16
64:17 66:6 71:6
80:3 94:24 95:21
104:15 124:14
128:20 142:15
147:20,24 167:4
168:6,14,23 176:8
182:8 183:12,21
185:18 187:7
200:15 211:10
215:22 216:10
223:12 225:17
230:6 238:9 241:5
**goal** 70:13
**goes** 65:8 84:10
126:6 167:23
212:23
**going** 8:10 9:8
11:6 16:4,13
22:22 29:3 44:21
51:18 54:4 78:20
83:25 84:4 85:25
94:15 96:20 98:10
98:19 106:4,15
116:20 135:4
152:3 158:2
170:13 171:15
175:21 176:25
182:2 187:23,24
191:19 244:8,11
**good** 7:3 88:23
93:18 118:23
234:14

**govern** 211:16
**government** 50:18
50:20 160:24
161:18 162:19
164:2 181:11
236:13 239:7,25
240:14 242:8
**governor** 27:6
169:12,23 220:12
220:23 222:3,10
222:20
**governor's** 50:25
163:3,8,11 169:17
218:8,23 220:16
**governs** 26:14
126:17
**grab** 196:21
**grand** 155:6,21,23
155:25 156:6,12
156:12,21 157:23
158:3 248:25
**great** 26:3 138:24
**griffin** 32:9
**gross** 101:6 128:24
**grossly** 99:22,24
100:3,12,17 101:6
105:8
**ground** 203:24
**groundrules** 8:11
**grounds** 97:4 98:8
**group** 146:3
**groups** 57:22
60:12,13,17 64:2,8
67:24 68:3,4,7,18
81:23
**guarantee** 135:5
214:13
**guess** 7:24 55:23
63:3 73:24,25
74:3 84:21

**guhman** 32:17,19
  32:20
**guidance** 63:23
  138:11 139:3,21
  141:6 142:5,8,13
  142:19 248:20
**guidelines** 52:8,12
  57:6 60:19
**guilty** 110:4,7,9

**h**

**h** 248:5 251:3
**habits** 129:3,12,15
  131:2
**half** 84:2
**hand** 225:6,7
**handed** 165:24
**handle** 21:16,18
  21:20 48:20
  118:15 126:6
**handles** 94:19
  126:5
**handwritten**
  230:24
**happen** 13:24 85:2
  121:16,17 182:24
  185:10 192:5
  201:3 225:13
**happened** 47:5
  48:8 49:12,25
  51:5,7 73:3,15,19
  80:14 82:14
  121:13 130:18
  131:17 173:24
  200:4,22 238:7
**happening** 47:18
  210:23
**happens** 9:13 40:8
  73:13 74:13 84:15
  237:25 238:15
**happy** 51:22

**harassment** 105:4
**hard** 9:6
**hardcopies** 16:23
  25:15
**harm** 105:11
  126:24 131:25
  136:9 172:12
  187:16 188:8
  189:22 190:18
**harmed** 227:19
  228:2
**harmful** 72:15
  78:3 107:17 108:6
  116:19 131:20
  206:3 215:17
  216:17 221:4
  238:14,17,19,22
**harms** 127:3
**hb** 158:18 162:17
  163:4,18,22 164:3
  164:11 165:17
  169:12 177:12
  180:3 192:10
  218:9 219:8
**hcq** 140:19,22
  141:7,18
**hdllaw.com**
  166:23
**head** 60:10 97:21
  98:2 112:18
  119:25 184:5
**healing** 80:4
**health** 13:11 36:3
  36:14 41:5 70:11
  72:11 122:21,22
  123:15 139:7,17
  139:24 140:7,9,11
  141:6 143:2,10
  155:6 156:6,12
  157:2 248:25

**healthcare** 19:19
  21:25 22:4,8,17
  42:21,25 43:13
  67:16 70:15
  117:11,21,24
  141:13 178:4,8
  179:20 198:4,4,18
  199:5 218:4
  223:19
**hear** 8:21 12:11
  24:20 25:23 74:14
  142:21 201:23
  220:2 234:16
**heard** 61:21,25
  148:5 169:18
  176:6 178:10
  234:24 243:22
**hearing** 89:12,14
  89:20,25 90:10,14
  90:24 91:4,6,17,21
  92:5,6,8,14,15,20
  110:2,22 128:25
  148:5 149:5
  187:21,22,25
  188:4,15 189:2,5,6
**heather** 157:4,5,6
**held** 2:4 5:14 17:4
  84:7 187:22,25
  189:7
**help** 148:2 158:9
  167:9 170:7
  199:18 239:23
**helpful** 86:17
  171:9 179:24
  189:13
**henderson** 21:13
**hereinbefore**
  247:14
**hereto** 252:7
**hey** 219:4 220:12

**higher** 13:10
**highest** 70:14
**hiring** 84:21,21
**history** 53:17 54:8
**hit** 173:4
**hiv** 51:21 52:4
**hodges** 29:15
**hold** 18:18 19:8
  34:11
**holder** 95:9,10
  98:24
**homepage** 44:13
  45:5 248:13
**honest** 130:12
**honestly** 53:18
  54:4 130:11
  202:18
**hormone** 151:17
  170:22 211:3
  212:4 213:24
  214:20
**hormones** 170:7
  224:3,15
**hospital** 59:14
  149:21 150:4,9,14
  150:25
**hospitalized**
  141:10
**hosted** 2:5
**hour** 11:24,24
  12:2 84:2
**house** 105:22
  175:16,22 197:8
  248:18 249:3
**hum** 9:5 83:2
  132:17 195:24
**human** 19:3
**hutchinson** 218:5
**hutchison** 191:3
**hyatt** 29:5

**hydroxychloroq...**
138:4,12 139:4
140:19 143:3,12
248:21

**i**

**i.e.** 141:14
**idea** 87:12 92:12
118:23 157:13
**ideas** 113:3
**identification**
15:17 24:13 44:16
69:23 105:24
138:15 155:8
165:8 175:18
217:20,25 229:11
**identified** 202:4
**identifies** 39:3
134:25
**identify** 101:18
135:22 175:22
197:5 229:18
**identifying** 102:12
**ignorant** 99:23,25
101:6,7 128:24
**imagine** 75:8
210:10,12
**immediate** 75:3
89:23 90:4 109:15
**impact** 226:2
**impose** 95:7 96:2
97:20 98:21
110:24 111:16
112:7 115:12
129:2 212:18
213:22
**imposed** 130:22
**imposing** 111:24
**improper** 77:3
104:16 130:6
**improperly**
113:17

**inadequate** 213:8
**inappropriate**
78:11 81:5
**include** 50:24 68:6
100:18 134:18
195:21 213:19
231:2
**included** 11:12
98:13 141:3
153:16
**includes** 48:11
69:3 228:16,19
**including** 21:3
84:3 151:17 152:8
156:5
**incrementally**
129:2
**incurred** 110:21
**indicating** 141:7
**indirect** 122:24
**individual** 43:5,7
48:15 75:2 141:15
143:19 170:18
177:5 178:17
243:15
**individually** 82:10
98:12 146:18
173:17
**individuals** 43:17
236:24 241:13
**inform** 13:17
135:15,17 209:15
**information** 38:5
38:10,10,25 40:14
53:23 64:5,8,17,18
76:21 84:23 86:9
104:21 115:3
119:9 124:3,10
133:16,19 136:12
141:5 146:10,12
150:2 191:22

192:10 212:15
228:5 234:13
**informational**
64:19
**informed** 13:13,16
52:17 132:15,20
133:14,19,25
136:7 148:24
149:9,14 202:22
203:7,14 209:23
210:4 212:15,19
213:7,9,11,21,22
214:19
**informing** 208:24
209:9
**inherently** 215:17
216:17
**initial** 166:18
**initiate** 242:6
**inmates** 78:10
**input** 56:15
123:17 124:23
125:7,23 161:14
**inquiry** 165:6
166:6 168:19
249:2
**inspections** 36:4,5
71:19
**inspector** 35:11
**inspectors** 35:6,10
35:18,20 36:12,16
**instance** 118:25
124:5 145:2
**instances** 149:15
**institute** 41:5
**instructs** 13:3
**intentions** 46:4
**interaction** 246:5
**interest** 243:18
**interested** 48:5
247:21

**interests** 110:17
111:19 242:21,25
**interventions**
151:15
**interview** 166:24
**intractable** 126:13
126:13
**introduce** 5:23
**introduced** 117:14
155:10 158:18
161:6 165:10
229:13
**introduction**
152:9 162:16
**intruding** 236:13
239:7 240:2,15
242:8 243:2
**investigate** 71:13
72:8,16,17,25
77:22 79:17 84:12
84:16 86:20
107:23
**investigated** 81:6
82:6 108:6
**investigating**
145:25
**investigation**
36:22 37:23 40:9
40:14 75:15 77:7
78:25 80:11 81:18
85:10 86:2,21
87:3,9 88:5
109:14 110:21
145:18 146:4,21
183:9 206:15
232:17
**investigations**
34:14 36:4,5,7
71:18 73:17 77:25
78:24 145:19

**investigator** 36:23
38:18
**investigators**
36:16,17 37:2,16
37:20 38:2 39:10
84:22 85:2
**involve** 81:21
176:21 177:13
**involved** 39:24
94:17 174:14,15
176:18 198:15
232:15
**involvement**
192:15
**involves** 108:3
**involving** 89:13
114:4 159:9,14
160:3
**issue** 8:5 16:21,22
47:13 49:14 67:5
67:9 74:7 76:23
81:11 93:7 94:22
95:8,25 98:23
110:13,13 112:18
115:18 144:14
173:2 177:17
206:12 210:18
211:25 217:2,4
223:11 225:6
232:4 236:19
**issued** 37:25 41:3
41:24 94:23 96:9
**issues** 34:13 36:7
98:12 113:15
118:13 236:18
237:12,14,16
239:3
**issuing** 84:24
**item** 191:16
**items** 34:9 134:21
192:20

**ivermectin** 78:14
79:5 144:16,21
145:10,23 147:3
147:14,18,22
148:8,15 207:12
207:16 208:3,11
209:2

**j**

**j** 134:15
**jail** 79:6 144:15
**jamiel** 166:19
**january** 23:16
**jm** 1:4 5:13
**joanna** 1:7
**job** 62:10
**jobs** 21:15
**john** 6:3 30:5,7
**joined** 145:17
196:18
**joining** 102:8
**jonathan** 3:7
**jones** 21:14
**juli** 21:11 166:3
167:13,20,21
168:3 219:15,22
220:14
**july** 139:5
**june** 140:15
**jurisdiction**
177:10,24
**justify** 74:22

**k**

**k** 134:18 166:23
**katherine** 191:4
**kind** 9:6 38:16
68:24 93:20 96:16
127:3
**kinds** 96:14,18
112:13,15 114:8
195:25 200:9

**knew** 176:13
**know** 9:14 10:3
13:11,16,23 14:13
22:24 23:10 25:19
28:17 34:24 37:5
37:12 41:14 44:18
44:21 49:17 50:23
51:12 53:9 54:21
55:5,8 63:16
64:14 66:13,17,23
75:12 77:4 80:25
86:16 93:17 94:15
96:21 97:23
100:25 108:25
109:21 111:7,22
113:16 114:13
116:6 120:11
121:25 125:10,20
130:14 132:3,4,9
133:6 135:23
136:17 147:24
149:13,15,23
150:22 151:6
163:16,20 167:2
169:23 170:17
171:2 172:14,21
173:3,22,25
175:12 194:8
197:13,19 198:25
200:20 201:19
203:8,22 204:13
204:22 207:9
209:17,18,19
210:7 213:4
219:19,23 222:15
222:25 223:6
225:14,16 231:13
231:25 234:2
239:2,2 242:3
245:13,20,22
246:4

**knowledge** 14:19
22:18 48:19,20
50:17,22 54:23,25
58:12,14 99:17
102:14 104:9,10
116:17,24 119:11
132:11 136:25
137:4 139:25
148:23 150:6,10
150:15,17 152:11
152:20 158:5,22
161:4 163:19,23
164:21 170:9,10
205:4 206:6,11
227:7,14,16 246:8
**known** 133:13
140:24 141:2
208:10
**knows** 170:11
**kodwyer** 166:22

**l**

**l** 134:21
**label** 137:21 138:3
141:14 143:3,11
208:5
**lack** 143:5,13
**land** 4:9 6:14,14
10:25 11:19 12:9
12:12 13:8 15:18
24:16,21,22 25:5
25:20,25 42:15
44:20 56:9 69:24
83:8 105:25
107:25 121:23
138:6,18,23
154:23 155:11
159:17 165:11
175:19 177:25
184:11 188:11
191:19 202:25
204:21 205:5

207:19 213:16
216:22,24 217:23
221:15 222:17
225:11 228:7
229:14 234:6
235:8,22 236:16
239:10 240:4
241:9,16 242:11
243:5 244:3,11,18
246:11,15 250:1
**language** 58:16,20
**laparoscopic**
133:13
**large** 156:5
**laser** 52:9
**launched** 85:11
**law** 46:9 67:13,14
67:15 120:18
161:17 165:17
169:13,24 180:21
181:19 182:4
185:20 197:12
201:19,21,24
202:2 210:13
215:6 218:9 222:4
224:8,9 237:4
241:6 243:2,11
244:20 245:14
**laws** 117:4 225:18
244:21,23
**lawsuit** 7:22 13:25
14:4,8 165:21
166:14 168:9,18
169:5,9 246:3
**lay** 37:17 136:7
**laying** 178:24
**learn** 212:12
224:22 227:13,22
**learned** 115:16
**leave** 12:25

**leaves** 208:13
**left** 109:10 141:15
143:19 208:15
222:22
**legal** 2:6 4:12
112:6 185:24
186:3,5,16,18
225:14,19 226:20
239:17 241:7,23
243:12 250:23
**legally** 198:5,19
199:6 223:20
241:18
**legislation** 13:21
53:14 117:6
192:16 234:10
239:14
**legislative** 66:9
164:3,8 176:11
197:22
**legislator** 48:15
123:14 163:21
**legislators** 123:10
123:18,23 124:11
125:5,14 128:17
163:14,15,17
173:6,10
**legislature** 46:12
46:22 47:10,14,23
48:11,12,19,23
49:5,10,21,22 50:2
50:4,15,19 53:11
58:17 61:12,16,24
62:15 63:2,6,10
65:8 66:4,10,20
67:6 102:20 117:3
117:20,24 118:12
119:3,8,12,20
120:21 121:3,4,21
122:4 123:18
128:15 158:18

160:25 161:7,15
187:5 214:14,17
216:3,21
**legitimate** 128:4
**lengthy** 216:7
**leslie** 1:10 3:13 5:9
6:1 7:4 15:21
138:18 197:3
**lester** 3:7 6:3,3
**letter** 85:14 86:14
200:10
**letters** 21:18
**level** 188:24
205:10,19 226:7
**levy** 110:18
**liberties** 3:10,15
**license** 2:8,10 7:23
7:24 22:2,5 34:12
42:22,23,25 89:16
89:19 90:6,9,14
91:2,8,10 92:4,16
92:21 95:7,8,25
96:8 97:3,9 98:9
98:21,23 108:22
109:12 110:11,12
111:8,13 113:8,10
114:15,16 118:3,7
118:15,24 129:7
129:10,13,16
130:21 131:8,11
183:11 185:17,23
186:10,14 187:23
187:24 189:8,9,11
191:3,4 228:14
247:25
**licensed** 22:8 43:9
43:11,17 75:9
93:23 105:7
112:22
**licensee** 74:15
76:2 84:23 85:17

85:17,21 86:2
88:18 89:9,13,15
90:13,20,24 91:2
92:7 95:18 108:15
110:14 111:17
115:8
**licensee's** 231:3,9
**licensees** 21:20
67:4 74:16 78:2
94:19 119:15
**licenses** 43:22
68:24 70:17
117:24
**licensing** 8:3 21:24
43:2 46:10 68:22
117:11,20 119:20
124:7,19,20
157:10 160:16
177:8,17,22 178:3
178:10 179:13,16
180:4,9
**licensure** 20:10
21:24 58:8 69:7
118:18
**lieu** 128:23
**life** 80:13
**lifetime** 135:10
**limit** 88:13
**limitations** 230:16
231:11
**limited** 96:4
108:25
**line** 84:6 177:2
251:4,7,10,13,16
251:19
**lines** 169:6 192:10
**link** 194:10
**liscensees** 43:20
**list** 23:17 34:9
51:18 100:10
120:19 157:19

191:16
**listed**  17:23 18:3
  38:3 41:21 95:7
  96:3 97:4 98:22
  99:18 103:23
  167:11 246:2
**listing**  40:2
**lists**  99:7 103:18
  133:23 134:10,21
**little**  1:17 3:18,23
  4:8 5:16 25:24
  46:14 68:21 74:3
  84:9 98:18 223:15
  223:17 234:23
  239:20
**llp**  3:4
**loaded**  195:8
**loading**  138:19
**lobbied**  173:6,9,10
**lobby**  164:14
  173:12,13
**long**  11:22 112:3
  112:19 135:6
  162:23 216:9,21
  220:10
**longer**  23:18 28:17
  33:18 140:20
**look**  11:7 23:17
  27:13 38:24 40:22
  42:5 51:23 53:19
  54:8 56:5 57:5
  58:7 63:23,25
  64:7 69:17 71:22
  75:17 88:9,14,19
  98:15,17 99:3,21
  100:20 101:9
  103:9 106:16
  109:17,19 114:2
  126:10 127:22
  128:22 132:13
  133:7 135:25

142:15 146:20
  147:25 165:14
  168:7,14,14,24
  183:22 190:9
  197:21 199:3
  230:6
**looked**  51:14
  88:11 111:15
  176:20
**looking**  34:4 53:21
  54:5 81:22 133:8
  176:15 185:13
  200:22 202:13
  234:2
**looks**  157:16
  166:18 167:10
**loss**  135:6
**lost**  23:23,25
**lot**  13:16 48:11
  113:25 159:14
**lots**  51:16
**louder**  25:24
**lynch**  166:19

**m**

**m**  6:20,20 134:2,3
  134:25 247:2,24
**ma'am**  22:13
  45:22 60:9
**mail**  196:3 230:25
**main**  130:2
**majority**  48:13
  64:21 115:14
  194:22
**making**  12:23
  15:20 42:2 68:19
  230:21
**malpractice**  99:23
  99:25 101:7
  128:24
**manage**  19:24
  20:2

**management**  19:4
  129:25 131:4
  135:6
**manager**  18:23
  20:16 21:10 39:19
**manager's**  21:10
**managers**  19:25
  20:21,24 21:3
  157:11
**mandate**  61:8
**mandated**  132:25
**mandates**  58:23
**mann**  3:24 6:12,12
**march**  54:9 229:9
  229:20 249:8
**mark**  15:9 17:10
  24:5 44:11 69:19
  105:18 138:9
  165:3 175:14
  196:23 217:10
  229:6
**marked**  15:16
  16:9 24:12 26:6
  44:15,24 69:22
  71:7 105:23
  138:14 155:4,7
  156:4 165:7,23
  175:17 196:24
  197:4 217:19,24
  229:10,19
**market**  220:25
  221:5,12
**material**  10:14
**materials**  10:17
  38:20,21 195:14
  196:2
**matt**  156:24
**matter**  5:8 122:8
  125:24 203:5
**maureen**  1:25 2:7
  5:21 247:2,24

**mcgee**  23:13
**mean**  16:16 18:10
  38:13 42:12 43:14
  56:25 57:3 58:4
  60:18 67:8,14
  82:22 99:6 100:9
  100:14 113:3
  117:25 147:12
  151:7 174:8,18
  186:6 192:25
  201:21 209:3
  211:11 214:11,12
  214:15 215:20
  216:5,6 223:3
  224:9 232:9
  233:16 240:19
**meaning**  86:9
  112:2 117:19
**means**  9:7,21
  67:11 74:21,24
  100:12 167:5
  178:21 211:6
  241:21
**meant**  167:20
**measure**  119:20
**media**  79:11,11
  159:21 166:20
  173:4 176:6 220:4
  220:5
**medical**  7:25
  15:15 17:21 18:7
  19:15 21:20 22:16
  24:7,9 26:10,10
  27:8,25 28:11,12
  28:13 34:4,8,11,13
  34:18,21 35:4,8
  38:16 40:21,25
  41:10 42:3,18
  43:6,10 44:14
  45:9,12,15,15,16
  46:5 47:18 54:16

59:14,20,22 63:21
64:2,2 66:25
67:18,24 68:3,8,18
68:24 69:3,7,11,21
70:5,10,15,17,19
70:20,21 71:7
81:12,15,17,21,22
82:7,15,16,21 83:4
83:11 85:23 86:13
87:4,10,13 88:17
88:19 92:3 94:25
95:6 98:20 99:5
100:19 103:15
106:20 107:5
108:18 109:17
110:19 111:2
112:21 116:16
120:14 122:9
126:10,17 128:4,5
128:21 135:11
136:22 137:2,7,14
140:6,9 141:12
146:25 147:9
148:9,25 149:10
151:4,7,14,15,23
152:6,13,19
153:13,17 154:4,9
154:14,20 155:22
159:15 162:14
171:8,17 172:9
173:18 174:3,23
175:6 178:23
179:14 182:23
186:12,25 189:19
190:6 191:3,4
195:3 203:6,10,12
203:21,23 204:20
205:3,13,18
206:18,24 207:5
209:8 210:2,15
212:3,14 213:10

215:16 216:16
217:3 221:5 222:5
222:12,21 224:24
226:4 227:19
228:3,13 234:3,12
234:20,21 235:4,5
235:6,12,15,15,19
236:6,14 237:17
239:8 240:2,15
242:19 243:3
245:24 246:7
248:7,9,14,16
**medication** 129:22
141:19
**medications** 130:3
141:14,22 211:15
211:22
**medicine** 32:15
33:7 34:12 42:10
42:13,23 43:7,8
47:19,21 75:12
76:18 77:17 117:5
120:6 121:20
125:24 204:9,12
204:18 228:11,24
233:13,23 234:5
234:15 235:20,21
235:24
**meet** 11:23 94:17
111:9
**meeting** 13:18
14:6 40:13 66:24
74:24,25 80:23
90:2,5 91:24 92:9
119:7 125:4
158:24 173:19,21
188:21 189:3
194:11 195:7,11
195:13
**meetings** 20:3
75:2 142:15

147:25 153:7,23
237:11
**meets** 203:18
**member** 14:12,14
15:4 48:4 49:4,14
49:21 73:12,13
93:17 113:2
122:19 137:5
153:8 161:15
163:2,10 170:18
238:24
**members** 22:20,24
23:2,3,15,18 27:5
27:24 28:8 38:8
40:12 56:14,14,15
60:13 80:24 82:9
123:10 124:15
142:18,22 149:23
150:11 153:12
159:3 160:3,4
170:14 173:16
181:15 193:11,13
193:15,17,20,22
194:3,19,25 210:8
219:11 227:10
237:24 238:5
**membership**
26:25
**memory** 55:3
**mention** 20:7 39:9
49:12 67:21 74:8
231:9
**mentioned** 12:19
31:12 53:6 60:4
62:14 63:20 68:7
72:19 97:22
144:14,20 196:20
222:3 223:17
**message** 220:22
**met** 11:18 121:10

**meua** 141:19
**mic** 25:24
**michelle** 191:3
**middle** 45:9
**mind** 92:12 120:2
**mindful** 83:24
**minor** 172:2 174:4
174:12,14,18
175:10 186:13
202:23 242:16,20
242:23 243:15
**minors** 151:4
152:14 154:20
175:6 203:5,12
210:16 212:3,14
213:10,24 214:20
217:3 222:22
226:23 227:8,15
227:18 228:2
246:6
**minute** 16:2
119:23 218:15
246:9
**minutes** 84:5
88:24 196:8
202:19 218:7
233:5
**mission** 45:10,12
45:24 70:11 71:3
**misspeaking**
145:15
**misunderstood**
66:18
**moment** 15:12
16:25 72:2 138:20
165:13,15 235:25
**monday** 229:20
**monitor** 129:3
**monitoring** 87:15
114:23,24 115:2,6
129:11,14 130:21

130:23,25
**monitors** 112:22
**month** 131:6
**months** 14:11 15:2
23:14 129:5,9
131:2,6 216:7,10
**morning** 7:3
**morris** 157:5,12
157:14,17
**mother** 1:7
**move** 118:19
183:8
**mp** 131:5
**multiple** 144:25
145:5,16

**n**

**n** 3:1 4:1 248:1
**name** 5:18 7:8,10
21:11 28:16 59:23
60:10 63:18 103:5
103:6 231:3,3,9,17
231:18
**named** 16:9
166:19 167:11
230:15
**national** 41:5
63:25 64:8,14
68:3
**nature** 64:6 117:6
145:21 190:12
194:9 228:6
**naturopathic**
118:3,10,11,24
119:19 121:2
123:2 124:6
**naturopaths** 120:2
**navigate** 225:9
**nay** 56:22
**nearly** 53:13 142:9
**necessarily** 77:13
83:15 201:21

**necessary** 35:7
212:10 215:22
252:6
**need** 9:25 10:4,7
16:13 21:17 36:21
39:7 40:2,16
53:12 64:14 75:5
77:21 80:10 86:2
86:4,21 87:8 88:5
94:12,13,17 97:24
98:13 102:3
106:13 108:9,16
111:9 113:12
117:15 136:13
142:15 144:7
146:20,21 154:7
167:6 175:7 182:6
183:10 185:18
188:4 213:13
214:6 225:15
226:21 234:9
241:7,23 244:13
244:14 245:15
**needed** 64:10
111:23 216:14
**needs** 37:23 40:18
44:2 62:15 75:6
75:23 85:17 91:10
124:17 180:21
182:18 183:9
**negative** 171:14
**negligent** 99:22,25
100:3,12,17 101:7
**neither** 220:18
247:16,19
**never** 50:25 51:12
82:13 132:5 146:5
146:9 152:8,11
169:21 171:9,18
171:20 172:18
178:10 215:9

217:3 222:14,24
223:7,8
**new** 3:6,6,12,12
9:2 21:12 203:24
203:25 232:7,8
**news** 73:11 74:9
74:12,14 78:18
159:21 176:5
181:6 220:5
**nod** 9:5
**non** 28:12 30:24
**normally** 156:16
235:21
**notary** 2:10 6:21
252:13,19
**note** 250:10
**noted** 252:7
**notes** 10:16,18
121:6 168:7,15,24
**notice** 2:6 11:9
15:10,13 16:10
17:13,23 18:3
92:7 190:24 191:2
191:13 221:18
233:22 234:3
244:7 248:6
**notified** 15:5
73:10
**notify** 14:16,21
104:25 230:20
**noting** 158:7
**number** 17:22
34:9,9 58:7 79:8
79:14 130:12
144:20
**numerous** 94:9
**nurse** 44:4
**nurses** 44:5
**nursing** 44:5
**nutritional** 134:14

**nutshell** 20:6

**o**

**o** 166:23
**obgyn** 33:15
**object** 12:20 42:15
121:23 154:23
159:17 177:25
184:11 188:11
191:19 213:16
216:22 221:15
222:17 234:6
241:9,16 244:3,7
**objected** 202:25
221:23
**objection** 12:9,13
13:3 56:9 83:8
107:25 138:6
191:25 204:21
205:5 207:19
225:11 228:7
235:8,22 236:16
239:10 240:4
242:11 243:5
**objections** 12:22
**obligation** 199:2
199:17 202:6,11
**obligations** 198:23
201:11,16
**obtain** 213:6
**obtaining** 213:23
**obviously** 159:13
**occupational**
45:18,18 59:18
60:5,6,8 68:9
**occur** 158:8
225:12
**occurred** 14:7
70:22 87:24 88:6
90:22 130:13
**occurrence** 80:9
80:10,21

**occurs** 89:14
**offenses** 99:2
**offer** 57:2
**office** 4:6 19:4
  39:2,13,14 50:25
  85:6 118:15
  122:18 163:3,7,8
  163:11 227:10
**officers** 31:12
**offices** 38:8
**official** 50:18
  93:11 158:23
  160:24 161:19
  162:19 164:2
  181:11 193:21
**oh** 66:18 73:4
  82:24 93:24 134:3
  232:20 238:25
**okay** 7:15,20 8:22
  8:24 9:9,10,18,19
  9:22 10:8,9,14,20
  11:7,15,18 12:7
  13:5,6,15 14:16,20
  14:25 15:9 17:16
  17:19 18:16 21:5
  22:14,19 24:4
  25:11,15 26:8,20
  27:23 30:18 31:2
  31:13 32:25 33:16
  33:20 34:3 35:2
  37:12 41:19,22
  42:7 46:13,21
  48:10 49:20 50:17
  51:8 53:9,19 54:2
  54:15 56:11 58:7
  58:15 59:8,13
  60:4,11 62:4,13
  65:15 66:10 67:21
  68:17 69:13,16
  71:6 72:5 77:19
  83:24 84:4 85:12

88:22 93:9 96:5
96:24 99:19
100:23 101:2,15
102:4,11 103:4,8
104:14 109:4,24
111:14 125:21
126:4,8 127:13
130:18 132:4,13
132:16 133:3
134:7 135:10
136:3,6,18 137:11
140:12 141:25
142:12 143:21
144:19 145:13
148:13,24 149:8
151:12,25 152:2
153:20 154:25
157:12,15,21,25
158:17,23 161:5
161:17 163:24
164:10 165:2
166:12 167:10
168:16 175:9,19
178:12 179:7,12
179:23 180:7
181:9,24 182:17
182:20 185:7,18
190:23 191:12
193:20 194:24
196:6,9 197:11
198:13,16 199:4
199:13,23 202:19
203:3,9 204:7
209:12 210:10
213:19 215:13
216:12 218:20
220:13,22 221:20
223:3 224:12
225:25 227:17
229:5,15 230:2
231:4,22 233:21

235:18 236:9,12
244:2,10,19 245:4
245:10,22
**onboard** 214:18
**once** 7:16 8:7,22
  48:8 76:10 80:14
  86:14 183:5
**ones** 37:8 53:6
  57:12,14,16 59:11
  59:12 73:8 97:22
  120:8 197:4
  245:25 246:2
**ongoing** 146:8
**open** 71:10 78:24
  78:25 87:8 133:13
  145:11,14
**opinion** 122:10
  171:21 217:17
  218:2 221:7,7,14
  221:22,25 225:18
  233:14,17 249:5
**opinions** 170:15
  221:17
**opioid** 61:5,13
  62:2
**opioids** 87:16
  126:9,22 127:7,11
  130:7 131:24
  212:5
**opportunity** 92:11
**option** 65:22
**options** 96:19
  111:5
**oral** 1:15 140:21
**order** 75:5 89:17
  89:22 91:12,16,20
  112:5,11 113:5,12
  113:18,22 114:24
**ordering** 105:9
**orders** 112:2
  113:25 114:5,8,12

**organization**
  27:17 56:24 94:19
**organizations**
  41:20,24 59:17
  60:20 63:22 68:9
**original** 188:13
  192:8 194:8
**orthopedic** 56:18
  56:24
**orthopedics** 56:3,6
  56:17
**orthopedists** 57:2
**osteopathic** 28:4
  45:15
**osteopathy** 30:2
**outcome** 86:16
  184:17 186:21
  231:21
**outpatient** 141:9
**outside** 47:2 49:20
  50:18 74:25
  154:22 173:20
  221:17 244:6
**outweigh** 141:2
  171:25
**overprescribed**
  212:6
**overprescribing**
  114:11 127:7
  211:2 212:4
**overprescription**
  126:21 127:10
  130:2
**override** 204:19
  204:25
**overstep** 94:6
**overutilizing**
  105:8
**owen** 3:21 5:15
  6:13 157:4,5,6

**ownership**  105:2

**p**

**p**  3:1,1 4:1,1
**p.m.**  144:9,12
  196:11,14 233:8
  233:11 246:14,18
**pa**  3:21 5:15
**package**  194:9
**packet**  100:4,8
  194:25 195:14
**paden**  32:25
**pagan**  166:2
  167:11,16
**page**  26:9,23 40:23
  45:6 70:2 95:2
  109:21 128:8,22
  176:25 251:4,7,10
  251:13,16,19
**pages**  192:19
**pain**  126:13 128:2
  129:22,24 131:4
  211:15,22
**painkillers**  77:5
  126:18
**pandemic**  121:11
**paper**  25:9
**parameters**
  203:18
**parent**  174:6,9,14
  174:18 242:16,24
**parents**  174:2,22
  175:7,11 202:20
  203:6,13 222:22
  242:20 243:17
**part**  35:3 40:21
  61:21 83:23 88:21
  91:4 94:11 100:3
  100:7 106:12
  108:18 114:11,24
  133:4 150:18
  156:9 162:9 194:8

194:20 197:15
220:2,22,25
222:12 224:13
**particular**  46:17
  54:17 60:25 63:13
  64:15 71:9 74:10
  93:14 96:16
  106:12 116:15
  118:4 137:2,7,13
  147:17 156:18
  157:23 160:10
  189:21 197:15
  203:20 204:10
  205:18 206:2
  235:19 236:5
**parties**  247:18
**party's**  218:3
**pass**  47:11 48:9
  160:12 162:9
  211:12 213:11
  214:18 216:19
**passed**  13:21 50:7
  51:17 61:8 120:5
  120:13 153:22
  160:10 244:20
**passes**  64:21 117:3
  212:22
**passing**  148:14
  154:3
**paste**  58:3
**patient**  94:9
  104:22,25 105:10
  105:11 133:14,15
  133:19 136:13
  172:2 174:7,10,11
  174:13,17 187:15
  187:16 188:7,8
  189:21,22 190:18
  197:19 198:6,20
  199:7,10,15 201:7
  208:6,8 223:21

224:5,23,23 225:5
226:13 232:2,7
237:21 238:7,8,17
239:3 241:19
242:16,16,21
**patient's**  141:12
**patients**  76:8 78:3
  87:10 94:8 104:17
  133:24 135:15,17
  141:16 143:20
  149:17 198:2
  199:25 200:18
  204:19 205:2
  208:13,16,19,23
  208:24 209:8,15
  209:21 210:3
  213:6 232:8
  236:25 237:8,19
  237:25 238:14,23
  242:3
**pdmp**  87:14 115:5
**penalties**  95:7
  96:2 98:22
**pending**  10:6
  34:14 191:7
**penny**  21:13
**people**  13:17
  23:17 48:11 70:12
  167:8 221:4 245:5
  245:10
**perceived**  90:16
**perform**  132:21
**performing**  105:9
  116:15 133:12
  135:18
**period**  65:5 66:8
  67:22 129:8
  158:19
**periodically**  9:24
**permit**  242:22

**permitted**  137:22
  205:12 207:6
  209:22 210:3
**person**  6:11 28:16
  67:12 90:10 167:5
  184:8
**personal**  193:24
  194:13 221:6,14
  221:16,22,25
  244:5,9,12
**personally**  246:4
**pharmacy**  36:2,13
  36:23 37:3 39:10
**philips**  33:8
**phone**  219:24
**physician**  27:12
  28:5,24 29:11,23
  30:14,21 31:14,21
  32:4,8,12,23 33:4
  33:11 36:20 45:16
  59:15 68:10 76:6
  82:2 86:16 104:20
  105:5,8 114:10
  115:8 119:19
  121:2 124:24
  129:4 174:6,9,13
  174:17 183:3,17
  188:16,17 190:13
  190:14 195:18
  200:13,14,15
  208:7,8 230:14,14
  233:20
**physician's**  129:10
  129:13,14,16
**physicians**  27:15
  27:20 30:24 33:21
  104:12 105:15
  112:22 118:3,11
  118:24 120:16,23
  123:2 133:11
  176:19 179:25

180:9,10,13
194:23 208:14,15
208:20 237:18
**place** 211:16
247:13
**placed** 26:5
**places** 69:13 99:13
**plaintiff** 5:7
**plaintiff's** 196:17
**plaintiffs** 1:8 3:3
6:2,5,8,11,13 7:5
190:25
**plan** 162:8
**planet** 68:16
**plastic** 31:17
**please** 5:23 6:18
9:17 24:6 69:18
**plus** 143:6
**pocket** 110:20
**point** 10:3 22:21
63:4 66:3,5 85:19
122:2 124:24
145:8 160:20
197:17 209:11
243:24 245:13
**popped** 25:20
**portion** 128:7
**position** 18:18,21
18:25 19:6 28:10
28:21 29:9,20
30:12 31:10 157:8
164:11,16,20
165:16 168:8,11
170:21 171:4,8,16
171:23 172:5,15
172:17,21,23,25
208:18 209:20,25
227:3,4
**positions** 21:7
173:17

**possibility** 160:22
164:16 240:6,8,11
240:13,20 243:20
**possible** 136:4
168:20,20 184:16
184:17,18 186:21
189:23 190:2,22
212:6 243:8,13,19
**post** 69:18 217:18
218:2 249:6
**posted** 15:11
**potential** 74:6
134:10 140:25
141:2 208:25
209:9
**potentially** 65:19
84:21 107:23
109:11 188:5
**power** 35:5
**powers** 41:9
**practice** 22:3
28:13 29:2,4,13
30:16,17 31:16,23
32:6,14 33:6,14,24
34:2,12 42:9,13
43:3,21 47:19,20
67:5,9,10 75:11
76:17 77:17 81:12
81:15,17,21 112:3
112:19 125:24
128:4,6 131:14
222:5,12 235:13
**practices** 24:7,10
26:10 34:4 35:8
40:21 41:10 45:14
46:5 57:6 60:19
60:25 67:18 69:11
70:21 71:8 82:7
83:5,11 85:24
86:13 88:17,20
92:3 94:25 99:5,9

106:20 107:6
108:18 109:18
110:19 111:2
114:6 120:14
124:19,21 126:11
126:17 128:21
146:25 147:10
148:9 178:23
186:25 235:5
248:10
**practicing** 27:11
42:22 43:7,8 72:9
72:22 110:15
111:18 112:14
113:6,13,19
114:14,20
**practitioner** 28:11
45:20
**practitioners** 27:9
**precautions** 51:20
52:3
**preference** 25:10
**pregnancy** 135:2
**preliminarily**
181:20
**prepare** 10:21
**prepared** 17:25
40:10,11 152:25
233:25
**prescribe** 113:19
114:18,20
**prescribed** 115:8
141:11 147:14
148:7 208:6
**prescribing** 78:9
111:8 129:3,12,15
130:25 144:16
145:10,23 207:16
209:16
**prescription** 36:8
36:11 64:15 87:14

113:16 114:6
115:5 126:9
129:21 130:6
208:9 209:4
**prescriptions** 61:5
77:4 126:18
209:13 211:17
**present** 4:11 38:7
38:8 39:2 40:15
91:3 93:4 112:25
125:2
**presented** 40:11
85:7,21 87:7,22
146:17 183:7
**presenting** 227:24
**press** 164:22,25
**presumably** 39:16
39:23
**pretty** 140:14
144:4
**prevent** 8:20
10:11
**prevention** 41:4
**previous** 47:9
56:10 62:10 102:6
203:2 213:17
222:18 228:8
241:10
**printout** 44:12
69:20 248:12,15
**prior** 19:8 55:5
102:8 133:11
162:16 181:24
247:4
**privilege** 13:2
191:22
**probably** 12:18
22:23 43:5 176:14
239:21
**probation** 110:14
111:16,24 112:7

**problem** 10:7
126:22 212:8
216:13
**problems** 154:19
**procedure** 49:14
67:13 205:22
213:7
**procedures** 47:17
66:16 67:3 105:10
116:4,8 160:11
162:22 171:25
177:5 178:17
180:2 222:4,11
**proceed** 7:2
225:16 239:18
**proceedings**
246:17 247:11
**process** 25:16 40:9
49:25 55:10,21
61:12 62:25 66:7
66:9 72:21 84:10
84:14 85:6,9 89:8
102:24 115:22
117:2,2,17 118:18
132:21 145:24,25
169:8,10 182:5,9
200:16 211:11
212:16,23 215:2
215:22 216:7
**processed** 21:17
85:13
**produced** 217:22
**products** 140:25
**profession** 70:17
72:10 234:4
**professional** 2:9
57:22 59:5,8,25
60:7 63:21,25
67:24 68:3 81:23
235:6,6,16 247:3

**professionals** 42:3
42:21 43:10,13
60:14 178:4,8
179:21 228:13
**program** 87:15
115:6,7
**prohibit** 116:9,11
136:18,21 137:2,6
137:13 138:8
205:17 207:15
208:2 215:18
240:24
**prohibited** 180:2
184:9,15 185:4
198:5,19 199:6
205:22 223:21
240:22 241:18
**prohibiting**
115:19 116:23
131:24 136:16
148:14 234:25
235:18
**prohibits** 116:14
**promoting** 226:23
**prompt** 75:14
76:24 77:6
**prompted** 53:10
53:14,24 54:11
74:12
**promulgate** 46:11
160:17,18 214:9
**promulgated**
104:8 116:13
135:25 160:19
161:25
**promulgating**
160:22
**promulgation**
55:21 61:11 66:7
115:21 211:11
212:22

**proof** 74:22
186:11
**properly** 214:22
**proposal** 136:25
**proposals** 208:2
**proposed** 63:4
66:11 67:23 132:5
137:6 148:17,21
206:16 207:14
**protect** 45:10,12
70:11 76:9,14
131:20 136:8
**protected** 232:13
**protection** 4:5
**prove** 232:23
**proven** 232:18
**provide** 53:22
60:13 83:5,12
116:11 124:3,10
202:22 203:13
205:12 208:23
209:7 212:13
225:8 226:12
245:7
**provided** 40:5
54:17 70:14 79:17
116:9 150:2
151:11 181:10
183:4 195:5
206:25 207:2,6
211:17 227:9
**provider** 7:25
28:12 75:9 117:12
117:21 118:5
141:13 224:7
**providers** 22:2,4,8
27:25 28:14 67:16
68:25 117:25
118:5 179:14
195:3 198:4,5,18
199:5 223:20

**providing** 76:3
78:2 152:5 179:21
180:2 182:23
183:18 184:8,14
185:4 186:12
189:18 190:6
200:13 203:7
210:15 212:2,14
213:24 222:21
224:15,22,25
226:16 240:21
**provision** 26:25
52:20 61:17 71:10
71:18 72:7 95:15
101:17 106:17,20
126:16 128:6
132:14 177:4,11
178:13,16,23
199:14
**provisions** 35:7
53:4,10 88:10
99:20 107:9
108:11 129:21
134:4 135:14
136:6
**psychiatric** 134:17
134:18
**psychiatry** 29:14
**puberty** 151:17
**public** 2:10 4:5
45:10,13 65:4,12
65:17 66:8 67:21
67:22 68:15 72:11
72:23 75:3,17
76:9,15 89:24
90:16 108:4
109:16 110:18
111:20 126:25
131:20 132:2
136:9 155:6 156:6
156:12 159:14

248:25 252:19
**pull** 191:2
**pulled** 105:25
  165:11 175:19
  176:6,10
**purpose** 143:15
  197:22
**purposes** 46:4
**pursuant** 2:6 41:8
  103:13 133:9
**put** 18:5 42:17
  54:18 58:3 61:11
  65:12 75:17
  106:17 115:21
  118:2,16 120:18
  125:13,14 172:11
  176:5 192:21
  196:16 226:9
**putting** 225:21
  242:3

**q**

**quality** 70:14
**question** 8:18 9:2
  9:14,16,18,21
  12:22,24 13:22
  27:18 39:8 49:2,9
  56:10 71:11,25
  77:20 81:10,25
  83:9 93:22 95:14
  125:22 136:20
  143:8 149:7 152:3
  156:10 159:7
  165:18 169:16
  170:25 171:14
  177:20 183:20
  184:19 186:16
  187:10 188:13,14
  191:20 203:2
  204:23 207:14,23
  213:17 216:2
  222:8,18 228:8

231:10 232:21
233:19 234:7,18
234:23 235:9
239:6,11,20 241:4
241:10 242:13
244:4,8,16,17
**questions** 9:12
  10:5 12:21 21:21
  22:20 84:6 89:10
  99:19 123:25
  124:2,7 125:6,14
  163:14 178:13
  218:16 221:16
  223:13 246:12
**quite** 79:12 127:21

**r**

**r** 3:1 4:1 6:20
  166:23 247:1
  251:3,3
**radiologist** 45:20
**radiology** 45:19
**ragon** 3:21 5:15
  6:13
**raised** 206:13
  217:4 225:20
  238:4
**raises** 241:25
**randomized** 207:2
  207:8
**randy** 4:12 5:18
**rape** 76:7
**rare** 47:4 48:6
  91:11
**rarely** 94:21
**ratto** 1:25 2:7 5:21
  247:2,24
**reach** 56:23 57:21
  122:20 163:25
**reached** 123:6
  146:5

**read** 28:16 34:15
  45:7,21 53:17
  70:8,24 71:24
  95:4 97:17 98:11
  101:13 106:10,13
  133:20 135:7
  140:13 141:24
  162:5 166:12
  178:15 180:20
  197:13,16 218:15
  218:19 229:24
  246:16 250:9
  252:5
**reading** 128:6
  130:24 198:8
**reads** 86:8,8
**ready** 182:14,18
**real** 80:13
**realize** 16:22
  117:23
**realizing** 171:13
**really** 8:15 75:12
  75:19 87:18 93:11
  159:18
**reason** 81:17
  199:16 238:20
  250:11 251:6,9,12
  251:15,18,21
**reasonable** 140:21
  140:24
**reasonably** 141:24
**reasons** 218:11
**recall** 14:13 32:16
  42:4 59:9 76:19
  101:8 113:24
  125:8 142:14
  143:24 155:18
  156:17 157:22
  160:15 162:6
  163:6 164:24
  169:14,22 200:19

200:23 202:23
219:23 220:19,21
220:25 223:23
239:5
**receipt** 250:18
**receive** 79:5,23
  85:19 86:25
  156:16 221:12
  242:23
**received** 10:23
  11:3 12:15 13:19
  15:15 24:12 44:14
  51:3 69:22 70:18
  79:15 85:15 86:10
  105:22 138:14
  146:16 151:2
  152:4,12 155:7
  156:15 157:22
  165:7 175:17
  182:9 183:6 188:2
  192:6 217:19
  227:20 228:4
  229:10
**receives** 70:15
**receiving** 172:9
  226:3 237:9
  241:14 242:4
  243:16 245:5,23
  246:6
**recess** 89:3 144:10
  196:12 233:9
**recognize** 17:10
  26:4 44:24 70:2
  166:7 170:6 172:7
  222:2,10
**recognized** 235:4
  235:13
**recognizes** 170:11
**recollect** 123:7
**recollection**
  142:10 158:10

162:3 198:10
231:21
**recommend** 242:6
**recommendation**
242:18
**recommendations**
93:13
**recommended**
141:21
**recommends**
242:5
**record** 5:2,24 7:9
8:10 12:23 16:24
17:3,5,7 24:20
26:9 49:3 84:8
89:2,5 106:4
138:25 144:9,12
156:9 158:6
165:25 166:6
175:3,21 196:11
196:14,16 229:18
233:8,11 246:14
**recorded** 5:5
**records** 23:9 38:16
87:4,5,10,13
**red** 74:18,20
**redo** 177:20
**refer** 111:25
150:22,23 245:7
**reference** 100:15
100:15
**referenced** 250:6
**referencing**
229:22
**referral** 177:4
178:16 200:14
224:15
**referred** 17:14
42:24 43:6 103:10
131:3

**referring** 11:4,9
121:2 151:15
161:11 224:6
**refresh** 158:9
198:9
**refresher** 97:25
**refusal** 95:24
231:25
**refuse** 95:8 98:23
232:8
**regarding** 18:2
22:7 124:11
129:21 152:5,12
155:21 161:8,20
163:22 164:3
**registered** 2:9
247:3
**regular** 9:3 74:25
**regulate** 42:13
44:4 67:2,16
211:5,6
**regulated** 235:21
**regulates** 204:18
235:24
**regulating** 42:9,21
43:12,14 45:14
204:8 228:11
234:3
**regulation** 22:9
42:3 46:17,19,23
47:25 48:14,16
49:6,23 50:21
51:9,25 52:8,14,16
52:21 53:20,22
54:6,19 56:2,5,7
57:20,23 58:23
59:2 61:5,7 63:3,4
64:21 65:11,20
66:11,19 102:17
102:22,25 103:9
103:17 107:22

108:14 117:4
120:6 121:20
122:9 127:20,21
127:24 128:10
132:6,14,24 133:4
137:6 148:14
154:3,8 159:15
162:9 195:22
201:12 204:11
206:16 211:7,16
212:7,21 213:3,11
213:20,21 215:4,6
215:18 216:19
228:23 233:13,22
234:5
**regulations** 24:8
24:10 26:11,14
46:3,8 51:15,17
52:13 55:10,12,25
57:8 58:16,20
60:23,24 62:16
63:15,24 65:5
67:23 71:8 102:17
127:10 129:18
149:13 160:8,9,13
161:20,25 162:21
211:15,22 212:18
248:10
**regulatory** 20:9
21:6 22:11,15
39:16,18,20 40:5
55:24 69:21 70:9
71:4 166:4 167:24
248:16
**rejected** 66:11,20
**relate** 114:5
**related** 19:18 52:4
63:21 76:3 123:25
141:6 154:19
163:4 173:11,18
195:17,22

**relates** 52:20
55:23 95:24 195:2
**relating** 36:7 56:3
160:13 162:10
**relation** 76:17
**relationship** 94:8
104:17 140:5
**relative** 247:16,19
**released** 139:12
**relevance** 138:7
207:20
**relevant** 41:7
63:11 83:18 93:7
106:17 179:18
192:23
**relied** 59:10
**reload** 16:5,8
**remdesivir** 141:19
141:23
**remember** 54:14
60:9 63:18 107:6
119:25 168:5,13
211:23 218:10
219:14 231:17
244:17
**remembering**
231:18
**remote** 1:15
**renew** 120:16
**renewing** 120:23
**repeat** 83:9 106:25
143:8 148:19
149:3,4,8 171:12
184:10 209:24
211:19 222:7
235:9
**rephrase** 73:16
171:15 205:8
216:14
**report** 38:7,21
39:2 40:4,10

84:24 87:14 94:14
97:23 115:7
**reported** 1:24
**reporter** 2:8,9
5:20 8:21 16:13
84:4 247:3
**reporters** 164:23
**representative**
121:7 206:7
**representatives**
162:20
**representing**
155:21
**reprimand** 94:22
110:13
**reprimands** 94:22
**request** 48:2,14
51:3 61:12,15,23
115:6 128:15
168:3 192:6,8,13
192:18
**requested** 38:11
39:4 46:11 47:10
51:10 123:14
**requesting** 128:17
**requests** 46:22
**require** 65:2 129:5
129:11,14 131:12
161:24 225:17
**required** 112:14
119:7,12 135:11
184:21 190:5
196:5 201:25
202:21 205:11
206:18 209:15
213:5 214:3
252:13
**requirement**
62:20 64:25
148:25 149:10
162:6 201:13

209:18,19
**requirements**
58:24 69:7 132:20
136:7 212:19
213:12,22 214:19
230:19
**requiring** 96:15
160:16
**rescind** 91:7
**research** 53:13
96:22 109:3,13
206:4 245:15
**researched** 192:11
**resort** 16:23
**resources** 19:3
**respect** 123:24
145:8 146:6
179:18 209:12
228:12 239:25
**respiratory** 45:17
59:19
**respond** 85:18
183:5 189:10
**responded** 168:6
183:17 187:14
**response** 85:20,21
86:8 87:21 88:4
168:25 169:2,7
183:7 188:17,22
189:19 191:14
**responses** 168:21
**responsibilities**
18:25 19:22
**responsible** 12:16
19:2 42:20 43:12
43:16 180:12
204:8
**rest** 126:6
**restrict** 205:17
**restricted** 113:8
113:10

**restricting** 218:4
**result** 65:20
105:11 133:17
135:7
**return** 250:13,17
**returning** 124:18
**revealing** 191:24
192:2
**review** 11:15 12:7
25:4,14 60:17
80:24 88:3,4
91:25 93:19
129:25,25 131:4
147:20,24 177:9
177:23 178:7,11
179:17 195:6
250:7
**reviewed** 10:22,24
17:16 43:23,24
70:18 86:11
**reviews** 70:16 72:3
79:24 80:6 188:18
218:17
**revised** 24:11
65:24 248:11
**revocation** 91:11
95:24 96:5 97:19
98:6,8 109:2
115:13 129:13
186:20 188:25
**revoke** 92:16 95:6
95:20,20 97:3
98:21 100:14,14
108:20,22 110:11
129:12,16 131:10
185:22 186:10,13
**revoked** 96:8
131:8 140:16
**rhys** 31:6,13
**richardson** 3:8 6:6
6:7 16:8 138:20

155:9 165:9
196:24 217:12,21
229:12
**right** 14:9 20:17
20:25 22:9 27:12
32:18 34:15 36:24
37:13 38:22 39:17
43:20 45:21 46:5
46:24 50:12,13
52:18,22 55:24
62:5 64:22 65:10
65:25 66:21 69:4
71:12 77:11 83:20
84:14 101:13
107:2 113:14
130:3 135:8
142:10 144:17,22
145:6 159:18
164:23 166:13,18
173:14 177:15
181:4 184:24
192:2 193:5
194:21 195:4,15
195:19,23 197:19
197:21 199:21
204:5 205:16
208:22 214:6,16
215:6,19,25 216:4
217:5,9 223:9
229:24 238:2
241:15,22 245:2
**rises** 188:24
**risk** 172:12
**risks** 135:16 141:3
143:6,15 171:24
208:11,25 209:9
209:15,23 210:5
212:16 213:5
**robert** 31:18
**rock** 1:17 3:18,23
4:8 5:16

**rodney** 32:9
**role** 37:15 139:20
**room** 186:18
**roughly** 219:18
**round** 156:21
**rounds** 155:6,21
  155:23 156:2,6,12
  156:12 157:23
  158:3 248:25
**roux** 133:13
**rpr** 1:25 247:24
**rule** 46:11 47:11
  47:11,15 48:5,8
  50:3,5 53:13,21
  55:19 101:12,25
  102:5,5,7,11,18,22
  103:2,11 104:4
  106:24 107:12
  108:19 115:18,21
  116:3,7,14 120:22
  127:15 160:17,18
  160:22 201:22,25
  202:7 211:9 214:9
  214:13,18,25
  215:24 216:2
**ruled** 181:25
**rules** 50:3,7,11
  58:2 62:11 63:17
  88:20 91:5 101:18
  103:8 104:6
  161:25 162:6
  225:15
**run** 131:5
**rutledge** 1:10 5:9
  23:21 33:17,25
  250:4 251:1 252:1

**s**

**s** 3:1 4:1 99:7
  101:10 107:5,20
  108:13 179:8
  187:2 248:5 251:3

**safely** 77:18
**safety** 70:11
**sanctions** 129:2
**sarah** 157:5,12,13
  157:17 229:9,20
  231:14 249:9
**satisfy** 230:19
**saw** 51:20 166:9
  169:21 203:17
  214:5 220:4
  242:17
**saying** 30:2 32:17
  52:22 55:2 85:14
  87:2 123:22
  125:22 182:22
  187:14 188:3
  200:11 202:8
**says** 29:25 34:7,10
  35:4 45:9 46:10
  46:16 54:7 70:9
  70:10 71:18 82:13
  87:8 95:5,20,21
  98:16,20 101:10
  102:22,25 103:13
  109:8,25 111:16
  113:12,18 128:23
  130:25 133:9
  134:8 135:5
  140:15 143:18
  156:24 167:18
  177:3 178:15
  185:24 186:4,5
  197:7,18,20,25
  198:18 199:5
  223:19 225:7
**scale** 64:19
**scenario** 46:15,22
**scenarios** 185:14
**scheduled** 74:25
  89:25

**schoening** 4:12
  5:18
**school** 82:15
**scientific** 205:19
  206:4
**scope** 43:3 67:4,9
  67:10,11 95:15
  221:18 239:11
  240:5 243:6 244:6
**screen** 16:14,19
  106:2
**scribber** 30:5
**scribner** 30:7
**search** 191:13,18
  192:4,19,20
  193:14
**searched** 192:4
**second** 192:13
**secretary** 29:21
  31:3
**section** 20:4,9,11
  21:6,24 22:9,15
  26:21 34:5,6 35:3
  39:18,21 40:6
  41:21 45:8 71:16
  71:22 95:2,12,23
  96:3,6 97:4,10
  98:19,22 99:2
  104:20,24 106:5
  109:18 126:10
  135:4 150:25
  176:23,24 200:2
  201:13 202:12
**sections** 20:2,7,8
  20:13,16 99:7
  115:4 139:18
**see** 16:10 23:9
  25:7,19,25 29:25
  42:6 44:10 51:15
  59:17 64:18 83:3
  87:9 96:4 98:13

  102:15 118:4
  133:8 139:11,15
  139:15 147:21
  153:9 154:7 176:2
  180:21 188:20
  197:9 219:4
  230:18 231:6
  234:24
**seeing** 15:22
  155:18 220:25
**seeking** 124:4,11
**seen** 26:17 41:13
  41:18,22 139:8
  155:16,20,24,25
  169:17 175:23
  218:10,12 229:16
**senator** 121:8
**send** 167:7 194:7
**sends** 74:17,19
**senior** 4:4
**sent** 55:20 66:4
  85:14,16 86:15
  139:16 157:4
  166:2 167:12,21
  167:22 195:7
  196:2,4 229:20
  250:14
**separate** 46:21
  145:18 146:18
**series** 134:13
**serious** 129:17
  141:3 143:6,15
**serve** 38:2 39:11
  131:19
**serves** 38:18
**service** 105:2
  116:15
**services** 18:23
  36:2,13,23 37:3
  39:10 116:11
  156:8,13 179:22

session 120:11
156:7
set 26:13,14
118:19 247:14
settings 141:10
severe 86:25
187:16 189:21
sexual 104:16
105:4
share 15:12,19,22
16:3,14,15,17,18
24:17 25:2,6,10,13
sharing 11:21
sheet 100:15
250:11
sheets 100:15
short 140:14 233:5
shorthand 151:24
shortly 14:4,7
show 115:7
showing 24:16
141:21
shown 17:9
shows 77:16
side 106:18
sign 37:25 246:16
250:12
signature 196:5
247:23
signed 250:20
significant 121:19
signs 133:14
similar 68:8 212:5
213:12 237:13
similarly 8:24
212:11
simon 28:18
simultaneously
25:3
single 43:23,24
49:14 147:21

153:8 185:14,15
195:6
sit 119:7
sitting 1:17 156:19
231:20
situation 41:15
75:16,21,23 83:16
85:5 185:21 190:9
224:20 226:10
232:7 241:2
situations 86:5
121:13 147:13
183:12,22
six 129:4 131:2,6
skipped 98:18
slightly 165:18
smaller 189:14
social 79:11
159:21 176:5
220:4,5
society 56:18,24
59:14,21,22 68:8
solutions 2:6
250:23
somebody 51:10
56:2 72:13 76:16
77:2,10 80:2
93:13 109:8 242:5
soon 103:10
sorry 12:10 15:25
20:23 24:18 63:17
90:17 95:21 96:12
97:16 105:19
111:12 117:18
118:8 127:18
134:3 148:19
159:12 176:8
196:22 197:6
199:21 201:23
206:22 222:7
228:18,22 232:20

239:5
sort 37:17 74:21
sorts 118:13
sought 161:15
sound 8:9,22
source 198:22
sources 201:15
spas 47:18
speak 15:6 25:23
48:17 57:2 122:18
122:19 153:8
169:18 190:13
speaking 8:16
24:19 89:7 237:15
239:19
specialist 4:12
specific 14:3 27:16
155:19 243:23
specifically 73:8
95:23 123:14
124:6 147:22
160:17 197:17
209:2 212:4
224:24 231:10
239:22
specified 129:8,15
133:5
spectrum 149:20
150:4,8,13,19,23
speculate 190:11
236:23
speeding 75:13,18
spell 213:11
spoke 10:24 13:10
14:12 84:20 175:2
238:21
spoken 13:7
245:19
sponsor 121:9
sponsors 121:9,14
123:6

staff 37:10 39:13
39:15 55:14 56:4
122:19 124:8,9,21
126:2,5,6 142:22
150:16 153:17,23
159:9 160:4 163:2
163:21,25 181:16
219:2,12
stage 84:25 146:10
staggs 23:22 33:17
34:2
stambough 191:5
stance 169:4 223:2
223:4,10
stand 222:15
standard 87:6
99:24
standards 79:18
83:6,13,17 88:15
100:19,24 210:17
start 19:5 28:15
42:19 45:11 87:3
209:6 215:22
221:9 237:7
started 7:7 47:8
220:7 245:11
stat 223:18
state 6:22 7:8
15:14 17:21 18:7
18:11 19:13 26:9
34:8,13 40:24
42:8,18 44:13
63:6 70:5,10,12
83:4 95:5 98:20
103:15 105:21
133:11 137:12
138:3 139:2 140:6
140:9 143:10
177:10,24 178:5
204:18 212:2
228:10 248:7,13

248:18
state's 143:4,13
statement 45:23
   71:2 168:12
   169:18 188:6
   218:11,24 238:22
statements 168:17
states 1:1 5:10
   129:7
statewide 102:23
stating 11:5 156:9
station 220:5
statistics 119:9
statute 35:3 46:16
   47:3 53:24 58:23
   99:16 106:8,13
   107:20 108:24
   128:11,16 132:25
   133:5 179:5 185:5
   198:10 230:15
   231:11
statutes 58:5
   106:6 129:17
   137:13 160:10
   202:4,17 242:2
statutory 53:11
   61:8,16
stay 129:10,13
staying 35:2
stenographically
   247:12
step 203:20 211:5
stepping 140:2
steps 129:19 216:6
stipulations 113:4
stop 198:8 199:15
   226:16
street 3:5,11,17
   4:7
strictly 185:12
   237:10

strike 58:18 96:12
   97:16 103:22
   182:3 236:3
stuck 120:2
studies 41:2,6,23
sub 139:18
subchapter 126:12
   128:21
subcommittee
   63:14,17,19
subcommittees
   63:8
subject 166:5,23
   177:7 185:8
   212:21
submitted 67:23
subpoena 37:24
   38:2,3,12,19 39:5
   39:11,12,14,21
   40:2 191:15
subpoenaed 84:23
subpoints 179:8
subscribed 252:14
subsection 27:13
   35:4 40:23 98:15
   99:4,22 101:10
   104:15 109:19,22
   110:6,8 111:15
   127:23 128:23
   134:8 140:10
   178:14 187:2
   198:17
subsections 71:23
   103:18,24 107:4
   108:12 134:5
subsector 197:19
subsequently
   231:14
substance 76:22
   77:16 94:16
   112:18 114:4

substances 114:18
   114:21 128:3
sued 13:14,20
   14:15,18,22 15:4
suffering 80:4
sufficient 212:15
suing 13:23
suite 5:16
sullivan 3:4,19 6:4
   6:7,9,9 16:4
supervision
   141:12
support 166:21,25
   167:4,22 173:7
supported 206:3
   207:2,7
supports 205:20
suppose 49:24,24
   103:10
supposed 225:9
sure 8:9 9:17 10:4
   15:20 36:18 37:18
   39:9 48:25 81:13
   83:10 102:3
   113:21 125:12,12
   128:7 136:20
   144:5 149:18
   168:4 184:12,19
   185:19 188:12
   214:10 215:14
   218:21 227:5
   240:16
surgeon 33:25
   81:11 82:13 109:9
   109:9 229:22
surgeons 80:7,18
   81:2,9 82:12
surgeries 52:18
surgery 31:17,24
   52:9 79:25 80:3,9
   80:12,15 132:16

132:22 133:12,18
   135:7,18 136:16
   151:18
surgical 57:20,22
   134:9
surprising 159:13
surrender 114:15
   129:6 130:21
   131:9,13
surrounding
   183:23
suspected 74:18
suspend 89:19
   91:7,21,22,23 92:4
   92:16 97:3 108:22
   109:11 110:11
   129:9 185:17
   186:9,13
suspended 90:5,14
suspending 92:20
suspension 75:6
   89:17,22 90:9
   91:12,16,20 96:4
   97:9,14,15,18 98:6
   98:8 100:12
   115:12 129:11
   186:19 188:25
suspicion 76:7
switch 116:25
sworn 6:18,21
   247:6 252:14
sylvia 28:18
system 192:12,21
   192:25 193:3
   195:9
systems 167:12
   193:18

| t |
|---|

t 247:1,1 248:5
   251:3,3

**tab** 24:6 44:10
69:18 105:20
138:10 155:3
165:3 175:14
196:21,23 217:8
229:6
**table** 26:22 57:15
**take** 9:23,24 10:6
10:8 26:17 38:23
57:19 71:24 72:2
76:14 86:9 88:23
94:12,13 96:16
97:8,24 106:14
108:14 125:25
129:20 144:2,5
155:3 157:18
164:10 165:3,14
168:8 169:4 171:7
175:14 180:17
181:17 182:4
185:19 196:7
216:20 217:7
218:15 223:14
232:19 233:4,5
**taken** 5:6 7:13
57:25 58:9 70:23
89:3 91:2,7 92:16
111:7 144:10
145:7 146:11
168:10 173:17
187:24 196:12
231:5 233:9
247:11
**takes** 181:12 216:7
216:9 225:3
240:13 245:18
**talk** 68:21 86:3
123:11 168:2
**talked** 81:23 96:14
97:14 106:19
107:3 126:8

127:14 159:16
160:7 186:23
194:24 201:10,12
202:19 207:11
211:14,21 213:3
218:7 223:18
245:16
**talking** 89:7 93:20
208:25
**talks** 220:23
**taught** 82:15
**team** 196:18
217:10
**tech** 16:21
**technologists**
57:21
**teleconference** 2:5
**tell** 7:20 14:14
19:21 20:8 21:5
22:23 28:9 33:23
45:3 54:11,12
57:12 64:11 73:5
73:8 78:5 79:11
79:21,22 87:20
101:23 112:9
115:25 117:8
166:17 191:17
200:8 213:5
226:15
**telling** 234:17
**ten** 79:8 88:24
146:16,16 196:8
233:5
**tenure** 41:14
**term** 43:16 135:6
151:9,22 179:5
**terminology**
102:16
**terms** 88:8 110:15
111:18 192:12,20

**terrible** 171:14
177:20
**territory** 203:25
**test** 51:21
**testified** 174:21
179:12 228:9
**testifies** 6:22
**testify** 17:22 18:2
76:12 152:24
247:6
**testifying** 152:22
223:5 233:23
**testimony** 10:12
102:7 154:16
172:22 175:5
250:9,18 252:8
**tests** 105:9
**text** 156:6
**thank** 5:25 7:12
16:7 17:8 22:14
26:3 27:19 30:8
34:3 40:20 44:7
44:23 57:19 62:13
69:25 86:17 89:6
98:5 106:3 127:16
140:12 144:13
155:4,12 168:2
189:13 196:15
214:4 217:15
229:15
**thanks** 7:3
**therapists** 45:17
45:18 60:8 68:9
**therapy** 45:19
59:18 60:5,6
151:17 170:23
211:3 212:5
213:24 214:20
**thereabouts**
219:19

**thing** 8:14 38:16
75:18 183:12
**things** 8:22 36:9
40:16 64:6 82:22
94:10 98:3 103:25
154:16 180:25
194:9
**think** 15:24 16:20
23:22,23 64:5
68:10,14 74:11
77:19 81:2,9
82:11 83:15 88:22
98:4 109:7 119:3
119:22,24 126:20
127:14 136:19
144:19 146:3
149:6 156:20
169:14 174:20,21
176:16 180:24
181:7 184:4 192:9
202:21 203:16
207:13,13 215:13
228:9 230:12
233:6 234:16
236:2
**thinking** 102:2
112:8 211:13
212:25 237:6
**third** 192:18
**thought** 66:25
111:23 210:11
**thousand** 43:20
**threat** 75:3 89:23
90:4,16 109:15
**three** 21:9 37:6,12
129:9 167:8
192:19
**throwing** 27:17
**time** 9:9 10:2,6
11:25 12:2,5,20,20
14:7,17 15:19

41:16 44:21 49:12
55:4,6 62:5,9
71:24 83:25 88:23
106:14,16 128:13
129:8,15 144:6
151:25 156:20
159:22 166:10
176:3,4 185:14
194:20,21,23
196:19 219:7,16
247:13 250:19
**timeframe** 112:25
250:8
**times** 7:15 73:6,23
75:25 122:3
173:23 210:12
238:16
**timothy** 32:25
**title** 26:9 29:25
31:2,10 197:20
**titled** 126:11,12
218:3
**today** 7:6 10:12,15
10:21 11:6 12:17
13:9,12 120:12
137:16
**told** 13:19 118:17
133:16
**tomorrow** 182:13
**top** 60:10 97:21
98:2 112:17
119:24 156:24
184:5 197:8
**topic** 46:17 49:23
152:24 153:4
160:11 162:13
191:12
**topics** 11:12 17:23
18:3 51:16 190:23
233:22

**total** 21:2
**touched** 126:20
215:13
**training** 19:16,18
22:17
**transcript** 8:12
247:11 250:6,20
252:5,8
**transgender** 218:4
229:24 232:3,24
245:23
**transition** 162:21
171:24 177:5
178:17 222:11
**treasurer** 30:13
31:4
**treat** 138:4 140:19
143:12 147:15
148:8 149:17
151:18 207:16
208:3 232:2
**treating** 140:23
199:14 224:2
226:14
**treatment** 81:5
109:10 115:17,19
116:16,20,23
126:14 128:2
136:22 137:3,7,14
138:13 139:5
141:8,20 143:4
149:10 170:3
172:11 174:3,23
187:15 189:20
190:19 198:7,20
199:11,16 202:22
203:6,21,24
204:10 205:13,18
205:20 206:2,18
206:24 208:23
209:4,6 210:6

220:24 221:5
223:22 224:5
234:25 235:14,19
236:6 237:2,9
241:20,21 242:19
248:22
**treatments** 148:25
171:9,17 172:10
203:11 207:5
209:8,21 210:2
212:17
**trials** 207:3,8
**tried** 37:17
**trouble** 149:5
**true** 50:6 171:6
210:21 247:10
252:8
**truth** 247:7,7,8
**truthfully** 37:11
109:6 130:11
202:15
**try** 8:16,21,24
9:15 16:5 38:24
60:23 61:3 90:18
189:15
**trying** 82:11
107:14 109:7
125:8 178:20
226:14 227:12
**tuesday** 166:2
**turn** 26:20 71:9,16
94:25 197:2
**two** 8:21 21:11
23:14,24,25 27:24
75:18 120:17,23
142:9 190:25
192:19 225:15,18
242:2
**type** 70:16 75:8
179:2 205:7 215:4

**typed** 9:7
**types** 43:21 96:11
97:19
**typical** 122:7,11
235:20,23
**typically** 124:10

**u**

**u.s.** 196:2 230:25
**ultimately** 153:22
169:13
**unapproved**
141:13
**undergo** 174:19
182:6 203:5,15
**undergoing** 237:2
**underneath**
118:16
**understand** 9:6,12
11:8 17:19 18:10
27:4,23,24 34:6
36:19 46:2,24
51:24 52:7 62:17
65:10 68:23 70:4
71:17 72:6 75:7
81:13 84:20 86:10
100:11,13 101:15
102:6 107:15
125:21 128:14
132:18 136:21
138:2 140:3
142:25 143:9
145:4 154:15
156:23 175:4
177:12 178:20
184:20 185:20
188:13 214:11
223:15 226:15
227:6 229:21
241:12 242:12,13
**understanding**
11:10 37:9 48:18

48:21 49:7,8
58:15 61:10,14,20
63:12 128:19
151:8,20 161:23
178:25 199:9
206:22,24 209:14
224:18 231:24
241:22
**understood** 9:22
27:19 37:18 61:22
62:13 74:5 77:19
77:24 117:19
123:22 215:8
223:12 240:17
**unethical** 103:25
107:10
**union** 3:10,15
**united** 1:1 5:10
129:6
**universe** 104:11
105:14
**unpack** 46:13
**unphysician** 82:3
**unprofessional**
95:13 99:3,4,10,15
106:21,22 107:4,9
107:19 108:12,23
177:6 178:18,24
179:3,9 185:2
186:24 187:3,6,18
188:9 224:13
**unrelated** 237:16
**unsafe** 115:18
**unwritten** 79:9
**updated** 141:6
**updating** 102:24
**upload** 25:2,8,12
**uploaded** 15:21
**uploading** 15:25
24:24 25:16
217:13

**ups** 13:10
**use** 36:2,9 79:5,25
82:3 93:12 100:21
115:9,19 131:24
137:21 138:3,12
139:3 140:17,18
141:7,13,14 143:3
143:6,11 144:21
148:15 151:22
193:18,22,24
194:18 208:2
209:13 230:22
248:20
**usual** 128:5 182:9
**usually** 42:23
51:12 55:13 68:5
74:13,20,23 80:23
81:7,14 89:16
91:13 93:8 97:22
174:5 187:22
209:18

**v**

**v** 1:9
**vague** 234:8
**valid** 34:11 190:19
**variety** 86:5
183:11
**various** 43:21,21
63:20 67:16
133:17 216:6
**verbally** 9:5,9
**verify** 250:9
**veritext** 2:5 5:19
5:22 250:14,23
**veritext.com.**
250:15
**version** 65:24
136:19
**versus** 5:9
**veryl** 29:15

**vestal** 229:9,20
231:14 249:9
**veto** 169:18,19
218:8,10,11,23,24
**vetoed** 169:12,24
218:3 219:4,8
220:12
**vice** 29:10
**video** 4:12 5:2
**videoconference**
1:15
**videographer** 5:1
5:20 6:17,25
16:12 17:2,6
88:25 89:4 143:25
144:8,11 196:10
196:13 233:7,10
246:13
**videotape** 2:3 5:5
**videotaped** 1:16
**view** 118:22
123:23 124:24
165:21 170:2
204:14,24 205:6,9
226:22 228:21,22
229:3,4 243:13
**views** 170:17
244:5,9,13
**violate** 129:20
242:7
**violated** 108:10
**violating** 187:13
224:4
**violation** 83:4,10
83:19 85:23 86:12
86:19,22 87:24
88:6,10,16 90:21
92:2 101:11
103:17 106:23
107:21 108:13,17
110:25 146:24,25

147:9,19 148:9
182:12 183:19
184:3,7,14,22
188:19,24 189:25
190:20 199:10,25
201:7 232:11
233:2 244:21
**violations** 70:20
70:22 75:13
101:17,19 102:13
104:2,7,11 105:15
107:11 129:17
**virtually** 2:4
**voice** 243:20
**voiced** 243:23
**voluntarily** 129:6
**vote** 48:13 56:21
64:22 65:3,11,25
92:2 115:14
183:24
**voted** 48:13 63:5,7
67:5 215:11
**votes** 37:22 55:18
186:2
**vs** 250:4 251:1
252:1

**w**

**w** 166:23
**wait** 8:25
**want** 22:19 36:18
46:13 55:9 68:21
81:13 87:3,12,13
88:12 97:23
101:25 116:25
124:23 131:5
136:20 140:10
174:24 175:2
188:12,20 190:13
196:16 197:14,16
197:17 214:10
215:14 223:12

**wanted** 47:24
    125:7 198:16
**wanting** 125:23
**wants** 141:17
**warner** 166:20
**washington**
    217:18 218:2
    249:6
**watch** 200:6
**way** 9:16 20:5
    72:10,23 83:12
    93:12 94:21 96:25
    102:15 142:8
    151:6 163:13
    173:10 212:5
    213:12 227:15
    235:2 239:18
**ways** 73:9 74:6
    227:7
**we've** 23:23 31:12
    78:7,8 83:25
    86:10,11 93:20
    98:18 113:24
    178:9 201:12
    217:24 237:4
**web** 1:15
**website** 44:14 45:6
    64:17 69:12 70:6
    139:19 176:11
    248:14
**weekly** 156:17
**weighing** 143:22
**weight** 68:18
    135:5,6
**welcome** 144:13
**welfare** 70:12
    72:11
**went** 80:16 109:8
    117:14,16,16
    182:13 241:3

**west** 3:17,22 5:15
**william** 33:17
**withdraw** 187:9
    187:11
**withdrawing**
    172:10 187:15
    188:7 189:20
    190:19
**witness** 6:18 16:15
    25:15 216:23
    221:19 244:9
    248:2 250:8,10,12
    250:19
**witnesses** 76:12,12
**witnessing** 237:11
**wondering** 111:25
**words** 28:10
    100:16 142:3
**work** 20:2 35:20
    36:22 37:3,21
    43:18 44:8 56:13
    59:11 71:4 86:6
    180:18
**worked** 19:12 37:5
    37:8 60:11,16
**working** 25:6
    84:22
**workplace** 194:15
**works** 20:4 36:19
    180:22
**wow** 196:6
**wrap** 84:5
**write** 11:25 39:21
    65:11
**writes** 38:20 39:11
    39:14 80:2
**writing** 14:17,21
    77:3 125:15
    230:23 231:2
**written** 10:17 79:7

**wrong** 80:16 97:17
    102:2 127:17
**wrongdoing** 71:13
    71:19 90:20

| x |
| --- |

**x** 1:5,12 113:12
    118:21 248:1,5
**xi01165** 2:8

| y |
| --- |

**y** 6:20,20 113:12
    118:21 133:13
    166:23
**yay** 56:21
**yeah** 24:25 211:20
    222:9 244:15
**year** 35:15 110:13
    120:17 166:11
    168:5 220:20
    230:8
**years** 73:25
    120:17,23 142:9
    142:16 177:6
    178:18 216:11
**yesterday** 12:4
**york** 3:6,6,12,12
**youth** 218:5
    220:24 222:6,13
    234:21

| z |
| --- |

**z** 113:12 118:21
**zoom** 2:4 121:11
    194:10

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.