## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## CENTRAL DIVISION

```
- - - - - - - - - - - - - - - - - - - - - - - - x
DYLAN BRANDT, et al.,                :
                      Plaintiff,     :
            v.                       :     Case No. 4:21-CV-00450-JM
                                     :
LESLIE RUTLEDGE, et al.,             :
                                     :
                      Defendant.     :
                                     :
- - - - - - - - - - - - - - - - - - - - - - - - x
```

## BRIEF IN SUPPORT OF MOTION TO EXCLUDE EXPERT TESTIMONY OF MARK REGNERUS

Plaintiffs challenge a law banning gender-affirming medical procedures to treat adolescents with gender dysphoria. They argue that the challenged law prohibits treatments that, based on scientific research and decades of clinical experience, are widely recognized in the medical community as safe and effective. Plaintiffs also allege that by cutting off patients' access to needed care, the challenged law would cause serious harms to the minor plaintiffs and transgender adolescents throughout Arkansas. *See*, *e.g.*, Mem. Supp. Pls.' Mot. Prelim. Inj. 40–43, 57–61, ECF No. 12. To defend the law, the State asserts an interest in protecting minors from what it contends are unnecessary, harmful, and experimental treatments that, they claim, lack evidence of effectiveness. *See*, *e.g.*, Defs.' Combined Br. Opp'n Pls.' Mot. Prelim. Inj. 1–2, 34, ECF No. 44. At trial, the Court will be tasked

with resolving factual disputes regarding medical treatments for adolescents with gender dysphoria, which will largely turn on expert testimony.

One of the States' proposed expert witnesses, Prof. Mark Regnerus, offers opinions on a host of medical issues concerning treatments for gender dysphoria—including the state of the research regarding the efficacy of medical treatments for the condition, the actual practices of medical providers in this field, and the ability of minors to consent to the medical interventions prohibited by the state under the Act.  But Prof. Regnerus lacks the qualifications necessary to offer those opinions.  He is trained exclusively in sociology.  According to his profile at the University of Texas, he conducts research "in the areas of sexual behavior, family, marriage, and religion."[1]  By his own admission, Prof. Regnerus has no experience or academic training in medicine, mental healthcare, or the treatment of gender dysphoria.  And he candidly acknowledges that transgender people have never been a focus of his research.

Prof. Regnerus also opines that the medical organizations, providers, and researchers that support, provide and research medical interventions for gender dysphoria are acting based on ideology rather than science.   But these opinions rest

---

[1]    Univ.  of  Texas  at  Austin,  Dep't  of  Sociology,  Mark  Regnerus, https://liberalarts.utexas.edu/sociology/faculty/mdr93  (last accessed June 20, 2022).

on the same medical opinions Prof. Regnerus lacks the qualifications to offer, in addition to anecdotes and unscientific commentary.

Federal Rule of Evidence 702 ensures that expert witnesses opine only on subjects within their field, and that their opinions are based on facts and reliable methodology. Prof. Regnerus has failed to clear that hurdle. His testimony should be excluded in its entirety.

## LEGAL STANDARD

Federal Rule of Evidence 702 places a special "gatekeeping role" on district courts. *Daubert* v. *Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993). To be admissible under Rule 702, expert testimony must satisfy three requirements: "First, evidence based on scientific, technical, or other specialized knowledge must be useful to the finder of fact in deciding the ultimate issue of fact"; "Second, the proposed witness must be qualified to assist the finder of fact"; "Third, the proposed evidence must be reliable or trustworthy in an evidentiary sense, so that, if the finder of fact accepts it as true, it provides the assistance the finder of fact requires." *Lauzon* v. *Senco Prods., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001) (citing *Daubert*, 509 U.S. at 591). "The proponent of the expert testimony must be able to prove its admissibility by a preponderance of the evidence." *Id.* (citing *Daubert*, 509 U.S. at 592).

One of *Daubert's* most important functions is ensuring that witnesses do not speak on matters that go "beyond the expert's expertise." *Am. Auto. Ins. Co.* v. *Omega Flex, Inc.*, 783 F.3d 720, 724 (8th Cir. 2015) (citing *Weisgram* v. *Marley Co.*, 169 F.3d 514, 520–521 (8th Cir. 1999)); *Khoury* v. *Philips Med. Sys.*, 614 F.3d 888, 893 (8th Cir. 2010). "The trial judge must determine whether the testimony has a reliable basis in the knowledge and experience of the *relevant discipline*." *Smith* v. *Rasmussen*, 249 F.3d 755, 758 (8th Cir. 2001) (emphasis added) (quoting *Kumho Tire Co., Ltd.* v. *Carmichael*, 526 U.S. 137, 149 (1999)). Accordingly, courts must exclude testimony whenever the witness is "not well-versed in the particular discipline relevant to their testimony." *Id.* at 759.

Even when a witness is testifying within the bounds of their expertise, the court must separate "expert opinion evidence based on 'good grounds' from subjective speculation that masquerades as scientific knowledge." *Pressley* v. *Lakewood Eng'g and Mfg. Co.*, 553 F.3d 638, 643 (8th Cir. 2009) (quoting *Glastetter* v. *Novartis Pharm. Corp.*, 252 F.3d 986, 989 (8th Cir. 2001)). If the testimony consists only of "vague theorizing based on general principles," it should be excluded. *Pro Serv. Auto., L.L.C.* v. *Lenan Corp.*, 469 F.3d 1210, 1216 (8th Cir. 2006).

**ARGUMENT**

**I.**    **PROF. REGNERUS IS NOT QUALIFIED TO OPINE ON MEDICAL ISSUES CONCERNING THE TREATMENT OF ADOLESCENTS WITH GENDER DYSPHORIA**

Under *Daubert*, experts may opine only on matters within their own field of expertise. *See Am. Auto. Ins. Co.*, 783 F.3d at 724; *Khoury*, 614 F.3d at 893. Prof. Regnerus's report offers a range of opinions about medical issues concerning the treatment of adolescents with gender dysphoria that go well beyond his qualifications. Although he may believe that his training in the field of sociology qualifies him to opine on research from other disciplines, *Daubert* requires a meaningful connection between an expert's knowledge and the opinions offered at trial. *See Smith*, 249 F.3d at 758. That connection is completely absent here.

**A.**    **Prof. Regnerus Lacks Any Qualifications in Medical Care, Mental Health, Gender Dysphoria, or Transgender People.**

Prof. Regnerus's expertise is exclusively in sociology. He has a Bachelor's degree, Master's degree, and PhD in Sociology. Since entering graduate school, he has worked only in sociology as a professor at UT Austin and Calvin College. He has published four books and dozens of peer-reviewed articles on sociological questions. He teaches only sociology courses, and routinely appears to discuss sociology at academic conferences. When asked to describe his "major areas of research," Prof. Regnerus listed "relationship behavior, sexual decisionmaking, . . . sexuality and family formation, marriage, and . . . sociology of

religion," all of which are sociological subjects. *Exhibit 4* – Deposition of Mark Daniel Regnerus, Transcript 44:3–6 ("Dep. Tr.").

By his own admission, Prof. Regnerus has no training or experience in medical care or mental health. *Id.* at 40:16–41:9. During his deposition, he acknowledged that he has never worked in a clinical setting and does not consult with healthcare providers as part of his work. *Id.* at 58:17–20. Prof. Regnerus has not written any peer-reviewed works concerning the effectiveness of medical or mental health treatments, nor does he teach courses on those subjects. *Id.* at 43:12, 52:22–53:1.

Prof. Regnerus's professional experience related to gender dysphoria and transgender people is similarly lacking. His education did not include instruction on "transgender healthcare or [gender] dysphoria," *id.* at 42:9, and he does not teach courses related to gender identity, *id.* at 54:25–55:2. He admitted that transgender people have never been the primary subjects of his work, *id.* at 49:23–50:3, and that he does not know how to diagnose or treat gender dysphoria, *id.* at 100:4–6, 101:23–102:1. His only peer-reviewed work focusing on transgender people in any way is about popular attitudes towards gender-affirming medical interventions. In other words, it is a paper analyzing the personal views of non-medical experts, the vast majority of whom are not transgender. *Id.* at 47:12–17. That work did not study the effectiveness of treatments for gender dysphoria, nor

did it engage with medical research in any way.  *Exhibit 1* – Declaration of Mark Regnerus ¶ 56 ("Regnerus Report") (discussing Mark Regnerus & Brad Vermurlen, *Attitudes in The U.S. Toward Hormonal and/or Surgical Interventions for Adolescents Experiencing Gender Dysphoria*, 51(4) Archives of Sexual Behavior 1891 (2022)).

Put simply, Prof. Regnerus lacks any training or experience that would qualify him to speak on healthcare generally or the treatment of gender dysphoria in particular.  When asked if it "would be fair to say you don't have academic training, professional experience, or peer-reviewed scholarship related to the efficacy of treatment for gender dysphoria," Prof. Regnerus candidly replied: "True."  *Exhibit 4* – Dep. Tr.  73:23–74:3.

**B.    Prof. Regnerus's Opinions On Medical Issues Concerning The Treatment of Adolescents With Gender Dysphoria Must be Excluded.**

Despite Prof. Regnerus's lack of qualifications concerning medical science, mental health, or the treatment of gender dysphoria, his report is filled with assertions about (1) the research on the efficacy of gender-affirming medical interventions, *Exhibit 1* – Regnerus Report ¶¶ 46-77, (2) the types of research that ought to be conducted about the efficacy of gender affirming medical treatment, *id*. ¶¶ 70–77, (3) the current practices of medical providers treating adolescent patients for gender dysphoria, *id*. ¶¶ 98–99, (4) the ability of minors to give informed consent

to medical care, *id*. ¶¶ 120–122, and (5) the connection between adolescent gender dysphoria and suicidality, *id*. ¶¶ 150–162.   These claims are well outside Prof. Regnerus's sociological training and experience, and therefore inadmissible under Rule 702.   *See Khoury*, 614 F.3d at 893 (holding that expert witnesses cannot opine on topics for which they lack any "training, education, or experience").

1. *Opinions about research on the effectiveness of gender-affirming medical care:*   Prof. Regnerus offers a host of opinions about medical research standards.  He devotes an entire section of his report to critiquing existing research that demonstrates the effectiveness of gender-affirming medical care.  *Exhibit 1 – Regnerus Report* ¶¶ 45–69.   Throughout these discussions, Prof. Regnerus repeatedly draws conclusions about individual medical studies measuring the effectiveness of hormonal or surgical treatments for gender dysphoria.  *See, e.g., id*. ¶ 57 (stating his view that "a cursory reading of [a medical research study] tells a far less optimistic story than the author's own confident interpretations of the post-surgical data.").  And he offers his own views on whether existing medical research shows that gender-affirming medical care benefits patients—going so far as to suggest that his own calculations regarding the efficacy of gender-affirming surgery should "ha[ve] ramifications for the treatment of adult and adolescent patients alike." *Id*. ¶¶ 57–60.

As discussed above, Prof. Regnerus lacks any qualifications in medical care or medical research in general, or the treatment of gender dysphoria specifically. Indeed, during his deposition, he acknowledged that he does not know basic facts about medical care, including facts that would be relevant to his assessment of the state of the science on gender-affirming medical care. For example, despite claiming in his report and during his deposition that any off-label use of drugs is "experimental," *Exhibit 1* – Regnerus Report ¶ 70, Prof. Regnerus was unaware of the fact that off-label use of drugs is very common in medicine, as Defendants' medical experts recognized, *Exhibit 4* – Dep. Tr. 276:18–20 (admitting that he did not know how common it was for drugs to be used for off-label purposes); *see Exhibit 6* – Levine Dep. Tr. 250:14–19; *Exhibit 5* – Hruz Dep. Tr. 337:14–18. He also explained that his opinions about how doctors should treat patients when data is uncertain were based only on his "observations of what goes on in the world" and his own "experience with healthcare," rather than "any kind of comprehensive survey" or "scientific study." *Exhibit 4* – Dep. Tr. 203:22–204:4.

2. *Opinions about research that should be performed:* Prof. Regnerus asserts that medical researchers assessing treatments for gender dysphoria should be conducting randomized controlled trials to evaluate the efficacy of that care. *Exhibit 1* – Regnerus Report ¶¶ 70–77. His report attacks the so-called "gender medicine industry" for disagreeing with him about the ethics of randomized

controlled trials in this context, and accuses medical providers of "complicity" and "near lawlessness" for treating patients without first conducting the trials he believes to be necessary. *Id*. ¶¶ 72–76.  Despite these broad assertions, Prof. Regnerus stated during his deposition that "it's tough to see [how such a trial would] work in reality," *Exhibit 4* – Dep. Tr. 179:14–15, and acknowledged that he does not know how common it is in medicine for drugs to be used without randomized controlled trials demonstrating effectiveness, *id*. at 276:14–17.  Again, he lacks qualifications to opine on medical research.

        3. *Opinions about how care is currently provided to adolescents with gender dysphoria:*  Dr. Regnerus claims that healthcare providers treating patients for gender dysphoria are failing to follow the guidance of professional organizations. Specifically, he opines that many clinics are failing to conduct psychological assessments before providing care to minors.  *Exhibit 1* – Regnerus Report ¶¶ 98–99; *Exhibit 2* – Rebuttal Report ¶ 3.  When asked to explain the basis for that opinion, Prof. Regnerus confirmed that it was "entirely based on . . . public commentary in newspapers and magazines." *Exhibit 4* – Dep. Tr. 247:1–3.  He testified that he did not know "how care is provided at any clinics in Arkansas," *id*. at 244:23–245:1, and had never "observed care being provided in an American clinic," *id*. at 240:19–21. When asked if he could "name any clinic that is not providing psychological assessments before providing care," Prof. Regnerus replied, "No.  But nor can I

name, you know, clinics who are." *Id*. at 242:20–24.   As discussed above, Prof. Regnerus lacks qualifications to opine on the treatment of gender dysphoria.

       4.   *Opinions about adolescents' ability to consent to care:* Prof. Regnerus repeatedly offers opinions on the psychological capacity and mental health of transgender adolescents.   Much of his report discusses research on the ability of teenagers to provide informed consent to medical interventions.   *See, e.g.*, *Exhibit 1* – Regnerus Report ¶¶ 120–122; *see also Exhibit 4* – Dep. Tr. 254:3–9 (testifying that one of his "beefs with this practice" is the "fundamental ability to have informed consent as a 13-year-old about something that you have not experienced").   His report lays out his own assessment of that topic, claiming that adolescents have a "questionable ability to consent." *Exhibit 1* – Regnerus Report ¶ 172.   As with his other views on medical issues, Prof. Regnerus has no training or experience that would qualify him to offer these views.   In addition, he testified that he has no "first-hand experience with the way clinics obtained informed consent" and does not know how clinics in Arkansas do so. *Exhibit 4* – Dep. Tr. 296:20–24. When asked to explain the "basis for [his] views on the informed consent process for minors," Prof. Regnerus responded that his knowledge on the topic came "[f]rom people's description of it, from you know, the [Plaintiffs'] expert witnesses." *Id*. at 284:5–15.

5. *Opinions about the relationship between gender dysphoria and suicidality*:   Prof. Regnerus questions whether gender dysphoria causes increased suicide and suicidality among transgender adolescents.   *See*, *e.g.*, *Exhibit 1 –* Regnerus Report ¶ 158 ("The evidence for actual suicide risk among gender dysphoria minors is simply unclear.").   Throughout his discussion of this topic, he offers opinions about the research on the psychological causes of suicide, and the additional research that he believes would be needed to demonstrate a link between gender dysphoria and suicide.  *Id*. ¶ 160 ("In the absence of data analyses that can control for the effects of other confounding and contributing factors, it becomes very difficult to establish that gender dysphoria is a solitary or primary driver of suicidality.").  Once again, Prof. Regnerus lacks the training necessary to evaluate psychological research and has no experience with the diagnosis or treatment of mental health conditions.

Rule 702 requires that experts be "well-versed in the particular discipline relevant to their testimony." *Smith*, 249 F.3d at 759.  Here, Prof. Regnerus opines on various medical issues concerning the treatment of gender dysphoria, while lacking the qualifications necessary to make him "well-versed" on those subjects.  Prof. Regnerus is not a doctor, does not work in the field of healthcare, has never worked in or observed medical clinics, and has never published research on the effectiveness of medical treatments of any kind, let alone treatments for gender

dysphoria. The complete disconnect between Prof. Regnerus's qualifications and his opinions renders his testimony inadmissible under *Daubert* and Rule 702.

### C.     General Training in Social Science Does Not Qualify an Expert to Speak on Scientific Research Outside Their Field.

Prof. Regnerus believes that he is qualified to opine on medical research because of his knowledge regarding "basic methodological matters." *Exhibit 1 – Regnerus Report* ¶ 3. According to Prof. Regnerus, his sociological training qualifies him to speak to the state of the academic literature in many other disciplines, including medical science, economics, or other social sciences. *Exhibit 4 –* Dep. Tr. 121:13–16 (agreeing with the statement "you don't need expertise or training in a particular scientific field to evaluate the quality of the science in that field").

Rule 702, however, is not satisfied simply because an expert has knowledge in some general subject unrelated to the parties' actual dispute. *See Khoury*, 614 F.3d at 893 (holding that even when an expert has "ability or expertise" in one field, his testimony must be excluded when he lacks "training, education, or experience" relevant to the issues in the case). Even when an expert is unquestionably qualified in certain subjects, his testimony must be excluded if those qualifications do not extend to the specific subject matter at issue. *See Am. Auto.*, 783 F.3d at 723 (affirming a district court that limited the testimony of an expert with a "thirty-year academic career, [who] had published hundreds of articles on

metallurgy and arc physics," because he lacked specific qualifications related to "product design and warnings"); *Wheeling Pittsburgh Steel Corp.* v. *Beelman River Terminals, Inc.*, 254 F.3d 706, 715–716 (8th Cir. 2001) (reversing a district court that permitted an expert that was well-qualified in one area to testify on matters beyond his expertise).

The Eighth Circuit has confronted this very problem in a case involving medical treatments for gender dysphoria. In *Smith* v. *Rasmussen*, an adult Medicaid recipient sued the Iowa Department of Human Services when the agency denied insurance coverage for a surgical treatment for gender dysphoria. 249 F.3d 755 (8th Cir. 2001). To justify its decision, the agency put forward the testimony of "an experienced, board-certified general psychiatrist, who has treated several patients with sexual disorders," to opine on "the effectiveness and necessity of sex reassignment surgery." *Id*. at 758. In excluding the expert's testimony on those topics, the district court cited the expert's lack of "expertise in the *specialized discipline of gender identity disorder*." *Id*. at 758–759 (emphasis added) (referring to a diagnosis that preceded gender dysphoria). The Eighth Circuit unanimously affirmed that ruling. If the expert in *Smith* was not close enough to the bullseye to offer an opinion on the efficacy of gender-affirming care, then Prof. Regnerus is not even on the board.

-14-

Prof. Regnerus has acknowledged that different academic fields use different research standards.  He has previously testified about the different research standards applied in sociology and psychology.  *Exhibit 8* – March 4, 2014 Trial Tr. 14:2–6, *Deboer* v. *Snyder*, No. 12-10285 (E.D. Mich. Mar. 4, 2014).  He also stated during his deposition that medical researchers employ different standards than sociological researchers. *Exhibit 4* – Dep. Tr. 120:8–13.[2]  Prof. Regnerus's own statements illustrate why the Eighth Circuit has repeatedly held that advanced training in one discipline does not qualify an expert to speak on unrelated topics.

Prof. Regnerus's asserted expertise in "basic methodological matters" is the only qualification he has offered to support his specific opinions on medical research and the effectiveness of treatments for gender dysphoria. *Exhibit 1* – Regnerus Report ¶ 3.  Under the principles long applied in this Circuit, that is not enough.

---

[2] In *DeBoer*, Prof. Regnerus opined that psychological research showing that children raised by same-sex parents fared no differently than children raised by opposite-sex parents was methodologically flawed, and that the views of major medical organizations recognizing that conclusion could not be trusted.  *Exhibit 7* – March 3, 2014 Trial Tr. 29–32, *Deboer*, No. 12-10285.  He admitted on cross-examination that the research standards used in his field of sociology are different than the standards used in psychological research.  *Exhibit 8* – March 4, 2014 Trial Tr. 13:13–14:22, *Deboer*, No. 12-10285.  The district court ultimately decided that his testimony was not credible.  *See DeBoer* v. *Snyder*, 973 F. Supp. 2d 757, 765–766 (E.D. Mich. 2014).

## II.  PROF. REGNERUS'S OPINIONS ABOUT "IDEOLOGICAL CAPTURE" SHOULD ALSO BE EXCLUDED

Prof. Regnerus opines that the "clinical discussion of gender dysphoria has recently become unmoored from empirical assessments," and has been "captured" by "advocates for what is sometimes called 'gender ideology.'" *Exhibit 1* – Regnerus Report ¶ 78.  Throughout his discussion of that topic, he claims that organizations, doctors, and researchers who support, provide, and research gender-affirming medical care are acting based on ideology rather than science.  But Prof. Regnerus's opinion about "ideological capture" rests on medical opinions he is not qualified to offer.

Prof. Regnerus concludes that ideology is at play only after determining, in his view, that the medical research shows that gender-affirming medical interventions are not effective, *Exhibit 1* – Regnerus Report ¶ 86; that minors cannot consent to such treatment, *id.* ¶ 127; and that treatment is provided on demand, without proper evaluation of patients, *id.* ¶ 98.   Given his assessment of these medical issues related to the treatment of gender dysphoria, it is not surprising that he would look for other factors, besides science, that explain the widespread acceptance of medical interventions to treat gender dysphoria.

Indeed, Prof. Regnerus recognizes that his opinion about ideological capture is inextricably intertwined with his views about medical research:

> That any purported 'consensus' on hormonal and surgical interventions at earlier ages should have developed so rapidly among American professional associations—and with so much projected confidence—*in the absence of obvious, consistent indicators of treatment efficacy*, and amid a surge in cases of gender dysphoria, is suspicious.

*Exhibit 1* – Regnerus Report ¶ 86 (emphasis added).  As that passage demonstrates, Prof. Regnerus's claim that "American professional organizations" are in the thralls of "ideological capture" is entirely dependent on his belief that those organizations have reached a conclusion about the state of medical science that differs from his own; because he thinks there is an "absence of obvious, consistent indicators of treatment efficacy," everyone who doesn't must be acting based on ideology rather than science.

As discussed in point I, *supra*, Prof. Regnerus is demonstrably unqualified to offer expert opinions on medical issues related to the treatment of gender dysphoria, including whether medical research shows that gender-affirming medical care is effective, how this care is provided, and whether adolescents are able to consent to the care.  Because Prof. Regnerus is not qualified to offer expert opinions on the host of medical issues that underlie his views on "ideological capture," he should not be permitted to testify about his conclusions that necessarily depend on these medical judgments.  For this reason alone, Prof. Regnerus's testimony related to ideological capture should be excluded.

Prof. Regnerus's opinion that ideological capture is at work with respect to support for gender-affirming medical care also relies on a number of unsupported and unreliable factual claims that should be rejected. *See Pro. Serv. Auto. LLC*, 469 F.3d at 1216 ("In the absence of any record evidence that [the expert] used reliable principles and methods or applied them reliably to the facts of this case to form his opinion, his causation opinion does not satisfy the Rule 702 standards for admissibility."); *Grp. Health Plan, Inc.* v. *Philip Morris USA, Inc.*, 344 F.3d 753, 760 (8th Cir. 2003) (rejecting expert testimony that "entail[ed] a great deal of speculation").

First, Prof. Regnerus's report includes a number of claims about doctors and researchers. He accuses doctors who provide gender-affirming medical care of rushing minors into care without appropriate psychological assessment and providing such care "on demand." *See, e.g.*, *Exhibit 1* – Regnerus Report ¶¶ 96–99; *Exhibit 2* – Rebuttal Report ¶¶ 3, 12, 13. And he accuses researchers of ignoring important research questions, such as transition regret or the demographics of youth identifying as transgender, for ideological reasons. *See, e.g.*, *Exhibit 1* – Regnerus Report ¶ 45 (claiming that researchers are not interested in understanding the purported shift in the number of youth identifying as transgender); *id.* ¶ 109 (asserting that "[t]ransgender activists and their allies in the professions have sought to minimize the experiences of people who regret their transition").

-18-

Prof. Regnerus fails to back up these bold claims with any reliable evidence.  Instead, on topic after topic, he makes extraordinary claims that rest entirely on anecdotes or unadorned speculation.  His claims about the nationwide practices of gender-affirming care providers are based on nothing more than "commentary" and the alleged practices of two clinics.  *Id*. ¶ 97–99; *Exhibit 4* – Dep. Tr. 243:20–22.  When pressed to explain his views, Prof. Regnerus admitted that he had no firsthand knowledge of how clinics provide gender-affirming medical care or how common it is for clinics to provide treatment in the manner he describes. *Exhibit 4* – Dep Tr. 240:19–21, 43:7–10 (when asked at deposition the basis for his statement in his report that psychological assessments of patients are "hardly occurring," he said "I should have said it is unclear in its frequency.").  And despite Prof. Regnerus's claims that researchers are ignoring important topics like transition regret or the changing demographics of young identifying as transgender, *Exhibit 1* – Regnerus Report ¶¶ 45, 109, his own report cites recent scholarship by one of Plaintiffs' experts on the subject of transition regret, *id.* ¶ 111 (citing Dr. Turban's 2021 study on detransitioners), while ignoring the discussion of the increase in referrals to gender clinics and the sex ratios of those young patients contained in the most recent draft of WPATH's standards of care, *see Exhibit 3* – Karasic Rebuttal Report ¶ 19.

Second, Prof. Regnerus claims that ideological bias is driving the work of major medical organizations that provide guidance on gender affirming medical care, like the Endocrine Society and WPATH. Yet his report is bereft of any analysis distinguishing the Endocrine Society or WPATH from the dozens of comparable organizations that exist throughout the medical community to develop best practices for treatment and advocate on behalf of their patients.

These opinions offered by Prof. Regnerus are "subjective speculation that masquerade[] as scientific knowledge." *Glastetter*, 252 F.3d at 989. In addition to resting on medical opinions he is not qualified to offer, Prof. Regnerus's views on "ideological capture" "entail[] a great deal of speculation [and] involve[] inferences that approach leaps of faith." *Grp. Health Plan*, 344 F.3d at 760. "Where opinion evidence is connected to existing data only by the *ipse dixit* of the expert, a district court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Pro Serv. Auto.*, 469 F.3d at 1215. That result is appropriate here, as Prof. Regnerus's report is devoid of any analysis that would close the gap between his sweeping opinions and the limited facts he offers in support. This is an additional reason Prof. Regnerus's testimony about ideological capture should be excluded.

## CONCLUSION

Prof. Regnerus's testimony does not reflect the "scientific, technical, or other specialized knowledge" that would make it "useful to the finder of fact." *Lauzon*, 270 F.3d at 686.  His opinions concerning medical issues related to the treatment of adolescents with gender dysphoria are well outside his area of expertise, and his opinions concerning ideological capture rely on those opinions he is not qualified to offer, in addition to unsupported assertions.  Because Prof. Regnerus is unqualified to offer the opinions in his report, and has failed to base opinions on "good grounds," *Glastetter*, 252 F.3d at 988–89, his testimony should be excluded in its entirety.

Dated:  June 22, 2022

*/s/ Leslie Cooper*
Leslie Cooper
Chase Strangio*
American Civil Liberties Union
Foundation
125 Broad St.
New York, NY 10004
Telephone:  (917) 345-1742
lcooper@aclu.org
cstrangio@aclu.org
*Attorneys for the Plaintiffs*

Beth Echols, Ark. Bar No. 2002203
Christopher Travis, Ark. Bar No. 97093
Drake Mann, Ark. Bar No. 87108
Gill Ragon Owen, P.A.
425 W. Capitol Avenue, Suite 3800
Little Rock, AR 72201
Telephone:  (501) 376-3800
echols@gill-law.com
travis@gill-law.com
mann@gill-law.com
*On behalf of the Arkansas Civil Liberties Union Foundation, Inc.*
*Attorneys for the Plaintiffs*

Breean Walas, Ark. Bar No. 2006077
Walas Law Firm, PLLC

Sarah Everett, Ark. Bar No. 2017249
Gary Sullivan, Ark. Bar No. 92051

P.O. Box 4591
Bozeman, MT 59772
Telephone:  (501) 246-1067
breean@walaslawfirm.com
*On behalf of the Arkansas Civil
Liberties Union Foundation, Inc.*
*Attorneys for the Plaintiffs*

Arkansas Civil Liberties Union
Foundation, Inc.
904 W. 2nd Street
Little Rock, AR 72201
Telephone:  (501) 374-2842
sarah@acluarkansas.org
gary@acluarkansas.org
*Attorneys for the Plaintiffs*

Garrard R. Beeney*
Brandyn J. Rodgerson*
Emily T.L. Armbruster*
Alexander S. Holland*
Sullivan & Cromwell LLP
125 Broad Street
New York, NY 10004
Telephone:  (212) 558-4000
beeneyg@sullcrom.com
rodgersonb@sullcrom.com
armbrustere@sullcrom.com
hollanda@sullcrom.com
*Attorneys for the Plaintiffs*

Laura Kabler Oswell*
Duncan C. Simpson LaGoy*
Sullivan & Cromwell LLP
1870 Embarcadero Road
Palo Alto, CA 94303
Telephone:  (650) 461-5600
oswell@sullcrom.com
simpsond@sullcrom.com
*Attorneys for the Plaintiffs*

Daniel J. Richardson*
1700 New York Avenue NW
Suite 700
Washington, DC 20006
Telephone: 202-956-7500
richardsond@sullcrom.com

*Attorney for Plaintiffs*

*\*Admitted pro hac vice*