IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

DYLAN BRANDT, by and through his mother,
Joanna Brandt, *et al.*,

                      PLAINTIFFS,

v.      No. 4:21-CV-00450-JM

LESLIE RUTLEDGE, in her official capacity as
the Arkansas Attorney General, *et al.*,

                      DEFENDANTS.

**DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION
TO EXCLUDE EXPERT TESTIMONY OF
MARK REGNERUS**

## I. INTRODUCTION

This is a case about the State of Arkansas's efforts to protect children from experimental medical procedures that cause irreversible psychological and physical damage. These procedures include surgeries such as cutting the breasts off of female children to make them look more masculine, giving breast implants to male children to make them look more feminine, surgically altering the genitalia of both female and male children, and providing cross-sex hormones and puberty blockers that permanently alter the development of children who receive them. To protect children from the harmful effects of these procedures, the Arkansas General Assembly passed the Save Adolescents from Experimentation (SAFE) Act (SAFE Act). This law prevents physicians from experimenting on children with these life-altering procedures whose benefits, if any, have not been shown to outweigh their known and unknown risks.

Plaintiffs argue the SAFE Act is unconstitutional, claiming there is a medical consensus that these irreversible, drastic medical treatments are necessary to treat children who have gender

dysphoria. And because of this alleged medical consensus, Plaintiffs claim children have the constitutional right to receive not just cross-sex hormones and puberty blockers, but also drastic surgeries such as mastectomies and genital transitions.

Plaintiffs' argument is built on a false premise. There is no medical consensus that these drastic, irreversible procedures are necessary to treat gender dysphoria in children. But that has not stopped Plaintiffs from trying to artificially create one.

To insulate its experts from criticism, Plaintiffs moved to exclude the expert testimony of Dr. Mark Regnerus, a sociologist with over twenty years of experience. In short, Plaintiffs claim that because Dr. Regnerus is not a physician, he cannot criticize the questionable methodologies used by those who defend the use of irreversible, disfiguring medical procedures on children. Plaintiffs' motion is ironic and a product of a bigger issue. As Dr. Regnerus explains in depth in his expert report, there is a sociological phenomenon in which science is pushed to the side for the benefit of social or political interests. Dr. Regnerus explains in his expert report that "we are [] seeing social and cultural change fostered through scholarship wed to political activism." And because of this political activism and social change, physicians are performing life-altering and disfiguring procedures on children without knowing whether these procedures' benefits outweigh their known and unknown risks.

The bottom line is Dr. Regnerus is not testifying as a medical expert; he is applying sociological and general scientific principles to analyze whether advocates properly support their claims when recommending life-altering procedures like puberty-blockers, cross-sex hormones, mastectomies, and genital surgeries to children and their parents. Plaintiffs are trying to redefine the nature of Dr. Regnerus's testimony to silence his criticisms. The Court should deny Plaintiffs' Motion to Exclude Expert Testimony of Mark D. Regnerus because it is improper to exclude his

expert testimony merely because Plaintiffs and their experts disagree with his opinions. As explained by the Eighth Circuit, "'[a]s a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility.'" *In re Bair Hugger Forced Air Warming Devices Prods. Liab. Litig.*, 9 F.4th 768, 778 (8th Cir. 2021) (quoting *United States v. Coutentos*, 651 F.3d 809, 820 (8th Cir. 2011)).

## II. BACKGROUND

Plaintiffs and their experts claim there is "a well-established medical consensus that certain medical treatments are necessary to treat some adolescents diagnosed with gender dysphoria." (Compl. ¶ 1.) That statement makes two assumptions. First, it assumes gender dysphoria is an accurate and immutable diagnosis for these children. That assumption is categorically false as tacitly admitted by organizations such as the American Academy of Pediatrics. (Regnerus Dec. ¶ 26, ECF No. 156-1; Regnerus Rebuttal Rep. ¶¶ 5–6, ECF No. 156-2.) Second, it assumes these medical "treatments" ultimately benefit the children more than they are ultimately harmed. Scientists have not reliably supported this claim either. (Regnerus Dec. ¶¶ 46–69.) The World Professional Association for Transgender Health (WPATH) Standards of Care illustrate the inconsistencies with Plaintiffs' proposed treatments for gender dysphoria.

According to Dr. Deanna Adkins, one of Plaintiffs' experts, WPATH is "the leading association of medical and mental health professionals in the treatment of transgender individuals." (Adkins Decl. ¶ 8, ECF No. 11-11.) In her declaration in support of a preliminary injunction, Dr. Adkins supports hormone therapy, puberty blockers, and chest surgery as possible "treatment" options for children diagnosed with gender dysphoria. (Adkins Decl. ¶¶ 36–38, ECF No. 11-11.)

Dr. Adkins also states, however, "[g]enital surgery for transgender women and men is not recommended until the person has reached the age of at least 18." (Adkins Decl. ¶¶ 38, ECF No.

11-11.) Yet, in her eighteen-page declaration, Dr. Adkins does not spend any time addressing why the line was drawn at age eighteen for genital surgery. To be fair, the WPATH Standards of Care do not explain why children cannot get genital surgery either. (*WPATH Standards of Care* [Ex. A] at 21). So why is the line drawn at eighteen for genital surgery? Is it because genital surgeries are irreversible? The use of puberty blockers can also cause permanent physiological changes. According to the WPATH Standards of Care, "[a]dolescents with male genitalia who start GnRH analogues early in puberty should be informed that this could result in insufficient penile tissue for penile inversion vaginoplasty techniques." (*WPATH Standards of Care* [Ex. A] at 20). Even though the line is drawn at age eighteen for genital surgeries, the WPATH Standards of Care do allow female children to undergo breast removal in certain circumstances. This, of course, is also permanent. (*WPATH Standards of Care* [Ex. A] at 21).

There is little distinction between the consequences of genital surgeries, chest surgeries, cross-sex hormones, and puberty blockers. While Plaintiffs try to make this a case about puberty blockers and hormone replacement, more is at stake here. As Dr. Regnerus notes in his rebuttal report, there are proposed changes to the WPATH Standards of Care pending that will give the green light to doctors to perform genital surgeries on children. (Regnerus Dep. 211:15–22, ECF No. 156-4.)

While Plaintiffs say there is a favorable risk/benefit ratio for surgeries performed on children with gender dysphoria, the truth is murky. The medicalization of gender dysmorphia is on shaky ground, largely due to social and political pressures that are interfering with proper medical and scientific evaluation of these practices. And as an experienced sociologist, Dr. Regnerus is well-qualified to offer opinions concerning this domain.

### III. LEGAL STANDARD

The United States Court of Appeals for the Eighth Circuit has "recognized that the 'liberal thrust' of Rule 702 [of the *Federal Rules of Evidence*] regarding the admissibility of expert testimony creates 'an intriguing juxtaposition with [its] oft-repeated abuse-of-discretion standard of review." *In re Bair Hugger Forced Air Warming Devices Prods. Liab. Litig.*, 9 F.4th 768, 777 (8th Cir. 2021) (quoting *Johnson v. Mead Johnson & Co.*, 754 F.3d 557, 562 (8th Cir. 2014)). District courts perform a gatekeeping function to ensure all scientific evidence is relevant and reliable. *Id.* (quoting *Union Pac. R.R. v. Progress Rail Servs. Corp.*, 778 F.3d 704, 709 (8th Cir. 2015)). Courts should liberally admit expert testimony. *Id.* (quoting *Union Pac. R.R. v. Progress Rail Servs. Corp.*, 778 F.3d at 790). Rule 702 of the *Federal Rules of Evidence* is "'one of admissibility rather than exclusion.'" *Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001) (quoting *Arcoren v. United States*, 929 F.2d 1235, 1239 (8th Cir. 1991)).

The Eighth Circuit has established a three-part test to determine whether an expert's testimony is admissible. "First, the testimony must be useful to the finder of fact in deciding the ultimate issue of fact, meaning it must be relevant." *In re Bair Hugger Forced Air Warming Devices Prods. Liab. Litig.*, 9 F.4th at 777 (citing *Johnson v. Mead Johnson & Co., LLC*, 754 F.3d 557, 562 (8th Cir. 2014)). Second, "the expert must be qualified to assist the finder of fact." *Id.* (citing *Johnson v. Mead Johnson & Co., LLC*, 754 F.3d 557, 562 (8th Cir. 2014)). Third, "the testimony must be reliable or trustworthy in an evidentiary sense." *Id.* (citing *Johnson v. Mead Johnson & Co., LLC*, 754 F.3d 557, 562 (8th Cir. 2014)). Something can be reliable even if the finder of fact concludes that it is incorrect. *Id.* (citing *Kuhn v. Wyeth, Inc.*, 686 F.3d 618, 625 (8th Cir. 2012)).

IV. ARGUMENT

The Court should deny Plaintiffs' Motion to Exclude Expert Testimony of Mark Regnerus because he has the proper qualifications and training necessary to testify concerning the lack of a rigorous basis in science for the medicalization of adolescent gender dysphoria, and his testimony is reliable. The field of sociology can touch upon many different fields of study. As Dr. Regnerus explains in his deposition, "one can also turn one's sociological attention to the norms, values, practices of . . . science. . . . So that's what I mean by sociology of science. You turn your sort of analytical gaze and interests and methods to the conduct of science, of which sociology is a part." (Regnerus Dep. 106:1–13, ECF No. 156-4.)

Throughout Plaintiffs' brief, they challenge the facts underlying Dr. Regnerus's expert opinion. (Pls. Br. in Supp. of Mot. to Exclude Expert Test. of Mark Regnerus 9, ECF No. 156.) But the Eighth Circuit is clear that challenges to the factual basis of an expert's opinion go to credibility, not admissibility. *In re Bair Hugger Forced Air Warming Devices Prods. Liab. Litig.*, 9 F.4th 768, 778 (8th Cir. 2021) (quoting *United States v. Coutentos*, 651 F.3d 809, 820 (8th Cir. 2011)). Plaintiffs' experts will undoubtedly disagree with Dr. Regnerus, but that is to be expected in our adversarial system.

In *Johnson v. Mead Johnson and Company, LLC*, the Eighth Circuit reversed a district court's decision to exclude an expert because the district court "violated [the] liberal admission standards [of Rule 702 of the *Federal Rules of Evidence*] by resolving doubts in favor of keeping the testimony out and relying upon its own assessment of the correctness of the expert opinions." 754 F.3d 557, 562 (8th Cir. 2014). By assessing the correctness of the expert opinions, the district court had wrongfully "disallowed the adversarial process to work." *Id.*

1.         Dr. Regnerus Is Qualified to Critique Scientific Methods and Conclusions as an Experienced Sociologist.

Plaintiffs broadly claim Dr. Regnerus "lacks any training or experience that would qualify him to speak on healthcare generally or the treatment of gender dysphoria in particular." (Pls. Br. in Supp. of Mot. to Exclude Expert Test. of Mark Regnerus 7, ECF No. 156.) Dr. Regnerus explained, however, that the sociology of health uses research methods that share similarities with the research methods in which he received training. (Regnerus Dep. 37:22-39:19; 125:25–126:8; 127:7–11, ECF No. 156-4.) Because the methods are similar, he is qualified to critique the methods used by health scientists in formulating their conclusions. As Dr. Regnerus explains:

> And my beefs. . . is more about the questions they pose, sometimes the statistical methods they employ, and sometimes about the interpretations, statistical interpretations they give to their . . .the analyses and the conclusions they draw from those analyses.

(Regnerus Dep. 120:1–7, ECF No. 156-4.) Dr. Regnerus relies "not only on [his] knowledge of the research in this domain, but also on the details of quantitative and qualitative research, subjects [he] has taught to sociology majors at least 20 times." (Regnerus Decl. ¶ 3, ECF No. 156-1.) Dr. Regnerus's testimony fits within the sociology of science, which is the "evaluation of how science operates." (Regnerus Decl. ¶ 5, ECF No. 156-1.) Moreover, Dr. Regnerus's critiques of scientific studies dealing with the treatment of gender dysphoria are a part of his conclusion that social and political pressures are powerfully shaping the treatment of adolescent gender dysphoria.

2.         Dr. Regnerus is Qualified to Discuss Research on the Effectiveness of Gender-Affirming Treatment on Children.

Plaintiffs' brief assumes a world where doctors alone can comprehend and critique the research methods used to evaluate the effectiveness of medical treatments for adolescent gender dysphoria. Plaintiffs claim that a sociologist with a doctorate degree, training in statistics and quantitative and qualitative analyses, and over twenty years of experience is incapable of

understanding the research methods and conclusions in a medical study. This view of scholarship is far too narrow. Dr. Regnerus can read a research paper, analyze its methods, and critique its conclusions. Plaintiffs and their experts might disagree with Dr. Regnerus's conclusions about medical research, but that is no reason to exclude his testimony. Rather, Plaintiffs will have the opportunity to cross-examine him, and their experts can dispute his testimony.

Plaintiffs also argue Dr. Regnerus should not be allowed to testify because they dispute the factual basis for his opinion. For example, Plaintiffs point to a discussion about the off-label use of medications in his deposition. (Pls. Br. in Supp. of Mot. to Exclude Expert Test. of Mark Regnerus 9, ECF No. 156.) Plaintiffs claim Dr. Regnerus is not aware that off-label use of medications is common. (Pls. Br. in Supp. of Mot. to Exclude Expert Test. of Mark Regnerus 9, ECF No. 156.) But that is not Dr. Regnerus's testimony. In fact, Dr. Regnerus testified that medications are used for off-label purposes, but he explains treatments for gender dysphoria are different due to its serious outcomes. (Regnerus Dep. 276:21–277:3, ECF No. 156-4.) Dr. Regnerus explains in his declaration that although using a medication for off-label use is not necessarily unsafe, "there's a significant gap between 'may be' and 'is' in particular circumstances." (Regnerus Decl. ¶ 77, ECF No. 156-1). Plaintiffs simply mischaracterize Dr. Regnerus's testimony.

Furthermore, it is appropriate for Dr. Regnerus to testify about the propriety of randomized trials. Plaintiffs claim Dr. Regnerus testified in his deposition that he did not know how a randomized trial would work. (Pls. Br. in Supp. of Mot. to Exclude Expert Test. of Mark Regnerus 10, ECF No. 156.) Dr. Regnerus actually testified it was unlikely the trials would happen in the current environment. (Regnerus Dep. 166:16–24, ECF No. 156-4.) Even if a randomized controlled trial is difficult in practice, that does not give the greenlight to perform life-altering

procedures without knowing whether they are likely to have a net benefit. Further, regardless of how difficult it might be to conduct a randomized controlled trial, the fact that randomized controlled trials do not exist should factor into the decision whether to permanently destroy a child's biological functioning. At trial, Plaintiffs can argue a randomized controlled trial is difficult, but that does not have any bearing on whether Dr. Regnerus should be able to testify.

      3.      Dr. Regnerus Can Testify About How Care is Currently Provided to Adolescents with Gender Dysphoria.

Plaintiffs claim his opinion that clinics are not conducting psychological assessments before providing care to minors is based solely on public commentary in newspapers and magazines. (Pls. Br. in Supp. of Mot. to Exclude Expert Test. of Mark Regnerus 10, ECF No. 156.) That is absolutely false. Dr. Regnerus's expert reports specifically point to the practices of Planned Parenthood, which operates in Arkansas and provides cross-sex hormones on an "informed consent" basis, i.e., without requiring a psychological assessment. (Regnerus Rebut. Rep. ¶ 12, ECF No. 156-2; *see* Regnerus Rep. ¶ 98, ECF No. 156-1). Indeed, the anticipated trial testimony will establish that clinics in Arkansas provide cross-sex hormones to minors without a psychological assessment. Plaintiffs also fault Regnerus for not observing the treatment of gender-dysphoric adolescents at medical clinics. (Pls. Br. in Supp. of Mot. to Exclude Expert Test. of Mark Regnerus 10, ECF No. 156.) But this is likely not possible due to privacy laws, and in any case it does not detract from his ability to criticize what those clinics themselves, and even the leadership of WPATH, admits is taking place (Regnerus Dep. 247:4-9, ECF No. 156-4). Regardless, Plaintiffs' arguments go to the weight of Dr. Regnerus's testimony, not its admissibility.

4.      Dr. Regnerus is Qualified to Testify About Informed Consent.

Plaintiffs mischaracterize Dr. Regnerus's testimony regarding his qualifications to offer testimony on informed consent. They claim he lacks personal experience and that his only knowledge comes from a review of their expert witnesses' testimony. (Pls. Br. in Supp. of Mot. to Exclude Expert Test. of Mark Regnerus 11, ECF No. 156.) But, again, that is false, and Plaintiffs leave out a substantial portion of Dr. Regnerus's testimony. For example, Dr. Regnerus actually has personal experience creating protocols "for university institutional review boards" concerning minors and research that involves obtaining informed consent (Regnerus Dep. 284:13–23, ECF No. 156-4.) Further, Dr. Regnerus explains informed consent is an important part of research ethics, a topic he teaches regularly. (Regnerus Dep. 285:1–3, ECF No. 156-4.) Dr. Regnerus has also been personally involved in research that involved seeking informed consent from minors. (Regnerus Dep. 285:4–17, ECF No. 156-4.) Dr. Regnerus has more than enough experience to be qualified to testify concerning informed consent.

5.      Dr. Regnerus is Qualified to Testify About the Relationship Between Gender Dysphoria and Suicide.

Suicide is a central topic of research in sociology, and has been ever since Émile Durkheim—the French researcher whose seminal work on suicide established sociology as an academic discipline—wrote in the 1800s. (*See* Regnerus Dep. 299:24-25, ECF 156-4). Dr. Regnerus gives his opinion regarding the lack of a clear relationship between gender dysphoria and suicidality through the evaluation and study of scientific literature. Plaintiffs' bizarre claim, however, is that Dr. Regnerus cannot possibly interpret and understand articles not published in a sociology journal. This narrow view of scholarship creates an impossible standard under Rule 702 of the *Federal Rules of Evidence*. Dr. Regnerus is a sociologist who is trained in statistics and qualitative and quantitative analyses. He is more than qualified to review, interpret, and analyze

scientific studies and their research methods, regardless of what journal they appear in. Indeed, Dr. Regnerus is far more qualified to opine on suicidality than, for example, Plaintiffs' expert Dr. Deanna Adkins—an endocrinologist who offers her own opinion that "[s]uicidality is of particular concern" for children with gender dysphoria. (Adkins Decl. in Support of P.I. ¶ 41, ECF No. 11-11).

Plaintiffs' reliance on *Smith v. Rasmussen* misses the mark entirely. 249 F.3d 755 (8th Cir. 2001). In *Smith*, the Eighth Circuit concluded a district court did not abuse its discretion in excluding an expert from testifying because he "lacked expertise in the specialized discipline of gender identity disorder." 249 F.3d at 759. Here, however, Dr. Regnerus indisputably has expertise in evaluating the research methods used to support the false claims that there are strong associations between gender dysphoria and suicide (Regnerus Rep. ¶¶ 38-45, ECF No. 156-2). And as a sociologist, he is also ideally suited to analyze whether treatments for gender dysphoria have been influenced by pressures other than those inherent to the scientific process. He is testifying primarily as a methodologist, not as a physician treating a patient.

      6.     Dr. Regnerus is Qualified to Testify About Ideological Capture, and his Opinion is Reliable.

Plaintiffs have moved to exclude all testimony regarding the ideological capture of gender dysphoria. (Pls. Br. in Supp. of Mot. to Exclude Expert Test. of Mark Regnerus 16, ECF No. 156.) Plaintiffs claim Dr. Regnerus's testimony about ideological capture is intertwined with his opinions about the medical research, or lack thereof, involving gender dysphoria. Because Plaintiffs say Dr. Regnerus is not qualified to testify about anything medically related, they claim he cannot testify about ideological capture. As discussed above, Dr. Regnerus is more than qualified to analyze the research methods used in the field of gender medicine, which are frequently not all that sophisticated to begin with.

Dr. Regnerus's testimony about ideological capture reveals the purported "consensus" about treatments for gender dysphoria is a product of sociopolitical influence. For example, while Plaintiffs' experts claim a person's gender is immutable, they offer no reasonable explanation why there is a sudden surge of "nonbinary" gender identity. (Regnerus Rebuttal Rep. ¶ 8, ECF No. 156-2.) Moreover, some of Plaintiffs' experts claim gender identity cannot be affected by outside influence. Yet, the Diagnostic Statistic Manual of Mental Disorders makes it clear that social norms are important in determining whether someone has gender dysphoria. (Regnerus Rebuttal Rep. ¶ 8, ECF No. 156-2.) The Seventh Edition of WPATH Standards of Care did not recommend that children get genital surgery. And yet the upcoming Eighth Edition of the WPATH Standards of Care will allow children to get genital surgery, and it also lowers the age children can get hormone treatment and breast surgery. (Regnerus Rebuttal Rep. ¶ 26, ECF No. 156-2.) As Dr. Regnerus explains, this is part of a shift to an aggressive treatment paradigm. (Regnerus Rebuttal Rep. ¶ 24, ECF No. 156-2.) The upcoming Eighth Edition of the WPATH Standards of Care also discusses suicide substantially more than the Seventh Edition. (Regnerus Rebuttal Rep. ¶ 39, ECF No. 156-2.)

If compliance with the WPATH Standards of Care ensures "safe, effective, and medically necessary" care, why are the age limits lowered so drastically in the Eighth Edition? Have children suddenly become mature enough to get genital surgery? What has changed over the last ten years to cause such drastic changes? It is certainly not biology and medicine. But the answer to that question is social pressure, which is something an experienced sociologist like Dr. Regnerus is ideally qualified to discuss and whose testimony should be trusted as reliable.

Sociology is the study of social relationships. Plaintiffs and their experts want to convince the Court that childhood gender dysphoria is a simple biological issue—one puberty blockers,

cross-sex hormones, or surgery can fix. But it is not a simple biological issue; it is a complex issue undoubtedly influenced by the social world. Plaintiffs try to isolate Dr. Regnerus's opinions, but they miss the bigger point. Current medical science does not show drastic, irreversible treatments for gender dysphoria are beneficial; sociology and ideological capture shows there is more at play with the rapid medicalization of gender dysphoria.

Dr. Regnerus's opinion on ideological capture is based on a review of many facts that are set forth in his expert reports. At this stage, it is improper to exclude his testimony merely because Plaintiffs disagree with his opinion.

7. Dr. Regnerus's Testimony is Relevant and Reliable.

Plaintiffs do not challenge the relevancy of Dr. Regnerus's testimony. Nevertheless, Dr. Regnerus's testimony is undoubtedly relevant. Expert testimony is relevant if it "advances the trier of fact's understanding to any degree." *Johnson v. Mead Johnson & Co.*, 754 F.3d 557, 562 (8th Cir. 2014) (quoting *Robinson v. GEICO Gen. Ins. Co.*, 447 F.3d 1096, 1101 (8th Cir. 2006)). Dr. Regnerus's testimony certainly bears on the central issues in this case.

Dr. Regnerus's testimony is also reliable. Sociologists often analyze sexuality, suicide, and scientific research methods. Here, Dr. Regnerus used his statistical, qualitative, and quantitative analyses experience to look at existing research to evaluate their methods. He then analyzed whether outside social pressure influenced scientific findings. "As long as the expert's scientific testimony rests upon 'good grounds, based on what is known' it should be tested by the adversary process with competing expert testimony and cross-examination, rather than excluded by the court at the outset." *Johnson v. Mead Johnson & Co., LLC*, 754 F.3d 557, 562 (8th Cir. 2014) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993)). Dr. Regnerus's testimony is

reliable, and he should get the chance to testify. Plaintiffs will have the opportunity to cross-examine him, and their experts can dispute his testimony.

## V. CONCLUSION

Plaintiffs' Motion to Exclude Expert Testimony of Mark Regnerus should be denied. The Eighth Circuit has made it clear Rule 702 of the *Federal Rules of Civil Procedure* is a rule of admissibility, not exclusion. Undoubtedly, Plaintiffs disagree with Dr. Regnerus's opinions. But he is an experienced sociologist with over twenty years of experience in disciplines such as statistics, qualitative analysis, and quantitative analysis. And with that experience, Dr. Regnerus analyzed the scientific literature about gender dysphoria through a sociological lens. Dr. Regnerus's opinion is relevant and reliable. He is more than qualified to identify and critique the flaws in Plaintiffs' case.

Respectfully Submitted,

LESLIE RUTLEDGE
Arkansas Attorney General


Dylan L. Jacobs (2016167)
ARKANSAS ATTORNEY GENERAL'S OFFICE
323 Center Street, Suite 200
Little Rock, AR 72201
Phone: (501) 682-2700
Email: dylan.jacobs@arkansasag.gov

Michael Cantrell (2012287)
ARKANSAS ATTORNEY GENERAL'S OFFICE
323 Center Street, Suite 200
Little Rock, AR 72201
Phone: (501) 682-2401
Email: michael.cantrell@arkansasag.gov

                Amanda D. Land (2012135)
                Assistant Attorney General
                ARKANSAS ATTORNEY GENERAL'S OFFICE
                323 Center Street, Suite 200
                Little Rock, AR 72201
                Phone: (501) 682-2029
                Fax: (501) 682-8118
                amanda.land@arkansasag.gov

*Attorneys for Defendants*