**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**CENTRAL DIVISION**

DYLAN BRANDT, by and through his mother,
Joanna Brandt, *et al.*,

PLAINTIFFS,

v.                         No. 4:21-CV-00450-JM

LESLIE RUTLEDGE, in her official capacity as
the Arkansas Attorney General, *et al.*,

DEFENDANTS.

---

**DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION**
**TO EXCLUDE EXPERT TESTIMONY OF**
**DR. PATRICK W. LAPPERT**

---

**I. INTRODUCTION**

This is a case about the State of Arkansas's efforts to protect children from experimental

medical procedures that cause irreversible psychological and physical damage. These procedures

include surgeries such as cutting the breasts off of female children to make them look more

masculine, giving breast implants to male children to make them look more feminine, surgically

altering the genitalia of both female and male children, and providing cross-sex hormones and

puberty blockers that permanently alter the development of children who receive them. To protect

children from the harmful effects of these procedures, the Arkansas General Assembly passed the

Save Adolescents from Experimentation (SAFE) Act (SAFE Act). This law prevents physicians

from experimenting on children with these life-altering procedures whose benefits, if any, have

not been shown to outweigh their known and unknown risks.

Plaintiffs argue the SAFE Act is unconstitutional, claiming there is a medical consensus

that these irreversible, drastic medical treatments are necessary to treat children who have gender

dysphoria. And because of this alleged medical consensus, Plaintiffs claim children have the constitutional right to receive not just cross-sex hormones and puberty blockers, but also drastic surgeries such as mastectomies and genital transitions.

Plaintiffs' argument is built on a false premise. There is no medical consensus that these drastic, irreversible procedures are necessary to treat gender dysphoria in children. But that has not stopped Plaintiffs from trying to create the impression of one.

Before the Court is Plaintiffs' Motion to Exclude the Testimony of Dr. Patrick W. Lappert (Dr. Lappert), an expert retained by Defendants. Dr. Lappert, an experienced plastic surgeon, has identified many problems with medicalizing the treatment of gender dysphoria in children. Nevertheless, Plaintiffs argue Dr. Lappert's testimony should be excluded because he does not subscribe to the very medical practices he critiques.

The Court should deny Plaintiffs' motion because they are attempting to create an impossible standard for the admission of expert testimony. Dr. Lappert has the medical and clinical knowledge to offer an expert opinion on problems associated with the surgical treatment of patients with gender dysphoria even if he does not engage in those questionable practices himself. Indeed, one could not expect a physician who performs mastectomies on female children to testify concerning the problems of that practice. Plaintiffs and their experts may disagree with Dr. Lappert's opinions, but he gets to express them under Rule 702 of the *Federal Rules of Evidence*.

## II. BACKGROUND

Plaintiffs and their experts claim there is "a well-established medical consensus that certain medical treatments are necessary to treat some adolescents diagnosed with gender dysphoria." (Compl. ¶ 1.) That statement makes two assumptions. First, it assumes gender dysphoria is an accurate and immutable diagnosis for these children. Second, it assumes these medical

"treatments" ultimately benefit the children more than they are ultimately harmed. But, contrary to Plaintiffs' assertions, neither conclusion has been scientifically established. The World Professional Association for Transgender Health (WPATH) Standards of Care illustrate the inconsistencies with Plaintiffs' proposed treatments for gender dysphoria.

According to Dr. Deanna Adkins, one of Plaintiffs' experts, WPATH is "the leading association of medical and mental health professionals in the treatment of transgender individuals." (Adkins Decl. ¶ 8, ECF No. 11-11.) In her declaration, Dr. Adkins supports hormone therapy, puberty blockers, and chest surgery as possible "treatment" options for children diagnosed with gender dysphoria. (Adkins Decl. ¶¶ 36–38, ECF No. 11-11.)

Dr. Adkins also states, however, "[g]enital surgery for transgender women and men is not recommended until the person has reached the age of at least 18." (Adkins Decl. ¶¶ 38, ECF No. 11-11.) Yet, in her eighteen-page declaration in support of a preliminary injunction, Dr. Adkins does not spend any time addressing why the line was drawn at age eighteen for genital surgery. To be fair, the WPATH Standards of Care do not explain why children cannot get genital surgery either. (*WPATH Standards of Care* [Ex. A] at 21). So why is the line drawn at eighteen for genital surgery? Is it because genital surgeries are irreversible? The use of puberty blockers can also cause permanent physiological changes. According to the WPATH Standards of Care, "[a]dolescents with male genitalia who start GnRH analogues early in puberty should be informed that this could result in insufficient penile tissue for penile inversion vaginoplasty techniques." (*WPATH Standards of Care* [Ex. A] at 20). Even though the line is drawn at age eighteen for genital surgeries, the WPATH Standards of Care do allow female children to undergo breast removal in certain circumstances. This, of course, is also permanent. (*WPATH Standards of Care* [Ex. A] at 21).

There is little distinction between the consequences of genital surgeries, chest surgeries, cross-sex hormones, and puberty blockers. While Plaintiffs try to make this a case about puberty blockers and hormone replacement, more is at stake here. As Dr. Lappert notes in his rebuttal report, there are proposed changes to the WPATH Standards of Care pending that will give the green light to doctors to perform genital surgeries on children. (Lappert Rebuttal Report ¶¶ 4–5, ECF No. 154-3).

While Plaintiffs say there is a favorable risk/benefit ratio for surgeries performed on children with gender dysphoria, the truth is murky. As an experienced physician and surgeon, Dr. Lappert is more than qualified to critique this medically and scientifically unsound "treatment" of children. Plaintiffs seek to insulate its experts from review by creating its own group of practitioners that have an interest in continuing to perform procedures that are causing permanent physical and psychological damage to children.

### III. LEGAL STANDARD

The United States Court of Appeals for the Eighth Circuit has "recognized that the 'liberal thrust' of Rule 702 [of the *Federal Rules of Evidence*] regarding the admissibility of expert testimony creates 'an intriguing juxtaposition with [its] oft-repeated abuse-of-discretion standard of review." *In re Bair Hugger Forced Air Warming Devices Prods. Liab. Litig.*, 9 F.4th 768, 777 (8th Cir. 2021) (quoting *Johnson v. Mead Johnson & Co.*, 754 F.3d 557, 562 (8th Cir. 2014)). District courts perform a gatekeeping function to ensure all scientific evidence is relevant and reliable. *Id.* (quoting *Union Pac. R.R. v. Progress Rail Servs. Corp.*, 778 F.3d 704, 709 (8th Cir. 2015)). Courts should liberally admit expert testimony. *Id.* (quoting *Union Pac. R.R. v. Progress Rail Servs. Corp.*, 778 F.3d at 790). Rule 702 of the *Federal Rules of Evidence* is "'one of admissibility rather than exclusion.'" *Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686 (8th Cir.

2001) (quoting *Arcoren v. United States*, 929 F.2d 1235, 1239 (8th Cir. 1991)). "[D]istrict courts are admonished not to weigh or assess the correctness of competing expert opinions." *Johnson v. Mead Johnson & Co., LLC*, 754 F.3d 557, 562 (8th Cir. 2014) (citing *Kuhn v. Wyeth, Inc.*, 686 F.3d 618, 625 (8th Cir. 2012)).

The Eighth Circuit has established a three-part test to determine whether an expert's testimony is admissible. "First, the testimony must be useful to the finder of fact in deciding the ultimate issue of fact, meaning it must be relevant." *In re Bair Hugger Forced Air Warming Devices Prods. Liab. Litig.*, 9 F.4th at 777 (citing *Johnson v. Mead Johnson & Co., LLC*, 754 F.3d 557, 562 (8th Cir. 2014)). Second, "the expert must be qualified to assist the finder of fact." *Id.* (citing *Johnson v. Mead Johnson & Co., LLC*, 754 F.3d 557, 562 (8th Cir. 2014)). Third, "the testimony must be reliable or trustworthy in an evidentiary sense." *Id.* (citing *Johnson v. Mead Johnson & Co., LLC*, 754 F.3d 557, 562 (8th Cir. 2014)). Something can be reliable even if the finder of fact concludes that it is incorrect. *Id.* (citing *Kuhn v. Wyeth, Inc.*, 686 F.3d 618, 625 (8th Cir. 2012)).

## IV. ARGUMENT

Plaintiffs allege Dr. Lappert is not qualified to offer an expert opinion on the diagnosis and treatment of gender dysphoria. (Pls. Br.in Supp. of Mot. to Exclude Expert Test. of Dr. Patrick W. Lappert 6, ECF No. 154.) Plaintiffs ask the Court to exclude Dr. Lappert's testimony on (1) the validity of the diagnosis of gender dysphoria; (2) his views on treatments for gender dysphoria and their lack of psychological benefits; and (3) his opinion that valid informed consent for these procedures cannot be obtained. (Pls. Br.in Supp. of Mot. to Exclude Expert Test. of Dr. Patrick W. Lappert 2, ECF No. 154.) The Court should deny Plaintiffs' motion because Dr. Lappert is

qualified to give expert testimony regarding the flaws in the practice of diagnosis and treatment of gender dysphoria under the lenient burden of Rule 702 of the *Federal Rules of Evidence*.

      1.      Dr. Lappert is Qualified to Testify About the Diagnosis and Treatment of Gender Dysphoria.

Plaintiffs' Motion to Exclude Expert Testimony of Dr. Patrick Lappert is no more than an attempt to artificially create a medical consensus that is not supported by fact. *See Gibson v. Collier*, 920 F.3d 212, 222–23 (5th Cir. 2019) ("There is no medical consensus that sex reassignment surgery is necessary or even effective treatment for gender dysphoria.").

Plaintiffs concede Dr. Lappert is qualified to testify "about risks and complications associated with surgical treatments for gender dysphoria." (Pls. Br.in Supp. of Mot. to Exclude Expert Test. of Dr. Patrick W. Lappert 2 n.1, ECF No. 154.) But this entails more than Plaintiffs are willing to recognize. To properly evaluate the likelihood of a surgical outcome that the patient will be satisfied with, a plastic surgeon must engage in psychological observation and assessment prior to performing a surgery. Dr. Lappert the example of a patient of his who, several months after a rhinoplasty, complained that the surgery had not sufficiently feminized his nose. Although the patient had presented with a request for a simple cosmetic improvement and gave no indication of any gender-related concerns, it turned out after the fact that he really desired "a radical change that he didn't voice" previously. (Lappert Dep. 21:15, ECF No. 154-4). Dr. Lappert further explains:

> One of the things you do as a plastic surge[on], . . . you have to have some sense for what's the motivation for seeking [surgery], because sometimes people can be struggling with severe emotional problems and they see their appearance as the reason for [their] emotional problems. And so a lot of what goes into the initial consultation has to kind of address itself to the motivation of the patient.

(Lappert Dep. 20:14-23, ECF No. 154-4.) Those patients who seek plastic surgery to address an underlying psychological wound are bound to be disappointed regardless of the operation's technical success because "you can never reach the depth of that psychological wound doing an operation." (Lappert Dep. 25:8-9, ECF No. 154-4.) Therefore, responsible plastic surgeons exercise diligence in seeking to identify the source and character of a patient's specific desire for a change to their physical appearance.

If Dr. Lappert can testify to the surgical complications of treatments for gender dysphoria, he should be able to, and has the professional experience that enables him to, testify whether the surgery should occur in the first place. Surgeons have a professional responsibility to ensure whatever surgery they intend to perform has a basis in medical science. They do not delegate their professional responsibilities to physicians making the underlying diagnosis.

Plaintiffs' reliance on *Smith v. Rasmussen* is misplaced. 249 F.3d 755 (8th Cir. 2001). There, the Eighth Circuit upheld the exclusion of a psychiatrist's testimony regarding the treatment of gender identity disorder. *Smith*, 249 F.3d at 758–59. The Eighth Circuit concluded the district court did not abuse its discretion in limiting the expert's testimony because it was not based on personal experience or knowledge of gender identity disorder. *Id.* at 759. The expert, however, was allowed to testify regarding "general principles and diagnostic criteria." *Id.*

Here, it is undisputed Dr. Lappert is qualified to testify as to the risks and complications of surgical treatments for gender dysphoria. (Pls. Br.in Supp. of Mot. to Exclude Expert Test. of Dr. Patrick W. Lappert 2 n.1, ECF No. 154.) Thus, unlike in *Smith*, Dr. Lappert has personal experience and knowledge about gender dysphoria. If Dr. Lappert is qualified to testify about surgeries used to treat gender dysphoria, he should be allowed to testify about *why* the surgeries are performed in the first place and whether the benefits, if any, outweigh the known and unknown

risks. By way of example, the anticipated trial evidence will show that the very hormone therapy used to treat adolescent females with gender dysphoria (i.e., the cross-sex use of testosterone) is known to *increase* breast dysphoria, often hastening surgical removal of their breasts at early age. And at the very least, Dr. Lappert can testify the diagnosis of gender dysphoria does not comply with "general principles and diagnostic criteria." *See Smith*, 249 F.3d at 759.

Plaintiffs claim Dr. Lappert does not have the training and experience to offer opinions on the diagnosis and treatment of gender dysphoria. (Pls. Br.in Supp. of Mot. to Exclude Expert Test. of Dr. Patrick W. Lappert 6, ECF No. 154.) Specifically, Plaintiffs claim he cannot testify about the diagnosis and treatment of gender dysphoria because it is not his *specialized discipline*. *Id.* at 8. But that is not the law in this Circuit. In *Robinson v. GEICO General Insurance Company*, the Eighth Circuit made it clear that "[m]ost courts have held that a physician with general knowledge may testify regarding medical issues that a specialist might treat in a clinical setting." 447 F.3d 1096, 1101 (8th Cir. 2006). Thus, the fact Dr. Lappert is not a psychiatrist or endocrinologist is not a determining factor.

*Robinson* was a car accident case. The plaintiff sued her insurance provider to seek payment of damages caused by an underinsured motorist. 447 F.3d at 1097–98. She claimed she hurt her shoulder. GEICO hired a neurologist as an expert, and he testified that the car accident did not injure plaintiffs' shoulder, rather she had a preexisting injury. *Id.* at 1099. The plaintiff claimed GEICO's expert testified outside his expertise and thus was not "qualified." *Id.* at 1100. Noting the liberal nature of Rule 702 of the *Federal Rules of Evidence*, the Eighth Circuit disagreed and concluded the district court correctly allowed the expert to testify. *Id.* The *Robinson* opinion also highlights the problems with relying on the cherry-picked statements Dr. Lappert made in his deposition.

Plaintiffs highlight several statements in Dr. Lappert's deposition in support of their claim he is not qualified to testify about the treatment of gender dysphoria. For example, Dr. Lappert admits he is not an endocrinologist in his deposition. However, Dr. Lappert goes on to explain:

> Well, I have to—as a—with my background in general surgery and plastic and reconstructive surgery I have to understand endocrinology. So, for example, when I was a general surgeon, if I was going to do a thyroidectomy I would have to understand what the endocrinopathy was about and the confidence I might have in the diagnosis. So the diagnostic side of endocrinology I had to understand. I had to understand the metabolic side of endocrinology before embarking on surgery for endocrinopathic diseases[.]

(Lappert Dep. 62:5–14, ECF No. 154-4.)

When explaining that gender dysphoria is a symptom of body dysmorphic disorder and not a diagnosis, Dr. Lappert explains he is speaking not as a psychiatrist, but as "a plastic surgeon with experience of people who have body dysmorphic disorder." (Lappert Dep. 133:20–134:4, ECF No. 154-4.) At its core, body dysmorphia and gender dysphoria deal with patients' dissatisfaction with their physical appearances.

As an example, Dr. Lappert testified in his deposition about the complexities involved in treating patients with body dysmorphia when they come to get surgery. (Lappert Dep. 25:8–27:9, ECF No. 154-4.) When asked whether he believed patients experiencing suicidal ideation could give informed consent for surgery, Dr. Lappert explained:

> That's a problem . . . That speaks of a profound psychological disturbance. who is seriously considering ending their life is dealing with a level of anxiety, and perhaps even a misperception of the world they are living in that I would consider renders them incompetent to give informed consent.

(Lappert Dep. 197:13–22, ECF No. 154-4.)

He further explains that many patients with body dysmorphia "ha[ve] a profound psychological wound" that surgery cannot fix. (Lappert Dep. 25:23–26:13, ECF No. 154-4.) In

short, Lappert's experience with patients with body dysmorphia qualifies him to testify regarding

the diagnosis and treatment of people with gender dysphoria.

Finally, Plaintiffs claim Dr. Lappert should not be able to give his opinion that informed

consent cannot be obtained for "gender-affirming medical care for adolescent patients." (Pls. Br.in

Supp. of Mot. to Exclude Expert Test. of Dr. Patrick W. Lappert 4–5, ECF No. 154.) But if Dr.

Lappert can testify about the "risks and complications associated with surgical treatments for

gender dysphoria," it is difficult to see how Dr. Lappert cannot be permitted to testify about the

ability to obtain informed consent for these same procedures. One of the principal pieces of

information physicians should tell their patients when getting informed consent is the risk of harm.

(Lappert Dep. 199:8–25, ECF No. 154-4.)

Plaintiffs rely heavily on the Middle District of North Carolina's decision in *Kadel v.

Folwell*. 2022 WL 2106270 (M.D.N.C. June 10, 2022). There, the district court excluded portions

of Dr. Lappert's expert testimony. *Id.* at *13–15. This Court, however, should not rely on the *Kadel*

opinion.

First, the Middle District of North Carolina is not in the Eighth Circuit. As discussed

previously, the Eighth Circuit has repeatedly applied an extremely liberal standard when analyzing

whether expert testimony is admissible under Rule 702 of the *Federal Rules of Evidence*. The

Middle District of North Carolina did not analyze Dr. Lappert's testimony under the guidelines set

by the Eighth Circuit.

In addition, Plaintiffs mischaracterize the opinion in *Kadel*. There, the Court did not limit

Dr. Lappert's testimony solely to the "risks or complications associated with surgeries." (Pls. Br.in

Supp. of Mot. to Exclude Expert Test. of Dr. Patrick W. Lappert 8, ECF No. 154.) Rather, the

Court also allowed Dr. Lappert to testify as to "his anecdotal experience treating patients seeking

to 'de-transition,' and the WPATH recommended role of the surgeon in treating gender dysphoria as compared to the role of the surgeon in other surgical contexts." *Kadel*, 2022 WL 2106270, at *15. The Court held "[Dr. Lappert's] testimony concerning the role of the surgeon under the WPATH guidelines, and more specifically his criticism that surgeons are not able or required to verify a gender dysphoria diagnosis, appears to arise from his extensive experience as a plastic surgeon and is admissible." *Id.* at *14.

Nevertheless, even the testimony limited in *Kadel* is admissible here. First, the Court in *Kadel* focused on the fact Dr. Lappert was not the specific specialist it thought was necessary to give an expert opinion. *Id.* at *13–14 (noting Dr. Lappert is not a psychiatrist, endocrinologist, statistician, or epidemiologist). This fact is not dispositive in the Eighth Circuit. Second, the court's opinion in *Kadel* focused on the fact Dr. Lappert did not take part in the practices he criticized. *Id.* at *14. For example, the Court concluded Dr. Lappert could not testify about his broader criticism of the WPATH standards because he was not involved with their development, and he was not an expert on how the standards were developed. *Id.* Dr. Lappert should not have to take part in the improper practices that he critiques just to give an expert opinion on their impropriety. A standard like this would severely limit rebuttal testimony in cases where there is disagreement as to the validity of the methods applied. The opinion in *Kadel* is not a death knell as Plaintiffs claim.

2.      Dr. Lappert's Testimony is Relevant.

Expert testimony is relevant if it "advances the trier of fact's understanding to any degree." *Johnson v. Mead Johnson & Co.*, 754 F.3d 557, 562 (8th Cir. 2014) (quoting *Robinson v. GEICO Gen. Ins. Co.*, 447 F.3d 1096, 1101 (8th Cir. 2006)). Notably, the Eighth Circuit has held that "Rule 702 [of the *Federal Rules of Evidence*] does not require a defense medical expert to be of

the identical medical specialty as the plaintiff's expert." *Robinson v. GEICO Gen. Ins. Co.*, 447 F.3d 1096, 1100 (8th Cir. 2006).

Plaintiffs do not challenge the relevance of Dr. Lappert's testimony. Nevertheless, Dr. Lappert's testimony meets the lenient burden of relevance. His testimony touches directly upon the issues in the case. Plaintiffs disagree with Dr. Lappert's opinion, but that is no reason to exclude the testimony.

3.       Dr. Lappert's Testimony is Reliable.

Like relevancy, Plaintiffs have not challenged Dr. Lappert's reliability. Assuming Dr. Lappert is qualified to testify about the diagnosis and treatment of gender dysphoria, the information and experience he relied on in his expert reports is reliable. Dr. Lappert's experience treating patients with body dysmorphia shares similar issues as those physicians who care for patients who have symptoms of gender dysphoria. He has also studied the relevant medical literature, has extensive experience in analyzing the sufficiency of scientific studies, and Plaintiffs do not assert that to be an illegitimate basis for his opinions. As the Eighth Circuit has stated: "As long as the expert's scientific testimony rests upon 'good grounds, based on what is known' it should be tested by the adversary process with competing expert testimony and cross-examination, rather than excluded by the court at the outset." *Johnson v. Mead Johnson & Co., LLC*, 754 F.3d 557, 562 (8th Cir. 2014) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993)). Dr. Lappert's experience over his long career as a plastic surgeon and study of the relevant literature show his testimony regarding the treatment and diagnosis of gender dysphoria is reliable.

## IV. CONCLUSION

Undoubtedly, Plaintiffs and their experts disagree with Dr. Lappert. But the law in the Eighth Circuit is clear—courts are expected to liberally admit expert testimony. Plaintiffs admit

Dr. Lappert is qualified to testify about the risks and complications associated with surgical treatments for gender dysphoria. Therefore, given the inextricable connection between those risks and the reasons why the surgeries are sought in the first place, he is necessarily qualified to testify concerning the reasons for those surgeries. And Dr. Lappert's many years of experience treating patients with body dysmorphia qualifies him to testify about the very similar issues concerning gender dysphoria. Therefore, Defendants request the Court deny Plaintiffs' Motion to Exclude Expert Testimony of Dr. Patrick W. Lappert.

Respectfully Submitted,

LESLIE RUTLEDGE
Arkansas Attorney General

Dylan L. Jacobs (2016167)
ARKANSAS ATTORNEY GENERAL'S OFFICE
323 Center Street, Suite 200
Little Rock, AR 72201
Phone: (501) 682-2700
Email: dylan.jacobs@arkansasag.gov

Michael Cantrell (2012287)
ARKANSAS ATTORNEY GENERAL'S OFFICE
323 Center Street, Suite 200
Little Rock, AR 72201
Phone: (501) 682-2401
Email: michael.cantrell@arkansasag.gov

Amanda D. Land (2012135)
Assistant Attorney General
ARKANSAS ATTORNEY GENERAL'S OFFICE
323 Center Street, Suite 200
Little Rock, AR 72201
Phone: (501) 682-2029
Fax: (501) 682-8118
amanda.land@arkansasag.gov

*Attorneys for Defendants*