# Exhibit 1

Page 1

1  IN THE UNITED STATES DISTRICT COURT

2  EASTERN DISTRICT OF ARKANSAS

3  CENTRAL DIVISION

4  CASE NO. 4:21-CV-00450-JM

5  ----------------------------------X

6  DYLAN BRANDT, by and through his

7  Mother, JOANNA BRANDT, et al.,

8            Plaintiffs,

9     V.

10  LESLIE RUTLEDGE, et al.,

11            Defendants.

12  ----------------------------------X

13

14

15     REMOTE/ORAL/WEB VIDEOCONFERENCE

16   VIDEOTAPED DEPOSITION OF AMY E. EMBRY

17    (Sitting in Little Rock, Arkansas)

18              May 10, 2022

19               10:00 a.m.

20

21

22

23

24  Reported by:

25  Maureen Ratto, RPR, CCR

## Page 2

```
 1                    * * *
 2
 3        Videotape deposition of Amy E.
 4   Embry, held virtually via Zoom
 5   Teleconference, hosted from Veritext
 6   Legal Solutions, pursuant to notice,
 7   before Maureen Ratto, Certified Court
 8   Reporter, License No. XI01165,
 9   Registered Professional Reporter,
10   License No. 817125, and Notary Public.
11
12                    * * *
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 3

```
 1   A P P E A R A N C E S :
 2
 3   Counsel for the Plaintiffs:
 4      SULLIVAN & CROMWELL, LLP
 5      125 Broad Street
 6      New York, New York 10004
 7      BY:  JONATHAN G. LESTER, ESQ.
 8           DANIEL RICHARDSON, ESQ.
 9
10      AMERICAN CIVIL LIBERTIES UNION
11      125 Broad Street
12      New York, New York 10004
13      BY:  LESLIE COOPER, ESQ.
14
15      AMERICAN CIVIL LIBERTIES UNION
16      OF ARKANSAS
17      904 West 2nd Street
18      Little Rock, Arkansas 72201
19      BY:  GARY SULLIVAN, ESQ.
20
21      GILL RAGON OWEN, PA
22      425 West Capitol Avenue
23      Little Rock, Arkansas 72201
24      BY: DRAKE MANN, ESQ.
25           BETH ECHOLS, ESQ.
```

## Page 4

```
 1   A P P E A R A N C E S, continued:
 2
 3   Counsel for the Defendants:
 4      SENIOR ASSISTANT ATTORNEY
 5      GENERAL, PUBLIC PROTECTION DIVISION
 6      OFFICE OF ARKANSAS ATTORNEY GENERAL
 7      323 Center Street
 8      Little Rock, Arkansas 72201
 9      BY:  AMANDA LAND, ESQ.
10
11   ALSO PRESENT:
12   Randy Schoening, Legal Video Specialist
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 5

```
 1        VIDEOGRAPHER:  We are on
 2   the audio and video record. It is
 3   10:05 a.m.  The date is May 10th,
 4   2022.
 5        This is the videotape recorded
 6   deposition of Amy Embry, taken by
 7   counsel for the Plaintiff in the
 8   matter of Dylan Brandt, et al
 9   versus Leslie Rutledge et al, filed
10   in the United States District Court
11   Eastern, District of Arkansas,
12   Central Division, Case No.
13   4:21-CV-00450-JM.
14        This deposition is being held
15   at Gill Ragon & Owen, PA, 425 West
16   Capitol, Suite 3800, Little Rock,
17   Arkansas.
18        My name is Randy Schoening
19   from the firm of Veritext, I'm the
20   videographer.  The court reporter
21   is Maureen Ratto, from the firm
22   Veritext.
23        Will counsel please introduce
24   themselves for the record.
25        MS. COOPER:  Yes.  Thank you.
```

Page 6

1   Leslie Cooper from the ACLU for
2   Plaintiffs.
3           MR. LESTER:  John Lester from
4   Sullivan & Cromwell for the
5   Plaintiffs.
6           MR. RICHARDSON:  Daniel
7   Richardson from Sullivan & Cromwell
8   for the Plaintiffs.
9           MR. SULLIVAN:  Gary Sullivan,
10  ACLU of Arkansas for the
11  Plaintiffs, in person.
12          MR. MANN:  Drake Mann, Gill
13  Ragon Owen for the Plaintiffs.
14          MS. LAND:  Amanda Land of the
15  Arkansas Attorney General on behalf
16  of the Defendants.
17          VIDEOGRAPHER:  Will the
18  witness please be sworn?
19              * * *
20  A M Y  E.  E M B R Y, having been duly
21  sworn by an authorized Notary of the
22  State of Arkansas, testifies as
23  follows:
24  DIRECT EXAMINATION BY MS. COOPER:
25          VIDEOGRAPHER:  You may

Page 7

1           AMY E. EMBRY
2   proceed.
3       Q.   Thanks so much.  Good morning,
4   Ms. Embry. I'm Leslie Cooper.  I'm with
5   the ACLU, counsel for Plaintiffs and I'll
6   be taking your deposition today.
7           Before we get started, can I
8   just ask you to state your full name for
9   the record?
10      A.   My name is Amy Elizabeth
11  Embry.
12      Q.   Thank you. And have you ever
13  had your deposition taken before?
14      A.   Yes.
15      Q.   Okay. How many times?
16      A.   Once.
17      Q.   Was that in your capacity as
18  an employee of the Board?
19      A.   Yes.
20      Q.   Okay. Can you tell me what
21  that case was about?
22      A.   It was a lawsuit basically for
23  a license action or action against a
24  license, I guess I should say.
25      Q.   So a medical provider

Page 8

1           AMY E. EMBRY
2   challenging a decision concerning a
3   licensing --
4       A.   Correct.
5       Q.   -- issue?
6       A.   Correct.
7       Q.   So you have been deposed once
8   before, so what I'm about to say may
9   sound familiar, but just to make sure so
10  we get a clean record I'm going to go
11  over some of the groundrules for
12  deposition taking so the transcript is
13  clear.
14          First thing is, the best we
15  can, to the best we can we should really
16  try to avoid speaking over one another.
17  So if you could give me a chance to
18  finish my question, even if you
19  anticipate what I'm asking, before
20  answering it will prevent the court
21  reporter from having to try to hear two
22  things at once. Does that sound okay?
23      A.   Yes.
24      Q.   Okay. And I similarly will try
25  to wait until you complete your answer to

Page 9

1           AMY E. EMBRY
2   ask a new question.
3           Also, unlike regular
4   conversations, we have to always answer
5   verbally. We can't nod or even say a-hum
6   because that's kind of hard to understand
7   in -- typed out what that means. So I'm
8   just going to ask you to do your best to
9   answer verbally each time. Okay?
10      A.   Okay.
11      Q.   It may be that I'll ask
12  questions that you don't fully understand
13  or are confusing. If that happens, just
14  let me know that the question wasn't
15  clear to you and I can try to ask the
16  question in a different way to clarify
17  it. So please make sure to do that if a
18  question is not clear.  Okay?
19      A.   Okay.
20      Q.   Because if you do answer a
21  question we will assume that means you
22  understood it. Okay?
23          We will take breaks as we go
24  through. I will take them periodically,
25  but if you feel you need to break at any

Page 10

AMY E. EMBRY

1           AMY E. EMBRY
2   time before I bring it up just let me
3   know and we can find a breaking point to
4   do that. We will just need to make sure
5   we get completed answers to any questions
6   pending and then I'll find a time to take
7   a break. So no problem if you need to
8   take a break. Okay?
9       A.   Okay.
10      Q.   Is there anything that would
11  prevent you from giving complete and
12  accurate testimony today?
13      A.   No.
14      Q.   Okay. Is there any material
15  you're consulting today in connection
16  with your deposition, any notes or
17  written materials?
18      A.   I do not have any notes or
19  anything with me.
20      Q.   Okay. Did you do anything to
21  prepare for your deposition today?
22      A.   Just -- I reviewed the
23  documents received for the deposition, I
24  reviewed that, and spoke with Amanda
25  Land.

Page 11

AMY E. EMBRY

1           AMY E. EMBRY
2       Q.   And when you say the documents
3   received, what documents are you
4   referring to?
5       A.   That was the document stating
6   that I was going to be deposed today.
7       Q.   Okay. We'll look at that just
8   to confirm. I understand you to be
9   referring to the notice of your
10  deposition; is that your understanding?
11      A.   Yes.
12      Q.   And that included topics for
13  the deposition?
14      A.   Yes.
15      Q.   Okay. You didn't review
16  anything else?
17      A.   No.
18      Q.   Okay. And you said you met
19  with Ms. Land; is that correct?
20      A.   Yes.
21      Q.   And without sharing any
22  content of your conversation, how long
23  did you meet with her?
24      A.   Maybe an hour, maybe an hour.
25  I didn't write down the beginning time or

Page 12

AMY E. EMBRY

1           AMY E. EMBRY
2   ending time, but maybe an hour.
3       Q.   When was that?
4       A.   Yesterday.
5       Q.   And just the one time?
6       A.   Yes.
7       Q.   Okay. Did you review any
8   documents with counsel?
9       MS. LAND:  Objection.
10      MS. COOPER:  I'm sorry. I
11      didn't hear.
12      MS. LAND:  I made an
13      objection.
14      A.   Again, it was the document
15  that I received for my deposition and
16  what I would be responsible for answering
17  today.
18      Q.   And I probably should have
19  mentioned this before, that your counsel
20  may from time to time object to some of
21  my questions. Some of them may be
22  objections about the form of my question,
23  in which case she's making the record and
24  I can either correct the question or you
25  can -- or leave it as is and you can

Page 13

AMY E. EMBRY

1           AMY E. EMBRY
2   answer. Unless she makes a privilege
3   objection and instructs you not to
4   answer, otherwise you can continue
5   answering. Okay?
6       A.   Okay.
7       Q.   Have you spoken with anyone
8   besides Ms. Land about your deposition
9   today?
10      A.   I spoke with higher-ups at the
11  Department of Health to let them know I
12  would be in a deposition today. I also
13  informed the Board that they were being
14  sued and that I would be deposed.
15      Q.   Okay. And when you say you
16  informed the Board, I know that's a lot
17  of people, how did you inform them?
18      A.   I believe it was at a meeting
19  and I just told them that we had received
20  documents that we were being sued because
21  of the legislation that was passed and
22  the question from them was; why are they
23  suing us? And I said I don't know.
24      Q.   And when did this happen?
25      A.   I believe the lawsuit was

Page 14

```
 1            AMY E. EMBRY
 2  filed last fall, so I don't have a date,
 3  a specific date, but it would have been
 4  in the fall or shortly after the lawsuit
 5  was filed.
 6       Q.   So that was a meeting you --
 7  that occurred some time shortly after the
 8  lawsuit was filed in this case; is that
 9  right?
10       A.   It could be. And again, I have
11  to say this was months ago. So it may be
12  that I only spoke with one Board member.
13  I just don't recall. I do know that I did
14  tell a Board member that we're being
15  sued.
16       Q.   Okay. Did you notify the Board
17  at any time in writing that they were
18  being sued?
19       A.   Not to my knowledge.
20       Q.   Okay. And did anybody else
21  notify the Board in writing, besides you,
22  that the Board was being sued?
23       A.   No, just the documents that
24  came.
25       Q.   Okay. And then so that was at
```

Page 15

```
 1            AMY E. EMBRY
 2  least several months ago that
 3  communication with at least one Board
 4  member about being sued. But more
 5  recently, since you've been notified
 6  about your deposition, did you speak to
 7  anyone in the Board about that?
 8       A.   No.
 9       Q.   Okay. And I'd like to mark as
10  Exhibit 1 the 30(b)(6) notice of the
11  Board. That will be posted on Exhibit
12  Share in a moment.
13       (Exhibit 1, 30(b)(6) notice
14       for Defendant Arkansas State
15       Medical Board was received and
16       marked on this date for
17       identification.)
18       MS. LAND:  This is my first
19       time using Exhibit Share, so I'm
20       just making sure I find it as well.
21       Leslie, has it been uploaded to
22       Exhibit Share yet? I am not seeing
23       it.
24       MS. COOPER:  I think it's
25       still uploading. Sorry about that.
```

Page 16

```
 1            AMY E. EMBRY
 2       Let's give it another minute before
 3  we abandon Exhibit Share.
 4       MR. SULLIVAN:  I'm going to
 5       try and reload the exhibit. I
 6       apologize.
 7       MS. COOPER:  Thank you.
 8       MR. RICHARDSON:  If you reload
 9       the folder named Marked Exhibits
10       you should see Exhibit 1, Notice of
11       30(b)(6) deposition.
12       VIDEOGRAPHER:  This is the
13       court reporter, we're going to need
14       someone to share that to a screen
15       share because the witness is not
16       able, I mean, I'm not able to go
17       out of the feed into the share. So
18       can you actually share it on the
19       screen?
20       MS. COOPER:  I think given
21       that tech issue that we didn't
22       realize would be an issue, we
23       should resort to the hardcopies.
24       Can we go off the record for just a
25       moment?
```

Page 17

```
 1            AMY E. EMBRY
 2       VIDEOGRAPHER:  Yes. We are off
 3       the record at 10:18 a.m.
 4       (Discussion is held off the
 5       record.)
 6       VIDEOGRAPHER:  We are back on
 7       the record at 10:20 a.m.
 8       Q.   Thank you. Ms. Embry, you've
 9  been shown a document that we'd like to
10  mark as as Exhibit 1. Do you recognize
11  this document?
12       A.   Yes.
13       Q.   Is this the Notice of
14  Deposition that you referred to earlier?
15       A.   Yes.
16       Q.   Okay. And you've reviewed this
17  entire document?
18       A.   Yes.
19       Q.   Okay. And do you understand
20  that you have been designated by the
21  Defendant Arkansas State Medical Board to
22  testify on its behalf concerning a number
23  of topics listed in this notice?
24       A.   Yes.
25       Q.   And are you prepared to
```

AMY E. EMBRY

1  testify on behalf of the Board regarding
2  the topics listed in this notice?
3      A.   Yes.
4      Q.   You can put that aside for
5  now. Are you currently employed by the
6  Arkansas State Medical Board?
7      A.   I am.
8      Q.   And if I say "the Board" will
9  you understand that I mean the Arkansas
10 State Board?
11     A.   Yes.
12     Q.   And are you currently the
13 Executive Director of the Board?
14     A.   Yes.
15     Q.   Okay. Since when?
16     A.   2018.
17     Q.   And did you hold any position
18 with the Board before 2018?
19     A.   Yes.
20     Q.   What position was that?
21     A.   It was the Administrative
22 Services Manager.
23     Q.   And what were your
24 responsibilities in that position?

AMY E. EMBRY

1      A.   I was responsible for the
2  human resources, accounting, budget,
3  general office management of the Board.
4      Q.   When did you start that
5  position?
6      A.   2014.
7      Q.   Prior to that did you hold any
8  employment with the Board?
9      A.   No.
10     Q.   What did you do before that?
11     A.   I worked at the Department of
12 Finance and Administration for the State
13 of Arkansas.
14     Q.   Do you have any medical
15 training?
16     A.   No.
17     Q.   Any training at all related to
18 healthcare?
19     A.   No.
20     Q.   Can you tell me what your
21 responsibilities are as the Executive
22 Director of the Board?
23     A.   I manage the day-to-day
24 functions of the Board, I have managers

AMY E. EMBRY

1  that manage certain sections, I also work
2  closely with the Board for Board meetings
3  and each section within the Board works
4  with the Board in their own way.  In a
5  nutshell, that's what I do.
6      Q.   Now, you mention sections.
7  Could you tell me what the sections are?
8      A.   We have a regulatory section,
9  licensure, we have IT and we have a
10 credentialing section.
11     Q.   And those are all of the
12 sections?
13     A.   Yes.
14     Q.   And you have someone who is a
15 manager for each of those sections; is
16 that right?
17     A.   Yes.
18     Q.   And are there other employees
19 of the Board besides you and those
20 managers?
21     A.   Yes. Those --
22     Q.   I'm sorry.
23     A.   Those managers do have
24 employees and we have right now I would

AMY E. EMBRY

1  say 25, between 25 and 30 total
2  employees, including the managers and
3  myself.
4      Q.   Okay. And can you tell me
5  within the regulatory section who the
6  employees are or what their positions are
7  and what they do?
8      A.   There are three employees, one
9  of those is a manager.  The manager's
10 name is Juli Carlson and she had two
11 employees who are fairly new, one is
12 Penny Henderson and the other is
13 Elizabeth Jones.
14     Q.   And what are their jobs?
15     A.   They handle all the complaints
16 that come in that need to be processed to
17 the Board, they also handle any letters
18 or communication from the Board to the
19 licensees. They handle continuing medical
20 education audits, any questions that come
21 in as far as how to file a complaint.
22     Q.   And do I assume correctly that
23 the licensing or licensure section has to
24 do with doctors and other healthcare

```
 1        AMY E. EMBRY
 2  providers getting their license to
 3  practice in Arkansas; is that correct?
 4      A.    It is the healthcare providers
 5  that we license, that is what they deal
 6  with.
 7      Q.    But any complaints regarding
 8  any licensed healthcare providers go to
 9  the regulation section; is that right?
10      A.    Correct.
11      Q.    Or regulatory, is that what
12  you called it?
13      A.    Yes, ma'am.
14      Q.    Okay. Thank you. The employees
15  in the regulatory section, do any of
16  those employees have medical or
17  healthcare training?
18      A.    Not to my knowledge.
19      Q.    Okay. I want to ask you a few
20  questions about the current Board members
21  of the Board. You have at this point, I'm
22  going to count here.  Maybe you can just
23  tell me how many because you probably
24  know it, how many Board members you have?
25      A.    In all we have 14 Board
```

```
 1        AMY E. EMBRY
 2  members.
 3      Q.    And of those Board members
 4  that are currently on the Board, are all
 5  -- have they all been on the Board since,
 6  say, the beginning of 2021?
 7      A.    With the exception of one. I
 8  would have to go back and check my
 9  records to see when they came in. I only
10  know of one that was not on the Board as
11  of 2021.
12      Q.    And who was that?
13      A.    Dr. Brian McGee. He was just
14  appointed within the past two months.
15      Q.    And any of the members who
16  were on the Board in January 2021, if you
17  look at that list of people, are any of
18  those members no longer on the Board?
19      A.    Yes.
20      Q.    Who is that?
21      A.    You have Dr. Rutledge,
22  Dr. Staggs. Bear with me, I have to think
23  about this. I think that's it. We've lost
24  two.
25      Q.    So you've lost two and you
```

```
 1        AMY E. EMBRY
 2  gained one?
 3      A.    Correct.
 4      Q.    Okay.
 5      MS. COOPER: Can we mark as
 6      Exhibit 2, tab 2, please, the
 7      Arkansas Medical Practices Act and
 8      Regulations.
 9      (Exhibit 2, Arkansas Medical
10      Practices Act and Regulations,
11      revised as of December 2, 2020 was
12      received and marked on this date
13      for identification.)
14      Q.    Do you have that in front of
15  you, Ms. Embry?
16      MS. LAND: I'm showing her my
17      Exhibit Share.
18      MS. COOPER: I'm sorry. Is
19      there someone speaking that I can't
20      hear on the record?
21      MS. LAND: That was Amanda
22      Land. I asked if I could have a
23      copy because I don't believe you
24      are uploading these to --
25      MS. COOPER: Yeah. We can
```

```
 1        AMY E. EMBRY
 2  upload to Exhibit Share
 3  simultaneously. You're able to
 4  review that, Amanda?
 5      MS. LAND: I'm on Exhibit
 6      Share. It seems to be working
 7      because I can see the first exhibit
 8      that you did upload, but if --
 9      whether it's in paper or Exhibit
10      Share, I don't have a preference.
11      MS. COOPER: Okay. We will
12      upload all of the exhibits on
13      Exhibit Share for counsel to be
14      able to review while giving
15      hardcopies to the witness. Okay. So
16      we're in the process of uploading
17      Exhibit 2.
18      And Amanda, if you can let me
19      know when you're able to see that.
20      MS. LAND: It has popped up
21      for me.
22      MS. COOPER: Amanda, I can't
23      hear you so well. If you can speak
24      a little louder or adjust the mic.
25      MS. LAND: I can see the
```

Page 26

AMY E. EMBRY

1
2  exhibit.
3          MS. COOPER:  Great. Thank you.
4      Q.    Ms. Embry, do you recognize
5  the document placed in front of you
6  that's been marked as Exhibit 2?
7      A.    Yes.
8      Q.    Okay. And that is the, for the
9  record, the title page is Arkansas State
10  Medical Board, Arkansas Medical Practices
11  Act and Regulations; is that correct?
12      A.    Yes.
13      Q.    And is this set of -- is this
14  act and set of regulations what governs
15  the Board?
16      A.    Yes.
17      Q.    And I take it you've seen this
18  document before?
19      A.    Yes.
20      Q.    Okay. If you can turn to
21  Section 17-95-301?
22      A.    Let me go to the table of
23  contents to get the page.
24      Q.    I believe it's 21. Is this the
25  provision that dictates the membership of

Page 27

AMY E. EMBRY

1
2  the Board?
3      A.    Yes.
4      Q.    And do I understand correctly
5  that there are 14 members appointed by
6  the Governor?
7      A.    Yes.
8      Q.    And 10 must be active medical
9  practitioners?
10      A.    Yes.
11      Q.    And one must be a practicing
12  physician; did I say that right? If you
13  look at Subsection 3 --
14      A.    Yes. That is the one that --
15  yes. There are physicians but this is the
16  one that is appointed by that specific
17  organization. That's what was throwing me
18  on your question.
19      Q.    Understood. Thank you. So
20  there are other physicians on the Board
21  as well?
22      A.    Yes.
23      Q.    Okay. And I understand -- do I
24  understand correctly that two members
25  must not be medical providers; is that

Page 28

AMY E. EMBRY

1
2  correct?
3      A.    Yes.
4      Q.    And one must be an osteopathic
5  physician?
6      A.    Correct.
7      Q.    Now, I'd like to go through
8  the current members of the Board and ask
9  you to tell me what their designated
10  position is on the Board? In other words,
11  are they a medical practitioner, are they
12  a non-medical provider, and what their
13  area of practice is, if they are medical
14  providers.
15          So we can start with -- and if
16  I read a name and that person is no
17  longer on the Board just let me know.
18  Sylvia Simon, is she still on the Board?
19      A.    Yes.
20      Q.    And what is her designated
21  position on the Board?
22      A.    She is the Chairman of the
23  Board, Chairperson of the Board.
24      Q.    And she is a physician?
25      A.    Yes.

Page 29

AMY E. EMBRY

1
2      Q.    What is her practice area?
3      A.    I'm going to say family
4  practice.
5      Q.    How about Brian Hyatt, is he
6  still on the Board?
7      A.    Yes.
8      Q.    And what is his designated
9  position?
10      A.    He is the vice-chair.
11      Q.    And he's a physician as well?
12      A.    Yes.
13      Q.    What is his area of practice?
14      A.    Psychiatry.
15      Q.    How about Veryl Hodges?
16      A.    Yes.
17      Q.    They're on the Board?
18      A.    Yes.
19      Q.    And what is their designated
20  position?
21      A.    He is the secretary of the
22  Board.
23      Q.    Is he a physician?
24      A.    Yes.
25      Q.    I see his title says DO, is

Page 30

```
1              AMY E. EMBRY
2  that a doctor of osteopathy, am I saying
3  that correctly?
4       A.   Yes.
5       Q.   Is John Scribber still on the
6  Board?
7       A.   That's John Scribner.
8       Q.   Thank you. Is he still on the
9  Board?
10      A.   Yes.
11      Q.   And what is his designated
12  position on the Board?
13      A.   He is the treasurer.
14      Q.   And he's a physician?
15      A.   Yes.
16      Q.   What is his area of practice?
17      A.   Family practice.
18      Q.   Okay. Elizabeth Anderson, is
19  she still on the Board?
20      A.   Yes.
21      Q.   Is she a physician?
22      A.   No.
23      Q.   So she's one of the designated
24  non-physicians on the Board?
25      A.   Correct.
```

Page 31

```
1              AMY E. EMBRY
2       Q.   Okay. Does she have a title
3  within the Board, such as secretary or
4  treasurer?
5       A.   No.
6       Q.   Rhys Branman still on the
7  Board?
8       A.   Yes.
9       Q.   And what is -- does he have a
10  designated position or title?
11      A.   All the designated were the
12  four officers we've already mentioned.
13      Q.   Okay.  Is Rhys Branman a
14  physician?
15      A.   Yes.
16      Q.   What is his area of practice?
17      A.   Plastic surgery.
18      Q.   Is Robert Breving still on the
19  Board?
20      A.   Yes.
21      Q.   And he's a physician as well?
22      A.   Yes.
23      Q.   What area of practice?
24      A.   Surgery.
25      Q.   Is Edward Gardner still on the
```

Page 32

```
1              AMY E. EMBRY
2  Board?
3       A.   Yes.
4       Q.   Is he a physician?
5       A.   Yes.
6       Q.   And his area of practice is?
7       A.   He's an ENT doctor, ENT
8  physician.
9       Q.   Is Rodney Griffin still on the
10  Board?
11      A.   Yes.
12      Q.   Is he a physician?
13      A.   Yes.
14      Q.   And is his area of practice?
15      A.   Family medicine, as far as I
16  can recall.
17      Q.   Is Betty Guhman -- am I saying
18  that right?
19      A.   Guhman.
20      Q.   Is Betty Guhman still on the
21  Board?
22      A.   Yes.
23      Q.   Is she a physician?
24      A.   No.
25      Q.   Okay. Is Timothy Paden still
```

Page 33

```
1              AMY E. EMBRY
2  on the Board?
3       A.   Yes.
4       Q.   Is he a physician?
5       A.   Yes.
6       Q.   What area of practice?
7       A.   Family medicine.
8       Q.   Is Don Philips still on the
9  Board?
10      A.   Yes.
11      Q.   And he's a physician?
12      A.   Yes.
13      Q.   And what is his area of
14  practice?
15      A.   OBGYN.
16      Q.   Okay. And I believe you said
17  William Rutledge and David Staggs are no
18  longer on the Board?
19      A.   That is correct.
20      Q.   Okay. Are they both
21  physicians?
22      A.   Yes.
23      Q.   And can you tell me what their
24  areas of practice are?
25      A.   Dr. Rutledge was a surgeon and
```

```
                          AMY E. EMBRY
 1
 2   Dr. Staggs was family practice.
 3        Q.    Okay. Thank you. We were
 4   looking at the Arkansas Medical Practices
 5   Act. If we can go to Section 17-95-303(5)
 6   and I understand that Section 303(5) are
 7   the duties of the Board and it says, "The
 8   Arkansas State Medical Board shall:", and
 9   list a number of items. And number (5)
10   says "have the authority to employ a
11   Medical Director who shall hold a valid
12   license to practice medicine in this
13   State to evaluate medical issues and to
14   assist in investigations pending before
15   its Board."  Did I read that right?
16        A.    Yes.
17        Q.    Does the Board employ a
18   Medical Director?
19        A.    No.
20        Q.    No. Since you've been with the
21   Board have they ever employed a Medical
22   Director?
23        A.    No.
24        Q.    Do you know why that is?
25        A.    No, I do not.
```

```
                          AMY E. EMBRY
 1
 2        Q.    Okay. Staying in that same
 3   part of the statute, Section 303, under
 4   subsection (7) it says, that the Medical
 5   Board shall "have the power and authority
 6   to employ one or more inspectors as may
 7   be necessary to carry out the provisions
 8   of the Arkansas Medical Practices Act."
 9        Does the Board employ
10   inspectors?
11        A.    We employed one inspector.
12        Q.    Is that in the past?
13        A.    Yes.
14        Q.    When was that?
15        A.    Within the past year. I don't
16   have exact dates.
17        Q.    But you don't currently have
18   any employed inspectors?
19        A.    Not employed by the Board, no.
20        Q.    Do you work with inspectors
21   who are not employed by the Board?
22        A.    Yes.
23        Q.    What is that arrangement? Can
24   you explain that to me?
25        A.    It is in the Arkansas code
```

```
                          AMY E. EMBRY
 1
 2   that we are to use Pharmacy Services at
 3   the Arkansas Department of Health for
 4   inspections, investigations -- not
 5   inspections, investigations.
 6        Q.    Is that only for
 7   investigations concerning issues relating
 8   to prescription of drugs?
 9        A.    Yes, and other things, we use
10   it also for others besides just the
11   prescription of drugs.
12        Q.    So these are inspectors that
13   are employed by Pharmacy Services at the
14   Department of Health?
15        A.    Correct, but it's
16   investigators not inspectors.  I believe
17   they're investigators.
18        Q.    So just I want to make sure I
19   understand how this works. If there is a
20   complaint against a physician, for
21   example, and the Board feels the need to
22   do an investigation it would work with an
23   investigator from Pharmacy Services; is
24   that right?
25        A.    Yes.
```

```
                          AMY E. EMBRY
 1
 2        Q.    How many investigators do they
 3   have at Pharmacy Services that you work
 4   with?
 5        A.    That I know of, we have worked
 6   with three.
 7        Q.    But are there others there
 8   besides the ones you've worked with?
 9        A.    That is my understanding but
10   that's not my staff, so I can't answer
11   truthfully on that.
12        Q.    Okay. You know of three; is
13   that right?
14        A.    Yes. That is correct.
15        Q.    And what is the role of these
16   investigators?
17        I sort of tried to lay out
18   what I understood but I'm sure that was
19   not a full description.
20        What do these investigators do
21   when you work with them?
22        A.    Well, if the Board votes that
23   there needs to be an investigation on a
24   complaint that comes in a subpoena will
25   be issued that I sign and those
```

Page 38

```
AMY E. EMBRY
1
2    investigators serve that subpoena for
3    whatever is listed in the subpoena.
4         Q.    Do they do anything else?
5         A.    They gather that information,
6    they do -- they evaluate it and they
7    present a report back to the Board
8    offices to present to the Board members.
9         Q.    When you say they gather
10   information, is that information that
11   they gather documents that are requested
12   by a subpoena that they then deliver; is
13   that what you mean?
14        A.    That is correct.
15        Q.    That might be some of their
16   medical records, that kind of thing?
17        A.    It could be, yes.
18        Q.    So the investigator serves the
19   subpoena that asks for documents and then
20   collects those materials and then writes
21   a report about the materials; did I get
22   that right?
23        A.    Yes, they take them back. They
24   will look through them and try to gather
25   what information they can, and then
```

Page 39

```
AMY E. EMBRY
1
2    present a report to the Board office.
3         Q.    And who identifies the
4    documents that are being requested in the
5    subpoena? Is that an employee of the
6    Board?
7         A.    I need you to clarify that
8    question.
9         Q.    Sure. So you mention that the
10   investigators from Pharmacy Services will
11   serve the subpoena. Who writes the
12   subpoena?
13        A.    The Board office does, staff
14   at the office writes the subpoena.
15        Q.    Which staff? Let's say it's in
16   -- presumably it's always in a regulatory
17   context, right?
18        A.    Yes, regulatory section.
19        Q.    So that would be the manager
20   or the other employees in the regulatory
21   section would write that subpoena?
22        A.    Correct.
23        Q.    Presumably with counsel is
24   that involved or no?
25        A.    Yes. It's a very generic
```

Page 40

```
AMY E. EMBRY
1
2    subpoena listing exactly what we need,
3    so...
4         Q.    And then the report is
5    provided to those within the regulatory
6    section when it's done?
7         A.    Yes.
8         Q.    And then what happens after
9    that in the investigation process?
10        A.    It is prepared, that report is
11   prepared to be presented to the Board
12   members, it's discussed at the next
13   meeting or if they feel they have enough
14   information from that investigation to
15   present it to the Board.  If not, there
16   may be other things that need to be done
17   and then the Board discusses it and they
18   make a decision on what needs to be done
19   next.
20        Q.    Thank you. While we're in this
21   part of the Arkansas Medical Practices
22   Act, if you can look at 17-95-303
23   subsection (9), bottom of the same page
24   and it's again, "The Arkansas State
25   Medical Board shall consider and give
```

Page 41

```
AMY E. EMBRY
1
2    deference to data, studies consensus
3    documents and conclusions issued by the
4    Center For Disease Control and Prevention
5    or the National Institute of Health
6    whenever their data, studies consensus
7    documents and conclusions are relevant to
8    any decision made pursuant to the Board's
9    powers and duties under the Arkansas
10   Medical Practices Act."
11             Is that something the Board
12   does?
13        A.    I have not seen it in my
14   tenure at Director. I don't know if a
15   situation has come up that they have to
16   do that. So during the time that I've
17   been the Board Director, I can't say that
18   I've seen that --
19        Q.    Okay.
20        A.    -- from these organizations
21   listed in this section.
22        Q.    Okay. Have you seen data,
23   studies, consensus documents or
24   conclusions issued by other organizations
25   that were considered by the Board in
```

Page 42

```
1              AMY E. EMBRY
2    making any decisions concerning
3    regulation of medical professionals?
4         A.   I do not recall that. I would
5    have to go back and look at documents to
6    see.
7         Q.   Okay. Is it fair to say the
8    Board is the State entity in Arkansas
9    charged with regulating the practice of
10   medicine; is that correct?
11        A.   Yes.
12        Q.   And what does that mean, to
13   regulate the practice of medicine to the
14   Board?
15             MS. LAND:  Object to form. You
16        may answer.
17        A.   Well, they put it in the code
18   that the State Medical Board is -- is --
19   let me start that over.
20             We are responsible for
21   regulating those healthcare professionals
22   that we license. If someone is practicing
23   medicine without a license it is usually
24   referred to our Board. So if someone has
25   another license with another healthcare
```

Page 43

```
1              AMY E. EMBRY
2    licensing board, but it does not fall
3    within their scope of practice what the
4    complaint is being made against that
5    individual, then it will probably be
6    referred to the Medical Board as
7    practicing medicine, this individual is
8    practicing medicine.
9         Q.   And for those who are licensed
10   by the Board, those medical professionals
11   licensed by the Board, you said you're
12   responsible for regulating those
13   healthcare professionals. What do you
14   mean by "regulating" them?
15        A.   Well, maybe that wasn't the
16   best term but we are responsible for
17   those individuals that are licensed by
18   us, but we work on a complaint basis.
19             So we have between 19 and 20
20   thousand licensees at the Board right
21   now in various practice and various types
22   of licenses.  And if a complaint comes in
23   every single complaint is reviewed by the
24   Board, every single complaint is reviewed
25   by the Board, and from there it is
```

Page 44

```
1              AMY E. EMBRY
2    determined what needs to be done. We do
3    get complaints that it may be, for
4    example, on a nurse, we do not regulate
5    nurses, we forward it onto the Nursing
6    Board.
7         Q.   Thank you.
8         A.   And we work on a complaint
9    basis.
10             MS. COOPER:  Can we see tab 3
11        and mark that as Exhibit 3?
12             (Exhibit 3, printout of the
13        homepage of the Arkansas State
14        Medical Board website was received
15        and marked on this date for
16        identification.)
17             MS. COOPER:  Amanda, if you
18        can let me know if that's available
19        to you.
20             MS. LAND:  Yes, it is. I'll
21        let you know each time going
22        forward.
23        Q.   Thank you.  Ms. Embry, do you
24   recognize what's been marked as Exhibit
25   3?
```

Page 45

```
1              AMY E. EMBRY
2         A.   Yes.
3         Q.   And can you tell me what that
4    is?
5         A.   This is -- it is the homepage
6    or a page from our website.
7         Q.   So I'd like you to read along
8    with me the box to the section in the
9    middle that says, "The Medical Board's
10   mission is to protect the public" --
11   excuse me, I'll start that again. "The
12   Medical Board's mission is to protect the
13   public and act as their advocate by
14   effectively regulating the practices of
15   medical doctors, osteopathic medical
16   directors, physician assistants, medical
17   corporations, respiratory therapists,
18   occupational therapists, occupational
19   therapy assistants, radiology
20   practitioner assistants and radiologist
21   assistants." Did I read that right?
22        A.   Yes, ma'am.
23        Q.   Is this an accurate statement
24   of the Board's mission?
25        A.   Yes.
```

Page 46

```
 1            AMY E. EMBRY
 2      Q.   And I understand the Board has
 3 authority to enact regulations to carry
 4 out the purposes and intentions of the
 5 Medical Practices Act; is that right?
 6      A.   Yes.
 7      Q.   So under what circumstances
 8 can the Board enact regulations?
 9      A.   If it is in the law where it
10 says that a licensing board shall or will
11 promulgate a rule or if we are requested
12 by the legislature to do so.
13      Q.   Okay. So I want to unpack that
14 a little bit.
15           So the first scenario is if a
16 statute says the Board shall enact a
17 regulation concerning a particular topic,
18 you will -- the Board will enact a
19 regulation; is that correct?
20      A.   Yes.
21      Q.   Okay. And then a separate
22 scenario is if the legislature requests
23 the Board to enact a regulation; did I
24 understand that right?
25      A.   Yes.
```

Page 47

```
 1            AMY E. EMBRY
 2      Q.   And that's outside of the
 3 context of a statute?
 4      A.   Yes. That is very rare.
 5      Q.   Has that ever happened since
 6 you've been with the Board?
 7      A.   Yes. It finished up when I
 8 became Director. It started with a
 9 previous Director and even though we were
10 requested by the legislature to come up
11 with a rule, the rule did not pass and it
12 was not enacted.
13      Q.   What was the issue that the
14 legislature asked you to come up with a
15 rule about?
16      A.   It was basically about
17 cosmetic procedures, as far as what was
18 happening at medical spas, what can be
19 considered the practice of medicine, what
20 cannot be considered the practice of
21 medicine.
22      Q.   And how was that communicated
23 to the Board by the legislature that they
24 wanted you to to come up with a
25 regulation?
```

Page 48

```
 1            AMY E. EMBRY
 2      A.   They can either make a request
 3 to the Board, themselves, through
 4 attorneys, they can ask a Board member,
 5 say we're interested in a rule about
 6 this. But again, that is very rare and
 7 since I've been with the Board since 2014
 8 that's only happened once, which the rule
 9 did not pass.
10      Q.   Okay. And given that the
11 legislature includes a lot of people,
12 does it have to be that the legislature
13 as a body has voted by majority vote to
14 request that regulation or could an
15 individual legislator ask the Board to
16 enact a regulation?
17      A.   I can only speak to my
18 understanding. I do not have any
19 knowledge of how the legislature would
20 handle that, but to my knowledge and my
21 understanding is that anybody can ask.
22      Q.   Anybody within the
23 legislature?
24      A.   Yes.
25      Q.   Can ask -- let me make sure I
```

Page 49

```
 1            AMY E. EMBRY
 2 asked that question that's not broken up
 3 for the record.
 4           So anybody who is a member of
 5 the legislature can ask the Board to
 6 enact a regulation; that's your
 7 understanding?
 8      A.   That is my understanding, but
 9 that would be a question for the
10 legislature.
11      Q.   And in the example that you
12 mention, the one time that happened since
13 you've been with the Board, the cosmetic
14 procedure issue, was that a single member
15 of the Board asked for that or how did
16 that come to you?
17      A.   That I do not know because I
18 was not on the front end of that when it
19 began, so I cannot answer to that.
20      Q.   Okay. Can anyone outside of
21 the legislature, who is not a member of
22 the legislature, ask the Board to enact a
23 regulation on a topic?
24      A.   I suppose. I suppose. It has
25 not happened but there is a whole process
```

AMY E. EMBRY

1
2 that the legislature must approve all the
3 rules. So even if we draft a rule, it has
4 to be approved by the legislature before
5 it can be considered an active rule.
6     Q.   And that's true of all of the
7 rules that have been passed by the Board
8 so far?
9     A.   Correct. Correct.
10     Q.   And I believe there's
11 something like 30-something rules; is
12 that right?
13     A.   That's right.
14     Q.   They've all been approved by
15 the legislature?
16     A.   Yes.
17     Q.   Okay. Has, to your knowledge,
18 any other government official, outside of
19 the legislature, let's say within the
20 executive branch of government, ever
21 asked the Board to enact a regulation?
22     A.   Not to my knowledge, not that
23 I know of.
24     Q.   That would include the
25 Governor's Office has never asked?

AMY E. EMBRY

1
2     A.   Since I've been Director, I
3 have not received that request.
4     Q.   And are you aware if that's
5 ever happened before?
6     A.   I am not aware if it's
7 happened before.
8     Q.   Okay. Can the Board enact a
9 regulation on its own without being
10 requested to do so by somebody else?
11     A.   It could but, again, it's
12 usually never done. I don't know if it
13 has been done.
14     Q.   So I looked through the
15 regulations that you have and I see that
16 there are lots of different topics about
17 which the Board has passed regulations.
18 I'm just going to list some and ask if
19 you're familiar.
20     I saw one about precautions
21 concerning HIV. And this is not a test.
22 Let me back it up. I'm happy to have you
23 look through.
24     Do I understand correctly that
25 Regulation 16, which is in Exhibit 2 --

AMY E. EMBRY

1
2     A.   That's correct.
3     Q.   -- is about precautions
4 related to HIV and some other
5 communicable diseases; is that correct?
6     A.   Yes.
7     Q.   And then I understand that
8 Regulation 22 has some guidelines
9 concerning laser surgery; is that
10 correct?
11     A.   Yes.
12     Q.   And there are guidelines, or I
13 should say regulations concerning
14 abortion in Regulation 36?
15     A.   Yes.
16     Q.   And there is a Regulation 27
17 concerns informed consent for gastric
18 bypass surgeries; is that right?
19     A.   Yes.
20     Q.   And then Provision 21 relates
21 to -- is a regulation concerning
22 anorexiant drugs. Am I saying that right,
23 anorexiant?
24     A.   Anorexiant.
25     Q.   Now, were you on the Board or

AMY E. EMBRY

1
2 not on the Board -- excuse me.
3     Were you employed by the Board
4 when any of those provisions were
5 enacted?
6     A.   The ones that you mentioned?
7     Q.   Yes.
8     A.   No, I was not at the Board.
9     Q.   Okay. And do you know if all
10 of these provisions were prompted by a
11 statutory directive by the legislature?
12     A.   I would need to go back and
13 research but nearly every rule is
14 prompted by legislation.
15     Q.   But some are not?
16     A.   I would have to go back and
17 read the history of each one. So I can't
18 answer that honestly.
19     Q.   Okay. Can we look at
20 Regulation 21 concerning anorexiants?
21     Would looking at this rule, or
22 I should say regulation, provide you with
23 the information about whether it was
24 prompted by a statute?
25     A.   It may.

Page 54

```
 1            AMY E. EMBRY
 2      Q.    Okay.
 3      A.    Again, I could not answer
 4  completely honestly without going back
 5  and looking how this began.
 6      Q.    So from the regulation,
 7  itself, where it says at the end, if you
 8  look along with me, "history adopted
 9  March 13, 1998 amended August 6, 2015
10  effective December 14, 2015", that
11  doesn't tell me what prompted it?
12      A.    It would not tell me because I
13  was not at the Board. If I was there I
14  may remember.
15      Q.    Okay. If the Board had a
16  concern about how medical care was being
17  provided in a particular field, could the
18  Board get together and put together a
19  regulation?
20      A.    They could.
21      Q.    They could. But you don't know
22  if they've ever done that?
23      A.    Not to my knowledge.
24      Q.    They have not done that, to
25  your knowledge, is that what you're
```

Page 55

```
 1  saying?
 2      A.    I have no memory of them doing
 3  that in my time at the Board.
 4      Q.    And do you know whether prior
 5  to your time at the Board that was ever
 6  done?
 7      A.    I do not know.
 8      Q.    I want to ask some of the
 9  process about enacting regulations. Who
10  within the Board, or is it someone within
11  the Board who drafts these regulations?
12      A.    They're usually drafted either
13  by staff or with the assistance of an
14  attorney.
15      Q.    And who decides on the
16  content?
17      A.    The Board votes on the final
18  draft. They approve what will be the rule
19  that will begin -- that will be sent for
20  the promulgation process.
21      Q.    So if it's a draft that
22  relates to let's say -- I guess they're
23  all within the regulatory context, right,
24  all of these regulations?  So if there's
25
```

Page 56

```
 1            AMY E. EMBRY
 2  -- if somebody were to draft a regulation
 3  relating to orthopedics, for example,
 4  would the staff who are drafting that
 5  regulation look to expertise within the
 6  field of orthopedics to draft the
 7  regulation?
 8      A.    Yes. That would be -- yes.
 9      MS. LAND:  Objection to form
10      on that previous question.
11      Q.    Okay. How would they -- how
12  would they do that?
13      A.    They would work with the Board
14  members and the Board members would have
15  their input. The Board members would then
16  say if they did not -- for example, if it
17  was orthopedics, if there is an
18  orthopedic society or association to get
19  some expertise, if they did not have that
20  expertise. And then changes would be made
21  to that and then the Board would vote yay
22  or nay on the draft.
23      Q.    If they were to reach out to
24  an orthopedic society or an organization
25  with expertise, would that mean to then
```

Page 57

```
 1            AMY E. EMBRY
 2  speak with orthopedists who could offer
 3  expertise; is that what you mean?
 4      A.    It could be, yes.
 5      Q.    Could it also be to look at
 6  any best practices guidelines they have?
 7      A.    Could be, yes.
 8      Q.    Have any regulations been
 9  enacted by the Board since you've been
10  employed by the Board?
11      A.    Yes.
12      Q.    Can you tell me which ones?
13      A.    I may not have been the
14  Director, but these are the ones that
15  were -- let me get back to the table of
16  contents. It will be the ones towards the
17  end. 39 was amended, 40 was created, 41,
18  42, 43 and 44 and 45.
19      Q.    Thank you. So let's take, for
20  example, Regulation 40, Arkansas Surgical
21  Technologists. Did the Board reach out to
22  any surgical professional groups in
23  developing that regulation?
24      A.    Let me flip to that. I believe
25  this was taken directly from the code,
```

Page 58

AMY E. EMBRY

1 which is on our rules, it's just cut and
2 paste and put in there what it is.
3     Q.    And by "code" do you mean
4 Arkansas statutes?
5     A.    Yes.
6     Q.    Okay. And let's look at number
7 43, Genetic Counselor Licensure, was that
8 taken directly from the code?
9     A.    Yes.
10     Q.    All of it?
11     A.    To my knowledge, yes.  Without
12 having documents in front of me, to my
13 knowledge yes.
14     Q.    Okay. Is it your understanding
15 that all of the regulations are language
16 from the legislature or -- let me ask it
17 differently. Strike that.
18          Does the Board ever develop
19 language for regulations, itself?
20     A.    Yes.
21     Q.    And is there ever a case where
22 the statute mandates a regulation and
23 certain requirements but the Board may
24 fill that out with additional details in

Page 59

AMY E. EMBRY

1 the regulation?
2     A.    Yes.
3     Q.    And is that where the
4 expertise of professional associations
5 may come in; is that correct?
6     A.    Yes.
7     Q.    Okay. Which professional
8 associations do you recall the Board
9 having relied on?
10     A.    The ones that we work closest
11 with, the ones that we have the most
12 contact with and I would say, okay, the
13 Medical Society, the Hospital
14 Association, Physician Assistant, and
15 these are all within Arkansas, these are
16 all Arkansas organizations. Let's see who
17 else? Occupational Therapy and
18 Respiratory.
19     Q.    So when you say the Medical
20 Society, is that an association called
21 the Arkansas Medical Society, is that its
22 name?
23     A.    Yes.
24     Q.    And is that a professional

Page 60

AMY E. EMBRY

1 association of doctors within Arkansas?
2     A.    Yes, it is.
3     Q.    Okay. And when you mentioned,
4 say, the Occupational Therapy, you said
5 Occupational Therapy, is that an
6 association, a professional association
7 of occupational therapists in Arkansas?
8     A.    Yes, ma'am. I can't remember
9 the exact name off the top of my head.
10     Q.    Okay. And when you've worked
11 with these groups did they -- again, did
12 members of those groups provide expertise
13 as professionals within the field?
14     A.    Sometimes, yes.
15     Q.    And when you've worked with
16 these groups did you ever review -- and
17 by "you" I mean the Board -- best
18 practices guidelines of those
19 organizations?
20     A.    Yes.
21     Q.    And does the Board, when it
22 enacts regulations, attempt to try to
23 enact regulations that are consistent
24 with best practices in a particular

Page 61

AMY E. EMBRY

1 field?
2     A.    They do try, yes.
3     Q.    Are you familiar with the
4 regulation about opioid prescriptions?
5     A.    Yes.
6     Q.    Was that a regulation that was
7 passed based on a statutory mandate?
8     A.    That was before I was the
9 Director. My understanding is that it was
10 drafted and put through the promulgation
11 process at the request of the legislature
12 because of the opioid epidemic.
13     Q.    So your understanding is
14 that's in that category of a request of
15 the legislature but not a statutory
16 provision?
17     A.    Correct.
18     Q.    That's correct?
19     A.    Yes. That's my understanding.
20     Q.    I may not have heard part of
21 your answer. I understood you to say it
22 was drafted at the request of the
23 legislature because of a concern; is that
24 what I heard?

Page 62

AMY E. EMBRY

1
2      A.    It was because of the opioid
3  epidemic.
4      Q.    Okay. That was before your
5  time on the Board; is that right?
6      A.    Yes.  Before I was Director,
7  yes.
8      Q.    You were employed at the Board
9  at that time?
10     A.    Yes.  But in my previous job I
11  had nothing to do with the rules or
12  anything.
13     Q.    Understood. Okay. Thank you.
14         You mentioned that the
15  legislature needs to approve any
16  regulations that the Board enacts. Did I
17  understand that correctly?
18     A.    Yes.
19     Q.    Has that always been a
20  requirement since you're aware?
21     A.    Yes.
22     Q.    Since you've been employed by
23  the Board?
24     A.    Yes.
25     Q.    And the process to get the

Page 63

AMY E. EMBRY

1
2  legislature approval after you enact a
3  regulation, or I guess you would call it
4  a proposed regulation at that point, does
5  it actually have to get voted on by the
6  State Legislature?
7      A.    It must be voted on by
8  committees and subcommittees.
9      Q.    So it's not the full
10  legislature that has to approve it but
11  the relevant committee; is that correct?
12     A.    That's my understanding, yes.
13     Q.    Is it a particular committee
14  or subcommittee that generally has to
15  approve your regulations?
16     A.    I do know it's -- it's the
17  Rules Subcommittee and I'm sorry, I can't
18  remember the name of the actual committee
19  that it's the subcommittee of.
20     Q.    You mentioned various Arkansas
21  professional medical or related
22  organizations that the Board will
23  sometimes look to for guidance in
24  developing regulations. Does the Board
25  ever look to national professional

Page 64

AMY E. EMBRY

1
2  medical groups like the American Medical
3  Association?
4      A.    Since I have been Director I
5  think it's more for information, data
6  collection, things of that nature.
7      Q.    And the Board will look to
8  those national groups for information and
9  data collection; is that correct?
10     A.    If needed, yes.
11     Q.    Can you tell me in what
12  context?
13     A.    An example may be that if they
14  need to know what the national average is
15  for a particular prescription of a drug,
16  the AMA, for example, may have that
17  information. They would go to the website
18  and see what information is there, so
19  just basically on an informational scale.
20     Q.    Got it. And when the Board
21  passes a regulation, that's by a majority
22  vote; is that right?
23     A.    Yes.
24     Q.    So it's not a consensus
25  requirement?

Page 65

AMY E. EMBRY

1
2      A.    No, but it does require a
3  vote.
4      Q.    Is there a public comment
5  period for regulations?
6      A.    Yes.
7      Q.    Is that before or after it
8  goes to the legislature?
9      A.    Before.
10     Q.    So do I understand right, the
11  Board will write the regulation, vote to
12  approve it, then put it out for public
13  comment or do I have that backwards?
14     A.    You are correct.
15     Q.    Okay. And then the Board
16  considers the comments that were made by
17  the public?
18     A.    Absolutely.
19     Q.    And potentially change the
20  regulation as a result?
21     A.    Could be. Could be. That is an
22  option.
23     Q.    And then they would have a
24  perhaps a revised version that they would
25  vote on again; is that right?

Page 66

AMY E. EMBRY

1
2     A.     That is correct.
3     Q.     And at that point it would get
4  sent to the legislature for approval?
5     A.     At that point any changes that
6  are made it has to go through the whole
7  promulgation process again, so it would
8  have the public comment period again and
9  then begin the legislative process.
10    Q.     Okay. Has the legislature ever
11 rejected a proposed regulation?
12    A.     Yes.
13    Q.     Do you know what about?
14    A.     It was the one we discussed
15 earlier, the one about the cosmetic
16 procedures.  That's the only one that I
17 know of.
18    Q.     Oh, I misunderstood. So the
19 Board actually did adopt a regulation but
20 the legislature rejected it; is that
21 right?
22    A.     Correct.
23    Q.     Do you know why?
24    A.     During the committee meeting
25 they thought the Medical Board did not

Page 67

AMY E. EMBRY

1
2  have the authority to -- to regulate
3  those procedures when they were not their
4  licensees and it was also a scope of
5  practice issue.  So it was voted down in
6  the legislature -- in the committee, in
7  the committee.
8     Q.     And what do you mean by "a
9  scope of practice issue"?
10    A.     Scope of practice basically
11 means was it in the Board's scope to say
12 this -- this person can or cannot do this
13 procedure; was it in the law?
14    Q.     And by "the law" you mean the
15 law that gives the Board authority to
16 regulate various healthcare providers?
17    A.     Yes.
18    Q.     The Arkansas Medical Practices
19 Act?
20    A.     Yes.
21    Q.     Okay. You mention the public
22 comment period. Do public comments ever
23 get submitted on proposed regulations by
24 professional medical groups?
25    A.     Yes.

Page 68

AMY E. EMBRY

1
2     Q.     Would those be Arkansas
3  professional medical groups or national
4  groups or both?
5     A.     Usually they are Arkansas.
6     Q.     Would that include the same
7  groups that you mentioned earlier, the
8  Arkansas Medical Society and similar
9  organizations for occupational therapists
10 and physician assistants, I think you
11 said?
12    A.     Yes.
13    Q.     Any others?
14    A.     Not that I can think of but
15 public comments can come from anyone,
16 anywhere on the planet.
17    Q.     Okay. And are those comments
18 from the medical groups given weight by
19 the Board in making a decision?
20    A.     Sometimes.
21    Q.     I want to talk a little bit
22 about licensing.
23         I understand the Board
24 licenses certain kind of medical
25 providers, correct?

Page 69

AMY E. EMBRY

1
2     A.     Yes.
3     Q.     And that includes medical
4  doctors, right?
5     A.     Yes.
6     Q.     Where would I find the
7  requirements for licensure of a medical
8  doctor in Arkansas? Where are those
9  contained?
10    A.     They're contained in the
11 Medical Practices Act but they're also on
12 our applications on our website.
13    Q.     Okay. But no other places
14 besides that?
15    A.     Not that I'm aware of.
16    Q.     Okay.
17         MS. COOPER:  Can we look at
18 tab 4 and post that, please, and
19 mark that as Exhibit 4?
20         (Exhibit 4, printout from the
21 Medical Board re: Regulatory and
22 Discipline was received and marked
23 on this date for identification.)
24    MS. LAND:  I have it.
25    MS. COOPER:  Thank you.

Page 70

AMY E. EMBRY

1
2     Q.     Do you recognize this page?
3     A.     Yes.
4     Q.     Do I understand correctly this
5  is from the Arkansas State Medical
6  Board's website?
7     A.     Yes.
8     Q.     And if you'll read with me the
9  box that says Regulatory/Discipline, it
10  says, "The Arkansas State Medical Board's
11  mission is to protect the health, safety
12  and welfare of the people of the State of
13  Arkansas with the goal that all citizens
14  are provided with the highest quality
15  healthcare. The Medical Board receives
16  and reviews complaints against each type
17  of medical profession it licenses. All
18  complaints received are reviewed by the
19  Medical Board to determine if there have
20  been any violations of the Medical
21  Practices Act. If the Medical Board
22  determines that violations have occurred
23  disciplinary actions are taken."  Did I
24  read that correctly?
25     A.     Yes.

Page 71

AMY E. EMBRY

1
2     Q.     Is this an accurate statement
3  of the Board's mission concerning
4  regulatory work?
5     A.     Yes.
6     Q.     Okay. I'd like to go back to
7  what we marked as Exhibit 2, the Medical
8  Practices Act and Regulations.
9     Before I turn to a particular
10  provision, I just have a more open
11  general question.
12     Can the Board, is it right,
13  can investigate allegations of wrongdoing
14  by doctors; is that correct?
15     A.     Yes.
16     Q.     And if you can turn to Section
17  17-80-106. I understand this is the
18  provision that says, "Investigations and
19  inspections of alleged wrongdoing",
20  correct?
21     A.     Yes.
22     Q.     If you look down to Section C
23  it has some subsections there and if you
24  would like to take the time to read (c),
25  and then the (2), I have a question about

Page 72

AMY E. EMBRY

1
2  that. So why don't you take a moment.
3     (Deponent reviews the
4  document.)
5     A.     Okay.
6     Q.     So do I understand correctly
7  from this provision or perhaps somewhere
8  else that the Board can investigate to
9  determine if doctors are practicing their
10  profession in a way as to endanger the
11  general health and welfare of the public?
12     A.     Yes.
13     Q.     So if somebody brings a
14  complaint that there is a doctor engaging
15  in some conduct that they say is harmful,
16  you would investigate that?  You, the
17  Board, will investigate that complaint?
18     A.     Yes.
19     Q.     You mentioned you're a
20  complaint-based -- it's a complaint-based
21  process. If it comes to the attention of
22  the Board that a doctor is practicing in
23  a way that is endangering the public, but
24  nobody has brought a formal complaint,
25  can the Board investigate?

Page 73

AMY E. EMBRY

1
2     A.     Yes.
3     Q.     Has that ever happened?
4     A.     Oh, yes.
5     Q.     Can you tell me about those
6  times?
7     A.     Well, I don't -- I could not
8  tell you specifically which ones without
9  documents in front of me but other ways
10  that we can be notified is if someone is
11  arrested, if they make the news, if a
12  Board member finds out about it, if it
13  happens in front of a Board member.
14     Q.     And this is something that's
15  happened -- when I say "this" let me
16  rephrase that.
17     Investigations that were done
18  in the absence of a formal complaint, is
19  that something that's happened since
20  you've been with the Board?
21     A.     Yes.
22     Q.     Can you estimate how many
23  times?
24     A.     If I had to guess, if I had to
25  guess in the four years since I've been

Page 74

AMY E. EMBRY

1
2  there, I would say a dozen, maybe a
3  little less. But that's my best guess
4  without documents in front of me.
5       Q.    Understood. And you said you
6  gave some examples of potential ways an
7  issue could come to the Board's attention
8  and in one example you mention was if it
9  made the news.
10           Are there particular examples
11  you can think of where something was in
12  the news that prompted the Board to act?
13       A.    Usually what happens is if we
14  hear on the news that a doctor or a
15  licensee, it doesn't have to be a doctor,
16  just one of our licensees is arrested, if
17  they are actually arrested that sends up
18  red flags. If they are just suspected but
19  no arrest has been made, that still sends
20  up red flags.  But usually an arrest
21  means they have something, some sort of
22  proof that they could justify an arrest.
23  And then we would usually have what's
24  called a "called meeting", which means a
25  meeting outside of our regular scheduled

Page 75

AMY E. EMBRY

1
2  board meetings, if that individual is an
3  immediate threat to the public, and we
4  could -- the Board could decide; does
5  this need to be an Emergency Order of
6  Suspension or what needs to be done?
7       Q.    And just to understand this
8  type of circumstance better, I imagine a
9  doctor or other licensed provider could
10  be arrested for something that has
11  nothing to do with their practice of
12  medicine, say, you know, really bad
13  speeding violations, would that be
14  something that would prompt the Board's
15  attention and investigation?
16       A.    Every situation is different.
17  They look at it; does it put the public
18  in danger? Speeding is one thing, two
19  DUIs is something else. So it just really
20  depends.  That's just examples, it's just
21  an example. So every situation is
22  different and the Board must address that
23  situation and decide what needs to be
24  done.
25       Q.    Have there been times when a

Page 76

AMY E. EMBRY

1
2  licensee was arrested for something
3  related to how they were providing care?
4       A.    Yes.
5       Q.    Can you give me examples?
6       A.    We had a physician who was
7  arrested on suspicion of rape with
8  patients and the Board took actions to
9  protect the public.
10           It was later, once it made it
11  to court, they could not have any
12  witnesses, no witnesses would testify, so
13  all the charges were dropped but the
14  Board had to take action to protect the
15  public.
16       Q.    Any other examples of somebody
17  arrested in relation to the practice of
18  medicine?
19       A.    Not that I can recall. And
20  again, if I had documents in front of me
21  I may have more information.
22       Q.    Could it be a substance abuse
23  issue, arrest for that would be something
24  that could prompt the Board's attention?
25       A.    Yes, absolutely.

Page 77

AMY E. EMBRY

1
2       Q.    What if, for example, somebody
3  was arrested for writing improper
4  prescriptions, you know, for friends to
5  get painkillers or something like that,
6  would that be something that could prompt
7  the Board's investigation?
8       A.    Yes.
9       Q.    And that would be whether or
10  not somebody brought a formal complaint
11  against the Board, is that right, against
12  the doctor?
13       A.    Not necessarily. There does
14  not have to be a formal complaint if
15  there is an arrest or something that
16  shows substance abuse or that could
17  affect their ability to practice medicine
18  safely.
19       Q.    Okay. Understood. I think I
20  asked the question awkwardly.
21           So there does not need to be a
22  complaint for the Board to investigate?
23       A.    No.
24       Q.    Understood. Have there been
25  any investigations of doctors or other

Page 78

AMY E. EMBRY

1          AMY E. EMBRY
2    licensees for providing care that is
3    considered harmful to patients?
4          A.    Yes.
5          Q.    Can you tell me about those
6    examples?
7          A.    We've had complaints, for
8    example, most recently we've had
9    complaints that a doctor was prescribing
10   a drug to county inmates that they felt
11   was inappropriate. And that's the most
12   recent one.
13         Q.    What drug was that?
14         A.    Ivermectin.
15         Q.    So that was a formal complaint
16   made to the Board?
17         A.    Several formal complaints made
18   to the Board and it also made the news.
19         Q.    That's something that the
20   Board was going to address and did
21   address?
22         A.    Yes. They are currently
23   addressing it and I can't say much more
24   on open investigations.
25         Q.    So the investigation is open

Page 79

AMY E. EMBRY

1          AMY E. EMBRY
2    now?
3          A.    Yes.
4          Q.    How many complaints did the
5    Board receive about that Ivermectin use
6    in the jail?
7          A.    Written complaints, if I had
8    to give a ballpark number, around ten.
9          Q.    And what about unwritten?
10         A.    Well, that would be from
11   media, social media and I could not tell
12   you how many there were. There were quite
13   a few but I could not give you an exact
14   number.
15         Q.    Has the Board received any
16   complaints or otherwise chosen to
17   investigate doctors that provided care
18   that departed from accepted standards in
19   the field?
20         A.    Yes.
21         Q.    Can you tell me some of those?
22         A.    I couldn't tell you exactly
23   but it is very common to receive a
24   complaint that the Board reviews in
25   which, for example we'll use surgery,

Page 80

AMY E. EMBRY

1          AMY E. EMBRY
2    somebody writes a complaint that the
3    surgery did not go well, that they're not
4    healing well or they're suffering from
5    that and it is very common when the Board
6    reviews that complaint they may ask the
7    surgeons on the Board; is this common?
8    They will say; yes, this is a common
9    occurrence in surgery; or no, it is not a
10   common occurrence, and we need to do an
11   investigation.
12         Q.    In the surgery example you
13   gave, that's a real life example that has
14   happened at least once that someone
15   complained about a surgery that they felt
16   went wrong; is that correct?
17         A.    Yes.
18         Q.    And then so the surgeons on
19   the Board would be consulted about
20   whether what was described is a common
21   occurrence or not?
22         A.    That's just my example, but
23   usually during the board meeting all the
24   Board members review that complaint, but
25   some of them may have, you know, may say;

Page 81

AMY E. EMBRY

1          AMY E. EMBRY
2    surgeons, what do you think about this,
3    and get their expertise.
4          Q.    And then if there's concern
5    that it may be inappropriate treatment,
6    then it would be investigated?
7          A.    Usually, yes.
8          Q.    And when you say they may ask
9    the surgeons about what do you think, is
10   the question; is this conduct by the
11   surgeon at issue consistent with accepted
12   medical practice or something else? I
13   just want to make sure I understand.
14         A.    Yes, it is usually accepted
15   medical practice.
16         Q.    So failure to follow accepted
17   medical practice could be a reason for
18   investigation?
19         A.    Could be.
20         Q.    And to determine the accepted
21   medical practice, does that involve
22   looking to some of these medical
23   professional groups that you talked
24   about?
25         A.    That would be a question for a

Page 82

AMY E. EMBRY

1      physician. I can't answer that as an
2      unphysician, as far as use.
3         Q.     But for the Board to determine
4      whether this is something that should be
5      investigated for failing to comply with
6      accepted medical practices, how do they
7      determine that?
8         A.     There are 14 Board members, so
9      each one determines that individually. I
10     think what I was trying to get to is that
11     if they ask the surgeons their expertise
12     and the surgeon says; this never should
13     have happened, they would have been
14     taught in medical school, or something
15     like that.  So it could be from medical
16     education, it could be from continuing
17     education, it could be from
18     certifications.
19        Q.     When you say "it could be from
20     medical education" and these other
21     things, what is the "it" you mean?
22        A.     Their decision.
23        Q.     Oh, what they might base it
24     on?

1      AMY E. EMBRY
2      physician. I can't answer that as an
3      unphysician, as far as use.
4         Q.     But for the Board to determine
5      whether this is something that should be
6      investigated for failing to comply with
7      accepted medical practices, how do they
8      determine that?
9         A.     There are 14 Board members, so
10     each one determines that individually. I
11     think what I was trying to get to is that
12     if they ask the surgeons their expertise
13     and the surgeon says; this never should
14     have happened, they would have been
15     taught in medical school, or something
16     like that.  So it could be from medical
17     education, it could be from continuing
18     education, it could be from
19     certifications.
20        Q.     When you say "it could be from
21     medical education" and these other
22     things, what is the "it" you mean?
23        A.     Their decision.
24        Q.     Oh, what they might base it
25     on?

---

Page 83

1      AMY E. EMBRY
2         A.     A-hum.
3         Q.     I see. But would it be a
4      violation of the Arkansas State Medical
5      Practices Act for doctors to provide care
6      that departs from accepted standards in
7      the field?
8         MS. LAND:  Objection to form.
9         A.     Could you repeat the question?
10        Q.     Sure. Would it be a violation
11     of the Arkansas Medical Practices Act for
12     doctors to provide care in a way that
13     departs from accepted standards in the
14     field?
15        A.     Not necessarily. I think it
16     would just depend on the situation.
17        Q.     But the accepted standards in
18     the field are relevant to assessing
19     whether there was a violation; is that
20     right?
21        A.     If I had to answer on how the
22     Board makes their decision, I would say
23     yes, that is part of their consideration.
24        MS. COOPER:  Okay. I'm mindful
25        of the time, we've been going for

---

Page 84

1      AMY E. EMBRY
2         close to an hour and a half.  Are
3         folks, including the court
4         reporter, okay going a few more
5         minutes until a break to wrap up a
6         line of questions?
7         (Discussion is held off the
8         record.)
9         Q.     Just to explore a little bit
10     more this process the Board goes through
11     when it's considering whether to
12     investigate a complaint, and I should
13     back up and ask, am I even describing
14     that right, that there is a process that
15     happens before a decision is made whether
16     to investigate; is that correct?
17        A.     Yes. Yes.
18        Q.     So in the case of a complaint,
19     a complaint is filed with the Board and I
20     understand you spoke earlier about
21     potentially hiring or not hiring, I guess
22     working with investigators to collect
23     subpoenaed information from the licensee
24     and then issuing the report, but before
25     you get to that stage does something

---

Page 85

1      AMY E. EMBRY
2      happen at the Board before investigators
3      are called to assist?
4         A.     Yes. And again, every
5      situation is different, but we do have a
6      process within the office that is
7      followed before it's presented to the
8      Board.
9         Q.     And what is that process
10     before the investigation would be
11     launched?
12        A.     Okay. So when a complaint
13     comes in the complaint is processed, a
14     letter is sent to the complainant saying
15     we have received your complaint; a copy
16     of that complaint is also sent to the
17     licensee and that licensee needs to
18     respond to that complaint.
19        At that point when we receive
20     that response both the complaint and the
21     response from the licensee is presented
22     to the Board and they determine if there
23     has been a violation of the Medical
24     Practices Act and then from there that is
25     -- they determine; are we going to do an

Page 86

AMY E. EMBRY

1
2 investigation; does the licensee need to
3 come and talk to us more before we decide
4 what we need to do?  There could be a
5 variety of situations of how this could
6 work out.
7          It could also be that the
8 Board reads it, reads the response and
9 they take it as information only, meaning
10 that we understand we've received the
11 complaint, we've reviewed the complaint,
12 there has been no violation of the
13 Medical Practices Act and that's the end.
14 And then once it is concluded a letter is
15 sent to the complainant and also the
16 physician to let them know the outcome.
17     Q.    Thank you. Very helpful.
18          So in the event that they
19 determine there is a violation, that's
20 when they would then investigate? Or do
21 they need the investigation to determine
22 if there is a violation?
23     A.    Again, it all depends on the
24 complaint. There are some complaints that
25 we receive that are so severe that we may

Page 87

AMY E. EMBRY

1
2 call the Chairman of the Board saying; do
3 you want us to start an investigation now
4 to at least gather some medical records,
5 description records, whatever they did?
6 Or it could be that it's a standard
7 complaint, it's presented to the Board
8 and the Board says; yes, we need to open
9 an investigation and we would like to see
10 these medical records for these patients.
11 And this is just an example, just to give
12 you an idea, that they could say we want
13 the medical records, we also want the
14 PDMP report, which is the Prescription
15 Drug Monitoring Program in Arkansas, for
16 opioids and so forth and they can
17 determine from there. So, again, it
18 really depends on the complaint.
19     Q.    So there are some complaints
20 where -- tell me if this is correct --
21 that when the complaint and the response
22 are presented to the Board, on the face
23 of it the Board can determine that a
24 violation has or has not occurred; is
25 that correct?

Page 88

AMY E. EMBRY

1
2     A.    Yes.
3     Q.    Do they ever review, the Board
4 ever review the complaint and response
5 and determine they need an investigation
6 to determine if a violation has occurred?
7     A.    Yes.
8     Q.    And then in terms of where
9 they look to determine what constitutes a
10 violation, would that be the provisions
11 that we looked at -- actually, let me ask
12 you generally because I don't want to
13 limit your answer if there is more.
14          Where does the Board look to
15 determine what standards they're applying
16 to determine what constitutes a violation
17 of the Medical Practices Act by a doctor
18 or other licensee?
19     A.    They look at the Medical
20 Practices Act and the rules that are a
21 part of it.
22          MS. COOPER:  Okay. I think
23     this would be a good time to take a
24     break. How is ten minutes.
25          VIDEOGRAPHER:  We are off the

Page 89

AMY E. EMBRY

1
2     record at 11:36 a.m.
3          (Recess is taken.)
4          VIDEOGRAPHER:  We are back on
5     the record at 11:48 a.m.
6     Q.    Thank you. When we were
7 speaking before we were talking about the
8 process the Board follows when there is a
9 complaint against a licensee and I just
10 have a couple of additional questions
11 about that.
12          Is there ever a hearing
13 involving a complaint against a licensee?
14     A.    A hearing occurs whenever
15 there is any action against a licensee,
16 against their license. Usually that's an
17 Emergency Order of Suspension.
18     Q.    So if the Board decides to
19 suspend a license there would be a
20 hearing first?
21     A.    Yes -- no.  Let me -- you can
22 do an Emergency Order of Suspension if
23 you feel there is an immediate threat to
24 the public and then there will be a
25 hearing at the next scheduled board

Page 90

AMY E. EMBRY

1          AMY E. EMBRY
2    meeting.
3          Q.    If the Board does not believe
4    there is an immediate threat would there
5    be a meeting before the suspended
6    license?
7          A.    Yes.
8          Q.    So if there is an emergency
9    suspension of the license it's followed
10   up by a hearing to allow the person to
11   contest it; is that correct?
12         A.    Correct.
13         Q.    So a licensee could have their
14   license suspended without any hearing?
15         A.    Yes.  If there is -- if there
16   is a perceived threat to the public.
17         Q.    I'm sorry. Let me -- let me
18   try to ask it differently.
19         If there is a complaint about
20   some wrongdoing by a licensee, and the
21   Board determines that a violation has
22   occurred, it would make that
23   determination before there would be any
24   hearing for the licensee?
25         A.    That is correct. Action can be

Page 91

AMY E. EMBRY

1          AMY E. EMBRY
2    taken on a license without a licensee
3    being present, but they must be given a
4    hearing and that is actually part of the
5    administrative rules in Arkansas.
6          Q.    So they get a hearing if
7    action is taken to rescind or suspend
8    their license?
9          A.    Correct. Any action on a
10   license, if they feel that it needs to be
11   a revocation, which is very rare, and
12   EOS, Emergency Order of Suspension is
13   usually the most common done by our
14   Board.
15         Q.    In that case there would be an
16   emergency order of suspension but it
17   would be followed up by a hearing?
18         A.    Correct.
19         Q.    But if it's not an emergency
20   order of suspension, but the Board would
21   like to suspend, would there be a hearing
22   and then a decision whether to suspend?
23         A.    No, they can suspend at a
24   meeting. For example, if a complaint
25   comes in, they review that complaint,

Page 92

AMY E. EMBRY

1          AMY E. EMBRY
2    they vote that there has been a violation
3    of the Medical Practices Act, they can
4    suspend the license then.
5          Q.    And then there is no hearing?
6          A.    And there is a hearing,
7    the licensee is given notice that their
8    hearing will be at the next board
9    meeting.
10         Q.    And they give -- are given an
11   opportunity to convince the Board to
12   change their mind, is that the idea?
13         A.    Correct.
14         Q.    And when there is a hearing --
15   so there's always a hearing when action
16   is taken to suspend or revoke a license;
17   is that correct?
18         A.    Yes.
19         Q.    Does the Board make a case at
20   the hearing for why it is suspending the
21   license?
22         A.    Yes. That falls on the
23   attorneys.
24         Q.    The attorneys for the Board
25   would do that?

Page 93

AMY E. EMBRY

1          AMY E. EMBRY
2          A.    Correct.
3          Q.    Would the attorneys for the
4    Board present experts?
5          A.    Yes, they could.
6          Q.    And those would be experts in
7    the relevant field at issue?
8          A.    Usually, yes.
9          Q.    Okay. And how does the Board
10   find those experts?
11         A.    There really is no official
12   way that we find them. We could use
13   recommendations of somebody in a
14   particular field.
15         For example, if a complaint
16   was against an ENT doctor, we may ask our
17   Board member who is an ENT; do you know
18   of anybody that would be a good expert to
19   review this.
20         Q.    So we've kind of been talking
21   about this but I haven't asked this
22   question; can the Board discipline a
23   doctor who is licensed by the Board?
24         A.    Oh, absolutely, yes.
25         Q.    And under what circumstances

AMY E. EMBRY

1
2  can a Board discipline a doctor?
3      A.   It could be that they're -- I
4  will give an example, that a complaint
5  comes in and it's more about boundaries,
6  that they feel they overstep their
7  bounds, they've become too close to
8  patients, they could have a relationship
9  with the patient. It could be numerous
10  things.
11          So part of the discipline can
12  be you need to take a boundaries course
13  and you need to take that documentation
14  to the Board and report back to the Board
15  to let us know what's going on.
16  Discipline, if there is substance abuse
17  involved they could say; you need to meet
18  with the Foundation, which is the
19  organization that handles licensees in
20  distress. So they can administer
21  discipline that way. Very rarely do we
22  issue a reprimand, but reprimands can be
23  issued.
24      Q.   If we can go back to Exhibit
25  2, the Medical Practices Act, and turn to

AMY E. EMBRY

1
2  Section 17-95-409, page 28.
3      A.   28?
4      Q.   Got that?  If you'll read with
5  me (a)(1) says, "The Arkansas State
6  Medical Board may revoke an existing
7  license, impose penalties as listed in
8  17-95-410 or refuse to issue a license in
9  the event the holder or -- in the event
10  that holder or complainant, as the case
11  may be, has committed any of the acts or
12  defenses defined in this section to be
13  unprofessional conduct."
14          My first question is, is this
15  the provision that defines the scope of
16  when the Board can discipline or the
17  circumstances under which the Board can
18  discipline a licensee?
19      A.   Well, this is when it may
20  revoke. This says when it may revoke.
21      Q.   Well, it says -- I'm sorry. Go
22  ahead.
23      A.   This section specifically
24  relates to revocation and refusal to
25  issue a license.

AMY E. EMBRY

1
2      Q.   And they impose penalties as
3  listed in Section 95-410, that's also
4  limited to, I see denial, suspension or
5  revocation. Okay.
6          So these are -- Section
7  17-95-409 are the circumstances under
8  which a license may be revoked or not
9  issued; is that correct?
10      A.   Correct.
11      Q.   And other types of discipline
12  for other -- excuse me. Sorry. Strike
13  that.
14          You talked about other kinds
15  of discipline, like requiring a doctor to
16  take a particular kind of course about
17  boundaries.  Where in the act, if
18  anywhere, are those kinds of discipline
19  options enumerated?
20      A.   That's going to be in the
21  code. I don't know exactly where in the
22  code. I would have to do some research to
23  find it.
24      Q.   Okay. Then let me ask a
25  different way.

AMY E. EMBRY

1
2          So the Board has the ability
3  to deny, suspend or revoke a license
4  based on the grounds listed in Section
5  17-95-409, correct?
6      A.   Yes.
7      Q.   And is it correct that the
8  Board has the authority to take other
9  action, like suspension of a license?
10      A.   Within this section, is that
11  what you're asking?
12      Q.   Well, let me ask it
13  differently.
14          You've talked about suspension
15  and emergency suspension. Is that
16  something -- I'm sorry.  Strike that. I
17  read it wrong.
18          Apart from denial, suspension
19  and revocation, are there other types of
20  discipline a Board can impose?
21      A.   Just off the top of my head,
22  the ones I've already mentioned.  Usually
23  it is, you know, we want you to report
24  back, check in, you need to take these
25  courses just as a refresher. That's, off

Page 98

AMY E. EMBRY

1
2   the top of my head, without having other
3   things in front of me, that's what I can
4   think of.
5        Q.   Thank you. And focusing then
6   on suspension and revocation, it is
7   correct then that 17-95-409 are all of
8   the grounds for suspension or revocation
9   or denial of license?
10       A.   In the code, yes. I'm going to
11  have to read through each one of these
12  individually. There may be other issues
13  but I need to see if it's included in
14  there.
15       Q.   Well, let's look at subsection
16  (2) of 17-95-409.  It says -- and
17  actually, before we look at that, just
18  because we've skipped around a little
19  bit, going back to section (a)(1), it
20  says, "The Arkansas State Medical Board
21  may revoke an existing license, impose
22  penalties as listed in Section 17-95-410
23  or refuse to issue a license in the event
24  that the holder or applicant, as the case
25  may be, has committed any of the actions

Page 99

AMY E. EMBRY

1
2   or offenses defined in this section to be
3   unprofessional conduct." And if we look
4   at subsection Unprofessional Conduct, as
5   used in the Arkansas Medical Practices
6   Act, what the citations mean, and it
7   lists sections (A) through (S), correct?
8        A.   Yes.
9        Q.   So those are all practices or
10  conduct deemed to be unprofessional
11  conduct under the Act; is that correct?
12       A.   Correct.
13       Q.   And are there other places
14  where conduct may be deemed
15  unprofessional conduct, besides what's in
16  this statute?
17       A.   To my knowledge, yes,
18  everything is listed here.
19       Q.   Okay. I have a few questions
20  about just a couple of these provisions.
21       If you could look at
22  subsection (G), "grossly negligent or
23  ignorant malpractice", does the Board
24  have a standard for determining grossly
25  negligent or ignorant malpractice?

Page 100

AMY E. EMBRY

1
2        A.   They do have a definition of
3   grossly negligent that they have as part
4   of their Board packet when considering
5   this. I do not have it in front of me,
6   though.
7        Q.   When you say "part of their
8   Board packet when considering this", what
9   do you mean by that?
10       A.   We give them a list of
11  definitions so they'll understand what
12  suspension means; grossly negligent
13  they'll understand that; if we say
14  revoke, what does revoke mean. It's just
15  a reference sheet, the reference sheets
16  of commonly used words.
17       Q.   And does "grossly negligent"
18  include departing from accepting
19  standards of medical care?
20       A.   I would have to look at the
21  definition that they use. Again, I don't
22  have that with me.
23       Q.   Okay.  Is it based on
24  community standards of care?
25       A.   I do not know.

Page 101

AMY E. EMBRY

1
2        Q.   Okay. Can you give examples of
3   some -- well, let me ask it differently.
4        Since you've been with the
5   Board has anyone faced discipline based
6   on gross and ignorant -- grossly
7   negligent or ignorant malpractice?
8        A.   Not that I can recall.
9        Q.   Could you look down to
10  subsection (S), the last one, it says,
11  "committing an ethical violation as
12  determined by the Board by rule." Did I
13  read that right?
14       A.   Yes.
15       Q.   Okay. So I understand from
16  this the Board has authority under this
17  provision to determine ethical violations
18  or to enact rules to identify what are
19  ethical violations; is that correct?
20       A.   Yes.
21       Q.   Has the Board done that?
22       A.   Yes.
23       Q.   Can you tell me where they've
24  done it?
25       A.   It is Rule -- I don't want to

AMY E. EMBRY

1

2 say it wrong, I'm thinking it is 17 but I

3 need to make sure.

4        Q.    Okay.

5        A.    No. It is Rule 32, Rule 32.

6        Q.    Do I understand from previous

7 testimony that this was a rule that was

8 enacted prior to you joining or becoming

9 employed by the Board?

10       A.    That is correct.

11       Q.    Okay. Is this the only rule

12 the Board has identifying ethical

13 violations?

14       A.    To my knowledge, yes.

15       Q.    By the way, I see sometimes

16 the terminology in these -- in the

17 regulations calls it a regulation and

18 sometimes it calls it a rule. Is there

19 any difference?

20       A.    It was in 2019 the legislature

21 said we had to change everything that

22 says "regulation" to "rule", that was

23 statewide, all agencies. So we are in the

24 process of updating everything. So

25 anything that says "regulation" would be

AMY E. EMBRY

1

2 changed to "rule". That is the only

3 difference.

4        Q.    Okay. But the content won't be

5 changed, just the name --

6        A.    Just the name.

7        Q.    -- that they would be all

8 rules. Okay.

9              Let's look at Regulation 32

10 that I suppose will soon be referred to

11 as Rule 32; is that correct?

12       A.    Yes.

13       Q.    It says, "Pursuant to Act 1178

14 of the 87th General Assembly the Arkansas

15 State Medical Board determines that the

16 following conduct is an ethical

17 violation."  And in that regulation it

18 lists subsections (a) through (e),

19 correct?

20       A.    Yes.

21       Q.    So these are enumerated

22 examples of -- strike that.

23            The conduct listed in

24 subsections (a) through (e) are the only

25 things that are deemed unethical or

AMY E. EMBRY

1

2 ethical violations by the Board; is that

3 correct?

4        A.    That is correct for this rule,

5 yes.

6        Q.    Are there other rules that

7 address ethical violations that the Board

8 has promulgated?

9        A.    Not to my knowledge.

10       Q.    So to your knowledge, this is

11 the universe of ethical violations for

12 physicians?

13       A.    Yes.

14       Q.    Okay. If we can just fairly

15 briefly go through them, subsection (a)

16 is about improper sexual contact or

17 relationship with patients; is that

18 correct?

19       A.    Yes.

20       Q.    Section (b) is about physician

21 disclosing confidential information about

22 a patient, correct?

23       A.    Yes.

24       Q.    Section (c) is about failing

25 to notify a patient that they have an

AMY E. EMBRY

1

2 ownership in a facility or service?

3        A.    Yes.

4        Q.    And (d) is sexual harassment

5 by the physician; is that correct?

6        A.    Yes.

7        Q.    And (e) is a licensed

8 physician grossly overutilizing or

9 ordering or performing tests or

10 procedures on a patient when that may

11 result in harm to the patient; is that

12 correct?

13       A.    Yes.

14       Q.    So that's the universe of

15 ethical violations for physicians; is

16 that correct?

17       A.    Yes.

18            MS. COOPER:  I'd like to mark

19       as Exhibit -- sorry -- 5 what is

20       tab 5.

21            (Exhibit 5, Arkansas State

22       House Bill 1718 was received and

23       marked on this date for

24       identification.)

25            MS. LAND:  It has pulled up on

Page 106

AMY E. EMBRY

1    AMY E. EMBRY
2    my screen.
3         MS. COOPER:  Thank you.
4         Q.    Just for the record, I'm going
5    to say this is Section 20-6-201 of
6    Arkansas Statutes.
7              Are you familiar with this
8    statute?
9         A.    I am.  It's been a while since
10   I've read it.
11        Q.    I would like to call your
12   attention to a particular part of this
13   statute but if you need to read more we
14   can take time to do that.
15             I'm going to, instead of
16   taking your time, why don't I look for
17   the relevant provision.  Let's put that
18   to the side and we'll come back to that.
19             So we talked earlier about the
20   provision in the Medical Practices Act
21   about unprofessional conduct. And that
22   one of the examples of unprofessional
23   conduct was an ethical violation as
24   determined by the Board by rule, correct?
25        A.    Could you repeat that?

Page 107

AMY E. EMBRY

1    AMY E. EMBRY
2         Q.    Right. That one of the -- we
3    talked earlier about the definition of
4    unprofessional conduct with subsections
5    (A) through (S) in the Arkansas Medical
6    Practices Act; do you remember that?
7         A.    Yes.
8         Q.    And then one of those
9    provisions for unprofessional conduct was
10   defined as unethical conduct or
11   violations as determined by the Board by
12   rule; is that correct?
13        A.    Yes.
14        Q.    So what I'm trying to
15   understand is if there were a complaint
16   about a doctor engaging in conduct that
17   was considered harmful by the complainant
18   but it didn't fall under any of the
19   categories in the unprofessional conduct
20   statute (A) through (S), and wasn't
21   considered an ethical violation under
22   Regulation 32, is that something the
23   Board could investigate and potentially
24   address?
25             MS. LAND:  Objection to form.

Page 108

AMY E. EMBRY

1    AMY E. EMBRY
2         A.    Yes. Yes, they could.
3         Q.    So anything that involves a
4    complaint by someone in the public
5    alleging that a doctor is engaging in
6    harmful conduct could be investigated by
7    the Board?
8         A.    Yes. It could be, yes.
9         Q.    And would the Board need to
10   determine that the doctor violated any of
11   those provisions that were defined as
12   unprofessional conduct subsections (A)
13   through (S) or an ethical violation under
14   Regulation 32 to take action against a
15   licensee?
16        A.    They would need to determine
17   if there had been any violation in any
18   part of the Medical Practices Act,
19   whether it's in code or in the rule.
20        Q.    And to revoke -- let me ask it
21   differently.
22             To revoke or suspend a license
23   would it have to be "unprofessional
24   conduct" under the statute we discussed?
25        A.    I don't know if it's limited

Page 109

AMY E. EMBRY

1    AMY E. EMBRY
2    just to that, a revocation. I would have
3    to do some research on that one.
4         Q.    Okay.
5         A.    But if -- I can't -- I can't
6    answer truthfully to that.
7         Q.    I'm just trying to think of --
8    for example, somebody says; I went to a
9    surgeon and the surgeon did this
10   treatment that left me disfigured, would
11   that potentially be a basis to suspend a
12   license?
13        A.    They would have to research,
14   they would have to do an investigation,
15   unless there was an immediate threat to
16   the public.
17        Q.    If we can look at the Medical
18   Practices Act, Exhibit 2, Section
19   17-95-410. Can we look at subsection
20   (e)(1), and when you have that let me
21   know, it's on page 29.
22        A.    What subsection?
23        Q.    (e)(1).
24        A.    Okay.
25        Q.    So it says here, "At the

Page 110

AMY E. EMBRY

1  conclusion of the hearing the Board shall
2  first decide whether the accused is
3  guilty of the charges against him or her
4  and then decide on the appropriate
5  disciplinary action; subsection (2), If
6  the accused is not guilty the Board shall
7  dismiss the charges; subsection (3), If
8  the accused is found guilty the Board may
9  do one or more of the following; (a)
10 revoke his or her license; (b) suspend
11 his or her license not to exceed one
12 year; (c) issue a reprimand; (d) issue a
13 probation allowing the licensee to
14 continue practicing under terms and
15 conditions found to be in the best
16 interests of the accused and the general
17 public; or (e) levy a fine up to $1,000
18 under the Arkansas Medical Practices Act
19 and collect out-of-pocket costs of
20 investigation incurred by the Board to
21 conduct the disciplinary hearing."
22           Those are all forms of
23 discipline that the Board can impose if a
24 doctor is found to be in violation of the

Page 111

AMY E. EMBRY

1  Medical Practices Act?
2      A.    Yes.
3      Q.    Are there other discipline
4  options besides those?
5      A.    As we discussed earlier, you
6  know, if there's no action taken against
7  the license they can say prescribing
8  courses, they need you to meet with
9  so-and-so or whatever.  But if this is --
10 if there is an actual -- an actual -- I'm
11 sorry -- an actual action against the
12 license.
13     Q.    Okay. And focusing in on
14 subsection (3)(d) that we looked at it
15 says, "The Board can impose a probation
16 allowing the licensee to continue
17 practicing under terms and conditions
18 found to be in the best interests of the
19 accused and the general public".  Is what
20 you just described an example of that,
21 you know, a course on anything that you
22 thought the doctor needed?
23     A.    Imposing a probation, I'm
24 wondering if this can refer to what we

Page 112

AMY E. EMBRY

1  call consent orders, meaning you're
2  allowed to practice as long as you do A,
3  B and C.
4      Q.    That's called a consent order?
5      A.    Yes. That's a legal document.
6  As far as impose a probation, I'm
7  thinking that's what that is.
8      Q.    And can you tell me examples
9  of some of those?  You called it a
10 consent order?
11     A.    Yes.
12     Q.    What kinds of conditions are
13 required? You can continue practicing if
14 you do A, B or C, what kinds of
15 conditions?
16     A.    Just some off the top of my
17 head, if it is a substance abuse issue,
18 they're allowed to practice as long as
19 they're in compliance with their contract
20 with the Arkansas Medical Foundation who
21 monitors distressed physicians licensed
22 by our Board. It could also be that they
23 have to complete these courses in a
24 certain timeframe and present it to the

Page 113

AMY E. EMBRY

1  Board member, the Board as a whole, and
2  -- I mean, that gives you some ideas,
3  that there are certain stipulations that
4  they must adhere to in order to continue
5  practicing.
6      Q.    Is there something called a
7  restricted license?
8      A.    No. We do not have a
9  restricted license.
10     Q.    You just have the consent
11 order that says you need to do X, Y or Z
12 to continue practicing?
13     A.    Right.
14     Q.    But even with, say, issues
15 concerning, you know, prescription of
16 drugs improperly there couldn't be a
17 consent order that says you can continue
18 practicing but you can't prescribe drugs?
19 Could that be something?
20     A.    Sure.  It could be in the
21 consent order, yes.
22     Q.    Has the Board ever done that?
23     A.    I can't recall. We've had a
24 lot of consent orders, so I would have to

Page 114

AMY E. EMBRY

1 look at that.
2     Q.     So one example you gave was
3 involving substance abuse. Have there
4 ever been consent orders that do relate
5 to prescription practices?
6     A.     Yes.
7     Q.     What kinds of consent orders?
8     A.     It could be, for example, if
9 the complaint was the physician or
10 whomever was overprescribing, that part
11 of the consent orders, if the Board chose
12 to do so, they could say, you know,
13 continue practicing but you must
14 surrender your DEA license.
15     Q.     And what is a DEA license?
16     A.     Drug enforcement, so you can
17 prescribe controlled substances.
18     Q.     So the doctor could continue
19 practicing but couldn't prescribe
20 controlled substances?
21     A.     Correct.
22     Q.     Is there ever monitoring as
23 part of the consent order, monitoring by
24 the Board?

Page 115

AMY E. EMBRY

1     A.     There is monitoring, but we
2 would gather that information from other
3 sections.  For example, as I discussed
4 earlier, the PDMP is the Prescription
5 Drug Monitoring Program, we can request a
6 report from that program to show what
7 physician or licensee prescribed to
8 whomever whenever. So we could use that
9 as -- to give you an example.
10     Q.     And when the decision is made
11 to impose discipline, whether suspension
12 or revocation or something else, is that
13 a majority vote by the Board?
14     A.     Yes.
15     Q.     If the Board learned that a
16 doctor were using a treatment that is
17 unsafe, could the Board issue a rule
18 prohibiting the use of that treatment?
19     A.     They could. They could draft a
20 rule and put it through the promulgation
21 process.
22     Q.     Has it ever done that?
23     A.     Yes.
24     Q.     Tell me about that.

Page 116

AMY E. EMBRY

1     A.     It was discussed earlier, it
2 was the rule about the cosmetic
3 procedures and that's the one that I have
4 since I have been at the Board that I
5 know about.
6     Q.     And that was a rule to ban
7 certain procedures across the board or
8 prohibit them from being provided at all?
9     A.     It was to say who could
10 provide those services, not prohibit.
11     Q.     So let me ask it differently.
12     Has the Board ever promulgated
13 a rule that prohibits anyone from
14 performing a particular service or
15 medical treatment?
16     A.     Not to my knowledge, no.
17     Q.     But it could if that came to
18 its attention that there was a harmful
19 treatment going around?
20     A.     Yes.
21     Q.     Has the Board ever considered
22 prohibiting a treatment across the board?
23     A.     Not to my knowledge, no.
24     Q.     I want to switch gears away

Page 117

AMY E. EMBRY

1 from the process, the Board's process.
2     When the legislature passes
3 laws concerning the regulation of
4 medicine, is the Board consulted about
5 legislation of that nature?
6     A.     Sometimes.
7     Q.     Can you tell me examples of
8 when it has been consulted?
9     A.     Most recently they were
10 considering licensing another healthcare
11 provider and they consulted with the
12 Board. They had a bill that was
13 introduced and they said if we went
14 forward with this bill what would need to
15 be done. We went with them and went
16 through that process.
17     Q.     I'm sorry. I may not have
18 understood.  You said "they" meaning the
19 legislature were considering licensing a
20 healthcare provider?
21     A.     Correct.
22     Q.     I didn't realize the
23 legislature licenses healthcare
24 providers.  What do you mean by that?

Page 118

AMY E. EMBRY

1
2    A.    They put forward a bill to
3  license naturopathic physicians.
4    Q.    I see.  Not a particular
5  provider but a category of providers?
6    A.    Correct. Correct.
7    Q.    So there was a bill to license
8  -- I'm sorry, what did you call the
9  category?
10    A.    Naturopathic.
11    Q.    Naturopathic physicians.  And
12  the legislature consulted with the Board
13  about what sorts of issues the --
14    A.    They would say if we decided
15  to license, how would your office handle
16  this if we put it underneath your Board?
17  And we told them when you're drafting the
18  bill this is how our licensure process is
19  set up now, so if you do move forward
20  with this bill we would ask you to
21  consider X, Y or Z.
22    Q.    Was the Board asked its view
23  on whether that was a good idea to
24  license naturopathic physicians?
25    A.    In that instance, no.

Page 119

AMY E. EMBRY

1
2    Q.    Are there any other examples
3  where you think that the legislature
4  consulted with the Board about a bill?
5    A.    There may have been.  The one
6  that I gave earlier, that's the one that
7  actually required a sit-down meeting but
8  it's very common for the legislature to
9  ask for statistics or information before
10  they draft a bill.
11    It is -- to my knowledge, it
12  is not required for the legislature to do
13  that and it has not done on any -- any
14  and all bills that would affect our
15  licensees.
16    Q.    Since you've been with the
17  Board or since you've been Executive
18  Director, are there other examples
19  besides the naturopathic physician
20  licensing measure that the legislature
21  consulted with the Board about?
22    A.    Let me think on that for a
23  minute. There may have been.  I just
24  can't think of any off the top of my
25  head. I just remember that one about the

Page 120

AMY E. EMBRY

1
2  naturopaths, that stuck out in my mind.
3    Q.    And since you've been the
4  Executive Director have there been any
5  bills that actually were passed
6  concerning the regulation of medicine?
7    A.    Yes.
8    Q.    Which ones?
9    A.    Well, I don't have the
10  documents in front of me, but 2021 was a
11  very active session and I do know that
12  the Act 626 that we're here about today,
13  that was passed, that would affect the
14  Medical Practices Act. There was also,
15  that affected the Board directly, is that
16  they changed that physicians could renew
17  for two years rather than one year, they
18  put that into law.
19    I don't have my list in front
20  of me. That's a couple of them.
21    Q.    Did the legislature consult
22  with the Board about the rule or bill
23  about physicians renewing for two years?
24    A.    No.
25    Q.    And when you said before that,

Page 121

AMY E. EMBRY

1
2  referring to the naturopathic physician
3  bill, that the legislature consulted with
4  the Board, who in the legislature did
5  that?
6    A.    I don't have my notes in front
7  of me but it was one representative and I
8  believe one senator and I believe they
9  were the sponsor and co-sponsors of the
10  bill so they met -- it was during the
11  pandemic, so it was via Zoom.
12    Q.    So is that something that has
13  happened in other situations that the
14  sponsors of a bill would consult with the
15  Board about a bill?
16    A.    It could happen, yes, that
17  could happen.
18    Q.    Have there been any
19  significant bills concerning the
20  regulation of medicine where the
21  legislature did not consult with the
22  Board?
23    MS. LAND:  Object to form.
24    A.    I would have to say yes. I
25  don't know what they are, but at some

                    AMY E. EMBRY
1
2    point, yes.
3         Q.    That there are times that the
4    legislature does not consult with the
5    Board?
6         A.    Correct.
7         Q.    Is it typical that they do
8    consult with the Board when it's a matter
9    of medical regulation?
10        A.    In my opinion, I wouldn't say
11   typical.
12        Q.    Sometimes yes, sometimes no?
13        A.    Correct.
14        Q.    And when they consult with the
15   Board, who on the Board do they consult
16   with?
17        A.    It would come through the
18   office. So they could speak to me, they
19   could speak to a member of my staff. They
20   could also reach out because we're under
21   the Department of Health, it may come
22   through the Department of Health. It
23   would be direct contact or it could be
24   indirect contact.
25        Q.    So in the example you gave

                    AMY E. EMBRY
1
2    about the naturopathic physicians, did
3    that come through you?
4         A.    Yes, it did, yes.
5         Q.    And you said it was the
6    sponsors of the bill that reached out?
7         A.    From what I can recollect,
8    without anything in front of me, yes.
9         Q.    And then do you then connect
10   the legislators with members of the Board
11   or do you just talk to them yourself?
12        A.    No. We do not do that at the
13   Board. We do not connect them unless it's
14   specifically requested by the legislator
15   or Department of Health or anything like
16   that, no.
17        Q.    So when the Board gave input
18   to the legislature -- legislators, I
19   should say, in what format did that come?
20        A.    For?
21        Q.    Let me ask it differently.
22        I understood you to be saying
23   that these legislators asked for the view
24   of the Board with respect to some
25   questions related to the bill. Were you

                    AMY E. EMBRY
1
2    the one who answered those questions to
3    provide the information they were
4    seeking?
5         A.    Yes. Because in that instance
6    for the naturopathic it was specifically
7    licensing questions and that would come
8    from the Board staff.
9         Q.    So the Board staff would
10   typically provide the information that
11   the legislators are seeking regarding a
12   bill?
13        A.    Yes.
14        Q.    It would not go to the Board
15   members?
16        A.    Only if it is something that
17   the Board needs to consider before
18   returning that. For example, as I used in
19   that example, the licensing practices,
20   the Board would -- the licensing
21   practices are what they are, the staff
22   could answer that. But if they are
23   asking; we want your input from a
24   physician point of view, or something
25   like that, we would either ask them to

                    AMY E. EMBRY
1
2    draft something that we would present to
3    the Board or they could come and address
4    the Board at the next board meeting.
5         Q.    And have legislators ever come
6    to address the Board on questions about
7    which they wanted input?
8         A.    I'm trying to recall. Since
9    I've been Director, no.
10        Q.    But do you know if that's been
11   done in the past?
12        A.    I'm not sure. I'm not sure.
13        Q.    And you said they could put,
14   the legislators could put questions in
15   writing for the Board; is that correct?
16        A.    Yes.
17        Q.    Has that ever been done?
18        A.    Not since I've been Director.
19        Q.    Before that?
20        A.    I don't know.
21        Q.    Okay. But I understand you to
22   be saying that if it were a question
23   about wanting input from the Board on a
24   matter of practice of medicine, that you
25   would take that to the Board, not answer

Page 126

AMY E. EMBRY

1               AMY E. EMBRY
2  it by staff alone?
3     A.    Correct.
4     Q.    Okay.
5     A.    The staff handles what the
6  staff can handle. The rest goes to the
7  Board.
8     Q.    Okay. We talked earlier about
9  prescription of opioids and I'd like to
10 look at Section 17-95-701 of the Medical
11 Practices Act.  And this is titled  --
12 subchapter (7) is titled Chronic
13 Intractable -- Chronic Intractable Pain
14 Treatment Act, correct?
15    A.    Yes.
16    Q.    And is this the provision of
17 the Medical Practices Act that governs
18 prescriptions for painkillers?
19    A.    Yes.
20    Q.    And I think you touched on it
21 in the past.  Has overprescription of
22 opioids been a problem in Arkansas?
23    A.    Yes.
24    Q.    Has it caused harm to the
25 public?

---

Page 127

1               AMY E. EMBRY
2     A.    Yes.
3     Q.    What kind of harms?
4     A.    Addiction.
5     Q.    And there have been complaints
6  to the Board about doctors
7  overprescribing opioids; is that correct?
8     A.    Yes.
9     Q.    Did the Board enact
10 regulations to address overprescription
11 of opioids?
12    A.    Yes, 2.8.
13    Q.    Okay. And that one is which
14 one, I think we talked about it, but --
15    A.    It's Rule 2.8.
16    Q.    Thank you. You said 2.8?
17    A.    No. I'm wrong about that. I'm
18 sorry.
19    Q.    I'm not finding it there.
20    A.    It is -- it's in Regulation 2,
21 Regulation 2 has quite a bit to it, and
22 if you look at 6 (a) and (b).
23    Q.    You said subsection 6 of
24 Regulation 2?
25    A.    Correct.

---

Page 128

1               AMY E. EMBRY
2     Q.    "The treatment of pain with
3  dangerous drugs and controlled substances
4  is a legitimate medical practice when
5  done in the usual course of medical
6  practice", that provision? I'm reading
7  just a portion of it just to make sure
8  we're on the same page; is that correct?
9     A.    Yes.
10    Q.    And this regulation, was this
11 all dictated by statute or did the Board
12 develop any of this?
13    A.    This was before my time, but
14 from what I understand, this was at the
15 request of the legislature.
16    Q.    Not by a statute but
17 legislators requesting it?
18    A.    Correct. That is my
19 understanding.
20    Q.    If we can go back to
21 subchapter 7 of the Medical Practices Act
22 that's on page 34, and if we look at
23 subsection (c)(1) it says, "In lieu of a
24 finding of gross and ignorant malpractice
25 the Board after a hearing may

---

Page 129

1               AMY E. EMBRY
2  incrementally impose sanctions as
3  follows: (a) monitor prescribing habits
4  of the physician not to exceed six
5  months; (b) require that the decision to
6  voluntarily surrender his or her United
7  States Drug Enforcement Agency license to
8  the Board for a specified period of time
9  not to exceed three months; (c) suspend
10 the physician's license, stay the
11 suspension and require monitoring of
12 prescribing habits; (d) revoke the
13 physician's license, stay revocation and
14 require monitoring of the physician's
15 prescribing habits for a specified time;
16 and (e) revoke the physician's license
17 for serious violations of statutes and
18 regulations."
19      Are these all steps the Board
20 can take if a doctor is found to violate
21 the provisions regarding prescription of
22 pain medication?
23    A.    Yes.
24    Q.    And the Board has a Pain
25 Management Review Committee to review

Page 130

AMY E. EMBRY

1        AMY E. EMBRY
2   complaints of overprescription of main
3   medications; is that right?
4        A.   Yes.
5        Q.   And have doctors faced
6   discipline due to improper prescription
7   of opioids?
8        A.   Yes.
9        Q.   Can you say approximately how
10  many, since you've been ED?
11       A.   Not truthfully. I honestly
12  could not give an honest number on that.
13  It has occurred.
14       Q.   Do you know if it's more than
15  20?
16       A.   Since I've been Director, no,
17  it's not more than 20.
18       Q.   Okay. But it's happened?
19       A.   Yes.
20       Q.   Did any of them have
21  monitoring or surrender of DEA license as
22  a discipline that was imposed?
23       A.   Describe "monitoring"?
24       Q.   Well, I'm just reading what it
25  says there; "monitoring prescribing

Page 131

AMY E. EMBRY

1        AMY E. EMBRY
2   habits up to six months."
3        A.   Yes. They can be referred to
4   the Pain Management Review Committee and
5   it could be that we want an MP run every
6   month for the next six months.
7        Q.   And some doctors have had
8   their DEA license revoked or they've had
9   to surrender it, I should say?
10       A.   We cannot revoke a DEA
11  license.
12       Q.   But you can require them to
13  surrender it as a condition to continuing
14  to practice?
15       A.   Yes, if that's what the Board
16  decides.
17       Q.   And has that happened?
18       A.   Yes.
19       Q.   Did these actions serve to
20  protect the public from harmful conduct
21  by these doctors?
22       A.   Yes.
23       Q.   Did the Board consider just
24  prohibiting the use of opioids
25  altogether, given the harm they were

Page 132

AMY E. EMBRY

1        AMY E. EMBRY
2   causing to the public?
3        A.   I do not know.
4        Q.   You do not know. Okay.
5             That's never been proposed as
6   a regulation by the Board?
7        A.   Not since I've been Director,
8   no.
9        Q.   Do you know why they did not
10  do that?
11       A.   I have no knowledge about
12  that. This was before I was there.
13       Q.   Okay. Can we look at
14  Regulation 27? This is the provision,
15  "Informed consent for gastric bypass
16  surgery." Okay?
17       A.   A-hum.
18       Q.   Do I understand correctly from
19  this that the Board has established
20  requirements for the informed consent
21  process before a doctor can perform
22  gastric bypass surgery?
23       A.   Yes.
24       Q.   And is this a regulation that
25  was mandated by statute?

Page 133

AMY E. EMBRY

1        AMY E. EMBRY
2        A.   Yes. Actually, by Act 1356.
3        Q.   Okay. And did the Board
4   develop any part of the regulation or was
5   it all specified by statute?
6        A.   I do not know. I would have to
7   look at the document.
8        Q.   And in looking at this I see
9   it says here, "Pursuant to Act 1356 of
10  the 84th General Assembly of 2003 all
11  physicians of the State prior to
12  performing gastric bypass surgery, also
13  known as open or laparoscopic Roux-en-Y,
14  will have the patient signs an informed
15  patient consent form acknowledging they
16  have been told information about the
17  various complications that can result
18  from the surgery. The complications and
19  information the patient must be informed
20  of are as follows:" Did I read that
21  correctly?
22       A.   Yes.
23       Q.   And then it lists (a) through
24  (i) as complications that patients must
25  be informed of, correct?

Page 134

AMY E. EMBRY

1
2       A.      It's actually A through M.
3       Q.      Oh, sorry. It is A through M.
4   And then some of those provisions have
5   subsections, correct?
6       A.      Yes.
7       Q.      Okay. So, for example,
8   subsection I says, "The following
9   surgical complications may arise", and it
10  lists 33 potential complications,
11  correct?
12      A.      Yes.
13      Q.      And then there are a series of
14  nutritional complications, four of those,
15  correct, under J?
16      A.      Yes.
17      Q.      And psychiatric complications
18  under K include 4, psychiatric
19  complication, correct?
20      A.      Yes.
21      Q.      And then L lists items 1
22  through 22 as additional complications,
23  correct?
24      A.      Yes.
25      Q.      And then M identifies

Page 135

AMY E. EMBRY

1
2   pregnancy complications, correct?
3       A.      Yes.
4       Q.      And then going back to Section
5   E says, "There is no guarantee of weight
6   loss or long-term weight management as a
7   result of getting surgery." Did I read
8   that right?
9       A.      Yes.
10      Q.      Okay. And then F, a lifetime
11  of followup medical care is required; is
12  that correct?
13      A.      Yes.
14      Q.      So these are all provisions
15  that doctors have to inform patients
16  about, complications and risks that the
17  doctors have to inform patients about
18  before performing gastric bypass surgery,
19  correct?
20      A.      Yes.
21      Q.      Now, how did the Board
22  identify all of these complications?
23      A.      I do not know. I was not at
24  the Board when this was created and
25  promulgated. So I would have to look at

Page 136

AMY E. EMBRY

1
2   that documentation.
3       Q.      Okay.
4       A.      But it is possible it came
5   directly from the Act.
6       Q.      Okay. And do these provisions
7   that lay out requirements for informed
8   consent for gastric bypass protect the
9   public from harm?
10      A.      My belief is yes.
11      Q.      And how is that?
12      A.      Well, it's information to the
13  patient, they need to be made aware of
14  these complications.
15      Q.      Did the Board ever discuss
16  prohibiting gastric bypass surgery?
17      A.      I do not know.
18      Q.      Okay. Does the Board prohibit
19  any -- I think I asked a version of this
20  question before but I want to make sure I
21  understand. Does the Board prohibit any
22  medical treatment across the Board?
23      A.      No.
24      Q.      And has the Board ever
25  considered, to your knowledge, a proposal

Page 137

AMY E. EMBRY

1
2   to prohibit a particular medical
3   treatment across the Board?
4       A.      Not to my knowledge, no.
5       Q.      Has any member of the Board
6   proposed a regulation that would prohibit
7   a particular medical treatment across the
8   Board?
9       A.      Not since I've been the
10  Director, no.
11      Q.      Okay. Are you aware of, as the
12  Director of the Board, of any State
13  statutes that prohibit a particular
14  medical treatment?
15      A.      The only one that I am aware
16  of is the one that we're here today to
17  discuss, Act 626.
18      Q.      You're not aware of any
19  others?
20      A.      No, I am not.
21      Q.      Now, is off-label use of drugs
22  permitted in Arkansas?
23      A.      Yes.
24      Q.      Is it common?
25      A.      Yes.  I would say so, yes.

Page 138

AMY E. EMBRY

1
2      Q.   And I understand that the
3  State allows off-label use of
4  hydroxchloroquine to treat COVID; is
5  that correct?
6           MS. LAND:  Objection to
7      relevance. You can answer.
8      A.   It does not prohibit it.
9           MS. COOPER:  Can we mark as
10     Exhibit 6, tab 8?
11          (Exhibit 6, Guidance For the
12     Use of Hydroxchloroquine and
13     Chloroquine For the Treatment of
14     COVID 19 was received and marked on
15     this date for identification.)
16          MS. COOPER:  Amanda, do you
17     have it up?
18          MS. LAND:  Leslie, it is not
19     loading for me.
20          MR. RICHARDSON:  One moment.
21     That should be available to you
22     now.
23          MS. LAND:  Yes, I have it.
24          MS. COOPER:  Great.
25     Q.   For the record, I'll just

Page 139

AMY E. EMBRY

1
2  state that the document is called
3  Guidance For the Use of
4  Hydroxchloroquine and Chloroquine For
5  the Treatment of COVID 19, dated July 29,
6  2020 from the Arkansas Department of
7  Health.
8           Have you ever seen this
9  before, Ms. Embry?
10     A.   Yes.
11     Q.   When did you see it?
12     A.   When it was released back in
13  2020.
14     Q.   And why was this -- why did
15  you see it? How did you come to see it?
16     A.   It was sent out by the
17  Department of Health to all of its
18  sub-agencies and sections. It was also on
19  their website.
20     Q.   Did the Board have any role in
21  the creation of this guidance?
22     A.   No.
23     Q.   That was done by the
24  Department of Health?
25     A.   To my knowledge, yes.

Page 140

AMY E. EMBRY

1
2      Q.   And just stepping back, I
3  understand that you're -- well, let me
4  ask you differently.
5           What is the relationship
6  between the Arkansas State Medical Board
7  and the Department of Health?
8      A.   We are within the Department
9  of Health. The State Medical Board is an
10  agency or subsection or whatever you want
11  to call it of the Department of Health.
12     Q.   Okay. Thank you.
13          And if we can just read along
14  together, since it's pretty short, it
15  says, "On June 15, 2020 the Food and Drug
16  Administration, FDA, revoked the
17  emergency use authorization, EUA, for the
18  use of chloroquine, CQ, and
19  hydroxchloroquine, HCQ, to treat COVID
20  19 after concluding it was 'no longer
21  reasonable to believe that oral
22  formulations of HCQ and CQ may be
23  effective in treating COVID 19, nor is it
24  reasonable to believe that the known and
25  potential benefits of these products

Page 141

AMY E. EMBRY

1
2  outweigh their known and potential
3  risks.' The latter included serious
4  adverse events. Based on this
5  information, the Arkansas Department of
6  Health, ADH, updated its guidance related
7  to HCQ and CQ indicating that their use
8  for treatment of COVID 19 should be
9  avoided in both outpatient and
10  hospitalized settings, but could be
11  administered prescribed and dispensed for
12  FDA medical supervision of a patient's
13  healthcare provider.  Unapproved use,
14  i.e., off-label use, of these medications
15  is left to the discretion of individual
16  clinicians and their patients. However,
17  the ADH wants clinicians to be aware that
18  coadministration of HCQ or CQ with
19  remdesivir and MEUA, approved medication
20  for treatment of COVID 19, is not
21  recommended based on data showing an
22  antagonistic effect of these medications
23  on the antiviral activity of remdesivir."
24          Did I read that reasonably
25  okay?

Page 142

AMY E. EMBRY

1  
2     A.    Yes.
3     Q.    Despite some of the big words.
4  So you said you were familiar
5  with this guidance, correct?
6     A.    Yes.
7     Q.    Was the Board consulted in any
8  way about this guidance?
9     A.    This was nearly two years ago
10 but my recollection right now is no, they
11 were not consulted.
12    Q.    Okay. Did the Board have any
13 conversations about this guidance?
14    A.    Not that I can recall. I would
15 need to go back and look at meetings.
16 It's been years.
17    Q.    Did you have any conversation
18 with Board members or Board have about
19 this guidance?
20    A.    No.
21    Q.    Did you hear any conversations
22 from Board staff or Board members about
23 it?
24    A.    No.
25    Q.    So I understand here that the

Page 143

AMY E. EMBRY

1  
2  Department of Health is allowing
3  off-label use of hydroxychloroquine to
4  treatment COVID despite the State's
5  awareness of the lack of evidence of
6  effectiveness plus serious risks of use,
7  correct?
8     A.    Repeat that question.
9     Q.    Yes. I understand from here
10 the State is -- the Department of Health
11 is allowing the off-label use of
12 hydroxychloroquine to treat COVID despite
13 the State's awareness of the lack of
14 evidence of effectiveness for this
15 purpose and the serious risks of using
16 it; is that correct?
17    A.    According to this document, it
18 says it's allowing the decision to be
19 left to the individual clinicians and
20 their patients.
21    Q.    Okay. And this is not
22 something the Board considered weighing
23 in on?
24    A.    Not that I can recall.
25          VIDEOGRAPHER:  Is there a

Page 144

AMY E. EMBRY

1  
2  chance we can take a break?  I've
3  got to change a card and I'm
4  getting pretty close.
5          MS. COOPER:  Sure. We can take
6  a break now. How much time do you
7  need?
8          VIDEOGRAPHER:  We are off the
9  record at 12:56 p.m.
10         (Recess is taken.)
11         VIDEOGRAPHER:  We are back on
12 the record at 1:50 p.m.
13    Q.    Thank you. Welcome back.
14          You mentioned earlier an issue
15 with some doctors or a doctor at a jail
16 prescribing Ivermectin for COVID. Did I
17 say that right?
18    A.    Yes.
19    Q.    Okay. And I think you
20 mentioned there were a number of
21 complaints about that use of Ivermectin;
22 is that right?
23    A.    Yes.
24    Q.    And was it all against the
25 same doctor or multiple doctors?

Page 145

AMY E. EMBRY

1  
2     A.    In that instance it was the
3  same doctor.
4     Q.    And so I understand that there
5  were multiple complaints against this
6  doctor and am I right that there was a
7  determination that no action was taken at
8  some point by the Board with respect to
9  the complaint against this doctor for
10 prescribing Ivermectin for COVID?
11    A.    This one is still open, so I
12 cannot say that nothing has been done.
13    Q.    Okay. So when you say "this
14 one is still open" and maybe I may be
15 misspeaking, but if there is
16 multiple complaints about one doctor,
17 then they get joined together as one
18 investigation or are they separate
19 investigations?
20    A.    It could. It depends on the
21 nature of the complaint as well.
22    Q.    And in this case with the
23 doctor prescribing Ivermectin, is there
24 one process only or have there been more
25 than one process in investigating these

Page 146

AMY E. EMBRY

1
2 complaints?
3      A.    I think we did group this one
4 into one investigation.
5      Q.    So the Board never reached any
6 conclusion with respect to this -- any
7 complaint against this doctor?
8      A.    It is still ongoing.
9      Q.    And it never took a complaint
10 for "information only" at any stage?
11      A.    They may have taken some for
12 "information only".
13      Q.    When you say "some", some
14 complaints against this doctor?
15      A.    Yes. So, for example, let's
16 say ten complaints were received. All ten
17 complaints would be presented to the
18 Board individually as separate
19 complaints. Some complaints may say we
20 need to look into this one further, we
21 need to do an investigation, whatever
22 they decide. There may be another
23 complaint to say, no, there was no
24 violation, from what we have found there
25 is no violation of the Medical Practices

Page 147

AMY E. EMBRY

1
2 Act and this one is closed.
3      Q.    So with these Ivermectin
4 complaints, some of them have been
5 closed?
6      A.    Yes.
7      Q.    And was that based on a
8 determination in those complaints there
9 wasn't a violation of the Medical
10 Practices Act?
11      A.    Yes.
12      Q.    And does that mean in those
13 situations the Board determined that
14 Ivermectin had not been prescribed to
15 treat COVID in those cases?
16      A.    It would depend on what that
17 particular complaint was. If it was a
18 complaint about Ivermectin and they took
19 it as no violation, then that's it but I
20 would have to go back and review every
21 single one of those to see if it was
22 specifically Ivermectin.
23      Q.    Was there ever a complaint --
24 and I know I could go review all the
25 board meetings and look at this myself,

Page 148

AMY E. EMBRY

1
2 but maybe you can help me cut to the
3 chase here.
4          Was there ever one where the
5 Board heard the complaint, had a hearing
6 and determined that even though the
7 doctor was found to have prescribed
8 Ivermectin to treat COVID, that it was
9 not a violation of the Medical Practices
10 Act?
11      A.    No. There has not been
12 anything like that.
13      Q.    Okay. Has the Board considered
14 passing any regulation prohibiting the
15 use of Ivermectin for COVID?
16      A.    No.
17      Q.    It's not been proposed by
18 anybody?
19      A.    I'm sorry. Could you repeat
20 that?
21      Q.    It hasn't been proposed by
22 anybody?
23      A.    Not to my knowledge.
24      Q.    Okay. Is informed consent a
25 requirement for medical treatments

Page 149

AMY E. EMBRY

1
2 generally in Arkansas?
3      A.    Could you repeat that?
4      Q.    Let me repeat that. Are you
5 having trouble hearing me?
6      A.    I think you were just breaking
7 up on that question.
8      Q.    Okay. I'll repeat it.
9          Is informed consent a
10 requirement for medical treatment in
11 Arkansas?
12      A.    I would have to check the code
13 but I do know we have some regulations
14 for informed consent, abortion, gastric
15 bypass and I do know on certain instances
16 you do have to have a consent form to
17 treat certain patients. For all of them,
18 I'm not sure about.
19      Q.    Is the Board aware of the
20 Gender Spectrum Clinic at Arkansas
21 Children's Hospital?
22      A.    I can't answer for all the
23 Board members, so I don't know if they're
24 aware of it or not.
25      Q.    But the Board, itself, has the

Page 150

AMY E. EMBRY

1
2  Board had any information provided to the
3  Board that made it aware of the Arkansas
4  Children's Hospital Gender Spectrum
5  Clinic?
6      A.    Not to my knowledge, no.
7      Q.    Did the Board ever have any
8  discussions about the Gender Spectrum
9  Clinic at Arkansas Children's Hospital?
10     A.    Not to my knowledge no.
11     Q.    Did any members of the Board
12 have any discussion about the Gender
13 Spectrum Clinic at Arkansas Children's
14 Hospital?
15     A.    Not to my knowledge.
16     Q.    What about Board staff?
17     A.    No.  Not to my knowledge, no.
18     Q.    So you've not been part of any
19 conversations about the Gender Spectrum
20 Clinic?
21     A.    No.
22     Q.    Do you know what I refer to
23 when I refer to Gender Spectrum Clinic?
24     A.    No. I just figure it's a
25 section of that hospital.

Page 151

AMY E. EMBRY

1
2      Q.    Has the Board ever received
3  any complaints concerning
4  gender-affirming medical care for minors?
5      A.    No.
6      Q.    And by the way, do you know
7  what I mean by "gender-affirming medical
8  care" or do you have an understanding of
9  that term?
10     A.    Yes.  It was the definition
11 provided in the document to me.
12     Q.    Okay. And just to be clear, in
13 case there is any confusion, by
14 "gender-affirming medical care", I'm
15 referring to medical interventions for
16 adolescents with gender dysphoria,
17 including hormone therapy or puberty
18 blocker or surgery to treat their gender
19 dysphoria.  Are we having a common
20 understanding there?
21     A.    Yes.
22     Q.    So I will use the term
23 gender-affirming medical care as
24 shorthand rather than say that every
25 time, okay?

Page 152

AMY E. EMBRY

1
2      A.    Okay.
3      Q.    So going back to my question,
4  has the Board ever received any
5  complaints regarding doctors providing
6  gender-affirming medical care?
7      A.    No.
8      Q.    Never? And that's including
9  before the introduction of what became
10 Act 626 and since?
11     A.    To my knowledge, it has never
12 received a complaint regarding
13 gender-affirming medical care.
14     Q.    And is that for minors or
15 adults?
16     A.    Correct.
17     Q.    Has the Board ever had any
18 discussions about gender-affirming
19 medical care?
20     A.    Not to my knowledge, no.
21     Q.    Well, so does that -- you are
22 testifying on behalf of the Board, and
23 you have been designated by the Defendant
24 Board to testify on this topic.
25            So have you been prepared --

Page 153

AMY E. EMBRY

1
2  can you answer on behalf of the Board
3  that the Board has not had discussions
4  about this topic, let's say, since you've
5  been Executive Director?
6      A.    There has not been discussion
7  at any of the board meetings. I cannot
8  speak for every single Board member to
9  see if they ever discussed it.
10     Q.    Are you aware of any
11 conversations with any -- with or between
12 any Board members concerning
13 gender-affirming medical care?
14     A.    No.
15     Q.    And are you aware of any
16 conversations that included any Board
17 staff about gender-affirming medical
18 care?
19     A.    No.
20     Q.    Okay. So when the bill that
21 became Act 626 was being debated and
22 ultimately passed, nobody at the Board
23 staff or at board meetings discussed it
24 at all?
25     A.    No.

Page 154

AMY E. EMBRY

1
2     Q.    Has the Board ever considered
3  are passing a regulation concerning
4  gender-affirming medical care?
5     A.    No.  Not as I've been
6  Director, no.
7     Q.    Did the Board ever see a need
8  for a regulation concerning
9  gender-affirming medical care?
10     A.    It was not communicated to me
11  if they did.
12     Q.    And so I asked you about
13  whether there were complaints about
14  gender-affirming medical care and you
15  said there weren't, but I understand from
16  your testimony earlier sometimes things
17  come to the Board's attention apart from
18  complaints.
19         Did any problems related to
20  gender-affirming medical care for minors
21  ever come to the Board's attention
22  outside of complaints?
23     MS. LAND:  Object to form.
24     A.    No.
25     Q.    Okay.

Page 155

AMY E. EMBRY

1
2     MS. COOPER:  Beth, if you can
3  take tab 9 and we'll have that
4  marked as Exhibit 7? Thank you.
5     (Exhibit 7, May 5, 2021 email
6  re: Public Health Grand Rounds was
7  received and marked on this date
8  for identification.)
9     MR. RICHARDSON:  Exhibit 7 has
10  been introduced.
11     MS. LAND:  I have it.
12     MS. COOPER:  Thank you.
13     Q.    Ms. Embry, you have Exhibit 7
14  in front of you?
15     A.    Yes.
16     Q.    Have you seen this document
17  before?
18     A.    I cannot recall seeing this
19  specific one.
20     Q.    Have you seen any documents
21  representing grand rounds regarding
22  gender-affirming medical care?
23     A.    I have to grand rounds.  I
24  can't say that I have seen it for
25  gender-affirming but I have seen grand

Page 156

AMY E. EMBRY

1
2  rounds.
3     Q.    And just to be clear the
4  document marked as Exhibit 7 is an email
5  including a document that has in large
6  text Public Health Grand Rounds,
7  Announcing a Session on Gender-Affirming
8  Care Services in Arkansas. I'm just
9  stating that for the record, not as part
10  of the question.
11         So you were not aware of a
12  grand rounds --public health grand rounds
13  on gender-affirming care services in
14  Arkansas?
15     A.    Well, I may have received this
16  email but we receive these normally
17  weekly, so I do not recall this one in
18  particular.
19     Q.    And so sitting here now is the
20  first time that you think you have been
21  aware of this grand round?
22     A.    Correct.
23     Q.    Just so I understand the email
24  at the top, it says from Matt Gilmore
25  ADH, is that the Arkansas Department of

Page 157

AMY E. EMBRY

1
2  Health?
3     A.    Yes.
4     Q.    And it's sent to Heather Owen
5  cc: Sarah Morris. Who is Heather Owen?
6     A.    Heather Owen is an employee of
7  the Board.
8     Q.    What is her position on the
9  Board?
10     A.    She is one of the licensing
11  managers.
12     Q.    Okay. And Sarah Morris?
13     A.    I have no idea who Sarah
14  Morris is.
15     Q.    Okay. Below that there is a --
16  it looks like it was forwarding an
17  earlier email from Sarah Morris to ADH
18  All. Is ADH All, do I take it, an email
19  list of all ADH employees?
20     A.    Correct.
21     Q.    Okay. So you would have
22  received this but you don't recall that
23  particular grand rounds?
24     A.    Correct.
25     Q.    Okay. Did anyone at the Board

Page 158

AMY E. EMBRY

1              AMY E. EMBRY
2 discuss the fact that there was going to
3 be a grand rounds on gender-affirming
4 care in Arkansas?
5     A.     Not to my knowledge.
6     Q.     And just for the record, I'm
7 noting that it's dated, the event was
8 dated to occur May 6th, 2021.
9        Does that help refresh your
10 recollection about whether there was any
11 conversation about this?
12     A.     There was no conversation with
13 me about this.
14     Q.     And you're not aware of others
15 discussing it?
16     A.     No.
17     Q.     Okay. When Act 626 was first
18 introduced in the legislature as HB 1570,
19 during that period when it was being
20 considered, did anyone at the Board
21 discuss the bill?
22     A.     No, not to my knowledge.
23     Q.     Okay so no official board
24 meeting discussion of the bill?
25     A.     No.

Page 159

1              AMY E. EMBRY
2     Q.     And you're not aware of any
3 conversations among the Board members
4 about the bill?
5     A.     No.
6     Q.     And you're not aware -- well,
7 let me ask you a different question.
8        Are you aware of any
9 conversation involving any Board staff or
10 employees about the bill?
11     A.     No.
12     Q.     Sorry if I'm -- I'm finding it
13 surprising that a bill that obviously had
14 a lot of public attention involving
15 medical regulation, nobody at the Board
16 talked about it at all?
17        MS. LAND:   Object to form.
18     Q.     Is that right? Really, nobody
19 discussed it?
20     A.     I found out about the bill it
21 was either on social media or the news.
22     Q.     Back at the time it was being
23 considered?
24     A.     Correct.
25     Q.     So just to be clear, you are

Page 160

1              AMY E. EMBRY
2 not aware of any conversations had among
3 any Board members or involving any Board
4 members or any staff about this bill that
5 became Act 626?
6     A.     No.
7     Q.     Now, we talked earlier about
8 other areas of regulations by the Board
9 that were -- where the regulations after
10 statutes were passed on the particular
11 topic like gastric bypass procedures.
12        Is the Board expected to pass
13 regulations relating to Act 626?
14     A.     I do not have the act in front
15 of me, but I do not recall that act
16 requiring any Licensing Board to
17 promulgate a rule. If it is specifically
18 in there that they will promulgate a rule
19 then it will be promulgated.
20     Q.     But at this point so far has
21 there been any discussion about a
22 possibility of promulgating a rule?
23     A.     No.
24     Q.     Has any government official in
25 the executive branch or the legislature

Page 161

1              AMY E. EMBRY
2 communicated with the Board about Act
3 626?
4     A.     No, not to my knowledge, no.
5     Q.     Okay. And when the bill was
6 introduced and being considered did
7 anyone from the legislature consult with
8 the Board regarding this bill?
9     A.     No.
10     Q.     And just to be clear, "this
11 bill" I'm referring to the bill that
12 became Act 626.
13     A.     No. No one contacted, no.
14     Q.     So the Board's input was not
15 sought by any member of the legislature?
16     A.     No.
17     Q.     Okay. And since the law Act
18 626 was enacted has any government
19 official communicated with the Board
20 about enacting regulations regarding the
21 Act?
22     A.     No.
23     Q.     So your understanding is that
24 the Act 626 does not require any
25 regulations or rules to be promulgated by

Page 162

AMY E. EMBRY

1
2 the Board?
3      A.    Yes, from my recollection. I
4 don't have it in front of me, I would
5 have to read through it again, but I do
6 not recall a requirement for rules in
7 that Act.
8      Q.    So there is no plan on the
9 part of the Board to pass a regulation
10 relating to Act 626?
11      A.    No.
12      Q.    Has the Board consulted with
13 any experts on the topic of
14 gender-affirming medical care?
15      A.    No.
16      Q.    So prior to the introduction
17 of HB 1570, the bill that became Act 626,
18 was the Board ever approached by any
19 government official or their
20 representatives about enacting
21 regulations concerning gender transition
22 procedures?
23      A.    As long as I've been Director,
24 no. Before that, I can't answer that.
25      Q.    And was the Board or any Board

Page 163

AMY E. EMBRY

1
2 member or Board staff contacted by
3 anybody from the Governor's Office
4 related to HB 1570 or Act 626, which it
5 later became?
6      A.    I was not, and I don't recall
7 anybody else in the office, being
8 contacted by the Governor's Office.
9      Q.    Are you aware of any Board
10 member being contacted by anyone from the
11 Governor's Office?
12      A.    I am not aware of anything.
13      Q.    So the way I had asked the
14 questions before about legislators, is
15 whether any of the legislators contacted
16 the Board. Do you know if anybody from
17 the Board contacted any legislators
18 concerning HB 1570?
19      A.    Not to my knowledge, no.
20      Q.    Do you know if anybody from
21 the Board staff contacted any legislator
22 regarding Act 626 or HB 1570?
23      A.    Not to my knowledge.
24      Q.    Okay. Did anyone from the
25 Board or the Board staff reach out to any

Page 164

AMY E. EMBRY

1
2 government official, executive or
3 legislative branches regarding HB 1570,
4 which later became Act 626?
5      A.    Did you say executive
6 branches?
7      Q.    Yes, from the executive or
8 legislative branches.
9      A.    No.
10      Q.    Okay. Did the Board ever take
11 a position on HB 1570?
12      A.    No.
13      Q.    Why not?
14      A.    The Board does not lobby.
15      Q.    Did the Board ever discuss the
16 possibility of taking a position about
17 the bill?
18      A.    No.
19      Q.    Was the Board ever asked its
20 position by anyone?
21      A.    Not to my knowledge.
22      Q.    But it was asked by press
23 reporters, right?
24      A.    I don't recall being contacted
25 by the press on this.

Page 165

AMY E. EMBRY

1
2      MS. COOPER:  Okay. Can we,
3 Beth, take tab 10 and let's mark
4 that as Exhibit 8.
5      (Exhibit 8, email dated May
6 25, 2021, re: CNN Inquiry was
7 received and marked on this date
8 for identification.)
9      MR. RICHARDSON:  Exhibit 8 has
10 been introduced.
11      MS. LAND:  I've got it pulled
12 up.
13      Q.    I'll give you a moment to just
14 take a look at that.
15      A moment ago I asked whether
16 the Board was ever asked its position on
17 HB 1570 or after it became law Act 626.
18 I'll ask a slightly different question
19 now.
20      Was the Board ever asked its
21 view on the lawsuit challenging Act 626?
22      A.    Yes.
23      Q.    And so the exhibit marked
24 Exhibit 8, which I have handed to you, is
25 a -- I'll describe for the record, an

```
1              AMY E. EMBRY
2    email from Chance Pagan sent Tuesday, May
3    25th, 2021 to Juli Carlson, cc:  Ann
4    Embry ASMB Regulatory/Disciplinary
5    Department, subject:  Forward CNN
6    Inquiry. That's just for the record.
7              Do you recognize this email?
8         A.   Yes, I do.
9         Q.   You were copied on it? You saw
10   it at the time?
11        A.   I was. This was a year ago.
12        Q.   Okay. And is this -- I do read
13   right that CNN was asking for comment
14   from the Board on the ACLU lawsuit
15   against Act 626?
16        A.   Yes.
17        Q.   And so tell me if I'm getting
18   this right, it looks like the initial
19   email is from someone named Jamiel Lynch
20   from Warner Media at, according to their
21   email address, to ASMB Support
22   Department, copying Kodwyer,
23   K-o-d-w-y-e-r, @HDLlaw.com, subject: CNN
24   Interview.
25              What is ASMB Support
```

```
1              AMY E. EMBRY
2    Department, do you know?
3         A.   That's just an email, email
4    that can go to Support Department, which
5    means more than one person has access to
6    that email. Anything that they need
7    assistance with they send it to that, and
8    so one of three or four people will be
9    able to help out.
10        Q.   Okay. So then it looks like
11   someone named Chance Pagan listed as
12   Systems Administrator sent this,
13   forwarded this email to Juli Carlson and
14   you; is that correct?
15        A.   Correct.
16        Q.   And who is Chance Pagan?
17        A.   He is in our IT department.
18        Q.   It says here in the email, "I
19   believe this would be for you."  I assume
20   he meant Juli Carlson; is that correct?
21        A.   That's why he sent it to Juli
22   and this was sent to the Support
23   department, which goes to IT. He
24   forwarded it onto the Regulatory
25   department.
```

```
1              AMY E. EMBRY
2         Q.   Thank you. Did you talk with
3    Juli Carlson about this request?
4         A.   I'm sure I did but this was a
5    year ago, and I don't remember. We would
6    have responded but I'd have to go back
7    and look at my emails and notes on this.
8         Q.   Did the Board take a position
9    on the ACLU lawsuit?
10        A.   No.  We would not have taken a
11   position.
12        Q.   Did it make a statement?
13        A.   I can't remember. I would have
14   to go back and look in my emails and look
15   at in my notes.
16        Q.   Okay. Was the Board asked for
17   comment or statements about Act 626 or
18   the ACLU lawsuit challenging Act 626,
19   apart from this CNN inquiry?
20        A.   It's possible. It is possible.
21        Q.   And what responses would the
22   Board have made?
23        A.   I would have to go back and
24   look at my notes but it would be a
25   generic response.
```

```
1              AMY E. EMBRY
2         Q.   A generic response to the
3    effect of what?
4         A.   We would not take a stance in
5    the lawsuit, it would be somewhere along
6    the lines -- and again, this is not what
7    the response would have said -- is that
8    we would have followed the process; we
9    have a lawsuit filed against us, we'll
10   follow the process.
11        Q.   Are you aware that the
12   Governor vetoed HB 1570 before it
13   ultimately became law?
14        A.   I think I do recall that, yes.
15        Q.   And were you aware that --
16   well, let me ask a different question.
17              Have you seen the Governor's
18   veto statement or heard him speak about
19   his veto?
20        A.   No.
21        Q.   You never saw it?
22        A.   Not that I can recall.
23        Q.   Do you know why the Governor
24   vetoed the law?
25        A.   No.
```

Page 170

```
          AMY E. EMBRY
1
2      Q.    Does the Board have a view
3  about the appropriate course of treatment
4  for adolescents with gender dysphoria?
5      A.    No.
6      Q.    Does the Board recognize that
7  gender-affirming hormones can be a help
8  to some adolescents?
9      A.    Not to my knowledge.
10     Q.    "Not to my knowledge" that the
11 Board knows, or the Board recognizes
12 this, rather?
13     A.    You're going to have 14
14 different Board members with 14 different
15 opinions, so you can have 14 different
16 answers.
17     Q.    Do you know the views of any
18 individual Board member?
19     A.    No.
20     Q.    Is the Board taking the
21 position in this case that no adolescent
22 can benefit from gender-affirming hormone
23 therapy?
24     A.    I don't feel I can answer that
25 question. The Board has not discussed it,
```

Page 171

```
          AMY E. EMBRY
1
2  so I don't know the answer to that.
3      Q.    So the Board doesn't -- the
4  Board doesn't have a position on that?
5      A.    No.
6      Q.    And is it also true the Board
7  does not have -- does not take the
8  position that gender-affirming medical
9  treatments can never be helpful to
10 alleviate gender dysphoria in
11 adolescents?
12     A.    Can you repeat that?
13     Q.    I'm realizing that was a
14 terrible question with a double negative.
15 I'm going to rephrase it.
16         Is it the Board's position
17 that gender-affirming medical treatments
18 can never alleviate gender dysphoria in
19 adolescents?
20     A.    It's never been discussed, so
21 they do not have an opinion on this at
22 the Board.
23     Q.    Is it the Board's position
24 that the risks of gender transition
25 procedures always outweigh the benefits
```

Page 172

```
          AMY E. EMBRY
1
2  for every minor patient with gender
3  dysphoria?
4      A.    Again, they haven't discussed
5  this, so there is no position that I'm
6  aware of.
7      Q.    Does the Board recognize that
8  for adolescents who are currently
9  receiving gender-affirming medical
10 treatments that withdrawing that
11 treatment from them could put them at
12 risk of harm?
13     A.    Again, they haven't discussed
14 this, so I do not know the Board's
15 position on this.
16     Q.    So does the Board have a
17 position on this?
18     A.    No, they have never discussed
19 it.
20     Q.    So it's not just that you
21 don't know the Board's position, is it
22 your testimony that the Board doesn't
23 have a position on this?
24     A.    They have not discussed
25 anything to have a position on this. This
```

Page 173

```
          AMY E. EMBRY
1
2  issue has not come up.  The Board did not
3  know about the bill or anything until it
4  hit the media, same as us.
5      Q.    So is it fair to assume that
6  nobody from the Board lobbied legislators
7  to support the bill?
8      A.    No.
9      Q.    Nobody lobbied -- nobody from
10 the Board lobbied legislators one way or
11 the other related to the bill?
12     A.    The Board does not lobby.
13     Q.    The Board doesn't lobby about
14 any bills; is that right?
15     A.    That is correct.
16     Q.    So members of the Board, have
17 they ever individually taken positions on
18 any bill related to medical care?
19     A.    Not at the Board meeting.
20     Q.    But outside of the board
21 meeting?
22     A.    I wouldn't know that.
23     Q.    Are you aware of any times
24 that happened?
25     A.    No. I don't know, no.
```

Page 174

AMY E. EMBRY

1
2      Q.    In Arkansas do parents have to
3  consent to medical treatment for their
4  children, for their minor children?
5      A.    Usually yes. That's between
6  the physician and the parent and the
7  patient.
8      Q.    And what do you mean by it's
9  "between the physician and the parent and
10  the patient"?
11      A.    Well, any care on any patient,
12  whether it's a minor or an adult, that is
13  between the physician and the patient. If
14  a minor is involved, then the parent is
15  involved.
16      Q.    When you say any care between
17  the patient and the physician and if it's
18  a minor the parent, do you mean the
19  decision about whether to undergo care?
20      A.    I would think it -- yes. Yes.
21      Q.    But I think you testified that
22  generally parents do have to consent for
23  medical treatment for their children, if
24  they want them to have that care? Excuse
25  me. Let me do that again because that was

Page 175

AMY E. EMBRY

1
2  my fault. I spoke over you. I just want
3  to get a clear record.
4          Do you understand your
5  testimony that in Arkansas generally
6  before minors can have medical care their
7  parents need to consent?
8      A.    Yes.
9      Q.    Okay. Are there exceptions
10  where the minor could consent on their
11  own without parents?
12      A.    I don't know.
13          MS. COOPER: Beth, if we can
14      take tab 12 and mark that as
15      Exhibit 9.
16          (Exhibit 9, copy of House Bill
17      1570 was received and marked on
18      this date for identification.)
19          MS. LAND:  Okay. It's pulled
20      up for me.
21      Q.    For the record, I'm going to
22  identify Exhibit 9 as House Bill 1570.
23          Have you seen this bill
24  before?
25      A.    Yes.

Page 176

AMY E. EMBRY

1
2      Q.    When did you see it for the
3  first time?
4      A.    For the first time it would be
5  after it was put on the news or social
6  media, however I heard of it, I pulled it
7  up.
8      Q.    Why did you -- sorry. Go
9  ahead.
10      A.    I pulled it up on the
11  legislative website.
12      Q.    Why did you do that?
13      A.    Because I knew that it would
14  probably affect the Board in some form or
15  fashion, so I was just looking at it.
16      Q.    Why did you think it would
17  affect the Board in some form or fashion?
18      A.    Because it involved
19  physicians.
20      Q.    And now that you've looked at
21  it, does it involve the Board in some
22  form or fashion?
23      A.    One section.
24      Q.    Which section is that?
25      A.    It's going to be from page 9

Page 177

AMY E. EMBRY

1
2  line 27, and the Code is 20-9-1504, it's
3  the enforcement.  And it says, "Any
4  referral for or provision of gender
5  transition procedures to an individual
6  under 18 years of age is unprofessional
7  conduct and is subject to discipline by
8  the appropriate licensing entity or
9  Disciplinary Review Board with competent
10  jurisdiction in this State."
11      Q.    And that's the one provision
12  within HB 1570 that you understand to
13  involve the Board --
14      A.    Yes.
15      Q.    -- is that right? Is that
16  because the Board is the appropriate
17  licensing entity at issue?
18      A.    Well, it is the appropriate --
19      Q.    Excuse me. I have to -- I
20  asked my question terrible. I'll redo it.
21          Is it because the Board is the
22  appropriate licensing entity or
23  Disciplinary Review Board with
24  jurisdiction in this State?
25          MS. LAND:  I'll object to the

Page 178

AMY E. EMBRY

1    AMY E. EMBRY
2    form. You can answer that.
3        A.    It is the licensing entity for
4    some healthcare professionals in the
5    State of Arkansas.
6        Q.    And is it also the
7    Disciplinary Review Board for some
8    healthcare professionals in Arkansas?
9        A.    We've always just been called
10   a Licensing Board. I've never heard us
11   called a Disciplinary Review Board.
12       Q.    Okay. So I have a few
13   questions about this provision, which is
14   20-9-1504, subsection (a).
15            As you read it says, "Any
16   referral for or provision of gender
17   transition procedures to an individual
18   under 18 years of age is unprofessional
19   conduct."
20            I'm trying to understand what
21   that means for your enforcement as you,
22   the Board, because there's a whole other
23   provision in the Medical Practices Act
24   laying out unprofessional conduct.
25            Is it your understanding that

Page 179

AMY E. EMBRY

1    AMY E. EMBRY
2    this is an additional type of conduct
3    that now constitutes unprofessional
4    conduct, in addition to what we discussed
5    in the other statute defining that term?
6        A.    Yes.
7        Q.    Okay. So I believe that one
8    had subpoints A through S defining
9    unprofessional conduct, so this is just
10   one more?
11       A.    Yes.
12       Q.    Okay. And you testified that
13   the Board is the licensing entity for
14   some medical providers.
15            Is there any other entity that
16   enforces or that is a licensing entity or
17   Disciplinary Review Board that would be
18   relevant with respect to enforcing Act
19   626?
20       A.    It depends on what healthcare
21   professionals would be providing these
22   services.
23       Q.    Okay. So let's break that
24   down. That's helpful.
25            So for physicians who are

Page 180

AMY E. EMBRY

1    AMY E. EMBRY
2    providing procedures that are prohibited
3    by HB 1570, the Board would be the
4    appropriate licensing entity; is that
5    correct?
6        A.    Yes.
7        Q.    Okay. Is there any other
8    entity in Arkansas that would be a
9    licensing entity for physicians?
10       A.    No, not for physicians.
11       Q.    Is there any other entity in
12   Arkansas that would be responsible for
13   discipline of physicians in Arkansas?
14       A.    No.
15       Q.    Does the Board have discretion
16   in deciding how to enforce Act 626,
17   should it take effect?
18       A.    It would -- it would work, as
19   the same as any other enforcement, if the
20   complaint came, that they would read the
21   law and see what needs to be done because
22   that's just how it works on a complaint
23   basis.
24       Q.    Well, I think you also said
25   while it's on a complaint basis, things

Page 181

AMY E. EMBRY

1    AMY E. EMBRY
2    can come to the Board's attention apart
3    from complaints that the Board could then
4    act on; is that right?
5        A.    Yes.
6        Q.    Like if it's in the news, for
7    example, I think you said?
8        A.    Correct.
9        Q.    Okay. Has the Board been
10   provided any direction from any
11   government official or entity about how
12   to enforce Act 626 if it takes effect?
13       A.    No.
14       Q.    Has the Board had any
15   conversations or any Board members or
16   Board staff about how the Board would
17   enforce Act 626 should it take effect?
18       A.    No.
19       Q.    Are you aware that the law Act
20   626 was preliminarily enjoined by Federal
21   Court in Arkansas and is not currently in
22   effect?
23       A.    Yes.
24       Q.    Okay. And prior to that,
25   before the court ruled, I believe --

Page 182

```
              AMY E. EMBRY
1
2   well, let's find this. I'm going to just
3   strike that and ask it differently.
4           If the law were to take effect
5   would there be a process the Board would
6   need to undergo to determine how to
7   enforce Act 626?
8      A.    No. It would go through the
9   usual process of any complaint received,
10  it would be addressed by the entire Board
11  and they would determine if there has
12  been a violation.
13     Q.    So if tomorrow Act 626 went
14  into effect the Board would be ready to
15  field any complaints should they arise?
16     A.    Yes.
17     Q.    Okay. It doesn't have anything
18  it needs to do to get ready for that?
19     A.    No.
20     Q.    Okay. So if Act 626 took
21  effect and a complaint came to the Board
22  saying that there is a doctor who is
23  providing gender-affirming medical care
24  to an adolescent, what would happen? What
25  would the Board do?
```

Page 183

```
              AMY E. EMBRY
1
2      A.    It would be the same as any
3   other complaint. The physician would be
4   provided a copy of the complaint and
5   asked to respond and once that is
6   received by the complaint and the
7   response is presented to the Board and
8   then they will move forward from there;
9   if there needs to be an investigation;
10  does action need to be brought against
11  the license; it could be a variety of
12  situations, but the whole thing will go
13  before the full Board and it will be
14  discussed.
15     Q.    And so if they got a
16  complaint, the Board got a complaint
17  about this and the physician responded
18  and admitted providing that care, would a
19  violation be determined?
20     A.    I can't answer that question.
21  That would go before the Board, they
22  would look at all situations, all
23  circumstances surrounding it. So I can't
24  answer how the Board would vote.
25     Q.    So there could be
```

Page 184

```
              AMY E. EMBRY
1
2   circumstances under which it might not
3   constitute a violation?
4      A.    No. I can't think of anything
5   off the top of my head.
6      Q.    So the Board would not have
7   any discretion not to find a violation if
8   the person admitted to providing care
9   prohibited by Act 626?
10     A.    Could you repeat?
11         MS. LAND:  Object to form.
12     Q.    Sure. Would the Board have no
13  discretion, it would have to find a
14  violation if a doctor admitted providing
15  care prohibited by Act 626?
16     A.    That is possible, that is a
17  possible outcome.
18     Q.    Possible? Let me ask the
19  question differently because I'm not sure
20  I understand your answer.
21         Would the Board be required to
22  make a finding of a violation of Act 626
23  -- let me ask that differently. I didn't
24  ask that right.
25         Would the Board have to make a
```

Page 185

```
              AMY E. EMBRY
1
2   finding of unprofessional conduct as
3   directed by Act 626 if a doctor admitted
4   to providing prohibited care under the
5   statute?
6      A.    Yes.
7      Q.    Okay. Would the doctor be
8   subject to discipline by the Board?
9      A.    Yes.
10     Q.    And what would happen? What
11  would be the discipline?
12     A.    That is strictly up to the
13  Board. You are looking at different
14  scenarios every single time.  Every
15  single case is different. It could be
16  that they find that they may have to
17  suspend the license, it could be that
18  they say; okay, you need to go back and
19  take these courses and make sure you
20  understand the law. It just depends.
21  Every situation is different.
22     Q.    Could the Board revoke the
23  license of the doctor?
24     A.    If their legal counsel says
25  they do have enough and that's what the
```

Page 186

```
 1            AMY E. EMBRY
 2  Board votes to do, yes, they can.
 3       Q.    When you say if their legal
 4  counsel says they do have enough, if the
 5  Board's legal counsel says they do have
 6  enough, is that what you mean?
 7       A.    Correct. Yes.
 8       Q.    And have enough what?
 9       A.    Evidence to either suspend or
10  revoke a license.
11       Q.    Would admission or proof of
12  providing gender-affirming medical care
13  to a minor be enough to suspend or revoke
14  a license?
15       A.    That would actually be a
16  question for the Board's legal counsel,
17  not me. It is very common for the Board
18  to ask the legal counsel in the room; do
19  we have enough for a suspension or
20  revocation before they make any decision.
21       Q.    But it's a possible outcome?
22       A.    Yes.
23       Q.    When we talked earlier about
24  the definition of unprofessional conduct
25  in 17-95-409 of the Medical Practices Act
```

Page 187

```
 1            AMY E. EMBRY
 2  and they had subsection A through S as
 3  conduct that's deemed unprofessional
 4  conduct, were those all determined by the
 5  legislature, those categories of
 6  unprofessional conduct or the Board?
 7       A.    Let me go back to that 17-95
 8  --
 9       Q.    Actually, withdraw the
10  question. I answered it myself. I
11  withdraw it.
12            If there were a complaint
13  against a doctor for violating Act 626
14  and the doctor responded by saying
15  withdrawing treatment from a patient
16  would cause severe harm to the patient,
17  would that be a defense to the complaint
18  for unprofessional conduct based on 626?
19       A.    Yes, it could be a defense.
20       Q.    It could be a defense. And
21  there would be a hearing on that?
22       A.    I hearing is usually held only
23  if a license is going to be -- action is
24  going to be taken against a license. A
25  hearing is not held just because a
```

Page 188

```
 1            AMY E. EMBRY
 2  complaint is received.
 3       Q.    So you're saying even before
 4  the need for a hearing, the Board could
 5  potentially deem a doctor's defense or I
 6  should say the doctor's statement that
 7  withdrawing the care a patient could
 8  cause harm to the patient as a defense to
 9  a complaint of unprofessional conduct
10  based on Act 626?
11            MS. LAND:  Object to form.
12       A.    So I want to make sure I
13  understand your question. The original
14  question was, you can do all this without
15  a hearing. So if a complaint comes in on
16  a physician, they gather the complaint,
17  the response from the physician, the
18  Board reviews it, they can decide then
19  there's been no violation and it's done.
20  They can also decide we want to see this
21  doctor at the next board meeting. They
22  can also determine just from the response
23  or from the complaint; has there been a
24  violation that rises to the level of a
25  suspension or a revocation?  If they do
```

Page 189

```
 1            AMY E. EMBRY
 2  that, then the hearing will be at the
 3  next meeting.
 4            So I'm getting confused as far
 5  as what you're asking as far as a hearing
 6  and a defense because a hearing is only
 7  held if action is brought against a
 8  license. Asking a doctor to appear is not
 9  an action against a license. Asking a
10  doctor to respond is not an action
11  against a license. So I'm confused as to
12  what you're asking.
13       Q.    Thank you. That's helpful.
14  I'll break it down into smaller bits and
15  try to focus better.
16            If there is a complaint
17  against a doctor on the basis that the
18  doctor is providing gender-affirming
19  medical care and the doctor's response is
20  to say withdrawing treatment for this
21  particular patient would cause severe
22  harm to the patient, so I could not do
23  that, is it possible that the Board could
24  determine that the doctor's conduct was
25  not a violation?
```

AMY E. EMBRY

1     A.    It's possible. They could
3  choose to do that.
4     Q.    So the Board would not be
5  required to discipline a doctor for
6  providing gender-affirming medical care
7  in all cases?
8     A.    Again, it depends on the
9  situation. They would have to look at all
10  the evidence before them.
11        If I had to speculate, if a
12  complaint came in of this nature they
13  would want to speak with the physician.
14  So more than likely the physician would
15  be likely to appear to discuss this.
16     Q.    And then if the Board were
17  convinced that the doctor's concern about
18  harm to patient in the event of
19  withdrawing treatment was valid, the
20  Board would not have to find a violation
21  and discipline the doctor?
22     A.    That is possible.
23     Q.    Okay. One of the topics on our
24  30(b)(6) deposition notice had to do with
25  two doctor plaintiffs in this case and

AMY E. EMBRY

2  their -- let me pull up the notice. The
3  medical license of Dr. Michelle Hutchison
4  and the medical license of Dr. Katherine
5  Stambough.
6        Do those doctors have any
7  pending complaints against them?
8     A.    No.
9     Q.    Have there been any complaints
10  against either doctor?
11     A.    No.
12     Q.    Okay. Another topic on our
13  notice was what the Board did to search
14  for documents in response to our
15  subpoena. I believe that was the last
16  item on the list.
17        Can you tell me what was done
18  to search for documents?
19        MS. LAND:   I'm going to object
20        to that question to the extent it
21        elicits any attorney-client
22        privilege information. So to the
23        extent she can answer that without
24        revealing any of that, I'll assert
25        that objection.

AMY E. EMBRY

2     Q.    Right. So without revealing
3  any attorney-client communications, what
4  was searched or how did the search
5  happen?
6     A.    We received the request and
7  then we gave it to our IT department and
8  I don't have the original request in
9  front of me but I think it was along the
10  lines any information we had on HB 1570
11  or 626. So we researched our entire
12  email system for those terms.
13        And then the second request
14  came in and we did it again and because
15  the Board hadn't any involvement with
16  this legislation there was not anything
17  in there.
18        When the third request came it
19  came with two or three pages of search
20  terms or search items and that is when
21  they put that through the system and all
22  these documents came out, whether they
23  were relevant to this act or not.
24     Q.    And when you say "through the
25  system" does that mean all employees of

AMY E. EMBRY

2  the Board?
3     A.    Yes, the entire email system.
4     Q.    For Board employees, though;
5  is that right?
6     A.    Yes.
7     Q.    Or is it beyond Board
8  employee?
9     A.    No. It is only Board employee
10  employees.
11     Q.    And what about Board members?
12     A.    No, we do not have email
13  addresses for Board members.
14     Q.    So you didn't search files of
15  any Board members?
16     A.    We don't have files on Board
17  members as far as communications. They
18  don't use any of our systems to
19  communicate.
20     Q.    Okay. So the Board members
21  don't have an official email that they
22  use in their business as Board members?
23     A.    No.
24     Q.    They just use their personal
25  email?

Page 194

AMY E. EMBRY

1
2     A.    Correct.
3     Q.    So when the Board members are
4  conducting Board business is it ever done
5  through email?
6     A.    No. Well, that is if we have
7  to send out some attachments that were
8  not part of the, you know, original Board
9  package, things of that nature, or if we
10 have to say; here is the Zoom link for
11 the board meeting or something like that.
12    Q.    And in those cases you'll
13 email to their personal email?
14    A.    Correct.
15    Q.    Or might it be their workplace
16 email?
17    A.    It might it depends on what
18 email address they choose to use.
19    Q.    For these Board members this
20 is just a part-time activity for them, is
21 that right, it's not their full-time?
22    A.    No. No. The majority of them
23 are full-time physicians.
24    Q.    Okay. And when you talked
25 about giving a packet to members of the

Page 195

AMY E. EMBRY

1
2  Board, I assume that relates to different
3  complaints against medical providers; is
4  that right?
5     A.    Yes. It is what is provided
6  that they review at every single board
7  meeting. They are sent out on disks and
8  they are loaded into their computer and
9  into the Board system and that is
10 everything that they will discuss or that
11 any appearances of that board meeting.
12    Q.    So it's based on what's on the
13 agenda at the next board meeting, they
14 will get a packet of materials; is that
15 right?
16    A.    Correct.
17    Q.    And that could be related to a
18 complaint against a physician; is that
19 right?
20    A.    Yes.
21    Q.    And that could include
22 something related to a regulation being
23 considered; is that right?
24    A.    A-hum.
25    Q.    And all of those kinds of

Page 196

AMY E. EMBRY

1
2  materials are sent on a disk in the U.S.
3  mail or how do they get them?
4     A.    No.  They are sent FedEx with
5  signature required.
6     Q.    Wow. Okay.
7          MS. COOPER:  Why don't we take
8  a break, maybe about ten minutes.
9  Okay?
10         VIDEOGRAPHER:  We are off the
11 record at 2:53 p.m.
12         (Recess is taken.)
13         VIDEOGRAPHER:  We are back on
14 the record at 3:06 p.m.
15         MS. COOPER:  Thank you. I just
16 want to put on the record that Beth
17 Echols, who is on the Plaintiff's
18 counsel team joined the deposition
19 some time ago but we have not
20 mentioned that until now.
21         Beth, can you grab tab 5?
22 Actually, I'm sorry, did we already
23 mark tab 5? We did, didn't we?
24         MR. RICHARDSON:  We marked it
25 as Exhibit 5.

Page 197

AMY E. EMBRY

1
2     Q.    So let's turn to Exhibit 5.
3     A.    I'm afraid, Leslie, that the
4  ones before 6 were not marked, so if you
5  could identify them?
6     Q.    I'm sorry, yes.  We'll do that
7  after but it is the document that says on
8  the top A Bill and it's House Bill 1718.
9          Do you see that?
10    A.    Yes.
11    Q.    Okay. Ms. Embry, are you
12 familiar with this law?
13    A.    I know of it. I've read it.
14    Q.    Well, I want to call your
15 attention to a particular part of it and
16 if you want to read more, that will be
17 fine but I specifically want to point to
18 the beginning where it says, it's called
19 Subsector 2, Patient Right-to-Know Act
20 and it says 20-6-201 is the title and if
21 you look right below that 20-6-202
22 Legislative Findings and Purpose.  You
23 got that?
24    A.    Yes.
25    Q.    And it says, "(a) the General

Page 198

AMY E. EMBRY

1
2  assembly finds that; (1) is patients are
3  entitled to continuity of care with their
4  healthcare providers; (2) healthcare
5  providers are prohibited legally and
6  ethically from abandoning a patient
7  before treatment has concluded." We can
8  stop reading there.
9          Does that refresh your
10  recollection about this statute?
11      A.    Yes.  This was done before I
12  was Director.
13      Q.    Okay.
14      A.    So I would not have been as
15  involved with this.
16      Okay. And so I wanted to ask
17  you, focusing in on subsection (a)(2) it
18  says, "Healthcare providers are
19  prohibited legally and ethically from
20  abandoning a patient before treatment has
21  concluded."
22          So is this another source of
23  ethical obligations of doctors in
24  Arkansas?
25      A.    Ethical I don't know, but it

Page 199

AMY E. EMBRY

1
2  is an obligation that the Board would
3  look at.
4      Q.    Okay. Well, I ask because it
5  says, "The healthcare providers are
6  prohibited legally and ethically from
7  abandoning a patient."
8          So is that your
9  understanding, that it would be an
10  ethical violation to abandon a patient
11  before treatment has concluded?
12      A.    Yes.
13      Q.    Okay. And so under this
14  provision if a doctor is treating a
15  patient and has to stop care for any
16  reason before treatment is concluded,
17  they have -- is it an ethical obligation
18  to help them find care from another
19  doctor?
20      A.    Yes.
21      Q.    Is that right? I'm sorry?
22      A.    Yes.
23      Q.    Yes, okay. And can complaints
24  be filed with the Board for doctors
25  abandoning patients in violation of this

Page 200

AMY E. EMBRY

1
2  section?
3      A.    Yes.
4      Q.    Has that ever happened?
5      A.    Yes.
6      Q.    Under your watch?
7      A.    Yes.
8      Q.    Can you tell me about those
9  kinds of circumstances?
10      A.    It would be a letter of
11  complaint saying that either they were
12  fired or they were abandoned by the
13  physician without providing another
14  physician or a referral to another
15  physician and it would go through the
16  complaint process.
17      Q.    Have any doctors been
18  disciplined for abandoning patients?
19      A.    I can't recall if they were
20  disciplined. I know some were called
21  before the Board to explain what
22  happened, but without looking at
23  documents, I can't recall if they were
24  disciplined.
25      Q.    But under the Board's

Page 201

AMY E. EMBRY

1
2  authority that could be something that
3  would happen?
4      A.    Yes.
5      Q.    And just to be clear, the
6  Board could discipline a doctor for
7  abandoning a patient in violation of
8  20-6-202?
9      A.    Yes, they could.
10      Q.    We talked about the ethical
11  obligations for doctors contained in
12  Regulation 32. And now we've talked about
13  an ethical requirement in Section
14  20-6-202.
15          Are there other sources of
16  ethical obligations for doctors in
17  Arkansas besides those?
18      A.    Not that I'm aware of. You
19  know, anything in the code that is law we
20  adhere to that as well. Just because it's
21  in the law doesn't necessarily mean there
22  is a rule.
23      Q.    I'm sorry. I didn't hear you.
24      A.    So if there could be a law
25  that we're not required to have a rule on

AMY E. EMBRY

1 that we must adhere to that law as well.

2 Q.    So if there were other

3 statutes that identified ethical duties

4 of doctors, that would be an ethical

5 obligation of doctors even if there is no

6 corresponding rule; is that what you're

7 saying?

8 A.    Correct.

9 Q.    Are you aware of any besides

10 this ethical obligation contained in

11 Section 20-6-202?

12 A.    Without looking at all my

13 documents, no, I can't answer that

14 truthfully. I can't say that with all,

15 through the Arkansas -- all Arkansas

16 statutes there aren't any others. I can't

17 say that honestly.

18 Q.    Okay. We talked a few minutes

19 before the break about parents being

20 required generally, I think you said, to

21 provide informed consent for treatment of

22 their minor children. Do you recall that?

23 A.    Yes.

24 MS. LAND:  I objected to the

AMY E. EMBRY

1 form of that previous question.

2 MS. COOPER:  Okay.

3 Q.    Is that correct, that as a

4 general matter, minors cannot undergo

5 medical treatment without their parents

6 providing informed consent?

7 A.    As far as I know.

8 Q.    Well, okay. That's fine.

9 Are there any other medical

10 treatments, besides gender-affirming

11 medical care for minors with gender

12 dysphoria, that parents cannot provide

13 informed consent for their children to

14 undergo?

15 A.    I don't -- I don't think so.

16 This is the only one that I saw that

17 meets those parameters, but no.

18 Q.    Under what circumstances could

19 the Board step in and ban a particular

20 medical treatment?

21 A.    I don't know of any because

22 they have not banned any medical

23 treatment, so that would be new ground,

24 new territory.

AMY E. EMBRY

1 Q.    So because it's not something

2 they've ever done you can't say under

3 what circumstances they would do

4 something like that; is that right?

5 A.    No.

6 Q.    Okay. And as the Board being

7 the entity responsible for regulating the

8 areas of medicine that you cover, when

9 would banning a particular treatment be

10 an appropriate regulation of the field of

11 medicine?

12 A.    I don't know.

13 Q.    The Board doesn't have a view

14 on that?

15 A.    No.

16 Q.    And when is it appropriate for

17 the State entity that regulates medicine,

18 the Board, to override patients and their

19 doctors' decisions about medical care?

20 MS. LAND:  Objection, form.

21 A.    I do not know the answer to

22 that question.

23 Q.    Does the Board have a view

24 about when it's appropriate to override

AMY E. EMBRY

1 patients and their doctors' decisions

2 about medical care?

3 A.    Not to my knowledge.

4 MS. LAND:  Objection to form.

5 Q.    Does the Board have any view

6 about the type of -- excuse me. Let me

7 rephrase that.

8 Does the Board have a view

9 about the level of evidence of

10 effectiveness that is required before

11 doctors should be permitted to provide a

12 medical treatment?

13 A.    No.  That has not been

14 addressed since I've been the Director.

15 Q.    So am I right that the Board

16 would not prohibit or restrict a

17 particular medical treatment based on the

18 level of scientific evidence that

19 supports that treatment?

20 A.    They have not, I can say that.

21 They have not prohibited any procedure. I

22 can't say what would be done in the

23 future.

24 Q.    Has it ever come up before the

```
1              AMY E. EMBRY
2   Board that a particular treatment is
3   harmful because it's not supported by
4   adequate scientific research
5   demonstrating its effectiveness?
6        A.    Not to my knowledge.
7        Q.    So as the representative of
8   the Board here, the Board is not aware of
9   that ever coming up, that has not come
10  up?
11       A.    Not to my knowledge.
12       Q.    Has there ever been any issue
13  raised with the Board whether in the
14  context of a complaint against a doctor
15  or otherwise an investigation against a
16  doctor or a proposed regulation about the
17  appropriate amount of evidence that's
18  required before medical treatment should
19  be allowed?
20       A.    No.
21       Q.    Is it the Board's
22  understanding that only -- sorry.
23             Is it the Board's
24  understanding that all medical treatment
25  that is provided in Arkansas and allowed
```

```
1              AMY E. EMBRY
2   to be provided is supported by randomized
3   control clinical trials?
4        A.    No.
5        Q.    Are there medical treatments
6   that are permitted to be provided in
7   Arkansas that are not supported by
8   randomized controlled clinical trials?
9        A.    I do not know the answer to
10  that.
11       Q.    We talked earlier about the
12  complaints about Ivermectin being used
13  for COVID and I think -- I don't think I
14  asked this question, has anyone proposed,
15  within the Board, to prohibit doctors
16  from prescribing Ivermectin to treat
17  COVID?
18       A.    No.
19             MS. LAND:  Objection to
20  relevance.
21       Q.    Why not?
22       A.    You are asking me? Is that
23  question toward me?
24       Q.    That's for you, Ms. Embry.
25             So you said there have not
```

```
1              AMY E. EMBRY
2   been any proposals to prohibit the use of
3   Ivermectin to treat COVID and I asked why
4   not?
5        A.    Because it is off-label drug
6   and what is prescribed between a patient
7   and the physician is between the
8   physician and the patient, as with any
9   prescription.
10       Q.    So even if there are known
11  risks for using Ivermectin for COVID and
12  no evidence of its effectiveness, the
13  Board leaves that decision to patients
14  and their physicians?
15       A.    It is left between physicians
16  and patients, yes.
17       Q.    And the Board is in agreement
18  with that position, that should be
19  between the patients and their
20  physicians?
21       A.    Yes.
22       Q.    Am I right that doctors can't
23  provide treatment to patients in Arkansas
24  without informing the patients of
25  potential risks?  I'm not talking about
```

```
1              AMY E. EMBRY
2   Ivermectin specifically, but in general.
3        A.    Do you mean as far as
4   prescription or treatment in general?
5        Q.    We can break that down. Let's
6   start with treatment in general.  Is it
7   correct that doctors can't provide
8   medical treatments to patients without
9   informing them of any potential risks?
10       A.    I believe so. I can't answer
11  completely on that point.
12       Q.    Okay. What about with respect
13  to use of prescriptions, that doctors --
14  is it your understanding that doctors are
15  required to inform patients of risks
16  before prescribing drugs?
17       A.    I'm not -- I don't know of a
18  requirement. I know it is usually done. I
19  don't know of a requirement.
20       Q.    Is it the Board's position
21  that there are some treatments patients
22  should not be permitted to consent to
23  after being fully informed of the risks?
24       A.    Could you repeat that?
25       Q.    Is it the Board's position
```

AMY E. EMBRY

1  that there are some medical treatments
2  patients should not be permitted to
3  consent to after being fully informed by
4  their doctors of the risks of the
5  treatment?
6       A.    I don't know. That would be a
7  -- the Board members would have to decide
8  that.
9       Q.    Okay. Imagine Act 626 didn't
10  exist, no one ever thought about it and
11  it was just -- imagine times before that
12  law.
13           If there was a doctor that was
14  providing gender-affirming medical care
15  to minors and was not following the
16  accepted standards in that field, could
17  that issue be addressed by the Board?
18       A.    If the complaint is filed,
19  yes.
20       Q.    And would that also be true if
21  it otherwise came to the Board's
22  attention that that was happening?
23       A.    Yes.
24       Q.    If the Board had a broader

AMY E. EMBRY

1  concern about doctors overprescribing
2  hormone therapy for adolescents with
3  gender dysphoria, is that something the
4  Board could step in and regulate?
5       A.    Regulate means to form a
6  regulation?
7       Q.    Yes.
8       A.    They can create a rule if they
9  choose to do so. It would go through the
10  promulgation process. It does not mean
11  that it would pass.
12       Q.    I'm just thinking about, we
13  talked about the very detailed
14  regulations about pain medications and
15  regulation in place to govern how
16  prescriptions can be provided, is that a
17  fair description?
18       A.    Could you repeat that?
19       Q.    Yeah. I'll ask it clearer.
20           We talked earlier about the
21  regulations for pain medications. You
22  remember that?
23       A.    Yes.
24       Q.    If there were an issue with,

AMY E. EMBRY

1  say, some doctors in the State providing
2  gender-affirming medical care to minors
3  and specifically overprescribing hormone
4  therapy, similar to the way opioids have
5  been overprescribed, would it be possible
6  for the Board to enact a regulation to
7  address that problem?
8       A.    Yes.  If they found it
9  necessary, yes.
10       Q.    And similarly, if the Board
11  were to learn that some doctors in
12  Arkansas who provide gender-affirming
13  medical care to minors were not providing
14  sufficient information in the informed
15  consent process about the risks and
16  benefits of these treatments, could the
17  Board enact regulations to impose
18  informed consent requirements?
19       A.    The Board can create a
20  regulation on any subject they choose.
21  Whether or not it passes the promulgation
22  process is what determines if it goes
23  into effect.
24       Q.    But I'm just thinking about,

AMY E. EMBRY

1  for example, the gastric bypass
2  regulation that we talked about earlier
3  that had, I don't know, dozens, dozens of
4  risks that doctors are required to tell
5  patients about before they can obtain
6  informed consent for the procedure. If
7  there was a concern about inadequate
8  informed consent with gender-affirming
9  medical care for minors, could the Board
10  pass a regulation to spell out informed
11  consent requirements in a similar way?
12       A.    Again, if they feel a need to,
13  for which they have a concern, they can
14  do that.
15           MS. LAND:  I'll object to the
16       form of that previous question as
17       well.
18       Q.    Okay. So that would include
19  enacting a regulation like the gastric
20  bypass informed consent regulation that
21  would impose requirements for informed
22  consent before obtaining -- before
23  providing hormone therapy for minors?
24       A.    Yes. And I believe on that

Page 214

```
1              AMY E. EMBRY
2  one, though, that that was through an Act
3  that was required.
4       Q.    Thank you. But that is
5  something the Board could do if it saw a
6  need; is that right?
7       A.    Yes. It could -- it could
8  attempt. Let me say that, it could
9  attempt to promulgate a rule.
10      Q.    And I want to make sure I
11 understand what you mean by that.
12           Do you mean they could come up
13 with a rule but there is no guarantee the
14 legislature would approve it; is that
15 what you mean?
16      A.    Correct. Right.
17      Q.    But assuming the legislature
18 were onboard, they could pass a rule to
19 establish informed consent requirements
20 for hormone therapy for minors if they
21 felt that that was something that was not
22 being done properly by all doctors in
23 Arkansas?
24      A.    If that's what the Board chose
25 to create a rule on, yes, that's the
```

Page 215

```
1              AMY E. EMBRY
2  process.
3       Q.    There is nothing about that
4  type of regulation that couldn't be done?
5       A.    Well, we can't make a
6  regulation that is against law. Right,
7  but we can --
8       Q.    Understood. Assuming Act 626
9  never existed, you would be able to do
10 that?
11      A.    If that's what the Board voted
12 to do.
13      Q.    Okay. And I think we touched
14 on this before but I want to be sure, if
15 the Board felt that gender-affirming
16 medical care for adolescents were
17 inherently harmful, it could enact a
18 regulation to prohibit that care; is that
19 right?
20      A.    I mean, if that was a concern
21 and that's what the Board felt was
22 necessary it would start the process, go
23 through the appropriate channels to
24 create a rule.
25      Q.    Right. And it could enact a
```

Page 216

```
1              AMY E. EMBRY
2  rule and then it would just be a question
3  of whether the legislature approved it;
4  is that right?
5       A.    Yes. And I mean, there's
6  various steps to this. I mean, it is a
7  lengthy process. It takes at least months
8  to get it done.
9       Q.    It takes how long?
10      A.    At least months. It could go
11 into years.
12      Q.    Okay. But if they felt -- if
13 the Board felt there was a problem and
14 they needed -- let me rephrase that.
15           If the Board felt that
16 gender-affirming medical care for
17 adolescents was inherently harmful it
18 could -- if the Board agreed that was the
19 case, they could pass a regulation
20 banning that care that could take effect
21 as long as the legislature approved it?
22      MS. LAND:  Object to form.
23      THE WITNESS:  Answer it?
24      MS. LAND:  Yes.
25      A.    Yes.
```

Page 217

```
1              AMY E. EMBRY
2       Q.    That issue of gender-affirming
3  medical care for minors has never been
4  raised as an issue at the Board; is that
5  right?
6       A.    That is correct.
7       MS. COOPER:  I'd like to take
8       tab 11. We haven't done that one
9       yet, right? I'm checking with my
10      team. Can we mark that as the next
11      exhibit, which is --
12      MR. RICHARDSON:  This will be
13      -- apologies, uploading -- this
14      will be Exhibit 10.
15      MS. COOPER:  Exhibit 10. Thank
16      you.
17           (Exhibit 10, Opinion article
18      in Washington Post dated April 8,
19      2021 was received and marked on
20      this date for identification.)
21      MR. RICHARDSON:  Exhibit 10
22      has been produced.
23      MS. LAND:  I've got it.
24      Q.    So we've now marked Exhibit
25 10, and just for identification, it's a
```

AMY E. EMBRY

1
2  document from the Washington Post opinion
3  titled Why I Vetoed My Party's Bill
4  Restricting Healthcare For Transgender
5  Youth by Asa Hutchinson, dated April 8th,
6  2021.
7       We talked a few minutes a
8  while back about the Governor's veto of
9  HB 1570 before it became law and I can't
10  remember if you said you've seen his veto
11  statement or his reasons for his veto.
12  Have you seen this before?
13       A.   No, I have not.
14       Q.   Could you -- why don't you
15  take a minute to read this and I'll have
16  a couple of questions.
17            (Deponent reviews the
18  document.)
19       Q.   Have you had a chance to read
20  it? Okay.
21            Just to make sure I'm covering
22  all bases, did the Board have any
23  discussions about the Governor's veto or
24  his statement about the veto?
25       A.   No.

AMY E. EMBRY

1
2       Q.   And the staff, the same?
3       A.   No. There may have been
4  conversations; hey, did you see he vetoed
5  it? But nothing as far as Board
6  business.
7       Q.   So you were aware at the time
8  that he vetoed HB 1570?
9       A.   Yes.
10       Q.   And that was something that
11  was acknowledged among members of the
12  Board staff?
13       A.   Yes.
14       Q.   Do you remember who?
15       A.   It was me and Juli Carlson.
16       Q.   That was back at the time?
17       A.   Yes.
18       Q.   Roughly around April 8th, '21?
19       A.   Thereabouts. I don't know the
20  date.
21       Q.   Who brought it up; was it you
22  or Juli Carlson?
23       A.   I don't recall and I know we
24  both got it on our phone that's how we
25  found out about it.

1            AMY E. EMBRY
2       Q.   I didn't hear part of what you
3  said.
4       A.   We saw it on social media or
5  from a news station, social media and
6  that's how we found out about it.  That's
7  what started the conversation, that's it.
8       Q.   And what did you say to one
9  another about it?
10       A.   Nothing. It was not a long
11  drawn out conversation.  It was just;
12  hey, the Governor vetoed this bill.
13       Q.   Okay. Did anybody -- did
14  either you or Juli Carlson express
15  agreement or disagreement with the
16  Governor's decision?
17       A.   No.
18       Q.   Neither one?
19       A.   Not that I recall. This was
20  well over a year ago, so not that I
21  recall.
22       Q.   Okay. In part of the message
23  the Governor talks about concerns about
24  youth accessing treatment on the black
25  market. Do you recall seeing that part?

1            AMY E. EMBRY
2       A.   Yes.
3       Q.   Well, do you agree in general
4  that it is harmful for people to access
5  medical treatment on the black market?
6       A.   Are you asking as a personal
7  opinion or as my opinion as Executive
8  Director?
9       Q.   Let's start with the Board, as
10  the Executive Director of the Board.
11       A.   Yes.  It is dangerous to
12  receive it on the black market.
13       Q.   Do you have a different
14  personal opinion about it?
15       MS. LAND:  I'll object to any
16       questions about her personal
17       opinions, that would be outside the
18       scope of the notice for her
19       30(b)(6) witness.
20       MS. COOPER:  Okay.
21       Q.   Did you have a different
22  personal opinion? You can answer, she
23  objected.
24       A.   No.  I don't have a different
25  personal opinion.

## Page 222

AMY E. EMBRY

2  Q.   Does the Board recognize, as
3  the Governor mentioned, that the
4  procedures banned by the Law 626 are
5  considered best practice medical care for
6  youth with gender dysphoria?
7  A.   I'm sorry. Repeat that
8  question.
9  Q.   Yeah. Does the Board
10 recognize, as the Governor does, that the
11 gender transition procedures banned by
12 Act 626 are part of best practice medical
13 care for youth with gender dysphoria?
14 A.   The Board has never discussed
15 that, so I don't know what their stand is
16 on that.
17 MS. LAND:  Object to the form
18    of that previous question.
19 Q.   And does the Board agree with
20 the Governor that the decision about
21 providing gender-affirming medical care
22 to minors is best left to parents and
23 doctors?
24 A.   Again, the Board has never
25 discussed this, so I do not know the

## Page 223

AMY E. EMBRY

2  Board's stance.
3  Q.   Okay. And does that mean the
4  Board doesn't have a stance, since you're
5  testifying on behalf of the Board?
6  A.   I don't know how to answer
7  that. They've never discussed it. It's
8  never been brought up to discuss. So I
9  don't -- as of right now they don't have
10 a stance because it's not been discussed.
11 It has not been an issue.
12 Q.   Understood. I want to go back
13 to few more questions about the Board's
14 enforcement of 626, if it should take
15 effect and to understand a little bit
16 more about that.
17 You mentioned a little while
18 ago we talked about Arkansas Stat
19 20-6-202 which says, "Healthcare
20 providers are legally and ethically
21 prohibited from abandoning a patient
22 before treatment has been concluded." Do
23 you recall that?
24 A.   Yes.
25 Q.   So if doctors are currently

## Page 224

AMY E. EMBRY

2  treating adolescents with
3  gender-affirming hormones, would the
4  doctor be violating their ethical duty to
5  discontinue treatment for a patient
6  without referring them to an alternative
7  provider?
8  A.   According to this law, yes.
9  Q.   And by "this law" you mean
10 20-6-202?
11 A.   Yes.
12 Q.   Okay. So that would be
13 unprofessional conduct on the part of a
14 doctor to discontinue gender-affirming
15 hormones without providing a referral to
16 another doctor to continue that care; is
17 that correct?
18 A.   Yes, that is my understanding.
19 Q.   So what is the Board to do if
20 that situation arises and a complaint is
21 filed or the Board otherwise comes to
22 learn about a doctor who is providing
23 care to a patient, an adolescent patient,
24 specifically gender-affirming medical
25 care, and was providing that care before

## Page 225

AMY E. EMBRY

2  Act 626 took effect and then after 626
3  takes effect feels the doctor cannot
4  discontinue that care because it would be
5  abandoning their patient?  So on the one
6  hand, there's the issue of abandonment
7  and on the other hand, Act 626 says the
8  doctor can't provide that care; how are
9  doctors supposed to navigate that
10 conflict?
11 MS. LAND:  Objection to form.
12 A.   If that were to occur, then
13 what would happen is the Board would let
14 their legal counsel know there is a
15 conflict of these two rules and we need
16 to know how to proceed. That attorney may
17 go further and it may require an AG
18 opinion. When two laws conflict they have
19 to ask for legal assistance.
20 Q.   Has the Board raised the
21 concern about Act 626 putting it in this
22 bind?
23 A.   No.  The Board has not
24 addressed Act 626 at all.
25 Q.   Okay. Does the Board have any

AMY E. EMBRY

1  
2  concerns about the impact of enforcing
3  Act 626 on adolescents who are receiving
4  gender-affirming medical care?
5      Q.    The Board has not addressed
6  this.  Nothing has been discussed at the
7  Board level of Act 626, so nothing has
8  been addressed.
9      Q.    So if the Board were put in
10 that situation where Act 626 took effect,
11 a complaint was brought to the Board
12 because a doctor is continuing to provide
13 care to a patient that they had been
14 treating beforehand, I'm trying to
15 understand, would the Board tell that
16 doctor they have to stop providing that
17 care?
18     A.    So are you asking if 626 was
19 in effect and it conflicts with 20-6-202,
20 the Board would ask for legal assistance
21 on this; what do they need to do.
22     Q.    Does the Board view Act 626
23 promoting the well being of minors?
24     A.    Again, the Board has not
25 addressed Act 626 so this has not been

AMY E. EMBRY

1  
2  discussed.
3      Q.    So the Board has no position?
4      A.    No position.
5      Q.    So then just to make sure I
6  understand, does the Board not have any
7  knowledge of ways Act 626 to benefit
8  minors?
9      A.    It has not been provided by
10 the Board Office to the Board members
11 anything about Act 626.
12     Q.    So the -- what I'm trying to
13 learn is whether the Board, itself, has
14 any evidence or knowledge that Act 626
15 would benefit minors in some way?
16     A.    To my knowledge, no.
17     Q.    Okay. Is the Board aware of
18 any minors in Arkansas who have been
19 harmed by gender-affirming medical care?
20     A.    The Board has not received any
21 complaints and that's how they would
22 learn about that.  So, no.
23     Q.    So again, I can be confident
24 that the Board will not be presenting any
25 evidence based on its own experiences of

AMY E. EMBRY

1  
2  any minors being harmed by
3  gender-affirming medical care?
4      A.    We have not received any
5  information or any complaints to that
6  nature.
7          MS. LAND:  Objection to form
8      on that previous question.
9      Q.    So I think you testified
10 earlier that the Board is the State
11 entity charged with regulating medicine
12 in Arkansas with respect to the
13 categories of medical professionals that
14 you license; is that correct?
15     A.    Correct.
16     Q.    And that includes doctors; is
17 that correct?
18     A.    I'm sorry? What was that?
19     Q.    And that includes doctors?
20     A.    Yes.
21     Q.    Is it the Board's view that
22 Act -- sorry.  Is it the Board's view
23 that Act 626 is an appropriate regulation
24 of medicine?
25     A.    The Board has not addressed

AMY E. EMBRY

1  
2  Act 626.
3      Q.    So it has no view?
4      A.    It has no view.
5      Q.    Okay.
6          MS. COOPER:  Can we mark tab
7      13 as Exhibit 11?
8          (Exhibit, 11, email dated
9      March 22, 2021, from Sarah Vestal
10     to ASMB was received and marked on
11     this date for identification.)
12         MR. RICHARDSON:  Exhibit 11
13     has been introduced.
14         MS. LAND:  I've got it.
15     Q.    Okay. Thank you. Ms. Embry,
16 have you seen Exhibit 11?
17     A.    Yes, I have.
18     Q.    For the record, I'll identify
19 it as an email marked "Confidential" from
20 Sarah Vestal sent Monday, 22 March, 2021.
21     I understand this to be
22 referencing a complaint against a surgeon
23 based on the complainant being
24 transgender; do I read that right?
25     A.    That is correct.

Page 230

AMY E. EMBRY

1
2     Q.    Okay.  Now, we didn't get the
3  complaint that this was about.  Was there
4  ever a complaint filed?
5     A.    I believe that I would have to
6  go back and look at the files again.  I
7  do not have the files with me and we get
8  an average of 400 complaints a year. So I
9  would have to actually have documents to
10  answer anything about this.
11          However, when this came in I
12  think this was the complaint because this
13  was asking, it was not filing a complaint
14  against a physician, no physician is
15  named.  It asks if there was a statute of
16  limitations for filing an ethics
17  complaint.
18     Q.    I see. So and this could
19  satisfy your requirements for a
20  complaint, they just have to notify the
21  Board that they are making a complaint,
22  there is no form they have to use?
23     A.    No, but it must be in writing.
24  It can be email, it can be handwritten,
25  U.S. mail, whatever, but it must be in

Page 231

AMY E. EMBRY

1
2  writing and must include the doctor's
3  name or licensee's name.
4     Q.    Okay. And what -- did this
5  complaint get taken up by the Board?
6     A.    I would have to see if an
7  actual complaint came in after this. This
8  cannot be considered a complaint because
9  it does not mention a licensee's name.
10  This was specifically a question as to
11  the statute of limitations for filing an
12  ethics complaint.
13     Q.    So you don't know whether
14  Sarah Vestal subsequently filed a
15  complaint?
16     A.    She may have because I do
17  remember this name but, again, it could
18  be that I'm remembering her name from
19  this document.
20     Q.    So sitting here now, you have
21  no recollection of the outcome of that.
22  Okay.
23          Now, assuming what she alleged
24  here is correct, understanding that we
25  don't know, but would the refusal to

Page 232

AMY E. EMBRY

1
2  treat a patient because they're
3  transgender be something that would be an
4  appropriate issue for the Board to
5  address?
6     A.    Again, that depends on the
7  situation. If it's a new patient, the
8  doctor can refuse new patients. So I
9  mean, you would have to get into more
10  detail to determine if there had been a
11  violation.
12     Q.    So if it was discrimination by
13  a doctor based on any of the protected
14  characteristics, that would not be
15  something the Board would be involved
16  with?
17     A.    If the investigation can be
18  proven, that is something the Board
19  would take up.
20     Q.    Oh, sorry. Let me clarify my
21  question.
22          Assuming she were able to
23  prove discrimination by her doctor
24  because she's transgender, is that
25  something the Board would -- could find

Page 233

AMY E. EMBRY

1
2  in violation?
3     A.    Yes.
4          MS. COOPER:  Can we take a
5     short break? Let's take ten minutes
6     and I think we're getting close.
7          VIDEOGRAPHER:  We are off the
8     record at 3:56 p.m.
9          (Recess is taken.)
10          VIDEOGRAPHER:  We are back on
11     the record at 4:15 p.m.
12     Q.    Ms. Embry, is Act 626 an
13  appropriate regulation of medicine?
14     A.    I do not have an opinion on
15  that.
16     Q.    And does that mean the Board
17  doesn't have an opinion about that?
18     A.    The Board, that would be a
19  question for the Board. Also, I'm not a
20  physician.
21     Q.    Okay. Now, this is one of our
22  topics on the notice about regulation of
23  medicine and so -- and you're testifying
24  on behalf of the Board and you should
25  have been prepared on these. So I'm

Page 234

AMY E. EMBRY

1  looking at the, you know, much of the
2  notice is about regulating the medical
3  profession. So is this -- is Act 626 an
4  appropriate regulation of medicine?
5      MS. LAND:  I'll object to the
6      form of that question and it is
7      also vague. You can answer.
8      A.    I would need more detail, such
9  as who drafted the legislation, who did
10 they consult with, did they consult with
11 anybody in the medical field? I don't
12 have enough information as to how this
13 was drafted to say if this is a good form
14 of medicine.
15     Q.    And I hear you and I think
16 that your answer is telling me maybe my
17 question could have been clearer because
18 I wasn't -- I wasn't asking about what
19 medical experts would say about
20 appropriate medical care for youth with
21 gender dysphoria, so let me ask the
22 question a little bit differently because
23 I see how it was heard by you.
24     Is prohibiting treatment that

Page 235

AMY E. EMBRY

1  is -- well, let me just ask it this way;
2  you're aware that gender-affirming
3  medical care is recognized as best
4  practices in the medical field by many
5  professional medical professional
6  associations?
7      MS. LAND:  Objection to form.
8      A.    Could you repeat that question
9  again?
10     Q.    Are you aware that
11 gender-affirming medical care is
12 recognized as best practice in the -- for
13 the treatment of gender dysphoria by many
14 medical associations, medical
15 professional associations?
16     A.    No, I was not aware of that.
17     Q.    Okay. Is prohibiting a
18 particular medical treatment, blanket
19 ban, typical of how medicine is -- the
20 field of medicine is normally regulated?
21     MS. LAND:  Objection to form.
22     A.    It is not typical as to how
23 Arkansas regulates medicine at the
24 moment.

Page 236

AMY E. EMBRY

1      Q.    And I think you said earlier
2  this is the only -- strike that.
3      I believe you said earlier Act
4  626 is the only ban on a particular
5  medical treatment in Arkansas that you're
6  aware of; is that correct?
7      A.    That I am aware of.
8      Q.    Okay. And that the Board is
9  aware of; is that correct?
10     A.    Yes, it is.
11     Q.    Okay. So do you have any
12 concerns about the government intruding
13 on the medical decisions families make
14 with their doctors?
15     MS. LAND:  Objection to form.
16     A.    I believe the Board would have
17 concern with some of the issues in 626.
18 If they were to address this issue they
19 may have concerns.
20     Q.    And which concerns or what
21 concerns?
22     A.    If I had to speculate to
23 answer for 14 individuals, it would be
24 about cutting off care to patients that

Page 237

AMY E. EMBRY

1  are already undergoing treatment. It
2  would also be a conflict with another
3  law, as we've already discussed earlier.
4      Q.    And what is your basis for
5  thinking that might be -- there may be
6  concerns? And let's start with the
7  cutting off care to patients already
8  receiving treatment.
9      A.    That is strictly from
10 witnessing the Board at board meetings.
11 What is -- issues that may not be exactly
12 like this but similar to it and how they
13 have addressed those issues.
14     Q.    So are you speaking of other
15 issues unrelated to gender-affirming
16 medical care where there were concerns
17 expressed by the Board about physicians
18 cutting off care for patients; is that
19 correct?
20     A.    Yes. It's called patient
21 abandonment.
22     Q.    And the Board, some of the
23 Board members have expressed concerns
24 about when that happens, when patients

Page 238

```
 1            AMY E. EMBRY
 2   are abandoned by doctors; is that right?
 3        A.    Yes.
 4        Q.    What concerns were raised by
 5   the Board members about that?
 6        A.    Just, in general, just the
 7   fact that patient abandonment happened,
 8   that they abandoned a patient with
 9   nowhere else to go and a complaint was
10   filed against the Board and they
11   addressed it as would any other
12   complaint.
13        Q.    Did the Board express concerns
14   that that's harmful to patients when that
15   happens?
16        A.    Yes.  At times they have said
17   it is harmful to the patient.
18        Q.    And why? Why did they say it
19   was harmful?
20        A.    They did not give a reason
21   why.  When they spoke of that it was just
22   a statement that it was harmful to
23   patients when you abandon them.
24        Q.    Which Board member said that?
25        A.    Oh, there's been -- I don't
```

Page 239

```
 1            AMY E. EMBRY
 2   know. I don't know, but there have been
 3   issues of patient abandonment that have
 4   been brought before the Board.
 5        Q.    I'm sorry. I can't recall if I
 6   asked you this question. Do you have
 7   concerns about the government intruding
 8   on the medical decisions families make
 9   with their doctors?
10        MS. LAND:  Objection to form
11        and to the scope of that question.
12        You can answer.
13        A.    I do believe upon any
14   legislation that comes before the Board
15   if they discuss, if they do have concerns
16   they do discuss it and they would ask
17   their legal counsel what would be the
18   best way to proceed.
19        Q.    And are you speaking -- I
20   asked the question a little bit generally
21   but I didn't probably ask it as
22   specifically as I should have and that
23   may help clarify your answer.
24        Do you have concerns about,
25   with respect to Act 626, the government
```

Page 240

```
 1            AMY E. EMBRY
 2   intruding on the medical decisions
 3   families make with their doctors?
 4        MS. LAND:  Objection to form
 5        and scope.
 6        A.    There is a possibility, yes.
 7   It's all I can say on that is that there
 8   is a possibility. Until it is addressed
 9   by the Board, I can't give a definite
10   answer.
11        Q.    And there is a possibility
12   that you would have concerns or there is
13   a possibility that if Act 626 takes
14   effect that the government would be
15   intruding on medical decisions families
16   make with their doctors? I'm not sure I
17   understood your answer.
18        A.    I would say yes to both.
19        Q.    So does that mean there is a
20   possibility that the Board, if faced with
21   complaints about doctors providing care
22   that is prohibited by Act 626, that the
23   Board may not enforce Act 626 and
24   prohibit doctors from or discipline
25   doctors for engaging in such care?
```

Page 241

```
 1            AMY E. EMBRY
 2        A.    Again, every situation is
 3   different, but if Act 626 went into
 4   effect, as your question is based on, if
 5   it were to go into effect, it would be in
 6   conflict with another law and the Board
 7   would need to ask for legal assistance on
 8   what to do.
 9        MS. LAND:  I'll object to the
10        form of that previous question.
11        Q.    And that conflict would only
12   be, if I understand correctly, in the
13   case of individuals who are already
14   receiving care from a doctor; is that
15   right?
16        MS. LAND:  Object to form.
17        A.    Yes. According to 20-6-202
18   it's legally and ethically prohibited
19   from abandoning a patient before
20   treatment has been concluded. So that
21   means they are already within treatment.
22        Q.    Right. So understanding that
23   the Board would need to ask for legal
24   advice from counsel about what to do in
25   the event of a complaint that raises this
```

Page 242

```
           AMY E. EMBRY
1
2  conflict between two statutes, if you
3  had, you know, putting aside patients who
4  are already receiving care and just
5  somebody who their doctor recommends or
6  would recommend that they initiate care
7  that would violate Act 626, do you have
8  concerns about the government intruding
9  into that decision made by families with
10 their doctor?
11       MS. LAND:  Objection to form.
12       A.    I don't understand the
13 question. I don't understand exactly --
14       Q.    Let me ask it differently.
15            If Act 626 were in effect and
16 a patient, minor patient and their parent
17 saw a doctor and after assessment the
18 doctor's recommendation would be
19 gender-affirming medical treatment, and
20 the parents and minor agree that that's
21 in the best interests of that patient,
22 but that Act 626 would not permit the
23 child or minor to receive that care that
24 the parent and doctor believe is in the
25 child's best interests, do you have
```

Page 243

```
           AMY E. EMBRY
1
2  concerns about the law intruding into
3  this medical decision that families make
4  with their doctors?
5        MS. LAND:  Objection to form
6    and scope.
7        A.    I would say that the Board, it
8  is possible that they would have
9  concerns.  But, again, if it were in
10 effect and it's in conflict with another
11 law, they would not do anything until
12 they advised their legal counsel.
13       Q.    And in your view it's possible
14 the Board would have concerns even if
15 there's an individual minor who is not
16 currently receiving care but is --
17 parents and doctors believe care would be
18 in their best interest?
19       A.    It is possible, it is a
20 possibility that the Board would voice
21 concerns.
22       Q.    But you have not heard
23 specific concerns voiced by anybody at
24 this point?
25       A.    No.
```

Page 244

```
           AMY E. EMBRY
1
2        Q.    Okay. Do you have concerns?
3        MS. LAND:  I'll object to the
4    form of that question to the extent
5    it's asking for any personal views
6    that would be outside the scope of
7    this notice. So I will object to
8    any question that's going to elicit
9    personal views of this witness.
10       MS. COOPER:  Okay.
11       MS. LAND:  And if we're going
12   to continue to ask her personal
13   views, that might need to be a
14   discussion we need to have further.
15       MS. COOPER:  Yeah. I just have
16   this question.
17       Q.    Do you remember the question?
18       MS. LAND:  You can answer.
19       A.    Okay. So I have concerns that
20 the law that was passed, Act 626, is in
21 violation of other laws.  That is my
22 concern.
23       Q.    And which other laws?
24       A.    The 20-6-202.
25       Q.    Any others?
```

Page 245

```
           AMY E. EMBRY
1
2        A.    Not that I'm aware of right
3  now.
4        Q.    Okay. So that's a concern
5  about people who are currently receiving
6  care not being able to have the doctor
7  continue to provide or refer them for
8  continuation of that care?
9        A.    Correct.
10       Q.    Okay. But not about the people
11 who haven't started care yet, there are
12 no concerns about that?
13       A.    I don't know -- at this point,
14 no. If the law were enacted, then more
15 research would need to be done.
16       Q.    And have you talked with any
17 families who will be directly affected by
18 Act 626 if it takes effect?
19       A.    Have I spoken to anyone? No.
20       Q.    Do you know any?
21       A.    No, I do not.
22       Q.    Okay. Do you know any
23 transgender adolescents who are receiving
24 gender-affirming medical care?
25       A.    The only ones that I am aware
```

Page 246

```
 1              AMY E. EMBRY
 2  of are the ones that were listed in the
 3  lawsuit.
 4         Q.    So you don't personally know
 5  or the Board doesn't have interaction
 6  with any minors who are receiving
 7  gender-affirming medical care?
 8         A.    Not to my knowledge.
 9         MS. COOPER:  Just a minute.
10     That's all I've got.
11         MS. LAND:  I don't have any
12     questions.
13         VIDEOGRAPHER:  We are off the
14     record at 4:35 p.m.
15         MS. LAND:  We would like to
16     read and sign.
17         (The proceedings were
18  adjourned at 4:35 p.m.)
19
20
21
22
23
24
25
```

Page 247

```
 1           C E R T I F I C A T E
 2         I, MAUREEN M. RATTO, a
 3  Registered Professional Reporter, do
 4  hereby certify that prior to the
 5  commencement of the examination, AMY E.
 6  EMBRY was sworn by me to testify the
 7  truth, the whole truth and nothing but
 8  the truth.
 9         I DO FURTHER CERTIFY that the
10  foregoing is a true and accurate
11  transcript of the proceedings as taken
12  stenographically by and before me at
13  the time, place and on the date
14  hereinbefore set forth.
15         I DO FURTHER CERTIFY that I am
16  neither a relative nor employee nor
17  attorney nor counsel of any of the
18  parties to this action, and that I am
19  neither a relative nor employee of such
20  attorney or counsel, and that I am not
21  financially interested in this action.
22
23
24     _____
25     MAUREEN M. RATTO, RPR
       License No. 817125
```

Page 248

```
 1            I N D E X
 2  WITNESS: AMY E. EMBRY            6
 3  DIRECT EXAMINATION BY MS. COOPER 6
 4
 5          E X H I B I T S
 6  Exhibit 1, 30(b)(6) notice for   15
 7  Defendant Arkansas State Medical
 8  Board
 9  Exhibit 2, Arkansas Medical       24
10  Practices Act and Regulations,
11  revised as of December 2, 2020
12  Exhibit 3, printout of the        44
13  homepage of the Arkansas State
14  Medical Board website
15  Exhibit 4, printout from the      69
16  Medical Board re: Regulatory and
17  Discipline
18  Exhibit 5, Arkansas State House  105
19  Bill 1718
20  Exhibit 6, Guidance For the Use  138
21  of Hydroxchloroquine and
22  Chloroquine For the Treatment of
23  COVID 19
24  Exhibit 7, May 5, 2021 email re: 155
25  Public Health Grand Rounds
```

Page 249

```
 1  Exhibit 8, email dated May 25,    165
 2  2021, re: CNN Inquiry
 3  Exhibit 9, copy of House Bill     175
 4  1570
 5  Exhibit 10, Opinion article in    217
 6  Washington Post dated April 8,
 7  2021
 8  Exhibit 11, email dated March     229
 9  22, 2021, from Sarah Vestal to
10  ASMB
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 250

1   AMANDA LAND, ESQ.

2   aland@arkansasag.gov

3                      May 24, 2022

4   RE: BRANDT, et al. vs. RUTLEDGE, et al.

5       5/10/2022, Amy E. Embry (#5219516)

6       The above-referenced transcript is available for

7   review.

8       Within the applicable timeframe, the witness should

9   read the testimony to verify its accuracy. If there are

10  any changes, the witness should note those with the

11  reason, on the attached Errata Sheet.

12      The witness should sign the Acknowledgment of

13  Deponent and Errata and return to the deposing attorney.

14  Copies should be sent to all counsel, and to Veritext at

15  erratas-cs@veritext.com.

16

17      Return completed errata within 30 days from

18  receipt of testimony.

19      If the witness fails to do so within the time

20  allotted, the transcript may be used as if signed.

21

22          Yours,

23          Veritext Legal Solutions

24

25

Page 251

1   BRANDT, et al. vs. RUTLEDGE, et al.

2   5/10/2022 - Amy E. Embry (#5219516)

3          E R R A T A   S H E E T

4   PAGE_____ LINE_____ CHANGE_____

5   _____

6   REASON_____

7   PAGE_____ LINE_____ CHANGE_____

8   _____

9   REASON_____

10  PAGE_____ LINE_____ CHANGE_____

11  _____

12  REASON_____

13  PAGE_____ LINE_____ CHANGE_____

14  _____

15  REASON_____

16  PAGE_____ LINE_____ CHANGE_____

17  _____

18  REASON_____

19  PAGE_____ LINE_____ CHANGE_____

20  _____

21  REASON_____

22

23  _____      _____

24  Amy E. Embry                     Date

25

Page 252

1   BRANDT, et al. vs. RUTLEDGE, et al.

2   5/10/2022 - Amy E. Embry (#5219516)

3         ACKNOWLEDGMENT OF DEPONENT

4       I, Amy E. Embry, do hereby declare that I

5   have read the foregoing transcript, I have made any

6   corrections, additions, or changes I deemed necessary as

7   noted above to be appended hereto, and that the same is

8   a true, correct and complete transcript of the testimony

9   given by me.

10

11  _____      _____

12  Amy E. Embry                     Date

13  *If notary is required

14              SUBSCRIBED AND SWORN TO BEFORE ME THIS

15      _____ DAY OF _____, 20____.

16

17

18      _____

19          NOTARY PUBLIC

20

21

22

23

24

25

Federal Rules of Civil Procedure
Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the

deponent or a party before the deposition is

completed, the deponent must be allowed 30 days

after being notified by the officer that the

transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to

sign a statement listing the changes and the

reasons for making them.

(2) Changes Indicated in the Officer's Certificate.

The officer must note in the certificate prescribed

by Rule 30(f)(1) whether a review was requested

and, if so, must attach any changes the deponent

makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES

ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.

THE ABOVE RULES ARE CURRENT AS OF APRIL 1,

2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES

OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.