<pre>
 1                IN THE UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF ARKANSAS
 2                        CENTRAL DIVISION

 3   DYLAN BRANDT, et al.,

 4                   Plaintiffs,
         v.                          No. 4:21CV00450 JM
 5
                                     October 18, 2022
 6                                   Little Rock, Arkansas
                                     8:30 AM
 7   LESLIE RUTLEDGE, et al.,

 8                   Defendants.

 9          TRANSCRIPT OF BENCH TRIAL - VOLUME 2
          BEFORE THE HONORABLE JAMES M. MOODY, JR.,
10              UNITED STATES DISTRICT JUDGE
                  _____
11
     APPEARANCES:
12
     On Behalf of the Plaintiffs:
13
         MR. CHASE STRANGIO, Attorney at Law
14       MS. LESLIE COOPER, Attorney at Law
         MR. JAMES D. ESSEKS, Attorney at Law
15       MS. LISA NOWLIN-SOHL, Attorney at Law
           American Civil Liberties Union
16         125 Broad Street, Suite 1800
           New York, New York  10004-2400
17
         MS. BREEAN WALAS, Attorney at Law
18         Walas Law Firm, PLLC
           Post Office Box 4591
19         Bozeman, Montana  59772

20
         MR. AVIV S. HALPERN, Attorney at Law
21       MS. LAURA KABLER OSWELL, Attorney at Law
           Sullivan & Cromwell, LLP
22         1870 Embarcadero Road
           Palo Alto, California  94303
23

24   Appearances Continuing...

25
</pre>

1

2      APPEARANCES CONTINUED:

3

4         MR. ARUN BODAPATI, Attorney at Law
          MS. LAUREN M. GOLDSMITH, Attorney at Law
5         MR. ALEXANDER F.R. PEACOCKE, Attorney at Law
          MS. REBECCA KADOSH, Attorney at Law
6         MR. JONATHAN G. LESTER, Attorney at Law
             Sullivan & Cromwell, LLP
7            125 Broad Street, Suite 2424
             New York, NY 10004-2498
8
          MR. DANIEL J. RICHARDSON, Attorney at Law
9            Sullivan & Cromwell LLP
             1700 New York Avenue
10           Washington, DC 20006

11        MR. GARY L. SULLIVAN, Attorney at Law
             ACLU of Arkansas
12           Legal Division
             904 West 2nd Street, Suite One
13           Little Rock, AR 72201

14        MS. SHARON ELIZABETH ECHOLS, Attorney at Law
             Gill Ragon Owen P.A.
15           425 West Capitol Avenue
             Suite 3800
16           Little Rock, AR 72201-2413

17

18    On Behalf of the Defendants:

19        MR. DYLAN JACOBS, Attorney at Law
          MR. MICHAEL CANTRELL, Attorney at Law
20        MS. AMANDA LAND, Attorney at Law
          MS. HANNAH TEMPLIN, Attorney at Law
21           Arkansas Attorney General's Office
             323 Center Street, Suite 200
22           Little Rock, Arkansas  72201

23

24         *Proceedings reported by machine stenography.  Transcript
       prepared utilizing computer-aided transcription.*
25


Karen Dellinger, RDR, CRR, CCR
United States Court Reporter
Karen_Dellinger@ARED.uscourts.gov (501)604-5125

```
               INDEX - VOLUME 2 (10/18/22)

WITNESSES FOR THE PLAINTIFFS:   Direct  Cross  Redirect  Recross

JACK TURBAN                      291    327

ARMAND ANTOMMARIA                356    410

DONNY RAY SAXTON                 430

AARON JENNEN                     447
```

1          (Proceedings continuing in open court at 8:30 AM.)
2               MR. STRANGIO:  Plaintiffs will call Dr. Jack Turban.
3          **JACK TURBAN, PLAINTIFFS' WITNESS, DULY SWORN**
4                       DIRECT EXAMINATION
5    BY MR. STRANGIO:
6    Q     My name is Chase Strangio from the ACLU.  Good morning,
7    Dr. Turban.  Thank you for being here.  Can you please state
8    your name for the record and spell it for the court reporter?
9    A     My name is Jack Turban.  J-a-c-k T-u-r-b-a-n.
10   Q     What is your profession?
11   A     I'm a child and adolescent psychiatrist.
12   Q     Dr. Turban's CV is Plaintiffs' stipulated Exhibit 1.  We
13   will forego the full qualifications provided no voir dire of
14   this witness.
15              MR. CANTRELL:  No objection, Your Honor.
16   BY MR. STRANGIO:
17   Q     Do you currently treat patients as a psychiatrist?
18   A     I do.
19   Q     Does that include adolescent patients?
20   A     Yes.
21   Q     Does that include prepubertal patients?
22   A     It does.
23   Q     Do you treat adolescent patients with gender dysphoria?
24   A     I do.
25   Q     In what settings do you treat patients with gender

Turban - Direct

1    dysphoria?

2    A    I'm an attending psychiatrist at the University of

3    California San Francisco where I see patients in our Child &

4    Adolescent Gender Center.  In that setting, I see patients as

5    part of our interdisciplinary team, and I also see patients one

6    on one for medication management for psychiatry.  I also

7    supervise adult psychiatry residents in the adult LGBT

8    psychiatry clinic.  And in that clinic, about 80 percent of our

9    patients are transgender or have gender dysphoria.  And I'm

10   also an attending psychiatrist in our eating disorders program

11   where I take care of patients with eating disorders in

12   co-occurring gender dysphoria.

13   Q    Have you published any scholarly -- have you published

14   any research or scholarly articles on the topic of gender

15   dysphoria?

16   A    Yes.

17   Q    You've published articles?

18   A    Yes.

19   Q    How many articles?

20   A    Somewhere between 20 and 30.

21   Q    Have those been in peer reviewed journals?

22   A    All those that I'm referencing have been peer reviewed

23   journals.

24   Q    On what topics have you published articles?

25   A    Generally on the mental health of transgender youth and

1 adolescents with gender dysphoria.

2 Q    The State's experts spent a lot of time critiquing your

3 particular research and focus on some published critiques of

4 your studies.  Has anyone written to these peer reviewed

5 journals expressing disagreement with your study findings or

6 methodology?

7 A    This is an area of research where there's a lot of

8 attention.  And generally when we publish papers, we get both

9 positive reactions and critiques or questions, and certainly

10 sometimes those are sent to the journal as well.

11 Q    And have there been positive reactions as well?

12 A    Yes.

13 Q    You mentioned that people have expressed disagreements at

14 times about your research.  Is this common in medicine?

15 A    Yeah, so it's considered a good part of the scientific

16 process that any time a paper is published that experts in the

17 field really look at it closely to understand the strengths and

18 limitations and to raise any questions they might have about

19 the methodology to try and move the field forward.

20 Q    And when people write in to a peer reviewed journal, how

21 do journals generally respond?

22 A    So they will look at what's been sent in and generally

23 take it very seriously.  Depending on the content of what's

24 been sent in, they may take different actions.  So if there is

25 concern about the validity of the conclusions of the paper,

Turban - Direct

1  they may retract it or actually take it down.  If there's a
2  smaller error, then they might issue a correction, and if it's
3  a critique that's interesting but doesn't impact the findings
4  of the study, they may publish that as a letter to the editor
5  along with the response from the authors to the original study.
6  Q    Have any of your papers been retracted?
7  A    No.
8  Q    Have any corrections been issued to any of your papers?
9  A    We've had small corrections to our papers, for instance,
10 the correction of a footnote of a table.
11 Q    Thank you.  So Dr. Turban, I want to start off by talking
12 about existing research into the medical interventions for
13 adolescents with gender dysphoria.  Is there scientific
14 research evaluating medical interventions for the treatment of
15 gender dysphoria in adolescents?
16 A    Yes.  So there are 16 studies looking specifically at the
17 impact of endocrine interventions like puberty blockers or
18 gender-affirming hormones on mental health.  There's an
19 additional body of research that looks at gender-affirming
20 surgery for the small number of patients who are considered
21 candidates for masculinizing chest surgery.
22 Q    What types of studies are there assessing the efficacy of
23 treatment for gender dysphoria in adolescents?
24 A    Generally there are two types of studies.  The first type
25 is longitudinal studying.  So these studies look at mental

1    health before and after the treatment, and generally those have
2    found that mental health improves for adolescents with gender
3    dysphoria after the treatment.  The other type of study you
4    might hear about are these cross-sectional studies.  And those
5    compare at one point in time people who receive the treatment
6    to people who did not receive the treatment, and those show
7    that people who received the treatment had better mental health
8    than those who did not.
9    Q     So in the area of gender dysphoria for adolescents, there
10   are longitudinal -- excuse me, withdrawn.  Are there randomized
11   controlled trials that assess the efficacy of treatment for
12   gender dysphoria?
13   A     No, there are not.
14   Q     Why not?
15   A     There are a few different reasons that there aren't
16   randomized controlled trials or RTCs.  There are scientific
17   concerns and then there are also ethical concerns.  So
18   ethically when we have a substantial body of literature
19   indicating that a treatment improves mental health, you have to
20   be really thoughtful about conducting a randomized controlled
21   trial where you're randomizing people to no treatment.  So if
22   you wanted to conduct an RTC, you would go through what's
23   called an institutional review board and that would be the
24   ethics board that would approve such a study.  And they
25   wouldn't approve a randomized controlled trial because there

1   would be concerns of the ethics of randomizing people to a

2   treatment group where mental health would get worse when you

3   could give them a treatment that would help.

4        Then in terms of scientific concerns, you usually want a

5   randomized controlled trial to be blinded or double blinded,

6   and what that means is that the people in the treatment group

7   in the placebo group don't know which group they're in, and the

8   investigators also don't know which participant is in which

9   group.  The problem with gender-affirming care is that it has

10  obvious physical effects, and in that case, the blinding

11  wouldn't work because people would know which group they're in.

12  Q    Are there any other limitations to conducting RCTs in

13  this area?

14  A    There's also the practical limitation where it would be

15  nearly impossible to recruit enough participants for the study

16  because parents wouldn't be willing to randomize or potentially

17  have their children randomized to a group that would be the

18  placebo where we would expect their mental health to get worse

19  when there's effective treatment available.

20  Q    When looking at this body of research assessing the

21  efficacy of treatments for gender dysphoria, what does this

22  body of research assess?

23  A    Generally they look at mental health outcomes.  The most

24  common ones that they look at are anxiety, depression, quality

25  of life, and suicidality.

Turban - Direct

1    Q      And what metrics do these studies use to measure mental
2    health?
3    A      So different studies use different mental health
4    outcomes, but there are all different scales of measuring those
5    aspects of mental health like anxiety, depression, quality of
6    life, suicidality.
7    Q      When did the research into efficacy of medical treatment
8    for adolescents with gender dysphoria begin?
9    A      To my knowledge, the first peer reviewed publication was
10   in the late 1990s, and that was published from the VUMC Center
11   for Expertise in Gender Dysphoria in Amsterdam.  They wrote
12   about a young person assigned female at birth who had severe
13   gender dysphoria, severe suicidal thoughts, and received a
14   puberty blocker, later received testosterone, and in young
15   adulthood, gender-affirming surgery, and had a very positive
16   mental health outcome.  In the decades since that paper, more
17   and more studies have come out showing that these treatments
18   improve mental health.
19   Q      Is there separate research studying the efficacy of
20   medical treatments for adults?
21   A      Yes.  That is outside my area of focus, but I can
22   generally say there are dozens more studies that go back
23   decades prior to that study in adolescents looking at these
24   treatments in adults.
25   Q      I want to ask you some specific questions about research

1    into the efficacy of puberty blockers.  Is there specific

2    research on the efficacy of puberty blockers to treat

3    adolescents with gender dysphoria?

4    A     Yes.

5    Q     What do the studies evaluating the efficacy of puberty

6    blockers to treat gender dysphoria show?

7    A     So, again, they fall into those two buckets.  So there

8    are longitudinal studies that look at mental health before and

9    after puberty blockers and those studies find that mental

10   health is better after puberty blockers.  And there are other

11   studies that compare those who received puberty blockers to

12   those who did not, and those show that people who received the

13   puberty blockers have better mental health than those who did

14   not.

15   Q     Are there any particular studies that you would point to

16   that specifically assess the efficacy of puberty blockers?

17   A     So to give specific examples, there's one study by de

18   Vries, et al. published in 2011 that looked at 70 adolescents

19   with gender dysphoria and measured their mental health before

20   and after and that study found that there were improvements in,

21   for example, anxiety and depression after treatment.  In the

22   realm of those cross-sectional studies, there was a study by

23   van der Miesen, et al. published in 2020 that compared over 150

24   adolescents who had received puberty blockers to over 150 who

25   did not, and in that study those who received the puberty

1    blockers had lower rates of anxiety and depression than those

2    who did not.

3    Q    Are there any limitations to these studies?

4    A    Yes.  So any study in medicine is going to have strengths

5    and limitations.  So when you look at the cross-sectional

6    studies like de Vries, et al., the strength is that they

7    establish that time relationship between treatment and improved

8    mental health.  But that study did not have a control group of

9    people who did not receive treatment.  On the other hand, the

10   van micen study didn't have that before and after time

11   component, but it did have that control group showing that

12   people who get treatment do better than people who did not.

13            THE COURT:  Can you spell van der Miesen?

14            THE WITNESS:  I can try.  V-a-n d-e-r M-i-e-s-e-n.

15            THE COURT:  Thank you.

16            THE WITNESS:  So when you're looking at this

17   research, it's really important to look at the research as a

18   whole because some of those studies, their strengths will

19   compliment some of the limitations of the other studies.

20   BY MR. STRANGIO:

21   Q    When you do look at this body of research as a whole,

22   what is the full picture that you get regarding the efficacy of

23   this treatment?

24   A    So when you look at all the studies together, they

25   indicate that these are effective treatments that improve

1    mental health, for instance, anxiety, depression, quality of

2    life and suicidality.

3    Q    Have you published any research on the efficacy of

4    puberty blockers to treat gender dysphoria?

5    A    Yes.  We published a paper in the *Journal of Pediatrics*.

6    That's the journal of the American Academy of Pediatrics.

7    Q    And is that a peer reviewed journal?

8    A    Yes.

9    Q    And what did that research show?

10   A    In that study, we looked at people who had ever desired

11   puberty blockers.  We then compared people who were able to

12   access them to people who were not able to access them.  We

13   adjusted for other variables that could have impacted the

14   results and the overall finding was that people who accessed

15   puberty blockers during adolescence had a lower odds of

16   considering suicide than those who desired that intervention

17   but were not able to access it.

18   Q    One of Defendants' experts, Dr. Hruz, claims that when

19   looking at the raw data in your pediatrics paper assessing the

20   efficacy of puberty blockers, it shows that suicidality

21   actually increased in patients receiving treatment.  What is

22   your response to that?

23   A    That is an incorrect way to interpret the study.  So in

24   scientific research, we always look at whether or not a result

25   is statistically significant.  And we never look to just the

Turban - Direct

1    raw data to make a point.  So if you look in that study of that

2    specific measure, you'll see there's no statistically

3    significant difference between the two groups.  When you look

4    at suicidal ideation, there is a statistically significant

5    difference showing that those who access the treatment have

6    lower odds of considering suicide.

7    Q    What is the difference between a statistically

8    significant difference and just what we might understand as a

9    difference when looking at the raw data?

10   A    So essentially what the statistics tell you is how sure

11   you can be that a result is real as opposed to just random

12   chance.  So in medicine we only draw conclusions based on the

13   statistically significant results.  Any time a statistic is

14   available, you need to look to it and not just rely on the raw

15   data.

16   Q    Is there any statistically significant data showing that

17   patients' mental health worsens while undergoing pubertal

18   suppression?

19   A    No, none that I'm aware of.

20   Q    Turning now to gender-affirming hormone therapy.  Is

21   there specific research on the use of gender-affirming hormone

22   therapy to treat gender dysphoria?

23   A    Yes.  So similar to puberty blockers, there are two types

24   of studies.  There are longitudinal studies that look before

25   and after.  For instance, there's a study by Allen, et al. that

1    looked at suicidality and they found that after

2    gender-affirming hormone treatment, adolescents with gender

3    dysphoria had less suicidality after treatment.  There are also

4    cross-sectional studies that compare people who received

5    treatment to those who did not.  An example of that is Green,

6    et al. that found that those who accessed gender-affirming

7    hormones during adolescence are less likely to have attempted

8    suicide than those who were unable to access those treatments.

9    Q     These studies focus on the treatment of adolescents with

10   hormone therapy for gender dysphoria?

11   A     Correct.

12   Q     Are there studies that assess the efficacy of hormone

13   therapy to treat adults with gender dysphoria?

14   A     Yes.  And again, that's outside my area of focus but

15   there are dozens more studies in adults.

16   Q     How did the results that you, to your knowledge, just

17   discussed with respect to adolescents being treated with

18   hormone therapy compare to the general body of research in

19   adults?

20   A     The results are similar both in adults and adolescents

21   indicating that these treatments improve mental health.

22   Q     I want to ask you a little bit about the body of research

23   with respect to surgery.  Is there research evaluating the

24   efficacy of surgical treatments for gender dysphoria?

25   A     Yes.  So I would highlight that the bar for considering

Turban - Direct

1   gender-affirming surgery for an adolescent is high in the vast
2   majority of cases restricted to gender-affirming masculinizing
3   chest surgery for birth-assigned females with gender dysphoria.
4   There have been a few studies of patients who meet those strict
5   criteria for having that surgery.

6        So if you look at that population, there was a study by
7   Johanna Olson-Kennedy that compared 68 adolescents with gender
8   dysphoria who had that top surgery to 68 adolescents who did
9   not have the top surgery.  In that study, those who had the
10  surgery had lower scores on a measure of chest dysphoria.
11  There was another study by Mehringer, et al.  That was a
12  qualitative study meaning that they interviewed individuals
13  that had these interventions and those who did not and asked
14  them about their experiences.  In that study, the adolescents
15  explained that these treatments improved their mental health
16  and that they felt it was the right decision for them.

17       There was another recent study from Kaiser by Tang, et
18  al. that looked at around 200 adolescents who had these
19  gender-affirming top surgeries and they looked specifically at
20  the rates of regret and found that regret rates were very low
21  on the order of about 1 percent.

22  Q    Overall, what do the studies of the efficacy of top
23  surgery in adolescents show?
24  A    So when you look at them together, they indicate that
25  there are high levels of satisfaction with these interventions

1   and that mental health improves.

2   Q      We've been talking about the existing evidence showing

3   that gender-affirming medical treatments can improve mental

4   health.  Is there data showing the benefits of those treatments

5   over time?

6   A      Yes.

7   Q      What is that data?

8   A      So the different longitudinal studies and cross-sectional

9   studies have had different follow-up periods and have looked at

10  mental health for different amounts of time after treatment.

11  So to give some examples, we published a study in PLOS One

12  where we looked at people who accessed gender-affirming

13  hormones during adolescence and we measured their mental health

14  around six or seven years after and found that mental health

15  was better for those who received treatment than those who did

16  not.  And another study by de Vries, et al. published in 2014,

17  they looked about somewhere between five and seven years after

18  puberty blockers as they followed people through these

19  treatment protocols.

20  Q      Are these periods of time for these longitudinal studies

21  typical for studies in pediatric psychiatry?

22  A      I would say they're actually very long follow-up periods

23  for pediatric psychiatry.  In one of my reports, I gave the

24  example of Lurasidone as a treatment for pediatric bipolar

25  disorder.  One of the trials that the FDA used to approve that

1   medication for adolescents was a six-week follow-up study.

2   Q     We've heard testimony at various points in this case that

3   has referred to the Dutch protocol.  Are you familiar with the

4   term "Dutch protocol"?

5   A     Yes.  The Dutch protocol doesn't have a specific

6   definition, but broadly refers to the practices of the VUMC,

7   Center of Expertise on Gender Dysphoria in Amsterdam, and their

8   approach to treating children and adolescents with gender

9   dysphoria.

10  Q     What were the practices at that VUMC Dutch clinic?

11  A     The two most important aspects of their protocol are,

12  one, that they conduct a comprehensive mental health assessment

13  prior to considering any gender-affirming medical interventions

14  for a minor.  The second is that they consider interventions in

15  a step-wise fashion from most reversible like a social

16  transition in which a young person may adopt a new name or

17  pronouns to least reversible like surgery.

18  Q     In the Dutch clinic, did patients present with gender

19  dysphoria in childhood?

20  A     So in their earlier studies, they did highlight that they

21  focused on that population of young people who specifically had

22  evidence of gender dysphoria as children that was apparent to,

23  say, their parents.  I'm not sure what their current clinical

24  population is.

25  Q     What medical interventions were provided to the patients

Turban - Direct

1    at the Dutch clinic as part of the studies that we have

2    discussed?

3    A    So they would consider puberty blockers at the earliest

4    stages of puberty, gender-affirming hormones in later

5    adolescence, and then generally gender-affirming surgery in

6    adulthood with occasional exception of gender-affirming top

7    surgery that may be considered earlier when indicated.

8    Q    You discussed this earlier, but what were the findings of

9    the effect of this treatment at the Dutch clinic?

10   A    Their studies have generally found improvements in mental

11   health with these treatments, improvements in anxiety,

12   depression, quality of life.

13   Q    Defendants' experts have said that this research is not

14   applicable to care in the United States because protocols are

15   different here.  What's your response to that?

16   A    I would not say that's accurate.  The treatment models in

17   the U.S. are very much based on the Dutch protocols, so they

18   similarly include the requirement of a mental health assessment

19   prior to starting gender-affirming hormones or puberty blockers

20   or gender-affirming surgery, and also similarly consider the

21   treatments in a step-wise fashion from most reversible to least

22   reversible.

23   Q    Defendants' experts also say that because the

24   participants in the Dutch research are a different population

25   than those treated in the United States because there, for

1  example, all participants had gender dysphoria from early

2  childhood and therapeutic support, the treatment protocols

3  developed in that research don't apply to youth that have not

4  had those experiences, what's your response to that?

5  A      I would say a few things.  So first is that the Dutch

6  studies are not the only studies that have been published so we

7  have studies from around the world including many places in the

8  United States including Texas, Missouri, Washington, showing

9  that among adolescents with gender dysphoria in the United

10  States, the mental health improves with these treatments.  In

11  the case of this early onset or early realization of one's

12  gender dysphoria, I would also point out that when we look at

13  large studies of transgender adults, as many as 40 percent

14  didn't come to understand their gender dysphoria or gender

15  identity until after puberty, so the notion that these

16  identities would not be stable just because someone came to

17  understand their gender identity after puberty is not supported

18  by the literature.

19      That being said, when we conduct mental health

20  assessments, the latest WPATH guidelines are quite clear that

21  if an adolescent doesn't have those signs of gender dysphoria

22  in childhood, which here we're referring to the prepubertal

23  period, that you would extend the diagnostic phase to make sure

24  you're really understanding that child and their situation well

25  before considering medical interventions.

Turban - Direct

```
1              THE COURT:  Doctor, just so I'm clear, when you say
2   extend the diagnostic phase, are you talking about extending
3   the mental health treatment?
4              THE WITNESS:  Correct.
5              THE COURT:  I just need to get in touch with the
6   jargon.  When you say extending the phase, what phase are you
7   referring to?
8              THE WITNESS:  So extending the mental health
9   assessment period which is a period of time that the mental
10  health professional --
11             THE COURT:  Start over, if you would, just on that
12  last part where the buzzer was going off in my ear.
13             THE WITNESS:  So the latest WPATH guidelines
14  highlight that if there were something like a lack of early
15  childhood gender dysphoria, that you would extend the period of
16  time that that young person and their family are working with a
17  mental health professional to decide whether or not these
18  treatments are appropriate.
19             THE COURT:  That's what I assumed, but I wanted to
20  confirm.  Thank you.
21  BY MR. STRANGIO:
22  Q    I think that -- did I cut you off?  I don't even recall.
23             THE COURT:  No, I did that.  I think we were both
24  involved.
25  BY MR. STRANGIO:
```

Turban - Direct

1    Q    I want to pivot a little bit to ask you a few questions
2    about what is sometimes referred to as the desistence
3    literature.  Are you familiar with the term "desistance"?
4    A    Yes.
5    Q    What does this term refer to?
6    A    The desistence literature generally refers to studies of
7    these very young prepubertal children who are referred to
8    gender clinics, following them over time to see how many of
9    them meet criteria for some gender-related diagnosis.  And
10   those diagnoses have been different throughout history, so in
11   the past, gender identity disorder, more recently gender
12   dysphoria.
13   Q    And Dr. Levine, one of Defendants' experts, suggests that
14   as many as 98 percent of minors with gender dysphoria come to
15   identify with their assigned sex thus most don't need
16   treatment, and I have some questions about this.  First, is it
17   true that the overwhelming majority of adolescents with gender
18   dysphoria come to identify with their assigned sex?
19   A    No.  So the research that he's presumably referencing
20   again is of these prepubertal children who would not be
21   candidates for any gender-affirming medical interventions and
22   there's broad consensus in the field that once adolescents
23   reach these early stages of puberty and experience gender
24   dysphoria that it's very unlikely for them to subsequently
25   identify as cisgender or, quote, desist.

1  Q    These studies that Dr. Levine is presumably referring to,

2  do you think they support the claims that Defendants' experts

3  make about them?

4  A    No, I don't.  And there are several reasons.  So one,

5  again, is that these are studies of prepubertal children who

6  would not be candidates for any gender-affirming medical

7  interventions.  And if you look through the literature, the

8  main place where you'll see these papers discussed is in people

9  talking about why we don't provide these interventions for

10  prepubertal children and that we wait until adolescence because

11  it seems that's when gender identity is much more stable.

12         The second problem is that these were kids who were

13  referred to gender clinics, but historically young people have

14  been referred to gender clinics for diverse reasons and many of

15  those kids were actually cisgender kids who did not have gender

16  dysphoria.  For instance, like a cisgender boy who had, quote,

17  gender atypical interests so you could think a cisgender boy

18  who liked dolls or who liked playing with dresses sometimes,

19  but was cisgender and wouldn't have gender dysphoria.

20  Similarly, birth-assigned females who maybe were tomboys for

21  lack of a better phrase, birth-assigned females who were

22  cisgender but have what you might consider a masculine

23  interest.  And, of course, it wouldn't be appropriate for

24  patients like that to receive gender-affirming medical

25  interventions.

1          I apologize that it's complicated, but the third reason

2   is that in those studies, the diagnosis at the time was this

3   diagnosis gender identity disorder, and there was a major

4   problem with that diagnosis in that it didn't require one to

5   have a gender identity different from their sex assigned at

6   birth.  So, again, you could meet that diagnosis if you were

7   say a cisgender boy who liked playing with girls and liked

8   dolls or liked playing dress-up, so that was fixed with this

9   latest diagnosis of gender dysphoria in the DSM-5 and that

10  latest diagnosis requires a young person to have a gender

11  identity different from their sex assigned at birth.

12         So for those three primary reasons, it's not appropriate

13  to apply that research to these questions of gender-affirming

14  medical care which are not considered until adolescence and are

15  only considered for adolescents who have gender dysphoria in a

16  gender identity different than their sex assigned at birth.

17  Q      Thank you.  Are you familiar with the term

18  "detransition"?

19  A      Yes.

20  Q      And does this term have a consistent definition

21  throughout the medical literature?

22  A      It does not.

23  Q      Within the medical literature, what are some things that

24  may be considered detransition?

25  A      So it's a broad heterogenous term that could mean, for

1   instance, any pursuing of gender affirmation and then stopping

2   that.  So to give a few examples, if someone were to take

3   gender-affirming hormones like testosterone for a period of

4   time and then stop taking testosterone, or if someone were to

5   adopt a new name and pronouns and then subsequently revert to

6   using the name and pronouns they were using prior, these would

7   all be examples of, quote, detransition.

8   Q    And if someone say reverted to identifying with their

9   assigned sex, would that also be an example of detransition?

10   A    Yes.  And I think the general point is that when you're

11   looking at this research about detransition, it's really

12   important that you look specifically at how that study is

13   defining detransition because there are these very diverse

14   definitions and you have to be really careful about drawing

15   conclusions and make sure you're tying it to how that study

16   defined detransition.

17   Q    You mentioned one metric used in the literature to

18   document what's called detransition might be the

19   discontinuation of medical treatment.  What are some reasons

20   someone might discontinue medical treatment for gender

21   dysphoria?

22   A    Similarly that would be a diverse heterogenous group.

23   For instance, someone might take testosterone for a period of

24   time, be happy with the results of the testosterone, find that

25   those physical effects alleviated their gender dysphoria and

Turban - Direct

1    stop the treatment because they're satisfied with the results

2    they've had.  There could be an instance in which somebody

3    starts hormones and let's say starts a new job or goes to a new

4    school, college, and then is harassed or discriminated against

5    for being transgender and their gender presentation and the

6    experience of expressing themselves in that way may become so

7    difficult that they feel they need to stop hormones and go back

8    to presenting as their sex assigned at birth.  There are rare

9    instances where people could lose their insurance or have a

10   medical condition develop that would result in them stopping

11   hormones, but there are really many reasons.

12   Q    Just to clarify, in these studies, does detransition mean

13   that a person goes from identifying as transgender to

14   subsequently identifying as non-transgender?

15   A    So not necessarily.  That could occur, but in some of

16   these other examples, the person may meet this definition of

17   detransition but continue to identify as transgender.  For

18   instance, the person who was satisfied with the effects of the

19   hormones or someone who was forced by external factors like

20   harassment or stigma to stop hormones, etc.

21   Q    Is the term "detransition" the same as transition regret?

22   A    No.  So transition regret is a more specific term that

23   means that somebody essentially wishes they had not undergone

24   the treatment that they pursued.

25   Q    If someone regrets treatment, does that mean that they no

1  longer identify as transgender?

2  A    It could but also not necessarily.  So, for instance, the

3  person who starts hormones and then goes to college and faces a

4  lot of discrimination may find that that experience was so

5  awful for them that they wish they had never pursued that

6  treatment.  So they would regret the treatment but continue to

7  identify as transgender.

8  Q    Is there research that looks at rates of detransition

9  among people who have received medical treatment for gender

10 dysphoria?

11 A    Yes.  Again, I would just highlight that it's really

12 important when looking at those different studies to look at

13 how they define detransition because they've used different

14 definitions.

15 Q    What does that research show?

16 A    Generally if you're looking at something like regretting

17 the treatment or subsequently coming to identify as cisgender,

18 those rates are very low on the order of around 1 to 2 percent.

19 If you expand the definition to mean say stopping hormones for

20 any reason, then the numbers could be higher.

21 Q    Is there medical literature that explores the reasons for

22 detransition?

23 A    Yes.

24 Q    What does that literature show?

25 A    There are a few different studies.  So we published a

Turban - Direct

1    study where we looked at 27,000 transgender adults, so people

2    who are currently living as transgender.  And in that study we

3    found that a large proportion had detransitioned at some point

4    in the past, over 10 percent, and the vast majority of them

5    said that they had those experiences of detransition in the

6    past because of these external factors, so harassment,

7    discrimination, etc.

8         There are also a few studies that look at people, a mix

9    of some of whom still identify as transgender, some of whom now

10   identify as cisgender.  And they have cited different reasons

11   including that they felt the treatment did not help them as

12   much as they had hoped or they were worried about a medical

13   complication developing or they felt that they needed other

14   treatments for their other mental health concerns separate from

15   the gender dysphoria and prioritized that over the gender

16   dysphoria.

17   Q    And are there examples in these studies of people who

18   thought it was the wrong decision for them?

19   A    Yes.

20   Q    In the studies that looked at the reasons for

21   detransition and included some people who thought it was the

22   wrong decision for them and possibly regretted treatment, did

23   those studies look at how common that experience was among the

24   total population of people receiving treatment?

25   A    No.  So one example is a paper by Lisa Littman and the

1    study looked only at people who had detransitioned.  So the

2    total sample there, the denominator, if you will, is just those

3    people who detransitioned.  So when we look at the studies of

4    all people who received the treatment, that's a very small

5    percentage.  But in interpreting that study, you need to keep

6    in mind that you're looking at a percentage of a small

7    percentage of the total population who have received this

8    treatment.

9              THE COURT:  Doctor, when you saw the denominator of

10   detransition, what definition of detransition are you using for

11   the denominator?

12             THE WITNESS:  It's complicated because it would

13   depend on the study.

14             THE COURT:  The one you were just referring to from

15   Lisa Lemon.

16             THE WITNESS:  That study was an on-line sample of

17   people who self-identified as having detransitioned, defined

18   somewhat broadly, but generally those were people who said they

19   started medical interventions and then stopped them or started

20   medical interventions and then pursued a different medical

21   intervention to undo the effects of the initial one if that

22   makes sense.

23             THE COURT:  Thank you.

24   BY MR. STRANGIO:

25   Q    So switching gears just a bit.  Defendants' experts

Turban - Direct

1  gleaned that in some studies, evaluating medical treatments for
2  adolescents with gender dysphoria, there were no findings of
3  mental health improvements from these interventions.  Is that
4  accurate?
5  A      There were two studies of the 16 that did not find
6  statistically significant improvements in mental health.
7  Q      And which two did not find statistically significant
8  improvements?
9  A      So, one, the study by Carmichael, et al.  This was a
10 study of adolescents in the United Kingdom who were followed
11 before and after puberty blockers and they did not find a
12 statistically significant difference in the mental health
13 measures that they looked at including self-harm.  There was
14 not an improvement.  There was also not a worsening of mental
15 health that was statistically significant.  One thing to keep
16 in mind when interpreting that study is that what we see for
17 most adolescents with gender dysphoria is that when they enter
18 puberty and their bodies start developing in ways that don't
19 match their gender identity, their mental health starts to
20 worsen because of that gender incongruence.  So the fact in
21 this study they didn't detect that worsening that we would
22 expect is notable.
23         The other study was a study by Hisle-Gorman.  That study
24 looked at mental healthcare utilization, so the number of
25 mental healthcare appointments that a person had both before

Turban - Direct

```
 1   and after starting gender-affirming medical treatments.  The
 2   thing that's difficult about that study is that mental
 3   healthcare utilization is very far removed from someone's
 4   actual mental health.  So they found that participants
 5   continued to see a mental health professional after the
 6   treatment but that also is considered good practice in this
 7   area that you continue to follow people closely.  So the fact
 8   that they were continuing to see a mental health provider
 9   doesn't mean that their mental health didn't get better or was
10   worsening.  So I would urge caution in interpreting that study
11   just because their outcome measure is so far removed from what
12   we care about clinically which is whether or not the person's
13   mental health is getting better or worse.
14   Q     Again, when we look at the body of research as a whole
15   about the efficacy of these gender-affirming medical
16   interventions to treat adolescents with gender dysphoria, what
17   does it show?
18   A     When you look at all the studies together, it indicates
19   that these treatments are effective in improving mental health,
20   specifically anxiety, depression, quality of life, and
21   suicidality.
22   Q     Are you familiar with the term "rapid onset gender
23   dysphoria"?
24   A     Yes.
25   Q     What is rapid onset gender dysphoria?
```

1    A    Rapid onset gender dysphoria is a term that entered the

2    medical literature through a paper by again Lisa Littman.  It

3    is a hypothesis that there's a specific type of gender

4    dysphoria in which adolescents come to identify as transgender

5    all the sudden or rapidly after the onset of puberty in that

6    this is a result of peer pressure or social contagion.

7    Q    Is rapid onset gender dysphoria a recognized mental

8    health diagnosis?

9    A    It is not.  The term entered the literature through this

10   study in which Dr. Littman posted an anonymous survey on four

11   websites.  These are websites that are generally considered to

12   have a bias against gender-affirming medical care.  And the

13   survey asked parents from those websites or anonymous

14   participants, presumably parents from these websites whether or

15   not they felt that their adolescent children came to identify

16   as transgender all of a sudden and if they felt that was a

17   result of social media, and perhaps not surprisingly because

18   this is what these websites focused on, but the participants

19   overwhelmingly said yes.

20        The paper received a lot of attention and criticism from

21   the medical community and subsequently underwent another

22   review, and a correction was issued on that paper in which the

23   authors very explicitly said that rapid onset gender dysphoria

24   is not a recognized mental health diagnosis at this time but

25   rather a hypothesis or a theory.  And really highlighted that

Turban - Direct

1    the problem with that study was that it didn't interview any of
2    the adolescents themselves or their healthcare providers.  In
3    clinical practice, we generally see that from parents'
4    perspectives a young person's trans identity is a surprise and
5    that announcement comes all the sudden or rapidly, but when you
6    talk to the young people, they usually say that they have been
7    thinking about this often for years and they're really afraid
8    of their parents' reactions, they're afraid that their parents
9    won't accept them or their parents will be mad at them.  So
10   while it may be rapid onset to the parents, you really need to
11   know if it's rapid in onset for the young people.
12   Q     When you're evaluating patients for making a diagnosis of
13   gender dysphoria in adolescents, do you consider social
14   influence?
15   A     Again, this rapid onset gender dysphoria idea is a
16   hypothesis, it's a theory, there's no evidence that that's a
17   true phenomenon, let alone that it's true for a large number of
18   adolescents.  That being said, this is a field where we are
19   very cautious, so when we're conducting the mental health
20   assessment, we certainly are working to understand the young
21   person's social environment at home in their community, at
22   school with their friends, and we would consider that
23   possibility of peer influence.  And if there were reasons to
24   believe that that were going on, then that is another situation
25   in which this diagnostic phase, that assessment period with a

1    mental health professional, would be extended until we feel

2    confident we truly understand what's going on and that this is

3    a good decision for that young person and their family.

4    Q     So you're talking about how you would conduct these

5    assessments in that diagnostic phase.  Are you aware of how

6    others in your field conduct these evaluations?

7    A     Yes.  So this is something that we talk about frequently

8    at mental health conferences, at scientific conferences among

9    my colleagues in the field.

10   Q     How common is it in this field to conduct these

11   comprehensive assessments that consider many possible

12   differentials, so to speak?

13   A     So all providers that I know consider the definitive

14   guidelines in this field to be the Endocrine Society guidelines

15   and the World Professional Association for Transgender Health

16   Standards of Care and they follow those guidelines which

17   highlight that really it's necessary to conduct this

18   biopsychosocial mental health assessment prior to initiating

19   any gender-affirming medical care.

20   Q     And shifting gears just a bit.  Some of the State's

21   experts have pointed to your reports from other countries,

22   specifically the UK, France, Finland, Sweden, Australia, and

23   New Zealand as demonstrating a lack of evidence of

24   effectiveness of gender-affirming medical interventions for

25   adolescents.  Are you familiar with these reports?

1  A     I'm familiar with them through reading the statements

2  from the State's experts.

3  Q     Do you know generally what these reports are from that

4  familiarity?

5  A     My understanding is that they are generally reviews of

6  the literature.  I would point out that the different summary

7  reports were published in different years, so some of them

8  don't consider the full body of research that has been

9  published to date but they're different in that respect

10  depending on which report you're looking at.

11  Q     Do any of the reports recommend banning treatment?

12  A     No.

13  Q     To your knowledge, are any of these reports peer

14  reviewed?

15  A     No.

16  Q     What is the purpose of peer review?

17  A     The purpose of peer review is to make sure that any

18  publication that's going out into the scientific literature

19  accurately reports the data, is using reliable data, has valid

20  conclusions, and is free from inappropriate bias.

21  Q     Is it common in medicine to have literature reviews that

22  identify gaps in research or knowledge?

23  A     Yes, I would say that the standard way in which one

24  writes a review of the literature is they talk about what

25  literature exists, they talk about what's known from that

1    literature, and then they generally highlight gaps.  And the

2    point of that is to hopefully inspire researchers to continue

3    to conduct more research to move the field forward.

4    Q      So we've been talking about the research showing the

5    efficacy of hormone treatments and some surgical treatments for

6    gender dysphoria.  Is there research demonstrating the

7    effectiveness of other treatments for gender dysphoria in

8    adolescents?

9    A      Outside of those set forth by the Endocrine Society

10   guidelines and WPATH you mean?

11   Q      Outside of the treatments that are recommended by the

12   Endocrine Society guidelines and WPATH, is there research

13   demonstrating the efficacy of other treatments for gender

14   dysphoria?

15   A      Not that I'm aware of.

16   Q      What about in adults?

17   A      No, not that I'm aware of.

18   Q      Are there randomized controlled trials showing

19   alternative treatments beyond those identified in the standards

20   of care in Endocrine Society guidelines that demonstrate the

21   effectiveness at treating gender dysphoria?

22   A      No.

23   Q      Are there longitudinal studies showing alternative

24   treatments are effective at treating gender dysphoria?

25   A      No.

```
1   Q     Are there cross-sectional studies showing alternative

2   treatments are effective at treating gender dysphoria?

3   A     No.

4   Q     Is there any research indicating the impact of delaying

5   treatment for gender dysphoria where that treatment is

6   medically indicated?

7   A     Yes.  Again, those cross-sectional studies I was

8   referencing compare people who access treatment to those who

9   continue through their lives without accessing treatment, and

10  they found that those who accessed the treatment had better

11  mental health outcomes than whose who continue along without

12  accessing treatment.  We also publish a paper in PLOS One where

13  we compared specifically people who accessed gender-affirming

14  hormones during adolescence to those who did not access them

15  until adulthood, and those who access them during adolescence

16  had lower odds of severe psychological distress when compared

17  to those who had to wait until adulthood to access treatment.

18  Q     Are there any studies assessing the impact of

19  interventions aimed at aligning a patient's gender identity

20  with their assigned sex?

21  A     Yes.  So in the field, we generally refer to those as

22  conversion efforts, colloquially people may call them

23  conversion therapies.  And studies have shown that exposure to

24  those approaches are linked to adverse mental health outcomes

25  including suicide attempts, and for that reason, those
```

1    practices have been labeled unethical by all major medical

2    organizations including the American Psychiatric Association,

3    the American Medical Association, and the American Academy of

4    Child and Adolescent Psychiatry.

5    Q    I want to just ask a few final questions about your

6    clinical practice as it relates to the research we've been

7    discussing.  We've heard testimony and you've testified today

8    about the protocols for the treatment of gender dysphoria and

9    adolescents reflected in the WPATH standards of care and in the

10   Endocrine Society guideline.  Are you familiar with those

11   guidelines?

12   A    Yes.

13   Q    Do you follow those guidelines in your own clinical

14   practice?

15   A    Yes.

16   Q    As both a clinician and a researcher with knowledge of

17   the state of the science in this area, what would it be like to

18   care for patients with gender dysphoria and their families if a

19   law banning the treatments outlined in those protocols were in

20   effect?

21   A    It would be emotional to think about.  Because the

22   reality is that we frequently in clinic have families that are

23   coming to us with these young people who are really struggling

24   with severe anxiety, depression, sometimes suicidal thoughts,

25   sometimes their mental health is declining so dramatically that

1    they can't go to school, and it's my job to tell families what

2    the evidence-based approaches are to help their child.  So if

3    these treatments were not an option, I'd be left without any

4    evidence-based approaches to treat this young person's gender

5    dysphoria.

6    Q     Thank you.  Just one moment to consult with my

7    co-counsel.  No further questions.  We'll pass the witness.

8              MR. CANTRELL:  Your Honor, if we could have just a

9    five-minute break.

10             THE COURT:  We're not going to break every time we

11   finish a direct and a cross.  We do this every time.  We've

12   only been going about an hour, or less than that.  So let's

13   proceed, please.

14             MR. CANTRELL:  It may take me just a minute.

15             THE COURT:  I understand.  I'll give you plenty of

16   time to set up.

17                      CROSS-EXAMINATION

18   BY MR. CANTRELL:

19   Q     Good morning.  My name is Michael Cantrell.  I believe

20   we've met before virtually and during the deposition.  I work

21   for the Attorney General's office.  I represent the defense and

22   I have some questions for you.  First of all, this is your

23   first trip to Arkansas.  Correct?

24   A     Correct.

25   Q     You've never practiced in Arkansas; is that right?

1    A       That is correct.

2    Q       You don't claim expertise in what treatment protocols are

3    followed by medical providers across Arkansas; is that right?

4    A       This is an area of medicine where we follow national

5    guidelines and international guidelines from WPATH and the

6    endocrine society so I would expect that clinicians here would

7    follow the same guidelines as those around the country.

8    Q       But you don't claim expertise in what protocols are

9    actually followed across the state of Arkansas, correct?

10   A       I would expect that they would follow the guidelines that

11   are followed around the nation.  I don't have any reason to

12   believe that they would be different in Arkansas, but I myself

13   do not practice in Arkansas, no.

14   Q       So I'm not sure that you're addressing the question.  I'm

15   asking whether or not you are claiming to have expertise in the

16   practices of specifically Arkansas practitioners.

17   A       I would expect practitioners in Arkansas would follow the

18   national guidelines, but I can't speak to what is done in any

19   individual clinic having not been there.

20   Q       So your answer is that no, you don't claim expertise in

21   the practices of Arkansas practitioners, I take it?

22   A       My expertise is in the treatment of gender dysphoria and

23   how that's practiced in the United States.  Again, I don't have

24   any reason to believe that would be different in Arkansas, but

25   no, I've not worked in a clinic in Arkansas to get a firsthand

1    account.

2    Q    You've never evaluated any of the minor plaintiffs in

3    this litigation, correct?

4    A    I have not.

5    Q    I understood you to testify and correct me if I'm wrong,

6    but I understood you to testify that a mental health assessment

7    is necessary before cross-sex hormones are prescribed to an

8    adolescent with gender dysphoria; is that right?

9    A    Correct.

10   Q    That's required by both the Endocrine Society and the

11   current WPATH guidelines, correct?

12   A    That is correct.

13   Q    So it would be practicing outside of those guidelines for

14   a provider to prescribe cross-sex hormones to a minor without a

15   mental health assessment; is that right?

16   A    Correct.

17   Q    Are you aware of any healthcare providers prescribing

18   cross-sex hormones to adolescents without a comprehensive

19   assessment?

20   A    I am not.

21   Q    So for many people, gender identity evolves over time; is

22   that right?

23   A    The research suggests that there's a strong biological

24   component of one's gender identity, so one has a core

25   biologically determined gender identity.  That being said, the

Turban - Cross

1  ways in which people apply language to it or describe it or

2  conceptualize it can certainly evolve over time.

3  Q    So your testimony today is that gender identity is

4  determined by biology?

5  A    That there's a strong biological determinant, yes, there

6  have been genetic studies that suggest a strong inheritable

7  component of trans identity.  And as I mentioned, there's this

8  core biological basis on which our gender identities are built,

9  but the language that we apply to that and the ways in which we

10 describe it and conceptualize it can evolve over a lifetime.

11 Q    You participated in a talk titled Transgender Youth

12 Understanding Detransition Nonlinear Gender Trajectories and

13 Dynamic Gender Identities.  Correct?

14 A    Yes.  I believe you're referencing a talk at the American

15 Academy of Child and Adolescent Psychiatry.

16 Q    And in that talk, you explained that although some may

17 think of gender identity as static, for many people it evolves

18 over time.  Correct?

19 A    Yes.  As I mentioned prior, the language that people

20 apply to their gender identity and how they conceptualize it

21 can evolve over time.

22 Q    You stated that psychiatrists must be aware of the

23 dynamic nature of gender identity.  Is that right?

24 A    Yes.  Much of this is similar to what I was speaking

25 about prior that there's a small population of people who,

1    quote, detransition and there are these heterogenous

2    experiences that are really important for us as psychiatrists

3    to understand.  Even if they're a small minority of our

4    patients, I think it's important that we understand and be able

5    to support all of our patients.

6    Q     You'd agree that a person's gender identity can lead them

7    away from their initial transition, correct?

8    A     Could you be more specific?

9    Q     So take a person who experiences gender dysphoria and has

10   a transition, and that person can experience -- as they grow

11   older, they can -- they can then come to understand their

12   gender identity in a way different from when they transitioned,

13   correct?

14   A     Yes.  Someone's conceptualization of their gender

15   identity can evolve over time.

16   Q     Gender identity is not always persistent, correct?

17   A     I'm not sure what you mean exactly.

18   Q     So let me ask this.  You published an article titled

19   "Dynamic Gender Presentations, Understanding Transition and

20   Detransition Among Transgender Youth."  Is that right?

21   A     Yes.

22   Q     In that paper, you took issue with this idea that gender

23   identity is always insistent, persistent, and consistent.  Is

24   that right?

25   A     Yes.  So, again, I was alluding to the fact that the

1   language and the way in which one conceptualizes their gender

2   identity can evolve over time.

3   Q     In that paper you explain that a person's gender identity

4   is not always persistent or consistent, right?

5   A     Yeah.  I believe in that paper we give an example of

6   somebody who identified their gender identity as binary in

7   transgender and later they identified as nonbinary for

8   instance, so again, the language and the ways in which we

9   conceptualize our gender identity can evolve over time.

10  Q     In that paper, you also explained that failure to

11  recognize the dynamic nature of gender identity does a

12  disservice to those whose evolving gender identity might

13  eventually lead them away from their initial transition.  Is

14  that right?

15  A     Yes.  As I was mentioning prior for the vast majority of

16  patients, this is not the case, but I think it's important that

17  we consider all patients and all possible outcomes, so I think

18  it's important that we be thoughtful about how to support

19  people whose gender identities may evolve over time.

20  Q     Also in that paper you explain that a detransition can be

21  driven by internal factors.  Correct?

22  A     We explain that it can be driven by external or internal

23  factors, yes.  External factors would be, for instance, what I

24  described prior of stigma, harassment, discrimination,

25  instances in which people are forced to detransition.  Also

1    often those external factors can lead to a lot of shame.

2    Q    I'm not asking you about the external factors.  Could you

3    tell me about the internal factors?

4    A    Yes.  Those external factors, for example, that shame,

5    could over time --

6    Q    No, no, I'm asking you about the internal --

7         THE COURT:  Sir, let him finish his question.

8    Please don't cut him off.

9         MR. CANTRELL:  Your Honor, if I may object to

10   nonresponsive answer from the witness.  I had asked him about

11   the internal factors and he's wanting to talk about external

12   factors that might lead to transition.

13        THE COURT:  Re-ask your question.

14   BY MR. CANTRELL:

15   Q    Dr. Turban, what are internal factors that might lead a

16   person to detransition?

17   A    I'm about to answer your question about internal factors,

18   but it does involve the word "external" to finish the sentence.

19   Q    If you would address the internal factors.

20   A    Over time those external factors can drive to internal

21   factors such as shame or internalized trans phobia or

22   discomfort with one's gender identity.  That would be one

23   internal factor.  Another internal factor could be an evolution

24   of one's gender identity and the way they conceptualize it

25   unrelated to those external factors, but it's important to

Turban - Cross

1    consider that there's not always a clean distinction between
2    external and internal factors, and sometimes the internal ones
3    are driven by external ones.  Sometimes they're not.
4    Q     Thank you.  You used the phrase "nonlinear gender
5    trajectory".  Correct?
6    A     Yes.
7    Q     What you call a nonlinear gender trajectory can include
8    people who identified as transgender and then later ceased to
9    identify as transgender.  Is that right?
10   A     I would add a bit of nuance that the word transgender can
11   be used in different ways.  So some people use the word
12   transgender to mean they have a gender identity opposite their
13   sex assigned at birth.  Some people use that as an umbrella
14   term that's a bit broader and that would include nonbinary
15   gender identities, but yes.
16   Q     So your answer is yes?
17   A     Yes, depending on how you're defining transgender.
18   Q     And I apologize.  For my benefit, what definition are you
19   using to answer yes?
20   A     I might throughout my testimony have to use the term
21   differently if we're talking about different bodies of
22   literature because they use it differently, but with both
23   definitions, it would be true that somebody could go from a
24   binary identity to a nonbinary identity or from binary trans
25   identity to later endorsing a cisgender identity.

Turban - Cross

```
 1   Q      And a person could go from initially identifying with

 2   their birth gender to then transitioning and identifying as a

 3   transgender identity and then potentially back to identifying

 4   with their birth gender, correct?

 5   A      That's certainly not a typical experience, but that would

 6   be possible.

 7   Q      I believe you discussed a study that you published in

 8   2020 titled "Pubertal Suppression for Transgender Youth and

 9   Risk of Suicidal Ideation."

10   A      Yes.

11   Q      That study you described as comparing mental health

12   outcomes for patients who wanted and received puberty blockers

13   with patients who wanted but did not receive puberty blockers.

14   Is that right?

15   A      Yes.

16   Q      That study included a multivariate analysis.  Is that

17   right?

18   A      Correct.

19   Q      The multivariate analysis is where you adjust for a range

20   of potential confounding variables.  Is that right?

21   A      Yes.

22   Q      Can you tell us what a confounding variable is?

23   A      So when you're looking at the relationship between two

24   variables, say puberty blockers and suicidality, a confounder

25   is something that could be related to both the exposure, so in
```

Turban - Cross

1  this case conversion therapy, and also related to the outcome,

2  in this situation suicidality.  And if you don't adjust for

3  those confounding variables, it could impact your results.

4  Q     So the multivariate analysis where you adjust for those

5  confounding variables, that multivariate analysis is what you

6  would rely on if you're looking for the purist impact of the

7  intervention, correct?

8  A     Yes.

9  Q     And in this case, there technically wasn't an

10 intervention, though, right, this was an observational study,

11 correct?

12 A     It was an observational study that looked at people who

13 received an intervention and those who did not.

14 Q     But there wasn't a -- let me ask you this.  What

15 contrasts to an observational study?

16 A     This was an observational study.

17 Q     What is the contrasting type of study to an observational

18 study?

19 A     I'm not sure.

20 Q     Were you actively making an intervention as opposed to

21 merely observing what takes place or what has taken place?

22 A     There are many such studies.

23 Q     Okay.  Let me just continue down a different road.  So

24 you ran the multivariate analysis in this study that we're

25 discussing for nine different outcome measures.  Correct?

Turban - Cross

1    A    Correct.

2    Q    And the multivariate analysis found no statistically

3    significant change in eight of those nine outcome measures.

4    Correct?

5    A    Yes.

6    Q    The only outcome measure that your multivariate analysis

7    resulted in a statistically significant change was in suicidal

8    ideation.  Correct?

9    A    Yes.

10   Q    So you found no statistically significant change in, for

11   example, illicit drug use, binge drinking or suicide attempt,

12   correct?

13   A    Correct.

14   Q    Even for suicidal ideation, the study cannot show that

15   the puberty blockers caused a lowering of suicidal ideation,

16   correct?

17   A    I would not use the study in isolation to make a causal

18   inference.  You would really need to look at the body of

19   literature as a whole to draw conclusions.

20   Q    So your answer is yes, correct?

21   A    Could you repeat the question?

22   Q    Sure.  Even for suicidal ideation, this study cannot show

23   that the puberty blockers caused a lowering of suicidal

24   ideation?

25   A    Correct, the study in isolation cannot show that.

Turban - Cross

1   Q     One of the reasons why is that there's sort of a chicken

2   and egg problem here.  Is that right?

3   A     Yes.  So any time you have a cross-sectional study that

4   doesn't have that longitudinal component that those

5   longitudinal studies have, there's the potential for reverse

6   causation which I think is what you're referring to as the

7   chicken and the egg.

8   Q     So isn't it true that one reason why a patient who wants

9   puberty blockers may not receive puberty blockers is because

10  they suffer greater mental health issues to begin with,

11  correct?

12  A     So the guidelines highlight that to initiate pubertal

13  suppression, other mental health concerns need to be reasonably

14  well controlled, so it's not that they can't have other mental

15  health conditions that are active.  In fact, frequently they do

16  and that's why you're initiating the treatment.  They need to

17  be sure that those other mental health conditions aren't going

18  to impair their ability to respond well to the treatment.

19  Q     So there's a potential confounder here, correct?

20  A     I'm not sure what specifically you're referring to.

21  Q     So kids who receive puberty blockers might show less

22  suicidal ideation because they had better mental health to

23  begin with?

24  A     That is possible.

25  Q     You say in your article that reverse causation cannot be

1  ruled out?

2  A     For this specific study in isolation, yes.

3  Q     You say it's plausible that those without suicidal

4  ideation had better mental health when seeking care and thus

5  were more likely to be considered eligible for pubertal

6  suppression, correct?

7  A     For this specific study, yes.

8  Q     It's fair to say this is a chicken and egg problem, what

9  comes first, what causes what?

10  A     That question of reverse causation in this particular

11  study, yes.

12  Q     Okay.  So shifting gears slightly, the statistical

13  significance is not the same thing as clinical significance,

14  correct?

15  A     Correct.

16  Q     Just because something -- just because there's a

17  clinically significant change in suicidal ideation doesn't mean

18  that there would actually be a clinically observable

19  difference, correct?

20  A     I think you said clinical twice.  Could you repeat the

21  question?

22  Q     I'm sorry, yes.  Just because there's a statistically

23  significant change in suicidal ideation doesn't mean that a

24  clinically significant change will be observed, correct?

25  A     As a general principle, yes.

Turban - Cross

```
1   Q     And a clinically significant change would be a change
2   that materially impacted a patient in real life.  Is that
3   right?
4   A     Yes.
5   Q     I believe that you also testified to some of the articles
6   that you've published which have made use of the United States
7   Transgender Survey.  Is that right?
8   A     Yes.
9   Q     I'll call this the USTS just for brevity.  So the USTS
10  was an on-line survey of transgender adults.  Correct?
11  A     It's a survey that lived on a website but the way they
12  actually recruited, they worked with over 400 LGBTQ outreach
13  organizations and it also included some in-person events where
14  people would come in person to take the survey on I believe
15  computers or iPads, but yes, the survey itself lived on line.
16  Q     It was a survey of transgender adults, correct?
17  A     Yes.
18  Q     So you just testified that the survey participants were
19  recruited by LGBT outreach organizations, correct?
20  A     Correct.
21  Q     And surveys conducted in that way are potentially subject
22  to recruitment bias, correct?
23  A     They are convenience samples.  So scientific and
24  epidemiologic research, we separate probability samples from
25  convenience samples.  I think that's what you're alluding to.
```

1  Q     Can you tell us the difference between a representative

2  sample and a convenience sample?

3  A     Yes.  So a representative sample or what I would call a

4  probability sample is when you randomly pick people out of a

5  population.  So, for example, people will use random digit

6  dialing where they will take a large database of phone numbers,

7  they'll pick random phone numbers and call those phone numbers.

8  And you can imagine that because you're picking random numbers

9  that you're getting a representative sample that's not biased

10 because you're just picking at random from the population.  So

11 the hope is that that is a representative sample of the full

12 population.

13      A convenient sample is anything else, where you don't

14 randomly select participants from the full population.  As you

15 can imagine, it's very difficult to build representative

16 samples particularly in minority mental health research because

17 the number of phone numbers you would have to call to amass a

18 sample that's large enough would be prohibitive, so you'll

19 mostly see nonprobability samples in this area.

20 Q     So when you use the -- let me make sure I'm following.  I

21 believe you've used the phrase "probability sample" and

22 "nonprobability sample"?

23 A     Yes.

24 Q     So a nonprobability sample is the same thing as a

25 convenient sample?

Turban - Cross

1    A      Yes.

2    Q      The USTS is an example of a nonprobability sample,

3    correct?

4    A      Yes, or you could call it a convenience sample.

5    Q      When you use convenience samples, your survey is subject

6    to recruitment bias potentially, correct?

7    A      It could potentially not be representative in the way

8    that a probability sample would be.

9    Q      So the answer is yes?

10   A      I wouldn't use the same terminology, that's not exactly

11   how we describe it, but yes.

12   Q      The survey was anonymous in the sense that no personal

13   identifying information was collected, correct?

14   A      Correct.

15   Q      All of the participants in the USTS would have identified

16   as transgender at the time of the survey; is that right?

17   A      Again, using that broader umbrella term of transgender,

18   yes.

19   Q      That would have included individuals who identified as

20   transgender, trans, genderqueer, nonbinary, and other

21   identities on the transgender identity spectrum?

22   A      Yes, that would be that broader umbrella I was referring

23   to.

24   Q      The USTS did not include anyone who had desisted or

25   detransitioned, correct?

Turban - Cross

1   A     We did publish a paper out of the USTS where we asked
2   people if they had ever detransitioned, and over 10 percent of
3   them had at some point in the past.
4   Q     But the USTS itself did not include any survey
5   participants who had desisted or detransitioned; is that right?
6   A     Ten percent or more of the sample had experienced
7   detransition in the past.  I think what you're alluding to is
8   that none of them identified as cisgender.
9   Q     Could you repeat that last part?
10  A     None of them identified as cisgender.
11  Q     At the time of the survey?
12  A     Correct.
13  Q     If I understand your testimony, you're saying that
14  10 percent of the population that was surveyed in the USTS had
15  transitioned and then subsequently detransitioned and then
16  maybe transitioned again; is that correct?
17  A     Correct.  Again, as I mentioned earlier, this is
18  detransitioned defined very broadly and there are different
19  definitions of detransition, so it's important to keep in mind.
20  In this specific instance they're looking at detransitioned
21  very broadly, not necessarily meaning regret or a change in
22  gender identity per se.
23  Q     So the data from the USTS was not collected as part of a
24  longitudinal survey, correct?
25  A     Correct.

Turban - Cross

```
1    Q      What is a longitudinal survey?
2    A      That would be a survey that surveys the same participants
3    at various subsequent time points.
4    Q      So the data from the USTS was collected at a single time
5    point?
6    A      Correct.  I specifically used the 2015 gender survey.
7    There is another one from earlier and there's one being
8    conducted now so there's different iterations of the gender
9    survey, but my researchers used the one from 2015.
10   Q      Your research only used the 2015 USTS?
11   A      My research used the 2015 USTS.
12   Q      That data was collected at a single point in time as
13   opposed to over multiple points in time as a longitudinal
14   survey would be?
15   A      Correct.
16   Q      Your articles conducted a secondary analysis of the USTS
17   data, correct?
18   A      Correct.
19   Q      Those articles used what's called a retrospective
20   self-report, correct?
21   A      Correct.
22   Q      And a retrospective self-report is subject to being
23   affected by recall bias, correct?
24   A      Yes.
25   Q      Can you tell us what recall bias is?
```

Turban - Cross

1   A     Recall bias generally refers to the difficulty people may

2   have in remembering something that happened in the past as

3   opposed to something that is happening to them in the given

4   moment.

5   Q     I believe you mentioned the Olson-Kennedy paper published

6   in 2018.  Do you recognize the paper I'm referring to?

7   A     Could you give me the title so I'm referring to the same

8   one?

9   Q     This was a case series reporting on patients who had

10  chest surgeries.

11  A     Do you have the title?

12  Q     Give me one moment.  The title of that paper would be

13  "Chest Reconstruction and Chest Dysphoria in Trans Masculine

14  Minors and Young Adults."

15  A     Yes, I don't know that it would be a case series per se,

16  but I know the paper you're referencing.

17  Q     Are you aware that this paper reported on five patients

18  who had chest surgeries?

19  A     I believe it was more than five unless we're talking

20  about different papers.

21  Q     So let me ask you this.  You're aware that that paper

22  reported on patients who had chest surgeries?

23  A     You're now making me wonder if we're talking about

24  different papers because I see the paper you're referencing.

25          MR. CANTRELL:  May I approach, Your Honor?

Turban - Cross

```
 1              THE COURT:  Certainly.
 2              THE WITNESS:  This is a study of pubertal
 3    suppression, not top surgery.
 4              MR. CANTRELL:  Your Honor, I've got the correct
 5    paper.
 6    BY MR. CANTRELL:
 7    Q    Dr. Turban, I've handed you a document titled "Chest
 8    Reconstruction and Chest Dysphoria in Trans Masculine Minors
 9    and Young Adults."  Do you recognize that as the Olson-Kennedy
10    paper that you testified concerning previously?
11    A    Yes, this is the paper I was thinking of.  It's of 68
12    patients who underwent surgery, not five.
13    Q    Okay.  Would you describe this as a case series?
14    A    I would.  It's essentially a cross-sectional study that
15    compares those who received top surgery with those who did not.
16    Q    Would it be fair to characterize it as a case series?
17    A    Case series sometimes implies that it's longitudinal and
18    this study is not.
19    Q    I see.  So this is not a longitudinal study and that
20    would give you hesitancy in saying that it's a case series?
21    A    Correct.
22    Q    Fair enough.  So if you would, take a look at page 434 of
23    that article.  There is a figure, age at chest surgery in the
24    post surgical cohort.  Do you see that figure?
25    A    Yes.
```

Turban - Cross

1   Q      Okay.  So reading the information in that figure, there

2   are five patients who had chest surgeries at age 14 and two

3   patients who had chest surgeries at age 13.  Is that right?

4   A      Correct.

5   Q      Would you support providing chest surgery to a 13 year

6   old or 14 year old?

7   A      As I mentioned earlier, surgery is a major decision.

8   Certainly surgery in a young adolescent is an even bigger

9   decision.  You're weighing the risks and benefits for an

10  individual case, and in the case of surgery, the risks and

11  potential side effects are very high.  Surgical complications,

12  anesthesia, etc., so you would need to be quite sure that the

13  potential benefits of the surgery are very, very high.  So

14  without knowing more detail about these specific patients, it

15  would be hard to say, but my presumption is that these patients

16  would have had very severe chest dysphoria where the

17  interdisciplinary team working with and evaluating them would

18  have considered that the risk of not having surgery would have

19  been much higher than the potential risks of surgery.

20         But I will say those would be outlier cases for the

21  patients that I've seen.  I would also point out that there are

22  different types of top surgery, and some procedures are more

23  involved than others.  I would have to look through this paper,

24  but for a patient that young, it's possible that they would not

25  have very much chest tissue so it might be a smaller surgery,

Turban - Cross

1    but I'd have to look at the paper in more detail if you wanted

2    me to comment on what specific surgeries these patients

3    underwent.

4    Q     Let me just ask you just to be clear that I understand

5    your answer.  It sounds to me like, and correct me if I'm

6    wrong.  It sounds to me like your testimony is that there

7    easily could be -- let me rephrase.  It sounds to me like your

8    testimony is that there could be scenarios in which you would

9    support chest surgery on a 13 year old?

10   A     Certainly not easily.  This would not be a common

11   decision.  But there could be extreme outlier cases where one

12   might decide that the benefits of surgery outweigh the risks

13   because as you can see from this graph, these are outliers, the

14   vast majority of patients would not be having surgery this

15   young.  This is only a sample of people who even accessed

16   surgery.  So you're talking about a small subsample of a

17   subsample.

18   Q     So shifting gears a little bit.  Dr. Turban, you would

19   agree that providing testosterone to a girl with gender

20   dysphoria can actually increase chest dysphoria.  Is that

21   right?

22   A     I think you may be referring to the Mehringer study or

23   you might have it in reverse.

24   Q     Take a look at --

25               THE COURT:  Are we on a different paper?

1        MR. CANTRELL:  No, it's the same paper, Your Honor.

2    BY MR. CANTRELL:

3    Q    If you would look at page 435, there is a section at the

4    upper right-hand column.  It discusses -- it says the

5    increasing chest dysphoria after testosterone treatment begins

6    does reflect a common clinical phenomenon.  A honeymoon period

7    after testosterone initiation may quickly become eclipsed by

8    the greater disparity between a more masculine presentation and

9    a female chest contour.  Clinicians should advise patients and

10   families that chest dysphoria may increase over time after

11   starting hormone therapy.

12   A    Sorry.  I see what you're referencing.  So they here are

13   no longer talking about the patients who had surgery, but

14   they're referencing their control group of people who did not

15   have surgery.  And yes, so while testosterone can impact other

16   aspects of physical gender dysphoria, testosterone does not

17   have much impact on chest tissue or chest contour, so for

18   patients taking testosterone, their gender dysphoria overall

19   may improve in several areas of their body, but their chest

20   dysphoria will not improve by the testosterone.  So when they

21   are thinking about their physical dysphoria, they may start to

22   highlight the chest more because the other areas of dysphoria

23   have improved but that has not.

24   Q    So Olson-Kennedy referred to increasing chest dysphoria

25   after testosterone treatment in this passage that I referred

1  to.  So would you agree that providing testosterone to a girl

2  with gender dysphoria can actually increase chest dysphoria?

3  A    I'm just going to get confused if you're using the phrase

4  "girl with gender dysphoria" to reference a trans masculine

5  person or someone assigned female at birth.

6  Q    Referring to a natal female.

7  A    So someone assigned -- could you repeat the question?

8  Q    Yes.  So the question is, you would agree that providing

9  testosterone to a natal girl with gender dysphoria can actually

10  increase chest dysphoria; is that right?

11  A    Yes.  As I just mentioned.  So the testosterone will

12  improve elements of physical dysphoria in other areas but not

13  the chest, so while overall gender dysphoria may improve, the

14  chest dysphoria specifically will not improve.  So their

15  relative focus on the chest dysphoria versus these other things

16  that are now better will increase.

17  Q    And chest dysphoria actually increases?

18  A    Correct.

19  Q    Okay.  Different set of questions.  Are you familiar with

20  -- well, you've discussed differences in onset, childhood onset

21  versus later onset, correct, of gender dysphoria?

22  A    I'm not sure what you mean by differences.

23  Q    Well, the distinction between the two types of onset of

24  gender dysphoria.

25  A    I would say some people have apparent gender dysphoria

1    that's obvious to their families in the prepubertal period and

2    some don't until after puberty starts.

3    Q    Are you aware of the difference between childhood onset

4    gender dysphoria and adult onset gender dysphoria?

5    A    Similarly these are just terms referring to the different

6    ages at which people come to understand their gender identity.

7    Q    So childhood onset gender dysphoria and adult onset

8    gender dysphoria have different developmental pathways,

9    correct?

10   A    By definition, yes, because some people in their

11   childhood development had an experience of gender dysphoria

12   that was apparent to them and some people didn't until

13   adulthood, so by definition there are different developmental

14   pathways.

15   Q    And, similarly, childhood onset gender dysphoria and

16   adolescent onset gender dysphoria have different developmental

17   pathways, correct?

18   A    Again, by definition, yes.

19   Q    Of the patients you have personally dealt with, greater

20   than 95 percent of those who begin puberty blockers go on to

21   take cross-sex hormones; is that right?

22            MR. STRANGIO:  Objection, mischaracterization of

23   testimony.

24            THE COURT:  I think you can handle that.

25            THE WITNESS:  I don't have specific data in front of

Turban - Cross

```
1    me on my patients.
2    BY MR. CANTRELL:
3    Q    Dr. Turban, you testified in a deposition in this case,
4    correct?
5    A    Yes.
6    Q    You were under oath during that deposition?
7    A    Yes.
8    Q    You swore to tell the truth in that deposition, correct?
9    A    Yes.
10   Q    Did you tell the truth in your deposition?
11   A    Yes.
12   Q    Plaintiffs' counsel was present during your deposition,
13   correct?
14   A    Yes.
15   Q    Let me ask you this, Dr. Turban.  What percentage of
16   patients who start pubertal suppression go on to take
17   gender-affirming hormones in your personal experience?
18   A    Again, I don't track that data with my patients
19   quantitatively.  Generally most, but I think it would be more
20   reliable to look at the published research literature that
21   suggests that greater than 95 percent.
22   Q    Okay.  That's consistent with your experience, correct?
23   A    Generally, yes.
24   Q    Some of your studies on mental health outcomes were
25   conducted thanks to a grant funded by pharmaceutical companies,
```

1  correct?

2  A     No.

3  Q     No?

4  A     No.

5  Q     So let me ask again just so I understand your testimony

6  today.

7          THE COURT:  You didn't understand the no that he

8  said twice?

9          MR. CANTRELL:  Your Honor, I'm wondering if it may

10  have been the way I worded the question.

11         THE COURT:  Okay.  You asked it twice, but go ahead

12  and ask it a third time.

13  BY MR. CANTRELL:

14  Q     Dr. Turban, you have previously disclosed that Pfizer is

15  tied to a grant that funded some of your research.  Correct?

16  A     I received a grant from the American Academy of Child and

17  Adolescent Psychiatry, and it sounds like you're referencing

18  that separately pharmaceutical companies had donated money to

19  that organization and that organization of child psychiatrists

20  ultimately provided me with a research grant of $15,000.

21  Q     And so that grant was funded by money contributed by

22  pharmaceutical companies, correct?

23  A     It's complicated the way it's set up.  So the American

24  Academy of Child and Adolescent Psychiatry has a fund in which

25  several different, I don't know if they're all pharmaceutical

1   companies, but certainly some of them are pharmaceutical

2   companies, donate into a pool of money.  That money is set

3   aside and then an independent panel of child and adolescent

4   psychiatry experts from around the country, they receive

5   applications from child psychiatry researchers to do research

6   grants and then they award those grants, and then under federal

7   reporting, they're required to later tie those grants to the

8   companies that donated into that pool of money.

9        So in this indirect way, yes, the pharmaceutical

10  companies gave money to this pool of funding that then a panel

11  of child psychiatrists who were independent of that body

12  awarded these research grants.  And I received one of those

13  research grants.  So to avoid any appearance of undisclosed

14  conflict of interest, I always disclose in all of my papers

15  that I received that grant from the American Academy of Child

16  and Adolescent Psychiatry in that they receive funding from

17  their industry partners which include Arbor and Pfizer.

18  Q    So to boil all that down, the grant that you received

19  was, in fact, funded by pharmaceutical companies, correct, in

20  part at least?

21  A    In part and in a direct way, yes.

22  Q    Do you know all of the pharmaceutical companies that

23  funded the grant?

24  A    I do not.  When you say the grant, you mean the fund at

25  the American Academy of Child and Adolescent Psychiatry?

1    Q    I'm referring to the funds that you used to produce your

2    studies.

3    A    So again, no, because they intentionally set it up in

4    this way so there wouldn't be any direct interaction between

5    the researchers or the people deciding who gets the grants and

6    any of the pharmaceutical companies, so I don't have any

7    knowledge of how the fund is set up or where the donations for

8    that fund set up because they intentionally have those deciding

9    who gets the awards and the awardees very far removed from that

10   process.

11   Q    But you are aware that there are several different

12   industry sponsors that donate money into that pool of money,

13   correct?

14   A    Yes.  As I think I mentioned in the deposition when I

15   received the award, I was not told what, if any, pharmaceutical

16   companies were tied to the grant or were later tied to the

17   grant.  I actually found out after our paper in Pediatrics was

18   published that through that Sunshine Act reporting, it had been

19   retroactively tied to a specific company called Arbor

20   Pharmaceuticals, but that's all that I'm aware of.

21   Q    So was Arbor Pharmaceuticals one of the companies that

22   funded the grant?

23   A    Yes, I believe that's one of the companies that donated

24   into this pool of money that was then used to give the grants.

25   Q    Arbor Pharmaceuticals manufactures a puberty blocking

1    drug, correct?

2    A    I believe they manufacture one, but I'm not sure the name

3    of it.  Triptodur, I believe.

4    Q    I'm sorry?

5    A    Triptodur, I think.  It's one of the ones that's not as

6    frequently used.

7    Q    Dr. Turban, you have no degree in endocrinology, correct?

8    A    Correct.

9    Q    You're not trained as a surgeon?

10   A    Correct.

11   Q    If I could have one moment, Your Honor.  Your Honor, I

12   have nothing further.

13             THE COURT:  Any redirect?

14             MR. STRANGIO:  No redirect, Your Honor.

15             THE COURT:  Sir, you can step down, you're free to

16   go.  Court's going to take about a 10-minute break and then

17   we're going to go to about 11:45.

18        (Recess from 10:19 AM until 10:40 AM.)

19             THE COURT:  What did you say your name was?

20             MS. NOWLIN-SOHL:  Li Nowlin-Sohl.

21        **ARMAND ANTOMMARIA, PLAINTIFFS' WITNESS, DULY SWORN**

22                         DIRECT EXAMINATION

23   BY MS. NOWLIN-SOHL:

24   Q    Dr. Antommaria, can you state your name and spell it for

25   the court reporter?

```
1    A     My full name is Armand, A-r-m-a-n-d, Herbert,

2    H-e-r-b-e-r-t, Matheny, M-a-t-h-e-n-y, Antommaria,

3    A-n-t-o-m-m-a-r-i-a.

4               THE COURT:  Are you related to the Tabasco people?

5               THE WITNESS:  I am not.  Not that I'm aware of.

6               THE COURT:  I think they're doing quite well.  I

7    haven't had many people with that name before.  But go ahead.

8    I digress.

9               MS. NOWLIN-SOHL:  Your Honor, I believe you have

10   Dr. Antommaria's CV in front of you as Plaintiffs' Exhibit 4.

11              THE COURT:  Go ahead.

12              MS. NOWLIN-SOHL:  Provided that Defendants don't

13   plan to voir dire the witness, I'll forego most of the

14   background.

15              MR. CANTRELL:  We do not, Your Honor.

16              THE COURT:  All right.  Continue.

17              MS. NOWLIN-SOHL:  Thank you.

18   BY MS. NOWLIN-SOHL:

19   Q     Dr. Antommaria, what is your profession?

20   A     I'm a pediatric hospitalist and bioethicist.

21   Q     What does bioethics entail?

22   A     Bioethics is the examination of ethical issues related to

23   healthcare in the biological sciences.

24   Q     What professional positions do you currently hold?

25   A     I am the director of the ethics center at Cincinnati
```

1   Children's Hospital Medical Center, the Lee Ault Carter Chair

2   of Pediatric Ethics, and a professor of medicine and surgery at

3   Cincinnati Children's Hospital Medical Center in the University

4   of Cincinnati School of Medicine.

5   Q     So can you tell us a little bit about what you do as a

6   pediatrician?

7   A     So about a third of my time is spent as a pediatrician

8   seeing patients.  My area of specialization is pediatric

9   hospital medicine, so I see children who are admitted into the

10  hospital with general pediatric concerns like asthma,

11  pneumonia, or bone infections.

12  Q     What do you do as director of the Ethics Center?

13  A     I oversee the functions of the Ethics Center for

14  Cincinnati Children's which would include clinical ethics,

15  research ethics, and organizational ethics.  My primary

16  activity is related to clinical ethics so I provide clinical

17  ethics consultation, address either dilemmas or conflicts

18  related to ethical issues for providers, work with a variety of

19  medical teams to address ethical issues that arise in the care

20  that they provide including our transgender clinic and our

21  differences of sex development clinic, and I help the

22  institution in terms of policies that have ethical issues, and

23  participate in research and scholarship.

24  Q     Do you have ethical consultations with patients as well

25  as providers?

Antommaria - Direct

1   A    Yes.  Our ethics consultation is open to anyone who's

2   directly involved in the patient's care and patients and their

3   families can request ethics consultation.

4   Q    Okay.  In your role as director of the Ethics Center, do

5   you work with transgender patients?

6   A    I do both in terms of individual consultation in cases

7   that include particular ethical issues as well as working with

8   the team in general in terms of its policies and procedures.

9   Q    In this role, do you keep up with the research on

10  treatment for gender dysphoria?

11  A    I do.

12  Q    So I will be asking you about some questions about the

13  medical treatments that are at issue in this case, but before I

14  do that, I'd like to start with some background questions on

15  medical research and medical decision making.  What is the goal

16  of medical research?

17  A    Research in general's goal is to contribute to

18  generalized knowledge.  Medical research can have a variety of

19  different goals, but one of the primary goals is to evaluate

20  the safety and efficacy of medical treatments.

21  Q    How is medical research conducted?

22  A    Medical research is conducted according to protocols that

23  would specify the steps in a research investigation.

24  Q    Are there different types of research studies?

25  A    There are two main categories of research studies:

1    Observational studies and randomized trials.

2    Q    What are observational studies?

3    A    Observational studies are studies that look at a

4    population at a particular time.  So cross-sectional studies

5    look at a population at a single point in time and longitudinal

6    studies look at a population over a period of time making

7    repeated measures.

8    Q    You mentioned randomized controlled trials.  What are

9    those?

10   A    So randomized controlled trials are studies in which the

11   participants are randomized, assigned to an intervention group

12   and a controlled group on a chance basis.

13   Q    Why randomization?

14   A    So observational studies can look at the association

15   between various factors.  So in a cross-sectional study, you

16   can look at the association between two things, but it's very

17   difficult to determine whether one thing caused the other

18   thing.  And in a randomized trial, you have greater opportunity

19   to demonstrate causation, so specifically let's say the

20   intervention caused the effect because in that, that effect is

21   not attributable to underlying differences in the intervention

22   group in the control group.

23   Q    What is a confounder?

24   A    A confounder would be one of those things that might be a

25   baseline difference between the group that was responsible for

1    the effect that wasn't appropriately controlled for.  So if you

2    were going to take, say, patients with asthma and you were

3    going to look at the effect of Albuterol and you were going to

4    randomize a group to get Albuterol and a group not to get

5    Albuterol, you might want to control for other factors that

6    contribute to asthma like cigarette smoking.  If you hadn't

7    controlled for tobacco exposure, that would be a confounder

8    that might contribute to the control that wasn't really part of

9    the study design.

10   Q    So you just talked a little bit about kind of how

11   observational studies and randomized controlled studies kind of

12   measure efficacy of a treatment.  How do randomized controlled

13   trials and observational studies compare to each other with

14   regard to measuring the safety of a treatment?

15   A    So a randomized controlled trial, particularly a placebo

16   controlled trial which the control group receives an

17   ineffective intervention, allows for comparison for what's

18   called the placebo effect, somebody who even got a sugar pill

19   might associate symptoms with receiving it and allows you to

20   make comparisons between the intervention group and the control

21   group in terms of the frequency of adverse effects of the

22   intervention.  Observational studies can still be very helpful

23   in terms of looking at adverse effects.  Particularly

24   randomized controlled trials might be done in a relatively

25   small population and an observational study might be

Antommaria - Direct

1    particularly helpful because it will allow you to follow a much

2    larger group of people.

3           So if you think about the COVID vaccine trials, there

4    were certain side effects of being vaccinated that were

5    identified in a randomized controlled trial like soreness at

6    the injection site, but it was only in the observational

7    studies that were done after the vaccines were approved that

8    identified some of the rare side effects such as clotting

9    problems in a small percentage of the individuals who were

10   vaccinated.

11   Q    So because this is complicated, and just to make sure I

12   understood correctly when you were talking about the randomized

13   controlled trials and the safety, so having the randomized

14   controlled trials helps to understand whether a safety concern

15   was caused by the treatment or by a confounder?  Is that

16   accurate?

17   A    No.  Whether the -- so in a randomized controlled trial,

18   even people who got a placebo might have adverse events.  So in

19   adult medicine if you were in a randomized controlled trial,

20   some finite group of people might have a heart attack but it

21   might not be attributable to the control.  So it allows you to

22   make that comparison between the intervention group and the

23   control group for things that are just naturally occurring in

24   the background.

25   Q    What are some of the factors that go into determining

Antommaria - Direct

1   which type of study to utilize?

2   A      Part of it is about what the study question is, what

3   you're trying to figure out.  There are also ethical,

4   logistical, and financial considerations that would go into the

5   selection of a study design.

6   Q      Is there a study design that is generally considered the

7   best quality?

8   A      So randomized controlled trials are generally considered

9   to be high quality evidence.

10  Q      Why is that?

11  A      Because of the ability to be more certain about causation

12  and the ability to potentially control for confounders.

13  Q      Are randomized controlled trials always appropriate for

14  medical research?

15  A      No, there are times when randomized controlled trials

16  would be unethical or when they would not be feasible and there

17  are certain types of questions for which observational studies

18  would be a more appropriate study design.

19  Q      When might a randomized controlled trial be unethical?

20  A      So in order for a randomized controlled trial to be

21  ethical there needed to be what's called clinical equipoise.

22  There has to be true uncertainty about whether or not the

23  intervention or the control is better, and the trial would also

24  need to be feasible.  So if you had good reason to believe that

25  you couldn't recruit enough people to participate in the trial

Antommaria - Direct

1   and the trial wouldn't be able to answer the question, it would

2   be unethical to start the trial because it would be problematic

3   to expose individuals to the risk of the trial without the

4   potential benefit of having the trial have a determinative

5   outcome.

6   Q     So you mentioned clinical equipoise.  Can you give me an

7   example of a study that might not have clinical equipoise?

8   A     So I'll use the asthma example again.  In asthma, if you

9   have a higher severity of asthma, it would be appropriate to be

10  on a daily medication in order to control your symptoms and it

11  would be generally unethical to ask somebody to come off of a

12  controller medication to participate in a study to be able to

13  compare an acute intervention to a control because we know that

14  the controller medications are effective.

15  Q     You mentioned logistical reasons.  When might there be

16  logistical reasons a randomized controlled trial would not be

17  possible?

18  A     So there might be logistical reasons about a site not

19  being able to recruit enough participants in the period of time

20  in which the study would occur, so in general when you're

21  designing a study, you do something called a power calculation

22  to determine how many participants you need and that you would

23  need to have good evidence that you could recruit that number

24  of participants during the study period to be able to move

25  forward.

Q     What does it mean for a study to be double blinded or
double masked?

A     So a study being double blinded means or double masked
would be that neither the investigators nor the participants
knew whether the participants were assigned to the intervention
group or the control group.

Q     Why is that important?

A     So it can be important for a number of reasons.  So
participants might have a preference about whether they want to
be an intervention group or the control group and if they know
or have reason to suspect that they're in the control group,
they might drop out of the study which would affect the
analysis of the study.  It might also affect the way they would
report certain outcomes and that in terms of the investigators,
masking is important because they also might have
precommitments that would lead them to unintentionally evaluate
people differently if they thought they were in the
intervention or in the control group.

Q     Are there times when it would be impossible to mask a
study?

A     There are times when it's not possible.  Very difficult
research involving surgeries would be a particular case in
point if you're going to randomize somebody to get a surgery or
not to get a surgery, they would know.

Q     So you mentioned in some situations it would not be

1    ethical or logistically possible to do a randomized controlled

2    trial.  Are there additional barriers to randomized controlled

3    trials?

4    A    Can you repeat the question, please?

5    Q    You talked a little bit about some of the ethical and

6    logistical barriers to doing randomized controlled trials.  Are

7    there any additional ones?

8    A    Cost would also be a consideration as to whether or not

9    you considered that logistical or not.  But randomized

10   controlled trials are generally more expensive and there might

11   not be sufficient economic resources in order to conduct a

12   randomized controlled trial.

13   Q    Are there additional barriers to pediatric randomized

14   controlled trials?

15   A    So randomized controlled trials are less frequent in

16   pediatrics for a variety of reasons including generally the

17   fewer number of individuals that are affected by a condition,

18   the smaller market for pharmaceutical products in pediatrics,

19   lower NIH funding, and barriers to recruitment of pediatric

20   children into research studies.

21   Q    You said that randomized controlled trials are considered

22   high quality research.  Does that mean -- or does that mean

23   that observational studies should not be relied upon to

24   evaluate medical treatments?

25   A    No.  Observational studies are frequently relied on in

Antommaria - Direct

1   terms of evaluating the efficacy or safety of a medical

2   treatment and at times they may be or in certain conditions

3   they may be the best or most appropriate type of evidence.

4   Q      Are all medical treatments supported by research

5   utilizing randomized controlled trials?

6   A      No, unfortunately.

7   Q      Do doctors make treatment decisions that have not been

8   researched using randomized controlled trials?

9   A      Yes.  Frequently healthcare providers need to make

10  decisions in the care of patients and there are not randomized

11  controlled trials available to support those decisions.

12  Q      Is that frequent in pediatrics?

13  A      Particularly in pediatrics.

14  Q      Can you provide an example of a treatment in pediatrics

15  that has not been researched using randomized controlled

16  trials?

17  A      So, as I said, I'm a pediatric hospitalist, I take care

18  of children admitted to the hospital with asthma.  Very

19  frequently we treat them with Albuterol as a quick-acting

20  medicine to try to relax the muscles around their airway and

21  steroids to decrease the inflammation and try to improve their

22  condition so they can be discharged.  There's ongoing

23  discussion about what type of steroids to administer to

24  hospitalized children, whether giving a longer course of a

25  twice-a-day medication is better or worse than a shorter course

1   of a different steroid medication, and having to make that

2   decision is something that we as providers, I as a provider or

3   our institution as an institution has had to make a decision

4   about without randomized controlled trials for inpatients.

5   Q    Does the absence of a certain type of study researching a

6   treatment mean that there's not sufficient evidence to support

7   the treatment?

8   A    No, there certainly could be sufficient evidence for a

9   treatment absent a particular type of study such as a

10  randomized controlled trial.

11  Q    What would happen if in the medical field treatment was

12  limited to only those treatments that have been studied by

13  randomized controlled trials?

14  A    Much of what I do as a provider or much of what doctors

15  do on a regular basis we would not be able to do.

16  Q    Would limiting treatments to only those that have been

17  studied by randomized controlled trials have an impact on

18  patient welfare?

19  A    It would likely have a substantial negative effect on

20  patient welfare.

21  Q    We've been talking about medical research.  How do

22  doctors use that research to inform their clinical practice?

23  A    So in general, healthcare providers should practice what

24  is called the evidence-based care, so in making treatment

25  decisions, they should use the best available evidence to

Antommaria - Direct

1    inform that care.

2    Q    What are clinical practice guidelines?

3    A    So clinical practice guidelines are summaries of the

4    evidence and recommendations for treatment developed frequently

5    by professional organizations to guide clinicians.  It's not

6    feasible for me as a individual provider to research the

7    evidence base for every single treatment I use.  So having

8    clinical practice guidelines is incredibly valuable in my

9    practice or any healthcare provider's practice in terms of

10   having summaries of evidence and recommendations for treatment.

11   Q    Could you provide some examples of medical professional

12   associations that publish clinical practice guidelines?

13   A    So in my field, the American Academy of Pediatrics

14   publishes clinical practice guidelines in the area of treatment

15   for gender dysphoria.  The Endocrine Society or WPATH, there

16   are a variety of different organizations that publish clinical

17   practice guidelines.

18   Q    How are clinical practice guidelines developed?

19   A    So there are processes for the development of clinical

20   practice guidelines in terms of selecting the body that will

21   develop the clinical practice guideline and managing potential

22   conflicts of interest that those individuals might have,

23   processes for searching the medical literature in order to

24   identify the evidence, and then processes for grading the

25   quality of that evidence and then making recommendations and

1   then disseminating the guidelines.

2   Q    What is a systematic review of the literature?

3   A    A systematic review of the literature would be one of the

4   initial steps in guideline development but also are done

5   independently of guideline development.  So it's a process of

6   searching the literature, identifying relevant studies,

7   summarizing the results of that study, and at times, there are

8   statistical analysis of those pooled results that are performed

9   which are referred to as meta-analysis.

10  Q    What is the difference between a systematic review of the

11  literature and a clinical practice guideline?

12  A    A systematic review of the literature summarizes the

13  evidence base and grades the quality of the evidence, but

14  systematic reviews of the literature do not make treatment

15  recommendations.

16  Q    Why is it useful for clinicians to have recommendations

17  in clinical practice guidelines?

18  A    So knowing the level of evidence doesn't in and of itself

19  tell you what to do that you need to consider the potential

20  benefits and risks of the intervention in addition to the level

21  of evidence supporting the intervention.  And so having

22  recommendations involves significant additional analysis and so

23  it's helpful to have those recommendations.

24  Q    Are there specific methodologies used in developing

25  clinical practice guidelines?

Antommaria - Direct

1    A      Yes, there are.

2    Q      Can you give me an example?

3    A      The most widely used methodology is the GRADE method.

4    Q      What does GRADE stand for?

5    A      GRADE stands for Grading of Recommendations, Assessment,

6    Development and Evaluations.

7    Q      What is the GRADE methodology?

8    A      So the GRADE methodology is a systematic process for

9    grading the quality of evidence and for the strength of a

10   recommendation.

11   Q      Why is it important to know the strength of a

12   recommendation and the quality of the evidence?

13   A      So knowing the quality of the evidence is important in

14   order to then make recommendations, and the strength of a

15   recommendation is based in part on the quality of the evidence

16   supporting the recommendation.  But as a provider, knowing the

17   strength of the recommendation is important because it informs

18   the way that I would interact with a patient relative to the

19   recommendation.  I might have a more extensive conversation

20   with a patient or a patient and their family about a weak

21   recommendation as opposed to a strong recommendation.

22   Q      Is an entire clinical practice guideline given a single

23   grade?

24   A      No.  Individual -- the evidence supporting individual

25   recommendations are given grades and the strength of individual

1    recommendations is graded, not the entire clinical practice

2    guideline.

3    Q     Do guidelines typically have multiple recommendations?

4    A     Typically they do.

5    Q     So you mentioned a grading system for the quality of the

6    evidence.  What are the quality levels of evidence?

7    A     So within the GRADE method, there are four levels:  High,

8    moderate, low, and very low quality.

9    Q     What factors is the quality of evidence grade based on?

10   A     It's based on the study design, the quality of the study

11   as it was performed, consistency if there are multiple studies

12   on the particular topic, and then something called directness.

13   Q     Can you tell me a little bit about what directness is?

14   A     Directness looks at the relationship between the study

15   and the patient or population that's being treated and whether

16   there's, for example, the patient that you're considering would

17   have been eligible for the study or would have met exclusion

18   criteria and, therefore, whether you're in some regards

19   extrapolating the results of the study to a different patient

20   population.

21   Q     You said that one of the factors is the study design.

22   How does the study design inform the quality of the evidence

23   grade?

24   A     So in general, randomized trials are considered high

25   quality evidence and observational studies are considered low

1    quality evidence.  Although there are ways in which those

2    initial gradings can be adjusted up or down based on other

3    factors.

4    Q    So just to break this down in the GRADE system, what type

5    of study design would as a default be considered quality

6    evidence?

7    A    A randomized trial.

8    Q    What type of study design would as a default be

9    considered low quality evidence?

10   A    An observational study.

11   Q    What type of study design would as a default be

12   considered very low quality evidence?

13   A    Other types of evidence such as case reports.

14   Q    As you just explained, those are initial grades only

15   subject to adjustment based on application of the other

16   factors?

17   A    Correct.

18            MR. LESTER:  May I approach, Your Honor?

19            THE COURT:  You can.  While we've got a break in the

20   action, some of this stuff we went over with the last witness,

21   and to the extent we're being cumulative, I'd ask that you skip

22   past those parts unless it's going to be inconsistent with what

23   the previous witness testified to.  So some of this grading

24   information we've already been through.

25            MS. NOWLIN-SOHL:  Yes, Your Honor.

```
 1              THE COURT:  I am mindful that this record isn't just
 2   for me so I understand all that, but to the extent we don't do
 3   things twice would be helpful in me reviewing this record.
 4              MS. NOWLIN-SOHL:  Understood, Your Honor.
 5   BY MS. NOWLIN-SOHL:
 6   Q     Dr. Antommaria, do you recognize this document?
 7   A     I do.  It's the initial publication describing the GRADE
 8   methodology.
 9   Q     Where was this published?
10   A     This was published in the British Medical Journal.
11   Q     Looking at page 4 of this document, on the left-hand
12   column kind of in the center of the page, how does GRADE define
13   low quality evidence?
14              THE COURT:  Before we get any further, let me
15   interrupt.  I've got this marked as Exhibit 6, which is not
16   Exhibit 6.
17              MS. NOWLIN-SOHL:  I am not seeking to have this
18   admitted as an exhibit.  That is a leftover deposition stamp.
19   Apologies.
20              THE COURT:  So I can just mark through Exhibit 6 as
21   to avoid confusion.
22              MS. NOWLIN-SOHL:  Yes, Your Honor.
23              THE COURT:  Got it.  You can start over.  I'm sorry.
24   BY MS. NOWLIN-SOHL:
25   Q     Dr. Antommaria, looking at this, how does GRADE define
```

Antommaria - Direct

1  low quality evidence?

2  A    Further research is very likely to have an important

3  impact on our confidence in the estimate effect and is likely

4  to change the estimate.

5  Q    What do you understand that to mean?

6  A    So research potentially will estimate the effect of an

7  intervention, so if you're an adult and you're taking a statin,

8  you know how much it would decrease your lipid levels and the

9  estimate might range from by decreasing it from say two to four

10  times, and the confidence is reflected by how wide that range

11  is.  And so low quality evidence that the magnitude of the

12  effect would change but also the confidence, the kind of width

13  of that range is likely to get smaller with additional studies.

14  Q    What does this GRADE article say is the definition for

15  high quality evidence?

16  A    That further research is very unlikely to change our

17  confidence in the estimate of effect.

18  Q    What do you understand that to mean?

19  A    That performing additional research is neither likely to

20  change what the estimate of the effect is, nor the confidence

21  that that is an accurate estimate of effect.

22  Q    Does low quality evidence mean that there's a likelihood

23  that treatment will be determined to be not effective in the

24  future?

25  A    No, it does not.

1    Q      Can you tell me why?

2    A      So having uncertainty about the effect is different than

3    having certainty of that something will be ineffective.  So low

4    quality evidence is that we will have some uncertainty about

5    the effect as opposed to having certainty that if additional

6    research was done it would demonstrate that something would be

7    ineffective.  The kind of colloquial way that's framed in

8    medicine, that absence of evidence is not evidence of absence.

9    There's just a difference between being uncertain about

10   something and being certain that something is going to be

11   different or is untrue.

12   Q      Does low quality evidence mean that there's a likelihood

13   that treatment will be determined to not be safe in the future?

14   A      No, it does not.

15   Q      What quality levels of evidence may a recommendation be

16   made upon?

17   A      Recommendations may be made on any of the levels of

18   quality of evidence.

19   Q      You mentioned that the GRADE system also indicates the

20   strength of recommendations.  How is the strength of

21   recommendation evaluated?

22   A      The strength of a recommendation depends on a number of

23   factors including the quality of the evidence, but largely on

24   the balance between the benefits and the risks.

25   Q      What are the levels of recommendation?

1  A      In later work, the GRADE working group refers to strong

2  recommendations and weak recommendations, although they

3  understand that the term "weak" might have inappropriate

4  connotations and that other terms might be better.

5  Q      So looking at page 6 of the document you have in front of

6  you and the left column near the top where it says do it or

7  don't do it, is that the level for a strong recommendation?

8  A      Yes.  So in this document, they don't use the language of

9  strong and weak, they suggest the language of do it or probably

10 do it as the distinction between the types of recommendations.

11 Q      How do they define the do it or strong recommendation?

12 A      As indicating the judgment that most well informed people

13 would make.

14 Q      How do they define the less strong or the probably do it

15 recommendation?

16 A      As indicating a judgment that the majority of well

17 informed people would make but a substantial minority would

18 not.

19 Q      Are there other considerations in making a recommendation

20 besides quality of the evidence?

21 A      So other factors would be the relative risks and

22 benefits, and secondary considerations would include things

23 like cost.

24 Q      Is it common for clinical practice guidelines to make

25 recommendations based on evidence that is graded low or very

Antommaria - Direct

1  low quality?

2  A    I guess it is, particularly in pediatrics.

3  Q    Why are recommendations made based on low or very low

4  quality evidence?

5  A    That may be the quality of evidence that's available to

6  the individuals who are writing the clinical practice

7  guidelines.  As a clinician and a patient presents themselves

8  to me with a condition, I need to be able to treat them at that

9  particular point in time.  I can't tell them to come back later

10  when there's more evidence available.  So clinicians make

11  treatment decisions based on the best available evidence to

12  them at that particular time.

13  Q    Is it common for pediatric clinical guidelines to make

14  recommendations based on evidence that is graded low or very

15  low quality?

16  A    It is.  If you look at the Endocrine Society's two other

17  clinical practice guidelines for pediatric conditions,

18  specifically obesity and congenital adrenal hypoplasia, the

19  majority of recommendations in each of those guidelines are

20  based on low or very low quality evidence or are ungraded good

21  practice statements.

22  Q    Do any of the Endocrine Society guidelines focused on

23  pediatrics have high quality evidence?

24  A    None of the three Endocrine Society guidelines that focus

25  on pediatric conditions have high quality evidence supporting

1  the recommendations.

2  Q     Is not providing medical treatment an affirmative

3  decision?

4  A     It is.

5  Q     If a clinical practice guideline were to recommend not

6  providing medical treatment, would that recommendation need to

7  rely on evidence?

8  A     It would.  So within the GRADE system and making

9  recommendations, it can be a recommendation to do something or

10 not to do something, but a recommendation to either do or not

11 do something should be based on evidence.

12 Q     Are there established ethical principles around medical

13 decision-making?

14 A     There are.

15 Q     Under principles of medical ethics, how does

16 decision-making around medical care for adults generally work?

17 A     So one of the key focuses of ethical decision-making for

18 adults would center around respect for autonomy and would be

19 instantiated in the process of informed consent, so seeking the

20 agreement of the patient in the treatment that is recommended

21 to them.

22 Q     Does the treatment decision ultimately lie with the

23 doctor or with the patient?

24 A     If a patient has medical decision-making capacity, it

25 rests with the patient.

Antommaria - Direct

1   Q      And under principles of medical ethics, how does
2   decision-making around medical care for minors generally work?
3   A      Medical care for minors is more complex because minors in
4   general do not have legal authority to make decisions for
5   themselves or may not have medical decision-making capacity so
6   decisions are made on their behalf by their parents or legal
7   guardians and that children then participate in medical
8   decisions that affect them to the extent that is
9   developmentally appropriate.
10  Q      With whom does the treatment decision ultimately lie for
11  minors?
12  A      So it would generally lie with their parent or legal
13  guardian.
14  Q      What should a healthcare provider disclose to a patient
15  and for minors their parent or guardian to enable them to make
16  an informed decision?
17  A      In general, they would disclose the indication for the
18  intervention, its potential benefits, risks, and the
19  alternatives to the proposed intervention.
20  Q      When the patient is an adolescent, does the patient have
21  a role in the informed consent process?
22  A      Yes.  In general, adolescents have increasing medical
23  decision-making capacity and the term would be that their
24  assent should be sought so their agreement with the proposed
25  course of treatment.

1   Q     You used the term "assent".  What does it mean to assent

2   to treatment?

3   A     So to assent to treatment would be that you have some

4   degree of understanding of the risks, benefits, and

5   alternatives, that you can evaluate those risks and benefits,

6   that you understand what that means in your own life, and that

7   you can express a preference, albeit not as fully as an adult

8   is capable of understanding or appreciating or evaluating.

9   Q     Does assent have any legal consequence?  Let me rephrase

10  that differently.  What's the difference between assent and

11  consent?

12  A     So informed consent would be a legal -- in some ways is a

13  legal category and a requirement.  Assent is in general a

14  ethical obligation on the part of the provider to involve the

15  patient in medical decision-making.  There are some exceptions

16  such as in certain research domains in which assent is also a

17  formal requirement.

18  Q     In general are adolescents able to understand the risks

19  and benefits of treatment?

20  A     So as a general matter, adolescents meaning, say,

21  teenagers are generally able to understand the risks, benefits,

22  and alternatives to an intervention.

23  Q     For adolescents who have the ability to assent to

24  treatment, must parents still provide informed consent?

25  A     In general, yes.

1    Q      Does having --

2              THE COURT:  Are we talking generally now or the

3    treatment at issue?

4              MS. NOWLIN-SOHL:  Generally.

5              THE COURT:  Thank you.

6    BY MS. NOWLIN-SOHL:

7    Q      Does having a mental health diagnosis impair medical

8    decision-making capacity?

9    A      At times it might, but having a mental health diagnosis

10   does not intrinsically mean that an individual lacks medical

11   decision-making capacity.

12   Q      Does the fact that a patient suffers from depression or

13   anxiety mean that they can't assent or consent to treatment?

14   A      No, it does not.

15   Q      So thank you for providing that background on medical

16   research and medical decision-making.  So I'm going to switch

17   now to the specific treatments at issue in this case.  Have you

18   read the Act at issue in this case?

19   A      I have.

20   Q      The Act refers to, quote, gender transition procedures,

21   end quote, but if I refer to the range of care falling within

22   that definition as gender-affirming medical care, will you know

23   what I mean?

24   A      Yes, I will.

25   Q      Do you know what the title of the Act at issue is?

```
 1   A     It is Save Adolescents From Experimentation.
 2   Q     Is gender-affirming medical care as it is being used by
 3   doctors to treat gender dysphoria experimentation?
 4   A     No, it is not.
 5   Q     Are there any clinical practice guidelines regarding
 6   gender-affirming medical care?
 7   A     Yes, there are.  They include the Endocrine Society
 8   clinical practice guideline as well as the World Professional
 9   Association for Transgender Health's clinical practice
10   guideline Standards of Care.
11   Q     What is the Endocrine Society?
12   A     The Endocrine Society is a professional society of
13   endocrinologists and endocrinology researchers.  I believe it
14   has over 15,000 members within the U.S. and internationally.
15   Q     The Endocrine Society guideline that you mentioned for
16   gender dysphoria, does that make recommendations with regard to
17   gender-affirming medical care for adolescents?
18   A     Yes, it does.
19   Q     So now I'm going to show you a document.
20         MR. LESTER:  May I approach, Your Honor?
21         THE COURT:  Sure.
22   BY MS. NOWLIN-SOHL:
23   Q     Dr. Antommaria, do you recognize this document?
24   A     Yes.  It appears to be the first several pages of the
25   Endocrine Society's clinical practice guideline for the
```

1   treatment of gender dysphoric or gender incongruent persons.

2   Q     Do you rely on this document in your professional

3   capacity?

4   A     I do.

5   Q     What methodology does the Endocrine Society guideline

6   use?

7   A     They use the GRADE methodology in terms of grading the

8   quality of the evidence and the strength of the recommendations

9   that they make.

10  Q     So I'm going to have you turn to the fourth page of this

11  packet which at the top says page 3872.

12  A     All right.

13  Q     Looking at the bottom right I think maybe the third

14  sentence from the bottom, what does the Endocrine Society

15  guideline say about strong recommendations?

16  A     The task force which is the group that formulated the

17  clinical practice guideline has confidence that persons who

18  receive care according to the strong recommendation will derive

19  on average more benefit than harm.

20  Q     Is that consistent with the GRADE article we looked at

21  earlier?

22  A     Yes, it is.

23  Q     Looking at that same section, what does the Endocrine

24  Society guidelines say about weak recommendations?

25  A     That weak recommendations require more careful

1    consideration of a person's circumstances, values, and

2    preferences that determine the best course of action.

3    Q     Is that consistent with the GRADE article we looked at

4    earlier?

5    A     Yes, it is.

6    Q     Does weak -- does a weak recommendation mean that

7    benefits do not outweigh the harms?

8    A     No, it does not.

9    Q     Is the Endocrine Society guideline supported by

10   scientific evidence?

11   A     Yes, it is.  The recommendations that are made in the

12   guidelines are supported by scientific evidence.

13   Q     What kind of evidence?

14   A     So in general, the recommendations related to the care of

15   adolescents are supported by low quality evidence.

16   Q     As you discussed before, does low quality have a very

17   specific meaning under the GRADE system?

18   A     It does.

19   Q     Do the studies discussed in the Endocrine Society

20   guideline demonstrate the safety and efficacy of

21   gender-affirming medical care for adolescents?

22   A     They do.

23   Q     Would randomized controlled trials comparing the current

24   treatment recommendation which is gender-affirming medical care

25   and mental healthcare to mental healthcare alone be ethical?

1    A      Not at this time.

2    Q      Why not?

3    A      So neither providers nor potential participants would

4    currently have clinical equipoise between treatment and not

5    receiving treatment, and because potential participants don't

6    have clinical equipoise and would be unlikely to enroll in such

7    a trial, such trials would not be feasible.

8    Q      Was there a time where a randomized controlled trial

9    comparing gender-affirming medical care to not receiving

10   gender-affirming medical care would have had clinical

11   equipoise?

12   A      In the late '90s, early 2000s there may have been

13   clinical equipoise at that particular point in time, but the

14   advent of the prospective observational studies as well as

15   additional clinical experience with treatment have resulted in

16   individuals no longer being in clinical equipoise.

17   Q      Can you provide other examples of treatments where the

18   window of clinical equipoise closed before randomized

19   controlled trials were conducted?

20   A      One of the areas in which I work at Cincinnati Children's

21   is that I oversee the -- that I chair the oversight committee

22   for our fetal care center, so fetal surgery is an active area

23   of development.  There is a randomized controlled trial of

24   fetal surgery for spina bifida, so in fetuses or children who

25   have a hole at the base of their spine.  And it was initially

1   surgery that opened the pregnant individual's abdomen and

2   uterus, removed the fetus, closed the hole, placed the fetus

3   back, closed the uterus and the abdominal wall, and then looked

4   at outcomes after the child was delivered and showed that it

5   was effective.

6           There have been movements since that time to do

7   fetoscopic surgery, so instead of taking the fetus out, to use

8   instruments that go through two or three small incisions to

9   make the repair while the fetus is still in the uterus.  I

10  think that it will be unlikely that there's a randomized

11  controlled trial of open versus fetoscopic surgery because of

12  increasing experience with fetoscopic surgery that clinical

13  equipoise may not -- probably does not currently exist or will

14  not exist before such a randomized controlled trial could be

15  performed.

16  Q    Are there other challenges that a randomized controlled

17  trial comparing gender-affirming medical care to not receiving

18  gender-affirming medical care would be likely to face?

19  A    So in particular the issue of blinding or masking is a

20  significant issue in that, say, individuals who receive puberty

21  blockers or don't receive puberty blockers would know because

22  of whether or not they develop secondary sexual

23  characteristics.  So it would not be possible to mask either

24  participants or investigators.  And within the GRADE

25  methodology even if such a study were ethical, which it is not

Antommaria - Direct

```
 1   currently, it would represent only low quality evidence because
 2   of intrinsic issues regarding the low quality of the study.
 3   Q     So just to make sure I understood that correctly, a
 4   randomized controlled trial on gender-affirming care would not
 5   be considered high quality evidence because of the challenges
 6   you identified?
 7   A     So let me be clear.  A randomized controlled -- a
 8   randomized placebo controlled study would not.  There are types
 9   of randomized controlled studies of gender-affirming healthcare
10   such as comparing different dosing regimes which would be
11   ethical and feasible, but in particular comparing
12   gender-affirming care to a placebo would be low quality
13   evidence because of the difficulty with masking or blinding.
14   Q     Are you familiar with the WPATH Standards of Care?
15   A     I am.
16   Q     What are the WPATH Standards of Care?
17   A     I would describe them as a clinical practice guideline
18   for the care of -- with the language of the current version
19   gender incongruent or gender diverse individuals.
20   Q     Do the WPATH Standards of Care recommendations for
21   gender-affirming medical care for adolescents rely on
22   scientific studies?
23   A     They do.
24   Q     What kinds?
25   A     The same types of studies that we discussed relative to
```

1  the Endocrine Society's guidelines, so they are largely

2  prospective observational studies as well as some

3  cross-sectional studies.

4  Q    Are the WPATH Standards of Care 8 recommendations for

5  gender-affirming medical care for adolescents consistent with

6  the Endocrine Society guideline recommendations?

7  A    Yes, they're largely consistent.

8  Q    Are you aware of any randomized controlled trial studying

9  whether mental health services alone to treat gender dysphoria

10 are effective?

11 A    I'm not aware of any randomized controlled trials for the

12 provision of mental health services alone.

13 Q    What about observational studies?

14 A    Not prospective observational studies.  There are some

15 case reports or anecdotes referred to in the literature, but

16 not observational studies.

17 Q    Defendants' experts rely on systematic reviews of the

18 literature for some of their positions.  Do those systematic

19 reviews of the literature recommend banning gender-affirming

20 medical care?

21 A    As I discussed previously, systematic reviews of the

22 literature do not make recommendations related to treatment.

23 So by definition they don't recommend banning gender-affirming

24 medical care.

25 Q    So how does the evidence base supporting gender-affirming

1  medical care for adolescents compare to the evidence base for
2  other medical treatments for minors?
3  A     It is generally comparable.
4  Q     The defendants raise the issue of potential risks
5  associated with gender-affirming medical treatment.  Are you
6  familiar with the risks?
7  A     I am.
8  Q     What are some of the more significant risks?
9  A     So in terms of the use of puberty blockers, there are
10 concerns about a decreased rate of increase in bone density.
11 So not that people's bone density actually goes down, it just
12 doesn't increase as quickly as it would otherwise, and some
13 speculative risks of increased fractures as older adults.  And
14 concerns that the use of puberty-blocking medications might
15 decrease the options for gender-affirming surgical care later
16 in an individual's life.  In regard to gender-affirming hormone
17 therapy, it would depend on the type of hormone therapy that's
18 provided.  The use of estrogens potentially increases the risk
19 of clotting or of strokes as well as the risk of increased
20 levels of triglycerides and the use of testosterone can cause
21 polycythemia or increased red blood cell count which would be
22 monitored and may cause hypertension as well as other kinds of
23 side effects like baldness.
24 Q     How do the risks of gender-affirming medical care compare
25 to the risks associated with other medical treatments that

Antommaria - Direct

1    adolescents may undergo?

2    A      I should say that gender-affirming hormone therapy also

3    has risks related to infertility, and I would say that the

4    kinds of risks that gender-affirming medical care pose are not

5    categorically different than the types of risks that other

6    types of pediatric healthcare pose.  So in particular related

7    to fertility, there are treatments that are used to treat

8    rheumatologic conditions and kidney diseases in pediatrics that

9    likewise pose risks to fertility in adulthood.

10   Q      Are there chest surgeries that adolescents may undergo

11   besides chest surgery for gender dysphoria?

12   A      There are a variety of chest surgeries that adolescents

13   may undergo including gynecomastia surgery.  So individuals

14   assigned male at birth may have proliferation of breast tissue

15   and they might undergo surgery to reduce that tissue.

16   Individuals may have deformities in their chest wall that their

17   chest either caves in or protrudes and they may have surgery to

18   correct that.  And individuals assigned female at birth may

19   undergo breast reduction or augmentation procedures as

20   adolescents.

21   Q      Are those chest surgeries predominantly about appearance

22   or physiologic function?

23   A      Although in minority of cases they may be performed based

24   on physiological function, in general, they're performed in

25   order to change someone's appearance.

Antommaria - Direct

1   Q      How do the surgical risks of breast augmentation for

2   cisgender girls and gynecomastia surgery compare to the

3   surgical risks of chest surgeries to treat gender dysphoria?

4   A      So in general, the risks are comparable.  So, for

5   example, in gynecomastia surgery, there are risks of bleeding,

6   infection, and poor appearance as a result either of asymmetry

7   or residual tissue left behind.  The main difference in the

8   risk would be the frequency of impairment in breast or chest

9   feeding would be a similar type of risk, but the frequency

10  would be higher in chest surgery for gender dysphoria.

11  Q      That difference in frequency is just to the risk of chest

12  feeding?

13  A      It's predominantly related to that risk.

14  Q      So the other risks that you identified, the frequency of

15  those risks is comparable?

16  A      In generally comparable.

17  Q      What is pectus excavatum?

18  A      Pectus excavatum is when the chest wall colloquially is

19  caved in in an individual.

20  Q      How do the surgical risks of pectus excavatum compare to

21  chest surgery for gender dysphoria?

22  A      There are rare complications of pectus repair which are

23  more severe than the risks entailed in top surgery for

24  individuals with gender dysphoria.  So one of the contemporary

25  ways of repairing pectus is to place a rod underneath the

Antommaria - Direct

1  sternum and there are unfortunately reports of individuals

2  whose hearts are perforated during rod placement and

3  individuals who have died as a result of surgery or who have

4  had severe anoxic brain injury that during the process of being

5  resuscitated from the injury that they received had a period of

6  time in which they got inadequate oxygen to their brains.  So I

7  would say that although that risk is not very frequent, it is

8  certainly a much more severe risk.

9  Q     Act 626 has a carve-out to allow treatments when used

10  with patients with disorders of sex development.  I have a

11  couple of questions about that.  Are there surgeries to change

12  the appearance of genitals on minors with disorders of sex

13  development?

14  A     Yes.  The most frequent surgery would be referred to as

15  feminizing genitoplasty, which would be the surgical procedure

16  to change the appearance of the external genitalia of

17  individuals who are assigned female at birth.

18  Q     And is this a treatment that some doctors perform on

19  minors with disorders of sex development?

20  A     Yes, it is.

21  Q     And is it performed on infants?

22  A     It is performed on infants and young children.

23  Q     Is feminizing genitoplasty performed on infants and young

24  children without their informed assent?

25  A     Yes, it's performed at ages in which the individual who's

Antommaria - Direct

1    undergoing surgery is incapable of providing assent.

2    Q    What is the level of evidence supporting feminizing

3    genitoplasty as treatment?

4    A    A systematic review that was published in 2018 which used

5    the GRADE methodology characterized the evidence base for

6    feminizing genitoplasty as very low quality.

7    Q    Is there any evidence that feminizing genitoplasty can be

8    harmful to the patient?

9    A    There are a substantial minority of individuals who

10   report harm as a result of feminizing genitoplasty including a

11   loss of sensation.

12   Q    Is there disagreement within the medical profession on

13   whether feminizing genitoplasty should be done on individuals

14   who cannot participate in the decision-making?

15   A    Yes, there's substantial ongoing discussion within the

16   medical profession, and some institutions have placed either

17   temporary or ongoing restrictions on performing feminizing

18   genitoplasty.

19   Q    You've talked about the evidence supporting

20   gender-affirming medical care for adolescents.  Is it unusual

21   for adolescent patients and their parents to make decisions to

22   undergo treatments supported by comparable levels of evidence?

23   A    No, it is not.

24   Q    Is it unusual for adolescent patients and their parents

25   to make decisions to undergo treatments with comparable risks?

Antommaria - Direct

1    A      No, it is not.

2    Q      With greater risks?

3    A      At times, yes, greater risks.

4    Q      For treatments where there is evidence of safety and

5    efficacy, how should the medical community respond to concerns

6    about limitations on the evidence?

7    A      Concerns about the limitations on the available evidence

8    should be responded to by improving the evidence base over

9    time.

10   Q      If the law prohibits adolescents from receiving

11   gender-affirming medical care, is it possible to conduct more

12   research on this treatment and gather more evidence in

13   Arkansas?

14   A      My understanding of the Act that we're discussing is that

15   it would both prohibit clinical care as well as further

16   research.

17   Q      So switching gears again, what does it mean to say a

18   medication is FDA approved?

19   A      The FDA approves medications based on its evaluation of

20   their safety and efficacy.

21   Q      What is meant by an indication --

22          THE COURT:  I'm going to go ahead and stop you there

23   before the next question.  We're going to break for lunch as

24   promised.  I know it's a minute before when I said I was going

25   to break, but this seems as good a time as any to break.  We're

Antommaria - Direct

1    going to break till 1:00.  As I mentioned, I need those two

2    seats and where Ms. Cooper is sitting.  Either side, it doesn't

3    matter.  They're creatures of habit and there's six of them and

4    I never know which side of the table, but I can direct them to

5    an open spot.  This particular case will be in recess till one.

6    You can step down and go about your business.

7         (Recess at 11:45 AM.)

8                   REPORTER'S CERTIFICATE

9        I certify that the foregoing is a correct transcript of

10   proceedings in the above-entitled matter.

11

12

13   /s/ Karen Dellinger, RDR, CRR, CCR
     ----------------------------------        Date: October 25, 2022
14   United States Court Reporter

15

16

17

18

19

20

21

22

23

24

25

Direct - Antommaria

1          (Proceedings resumed at 1:03 p.m.)

2               MS. NOWLIN-SOHL:   Shall we retrieve the witness?

3               THE COURT:   Sure.

4               Welcome back.

5               THE WITNESS:   Thank you, sir.

6     BY MS. NOWLIN-SOHL:

7     Q.    Okay.   Dr. Antommaria, before the break we started

8     talking about FDA approval for medications.   Can you

9     remind me what does it mean to say a medication is FDA

10    approved?

11    A.    The FDA approves medications that are proven to be

12    safe and effective.

13    Q.    What is meant by an indication in the context of FDA

14    approval?

15    A.    An indication is for a particular purpose in a

16    particular population, a group of patients and at a

17    particular dose.

18    Q.    If a medication receives FDA approval for an

19    indication, is it only allowed to be used for that

20    indication?

21    A.    No, it is not.   Licensed prescribers are able to

22    prescribe medications for other uses in addition to the

23    indicated use.

24    Q.    Are there limitations on prescribing an FDA approved

25    medication for indications other than the one it was

Direct - Antommaria

1    approved for?

2    A.   Not by the FDA.  The primary restriction is on

3    pharmaceutical companies, that they're not permitted to

4    advertise medications for unapproved indication.

5    Q.   Are prescribers generally free to prescribe a

6    medication for other indications?

7    A.   Yes.  It's at their individual discretion to use a

8    medication that's approved for one indication for other

9    indications.

10   Q.   What does it mean to use an FDA-approved medication

11   off-label?

12   A.   off-label is the colloquial term for using a

13   medication for an unapproved indication or an indication

14   other than the approved indication.

15   Q.   So we've been talking about indication.  Can you

16   explain what it could look like to use an FDA medication

17   off-label?

18   A.   So, again, I'm a pediatrician.  I routinely prescribe

19   medication off-label.  So for example, if I have a patient

20   admitted to the hospital with a bone infection, I may use

21   an antibiotic like nacillin into treat their bone

22   infection.  It is approved by the FDA for use in

23   individuals who are 18 years old and older, but not for

24   individuals who are under 18 years of age.  So even though

25   I routinely prescribe it and my peers and colleagues

Direct - Antommaria

1   routinely prescribe, it is an off-label use.

2   Q.    And I think you said an off-label use would also be

3   using it in a different dosage than it was approved for?

4   A.    Yes.   That's correct.

5   Q.    And off-label usage would also be using it for a

6   different treatment than it was approved for?

7   A.    For a different clinical condition, yes, correct.

8   Q.    Does using a medication off-label mean that there is

9   not evidence supporting its use?

10  A.    No.   It does not mean that.   In fact, there are a

11  number of uses of medication that are off-label that are

12  well supported by evidence, including randomized

13  controlled drugs.

14  Q.    Does using a medication off-label mean that the

15  treatment is experimental?

16  A.    No, it does not intrinsically mean that.

17  Q.    Is it unusual for a medication to be prescribed for

18  indications other than the one it was approved for?

19  A.    It's common for medications to be used off-label.

20  So, again, as a pediatrician, there are studies that show

21  that, in 30 percent of pediatric encounters, a medication

22  is prescribed off-label using very narrow definitions of

23  off-label.   And then in particular, clinical context that

24  number goes up significantly.   So in a pediatric cardiac

25  critical care unit, the rate of off-label use might be 80

Direct - Antommaria

1    percent of medications are being used off-label.

2    Q.    Is off-label used more common in pediatrics?

3    A.    Yes, it is.

4    Q.    If there is evidence that an off-label use is safe

5    and effective, are there reasons a manufacturer might not

6    seek additional FDA approval for additional indications?

7    A.    Yes.   In particular, given the small market share

8    that the pediatric population may represent, may not be

9    cost effective for them to seek approval for additional

10   indications.

11   Q.    You've talked about the Endocrine Society guideline

12   for treatment of gender dysphoric persons and WPATH

13   Standard of Care.   Do those practice guidelines provide

14   that doctors inform families of the potential risks and

15   benefits of treatment?

16   A.    Yes.   They are explicit in their recommendations that

17   individuals should be informed of the potential benefits

18   and risks.   So in particular, the potential impact on

19   fertility is identified and recommendations made that

20   individuals should be counseled regarding potential

21   methods of fertility preservation.

22   Q.    You said earlier that in medicine the decision of

23   whether to undergo treatment ultimately rests with the

24   patient, and in the case of a minor, with their parent or

25   guardian.

Direct - Antommaria

1    Are the Endocrine Society guidelines and the WPATH
2   Standards of Care consistent with that?
3   A.    Yes, they are.
4   Q.    Going back to the informed consent process you
5   discussed earlier for medical decision making for minors.
6   Is there anything about gender-affirming medical care that
7   makes the informed consent process inadequate to enable
8   minor patients and their parents or guardians to make
9   decisions about medical treatment?
10  A.    No, there is not.   The informed consent process is
11  the discussion of the potential indications for the
12  treatment, the risk, benefits, and alternatives, and that
13  can be done for the different modalities of
14  gender-affirming care in the same way it's done for other
15  types of medical treatment.
16  Q.    Does Act 626 have implications for doctor's ability
17  to comply with their ethical obligations?
18  A.    Yes, it does.
19  Q.    Can you tell me more about that?
20  A.    So health care providers have an obligation to
21  benefit their patients, and the Act puts health care
22  providers in the untenable position of not potentially
23  providing medically-indicated treatment to patients that
24  they believe would result in benefit to the patients, or
25  violating the Act and potentially losing their license and

Direct - Antommaria

1  their ability to practice medicine and benefit other

2  patients.

3  Q.    Some of the State's experts have asserted that some

4  doctors are providing gender-affirming medical care to

5  adolescents without appropriate psychological assessments

6  and without properly informing families of risks.

7      If an individual doctor provides treatment in an

8  inappropriate manner or without informed consent, how

9  might that be addressed?

10 A.    There are multiple ways in which in the medical

11 profession that might be addressed.  For example, as a

12 credentialed employee of Cincinnati Children's, if there

13 was a limitation in my practice, there is a professional

14 practice evaluation committee that could evaluate my

15 performance, recommend a remediation plan, and potentially

16 recommend that my privileges at the institution be

17 suspended or withdrawn.  All states have state medical

18 boards that can evaluate accusations of unprofessional

19 conduct and, again, can take disciplinary action against

20 providers, including withdrawing their license.  And there

21 are actions through malpractice, including actions for

22 inadequate informed consent.  There are multiple

23 safeguards against unprofessional practice in this area.

24 Q.    Those are all safeguards that are currently in place

25 to regulate medical providers to ensure appropriate care?

Direct - Antommaria

1   A.   Correct.   They are.

2   Q.   Are you aware of any empirical studies showing that

3   providers are providing gender-affirming medical care

4   without appropriate informed consent?

5   A.   No, I'm not aware of any empirical research

6   demonstrating that there's consistent unprofessional

7   behavior.

8   Q.   Some of the State's experts have attempted to

9   discredit WPATH by asserting that they are not a

10  scientific organization because their membership includes

11  members of the trans community who are not medical

12  professionals.

13       Is the inclusion of other stakeholder groups atypical

14  for research or the development of clinical practice

15  guidelines?

16  A.   So full membership within WPATH is limited to

17  individuals who have professional roles relevant to the

18  welfare of trans individuals.   So full membership is

19  restricted to individuals with appropriate professional

20  backgrounds.   Relevant to the development of SOC 8, the

21  standard -- the eighth version of the Standards of Care

22  document, membership included full members as well as

23  other stakeholders.   The other stakeholders were ten to 15

24  percent of the overall body.   And the inclusion of

25  stakeholders is a important priority in health care.   So

Direct - Antommaria

1    the agreed-to methodology, which is a way of looking at
2    the quality of consensus guideline of clinical practice
3    guidelines, emphasizes stakeholder involvement.  And there
4    are particular research methodologies that emphasize
5    patient involvement, including community-based
6    participatory research.  And there are federally-funded
7    entities such as Patient Centered Clinical Outcomes
8    Institute which emphasize the importance of patients
9    participating in research. And so the involvement of other
10   stakeholders in the development of SOC 8 is consistent
11   with other areas of health care incorporating
12   stakeholders.
13   Q.   So some of the State's experts, in support of their
14   position in favor of Act 626, point to systematic reviews
15   of the literature that describe the evidence base for
16   gender-affirming medical care is limited.
17        What's your response to that?
18   A.   As we discussed this morning, there's significant
19   differences between systematic reviews of literature and
20   clinical practice guidelines.  Systemic reviews of the
21   full literature cannot make treatment recommendation.
22        As a clinician, when a patient comes to me with a
23   concern, I need to address their concern based on the
24   current best available evidence.  I can't tell a patient
25   to come back in five or ten years from now when more

Direct - Antommaria

1    evidence is available.  I need to use the current best

2    available evidence in making treatment recommendations for

3    them.

4    Q.    Some of the State's experts reference a systemic

5    review of clinical practice guidelines by Dallon, et al,

6    in support of the claim that the Endocrine Society

7    guidelines and the WPATH Standards of Care are of low

8    quality.

9          What's your response to that?

10   A.    So the Dallon study looked at chemical practice

11   guidelines using the agreed-to methodology.  The authors

12   of the agreed-to methodology explicitly state that their

13   method cannot be used to make categorical claims about

14   whether a clinical practice guideline is of high or low

15   quality.  So that type of characterization of say SOC 7 as

16   being low quality is an inappropriate use of the Dallon

17   study and is not based on the underlying methodology on

18   which it relies.

19   Q.    Some of the State's expert cite treatment

20   recommendation from government health authorities in

21   Finland and Sweden in support of their position.

22         Are you familiar with those recommendation?

23   A.    I am.

24   Q.    What's your response?

25   A.    Neither Finland nor Sweden ban gender-affirming

Direct - Antommaria

1  health care, and the substantial changes that many of the
2  European countries are making are to make the provision of
3  gender-affirming health care more in alignment with the
4  type of care provided in the United States, including
5  provisions through multidisciplinary teams in regional
6  systems of care.
7  Q.    Do Sweden or Finland's treatment recommendations
8  evaluate the strength of the underlying evidence?
9  A.    So it's somewhat difficult to review the methodology
10  of the Sweden and Finnish documents in full because
11  they're not fully available in English translation, but to
12  the -- for example, to the extent that there is an English
13  language summary of the 2002 Swedish document, it does not
14  appear to be based on as robust a methodology as say, for
15  example, the Endocrine Society's clinical practice
16  guidelines.  Although it does make recommendations, it
17  neither grades the quality of the evidence supporting the
18  recommendations nor the strength of the recommendation
19  that's being made.
20  Q.    Are you familiar with a report from the United
21  Kingdom known as the Cass Interim Report?
22  A.    I am.
23  Q.    Can you briefly describe what that is?
24  A.    So Dr. Cass was asked to review the provision of
25  gender-affirming health care within the United Kingdom.

Direct - Antommaria

1    She has issued an interim report.  I would summarize the

2    main recommendations of her interim report in two regards.

3    One is to develop a regional system of health care

4    delivery of gender-affirming care through

5    multidisciplinary teams.  And the second recommendation is

6    to develop -- is to augment research that's being done in

7    the delivery of gender-affirming care.  But none of her

8    recommendation are to ban gender-affirming care within the

9    United Kingdom.

10   Q.    Some have characterized that report as shutting down

11   gender-affirming care for adolescents in the United

12   Kingdom.  Is that correct?

13   A.    I would says that that's a mischaracterization of the

14   report.  The report actually expands the provision of

15   gender-affirming care within the United Kingdom through

16   the establishment of regional centers.  Although the

17   current center that is delivering care is being closed,

18   that does not represent the shutting down of

19   gender-affirming health care within the United Kingdom.

20   Q.    Just to be clear, did the Cass report advise

21   restricting adolescents access to gender-affirming medical

22   care?

23   A.    No, it did not.  It's expanding adolescents access to

24   gender-affirming health care.

25   Q.    Some of the State's experts rely on other

Direct - Antommaria

1  organization's views about gender-affirming medical care,

2  such as the Society for Evidence-Based Gender Medicine,

3  also known as its acronym as SEGM, rather than Endocrine

4  Society and WPATH.

5      What's your reaction to that?

6  A.  As we've discussed this morning, the Endocrine

7  Society's recommendations are based on -- I'll go back a

8  step.

9      So the Endocrine Society and WPATH's membership in

10  their membership guidelines are very clear.  So, for

11  example, if you go to WPATH's website, you can see all of

12  the members of the organization and their areas of

13  expertise, and that the Endocrine Society and WPATH use

14  robust methodologies to make their clinical practice

15  guidelines.

16      SEGM is not clear and transparent with regard to its

17  membership.  Some of the members of its advisory board

18  have unclear expertise relative to gender-affirming care,

19  including an individual with a PhD in evolutionary biology

20  and another individual with a PhD in biophysics, whose

21  main area of research appears to be in countermeasures to

22  chemical weapons attacks.  And the recommendations that

23  they make are not based on a robust methodology such as

24  the grade methodology.

25  Q.  Dr. Antommaria, you've talked about how treatment

Direct - Antommaria

1    recommendations are made in the field of medicine and the

2    types of evidence used to support and evaluate them.  You

3    also talked about ethical principles of medical decision

4    making and how patients and families are free to make

5    health care decisions even in the face of risks.

6         To summarize, is there evidence supporting the safety

7    and efficacy of gender-affirming medical care?

8    A.    Yes, there is.

9    Q.    Is the amount of evidence supporting gender-affirming

10   medical care comparable to the amount of evidence

11   supporting the other types of pediatric treatments?

12   A.    The quality of the evidence supporting

13   gender-affirming medical care is comparable to the quality

14   of the evidence supporting many other medical treatments

15   within pediatric health care.

16   Q.    Is there anything about gender-affirming medical care

17   for adolescents that warrants singling it out and taking

18   away the care decision from families and doctors?

19   A.    No, there is not.  There's not categorically that is

20   categorically different about gender-affirming medical

21   care that distinguishes it from other forms of pediatric

22   health care.

23         MS. NOWLIN-SOHL:  May I just have one moment,

24   Your Honor?

25         THE COURT:  Sure.

Cross - Antommaria

1    BY MS. NOWLIN-SOHL:

2    Q.   Just one quick clarifying question.

3         Earlier you mentioned -- we were talking about the

4    report -- the study from Sweden, and you mentioned that it

5    was a 2002 study.  Is that accurate?

6    A.   So the most recent Swedish report that I'm aware of

7    was published in 2002 by a federal -- one of its what I'm

8    assuming is the equivalent of a federal health care

9    organization on making recommendations regarding the

10   development of regional centers for the delivery of

11   gender-affirming health care.  I don't have the specific

12   reference from -- in front of me.  I would be happy to

13   provide that to the Court if that would be beneficial.

14           MS. NOWLIN-SOHL:  No further questions.  Thank

15   you.

16                 CROSS-EXAMINATION

17   BY MR. JACOBS:

18   Q.   Good afternoon, Dr. Antommaria.  My name is Dylan

19   Jacobs.  I'm one of the attorneys with the Attorney

20   General's office representing the defendants.  I don't

21   believe we met prior to today.

22        Do you treat patients with gender dysphoria within

23   your own clinical practice?  Let me clarify.  Do you treat

24   patients for gender dysphoria in your own clinical

25   practice?

Cross - Antommaria

1  A.    So I do treat patients with gender dysphoria in my

2  clinical practice as they present with other medical

3  conditions, but I do not treat them for gender dysphoria

4  per se.

5  Q.    So you do not prescribe puberty suppression

6  medications or cross-sex hormones for minors in your own

7  clinical practice, correct?

8  A.    So if a patient was admitted to the hospital who was

9  currently on medication, I would continue it during their

10  hospitalization, but I don't initiate their

11  gender-affirming hormone therapy or monitor the ongoing

12  provision of that therapy.

13  Q.    So same question with regard to psychiatric therapy.

14  You yourself don't prescribe psychiatric therapy in the

15  course of treating patients for gender dysphoria, right?

16  This is not part of your clinical practice?

17  A.    That is correct.

18  Q.    So to the extent that you've been involved in

19  treatments for gender dysphoria, has that been only

20  ethical consultations?

21  A.    So that has been in regard to the establishment of

22  our transgender clinic in our institution.  Its ongoing

23  activities in the care of patients and then my involvement

24  within the care of individual patients has been in regard

25  to individual clinical ethics consultation.

Cross - Antommaria

1  Q.   Outside of this clinical ethical consultations, just
2  to be clear -- strike that.
3       Those clinical ethical consultations, that is the
4  entire universe of your own clinical practice with regard
5  to treating for gender dysphoria, correct?
6  A.   So as a pediatrician, I don't treat patients for
7  gender dysphoria, per se.  And as a bioethicist, doing
8  clinical ethics consultation on gender dysphoria is one of
9  the areas in which I do clinical ethics consultation.
10       I don't -- I don't quite understand the question
11  relative to -- clinical practice relative to clinical
12  ethics consultation.
13  Q.   I think you've answered my question, Doctor.
14       So you remember you testified quite a bit about the
15  grade methodology and its use for the Endocrine Society
16  guidelines.
17       Do you recall that?
18  A.   Yes, I do.
19  Q.   So I believe you -- so you distinguished between a
20  strong versus weak recommendations according to the grade
21  methodology setting that out.  I believe you said that a
22  weak recommendation under the grade methodology indicates
23  there is a substantial minority of practitioners who had
24  not agreed with that recommendation.  Or how did you
25  phrase that answer?

Cross - Antommaria

```
 1   A.    I apologize.  I no longer have the document in front
 2   of me.   The difference between a strong and weak
 3   recommendation is that the strong recommendation would be
 4   that most individuals would be expected to agree with the
 5   recommendation, and that a weak recommendation would be
 6   that, while still the majority of individuals would be
 7   expected to agree with that recommendation, a minority of
 8   individuals may not.
 9   Q.    I think you used the language in your testimony
10   "substantial minority."  Is that accurate?
11   A.    So again, if -- I returned the document.  I was
12   reading from the document.  I don't have it in front of
13   me.   And so that is -- that may be the language that I
14   used, but I hate to commit to a specific words if I'm
15   reading from a document without having the document in
16   front of me.
17   Q.    You think it's fair to say that there is a medical
18   consensus over, say, a specific recommendation if a
19   substantial minority of practitioners disagree with it?
20   A.    I'm sorry.  I don't believe that is the way that the
21   grade methodology describes what a weak recommendation is.
22   In particular, it's not a reference to other medical
23   practitioners, but it's a reference to the individuals for
24   whom the recommendation is being made, specifically
25   patients.  It's not a reflection of professional consensus
```

Cross - Antommaria

1   or lack of professional consensus.

2   Q.    You talked about informed consent and the process for

3   that.   And I think you testified that simply having

4   depression or anxiety doesn't mean that a person is

5   necessarily unable to give informed consent for a medical

6   procedure.   Is that accurate?

7   A.    Correct.   There are empirical studies of individuals

8   with mental illnesses that evaluate their medical

9   decision-making capacity in that individuals who are

10  diagnosed with mental illness do not intrinsically or at a

11  higher rate lack medical decision-making capacity.

12  Q.    But you would agree that having depression or having

13  anxiety can impair a person's ability to give informed

14  consent for medical procedures, right?

15  A.    There may be -- there may be instances in which

16  someone's depression or anxiety symptoms influence their

17  medical decision-making capacity.

18  Q.    Do you recall citing a study in your report in this

19  case, and one of the authors was Wang, that measured

20  between nine and 31 percent of patients with depression

21  being impaired in their ability to give informed consent

22  to medical procedures?

23  A.    So I did cite evidence in my report.   I don't

24  remember specifically off the top of my head right now

25  which studies I cited or the specific results of those

Cross - Antommaria

1  studies.  I apologize.

2  Q.   Do you think 31 percent of patients as a general

3  matter being unable to give informed medical consent is a

4  substantial number?

5  A.   Substantial.  I apologize, but it's hard for me to

6  understand the significance of your question.  If I'm

7  seeking informed consent from an individual, I would need

8  to perform an individual assessment of their capacity.  So

9  that general statistic isn't particularly helpful in

10  making a judgment about an individual patient in front of

11  me from whom I would be seeking informed consent.

12  Q.   I think you testified earlier that you rely on the

13  Endocrine Society guidelines in a professional capacity.

14  Is that correct?

15  A.   Correct.

16  Q.   And how do you do that in terms of your clinical

17  practice?  Do you rely on the Endocrine Society guidelines

18  during ethics consults?

19  A.   Yes.  So the Endocrine Society makes a number of

20  recommendations, some of which have ethical implications.

21  So it's important for me to understand the guideline and

22  the justification for the recommendations that it's

23  making.  In particular, it makes a number of

24  recommendations about the way in which individuals should

25  be involved at different phases of treatment which is

Cross - Antommaria

1  important for me to understand in the context of doing

2  clinical ethics consultation.

3  Q.    So specifically, the Endocrine Society guidelines

4  regarding treatment of adolescents with gender dysphoria,

5  in your own clinical practice, you wouldn't have occasion

6  to rely on those, would you, since you don't treat

7  adolescents with gender dysphoria in your clinical

8  practice?

9  A.    So I'm sorry.  Are you now referring to my clinical

10  practice as a pediatric hospitalist or bioethicist?

11  Q.    The former.  So I'll restate the question.

12      In your clinical practice as a pediatrician, you

13  wouldn't have cause to rely on the Endocrine Society

14  guidelines because you don't treat patients for gender

15  dysphoria, correct?

16  A.    So you're correct that I did previously state that I

17  do not treat patients for gender dysphoria, per se.  I

18  think it's still nonetheless beneficial for me as a

19  pediatric hospitalist to be familiar with the treatment

20  recommendations for individuals with gender dysphoria as I

21  care for them with other medical conditions.

22  Q.    Switching gears a little bit.  You had a lot of

23  testimony on the potential risks of some of the treatments

24  that are at issue in this lawsuit.  So I think you had

25  testimony about whether puberty suppression medications

Cross - Antommaria

1    and hormonal treatments are -- present categorically

2    different risk profiles to other endocrine treatments.

3        Do you recall that series of questions during your

4    direct testimony?

5    A.    Yes.  I've testified about the potential risks of

6    gender-affirming health care as well as their potential

7    benefits.

8    Q.    You mentioned specifically as to fertility there are

9    rheumatological conditions and kidney conditions for which

10   endocrine treatment might have impacts on fertility.

11       Did I summary that correctly?

12   A.    Yes.

13   Q.    Now, are you aware -- well, take a step back.

14       Would you agree with me that gender dysphoria is a

15   psychological condition?

16   A.    So the American Psychiatric Association currently

17   categorizes gender dysphoria as a mental health condition,

18   but the ICD-11 does not characterize it as a mental health

19   condition.  I believe the terminology is a condition

20   related to sexual health.

21   Q.    So I think we've had testimony and see if you agree

22   that it's -- when a practitioners is treating gender

23   dysphoria, that the goal for treatment is to alleviate

24   psychological distress that is caused by gender dysphoria.

25       Is that how you understand treatment for gender

Cross - Antommaria

1  dysphoria to work?

2  A.    That is one of the possible constructions of the goal

3  for treatment.  I don't believe that that is currently the

4  way that SOC 8 characterizes the goal of treatment.

5  Q.    Is there another goal of treatment besides

6  alleviating psychological distress that you're aware of?

7  A.    The positive construction would be promoting an

8  individual's comfort in terms of the relationship between

9  their gender identity and their physical body.

10  Q.    So under your understanding of the Endocrine Society

11  Guidelines and the WPATH Standards of Care as they apply

12  to treatment for adolescents, so is it -- is it your

13  understanding that psychological distress caused by gender

14  incongruence is a necessary requirement for a diagnosis of

15  gender dysphoria?

16  A.    So under the DSM, a clinically significant level of

17  dysphoria is a necessary component of a diagnosis of

18  gender dysphoria.

19  Q.    Would you agree with me that, when a provider is

20  attempting to alleviate a patient's distress associated

21  with gender dysphoria, that they're treating a

22  psychological issue?

23  A.    Can you help me understand what you mean by

24  "psychological issue"?

25  Q.    What do you -- what would you say?

Cross - Antommaria

1   A.    So one's gender identity is based on one's internal

2   sense of one's gender.  And so, yes, it's addressing their

3   psychological states.

4   Q.    So going back to endocrine treatments, you mentioned

5   rheumatological conditions and kidney conditions,

6   treatments for which can impact fertility in children.

7        Was that your testimony?

8   A.    It was.

9   Q.    Are you aware of any Endocrine Society Guidelines on

10  treatments for psychological conditions where an impact on

11  fertility is a risk?

12  A.    So the Endocrine Society has a number of clinical

13  practice guidelines, only two of which are applicable to

14  the pediatric population in which I'm familiar.  So I

15  don't know that I can generally answer your question about

16  the comprehensive scope of the Endocrine Society's

17  guidelines.

18  Q.    Limit the Endocrine Society Guidelines that apply to

19  treatments of adolescents.  Other than treatments for

20  gender dysphoria, are you aware of any Endocrine Society

21  Guidelines regarding treatment recommendations for

22  psychological conditions that pose a risk to fertility?

23  A.    So the two other Endocrine Society Guidelines of

24  which I'm familiar that apply to pediatric patients are

25  their guidelines related to obesity and their guideline

Cross - Antommaria

1   related to the treatment of congenital adrenal

2   hyperplasia.  And I'm not aware of that either any of the

3   treatment recommendations in either of those guidelines

4   have negative impacts on fertility.

5   Q.   So you also talked about surgical procedures.  So one

6   of them I think was pectus excavatum.

7        Did I pronounce that right?

8   A.   Yes.

9   Q.   So that is the treatment of the condition where the

10  chest wall is caved in, for a colloquial description?

11  A.   Yes.  That the sternum or the central part of the

12  chest is lower than the rest of the chest.

13  Q.   Are you aware of any reports of patients having the

14  surgery complication-free and later regretting having the

15  procedure?

16  A.   So it's hard for me to answer that question because I

17  haven't reviewed the literature for that particular

18  outcome.

19  Q.   So the answer is, sitting here today you're not aware

20  of what I asked?

21  A.   So sitting here today, I'm not aware of any reports

22  of regret, which is not to say that they don't exist in

23  the literature.

24  Q.   So same question with gynecomastia.  Assuming surgery

25  is complication free, are you aware of reports of boys

Cross - Antommaria

1  later who regret that they had gynecomastia surgery?

2  A.    So, again, I didn't review literature for that

3  particular outcome, so it's hard for me to answer your

4  question.   But as I sit here today, no, I'm not aware of

5  individuals who had uncomplicated surgery who regret

6  undergoing that surgery.

7  Q.    Moving on to the discussion of FDA approval.   As you

8  understand the FDA approval process, it attempts to ensure

9  the safety and efficacy of a drug.   Is that an accurate

10  description of what that process is for?

11  A.    So the FDA approves both drugs and devices, but

12  relative to both drugs and devices, it's making a

13  determination of the safety and efficacy.   I think it's

14  important to say that safety doesn't mean that there are

15  not adverse effects of either a drug or device, but that

16  the benefits of the drugs or device outweigh the potential

17  risks.

18  Q.    Would you describe the FDA approval process for drugs

19  as rigorous?

20  A.    So the FDA approval process for drugs generally

21  requires two randomized control trials.

22  Q.    You've testified that the medications used and the

23  treatments at issue in this lawsuit are all prescribed

24  off-label when they're being prescribed for gender

25  dysphoria, right?

Cross - Antommaria

1    A.    Correct.

2    Q.    And they're able to be prescribed off-label because

3    the medications have been FDA approved for other

4    indications in the past, right?

5    A.    That is correct, but, for example, the approval of

6    GnRH analogs for the use of central precocious puberty

7    isn't based on two randomized controls trials because

8    there are not randomized control trials of that condition.

9    Q.    So this may be, I don't know, a wild assumption, but

10   try and assume with me that all the medications at issue

11   here, so are GnRH agonous, testosterone, estrogen,

12   progesterone, androgen blockers, assume for the purpose of

13   this question that they never been FDA approved.  You

14   can't testify, can you, that based on the evidence you've

15   reviewed about the safety and efficacy of these drugs that

16   you know they would get FDA approval if they had to go

17   through that process for the indication of treatment for

18   gender dysphoria, can you?

19   A.    Can you restate your question, please?

20   Q.    So assume -- I'll get my assumption out -- that none

21   of the medications that were -- have been discussed during

22   the course of this trial had received FDA approval.  And I

23   realize they have, but assume with me that they have not.

24   Can you do that?

25   A.    I think that's a very different world than the world

Cross - Antommaria

1  in which we're living so I think it's hard for me to make

2  that assumption given that estrogen and testosterone have

3  been utilized since the '50s.

4  Q.   Sure.  I recognize this may be a wild assumption, but

5  I'm asking you to make the assumption for this

6  hypothetical.

7       Can you agree to do that for me?

8  A.   I can try.

9  Q.   So you've testified that you are familiar with the

10 literature regarding the safety and efficacy of treatments

11 for gender dysphoria using these medications, right?

12 A.   Correct.

13 Q.   Can you testify that, based on your knowledge of the

14 available literature on the safety and efficacy of these

15 drugs, that, if companies were to seek FDA approval for

16 the indication of treating gender dysphoria, that they

17 would receive that FDA approval?

18      THE COURT:  Mr. Jacobs, I don't understand the

19 whole context of the question.  You're telling -- you're

20 asking him to assume that the FDA never approved

21 testosterone but would they approve it now if it was

22 submitted?

23      MR. JACOBS:  Basically, Your Honor.  The premise

24 of my question is, if testosterone had never been approved

25 for medical use and pharmaceutical companies were trying

Cross - Antommaria

1  to get it approved today for treatment of gender

2  dysphoria, whether -- based on the evidence we have about

3  safety and efficacy, whether the FDA would approve it for

4  that indication.

5          THE COURT:  How can he speculate as to that?

6          MR. JACOBS:  I don't know.  Maybe he can't, but

7  that was my question.

8          THE COURT:  I guess I understand your question

9  now, but it seems to me you're asking me, would a drug be

10  approved that we know is approved as of now for general

11  use, would it be approved if asked to be approved -- go

12  ahead.  If you can answer that question, sir, go ahead.

13          THE WITNESS:  It's impossible for me to answer

14  your question because the evidence that we currently have

15  available is only available because the medication is able

16  to be used for off-label uses.  In order to -- for an

17  unapproved drug, you have to go through a fundamentally

18  different process in order to submit a -- to be able to

19  get permission to use that medication in a clinical trial.

20      So the world that you're describing in your

21  hypothetical is a world in which the evidence that we

22  currently have doesn't exist, so it's hard to speculate

23  about what the outcome would be because the evidence we

24  have wouldn't exist if these medications weren't approved

25  for other indications.  It's such a foreign world that

Cross - Antommaria

1   it's not possible to speculate what the FDA would or would

2   not have done.

3   BY MR. JACOBS:

4   Q.   You talked a little bit about informed consent, how

5   -- what the Endocrine Society Guidelines and the WPATH

6   Standards of Care have to say about informed consent for a

7   treatment for gender dysphoria.

8        Do you recall that testimony?

9   A.   I do.

10   Q.   Do you have any specific knowledge of what providers

11   in Arkansas who are treating adolescents with gender

12   dysphoria do in terms of getting informed consent from

13   their patients?

14   A.   Can you state that question again, please?

15   Q.   Do you know whether -- I'll back up and say this.

16        Do you know whether the providers in Arkansas who are

17   providing treatments for gender dysphoria are following

18   the Endocrine Society Guidelines or the WPATH Standards of

19   Care?

20   A.   I have no firsthand knowledge about individual

21   providers within Arkansas, although the norms and

22   standards are not unique to Arkansas.

23   Q.   So same question about informed consent in

24   particular.  You don't have any firsthand knowledge of how

25   providers in Arkansas providing treatment for gender

Cross - Antommaria

1  dysphoria go about getting informed consent from their

2  patients, right?

3  A.    So the ethical standards for obtaining informed

4  consent are the same in Arkansas as they are throughout

5  the US, but, no, I've not observed individual providers in

6  Arkansas seeking to obtain informed consent from their

7  patients.

8  Q.    I think you talked about a few other ways, I guess,

9  I'd summarize it as addressing provider misbehavior or

10  malpractice.  I think one of those was medical review

11  boards.  Do you recall what the other options you

12  mentioned in your direct testimony were?

13  A.    So I would characterize it as unprofessional conduct

14  or malpractice, and there are mechanisms within health

15  care organizations to address unprofessional behavior, as

16  well as within state medical boards, and that malpractice

17  is handled within the legal system.

18  Q.    So for medical board review, would you agree with me

19  that a medical board taking action against a provider

20  generally happens after the provider has taken an action

21  that may be unprofessional or unethical?

22  A.    Yes.    Reports to the medical board would be reports

23  of past behavior which was unprofessional.

24  Q.    Same thing for a hospital's medical review board;

25  that the behavior would be reported after it happened and

Cross - Antommaria

1  any interventions would occur after the behavior happened

2  necessarily, right?

3  A.   So actions regard to an individual provider would be

4  after their behavior occurred.  The potential threat of

5  action on behalf of the -- by the state medical board is

6  likely to influence prospective behavior and there are

7  other norms and expectations that influence prospective

8  behavior on the part of providers.

9  Q.   And same question with regard to medical malpractice

10 lawsuit.  In your experience can you sue a medical

11 provider for something they haven't done yet for

12 malpractice?

13 A.   No.  A lawsuit would be filed after an accusation,

14 but the threat of a malpractice lawsuit has ongoing affect

15 on provider behavior before they engage in behavior.

16      MR. JACOBS:  If I can have a moment, Your Honor.

17 I think we're --

18      THE COURT:  Sure.

19 BY MR. JACOBS:

20 Q.   So I think you said in your testimony that the use of

21 a medication off-label is not -- does not necessarily make

22 that an experimental use of the medication, correct?

23 A.   Correct.  The implication that is drawn in many of

24 the criticisms of the gender-affirming health care is the

25 implication that, because the medications are being used

Cross - Antommaria

1  off-label, that it is somehow inappropriate or

2  investigational.

3  Q.   But in general an off-label use of a medication could

4  in the abstract be experimental, right?

5  A.   So there are --

6          MS. NOWLIN-SOHL:  Objection.  Vague.

7          MR. JACOBS:  If he thinks it's vague, he can

8  clarify.

9          THE COURT:  I'm just reading my real-time.

10         MS. NOWLIN-SOHL:  He asked in general and in the

11 abstract --

12         THE COURT:  I'm reading it.

13     Give it a whirl.

14         THE WITNESS:  So there certainly are clinical

15 trials of off-label uses of medications, but when a

16 clinical trial of the off-label use of a medication is

17 being performed, it's very well circumscribed as research

18 and would require institutional review prior to approval.

19         MR. JACOBS:  I think that's all I've got, Your

20 Honor.  Pass the witness.

21         MS. NOWLIN-SOHL:  No redirect, Your Honor.

22         THE COURT:  Go be free.

23         THE WITNESS:  Thank you, sir.

24         MR. STRANGIO:  Your Honor, our next witness is

25 parking his car, so we're trying to move this along.  That

Cross - Antommaria

1    was our last expert, but we do have a fact witness coming

2    in.  So if we could --

3              THE COURT:  Who is your next witness?

4              MR. STRANGIO:  Our next witness Donny Ray

5    Saxton.

6              THE COURT:  Donny Ray?

7              MR. STRANGIO:  Yes.

8              THE COURT:  Okay.

9              MR. STRANGIO:  We just --

10             THE COURT:  We'll await his arrival.

11             MR. STRANGIO:  Thank you very much.

12        (Pause in the proceedings.)

13             MS. ECHOLS:  Your Honor, our witness is here.

14             THE COURT:  Good afternoon.

15             THE WITNESS:  Good afternoon.

16             THE COURT:  What's your name?

17             THE WITNESS:  Donny Ray Saxton.

18             THE COURT:  Do you swear to tell the truth?

19             THE WITNESS:  Yes, sir.

20             THE COURT:  Have a seat.

21             MS. ECHOLS:  Your Honor, the defendants have

22    agreed to stipulated Exhibit Number 6.

23             THE COURT:  Defendants' 6?

24             MS. ECHOLS:  Plaintiffs' 6.

25             THE COURT:  All right.

Direct - Saxton

```
 1          MS. ECHOLS:  May I approach, Your Honor?
 2          THE COURT:  Sure.  I think it's already in, but
 3   go ahead.
 4        DONNY RAY SAXTON, PLAINTIFF WITNESS, DULY SWORN
 5                      DIRECT EXAMINATION
 6   BY MS. ECHOLS:
 7   Q.   Would you please state your full name for the court?
 8   A.   Yes, ma'am.  My name is Donny Ray Saxton.
 9   Q.   Do you have children?
10   A.   Yes, ma'am.
11   Q.   How many children do you have?
12   A.   There are five of them.  There's four biologicals and
13   then baby sister that I've helped raise.
14   Q.   Can you say your children's names and ages?
15   A.   Yes, I've got Keely, 22.  Parker is 17.  Abigail is
16   16.  Emma is 15.  And little Lana Tackett is 14.
17   Q.   Do you have sole custody of Parker and his younger
18   sisters?
19   A.   I have custody of Parker, Abigail and Emma.  Lana
20   lives with her biological aunt.
21   Q.   How long have you had sole custody of the children?
22   A.   Since my divorce, about ten years ago or so.
23   Q.   As custodial parent, are you tasked with making
24   decision for the children?
25   A.   Yes, ma'am.
```

Direct - Saxton

1  Q.   What grade is Parker in?

2  A.   He's a senior this year.

3  Q.   Can you describe Parker?

4  A.   Yeah.  Now, he's a cool kid.  He loves his choir, his

5  friends, his art, and he loves birthdays.  Everybody's

6  birthday -- if you got a birthday, he's the man.

7  Q.   Is Parker involved in activities?

8  A.   Yes, he is.  He's a -- he is member of a program

9  called EAST that does some volunteering around in our

10  community, he's active in choir, and also in a special

11  choir through his school.

12  Q.   Does Parker have plans for after high school?

13  A.   Yeah.  I'm actual happy to say that he wants to be a

14  social worker.

15  Q.   What was Parker's assigned sex at birth?

16  A.   He was assigned female.

17  Q.   Does Parker identify as female today?

18  A.   No, ma'am.

19  Q.   What is Parker's gender?

20  A.   He's male.

21  Q.   When did Parker tell you he was male?

22  A.   He come out to me in the end of 2019.

23  Q.   How did Parker tell you?

24  A.   Through a letter, a pretty heartfelt letter

25  explaining his situation, his inner feelings, and it was

Direct - Saxton

1    -- it was -- it was a long letter, but it was a good read.

2    And that was when he explained to me that he didn't want

3    to be referred to in the feminine and to please

4    acknowledge that.

5    Q.    What did you think when you read the letter?

6    A.    At that point, a lot of things came clear.  You know,

7    that explained a lot.  So that gave us a stepping off

8    point so I was -- I was pretty relieved and hopeful.

9    Q.    Were you surprised?

10   A.    I wasn't really surprised, no, ma'am.

11   Q.    Why not?

12   A.    Well, he's already -- he'd already started dressing

13   more masculine, cut his hair off.  I had been finding

14   multiple sports bras put together.  I assumed was, you

15   know, to hide his curves.  So it wasn't really surprising.

16   Q.    You testified that Parker was involved in choir.

17   What does he wear for choir?

18   A.    Oh, he wears tuxedo.  Yeah, that's pretty cool.

19   Q.    Can you explain how that came about?

20   A.    Right.  So in ninth grade, he decided he wanted to be

21   in choir.  He had worked alongside some of the other

22   students in choir and he was in band at the time.  Well,

23   he decided that he wanted to try out for choir.  And as

24   they went along, he soon realized that he would be needing

25   to wear a dress to continue, and so we had to address

Direct - Saxton

1   that.   That was a big deal.

2   Q.   What was Parker's mood and behavior like at home

3   before he came out to you?

4   A.   It was dark, anxiety, depression.   He didn't -- I

5   mean, he didn't socialize.   He wouldn't answer his phone

6   for his best friends, you know, a lot of times.   It was

7   real troubling to watch.

8   Q.   When did you start seeing this behavior?

9   A.   Right around puberty.   It was a -- it was a fairly

10  rapid decline if I'm being honest.   It was alarming.

11  Q.   How did Parker react to his changing body?

12  A.   He tried to hide.   As I said before, the multiple

13  sports bras, baggy clothing, everything was a hoodie.

14  Yeah.   Short hair.

15  Q.   How did he respond to his reflection?

16  A.   He would -- he would oftentimes cover the -- cover

17  the mirror.   At that time, the bathroom that he was using

18  to get out of the shower, there was a large mirror there

19  so he would stickpin a towel over where he didn't have to

20  see his reflection when he got out.

21  Q.   Did he like using the restroom in public?

22  A.   He hasn't used a public restroom since preschool.

23  Q.   How did that impact Parker and your family?

24  A.   We, obviously, had to make accommodations for that on

25  any trips.   You know, anything over three or four hours

Direct - Saxton

1  was, we would have to spend the night.  If it's somewhere
2  we'd been before that had, like, a family restroom or
3  something, it had to been an emergency, but pretty much we
4  had to spend the night or plan a day trip.
5  Q.   What, if anything, did you do to address these
6  behaviors you were seeing in Parker before he came out?
7  A.   Before he came out.  Yes, we -- I had spoke to his
8  guidance counselor at school, and that's when we were
9  referred to Pinnacle and we started seeing a therapist
10  there.
11  Q.   Did Parker also see a psychiatrist at Pinnacle
12  Pointe?
13  A.   Yes.  After about three or four months.
14  Q.   What was the psychiatrist's name?
15  A.   That was Dr. Conley.
16  Q.   Did Dr. Conley prescribe any medications for Parker?
17  A.   A little ways down the road, yes, Dr. Conley
18  prescribed Zoloft for anxiety, depression.
19  Q.   After Parker came out to you, what did you do to
20  support him?
21  A.   That's when we -- you know, of course, I let him know
22  that I was there for him and that, you know, I loved him
23  and he meant the world to me.  And then I wanted -- you
24  know, we needed to figure out -- at that time, I didn't
25  have a clue what transgender meant outside of what we see

Direct - Saxton

1  in the news and everything.  So I was -- I was pretty much

2  -- had to wake up to that, so.

3  Q.    Did you go to counseling with Parker?

4  A.    Yes.  We -- that's when we started talking to the

5  counselor about that and made, you know, adjustments

6  because, like I said, we actually had somewhere to go

7  from, you know, as compared to before.

8  Q.    Were you referred to the Gender Spectrum Clinic?

9  A.    Not immediately, but, yes eventually.

10  Q.    Who made that referral?

11  A.    That would have been Dr. Conley.

12  Q.    When was your first contact with the Gender Spectrum

13  Clinic?

14  A.    That was in June of 2020.

15  Q.    And who did you speak with initially?

16  A.    That was when I we spoke with Kristin -- Kirsten.

17  I'm sorry.

18  Q.    Did Kirsten do an assessment?

19  A.    Kirsten talked to us about what they did down there

20  and actually set us up, you know, with an appointment and

21  said, you know, that might be somewhere that we could go,

22  because at that time we had no supportive reference.  All

23  we had was what was inside of Parker.

24  Q.    When was Parker's first visit to the clinic?

25  A.    That was about a week later.

Direct - Saxton

1   Q.    What happened at that visit?

2   A.    That's where we met Dr. Hutchison and Sean, the nurse

3   at the time.  Sweetest thing.  We met the chaplain.  We

4   met the entire staff.  Of course, we met face to face with

5   Kirsten that day.  It was -- it was -- they were very,

6   very open and hospitable to us and that meant a lot.

7   Q.    Did Parker meet with Dr. Hutchison that day?

8   A.    Yes, ma'am, he did.

9   Q.    Did you discuss any specific treatments with Dr.

10  Hutchison that day?

11  A.    We talked about -- we went further into what the

12  Gender Spectrum Clinic did and we talked about, you know,

13  some things that was going on.  Parker described, you

14  know, that he had a lot of anxiety around his menstrual

15  cycle, around his period.  So we addressed that.

16        Dr. Hutchison said that, you know, what she felt and

17  that -- of course, that maybe we should address the

18  menstrual thing first so we could advance with a clear

19  head, in other words.

20  Q.    Did Dr. Hutchison explain what treatment that she

21  would recommend to stop the period?

22  A.    Yes.  At that point, she said that Depo-Provera had

23  been pretty successful and that a lot of times that was

24  the furthest that, you know, step that they had to take

25  there.

Direct - Saxton

1  Q.   Did she explain the potential risks and benefits to

2  the use of Depo-Provera?

3  A.   Yes, ma'am, she did.

4  Q.   What, if any, concerns did you have about the

5  Depo-Provera?

6  A.   I really didn't have any.  My younger daughter had

7  been on Depo since 12 so it had worked for -- it served

8  its purpose.

9  Q.   Did you consider the use of testosterone at that

10  time?

11  A.   No.  We talked about it, but at that point, like I

12  said, Dr. Hutchison said, you know, that the program was

13  -- wasn't about that kind of stuff, that it was more about

14  treating -- finding the -- finding the source and treating

15  from there, so.

16  Q.   Were either you or Parker ready to take that step at

17  that time?

18  A.   For me, that was -- that was no.  No.  I was still

19  new to understanding.  I was researching for my child, so.

20  Q.   Was Parker prescribed Depo-Provera during that visit?

21  A.   Yes, he was.

22  Q.   Did the Depo-Provera help Parker?

23  A.   It really did help.  It helped the -- there was some

24  really low lows among the depression.  The depo kind of

25  leveled that off, but it was -- you know, it was -- it was

Direct - Saxton

1   what it was.

2   Q.   Did the Depo-Provera fully address Parker's gender

3   dysphoria?

4   A.   No.   Unfortunately, no.

5   Q.   How do you know?

6   A.   We still -- we still had the depression, the social

7   anxiety, a lot of compulsive bathing and hand washing, the

8   reflection -- the aversion to his reflection.   There was

9   several things.

10  Q.   Has Parker visited the Gender Spectrum Clinic since

11  that first visit in 2020?

12  A.   Yes.

13  Q.   How frequently does he attend?

14  A.   That's about every three months.

15          THE COURT:   Mr. Saxton, I know you're

16  anticipating what her questions are, but my court reporter

17  is taking down everything y'all say.   So if you can wait

18  for her to finish before you start to help her sort things

19  out.

20          THE WITNESS:   Absolutely.

21          THE COURT:   Thank you.

22  BY MS. ECHOLS:

23  Q.   What happened at your regular visits?

24  A.   That was when -- that was when we'd usually see

25  Dr. Hutchison.   We kind of talk about how we were feeling,

Direct - Saxton

1  you know, and if everything was working.  Of course, the

2  routine blood pressure, this and that.  And we'd just talk

3  and have a great visit, and she'd always ask us if there's

4  anything we -- else that we needed, that she could do for

5  us.

6  Q.    And did Parker receive his Depo-Provera shots at

7  those visit?

8  A.    Yes, ma'am.

9  Q.    Did there come a time when Parker expressed interest

10 in taking testosterone?

11 A.    Yes, ma'am.  He expressed interest probably three or

12 four months after the first visit.  After Depo had really

13 started working and he was able to think more clearly, I

14 believe.  He started researching testosterone and he had a

15 pretty comprehensive assessment of it that he brought to

16 me when he made his case.

17 Q.    Did you agree that testosterone was appropriate for

18 Parker?

19 A.    After all the counseling and talking to everyone, I

20 really wanted to give it a try.  I really thought that

21 that was where we needed to be.

22 Q.    What happened next?

23 A.    That was when we actually talked to Dr. Hutchison on

24 the phone and that's -- it was kind of at the height of

25 COVID.  A lot was going on with that.  That's when she

Direct - Saxton

1  said we will talk about the next time that you come in.

2  Q.   And when was the next scheduled appointment?

3  A.   That was in April of 2021.

4  Q.   Who were you scheduled to see in April of 2021?

5  A.   We were going to go ahead and get a psychological

6  exam was what we were anticipating.

7  Q.   And did you understand that was a step before Parker

8  could begin the testosterone treatments?

9  A.   Yes.

10  Q.   Did Parker see a psychologist at the Gender Clinic?

11  A.   Yes, ma'am.

12  Q.   Did the psychologist confirm Parker's diagnosis of

13  gender dysphoria?

14  A.   Yes, ma'am, she did.

15  Q.   What, if anything, else was required before Parker

16  could begin testosterone?

17  A.   Sure.  Of course, there was the pregnancy test that's

18  always, you know, no matter what.  There was blood work,

19  of course, the psychological evaluation.  And we had to

20  sit down and make sure that we talked it through so that

21  we knew everything that testosterone entailed.

22  Q.   Would you talk that through with Dr. Hutchison?

23  A.   Yes.

24  Q.   Did you and Parker make the decision to begin

25  testosterone?

Direct - Saxton

1  A.   We did.

2  Q.   And when was that decision made?

3  A.   That was May 27 of 2021.

4  Q.   Was that at a regularly-scheduled appointment?

5  A.   It was.

6  Q.   Before moving forward with the testosterone, did you

7  become aware of House Bill 1570?

8  A.   We did.   That was while we were waiting on that

9  appointment to see the psychologist.

10 Q.   What was your understanding of what the bill would

11 do?

12 A.   My understanding was that it would shut down any of

13 that gender-affirming care that Parker had been receiving

14 or was anticipating.

15 Q.   Was Parker aware of House Bill 1570 at that time?

16 A.   Yes, he was.

17 Q.   How did Parker respond to the legislation?

18 A.   His words were -- I'm not sure if I'm supposed to say

19 what he says, but he --

20          THE COURT:   I suspect we've heard it all before.

21          THE WITNESS:   I appreciate that.

22     He said, I feel like we've done all of this for

23 nothing, and he went to a -- right back to the deep, dark

24 place he had been.

25 BY MS. ECHOLS:

Direct - Saxton

1  Q.   What kind of behaviors were you seeing at that time?

2  A.   It's really hard to say because he was so withdrawn

3  and isolated.  He was broken.

4  Q.   What, if anything, did you do?

5  A.   I reassured him and told him that we would figure out

6  whatever we needed to figure out and that don't give up.

7  I started sleeping on the couch, you know, as close to him

8  as I could.

9  Q.   Why did you think that was necessary?

10  A.   Well, I just didn't know.  I mean, he's a loving

11  soul, but you never know when it's someone that's that far

12  down.  You just really don't.  You worry a lot.

13  Q.   Were you afraid he would hurt himself?

14  A.   I was -- I was very fearful of that.

15  Q.   Did you do anything else to help keep him safe?

16  A.   Everything I could.  I mean --

17  Q.   Did you seek additional treatment for him?

18  A.   We did.  We went back to see Dr. Conley.  That's when

19  he got on Prozac, you know, and that was to him he -- he

20  didn't want to do that, but that's what we did.

21  Q.   Did you keep your May 2021 appointment at the Gender

22  Spectrum Clinic?

23  A.   You bet we did.

24  Q.   What, if anything, happened at that appointment?

25  A.   That's when we actually started testosterone.  We had

Direct - Saxton

1  official diagnosis, we went over everything, and we

2  started testosterone that day.

3  Q.    Did Dr. Hutchison discuss the potential risks and

4  benefits of testosterone with you and with Parker?

5  A.    Extensively, yes.

6  Q.    Did Dr. Hutchison explain the potential risks to

7  Parker's fertility?

8  A.    Yes, she did.

9  Q.    Did Parker have any concerns about that?

10  A.    Parker has always believed that there's lots of ways

11  to make a family, so he thought about that for almost a

12  year.  So we're good.

13  Q.    After receiving the information from Dr. Hutchison

14  did you and Parker still want to proceed?

15  A.    Yes, we did.

16  Q.    Can you describe how taking testosterone has affected

17  Parker?

18  A.    He is a new person, a completely -- a complete

19  turnaround of the broken, depressed, anxious, shell that

20  he was before testosterone.  It's amazing.  Truly amazing.

21  Q.    Does he have more confidence than he did before?

22  A.    He's got huge confidence, almost too much at times,

23  but that's good.  He's kind like his old dad, so it's

24  good.

25  Q.    Can you give some examples of his increase in

Direct - Saxton

1  confidence while taking the treatments?

2  A.   One big thing was -- that really stands out to me is

3  him volunteering and being selected to read some of the

4  names of the fallen first responders at the 911 memorial

5  this year.  It was a pretty good crowd and he was really

6  confident and really his voice was strong.  I mean, he's

7  my hero.

8  Q.   Do you think he would have been able to do that

9  without the treatment?

10  A.   He wouldn't have considered it.

11  Q.   Who do you believe was in the best position to make

12  decision regarding Parker's treatment?

13  A.   That would be myself, Parker, and the medical

14  community.

15  Q.   Where do you live, Mr. Saxton?

16  A.   I live in Vilonia, Arkansas.

17  Q.   How long have you lived in Vilonia?

18  A.   I've lived there 35 years.  My kids have lived there

19  their entire life.

20  Q.   How are you employed?

21  A.   We own a small plumbing company.

22  Q.   Who is "we"?

23  A.   Ma'am?

24  Q.   I said, who is "we"?  Who owns the plumbing company?

25  A.   That would be me and my parents.

Direct - Saxton

1  Q.    How long have you and your parents operated the

2  plumbing business?

3  A.    It was founded 31 years ago.  We bought the first

4  permit Vilonia ever issued.

5  Q.    Are you and your family involved in the community?

6  A.    Holler if you need us.

7  Q.    Do you have any family outside of Arkansas,

8  Mr. Saxton?

9  A.    I have one daughter, Keely.  She just got her

10  bachelor's at University of Oklahoma.

11  Q.    Do your children attend school in the Vilonia

12  community?

13  A.    Yes, ma'am, they do.

14  Q.    Do they have friends there?

15  A.    All of their friends are there.

16  Q.    Are they involved in any school activities?

17  A.    Choir for Parker.  Band for Abigail.  She is the

18  middle child.  She has that middle child thing.  Then Emma

19  is fast tracking to a degree in construction scientist --

20  science through a pathways program.

21  Q.    Has your family discussed what you would do if Act

22  626 goes into effect?

23  A.    Yes, ma'am.  That was a hard talk.

24  Q.    What would you do?

25  A.    Unfortunately, we got together and we're a family.

Direct - Saxton

1   So without Parker, we're not a family.  So we'd have to --
2   we'd have to pick up and find somewhere that we could have
3   our -- we could have Bro.
4   Q.   Would your parents be able to operate the business if
5   you left the state?
6   A.   Not at this point, no, ma'am.
7   Q.   Could you financially support your family if you had
8   to move outside the state?
9   A.   It would be a struggle.
10  Q.   How do you feel about the prospect of leaving
11  Arkansas?
12  A.   I don't want to leave Arkansas.  This is home.  This
13  is home and we're from a small town.  They've transitioned
14  with us, you know.  They accept us.  They welcome us in.
15  We're not guaranteed that anywhere else.  So I'm thankful
16  that we are where we are, but if we had to, we would find
17  -- we would find our place.
18  Q.   What do you think would happen to Parker if
19  gender-affirming care was not available to him?
20  A.   I'm not going to think about that.  I just won't.
21          MS. ECHOLS:  Pass the witness.
22          MR. JACOBS:  Nothing from us, Your Honor.
23          THE COURT:  You may step down.
24          THE WITNESS:  Thank you, sir.
25          MS. ECHOLS:  Your Honor, our next witness will

Direct - Jennen

```
 1    be Aaron Jennen.
 2              THE COURT:  Swear to tell the truth, sir?
 3              THE WITNESS:  Yes, sir.
 4              THE COURT:  Have a seat.
 5         AARON JENNEN, PLAINTIFF WITNESS, DULY SWORN
 6                    DIRECT EXAMINATION
 7    BY MS. ECHOLS:
 8    Q.    Would you please state your full name for the Court?
 9    A.    Aaron Jennen, A-a-r-o-n J-e-n-n-e-n.
10    Q.    Are you married?
11    A.    I am.
12    Q.    What is your spouse's name?
13    A.    Lacey, L-a-c-e-y.
14    Q.    How long have you and Lacey been married?
15    A.    22 years.
16    Q.    Do you and Lacey have any children?
17    A.    Yes.  We have three children.
18    Q.    What are your children's names and ages?
19    A.    My oldest child is Parker.  She's 17.  My -- I'm
20    sorry.  Sabrina, she's 17.  My middle child is Parker,
21    she's 14.  Sorry.  And my youngest is London, she's 11.
22    Q.    You mentioned you have a child Sabrina.  What grade
23    is she in?
24    A.    She's a senior.
25    Q.    Can you describe Sabrina?
```

1  A.   Yeah, she's beautiful.  I mean, I'm fairly confident
2  that she has the most envied hair in this courtroom, if
3  not the courthouse.  She's incredibly smart, gifted.  She
4  loves hanging out with her friends and the outdoors and
5  especially going hikes and picnics and -- yeah, she's
6  amazing.
7  Q.   Is Sabrina involved in any activities?
8  A.   Yes.  She is -- of course, she goes to school.  She
9  is a DM for a Dungeons and Dragons group amongst her
10 friend and, yeah, loves her community.
11 Q.   Does Sabrina have plans to attend college?
12 A.   Yes, she does.
13 Q.   What does she plan to study?
14 A.   Right now it's either nursing or art.
15 Q.   What was Sabrina assigned sex at birth?
16 A.   Male.
17 Q.   Does Sabrina identify as male today?
18 A.   No.
19 Q.   What is Sabrina's gender?
20 A.   Female.
21 Q.   When did Sabrina tell you she was female?
22 A.   It was the day after her birthday.  A few weeks
23 before her birthday, she had told us that she had a
24 surprise for the family and not to look at our bank
25 account.  And that's not in Lacey's nature to not look at

Direct - Jennen

1  a bank account when somebody tells her not to.  So she did

2  and noticed a purchase from pridepalace.com, which we were

3  unfamiliar with at the time, but then realized that was a

4  company that sold pride flags online.  And so when we saw

5  that and with her saying I have a surprise for the family,

6  you know, initially we thought, maybe she's going to come

7  out to us as gay.  We really didn't know, but -- so we

8  just waited for her to tell us.

9        And then the day after her birthday, she just came to

10  us and said, mom, dad -- we're in the -- kind of the

11  living area of our house.  And she came up to us and said,

12  mom, dad, I got something I need to tell you.  I'm trans.

13        And I knew that was a big parenting moment. And I

14  didn't want to mess it up.  And I just told her that I

15  love you, I support you no matter what, never do anything

16  or say anything to change that, and asked her, you know,

17  how she came to that.

18        First, she explained that she had this big production

19  planned that she had ordered this flag and that she was

20  wanting to do this big reveal, but the -- it was COVID and

21  so -- it was July of '20 and the shipping was delayed and

22  so she got tired of waiting on the delivery and couldn't

23  just wait anymore.

24        So then she explained that she'd always felt like

25  there was something different about her, that she never

Direct - Jennen

1   really knew what it was, but she had time to just reflect
2   and think about it.  And she later told us about how she
3   was playing Animal Crossing at the time, which was kind of
4   popular if everybody remembers that, and she changed her
5   character from male to female and just said she felt
6   overwhelming sense of joy and started to realize her
7   identity.
8   Q.   What was your reaction?
9   A.   I didn't show it, but at first I was -- I was
10  surprised.  Sabrina was not a -- never had expressed
11  interest in playing with dolls or wearing feminine clothes
12  or anything like that, but there were other things with
13  hindsight that I look back on now that -- that I thought
14  were quirks that I now recognize as probably signs of her
15  dysphoria.  She had always insisted on wearing a shirt
16  when going swimming, which I know is common among kids who
17  have issues about their body, but she was very, very fit.
18  She was black belt in martial arts.  She was very, very
19  fit.  She had extreme anxiety about using the bathroom in
20  the public to the point where sometimes she would insist
21  on -- she would be in the middle of something and she
22  would insist on us going home so she could use the
23  bathroom, and we would accommodate.  She hated having her
24  picture taken to the point where she would, you know,
25  visibly anxious about having her picture taken, things of

Direct - Jennen

1  that nature at the time that we chalked up to quirks, but

2  with the benefit of hindsight realized what she was

3  experiencing.

4  Q.   Did you have concerns when she told you?

5  A.   Yes.   Initially, my concerns were, does she know what

6  that really means.   She was 15 at the time, just turned

7  15.   Did she really know what that means.   I wondered, is

8  this -- is this something she's trying on and feeling out

9  and trying to see if this is who she is.   Is this a phase?

10      And then my overriding concern though was her safety

11  because I knew this society, especially in the state we

12  live in, that there's not a lot of understanding around

13  transgender identities and I was concerned about her

14  coming into contact with people outside her circle of

15  safety and what their reaction would be.   And then

16  especially among her peers, you know, whether or not she

17  would be bullied or harassed or worse.

18  Q.   How did you address your concerns?

19  A.   Well, the first thing Lacey and I did after we spoke

20  with Sabrina is, she and I retreated to our bedroom and

21  talked about what she just told us.   And I think like most

22  parents do these days, you Google it, right.   So first

23  thing I did was Google, you know, what do you do when your

24  child comes out to you as trans.   I think that's literally

25  what I typed in. And the -- everything we were reading

Direct - Jennen

1  basically said, one, is love and support your child and,

2  two, seek out mental health professionals.

3  Q.   What steps did you take as a family to support her?

4  A.   First thing we did was -- she had told us when she

5  came out to us, when she sad, mom, dad, I'm trans and, by

6  the way, I would like for you to call me Sabrina and use

7  she/her pronouns.  So first we adopted that in our

8  household.

9       We reached out to a mental health professional and

10  scheduled an appointment.  She'd also, when she came out

11  to us, announced that -- we had just moved from Fort Smith

12  to Fayetteville, and she made -- she was adamant about

13  starting the new school year as Sabrina.

14       So in addition to making that appointment with the

15  mental health professional, we reached out to the school

16  counselor to find out what we needed to do to make that

17  happen.

18  Q.   How did Sabrina express her gender identity after

19  coming out?

20  A.   Initially, it was growing out her hair, using the

21  name Sabrina.  I think she was still at the time

22  work-shopping a middle name, and she ultimately settled on

23  Faye.  She also used -- changed her pronoun usage.  And,

24  you know, we asked her, hey, do we need to buy -- go

25  shopping for different clothes?  What do you want to do?

Direct - Jennen

1    And, no, she said that she thought at first she wanted to

2    dress more androgynous and that wanted to, you know, wait

3    to start dressing more feminine until her hair grew out

4    and she was more, as what she called it, passing.

5         One of the things we did do though is, Lacey took her

6    shoe shopping and she bought a pair of very I guess --

7    white feminine Doc Martens that she was extremely excited

8    about.  Was good memory for them.

9    Q.   Has Sabrina legally changed her name?

10   A.   Yes.

11   Q.   Who helped her do that?

12   A.   I did that.

13   Q.   Are you an attorney?

14   A.   I am an attorney.

15   Q.   Has Sabrina been diagnosed with gender dysphoria?

16   A.   She has.

17   Q.   When did that happen?

18   A.   Shortly after her first appointment with her

19   therapist.  We had an initial appointment.  It was

20   virtually because of COVID in which there was a session --

21   a portion of the session was all of us meeting together

22   and then another part of the session was Sabrina meeting

23   with her therapist separately.  After that session, she

24   was diagnosed with gender dysphoria as well as major

25   depressive disorder.

Direct - Jennen

1  Q.    And you said her therapist.  Who was her therapist?

2  A.    Katie Campbell.

3  Q.    And is Sabrina still seeing Ms. Campbell?

4  A.    She is.

5  Q.    How often does she see Ms. Campbell?

6  A.    Currently, she's seeing her every other week,

7  although she had an extra appointment last week just

8  because she knew we would be here.

9  Q.    Has Sabrina's gender dysphoria diagnosis -- excuse

10  me.

11        After Sabrina's gender dysphoria diagnosis in July of

12  2020, did you seek any medical consultation or treatment

13  for her?

14  A.    Eventually.  After about three months of meeting with

15  Ms. Campbell, she advised that she thought Sabrina might

16  benefit from hormone therapies and gave us the name and

17  the number of a doctor in Fayetteville that provided that

18  treatment.

19  Q.    And what name did she give you?

20  A.    Dr. Stephanie Ho.

21  Q.    After you obtained that information, did Sabrina

22  immediately visit Dr. Ho?

23  A.    No.  If it had been up to Sabrina, she would have.

24  But, you know, for Lacey and I, it was one thing -- it was

25  -- this was still new.  It was like when she first came

Direct - Jennen

1  out to us, you know, she was like, I'm Sabrina, I want to

2  be she/her pronouns, I'm going school as Sabrina.  We had

3  to tell her, whoa, you know, you've been living with this

4  and sitting with this for a while.  We've been living with

5  this like five minutes now.  You got to give us a chance

6  and time and space to catch up to you.

7       So when October rolled around and after an

8  appointment, the recommendation for -- to consider hormone

9  therapies was made.  Just like before -- like with her

10  wanting to go ahead and start her social transition, she

11  was ready to medically transition, but we told her, we've

12  got to, you know, do some more research.  This is -- it's

13  one thing to socially transition, to change your name and

14  how you dress and those kinds of things.  It was, for

15  Lacey and I, a medical transition was something a little

16  more serious that required a little more deliberation and

17  gave us a little more pause and hesitation.

18  Q.   Did you ultimately schedule a visit for Sabrina with

19  Dr. Ho?

20  A.   We did.

21  Q.   When was that?

22  A.   It was in December of that year.

23  Q.   What happened during Sabrina's initial visit?

24  A.   During the initial visits, Sabrina met with a member

25  of Dr. Ho's staff and outlined kind of what their practice

Direct - Jennen

1    and protocols were, answered some questions -- initial

2    questions, as well as provided us -- went over the risks

3    and benefits of the -- of the treatments, as well as

4    provided us literature in written form regarding those

5    risks and the benefits, as well as the protocols that they

6    use which I believe were from the University of San

7    Francisco.

8    Q.    Did you and your wife review the materials together?

9    A.    Yes.   That night.

10   Q.    What was your reaction to Sabrina undergoing hormone

11   treatment for her gender dysphoria?

12   A.    It was -- initially it was, again, something that we

13   gave a lot of discussion about between she and I.  Like we

14   did when she came out to us, something we Googled a lot

15   and read a lot about.  It is something that we took a lot

16   of time, thought, and prayer in deliberating before making

17   that decision.

18   Q.    Did Sabrina see Dr. Ho in January of 2021?

19   A.    Yes.   After the initial appointment and after

20   visiting as a family and discussing this over the

21   Christmas break when she was at home, we ultimately made

22   the decision to schedule a followup appointment to get a

23   few more questions answered and -- yeah.  So that would

24   have been in January.

25   Q.    Did you discuss any specific treatments at that

Direct - Jennen

1    appointment with Dr. Ho?

2    A.    Yes.   She explained that if -- if Sabrina started

3    therapy, that the therapy would be a regimen of

4    testosterone blocker as well as estrogen coupled with

5    routine monitoring of her blood levels.

6    Q.    Did Dr. Ho explain how the hormone therapy worked?

7    A.    Yes.

8    Q.    Did Dr. Ho explain the potential benefits and

9    possible risks and side effects of treatment with you that

10   day?

11   A.    Yes.

12   Q.    Do you and your wife make medical decisions for your

13   three children?

14   A.    We do.

15   Q.    Did you and your wife make the parental decision in

16   consultation with Dr. Ho to provide hormone therapy?

17   A.    Yes, we did.

18   Q.    Did you consent to Sabrina receiving hormone therapy?

19   A.    We did.

20   Q.    As a parent, was this experience typical of your

21   experience as consenting to medical treatment for your

22   children?

23   A.    Yes.   We had children who had adenoids removed and

24   tubes put in their ears, and it was a similar process to

25   those medical procedures.

Direct - Jennen

1  Q.   What was Sabrina prescribed that day?

2  A.   A testosterone blocker that begins with an S, and I

3  can't remember off the top of my head now, but I think

4  it's been mentioned during the course of this trial, as

5  well as estrogen.

6  Q.   As Sabrina visited Dr. Ho since January of 2021?

7  A.   Yes.   Routinely.

8  Q.   How frequently does she return to see Dr. Ho?

9  A.   It's approximately every three months to monitor her

10  dosages.   Prior to those appointments, she has blood drawn

11  and lab tests run to monitor for the things that they

12  monitor for, make sure that everything is safe and

13  healthy.   And once those results are in, she has a

14  followup visit during which they go over the results of

15  the testing as well as asked her about the primary goal of

16  how she's feeling regarding the stress of her dysphoria.

17  Q.   How is Sabrina doing now?

18  A.   She's doing great.   She -- her dysphoria seems to be

19  almost entirely alleviated.   She's very happy for the most

20  part.   She still has some struggles related to her

21  diagnosed depression and school stress, but as it come to

22  her dysphoria, she loves having her picture taken.   She

23  takes selfies all the time.   She drawings self portraits

24  quite a bit.   She doesn't mind having her picture taken.

25  Not only that, she smiles when she has her picture taken,

Direct - Jennen

1   which is nice.  Yeah.

2   Q.   What is most noticeable about the changes in Sabrina

3   since she started the hormone therapy?

4   A.   When she came out to us -- when she first came out to

5   us and told us that she was trans, at that time she had

6   just a very visible appearance of joy on her face just

7   telling us that.  A lot of her issues that she had prior

8   to coming out to us and as she socially transitioned began

9   to resolve.  I would say, once she started hormone

10  therapy, the improvement, as I would say, was amplified to

11  the point that she is how she appears today.

12  Q.   Would you describe her as confident?

13  A.   Very.  She's very confident, so much so that she put

14  her name in the hat for homecoming queen this year.

15  Q.   Do you ever question your decision to consent to

16  hormone therapy for Sabrina?

17  A.   At the time we made the decision, I felt that we were

18  -- I thought we were making the best decision that we

19  could based on the information we have.  And I would say

20  today with hindsight, I now know that was the best

21  decision.

22  Q.   How long has your family lived in Arkansas?

23  A.   My wife and I have both lived here all our life as

24  well as our children.

25  Q.   How long have you been in Fayetteville?

Direct - Jennen

1    A.    Since April of 2020.

2    Q.    What is your current job?

3    A.    I'm currently an assistant United States attorney for

4    the US Attorney's Office in the Western District of

5    Arkansas.

6    Q.    How long have you worked as an attorney for the

7    government?

8    A.    For the federal government has been since 2014.

9    Prior to that, I was a deputy prosecuting attorney in

10   Sebastian County for almost a decade, and before that I

11   was a child support -- I was a staff attorney for the

12   Office of Child Support Enforcement.

13   Q.    Are you and your family involved in any community

14   organizations?

15   A.    Yes.  My wife is the chairman of the Urban Forestry

16   Advisory Board for the City of Fayetteville.  I'm a board

17   member of the Transgender Equality Network in northwest

18   Arkansas.  And yeah.

19   Q.    Other than your wife and three children, do you have

20   any family in Arkansas?

21   A.    Yes.  My mother and stepfather and their daughter, my

22   step-sister, all live in northwest Arkansas.  My sister

23   and her husband and their children, my nieces and nephews,

24   live in northwest Arkansas.  My brother and his partner

25   and their children live in northwest Arkansas.  My

Direct - Jennen

1    brother-in-law and his wife and children live in northwest
2    Arkansas.  My in-laws live in northwest Arkansas.  Lacey's
3    -- my grandparents are deceased, but Lacey's grandmothers
4    both live here in Arkansas.
5    Q.    So pretty much everyone?
6    A.    Yes.  Our entire -- I guess cousins, uncles, aunts,
7    everybody lives here.
8    Q.    Do your children go to school in Fayetteville?
9    A.    Yes.  All three of them attend Fayetteville schools.
10   Q.    Do they have friends there?
11   A.    Yes.
12   Q.    Are they involved in school activities?
13   A.    Yes.  Parker is a member of the freshman cheer team
14   at the high school as well as on the wrestling team.
15   London is on the yearbook club.
16   Q.    Are you aware of Act 626?
17   A.    I am.
18   Q.    What is your understanding of what Act 626 would do
19   if it goes into effect?
20   A.    It would ban medically-necessary lifesaving care for
21   transgender minors.
22   Q.    Does that concern you?
23   A.    Yes.
24   Q.    Why?
25   A.    There's the overriding concern which I think has been

Direct - Jennen

1   communicated during the other witness's testimony of the
2   harm it would cause to the transgender minor population as
3   a whole.  But for our family specifically, I'm concerned
4   about the impact it would have on Sabrina.
5   Q.   Could you explain that more?
6   A.   Sure.  First, I can tell you that with the success
7   that the treatment has had with Sabrina, that her not
8   receiving treatment is not an option; that the State is
9   essentially forcing us to make one of two very hard
10  decision:  One being that we go travel outside the state
11  to someplace else that she can obtain this care at much
12  great expense of both money and time.  Yes, while I'm an
13  attorney, I'm sure as the State's lawyers know, government
14  attorneys don't make tons of money.  We're a single-income
15  family and that would be quite a burden.  But we do have
16  the support of our family and community that would I think
17  fill the gaps if need be if that's the decision we make.
18  That leaves only one other option, that option being that
19  we move.  And I have -- which would be difficult.  Sorry.
20  Q.   That's okay.  Mr. Jennen, do you consider Sabrina not
21  receiving the treatment an option?
22  A.   No.
23  Q.   Why not?
24  A.   I believe it would be an absolutely detriment to her
25  mental health, would be a detriment to the loving,

Direct - Jennen

1   amazing, beautiful, thriving child that she is growing
2   into.  I worry about, you know, what impact that would
3   have on her mental health.  I'm already concerned about
4   how that makes her feel about who she is, what her
5   identity is.  I worry about the thought of having to leave
6   the support system that we've built around our family from
7   our family-family to, you know, some of the people in this
8   room that put their arms around us.  I worry about what
9   she thinks that the state she's lived in her whole life
10  and I know that she loves, what that means the state
11  thinks about her and who she is and who she wants to be.
12  Q.   What do you think would happen if Sabrina did not
13  have access to gender-affirming health care?
14  A.   I promise you that will not happen.  But,
15  hypothetically, if it did, I worry about her withdrawing
16  back into the person that she was before she started it, a
17  person that was unhappy, that said things to her mother
18  and I like, what's the point of life.  Saying things like,
19  I don't see a future for myself, which is difficult
20  because how amazing she is.
21         MS. ECHOLS:  Pass the witness.
22         MR. JACOBS:  We don't have anything, Your Honor.
23         THE COURT:  You can step down, sir.
24      How long do you anticipate your next witness is going
25  to last?

1    MS. WALAS:  Your Honor, we're actually going to
2  take care of the deposition designations and call those
3  and introduce those real quick and then take care of
4  another housekeeping matter related to the legislative
5  history.  So I'm assuming it will take 15 minutes or less.
6    THE COURT:  I'm trying to coordinate changing of
7  the guard on the court reporters.  So we'll continue and
8  then we may break in the middle of that so.
9    MS. WALAS:  Plaintiff calls Representative Robin
10  Lundstrum via deposition testimony.  Per the joint
11  pretrial order, the videotaped testimony doesn't need to
12  be presented to the Court.  Plaintiff would move to admit
13  Plaintiffs' Exhibit 28 and the related Exhibits 29 through
14  34.
15    MS. LAND:  Your Honor, we object to this
16  happening today.  We haven't been notified that this was
17  the plan for Representative Lundstrum's deposition
18  transcript to be introduced today as an exhibit, and it
19  was our understanding, pursuant to the pretrial order that
20  the parties agreed to, that we would be notified of that
21  in advance.
22    THE COURT:  How much advance notice do you need?
23    MS. LAND:  We are not aware of --
24    THE COURT:  I guess what I'm saying is, assuming
25  you're getting notice now, how long do you need before you

1  can respond?

2          MS. LAND:  It's hard to say what we're

3  responding to.  The parties agreed that we would both

4  notify each other of witnesses beforehand, as well as

5  exhibits beforehand.  It's somewhat safe to say this is a

6  mixture of both.  I'm not sure what the plaintiffs are

7  intending to do specifically with the deposition

8  designation, but --

9          THE COURT:  Do you have the -- I stepped on you.

10  I didn't mean to.

11      Do you have the proposed designations of this

12  witness?

13          MS. LAND:  We do.  The parties -- both of them

14  have submitted --

15          THE COURT:  So you knew what they were going to

16  present.  What are you claiming you need in the way of

17  responding to what portions of those depositions are

18  either -- I'm not sure.  It's not like you're having to

19  prepare for this witness.  I'm assuming you cross-examined

20  her during her deposition or whatever, but it's not like

21  you're having to prepare a cross-examination or prepare

22  the night before for this particular witness.  So I get

23  back to saying, now that you have notice, how long do you

24  think you need to respond to the fact that it's your turn

25  to make arguments about why these designations aren't

1   appropriate.

2           MS. LAND:  It's really difficult to say, Your

3   Honor.  I don't know what the plaintiffs are about to do

4   with this testimony.  So to the extent I need to prepare

5   any oral arguments on why they should be excluded more

6   than just this notice would be --

7           THE COURT:  I get that.  I know not now, but I'm

8   trying to ask you.

9           MS. LAND:  It would be helpful if plaintiffs

10  could indicate what their plan is this afternoon for

11  Representative Lundstrum.

12          MS. WALAS:  Your Honor, as the depositions have

13  already been designated, exchanged with the other side,

14  and they have done their counter-designations, we're just

15  going through the formality of officially introducing

16  those designations and giving them to the Court.  The

17  Court has already issued a ruling saying that was

18  defendants' objections to our designations will be

19  considered by the Court in reviewing those, and their

20  objections have also been designated by them and are noted

21  in this exhibit which they also have.

22          THE COURT:  So correct me if I'm wrong, you're

23  just making an official offer and designation in the

24  record of things that have already been provide to the

25  Court that may already be of record.

1          MS. WALAS:  The designation -- they did not

2     stipulate to the admissibility of the deposition

3     transcripts or the testimony.  And so we are just seeking

4     to admit that testimony by deposition pursuant to Rule 32,

5     I want to say.  I might be wrong on that.  But -- and just

6     introduce that in and present them to the Court because

7     they're not stipulated exhibits.  And per your order, they

8     need to be exhibits and then we had agreed to present them

9     this way.  The only reason that they didn't notice that we

10    were going to do this today is that things moved faster

11    and we're trying to not waste the Court's time, Your

12    Honor, and we're trying to take care of some housekeeping

13    matters with some witnesses.

14          MS. LAND:  Your Honor, I don't have

15    Representative Lundstrum's deposition with me here today.

16    I could have --

17          THE COURT:  She's not going to read it into the

18    record.  She's telling me that she's just officially

19    offering that so, when I go back on my time as opposed to

20    court time, I review that deposition and I determine

21    what's relevant and admissible and do so with your

22    counter-designations as well.  I mean, are you going to

23    claim that those weren't her statements or that it's not

24    an authentic deposition or certified deposition or --

25          MS. LAND:  No, Your Honor.  We are stipulating

1    to the authenticity of these documents.  It's plaintiffs'
2    counsel saying that you're just going to be reading the
3    line designation into the -- I don't understand.
4           THE COURT:  No, ma'am.  What I understand is,
5    she's -- I don't know.  This is what I understand, is
6    that, rather than read these depositions aloud in court, I
7    don't need to have y'all read to me.  I can read them back
8    in my office.  I was going to make determinations as I
9    read through them what I considered admissible and perhaps
10   probative.  And if I didn't use it in my order, then it's
11   clear that I didn't find it probative or didn't find it
12   worth mentioning.  But I did not understand that any of
13   her deposition was going to be read at this time.  Is
14   that --
15          MS. WALAS:  No, Your Honor.  We're just seeking
16   to admit Plaintiffs' Exhibit 28 which is the designated
17   deposition designations and the related exhibits to those
18   designations which are Plaintiffs' Exhibit 29 through
19   Plaintiffs' Exhibit 34.
20          THE COURT:  I see that as a formality, but --
21          MS. LAND:  Defendants will note for the record
22   their objection to the deposition.
23          THE COURT:  Are those made in your
24   counter-designations or are you just saying you just
25   object to her testimony together?

1      MS. LAND:  We did submit objections to the
2  designations that plaintiffs made in this case previously
3  via motion, I believe.
4      THE COURT:  Those are going to be considered on
5  the fly as I went through.
6      MS. LAND:  Yes, Your Honor.
7      THE COURT:  Is there anything left for you to do
8  in response to some notice that this was going to be
9  happening?
10      MS. LAND:  I'll make an objection if I feel the
11  need to.  I would ask that I be permitted to do that as we
12  go along.
13      THE COURT:  You're not going to be back there
14  with me.  What I'm trying to say is, she's not reading
15  anything into the record with regard to Representative
16  Lundstrum and I'm going to be back there addressing your
17  objections as I read the deposition and making notes along
18  the way whether or not I overrule or sustain those
19  objections.  What I'm saying is, what else do you need to
20  present to me before I get to that?  You've made your
21  objections on the record to each line and paragraph or
22  page and line of her deposition, correct?
23      MS. LAND:  Correct.
24      THE COURT:  So is there anything else for me to
25  hear from you on those designations?

470

1          MS. LAND:  I'm not aware of any at this time

2    based on what's been elicited just now.

3          THE COURT:  I'm not sure she's offering anything

4    other than that.  I think -- not sure why, but she's just

5    doing it formally in open court so it's a part of the

6    record.

7          MS. LAND:  I just wanted it noted that we

8    weren't aware this was happening today, even though we

9    agreed that we would notify each other of exhibits -- of

10   when they would be introduced.

11         THE COURT:  I thought I told you all of that the

12   morning of we started on Monday that I was going to be

13   handling it and actually before then.  And she's not doing

14   anything but offering the deposition.  And I'm assuming

15   all of the depositions designations that I have back there

16   have already been offered for the record.  I don't know

17   that she's doing anything that hadn't already been done,

18   unless she can tell me otherwise.

19         MS. WALAS:  No, Your Honor.  The only thing is

20   we narrowed Representative Lundstrum's designations from

21   what we had previously designated.

22         THE COURT:  Okay.  So nothing new?

23         MS. WALAS:  Nothing new, Your Honor.

24         THE COURT:  All right.  What else?

25         MS. WALAS:  So we would move to admit

1    Plaintiffs' Exhibit 28 and the related exhibits,

2    Plaintiffs' 29 through 34 related to Representative

3    Lundstrum's deposition designations.

4              THE COURT:  Are those attached?

5              MS. WALAS:  They're each a separate exhibit.  So

6    it will Exhibit 28, 29, 30, 31, 32, 33, and 34.

7              THE COURT:  But are those attached to the

8    deposition designations?

9              MS. WALAS:  Yes, Your Honor.  They're mentioned

10   in those designations and they're --

11             THE COURT:  Mentioned or attached?

12             MS. WALAS:  I'm not sure if I know the

13   difference between attached.  They were attached as part

14   of the deposition and then we labeled, say, that

15   Deposition Exhibit 7 as Plaintiffs' Exhibit 29.  But they

16   were part of the deposition.  So they'll be -- I guess I'm

17   not understanding your question.

18             THE COURT:  If I sit down with a deposition, are

19   the exhibits are going attached to the deposition or in a

20   separate binder where I go look for them?

21             MS. WALAS:  It's going to be one binder, Your

22   Honor, where the deposition is first, the related exhibits

23   are immediately after it, just like a normal deposition

24   thing you get from the court reporter.

25             THE COURT:  Counsel, that's attached to me.  So

1    thank you.

2            MS. WALAS:   Thank you, Your Honor.   Are those

3    admitted?

4            THE COURT:   I haven't looked at them right now

5    so the notion that I can rule on those objections to those

6    exhibits right now, I don't even have them up here.   So

7    I'll take that under advisement.

8            MS. WALAS:   Thank you, Your Honor.

9        Next plaintiff would {Amy Embry via deposition

10   testimony.   Per the joint pretrial order, the videotape

11   deposition doesn't need to be presented.   Plaintiffs would

12   then move to admit Plaintiffs' Exhibit 9, which is the

13   deposition of Ms. Amy Embry and the related exhibits

14   Plaintiffs' Exhibit 10, 11, 12, 13, 14, 15, 16, and 17.

15           THE COURT:   Let me back you up a minute on the

16   last witness.   Are all of your objections to any exhibits

17   to that deposition of record or written down anywhere for

18   me?

19           MS. LAND:   Yes, Your Honor.

20           THE COURT:   Okay.   How about this witness?

21           MS. LAND:   Yes, Your Honor.

22           THE COURT:   Okay.   Same ruling.   Don't have it.

23   Not ready for it.   Next.

24           MS. WALAS:   Third, plaintiff calls Dr. {Rhys

25   Branon via deposition testimony.   Per the joint pretrial

1  order, the videotape deposition testimony doesn't have to

2  be presented to the Court.  Plaintiff would move --

3         THE COURT:  Ms. Walas, slow down a little bit.

4  Keep going.

5         MS. WALAS:  Plaintiff moves to admit Plaintiffs'

6  Exhibit 18 which is Dr. Branon's deposition designations

7  and the related exhibits, Plaintiffs' Exhibit 19 and 20.

8     If I may approach, Your Honor, I have all of those in

9  a binder for you.

10        THE COURT:  You can put them on that table.

11 I'll get them later.  I'm running out of room.

12        MS. LAND:  Your Honor, I would like to note the

13 same thing I noticed previously for Representative

14 Lundstrum's deposition transcript.  We weren't aware that

15 Branon and Embry would be brought up today as well, but as

16 I noted, those objections have been made on the record as

17 to the deposition transcripts respectively.

18        THE COURT:  Okay.

19        MS. WALAS:  Hold on one second, Your Honor.

20        THE COURT:  Sure.

21        MS. WALAS:  Your Honor, I thought I had one more

22 matter, but we're going to take care of that tomorrow.

23        THE COURT:  Can you let opposing counsel know

24 what that other matter is so we don't have any notice

25 issues?

1          MS. WALAS:  We're going to deal with introducing

2    the legislative history through the transcripts of the

3    hearings and the vote.

4          THE COURT:  Okay.

5          MR. STRANGIO:  Your Honor, I just want to note

6    for the Court's attention that our next witness is flying

7    in and after your court's -- Your Honor's announcement

8    yesterday, we've been streamlining our testimony in the

9    hopes that we may have an opportunity to conclude trial

10   this week.  We understand that's not possible.  But it is

11   looking very likely that we will close our case in chief

12   tomorrow at the end of the day, at the latest first thing

13   Thursday morning, and we have no other witnesses currently

14   here to testify.

15        So we wanted to let Your Honor know and also see if

16   we could make some progress on using the remainder of this

17   week for the State -- some of their witnesses.  We

18   notified them yesterday as well as at lunch about this.

19   Just letting Your Honor know that we have no other

20   witnesses here today.

21        THE COURT:  Ms. Land, where are you on document

22   183(1) which was what I thought a joint stipulation of

23   fact but is actually a proposed stipulation of fact from

24   the plaintiffs.  You said you were going to look at that

25   and find out what you could stipulate to.

1      Are you prepared to tell me what you're willing to
2  stipulate to before the plaintiffs rest?
3              MR. JACOBS:  Dylan Jacobs, Your Honor.
4              THE COURT:  I'm sorry.
5              MR. JACOBS:  We're not prepared to do that
6  today, but I think we could make a commitment to do that
7  before the plaintiffs rest tomorrow so maybe we could
8  address it tomorrow morning.
9              THE COURT:  Okay.
10             MR. JACOBS:  Just haven't -- it hadn't been
11  decided yet.
12             THE COURT:  All right.  I'll hear from you in
13  the morning then.
14             MR. STRANGIO:  Thank you, Your Honor.
15             MR. JACOBS:  Your Honor, on the matter of the
16  rest of the week, our side is still trying to run down
17  whether it's possible for any of the witnesses that we
18  have on our witness list to testify Thursday and Friday.
19  We don't have a final answer on that yet to whether we can
20  be prepared to take their testimony on Thursday or Friday.
21             THE COURT:  A lot of that depends on your
22  stipulations.  I mean, there's some stipulations about
23  certain -- what certain local people said.  By "local," I
24  mean Arkansas people said or didn't say, but they're not
25  -- you're not willing to stipulate to that, then I'm going

1   allow the plaintiffs to call them.  They need to know
2   that.
3            MR. JACOBS:  So I don't understand plaintiffs to
4   be waiting on our decision on stipulations to -- if
5   further witness are going to be called.  They can correct
6   me if I'm wrong about that.
7            THE COURT:  I'm reading stipulations that I
8   thought had been made, so it didn't bring it up as to what
9   Ms. Lundstrum may have said on the floor or whatever.  And
10  if she not going to admit that and -- then she can either
11  say she did or didn't here in court.  But they have a
12  right to know whether or not you're going to stipulate to
13  those facts or whether or not they need to be prepared to
14  prove them otherwise.
15           MR. JACOBS:  Representative Lundstrum I think
16  that, to the extent it's going to come in in the
17  deposition testimony or not, right, so I don't have -- I
18  don't know that that's --
19           THE COURT:  I don't know.  I haven't --
20           MR. JACOBS:  -- correct me if I'm wrong about
21  that, but I don't understand plaintiffs to be waiting on
22  our decision about stipulations to whether or not they're
23  going to call Representative Lundstrum.  If that's true,
24  they can --
25           THE COURT:  I don't know either, Mr. Jacobs.

1    I'm just saying that in large part what the plaintiffs
2    have to prove depends on what you're willing to stipulate
3    to.   And now that I've looked through it, I've only gotten
4    to the first -- first 31 stipulations, and most of them I
5    don't understand why you even have to think about it,
6    whether or not anyone is a certain age or whether or not
7    they were diagnosed at a certain time, all of which is
8    either a fact or not.   It's not up to dispute.
9        So I'm not sure, first of all, why all of that wasn't
10   addressed before we got to trial or why -- I know we were
11   busy yesterday, but a lot of this stuff -- I made one
12   correction on the Saxton family that Mr. Saxton didn't
13   already testify to, and that is he's from Vilonia not
14   Conway, but the rest seem irrefutable.
15       So I need to know what is proven in this case or not
16   before I make decisions about where we go from there.   A
17   lot of this is pretty pro forma or pretty obvious to me
18   that it either is or it isn't.
19            MR. JACOBS:   I think, again, we'll address that
20   in the morning with the Court prior to plaintiffs resting
21   the case.
22       As far as what I was initially talking about in terms
23   of whether we're going to call witnesses on Thursday or
24   Friday, I understand that to be a different issue.
25   Plaintiffs can correct me if I'm wrong.   I don't

1    understand their decision to call anymore witnesses to be

2    resting on whether we're going to stipulate to any of the

3    proposed stipulations.

4           MS. WALAS:  Specific to the -- to the

5    legislative history itself, Your Honor that's a matter of

6    you could take judicial notice of under Federal Rule

7    201 --

8           THE COURT:  Let me rephrase what I think he's

9    trying tell me, is that, if they don't agree to a single

10   stipulation, is everything that you're attempting to prove

11   in the depositions that I have back in my office or would

12   you need to call live testimony to establish those?

13      Is that fair, Mr. Jacobs?

14          MR. JACOBS:  I think that's what I'm getting at.

15          THE COURT:  That's what I'm asking because I

16   don't know the answer to that question.

17          MS. WALAS:  Your Honor, I think that's a mixed

18   bag because, one of the matters that we wanted to address

19   tomorrow and we wanted to bring up about the legislative

20   transcripts in the hearing is that the Court can take

21   judicial notice of legislative history which would include

22   the hearings of the transcripts and things such as that --

23   or the transcripts of the hearings from the floor of The

24   Senate and the House and also the votes.  That's a matter

25   that the Court Can take judicial notice of, so that would

1  not necessarily impact us per se on what witnesses to call

2  but it made depending upon what other facts that they may

3  or may not stipulate to in there.  It does influence also

4  the manner in which we will present potentially the rest

5  of the witnesses as if they stipulate to facts and we

6  don't have to cover that fact in that direct witness and

7  it would also save the Court some time and perhaps also

8  get us into their case sooner.  That's the one reason why

9  it would be helpful in that it would assist us in

10  streamlining our trial as we've been going.

11        And then if they stipulate to that legislative stuff

12  and you don't have to take necessarily judicial notice of

13  the whole thing, although the Court still can, and that's

14  a regularly common practice within the Eighth Circuit and

15  throughout the nation, but there is at least a few Eighth

16  Circuit cases that say that you can take judicial notice

17  of the legislative hearings and votes.

18        THE COURT:  Other than the question of relevance

19  and whether or not I'm supposed to factor in legislative

20  transcripts and all, do the defendants have any technical

21  objection to whether or not they're authentic or whether

22  or not I can take judicial notice?  I mean, is it down to

23  whether or not it's relevant or whether or not I should

24  consider it or is it some other technical admissibility

25  issue?

1           MR. JACOBS:  As far as the legislative

2    documents, Your Honor, I think our --

3           THE COURT:  Would it require live testimony to

4    overcome?  Are you submitting --

5           MR. JACOBS:  I think our objection is relevance.

6    I don't think we don't have technical objections that

7    these aren't authentic reproductions of the legislative

8    documents.  I think it's -- by stipulating to its

9    admissibility, I think we would be at least impliedly

10   stipulating to its relevance and I --

11          THE COURT:  Well, I can parse through that.  You

12   can stipulate to its authenticity or stipulate to the fact

13   that I can or can't take judicial notice of it without

14   waiving your relevance objection.  I let people split that

15   and say, I don't have any technical objections but I don't

16   think you ought to pay any attention to it whether it

17   comes in or not for relevance or otherwise objections.

18   And I will allow you to preserve that.

19          What I need to know is, prior to getting these

20   stipulations, is there anything that you're not willing to

21   waive that would require live testimony to cure?

22   Relevance isn't going to get that.  I get to make that

23   call.

24          MR. JACOBS:  Nothing that will require live

25   testimony, Your Honor.

1          THE COURT:  Okay.  Well, that's where I was

2     headed, long way around.

3        Does this mean you get to go to Boy Scouts?

4        All right.  We're going to start at 9 in the morning

5     unless we have something else we can accomplish this

6     afternoon right now.

7          MR. JACOBS:  I was going to finish what I

8     started saying earlier, is just, as far as -- assuming the

9     plaintiffs do close their case on Wednesday, they predict

10    they might --

11         THE COURT:  Tomorrow.

12         MR. JACOBS:  -- tomorrow.  We're still

13    assessing, one, which of our witnesses, if any, are

14    available to come on Thursday and Friday to travel in;

15    and, two, I guess whether we can be prepared to do that.

16    So I hope after phone calls this afternoon we'll have a

17    better idea to give the Court an update on that.

18         THE COURT:  Thank you.

19         MR. STRANGIO:  I think nothing further from

20    plaintiffs provided first thing in the morning tomorrow we

21    check in on defendants' witness availability for the

22    remainder of the week.  Thank you, Your Honor.

23         THE COURT:  That's between the two of you, sure.

24        You going to make your deadline, Mr. Ellis?

25         MR. ELLIS:  Yes, sir.

1          THE COURT:  See you in the morning at 9.

2      (Proceedings adjourned at 3:32 p.m.)

3                * * * * *

4           REPORTER'S CERTIFICATE

5      I, Valarie D. Flora, FCRR, TX-CSR, AR-CCR, certify

6  that the foregoing is a correct transcript of proceedings

7  in the above-entitled matter.

8      Dated this the 24th day of October, 2022.

9  /s/ Valarie D. Flora, FCRR

10  -------------------------

11  United States Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25