```
1              IN THE UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF ARKANSAS
2                        CENTRAL DIVISION
   DYLAN BRANDT, et al.,
3           Plaintiffs,
        v.                           No.  4:21CV00450 JM
4                                    October 21, 2022
                                     Little Rock, Arkansas
5                                    9:01 AM
   LESLIE RUTLEDGE, et al.,
6           Defendants

7

            TRANSCRIPT OF BENCH TRIAL - VOLUME 4
8          BEFORE THE HONORABLE JAMES M. MOODY, JR.,
                  UNITED STATES DISTRICT JUDGE
9                  _____

10

   APPEARANCES:
11

   On Behalf of the Plaintiffs:
12

        MR. CHASE STRANGIO, Attorney at Law
13      MS. LESLIE COOPER, Attorney at Law
        MR. JAMES D. ESSEKS, Attorney at Law
14      MS. LISA NOWLIN-SOHL, Attorney at Law
            American Civil Liberties Union
15          125 Broad Street, Suite 1800
            New York, New York  10004-2400
16
        MS. BREEAN WALAS, Attorney at Law
17          Walas Law Firm, PLLC
            Post Office Box 4591
18          Bozeman, Montana  59772

19      MR. AVIV S. HALPERN, Attorney at Law
        MS. LAURA KABLER OSWELL, Attorney at Law
20          Sullivan & Cromwell, LLP
            1870 Embarcadero Road
21          Palo Alto, California  94303

22      MR. GARY L. SULLIVAN, Attorney at Law
            ACLU of Arkansas
23          Legal Division
            904 West 2nd Street, Suite One
24          Little Rock, AR 72201

25
```

1   APPEARANCES CONTINUED:

2       MR. ARUN BODAPATI, Attorney at Law
        MS. LAUREN M. GOLDSMITH, Attorney at Law
3       MR. ALEXANDER F.R. PEACOCKE, Attorney at Law
        MS. REBECCA KADOSH, Attorney at Law
4       MR. JONATHAN G. LESTER, Attorney at Law
           Sullivan & Cromwell, LLP
5          125 Broad Street, Suite 2424
           New York, NY 10004-2498

6

        MR. DANIEL J. RICHARDSON, Attorney at Law
7          Sullivan & Cromwell LLP
           1700 New York Avenue
8          Washington, DC 20006

9       MS. SHARON ELIZABETH ECHOLS, Attorney at Law
           Gill Ragon Owen P.A.
10         425 West Capitol Avenue, Suite 3800
           Little Rock, AR 72201-2413

11

On Behalf of the Defendants:

12

        MR. DYLAN JACOBS, Attorney at Law
13      MR. MICHAEL CANTRELL, Attorney at Law
        MS. AMANDA LAND, Attorney at Law
14      MS. HANNAH TEMPLIN, Attorney at Law
           Arkansas Attorney General's Office
15         323 Center Street, Suite 200
           Little Rock, Arkansas  72201

16

On Behalf of witness Janet Cathey:

17

        MR. STEVEN SHULTS, Attorney at Law
18         Shults Law Firm, LLP
           200 West Capitol Avenue,  Suite 1600
19         Little Rock, Arkansas 72201

20  On Behalf of witness Stephanie Ho:

21      MS. BETTINA E. BROWNSTEIN, Attorney at Law
           Bettina A. Brownstein Law Firm
22         904 West Second Street, Second Floor
           Little Rock, Arkansas 72201

23

24       *Proceedings reported by machine stenography.*
     *Transcript prepared utilizing computer-aided transcription.*

25

1              INDEX - VOLUME 4 (10/21/2022)

2    WITNESS FOR DEFENDANTS:   Direct   Cross   Redirect

3    CATHY CAMPBELL   [Proceedings under separate cover.]

4    STEPHANIE HO                733      745      750

5    JANET CATHEY                753      773

6    EXHIBITS RECEIVED:                            PAGE

7    Defendants' 59                                765

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1        (Proceedings commencing in open court at 9:01 AM)
 2            THE COURT:  Good morning.  We're back on the
 3   record.  Is the -- I guess the order of proof now is the
 4   defendants are going to put on some witnesses.  Is that
 5   correct?
 6            MR. JACOBS:  Yes, Your Honor.
 7            THE COURT:  I guess before we get started.  You
 8   wanted your opportunity to -- first of all, are the
 9   plaintiffs resting?
10            MR. STRANGIO:  Good morning, Your Honor.  Just
11   one housekeeping matter.  I believe the only outstanding
12   item is the 160 documents that Your Honor is reviewing in
13   camera.
14            THE COURT:  And designation -- and the
15   deposition designations and -- you're kind.  Thank you for
16   saying it's just that, but it's a little more than that.
17            MR. STRANGIO:  Yes, but plaintiffs rest subject
18   to any possible documents that would have to be introduced
19   potentially during the week of the 28th.  But subject to
20   that, plaintiffs rest.
21            THE COURT:  As to your witnesses, you're resting
22   and you have submitted exhibits that I will rule on.  So
23   subject to that, I understand.  And there won't be any
24   further submissions I guess is what is fair to say.
25            MR. STRANGIO:  Your Honor, that's largely right.
```

```
 1            THE COURT:  In the way of exhibits or witnesses.
 2            MR. STRANGIO:  In the way of exhibits or
 3   witnesses thus far with respect to the designations.  I
 4   believe there are still the documents that Your Honor is
 5   reviewing.  So if we were to receive one of those
 6   documents after your view in camera and would need to
 7   separately proffer them, but if you're taking the position
 8   that you're going to review them separately and take them
 9   under advisement subject to whatever outstanding
10   objections that defendants have, but our understanding
11   with respect to the documents that you're reviewing in
12   camera is Your Honor is still making a decision as to
13   which ones of those would be turned over to plaintiffs.
14            THE COURT:  So to be clear, it's possible but
15   unlikely any additional documents are going to be done.
16        My question so counsel for the legislators was, when
17   I was reviewing emails, it didn't appear that I was
18   getting the entire email chain or attachments.  Some
19   people were sending emails to themselves in a way of a
20   to-do list, which I do and -- whether you're texting
21   yourself or emailing yourself.  It was a second phase
22   deeper dive into those documents I'd already reviewed.  So
23   it wasn't clear to me who was being copied on certain
24   email chains at a much deeper level because I wasn't able
25   to follow.  And that's what that second request was for.
```

1      I spoke with counsel who was providing the documents,
2  and they said they would try to get that further level of
3  CCs, blind CCs, attachments, or whatever.  And that is --
4  I guess what I'm saying is, I was 95 percent there when I
5  made my initial ruling and was curious about this last
6  five percent.  So I will still get you that ruling, but
7  I'm not sure what it's going to yield.
8           MR. STRANGIO:  Understood, Your Honor.  Just on
9  the off chance there would be an additional document to
10  proffer to the Court after that time, we would rest
11  subject to that, but otherwise plaintiffs rest.
12           THE COURT:  Okay.
13           MR. STRANGIO:  Thank you, Your Honor.
14           THE COURT:  If you don't mind, if you are going
15  to go straight into that, if you can go to a podium or --
16  the distance from your mouth to the microphone is my
17  concern.
18           MR. JACOBS:  So I think I was going to just
19  raise, if I could, just the scheduling again.  Just I
20  wanted to confirm, further update.
21      So we got all of our witnesses confirmed availability
22  for November 28 through December 1.  Out of that, we think
23  November -- the Wednesday, November 30, can be a morning
24  only and then the Court would have the afternoon free.
25      With the other three days, I think we will at least

1   stretch from morning into the afternoon and so --

2          THE COURT:  Half day is plenty.  Do what you

3   want with the other three days.

4          MR. JACOBS:  I didn't know if the Court was

5   interested in whether it could get a schedule for the

6   30th.  I can represent that that's feasible.  So I wanted

7   to give that information.

8          THE COURT:  We'll probably use that half day on

9   the 30th, but I won't book anything other than a lunch

10  hour on the remaining three days.

11         MR. JACOBS:  Okay.  Just so I can confirm --

12         THE COURT:  Or anything before 1:30 on that

13  Wednesday so.

14         MR. JACOBS:  Understood.  Just so I can confirm

15  with our witnesses, I think plaintiffs said they're good

16  with the schedule.

17     Can I go back on the understanding that this is the

18  -- going to be the schedule?

19         THE COURT:  You may.

20         MR. JACOBS:  Thank you, Your Honor.  That's all

21  I have for that.

22     I'm fine with coming to the podium.  I could also

23  just sit and go --

24         THE COURT:  Whichever, so long as my court

25  reporter is satisfied with getting a good recording.  I

1   don't have a preference.

2           MR. JACOBS:   Okay.   For this type of motion --

3           THE COURT:   Suits me.

4           MR. JACOBS:   So the defense would move for

5   judgment as a matter of law.   We don't think that the

6   evidence that's been produced by plaintiffs in their case

7   in chief entitles them to relief on any of their legal

8   claims.   So I'll sort of take these in other words

9   briefly.

10       Whether the SAFE Act is sex selective and the subject

11  of heightened scrutiny, I recognize at this point the

12  Court is bound by the panel decision on that, so we

13  continue to maintain that the Act does not discriminate

14  based on sex.   We've heard testimony about the procedures,

15  and we think that it's clear that the gender transition

16  procedures that the Act prohibits are not the same as

17  other indicated uses of these medications, even if it

18  happens to be the same drug that is used in these

19  different procedures.

20       As to puberty blockers, we think there's no

21  difference in treatment between men and women, male and

22  females.   It's the same protocol.   The act operates the

23  same as to both sexes.   As to cross-sex hormones, the

24  evidence shows that using, for example, testosterone for

25  delayed puberty in boys is not the same thing as using it

1   in gender transition for girls.  Different clinical

2   indications, different treatment purposes.  The witnesses

3   confirm that there is largely no medical indication for

4   cross-sex hormones beyond the gender transition procedures

5   at issue.

6        As to surgeries, we haven't really heard much

7   testimony on the surgeries.  I think some have been

8   mentioned.  I think the main surgery that plaintiffs claim

9   raises a sex selective restriction is gynecomastia surgery

10  versus mastectomies.  I think those are not the same

11  procedures.  There are different clinical indications for

12  diagnosing whether those are needed.  They're for

13  different purposes.  I think the -- what's colloquially

14  referred to as bottom surgeries are different enough that

15  that speaks for itself.

16       So for that reason we don't think the -- there is any

17  sex selectivity that would raise heightened scrutiny,

18  again, not withstanding the panel's ruling at this point.

19       The second equal protection claim:  Whether

20  transgender status is a suspect or quasi suspect class, an

21  issue the Court isn't bound by the panel decision on

22  because it didn't address it.  So we continue to maintain

23  that the Court should not recognize a novel quasi suspect

24  class.  The Supreme Court hasn't recognized new quasi

25  suspected classes like this since sort of the modern era.

1   It hasn't been done with regard to individuals with
2   developmental disabilities.  It hasn't been done with
3   regard to homosexuals.  And we don't think that the Court
4   should do it with this classification either.

5        As far as historical discrimination as a class, which
6   is an element of what the Supreme Court has said is
7   required to recognize a quasi suspect class, there wasn't
8   really any evidence in the record about sort of the
9   historical case like you'd see from an expert witness or a
10  historian, the types of things that you might see like in
11  the trial we did a few months back in the voting rights
12  case where there was expert witnesses who testified as the
13  history of this.  We don't have that.

14       There's been a lot of testimony sort of relevance to
15  whether transgender status is an immutable characteristic.
16  I think we've had acknowledgement from every expert on the
17  plaintiffs' side that gender identity is not actually
18  immutable, which has been their legal case.  It can and
19  does change over time.  And there may be dispute over who
20  can change it and the degree to which it can change, but I
21  think all of them have acknowledged that it can change,
22  and one's understanding of one's gender identity
23  separately evolves over time.

24       The experts recognize that there are individuals who
25  transition into another gender identity and then

1    transition back into the first one or into a different

2    one.  And at least Dr. Adkins acknowledges that that is an

3    actual change or can be in those individual's gender

4    identities or it could be a change in the understanding.

5         That's, I think, opposite the position the plaintiffs

6    have taken in terms of their legal case, that transgender

7    status is an immutable characteristic.  So we think that

8    that defeats the claim that this is a quasi suspect class.

9         On the substantive due process claim, the parental

10   rights claim, I think it's important to clarify what the

11   right at issue actually is.  There is a historical right

12   of parents to make medical decisions on behalf of their

13   children, but that's a recognition that children lack

14   legal capacity to do that.  But since they can't make a

15   decision legally, someone has to.  So the parents step in

16   -- into the shoes of their children to choose for them.

17        The right the plaintiffs are trying to get recognized

18   is something different.  It's not who makes the decision.

19   It's what decisions can be made.  And so the -- whatever

20   the bounds of the substantive due process right that does

21   exist in this area, it's the right for parents to make a

22   decision instead of their child rather than someone else

23   making the decision in place of the parent.  It's not a

24   right to open up the universe of what decisions are

25   available to be made under state law.

1      So we don't think that the Court ought to recognize
2  this entirely novel substantive due process right in it's
3  final ruling.  Again, that's an area where the Court is
4  not bound by either its prior ruling or the panel ruling
5  because the panel ruling didn't address that issue.
6      The last issue, the free speech claim.  There hasn't
7  really been testimony or at least not very much on the
8  impact of the SAFE Act on provider referrals.  The
9  remaining plaintiff in this case, Dr. Stambough, didn't
10  testify about providing referrals for these sorts of
11  treatments, whether it's hormone treatments or surgeries.
12  There's nothing in the record about that.
13      There's testimony that the clinic is still seeing
14  patients, new patients, but they're not being provided the
15  gender transition procedures that are prohibited by the
16  SAFE Act. There's no testimony in the record on
17  plaintiffs' case that those procedures are being -- or
18  referrals are being provided for those patients elsewhere.
19  I think that at least is a standing issue because there's
20  been no testimony about injury, that these referrals are
21  actually something that would happen absent the SAFE Act.
22           THE COURT:  Doesn't the SAFE Act prohibit the
23  referrals?
24           MR. JACOBS:  It does, Your Honor.
25           THE COURT:  Isn't the SAFE Act suspended now so

1    there's no need to refer until and unless the SAFE Act --
2    I mean, I guess there's a potential that you need to refer
3    because you don't have the skills or the facilities to
4    address a certain issue.  I mean, that's usually why
5    people get referred for other diseases, like to the Mayo
6    Clinic for cancer because they have a different capacity,
7    I guess is the way I'm trying to say it, but I'm -- I'm
8    trying to process what you're saying about the First
9    Amendment claim is that the claim would be, if this ban on
10   transgender treatment is in effect, then we would have to
11   refer these patients out of state, and it's at that point
12   in time that we couldn't -- that our -- that the damage
13   would -- I guess the harm would be done to us.
14        So I guess I'm trying to use Mr. Cantrell's
15   chicken-or-the-egg comment that it's not until they can't
16   do things the referrals are needed.  And I know that
17   that's perhaps not of record, but that's what's been
18   briefed and understood it to be; that should we not be
19   able to do it as a doctor, at that point, our First
20   Amendment rights are infringed because we can't even
21   referral it elsewhere.
22        I only say that because I'm going to have to address
23   all of is this, and I want you to have the opportunity to
24   frame your argument around the evidentiary issue on that.
25             MR. JACOBS:  I think I understand.

1        So I think there are maybe sort of three levels to

2   the standing issue.  I think Your Honor was on one of

3   them.   So I think the first one is whether referrals are

4   happening today that would or would not happen with the

5   SAFE Act in place.  I think the point that I was making is

6   that -- so I think the testimony was that nobody performs,

7   for example, the surgeries in Arkansas.  So, necessarily,

8   any Arkansas patients would have to be referred out for

9   surgeries.  I think -- I don't recall any testimony that

10  any referrals like that are actually happening now.  I

11  think the most was maybe someone given a name and it

12  wasn't one of the actually providers at issue here.  So I

13  think -- that I think is sort of a lack of evidence about

14  the injury on the surgery point.

15       And in terms of the hormonal treatments at issue

16  currently, so I think the testimony from Dr. Hutchison and

17  Dr. Stambough was that, for example, the Children's gender

18  clinic is no longer seeing new patients.  Excuse me.  They

19  are seeing new patients, but they're not providing them

20  these procedures that the Act prohibits.  And there was no

21  testimony that those patients who currently, absent the

22  effect of the law, are not getting these treatments from

23  the Children's gender clinic -- there is no testimony that

24  they're right now being referred elsewhere, whether in

25  state or out of state.  So I think that is additionally

1    sort of the lack of testimony about the injury.

2          And then I think the third step of that, which is

3    what Your Honor was getting to, of whether, if the Act

4    went into effect, would the current patients have to be

5    referred out and then perhaps there would be an injury on

6    the physician then.  I'm not sure that there was actually

7    testimony to that effect. So I think --I don't know that

8    there is evidence to establish standing even on that

9    because I don't think anybody talked about it.

10         Then separately from the standing issue whether this

11   is a speech restriction, our position continues to be that

12   this is not an actual speech restriction.  It's a conduct

13   restriction, the conduct being the practice of medicine.

14   Providing a referral is a medical decision that's made

15   based on medical judgment.  It's not really speech.  To

16   the extent that there is sort of speech necessary for the

17   conduct of communicating this, I think that's incidental.

18         There are all sorts of professional regulations that

19   could be stretched to sort of look like speech even though

20   we kind of think of them as conduct regulations.  I think

21   the clearest example that I would make -- or the

22   comparison I guess would be the restriction on an attorney

23   in a case talking with an opposing party who is

24   represented by counsel.  So I think everyone would think

25   of that --

1      THE COURT:  Even in that case, they can talk to
2  the client.  They just can't do it without their attorney
3  present.
4      MR. JACOBS:  But assuming the attorney isn't
5  present, then you have that --
6      THE COURT:  Right.  But the actual speech, the
7  actual talking to the opposing party's client, is not
8  restricted.  It's only the means in which they can do
9  that.  They have to be chaperoned, for lack of a better
10  term, and they ask and say the exact same thing.  Their
11  speech isn't abridged.  It's just a protection to the
12  opposing client's -- opposing party that they have their
13  lawyer present, similar to Miranda.  I mean, that's a
14  stretch, but you know what I'm talking about.
15      So that's not a restriction on what's being said.
16  That's a restriction on who needs to be present to say
17  those things.  If I follow your argument.
18      MR. JACOBS:  I think, if we viewed it that way,
19  it would be a time, place, and manner restriction on
20  speech as in, there is a -- you know, the attorney being
21  there or not is a time, place, and manner. So I think that
22  is saying that it's -- conceiving it as a speech
23  restriction when I think sort of my larger point is that I
24  don't think that we really think of that as a speech
25  restriction as all.  We think of it as a restriction on

1   conduct because, when in the course of a representation an
2   attorney is communicating with opposing party, it's --
3   they're doing something as a lawyer.  And that's really
4   what we're regulating.
5         The comparison that I'm trying to draw is that it's
6   really the same when you're talking about practicing
7   medicine, that all sorts of medical regulations as to what
8   a provider can or can't do.  If you squint, they might be
9   speech regulation because a lot of practicing medicine
10  might be, for example, sitting in the room with a patient
11  and talking to them.
12        THE COURT:  What time, place, or manner would
13  this referral be allowed under this particular act?
14        MR. JACOBS:  I don't think -- so --
15        THE COURT:  Who has to chaperon the doctor to
16  make this referral or who -- under what circumstances
17  would this doctor be allowed to make those statements
18  under your analogy?
19        MR. JACOBS:  My analogy is not that the SAFE Act
20  is a time, place, and manner restriction on speech.  My
21  point is that the SAFE Act is not a restriction on speech
22  at all.  And so with the lawyer example, the way that Your
23  Honor was sort of analyzing it, if you were to think of
24  that lawyer-witness interaction as a speech restriction,
25  then I think it would be -- make it time, place, manner.

1    But I think my point with the lawyer analogy is that

2    that's not a speech restriction at all either.

3         I don't think we really think of it that way.  And

4    all sorts of conduct-based regulations on professions are

5    really like that in that, you know, there may be

6    incidental words that a doctor can't say to a patient

7    because they're not allowed to practice medicine in some

8    certain way, whether it's ethics issue, whether it's not

9    being able to recommend a treatment that's prohibited by

10   the FDA.  We could think of examples.  But I think my

11   larger point is, there is no speech restriction on -- in

12   the referral prohibition.

13             THE COURT:  Do you think this act restricts a

14   doctor from talking to a third party about, generally, if

15   I was interested in this, and then that third party who is

16   not a doctor tells the patient?  What's the restriction

17   there?

18             MR. JACOBS:  The SAFE Act prohibits a referral.

19   And I think "referral" has a specific meaning in the

20   statute as something that a doctor does in the course --

21   course of his medical practice for a patient.  So talking

22   to someone else who is not a patient who maybe that person

23   -- I don't think the SAFE Act restricts that.

24        So I think that the restriction is fairly narrow in

25   what it operates against.

1          THE COURT:  Verbal advice to a patient to go

2     elsewhere is a referral or not?

3          MR. JACOBS:  I think that -- I think if a doctor

4     is counseling a patient and --

5          THE COURT:  I'm talking about a different

6     situation.  I'm talking about, he's talking to patient's

7     uncle, and patient's uncle tells the patient, here's what

8     I would do if I were you.  Is that barred by the Act under

9     your understanding because it's not a referral, it's not

10    me signing something like the torturous process I went

11    through last week on getting an MRI because I didn't go to

12    my primary care physician to make a referral to get this

13    done.

14       So I'm trying to mesh what you consider speech with

15    your definition of referral.

16          MR. JACOBS:  I think if it's -- so certainly if

17    it's advice given to the patient -- I know you were asking

18    about the uncle.  We'll answer that.  If it's advice given

19    to the patient for a medical purpose that's based on the

20    physician's medical judgment, that would be a referral.

21    If it is advice given --

22          THE COURT:  It's not a true referral from the

23    receiving doctor that you're talking about?  This is

24    advice versus what I consider a technical referral where

25    the receiving doctor looks in his file and says, I was

1    referred by Dylan Jacobs.

2         MR. JACOBS:  I think that's the other half of

3    the restriction.  So I think that -- you know, if --

4    assume that this doctor doesn't talk to any other doctor

5    and just tells a patient, I think you should go see Dr.

6    X --

7         THE COURT:  He can't talk -- the treating

8    physician under this law cannot talk to another doctor

9    about any given particular patient?  Is that covered?

10        MR. JACOBS:  I think if it constitutes a

11   referral in the sense of, I have this patient, it's my

12   medical judgment that I am referring to you for -- them to

13   you for one of these gender-transition procedures and it's

14   based on the doctor's medical judgment, I think that

15   constitutes a referral under the Act of what we would

16   think of it.  So I think there's maybe a patient part of

17   the referral and a coordinating physician part of the

18   referral.

19        If I could address the uncle portion, I guess.  I

20   think my answer would be that, if the doctor is using his

21   medical judgment to direct a patient to some medical

22   treatment through an intermediary and the intent is the

23   intermediary is going to tell the patient, I don't think

24   that's any different.  I think that's still a referral, if

25   that's the reason why he's doing it.  If he's talking with

1    someone at the grocery store and he doesn't have the
2    patient in mind -- and we could get into kind of odd
3    scenarios, but I think that the core of it is using
4    medical judgment to recommend a medical procedure and a
5    provider to provide that procedure.
6         So that's why I think that -- that's why our position
7    is that is a conduct restriction on the practice of
8    medicine rather than something that ought to be conceived
9    as a speech regulation.
10        So based on the evidence the plaintiffs submitted and
11   our legal case, we think we're entitled to judgment as a
12   matter of law.  And so we would ask the Court to grant
13   that.
14            THE COURT:  You didn't think much of the note.
15   I was more looking at your body language.
16            MR. JACOBS:  I was finished.  I was finished.
17   I'm still finished.  That's my motion.  I think we
18   recognize it's probably a formality, but --
19            THE COURT:  Fair enough.  I was just processing
20   in my head.  We had the general treatment ban and then we
21   had the First Amendment ban.  Do you think that covers the
22   waterfront on your motion that you want to offer?
23            MR. JACOBS:  Yes, Your Honor.
24            THE COURT:  Response.
25            MR. STRANGIO:  Thank you, Your Honor.  Chase

1   Strangio.

2       Plaintiffs oppose defendants motion for judgment as a

3   matter of law.  I want to first address that various

4   reasons why heightened or strict scrutiny are triggered,

5   which would then place the burden on the defendants in

6   this case.

7       So as we've briefed extensively and as our evidence

8   has shown, this law discriminates on the basis of sex and

9   transgender status.  It discriminates on sex in a up in of

10  different ways.  It does so --

11          THE COURT:  Let me interrupt you.  Part of the

12  argument that Mr. Jacobs conceded is that I'm bound by the

13  panel -- Eighth Circuit panel's ruling on that.  So I'm

14  not sure you need to make that argument.

15          MR. STRANGIO:  Your Honor, if I could make the

16  argument given that the defendants have moved for

17  rehearing en banc on that particular question and have

18  asked the Eighth Circuit panel to revisit it while --

19          THE COURT:  Does your argument to me waive any

20  right you might have to make an argument at the Eighth

21  Circuit for that?

22          MR. STRANGIO:  No, Your Honor, but in the event

23  that the Eighth Circuit instructs this court differently,

24  I think there's some -- a few reasons why sex

25  discrimination applies in this case separate and apart

1    from the way in which the Eighth Circuit interpreted it.

2            THE COURT:  I guess my point is, for this point

3    in the proceeding, I'm bound to accept your argument.

4            MR. STRANGIO:  Fair enough.

5            THE COURT:  So I'm not sure you need to make it.

6    I guess.

7            MR. STRANGIO:  I'll move on from that.

8            THE COURT:  Go ahead if you like to, but I have

9    my marching instructs from Eighth Circuit as to how to use

10   strict scrutiny in the sex gender context, and they align

11   with your wishes I guess.

12           MR. STRANGIO:  Yes.  Understood.  For that

13   reason, we believe that sex discrimination triggers

14   heightened scrutiny as both Your Honor and the Eighth

15   Circuit have found, and separately that the Act, as the

16   evidence has shown, as it's in the plain text also

17   discriminates on the basis of trans status independently

18   triggering heightened scrutiny for that reason.

19       And that can be understood in two ways.  And I do

20   want to mention both of them.  In the first is that trans

21   status discrimination is inherently sex discrimination as

22   the Supreme Court has held in Bostock.  So that's an

23   independent triggering of heightened scrutiny separate

24   from the determination by this Court potentially that

25   trans status itself is a quasi suspect classification.

724

1  As we've shown in our briefing, we believe that it is.

2      The one point I want to respond to from the

3  defendants' presentation is the question about the

4  immutability.  And under the Supreme Court's doctrine in

5  this area, immutability is either something that someone

6  cannot change or something that one should not have to

7  change because it is so fundamental to who they are.  I

8  believe that we heard extensive testimony as to that

9  particular aspect of transgender identity, both that it

10 has a biological basis, but also that it is a fundamental

11 core aspect of someone's identity. So that also is a basis

12 on which heightened scrutiny is triggered.

13     I think responding to the fundamental rights and

14 First Amendment arguments, which independently also

15 trigger strict scrutiny in this case, as parents have

16 testified, they have historically made medical decisions

17 for their children.  This is not something they would be

18 able to do were this act to go into effect.  It infringes

19 upon their right to make those decision, something that

20 the court -- the Supreme Court has long recognized as a

21 fundamental right.

22     With respect to the referral provision, I do want to

23 address that before I move to the rational basis piece of

24 the argument, which I think is also important to address

25 here.

1      There was actually quite specific testimony from

2  Dr. Stambough yesterday that, in light of the current

3  restrictions on the clinic's ability to prescribe

4  treatment to new patients, that they have been having

5  verbal conversations with patients, which constitute

6  speech and are, therefore, after those conversations,

7  instructing patients of where to go to receive the

8  treatment that they are not able to provide.  We think

9  this is a clear example of speech that would be infringed

10  based on the content of the speech were the Act to go into

11  effect.

12      So certainly, based on the evidence, Dr. Stambough

13  has standing with respect to these referrals that she

14  would not be able to make.  With respect to the question

15  even that I believe Your Honor was asking of defendants of

16  sort of whether this is conduct or speech, even if this

17  were speech incidental to conduct, it would still trigger

18  a heightened level of review, not strict scrutiny, which

19  we think is warranted in light of the fact that this is a

20  content-based restriction on the speech.

21      In other words, a doctor would be able to say -- to

22  say a family, to the Dennises, you can go travel to

23  receive counseling treatment out of state for this

24  condition, but Dr. Stambough would not be able to say, you

25  are able to go see X, Y, or Z provider for endocrine

1  treatment for gender dysphoria.  That is a content and a

2  viewpoint-based restriction on speech triggering strict

3  scrutiny.

4       Given that those are the reasons why heightened or

5  strict scrutiny is triggered, it's defendants' burden.  We

6  certainly don't think they could meet that burden, but

7  certainly have not at this point in the case met that

8  burden.

9       In any event, even if this Court were to find that no

10  heightened scrutiny applies, we have heard testimony about

11  the various medical procedures that are banned under the

12  Act and that there are many forms of medical care,

13  particularly in pediatrics where there are no randomized

14  control trials for example, where there may be a need for

15  more research and data, where there are potentially some

16  irreversible effects.  And yet it is only this care that

17  is singled out by the State of Arkansas for prohibition.

18  In fact, the precise care is permitted, including in

19  context where the purpose of the care is to affirm a

20  patient's gender affirmation, as long as it's not a

21  transgender person that this care is permitted.

22       We think that for this reason plaintiffs have shown

23  through their evidence that this law makes no sense in

24  light of how Arkansas treats other types of care.  It

25  imposes in the end a broad and undifferentiated disability

1  on a single class of people without a legitimate basis.

2  And the Supreme Court had repeatedly made clear that that

3  that is impermissible.

4       The harms of this law have been shown to be severe.

5  This Court has heard testimony all week of how this

6  treatment has greatly improved the lives of the individual

7  plaintiffs here in Arkansas and that this is typical of

8  this care.  As their parents testified for Dylan, for

9  Parker, for Brooke, and for Sabrina, this care has turned

10  the lights on for them.  It has improved their health and

11  well-being.  And taking it away would be potentially

12  catastrophic.  And as Dylan said, this care has been

13  synonymous with hope.

14       So the harms of this law a clear.  We believe that it

15  must be tested under heightened scrutiny which places the

16  burden on the defendants which they certainly have not met

17  at this point, but that under any standard of review this

18  law is unconstitutional.

19       Plaintiffs oppose defendants' motion and respectfully

20  ask that the Court deny it.

21           THE COURT:  Motion will be denied at this time.

22  We got a witness on deck?

23  We have a witness on deck?

24           MR. CANTRELL:  I believe we do, Your Honor.

25  Just to preview, Your Honor, we anticipate that our first

1    two witnesses at least will involve confidential

2    testimony.

3              THE COURT:  Is there any portion of that

4    testimony that we can get out of the way before we dismiss

5    the remainder of the crowd, or not?  I don't have a

6    preference.  I'm just saying, the last one we did, we did

7    kind of a halfway not privilege, second half privilege

8    situation.  Are this -- these facts so intertwined with

9    your entire direct that I need to dismiss everyone now?

10   Your call.  You're the only one that knows really.

11             MR. CANTRELL:  Yes, Your Honor.  So the first

12   witness, I believe it would be appropriate to have all of

13   the testimony with the --

14             THE COURT:  Sealed.

15             MR. CANTRELL:  -- cleared.

16        The second witness, there is a first portion that

17   would be nonconfidential following by a confidential

18   section of questioning.

19             THE COURT:  All right.  Then I'm going to ask

20   y'all do the same thing we did last time and look around

21   the room and find out who you're comfortable with, and the

22   remainder of the individuals will be asked to sit outside

23   for this portion or this witness and perhaps a portion of

24   the next.

25             MR. HALPERN:  Your Honor, one more quick

1  statement.  Aviv Halpern on behalf of the plaintiffs.

2          THE COURT:  Come forward to the mic.

3          MR. HALPERN:  This witness in particular is also

4  especially sensitive so we'd ask, to the extent possible,

5  to actually further restrict the courtroom as much as

6  possible to just people who are directly -- that on both

7  sides are -- have directly been involved with these

8  records.  They're therapist records for a particular

9  plaintiff.  So we're going to clear our side in terms of

10  everyone except for that minor plaintiff.  But to the

11  extent possible, if there are lawyers in the gallery that

12  have not been directly involved with these records, we'd

13  ask that -- to the extent we could exclude them, we would

14  like to.

15          THE COURT:  I'll see what I got left after we do

16  the first thinning.

17          MR. HALPERN:  Thanks, Your Honor.

18      [Sealed proceedings under separate cover.]

19          THE COURT:  We're going to cycle back to sealed/

20  not sealed on this next witness.  How long do you

21  anticipate your direct on this witness?

22          MR. CANTRELL:  Not as long as for Ms. Campbell.

23          THE COURT:  I didn't pay attention to when we

24  started, Mr. Cantrell.  Can you give me a time how long

25  you think you might --

1          MR. CANTRELL:  I was hoping to avoid doing that,
2   Your Honor, because --
3          THE COURT:  I'm not going to hold you to it.  I
4   just want an estimate because we have an hour until lunch
5   roughly.
6          MR. CANTRELL:  Your Honor, I will -- so the
7   issue will be that the first part of Ms. Ho's testimony
8   would not -- would not be confidential testimony.
9          THE COURT:  How long do you think that will
10  take, the nonconfidential portion of her testimony, on
11  direct?
12      Because here's -- here's the problem.  We bring them
13  in and then you're going to have to allow cross in the
14  middle of your examination of this witness on
15  nonconfidential issues unless she goes last.  So I've got
16  to bring them in, let them hear your direct, let them hear
17  their cross, and then take them back out and you finish
18  your direct under the sealed portion.  That's awkward.
19         MR. CANTRELL:  Yes, Your Honor.  I will say I
20  believe that we can get through -- I don't know how long
21  counsel's cross would be, but I believe we could get
22  through the nonconfidential portion before lunch.
23         THE COURT:  You don't have a problem with them
24  crossing the nonconfidential portion in the middle of your
25  direct, because that's what it's going to take.

1    MR. CANTRELL:  However Your Honor believes would

2  be the appropriate way to proceed.

3    THE COURT:  I'm asking you how do you want to

4  proceed.  What I'm inclined to do is just not let anybody

5  in and open the transcript on this portion, but I've never

6  had a situation where we've had to direct and cross and

7  then direct and cross and then recross, and it's starting

8  to push me, pull me on bringing people in and out.

9    So I'm inclined just to proceed with this witness as

10  if she were sealed, and we can decide what to do with her

11  testimony afterwards so you're direct won't be

12  interrupted.

13    MR. CANTRELL:  Your Honor, may I have just a

14  moment to confer with counsel?

15    THE COURT:  Sure.

16    MR. CANTRELL:  Your Honor, if the

17  nonconfidential portion of Dr. Ho's testimony will be

18  unsealed, then we can -- we can keep the courtroom closed

19  at this moment.  We have no objection to that.

20    THE COURT:  Okay.  That's probably how I'll

21  proceed.  I've got to make sure that we clearly demark

22  when we're going from one line to the other.  So if you'll

23  give me a heads up saying, that concludes my open portion

24  and is would like to be my closed portion, it would help

25  me on figuring out what to review when I decide what to

```
 1  unseal.
 2          MR. CANTRELL:  Yes, Your Honor.
 3          THE COURT:  Let's bring -- is it Dr. Ho?
 4  Mrs. Ho?
 5          MR. CANTRELL:  Defense calls Dr. Stephanie Ho.
 6          THE COURT:  Okay.  Is she in the room?  Somebody
 7  go get her.
 8      Dr. Ho, come on forward.  Are you her attorney?
 9          MS. BROWNSTEIN:  May she take her water up there
10  with her?
11          THE COURT:  Sure.  Ms. Brownstein, we've been
12  allowing people to use the jury box, if you'd like to
13  listen more closely.  If you can hear from back there.
14  I'm not asking you to move.  I'm just offering alternate
15  seating.
16          MS. BROWNSTEIN:  Okay.  Thank you.
17          THE COURT:  Do you want to make an appearance so
18  we know who we're talking about?
19          MS. BROWNSTEIN:  I can make an appearance as the
20  attorney for Dr. Ho.
21          THE COURT:  Who are you?
22          MS. BROWNSTEIN:  I'm Bettina Brownstein of the
23  Bettina Brownstein Law Firm.  Thank you.
24          MR. CANTRELL:  May I proceed, Your Honor?
25          THE COURT:  Certainly, Mr. Cantrell.
```

HO - DIRECT

| | |
|---|---|
| 1 | MR. CANTRELL:  Good morning. |
| 2 | THE COURT:  You swear to tell the truth? |
| 3 | THE WITNESS:  I swear to tell the truth. |
| 4 | STEPHANIE HO, DEFENDANTS' WITNESS, DULY SWORN |
| 5 | DIRECT EXAMINATION |
| 6 | BY MR. CANTRELL: |
| 7 | Q.   Dr. Ho, my name is Michael Cantrell.  I'm with the |
| 8 | with the Attorney General's office, and I represent the |
| 9 | defense in this case.  I believe we've met before during |
| 10 | your deposition.  So good morning. |
| 11 | Can you state your name for the record and spell your |
| 12 | last name, please? |
| 13 | A.   My name is Stephanie Ho, last name is spelled H-o.  I |
| 14 | use she/her pronouns. |
| 15 | THE COURT:  What was that last part? |
| 16 | THE WITNESS:  I use she/her pronouns. |
| 17 | THE COURT:  Okay. |
| 18 | BY MR. CANTRELL: |
| 19 | Q.   Dr. Ho, you are a family physician, correct? |
| 20 | A.   That's correct. |
| 21 | Q.   You are not a pediatrician, correct? |
| 22 | A.   I'm not a pediatrician. |
| 23 | Q.   And you've not obtained specialized training in |
| 24 | psychiatry.  Is that right? |
| 25 | A.   I'm not a psychiatrist. |

HO - DIRECT

1  Q.    You've not obtained specialized training in

2  psychology.

3  A.    I'm not a psychologist.

4  Q.    You've not obtained specialized training in

5  endocrinology, correct?

6  A.    I'm not an endocrinologist.

7  Q.    You provide cross-sex hormones to patients with

8  gender dysphoria, correct?

9  A.    That's correct.

10  Q.    By the term gender dysphoria, you mean a discomfort a

11  person has with a certain feature of their body.  Is that

12  right?

13  A.    That's right.

14  Q.    And you do not make use of the Diagnostic and

15  Statistical Manual in your practice, correct?

16  A.    The DSM criteria is what I use to determine if

17  somebody has gender dysphoria, those guidelines.

18  Q.    Dr. Ho, you also provide cross-sex hormones to

19  patients with gender nonconformity.  Is that right?

20  A.    That is not correct.

21  Q.    Just to -- just so I'm clear, you -- the question

22  that I was asking was, whether you provide cross-sex

23  hormones to patients with gender nonconformity.  And you

24  answered, no.

25  A.    That's correct.

HO - DIRECT

```
1   Q.   So Dr. Ho, you testified in a deposition in this
2   case.  Is that right?
3   A.   Yes, sir.
4   Q.   And you were under oath during that deposition?
5   A.   Yes, sir.
6   Q.   And you swore to tell the truth in that deposition,
7   correct?
8   A.   That's correct.
9   Q.   And did you tell the truth during your deposition?
10  A.   I did, but I may have misspoke.
11  Q.   And your counsel was present during that deposition,
12  correct?
13  A.   That's correct.
14  Q.   Dr. Ho, do you recognize this as the -- Dr. Ho, do
15  you recognize this as the nonconfidential portion of the
16  deposition you gave in this case dated April 15, 2022?
17  A.   That's correct.
18  Q.   And turn to Page 14 of that deposition.  And
19  beginning at page -- so Page 14, Line 12, I will read.
20       Question:  I think you just answered my next
21  question.  My question was going to be, what do you call
22  the gender-related condition for which you prescribe
23  hormones?
24       Answer:  I call it gender nonconformity.
25  A.   That's correct.
```

HO - DIRECT

1  Q.   I read that correctly?

2  A.   Correct.

3  Q.   Dr. Ho, by gender nonconformity, you mean that a

4  person does not identify with the gender they were

5  assigned at birth, correct?

6  A.   That's correct.

7  Q.   And you've provided cross-sex hormones to minors for

8  around five years.  Is that right?

9  A.   That's correct, roughly.

10  Q.   Your goal in prescribing cross-sex hormones is to

11  help the patient feel affirmed in their gender identity,

12  correct?

13  A.   Correct.

14  Q.   And the goals of treatment are sometimes set by the

15  patient, correct?

16  A.   All care is individualized.

17  Q.   And so by saying all care is individualized, you mean

18  that -- that sometimes the goals of treatment are set by

19  the individual patients, correct?

20  A.   The goals of the patient are included in the

21  individualized therapy that's provided.

22  Q.   You provide cross-sex hormones to patients on an

23  informed consent basis.

24  A.   That's correct.

25  Q.   And that differs from the treatment model used at the

HO - DIRECT

1  Arkansas Children's Hospital Gender Spectrum Clinic,

2  correct?

3  A.    I don't know what guidelines they have.

4  Q.    Are you familiar with the Arkansas Children's

5  Hospital Gender Spectrum Clinic?

6  A.    I'm aware of it, yes.

7  Q.    What is your understanding of the difference between

8  your informed consent-based treatment and what the Gender

9  Spectrum Clinic does?

10  A.    So it's my understanding that the Gender Spectrum

11  Clinic requires a psychological evaluation prior to

12  initiation of hormone therapy.  My clinic is informed

13  consent-based, which means that the patient and the parent

14  are provided all information that is appropriate and

15  important for them to make an informed decision.

16  Q.    So you don't typically require patients seeking

17  cross-sex hormones to meet with a psychologist before

18  getting a prescription, correct?

19  A.    I don't technically make them meet with a mental

20  health provider, correct.

21  Q.    And there's no standard period of time that a patient

22  has to wait to receive cross-sex hormones, correct?

23  A.    Correct.

24  Q.    You're aware that even experts in trans care provide

25  different answers to questions about best practices in

HO - DIRECT

1    trans care.

2    A.   I don't know what other providers would say.  I can't

3    speak to that.

4    Q.   Are you aware that -- that different clinics have

5    different protocols for providing cross-sex hormones?

6    A.   I understand that that is the -- yes, I'm aware.

7    Q.   Are you aware that differences in practices across

8    clinics are due in part to a general lack of research

9    supporting rules for prescribing cross-sex hormones?

10   A.   I don't understand your question.

11   Q.   Dr. Ho, you used the TransLine Prescriber Guidelines

12   in your practice, correct?

13   A.   Correct.

14   Q.   And you trust the TransLine guidelines to provide

15   reliable information, correct?

16   A.   I do.

17   Q.   Are you aware that those guidelines state that even

18   experts in trans care provide different answers to

19   questions about best practices?

20   A.   I don't recall reading that line specifically.

21           MR. CANTRELL:  One moment.

22           THE COURT:  Let me short cut.  Do you agree or

23   disagree with that statement?

24           MS. COOPER:  Your Honor, if I may object.  This

25   seems to be going into expert testimony, not fact witness

1    testimony about her practices.

2              THE COURT:  I think he's asking does she think

3    care providers can disagree is how I heard the question.

4    But I'm not sure that takes an expert to answer that

5    question.

6         But what was your question, Mr. Cantrell, so I don't

7    misstate or mischaracterizes your question?

8              R. CANTRELL:  So the question goes to the fact

9    that Dr. Ho --

10             THE COURT:  I just want you to restate your

11   question so I can know what to deal with.

12             MR. CANTRELL:  Yes, Your Honor.

13   BY MR. CANTRELL:

14   Q.   The question was, you're aware that those guidelines

15   state that even experts in trans care provide different

16   answers to questions about best practices.

17             THE COURT:  If she can answer that question, I'm

18   going to allow it.

19             THE WITNESS:  I'm aware that different practices

20   provide individualized care based on their assessments of

21   their patients.

22   BY MR. CANTRELL:

23   Q.   Are you aware that the TransLine guidelines -- let me

24   back up.

25        You've testified that the TransLine guidelines are

1  reliable, correct?

2  A.    The TransLine guidelines are the guidelines I use

3  because I find them evidence based and appropriate to

4  apply to my practice.

5  Q.    You trust them to provide reliable information.

6  A.    I do.

7  Q.    And you're aware that those guidelines state that

8  differences in practice are result of a general lack of

9  research supporting rules for prescribing cross-sex

10  hormones.

11  A.    I'm generally aware of that statement, yes.

12  Q.    Are you aware that many of the suggestions in the

13  TransLine Prescriber Guidelines are based on low-level

14  evidence in nontransgender population.

15  A.    I'm aware.

16  Q.    You're aware that many of the suggestions in

17  TransLine Prescriber Guidelines are not based on hard

18  evidence.

19  A.    Can you repeat the question?

20            MS. COOPER:  Object on vagueness.

21            THE COURT:  Which guidelines are you talking

22  about, Mr. Cantrell?  You can't just say some guidelines.

23  You need to be more specific.

24            MR. CANTRELL:  Thank you, Your Honor.

25            MS. COOPER:  Your Honor, just to -- for

HO - DIRECT

1    clarification, my objection on vagueness was to the

2    language "hard evidence."

3                THE COURT:  Was to?

4                MS. COOPER:  "Hard evidence."

5                THE COURT:  "Hard evidence"?  I'm sorry.  I

6    can't hear you and I can't see you.

7                MS. COOPER:  My objection on vagueness was to

8    his reference to hard evidence, the term "hard evidence."

9                THE COURT:  Maybe that too but I -- I have no

10   idea how big these guidelines are, but the notion that

11   some of them and some of them might not be X, Y, or Z hard

12   evidence or otherwise was my problem with the question.

13   I've got to understand question so I can understand the

14   answer.  I appreciate the focus on hard evidence, but I

15   didn't even get there yet so.

16      I understand she says she relies on these guidelines,

17   Mr. Cantrell, but I need you to get to what portion of the

18   guidelines you think are salable with regard to these

19   patients because, as mentioned before, she's not an

20   expert.  She's here to testify about her treatment of

21   these particular patients.

22               MR. CANTRELL:  Yes, Your Honor.  I will -- I'll

23   just move on.  That was my last question on that that

24   topic.

25   BY MR. CANTRELL:

HO - DIRECT

1  Q.   Although I will ask not specifically about those

2  guidelines, but in the way that you use the guidelines.

3  So you don't use the TransLine guidelines to treat any

4  condition other than gender dysphoria and gender

5  nonconformity, correct?

6  A.   I use those guidelines to treat gender dysphoria.

7  Q.   Dr. Ho, your goal in prescribing cross-sex hormones

8  to a patient is for patient to feel affirmed in their

9  gender identity, correct?

10 A.   That's correct.

11 Q.   And you -- you're basing care more on your patient's

12 experience and satisfaction as opposed to objective lab

13 results, correct?

14 A.   I base my care and provide for a level of affirmation

15 as opposed to a specific lab value or -- or things like

16 that.  I treat the patient, not the lab.

17 Q.   And so I -- as I understand it, the answer to my

18 question would be yes.  Is that right?

19 A.   Can you repeated the question?

20        MS. COOPER:  Objection.  Vague.

21 BY MR. CANTRELL:

22 Q.   Yes.  So the question, your goal is in prescribing

23 cross-sex hormones in a patient is for patients to feel --

24 I'm sorry.  That was not the question.

25    You're basing care more on your patient's experience

HO - DIRECT

1    and satisfaction as opposed to objective lab results,

2    correct?

3    A.   Correct.

4    Q.   Cross-sex hormones are sometimes referred to as

5    hormone replacement therapy.

6    A.   That's correct.

7    Q.   But hormone replacement therapy was traditionally

8    something used to treat post-menopausal women, correct?

9    A.   Correct.

10   Q.   When used in adolescents with gender dysphoria, a

11   cross-sex hormone is not replacing any hormone, correct?

12   A.   That's correct.

13   Q.   You agree that cross-sex hormones could cause your

14   patients long-term effects that are unknown at the present

15   time.

16   A.   I agree.

17   Q.   And you tell your patients that cross-sex hormones

18   can cause infertility, correct?

19   A.   Correct.

20   Q.   Not many of your patients pursue fertility

21   preservation, correct?

22   A.   That's correct.

23   Q.   Have you treated any patients for gender dysphoria

24   since -- I'm sorry.

25        Have you received any new patients presenting with

1  gender dysphoria since February of this year?

2  A.   Yes.

3  Q.   Have you -- have you received any referrals from any

4  other person in Arkansas?

5  A.   Yes.

6  Q.   Since February of this year?

7  A.   Yes.

8  Q.   Have any of those referrals come from the Gender

9  Spectrum Clinic?

10 A.   Yes.

11 Q.   How many of those have come from Gender Spectrum

12 Clinic?

13 A.   Maybe three to five.

14         MR. CANTRELL:  If I can have a moment, Your

15 Honor.

16         THE COURT:  Sure.

17 BY MR. CANTRELL:

18 Q.   Dr. Ho, how many patients have you treated with

19 cross-sex hormones during your career?

20 A.   Do you mean adults or adolescents?

21 Q.   Let's stick to adolescents.  And specifically let me

22 be clear.  Let's stick to those under age 18.

23 A.   Okay.  I'm not great at estimation, but I would say

24 maybe around 20.

25 Q.   And how many patients do you currently treat?  How

1    many -- how many patients under age 18 do you currently

2    treat with cross-sex hormones?

3    A.    Maybe between 30 to 40.

4              MR. CANTRELL:  Pass the witness.

5              THE COURT:  Mr. Cantrell, unless you need that

6    at your desk, you can leave that up there until we're

7    done, unless you need it to take notes.

8              MR. CANTRELL:  I will -- I will take some of

9    them.

10              THE COURT:  Okay.

11                        CROSS-EXAMINATION

12    BY MS. COOPER:

13    Q.    Good morning, Dr. Ho.  I'm Leslie Cooper for the

14    plaintiffs.

15              THE COURT:  Ms. Cooper, hang on a second.  Let

16    him get a seat and then we'll continue.

17              MS. COOPER:  Sure.

18              THE COURT:  Go ahead.

19              MS. COOPER:  Thank you.

20    BY MS. COOPER:

21    Q.    Dr. Ho, just want to clarify something you were just

22    asked.  You were asked how many patients who were under 18

23    have you treated with hormone therapy.  And I believe you

24    said you estimated around 20.  Is that correct?

25          Well, let me followup where the confusion was,

HO - CROSS

1  because then you asked, how many patients you currently

2  treat.  And I'm not sure if it was specified whether the

3  question was about minors or minors and adults.  You said

4  30 to 40.

5      So can you help clarify that?

6  A.   I guess I didn't understand if I was speaking before

7  February like I was asked prior or if I'm speaking in

8  total.

9  Q.   Okay.  And prior to February, approximately how many

10 adolescents -- patients under 18 did you treat with

11 hormone therapy?

12 A.   Approximately 20.

13 Q.   And you then you mentioned you were referred from

14 adolescents or under 18 patients by the Arkansas

15 Children's Hospital gender clinic.  Is that correct?

16 A.   They have made referrals, yes.

17 Q.   I believe you said that was about three to five.  Was

18 that right?

19 A.   Yes.

20 Q.   And so the number 30 to 40 that you were referencing,

21 was that adult patients?

22 A.   No.  That is referrals from outside providers and

23 people who have sought care on their own.

24 Q.   Understood.  Since the change in the protocols at the

25 Arkansas Children's hospital?

HO - CROSS

1    A.    Correct.

2    Q.    You testified that you would provide gender-affirming

3    hormone therapy to patients with gender dysphoria.  You

4    also used the term, gender nonconformity.  I want to ask

5    you if you wanted to explain something about the use of

6    that term?  It sounded like you were beginning to.

7    A.    Yes.  So gender nonconformity is basically a person's

8    -- who does not identify with the sex they were assigned

9    at birth.  Not all people who are gender nonconfirming

10   have gender dysphoria, and so hormone therapy is indicated

11   for gender dysphoria.

12   Q.    And Mr. Cantrell pointed to your testimony about use

13   of treatment hormone therapy for conditions relating to

14   gender issues, and I believe pointed to testimony where

15   you said, gender nonconformity.  Can you explain that

16   testimony?

17   A.    Yes.  I believe that I misspoke.  Gender

18   nonconformity and gender dysphoria sometimes in common

19   language and discussion are accidentally used in

20   interchangeably.  But my intention was to say gender

21   dysphoria.

22   Q.    With your minor patients with gender dysphoria, is it

23   correct that each patient's mental health is evaluated in

24   some way prior to prescribing hormones in your practice?

25   A.    Yes.

HO - CROSS

1   Q.   Is that done by using screening tools for depression
2   and anxiety?
3   A.   That's correct.
4   Q.   Does that include talking to the patient?
5   A.   Absolutely.
6   Q.   Does that include talking to their parent?
7   A.   Yes.
8   Q.   And is it correct that you inform minor parents and
9   their patients [sic] of the potential risks of treatment
10  before initiating hormone therapy?
11  A.   Correct.
12  Q.   And that includes, I believe you testified, telling
13  them about potential risks of infertility?
14  A.   Correct.
15  Q.   Is that all part of the informed consent process to
16  make them aware of the potential risks and benefits of
17  care?
18  A.   Correct.
19  Q.   You provide this information to families in verbal
20  and written forms.
21  A.   Absolutely.
22  Q.   And with minors, you determine a patient's capacity
23  to make an informed decision through talking with the
24  patient and their parent.  Is that correct?
25  A.   Correct.  And an overall general assessment of the

HO - CROSS

1  patient -- patient's care and taking all of that into

2  consideration before I would decide to prescribe.

3  Q.   And you do not prescribe puberty blockers as

4  gender-affirming care, do you?

5  A.   No.

6  Q.   And going back to the number of patients for whom you

7  -- minor patients that you treated for gender dysphoria,

8  that number that you gave prior to February of '22 that it

9  was a total of 20 patients, does that go back to 2017;

10  from 2017 to February of '22 you saw about 20 underage 18

11  patients for and provided hormone therapy?

12  A.   That's correct.

13  Q.   And just a couple of more questions, Dr. Ho.

14       You diagnosed Sabrina Jennen with gender dysphoria

15  before initiating hormone therapy.

16  A.   Correct.

17  Q.   And you regularly see Sabrina to monitor her hormone

18  therapy?

19  A.   That's correct.

20  Q.   Is hormone therapy benefiting Sabrina?

21  A.   Yes.

22       MS. COOPER:  Just a moment, Your Honor.

23       Nothing further, Your Honor.

24       MR. CANTRELL:  Your Honor, before I proceed, I

25  just want to make clear that this is the nonconfidential

HO - REDIRECT

1    portion and we've had direct and cross and this is

2    redirect and we will have a subsequent portion during

3    which we have confidential testimony.

4              THE COURT:  So you're saying we're starting the

5    sealed portion of this proceedings?

6              MR. CANTRELL:  Not at this time.  Not yet, but

7    soon.  I will let you know.

8              THE COURT:  So this is your redirect on the

9    nonsealed portion?

10             MR. CANTRELL:  Yes.

11             THE COURT:  Okay.

12                    REDIRECT EXAMINATION

13   BY MR. CANTRELL:

14   Q.   Dr. Ho, can you can you explain the 30 to 40 figure

15   again for my benefit?  When you give the 30 to 40 person

16   figure, what does that represent?

17   A.   The 30 to 40 figure represents all of the patients

18   that I see under the age of 18 for gender-affirming care.

19   Q.   Okay.  And that is currently?

20   A.   That's currently.

21   Q.   Okay.

22             MR. CANTRELL:  May I have a moment, Your Honor?

23             THE COURT:  You may.

24             MR. CANTRELL:  Nothing further at this time for

25   the open portion, Your Honor.

1        THE COURT:  You can move to the closed portion
2    then.
3        [Sealed proceedings under separate cover.]
4        THE COURT:  You're off your subpoena.  Free to
5    go.
6        THE WITNESS:  Thank you.  What do I do with --
7        THE COURT:  Just leave it there.  Thank you,
8    Dr. Ho.
9        Have a good day, Bettina.
10        MS. BROWNSTEIN:  Thank you, Your Honor.
11        THE COURT:  Mr. Cantrell, can you give me an
12    estimate on how long -- in light of these last two
13    witnesses, how long you think your third and final witness
14    is going to go?  I am considering going straight through
15    rather than everyone have to wait for us.
16        MR. CANTRELL:  Yes, Your Honor.  I'll defer to
17    co-counsel.
18        MS. TEMPLIN:  Your Honor, this will be
19    relatively short, although we'll need a moment to pull out
20    a couple of exhibits.
21        THE COURT:  Why don't we go ahead and do that.
22    We're going swap out court reporters while you do that.
23    We'll just work straight through.
24        Is there any sealed portion of this next witness we
25    need to worry about?

1          MS. TEMPLIN:  Nothing like those, Your Honor.  I

2     may end up referring as -- to use as impeachment material

3     some exhibit --

4          THE COURT:  My point is, do I need to exclude

5     the rest of the audience from this next witness?

6          MS. TEMPLIN:  No, Your Honor.

7          THE COURT:  Perfect.  Thank you.  You let them

8     know we're going to go ahead.

9       (At recess was taken at 12:01 p.m.)

10                         *  *  *  *  *

11                  REPORTER'S CERTIFICATE

12       I, Valarie D. Flora, FCRR, TX-CSR, AR-CCR, certify

13     that the foregoing is a correct transcript of proceedings

14     in the above-entitled matter.

15       Dated this the 26th day of October, 2022.

16     /s/ Valarie D. Flora, FCRR

17     ---------------------------

18     United States Court Reporter

19

20

21

22

23

24

25

Cathey - Direct

```
1        (Proceedings continuing in open court at 12:07 PM.)
2            MS. TEMPLIN:  Your Honor, the State calls Dr. Janet
3   Cathey to the stand.
4        JANET CATHEY, DEFENDANTS' WITNESS, DULY SWORN
5            MR. SHULTS:  Good afternoon, Your Honor.  I'm Steve
6   Shults with the Shults Law Firm in Little Rock.  We represent
7   Dr. Cathey and I'm here in case I need to object to any
8   questions that might ask for privileged information or might
9   ask for opinion because Dr. Cathey is here as a subpoenaed fact
10  witness, not as an expert witness.
11           THE COURT:  Understood.  You can sit wherever you
12  can hear the best.  The jury box is open to you or if you can
13  hear fine from any other available seat, you're free to take
14  your choice.
15           MR. SHULTS:  Thank you, Your Honor.
16  BY MS. TEMPLIN:
17  Q    Good afternoon, Dr. Cathey.  Could you introduce yourself
18  to the Court and spell your last name for the court reporter?
19  A    I'm Dr. Janet Cathey.  C-a-t-h-e-y.
20  Q    Dr. Cathey, what type of medicine do you practice?
21  A    I'm board certified in obstetrics and gynecology.
22  Q    When did you graduate from medical school?
23  A    I graduated from medical school at UAMS in 1982.  I did
24  my residency in OB/GYN at UAMS and finished in 1986.
25  Q    Just to clarify, have you had any formal training in
```

1    pediatrics?

2    A      Just as what we do as part of our residency, studying

3    women's health.

4    Q      What about in psychiatry or psychology?

5    A      No formal training, just years of doing it.

6    Q      Where do you currently practice?

7    A      I'm at Planned Parenthood.

8    Q      Did you see transgender patients before you went to

9    Planned Parenthood?

10   A      Yes, I've seen transgender patients almost from the start

11   of my practice 40 years ago.

12   Q      What is your current role at Planned Parenthood?

13   A      At Planned Parenthood, I'm a clinician.  I'm also

14   director of transgender health for Planned Parenthood Great

15   Plains.

16   Q      Do you prescribe puberty blockers?

17   A      No.

18   Q      Have you ever throughout your history prescribed puberty

19   blockers before Planned Parenthood?

20   A      No.

21   Q      Do you prescribe feminizing hormone therapy?

22   A      Yes.

23   Q      Do you prescribe masculinizing hormone therapy?

24   A      Yes.

25   Q      Have you ever prescribed hormone therapy to a minor?

Cathey - Direct

```
1    A      Yes.
2    Q      What's the youngest patient you've prescribed hormone
3    therapy to?
4    A      When I was on faculty at UAMS, 14.
5    Q      Just to clarify, have you prescribed hormone therapy to a
6    minor while working for Planned Parenthood?
7    A      Yes.  At Planned Parenthood, we'll see 16 and 17 year
8    olds.
9    Q      About how many have you seen at Planned Parenthood?
10   A      It is not -- I do not have the exact numbers.  It is not
11   a significant part of the transgender population that we see.
12   Q      Has the number of patients you've seen increased since
13   the gender spectrum clinic declined to take new patients who
14   are minors?
15   A      No, we have not seen an increase.
16   Q      Have you received any referrals from that clinic or from
17   any other provider in Arkansas?
18   A      Not to my knowledge, no.
19   Q      Other than you, does anyone else at Planned Parenthood
20   prescribe hormones?
21   A      Yes.  We have two APNs that also prescribe hormones.
22   Q      Do the Planned Parenthood guidelines allow you to
23   prescribe hormones to minors?
24   A      Yes, with parental consent.
25   Q      Is there a minimum age?
```

Cathey - Direct

```
1    A      16.
2    Q      Just to clarify, is there any reason why you would
3    prescribe to someone younger than 16?
4    A      We would not at Planned Parenthood.
5              MS. TEMPLIN:  Your Honor, I'd like to refer her
6    briefly to a document that was designated confidential during
7    depositions.  I don't believe it's been sealed in this
8    proceeding but wanted to raise it with you before using the
9    document now.
10             THE COURT:  Can you show it to me?
11             MS. TEMPLIN:  I can.
12             THE COURT:  Y'all know what she's talking about?
13             MS. COOPER:  Yes, Your Honor.
14             THE COURT:  Is there any objection?
15             MS. COOPER:  Can you specify to make sure we're on
16   the same page?
17             MS. TEMPLIN:  This is Exhibit 62.
18             THE COURT:  This is indicated as Cathey Bates No.
19   333.  You want to look at it, Mr. Shults?
20             MR. SHULTS:  Yes, please, Your Honor.
21             MS. COOPER:  We understand.  I believe that --
22             THE COURT:  I'm not sure why it's marked
23   confidential, but y'all may have a purpose for having marked it
24   that way.
25             MS. COOPER:  I believe it was marked confidential by
```

Cathey - Direct

1    Dr. Cathey's counsel.

2          THE COURT:  Are you talking about just that page or

3    more than that page?

4          MS. TEMPLIN:  I just plan to use that page, Your

5    Honor.

6          MR. SHULTS:  Your Honor, we also represent Planned

7    Parenthood Great Plains, Dr. Cathey's employer, and I believe

8    that's from guidelines used by Planned Parenthood Great Plains

9    and frankly I don't remember all about the sensitivity of it or

10   reason it was marked confidential, but if it can be received

11   under seal that would be appropriate I think.

12         THE COURT:  I'm going to allow her to question this

13   witness.  I don't know if I received that document in total or

14   not, but if I do actually receive the exhibit, it will be

15   received under seal and I guess we can go on a question by

16   question basis whether or not you want her to answer in the

17   open to questions posed to her right now.

18         MR. SHULTS:  I think that's fine for her to testify

19   in response to questions, and if I have any objection to a

20   particular question, I'll make that objection, Your Honor.

21   Thank you.

22         THE COURT:  You may proceed.  Does she have a copy?

23         MS. TEMPLIN:  To clarify, Your Honor, I just plan to

24   ask one question about this as impeachment, not to offer it

25   into evidence.

Cathey - Direct

```
1              THE COURT:  Okay.  To orient it correctly, you may
2    need to pull it -- I'm not sure you can --
3              MS. TEMPLIN:  I believe you're right, Your Honor.
4    BY MS. TEMPLIN:
5    Q    Dr. Cathey, can you see this page clearly?
6    A    Yes.
7    Q    At the bottom of the page, Roman numeral II, it reads:
8    Must obtain waiver from PPFA to provide minor's age under 16
9    years.  Did I read that correctly?
10   A    Yes.
11   Q    Does that indicate that Planned Parenthood guidelines
12   allow some patients to obtain hormone therapy if they're under
13   16 years old with a waiver?
14   A    With a waiver, these guidelines are for all of Planned
15   Parenthood throughout the country.  So our -- we would not get
16   a waiver at -- I wouldn't ask for a waiver.
17   Q    So just to clarify, your particular office --
18             THE COURT:  Doctor, I think the question is:  Does
19   paragraph 2 insinuate that you treat people at Planned
20   Parenthood under 16?
21             THE WITNESS:  No, not at Planned Parenthood Great
22   Plains.
23             THE COURT:  Is that your question?
24             MS. TEMPLIN:  That is.  I just wanted to clarify
25   whether Planned Parenthood Great Plains followed the Planned
```

 1   Parenthood Federation of America standard or did not treat

 2   patients under 16 with a waiver.  And I believe your testimony

 3   is that you would not see anyone under 16?

 4              THE WITNESS:  We wouldn't.  Our particular

 5   affiliate, we wouldn't ask for a waiver.

 6   BY MS. TEMPLIN:

 7   Q     Okay.  Dr. Cathey, what diagnosis would you give your

 8   transgender patients?

 9   A     Usually it's going to be a diagnosis of gender dysphoria.

10   Q     Do you require a gender dysphoria diagnosis before you

11   prescribe hormones?

12   A     Yes, I would.

13   Q     Dr. Cathey, were you deposed in this case?

14   A     Yes.

15   Q     Was your lawyer present at your deposition?

16   A     Yes.

17   Q     Did you swear to tell the truth?

18   A     Yes.

19   Q     Did you tell the truth?

20   A     Yes.

21   Q     Is this a copy of your deposition, the nonconfidential

22   portion?

23   A     Yes.  I have no reason to think it's not.

24   Q     Is yours not on?

25   A     Yes, it's on.

Cathey - Direct

1   Q     Sorry.  Turning to page 22, starting at line 16, reading
2   the question.  "Sure.  So let me try to do better.  Do you --
3   do you require that someone have a diagnosis of gender
4   dysphoria or endocrine disorder unspecified before you will
5   prescribe the pharmaceutical products for a gender identity
6   related condition?"  Turning to the next page.  Starting on
7   line 2.  "Not -- I would say the majority of the time, majority
8   of the time, they are going to carry one of those diagnoses.
9   There are people that -- you used the word gender
10  nonconforming -- that are not particularly dysphoric, but it is
11  their desire to be placed on hormone management."
12        Did I read that correctly?
13  A     You read it correctly.
14  Q     To clarify, are there some people who are gender
15  nonconforming who do not formally have gender dysphoria but
16  want to be placed on hormone management who you would prescribe
17  hormones to?
18              MS. COOPER:  Objection, mischaracterizing.
19              THE COURT:  Doctor, you can answer the question if
20  you understand it.
21  BY MS. TEMPLIN:
22  Q     I can read the next couple lines of this deposition.
23  Starting on line 8, another question.  "Okay.  And there are
24  circumstances when you will prescribe hormones, for example, to
25  those patients?"  Line 11.  Answer:  "Yes."

1    Is that correct?

2  A    That's what it says.  But this was -- as I look back on

3  this, it is confusing because we're getting into diagnosis

4  codes and then the word "gender nonconformity" comes in here,

5  and there's also the question of when you start asking a

6  physician have you ever, would you ever, those are sometimes

7  difficult questions.  So looking at that, thinking about that,

8  I would say no, I wouldn't.  I would not treat someone for a

9  condition that they did not have, a diagnosis they did not

10  have.

11  Q    Just to confirm, you testified today that you have never

12  prescribed hormones to someone without a formal gender

13  dysphoria diagnosis?

14  A    Yes, I would stick with that.

15  Q    Do you require your patients to participate in therapy or

16  to get a mental health diagnosis before they receive hormone

17  therapy?

18  A    No.  We use an informed consent model.

19  Q    When a patient comes in to your office, will you

20  prescribe hormones on the first visit?

21  A    I would under certain conditions.  It's not going to be

22  someone who walks in and says I want hormones and they get

23  hormones.  That would be mischaracterization.

24  Q    You testified just now that you obtained consent before

25  prescribing hormone therapy?

Cathey - Direct

1   A      Yes.

2   Q      How do you understand consent?

3   A      Now, are we talking about minors or are we talking about

4   all patients?

5   Q      Let's focus on minors for now.

6   A      Minors are going to have to have parental consent.

7   Q      Do you personally obtain that consent?

8   A      Do I?  Am I the one that watches them sign the piece of

9   paper?

10  Q      Correct.

11  A      No.

12  Q      Who is it who obtains the consent on the piece of paper?

13  A      The medical assistant has them sign the consent.

14  Q      So the process is having them sign a consent form, right?

15  A      The physical process, yeah.

16  Q      Do those assistants have medical training?

17  A      They are -- they have a type of vocational training.

18  They're not licensed.

19  Q      So they do not have a nursing or a medical degree?

20  A      No, but I go over that consent with them.

21  Q      How long do they talk with each patient?

22  A      Probably 15 or 20 minutes.

23  Q      Is this 20-minute discussion only about informed consent

24  or are there other things they're doing during this time?

25  A      There's other things.

```
1    Q     For example, which things?

2    A     They talk to them about their medical history, they get

3    their vital signs, they just ask them what they're in for, just

4    a general pre-physician, pre-provider discussion.

5              MS. TEMPLIN:  Your Honor, may I approach?

6              THE COURT:  Sure.

7    BY MS. TEMPLIN:

8    Q     Dr. Cathey, do you recognize this first form?

9    A     Yes.

10   Q     What is it?

11   A     That's the Planned Parenthood -- the first is consent for

12   feminizing hormones.

13   Q     Is this your form, the form your office uses?

14   A     It's what we use now.

15   Q     Is this form an accurate representation of what your

16   office tells patients seeking hormone therapy?

17   A     Yes.

18   Q     Does Planned Parenthood keep this form on record as part

19   of its regular business practice?

20   A     Yes.

21             MS. TEMPLIN:  Your Honor, I'd like to offer Exhibit

22   59 into evidence under the business record exception.

23             MS. COOPER:  Objection, Your Honor.  This is a

24   consent form.  It is not the foundation that this is something

25   kept in ordinary business practices.
```

Cathey - Direct

```
 1            THE COURT:  Well --

 2            MS. TEMPLIN:  Your Honor, Dr. Cathey just testified

 3    they do keep this as part of their record and this court has

 4    admitted other consent forms under the business record

 5    exception during the testimony of Dr. Hutchison.

 6            MS. COOPER:  Your Honor, if I may add, it seems this

 7    exhibit is a collection of various forms, it's not just one.

 8            THE COURT:  I guess that's my question.  I'm looking

 9    at --

10            MS. TEMPLIN:  Your Honor, we would be happy to --

11            THE COURT:  Please let me finish.  I'm looking at a

12    40-page document, and similar to what I asked Mr. Cantrell,

13    what is the relevant portion of this document that you want

14    considered?

15            MS. TEMPLIN:  Your Honor, I was just about to answer

16    that.  We would be happy to admit the first two forms, one for

17    masculinizing hormone therapy, one for feminizing hormone

18    therapy, and if this court did not want to admit --

19            THE COURT:  That would be Bates numbers what?

20            MS. TEMPLIN:  Apologies, let me pull it up.  Bates

21    numbers 360 through 367.

22            MS. COOPER:  Your Honor, if I may, I believe this is

23    a blank form.  And I understand they keep these records when

24    forms are signed.  This is not a signed consent form.  And in

25    addition, the exhibit they submitted was a -- this is part of a
```

Cathey - Direct

1    larger exhibit.  I don't think it's appropriate to then just

2    take a portion now of an exhibit.  This was an exhibit that --

3              THE COURT:  Mr. Cooper, I asked them to do that

4    because they narrowed 30 pages from this record that she

5    doesn't think are necessarily relevant, so if you want to offer

6    the rest of it, you can, if you think it's somehow relevant in

7    your cross.  But the notion that they didn't supply the entire

8    document is because the entire document in their estimation

9    isn't relevant.  So I'm not going to sustain it on that basis.

10   I am going to ask Dr. Cathey, I know these are forms, but is

11   this the form you have your clients sign to obtain informed

12   consent?

13             THE WITNESS:  This 360 through 367 are what we

14   currently use at Planned Parenthood to obtain consent.

15             THE COURT:  What's your other objection, Ms. Cooper?

16             MS. COOPER:  Your Honor, again, the business records

17   are records that are kept in the course of business, and when

18   it's a document with a patient's signature, that's the record

19   that's kept.  I don't understand the blank forms to be part of

20   that.

21             THE COURT:  Overruled, and I'll receive 59, Bates

22   stamps Cathey 360 to 367.  Is that the right numbers?

23             MS. TEMPLIN:  It is, Your Honor.  Thank you.

24             THE COURT:  All right.

25         (Defendants' Exhibit 59 received in evidence.)

Cathey - Direct

```
 1   BY MS. TEMPLIN:
 2   Q     Dr. Cathey, let's start with page 360.  What form is
 3   this?
 4   A     This is the consent for feminizing hormone therapy.
 5   Q     At the bottom under what are the risks, this form notes
 6   that estrogen can harm the liver, increase the amount of fat
 7   and/or cholesterol in the blood, increase the risk of heart
 8   disease, increase the risk of blood clots in the legs, lungs or
 9   brain, stroke, increase blood pressure, increase the risk of
10   diabetes, sugar, increase the risk of gallbladder problems,
11   cause migraine headaches, cause pituitary tumors, tumor of
12   small gland in the brain which makes prolactin.  Is that an
13   accurate representation of what your assistant will advise
14   clients during those 15 minutes?
15   A     I'm the one who's going to advise them of those risks,
16   and those risks are extremely small.
17   Q     To clarify then, do patients sign a consent form before
18   they have discussed the risks with you?
19   A     Yes, just physically as far as the flow of traffic so to
20   speak, that's the way, yes.
21   Q     So let me briefly --
22   A     But they're not going to leave without me talking about
23   this.
24   Q     So let me briefly ask you about what you discuss with
25   them.  How long do patients spend with you?
```

Cathey - Direct

1   A     Probably anywhere from 40 minutes to an hour.

2   Q     Is the bulk of that time spent discussing the consent

3   form or are there other things that you're discussing with them

4   as well?

5   A     No, there's a lot of things we're discussing.

6   Q     What other things?

7   A     They're going to come in, I'm going to get a medical

8   history, past medical history, past surgical history, just talk

9   to them about, you know, what are you here for today, tell me

10  about why, you know, what your earliest memories are

11  identifying as the opposite gender, you know, and patients

12  usually have very compelling stories about this.  Go through

13  them just the process of going through puberty, what it was

14  like, and what their goals are for therapy, and you know, what

15  their long term goals are, just talk to them and get a general

16  conversation with them.

17  Q     So breaking down that 40 to 60 minutes, about how much of

18  that period do you think you spend discussing the information

19  in the consent forms versus these many other important things

20  to discuss with the patients?

21  A     I don't think that's a question I can answer because

22  every patient has different parts of that that are more

23  important and specific to that patient.

24  Q     Okay.  So just to look at a couple other pages in this

25  consent form.  On page 362, the heading, "Can I Get Someone

1   Pregnant?"  Reads:  "No one can tell you for sure if you'll be

2   able to cause a pregnancy after taking feminizing hormone

3   therapy.  You could cause a pregnancy or you may never be able

4   to even if you stop the medicines."

5          Is this something that you discuss with patients?

6   A    Yes.

7   Q    Flipping to page 364.  What is this form?

8   A    This is the consent for masculinizing therapy.  Again, at

9   the bottom of the page under the heading, "What are the risks?"

10  Reads:  "Testosterone can increase your red blood cell count,

11  increase the amount of fat and/or cholesterol in the blood,

12  increase the chance of getting diabetes, sugar, harm the liver,

13  rare."

14         Are these risks that you discuss with your patients?

15  A    Yes.

16  Q    On the next page, the bottom bullet-pointed list, I won't

17  read the whole thing, but the sentence above it reads:  "Some

18  of the changes will probably not go away even if you stop

19  taking testosterone."

20         Is this something you mention to your patients?

21  A    Yes.

22  Q    Flipping the page one last time, on page 366, the top

23  paragraph under "Can I get pregnant?  No one can tell you for

24  sure if taking testosterone will affect your ability to get

25  pregnant.  You could get pregnant or you may never be able to

Cathey - Direct

1   get pregnant in the future even if you stop the testosterone."

2        Is this something that you mention to your patients?

3   A    Yes.

4   Q    At this point when you prescribe treatment, is there a

5   criteria that you use to determine which treatment is

6   appropriate for the patient?

7   A    A criteria like a checklist or?

8   Q    A diagnostic criteria like a checklist.

9   A    The decision to make whether a patient is going to go on

10  hormone therapy or not is a determination that I make based

11  upon my assessment of whether they can understand the risks,

12  the benefits, how to take the therapy, whether they have

13  reasonable goals, whether I think they can cognitively and are

14  mature enough to make these decisions.

15  Q    Would you prescribe someone whatever treatment they would

16  prefer and ask you for as opposed to selecting between

17  different options?

18  A    We're usually going to have a standard that we start

19  with.  I'm the one who decides the therapy.  The patient, I'm

20  going to take -- that's kind of part of their goals of therapy,

21  you know, when they tell me what their goals are.

22            MS. TEMPLIN:  Your Honor, I would like to just use

23  one other piece of the confidential exhibit.  Should I show you

24  this page also and Dr. Cathey's attorney?

25            THE COURT:  I would start with Dr. Cathey's attorney

```
 1   and move to Ms. Cooper and then I'll probably not need to be
 2   consulted after that point.
 3             MS. TEMPLIN:  I believe Dr. Cathey's attorney has
 4   okayed using this.
 5             THE COURT:  How about Ms. Cooper?
 6             MS. TEMPLIN:  Okay.
 7   BY MS. TEMPLIN:
 8   Q    Dr. Cathey, can you read this page?
 9   A    Yes.
10   Q    The first paragraph says, "Keep in mind they probably
11   already know what you are going to tell them about hormone
12   therapy and they already have in mind what they want to be
13   prescribed."
14        To clarify, do you understand that patients already know
15   what they want to be prescribed and you will prescribe them
16   what they already want?
17   A    No.  That's totally out of context.
18             THE COURT:  What's the objection?
19             MS. COOPER:  The objection is I believe this is a
20   different document than the document that we were looking at
21   before.  Can we clarify that, please, and establish foundation?
22             MS. TEMPLIN:  I apologize.  This is Exhibit 61.
23             THE COURT:  So is that the document you showed
24   Mr. Shults?
25             MS. TEMPLIN:  This is the document I showed both
```

1    attorneys.  This is in document 61.  And I should ask Dr.

2    Cathey.  What is this slide from?

3              THE WITNESS:  This is a page from a PowerPoint I

4    gave to providers within Planned Parenthood.  This is a

5    statement.  It's just like an intro on the PowerPoint and I

6    would say that and then I would say, but it is your decision on

7    how to manage these patients.  Patients come in and those are

8    their goals and this is what as a provider you can expect from

9    patients, but that's not what you're going to do.

10   BY MS. TEMPLIN:

11   Q    Do you set the dosage amount, the length of therapy, or

12   is that also individualized based on the patient's goals?

13   A    It's individualized based on what I think is the best

14   medical practice for that patient.

15   Q    So based on their goals, what you think --

16   A    Their goals are part of it.

17             MS. TEMPLIN:  Can I have a moment, Your Honor?

18   BY MS. TEMPLIN:

19   Q    Dr. Cathey, I just wanted to ask one follow-up question

20   on the 16 or under treatment issue.  Is it your testimony that

21   Planned Parenthood Great Plains would not treat anyone under 16

22   or that it would not request the waiver to treat those under

23   16?

24   A    I really don't know how to clarify that more.  If any

25   Planned Parenthood affiliate, be it Little Rock, New York,

Cathey - Direct

1   Florida, if they were going to treat someone under 16, they
2   have to get a waiver.
3   Q      So if --
4   A      And that comes from Planned Parenthood.
5   Q      So if someone from Planned Parenthood gave someone under
6   16 a waiver and they came to Planned Parenthood Great Plains,
7   would Planned Parenthood Great Plains treat them?
8   A      No.  I would request a waiver that I wanted to treat
9   someone that was 15 so the patient doesn't request the waiver,
10  the provider.  Is that what you're asking me?
11  Q      I'm just trying to clarify whether there is another way
12  to get the waiver and you --
13  A      No, the waiver comes through the provider.
14  Q      Also one more clarifying question.  Once again, is your
15  testimony that you have not treated anyone under 16 or that you
16  would not treat anyone under 16?
17          THE COURT:  While at Planned Parenthood?
18  BY MS. TEMPLIN:
19  Q      At Planned Parenthood Great Plains.  Yes.
20          Thank you, Your Honor.
21  A      I have not and because we've always had the Children's
22  clinic available, there's not been a need to treat anyone under
23  16.  I don't think I would.
24  Q      You don't think you would?
25  A      No.

Cathey - Cross

```
1             MS. TEMPLIN:  Pass the witness, Your Honor.
2                         CROSS-EXAMINATION
3   BY MS. COOPER:
4   Q    Hi, Dr. Cathey.  My name is Leslie Cooper.  I'm with
5   Plaintiffs' counsel.  I just have a few questions for you
6   today.  When you were asked about the number of 16 and 17 year
7   olds you treated with hormone therapy at Planned Parenthood,
8   you said you weren't sure of the amount and that it wasn't very
9   much, I believe.  When you testified at your deposition, you
10  said it was probably less than six visits a year since 2018.
11  Does that sound about right?
12  A    Yes.
13  Q    Is that because --
14  A    And I had said in the deposition, I said this would be a
15  guess.
16  Q    That's because once Arkansas Children's Hospital's gender
17  clinic was developed, that's where everyone sent kids.  Is that
18  right?
19  A    Yes.
20  Q    When was the last time you provided gender-affirming
21  hormone therapy to somebody under 18?
22  A    In June of 2021.
23  Q    At your deposition, you were asked about your -- sorry,
24  about your evaluation of 16 and 17-year-old patients prior to
25  providing gender-affirming hormone therapy.  I want to show you
```

Cathey - Cross

1    a portion of that.

2          THE COURT:  Ms. Cooper, if it's easier, you can move

3    to that and treat it like a podium and use that screen so

4    you're not --

5          MS. COOPER:  I'm just making sure it's on.

6    BY MS. COOPER:

7    Q    I have up page 38 of your deposition.  If you could go

8    down to line 12, midway down on the page.  Are you with me?

9    A    Yes.

10   Q    If you would read along with me.  "Well, once I see the

11   patient, these are usually extended visits, probably 40 minute

12   visits on the average.  Do you want to know specific questions

13   I ask them or how a visit goes generally?  I ask questions

14   about their medical history, their gender identity, you know,

15   why they -- why they think they have gender dysphoria, you

16   know, how this identity has played out through puberty.  Why

17   they feel like now they want to be on hormone therapy.  What do

18   they expect from hormone therapy.  What their ultimate goals

19   would be.  During that time, I have time to assess their

20   maturity, their cognition, you know, the parental interaction

21   between the parent and child.  So there's a lot of things we're

22   looking at.  And the questions are not always the same

23   obviously.  A lot of the 16 or 17 year olds that come in have

24   already seen mental health providers and that's how they got to

25   us."

Cathey - Cross

1          Is that your testimony?

2   A     Yes.

3   Q     You testified, I believe, that you don't require patients

4   to see a mental health provider; is that correct?

5   A     That's correct.

6   Q     But seeing a mental health provider is always encouraged?

7   A     Yes.

8   Q     And one of the services that Planned Parenthood offers is

9   making appointments or contacts with mental health providers?

10  A     Yes.

11          MS. COOPER:  No further questions.

12          MS. TEMPLIN:  No redirect, Your Honor.

13          THE COURT:  Can we excuse this witness from her

14  subpoena?

15          MS. TEMPLIN:  Yes, Your Honor.

16          THE COURT:  All right.  Dr. Cathey, you're free to

17  go.

18          MR. SHULTS:  Thank you, Your Honor.

19          THE COURT:  Thank you, Mr. Shults.  Does that

20  conclude our festivities for the day?

21          MS. COOPER:  Your Honor, I just have one also

22  housekeeping matter.  We've invoked the rule to keep witnesses

23  sequestered during the course of the trial.  Sorry, of course,

24  nonparty witnesses.  That was implied, sorry about that.  And I

25  just want to get clarification that that would mean that any

1    transcripts rough or final ones become available may not be

2    provided to the remaining witnesses who have not yet testified

3    or that they be made publicly available where those witnesses

4    could access them.

5                THE COURT:  Yes.  It would defeat the purpose if

6    they could read as opposed to just hearing it, so yes.  If

7    they're going to be called as a witness, you shouldn't -- they

8    shouldn't be able to be present in court, read transcripts from

9    court or be told what the testimony of other witnesses were

10   while they were not here while they're under the rule, so my

11   understanding of the spirit of that rule would include what

12   you're discussing.

13               MS. COOPER:  Thank you, Your Honor.

14               THE COURT:  Anything else for the good of the cause?

15               MR. JACOBS:  That's all the witnesses from us today,

16   Your Honor.

17               THE COURT:  See y'all on the 28th.

18         (Recess at 12:45 PM.)

19                     REPORTER'S CERTIFICATE

20     I certify that the foregoing is a correct transcript of

21   proceedings in the above-entitled matter.

22

23   /s/ Karen Dellinger, RDR, CRR, CCR
     ----------------------------------        Date: October 27, 2022
24   United States Court Reporter

25