1          IN THE UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF ARKANSAS
2                   CENTRAL DIVISION

3   DYLAN BRANDT, et al.,

4                   Plaintiffs,
       v.                            No. 4:21CV00450 JM
5
                                     November 28, 2022
6                                    Little Rock, Arkansas
                                     8:57 AM
7   LESLIE RUTLEDGE, et al.,

8                   Defendants.

9        TRANSCRIPT OF BENCH TRIAL - VOLUME 5
         BEFORE THE HONORABLE JAMES M. MOODY, JR.,
10              UNITED STATES DISTRICT JUDGE
                   _____
11
    APPEARANCES:
12
    On Behalf of the Plaintiffs:
13
        MR. CHASE STRANGIO, Attorney at Law
14      MS. LESLIE COOPER, Attorney at Law
        MR. JAMES D. ESSEKS, Attorney at Law
15          American Civil Liberties Union
            125 Broad Street, Suite 1800
16          New York, New York  10004-2400

17      MS. BREEAN WALAS, Attorney at Law
            Walas Law Firm, PLLC
18          Post Office Box 4591
            Bozeman, Montana  59772
19
20      MR. AVIV S. HALPERN, Attorney at Law
        MS. LAURA KABLER OSWELL, Attorney at Law
21          Sullivan & Cromwell, LLP
            1870 Embarcadero Road
22          Palo Alto, California  94303

23

24  Appearances continuing...

25

```
 1

 2    APPEARANCES CONTINUED:

 3    On Behalf of the Plaintiffs:

 4        MR. ARUN BODAPATI, Attorney at Law
          MS. LAUREN M. GOLDSMITH, Attorney at Law
 5            Sullivan & Cromwell, LLP
              125 Broad Street, Suite 2424
 6            New York, NY 10004-2498

 7        MR. DANIEL J. RICHARDSON, Attorney at Law
              Sullivan & Cromwell LLP
 8            1700 New York Avenue
              Washington, DC 20006
 9
          MR. GARY L. SULLIVAN, Attorney at Law
10            ACLU of Arkansas
              Legal Division
11            904 West 2nd Street, Suite One
              Little Rock, AR 72201
12
          MS. SHARON ELIZABETH ECHOLS, Attorney at Law
13            Gill Ragon Owen P.A.
              425 West Capitol Avenue
14            Suite 3800
              Little Rock, AR 72201-2413
15
16    On Behalf of the Defendants:

17        MR. DYLAN JACOBS, Attorney at Law
          MR. MICHAEL CANTRELL, Attorney at Law
18        MS. AMANDA LAND, Attorney at Law
          MS. HANNAH TEMPLIN, Attorney at Law
19            Arkansas Attorney General's Office
              323 Center Street, Suite 200
20            Little Rock, Arkansas  72201

21

22

23        Proceedings reported by machine stenography.  Transcript
      prepared utilizing computer-aided transcription.
24

25
```

INDEX - VOLUME 5 (11/28/22)

| WITNESSES FOR THE DEFENDANTS: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| STEPHEN LEVINE | 781 | 885 | 955 | 959 |

```
1              (Proceedings continuing in open court at 8:57 AM.)
2                   THE COURT:  Are y'all ready?
3                   MR. JACOBS:  Your Honor, Defendants are ready to
4      call, I guess, our next witness, not our first witness.  One
5      thing I wanted to check in on.  So Dr. Regnerus is prepared to
6      testify remotely tomorrow, and I wanted to ask at what time the
7      Court could begin tomorrow with the hope that it could begin I
8      guess as early as we can make it happen.  Because Dr. Regnerus
9      is testifying late in the evening from where he's located, so
10     just to avoid him having to run into testifying in the wee
11     hours of the early morning, if we could start as early as we
12     can.  I recognize that --
13                  THE COURT:  I expect this will likely make everybody
14     cringe, but courthouse opens at 7:30.
15                  MR. JACOBS:  Could we -- I think he'd be available
16     to start at like 8:00.
17                  THE COURT:  That's fine.  That would give everybody
18     time to get in the building and get settled and we could make
19     sure stuff is up.
20                  MR. JACOBS:  Okay.  That's all the preliminary
21     matters that we have.
22                  THE COURT:  So with an asterisk, you've got my
23     entire week.  What are your thoughts on how long you're going
24     to take?
25                  MR. JACOBS:  Our witnesses will be done Thursday and
```

Levine - Direct

```
 1    we'll rest on Thursday.
 2              THE COURT:  I've got two sentencings, one at 1:00
 3    and one at 2:00 on Wednesday.  Those usually last 30 minutes,
 4    so we're probably going to work a little later into lunch on
 5    Wednesday.
 6              MR. JACOBS:  That won't be a problem, Your Honor.
 7              THE COURT:  And then it looks like I've got a lunch
 8    hearing on the 1st.  Okay.  That's what is on my schedule other
 9    than you guys.  So are we ready to jump back in?
10              MR. JACOBS:  We're ready, Your Honor.  Defendants
11    will call Dr. Stephen Levine.
12              THE COURT:  Sir, if you could come on the far side
13    of that silver rail.  Good morning.
14         STEPHEN LEVINE, DEFENDANTS' WITNESS, DULY SWORN
15                       DIRECT EXAMINATION
16    BY MR. CANTRELL:
17    Q    Good morning, Dr. Levine.
18    A    Good morning.
19    Q    Can you state your name and spell it for the record.
20    A    Stephen, S-t-e-p-h-e-n, Barrett, B-a-r-r-e-t-t, Levine,
21    L-e-v-i-n-e.
22    Q    Thank you.  Dr. Levine, can you tell us what academic and
23    clinical positions that you currently hold?
24    A    I am clinical professor of psychiatry at Case Western
25    Reserve University.  I'm a staff psychiatrist in a group
```

1   private practice outside the university at this point.

2   Q     How long have you held those positions?

3   A     Well, I started at Case Western Reserve in my residency

4   in 1970.  I became assistant professor in 1973 and full

5   professor in 1986, I think perhaps 1984, and I've been seeing

6   patients throughout that time.

7   Q     Dr. Levine, I'll ask you to speak a little bit more

8   directly into that microphone if you will.  Dr. Levine, do you

9   have a CV?

10  A     I do.

11  Q     Okay.

12        Your Honor, may I approach?

13              THE COURT:  Sure.

14  BY MR. CANTRELL:

15  Q     Dr. Levine, if you will, I've handed you a binder.  If

16  you would, turn to tab number one which should be Exhibit No.

17  1.  Do you recognize this as your CV?

18  A     I do.

19  Q     Does your CV contain a listing of your publications and

20  other professional activities?

21  A     It does.

22  Q     Do you have any subsequent publications that are not

23  listed on your CV?

24  A     I'm sure I do.  On March 17th of this year, I published

25  with two colleagues a paper called *Reconsidering Informed*

1    *Consent for Transgender Identified Children, Adolescents and*

2    *Young Adults*.  That article had four invited commentaries, and

3    subsequently my coauthors and I wrote two separate responses to

4    those commentaries.  So in addition, there's an article coming

5    out in press on this topic of gender dysphoria.  So probably

6    there are four or five different additional papers that are not

7    listed in this.

8    Q    Are you aware of any impact that your Reconsidering

9    Informed Consent article has had?

10   A    I'm sorry?

11   Q    Are you aware of any impact that --

12   A    Oh, as of yesterday morning, that article was downloaded

13   45,870 times throughout the world which means that it's in the

14   top 5 percent of articles read in all branches of science and

15   it is the number one article most often downloaded from the

16   individual journal that it was published in.  So that article

17   has had widespread dissemination across the world.

18   Q    Dr. Levine, can you tell us about your history and

19   experience treating patients with gender-related psychological

20   conditions?

21   A    In 1974, a colleague and I in Cleveland started the first

22   gender identity clinic in Ohio and we've been seeing patients

23   in one form or another in one iteration of that clinic or

24   another since that time.  We lost count in 1989, I think.  We

25   had 325 patients that we had seen over those years from 1974 to

Levine - Direct

1    1989, and we continued -- after I left the university, we
2    continued our gender identity clinic under a different name.
3    And so in the early years, almost all the patients were adults.
4    Some of them were older teenagers, 20 years old, 19 years old,
5    but most of them were adults.  And in recent years, the vast
6    majority of patients that we have seen are young people,
7    adolescents primarily, and sometimes parents bring in younger
8    children to us.
9         I should say that gender identity disorders are only one
10   aspect of my clinical interest.  Over the years, I've been
11   interested in all things involved humans and sexuality.  So
12   I've been involved with sexual dysfunction, marital
13   relationships as well as general psychiatric problems of adults
14   and teenagers.
15   Q    Dr. Levine, have you previously supported your adult
16   patients' efforts to obtain medical interventions for gender
17   dysphoria?
18   A    Yes.  In those years, early years when almost all of our
19   patients were adults, many of them requested and obtained
20   hormones.  And some of them requested and obtained various
21   forms of surgery.
22   Q    I'll ask a similar question for minors.  In the past,
23   have you supported patients' efforts to obtain medical
24   interventions for gender dysphoria for minors?
25   A    Well, I think of minors as in two categories, prepubertal

Levine - Direct

1    minors and postpubertal minors, and so we have certainly

2    evaluated and offered psychotherapy services to families of

3    children who were prepubertal.  And we have occasionally done

4    that, I mean not -- I'm sorry, but for adolescents or

5    postpubertal children, we have on occasion given cross-sex

6    hormones.  We have never administered in any of our clinics

7    puberty-blocking hormones.

8    Q     Dr. Levine, have you formed conclusions concerning the

9    safety and efficacy of treatment of minors with gender-related

10   psychological conditions?

11   A     Well, many of the adolescents that we see have associated

12   psychiatric conditions.  Our experience is pretty typical

13   across the world.  So we have attempted to both assess those

14   conditions and consider with the families and the patients what

15   can be done about those things.  That's a psychological

16   approach of prolonged assessment and psychotherapy and trying

17   to address the underlying problems.  On occasion, we have

18   supported the idea that when a child is old enough, which in

19   our state is usually 18, if they still would like to have

20   hormones, I have personally written letters supporting that

21   process.

22   Q     That's once they reach 18 do I understand?

23   A     Yes.  Or yes.

24   Q     So does that represent a shift in your view?

25             THE COURT:  Doctor, let me interrupt you for a

Levine - Direct

```
 1    minute because you were talking about adolescents when you
 2    spoke, and then he -- Mr. Cantrell asked you about over 18.
 3    That's not jiving in my head.
 4              THE WITNESS:  Well, I think of adolescents, Your
 5    Honor, as things that end in teen, and psychologically
 6    adolescents we generally think ends at 20, 21.  So a 19 year
 7    old is an adolescent to me.  The age of majority for medical
 8    consent in Ohio, I think, is 18.
 9              THE COURT:  Got it.  So the problem I'm having with
10    figuring out what your opinion is is your definition of
11    adolescent is straddling the age of majority in Arkansas, so
12    you're talking about post-pubescent as an adolescent that would
13    range from, I don't know, what was your number?  We'll just
14    pick a number.
15              THE WITNESS:  Well, the vast majority of the
16    patients that we see that are what I call postpubertal are far
17    less than 18.
18              THE COURT:  I understand.  That's what I'm trying to
19    decide.  You were mentioning adolescents in your opinion just
20    now, and Mr. Cantrell said are we talking about anybody over
21    18.  I'm having trouble deciding how far or the scope of your
22    opinion, because you said adolescents, he's saying adults.
23    There's a overlap between 18 and 19 for adolescent adults which
24    I'm having to wrap my head around a little bit.  Not that I
25    don't agree with you, that there's some people who are over 18
```

Levine - Direct

1    that act like what I consider adolescents, but what I need to

2    focus in on is what is the scope of your opinion.  Are we

3    talking about adults or are we talking about people who are

4    under 18?

5             THE WITNESS:  I will try to confine my use of the

6    word "adolescent" to those 17 and younger.

7             THE COURT:  Thank you.  That'll help me.

8    BY MR. CANTRELL:

9    Q    Dr. Levine, if I can just summarize what I think your

10   testimony is, and please let me know if this is correct.  That

11   you do not currently recommend medical treatments for patients

12   who are under the age of 18?

13   A    Correct.

14   Q    Can you broadly outline the information that you have

15   considered in coming to that conclusion?

16   A    Well, I've been following the psychiatric or I've been

17   following the literature of gender dysphoria since 1973, and so

18   my opinions are based on what is published in the literature

19   and a critical evaluation of what is published in the

20   literature and, of course, my accumulated experience since 1973

21   and 1974 with these patients.

22   Q    And in forming your conclusions, did you rely on sources

23   of information that are widely used in your field?

24   A    Yes, the papers that I mentioned, the paper that has been

25   downloaded across the world so often, it was a critical

Levine - Direct

1    evaluation of the two papers that are most widely used by the

2    organizations that support the medicalization or affirmative

3    care of adolescents.  So I've certainly used the data that are

4    the basis of affirmative care.  Affirmative care being perhaps

5    a euphemism or way we talk about medicalization of teenagers

6    with hormones and surgery.

7              MR. JACOBS:  And, Your Honor, if the plaintiffs will

8    not be interested in voir diring the witness, I'll forego any

9    further investigation into Dr. Levine's qualifications.

10             THE COURT:  Okay.  That's fine.  Doctor, I've got

11   one more question.  Mr. Cantrell said that you don't currently

12   recommend medical treatments for patients who are under the age

13   of 18.  Medical treatments in my opinion would include any

14   hormones or any medicine at all.  Can you tell me what you mean

15   by recommending any medical treatment for patients under 18?

16             THE WITNESS:  I was speaking in a very narrow sense,

17   Your Honor, of puberty-blocking hormones and cross-sex

18   hormones.  So if it's a biologic male, we generally, we do not

19   now prescribe estrogens for that trans identified person.  And

20   if it's a biologic female, we don't generally prescribe

21   testosterone for 17, 16 year olds, 15 year olds.  But we give

22   insulin.  I mean, I don't give insulin, but --

23             THE COURT:  I understand that you prescribe, but may

24   not inject.  But I'd understood your description of your

25   clinical practice to include some medical treatment for people

1    under the age of 17.

2              THE WITNESS:  And as a psychiatrist, I treat for

3    anxiety and depression and psychosis and substance abuse.

4              THE COURT:  Right.  That's why I was having again a

5    little disconnect with the scope of the comment, but I'm on

6    track now.  Thank you.

7              THE WITNESS:  Could I just ask if I could have a

8    water?

9              THE COURT:  Sure.

10   BY MR. CANTRELL:

11   Q    So Dr. Levine, just to try to tie a bow on it and to

12   summarize what you've said that you do not support or recommend

13   puberty blockers or cross-sex hormones for patients under 18

14   with gender identity related conditions; is that correct?

15   A    That's what I said, yes.

16   Q    Okay, thank you.  Dr. Levine, can you tell us what is

17   gender dysphoria and why does it matter how we treat

18   adolescents with gender dysphoria?

19   A    Well, gender dysphoria refers to the incongruence between

20   one's identity as -- one's gender identity as being different

21   than the sex of the body.  Depending on the criteria --

22   depending on the nosology or the classification systems that

23   are being used in America, the DSM-5-TR is a classification

24   system that requires and defines gender dysphoria as distress

25   over the incongruence between one's current gender sense of

Levine - Direct

1    self and one's body and often is associated with the desire to

2    have the secondary sex characteristics and to portray -- of the

3    opposite sex, and to portray one's self in society as a member

4    of the opposite sex.

5         Gender dysphoria implies and requires, according to that

6    diagnosis, distress or perhaps we should call that a kind of

7    suffering.  But there is another classification system used in

8    Europe called the ICD-11 now, and it does not require the

9    presence of distress, it just requires the aspiration to live

10   as a member of the opposite sex.  This is all complicated not

11   only by the fact that we have two different classification

12   systems in the world to define gender, to define this problem,

13   but also the fact that the form of gender identity variations

14   that are showing up in the last ten years have gone from the

15   previous distress over not being a member of the opposite sex

16   to defining one's self broadly as either having we call

17   nonbinary, that is I'm neither male nor female, I am a

18   combination of male and female or I'm neither male nor female.

19   And that's evolving.

20        It's been an interesting thing to watch in the last ten

21   years, the rapid evolution of the sense of an atypical gender

22   identity, but generally in America we refer to gender dysphoria

23   as a distressful condition where there's a mismatch between the

24   biologic sex and its sexual characteristics and one's sense of

25   gender identity.  That is, my body and I don't match.

Levine - Direct

1  Q      Dr. Levine, can you tell us how -- can you explain how we

2  treat minors with gender dysphoria shapes their chances of

3  living a happy and healthy life?

4  A      So the real issue here is the consequences of gender

5  change.  When I use the term "affirmative care", I'm referring

6  to giving cross-sex puberty-blocking hormones, cross-sex

7  hormones in various surgeries, removal of the breast, removal

8  of the testes, removal of the penis and of the ovaries, of the

9  uterus and so forth.  So the consequences of these affirmative

10  medical treatments in adolescents are going to be a consequence

11  for the rest of that person's life.  And so when 13 year olds

12  and 14 year olds say that I never want to have children, I

13  can't possibly live in this body, they are predicting or

14  they're asking for, and the medical profession, that is

15  affirmative, is cooperating with sterilizing them, with giving

16  them characteristics of the opposite sex which will affect

17  every aspect of their life in adult life.

18       And what we're talking about is cooperating with a

19  passionate view that a 13, 14, 15, 16 year old or sometimes

20  even younger has about their future, and they really have very

21  little concept of what their future holds.  So we think that

22  there needs to be a lifelong perspective about the consequences

23  of gender change in adolescents and even earlier of younger

24  minors.  So what I'm saying is that based upon my clinical

25  experience that the treatment of adolescents and younger people

1   with gender dysphoria needs to have a lifelong perspective, we

2   need to be thinking about what we know about adults with

3   transgender identities and what medical and psychological and

4   social problems they have before we start administering

5   hormones to 15 year olds.

6   Q     Dr. Levine, can you just tell us briefly what is it that

7   is known about adults who have gone down that road?

8   A     Well, every public health study of transgender

9   communities of adults recognizes that they are disadvantaged in

10  terms of healthcare, they have more substance abuse, they have

11  shortened life expectancies, they have more vocational

12  problems, they're on disability more often than the general

13  population, and trans communities are often looking for

14  continued psychiatric care and at rates that are higher than a

15  general population.  And the sad part is that even after --

16  there's evidence that even after total -- doing everything that

17  doctors and surgeons can do for people, they still have a

18  higher suicide rate than the general population.

19        So if you look at all cause mortality, if you look at

20  completed suicides, if you look at the incidence of cancer, of

21  heart disease, all these things are higher in the adult trans

22  communities.  And the ironic thing is that all the articles

23  that specify these things are urging more trans care, which is

24  a very hard thing for me to get my head around when we see that

25  the profile of the health and the social problems of adult

Levine - Direct

1    trans communities are so problematic and then we have a group
2    of people who are arguing for giving younger people -- putting
3    them on a pathway to join that community of problems.  And so
4    I'm looking -- I'm one of the people who say wait a second, one
5    of the things we need to think about when we're considering
6    giving hormones and reinforcing and supporting the idea that
7    you can live a happy, successful life as a trans person is to
8    look at the lives of adults who are trans.
9         I'm not talking about picking out one person who's
10   successful or five people who are successful but look at the
11   public health data.  The public health data which has been
12   published in very reputable journals all recognize that the
13   trans community is a problematic community in terms of public
14   health parameters.  And this has been known probably for at
15   least ten years.  So what we have here is this idea that we
16   have advocates who are saying let's full speed ahead, take
17   every child who says that they're trans or nonbinary and let's
18   support them and tell them that they can have a happy,
19   successful life, we'll remove their sexual organs, we'll cause
20   sterility for them, we'll change their social patterns of
21   intimate relationships and at the same time we know that
22   marriage rates and sexual dysfunction and even physical health
23   parameters are all problematic, that is, the risk of problems
24   are far greater in the trans communities in adult life.
25        So this is part of the basis of my worry, my public

Levine - Direct

1    health worry about what we're doing to young people.

2    Q      Dr. Levine, do you care for your transgender patients?

3    Do you have care and concern for your transgender identifying

4    patients?

5    A      Yes.  I actually think that the things I'm talking about

6    is in their best interest for them to consider what they're

7    doing from a long term life cycle perspective.  I've heard 15,

8    16-year-old patients tell me that won't happen to me.  How they

9    can be sure that won't happen to me.  One of the patients who

10   said don't worry, I'm very smart, Dr. Levine, that won't happen

11   to me is now deceased at age 18 from fentanyl overdose.  And

12   when I was seeing him, this person wasn't using anything but

13   marijuana, but he went to college as a transsexual and couldn't

14   get a roommate so they assigned him a roommate of another

15   transsexual person but only two trans persons in the college

16   and they didn't get along and he transferred schools.  And he

17   went to a new school and he made three overdoses and the third

18   one was fatal.

19          So I know there are people who do well as trans people at

20   least for a long period of time.  And I'm not saying every

21   trans person is problematic, believe me, I'm not, but in

22   thinking about the fate of the patients who are coming to see

23   me in teenage years, I'm aware of the adult trans people I've

24   taken care of for 30 years.  And so I'm worried and so I am in

25   my view caring for these people.  I'm caring for their long

Levine - Direct

1  term interests.  I'm caring for their human potential.  I'm
2  caring for them as people.
3  Q    Dr. Levine, can you tell us -- shifting gears slightly,
4  can you tell us what changes have been observed to the number
5  of patients presenting with pubertal onset dysphoria compared
6  with early childhood onset dysphoria in the past 10 to 15
7  years?
8  A    Well, there has been a dramatic and poorly explained
9  rapid increase in the incidence of people who are transgender
10 identified.  The Tavistock Clinic took care of -- in 2005,
11 2006, the Tavistock Clinic, I think, had in one year, nine, and
12 over the course of five years, about 50 people from the UK and
13 then about 12 years later, they had 2750 some people.  In other
14 words, there has been a dramatic increase in the request for
15 trans-related affirmative services, or at least psychiatric
16 evaluations over the course of 10 or 15 years.  It used to be
17 in the previous century and the early part of this century, it
18 used to be there were 3.5 biologic males who wanted to be
19 females for every biologic female who wanted to be males.
20      And today the vast -- the typical person presenting for
21 help as a biologic female who wants to be or labels herself a
22 trans male in some clinics, it's seven females, biologic
23 females to biologic males to every one biologic male now.  So
24 the overall incidence is much closer now to one to one because
25 of the rapid increase both in males who want to be females and

Levine - Direct

1    in females who want to be males.  But the explanation for this
2    is something we can only speculate about.
3          But there has been a dramatic change in the number of
4    girls who were never cross-gender identified as children, and
5    that is in grade school who around puberty get this idea that
6    they would prefer to be a male.  And that's been happening in
7    Australia and in Europe and in North America and I believe in
8    Asia as well.
9    Q     Can you tell us how these rapid demographic shifts bear
10   on the question of whether gender dysphoria is socially or
11   culturally influenced?
12   A     Well, I believe the biology doesn't change that much in
13   15 years.  Our genes and how they operate, the program for the
14   human life cycle doesn't change that much, and I don't think
15   that the distress of children or pubertal children is that
16   different.  What is different is the social interpretations of
17   what it means to be distressed around puberty about one's body,
18   about one's bodily functions and about one's roles that they
19   see that older people have.  And so children are redefining
20   their sense of self in terms of this trans ideology today and
21   their beliefs that many of them believe that this is
22   biological, it has nothing to do with what they're going
23   through as 12 and 13, 14 year olds.
24         And it just doesn't make scientific sense that we
25   suddenly have a change, suddenly biology is rearing its head in

Levine - Direct

1   dictating a trans identity.  As many people have come to

2   realize that teenagers and now especially during COVID when

3   teenagers were at home have spent a great deal of time on the

4   internet and we believe that the internet has many

5   opportunities to learn about trans life, and we think this has

6   been an influence on the rising incidence of transgender

7   identities.

8        But I can say that while I could go on and speculate

9   about why there has been this increase, I don't really think

10   that science can tell you why.  We can speculate and various

11   people have various speculations.  Some people think it's a

12   social contagion from the internet, other people think it's a

13   social contagion from friends, close relationships, especially

14   among girls who have a friend who's trans.  Some people think

15   that it's a retreat from adverse life experiences and family

16   disruptions and inability to like both parents or love both

17   parents, but these are all speculations, and I doubt since

18   there are so many people involved with this that we would find

19   one explanation that would explain everything.

20        We need to understand that in mental health work and

21   trying to grasp what happens to people who become who they

22   become and why, that we can't ever find one explanation for

23   things.  Things are multifactorial, so I think this phenomenon

24   must be multifactorial as well, but it is a dramatic worldwide

25   change in how young people are identifying.  And they're not

1    identifying as transsexuals like they were in 1990, for

2    example.  The majority of them are identifying in something

3    that they call nonbinary.  They're neither male nor female,

4    they're somewhere in between and they recognize that they're

5    evolving.  And I like the term "gender fluid" because it talks

6    about the processes of becoming.

7           Now, as we know from general psychology, adolescence is a

8    period of time where there are dramatic changes between puberty

9    and the end of adolescence, we'll call that 18 for our

10   purposes.  There are dramatic changes in many aspects of

11   identity, and gender identity is just one aspect of that change

12   from youth or childhood to the end of adolescence.  The

13   great -- the leaders in this field like Erik Erikson have said

14   that one of the tasks of adolescence was to clarify sexual

15   identity.

16          And sexual identity today is known to include three

17   aspects:  Gender identity, which we're discussing today;

18   orientation, which we haven't mentioned yet, that is whether

19   I'm homosexually attracted or heterosexually attracted or

20   bisexually attracted, and what I call the intention component,

21   that is what interests me sexually in what I do with my

22   partners, whether I'm just conventional or whether I'm a little

23   on the kinky side or sadomasochistic side, for example.  So

24   those are the aspects of identity that are known to evolve in

25   all human beings as we go from say 11 or 12 to 18 and if you

1    will, older, 21 or even older.

2    Q    Dr. Levine, what's the state of the evidence concerning

3    the existence of a brain structure that causes gender

4    dysphoria?

5    A    Well, there's been a lot of speculation over the years

6    whether this is biological, and if it's biological, is it in

7    hormones, is it something caused by prenatal hormones, and for

8    years that has been investigated.  We've never made any

9    progress to demonstrate that it's a hormonal phenomenon, so the

10   next thing was, is it a brain structure.  And the most recent

11   article on this which was published in 2021 from an Italian

12   group summarized the state of being that there's nothing

13   specific about the brain that can be said to be the cause or

14   the antecedent of gender dysphoria.

15        And all the studies are complicated by the fact that many

16   of them with patients who were already on hormones and hormones

17   themselves may have caused brain abnormalities, and one can't

18   distinguish changes in the brain that may be due to homosexual

19   orientation from changes in the brain that may be due to either

20   the treatment of or the presence of a gender dysphoria.

21        So it's inconclusive.  And I think -- I've been in trials

22   where the other expert witness has testified that this is a

23   brain structure problem, and even though the data by the people

24   who are experts in this cannot conclude that, there are

25   individual studies that suggest that possibly this is true, but

1    these are older studies that the MRI -- there's newer

2    technology that comes out all the time, but the most recent

3    studies which were published in 2019 and again last year, are

4    very conservative in their conclusions, so I would say that as

5    of today, we have no right to think that this is -- that the

6    brain structures of transgender identifying teenagers are

7    distinctly different and we cannot say this is the prelude, the

8    neurophysiologic or neuroanatomical prelude to future gender

9    identity -- gender dysphoria.

10        We have to separate preferred ideas and speculations from

11   what science knows.  Science does not know that there's a brain

12   structure that causes either in males or females a transgender

13   identity or gender dysphoria or gender incongruence, depending

14   on which classification system you prefer.

15   Q    So we've discussed some of the social influences that may

16   affect gender dysphoria.  Can you talk a little more

17   specifically about what social factors influence pubertal onset

18   gender dysphoria, for example?

19   A    I think exposure to the internet and transgender sites, I

20   think early life bonding difficulties.  Transgender identities

21   are much more common in foster children, for example, than in

22   non-foster children, children in home.  I'm sorry.  I think I

23   lost my place.  Would you repeat your question?

24   Q    Sure.  I was asking about social factors that influence

25   pubertal onset gender dysphoria.

Levine - Direct

A      By social, we want to separate things that are in society
as a whole, celebrities, fashion.  Clothing fashion has become
the -- Madison Avenue picks up on these kind of things and so
clothing styles, entertainment in the media, and what is taught
at schools, these are all part of the environment of the child
that is called social, but also determinative social force are
the social forces within the family.  And so when there are
disruptive bonds between mother and child and father and child,
when there is violence in the home, when there is sexual abuse
in the home, these are all social factors that we can separate
from the psychological impact of those social factors, you see.

        The best we can do is to list the megasocial factors, the
media, fashion industry, the entertainment industry, what's in
the paper, social movements, political movements that are going
on, the celebration, the celebration of a trans life as a
diverse life and as a part of an ideology of including more and
more people in the right to have a full life without
discrimination.  How that impacts on the brain of a developing
child, none of us are sure.

        Then there are the social factors that involve the bonds
between parents, the things that go on in the family, that
which is admirable and that which is not admirable in one's
parents and grandparents and aunts and uncles and so forth.
And we have the child's understanding of what it means to be a
male and what it means to be a female, you see.  These are all

Levine - Direct

1    factors that are outside the child but they impinge upon the

2    child.  And none of us, none of us know exactly how those

3    things are going to influence in any individual child, but the

4    fact that they're there and the fact that we have an explosion

5    of incidence of transgender identity across the world must mean

6    that some of the things that are happening around us in the big

7    system, not the family system, must be interacting with the

8    things that are happening in the family system to produce the

9    psychological changes that are somewhat unpredictable.  I

10   should say are always somewhat unpredictable for your child and

11   my child.

12   Q     And what can you tell us about differences in

13   susceptibility to social influences as between boys and girls?

14   A     Well, I can only suspect that it must be more difficult

15   in today's age when in the larger social influences where

16   there's been so much emphasis, and rightly so, on how women's

17   lives have been constrained by societal concepts and in the

18   last 20, 30 years, women have developed all new -- there are

19   many new opportunities for women to do what they're able to do

20   and what they want to do and many of these kids I think have

21   seen the fact that women have been discriminated against and

22   women have been held back by social concepts, and so girls --

23   girls going into puberty not liking their bodies and the body's

24   physiologic functions for a while and seeing the social

25   discrimination or the barriers that women have may in fact make

1    them more vulnerable to deciding that it's no good to be a

2    woman and it's better to be a man.

3          I'm speculating, you see.  I think the answer to your

4    question always is going to be a speculation.  Various people

5    who have studied this have said that it's not clear why girls

6    are more vulnerable these days to being trans.  I wish I could

7    tell you definitively the answer to your question.  I think

8    about that a lot, but I realize it's just Dr. Levine's

9    thinking.  It's not science.

10   Q     Dr. Levine, are you familiar with what has been called

11   the desistance studies?

12   A     What was the first part of the question?

13   Q     Are you familiar with what has been called the desistance

14   studies?

15   A     Yes, I know about desistance.

16   Q     Just to develop the question a bit, can you tell us about

17   those class of studies and the patient population that they

18   pertain to?

19   A     Yes.  Well, desistance has several meanings.  The most

20   dramatic meaning of desistance is somebody who has identified

21   and lived as a trans person who decides to return to living in

22   consonance with their biologic sex.  And the desistance as we

23   know it today is appearing, data are appearing about the rates

24   of desistance and the desistance studies of people -- well, I'm

25   sorry, I have to divide the answer to the question of

Levine - Direct

1    desistance of minors who have been identified as cross-gender
2    children or gender dysphoric children versus people who have
3    been treated for trans with affirmative care in adolescence.
4        So among the first group, that is the minors who are
5    cross-gender identified, the desistance studies, there have
6    been 11 desistance studies and each of the 11 studies have
7    shown that the majority of children who are cross-gender
8    identified who are not socially transitioned or given any
9    hormones and so forth, these children desist, the majority of
10   these people, by the time they're adolescents or at the end of
11   adolescence, the vast majority of these children have returned
12   to living a gender identity in keeping with their biologic sex.
13       But the second group of desistance studies involve the
14   people who have been given affirmative care, most of these
15   people are people who did not have a trans identity during
16   grade school years, and the couple of studies that are
17   available from the UK, within 16 months, 6.9 percent of kids
18   had desisted and another 3 percent looked like they were
19   desisting and yet another study showed people who got hormones
20   first at age 20, that up to 30 percent of them had desisted in
21   five years, that is, had returned to not taking hormones and
22   seemed to live again in their -- in a way that's consistent
23   with their biologic sex.
24       So what we're having now is a group of people -- and the
25   famous study about this is by Lisa Littman who recently

Levine - Direct

1    published accounts of 100 people who desisted and the stated

2    reasons for it.  But the awareness of desistance is a

3    contraversion of the idea that I used to hear a lot of from

4    affirmative care advocates that gender identity is not only

5    biologic but it's immutable.  That is, it's unchangeable, and

6    once a transgendered person, always a transgendered person.  So

7    we have these desistance studies.  We have these people who no

8    longer live that way.

9          I published a study a few years ago of a man that saw me

10   when he was a junior in college and he lived as a woman for 30

11   years and desisted and came back to see me 30 years later to

12   help return to living as a male.  So anecdotally, that is,

13   individual doctors have these experiences with desistance, but

14   now we have studies that are beginning to show the rate of

15   desistance and we suspect that desistance is going to be much

16   more common in the future as we have exploded in the number and

17   the way we treat these teenagers without adequate assessment

18   and adequate attempt to provide them with help with some of the

19   problems that they're having.

20   Q    Dr. Levine, you mentioned the 11 research studies that

21   indicated a high rate of desistance.  Are you aware of attempts

22   to discount applicability of that research?

23   A    Oh yes.  The big issue in the attempt to discount that

24   research was that some of these kids that were cross-gender

25   identified were subthreshold for the diagnosis at the time was

Levine - Direct

1    called Gender Identity Disorder of children.  And so the data
2    was reanalyzed and it still showed that the people who met the
3    criteria, all the diagnostic criteria that's called the DSM-IV
4    criteria in those days, they desisted at the rate of
5    67 percent, and the ones that were subthreshold desisted at the
6    rate of 93 percent.  So it stands that the majority of children
7    who are cross-gender identified who are not socially
8    transitioned who are not encouraged in this will desist, that
9    is, will return to the fact that they are reasonably happy
10   living in their biologic sex.
11        Now, what you should know about all this is that studies
12   in the 1980s have demonstrated that gender atypical children
13   grow up at a far greater rate to be homosexual men or lesbian
14   women or bisexual adults.  It's not that cross-gender identity
15   does not have a consequence, that is, it isn't a prelude to
16   something.  The natural history of strong cross-gender identity
17   is to develop a homosexual or bisexual orientation in
18   adolescence and adult life.  And so this leads to some concerns
19   that by medicalizing or socializing a 4 year old or 6 year old
20   or an 8 year old into the opposite gender presenting them the
21   opposite gender, what we're really doing is trying to get rid
22   of homosexual people, and that this does not seem right to many
23   of us.
24        The natural history of cross-gender identity is to
25   largely become a gay adolescent, a gay and lesbian adolescent.

1    And what we're doing is then if we medicalize them, if we give

2    them a diagnosis and put them on a track to socialize them in

3    school as the opposite gender and then give them

4    puberty-blocking hormones and then cross-sex hormones and then

5    take off their breasts or their penis and their scrotum and so

6    forth, what we're really doing here is interfering with the

7    natural development of homosexual orientation.  And what we're

8    doing is putting them on a course that they're going to need

9    medical care and be more susceptible to medical illnesses

10   including benign -- some incurable things like gallbladder

11   disease and the need for surgery for gallstones.

12          So this whole idea of what I'd say premature

13   decision-making without understanding of the lifetime

14   consequences of this includes the not understanding that these

15   are likely to be homosexual children, young homosexual

16   adolescents and adults when they grow up.  And what's wrong

17   with that.  You see, why would we medicalize, why would we

18   change that natural evolution of cross-gender identifications

19   are a prelude, statistically significant prelude to adolescent

20   and adult orientation of homosexual nature.

21   Q     Shifting gears here.  Dr. Levine, let's talk about the

22   two primary treatment models for gender dysphoria.  So can you

23   tell us what are the two primary models of therapy for

24   adolescents with gender dysphoria?

25   A     The most -- there are two.  One is a profound and

Levine - Direct

1    thorough psychiatric assessment that would lead to family and
2    individual psychotherapy and the other is the gender
3    affirmative model.
4    Q    Tell us about the psychotherapeutic approach to minors
5    with gender-related psychiatric conditions.
6    A    As I may have already mentioned, a vast majority of these
7    children and adolescents have recognizable problems with
8    anxiety, socialization, depression, ADD, and a very large
9    percentage of them are autistic or on the autistic spectrum
10   disorder.  So some of them as well, some of the older ones like
11   15 year olds are already heavily using marijuana.  And anyway,
12   if you look at any one of those things, the anxiety, the
13   depression, eating disorders, evidence of self-harm,
14   suicidality, substance abuse, autism, ADD, learning
15   disabilities, and so forth, all those things need some kind of
16   attention from a mental health professional.
17        When they have gender dysphoria along with those things,
18   there is this tendency to think all these things are going to
19   get better if we can transition the child.  The child has this
20   passionate notion that they are trans and that they need and
21   want and fervently desire hormones and they can't possibly live
22   their life in their sex bodies.  So the psychiatric or the
23   psychotherapeutic approach begins with a competent, slow
24   psychiatric assessment of all the associated problems and an
25   attempt to interest both the parents and the -- because we're

1   talking about minors here, the parents have to be involved,

2   both the child and the parents in cooperation with seeing what

3   we can do to understand how each of these problems got

4   manifested, what were the antecedents and what can we do about

5   it.

6          Now, as you know -- I'm sorry, you may not know, but the

7   incidence of childhood adversity among this group is very high,

8   so when they have been physically abused or sexually abused or

9   they've had disruptive -- disruptions between their mother and

10  their father and themselves and so forth, we tend to talk about

11  the child's development, help them understand what they feel,

12  give them words for what they feel and work through the events

13  that happened to them when they were younger from the point of

14  view of their now more mature 18, 14 year old, 15 year old

15  sensibilities, their understandings of life, so this process is

16  not an attempt to change their gender identity, it's an attempt

17  to help them with what we call comorbidities.

18         And I can tell you, Your Honor, that other psychiatric

19  problems that children face are all treated -- primarily the

20  first step are treated with an assessment and psychiatric

21  individual and family interactions.  Gender dysphoria seems to

22  be the exception.  If a child presents with gender dysphoria,

23  we bypass all that problem and sometimes within one hour, some

24  affirmative therapists are saying to the parents your child is

25  gender dysphoric and the treatment should be hormones or

Levine - Direct

1    socialization in the opposite gender.  And this does not make

2    any sense to people who have practiced psychiatry for years and

3    understand that transgender people are human beings first.

4    They're not trans people first, they're humans first.

5         And when they have all these psychiatric challenges, they

6    deserve the standard psychiatric care which involves a thorough

7    assessment and opportunities to consider what lies behind this

8    anxiety, what lies behind this self-harm, what lies behind this

9    suicidality, these thinking and thoughts of suicide, why are

10   you depressed, what is the explanation of why you can't make

11   friends, why you're so unhappy as a person, why you're so

12   pessimistic.  This is just what I consider to be and others

13   consider to be good psychiatric care.

14   Q    Can you tell us how psychotherapy could be helpful with

15   respect to minors' perceptions of what it means to be a male or

16   what it means to be a female?

17   A    Well, an 8 year old or a 12 year old's concept of what

18   the range of male -- of acceptable behavior for men, what

19   acceptable behaviors -- what behaviors are acceptable to be a

20   man is very limited in a young person.  I've had many a patient

21   in the early years when I asked why do you want to be a woman

22   and the answer comes out to be something close to, well, I have

23   all these feelings and I want to express my feelings and my

24   sisters can express their feelings, but in my family, we can't

25   express our feelings if we're male.  I'm not saying that that's

1    the explanation for all transgenderism.  I'm just saying that
2    children have a very limited concept of the possibilities of
3    what they can be in the world.
4        We can be thoughtful, compassionate, noncompetitive, like
5    bright colors, like to sing and dance, be more interested in
6    theater and theology and still be a male.  You see, I can wear
7    pink, I can be a male and wear pink.  I can express myself in
8    fashion as a male anyway I want.  I don't have to change my
9    body in order to express myself as a male.  And an 8 year old
10   doesn't understand that.  Even a 13 year old doesn't understand
11   that.  And we can say the same things for girls, you see.
12       When I was growing up, when I think about the ideas that
13   I believed when I was a child, I believed that a girl could not
14   biologically learn how to throw a softball.  That's what I
15   believed as growing up in my society.  And just look at what
16   has happened in the course of a generation or a lifetime where
17   our concepts of what a woman can be and what a man can be has
18   changed so dramatically.  It takes time to understand these
19   things.  We don't get this when we're 4 and we're 6 and we're
20   8.  We don't even get it sometimes when we're 25.
21       So psychotherapy is an opportunity to have a conversation
22   of trust in a place that's safe with somebody who's
23   compassionate and thoughtful and interested in the welfare of
24   that particular child, you see.  And that is not how
25   affirmative care works.  Affirmative care says psychotherapy

Levine - Direct

1   only should be supportive of the transgender identity and
2   should be cheerleading for the opportunity to go forward as in
3   this changed way, and minimizes all the dangers or doesn't even
4   discuss the dangers.  So psychotherapy is really a process of
5   getting to know the child in a position of trust and
6   confidentiality, of helping the parents understand what science
7   knows about the pros and cons, the benefits and the risks, and
8   eventually to help the child talk about his own concerns about
9   this, you see.  This is what has been, in some of our writings,
10  referred to as true informed consent.
11       Informed consent requires time to appreciate the risks
12  and the aspirational benefits that risks, you see, the harms
13  and what we know about adult trans communities and their social
14  problems.  So that has to be conveyed to the parents and that
15  has to be conveyed to the child or the child has to come to
16  grips with his own or her own fears about what they're
17  undertaking.  You see, when a 15 year old says I have no fears,
18  this won't happen to me, these harms cannot -- I'll get a good
19  surgeon.  You see, human beings are ambivalent about
20  everything.  I think we need to understand that.  There's more
21  ambivalence about things -- we're ambivalent about our husbands
22  and our wives.  We're ambivalent about our children.  We have
23  mixed feelings about everything.
24       And the idea that a 15 year old has no ambivalence about
25  this is an indication either, one, they're lying to us; two,

Levine - Direct                                                813

1    they're lying to themselves; or three, they have not lived long

2    enough to appreciate the complexity of the struggle it means to

3    be a human being, which is there are mixed feelings about

4    almost everything we do.  There are mixed feelings about my

5    wonderful profession of being a doctor.  I'm sure those lawyers

6    in this room have mixed feelings about being a lawyer.  You

7    see, it's just in the nature.  It's what psychiatry has learned

8    about the nature of human life is that we're conflicted.  We

9    struggle.

10   Q     Let me ask you about body discomfort.  How can

11   psychotherapy help with body discomfort?

12   A     Well, we have a body, it has characteristics, it's kind

13   of the universal thing that we struggle with our

14   characteristics of our body.  We're too tall or we're too

15   short, we're too thin or we're too heavy.  This organ is big or

16   too small.  We talk about these things, you see, but in dealing

17   with and creating a trustful environment in which a child or

18   teenager can tell us over time what he or she thinks and feels

19   and we accept it and understand it and process it, many times

20   people's attitudes change about their body parts.  In

21   psychiatry we have this diagnosis called body dysmorphic

22   disorder.  It's a problem when one particular body part is the

23   source of great distress.

24        But gender dysphoria, when it meets criteria, when people

25   meet criteria, it's not simply about one body part, it's about

Levine - Direct

1    the body parts that designate them as a member of their
2    biologic sex.  So we're not talking just about the shape and
3    size of the breasts, we're talking about the presence of the
4    breasts, for example, in a trans male teenager.  So when we're
5    talking about all those other issues that I mentioned
6    previously, sometimes there are attitudes toward those body
7    parts and toward the sex body begins to modify and they come to
8    accept the fact that they are a male or a female and they have
9    to find some way of living within that body without doing harm
10   to that body.

11        So I can't tell you -- there's no technology for doing
12   that, like step one, step two, step three, you see.  It is a
13   process of a trusting conversation over time where a child can
14   express their thoughts and feelings about their -- about every
15   aspect of their lives, and some of that conversation involves
16   their discomfort with their sex body parts.  I don't think I
17   can tell you more specifically than that.

18   Q    Can you tell us about any experience you have with
19   patients who maybe fail to realize that they're not unique with
20   respect to body discomfort?

21   A    Yes.  You know, I think all of us in the room can
22   understand, can remember going through puberty and the
23   discomforts we had with our bodies, our bodily selves, and some
24   of us had discomforts with some of the character traits we had.
25   We weren't courageous enough, for example, or we weren't strong

Levine - Direct

1    enough or we weren't pretty enough, or we weren't smart enough,

2    we weren't athletic enough.  All these things that when we're

3    going through puberty are exaggerated but they're private,

4    they're subjected privacies that we don't talk very often to

5    our peers about or to our parents about so we think it's

6    unique.

7           The discovery of the pleasures of genital touching, for

8    example, which is a universal phenomenon is an extremely

9    private phenomenon, so we as 7th graders and 6th graders and

10   5th graders, we think it's unique to us.  When, in fact, it's

11   going on in every chair in every classroom we sit in, you see.

12   So the trusted process of psychotherapy is a process where

13   these things can be discussed, and so generally speaking, this

14   is a very helpful thing for human beings.  And it doesn't,

15   quote, cure this or that by some technology, it's about a

16   trusted human relationship that allows the sense of self to be

17   better understood, you see.  And it keeps people from believing

18   they're the only ones who are discomforted by menstruation, for

19   example, or their breast size, or how their mother has been

20   demeaned by their father.

21   Q    Can you explain how psychotherapy can help, for example,

22   with coping or resilience skills?

23   A    Well, the processes I've just talked about, the child

24   gets more awareness of what he or she feels, has words for what

25   he or she feels, and begins to process the feelings that they

Levine - Direct

1   have and they gain confidence in talking, they gain confidence

2   in how they view themselves, you see.  And they sometimes get

3   courage to do things that they were afraid to do before.  This

4   sometimes is referred to as the process of gaining resilience

5   and coping better with all things that are coming down the pike

6   for them in life.

7        So psychotherapy helps people mature.  It helps people

8   understand themselves and by nature it helps them understand

9   others, and in this process, they can then make decisions that

10  are better informed.

11  Q    Can you tell us -- explain whether the psychotherapeutic

12  approach, is this the same thing that is called conversion

13  therapy or reparative therapy or are these different things?

14  A    Well, Mr. Cantrell, this whole field of gender medicine

15  is so politicized that in order to prevent the processes that

16  I've just described, these processes have been pejoratively

17  relabeled as either reparative therapy or conversion therapy,

18  and the politics of this is such that is so powerful that

19  people like to do things like I do, that is, psychotherapists

20  have been frightened to be called a conversion therapist

21  because conversion therapy is some kind of attempt to change

22  people's gender identity.

23       Historically it's based on psychiatry's misadventure when

24  before 1974, psychiatry thought that homosexuality was some

25  kind of psychopathologic state and they devised treatments to

Levine - Direct

1    cure homosexuality which, of course, all failed, and became --
2    the term "conversion therapy" arose from that history of
3    psychiatry, and mostly in the 20th century, but that term has
4    just been applied by people who were involved in affirmative
5    care as conversion therapy.  This is so bad -- this is so bad
6    and this came about in large part because the Standards of Care
7    that WPATH issued ten years ago or more said that psychiatric
8    assessment did not have to be done, all they had to do was
9    affirm the presence of gender identity disorder and that
10   psychotherapy was not the treatment for gender dysphoria, the
11   psychotherapy should only be supportive of the transition.

12        So before we knew it, all kinds of -- anyone who wanted
13   to talk in the way that I've been describing to you was
14   referred to as conversion therapy.  And there have been laws
15   passed in various municipalities preventing conversion therapy.
16   But it's been a great unscientific leap by using the term
17   "conversion therapy" for what I'm talking about, from
18   conversion therapy of trying to cure homosexual people of their
19   homosexual desire.

20        Now, you need to understand that in the United States,
21   this politicization of psychotherapy as an approach to gender
22   identified -- cross-gender identified children and adolescents,
23   in the United States, conversion therapy is what is thrown at
24   people like me.  We're called anti-trans people and conversion
25   therapists.  But in Europe and Sweden and Finland and the UK,

1    in France, psychotherapy is the most recent recommended --
2    first approach recommendation to the treatment of gender
3    atypical youth.  It's only in America that we talk about
4    conversion therapy and people like me are attacked as
5    conversion therapists.
6         I'm not a conversion therapist when I'm trying to convert
7    someone from depression to not being depressed or from an
8    anxious person to being a confident person, from a substance
9    abusing person to being a sober person, you see, but I'm
10   attacked as a conversion therapist when I'm trying to do
11   psychotherapy with a family and a child who's thinking about
12   changing their gender presentation.  It makes no sense in some
13   larger way.  It's politics, politics, politics.  And it's part
14   of trying to suppress any attempt, any attempt to give people a
15   wider choice so that when they're older they can make an
16   informed decision about how they want to live.
17   Q    So you've talked about how psychotherapy can help a
18   person, a patient recognize how things may change as they
19   mature, as they gain life experience.  Can you say a little bit
20   more about how that is different from conversion therapy?
21   A    I think conversion therapy thinks that the person, you
22   cannot be a trans person, it's a terrible thing to be, you're
23   immoral to do that.  That's not how psychotherapy works.
24   That's not how psychotherapy works at all.  Psychotherapy works
25   by listening to the patient's narrative of their lives, by,

1    over time, developing a trustful environment, a trust, and a

2    confidential environment where the child can share increasingly

3    over time his or her subjective experiences and raises

4    questions about the sources of their problems which often are

5    self-harm, low self-esteem, poor socialization, being very

6    anxious about numerous things, and frequently trying to get

7    them out of a state of depression.

8         It's not attack on their current gender identity.  It's

9    an attempt to establish a relationship where their subjective

10   lives can be shared with another hopefully informed mature

11   person who's kind and compassionate and knowledgeable about

12   what distorts, for example, physical abuse and sexual abuse and

13   being sold as a sexual slave, so to speak.  I mean, I've had

14   patients who at age 4 have been farmed out for money for sexual

15   purposes.

16        So psychotherapy is mischaracterized by affirmative care

17   people and the word that they use is conversion, but it's like

18   they have no understanding really of what good psychotherapy

19   consists of.  And it is not an attack on the gender identity of

20   the patient.  It is trying to understand the development of the

21   person and what explains the numerous symptoms that they have.

22   Q    So we've been talking about the psychotherapeutic

23   approach.  I'm going to switch over and talk more specifically

24   about what you've called the gender affirmative approach.  Can

25   you just briefly tell the Court what is the medicalized

Levine - Direct

1    approach, how it differs from the psychotherapeutic approach?

2    A    Well, when a child, an adolescent says that they are

3    transgender, whatever word they use, numerous words that could

4    fall under that umbrella like I'm gender binary, I'm gender

5    fluid, I'm pan gender, I'm agender, the therapist reviews

6    ideally the criteria for gender dysphoria or gender

7    incongruence and is not interested in how the person got to

8    that identity state, but what to do to support that identity

9    state.  And so the things to support would be to explain how

10   they may proceed.  They may present themselves in school in a

11   different way.

12        They can cut their hair short if they're a girl, they can

13   wear boys' clothing, they can wear girls' clothing.  I'm trying

14   to jump between the biologic male and the biologic female, be

15   confusing.  And so there are -- there are just a limited ways

16   of medical support or affirmative care.  One is to socially

17   transition, that would include clothing and name, name change

18   and so forth.  And then depending on the age, it would be

19   puberty-blocking hormones, cross-gender hormones, removal of

20   the breasts.  That's usually the first surgery that's done in

21   the youngest of people is bilateral mastectomies for trans

22   identified male teenagers.

23        The usual genital surgeries to get rid of the penis and

24   the scrotum are not typically done before age 18.  So it's just

25   the sequence of social transition, various forms of hormones

1    and various forms of surgery.  And the surgeries not only are
2    breasts and genital surgery, but for many times, there's facial
3    feminization surgery, there's surgery on the larynx trying to
4    make the voice more -- higher in the registers for biologic
5    males who are trans females, and there are numerous other
6    cosmetic things that may be done.  But the psychotherapy that
7    WPATH recommends as part of medical affirmative treatment is
8    supportive therapy.
9          It's not investigating the things that I've talked about.
10   It's not investigating the influence of childhood adversities.
11   It's to support the presentation of the self, the new self, and
12   to be optimistic about and make suggestions to deal with
13   whatever ongoing medical psychiatric problems that may exist.
14   The truth is that in all medical care, especially in the United
15   States, in all medical care, we do what we do, the surgeon does
16   the surgery, the endocrinologist does the hormones, and then we
17   basically lose sight of the patient.
18         So we don't really know what happens to those people over
19   time.  That's one of the reasons why studies are so important.
20   So medicalization therapy is pretty simple therapy.  It is
21   staged therapy.  This stage, this stage, this stage, this
22   stage, goodbye.  Have a nice life.
23   Q    So in view of that and in view of the current state of
24   the evidence, can you explain what are the fundamental problems
25   with prescribing hormones and surgery to minors for

1  gender-related psychological issues?

2  A    Well, we don't have any follow-up studies on what happens

3  to these teenagers who are given hormones.  They're often given

4  hormones by pediatric endocrinologists and the child gets to be

5  20, 25, 30, and the pediatric endocrinologist turns them over

6  to someone else.  And because medical care is there's nothing

7  compelling a patient to come back to a doctor, you see.  If the

8  patient doesn't like the doctor, they don't come back.  What we

9  really need in this field is to know what the consequences of

10 affirmative care are prospectively.  The research that needs to

11 be done is much more sophisticated than it ever has been done

12 in order to answer the questions that we have.  I'm sorry, I

13 think I've lost your original question.

14 Q    Let me ask this question.  Can you tell us what is the

15 evidence that gender dysphoria is cured or ameliorated by

16 hormones or surgery?

17 A    Gender dysphoria, you recall, is a distress about not

18 having the full characteristics of the opposite sex, and gender

19 dysphoria from the doctor's point of view is ameliorated by

20 giving them what they want, that is cross-sex hormones.  They

21 really don't know whether, for example, if you give

22 testosterone to a biologic girl and they don't really know

23 whether the gender dysphoria disappears.  If you take off the

24 breasts of a gender dysphoric male, they still have female

25 genitals so they live with the social appearance or the

Levine - Direct

1    appearance of the chest and female genitalia.  So the

2    incongruence of the body continues, you see, and the idea that

3    surgery, for example, taking -- changing -- what we call

4    vaginoplasty, creating a vagina, female appearing genitals from

5    a biologic male in a trans female, many of those people are

6    still gender dysphoric, they don't feel like they're feminine

7    enough.

8         Their bodies are tall or masculine in some ways, many of

9    them want to have a facial feminization surgery, so the quest

10   to increasingly feminize over time would indicate to people

11   like me that gender dysphoria persists, you see, that you're

12   putting this child on a pathway where they're always going to

13   be a little concerned that they're not feminine enough or

14   they're not masculine enough.  And then when it comes to

15   intimate relationships, you see, it's a particular problem for

16   trans people.

17        The number of people who are interested in forming an

18   intimate romantic relationship with a trans person is limited

19   compared to cis-gendered people.  And the post surgical

20   problems include sexual dysfunction, and the post hormonal

21   problems include sexual dysfunction.  These things are not

22   discussed widely.  Sex is a very difficult thing for people to

23   talk about in general conversation.  So when we're thinking

24   about the long term follow-up of hormone treatment, we really

25   mean the long term follow-up.  When we are talking about the

Levine - Direct

1   consequences or the harms, we need to specify what harms we're

2   talking about and people need to know in order to be informed

3   going into this treatment what these harms and what these

4   consequences are.

5        And my point or our point has been that informed consent

6   for trans children and their families has been woefully

7   inadequate because it's left out the long term uncertainties,

8   you see, it's uncertain because we haven't done the studies.

9   We only have cross sectional looks at the adult communities and

10  their problems and we only have the immediate and the one-year,

11  two-year follow-ups of the surgical complications of genital

12  surgery and breast surgery.  So these are the harms and the

13  uncertainties about the harms that parents need to be informed

14  about which they're not being informed about.

15  Q    Would that include, for example, the evidence of long

16  term impact on quality of life measures, is that what you're

17  getting at?

18  A    For example, I can't remember the specific citation, but

19  a recent study I read said the quality -- one questionnaire of

20  quality of life showed that post surgically the general

21  psychological quality of life was improved from the

22  pre-surgical time but the quality of health, the physical

23  health dimensions were worse, and that's because even though in

24  informed consent, people are advertising that hormones and

25  surgery are safe and effective, but when you look at 30 percent

1    reoperation rates, it doesn't seem very effective to me.  So

2    the health concerns of people post surgically are often

3    problematic and that gives rise to, well, I'm glad I had the

4    surgery because I'm now more of a man or more of a woman, but I

5    don't feel so healthy, I got this problem or that problem.

6              THE COURT:  Mr. Cantrell, I'm going to interrupt you

7    and take a short break and give Karen a break and me as well.

8    Let's be in recess until 10:50.  You can step down, Dr. Levine.

9         (Recess from 10:34 AM until 10:50 AM.)

10   BY MR. CANTRELL:

11   Q    Dr. Levine, welcome back.

12   A    Thank you.

13   Q    So before the break we were talking about the

14   gender-affirmative or medicalized approach to adolescent gender

15   dysphoria.  I want to continue with that.  Can you tell the

16   Court -- I want to talk about some of the psychosocial risks of

17   the medicalized approach.  So can you explain to the Court some

18   of the psychosocial risks pertaining to friendships that

19   transgender identifying patients tend to have as they grow

20   older?

21   A    It's hard to know.  On a rate basis, I can tell you from

22   my clinical experience that the transgender identified teenager

23   often counts among their only friends to be other gender binary

24   or trans identified friends.  That begins to evolve because

25   before a child is transgender identified, he or she may have a

Levine - Direct

1   range of friends that no one -- the issue of sexual identity is
2   not part of that friendship, it's only the sex is part of the
3   friendship.  The sex of the body.  Girls being with girls and
4   boys with boys.
5        But as the identification gets socialized, the friendship
6   patterns tend to change and there's a lot of support among the
7   trans people and, in fact, in my clinical experience, most of
8   the early romantic relationships between trans people among
9   trans adolescents is with -- the romantic relationship is with
10  another trans identified person.  So a trans male would have a
11  romantic relationship with another trans male and then think of
12  themselves as sort of gay.  Or the trans female would have a
13  romantic relationship, a sexual relationship with another trans
14  female.
15       There's a lot of support for trans people from the
16  internet, and so some of the friendship patterns that I've
17  witnessed are virtual patterns, so someone in Ohio has a really
18  good friend in Texas and they talk every day in Texas but it's
19  a trans identified person.  If we go back, if I could -- just a
20  little aspect of your question about puberty-blocking hormones
21  and the psychosocial effects of puberty-blocking hormones.
22  Puberty-blocking hormones are being given at a time when their
23  age mates are undergoing puberty and are changing.  They're
24  growing taller, they're growing secondary sex characteristics,
25  they're starting menstruation and ejaculation, and they're

1   having sexual attractions to one another, and they're learning

2   from these painful experiences.  Whereas the child that's kept

3   in a prepubertal state by hormones who often feels in part

4   because of a high incidence of autism, they're having

5   friendship patterns, friendship problems in the first place,

6   some of those autistic kids, they are not changing

7   biologically, and that has social, psychosocial implications

8   for their peers.

9        So if they're kept on these hormones for a couple years,

10  three years, sometimes four years, they remain looking like a

11  10 year old where everyone else is 14, 15 years old, you see,

12  and are having patterns.  So the psychosocial implications of

13  puberty-blocking hormones can be I'm even further isolated,

14  therefore I'm further depressed, you see.  Because in

15  adolescence, one of the key factors in happiness of adolescence

16  is their social connections with their peers.  And so if we

17  give kids, if we give them this medical treatment, there's a

18  tendency for them to be even more socially isolated, and

19  therefore more anxious and more depressed.

20  Q    Can you talk about the psychosocial risks of this

21  medicalized approach as it pertains to a person coming to

22  realize the meaning of permanent sterility?

23  A    During adolescence, I don't think it's a big issue at

24  all.  I think relative infertility or permanent sterility -- I

25  make a distinction between those two terms by the way.  When

Levine - Direct

1    you take out the uterus and the ovaries or you remove the

2    testes, we're permanently sterilizing people, but infertility

3    is a relative thing so that if someone just takes hormones and

4    wants to have a baby, someone takes testosterone, retains their

5    uterus and their ovaries and they choose ten years later that

6    they would like to have a baby, they can stop their

7    testosterone, they're relatively infertile, they're not

8    sterile.  But once you remove their uterus, they're sterile.

9    You understand those distinctions?

10   Q     Uh-huh.

11   A     So the issue about sterility is not -- or infertility is

12   not seemingly germane to the 15 year old, to the 16 year old,

13   to the 17 year old.  But as time goes on and interpersonal

14   relationships are characterized by things that people in their

15   20s are concerned with, career, stable relationships, love,

16   sexual pleasure, reproduction, all the sudden a child who at 15

17   wasn't concerned about this, it sort of comes into focus, I

18   can't have a child.  And that may have meaning for my partner

19   who wants to have a child, you see, and it may have meaning for

20   me because oh, my god, I can't have a child.  Or if I can't

21   have a child by stopping my testosterone, I can't breast feed

22   this child because I don't have any breasts anymore because I

23   was eager to get rid of them when I was 14 years old.

24         So when I talked earlier about a life cycle perspective,

25   this is one of the implications of that.  That these events,

Levine - Direct

1    these medical events, these surgical events, they have meaning,

2    but the meaning does not appear for years later, and then they

3    have a different life trajectory, you see, which may not

4    displease everyone.  Lots of people don't have children, but

5    many people want to have children.  Even those who don't want

6    to have children like the idea that they can have children if

7    they chose in the future.  But that option is gone for people

8    who have been surgically fixed, whatever.

9    Q    Can you say a little bit more, briefly, about the

10   psychological life tasks that are faced by a 20, 30, 40 year

11   old as opposed to an 18 year old or younger?

12   A    The life tasks of a 20 year old is to find one's

13   identity, is to find one's vocation, one's vocational pathway,

14   it's to find someone to love or to be loved or to choose to

15   have a life without permanent connection.  So it has to do with

16   the fixity that one is settled with who I am in terms of sexual

17   identity, and the issue is what will I do in the world

18   vocationally, how will I identify vocationally, and where do I

19   stand in terms of my aspiration for romance and permanent,

20   stable, loving connection, because love has two faces.

21        I want to love somebody and I want to be loved by

22   somebody, and if I want to be married or I want to have a

23   stable relationship, that is, what are my chances of finding a

24   partner and what are my chances of staying with that partner

25   through thick and thin throughout the course of my life until

1    death do us part.  So those are the three issues.

2         And then when we think about the endocrine treatment and

3    then the surgical treatment of trans teenagers, we need to

4    think about how that will impact on sexual identity continuing

5    or absent gender dysphoria, perfect happiness with my

6    transgender state and this body, how will this impact on my

7    vocational aspirations and my ability to actually get the jobs

8    that I seek, that I desire.  And what would it mean in terms of

9    finding a stable relationship, a loving relationship, and the

10   creation of a family, and what are my aspirations to be a

11   parent.

12        So these are the things that the parents of 13 and 14

13   year olds and sometimes 8 year olds and 9 year olds have to

14   consider.  We are not talking about will the child be happy at

15   age 9 because she is on puberty-blocking hormones.  We're

16   talking about will this person be happy at age 29 with the new

17   state, a new biologic state, a new social state and new

18   opportunities.  And, you know, I don't know how this fits in,

19   but when people are writing about the problems of trans people,

20   they talk about minority stress and the fact that trans people

21   are still the object of considerable discrimination and so this

22   is not a good thing.

23        We're not saying discrimination is a good thing, we're

24   saying quite the opposite, but the reality for parents facing a

25   decision shall I transition my child, shall I give my child

Levine - Direct

1    step one hormones, step two hormones, and step three surgery,

2    what does this mean for my child's future in terms of society's

3    attitudes toward trans people and whether there are

4    opportunities for it.  I know there are very successful trans

5    people in many, many fields, you see, but it's the rate.  It's

6    the rate of opportunity, not the fact that one or two or five

7    or ten or 10,000 break through.  What about 100,000 who don't

8    break through because of discrimination?

9         So parents have to think about these things and doctors

10   need to be able to present these things to the families of

11   pediatric patients who are transgender.  They need to think

12   about this.  They may still decide to transition their child,

13   but they have to be able to have an opportunity to think about

14   this, the pros and the cons and the harms that are known and

15   the harms that may be unfolded in the future.  It's really hard

16   for parents to think about the sexual lives of their children.

17   That's difficult for any parent.

18        And you see how is it that doctors talk about sexual

19   dysfunction, future sexual dysfunction to a parent of an 11

20   year old.  It's a really tough discussion.  Parents don't like

21   to think about this, but it's part of the reality of what

22   they're getting into, what they're helping their child to get

23   into.

24   Q    Can you explain the evidence concerning whether a

25   medicalized approach to adolescent gender dysphoria reduces

Levine - Direct

1    suicide?

2    A     The worst -- let's start with the worst thing to be said

3    to a parent.  Would you rather have a trans daughter than visit

4    your son in the cemetery?  This used to be frequently told to

5    parents.  So I just want to begin there.  The next thing I want

6    to say to you is the suicide rate of people who have completed

7    all the transgender treatments that medicine has to offer is

8    higher than the general population by a very large factor.  The

9    third thing I want to say is that when we talk about suicide,

10   we need to discriminate between suicidal ideas, thoughts of

11   suicide, suicide attempts that are minor, scratching the self,

12   trying to hang one's self with the pants of your Levi's, you

13   see, from a serious suicide attempt that could be lethal under

14   certain circumstances, and actual completed suicide.

15         Suicide ideation is very common in trans teens.  Suicide,

16   completed suicide in trans teens is just slightly greater than

17   the suicides of people with mental illness of the same age

18   group like schizophrenics, bipolar, substance abusing people.

19   The Tavistock Clinic analysis of suicide there found in the

20   course of, I think, a decade, a little more, of treatment, the

21   Tavistock clinic comes up because it has the most patients in

22   Europe and probably anywhere in the world.  And in that study,

23   there were four completed suicides in, I think, I don't

24   remember, 12 years or 15 years, something.  Two of them were on

25   the wait list waiting for treatment and two of them were in the

Levine - Direct

1   midst of hormonal treatment.  So the actual completed suicide
2   rate among kids in treatment is relatively small.  It's a rare
3   event, but suicidal thoughts are very common.
4        I would -- if we wanted a round number, there's about a
5   50 percent chance that a trans teenager has had thoughts of
6   suicide.  And that's much higher than non trans kids.  But you
7   see, we don't want -- we want to separate suicidal thoughts
8   from attempts at suicide that are serious and potentially
9   lethal from completed suicide.  We can't just lump all those
10  things together.  We need to be very discriminate in what we're
11  talking about.
12  Q    So what would you say in response to the claim that the
13  medicalized approach will reduce the risk of suicide for
14  adolescents?
15  A    I think show me the data that, in fact, that that's true.
16  It doesn't exist.  The data doesn't exist.  But the scare of
17  parents that their child will suicide and when parents are
18  perceived by their children to be resistent to transition for
19  their kid, suicidal ideation increases.  So we need to think
20  about, those of us on the front lines, why is this person
21  suicidal?  Are they suicidal because they are so pessimistic
22  about their parents' attitude supporting them?  Are they
23  suicidal because they've been suicidal because they've been
24  depressed since they were 8 years old?
25        We need to understand why.  And that's the job of the

1    psychotherapist, the psychologist, the mental health
2    professional.  It's not simply to say, oh my god, we're going
3    to cure them of their suicidal potential by giving them
4    hormones.  Giving them hormones, if that's what they want, will
5    make them feel better, you see, but it doesn't prevent them
6    being suicidal when they confront some other problem that they
7    have as a result of being trans.  Their friendship patterns,
8    their social isolation, their not knowing what to do about
9    going to the prom, whatever.
10   Q     When you say that giving hormones to an adolescent would
11   make them feel better, is that a short term or long term
12   effect?
13   A     I think all the clinicians who give hormones will tell
14   you that they perceive that their patients are much happier now
15   that they're on hormones because they ask that question and the
16   patient looks happier.  But these are all short term things.
17   If I want a train for Christmas and my parents can't afford it
18   and a train appears at Christmas time under my Christmas tree,
19   I'm going to be much happier for a short period of time.  So
20   what we're saying is that when we're talking about the ability
21   to love the self, to protect the self, to not put one's self in
22   danger of harm, either harmed by others or self-harm like
23   suicide, there's really very little evidence that hormones in
24   the long run prevent suicide.
25          And as I've already said to you, we have data that shows

Levine - Direct

1   that people who have had the complete process have more

2   suicide.  And I think an earlier study from Holland by several

3   thousand people who have been treated with hormones only and

4   not surgery, the suicide rate was also elevated.  The death by

5   suicide was pretty high.

6        Suicide is a problem for trans people, but it's not a

7   problem immediately.  It's a long term problem.  If you look

8   ten years after the final surgery is done, that's when the

9   suicide rate begins to be more dramatically elevated.  There is

10  suicide at every stage.  Suicide is known to exist at every

11  stage in the medical transitional process, but the highest

12  level is ten years afterwards.

13  Q    Ten years after?

14  A    After the last surgery, the last genital surgery or

15  breast surgery.

16  Q    So shifting to a different topic, I want to talk to you

17  about your history and experience with the World Professional

18  Association for Transgender Health.  So please tell us about

19  your history and experience with WPATH.

20  A    Because I was interested in all things sexual when I was

21  done with my psychiatric residency, I got interested in this

22  new phenomenon, at least in Cleveland it was a new phenomenon.

23  We called it transsexualism in those days.  And there was a

24  professional organization called the Harry Benjamin

25  International Gender Dysphoria Association.  And so they had

Levine - Direct                                    836

1   meetings and I attended those meetings probably from the early
2   '70s on, and I was chosen to be the chairman of the fifth
3   rendition of the Harry Benjamin Association's fifth version of
4   the Standards of Care.  I was the chairman of that committee
5   including the seven other people.  And in 1999, we issued the
6   Standards of Care.  So I was a member of that.
7        I think in 2007, they changed their name to the World
8   Professional Association for Transgender Health, WPATH.  So I
9   was quite aware, of course, being the chairman of that
10  committee that wrote the standard, the 21-page Standards of
11  Care, of how we actually made those recommendations that we
12  made.  But I was aware as soon as we submitted those, the
13  president of the organization did not like the idea that our
14  collective wisdom required that two independent mental health
15  professionals needed to give an opinion that hormones were
16  indicated in this particular patient.  He thought that was much
17  too conservative and he immediately reissued a new committee to
18  rewrite the sixth Standards of Care which came out three years
19  later.
20       In the meantime, I attended another meeting and I began
21  to realize that the powers that be in WPATH were not so
22  interested in understanding what this phenomenon was about and
23  what should we do for these people and what are the evidence
24  that what we're doing for these people are helping them.  It
25  was much more politicized and it became a pro trans treatment

1    organization.  And as I thought of myself as interested in all

2    things sexual, but in particular in gender identity, what we

3    called in those days gender identity disorders, I thought we

4    departed from the skeptical wanting to be helpful but trying to

5    understand it and learning about this phenomenon, we departed

6    from what I call the scientific approach to it, to a

7    politicized advocacy approach to it.

8         We were sure, that is, the organization was sure that

9    they were helping people, not harming people, and that we

10   should go full speed ahead in maximizing the access to

11   treatment, and at which time, I decided I no longer could be

12   part of it because they departed from what I believed was the

13   legitimate interest in learning about the phenomenon in trying

14   to discern how best to help people.  They decided they knew

15   best how to help people without the evidence that they knew

16   best.  And that was a political thing.

17        So the organization became -- now we just call it WPATH.

18   It became both -- they call themselves a scientific

19   organization, they call themselves a policy making

20   organization, and they call themselves an advocacy

21   organization.  And those three things are incompatible.

22   Science is not advocacy.  Science is answering a question.  And

23   you can't even ask a question if you know the answer.  And if

24   the answer is politically -- it's a political question, it's an

25   ideologic question.  We were asking scientific questions and

Levine - Direct

1  they were responding politically, ideologically.

2  Q     So how would you evaluate WPATH's claim to speak for the

3  psychiatric profession?

4  A     WPATH speaks for the people who belong to WPATH.  They

5  speak for the population of trans people who believe in the

6  civil rights of adults with transgenderism.  They don't speak

7  for the doctors who take care of the inpatients when

8  transsexual people make suicide attempts that are put in the

9  hospital are so depressed they can't function.  They don't

10  speak for the doctors who take care of them as outpatients.

11  They don't speak for the vast, vast majority of physicians who

12  encounter the healthcare issues of the trans people.  But they

13  say they speak for the medical profession and they are very

14  successful politically.

15        WPATH is a very successful political organization because

16  they've convinced courts all over that they have the standards

17  of care, they have the knowledge and they have the science.

18  And what I am saying to you is that the decisions and the

19  policies that are made are declarative principles that they

20  declare principles.  They're not based on science, they're

21  based on what they think would be helpful to facilitate the

22  lives of transgender people.  We're all trying to facilitate

23  the lives of transgender people.  That's the point.

24        Even people who are opposed to hormones for 14 year olds

25  are trying to facilitate the lives of transgender people.

Levine - Direct

```
 1   We're not -- we seem to be on opposite positions, you see, but
 2   all of us are concerned sincerely with how best to help people
 3   who are transiently or permanently identified in teenage years
 4   or in early years with their identity, preoccupied with their
 5   identity.  What we're saying is that all of us are concerned
 6   about the long term outcome of these people.  The health, the
 7   mental health, the physical health, the social health, the
 8   vocational health.  And I just think WPATH has abandoned the
 9   idea that skepticism is the scope of science.  They don't
10   permit skepticism.  They boo.
11        I was at a Galveston meeting and when someone said
12   something cautionary, people booed.  This is not what happens
13   in American Cardiology Association and American -- this is not
14   how science works, you see.  But in WPATH, that's how it works.
15   WPATH suppresses evidence to the contrary.  And we've already
16   discussed conversion therapy, you see, which is an example of
17   suppression of ideas to the contrary.
18        So WPATH really is not taken seriously in Europe anymore.
19   Finland doesn't follow that.  The UK doesn't follow that.  I
20   actually think Germany is about not to follow it.  So although
21   WPATH says world association, it really is much more of a
22   United States association these days, where most of the members
23   are from the United States anyway.
24   Q    Earlier I believe you mentioned the psychiatrists who
25   treat patients who seek inpatient psychiatric care.  And I just
```

1   want to follow up to make sure that I'm following what you

2   said.  What's the relationship between those psychiatrists and

3   WPATH?

4   A     Mr. Cantrell, you asked me if they stand for the medical

5   profession, they represent the medical profession.  And I'm

6   saying that these people in WPATH aren't inpatient

7   psychiatrists, they don't take care of people when they make

8   suicide attempts or when they're depressed or when they're in

9   substance abuse treatments.  Those people are identified --

10  those patients are identified as trans people.  But the people

11  who take care of them and seeing them at their worst,

12  psychiatric inpatient is when a person is really decompensated,

13  those people aren't members of WPATH.  And when they come to

14  see people like me because they're depressed after transition,

15  WPATH doesn't see -- the people who take care of patients when

16  they seek outpatient treatment or inpatient, they're not

17  members of WPATH.

18         Members of WPATH give hormones and they use surgery and

19  they're advocates, you see, they don't take care of the

20  consequences.  And they say they stand for the medical

21  profession, but they say WPATH is really an effective public

22  relations.  They have convinced courtrooms that they are the

23  standards of care and they represent medicine's best thinking.

24  And they don't represent medicine's best thinking to the

25  Europeans any longer because the Europeans started this and

Levine - Direct

1  they've seen the outcomes much more than America has seen the

2  outcomes.

3  Q     We'll address that in a moment.  Continuing with WPATH,

4  how would you evaluate the WPATH Guideline's concern for

5  uncovering the reason why a patient is experiencing gender

6  dysphoria?

7  A     I don't think they're that interested in that subject.  I

8  think they're interested in the diagnosis and how to support

9  the people in their transition.  They're not interested in the

10 background factors, the adversities, the family dysfunction,

11 the disruptions in bonds, the sexual abuse or the autism.

12 Actually they kind of think that autism is no reason not to

13 proceed with transgender, not to be cautious about it.  They're

14 just autistic people, they're just on the spectrum.  But the

15 truth is that among the trans community, the people who go for

16 trans services, the incidence of autism and the people who are

17 requesting services is seven times higher than the incidence of

18 autism in the general population, and that's from -- that's

19 been demonstrated on three different continents, you see.

20      So there's something about neuro-atypical or autistic

21 people that predisposes them to think at some point in their

22 lives, usually in teenage years, that they could have a better

23 life and that they are, in fact, a trans person.  We know that

24 autism, without gender dysphoria, is a considerable challenge

25 for families and for the individual autistic persons.  In fact,

Levine - Direct

1   they have a higher suicide rate than the general population as

2   well.  They have many more social problems.  Some of them are

3   brilliant people and they make wonderful contributions, but

4   interpersonally and personally, the typical autistic person has

5   a lot of challenges that the rest of us don't have.

6        So they're not so interested in what presented, what

7   forces led to the crystallization of an identity as a trans

8   person, they're just interested in how to support these people

9   and to make sure that they get what they want and they get it

10  as soon as possible.  And they believe these people live

11  happily ever after even though they have no data to show that.

12  In fact, there's data to show quite the opposite.

13  Q    Earlier you were talking about the different versions of

14  the WPATH guidelines.  Can you explain how WPATH's guidelines

15  have historically dealt with psychotherapy and how they have

16  changed since your involvement?

17  A    Well, prior to the 7th version which I think was

18  published in 2011, psychiatric assessment was required.  Even

19  psychotherapy was required.  And in 2011, psychotherapy

20  assessment was referred to as gatekeeping.  Gatekeeping was

21  used in a very negative fashion.  It became a source of oh, my

22  god, you wouldn't want to be called a gatekeeper, you see.  The

23  principle in medical ethics -- the first principle in medical

24  ethics is "above all, do no harm."  There is another principle

25  -- and there are several principles in medical ethics.  There

Levine - Direct

1   is one called "respect for patient autonomy." So in this -- in
2   the ethical conflict in taking care of trans people, the doctor
3   is caught between "above all, do no harm" and "respect what the
4   patient wants". The patient's autonomy, respect for autonomy.
5        It's one thing to understand that patients have a right
6   to choose or choose to have a recommended care or not choose to
7   have a recommended care when they're an adult. But I'm not so
8   sure that an 11 year old gets to choose the medical treatment
9   that he or she desires. And what WPATH did in the 7th edition
10  is it said the major principle to follow is "respect for
11  patient autonomy", not "above all, do no harm." Not always act
12  in the patient's best interest. That's the third principle,
13  you see.
14       So that reordering from the Standards of Care is that
15  give the patient what they want as opposed to you, doctor, your
16  job is to see to the patient's health, short term and long term
17  health, and above all, do not put this person in harm's way.
18  So how we negotiate, how doctors and psychologists negotiate
19  the clash between these ethical principles is one of the things
20  we're talking about here today but at the level of medical
21  ethics.
22  Q    So shifting to a new topic, you've mentioned the European
23  countries, and I'd like to talk to you about the national
24  reviews that have been conducted there and elsewhere. So can
25  you explain generally what the national reviews are?

Levine - Direct

1    A      Well, there generally is a standard when any medical
2    topic is reviewed that up to 30 percent of people who are on
3    the committee should work in the area and they're allowed to
4    earn their living by working in that area, but 70 percent of
5    these people -- of the people in the committee need to be from
6    outside the field but have expertise in science and in studies
7    and what we call methodologic studies or epidemiologic studies.
8    So these national reviews meet these criteria where they have
9    people who have expertise in reviewing the quality of science
10   that is published.
11          Now, all publications are not created equally, you must
12   understand scientifically.  So the committees from Sweden and
13   England and UK and Finland, and there's one just recently
14   published from McMaster University in Canada, all these people
15   are -- they meet these criteria of being methodologists and
16   each of these independent reviews of puberty-blocking hormones
17   and cross-sex hormones for minors have said that the quality of
18   evidence was low or very low.  Those are very scientifically
19   well recognized designations for puberty-blocking hormones.
20          The designation is very low quality for cross-sex
21   hormones, it's low quality, and both of those mean that
22   scientifically the chances of the expected benefits will not be
23   forthcoming.  And each of those four reviews have said that we
24   cannot guarantee based on the nature of science that the harms
25   that these interventions will lead to don't outweigh the

Levine - Direct

1    benefits.  That is, the benefits do not necessarily outweigh

2    the harms.

3         Independent groups have reached the same conclusion.

4    Even the Endocrine Society that advocates for the treatment of

5    hormones have acknowledged that the quality of scientific

6    evidence for puberty-blocking hormones' producing benefit is

7    very low quality, and of cross-sex hormones are low quality.

8    But nonetheless, they recommend that this is the center of

9    treatment of trans -- ought to be the center of treatment of

10   trans care.  And so Sweden and the UK and Finland have all said

11   it isn't true, that treatment of choice should be

12   psychotherapeutic assessment and psychotherapeutic processes.

13        So the question is do we listen to science or do we

14   listen to advocates.  Do we listen to politics that come and go

15   or do we listen to the grounded data that independent,

16   scientifically credentialed people have concluded and

17   generated.  And I say if you pay attention as a doctor to the

18   ethical uncertainties that you have, the qualms that you have,

19   and then you pay attention to that and then you read the data

20   that these people are producing, this is the best we have, then

21   I think we ought to say do we believe in science or do we

22   believe in politics.

23   Q    So how would one of these reviews of the literature

24   compare to a single peer reviewed study?

25   A    Well, the things that we're talking about are looking at

1    all the studies that meet criteria, reasonable criteria to be

2    investigated.  A peer review study, you know, I, for example,

3    write a paper and I send it to you, you're the editor of the

4    journal and you select up to three different people who are

5    experts in the field and you give me feedback on my paper and

6    then I change my paper or I don't change my paper and then the

7    paper is accepted or it's rejected, that's individual paper.

8    So these committees have taken all the papers in that

9    particular subject area, those two subject areas, for example,

10   and they've looked at them all and they've looked at them by

11   people who are expert in this.  Now, I just give you one

12   example of one paper.

13          The American Journal of Psychiatry is one of the premier

14   journals in my field.  In 2019, they published on line a paper

15   that looked at a Swedish experience with hormones and

16   surgeries.  And the American Journal of Psychiatry sent this

17   paper to three different reviewers and the paper got accepted

18   and it was published on line in 2019.  Immediately, 12

19   different authors authoring seven different letters to the

20   editor appeared in the journal's office saying this study's

21   conclusion meaning that we should have a stronger policy that

22   more people should have gender-affirming care including

23   surgery, those 12 people said the data in this study do not

24   support the conclusions.

25          So the editor of that journal then sent that journal to

Levine - Direct

1    two new independent separate from one another statisticians who

2    then wrote back to the editor that the data -- the conclusions

3    of that study have no relationship to the data that they

4    presented, that it was spun in some way, you see, so the letter

5    to the -- so the editor of that particular journal in August of

6    2020 had those original seven letters published, and the

7    authors of the original paper wrote a retraction to the study.

8          So I give you this as an example because you asked what

9    is the difference between the evaluation of an individual paper

10   that is submitted which the editor then sends to, quote,

11   experts, and if all the experts believe in affirmative care,

12   they think this is a good paper, but when people who are much

13   more oriented toward the science of it, that is, the data of it

14   and the relationship between the data and the conclusions, what

15   we get is a whole different conclusion.

16         And so we have a lot more respect for Sweden and Finland

17   and UK's process of getting a committee of experts to look at

18   all the studies on a particular topic and then rate the level

19   of science.  And the rating of the level of science says that

20   the expected benefits that the advocates support may not be

21   delivered, they're likely not to be realized, and that the

22   harms seem to outweigh the benefits.  That's the state of

23   science 2022.

24   Q    You mentioned that a peer reviewed paper may have three

25   reviewers.  Would the national reviews have three reviewers?

Levine - Direct

```
1    A     No.  They would have more.

2    Q     Would you have any response to the claim that the changes

3    that have been made in Europe as a response to these reviews

4    bring the treatment there more in alignment with treatment in

5    the United States?

6    A     I think I misheard your question.

7    Q     Let me ask it again.  So would you have any response to

8    the claim -- so there's a claim that changes in Europe in

9    response to these reviews that have been done actually bring

10   treatment there more in alignment with treatment as it's done

11   in the United States.  Would you have any response?

12   A     It's quite the opposite.  It's quite the opposite.

13   United States seems to be -- in the last five, six years, we've

14   gone from a handful of gender clinics to over 70 clinics in the

15   United States delivering affirmative care.  Most of these

16   clinics have their names -- have affirmative care in their

17   names.  They're pro hormones and pro getting people into

18   surgery.  We've had a rapid explosion because we've had a rapid

19   incidence of people requesting services all over the United

20   States.  Those services are not psychotherapeutic even though

21   they say they do psychiatric evaluations.  I've had countless

22   parents coming to me telling me that they took their kid to one

23   of these places and in an hour or two, they were recommending

24   hormones, you see.

25         So what Europe is saying, at least those four places in
```

Levine - Direct

1    Europe is saying is please wait, wait, wait, this is a
2    psychiatric problem, this is not a, quote, medical genetically
3    derived problem.  This is a psychosocial developmental problem.
4    It should be treated with psychotherapeutic evaluation and care
5    and thoughtful care, not quick to the endocrinologist, not
6    quick to the breast surgeon, just because a child thinks in a
7    certain way.
8         So it's not that the United States is in tune with
9    Europe, it's been in tune with Holland and the Dutch studies.
10   Which I don't know if you'll ask me about those, the Dutch
11   studies are the two studies that the Standards of Care and the
12   Endocrine Society base their affirmative care on, and those
13   studies have a lot of methodologic problems.  So no, the answer
14   to your question as far as I can see is United States is going
15   the opposite direction than where Europe that started this
16   process is going, opposite.
17   Q    Let me ask you briefly about each of these reviews.
18   First look at the UK.  Can you tell me about the reviews that
19   have taken place there?
20   A    Well, they've been in a series.  First there was a study
21   that tried to replicate the Dutch studies that failed to
22   replicate the finding of psychological improvement, and then
23   the National Health Service had a preliminary review.  And then
24   just recently months ago, they decided to restructure the way
25   they delivered trans care in the United Kingdom.  And there

1   used to be two clinics, the Portman Clinic and Tavistock
2   Clinic, that saw all those cases.  Those are the clinics from
3   which the data we talked about before where they were small to
4   rising incidence of trans people were demonstrated.
5         It was very apparent that those people could not handle
6   all the requests and that they were -- they had too long a wait
7   list and so the UK then decided that we should not centralize
8   this, we should decentralize this, and people should in their
9   communities get care that begins with assessment and
10  psychotherapy.  So the Portman Clinic and the Tavistock Clinic
11  as of March 2023 will no longer exist, or at least their gender
12  identity service will not exist any longer.  And so UK has
13  backed off of assessment, hormones, surgery.
14  Q    What can you tell us about the UK's conclusions
15  concerning their review of the safety and efficacy of medical
16  treatments for gender dysphoria on minors?
17  A    Actually not to repeat, but it's just what I previously
18  said, that the low quality of evidence and the concern with the
19  unexplained rapid increase in the incidence of this problem and
20  the fact that there are now appearing from the UK evidence of
21  detransition of kids who are put on hormones in their teenage
22  years and who have had their breasts removed.
23  Q    Can you tell me about the relationship between the
24  reviews that we've discussed in UK and the Cass Review?
25  A    That is the Cass.  They're the same.

Levine - Direct

1    Q      Okay.  Then moving to Sweden, can you tell us about the
2    review that took place there and their conclusions?
3    A      Well, it's going to be a little repetitive, but Sweden
4    said that while we could go ahead and give hormones to
5    adolescents, they only can be given in a predesigned research
6    protocol that gave science a chance of getting the answer to
7    the question that just because someone was transgender
8    identified in youth does not mean that they have access to
9    this.  They should have access to psychiatric care first, but
10   they recognized that there are families who believed that this
11   is the best treatment for their child, but those people need --
12   they can only get those treatments if it's part of a research
13   protocol.  They didn't specify what the elements of that
14   research protocol would be, but they just said it would be a
15   research protocol.  And the research protocol was -- I think is
16   going to be done at the Karolinska Institute, which is -- we
17   Americans know that as sort of the home of the Nobel Peace
18   Prize.  The Nobel Prize.  It's not just peace prize.
19          So Sweden, like Finland and like UK, have evaluated the
20   evidence and they all say let's pause about this.  Some of them
21   said let's not pause completely but let's pause in general and
22   if we can't do it scientifically, we can't do it at all.  And
23   that's a very powerful thing.  You see, the big question is,
24   ethical question, we can feminize bodies and masculinize
25   bodies.  The issue is, should we.  And we say the question is a

Levine - Direct

1    scientific question.  And it depends upon the outcome.

2         And what we've done is that we've done the feminization

3    and masculinization of bodies, but we haven't found out what

4    the outcomes are, and we are saying full speed ahead in America

5    with the unknown outcomes.  So I go back to the question,

6    clearly we can masculinize and feminize bodies.  The issue is,

7    is there scientific justification for doing this.  And in order

8    to answer that question, we have to define the parameters that

9    we will use to justify doing it or not justify doing it.  And

10   we haven't defined even the parameters, so this looms over all

11   of us.  Should we, are we harming people, are we helping

12   people.  And people here are not just the patients themselves

13   but the people connected to those patients.  Which we generally

14   don't discuss in this field.

15   Q    Let me also ask you about Finland.  And thank you for

16   being aware and not being repetitive, but I do want to ask you

17   about Finland and your awareness of the review and what has

18   taken place there.

19   A    Well, Finland, I think after Sweden said -- made

20   statements like the brain is known to develop into its most

21   mature form by mid 20s and in general, people do not have the

22   cognitive decision-making process, the ability to think clearly

23   about life changing events until that age, and so in general,

24   they recommended that we wait to give any hormones to patients

25   who are transgender identified until about that age, I think

1    they said 26 originally, 26.  After that, they said whether the

2    person can make a good judgment or not, they certainly, they're

3    developed as best they're going to develop, so it's up to them

4    whatever they do.

5         But the state of Finland is still responsible for people

6    less than maturity, cognitive maturity.  They also said, I

7    believe, that under certain circumstances, it might be

8    acceptable, but that needed to be run by a panel of experts,

9    but in general, Finland said, whoa, we have followed the Dutch

10   protocol and our impression of the outcomes in our Finnish

11   population is not very positive.  Let's put a stop to this.

12   Q    Can you explain how the United Kingdom, Sweden, and

13   Finland are better situated than we are here in the United

14   States due to the fact that there is a national health system

15   in those countries?

16   A    Yes.  We'll just take Sweden for example, is that every

17   medical encounter, every judicial encounter, every automobile

18   accident gets reported to a central databank, so when

19   scientists want to mine the data, they know everyone who's been

20   in an emergency room with a suicide attempt who's trans, they

21   have data about that.  Everyone who's in a psychiatric

22   hospital, they know about that.  Every suicide, they know

23   about, at least what's on the death certificate, you see.  So

24   it is possible.

25        This is the basis of a classic study that was published

1  in 2011 that showed that the suicide rate in post operative

2  people was 19.1 times greater than two control groups of

3  Swedish people, you see.  And it showed that the suicide rate

4  specifically among trans males was 40 times higher.  And it

5  took about ten years for this data to develop.  And they also

6  showed that the death rates from cancer and heart disease were

7  higher, and the number of automobile accidents was higher, and

8  the number of criminal charges were higher.  They showed in

9  2011 that based on everyone who had sex reassignment surgery

10  over a 30-year period, this was the data, it was mined from

11  what you were talking about from the national collections of

12  data.

13       And the study I just mentioned to you from the American

14  Journal of Psychiatry also came from that data, you see.  So

15  Sweden and Finland and Denmark and the UK, they have access to

16  data mining.  We call it data mining of big data that we don't

17  have in the United States, we don't even have in Arkansas, in

18  Ohio, and Pennsylvania.  The only data we have are through

19  insurance companies, and those are often -- United Healthcare

20  does all the states or many of the states.  We have Medicare,

21  but most of the kids aren't on Medicare that we're talking

22  about.  Some of them are on Medicaid.

23       Anyway, we in America, we do not have the opportunities

24  to collect data that your smaller European countries have.  And

25  that's why most of the studies are coming from Europe, they're

Levine - Direct

1    not coming from the United States.

2    Q    I also wanted to ask you about what has taken place in

3    France.  Can you talk about the statement from France?

4    A    I don't think France has had an independent review in the

5    same way that the other countries have had.  I'm not certain

6    about this, Mr. Cantrell.  But I know France has issued a

7    statement of caution of recommendation of psychotherapy or

8    psychiatric assessment and therapy as the first approach to

9    this and not hormones.  But I'm not aware of a French blue

10   ribbon committee of scientists.  I have a feeling it was based

11   upon the work of other countries, but I'm not certain.

12   Q    So we've looked at the various reviews and talked about

13   various reviews.  I want to talk a little bit about the studies

14   that have been done or could be done to increase the quality of

15   evidence, specifically controlled studies, and I'd like to ask

16   you whether controlled studies could ethically be done in this

17   area.

18   A    This is an area of controversy.  Many people think it's

19   impossible to ethically do controlled studies because everyone

20   knows that hormones and surgery are the best treatment for

21   trans teens.  This concept that you can't do a controlled study

22   because you don't have what we call in science equipoise, that

23   is, we don't have a state of understanding that we don't know

24   what the best treatment approach is.  If the doctors who do

25   affirmative care believe as they do this is the best approach,

1   they can't ethically inform people, they can't get people to

2   enter into a placebo controlled or a psychotherapy versus

3   medication controlled trial, you see.

4          But if you understand the science, you know that the

5   affirmative care doctors need to recognize that they don't

6   know.  They've been doing this by fashion, they've been doing

7   this because they were told this is the treatment of choice,

8   they were told science has already established this, and,

9   therefore, equipoise can be done, but even if we don't do a

10  controlled study, if we do a controlled study, we need to ask

11  ourselves what controlled groups would we use.  Would we use

12  affirmative care as we've already decided versus psychotherapy

13  only versus nothing, just letting development happen versus

14  merely supportive therapy.

15         I think that if we could convince scientists that we

16  don't know the right answer and then those people can convince

17  the parents and the child that we don't know the right answer

18  and they have to submit to let's say we're going to use three

19  groups, we're going to randomly assign you to three groups and

20  we're going to evaluate you at these time intervals using these

21  methods, then in five years and in ten years, we will not have

22  this kind of debate in the courtroom, we'll have the answer,

23  you see.  And maybe it may very well be that the kids who get

24  affirmative care will be far superior in their psychological

25  developmental outcomes than the kids who get psychotherapy, but

Levine - Direct

1   it could be quite the opposite and it could be that the third

2   group for no treatment at all, most of them have desisted and

3   have gone on with their lives and those people did equal to or

4   better than either of the other two.  We don't know.

5        The point is we don't know and, therefore, we can't have

6   equipoise.  We can't have a multisite.  And I say because we

7   need large numbers, it has to be not just people in Arkansas,

8   it has to be multisite with protocol that has been decided in

9   advance, not in retrospect.  And we have to commit to following

10  every one of those people in each group.  That's how science is

11  done, prospective science is done.  That's expensive.  That's

12  difficult.  But it can be done.

13       Now, the other if you can't do a controlled study, then

14  you have to decide to do what we call a large group cohort

15  study where there's no control but everyone who enters into the

16  protocol like everyone who seeks assessment has to be followed,

17  not just the ones who got treatment, but the ones who didn't

18  get treatment, the ones who dropped out of treatment, we need

19  to know what happens to these people, but we can't do it if we

20  just take the people who continue in the treatment and don't

21  study the drop-outs from the treatment.  And we need to include

22  the death rates of these groups.  All these studies would have

23  death rates as one of the parameters, the secondary outcomes

24  that we study.

25       So when we do those kind of scientific studies, we

1    designate a primary set of outcomes.  These are the most

2    important parameters we're going to study and these are the

3    secondary or the least important or the less important ones.

4    And what we really want to see is that the primary and the

5    secondary outcomes match.  We don't know the answer, you see.

6    And I think to go back to what I said before, Mr. Cantrell and

7    Your Honor, we're all interested in maximizing the outcomes of

8    these kids, giving them the potential to develop fully without

9    obstacles.

10        We have to admit we don't know really which is best, but

11   we are saying given the fact that psychiatry has existed for

12   over 150 years and that we treat all other developmental

13   problems in our field with these processes of assessment and

14   treatment with or without medications and not hormonal

15   medications but other medications, we ought to treat trans

16   people like they're like the rest of us.  They deserve

17   thoughtful, compassionate, scientifically informed care.

18   Q    Let me --

19            THE COURT:  We're going to break for lunch before

20   you ask him your next question.  We're going to break till

21   1:00, so court will be in recess till then.

22        (Recess at 11:59 AM.)

23                    REPORTER'S CERTIFICATE
        I certify that the foregoing is a correct transcript of
24   proceedings in the above-entitled matter.
     /s/ Karen Dellinger, RDR, CRR, CCR
25   ----------------------------------         Date: December 3, 2022
     United States Court Reporter

LEVINE - DIRECT

1    (Proceedings commencing in open court at 1:03 p.m.)
2  BY MR. CANTRELL:
3  Q.    Good afternoon, Dr. Levine.
4  A.    Good afternoon again.
5  Q.    I wanted to follow up with a couple of questions
6  related to what we were talking about before lunch.
7       First of all, I wanted to ask you about follow-up of
8  patients here in the United States.  Can you tell us
9  whether -- is there any uniform standards of following
10  patients after medical procedures for gender dysphoria in
11  the United States?
12  A.    Historically, we've asked patients that we've taken
13  care of to give us follow-up and to come tell us how
14  they're doing on an annual basis.  That almost never
15  happens.  I am -- I've read recommendations -- in fact, we
16  put it in the Standards of Care in 1999 that people should
17  be followed up extensively so that we could see the
18  outcomes.  And as far as I can see, this has not happened.
19  And neither the Swedes or the Finns comment in their
20  report that, in 2015 in their previous review, when people
21  -- when they asked for follow-ups from the people who were
22  delivering the care, it was very apparent five years later
23  that they did not have systematic follow-ups.
24       If you're a surgical patient, the surgeon is done
25  with you when you're healed and you're functional.  When

LEVINE - DIRECT

1    you're an endocrine patient, depending on the age of which
2    you specialize, you may follow a patient for the rest of
3    their lives or until they stop taking hormones or you pass
4    them on to an adult.  So the follow-up is not consistent.
5         As we spoke earlier today, there's no central record
6    keeping in the United States so that we could
7    retrospectively look and see what happened to a cohort or
8    a group of people that were given hormones or surgery or
9    transition services, whatever.
10        So although it would be ideal that we would have
11   follow-up, I would say that 70 years after we -- after the
12   medical profession has been involved in the trans -- in
13   trans care, we really don't have excellent follow-up
14   studies of any of our interventions.  Although, there are
15   hundreds of follow-up studies, they're not excellent,
16   they're not of high quality, they have very different
17   durations of follow-up and different means of following
18   up.  And it's not what we would do if we did a
19   scientifically predesigned study where we would designate
20   how we're going to measure it and when we're going to
21   measure it and, as I said before, what would be the most
22   important or primary measurement outcomes and what would
23   be the secondary outcomes.
24        We're flying -- I wouldn't say we're flying blind
25   because all of us who take care of patients have clinical

LEVINE - DIRECT

1   exposure to individual patients, but loss to follow-up is
2   typically in the 50 to 70 percent range in any study.
3   Q.   What is the -- what are some of the negative
4   consequences of such a high loss to follow-up?
5   A.   You don't know if people are happy or miserable or
6   detransitioned or made suicide attempts or got admitted to
7   a psychiatric hospital or gotten married and --
8          THE COURT:  Doctor, can you slow down a little
9   bit?  My court reporter is trying to take down everything
10  you say.  So continue.  You just got on a roll there for a
11  minute.
12          THE WITNESS:  It's me, Your Honor.
13      So when we don't know what happened, we don't know
14  what happened in a positive way and we don't know what
15  happened in a negative way and we don't know what happened
16  in a medical way, we don't know what happened in
17  vocational way, we don't know what happened in a social
18  way, and we certainly don't know about the subjective
19  aspect of how the patient experiences his or her gender at
20  the moment and how that has evolved.
21      These are all reasonable questions, but after 70
22  years we don't have the answers.  And I don't think that,
23  given the fact that we don't have the answers, we should
24  assume it's all positive or it's all negative.
25      Knowing what we know about other human beings, we

LEVINE - DIRECT

1  should assume it's probably a mixture.  Some do well
2  reasonably.  Some do disastrous.  Some do not so well and
3  not so bad.  So very positive, very negative mix.  And I
4  would expect, just speculating, mixed would be the most
5  common one.
6  BY MR. CANTRELL:
7  Q.   I want to talk to you about the Dutch studies.  Can
8  you tell us what the Dutch studies are and indicate how
9  they've been used and --
10 A.   The Dutch have had a group of researcher -- clinician
11 researchers for many, many years and have done many
12 studies.  Generally, they were the first and most
13 respected researchers in the field.  When we refer to the
14 Dutch studies today and when WPATH refers to the Dutch
15 studies and when the Endocrine Society refers to the Dutch
16 studies, they're referring to a study of -- that was
17 published in 2011 and a follow-up study that was published
18 in 2014.
19      The first study was of the results of puberty
20 blocking, and the second study, the 2014 study, was the
21 results of the whole sequence of puberty blocking,
22 cross-sex hormone, surgery, and then between one and one
23 and a half years of follow-up of evaluation.  So those are
24 the two studies that generally most references to the
25 Dutch group.

LEVINE - DIRECT

1    Q.    Can you talk about how those studies have been used
2    and whether that use is appropriate?
3    A.    Well, when the 2014 study showed that the children --
4    the 55 children who had undergone surgery and were
5    followed for up to a year and a half were thought to be
6    positive outcomes and that they had, quote, no gender
7    dysphoria any longer and were doing pretty well compared
8    to the general sense of what the Dutch community at that
9    time was, at that age group.  That got scaled across the
10   world as evidence that trans-affirmative care is the best
11   treatment for trans-identified children.  And that's when
12   we had an explosion starting in 2014 and '15 of the number
13   of people seeking care and the gradual beginning of
14   cross-gender clinics in the United States and elsewhere
15   for these people.  This is the scientific basis of the
16   explosion of trans care in the United States, the 2014
17   Dutch study.
18         So you should know that in the original study there
19   were 197 people and I think 111 were thought to be
20   mentally reasonable enough to offer them cross -- puberty
21   blocking hormones.  And 70 of them, actually, the families
22   agreed to be in the study.  And then the 2014 study only
23   had a follow-up on 55 of the 70.  The 15 dropouts of the
24   study included one death from surgery, had an infection,
25   complication that killed the person.  And several dropped

1    out because of obesity and the development of diabetes.

2    And I think 11 of them -- among the 11, if I haven't

3    summarized, many of them just refused follow-up and

4    there's been no understanding of why they dropped out.

5         So you need to understand the scientific basis of the

6    scaling up of transgender care, affirmative medical and

7    restrictive care is the basis of one uncontrolled study

8    done in Holland that was finished in 2014.

9         There's an attempt today to do a follow-up of those

10   people that was just reported in a national meeting, and

11   they couldn't find 50 percent of the people.   So that's --

12   so we don't know what the long-term follow-up would be.

13        Obviously, culture is interested.   Everyone is

14   interested in what happened to those 55 people or, shall I

15   say, the 69 people who are still alive during the course

16   of -- from 2014 to today.   We don't know what happened to

17   those people.

18        So the studies are -- they were widely embraced.   And

19   today -- and I think it's only today that researchers are

20   aware of the limitations of that study, and there are

21   many.

22   Q.   Can you tell us a little more specifically about the

23   limitations?

24   A.   Well, number one, there was no control group.   Number

25   two, only -- when I gave you those numbers, 197 or

LEVINE - DIRECT

1   whatever number -- maybe it was 197 to 111, the

2   differences were people who were thought to be not

3   mentally healthy enough or families not stable enough to

4   even consider giving them puberty blocking hormones.  Then

5   when we went from 111 to 70, both the families generally

6   didn't think this was a good idea.  So -- so number one.

7        Number two rather, they're not -- number one, it's

8   not a controlled study, so all these things could have

9   happened for reasons other than affirmative care.

10       They selected the healthiest of the children and the

11  healthiest of the families.  So when you demonstrate, you

12  start with health and then you end up in health, and you

13  can't really say that the health that you see at the end

14  of the study is due to the fact that they had care.

15       So today we don't -- we don't insist that people not

16  have psychopathology.  And so the idea that taking a group

17  -- a study that was based on the absence of medical health

18  problems and applying it to everyone who comes doesn't

19  make sense.

20       And even the authors of the study have said two years

21  ago that it's a little frightening that the world has

22  embraced their research, which was about children who were

23  cross-gender identifying from preschool and early school

24  and who got worse during puberty with their gender

25  dysphoria who were still healthy except for being

LEVINE - DIRECT

1  depressed over their gender dysphoria, and then applying
2  that study to those people to anyone didn't make any
3  sense.  And the authors of the study said that.  It's not
4  Dr. Levine who's saying that, you see.  So that's one of
5  the problems with the study.
6     The other problem with the study is the Dutch made
7  sure that those kids had a lot of support and they dealt
8  with both their parents and the kids with whatever issues
9  were coming up in the families.  So the Dutch concluded
10 that affirmative care was good for transgendered youth,
11 but, of course, they were giving two treatments at once.
12 They were giving psychotherapeutic treatment at the same
13 time they were giving medical treatment.
14    But, you see, that's not -- that's not is what is
15 promulgated to the world.  What is promulgated to the
16 world is that hormones, social change, and surgery is what
17 creates these well-adjusted children.
18    The other limitation about this is that most of the
19 parameters of mental health that they measured were not
20 changed from the early measures.  They didn't change at
21 all.  And the ones that -- the psychological measures were
22 only available on 32 of the 55 people.  So the
23 generalizations that the world has taken that this is
24 scientifically proven is based on things that the people
25 who believe that, they don't even know about what was in

LEVINE - DIRECT

1    that study, you see.  So today we appreciate that.

2        And these other people who have reviewed this

3    recognize that the databases for this kind of treatment is

4    very limited.  There was an attempt in England to

5    replicate the study.  It failed to it.  They took anyone

6    who -- they took anyone who was gender identifying and

7    gave them the treatment, and they could not demonstrate

8    any psychological benefit.

9        So the other problem with the study, which I'm going

10   to have trouble articulating so that everyone understands,

11   is that the claim that there was no gender dysphoria one

12   and a half years after the last surgery was based upon one

13   questionnaire.  And the questionnaire was given -- say, if

14   you were biologic male, there were questions about how --

15   your sense of your maleness.  Then when you were done and

16   you were a female, you were given the questionnaire for

17   the females.  And so -- so by switching the

18   questionnaires, which has been a very big contentious

19   matter, even deVries, who is the senior author of the

20   paper, recognizes there was a limitation in the

21   questionnaire.  And now they've devised a different

22   questionnaire that is more -- that is not sex oriented or,

23   you know, biologic sex oriented.

24       So all of these things combine, the lack of control,

25   the concomitant use of psychotherapy, selection bias for

LEVINE - DIRECT

1    the people were -- and families who were very healthy and

2    supportive, you see, all of these things enter and make --

3    do not apply to the average -- may be a presumption -- the

4    average person in Arkansas who is applying for help for

5    gender dysphoria who may be of a range of mental health

6    capacities and abilities and so forth and have a range of

7    families -- of family circumstances.

8        So listen, all science, no matter the study, has

9    limitations.  Many of those limitations are not

10   appreciated for several years.  It takes time to

11   appreciate the strengths and the limitations of study.

12   And in science, we don't rely on any one study.  We rely

13   on studies done from different perspectives, all coming

14   together on a particular point.  But see, in this field,

15   one study -- one study that had two parts has become the

16   sole foundation for the justification of a worldwide

17   phenomena.

18   Q.   So let me follow up about the gender dysphoria scale.

19   Can you explain -- so you said there was a scale -- one

20   gender dysphoria scale for males, one gender dysphoria

21   scale for females.  Can you explain more specifically how

22   patients were evaluated at baseline and then

23   subsequently --

24   A.   They use the same scale.  The scale was based on

25   biologic sex and based on -- at follow-up, the scale was

LEVINE - DIRECT

1  on the new -- they assumed they were a new gender, a new

2  -- in this case, we use the word synonymously, gender and

3  sex.

4        On the scale that I -- on the first scale, I hate it

5  when people refer to me as a boy.  And then on a score of

6  one to five, yes, I have five.  And then when you take the

7  female scale and you say, I hate it when people refer to

8  me as a girl.  And there is -- it's not a five, it's a

9  one, you see.  And, therefore, when they add up all of

10 those kind of 12 different questions, when they add up all

11 of those things, it looks like there is no gender

12 dysphoria.

13 Q.   I want to talk to you now about informed consent.

14 Dr. Levine, you've written about informed consent.  Can

15 you tell the Court what that is and what procedures

16 informed consent is required for?

17 A.    Informed consent is both a legal and a ethical --

18 it's a legal obligation of the provider and it's an

19 ethical obligation within the medical and psychological

20 association.  It is to recognize the nature of the problem

21 that's being treated, the alternative -- the treatment

22 recommendations and the alternative treatment and the

23 benefits expected from the treatment and the harms or the

24 negative consequences of the treatment both in the short

25 term and in the long term.

LEVINE - DIRECT

1    So it also asks the doctor to tell the parents and
2    the child about what is uncertain about the treatment.
3    So everything that we've been talking about this
4    morning and since we resumed this afternoon is related to
5    the informed consent process.
6    Children are not able to legally consent, but -- so
7    their parents have to consent.  And I contend -- and I
8    should say we contend and so do the Dutch contend that the
9    informed consent begins in the process of a psychiatric
10   evaluation and it extends in the process of getting to
11   know the family and getting to know the patient in great
12   detail.  So informed consent is not like going to the
13   hospital with pneumonia where you get an IV and
14   antibiotics and we don't have you sign anything.  We just
15   assume -- informed consent is assumed and not required to
16   be written down in a legal way.  But, clearly, the
17   administration of cross-gender hormone or puberty-blocking
18   hormones or the removal of healthy tissue requires a
19   written informed consent.
20   But my point, and not just my point, other people
21   believe that informed consent should be a process and not
22   signified by, here's a three-page paper with all the
23   risks, sign here, which I see I've seen done.
24   When I had surgery a few years ago, that's how my
25   informed consent was.  It was done 20 minutes before I was

LEVINE - DIRECT

1    anesthetized.  But I understand that's how things work in
2    the surgical thing.  But here we're talking about
3    transforming the future of a child, and informed content
4    is not just making a diagnosis and asking the patient if
5    they want hormones.  Informed consent is a process between
6    the provider and the parents and the child about the
7    benefits and the risks and the uncertainties, you see,
8    what is known and what is not known.
9           Now, what is not known is so vital here.  Youth
10   think, a 14-year old, that taking hormones will make you
11   live happily ever after.  But we doctors need to
12   understand what is the basis of happily ever after.  And
13   when we don't have a basis for it, when we have an
14   awareness of, for example, the elevated suicide rates in
15   Sweden of after all of these interventions, we feel like
16   informed consent -- somebody in the family needs to know
17   about these things.
18          So we're not saying informed consent prevents going
19   ahead in America with these treatments.  We think it's a
20   prerequisite for going ahead when the appropriate people,
21   the parents, with the assent -- not the consent, but the
22   assent of the child and the physician, they can go ahead,
23   but they have to have informed consent.
24          When informed consent is perfunctory or abbreviated
25   -- so abbreviated that there is no real true information

LEVINE - DIRECT

1   or appreciation, you see.  What does a parent need to

2   think about when we're doing something that's going to

3   sterilize their child?  They need to think about that.

4   they need to think about that for their child.  They need

5   to think about that for themselves.  They need to think

6   about that for their family.  That doesn't mean they can't

7   go ahead.  It just means they need to think about it.

8   They're responsible for making the decision, and it's a

9   weighty decision.  And all of us agree it's a weighty

10  decision.  We believe informed consent needs to bring the

11  weight, the seriousness of the moment, to people's

12  awareness and not do it naively.

13  Q.    So does proper informed consent require multiple

14  sessions over time?

15  A.    Yes.  Yes.  It's a process.  It's not an event.

16  Q.    Can you tell us how -- how the ethical principle "do

17  no harm" plays in to the informed consent process?

18  A.    Please repeat that question.

19  Q.    Can you tell us how the ethical principle of "do no

20  harm" -- "first, do no harm" plays into the informed

21  consent process?

22  A.    Yes.  Because of the uncertainties of the long-term

23  outcome and the evidence of the harms or the problems that

24  adult trans communities have, it is ethically required

25  because of, "above all, do no" harm, which is the primary

LEVINE - DIRECT

1    medical ethical principle.  It's important to share that

2    with the parents.

3         You're putting this child -- now your child may be

4    different.  Your child might be bright or may be more

5    charming, may be much more natural in his cross-gender

6    feelings and expressions and behaviors.  This may not

7    happen to your child.  But if we look at the general group

8    of people, these harms need to be appreciated.

9    Q.   Is there any relationship between age of

10   sterilization and incidents of regret?

11   A.   Sterilization used to mean basically tying the tubes

12   of young teenagers and people who were older teenagers.

13   And the obstetricians published several studies, maybe ten

14   years ago, showing that the younger the sterilization of

15   women took place, the greater the subsequent incidents of

16   regret.  So that it was different if you're tying the

17   tubes of a 43-year old mother who's had three children and

18   tying the tubes of a 17-year old who says, I don't want to

19   have children.

20   Q.   Is there an established standard among practitioners

21   for the process of obtaining informed consent for minors?

22   A.   I don't think so.  I think it varies from clinic to

23   clinic.  I may vary from clinician to clinician, from

24   hospital to hospital, from state to state, country to

25   country.  We actually think that would be great in the

LEVINE - DIRECT

1   future if an international committee would create such a
2   document.
3   Q.   So earlier we talked about the increased rates of
4   transgender identification among youth.   Has this increase
5   -- has this increase created pressure on practitioners to
6   rapidly evaluate youth and make recommendations?
7   A.   All doctors are concerned today about the rapidity
8   with which they're forced to see patients.   Efficiency is
9   the new corporate standard in medical care.   So here I am
10  talking about a relationship between a family and a
11  patient and a doctor or a team of doctors that require
12  time and consideration by -- appropriate consideration.
13  There are many forces available in culture -- extent in
14  culture today acting on the medical profession to increase
15  their efficiency, to decrease the amount of time we spend
16  with patients.   This is a little antithetical to informed
17  consent.
18       If you have a lot of patient to see, you don't have a
19  lot of time to spend with patients, and developing this
20  relationship is impossible.   And it's not impossible
21  because of the doctor personally; it's impossible because
22  of the system in which the doctors operate.   They pressure
23  them terribly to be efficient.   And in gender dysphoria, I
24  think requires a thoughtful, slow, deliberative,
25  assessment process and therapeutic relationship process.

LEVINE - DIRECT

1   And, unfortunately, the numbers of people applying for

2   care to these new clinics and the number -- the small

3   numbers of staff and the absence of experienced

4   psychiatrics often forces -- makes all of this stuff -- I

5   use the term high through-put, rapidly processing people,

6   using -- getting higher numbers of people through,

7   generating lots of mastectomy for young women.

8          THE COURT:  Doctor, are you referring to

9   Arkansas statistics or nationwide?

10         THE WITNESS:  Nationwide.

11  BY MR. CANTRELL:

12  Q.   Dr. Levine, can you tell us what the informed consent

13  model of care is and how that differs from informed

14  consent as you're discussing it now?

15  A.   It's so interesting to me.  In this field, there are

16  euphemisms.  There are nice ways of saying things that are

17  not quite true.  For example -- I'm going to get to your

18  answer.

19       For example, we don't talk about mastectomy in trans

20  care; we talk about top surgery.  We don't talk about

21  penectomies and testicular removal; we talk about bottom

22  surgery, you see.

23       So in the 7th Edition of trans -- of the WPATH

24  Standards of Care, they talk about informed consent model.

25  That sound wonderful.  What does that mean?  Never

LEVINE - DIRECT

1  defined.  And on that basis, when we took out the mental

2  health professional as a requirement, the gatekeeper --

3  when we got rid of the gatekeeper and we had informed

4  consent model, what that meant is autonomy was more

5  important that this, "above all, do no harm."

6       So as long as the patient made the diagnosis -- was

7  given the diagnosis and the patient wanted it, whether the

8  parents were involved or not, the patient had -- was

9  informed about the benefits and the risks, and that's the

10  informed consent model.  And that Dr. Levine and

11  colleagues and others are saying, including the Dutch

12  themselves, that is not informed consent.  Informed

13  consent is not a perfunctory signing of the document.  It

14  is a process.

15       But you see that's the euphemism, the informed

16  consent model.  We followed the informed consent model.

17  It really is based upon autonomy versus -- most important.

18  Q.   So we talked about desistance.  I want to talk to you

19  briefly about detransition.  And can you tell us what

20  detransition is and what the evidence is concerning the

21  rate of detransition among patients seeking treatment?

22  A.   Well, for a very long time, detransition or regret

23  was used sometimes synonymously.  And post surgically

24  throughout the world, the advocates of care said the

25  regret rate was one to two percent most.

LEVINE - DIRECT

1    Detransition, to answer your question, in some sense
2  means, I lived as the opposite gender for a time and I've
3  decided this is not for me any longer and I'm going to
4  return to live in a world that's more constant -- or
5  congruent with my biologic sex.  That is detransition.
6    So, you know, my patients who lived as a woman,
7  presented themselves as a woman, taking the hormones and
8  then stopped taking the hormones and returned to living as
9  a male are detransitioned.  But if you have a very strong
10 identification with -- say, you're a male and you -- as a
11 teenager, you have a very strong identification as a
12 female and you live as a female and you're insisting that
13 you're a woman, I am a woman, and then ten years pass and
14 then you recognize, well, there's strong pieces of me
15 that's a man, I'm a man and I'm a woman.  So your label
16 for yourself is not trans sexual anymore.  You relatively
17 detransitioned to, well, I'm both or I'm neither or I'm a
18 special case.
19   That's generally not called transitioning --
20 detransitioning but that happens in the evolution over
21 time of the sense of self as one -- as one confronts
22 timing and life's issues, you see.
23   But detransition generally refers to people who are
24 on hormones who stop taking hormones and who were living
25 in the opposite gender role and who returned to letting

LEVINE - DIRECT

their hair grow longer, for example, if they're a biologic
female and dressing more either neutrally or as a woman
more feminine.

So it has different meanings and it's sometimes
confused with regret, detransition.  And many people who
regret what they did are trapped in what they've done and
there's -- so they don't detransition, but they live
however they can and -- but if you ask them about their
current gender identity, it's different than their gender
identity at age 17.

If you ask any 17-year-old how they think about
themselves and then ask them 30 years later how they think
about themselves, we will smile and say, well, we've
evolved as people.  As I said before, trans people are
basic human people.  And all the things that are true
about the evolution of our sense of self for humans
include human trans people.  It too evolves.  And so
detransition can be extreme to return or it can be more
modest and a return toward but not completely.

We don't know the rates of the latter.  About the
rates of the former, there's just been three studies
published in the last year and a half, two years that have
different rates up to 30 percent in 16 months or five
years.  More studies are going to be appearing I expect in
the next five years.  We had this -- we -- five years from

LEVINE - DIRECT

1   now, I -- I can give you much more -- I hope I can give

2   you much more data on that, more information.

3   Q.   Based on the data that we have, does there appear to

4   be any movement in the rate of detransition?

5   A.   Yes.

6   Q.   What is that?

7   A.   It's increasing I think, both anecdotally and in

8   terms of systematic looks at that.  And, you know, the

9   much maligned work of Lisa Littman, much maligned by the

10  affirmative care people.  She interviewed a hundred

11  detransitioners and found some very important information

12  in that people felt they had an inadequate psychiatric

13  evaluation, an inadequate process, and no one was

14  interested in what happened to them in a negative way when

15  they were children.  They now see that their trans

16  identity was an escape from even thinking about the events

17  that happened to them as children.

18       In general, you didn't just -- one more thing.  In

19  the first edition of the *Handbook of Clinical Sexuality*

20  *for Mental Health Professionals*, which I edited, I had

21  Freeman Faflin (phonetic spelling) who was an affirmative

22  care psychiatrist from Germany, write a chapter on

23  transgender phenomenon.  This was in 2004.

24       He wrote about a patient that who subsequently became

25  a psychiatrist and who was his patient when he

LEVINE - DIRECT

1  transitioned -- when she transitioned to male.  And then

2  when the training was finished and the patient came back

3  to Dr. Freeman Faflin, the patient said, I could not tell

4  you or I could not tell myself about my sexual abuse as a

5  child.  I think that, if I knew that, if I would have

6  talked about that, I probably would not have transitioned.

7  That was in 2004 and that was in a textbook.

8       So we were -- Dr. Faflin was recognizing in 2004 the

9  possibility of that kind of detransition or that kind of

10 regret.

11      You need to understand, Dr. Faflin in 1991 published

12 a study that was a review of all of the surgical outcome

13 data.  And in that study in 1991, it was used to

14 promulgate sex reassignment surgery, even though I think

15 more than half the people were lost to follow-up in the

16 studies that he reviewed.

17      So we all -- we've always been aware of this problem

18 intuitively.  There's always been evidence of it.  There's

19 always been concerned, and yet the field in the United

20 States has just ignored all of our concerns.  And so we

21 practice now based on fashion and not based on science.

22           MR. CANTRELL:  Your Honor, may I have one

23 moment?

24           THE COURT:  Sure.

25 BY MR. CANTRELL:

LEVINE - DIRECT

1  Q.   Dr. Levine, just one final question.  Can you -- can

2  you tell the Court why, in your opinion, states across the

3  nation have felt the need to enact laws like the SAFE Act

4  in relation to the medical profession and what has taken

5  place in the past ten or so years here in the United

6  States?

7          MS. COOPER:  Objection.  Foundation to be giving

8  opinions about the basis for other states' legislation.

9          MR. CANTRELL:  Your Honor --

10         MS. COOPER:  -- speculation.

11         MR. CANTRELL:  -- Dr. Levine is an expert and

12  he's an observer of the field and I think --

13         THE COURT:  I'm not sure why it's relevant, but

14  I'm going to let him give his opinion.

15         THE WITNESS:  Well --

16         THE COURT:  Are you asking this witness to give

17  the legislative intent for states across the nation?

18         MR. CANTRELL:  No, Your Honor.

19         THE COURT:  That's how I read your question.  It

20  says:  Can you tell the Court why, in your opinion, states

21  across the nation have felt the need to enact these laws.

22         MR. CANTRELL:  I'm asking Dr. Levine to talk

23  about the medical profession and --

24         THE COURT:  That's a different question, Mr.

25  Cantrell.  You're asking this witness to tell me why

LEVINE - DIRECT

1    legislators across the nation have decided to pass laws.

2              MR. CANTRELL:  Okay.  Let me --

3              THE COURT:  I'm reading your question off the

4    real-time so.

5              MR. CANTRELL:  I would like to rephrase the

6    question.

7              THE COURT:  That would be great.

8              MR. CANTRELL:  Thank you, Your Honor.

9    BY MR. CANTRELL:

10   Q.   Dr. Levine, based on your expertise and your

11   awareness of the practices that have been put into effect

12   over the last ten to 15 years here in the United States,

13   is it -- is it any surprise to you that -- that states

14   have sought a need to enact laws such as the SAFE Act?

15   A.   Mr. Cantrell and the Court, you don't know this, but

16   I'm a bit of a cynic about political things, and I notice

17   that the 16 or 17 states, including Ohio, that is

18   considering limiting doctors' ability to practice medicine

19   as determined by the medical profession.  It seems that

20   it's a kind of a Republican talking points these days

21   versus a liberal democratic talking point.  For example, I

22   do some work in Massachusetts, and they are very liberal

23   about this, they're very affirmative about this.

24        And so I believe in a larger sense, beyond the

25   politics about this, that there is a kind of profound

LEVINE - DIRECT

1   worry about what we're doing to children and to their
2   families, and that certain states are much more sensitive
3   to this because they tend to be much more religious in
4   their basis and in their beliefs.  And there is a -- see,
5   I as a physician, talk about the ethics in its
6   relationship to science.  But people who aren't in the
7   medicine but who have strong feelings about this talk
8   about this in terms of God and God made man and woman and
9   they shouldn't -- doctors shouldn't play around in that
10  area.  So I think there is an element of religious values
11  being played out in various state legislators as well.
12      So when we look at this phenomenon as a social
13  phenomenon in a critical way, I think we need to think
14  about the cultural values that are represented through
15  state legislatures and the feeling that COVID, for
16  example, brought all of this skepticism about science, the
17  science of vaccination and the science of masking.  And so
18  many people have developed a new skeptical, non --
19  untrusting view of the institutions that medicine
20  represents, including public health authorities, including
21  what the doctor says are recommended treatments.
22      So I think earlier this morning you asked me to talk
23  about the big social forces.  This belongs -- your
24  question belongs to the big social forces that incorporate
25  religious values and political values.  And there are

LEVINE - DIRECT

1    different -- obviously, there are different political

2    values just like there are different religious values, and

3    these are reflected somehow in ways I don't understand

4    through legislative bills that are being debated and

5    passed in various states.

6    Q.   Let me ask you this.  So is it necessary for a person

7    to have specifically religious values in order to oppose

8    gender transition?

9            THE COURT:  We're way far afield, Mr. Cantrell.

10           MR. CANTRELL:  Your Honor, I anticipate that

11   plaintiffs will attempt to use religious issues with

12   respect to --

13           THE COURT:  If and when they do, we'll deal with

14   that.  But this witness is not the one that's going to

15   talk about whether or not people can or can't oppose in a

16   general sense transgender treatment.  That's not what he's

17   here to testify to.

18           MR. CANTRELL:  Dr. Levine has a scientific view

19   and I believe that his testimony is that if --

20           THE COURT:  That's not what you asked again, Mr.

21   Cantrell.  I'm ruling on what your questions are.  You

22   asked him, would somebody have to have a religious view to

23   oppose this.  He's not here to testify about what the

24   average Joe may decide or the average legislator may

25   decide about transgender treatment.  That's not what he's

LEVINE - CROSS

1  here to tell me about to help me with this case.

2          MR. CANTRELL:  Yes, Your Honor.  I'm going to

3  take it back to the science if -- if Your Honor will

4  allow.

5          THE COURT:  Okay.  Let's get there.

6          MR. CANTRELL:  Okay.

7  BY MR. CANTRELL:

8  Q.  Dr. Levine, the views that you've expressed this

9  morning, are -- are they based on science or nonscientific

10  consideration?

11  A.  I hope my views are based upon the combination of

12  review of the scientific literature and my own clinical

13  experience over 50 years.

14  Q.  And so you would not -- you would not say that --

15  well, let me just pause.

16          MR. CANTRELL:  If I may have one moment, Your

17  Honor.

18          THE COURT:  Sure.

19          MR. CANTRELL:  Pass the witness, Your Honor.

20                    CROSS-EXAMINATION

21  BY MS. COOPER:

22  Q.  Good afternoon, Dr. Levine.  I'm Leslie Cooper.

23  We've met.  I'm with the ACLU.

24      Dr. Levine, you're aware this trial began last month

25  and it's now resuming this week.  Is that correct?

LEVINE - CROSS

1   A.   Yes.

2   Q.   Have you reviewed any transcripts of the first week

3   of trial?

4   A.   No.

5   Q.   Has anyone spoken to you about the testimony that was

6   given during the first week of trial?

7   A.   No.

8   Q.   You've been a psychiatrist seeing patients, I believe

9   you said, since 1973.  Is that correct?

10   A.   I started my residency three years before and I saw

11   patients then, so officially as credentialed psychiatrist,

12   yes, 1973.

13   Q.   And the overwhelming majority of your patients have

14   been adults.

15   A.   Over the years, yes.

16   Q.   Is that right, that the overwhelming majority have

17   been adults?

18   A.   Yes.

19   Q.   Is that a yes?

20       And you've estimated that you've seen about 50

21   minors, patients under 18, in your nearly 50-year career.

22   Is that correct?

23   A.   Yeah.  In a previous testimony, give can you give me

24   that number?

25   Q.   I can show you.

LEVINE - CROSS

```
1          THE COURT:  Let's short cut.  Is that true?
2          THE WITNESS:  It's approximately true.
3          MS. COOPER:  Thank you, Your Honor.
4   BY MS. COOPER:
5   Q.   And you've testified that you've seen about six
6   prepubertal children in your career over 50-plus years.
7   A.   Yes.  That's probably approximately true, personally
8   seen.
9          THE COURT:  What was the last part?  I couldn't
10  hear you?
11         THE WITNESS:  I'm sorry?
12         THE COURT:  I didn't hear the last couple of
13  words.  Did you say something --
14         THE WITNESS:  That I personally have been
15  involved.
16         THE COURT:  Thank you.  You faded off.  I
17  couldn't hear.
18  BY MS. COOPER:
19  Q.   I believe you testified on direct that there are
20  about 70 gender clinics in the United States.  Is that
21  right?
22  A.   Yes.
23  Q.   And you don't know how different practitioners or
24  clinics provide care, correct?
25  A.   There are many, many practitioners.  How would I
```

LEVINE - CROSS

1    possibly know how they all provide care?  I've been aware

2    of some instances of care, yes.

3    Q.    So there are many practitioners and clinics about

4    which you don't know protocols --

5    A.    Many.

6    Q.    And you don't know how common it is for clinicians to

7    provide hormone therapy to minors without a careful

8    assessment of the child and their comorbidities.  Is that

9    correct?

10   A.    Well, I've been in touch with many parents from all

11   over the country who have indicated that to me.  But in a

12   numerical sense with a denominator, I'm not aware.  I

13   certainly have had many experience where I heard

14   complaints of -- about that.

15   Q.    You don't know if it's a small minority, a majority,

16   or something in between?

17   A.    I don't know that 38 percent do and 42 percent don't

18   or -- I don't have that kind of information.

19   Q.    You wouldn't say whether it's a majority or a

20   minority.

21   A.    Couldn't say.

22   Q.    You don't have any knowledge about how gender

23   affirming medical care is provided to minors in Arkansas.

24   Is that correct?

25   A.    That's correct.

LEVINE - CROSS

1  Q.   You don't know what kind of protocols doctors in
2  Arkansas follow when they treat minors with gender
3  dysphoria, do you?
4  A.   I have no contact with doctors in Arkansas.
5  Q.   So you don't know whether they thoroughly assess
6  patients, including their psychological comorbidities.
7  A.   Ms. Cooper, doctors always will say they thoroughly
8  assess their patients.  The question is, what constitutes
9  the thorough assessment and how long does that take.
10      So, you know, it may very well be that a hundred
11  percent of doctors in Arkansas think that they're doing a
12  thorough assessment.
13  Q.   But you don't know how any of them do that
14  assessment, do you?
15  A.   Nor do you.
16  Q.   You don't know if the protocols used by doctors in
17  Arkansas treating gender dysphoric minors include
18  psychotherapy.
19  A.   I don't know that they have a protocol and I don't
20  know that they would agree what psychotherapy is and I
21  don't know that they have credentials to do psychotherapy
22  because, you see, we've removed the need for a mental
23  health professional to be involved with this for the last
24  12 years.  So many of these clinics have masters prepared
25  mental health professionals, often green people in terms

LEVINE - CROSS

1    of experience, doing mental health assessment.

2    Q.    You don't anything about who was doing mental health

3    assessments of minors in Arkansas, do you?

4    A.    No, I don't.

5    Q.    You don't know if doctors in Arkansas provide hormone

6    therapy after a one-hour visit as you've described here

7    and elsewhere.

8    A.    I don't know for certain what percentage of doctors

9    do that.

10   Q.    You don't know if any in Arkansas do, do you?

11   A.    As I said before, neither do you.

12   Q.    And you don't know if they explore -- the doctors in

13   Arkansas explore how patients come to identify as

14   transgender when seeing these patients?

15   A.    It would follow from my answers that you're right

16   about that.  I don't know whether they know about the

17   development of trans identity.

18   Q.    You don't know anything about how Arkansas doctors

19   engage in the informed consent process before providing

20   hormone therapy to minors, do you?

21   A.    No, I don't.

22   Q.    You don't know how thorough it is and if it's a

23   process versus a one-time event, do you?

24   A.    No, I don't.

25   Q.    Do you know - you don't know how many, if any, top

LEVINE - CROSS

1    surgeries are performed on minors in Arkansas, do you?

2    A.    What was that question?

3    Q.    You don't know how many, if any, top surgeries are

4    performed on minors with gender dysphoria in Arkansas, do

5    you?

6    A.    No, I don't.

7    Q.    And you've described what you call the affirming

8    model of care.  Is it correct that you don't know if any

9    or how many doctors who treat patients with gender

10   dysphoria in Arkansas -- minors with gender dysphoria,

11   practice the way you've described the affirming model of

12   care, do you?

13   A.    I'm not familiar with medical care in any division of

14   medicine in Arkansas.  I am aware of general patterns.

15   And I guess the answer to your question is, I will always

16   be -- I'm unaware of anything related to Arkansas.

17   Q.    You have treated patients with gender dysphoria,

18   correct?

19   A.    Correct.

20   Q.    You diagnosed patients with gender dysphoria -- or

21   actually let me ask that differently.

22         When you evaluate minors for gender dysphoria, what's

23   reported by the parents contributes to your assessment of

24   whether the patient has gender dysphoria.  Is that

25   correct?

LEVINE - CROSS

1    A.    Of course.

2    Q.    And when you diagnosis patients for other --

3    A.    Excuse me.  I didn't answer that correctly.

4    Q.    I'm sorry.

5    A.    What is reported by the parents tells me about when

6    the gender dysphoria appeared.  It doesn't influence the

7    diagnosis.   The diagnosis is actually made by the patient.

8    It's not really made by the doctor.   The doctor writes it

9    down and makes the diagnosis in the shortest claim, but

10   its the patient's self report that leads to the diagnosis.

11   We have no objective appraisal for the diagnosis.

12         So parents tell us about the early years of a

13   person's life beyond when they could possibly tell us

14   about what happened in the first four years of their life.

15   They tell us about their gender expressions during grade

16   school and the onset of gender dysphoria.

17         So in that sense, I had to correct my answer.

18   Q.    This contributes to your -- this information from

19   parents contributes to your assessment of whether someone

20   meets criteria for gender dysphoria, correct?

21   A.    No.

22   Q.    That's not your view?

23         You were deposed in this case, were you not, in May?

24   A.    I don't think you and I are understanding each other.

25   I don't know if it's my fault.

LEVINE - CROSS

1  Q.   Can we turn to page 41 of the deposition?

2          MS. COOPER:  Can we turn on the monitors?  Thank

3  you.

4          MR. CANTRELL:  Your Honor, I'd just ask if

5  counsel could clarify the question so that it's clear

6  whether or not they're speaking past one another.

7          THE COURT:  Can you reask your last question?

8  BY MS. COOPER:

9  Q.   When you meet with parents and learn information you

10  described getting from parents, does that contribute to

11  your assessment of whether somebody -- a minor patient

12  meets criteria for gender dysphoria?

13  A.   What it meets is the age of onset of their parents'

14  presence of gender dysphoria.  It doesn't determine the

15  diagnosis, per se, is what I've been saying to you.

16      When -- what you're quoting, you mentioned you meet

17  with the parents, too, does that contribute to your

18  assessment whether someone meets the criteria for gender

19  dysphoria, what's reported by the parents.  And then I

20  say, of course.

21      Perhaps today I'm being more clear about that.  What

22  I want to know from the parents is what happened early in

23  life, and what I want to know is what other developmental

24  challenges the child had in -- before the onset of gender

25  identity atypicality, you see.  So to make the diagnosis

LEVINE - CROSS

1   of rapid onset gender dysphoria versus lifelong gender
2   dysphoria, the parents -- the parents' view is vital, you
3   see.
4       But, you know, today most of the onset of the gender
5   dysphoria presents itself at first in adolescence, not at
6   age four.  In that sense, you and I are talking past each
7   other.
8   Q.   All right.  If we can look at -- just to wrap this
9   question up for clarity, on page 41 -- can you see the
10  screen in front of you --
11  A.   Yes.
12  Q.   -- beginning on line 22.  Question:  Does your -- you
13  mentioned that you meet with the parents too.  Does that
14  contribute to your assessment whether someone meets the
15  criteria for gender dysphoria, what's reported by the
16  parents.
17      Answer:  Of course.
18      That was your testimony?
19  A.   I thought I just explained what I meant by that.
20  Q.   When you diagnosis patients for other conditions like
21  depression or bipolar disorder, do you rely on self-report
22  of patients?
23  A.   And reports from the parents.
24  Q.   Reliance on self-report from the patients and
25  information from parents is not unique to the diagnosis of

LEVINE - CROSS

1   gender dysphoria, is it?

2   A.    That's right.  It's not unique.

3   Q.    Diagnosing patients based on self-report and

4   information from families who know the -- people who know

5   the patient, that's how psychiatry works, isn't it?

6   A.    Ideally.

7   Q.    You were deposed this past March in a case called BPJ

8   in West Virginia.  Do you remember that case involving

9   athletics?

10  A.    Yes.

11  Q.    I'd like to show you a passage from -- well, a

12  passage from your deposition in that case.  Can we look at

13  paragraph 6, please?

14        Do you see that in front of you in paragraph 6?  It

15  says, if you'll read along with me:  In the course of my

16  five decades of practice treating patients -- I'm sorry.

17  This is not your deposition.  Let me back up.  I misspoke.

18        You remember giving a report in the BPJ case.  Is

19  that right?

20  A.    I vaguely remember.

21  Q.    And is this your expert report?

22  A.    I don't know.  You just --

23  Q.    Can we scroll through this front page just to show?

24  A.    It's my signature, yes.

25  Q.    So if we can turn back to paragraph 6.  And I would

LEVINE - CROSS

1   like you to read along with me.  In the course of my five

2   decades of practice treating patients who suffer from

3   gender dysphoria, I have at one time or another

4   recommended or prescribed or supported social transition,

5   cross-sex hormones, and surgery for particular patients,

6   but only after extensive diagnostic and psychotherapeutic

7   work.

8        So you wrote this passage, correct?

9   A.   Yes.

10  Q.   And you have supported patients' social transition.

11  Is that correct?

12  A.   This -- this paragraph or sentence doesn't give an

13  age group.

14  Q.   Understood.  But I'm just asking generally, you have

15  supported --

16  A.   Many four-year-olds.

17  Q.   Yes.  Okay.  You have counseled some parents to

18  support the transgender identification of their child,

19  haven't you?

20  A.   I'm not sure that's true.  Depending on what you mean

21  by child.  Child -- a could be 25.  That is a child of a

22  parent can be 25.

23  Q.   You've counseled some parents to support their minor

24  child's social transition, haven't you?

25  A.   I have on rare occasion, yes.

LEVINE - CROSS

1  Q.    And switching back to adults, you've written letters

2  of authorization for adults seeking gender-affirming

3  surgeries.  Is that correct?

4  A.    I have.

5  Q.    And you've done that as recently as the past two

6  years.

7  A.    I have.

8  Q.    And you've also written letters authorizing hormone

9  therapy for adult patients with gender dysphoria.

10  A.    I have.

11  Q.    And these are letters they can take to the

12  endocrinologist.  Is that right?

13  A.    Yes.

14  Q.    And you have written such letters approving hormone

15  therapy for minors under 18 in a few cases within the past

16  five years, haven't you?

17  A.    I don't think in the past five years.

18  Q.    Okay.  Can we turn to Dr. Levine's deposition, page

19  78?

20      I would like you to read along with me starting on

21  line 3.  So between you and Mrs. Novak, there have been a

22  handful of cases in the past, say, five years where you

23  have approved hormone therapy for minor.  Is that right?

24      These are particularly fraught difficult

25  circumstances, yes.

LEVINE - CROSS

1  A.   Yes.

2  Q.   Mrs. Novak is someone who works in your medical

3  practice -- or your psychiatry practice?

4  A.   She's a younger colleague of mine.

5  Q.   That was your testimony.

6  A.   I'm sorry?

7  Q.   That was your testimony that I read correctly.

8  A.   Yes.  I'm just not sure today whether it's five years

9  or six years now.  And in generally, there have been a few

10  very fraught cases where we felt that this is a very

11  reasonable thing given the severity, the complexity of the

12  case, and that we would -- we, along with parents, would

13  hold our breath that this would be of help.

14  Q.   And you have cosigned letters for hormone therapy for

15  minors written by Mrs. Novak, again, approving some minors

16  for hormone therapy.  Is that right?

17  A.   Yes, but this has not occurred very recently, Ms.

18  Cooper.

19  Q.   You would not write a letter supporting hormone

20  therapy for a minor if you did not believe the patient had

21  gender dysphoria, correct?

22  A.   Correct.

23  Q.   And you would not write a letter approving a minor

24  for hormone therapy without first determining that they

25  had a longstanding, stable gender identity.  Is that

LEVINE - CROSS

1  correct?

2  A.    Yes.

3  Q.    You've served as an expert witness in a case called

4  Keohane -- I'll spell that.   K-e-o-h-a-n-e -- in Florida

5  in 2017.   Is that correct?

6  A.    I did.

7  Q.    And you were deposed in that case?

8  A.    I was.

9  Q.    I would like to show you a passage of your

10  deposition.

11        Can we put up the Keohane transcript page?

12        First, confirm this is the deposition.   We have that

13  is this your deposition that you gave.

14  A.    Yes.

15  Q.    Let's go to page 59.   And on line 10, if you will --

16  beginning on line 10, read along with me.

17        I recommend psychotherapy to people and so I don't

18  exactly follow the standards.   The 7th Edition wants to

19  give adolescents hormones very quickly and we're much more

20  cautious.   We will give adolescents --

21              THE COURT:   Can you slow down?

22              MS. COOPER:   I'm sorry.

23  BY MS. COOPER:

24  Q.    I'll start that sentence again.   The 7th Edition

25  wants to give adolescents hormone very quickly and we're

LEVINE - CROSS

1    much more cautious.  We will give adolescents hormones,

2    but not as quickly as the Standards of Care would like.

3         That was your testimony in Keohane.

4    A.   I have to say yes.

5    Q.   And just to clarify, the Standards of Care you're

6    referring to in the 7th Edition, is that the WPATH's

7    Standards of Care 7th Edition?

8    A.   Yes.

9    Q.   When you were deposed in May of this year in this

10   case, the Brandt case, you testified, did you not, that

11   going forward you have not made a decision to no longer

12   write letters approving hormone therapy for patients under

13   18 years of age.

14   A.   Indulge me a minute.  In the previous thing you put

15   up, my deposition of adolescents was not the definition I

16   gave to the Judge earlier this morning.  It was my

17   definition of an adolescent is somebody 19 years of age.

18   And so if you reread that, it would include 18-year-olds

19   and 19-year-olds.

20        So would you repeat the last question you asked me?

21   Q.   Sure.  When you were deposed this past May in this

22   case in Arkansas, you testified that, going forward, you

23   have not made a decision to categorically not write

24   letters approving hormone therapy for patients under 18,

25   correct?

LEVINE - CROSS

1   A.    I don't remember saying that, but if you have that, I

2   trust you.

3   Q.    Yeah.  I think we want to put that in the record.

4         Can we look at deposition page 227?

5         And if you go to line 3, part way through beginning

6   with the words, "Have you made a decision."  Are you with

7   me?  It's highlight.

8         Have you made a decision to no longer consider

9   hormone therapy for anybody who has not reached their 18th

10  birthday since you provided those letters?

11        Answer:  I've made a decision to be very cautious and

12  to put a period of time in therapy between me and the

13  letter.

14        You go on to say more, which you're welcome to read

15  if you would like, but I want to continue on to another

16  passage that picks up rather than taking the Court's time

17  reading a lot of discussion in between.

18        If we could turn to page 228, line 3.  Let me know if

19  you want to review there.

20        MR. CANTRELL:  Your Honor, I would like to just,

21  if we could, take a look at the intervening testimony,

22  glance at that.

23        MS. COOPER:  Sure.  We can post that.

24  Absolutely.

25        THE COURT:  I thought you were in the

LEVINE - CROSS

1  deposition, Mr. Cantrell, but go ahead.

2  BY MS. COOPER:

3  Q.   Do you have that in front of you now, Doctor?  If you

4  look at line 3 and read along with me.

5       So I'm not sure if that answers my question.  Have

6  you made a decision to no longer provide letters?

7       Answer:  Oh, I'm sorry.  No, I haven't made that

8  decision.

9       Question:  So would it be a case-by-case basis if

10 there were a patient that you felt it was appropriate for

11 you -- appropriate for, you would consider doing it, say,

12 a 17-year-old or a 16-year-old?

13      Mr. Cantrell:  Object to form.

14      Answer:  I don't have a -- yes.  The answer to your

15 question is yes.

16      I'm not going to ask you if that was your testimony

17 again --

18 A.   Thank you.

19 Q.   -- since I see how you love those questions.

20      Now, today you testified that you would not recommend

21 hormone therapy for patients under 18.  Do you mean you

22 would not generally recommend hormone therapy as a general

23 matter?

24 A.   Yes.

25 Q.   So there may be exceptional cases where you would

LEVINE - CROSS

1  still consider it appropriate.

2  A.   Yes.   These are very fraught circumstances.   I think

3  all of us all over the world recognize that we are under

4  very difficult circumstances sometimes.   We don't know

5  what to do and we eventually go along with the patient's

6  sincere desire to try hormones.

7  Q.   Now, you talked on direct about an article you wrote

8  called, *Reconsidering Informed Consent for*

9  *Trans-identified Children, Adolescents, and Young Adults.*

10       And I just want to ask you a couple of questions

11  about that article.

12       In this article, you recommend informed content

13  process that you think providers should undertake before

14  authorizing medical or surgical transition for minors,

15  correct?

16  A.   Yes.

17  Q.   I'd like to pull up a passage from that article to

18  show you.   If we can look at page 2.   And I have some

19  material highlighted.   Actually, I would like you to skip

20  to -- sorry.   I wasn't in front of the mic.   I would like

21  to skip to the second highlighted paragraph.

22  A.   I know what you're you talking about.

23  Q.   We over highlighted.   If you'll read along with me in

24  the second paragraph there.

25       Social transition, hormonal interventions, and

LEVINE - CROSS

1    surgery have profound implications for the course of the

2    lives of young patients and their families.  It is

3    incumbent upon professionals that these consequences be

4    thoroughly patiently clarified over time prior to

5    undertaking any element of transition.

6         The informed consent process does not preclude

7    transition; it merely educates the family about the state

8    of the science underpinning the decision to transition.

9    Social transition hormones and surgeries are unproven in a

10   strict scientific sense and, as such, to be ethical,

11   require a thorough and fully informed consent process.

12        So in your view, it is ethical to provide gender

13   affirming hormone therapy to minor patients if the doctors

14   engage in the thorough evaluation process you describe in

15   your article and the thorough informed consent process

16   that fully informs patients and their parents of the risks

17   as well as the state of science, right?

18   A.   If you read on in that article, I raise the question

19   of what do the doctors actually know about the state of

20   science and the risk and what false beliefs or beliefs

21   that are not scientifically established that they have.

22   So that can they give informed consent is an issue.  Can

23   they provide informed consent process is an issue if

24   they're not informed themselves, if they have false

25   assumptions; for example, that is biologically dictated,

LEVINE - CROSS

1   that is immutable, that it cures suicidal ideation, and

2   that it makes everyone live happily ever after, you see.

3        So in order to understand that last -- the

4   second-last sentence there, it does not preclude

5   transition.  It presumes that the doctor is knowledgeable.

6   And what it I have been saying is that all the doctors are

7   not equally knowledgeable about the state of science.

8   Q.   But you're not saying that no doctors are

9   knowledgeable.

10  A.   Of course I'm not saying that, Ms. Cooper.

11  Q.   In that article that we're looking at here, you don't

12  say that gender-affirming medical care, specifically

13  hormone therapy or blockers or surgeries, should be

14  categorically prohibited for minors, do you?

15  A.   No, I don't.  This is -- that was not the topic of

16  this article.

17  Q.   You testified that you would like to see an

18  international committee -- this was today.  You testified

19  that you'd like to see an international committee

20  developed standards for informed consent to provide

21  gender-affirming medical care to adolescents.  Is that

22  right?

23  A.   Yes.

24  Q.   So, you're not seeking to prohibit care, but to

25  ensure that patients have been thoroughly provided

LEVINE - CROSS

1   information and take the time and patience to understand

2   it before making this monumental decision.

3   A.    Ms. Cooper, when you say "patients," you need to ask

4   -- for me to agree to that, you have to add parents and

5   patients.

6   Q.    Thank you.  Let me ask it differently.

7       So you're not looking to prohibit care, but to ensure

8   that patients, and particularly their parents when they're

9   minors, have thorough information in order to be able to

10  adequately make that decision.  Is that correct?

11  A.    I am not motivated to prohibit care.  I am motivated

12  to clarify the scientific basis upon which the care is

13  provided, and if the basis is inadequate, to let doctors

14  be cautious about this.

15  Q.    And to inform families of this information as well.

16  A.    And to inform -- to use their own ethical unease

17  about the wisdom of this in their informing patients and

18  parents about the state of science here and what is not

19  known, the uncertainties, and the risks of harms.

20  Q.    And your view is that, if families are -- by

21  "families," I'm specifically focusing on parents -- are

22  fully informed about the risks and the state of the

23  science, the decision about whether to pursue hormone

24  therapy for adolescents -- minor adolescents should be

25  made by the parents, patient, and doctors.  Is that

1    correct?

2    A.    I would prefer that the doctors be extremely well

3    informed about the outcome of hormone treatments or the

4    lack of outcome of hormone treatments before they are

5    offering that as the first treatment or the second

6    treatment even of the child -- the child who is so --

7    who's transgendered.

8    Q.    Assuming those doctors are informed as you've

9    described, is it your view that family -- if families are

10   fully informed about the risks and the state of the

11   science -- the science, sorry -- the decision about

12   whether to pursue hormone therapy for minors to be made by

13   the parents, patient, and doctors?

14   A.    Yes.   Assuming that the parents are informed about

15   the psychosocial consequences of transforming the body and

16   transforming -- and solidifying, making more certain about

17   the trans identity when, if left alone, the child would

18   have more years to have social and romantic experiences

19   upon which to make that decision that they want to live as

20   a trans person.

21        All of us intuitively have doubts about a

22   15-year-old's knowledge about her future or his future.

23   And we are just trying to give those -- that developmental

24   process of adolescence the chance to proceed before we do

25   something that changes the direction of that developmental

LEVINE - CROSS

1  outcome.

2      I think people who are advocates of hormonal

3  intervention recognize that they are precluding a bunch of

4  possibilities for their patients because their patients

5  passionately want this, you see, and they're certain

6  nothing bad is going to happen to them, it's going to

7  improve their lives.  But, you see, we doctors have a

8  knowledge that the 15-year-old patient and their families

9  may not have, and it's our responsibility to bring that

10  knowledge to bear in the informed consent process.

11  Q.   Okay.  To be clear, you have written an article about

12  what the informed consent process should look like in the

13  case of providing hormone therapy to minors with gender

14  dysphoria, correct?

15  A.   That article talks about not so much what they should

16  do, but what the evidence shows.  I have not written an

17  article and said, informed consent should have the

18  following 16 features.  I've said, here are the barriers

19  to informed consent.  And I think if you take out one

20  sentence or one paragraph without reading the whole

21  article, you miss the point.

22  Q.   But it's not your testimony, is it, that informed

23  consent for minors to receive hormone therapy for gender

24  dysphoria is an impossibility, is it?

25  A.   It's not only a possibility, it's happening all over

LEVINE - CROSS

1   the country.

2   Q.   But proper informed consent.

3   A.   I don't know.  We don't know.  None of us know what

4   the informed consent is in Missouri and in this clinic in

5   Missouri versus that clinic in Missouri and this doctor in

6   Iowa versus that doctor in Iowa.

7   Q.   Understanding you don't know how each doctor provides

8   care, is it your view that if families who are seeing a

9   well-informed doctor under your understanding of what that

10  means, are fully informed about the risks and the state of

11  the science, the decision about whether to pursue hormone

12  therapy for adolescents -- minor adolescents should be

13  made by the parents, patient, and doctor.  Is that

14  correct?

15  A.   It is my testimony that that team of well-informed

16  doctor, scientifically well-informed, parents that have a

17  respect for the doctor and have met with the doctor

18  numerous times, and the doctor who has a relationship with

19  the patient, and after that patient has had a process of

20  psychotherapy where these matters, their ambivalence, the

21  uncertainty, their eating disorders, and their self-harm

22  episodes, et cetera, have been thoroughly explored -- if

23  that team of doctors, patient, and parent want to do that,

24  that's what doctors do.  We do that for cancer as well,

25  you know.

LEVINE - CROSS

1  Q.    And they are the people who should make that

2  decision?

3  A.    I would prefer doctors make the decision, of course,

4  but I want doctors to be informed not by politics, which

5  they are, but by science, which they're not.

6  Q.    I want to go back to -- again, we talked about the

7  BPJ case.  I think we looked at your report there before.

8  I want to ask you a question about your deposition.  You

9  were deposed in that case, correct, earlier this year?

10 A.    Yes.  I trust you.

11 Q.    If we can put up the front of the BPJ deposition.

12     Does that look like your deposition?  Does that look

13 like your deposition?

14 A.    I'm sorry.  I thought you were --

15 Q.    Is that a yes?

16 A.    Yes.

17 Q.    That was in March of this year.  Is that what it

18 says?

19 A.    Yes.

20 Q.    If you can look on page 133, and I'll ask you to read

21 along with me, starting on line 20, just the highlighted

22 passage.

23     There's an ethical responsibility, a professional

24 responsibility to teach the parents, teach the adult what

25 is known and what is not known.  What they decide is their

LEVINE - CROSS

1  business, it's their prog -- it's their prerogative, it's

2  their child, it's their seven-year-old.  It's not my

3  seven-year-old, see.  It's not your seven-year-old.  It's

4  not your 14-year-old.  It's theirs.

5        THE COURT:  Ms. Cooper, slow down a little bit.

6  BY MS. COOPER:

7  Q.   That was the end of the passage.  So that was your

8  testimony in March, Dr. Levine?

9  A.   Taken out of context, it is, yes.

10 Q.   Some people -- excuse me.  You agree, don't you, that

11 there are some people who benefit, including long term,

12 from gender-affirming medical treatments?

13 A.   Yeah.  Yes.  I have seen people who are happy that

14 they have made the transition, yes.

15 Q.   And I want to switch gears and focus a little bit on

16 the law at issue in this case.  You have concerns about

17 the law, Act 626, with respect to minors who are already

18 receiving hormone therapy and doing well but would be

19 required to discontinue treatment if the law took effect.

20 Is that correct?

21 A.   Yes.

22 Q.   You have concerns about -- specifically, about youth

23 who have already been stabilized in their new gender

24 having to discontinue treatment.

25 A.   Yes.

LEVINE - CROSS

1   Q.   I'm sorry.   Yes?

2   A.   Yes.

3   Q.   You believe that for youth who are currently

4   receiving hormone therapy, requiring them to discontinue

5   treatment could create a psychological -- could create

6   psychological and physiological problems, correct?

7   A.   Most certainly, I think it would be a psychological

8   challenge for those folks, whether physiologically or

9   cause a significant problem is not clear because,

10  depending on their age and depending on the original

11  maturation of their ovaries and testes, stopping estrogen

12  or stopping testosterone abruptly may cause brief periods

13  of thermo-regulatory -- what we call hot flashes.

14       But I think if a person's just had hormones, say,

15  starting at age 15 or 16, their gonads had matured enough,

16  that they would begin the secretion of progesterone and

17  estrogen for biologic girls and testosterone for boys.

18  But I think psychologically, it would be a shocking and

19  devastating thing for them.

20       There are lots of negative things that happen to all

21  of us in life that are shocking and devastating, and we

22  learn to cope with it.   And what I said at the deposition

23  is that doctors are compassionate people generally and

24  they would find a way to be of help.   And my concern with

25  the law as ti was originally written is that it seems to

LEVINE - CROSS

1  leave out what you're talking about.  And that I thought
2  that the Attorney General would be kind and compassionate
3  to those people.  But I just thought the doctors would
4  take care of it, but the law left out that, and that was
5  my concern.
6  Q.    So you would prefer for the law to have made
7  provisions for minors who were doing better or functioning
8  well with medical transition and want to continue
9  treatment, but you weren't consulted, right?
10 A.    I was not consulted.
11 Q.    But you would also prefer for the law to have made
12 those provisions.  Is that right?
13 A.    You know, I don't have credentials as a legislature,
14 Ms. Cooper.  I don't understand the process.  I'm just a
15 doctor and concerned about the welfare of individuals who
16 think one thing and are treated medically and are
17 encouraged to believe that they are something and that it
18 will never change and then the infrastructure of that
19 belief is pulled away from them.  Of course, they're going
20 to have a psychological reaction that's going to be
21 anxiety prone and depressive prone and may even lead to
22 temporary suicidal ideation.
23       But I just think that if the law goes into effect and
24 the doctors can identify those people, they will respond
25 to those people knowing what's coming and make some

LEVINE - CROSS

1  provisions for their care and perhaps even have some

2  relationship to the legislature to add additional law to

3  provide guidance for how to take care of these people.

4  But this is not my expertise.

5  Q.   Just to clarify, can we look at page 170 of the

6  deposition, line 15?

7      Do you see where it's highlighted on line 15,

8  beginning of the highlighting the word, but, "but there

9  are kids."

10     But there are kid who I will presume with you that

11  there are children who are doing better or who are

12  functioning well in their new role and who want to

13  continuing.  And I think solutions will be found.  You

14  know, I would you prefer this law to have made provisions

15  already for that, but that wasn't in.  I wasn't consulted.

16     I read that correctly?

17 A.   As I told you many times in deposition, you are an

18  excellent reader.

19 Q.   Thank you.

20     In your opinion, the law does have a problem now

21  regarding how to treat those minors who are already

22  receiving hormone therapy, correct?

23 A.   It's a problem.

24 Q.   And you believe that for families of minors who have

25  been on hormone therapy and are doing well, if the law

LEVINE - CROSS

1   takes effect, they will have to find a solution like going

2   to another state for treatment, correct?

3   A.   That would be one solution.  I think the doctors in

4   the state will take care of it.

5   Q.   By convincing the legislature to change the laws?

6   A.   By convincing the legislature or having an

7   understanding with the Attorney General's office about

8   this special case or these cases or just privately taking

9   care of medical care in a private way that, you know, you

10  don't know about.

11  Q.   Under the radar, you're saying.

12  A.   Of course.  Doctors function that way all the time.

13  Q.   And you've testified that you hope that medical

14  professionals would approach the legislature to not put

15  doctors in harm's way if they are taking care of minor

16  patients that they've previously committed to treat with

17  gender-affirming medical care, correct?

18  A.   I consider doctors to be a community resource.  It's

19  taken years and years of development.  The society has

20  invested in to create a doctor with skills in a particular

21  specialty area.  And to punish the doctor and to -- by

22  removing him from medical practice, defining -- depriving

23  the community of that resource seems Draconian.  And I

24  think it's intended to scare doctors not to be involved

25  with this, as opposed to, I'm going to put you in jail and

LEVINE - CROSS

1  make you lose your license.

2      So I do have this bias about doctors.  I have very

3  positive view of doctors and their good intention and

4  their role in society and I think of them as community

5  resources.  And anything that challenges the community

6  resource, short of moral repugnant behavior or

7  incompetence, I think I don't like.

8  Q.    You talked a little bit in directed about research

9  and the need for more research on gender-affirming medical

10  care for minors.

11      Would you agree that minors should be able to receive

12  gender-affirming medical care in the context of clinical

13  trials?

14  A.    Oh, yes.  I think that would be wonderful.

15  Q.    If someone were to ask you your opinion about a law

16  like the Arkansas law in this case, you would favor an

17  exception to the law for participation in clinical trials,

18  correct?

19  A.    Depending on what we mean about -- depending on the

20  scientific merit of the clinical trial.

21  Q.    Assuming it was a robust clinical trial like the type

22  were you describing earlier.

23  A.    Yes.

24  Q.    You would favor an exception for that?

25  A.    Yes, whether it's in Arkansas or Missouri or Ohio and

LEVINE - CROSS

1    ideally in all three.

2    Q.    Yeah.   I think you testified earlier that -- in

3    response to a question about the research, you said in

4    five years, I could give you more data, I think was the

5    way you put it.   But not data from Arkansas, right, if the

6    law goes into effect because that research wouldn't be

7    able to be conducted here?

8    A.    I would be happy if it were five other states, five

9    other -- five years from now.   I don't care what the state

10   is.

11   Q.    You were in discussions with the Alabama Attorney

12   General's office about serving as an expert witness in the

13   case there challenging a ban on gender-affirming medical

14   care for minors, correct?

15   A.    I did have a phone conversation, yes.

16   Q.    You told them you had concerns about the Alabama law.

17   Is that right?

18   A.    Yes.

19   Q.    You were uncomfortable with the Alabama law.

20   A.    I don't exactly remember what I was uncomfortable

21   with.   I think it was about the punishment of doctors,

22   removing doctors' licenses.

23   Q.    That was a concern to you.

24   A.    I just explained it.

25   Q.    I think you may have touched on this, but is it fair

LEVINE - CROSS

1  to say, if doctors in Arkansas were to lose their licenses

2  for providing gender-affirming medical care to minors,

3  that would be a concern to you?

4  A.  It would be a concern to me.  As I remember the law,

5  it doesn't say, lose your license.  It says, reporting you

6  to the state medical board for whatever you decide.  I

7  doubt very much that the board would take away a doctor's

8  license.

9  Q.  But if they did, that would be a concern to you?

10  A.  That would be a concern probably to all doctors

11  everywhere.

12  Q.  Now, when you were retained by the Arkansas Attorney

13  General's office to provide -- to serve as an expert

14  witness in this case, you understood you were being hired

15  to provide information about the state of the science in

16  the field.  Is that correct?

17  A.  Yes.

18  Q.  You were not submitting an expert report in this case

19  to express your support for the law, correct?

20  A.  Right.  I was here to represent a balanced view of

21  the state of science.

22  Q.  You mentioned you had some concerns about the law

23  already, correct?

24  A.  Correct.

25       MR. CANTRELL:  Your Honor -- I was going to

LEVINE - CROSS

1    object on the basis of asked and answered.  It's the third
2    time counsel has asked that particular question.
3              MS. COOPER:  I think I'm through with that line
4    of questions.
5              THE WITNESS:  Your Honor, can we have a bathroom
6    break?
7              THE COURT:  Yep.  Take about a 15-minute break.
8    The Court will be in recess to 20 until 3:00.
9         (A recess was taken at 2:40 p.m.)
10                        * * * * *
11                   REPORTER'S CERTIFICATE
12        I, Valarie D. Flora, FCRR, TX-CSR, AR-CCR, certify that
13   the foregoing is a correct transcript of proceedings in the
14   above-entitled matter.
15        Dated this the 5th day of December, 2022.
16   /s/ Valarie D. Flora, FCRR
17   -------------------------
18   United States Court Reporter
19
20
21
22
23
24
25

```
 1          (Proceedings continuing at 3:00 p.m.)
 2   BY MS. COOPER:
 3   Q.   Dr. Levine, you submitted a report in opposition to our
 4   plaintiffs' motion for preliminary injunction.  Do you remember
 5   doing that in this case?
 6   A.   In this case?
 7   Q.   In this case, yeah.
 8   A.   That's too legalese for me.
 9   Q.   Okay.  Let's show you -- if you can put up the report or
10   the rebuttal.
11          If you can look at the document on the screen dated
12   July 9th, '21, or filed.  On the top, it says, "July 9th, '21,
13   declaration of Stephen Levine."  Is this a report that you
14   prepared in this case?
15   A.   That was my original report.
16   Q.   Okay.  If you can look at page -- excuse me -- paragraph
17   35, and read along, the highlighted material.
18          "To my knowledge, there is no credible scientific evidence
19   beyond anecdotal reports that psychotherapy can enable a return
20   to male identification for genetically male boys, adolescents,
21   and men, or return to female identification for genetically
22   female girls, adolescents and women."
23          That's what you said in your report?
24   A.   That's what I did say, yes.
25   Q.   Okay.  Now, you talked on direct about your clinical
```

1  experience, and you mentioned that most of your patients were

2  adult patients.  It's correct that you've had only two patients

3  who have detransitioned after medically transitioning.  Is that

4  correct?

5  A.    That I'm aware of at the moment, yeah.

6  Q.    Okay.  And in your report in this case, you cited a paper

7  by Exposito-Campos about detransition.  Correct?

8  A.    Yes.

9  Q.    And you noted that the Exposito-Campos review of

10 detransitioning claimed to have identified 16,000 entries in a

11 search of proliferating websites devoted to this topic.  Is that

12 correct?

13 A.    Detransitioning, yes.

14 Q.    And, to be clear, this did not represent 16,000

15 detransitioners.  Right?

16 A.    It's not possible to know what percentage of them are

17 individual people who have detransitioned.

18 Q.    That was a reference of the number of people participating

19 in these online groups.  Is that right?

20 A.    Right.

21 Q.    Uh-huh.  Okay.  Now, you talked some during direct

22 testimony about detransition and studies looking at rates of

23 detransition.  I just had a couple of questions about that.  You

24 mentioned that there was a study that said that there was a rate

25 of about 30 percent of patients detransitioned.

1    A.    Yes.

2    Q.    Right?  How was detransition defined in that study?

3    A.    I think as stopping hormones.

4    Q.    People may stop hormones without going back to reverting to

5    their biological sex.  Correct?

6    A.    Yeah.  The study is about the rate, you see.  It's not

7    about the details, right?

8    Q.    Okay.  And I would like to pull up a passage in your

9    rebuttal report in this case.  Do you have that, paragraph 17?

10   If you can look at page 1, is this your rebuttal?

11        Oh, is this the same document?  I'm sorry.  It is the same

12   document.

13        This is your report you wrote in this case?

14   A.    I trust you.

15   Q.    It has your name on it.  Right?  Did you look at it?  I

16   want to make sure we're on the same page.

17   A.    A rebuttal declaration of Dr. Stephen Levine, M.D.

18   Q.    Let's look at paragraph 17, please.  I would like to have

19   you go down sort of towards the bottom, second-to-last line in

20   that paragraph, beginning with the word "according."  And read

21   along with me.

22        It says, "According to a recent study from a UK adult

23   gender clinic, 6.9 percent of those treated with

24   gender-affirmative interventions detransitioned within 16 months

25   of starting treatment, and 3.4 percent had a pattern of care

1    suggestive of detransition, yielding a rate of probable

2    detransition in excess of 10 percent.  Another 21.7 percent of

3    patients disengaged from gender clinics without completing their

4    treatment plan.  While some of these individuals later reengaged

5    with the gender service, the authors concluded detransitioning

6    might be more frequent than previously reported."

7         That's a passage from your report.  Correct?

8    A.   Correct.

9    Q.   Now, when you spoke earlier about 6.9 percent and about

10   3 percent suggestive of detransitioning, that was this study you

11   are talking about.  Is that correct?

12   A.   There was another study.

13   Q.   That was another study that also --

14   A.   That was a subsequent study.  It was one where people were

15   placed on hormones around age 20, and five years later they had

16   a rate of detransition I think closer to 30 percent.

17   Q.   Well, so that number of 30 percent -- because I'm looking

18   here in 21 percent plus 10 percent gets to be around 30 percent,

19   that's not your 30 percent number?

20   A.   Is that the Boyd study or the Hall study?

21        So No. 9 is the Hall study.  I'm sorry.  No. 9 is the Boyd

22   study.

23   Q.   Okay.

24   A.   So, you know, my point is that these are early rate

25   studies.  There will be more studies.  The fact that

1    detransition occurs in various forms to various degrees should

2    not be denied any longer.  The incidence of using this 1 or

3    2 percent of regret for the whole phenomenon of maybe a mistake

4    has been made somewhere along the line no longer is acceptable.

5    What we need to think is that with the rising number of people

6    getting hormones and the rising number of people saying they are

7    transgender and then the rising number of people getting access

8    to hormones, we should expect that some of those people, given

9    the ordinary ambivalence of the human soul, will change their

10   mind as they get older and detransition to various degrees.

11   These studies are just the first early reports.

12   Q.    Understood.  But my question has to do with the 30 percent

13   figure you gave.  These studies don't show that 30 percent of

14   patients who were on treatment detransitioned.  Isn't that

15   right?

16   A.    I think -- yes, that's right.  They are showing that

17   30 percent dropped out of treatment or were lost to the original

18   treatment plan.

19   Q.    So, to be clear, they showed that 6.9 percent, what you

20   described here, 6.9 percent detransitioned, and another

21   3.4 percent had a pattern of care suggestive of detransition.

22   But separately, to get to the remainder, to get to that

23   30 percent are 21.7 percent who are just people who dropped out

24   of the program.  Right?

25   A.    And that's study No. 1.  That's Hall.

1   Q.   Just to clarify, we don't know if 21 percent of those

2   people detransitioned.

3   A.   No.  They may have gotten their care at a different

4   country.

5   Q.   In fact, your own description says some of them reengaged

6   in the clinics in those 21 percent.

7   A.   That was a quote.

8   Q.   That was a quote.  Okay.  Tell me, so there's another study

9   that showed 30 percent detransitioned?  Which one is that?

10  A.   If you look down further to No. 9, reference No. 9 to Boyd,

11  that's a study of older people detransitioning.

12  Q.   Okay.

13  A.   My point, Ms. Cooper, is that people detransition.  And we

14  shouldn't be surprised, and we shouldn't sell the public that

15  once a trans always a trans.

16  Q.   I want to switch gears for now and ask you about a

17  presentation you gave at the American Psychiatric Association

18  this past May.  Correct?

19  A.   Correct.

20  Q.   Yeah.  You presented at an annual conference of the

21  American Psychiatric Association in a symposium on reexamining

22  the best practices for transgender youth.  Is that correct?

23  A.   That is very correct.

24  Q.   And among your co-presenters were Ken Zucker.  Correct?

25  A.   Yes.

Levine - Cross                                        926

1    Q.    And others were Lisa Marchiano and Sasha Ayad?  Correct?

2    A.    Yes.

3              THE COURT:  Ms. Cooper, can you spell that last name?

4              MS. COOPER:  I can.  Ayad is A-y-a-d.

5    BY MS. COOPER:

6    Q.    And all four of you who were on that panel are people who

7    have dissenting views from APA policies on trans healthcare.

8    Correct?

9    A.    That's right.

10   Q.    Okay.  And the APA was aware that the four of you were

11   presenting ideas that were not in keeping with official policies

12   of the APA.  Correct?

13   A.    Yes.  They made an announcement of that before we were

14   allowed to present.  And they sent a special person to moderate

15   it.  They didn't allow me, the chairman, to moderate it, but

16   they didn't tell me they were going to do that.  They just

17   showed up three minutes before the symposium, yes.

18   Q.    And while you were talking, the group in the audience was

19   polite, and no one interrupted.  Is that correct?

20   A.    While I --

21   Q.    While you were presenting on the panel.

22   A.    Yes.  They were very polite until the presentation was --

23   the presentations were finished.

24   Q.    Excuse me?  Until the presentations were --

25   A.    Finished.

1          THE COURT:  Dr. Levine, as a psychiatrist, how did
2   that make you feel?  No.  I'm kidding.
3          THE WITNESS:  I can answer that, Your Honor.
4          THE COURT:  You don't have to answer it.  I'm just
5   trying to shake things up a bit.  Keep going.
6          THE WITNESS:  You succeeded.
7   BY MS. COOPER:
8   Q.   No one interrupted.  Correct?
9   A.   I'm sorry?
10  Q.   No one interrupted the presentations.  Correct?
11  A.   The only interruption in the presentation was when I began
12  to speak to introduce the symposium, this woman appeared and
13  told me to wait a minute, she was going to make the first
14  comment.
15  Q.   But there wasn't a disruption of the content of the
16  presentations?
17  A.   That's right.
18  Q.   We just mentioned Ken Zucker, who was on the panel with
19  you.  Is it correct that he is called -- excuse me -- he is a
20  proponent of what some call watchful waiting for prepubertal
21  children?
22  A.   That's not what he presented about.
23  Q.   But your understanding is he's a proponent.  I'm sorry if
24  that wasn't clear.  Putting aside his presentation at the panel,
25  he is a person who supports watchful waiting for prepubertal

1    children with gender dysphoria.  Correct?

2    A.   He was one of the original people who I think coined the

3    term.  But we would have to understand what watchful waiting

4    means.

5    Q.   Uh-huh, yeah.  He doesn't favor social transition for

6    prepubertal children.  Is that correct?

7    A.   I think so.  I think that's correct.

8    Q.   Dr. Zucker has provided puberty blockers to minors -- I'm

9    sorry -- to minors who are post-puberty adolescents.  Correct?

10   A.   I actually cannot testify with any certainty about how Dr.

11   Zucker practices and has practiced.  You should know that Dr.

12   Zucker was the first and most well-known researcher on childhood

13   gender identity disorder and was formulating various ways of

14   evaluating and testing and treating these people.

15   Q.   My question, though, is about his use of blockers.  At the

16   symposium, he said that he sometimes provided blockers to

17   minors.  Correct?

18   A.   I don't remember if he said that at the symposium.  If you

19   have evidence that he said it, then I trust you.

20   Q.   Let's look at page 300 of the deposition.  Let's look at

21   the question above just to give context.

22       "Question:  And Ken Zucker, Lisa Ayad and Lisa Marchiano

23   are people you would describe as supporting a more cautious

24   approach with respect to providing hormone therapy to minors.

25       "Answer:  As Dr. Zucker said during the symposium, you

1   know, he sometimes has to prescribe puberty blockers to

2   children.  But certainly I think you summarized what all four of

3   us believe."

4        That was your testimony.  Correct?

5   A.   Back in that deposition, I remembered that.  But today --

6   Q.   You don't remember now.  Okay.  Understood.

7        I'm going to switch gears a bit.  You prescribe medication

8   to patients for various psychiatric conditions like depression.

9   Right?

10  A.   I already said I have, yes.

11  Q.   And you've prescribed drugs to patients for off-label use.

12  Correct?

13  A.   Generally not.

14  Q.   There are times you have prescribed drugs for off-label

15  use.  Correct?

16  A.   I can't remember a moment at this moment, but it's likely

17  that I might have.

18  Q.   Okay.  Let's just put up page 249 of the deposition to

19  refresh your recollection perhaps.  Do you have that in front of

20  you?  Starting on line 8 -- do you have that?

21  A.   I have it, yeah.

22  Q.   "Question:  Do you never prescribe off-label drugs, drugs

23  for off-label use?

24        "Mr. Cantrell:  Object to form.

25        "Answer:  Yes.  There are times that I've prescribed drugs

Levine - Cross

1    for off-label use."

2         That was your testimony.  Correct?

3    A.    Oh, yes, yes.  That was my testimony.

4    Q.    Okay.  Off-label drug use is very common in probably every

5    field of medicine.  Correct?

6    A.    Yes.

7    Q.    Uh-huh.  And the fact that a drug is being used off label

8    does not make the use experimental.  Correct?

9    A.    In some sense it is experimental.  It's not approved.

10   There hasn't been evidence other than in a clinical fashion to

11   do it.  It's not experimental in the same serious way we're

12   talking about using the various drugs for gender dysphoria off

13   label and perhaps experimental.

14   Q.    You would agree, though, that the fact that a drug is being

15   used off label does not alone mean that it's experimental.

16   Correct?

17   A.    I would agree with that.

18   Q.    People in your field know the difference between articles

19   that are peer reviewed in a scientific journal and different

20   kinds of publications.  Right?

21   A.    Yes.

22   Q.    Speaking generally about psychiatric conditions, you would

23   agree that because of the complexity of the human psyche and the

24   difficulty of running controlled experiments in this area,

25   substantial disagreements among professionals about the causes

Levine - Cross                                     931

1   of psychological disorders and about the appropriate therapeutic

2   responses are not unusual.  Correct?

3   A.    That's quite a mouthful.

4   Q.    Would you like me to --

5   A.    No, no.  I understand.  That's sort of a general

6   establishment that we don't know a great deal about the causes

7   of various diagnosable conditions and that different

8   professionals have different views about the causes or the

9   relative importance of causes.  It is to some extent a Tower of

10  Babel.

11  Q.    And that is true with respect to the appropriate

12  therapeutic responses to various psychiatric conditions, that

13  people may have different approaches to what's the appropriate

14  psychotherapeutic response?

15  A.    Well, they address people by professional A are treated

16  with these drugs and professional B for these drugs.  But on a

17  scientific basis, we know that A and B, there's no significant

18  difference, even though you as a doctor prefer this drug and I

19  as a doctor don't like that drug.

20  Q.    You testified today that the WPATH Standards of Care no

21  longer require a mental health assessment prior to initiating

22  hormone therapy.  Now, that's for adults.  Right?  You were

23  talking about adults, because there is a mental health

24  requirement for minors seeking gender-affirming hormone therapy.

25  Correct?

1   A.   I hope so in the DSM -- I'm sorry -- in the Standards of
2   Care, eighth edition, yeah.
3   Q.   Do you know?
4   A.   I can't remember.  I think -- see, these are words that I
5   read, but it's the translation of words into action is the
6   issue.  And who is a mental health professional and what
7   credentials and what level of experience and what understanding
8   of this disorder do they have, and how much do they know about
9   the state of science?  I mean, you have to ask yourself the
10  question in those 70 clinics who is providing the psychiatric
11  assessment.  You know, it used to be the psychiatrist and Ph.D.
12  psychologists were the only credentialed.  That's not true now.
13  Lesser educated people are credentialed.  Now even nurse
14  practitioners are making the diagnoses and prescribing hormones.
15  Q.   But you don't know how that is done at most of the clinics
16  across the country.  You don't know if that's the case.  Right?
17  A.   I know it's in the case of some places.
18  Q.   Again, going back to the WPATH Standards of Care 8, would
19  you disagree, or would you agree, I'll ask, that they require a
20  comprehensive psychosocial assessment for minors who are seeking
21  gender-affirming medical care?
22  A.   Yes.  That's exactly what I mean about the words versus the
23  behaviors and the credentials of those who can provide those
24  comprehensive things.  You see, in order to be a credentialed
25  mental health professional in WPATH, you have to agree to

1    WPATH's principles.

2    Q.   But, again, you don't know how most practitioners around

3    the country, how credentialed they are and how they provide

4    care.

5    A.   Who in the world knows?

6    Q.   But you don't.

7    A.   I don't and you don't.

8    Q.   Okay.  Now, I want to switch gears and talk about some of

9    the European reports that you talked about.  Let's start with

10   Finland.  You talked about a report from Finland.  Do you

11   remember talking about that?  Okay.  And you mentioned that a

12   committee of, I believe you said, blue ribbon experts put

13   together these international reports.  Which were the experts

14   who were the blue ribbon experts who put together the Finnish

15   report?

16   A.   Their names?

17   Q.   Anything about them.

18   A.   I don't know their names.

19   Q.   Do you know anything about them?

20   A.   Well, I know the head of this national program.  I know

21   her, but I don't know her colleagues.

22   Q.   And do you know what organization put that report out?

23   A.   Well, it's called COHERE.  Please don't ask me what the

24   COHERE stands for.

25   Q.   How many experts were on that blue ribbon committee that

Levine - Cross

1    COHERE put together?

2    A.   I don't know the specific number, but those committees

3    usually number six or more people.

4    Q.   But you don't know about how many were on the Finnish --

5    A.   I don't know.

6    Q.   Could it have just been the one doctor?

7    A.   No, no way.

8    Q.   What do you know about their expertise in gender dysphoria

9    treatment?

10   A.   Well, I would presume, as I testified before, that what we

11   call blue ribbon committees have some people on it who are

12   expert, but there's a limited number.  And the majority of the

13   experts are people from various fields whose credentials have to

14   do with expertise in study evaluation.

15   Q.   You presume that.  But do you know if that happened in the

16   Finnish report?

17   A.   No.  But I've been on the Cochrane report, which is an

18   Irish group, with a large number of people.

19   Q.   Yeah.  But I'm asking about the Finnish report.

20   A.   As I already said, I don't know the names and the

21   credentials of the specific people in that report.  I have a

22   trust that you don't seem to share that those kind of national

23   reports are done with highly credentialed people and never one

24   person.

25   Q.   Except the Cass report you talked about.  Right?

1  A.   The Cass report, Cass is the senior author of a committee

2  of people.

3  Q.   How many people are on that committee?

4  A.   I don't offhand know.  You could look and see at her

5  report.  It probably lists the people.

6  Q.   Do you know anything about the expertise of the people on

7  the Cass report committee you say exists?

8  A.   I would assume, just as I answered previously.  You are

9  aware of the Dallon report, which reviewed all the standards of

10 care that were in existence.  They published a report in April

11 of '21, so they reviewed all the various standards of care for

12 transgender.

13 Q.   Are they part of the Cass report?

14 A.   Pardon me?

15 Q.   I'm asking about the Cass report.

16 A.   No.  The Dallon report was the one that reiterated the

17 standards of which -- upon which these things are judged.  And

18 the concept of 30 percent comes from the Dallon report, and the

19 concept that these standards of care are supposed to be reissued

20 every five years comes -- these are the standards of these

21 high-level committees, you see.

22 Q.   I think I understand where we may be talking at each other.

23 Is it your understanding these European reports you mentioned

24 are all clinical practice guidelines of the type that the Dallon

25 report talks about, including the Cass report, that that's a

1   clinical practice guideline?

2   A.   Let me answer your question.  It's my understanding that

3   this Finnish -- the Finnish, the Swedish and the UK report and

4   the McMasters report from McMasters University in Canada are all

5   populated by people who have expertise in evaluating studies and

6   that are limited.  The numbers of people who are actually

7   involved in the field are limited.

8   Q.   But your understanding is based on the Dallon report

9   recommending that that's how these things should be done -- I'm

10  sorry -- the Dallon paper about how clinical practice guidelines

11  should be created?

12  A.   That's if you are looking for a reference that verifies

13  what I'm saying, I refer you to the Dallon report.

14  Q.   So did the Dallon report --

15  A.   I think the national -- like the National Health Service's

16  concern with how care is delivered throughout the United

17  Kingdom, so they have considerations that are far beyond what do

18  the people with Tavistock Clinic do.  They are asking the

19  question what is the scientific basis for what the people at the

20  Tavistock Clinic do, and they think -- that's what the Swedish

21  report and the Finnish report, what is the scientific -- what is

22  the evidence that supports what we're doing in our country to

23  these young people?

24  Q.   I understand that your questions about -- your testimony

25  about what these reports talk about.  My question is going to

1    the basis of your statement that these three reports from

2    Finland, Sweden and UK, and now you've mentioned the university

3    report out of Canada, all were blue ribbon committees of

4    experts.  The basis of your knowledge that these were experts on

5    those committees, where is that coming from?  Is it coming from

6    the Dallon article recommending that that's a good practice in

7    writing reports and you are assuming that they followed that

8    practice?

9    A.   It's coming from the history in medicine, not just in this,

10   that when the treatment for an individual condition is reviewed

11   by a major super organization like Medicare reviewing the

12   surgical reports for transgenderism that the people who are

13   reviewing 50 or a hundred reports have expertise.  I don't know

14   the names of the people.  I don't even know whether they are

15   from urology or gynecology or psychiatry.  But those general

16   superordinate structures in societies, sometimes in nations,

17   like the Medicare reports here, they have what I call blue

18   ribbon people on it, people who have credentials to objectively

19   look at the state of science beyond the passion of

20   practitioners.

21   Q.   And just to be clear, though, you don't know anything about

22   any of the specific people on these committees in any of these

23   countries.

24          MR. CANTRELL:  Your Honor, I think we've beat this to

25   death.

1            THE COURT:  Is that true, Doctor?

2            THE WITNESS:  It is true.

3    BY MS. COOPER:

4    Q.   Okay.  Now, the French report, the French document that you

5    talk about, that's not a review of the literature.  Right?

6    A.   I'm sorry.  Which one?

7    Q.   The French application.

8    A.   The French, I don't think -- I don't want to testify it's

9    based on a review.

10   Q.   So you don't know if that was done by a blue ribbon

11   committee of experts?

12   A.   I don't know who did it, just there was a national body in

13   France.

14   Q.   Okay.  Thank you.  That helped clarify that.  I want to go

15   back to some of these individual reports and just a few

16   questions.  The Finnish report did not recommend banning

17   gender-affirming medical care for minors, did it?

18   A.   I think in special cases they thought it could be

19   continued.

20   Q.   In fact, it allowed puberty blockers on a case-by-case

21   basis after careful consideration.  Isn't that what it says?

22   A.   I think so.

23   Q.   And it says in the Finnish report that hormone therapy

24   could be provided to minors based on a thorough case-by-case

25   consideration if it can be ascertained that the identity as the

1   other sex is of a permanent nature and causes severe dysphoria.

2   Is that correct?

3   A.    Yes.

4   Q.    Now --

5   A.    Ms. Cooper, then how could a bunch of doctors know that a

6   nine year-old's gender identity is permanent?  It only could be

7   based on the fact it has existed for three years.

8   Q.    Is anybody providing hormone therapy -- cross-sex hormone

9   therapy to nine year-olds?

10  A.    Yes, yes, yes.

11  Q.    Cross-sex hormone therapy?

12  A.    No, no.

13  Q.    That's what we're talking about.

14  A.    Puberty blocking hormones.

15  Q.    This was about cross-sex hormone therapy.

16  A.    Oh, I'm sorry.

17  Q.    Yeah.

18  A.    Even so, if somebody has consistent cross-gender

19  identification from 12 to 16, there's no guarantee that that

20  person will be cross-gender identified at 25.

21  Q.    But that's what the Finnish report said, what I described.

22  A.    Right.  You see the limitations inherent even in policy.

23  Q.    So, turning to the French report, just to be clear, they

24  did not recommend prohibiting gender-affirming medical care for

25  minors, did they?

Levine - Cross

1    A.    I don't know.

2    Q.    You don't know?

3    A.    At this moment.

4    Q.    Uh-huh.  So you don't know if in France minors can receive

5    gender-affirming medical care to treat gender dysphoria?

6    A.    I think this was a general recommendation rather than a

7    prohibition.  And the recommendation was psychotherapy and

8    psychiatric evaluation first.

9    Q.    Okay.

10   A.    I think what we have in common here in all of these

11   countries we're talking about is the recommendation, the prudent

12   recommendation that psychiatric evaluation and attention to

13   associate a psychopathology and worry about both detransition

14   and the rapid rise in the number of people calling themselves

15   transgender calls for a different approach, not the preclusion

16   of individual cases getting a particular treatment, but, in

17   general, doctors of our country think psychotherapy first, not

18   hormones first, not transition first.  That's what these things

19   have in common, whether I remember one phrase or another from

20   the report.

21   Q.    And your assumption is in the U.S. doctors are doing

22   medical transition before psychotherapy?

23   A.    Oh, yes.

24   Q.    But you don't actually know how many doctors do that.

25   Right?

Levine - Cross

1  A.   Like you, I don't know the exact number.

2  Q.   But you don't know?

3  A.   Yes.

4  Q.   And just to go back to the French report, is it correct

5  that the report says that psychological support should be

6  provided, but in the event of persistent desire for transition,

7  a careful decision about medical treatment with hormone blockers

8  or hormones of the opposite sex within the framework of

9  multidisciplinary consultation meetings is considered?

10  A.   You need to ask what multidiscipline consultation means.

11  Q.   I'm asking, is it your understanding that that's what the

12  French document that you talked about earlier provides?

13  A.   I presume you are accurately reading from the French

14  document.  I have no reason to distrust you on that.

15  Q.   Let's put it up so we don't have to wonder.  Can you go to

16  the top so we can see the beginning of it?  Is this the French

17  document you were talking about from the National Academy of

18  Medicine?

19  A.   You translate very well.

20  Q.   Thank you.  If we look at the highlighted portion, if you

21  will read with me -- actually, let's look above, where it says

22  in bold, "The National Academy of Medicine draws the attention

23  of the medical community to the increasing demand for care in

24  the context of gender trans-identity in children and adolescents

25  and recommends:  A psychological support as long as possible for

Levine - Cross                                        942

1    children and adolescents expressing a desire to transition and

2    their parents."  I'm not sure about the last.  Oh, psychological

3    support for their parents.  I'm sorry.  Let me read that again

4    because I confused myself, just for the record.  "A

5    psychological support as long as possible for children and

6    adolescents expressing a desire to transition and their

7    parents."  And, second, it says, "In the event of a persistent

8    desire for transition, a careful decision about medical

9    treatment with hormone blockers or hormones of the opposite sex

10   within the framework of multidisciplinary consultation

11   meetings."  That's what the French report says.  Correct?

12   A.    Yes.  Do you want to leave that on for a second?

13   Q.    Do you want it?

14   A.    Yes.  Because I want to talk about it.

15   Q.    I'll leave it up.  On redirect, counsel can ask you about

16   it or put it up if he wants to.

17        I want to ask a few questions about the Swedish report that

18   you talked about.  Is it correct that the Swedish report

19   provides that puberty blockers and hormone therapy can be

20   provided to minors in research settings and in exceptional

21   circumstances?

22   A.    Yes.

23   Q.    And these recommendations provide that criteria for

24   offering blockers and hormone therapy to treat minors with

25   gender dysphoria should link more closely to those used in the

1    Dutch protocol.  Correct?

2    A.    What was the first part of that question?

3    Q.    These recommendations --

4    A.    Yeah.  I'm sorry.  In certain cases they can do it like the

5    Dutch protocol did it.  If that's what you mean, yeah.

6    Q.    Okay.

7    A.    You see, these national bodies are making exceptions for

8    special cases.  That doesn't mean 60 percent of the cases.  It

9    doesn't mean 40 percent of the cases.  It means a very small

10   percentage of the cases.

11   Q.    And so the Swedish report follows the Dutch protocol used

12   in the Dutch studies that you talked about earlier.  Is that

13   right?

14   A.    Yes.  That's the sequence, you know.

15   Q.    So just a few questions on the Cass report that we touched

16   on.  Again, like the other European reports you talked about,

17   the Cass report did not recommend stopping endocrine treatment

18   for minors with gender dysphoria, did it?

19   A.    No.

20   Q.    Endocrine treatment is provided to minors in the UK to

21   treat gender dysphoria.

22   A.    The Cass report also said what I've been saying all day,

23   that we should think that the first line of treatment is

24   psychological assessment and thorough approach to the

25   comorbidities.  What it doesn't say is that nobody should ever

1    get these drugs.

2    Q.   And you mentioned a report from Canada.  Hormone therapy

3    and puberty blockers are not prohibited for minors in Canada,

4    are they?

5    A.   No.  This was done for the State of Florida.  It was not

6    done by the Canadian National Service.  But what it did was

7    reiterate the low quality of evidence for puberty blockers being

8    beneficial and for cross-gender hormones being beneficial or

9    them in sequence being beneficial.  Based on international

10   standards, blue ribbon people, sophisticated people, every

11   review says that the scientific objective review of the evidence

12   supporting these treatments is of very low quality.

13   Q.   I'm not asking about the quality of evidence.  I'm asking

14   about the recommendations in the reports.  That's what my

15   questions were focused on.  And going back to the Canadian

16   report, do I understand from what you said earlier that that's a

17   report that was prepared to be used in litigation to support a

18   ban on treatment in Florida?

19   A.   I don't know exactly why it was done.  What I was trying to

20   help you not make a mistake in thinking, that it was part of

21   Canadian national policy.  It was an academic center.  That

22   place does reviews, does all kind of reviews.  And somebody I

23   think from the State of Florida commissioned and paid for the

24   review.  And the review said, and it was objectively done, the

25   same thing that the other reviews have said, low quality and

1    very low quality evidence and meaning that the risk of harm,

2    that the risk of harm exceeded the knowledge of the benefits.

3    Q.    So just to be clear, in Canada there's not a prohibition on

4    treatment for minors with gender dysphoria?

5    A.    As far as I know, there's no prohibition in Canada.

6    Q.    And none of these countries we talked about, in other

7    words, Finland, Sweden, UK, Canada, France, none of them have

8    prohibited care like Arkansas has.

9    A.    None of them have what?

10   Q.    Have prohibited care like Arkansas has in its law.  Let me

11   say it again if that wasn't clear.  None of the countries you've

12   talked about:  Finland, Sweden, UK, Canada or France, has

13   prohibited gender-affirming medical care for minors the way

14   Arkansas has in the law at issue in this case.

15   A.    All those countries have used the medical profession and

16   the agents of the medical profession, the institutions within

17   the medical profession, to review the scientific evidence and

18   then to form policies based on that evidence.  They have not

19   passed as far as I know laws prohibiting and punishing doctors.

20   Q.    And those policies that they have passed do not recommend

21   banning care the way Arkansas does.  Correct?

22   A.    They said being prudent with special cases.  As I pointed

23   out to you, my interpretation of special cases doesn't mean

24   50 percent or 60 percent or 40 percent.  It's a small number of

25   cases.

Levine - Cross                                           946

1    Q.    And all of those five countries you believe have said that,
2    just special cases?
3    A.    For all the countries except, you know, Sweden said with
4    the exception of I think rare special cases, all of those cases
5    that are going to get treatment have to get treated within a
6    protocol.
7    Q.    France didn't limit it to special cases, did it?
8    A.    Well, when I asked you to put that up, I was going to point
9    out the vagueness of those words and what they had to translate,
10   those words.
11   Q.    Well, we can put it back up because I want to go back to
12   that passage that said "in the event of a persistent desire for
13   transition, a careful decision about medical treatment with
14   hormone blockers or hormones of the opposite sex within the
15   framework of multidisciplinary consultation meetings," that's
16   what they described.  Correct?
17   A.    So the question is -- one of the questions about this
18   highlighted, these two sentences, is what does it mean, the
19   framework of multidisciplinary consultation meetings?  Does it
20   mean with the nurse practitioner and the social worker and the
21   psychiatrist and the psychologist?  Does it mean with the
22   endocrinologist?  Does it mean with the surgeon, you see?  Does
23   it mean with a committee of trans people themselves?  What does
24   it mean?  WPATH always talks about that as well, you see.  What
25   I'm talking about, and I think what all of these national bodies

1    are talking about, is the recognition that there's something

2    amiss psychologically and developmentally in a large percentage

3    of trans-identified children and adults and that the right

4    professional needs to deal with it.

5          So when we talk about multidiscipline, what we're really

6    talking about, does the endocrinologist agree?  Does the surgeon

7    agree?  They are not talking about the psychologist and the

8    nurse practitioner.  They are just taking one of those mental

9    health professionals.  And you know how systems work where M.D.s

10   get, you know, they tend to be looked at as more expert than

11   lesser trained people.  So that's one of the vagueness about

12   these two sentences that you've highlighted.

13   Q.   And you brought France up as an example of a better course,

14   a better approach, I understood.  Is that not your view anymore?

15   A.    No.  I bring it up because even France is saying a

16   psychological assessment should no longer be downgraded.  Mental

17   health professionals, the implication to me is that mental

18   health professionals should not be viewed disparagingly as mere

19   gatekeepers, you see, that people need to be considered.  Their

20   psychological state needs to be considered by people who have

21   the capacity to take a developmental history, to know what it

22   means and to try to arrange a conversation for a therapy or

23   medication and combinations of the above that might ameliorate

24   some of the suffering that is in within the soul, within the

25   person, within the personality of the patient or the family.

1    That's all.  I don't know what you are trying to get me to say

2    here.

3    Q.   I'm confused because you are saying that care in the United

4    States is leaving out the psychological evaluation and

5    treatment.  But I think you agreed that the WPATH Standards of

6    Care 8 specifically requires a comprehensive psychosocial

7    evaluation before you would consider hormone treatment for

8    minors.  Is it just your assumption nobody is following the

9    standards?

10   A.   Ms. Cooper, these are words.  Comprehensive psychiatric

11   evaluation.  I mean, I work in a multidisciplinary multi-health

12   clinic.  And I can tell you that the various levels of education

13   that passes for mental health professionals are quite different.

14   The concepts that people have in mental health are quite

15   different.

16   Q.   Is that different in Europe than in the U.S.?

17   A.   Oh, absolutely.

18   Q.   So they are all qualified there, but here you are assuming

19   most are not, to provide the care?

20   A.   No.

21   Q.   I'm just trying to understand the distinction.

22   A.   I'm not saying that at all.  You and I are crossing each

23   other at a very high altitude.

24   Q.   I understand your criticism of care here is that

25   practitioners are downgrading mental health evaluation and not

1    taking that into consideration in comorbidities, but in Europe

2    they are focusing on that.  But when I pointed out that the

3    standards of care here actually require that, you said, well,

4    they don't really follow the standards.

5    A.    Ms. Cooper, what I was trying to say to you, you can read

6    these wonderful words in the standards of care, but it turns out

7    the devil is in the details.  The devil is how it's translated,

8    who is doing the psychiatric assessments, what mindset do they

9    have, what knowledge do they have, and how long do they have to

10   do it.  Every clinic can say we do comprehensive care.  Every

11   clinic will say we do these evaluations.  But from the parents'

12   point of view or the educated parents' point of view, that is

13   not what is happening to their child frequently.

14   Q.    For some families you've talked to.

15   A.    Frequently.

16   Q.    For some families you've talked to.  Correct?

17   A.    I'm sorry?

18   Q.    For some families you've talked to.

19   A.    Almost for all the families I've talked to.

20   Q.    Which is a tiny amount, representing a very tiny amount of

21   the clinics around the country.  Correct?

22   A.    And I don't know what percentage of the clinics, but they

23   are from many states.

24   Q.    I just have a few more questions.  I want to go back to the

25   second study on detransition that you mentioned showing the

1   30 percent detransition rate.

2   A.    The Boyd study?

3   Q.    That was the one by Boyd.  Thank you.  We're going to put

4   that up so we can get clarity on that.  Looking at a study

5   called "Care of Transgender Patients:  A General Practice

6   Quality Improvement Approach" by Isabel Boyd, et al., that's the

7   study you are talking about?

8   A.    That was I think a primary care study.

9   Q.    Okay.  You have the highlighted portion in front of you?

10  A.    Yes.

11  Q.    "3.2.4.  Undesired Treatment Outcomes (stopping hormones,

12  abnormal blood test results, side effects and complications)."

13  It says here, "Nine patients had stopped hormone therapy, one

14  related to practice policy because they had not attended any GIC

15  follow-up (the patient has restarted since the audit).  Thus,

16  eight patients had stopped hormones voluntarily (20 percent

17  stopping rate; six trans men, two trans women).  These patients

18  had been on treatment for a mean of five years (range 17 months

19  to 10 years).  Four trans men had comments in the record that

20  related to a change in gender identity or detransitioning (4 out

21  of 41, 9.8 percent) quote:  Would like to gradually

22  detransition.  No longer wish to live your life as a male.  Has

23  decided to detransition.  Feels comfortable having decided to

24  dress and appear more feminine.  Feels it was a mistake

25  identifying as non-binary now, close quotes.

1    None of these patients had undergone any gender-related

2    surgery.  They had presented at a mean of 18 years of age, taken

3    testosterone for a mean of 18 months and currently presented as

4    female (three) or non-binary (one).  The other four patients who

5    had stopped hormones continued to present as trans (two women,

6    two men):  One, who had experienced orchidectomy, had a record

7    of regret (no hormonal treatment currently, regrets gender

8    reassignment); one had a medical reason noted for stopping,

9    quote, problems with PV bleeding despite androgen; two had no

10   specific reason for stopping in their record, but it was

11   documented that they had stopped."

12       So I see a 20 percent stopping rate, but I don't see a

13   30 percent detransition rate anywhere in there.  Is this the

14   study you are talking about?

15   A.   Yes.  But, you know, I haven't read this study since it

16   came out.  And you've picked out one paragraph.  And perhaps we

17   could sit down and read it together and figure out whether I'm

18   right or wrong.  And if I'm wrong, I'm wrong by 10 percent.  The

19   point is, Ms. Cooper, the detransition for various reasons

20   happens.  If it happens in this clinic, we should assume it

21   happens in Arkansas and in Missouri and everywhere else.  And

22   the idea that people think it's a mistake is one of the things

23   I've tried to talk about this morning.  We can't be sure that a

24   14 or 15 or 17 year-old knows what his or her future is going to

25   be.  And if they cannot be prudent, we have to be prudent.  And

1   if the medical profession isn't prudent about this, isn't

2   careful, isn't aware of the limitations, I guess legislatures

3   make a decision.

4       So I'm just asking the medical profession to be prudent and

5   to know about the evolution of gender identity.  Even after it's

6   been solid during adolescence for three years or four years, it

7   doesn't mean that when you are 23 you don't think differently.

8   We must be prudent, and we must protect people sometimes against

9   things that we have reason to believe that a majority of people

10  may come to regret.  Now, you see the real question here is not

11  the Boyd study.

12  Q.   Well, I do want to stay on the Boyd study for a minute.  I

13  understand your point that detransition happens.  And that is

14  not the question I want to -- I'm not arguing about that.

15  A.   Good.

16  Q.   I'm asking about this 30 percent number that you testified.

17  I understand now you may be not standing by that 30 percent

18  figure?

19  A.   Yeah.  Maybe I'm going back to 20 percent.

20  Q.   Then, even the 20 percent you would agree is not a

21  representation of detransition, but it represents the number of

22  people who stop medical transition for various reasons, some

23  medical reasons and unknown reasons.  Correct?

24  A.   I don't think you are going to make compelling points in my

25  view by picking out one paragraph and not looking at the whole

1    thing.

2    Q.   You used the number 30 percent, and this appears to be

3    where it came from, so I need to pick it apart.

4    A.   I do not represent myself as infallible.  And my

5    statements, I can't imagine every statement is verifiable that I

6    ever make in my life.  I'm doing the best I can with my memory.

7    Q.   Fair enough.  It's not a memory test.  Looking at it here

8    now, though, you would agree that this study does not even say

9    20 percent detransitioned.  It says 20 percent stopped the

10   medical transition for various reasons.

11   A.   Well, can you tell what the denominator here is?

12   Q.   Well, 20 percent.  Twenty is a percentage.

13   A.   That requires a denominator.  What number of people are we

14   talking about?

15            THE COURT:  Twenty out of a hundred.

16            THE WITNESS:  That's not --

17   BY MS. COOPER:

18   Q.   41 is the N.  If you want to know the number, it's 41 I

19   think it says.  Four out of 41 were the ones who --

20   A.   Is 41 the denominator?

21   Q.   4 out of 41 detransitioned.

22   A.   So nine of 41 people stopped their hormones.  Is that what

23   you are saying?  So we do that math.  9 of 41.

24   Q.   Twenty percent stopped.

25   A.   It's over 20 percent.

1   Q.   Stopped hormones?

2   A.   Yeah.

3   Q.   I just want to be clear, though, that doesn't represent

4   detransition.  It represents stopping hormones for a variety of

5   different reasons.

6   A.   And I want to be clear.  I want to be clear that you don't

7   know it doesn't represent detransition.  It means stopping

8   hormones.  Why does a person stop hormones?

9   Q.   Well, it says right here problems with bleeding despite

10  androgen, and two had no specific reasons.  You don't understand

11  people stopping hormones besides detransition?

12  A.   What are you quizzically asking?

13  Q.   Do you think the only reason somebody who is on hormone

14  therapy for gender dysphoria would stop treatment, that the only

15  reason would be because they detransitioned?

16  A.   No.  Some stop because they get hypertension.  Some stop

17  because they get obese.  Some stop because they get blood clots.

18  Some stop because their hemoglobin levels go way up and they are

19  threatened with stroke.

20  Q.   But they may still maintain their trans identity.  Correct?

21  A.   And, of course, if that would happen to a person, that

22  would make them rethink everything.

23  Q.   I think we can put this study aside, and just a couple of

24  questions.  Prior to this case, you had never heard of Mark

25  Regnerus.  Correct?

1    A.    Mark who?

2    Q.    Regnerus.

3    A.    Regnerus?

4    Q.    R-e-g-n-e-r-u-s.  It sounds like you still may not know who

5    he is.  Is that correct?

6    A.    I don't remember who he is.

7    Q.    And prior to this case, you didn't know who Patrick Lappert

8    is.  Correct?

9    A.    That name is more familiar, but I can't, yes.

10   Q.    You don't know who he is?

11   A.    I don't remember.

12          MS. COOPER:  Just a moment, please.

13        Pass the witness.

14                      REDIRECT EXAMINATION

15   BY MR. CANTRELL:

16   Q.    Dr. Levine, do you still have the binder in front of you?

17   A.    Yes.

18   Q.    If you would, turn to tab 9.  This should be the French

19   National Academy of Medicine document that Ms. Cooper was asking

20   you about earlier.

21   A.    Yes.  It's in front of me.

22   Q.    And I want to direct your attention, if you can see here,

23   to the third paragraph.

24   A.    Uh-huh.

25   Q.    If you will read with me, it says, "Whatever the mechanisms

1   involved in the adolescent, overuse of social networks, greater
2   social acceptability, or example in the entourage, this
3   epidemic-like phenomenon results in the appearance of cases or
4   even clusters in the immediate surroundings.  This primarily
5   social problem is based, in part, on a questioning of an
6   excessively dichotomous vision of gender identity by some young
7   people."  Did I read that correctly?
8   A.    You, too, read very well.
9   Q.    Thank you.  And moving down --
10          THE COURT:  What's the question other than what you
11   read to him, Mr. Cantrell?  Did you read it correctly is not
12   really a question of this witness.
13          MR. CANTRELL:  Well, Your Honor --
14          THE COURT:  I'm not going to let you read to him and
15   then ask him if you read that correctly like on
16   cross-examination.  What is your question of this witness?
17          MR. CANTRELL:  Well, Your Honor, Ms. Cooper read
18   several passages.
19          THE COURT:  Right.  But you don't just get to read to
20   me and ask him if you read that correctly.  That's not a
21   question and is probably the definition of a leading question,
22   which I'm not going to go into now.  But I'm not going to have
23   you just read parts of this to me and ask him "did I read that
24   correctly?"  What's your question to this witness about this
25   material?

1    BY MR. CANTRELL:

2    Q.    Okay.  Dr. Levine, here's my question.  Dr. Levine, Ms.

3    Cooper's line of questioning would give the impression that the

4    French National Academy of Medicine was not quite as concerned

5    as you had previously testified was the case.  Do you have

6    anything in response to say?

7    A.    Well, that paragraph, I think, telling you that the French

8    National Academy is concerned about the social origins of

9    this -- and they went on a limb and said what they thought some

10   of the social origins and social forces actually were.  Given

11   the fact that the National Academy of Medicine of France thinks

12   that this is socially constructive for many of these children,

13   for the majority of these children, that they go on to urge

14   caution, they are also saying there may be some cases that

15   deserve or justify the use of hormones, but the social forces

16   that are shaping this in epidemic proportion makes people, makes

17   the doctors of France, should make the doctors of France prudent

18   and careful.  That's all.  That's what I understand that

19   paragraph to mean.

20   Q.    Dr. Levine, is that further reflected when you look down to

21   the next-to-last paragraph on this page, where it's referring to

22   "a great medical caution must be taken in children and

23   adolescents, given the vulnerability, particularly

24   psychological, of this population and the many undesirable

25   effects, and even serious complications, that some of the

1    available therapies can cause"?

2    A.    Yes.   In answer to the previous question of Ms. Cooper, I

3    listed some of the serious medical complications.   Those are

4    just the psychological complications.   So I use the word

5    "prudent."   The French translate their word for caution.

6    Prudent and caution to me are synonyms, you know.   It also says

7    in that paragraph that Sweden has banned the use of hormone

8    blockers, which was different than what I was led to believe by

9    Ms. Cooper.

10   Q.    Ms. Cooper also asked questions concerning, I believe, the

11   possibility of clinical trials taking place in Arkansas.   Are

12   you familiar with any clinical trials that are taking place in

13   Arkansas or planned to take place in Arkansas?

14   A.    I'm not familiar, nor have I heard of that.   A clinical

15   trial, that has to be prospective.   You know, to begin with

16   certain patients, put them in different groups and then follow

17   them for a number of designated years with predetermined outcome

18   measures and definitions of primary and secondary outcomes that

19   we're going to focus on when we evaluate the people and follow

20   up is a very expensive thing.   It requires usually federal

21   funding or some big funding source like the Gates Foundation

22   that has billions of dollars.   It's a lifelong project really

23   for the original investigators because you are going to have to

24   study people for ten years or more.   Those are tough studies to

25   do.   They are very expensive, but they are vital studies to do.

1        MR. CANTRELL:  If I can have a moment, Your Honor.

2        THE COURT:  You may.

3        MR. CANTRELL:  Nothing further, Your Honor.

4        MS. COOPER:  Your Honor, if I may do one question on

5    recross.  If we can put up the French National Academy document

6    again.

7                        RECROSS-EXAMINATION

8    BY MS. COOPER:

9    Q.    I believe, Dr. Levine, you testified just now on redirect

10   that Sweden bans or that France in this National Academy of

11   Medicine document said that Sweden bans puberty blockers.  But I

12   want you to read with me here the bottom full paragraph

13   highlighted -- thank you -- starting with "In this respect, it

14   is important to recall the recent decision (May 2021) of the

15   Karolinska University Hospital in Stockholm to ban the use of

16   hormone blockers."  Is that what you were referring to?

17   A.    Yes.

18   Q.    So that's one hospital, right, not a Swedish national

19   policy, just to clarify.

20   A.    That's the -- the Karolinska Institute is the premiere

21   hospital.

22   Q.    Right.

23   A.    The world-renowned hospital.  And there must be a

24   relationship between the review board and this clinic because

25   they wanted all the research to be done at the Karolinska.

1   Q.   I understand you are speculating about the connection

2   there.  But the national review board of Sweden did not ban

3   blockers.  Correct?  We talked about that before.

4   A.   If Karolinska blocked blockers and if Karolinska is the

5   primary site for the Swedish people to get gender-affirming

6   care --

7   Q.   Is it your understanding that's the only place you could

8   get gender-affirming medical care if you are a minor in Sweden?

9   A.   I'm not sure.  Sweden is a small country compared to the

10  United States.  Those countries tend to create clinics like the

11  Portman Clinic in the UK that funnel these patients to the

12  centers of excellence, the centers of study.

13  Q.   But you don't know how it's done in Sweden?

14  A.   I don't know for sure how it's done in Sweden.  I do know

15  Sweden, we're very concerned about the suicide rates of their

16  transgender population.  The last report I had, it was

17  3.5 percent higher than the general population.

18  Q.   I lied.  I have a second question, if that's okay, related

19  to the same topic.  I would like to put up another document, the

20  Swedish national report that we have discussed.  This is, for

21  reference, DX17.  This is the Swedish report you were discussing

22  earlier.  Correct?

23  A.   The translation of it?

24  Q.   The English translation.  If we can scroll, if you can look

25  at the first highlighted paragraph with me.  "To minimize the

1    risk that a young person with gender incongruence later will

2    regret a gender-affirming treatment, the NBHW deems that the

3    criteria for offering GnRH analog and gender-affirming hormones

4    should link more closely to those used in the Dutch protocol,

5    where the duration of gender incongruence over time is

6    emphasized.  Accordingly, an early childhood onset of gender

7    incongruence, persistence of gender incongruence until puberty

8    and a marked psychological strain in response to a pubertal

9    development is among the recommended criteria."

10        I'm sorry.  I'm reading the wrong paragraph.

11        Apologies.  I'm going to read the highlighted second

12   paragraph.  "To ensure that new knowledge is gathered, the NBHW

13   further deems that treatment with GnRH analogs and sex hormones

14   for young people should be provided within a research context,

15   which does not necessarily imply the use of randomized

16   controlled trials, RCTs.  As in other healthcare areas where it

17   is difficult to conduct RCTs while retaining sufficient internal

18   validity, it is also important that other prospective study

19   designs are considered for ethical review and that register

20   studies are made possible.  Until a research study is in place,

21   the NBHW deems that treatment with GnRH analogs and sex hormones

22   may be given in exceptional cases, in accordance with the

23   updated recommendations and criteria described in the

24   guidelines."  This is the requirement or provision in the

25   Swedish national report.  Correct?

1  A.   Correct.

2  Q.   Okay.  Thank you.  Nothing else.

3          MS. TEMPLIN:  Judge, if you are ready to proceed to

4  the next witness, we would call Dr. Patrick Lappert.

5          THE COURT:  Are we going to be able to finish that

6  witness before five o'clock?

7          MS. TEMPLIN:  I could try and get through at least a

8  good chunk of mine.  I don't know about cross.

9          THE COURT:  We're starting at eight o'clock on another

10  witness, right, Mr. Jacobs?

11          MR. JACOBS:  That is the plan, Your Honor.  Can we

12  have a moment to chat about the schedule with Dr. Lappert?

13          THE COURT:  Sure.

14      (Brief recess.)

15          MR. JACOBS:  So given how late in the day we are, I

16  don't think there's any way we could finish with Dr. Lappert

17  today without going forever.  So I think what we would propose

18  is to go ahead and adjourn for today, start with Regnerus

19  tomorrow in the a.m.  I think, if we start close to 8 a.m., it's

20  very likely we could be done by like one or whenever the Court

21  wants to break for lunch.  That may be ambitious, but I think

22  it's pretty close.

23          THE COURT:  With Zoom?

24          MR. JACOBS:  Yeah, with the Teams meeting and be done

25  with that.  Then Dr. Lappert will go after Dr. Regnerus

1    tomorrow.  So he's willing to change his travel.

2              THE COURT:  How long do you anticipate him going?

3              MR. JACOBS:  Dr. Lappert?

4              THE COURT:  Yes.  Witness two tomorrow after the Zoom,

5    because we're talking about going until one, taking a lunch

6    break, then we're at two.

7              MS. TEMPLIN:  Your Honor, it's not going to take me

8    three hours with Dr. Lappert.  I'm not sure how long plaintiffs

9    have planned on cross.  I certainly from my end can anticipate

10   being done by five.

11             MR. JACOBS:  If I had three hours with Dr. Regnerus, I

12   would be very surprised if I had that long with him.  When I say

13   done by one, now that I'm thinking about it, I could probably

14   push that down to noon realistically maybe.

15             THE COURT:  My point is, if y'all are done with this

16   witness at five tomorrow, then we're going into the following

17   day with him also.  So checking with his availability tomorrow

18   does no good.

19             MS. TEMPLIN:  No, Your Honor.  I anticipate both sides

20   could possibly be done by five depending on the length of cross.

21   I certainly do not plan to spend three hours on direct

22   examination.  From two, it would not take me until five to do

23   direct examination.

24             THE COURT:  I misheard you.  I thought you said you

25   would be done by five.

1          MS. TEMPLIN:  Apologies.

2          MR. JACOBS:  That's what we would suggest.  Dr.

3    Lappert is willing to change around his travel to make that

4    work.  I think we went a little bit longer with Dr. Levine than

5    we anticipated.  We hoped to be able to do both today.  So long

6    as the Court has tomorrow afternoon available, so long as

7    there's not any objections on that end, I think we could switch

8    those and get everything done.

9          THE COURT:  The only thing I have in my week that's in

10   y'all's way is the one o'clock 30 minute and the two o'clock 30

11   minute on Wednesday, then the noon hour on Thursday.

12         MR. JACOBS:  Neither of those will be problems on our

13   end, Your Honor.  If that's acceptable to everybody, I think we

14   will proceed with Dr. Regnerus tomorrow when we get everything

15   set and then proceed with Dr. Lappert.

16         THE COURT:  If we get both of them done tomorrow, how

17   late do you anticipate going on Thursday?

18         MR. JACOBS:  On Thursday, Your Honor, it could be a

19   full day on Thursday.  I just don't know whether it's going to

20   be sort of an early day out on Thursday or not at this point.

21         THE COURT:  I'm just curious.

22         MR. JACOBS:  Regardless of this, we'll still be

23   totally done on Thursday with our witnesses.  That won't impact

24   this at all.

25         THE COURT:  All right.  Court is in recess until

1    eight o'clock tomorrow.

2              MR. JACOBS:  Yes, Your Honor.

3         (Overnight recess at 4:19 p.m.)

4                    REPORTER'S CERTIFICATE

5       I certify that the foregoing is a correct transcript from
    the record of proceedings in the above-entitled matter.

6

7    /s/Elaine Hinson, RMR, CRR, CCR      Date:  December 4, 2022.
    United States Court Reporter

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25