1          IN THE UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF ARKANSAS
2                    CENTRAL DIVISION

3   DYLAN BRANDT, et al.,

4                    Plaintiffs,
       v.                              No. 4:21CV00450 JM
5
                                       November 29, 2022
6                                      Little Rock, Arkansas
                                       8:03 AM
7   LESLIE RUTLEDGE, et al.,

8                    Defendants.

9        **TRANSCRIPT OF BENCH TRIAL - VOLUME 6**
          BEFORE THE HONORABLE JAMES M. MOODY, JR.,
10              UNITED STATES DISTRICT JUDGE
                 _____

11
    APPEARANCES:
12
    On Behalf of the Plaintiffs:
13
        MR. CHASE STRANGIO, Attorney at Law
14      MS. LESLIE COOPER, Attorney at Law
        MR. JAMES D. ESSEKS, Attorney at Law
15          American Civil Liberties Union
            125 Broad Street, Suite 1800
16          New York, New York  10004-2400

17      MS. BREEAN WALAS, Attorney at Law
            Walas Law Firm, PLLC
18          Post Office Box 4591
            Bozeman, Montana  59772
19
20      MR. AVIV S. HALPERN, Attorney at Law
        MS. LAURA KABLER OSWELL, Attorney at Law
21          Sullivan & Cromwell, LLP
            1870 Embarcadero Road
22          Palo Alto, California  94303

23

24  Appearances continuing...

25

```
 1

 2    APPEARANCES CONTINUED:

 3    On Behalf of the Plaintiffs:

 4        MR. ARUN BODAPATI, Attorney at Law
          MS. LAUREN M. GOLDSMITH, Attorney at Law
 5          Sullivan & Cromwell, LLP
            125 Broad Street, Suite 2424
 6          New York, NY 10004-2498

 7        MR. DANIEL J. RICHARDSON, Attorney at Law
            Sullivan & Cromwell LLP
 8          1700 New York Avenue
            Washington, DC 20006
 9
          MR. GARY L. SULLIVAN, Attorney at Law
10          ACLU of Arkansas
            Legal Division
11          904 West 2nd Street, Suite One
            Little Rock, AR 72201
12
          MS. SHARON ELIZABETH ECHOLS, Attorney at Law
13          Gill Ragon Owen P.A.
            425 West Capitol Avenue
14          Suite 3800
            Little Rock, AR 72201-2413
15

16    On Behalf of the Defendants:

17        MR. DYLAN JACOBS, Attorney at Law
          MR. MICHAEL CANTRELL, Attorney at Law
18        MS. AMANDA LAND, Attorney at Law
          MS. HANNAH TEMPLIN, Attorney at Law
19          Arkansas Attorney General's Office
            323 Center Street, Suite 200
20          Little Rock, Arkansas  72201

21

22

23        Proceedings reported by machine stenography.  Transcript
      prepared utilizing computer-aided transcription.
24

25
```

Karen Dellinger, RDR, CRR, CCR
United States Court Reporter
Karen_Dellinger@ARED.uscourts.gov (501)604-5125

```
1        INDEX - VOLUME 6 (11/29/22)

2  WITNESSES FOR THE DEFENDANTS:   Direct   Cross   Redirect   Recross

3  DANIEL REGNERUS              970,979   1025     1033

4  PATRICK LAPPERT           1037,1043   1080     1081

5

6  VOIR DIRE BY PLAINTIFFS:

7  DANIEL REGNERUS                   972

8  PATRICK LAPPERT                  1040

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1          (Proceedings continuing in open court at 8:03 AM.)
 2          MR. JACOBS:  I think just briefly before we get
 3  started with Dr. Regnerus, the parties conferred in advance of
 4  Thursday regarding closings, and I think we've both agreed that
 5  if the Court's amenable to it, we would just not have closing
 6  arguments and instead just submit proposed findings of fact and
 7  conclusions of law at some point after the close of trial and
 8  discuss schedule wise.  We just wanted to raise that just for
 9  scheduling purposes.
10          THE COURT:  Suits me.  What does that do to the
11  schedule?
12          MR. JACOBS:  I don't think -- well, we'll still
13  finish on Thursday.
14          THE COURT:  I guess that's what I'm asking.
15          MR. JACOBS:  Yeah, we just won't have to stay any
16  later than we otherwise would to do arguments.
17       So Defendants would call Dr. Regnerus.  Are we ready to
18  go?
19          THE COURT:  Doctor, can you hear me?
20          THE WITNESS:  I can.  Can you hear me?
21          THE COURT:  I can.  Would you raise your right hand?
22       DANIEL REGNERUS, DEFENDANTS' WITNESS, DULY SWORN
23          THE COURT:  I'm not sure what camera to look into,
24  so y'all are free to proceed.
25                    DIRECT EXAMINATION
```

```
1   BY MR. JACOBS:
2   Q     Dr. Regnerus, does it help if I have my video on, or my
3   screen on for you to look at?
4   A     I think so.
5   Q     Okay.  I can turn it off if it's distracting.  Can you
6   state and spell your name for the court reporter?
7   A     My name is Mark Regnerus.  Spelled M-a-r-k
8   R-e-g-n-e-r-u-s.
9   Q     What is your profession?
10  A     I'm a professor of sociology.
11  Q     And how long have you been a sociologist?
12  A     Like, I started training for it in 1994 and then employed
13  as a sociologist since 2001.
14  Q     What is it that sociologists do?
15  A     They study the influence of mostly structures on human
16  behavior and also development of those social structures and
17  how they influence the course of our lives and vice versa.
18  Q     And do sociologists do that through performing research?
19  A     We do.
20  Q     Have you conducted research yourself?
21  A     I have.
22  Q     What are some of your research areas?
23  A     I began as a sociologist for religion, and I still dabble
24  in that a little bit, but not that much.  I primarily study
25  relationship behavior, romantic and sexual relationship
```

Regnerus - Direct

1    behavior, and to some extent, marital and decision making,

2    things like that.

3    Q      Has your work been published?

4    A      Yes.

5    Q      As part of your work as a sociologist, are you familiar

6    with the principles of study design and methodology?

7    A      Yes.

8    Q      Does your expertise include critically evaluating

9    research?

10   A      Yes, I do that sometimes in reviews for journalists.

11   Sometimes I do that when I'm teaching research methods.  And

12   I've published at least one study, perhaps more, and some

13   essays critically evaluating research conclusions of methods of

14   others.

15          MR. JACOBS:  Your Honor, similar with Dr. Levine, if

16   there's not going to be any voir dire of the witness, I think

17   we'll just rest on his CV and move on to the rest of the

18   questioning.

19          MR. RICHARDSON:  Your Honor, Plaintiffs don't object

20   to Professor Regnerus's training in sociology, but based on his

21   reports in this case, we do have concerns first that he will

22   testify about matters outside of sociology and, second, that

23   his sociological opinions will be based on his assessment of

24   areas outside of his expertise like the quality of medical

25   evidence, so we would like to voir dire the witness.

```
 1              THE COURT:  Okay.

 2              MR. RICHARDSON:  Your Honor, would you prefer if I

 3    come to the --

 4              THE COURT:  I don't have a preference if the doctor

 5    can hear you wherever you are.  You just need your mic right

 6    there.

 7                    VOIR DIRE EXAMINATION

 8    BY MR. RICHARDSON:

 9    Q     Professor Regnerus, my name is Dan Richardson, attorney

10    with the plaintiffs.  Good morning or good evening where you

11    are.  You only have degrees in sociology, correct?

12    A     Yes, that's correct.

13    Q     So you don't have any degrees in medicine?

14    A     That's correct.

15    Q     How about psychiatry?

16    A     No.

17    Q     And psychology?

18    A     No.

19    Q     Your academic training did not include training on how to

20    diagnose or treat medical conditions; is that right?

21    A     That is correct.

22    Q     And it did not include training on how to diagnose or

23    treat mental health conditions; is that right?

24    A     That is correct.

25    Q     Is it correct that you have no academic training at all
```

1   related to transgender healthcare or gender dysphoria?

2   A    Not in terms of a diagnosis or medical and psychological

3   side.  In terms of medical research, there's a fair amount of

4   medical research in this domain that well-trained social

5   scientists can evaluate.  I do not evaluate things that are

6   outside my purview.  I stick to statistics in this domain.

7   Q    Understood, but just to clarify, do you have any academic

8   training related to transgender healthcare or gender dysphoria

9   specifically?

10  A    No.

11  Q    So while you were working toward your academic degrees as

12  I understand it, there were courses offered about gender but

13  you just didn't take them; is that right?

14  A    That was not an interest of mine at the time, correct.

15  Q    So you did not take courses in gender even when they were

16  offered to you?

17  A    That was 20 years ago, but no.

18  Q    Have you ever conducted a clinical trial in medicine?

19       THE COURT:  Doctor, can you repeat your last answer?

20       THE WITNESS:  I have not in medicine.

21       THE COURT:  Doctor, from time to time I'm going to

22  ask you to repeat yourself because my court reporter is taking

23  down everything we say and she can catch some things and not

24  others so if you can just anticipate that.

25       THE WITNESS:  No problem.

1          THE COURT:  I might not be up in your grill as much

2     so you'll know why I'm doing that, but thank you.

3          THE WITNESS:  Sure.

4     BY MR. RICHARDSON:

5     Q     Professor, is it right that you've never submitted

6     research on the effectiveness of care for gender dysphoria to a

7     peer reviewed publication?

8     A     That is correct.

9     Q     Is it correct that you've never served as a peer reviewer

10    for any academic work involving gender dysphoria?

11    A     That I cannot recall.  If it was, it would be strictly to

12    the statistical side of things.

13    Q     But you don't recall any piece specific to gender

14    dysphoria that you peer reviewed?

15    A     Not specific.

16    Q     Am I correct that you've authored one peer reviewed

17    publication that discusses transgender people or gender

18    dysphoria?

19    A     In terms of peer reviewed publications, correct.

20    Q     And that piece is called *Attitudes in the U.S. Toward*

21    *Hormonal and/or Surgical Intervention for Adolescents*

22    *Experiencing Gender Dysphoria.*  Is that right?

23    A     Correct.

24    Q     That paper was a national survey of attitudes about

25    medical interventions to treat gender dysphoria, right?

Regnerus - Voir Dire by Mr. Richardson

```
1    A    Yes.
2    Q    So that paper did not address the effectiveness of
3    gender-affirming medical care?
4    A    No.
5    Q    And it does not address the safety of that care?
6    A    No.
7              THE COURT:  At some point we're getting past voir
8    dire into cross.
9              MR. RICHARDSON:  I just want to ask another question
10   about that specific paper for qualifications, Your Honor.
11             THE COURT:  Okay.
12   BY MR. RICHARDSON:
13   Q    As part of that research, did you interview or talk with
14   any healthcare providers who treat transgender youth?
15   A    Not that research.
16   Q    And apart from that one paper, you don't have any other
17   peer reviewed scholarship related to transgender people or
18   gender dysphoria?
19   A    Correct.
20   Q    So, instead, your research I think you put it this
21   morning is focused on religion, relationship behavior, and
22   marriage?
23   A    Yeah, I mean, sexual relationship behavior, basically.
24   Q    Okay.  It is not focused on gender dysphoria, right?
25   A    Not specifically.
```

1   Q    And it hasn't focused on transgender people?

2   A    They have come up as participants in the surveys and

3   control variables, data analysis, but not as, like,

4   interviewees.

5   Q    Your research is not focused on gender identity then

6   either, right?

7   A    Only, again, as a measure and further discipline models.

8   Q    You don't teach any classes related to gender identity,

9   right?

10  A    I don't.

11  Q    You don't teach any classes focused on gender dysphoria;

12  is that right?

13  A    Correct.

14  Q    Okay.  You don't have any experience working in the

15  clinic that provides gender-affirming medical care; is that

16  correct?

17  A    That is correct.

18  Q    Okay.  And clinicians don't contact you to consult about

19  the care they're providing, right?

20  A    No, although I have fielded phone calls with frustrations

21  about such care, but not as a consultant.

22  Q    So just to clarify, during those calls you were not asked

23  to provide views on how to provide gender-affirming medical

24  care?

25  A    No.

Regnerus - Voir Dire by Mr. Richardson

1   Q     And you haven't worked in a medical or mental health
2   clinical setting of any kind, correct?
3   A     No.
4   Q     So you would not know how clinics go about obtaining
5   informed consent?
6   A     Only by their own description of it.  It's not radically
7   different than how I obtain informed consent from participants
8   in my studies.  Probably a lengthier process, but I'm well
9   acquainted with the informed consent process in general.
10  Q     But you acknowledge that informed consent might be
11  different in the medical setting?
12  A     Sure.
13  Q     And what is your knowledge of informed consent in the
14  medical setting based on?
15  A     Reading materials.
16  Q     But no materials that you would have been peer reviewing
17  or publishing or teaching about, right?
18  A     No, no, it's a part of the building of the report for
19  this case.
20  Q     Okay.  And have you ever been part of a group that
21  established or revised a medical standard?
22  A     Medical standard, no.
23  Q     Thank you, Professor.
24        Your Honor, based on the witness's testimony, we would
25  ask you to limit his testimony to exclude certain topics.

1    Those would be --

2           THE COURT:  If he gets into those topics, I'll allow

3    you to object at that time and then I'll deal with them.  I'm

4    going to let you keep track of what you think is appropriate or

5    not and I'll deal with it on a question by question basis if

6    that suits you.

7           MR. RICHARDSON:  Understood.  Thank you, Your Honor.

8        (Recess at 8:16 AM.)

9                      REPORTER'S CERTIFICATE

10       I certify that the foregoing is a correct transcript of

11   proceedings in the above-entitled matter.

12

13   /s/ Karen Dellinger, RDR, CRR, CCR
     ----------------------------------      Date: December 4, 2022
14   United States Court Reporter

15

16

17

18

19

20

21

22

23

24

25

1           (Proceedings continuing at 8:27 a.m.)

2                   DIRECT EXAMINATION CONTINUED

3    BY MR. JACOBS:

4    Q.    Can you hear me, Dr. Regnerus?

5    A.    I can.

6    Q.    Can you explain what the term "sociology of science" is?

7    A.    It's when you take your methods and disciplinary tools you

8    have, and you train it on your own discipline and studying how

9    it operates.

10              COURT REPORTER:  I am having trouble hearing.

11              THE COURT:  Just do the best you can.

12   BY MR. JACOBS:

13   Q.    I will just ask that question over if that works.  So I

14   asked you if you could tell us what the term "sociology of

15   science" means.

16   A.    Sociologists take the tools of their discipline,

17   methodological skills, etc.  And they train it on the discipline

18   itself, the practice of sociological science.  And it seeks to

19   evaluate how this works and does it accomplish what it claims to

20   set out to accomplish.  Are there norms that seem distinctively

21   unscientific that are operative in the discipline.  Instead of

22   training on sociology, on family or religion, we just turn it

23   around and say, well, what is it like to do sociology?

24   Q.    What can sociology tell us?  What kinds of questions can it

25   answer about the medical treatment of gender dysphoria?

1    A.    We're not going to weigh in on treatment decisions per se.

2    But we could evaluate are they made evenly, what kind of

3    measures could they use and are measures comparable, especially

4    insofar as they are evaluating things that overlap with what

5    social scientists would collect.  For example, Professor Turban

6    does survey research like I do survey research.  So there's a

7    variety of us who can evaluate the kinds of measurements he uses

8    because they are similar to ours, the same thing with some of

9    the analytic models that are used in medicine.  There's often

10   sociologists brought in as analysts for medical data, especially

11   when comparing outcomes.

12        One of my best friends from graduate school, we both got

13   Ph.D.s in sociology from the same university.  And he goes off

14   to work in a medical center doing studies with doctors, and I go

15   off to an eastern university.  The skill set is the key in what

16   we use it.  We do not weigh in on things that we don't know

17   about.  We stick to our comments.

18   Q.    Are you familiar with the practice that some of the medical

19   field call gender-affirming treatments or gender-affirming care?

20   A.    Insofar as I've read about them, I think I'm familiar with

21   some aspects of them.  What I can tell, they can vary.  But, in

22   general, I understand the term.

23   Q.    What do you, in general, understand the term

24   "gender-affirming care" to encompass?

25   A.    I have a little feedback, but I think I understand the

1    question.  It is an approach that does give the patient a little

2    bit more authority in the process and purports to listen to the

3    patient and sort of lean in the direction performing the care

4    that they wish to receive if, in fact, they understand the

5    nature of their own condition.  So a little bit fewer barriers

6    to care and a little bit less concern about other comorbidities

7    that may be occurring in terms as barriers to delivery of care.

8             MR. RICHARDSON:  Objection, Your Honor.

9             THE COURT:  Doctor, let me interrupt you.  I'm not

10   sure you heard the question, or maybe the transcription is not

11   the same.  But the question was:  What do you, in general,

12   understand the term "gender-affirming care" to encompass?

13       Is that what you asked?

14            MR. JACOBS:  That was my question.  I was going to

15   sort of move on a little bit from that and just --

16            MR. RICHARDSON:  Sorry, Your Honor.  We would object

17   to Professor Regnerus's response to that question.  It goes

18   outside of his expertise.

19            THE COURT:  To what his understanding of

20   gender-affirming care is?

21            MR. RICHARDSON:  Well, his response got into how that

22   care is provided and diagnosed.

23            THE COURT:  I understand that his response was well

24   far afield of the question, and that's why I asked him if he had

25   heard the question.  So Mr. Jacobs said he was going to move on

1    from that.

2        I'm going to put it back in your lap, Mr. Jacobs, and let

3    you proceed.

4              MR. JACOBS:  Sure.

5    BY MR. JACOBS:

6    Q.   Dr. Regnerus, do you understand gender-affirming care to

7    include medical and surgical interventions for some patients?

8    A.   Yes.

9    Q.   And do you understand that the medical and surgical aspects

10   of gender-affirming care are some of the treatments that are

11   prohibited for minors under the SAFE Act, the law at issue in

12   this lawsuit?

13   A.   Yes.

14   Q.   In the work you've done in this case, what is your

15   understanding of the gender-affirming model of care's prominence

16   with practitioners of gender-related medicine today in the

17   United States?

18             MR. RICHARDSON:  Objection, Your Honor.  It goes

19   beyond the witness's expertise.

20             THE COURT:  I'm going to allow him to answer what his

21   understanding is, but he's probably going to have to lay a

22   foundation to go beyond what his understanding is.

23        Go ahead and answer the question, Doctor, if you can.

24             THE WITNESS:  Would you repeat the question?

25             THE COURT:  Repeat your question, Mr. Jacobs.

1  BY MR. JACOBS:

2  Q.   The question is what is your understanding of the

3  gender-affirming model of care's prominence with practitioners

4  of gender-related medicine today in the United States?

5           THE COURT:  Forgive me, but I'm not even sure I

6  understand the question.

7           MR. JACOBS:  I'll reword it.

8  BY MR. JACOBS:

9  Q.   Based on the work that you've done in this case, Dr.

10 Regnerus, is it your understanding that the gender-affirming

11 model of care is the more prominent approach to treating gender

12 affirming -- excuse me -- to treating gender dysphoria in minors

13 in the United States?

14          MR. RICHARDSON:  Objection, Your Honor.  Leading.

15          THE COURT:  I'm going to allow the leading.

16     Answer the question, if you can, Doctor.

17          THE WITNESS:  Yes.  My understanding, given the

18 reading about the affirmative care and model, is that it's

19 increasingly common.  But I have no absolute knowledge of that.

20 I know there's a significant debate about the affirmative care

21 model.  It seems to be increasing in prominence.

22 BY MR. JACOBS:

23 Q.   I want to shift gears a little bit.  Can you explain, as a

24 sociologist, what you understand the term "ideology" to mean?

25 A.   Ideology is sort of a belief system about the way something

```
 1   works.  It's easily sort of a grand system.  But it's largely
 2   restricted to beliefs and understanding of how something works
 3   and what would one often do.  It's an overarching belief system.
 4   Q.   Can you sort of offer us like a contrast of what you might
 5   mean to say when a decision is based on ideology rather than
 6   being based on science?
 7            THE COURT:  I'm not sure we need expert opinions on
 8   the difference between ideology.
 9        Doctor, is your definition of ideology any different than
10   the average lay person's definition of ideology?
11            THE WITNESS:  Probably not.
12            THE COURT:  Okay.
13            MR. JACOBS:  I'll move on from that, Your Honor.
14            THE COURT:  Thank you.
15   BY MR. JACOBS:
16   Q.   Have you used your training as a sociologist and that
17   background to assess the relationship between ideology and the
18   evolving treatment of gender dysphoria in the United States?
19   A.   Yes.
20   Q.   I want to ask about some of your observations.  Are you
21   familiar with the term "idealogical capture"?
22   A.   I am.
23   Q.   Could you describe your understanding of what that term
24   means?
25   A.   Idealogical capture is a series of authority.  Authority is
```

1    the successfully co-opting, particularly regarding professional

2    organizations, in order to serve the aims and ends of a

3    particular set of actors or, in this case, activists.  So it's

4    basically the co-opting of authority of a larger professional

5    organization to serve the interests of a particular group.

6    Q.   Have you observed the phenomenon of idealogical capture in

7    the course of assessing the treatment of gender dysphoria in the

8    United States?

9             MR. RICHARDSON:  Objection, Your Honor.  The witness

10   testified that he has no knowledge or background in

11   gender-affirming medical care for treatments for gender

12   dysphoria.

13            THE COURT:  Lay a foundation for the answer to that

14   question, Mr. Jacobs.  I need to know what he's basing his

15   answer on before I allow him to continue.

16            MR. JACOBS:  Maybe I'll break it down into smaller

17   parts then, Your Honor.

18            THE COURT:  Great.

19            MR. JACOBS:  I'll do it that way.

20   BY MR. JACOBS:

21   Q.   Is a part of what sociologists do to examine things like

22   the norms?

23            THE COURT:  I guess I'm more interested in what he's

24   done as opposed to what sociologists do.  What has he done in

25   preparation for that question I guess is what I'm trying to get

1    to.

2            MR. JACOBS:  I guess I was trying to lay a foundation

3    for the foundation, if that makes sense.

4            THE COURT:  Fair enough.

5    BY MR. JACOBS:

6    Q.    Is a part of what sociologists in general do to assess

7    social norms?

8          Can you hear me, Dr. Regnerus?

9    A.    No.  I didn't catch that last part.

10   Q.    Is it a part of what sociologists do -- excuse me.  Is

11   assessing social norms part of what sociologists do?

12   A.    Yes.  That's central to sociology.

13   Q.    And can that include things like language and terminology?

14   A.    Right, right.

15   Q.    Can you briefly describe what sociologists might analyze

16   about things like language and terminology when you are doing

17   work?

18   A.    Right, right.  In general or with regards to this case?

19   Q.    In general, just a little primer, I guess.

20   A.    Right.  So we look at sort of language changes, a

21   terminology change over time, and what it means and why it

22   happens and what it might signal for the future.  That's one

23   example.  Norms, we look at how behavior has changed over time

24   and does it signal changes in attitudes, changes in dominant

25   patterns of expected behavior, that sort of thing.

1  Q.    Going back to this notion of idealogical capture, might
2  that involve language or terminology becoming intertwined with
3  ideology?  And, if so, can you explain how?
4           MR. RICHARDSON:  Objection.  Leading.
5           THE COURT:  I'm going to allow it.
6           THE WITNESS:  Do you want me to give an example in
7  this case?
8  BY MR. JACOBS:
9  Q.    I was sort of asking as a general matter first if you can.
10 A.    You are asking for what?
11 Q.    Well, so let me ask in general.  So what exactly am I to
12 mean for terminology to be intertwined with ideology from the
13 perspective of a sociologist?
14 A.    How we even talk about something in sociology can sort of
15 reflect and also can change the course of the study of
16 something.  So when we talk about religion, for example, you
17 know, if we use the term "religiosity," just kind of a technical
18 measurement term, we know what we mean by that.  It doesn't mean
19 it percolates out into common parlance, but it can.  So there
20 can be a two-way relationship between what we study, what
21 sociologists see and write down.  And then it can turn around
22 and go out back and affect the people that we're studying, so
23 it's kind of a feedback mechanism.
24 Q.    Have you observed this in the context of gender dysphoria
25 and the treatment of gender dysphoria?

1            MR. RICHARDSON:  Objection, Your Honor.  The witness

2     testified that he has no experience in gender dysphoria or the

3     treatment for gender dysphoria.

4            MR. JACOBS:  Your Honor, the question is about

5     language.

6            THE COURT:  Where are we going with this, Mr. Jacobs?

7     I'm trying to figure out whether or not, one, this witness has

8     done any specific research on authority capture or whatever.

9     And I'm assuming that where it's going is that these various

10    groups that promote transgender have been co-opting this

11    authority as opposed to the flip side of that, which are the

12    organizations that are not promoting transgender authority.

13           But I've yet to see what this witness has done to put

14    co-opting of authority or idealogical capture, what he's done to

15    put that in the transgender context.  And you've given me your

16    primer, so thank you for that.  I kind of knew that part.  But

17    what I'm trying to do is find out what this witness has done to

18    study the relationship of idealogical capture as to this

19    question to transgender norms or whatever you want to put in

20    there.  And have you seen it isn't enough for me to allow him to

21    answer the question.  I need to know what he's done to answer

22    that question, because based on the voir dire, he hasn't done

23    much to associate the questions you are asking with transgender

24    in preparation of his testimony.

25           So that's what I was trying to get to is what has he done

 1   with regard to transgender research or evaluation that can allow

 2   him to answer that question, not like all of us in this room who

 3   either read the paper or other has seen stuff like that.  So I

 4   need to know what his expertise is going to do to help me answer

 5   my questions, and that's where I was headed with it.

 6             MR. JACOBS:  I think that was what I was intending to

 7   get out with that question, Your Honor.

 8             THE COURT:  Well, I need to know what he has seen, not

 9   has he seen it.  So we've all seen stuff, but we're not all

10   allowed to testify in this case.  So I need to know how his

11   experience or expertise is going to help me beyond the average

12   lay person if he's going to give his opinions on it.  So keep

13   trying, I guess.

14   BY MR. JACOBS:

15   Q.   So, Dr. Regnerus, do you have experience as a sociologist

16   examining norms of behavior and language and terminology?

17   That's my question.

18   A.   For this case, in my expert witness report, yes.

19             MR. RICHARDSON:  Objection, Your Honor.  We

20   established that he had not done any work on gender dysphoria.

21             THE COURT:  The question, as far as it went, was not

22   objectionable.  I understand you might think that's not enough.

23   But he hasn't asked another question yet, so I'm going to

24   overrule that objection.

25             MR. RICHARDSON:  Understood, Your Honor.  I just

1    wanted to note that he said it was only in preparation for this

2    litigation.

3    BY MR. JACOBS:

4    Q.    Just to clarify, outside of previously what you've done

5    prior to this litigation, setting aside the topic of gender

6    dysphoria, have you used your training as a sociologist to

7    assess things like social norms and language and terminology?

8    A.    Yes, yes.

9    Q.    What areas, you know, have you used the skill set in

10   throughout your career?  What subject areas?

11   A.    Right.  Relationship behavior norms, how people talk about

12   each other, sociology, religion.  I've written essays on some of

13   these subjects at hand based on observations of what's going on

14   broadly within the field as it can be discerned from journal

15   articles, from discussions of the field.

16   Q.    What are the methods that you've used to do that only

17   applicable -- I'm sorry.  Are the methods that you've used to do

18   that only applicable to those fields, or are they portable to

19   other fields?

20   A.    I don't know.  It's probably the sociology of science, how

21   people are asking questions, survey questions, interview

22   questions of the patterns and how people are interacting with

23   subjects, whether they are research subjects or patients.

24   Q.    And specific to research and conducting research, is there

25   any relationship between ideology and how research is conducted?

1   A.   Sure.  I mean, the way we ask questions often reflects with

2   what we think is true about a particular process, which can be

3   disputed.  Are you looking for examples?

4   Q.   No, not just yet.  And have you used the skill set to

5   analyze, for example, the language that has been used in the

6   debate and discussion concerning the treatment of gender

7   dysphoria in the United States?

8           MR. RICHARDSON:  Objection, Your Honor.  It goes

9   beyond the witness's expertise.  He testified he's applied his

10  expertise to other topics, not gender dysphoria.

11          THE COURT:  I'm going to let Mr. Jacobs finish his

12  question.

13          THE WITNESS:  Yes.

14          THE COURT:  Well, I'm not sure you didn't get

15  interrupted.

16      Would you restate your question, Mr. Jacobs?

17  BY MR. JACOBS:

18  Q.   Dr. Regnerus, have you used your training as a sociologist

19  and the methods we've been discussing to analyze the language

20  that's been used in the debate and discussion surrounding

21  medical treatment of gender dysphoria?

22  A.   I have.

23  Q.   And what have been the results of that analysis?

24          THE COURT:  Well, I need to know how he has done that

25  as opposed to going to the results.

1   BY MR. JACOBS:

2   Q.   Dr. Regnerus, could you sort of explain your work and

3   methodology, how you've gone about conducting that analysis?

4   A.   Right.  This was done by evaluating, especially on medical

5   journals and medical research in this area, is talking about the

6   subject matter, how they analyze data, how they collect data,

7   the measures they use, how they ask questions.  This is all

8   available in medical research that all of us can access.

9          THE COURT:  Doctor, when you refer to "they," who are

10  you talking about?

11         THE WITNESS:  Medical researchers and those who write

12  articles about medical research.

13         THE COURT:  Medical researchers in general or medical

14  researchers that deal with transgender questions?

15         THE WITNESS:  Right.  In this case, Your Honor, I

16  evaluated the later.

17         THE COURT:  That's all I wanted to know.  Continue.

18         THE WITNESS:  Yes, sir.

19         THE COURT:  I said continue.  I interrupted you for a

20  clarification.  If you are done, that's fine.  He can ask his

21  next question.

22         THE WITNESS:  Sure.

23         THE COURT:  But I didn't want to cut you off.

24         THE WITNESS:  No.  That's fine.

25  BY MR. JACOBS:

1  Q.   Just to clarify, were you finished with your answer, Dr.
2  Regnerus?
3  A.   I think I was.  Mostly evaluation of existing published
4  research.
5  Q.   What were your findings from your analysis?
6  A.   So there's a variety of terms that are being used and
7  employed, not just in public parlance, but they can be, but are
8  actually used in data collection processes in a way that,
9  frankly, they didn't used to be.
10       So one of the more common examples is the term "assigned at
11  birth," right, in particular, sex assigned at birth.  This is a
12  term that had its beginning probably within the last decade or
13  so.  Some people may have been talking about it a little bit
14  before then.  But it's a term that still doesn't exist on most
15  published social science and probably medical research, although
16  it is growing in frequency.
17       Obviously, there's some people who think, oh, this is a
18  perfectly fine way of asking about the sex of a person, right?
19  But it also indicates that there's a process going on here where
20  a physician or some particular authority comes alongside and
21  does the assigning of sex at the birth of the child, whereas a
22  very long time we used to understand sex is observed, right?
23  Sometimes it's observed in utero, when the doctor is getting a
24  pre -- an exam during pregnancy and says, "Oh, congratulations,
25  you are going to have a girl."  But now we talk about this, and

1  we actually put surveys in front of people that says "what sex

2  were you assigned at birth?"  I think most times people play

3  along with that.  But, you know, it's certainly recognizing

4  there is a particular value embedded in how we ask about that

5  question that signals something has changed about how we

6  understand sex and how it is measured.

7       So I used to just ask, you know, are you male or female?

8  And in rare cases people would make an exception for intersex

9  conditions.  Usually you capture the vast majority of the

10 population by asking about male, female.  Now I see surveys

11 doing a two or three part question to just getting at what used

12 to be understood as dimorphic sex, male or female.

13      That's one example of one measure out of a variety of

14 measures in this domain that to me signal the ideological

15 capture of even like the method by which we document basic

16 things.

17           MR. RICHARDSON:  Your Honor, we would object to that

18 portion of the answer that discussed medical research and the

19 terms used by medical scientists and practitioners.

20           THE COURT:  Overruled.

21 BY MR. JACOBS:

22 Q.   In the changing of language that you were just giving an

23 example of, how does that affect, or how might that affect how

24 research is conducted, the questions that are asked and the

25 results that are, you know, obtained from research?

1    A.    Right, right.  So there's certain pressure put on people to

2    -- scholars, I should say, researchers, to change how they ask

3    the questions like the one I just gave.  That signals to

4    scholars, oh, do I change the way I ask about this question and

5    have for decades, or do I stay put and ask it in the way I wish

6    to?  The whole thing creates tension, professional tension,

7    often.  You will see guidance from organizations suggesting that

8    we change the way we ask about sex.  So that's an example of the

9    sort of capture of authority.  And then researchers have to

10   figure out what am I signaling when I change the way I ask a

11   question, right?

12         Another example is the use of the term "cisgender."  I

13   remember when I first heard that 10, 15 years ago, I thought,

14   wow, that probably won't catch on.  But to some extent it has,

15   but it's not in popular parlance.  But it's certainly increasing

16   in frequency in researchers' parlance, certainly in legal

17   parlance too as far as I can tell.  And, you know, it's not a

18   neutral term.  It kind of indicates and portrays that some

19   situation, some social situation that's common to persons, has

20   changed and that there's a new way to talk about something, and

21   not just talk about something, but something has changed in the

22   social world which is better reflected than using the new term,

23   right, according to some.  There's theological conflict over the

24   very words we use in this domain.

25         Another example, non-binary.  When you are talking about

```
 1   sexual dimorphism, male, female, then relatively recently we
 2   sort of inserted the language around non-binary.  This happens
 3   outside of medical research as well.  This is in social
 4   research.  So, you know, that's not really a question of sex, is
 5   it, or is it?  So it creates confusion for researchers about,
 6   well, do I need to measure this?  Do I need to add categories to
 7   my list of sex categories, or do I create another question for
 8   gender?  So even kind of documenting basic, or at least ideas
 9   that were long considered basic, take on this sort of
10   idealogical charge and meaning because we use new terms, right?
11   Q.   I'm going to shift gears just a bit.  As a sociologist,
12   have you studied or analyzed how groups and organizations debate
13   a known consensus on topics?
14   A.   Uh-huh.
15   Q.   I'm sorry.  If you answered the question, I didn't hear
16   your answer.
17             THE COURT:  He said:  Uh-huh.
18             THE WITNESS:  I didn't catch the last part of the
19   question.  Sorry.
20   BY MR. JACOBS:
21   Q.   As a sociologist, have you analyzed how groups and
22   organizations might debate issues and build consensus on topics?
23   A.   Yes.
24   Q.   For this case, have you analyzed the growing consensus
25   concerning gender-affirming care or gender-affirming treatments
```

1    for gender dysphoria in minors?

2    A.    By my read of what's being said publicly within the field

3    and what's discernible in research print.

4    Q.    Just to clarify, I think I asked have you done it, have you

5    done that, not how have you done that.

6    A.    Yes.

7    Q.    Yes.  Okay.  And this may repeat a little bit.  But how

8    have you gone about doing that in this case?

9    A.    That's what I was mentioning.  By observing, reading fairly

10   widely about publicly discernible debates that are going on

11   within the medical community insofar as they are published,

12   either in long form or in research articles, letters to the

13   editor, letters of concern to journals, that sort of thing.

14   Q.    Have you observed a change over time in the discourse

15   related to this consensus of prominence of gender-affirming

16   care?

17              MR. RICHARDSON:  Objection, Your Honor.  It goes

18   beyond the witness's expertise.

19              THE COURT:  I'm going to allow him to testify that

20   based on what he's read, either old or new, how he thinks it's

21   becoming more prevalent or not is what I understand the question

22   to be.  So I'm going to allow him to testify based on what he's

23   seen does he think it's more prevalent or not.

24              THE WITNESS:  Yeah.  There's certainly been a shift in

25   the debate as concerns what's called the Dutch protocol, which

1    by popular reading of it concerns being aware of and concerned

2    about --

3              THE COURT:  Doctor, let me interrupt you.  That's not

4    what I understood the question to be.  I understood it to be do

5    you find it to be more widely discussed, or whatever you want to

6    say, based on your reading, not some analysis of the Dutch

7    study.

8              THE WITNESS:  Right.  I'm not particularly talking

9    about how the Dutch study works, just it has become less

10   prominent, and affirmative care seems to have been growing.

11   Yet, there's signs of debate and contest about what's the right

12   thing to do.

13             THE COURT:  Doctor, let me interrupt you.  That's a

14   different question.  So what is your answer to whether or not

15   your review of the documentation seems to make this topic more

16   prevalent or not?

17             THE WITNESS:  It does seem to be more debated.

18   BY MR. JACOBS:

19   Q.   Have you analyzed the influence of professional medical

20   organizations in the United States on this debate?

21   A.   I have analyzed their public statements, often published in

22   journals.

23   Q.   Can you describe your observations on the role of those

24   organizations and the discussion and talk of consensus about

25   gender-affirming care?

1          THE COURT:  Mr. Jacobs, I'm not sure -- again,

2    sometimes I know where people are going, and other times I

3    don't.  I don't understand the question you are asking this

4    witness.

5          MR. JACOBS:  It might have been a bad question.

6          THE COURT:  No.  Help me understand what the question

7    to the witness is.  I mean, you asked him what the role of these

8    organizations was, and I'm not sure what organizations you were

9    talking about or how he would know what their role is any more

10   than you and I would.

11         MR. JACOBS:  Let me perhaps rephrase this into

12   something more understandable.

13         THE COURT:  I mean, if that's what you are asking him,

14   what organizations are you talking about, and what is their

15   role, I get that question.  But I feel that you are headed

16   somewhere else with it maybe because I'm thinking that's too

17   simplistic.

18         MR. JACOBS:  Well, I think that was sort of more of a

19   foundation question to get into more.

20   BY MR. JACOBS:

21   Q.   So when I say American professional medical organizations,

22   Dr. Regnerus, what do you understand those organizations to be?

23   A.   Like the American Academy of Pediatrics, the American

24   Medical Association, the American Psychological Association,

25   Endocrine Society.

1    Q.    You don't have to list all of them.  But those are the

2    types of organizations that you understand that term to mean?

3    A.    Right.

4    Q.    And in the course of your work analyzing the discussion and

5    debate concerning gender-affirming care, what have you seen as

6    the role of those professional organizations?

7    A.    They seem to be -- they offer guidance.  They offer

8    standards of care, suggestions, short of rules, so far as I can

9    tell, from the outside.  And then, you know, I observe how

10   people react to that, for example, the American Academy of

11   Pediatrics stating their new guidance.  I think it was in 2017.

12   And kind of some of its more popular concern about the American

13   Academy of Pediatrics had a lot of pediatricians in the United

14   States wondering where the new guidance came from and who wrote

15   it and what was the decision-making process by which that

16   guidance came to be.

17   Q.    Have you observed a consensus among these professional

18   organizations in the United States specifically concerning

19   gender-affirming care?

20   A.    On some of them they seem to endorse gender-affirming care.

21   At the same time, there is, you know, there's a lot of conflict

22   over whether the consensus was legitimate or settled too soon

23   and how in part the research consensus came to be, also how the

24   guidance came to be.  So all of these domains, especially in

25   this area of health, seem to play out in the public sphere more,

1    say, than they would for, you know, oncology, for example.

2    Q.    Are you familiar with the term Castro consensus?

3    A.    I am.

4    Q.    Could you explain what that means?

5    A.    Right.  A Castro consensus occurs when consensus is viewed

6    as a proxy for truth.  It's not the same as the truth, but it's

7    a consensus means this is true.  It depends on whether the

8    consensus was arrived at by independent evaluation, free

9    evaluation, free from any sort of strong norms or suggestions

10   like so that people can be free to sort of find where the data

11   lead.  That's how we get to good consensus.  Castro consensus is

12   when it looks likes it's not free, it's not independent, it's

13   the result of sort of a forced consensus.  And that truth

14   becomes whatever the consensus says it is.

15   Q.    Is it your opinion that this phenomenon has occurred in the

16   debate discussion about the treatment of gender dysphoria?

17            MR. RICHARDSON:  Objection, Your Honor.

18            THE COURT:  Sustained.  You haven't laid any

19   foundation that he's done any studies on that this phenomenon

20   even exists in this field or how it's affected people's minds.

21   So, short of that, I'm going to sustain the objection.

22   BY MR. JACOBS:

23   Q.    I'll back up.  Is it part of your training and background

24   in sociology and the sociology of science to question consensus

25   and analyze whether a Castro consensus exists in a field?

1    A.   We don't often label it as a Castro consensus, but the idea

2    is certainly present.  In the area I worked in for some time,

3    the study of adult/child outcomes, the mothers and fathers who

4    had been in same sex relationships, which plaintiffs' attorneys

5    will remember, there was sort of a Castro consensus at work in

6    that field where even before lots of good data collection and

7    sort of random studies, actually representative studies had come

8    in, there was already kind of this consensus forming that there

9    was no differences between children who grew up in one kind of

10   household as opposed to another kind of household.  There were

11   sociologists who analyzed at a macro level this data, including

12   that, yes, there's consensus here.  I didn't really dispute that

13   there was a consensus.  I disputed whether the consensus was

14   free and not sort of the result of wide agreement short of

15   rational science, so it felt like that was a proxy for truth.

16   And I thought it was false.

17   Q.   So in that case, what sort of methods or approach did you

18   take going about to determine whether there was a legitimate

19   consensus that existed?  What sorts of things did you do?

20   A.   Well, I didn't undertake that.  I observed it in the

21   language which social scientists used about that subject, the

22   study.  And there was a well trafficked article probably eight

23   or nine years ago that talked about consensus in this and used

24   sort of the conclusions of a variety of studies to build the

25   idea that, ah, since these studies say this is the case, then we

1    have consensus.  You know, the truth in this area should not be

2    built on consensus.  It should be built on a wide variety of

3    studies using methods appropriate to the subject of study and

4    building complexity, not the race to complexity.  I mean, I

5    think that's important for people to document basic associations

6    and then build in complexity.  In that domain there was a rush

7    to complexities, which to me I thought they were hiding

8    something.  They don't want to hide anything if they are trying

9    to generate a bona fide widely shared free agreement as a

10   consensus.

11   Q.   So turning back to this case and gender-affirming care, how

12   did you go about analyzing the consensus and determining what

13   that was based on?

14   A.   That's based on a read of the sort of widely popular

15   discussions of affirmative care and research around it and

16   discussions of support for it, concerns about it, concerns about

17   it outside of that research in a medical domain, concerns about

18   it within that research in a medical domain, to suggest that any

19   sign that there is wide agreement in this domain to me read as

20   if it was artificially created and that there was a lot more

21   dissent, obvious dissent, dissent playing out in the national

22   newspapers of the United States than sort of supporters of

23   affirmative care were letting on.

24         MR. RICHARDSON:  Your Honor, we would object to that

25   answer.  He testified that part of his opinion was based upon

1  his review of medical research, and earlier he testified he has

2  no relevant experience in medical research.

3          THE COURT:  I'm going to allow it.

4  BY MR. JACOBS:

5  Q.   Have you observed any trends over time in the discussion

6  regarding the consensus toward gender-affirming care?

7  A.   Well, I just mentioned a little bit sort of this trend

8  towards disputes in domain being carried out in popular print.

9  It seems like there's far more of a power struggle going on, as

10 is apparent by reading about the field, than --

11         THE COURT:  Doctor, who is the power struggle between?

12         THE WITNESS:  So far as I can tell, it's different

13 wings of the affirmative care.

14         THE COURT:  What do you mean by different wings of the

15 affirmative care?

16         THE WITNESS:  Different doctors.

17         THE COURT:  Who is -- let me finish my question.  Who

18 is in opposition to the American Pediatric Association or the

19 Endocrine Society or whatever the number of groups that you were

20 referencing?  I understand that you are saying they come to a

21 Castro consensus or whatever that word means.  We've talked

22 earlier about language and short terms for things.  And I

23 understand that, rather than give a paragraph explanation of

24 what the Castro consensus means, we just come to a short term or

25 a shorthand version of that word like cisgender instead of

1    explaining all of what that means.

2        But what I'm trying to do is, when you say there's a

3    conflict, I've heard you talk about who is in favor of it.  Who

4    is opposing these groups based on your reading and research,

5    because, I mean, if there's conflict, I'm just trying to see who

6    is at war.

7            THE WITNESS:  So the consensus, there are people who

8    think this kind of treatment should not be conducted on minors.

9            THE COURT:  And who are those people that we're

10   talking about?

11           THE WITNESS:  So there are people who have lost their

12   position or been demoted to talk about this.  So, for example,

13   Ken Zucker is the Journal -- *Archives of Sexual Behavior Journal*

14   editor who was in charge, I believe, of the Toronto gender

15   clinic.  And he was removed from his position because he was

16   advocating for too much caution for patients in treatment,

17   displaying concern for parents and families.  That's just my

18   reading of it from the outside.

19           THE COURT:  Right.  I guess what I'm trying to figure

20   out --

21           THE WITNESS:  He lost his job at the gender clinic for

22   that.

23           THE COURT:  Doctor, if I can interrupt you for a

24   minute.

25           THE WITNESS:  Yeah.

1        THE COURT:  We've talked about societies and

2   organizations and whatnot.  And maybe you were getting to it and

3   I interrupted you.  But you are talking about an individual that

4   is opposing that.  What I'm talking about is this a large group

5   that is in favor of this and a small group that's not, or are

6   these an equal debate, kind of like an election of a fifty-fifty

7   situation?  And I'm trying to get a feel so I can understand

8   what your opinions are about this consensus.  Who is opposing

9   these organizations that you say have rushed to judgment, as I

10  paraphrase your testimony?

11       THE WITNESS:  Right.  I'll say two things about this.

12  One is that there are people writing and complaining, including

13  pediatricians, and feeling like they are unable to voice their

14  concerns because this sort of Castro consensus is the dominant

15  paradigm and that if they don't go along with this treatment

16  path, if they object to it, they risk losing their job or losing

17  patients, etc.  And they just feel like they don't have freedom

18  to object.  And some will say, I'll redirect patients elsewhere.

19       But then, at a level above that, you have evidence from

20  Finland, Sweden and the United Kingdom about changing direction

21  a little bit on care.  It's not my judgment about why exactly

22  they decided to do that, but there is significant concern about

23  a rush to treating adolescents, the ages at what adolescents are

24  treated with hormones or surgery and concern that it's all too

25  premature and that they are still a minor, not the age of

1    adulthood.

2            THE COURT:  Doctor, I'm not so concerned with what the

3    opposition's positions are as I am identifying who the

4    opposition is.

5            THE WITNESS:  Right.  There are particular

6    organizations in Sweden, Finland, UK, that hold those --

7            THE COURT:  And we've had testimony about all those

8    studies, so I'm familiar with that.  But you gave an opinion

9    that there was conflict.  And is your opinion about this

10   conflict limited to those foreign studies and these individuals

11   who have either been fired or perceived to have been silenced?

12           THE WITNESS:  It's limited sort of an outside

13   observation of what's going on within this group and how

14   researchers are treated if they dissent.  So one of the more

15   famous dissenting pieces of evidence is from Lisa Littman, which

16   you may have already heard about, and how it was an assessment

17   of this rapid onset gender dysphoria.  And no sooner had that

18   article come out, all seemed fine.  The Brown University, I

19   believe's, public health dean issues a statement saying this is

20   an interesting article.  And all of a sudden they are beset with

21   criticism from the outside, and they are like deer in

22   headlights.  What's wrong with this?  Is there something wrong

23   with it?  Did we miss something?  The journal editors freak out

24   a little bit and put the article under re-review, which is a

25   very strange process.

1          THE COURT:  Doctor, I understand that.  Let me

2     interrupt you again, because my question is really more limited

3     to that.  Are there any organizations in America, medical or

4     otherwise, that you are able to identify that oppose these views

5     of the American Pediatric Association, etc., that form your

6     opinions, because I'm trying to decide how much weight to give

7     what you are telling me.

8          THE WITNESS:  Right.  I believe it's called SEGM.

9          THE COURT:  What is that?

10          THE WITNESS:  I'm blanking exactly.  I believe it's

11     the Society for Evidence in Gender Medicine, I believe.  They

12     are a loose configuration of people -- I'm not quite sure how

13     many -- a fair number, who sort of contest openly the move

14     towards more affirming gender medicine.  And they often write

15     op-eds or letters to the editor for journals.  For example,

16     several of them wrote criticizing a very large and pretty good

17     study of Swedish data where the author concluded that surgery

18     had a positive effect on the downstream ten-year mental

19     health --

20          THE COURT:  Doctor, I don't need to get into what they

21     are saying because I'm not sure you are qualified to comment on

22     that, at least based on what you told me your qualifications

23     are.  I'm trying to dial down to what you are trying to tell me

24     and qualified to tell me that, as a sociologist, based on your

25     statistical review of the body of stuff, who is opposing who.

1   And I think you probably answered my question.

2       My next question is did you limit your opinions or the

3   basis of those opinions to this one organization you referred me

4   to or these various individuals in giving me your opinion that

5   there's conflict among the people in the know?

6           THE WITNESS:  Right.  So there's those conflicts.

7   There's the *60 Minutes* controversy that played out a year or two

8   ago, where there was open seeking to suppress the interviews

9   that were going on about affirmative gender medicine on *60*

10  *Minutes* about detransitioners in particular.  There were

11  researchers, published medical scientists, who were trying to

12  get people to stop talking to Lesley Stahl.  That's just an

13  example of how contrary assessments here are suppressed.

14  Pediatricians who object feel like they are silenced.

15      Another example is when Amazon, in response to criticism of

16  them, banned a book called *When Harry met Sally* by Ryan

17  Anderson, and I think they eventually brought it back.  But

18  there was just this like, wow, banning books on things just

19  because people object.  There's just a sense that's obvious from

20  the read of what is popularly available in this domain that an

21  aggressively affirmative care model, there are people who

22  dispute it but would feel like they can't publicly dispute it.

23  BY MR. JACOBS:

24  Q.   I want to turn to a portion of, I guess, something you

25  mentioned when you were talking with Judge Moody.  You mentioned

1   Lisa Littman's, I think, 2015 article.  Was that the one you

2   were referencing?

3   A.    The one in Public Library of Science?

4   Q.    That's the one.  I don't want to ask you to repeat the

5   discussion you had about what happened following that article.

6   But I guess in your work in sociology of science, was the

7   reception of Lisa Littman's article outside of the norm?

8            THE COURT:  Mr. Jacobs -- let me interrupt you,

9   Doctor.  Here's the problem I have with some of this.  What

10  investigation or something did he do to find out about the

11  reception as opposed to I just looked at these things and saw

12  the reaction in the newspaper?  For him to give me meaningful

13  testimony, he has to have done something to give me more than a

14  lay opinion about how he reads the tea leaves.  So if we were

15  going to get there, that's fine.  But it sounds to me like we

16  jumped straight to what was the reception that her article got.

17  BY MR. JACOBS:

18  Q.    Okay.  I'll back up for a moment.  So we have the

19  information out there, could you briefly explain what that

20  paper, you know, was about, how the course of it being published

21  and the offense that occurred after it being published before I

22  ask you about your work analyzing that?

23  A.    Okay.  She examined sort of the surge in gender identity,

24  gender dysphoria among adolescents, especially adolescent girls,

25  if I'm not mistaken, and inquired of parents of those teenagers,

1  knowing that this gender dysphoria was happening among

2  adolescents who had not previously shown any sort of sign of

3  such dysphoria, which is distinctive from the Dutch protocol

4  talks about sort of people who had this since childhood and how

5  it tended to occur in groups of friends within particular

6  schools.

7       And the parents described to Dr. Littman sort of some of

8  the social characteristics of the kids.  You know, I think there

9  was like one-third of the friendship groups in the study,

10 friendship groups of the kids, witnessed half or more of that

11 friendship group identifying as transgender in a fairly tight

12 time frame.  And she said this is about 70 times as high as you

13 would expect to find.

14 Q.   Sorry.  I thought you were done.  The timing on the

15 electronic transmission.

16 A.   There's also sort of, you know, this idea of a social

17 aspect, almost a social contagion that kids who are being

18 diagnosed with gender dysphoria seem to signal that they were --

19 or parents would signal they were influenced by things they had

20 seen on the internet.  That was part of the blow-back I think

21 that she got for this.

22      She's just describing this rapid onset gender dysphoria,

23 which, after it was published, quickly was denounced from

24 outside the academy first, and then the academy response, what

25 should we do here?  And the editors decided to re-review the

1    study.

2         She issues sort of an update, but it's not really a

3    correction.  And opponents of hers used that update as kind of

4    evidence like, oh, that she had done something wrong and that

5    there is no evidence for sort of a social side to gender

6    dysphoria.  That was a fairly famous occurrence in this domain,

7    and you can read it.  You can read the article itself.  You can

8    read the response.  But it was also playing out in a more widely

9    public academic debate about this.

10        And it's kind of highlighted how the administration of

11   Brown University, where she worked, wrestled with what are we

12   supposed to do about this?  They were concerned about appearing

13   uncaring towards people with gender dysphoria.  So it just

14   looked like they were critical of Dr. Littman, and they should

15   have been supportive of her academic freedom.

16        THE COURT:  Mr. Jacobs, can you just tell me where you

17   are headed with this because all I'm hearing is that people are

18   forming opinions which are causing debate, and some people may

19   or may not be appropriately --

20        MR. JACOBS:  I have a tie-up question on the Littman

21   stuff.

22        THE COURT:  I would just like to know where we're

23   headed because he can't testify whether or not the criticism was

24   appropriate or not.  All he is telling me is that there was a

25   report made and there was backflow and that that shows that

1   there was criticism of her opinions.  I need to know what point

2   you are trying to make maybe in a broader sense so I can get

3   something out of this time we've invested with this witness.

4          MR. JACOBS:  I think I'll get it out of this last

5   question.

6          THE COURT:  Well, humor me and just tell me.

7          MR. JACOBS:  What I'm going to ask, his training in

8   sociology of science, he knows how research methods are done,

9   how stuff is published, how critical reception works.  I think

10   the point we're hoping to get at with this is in this particular

11   field, in this particular discussion about this article, is this

12   outside of the norm of how this usually works?  Is there

13   something else going on that is different?

14          THE COURT:  And assuming he can do that, what does it

15   have to do with the decision I have to make here today?

16          MR. JACOBS:  I think part of what the claimed medical

17   consensus about this, as a part of the plaintiffs' case here, is

18   that all these organizations, that there's consensus about this.

19   And part of what I think Dr. Regnerus's analysis is, well, not

20   the medical side of the consensus, but what else is influencing

21   this?  Is it coming from outside of the medical field?  What are

22   the sociological factors surrounding the debate that might be

23   affecting this, might make something seem like a medical

24   consensus which is maybe something else?

25          THE COURT:  Right.  And I asked him that exact

1  question, and he said at least from the side that was opposing

2  it he didn't see any groups or factors trying to influence this

3  field of discussion.  So I'm not sure who is arguing over it has

4  anything to do with the constitutionality of this particular

5  statute.  I know you say that they think there's consensus, and

6  it's apparent to me that it's not because there's a lot of

7  people who have views about all of this, and they are not all

8  the same.  And if he's there to tell me that, I get it.  But I'm

9  not sure what we're doing here or what I'm supposed to take away

10 from it.

11      MR. JACOBS:  So I think part of it is the premium that

12 the plaintiffs' case is placed on the consensus of, say, the

13 professional organizations themselves.  That was in -- frankly,

14 Your Honor's preliminary injunction rulings referenced all of

15 this.  If that is a thing that is important in the lawsuit, then

16 I think it's fair for us to be able to say, well, we have the

17 medical experts who are talking with the medical side.  But as

18 far as the nonmedical influences on this consensus building

19 process --

20      THE COURT:  But what nonmedical influences or people

21 has he discussed so far, because I asked him that specific

22 question.  What other groups are part of this debate?  And I got

23 a couple of individuals who had been criticized or whatever.  If

24 the point you are trying to make is not everybody is on board

25 with the other organizations, I acknowledge that.  And I don't

1    know that I need to know why, that some gentleman reads these

2    articles that really doesn't know much about the field and says

3    that there may or may not be some Castro consensus or there may.

4    What evidence has he got other than I look out there in the

5    world and see that there's discord about this situation?

6            MR. JACOBS:  So I think the particular thing I was

7    getting at with the Littman article I hope to ask is he knows

8    how the science is usually done and how that's usually done and

9    to ask him if it was different reception-wise.

10           THE COURT:  But what studies, other than just kind of

11   looking to see what's out there, has he done to evaluate that?

12   And I still haven't gotten any of that other than I watched *60*

13   *Minutes* and they were hard on somebody that wanted to talk about

14   desistance, or I read the articles and some were critical of

15   these situations, all of which you would expect in any

16   controversial treatment from cancer chemotherapy, abortion or

17   whatever.  I'm just trying to find out what I'm supposed to take

18   away from this witness.

19           MR. JACOBS:  The question that I'm hoping to ask about

20   the Littman article in particular focuses on he mentioned in his

21   answer that there was a criticism response outside of the

22   scientific academy about this.  I'm hoping to ask the degree

23   that appears that influence had on the response to this

24   scientific article, if that's typical in how he sees things from

25   the sociology of science or if this is atypical.  I think that

1    serves as an example of not just the lack of consensus but the

2    effect to which professional organizations and others and

3    activists are working to affect scientific debate.  I think

4    that's part of our broader point with this.

5                THE COURT:  I'm still not sure how that helps me

6    decide this case, whether or not it's atypical of a hot button

7    issue or not.  But let's move on and see if you can make your

8    record on it.

9    BY MR. JACOBS:

10   Q.   Dr. Regnerus, can you hear us and everything?

11   A.   Yes.

12   Q.   Going back to the Littman article, we were talking about

13   the reception.  You mentioned that there was a response from

14   outside the academy.  Can you elaborate on what you meant by

15   that?

16   A.   So the immediate outcry upon publication of it was intense

17   and calling for her to be fired, for the article to be

18   retracted, even though it was largely something just basic

19   description and not making wild leaps and claims about how

20   gender dysphoria operates.  It's just documenting what's going

21   on.

22        But since it seemed to be outside the purview or outside

23   these standard kind of model, she was peer reviewed.  And they

24   called for a re-review of the study.  I happen to know what

25   that's like.  And it's driven by fear of basically people had

1    keyboards being hostile towards strangers.  So it signals in

2    organizations, like universities are very sensitive to popular

3    outcry in this domain.  So I think this is an example of the

4    very difficult way of contesting what seems to be this premature

5    consensus, so the price you pay for going against the grain.  So

6    she managed to keep her job, although it was tarnished by this

7    experience.  Other people weren't so lucky.  Lisa Littman was

8    asked to step down from this job for contesting some of the

9    basics from affirmative care.

10   Q.   If I could just stay on Littman for one more question.  My

11   question is so, in general, retractions or clarifications of

12   academic papers, is that an uncommon phenomenon, or does that

13   happen?

14   A.   It happens.  They seldom make the news.  Littman's case, it

15   sort of kind of shook the university research community world

16   for a time in part because it seemed based on nothing more than

17   her to basic findings, so it wasn't like people read it, like,

18   oh, that can't be true.  It was just immediate outrage to

19   suggest that there could be social pressure that affects the

20   diagnoses of gender dysphoria.

21   Q.   Okay.  So I'm going to switch topics for a bit.  Well, so

22   maybe not so different.  Have you noticed any, I guess, trends

23   in the provision of gender-related care in the United States in

24   terms of the market for that care and how that care is provided

25   over time in terms of how it's delivered, things like that?

1          MR. RICHARDSON:  Objection, Your Honor.  The witness

2    testified he has no expertise in the provision of

3    gender-affirming care.

4          THE COURT:  Sustained.

5    BY MR. JACOBS:

6    Q.   So have you, as part of your work in this case, did you

7    review any sociological data about the rate at which minors

8    identify as transgender and how it's changed over time?

9    A.   Uh-huh.  I did.

10   Q.   Generally speaking, what have those trends been?

11   A.   Rapid growth so far as I can tell.

12   Q.   Has there been a change in the statistics related to the

13   sex of those who are coming to identify as transgender in

14   childhood?

15   A.   Right.  Previously most diagnoses that were recorded were

16   of boys who were diagnosed with gender dysphoria.  Then, over

17   time, up to present, that ratio of boys to girls has

18   flip-flopped.  So natal girls are far more likely today to be

19   diagnosed with gender dysphoria than boys, which raises the

20   question of why.

21          And one of my concerns, and I raised it in my expert

22   report, was that there has just been insufficient attention to

23   the question of why.  It's not as if I need to weigh in on why.

24   But the medical researchers ought to weigh in on why because

25   something significant is going on.  There's a surge in cases,

1   and there's this flip-flop in sex ratio.  And it just breathes

2   -- those of us who do research in this area -- that they were

3   largely ignoring the kind of big picture why, where is this

4   coming from, question.  I think if this was occurring in, say,

5   cancer research or medical -- I'm sorry -- heart, cardiac

6   research, there's a condition -- I'm sorry?

7   Q.    I don't think there was anything on our end.

8   A.    Oh, sorry.  If there's a cardiac or a cancer condition that

9   was increasing rapidly in frequency, I think we would want to

10  know where that may be coming from instead of sort of ignoring

11  it and then see a flip-flop in the sex ratios.  It reads as if

12  the gender affirmative care industry is insufficiently concerned

13  about the developments in this domain.  You know, it just raises

14  the basic question where did that come from, right, why the

15  flip-flop, why the surge.  Littman writes about the surge to

16  some extent.  There's a documentation of it but kind of no

17  sustained study of where it has come from.

18       Now, some people will say it's a function of long

19  suppressed gender dysphoria.  The stigma diminishes about it.

20  More people can express it.  But that's speculative.  I'm just

21  struck by how little genuine research there is on these

22  fundamental questions.

23       MR. RICHARDSON:  Your Honor, we would move to strike

24  Professor Regnerus's answer to that question.  He is not

25  qualified to assess medical research or why medical research may

1   be happening.  He is also not a mental health professional

2   qualified to testify about the causes of gender dysphoria.

3              THE COURT:  I'm not going to strike it, but I'm well

4   aware of what he testified to and what he can't, and I'll take

5   that up.

6        Again, Mr. Jacobs, we know, or based on his reading there's

7   not a lot of research as to why the ratio between girls and boys

8   flipped.  What am I supposed to take from that?  That there's

9   more we need to know, agreed.  That's what every expert has

10  testified to so far.  Why did he just tell me again?  What am I

11  supposed to get from that?

12             MR. JACOBS:  I asked that question so I can ask my

13  next question, I guess.

14             THE COURT:  What's your next question?

15  BY MR. JACOBS:

16  Q.   My next question, specifically on the male/female ratio

17  flip, are you aware of any sociological data showing a similar

18  trend in adults?  By that I mean are you aware of any

19  sociological data showing an increase of female relative to

20  males identifying as transgender in the adult population?

21  A.   Not in the adult population, not that I'm aware of.  Now,

22  if you are asking about sexual identity, we see a rise in female

23  bisexuality, a surge in that.  I consider that different than

24  gender identity.

25  Q.   I want to go back to -- let's switch topics a little bit.

1    There's been a lot of discussion in this case on research

2    concerning suicidality and suicidal ideation in transgender

3    minors.  Have you reviewed that research in the course of your

4    work in this case?

5    A.    I have.

6    Q.    And I'm not asking you to give any medical opinions --

7    A.    Right.

8    Q.    -- about that research.  But in terms of research design,

9    study design and statistical methodology, what are your

10   observations about what that research says?

11   A.    Right.  First, in the general discourse, popular discourse

12   about gender dysphoria, it seems quite associated with increase

13   in suicidality.  So a lot of people are writing on this subject,

14   etc., connecting it to increasing suicidality.  And, yet,

15   there's also research that comes alongside it and says, well,

16   you know, if we distinguish suicidality from actual suicides,

17   completed suicides, we see a much more narrow story validated,

18   whether it's the UK kids clinic, also the Amsterdam clinic,

19   documenting fairly small numbers of actually completed suicides

20   among gender clinic patients, which is just a very different

21   impression on this than when you read about suicidality, which,

22   again, back to the idea of ideological capture, if you make this

23   about suicidality rather than suicide, then we're talking about

24   very different measures of suicidality, like thinking about it.

25         We know from evidence in the sociology of suicide that

1   adolescents are far more apt to think about suicide than, say,

2   middle-aged adults, right, even though middle-aged adults in the

3   United States are extraordinarily more apt to actually carry out

4   a suicidal act, right?  So there's this impression that gender

5   dysphoria is connected tightly with suicidality, right?  But

6   what does it mean?  What does it mean to sort of make up various

7   rules of suicidality?  Is there actually an elevated risk of

8   completed suicides among transgender youth or youth with gender

9   dysphoria?  I think it's far more related to attitudes about it,

10  possibly to attempts, but not completed suicides.

11      Suicide is by definition rare and noisy, meaning like it's

12  hard to establish causality based on what you know about

13  persons.  So the white male suicide rate in the United States is

14  the highest.  But we don't go out and think about, oh, something

15  about being white causes suicide or something about being male

16  causes suicide.  We know there's more to it than this.

17      But there's a rush in the literature, as far as I can tell,

18  to sort of equate suicidality with gender dysphoria.  And it

19  seems to be used as a motivation for, wow, we need to move

20  people towards treatment, less this risk of suicide plays out.

21      So in a popular discourse around gender dysphoria, there's

22  a strong connection made between the experience of gender

23  dysphoria and the risk of the person who experiences this, their

24  suicide.  The phrase, you would rather -- would you rather have

25  a living child or -- a living son or a dead daughter?  Again,

1   how often this terminology is actually used is unclear.  But

2   there's this connection being made in the research that there's

3   a short leap between the experience of dysphoria and the risk of

4   suicide, which does seem to be not what the literature on

5   completed suicide finds.

6   Q.    Dr. Regnerus, based on the review that you've done of the

7   literature in this area and observing the public discourse, what

8   are your conclusions on the openness of debate in this area and

9   the effects that the discourse have had on them?

10  A.    Thanks.  So I've done research in domains that are fairly

11  sensitive, the study of sexual behavior, etc.  I mentioned an

12  earlier study.  So I'm used to a bit of controversy when I see

13  it.  And this reminds me of that previous experience, the

14  domain.  There's not a whole lot of medical research domains

15  that get the attention that this one is getting.  Now, I know

16  it's sensitive, etc.  We're talking about teenagers, minors,

17  being able to consent to such treatment.  It certainly involves

18  a measure of controversy that the average study does not.

19        Again, back to the idealogical capture authority, the

20  professional organizations appear to act as if like they know

21  exactly what they think ought to be the case.  They change the

22  standards, etc.  They have lowered the bar in some cases.  WPATH

23  has made it sort of stage, not age.  So you just get this

24  impression, what's going on in these professional organizations

25  and their influence on the field and the ways in which

1    clinicians can feel torn about what they ought to recommend for

2    children here, you see a field that is wrestling with very, very

3    significant issues.  And to me it's not a field where you can

4    openly dissent or say, I'm not going to go in that direction of

5    treatment.  I'm going to do this kind of practice.  It seems to

6    funnel and channel clinicians towards one right way in some

7    ways.

8              MR. JACOBS:  No further questions, Your Honor.

9              THE COURT:  We're going to take a break until the

10   bottom of the hour.  So I don't have to do the calculus on your

11   time frame and mine, we're going to go to the bottom of the

12   hour.  Court will be in recess here until 10:30, and to the

13   bottom of the hour where you are, Doctor.

14             THE WITNESS:  Thank you.

15        (Recess at 10:09 a.m.)

16                     REPORTER'S CERTIFICATE

17        I certify that the foregoing is a correct transcript from
     the record of proceedings in the above-entitled matter.

18

19   /s/Elaine Hinson, RMR, CRR, CCR      Date:  December 4, 2022.
     United States Court Reporter

20

21

22

23

24

25

```
 1              (Proceedings continuing in open court at 10:34 AM.)
 2              THE COURT:  I would ask that you not replow the
 3     ground that you've already done in voir dire because I already
 4     know what those questions are going to be.  So if you would not
 5     be redundant in that regard, you have the floor.
 6              MR. RICHARDSON:  Understood.  Thank you, Your Honor.
 7                        CROSS-EXAMINATION
 8     BY MR. RICHARDSON:
 9     Q     Professor Regnerus, can you hear me all right?
10     A     I can.
11     Q     Thanks for staying on.  I know it's late there.  We'll
12     keep this pretty brief.  You're aware that this trial began
13     last month and it's now resuming this week, right?
14     A     Yes.
15     Q     Have you reviewed any transcripts from the trial?
16     A     I have not.
17     Q     Have you spoken to anyone about the testimony that was
18     given during the first week of trial?
19     A     I have not.
20     Q     Are you a contributing editor for a publication called
21     Public Discourse?
22     A     I am.
23     Q     Public Discourse is not a peer reviewed academic journal.
24     Isn't that right?
25     A     It's reviewed by a team of editors, it's not reviewed as
```

Regnerus - Cross

1    in sending it out for other people elsewhere to look at, no.

2    Q      So it doesn't go through the process that something

3    published in a peer reviewed journal would go through to be

4    published on *Public Discourse*?

5    A      Correct.  It's also largely essays on different kinds of

6    topics.

7    Q      Is *Public Discourse* run by the Witherspoon Institute?

8    A      It is.

9             THE COURT:  The what institute?

10            MR. RICHARDSON:  Witherspoon Institute.

11            THE COURT:  Thank you.

12   BY MR. RICHARDSON:

13   Q      Sorry, your answer?  I didn't hear your answer,

14   Professor.

15   A      It is.

16   Q      Is the Witherspoon Institute an independent research

17   center that works to enhance public understanding of the moral

18   foundations of free and democratic societies?

19   A      It sounds like that when you're reading from it.  I'm not

20   familiar with what exactly they state about themselves, so I'll

21   take your word for it.

22   Q      Did the Witherspoon Institute provide funding for

23   something you published called the New Family Structure Study

24   or NFSS?

25   A      They helped raise the money for it.  They said it's

Regnerus - Cross

```
 1    expensive and they asked around for funding to accomplish that

 2    in conjunction with other organizations.

 3    Q      Did you previously --

 4    A      For data collection.  Not for the publication of a study,

 5    but for the data collection to which has been made public.

 6    Q      Understood.  Did you previously testify as an expert

 7    witness in a case called DeBoer against Snyder?

 8    A      I did.

 9    Q      That case was about a Michigan law prohibiting same sex

10    marriage, correct?

11    A      I think it was tied to adoption, but yes, that was what

12    it was concerned with, yeah.

13    Q      You testified as an expert on the side of the state in

14    that case, right?

15    A      Yes.

16    Q      Was your work on the New Family Structure Study discussed

17    by the district court in Deboer?

18    A      By the district court?  Federal district, that's what

19    you're talking about?

20    Q      Was it discussed in the judge's opinion in the case?

21    A      I think so.

22    Q      I'd like to show you a passage from that opinion.  We're

23    going to put this on the screen.  Can you see that, Professor?

24    A      Not yet.

25    Q      This is going to be on page 766.  You see the highlighted
```

1  passage there?

2  A    I do.

3  Q    Can you read with me, please?  "The Court finds

4  Regnerus's testimony entirely unbelievable and not worthy of

5  serious consideration.  The evidence adduced at trial

6  demonstrates that his 2012 study was hastily concocted at the

7  behest of a third party funder."  Do you see that passage?

8  A    I do.

9  Q    Do you see a passage a little further down on the page

10 also highlighted?

11 A    Not yet.

12       THE COURT:  Do you have a question of him about that

13 other than --

14       MR. RICHARDSON:  I do.  I want to give both

15 passages.

16 BY MR. RICHARDSON:

17 Q    Can you read with me, please?  "The funder clearly wanted

18 a certain result and Regnerus obliged."  Do you see that?

19 A    I see it.

20 Q    In those passages, is the funder the Court is referring

21 to the Witherspoon Institute?

22 A    I'm presuming that's probably it although in the article

23 itself, I made clear who the funding organizations were.  I

24 think I mentioned both the Witherspoon Institute and the

25 Bradley Foundation.

1  Q     Is the study the Court is referring to in that passage

2  the New Family Structure Study or NFSS?

3  A     The New Family Structure Study is the data.  That's just

4  data.  I think he's referring to the study with a much longer

5  name that appeared in the peer reviewed journal, *Social Science*

6  *Research*, June or July issue of 2012.  You can call it the New

7  Family Structure Study, but that's the reference to the data

8  which has been used in multiple studies, used for studies of

9  other kinds of things, but he's referring rather to the

10 published study mid 2012.

11 Q     Understood.  Thank you.  So is that published study

12 from 2012 the study you were referencing earlier today with

13 Mr. Jacobs when you talked about your work on the well-being of

14 children raised by same sex parents?

15 A     Right.

16 Q     Thank you.  Are you familiar with the Alliance Defending

17 Freedom or ADF?

18 A     I am.

19 Q     Is ADF a legal organization committed to protecting god's

20 design for marriage and family?

21 A     I'm going to have to take your word for it you're reading

22 off their website or something like that.  As far as I know,

23 they are a religious freedom defense organization.  They don't

24 seem to litigate much in terms of marriage or family these

25 days.

Regnerus - Cross

1  Q     Okay.  Did you attend a meeting hosted by ADF in Arizona?

2  A     I think I know what you're referring to, so yes.

3  Q     That meeting took place in 2017, correct?

4  A     No.  At a deposition, you asked and I told you I couldn't

5  remember exactly when.  It was before COVID era and it was

6  after 2015.

7  Q     And that meeting in Arizona was focused on sexuality and

8  gender identity, right?

9  A     Probably yeah, I think.  I know we talked about gender

10 identity.  I don't remember what else was talked about.

11 Q     During the meeting, there was a discussion about the lack

12 of experts willing to testify in cases involving transgender

13 issues.  Is that right?

14 A     Yeah, it was probably brought up.  I don't recall.  I

15 remember going around the room and they asked us what we were

16 working on.  What exactly was said besides that, I have a vague

17 memory of the meeting itself.

18 Q     Do you recall if meeting attendees were asked if they'd

19 be willing to serve as experts?

20 A     You know, I don't even remember what I said at the

21 deposition.  Maybe.  It just doesn't -- it sounds like

22 something ADF would do, but I don't recall the question being

23 posed.  Again, I'm not surprised if they asked it.

24 Q     Okay.  But if that discussion happened, you would have

25 been there for it?

1  A    I think so unless it happened the last day and I left

2  early.  Again, I have only the vaguest recollection of that

3  meeting.

4  Q    Okay.  Can I show you your deposition real quick?  We'll

5  put it up on the screen for you.

6  A    As I said, the deposition, I might have said yeah.  They

7  probably asked.

8  Q    Just to refresh your memory, we'll briefly pull it up.

9  A    I'm not surprised if it was said.  Pretty much the same

10  thing I just told you.

11  Q    Yep.  And then a little further down, do you see a

12  question:  "Would you have been there for that?  Your answer

13  was:  For that discussion?  Question:  Was for that discussion.

14  And you said, If it happened, yes, because I think I stayed in

15  the balance of the time."

16  A    Meaning to the end.  Again, I remember one instance of

17  being in the room and people going around talking about what

18  they were doing.  Besides that, I don't remember a whole lot

19  about the conference.

20  Q    Paul Hruz was at the ADF meeting, right?

21  A    I believe so.

22  Q    And Patrick Lappert was at the ADF meeting, right?

23  A    I think I said in the deposition I don't remember because

24  I really don't know who he is.

25  Q    Just shifting gears a little bit.  Research standards are

Regnerus - Cross

1   different in sociology, psychology, and medicine, correct?

2   A     Research standards?  Standards can be different, but the

3   demand for sort of high quality measurements and key values,

4   statistical models, these things are comparable, but you know,

5   they're concerned about particular things more than other

6   things.

7   Q     Understood.  I'd like to show you a passage of your

8   deposition again.  Do you see the highlighted passage on the

9   screen?

10  A     Yes.

11  Q     "Question:  Understood.  So we've got research standards

12  that may differ between fields like social and psychology?

13  Answer:  Correct.  Question:  And medical research?  Answer:

14  Correct."

15        Are those the questions you were asked and the answers

16  you gave at your deposition?

17  A     Yes.

18  Q     Would it be fair to say that research methods also vary

19  across the different scientific fields?

20  A     Yes.

21  Q     So a study can be useful to a psychologist even though it

22  might not be given a lot of weight by a sociologist, correct?

23  A     It could be criticized by a sociologist but for different

24  things.

25  Q     But just to clarify, your answer was yes, that a study

1  could be useful to a psychologist even if not given weight by a

2  sociologist?

3  A    Yes.

4  Q    Healthcare providers might place weight on research that

5  would not be valuable to a sociologist.  Isn't that right?

6  A    Yeah, I suspect.

7        MR. RICHARDSON:  Nothing further, Your Honor.  We

8  pass the witness.

9                REDIRECT EXAMINATION

10 BY MR. JACOBS:

11 Q    Dr. Regnerus, is it common in your experience for

12 academics to attend conferences with each other and perhaps

13 with academics from other disciplines?

14 A    Yes.

15 Q    Have you attended -- back up.  If you had to guess, how

16 many of these sorts of conferences have you attended over your

17 career if you could ballpark it?

18 A    In general, interdisciplinary in nature or?

19 Q    Back up.  In general.  Interdisciplinary or not, in

20 general, about how many academic conferences would you say that

21 you've attended in the course of your career?

22 A    I sent you a list of a variety of them, but for a while,

23 I was going to three a year, four a year.  Some of them are

24 limited to sociology, some of them are interdisciplinary.  Some

25 of them are sort of privately funded areas of interest, some of

1  them are marriage and sociological association, etc.

2  Q     I think you testified that there could be some

3  differences in research methodologies between various fields.

4  Are there similarities?

5  A     Sure.  As I was inferring in my comment, measurement

6  issues are something that we all value, so when I said earlier

7  about assigned sex at birth, this becomes a measurement issue,

8  not just medical research, but in sociological research,

9  psychological research, and something that we all kind of take

10  to heart, maybe dispute, think through, but certainly

11  acknowledge the ramifications of, because measures in one field

12  would probably be used in other fields.

13       So, for example, I use a short form depression index

14  that, you know, a sociologist didn't create but a psychologist

15  did.  I tend to like it.  So we share a lot of things across

16  disciplines.  We share model building techniques.  So one of

17  the reasons I -- one of the topics I cover in the report is a

18  variety of the publications that have come out using methods,

19  survey research methods and analytic tools that are comparable

20  in medical research and in sociological research, standard

21  professional models, group comparisons, etc.  So why I even get

22  into this is because I and other people looked at some of the

23  results that were coming from folks like Professor Turban who

24  shares a lot of not necessarily the same interests but a lot of

25  the sort of same survey research, data collection efforts,

1    analysis efforts.

2         So I can read Turban, a lot of people can read Turban and

3    evaluate the quality of a study like that, so don't have to

4    have an M.D. to understand there's measures, there's methods,

5    there's analyses, and that we can read them too.

6    Q    You mentioned I think in your cross-examination maybe a

7    difference in P values between disciplines.  Could you explain

8    what you meant by P value?

9              MR. RICHARDSON:  Objection, Your Honor.  That was

10   not raised on direct as best I can tell and goes beyond the

11   scope of cross.

12   BY MR. JACOBS:

13   Q    Dr. Regnerus, did I hear you use the term "P value"

14   during your cross or did I mishear you?

15             THE COURT:  I didn't hear anything about a P value,

16   but if he wants to limit his testimony shortly to tell me

17   generically what a P value is as opposed to a beta, I have no

18   objection to him rolling through that.

19   BY MR. JACOBS:

20   Q    I guess the first question, Dr. Regnerus, did you mention

21   the term "P value" or did I mishear you?

22   A    P value came up in some conversation, so I mean, if you

23   want me to mention it, it's just a measure of statistical -- a

24   way of detecting statistical significance of one particular

25   variable.  We use it in sociology, we use it in medical

Regnerus - Redirect                                           1036

1  research, psychology, etc.

2  Q    Do different disciplines look for higher or lower P

3  values in their published work?

4  A    Right.  Some disciplines with smaller samples will

5  consider a P value of less than .10 to be statistically

6  significant and worth talking about.  If you look at big

7  demographic data sets and will want it to be P of less than

8  .001 meaning like the odds of it being random, randomly

9  different from zero are really low in that case, so the

10 standards of statistical significance can vary.  Usually it

11 depends on the size of the data set, less than the discipline.

12 Q    So I want to turn briefly to you mentioned the NFSS study

13 during your cross-examination.  Are you aware of any criticism

14 of your collection of the underlying data for that study as

15 opposed to the conclusions that you may have reached from that

16 data?

17 A    Well, at the beginning, they're a little bit like Lisa

18 Littman, I came under a fire storm for all aspects of it, but

19 over time, it became limited to modeling decisions and language

20 use.  But no, eventually, like, the data were not a problem.

21 In fact, the data collection was -- I had a lot of advisers in

22 that including people who certainly would have disagreed with

23 me for my opinions in the *DeBoer v Snyder* case.  The data is

24 out there, it's still publicly used, it's been used in analysis

25 of completely different kinds of research questions.  So no,

```
 1   people didn't really have a problem with the data.
 2              MR. JACOBS:  No further questions, Your Honor.
 3              MR. RICHARDSON:  Nothing more from us, Your Honor.
 4              THE COURT:  Thank you, Doctor.  We'll let you
 5   disconnect and be about your business.
 6              THE WITNESS:  All right.  Thank you, Your Honor.
 7              MR. JACOBS:  We've got another witness if the
 8   Court's ready for it or I don't know what time you were
 9   planning to break for lunch today.
10              THE COURT:  Probably 1:00, so let's get an hour into
11   it and we'll proceed from there.
12              MR. JACOBS:  Defense will call Dr. Patrick Lappert.
13      PATRICK LAPPERT, DEFENDANTS' WITNESS, DULY SWORN
14                        DIRECT EXAMINATION
15   BY MS. TEMPLIN:
16   Q     Good morning, Dr. Lappert.  Could you state your name and
17   spell it for the court reporter?
18   A     Patrick Walter Lappert.  L-a-p-p-e-r-t.
19   Q     Dr. Lappert, what is your profession?
20   A     I'm a physician surgeon.
21   Q     What type of surgeon?
22   A     Plastic and reconstructive surgery.
23   Q     How long have you been a plastic surgeon?
24   A     I did my training in 1992, so 30 years.
25   Q     What do plastic surgeons do?
```

Lappert - Direct

1  A     Our business is about the restoration of form and

2  function primarily.  That's what the term "reconstructive

3  surgery" is meant to convey.  In cases of trauma, injury of any

4  kind, cancer, congenital deformity.  That's our primary work.

5  We also do a lot of aesthetic surgery where form is primarily

6  the issue at hand and it's aimed at improving the subjective

7  life of the person who's seeking an improvement in their

8  appearance.

9  Q     In addition to your practice as a surgeon, have you

10 published any articles or scholarship on plastic surgery?

11 A     Yes, I have.

12 Q     Have you published any on the procedures at issue in this

13 trial?

14 A     Well, in the sense that one of the issues at hand is

15 surgery of the breast.  So I published an article in

16 collaboration with Dr. Bryant Toth in San Francisco on the

17 subject of preoperative planning.

18           THE COURT:  Can I get you to spell the name of that

19 other doctor?

20           THE WITNESS:  Certainly.  It's B-r-y-a-n-t T-o-t-h.

21           THE COURT:  Thank you.

22           THE WITNESS:  The article was about preoperative

23 planning in breast cancer surgery.  The collaboration between

24 general surgeons, cancer surgeons, and the plastic

25 reconstructive surgeons seeking a better outcome.

1   BY MS. TEMPLIN:

2   Q      Dr. Lappert, have you treated any transgender patients?

3   A      I have.

4   Q      Can you tell us a little bit about that?

5   A      Well, in terms of general treatment consultation and

6   things like that in my office, we offer laser services so I

7   have several patients who come to me seeking laser hair removal

8   from their faces.  That's sort of an ongoing part of the

9   practice lately.  As far as surgical treatment, only one

10  patient, two surgeries.  The explantation of breast implants

11  that were placed and then the gynecomastectomy to reverse the

12  effects of female hormones on his chest.

13  Q      So to clarify, was that person detransitioning?

14  A      That's correct.

15  Q      And have you performed any gender transition procedures?

16  A      I do not do that.

17  Q      Do you have a CV?

18  A      I do.

19          MS. TEMPLIN:  Your Honor, may I approach the

20  witness?

21          THE COURT:  You can.  I've got it in the book as 4

22  under a defendants' stipulated exhibit, so I have the benefit

23  of it and it's in the record, but go ahead.

24  BY MS. TEMPLIN:

25  Q      Dr. Lappert, is that your CV?

```
 1    A     It is.

 2               MS. TEMPLIN:  Your Honor, depending on whether the

 3    plaintiffs wish to voir dire the witness, otherwise we would

 4    seize questioning on his qualifications and rest on the CV.

 5               MS. OSWELL:  Your Honor, we do have voir dire

 6    questions for this witness.  As the Court knows, we have moved

 7    to exclude this witness on testifying beyond the scope of his

 8    expertise as a plastic surgeon.  With the Court's permission,

 9    we do have a few questions to establish the basis of our

10    objections.

11               THE COURT:  Briefly.

12                    VOIR DIRE EXAMINATION

13    BY MS. OSWELL:

14    Q     Good morning, Dr. Lappert.  My name is Laura Oswell.  I'm

15    an attorney for the plaintiffs in this case.

16          Doctor, you're not a psychiatrist, correct?

17    A     That's correct.

18    Q     You're not a psychologist either, are you?

19    A     That's correct.

20    Q     You do not claim to be an expert in mental health?

21    A     No, I don't.

22    Q     And you're not an endocrinologist?

23    A     I am not.

24    Q     You're not an expert in endocrinology?

25    A     I am not.
```

1   Q     You don't claim to be an expert in pediatrics?

2   A     I do not.

3   Q     You don't hold yourself out to others as an expert in

4   medical ethics or bioethics, do you?

5   A     I do not.

6   Q     You don't claim to be an expert in the diagnosis of

7   gender dysphoria?

8   A     Expertise, no.  I'm familiar with the process of

9   diagnosis, but I'm not an expert.

10  Q     You have never diagnosed any person with gender

11  dysphoria, have you?

12  A     I have, but in the course of my practice, persons come to

13  me with issues relating to their appearance, but they ascribe

14  to their gender presentation so I have made that diagnosis and

15  excluded them from surgical intervention.

16  Q     Could we quickly just take a look at your testimony in

17  this matter?  You were deposed, Dr. Lappert, in this case on

18  May 6th of this year; is that correct?

19  A     Correct.

20  Q     We're going to take a quick look at your testimony.  It

21  will be up on the screen just a moment here.  Here we go.

22  Direct you to page 150, line 18.  Question here is:  "Have you

23  ever diagnosed someone of gender dysphoria?  Answer:  Are you

24  talking about like making a formal diagnosis and sending an

25  insurance document?  Answer:  No."

Lappert - Direct

1    Did I read that correctly?

2 A    You read it correctly, yes.

3 Q    Thank you.  You have not conducted or published research

4 on gender dysphoria or transgender people.  Is that correct?

5 A    That's correct.

6 Q    You agree that gender dysphoria is not your area of care,

7 correct?

8 A    Correct.

9 Q    Your only education or training in gender dysphoria was

10 one weekend class at the California Society for Plastic

11 Surgery, wasn't it?

12 A    Correct.

13 Q    You do not claim to be an expert in the treatment of

14 gender dysphoria, do you?

15 A    I do not.

16 Q    And you only hold yourself out as an expert in plastic

17 and reconstructive surgery, correct?

18 A    Correct.

19 Q    Thank you.

20    Your Honor, I know in your order on our motion to

21 exclude, you asked us to take our objections question by

22 question.  We would plan to do so in accordance with the

23 Court's instruction.

24          THE COURT:  Thank you.

25 BY MS. TEMPLIN:

Lappert - Direct

1    Q      Dr. Lappert, in your experience, why might patients want
2    plastic surgery?
3    A      Well, two broad categories.  They might want plastic
4    surgery because of something they've suffered, as I say,
5    trauma, cancer care, congenital deformities, or they might want
6    plastic surgery as a means of improving their appearance,
7    seeking an improvement in their subjective life.  That's what's
8    called aesthetic surgery.
9    Q      The first category, do you have a term for that?
10   A      It's called reconstructive surgery.
11   Q      Are there different ethical considerations for
12   reconstructive and aesthetic surgery?
13   A      There are.
14   Q      Could you explain?
15   A      Certainly.  In the case of reconstructive surgery, you
16   have a patient who has a measurable objective deficit of some
17   kind that, as I said, they have either acquired from trauma,
18   from congenital deformity, from cancer care or among other
19   reasons.  And that's something that's objectively visible,
20   quantifiable, loss of function, loss of form.  So that differs
21   from aesthetic surgery where generally speaking the patient
22   presents with findings that are within the realm of normal.
23   But perhaps at the limit of normal say, for example, the
24   prominence of the ears or the size of the nose relative to the
25   size of the face.  So that would be aesthetic surgery.

Lappert - Direct

1     Now, the ethical difference between those two is that
2  with reconstructive surgery, the patient presents with a
3  deficit and very typically a deficit of function, say for
4  example, loss of a limb from trauma, they have a deficit of
5  function.  And the aim of reconstruction there is to restore
6  function and form, and generally function takes precedence over
7  form most typically, although sometimes all you can offer is
8  the restoration of form.
9     Say, for example, the loss of an eye, I can't give them
10  back an eye, but I can give them a prosthetic eye so I restored
11  form, but I haven't restored function.  But one of the
12  principles there is that when planning a reconstructive
13  operation, generally what we're doing is we're borrowing from
14  other areas of the body or even maybe proximate areas of the
15  body in order to restore the form and the function and what
16  that causes us to have to reflect on is what is called the
17  donor defect.  So, for example, if I'm reconstructing the
18  perineum of somebody who had a bomb injury in the area around
19  the genitalia or the upper thigh, I might be using muscles from
20  the upper thigh to cover the defect and to have closure of the
21  wound while attempting to preserve function, but the patient
22  will be paying a price because I would borrow a muscle and skin
23  from one area of the body to reconstruct the injured part.  So
24  that's what we call donor defect or the price the patient pays
25  for the reconstruction.

Lappert - Direct

1    And one of the general principles is you try to give up
2    as little as humanly possible in getting the reconstruction.
3    But sometimes you do have slight deficit in function.  For
4    example, if I reconstructed the breast of a woman and used the
5    muscle from her back, the latissimus dorsi muscle and rotated
6    it around to the chest and placed an implant there, she's going
7    to be paying a price in terms of strength of the upper limb in
8    order to have the restoration of form of the breast.  That's
9    the donor morbidity, donor defect.  And we have to weigh that
10   out.  That contrasts very dramatically with aesthetic surgery
11   where what you're trying to obtain is form where that's a
12   circumstance where you would not want to surrender function for
13   the sake of a cosmetic result.  So there's a very, very
14   important difference there.
15       You do not sacrifice function for the sake of a cosmetic
16   result.  For example, if I was trying to beautify somebody's
17   nose, if I planned an operation in which she got perfect
18   appearance, the symmetry, the proportion, everything was
19   absolutely perfect, congruent even with her ethnicity,
20   everything perfect, but if she were not able to breathe through
21   that nose, that would be an abject failure.  And so one doesn't
22   do that.
23   Q    Just to clarify, I think you have used both the terms
24   "aesthetic" and "cosmetic".  Are those synonyms or are there
25   slightly different meanings?

Lappert - Direct

1   A     Sort of slightly different.  Cosmesis or cosmetic

2   addresses essentially the form and proportion and all of those

3   things that enter into it.  For example, if I was

4   reconstructing a nose, I would want it to be a third of the

5   height of the face and a fifth of the width of the face and so

6   on.  That's the cosmesis side of it.

7         But aesthetics addresses itself to how it affects the

8   subjective life of the patient, and that's generally why the

9   patient came to you in the first place.  They're looking for an

10  improvement in their subjective life.  Maybe because of

11  something that constantly calls attention to itself.  Somebody

12  who is in the public light who's constantly being asked are you

13  getting enough sleep.  She is perfectly rested, but she appears

14  tired all the time, that's an annoyance to somebody who's in a

15  profession where she's in the public light.  So if I can make

16  her look rested, then I've done a great good for her.  It's a

17  cosmetic process, but it's an aesthetic result.

18  Q     When someone seeks reconstructive surgery, are there

19  criteria that you use to diagnose abnormalities?

20  A     Well, that certainly includes the whole breadth of my

21  training as a physician and surgeon, so there are physical

22  criteria, there are functional criteria.  And depending on what

23  is being reconstructed, one may predominate over the other.

24  For example, reconstructing a hand on a man can be a very

25  different process from reconstruction of a hand on a young

Lappert - Direct

```
1   girl.  In a man, if I'm reconstructing his helping hand, his
2   nondominant hand, cosmetic result isn't really a big concern
3   typically.  What you're really looking for is a functional
4   restoration so that he can work.  Those are sort of the issues
5   that enter into it.
6   Q    Talking more specifically about the procedures here, why
7   might a transgender individual seek gender transition plastic
8   surgery?
9              MS. OSWELL:  Objection, Your Honor.  This goes
10  outside the scope of the expert's expertise.
11             THE COURT:  I'm going to let the doctor testify
12  about what -- I'm not sure this is a question for --
13             MS. TEMPLIN:  Your Honor, I can rephrase.
14             THE COURT:  Let me finish, please.  I'm not sure
15  this is a question that requires expert testimony.  We all know
16  what the options are depending on the direction an individual's
17  taken about what surgeries are available.  I'm not sure we need
18  him to tell us that because we've gone over it.  So, Doctor, do
19  you agree with that?  Or do you think that there's something
20  you have to offer that we don't already know?  And I know you
21  don't know what we already know, but there's a limit to what
22  could be requested in a transgender surgery, and do you think
23  that's commonly known?
24             THE WITNESS:  I think what all these surgeries have
25  in common is that the patient is seeking happiness.
```

Lappert - Direct

```
1          THE COURT:  Okay.  Let's go to your next question.
2    BY MS. TEMPLIN:
3    Q     Dr. Lappert, are those surgeries reconstructive or are
4    they aesthetic?
5    A     Well, because the patient is typically -- I would say
6    typically, because the patient is presenting with normal
7    physical appearance and function and because the primary
8    motivation is in the subjective life of the patient, then that
9    meets all the criteria for aesthetic surgery.
10   Q     Setting aside patients with gender dysphoria, do you ever
11   see patients who want aesthetic surgery to alter a body part
12   causing them significant mental distress?
13   A     I do.  It's a routine part of being an aesthetic surgeon.
14   Q     Can you tell us a couple of those examples?
15   A     A very common example is a man seeking rhinoplasty.  In
16   fact, this is one of the ones that's most commonly discussed in
17   the world of plastic surgery because it's a risk event for the
18   surgeon, and let me explain.  Men presenting for rhinoplasty
19   surgery or aesthetic surgery of the nose, first of all, it's a
20   common presentation, very often they're presenting because they
21   have a functional problem as well.  The surgery is very
22   straightforward and generally what you're seeking is
23   restoration.  Perhaps they were struck boxing or something, who
24   knows, but there's a slight form problem there and when you
25   correct the form problem, their function is restored.
```

1      But another subcategory of male rhinoplasty would be the
2  patient presenting seeking a purely cosmetic change in the
3  nose.  And it's a common thing that when having the discussion
4  with the patient about their desires for the surgery, they will
5  point to things about their nose that they dislike, and this is
6  a common thing in cosmetic surgery.  And while the patient is
7  presenting their complaint, I as a plastic surgeon am examining
8  their nose sort of sub rosa, if you will, so while they're
9  describing their nose, I'm looking at their nose trying to see
10  if I see what they see.  And this is a very important part of
11  being a cosmetic surgeon is I have to be able to see what the
12  patient sees, because if I don't see what the patient sees,
13  there's no hope that I can get the patient what they're
14  seeking.  And the result of happiness is what they all want.
15      But what will happen sometimes, it's not all that common,
16  but it's common enough that we talk about it in the world of
17  plastic surgery is that they'll be describing a defect that I
18  can't see, and while they're describing the defect, very often
19  they'll be describing the burden of sorrow that the defect
20  causes them.  Very often they'll talk about maybe having been
21  to a prior consultation with another plastic surgeon who
22  himself perhaps tried an operation and didn't give them the
23  result they wanted.  But what will happen is while they're
24  describing their condition and while I'm examining the patient
25  without actually laying hands on them, they'll often times

1    become very emotional and start talking about how this has
2    affected their life.
3        Perhaps they'll talk about how their level of isolation
4    that they experience or the lack of a social life or failure to
5    be promoted at work.  Basically what you're dealing with here
6    is somebody who is ascribing their sorrows to their appearance.
7    This is something that as plastic surgeons this is an essential
8    part of our training as plastic surgeons because if you're
9    going to offer aesthetic surgery, you have to be able to ferret
10   out these patients who have an expectation of a result, an
11   expectation of a happiness that's not achievable through
12   cosmetic surgery.
13       And these patients also put the doctor at risk.  Dr. Mark
14   Gorney, the founder of a company called The Physicians Company,
15   very familiar with insuring doctors against harm, he gave us a
16   lecture one time describing the surgeons at highest risk of
17   violent harm are plastic surgeons doing rhinoplasties on men,
18   murders.  And it speaks to the profound level of subjective
19   investment that a patient may have in their appearance.  And
20   his theory about this, and I think experience bears it out, is
21   that the patient is ascribing their sorrows to a physical
22   attribute because they don't want to look at the actual cause
23   of their sorrow.  This is where my training taught me this in
24   plastic surgery.  And as I said earlier, this is a common
25   experience in consultation with cosmetic surgery.

1  Q     To clarify, how have you been trained to recognize signs

2  of mental distress or mental illness if a patient comes to you

3  asking for something?

4  A     Well, so the common features that I see is the patient

5  will be describing a defect that I may not be able to see.  The

6  other one is that the patient will be describing a level of

7  emotional harm caused by the defect that they see, a level of

8  sorrow.  They'll be describing what started out as a simple

9  routine cosmetic consultation has now in the course of a

10 conversation developed into something profound in their life,

11 something that's a cause of their sense of isolation or a cause

12 of their sense of failure in life.

13        Or, for example, a common one is women seeking breast

14 enhancement and in the course of the consultation they'll be

15 talking about how they fear they're losing their partner and if

16 they had better looking breasts, that they wouldn't be losing

17 their partner.  This is a real red flag for plastic surgeons

18 because essentially what the patient is hanging their life on

19 is what they perceive as the quality of your cosmetic surgery.

20 Q     You've mentioned potential dangers to plastic surgeons in

21 those situations.  Are there any other ethical reasons why a

22 plastic surgeon may be hesitant to treat patients for those

23 reasons?

24 A     Well, the term that's applied to patients who present to

25 plastic surgeons seeking an unmeetable improvement in their

1  subjective life is called body dysmorphic disorder, and this is

2  well characterized.  And you find it in the DSM-III, but you

3  also find it in textbooks of plastic surgery because this is

4  one of the very important areas of broad overlap between the

5  world of psychiatry, psychology, and plastic surgery because

6  aesthetic surgery, we're talking about the patient's feelings.

7       So body dysmorphic disorder is a very important diagnosis

8  for the plastic surgeon to make because to offer surgery to a

9  patient that they know to be presenting with body dysmorphic

10  disorder is considered misdiagnosis or failure to diagnose or

11  malpractice for offering surgery in that circumstance because

12  essentially you're offering the patient the hope in something

13  that's not founded.

14  Q    So if you had a patient come to you who wanted plastic

15  surgery and you suspected had body dysmorphic disorder, would

16  you perform that surgery?

17  A    I would not.

18  Q    Why not?

19  A    Because it's a disservice to the patient.  It's a common

20  thing that the patients will, when they have such surgeries,

21  there's a period of happiness.  This is a very common thing.

22  There's a period of happiness after the surgery, there's a time

23  of excitement, but then the excitement has worn away.  They're

24  no longer hearing compliments from their friends, they're no

25  longer feeling the emotional support or the satisfaction,

Lappert - Direct

1  because they've essentially sought a physical remedy for a

2  subjective problem.  And, of course, that's an impossibility.

3        And that's really what's at the heart of body dysmorphic

4  disorder and the reason why you don't offer surgery to them

5  because essentially you're abusing the patient in doing it, and

6  the abuse is financial.  The abuse is holding out a false hope,

7  and then the patient is left with essentially the same sorrow

8  and a bill for plastic surgery and their hopes have not been

9  realized.

10  Q     Let me pivot just a little bit.  What is your

11  understanding of informed consent?

12  A     Informed consent is the process by which the patient is

13  helped to make a decision for or against a particular care.  It

14  is a process of informing the patient about the reasons for

15  offering the procedure, what we call the indications as well as

16  the risks.  And an important part of informed consent is

17  alternative treatments.  So, for example, if I'm presenting a

18  consent form to a parent because the child has been diagnosed

19  with a hernia, I have to talk to the parent about the risks of

20  the hernia.  I have to talk to the patient about the risks of

21  the surgery to correct the hernia.  I have to discuss with them

22  alternative surgical methods for managing it, say for example,

23  endoscopic versus open and the use of mesh and all those sorts

24  of things.

25        There's usually differences of technique or methodology.

Lappert - Direct

1    And then I have to talk to them about the alternative
2    treatments so that the parents can have an understanding.  So
3    the discussion of risk is not only the risk of the surgery but
4    also the risk of not operating as well as the risks of the
5    various alternatives.
6         In that way, the parent in this case would have the
7    resources to make an informed decision.  Generally it's frowned
8    upon to pressure the person, the parent, in a particular
9    direction other than to offer that this is a high risk surgery,
10   this is a low risk surgery, higher likelihood of success, that
11   sort of thing.
12   Q    Does informed consent differ based on the evidence
13   available?
14   A    Well, it does.  So there are certain things that are
15   anecdotal on the part of the doctor.  So, for example, I guess
16   one of the newer things that I offered in my practice was the
17   use of autologous fat for the management of problematic wounds.
18   This is novel stuff.  And so all I can offer the patient in
19   that circumstance is my anecdotal experience.  I can say I've
20   done this treatment on radiation burn wounds, I've had seven
21   patients and this has been my result.  While it's certainly
22   encouraging, I could not stand in front of the patient and say
23   this has a 90 percent likelihood of success, because I don't
24   have that level of data.
25        All I have is anecdotal data, what we call level five

Lappert - Direct

1    evidence, one practitioner, me, and my anecdotal experience.

2    Level five evidence is not something that I could walk into the

3    consultation room and say this is what we must do, because I

4    don't have that level of evidence.  All I can say is my

5    experience tells me and I'm a plastic surgeon, I used to be

6    board certified, all that kind of stuff.  But that's low level

7    evidence, as compared to walking in and talking to a patient,

8    having what we call level three evidence, longitudinal study

9    that shows, well, long term evidence shows us that patients who

10   get autologous fat grafting for radiation burn wounds have a

11   75 percent likelihood of healing those wounds within three

12   months.  That's what the science shows us.  That I could

13   present with a lot more confidence, level three evidence.

14   Q    Let's return to the hypothetical of the patient who comes

15   with what you suspect might be body dysmorphic disorder and

16   wants a rhinoplasty.  What is that patient's capacity for

17   informed consent?

18   A    A person with body dysmorphic disorder?

19   Q    Yes.

20   A    Well, I guess --

21            THE COURT:  Are you talking about in general or are

22   you talking about --

23            MS. TEMPLIN:  For surgery.

24            THE COURT:  You're asking what this person's

25   capacity for informed consent could be and it's a hypothetical

Lappert - Direct

1    person.  I'm not sure I follow the question.

2    BY MS. TEMPLIN:

3    Q     Let me rephrase.  If you had a patient in the

4    hypothetical that we discussed who was seeking plastic surgery

5    to cure something such as body dysmorphic disorder, would that

6    factor in to your understanding of whether that patient could

7    consent to that plastic surgery or not and how?

8    A     Well, I would have to agree that being a hypothetical,

9    there's a whole broad range of possibilities here, and

10   depending on the seriousness of the surgery we're considering,

11   that would have a great effect.  There are some persons who are

12   so emotionally invested in their appearance or seeking cosmetic

13   surgery that they'll speak of a desire to end their life, for

14   example, they'll say that this has got to go right or I'm going

15   to end my life.  That would be absolutely exclusionary because

16   a person who is threatening suicide by definition is considered

17   incompetent to give consent regardless of what they're seeking.

18   So comparing that to somebody who has a trivial anxiety about

19   something and you just improve the appearance of their nose,

20   that would be a very different category and I would consider

21   them quite competent to give consent.  So it really touches

22   upon how grave the matter is.

23   Q     You mentioned also that the risks would factor into that

24   particular calculus just now.  Will you explain that a little

25   bit further?

Lappert - Direct

```
 1    A      Well, for example, the risk of pinning someone's ears
 2    back because their ears are prominent, that's about as low risk
 3    surgery as I could imagine.  There's no risk of function lost,
 4    there's little or no risk of local problems even.  So that
 5    would be a very low risk procedure.  On the other hand, doing
 6    an operation that involves the transfer of large flaps of
 7    tissue and the removal of natal tissues, there's a lot at risk
 8    there.  For example, in the case of transgender surgery, you're
 9    talking about hazarding a fundamental human function, which is
10    capacity for sexual embrace and reproduction.  That's a huge
11    thing to put in jeopardy compared to a cosmetic ear surgery.
12    Q      You're not a psychiatrist, but as a plastic surgeon, are
13    you familiar with what gender dysphoria is?
14    A      Yes, I am.
15    Q      How are you familiar with that?
16    A      I follow the literature.  I've reviewed the DSM.
17    Q      Are you familiar with the WPATH guidelines on treating
18    patients who are seeking gender reassignment surgery?
19    A      I am.
20    Q      What do those guidelines recommend?
21    A      Well, first of all, they recommend affirmation.  The
22    basic position of the WPATH documents is affirmation.  They
23    have portions of their what they call the WPATH Standards of
24    Care that discuss psychological, psychiatric support, but
25    there's little to nothing in there about the process of
```

1    diagnosis, which is a very troubling thing.  The diagnosis is

2    what the patient presents with.  So the recommendation, the

3    default position of the WPATH documents is affirmation.

4    Q     For specifically in the surgical context, what would that

5    mean?

6              MS. OSWELL:  Your Honor, we object to this line of

7    questioning on the grounds that the witness is not an expert in

8    gender-affirming care and was not included in his expert

9    report.

10             THE COURT:  Sustained.

11   BY MS. TEMPLIN:

12   Q     Dr. Lappert, can you predict whether a transgender

13   patient would be satisfied with the outcome of cosmetic

14   surgery?

15   A     I cannot.

16   Q     Is there evidence on this?

17             MS. OSWELL:  Objection, Your Honor.  Again, outside

18   the scope of the testimony.  The doctor has testified that he

19   has not performed any sort of gender-affirming care surgery.

20             MS. TEMPLIN:  Your Honor, Dr. Lappert has also

21   testified that as a plastic surgeon, he has to take into

22   account his patient's goals and whether it would be effective

23   and whether that expertise -- we believe he has the expertise

24   to discuss that.

25             THE COURT:  I'm going to limit it to his practice.

Lappert - Direct

```
 1              THE WITNESS:  Could you repeat the question?
 2    BY MS. TEMPLIN:
 3    Q    Yes.  In your practice, can you predict whether a
 4    transgender person who comes to you -- have you been able to
 5    predict whether that person would be satisfied with --
 6              THE COURT:  He's already answered that question.
 7              MS. TEMPLIN:  Apologies.
 8    BY MS. TEMPLIN:
 9    Q    In your review of the evidence as part of your practice,
10    what does the evidence show?
11              THE COURT:  No, ma'am.  I just said that he can
12    testify to what he has personally done in his practice, not
13    what the evidence shows.  So he can testify to his actual
14    interaction with patients and what the outcomes were, but I'm
15    going to limit it to that.
16              MS. TEMPLIN:  Can I ask him about certain studies
17    that may have been referred to in his expert report or is that
18    also outside the scope of permissible testimony, Your Honor?
19              THE COURT:  I don't know what your question is so I
20    can't answer that question.  I can tell you what I'm limiting
21    to you the question that's before the witness now.  He can
22    answer to the extent that he has hands-on experience with that,
23    but your next question I'll just have to field as it comes.
24    BY MS. TEMPLIN:
25    Q    Okay.  I'll try that question then.  Dr. Lappert, are you
```

Lappert - Direct

1  familiar with a 2020 study conducted by Richard Bränström and

2  John Pachankis on the mental health outcomes among transgender

3  individuals after gender transition surgeries?

4          MS. OSWELL:  Your Honor, we object to the

5  reference --

6          THE COURT:  He can answer whether or not he's

7  familiar with it.

8          THE WITNESS:  I have read the paper.

9          THE COURT:  I'm just going to limit you to that.

10  What's your next question, ma'am?

11          MS. OSWELL:  Your Honor, we have a further objection

12  here.  This study was not included in Dr. Lappert's expert

13  report for purposes of this litigation, or in his rebuttal

14  report or in his deposition testimony and should be excluded on

15  that basis.  And on the basis that it's outside his field of

16  expertise.

17          THE COURT:  Is that true or can you point to me some

18  designation of this report in his expert designations?

19          MS. TEMPLIN:  I don't have a reference to that.

20          THE COURT:  Then it'll be sustained.

21  BY MS. TEMPLIN:

22  Q    Are you familiar with the Centers for Medicare and

23  Medicaid Services' 2016 final decision memo on gender dysphoria

24  and gender reassignment surgery?

25          MS. OSWELL:  Your Honor, we have the same

1    objections.  This study was not included in Dr. Lappert's

2    expert report, rebuttal report, or his deposition testimony.

3    It is also outside his field of expertise.

4            THE COURT:  Same question, ma'am.  Is that true?

5            MS. TEMPLIN:  I don't know if it's in his report.

6    We are asking because that report is relevant for plastic

7    surgeons, just his own practice and what type of procedures he

8    would offer.

9            THE COURT:  Sustained.

10           MS. TEMPLIN:  Okay.

11   BY MS. TEMPLIN:

12   Q    Dr. Lappert, we've talked about mental health as

13   something that you consider before you perform aesthetic

14   surgeries.  Are there any other criteria you consider before

15   operating?

16   A    Well, I have to consider whether it's within my training

17   or within my capacity to a particular operation that may be

18   requested.  I have to consider the particular circumstances of

19   the patient, perhaps their health, perhaps their medications,

20   whatever it may be that may be precluding them from surgery.  I

21   have -- in the case of cosmetic surgery, I have to consider

22   what's the likelihood that I can satisfy what the patient's

23   desires are as we talked about before.

24   Q    Do you consider the patient's age?

25   A    Yes, I do.

1  Q      Would you perform cosmetic or aesthetic surgery on a
2  minor generally?
3  A      Only certain surgeries would I consider.  Some yes and
4  some no.
5  Q      Can you explain that?
6  A      Well, for example, like otoplasty in a child who has a
7  deformity of the ear, prominent ear, for example, a child in
8  late grade school or middle school, this is a source of
9  tremendous grief sometimes to the child.  And while it may seem
10  trivial, it can be a real burden to the child.  So that would
11  be an example where a simple 20-minute operation with zero risk
12  can change the life of that child, and I would gladly offer
13  them that surgery.  An example of a surgery I would not offer a
14  child would be breast augmentation in a 15-year-old girl, for
15  example.  That's out of the question.  I would not do that.
16  Q      Why not?
17  A      Because, first of all, the child does not have the
18  capacity to give informed consent.  By legal definition,
19  they're not capable of it.  For the parent to make that consent
20  for a cosmetic procedure like that, I would have trouble with
21  that.  And generally speaking, the American Society of Plastic
22  Surgery looks askance at cosmetic breast augmentation in
23  adolescent females.
24  Q      Dr. Lappert, is there a good -- so you've just testified
25  that you would not perform breast augmentation on a female who

Lappert - Direct

1   just wants larger breasts.  Would you take the same approach to

2   a transgender female who seeks transitioning surgery?

3   A    Well, it's -- when you say transgender female, are you

4   saying a male --

5   Q      Biological male --

6   A      -- seeking to present as female?  Yeah, I would put that

7   in the same category.  It's a cosmetic breast surgery seeking a

8   subjective improvement in their life, yeah.

9   Q    Let's talk about some of the surgeries that transgender

10  minors might seek.  What are so-called top surgeries?

11  A    Top surgeries include surgeries of the face and the neck

12  as well as surgeries of the breast.  They might include

13  masculinizing of the face or feminizing of the face, feminizing

14  of the neck, or breast surgery, either breast augmentation or

15  mastectomy and chest masculinization.

16  Q    What are bottom surgeries?

17  A    Bottom surgeries are definitive surgeries on the

18  genitalia.  They may include -- well, they typically include

19  castration, removal of the ovaries or removal of the testicles

20  and use of the natal genital tissues to create counterfeit

21  genitalia.  In the case of females seeking to present as males,

22  they may include the transfer of tissues from remote parts of

23  the body to create a counterfeit phallus.

24  Q    So starting with surgeries for a male transitioning and

25  seeking to present as female, have you ever performed facial

1  feminization surgery?

2  A     No.

3  Q     Are there similar procedures you've performed on

4  nontransgender individuals that would utilize the same

5  techniques?

6  A     Yes.

7  Q     What are those techniques?

8  A     Well, for example, the reduction of a frontal boss, a

9  large bony ridge above the brow is a common procedure done on

10 women seeking a less masculine appearance around their eyes.

11 This is a common operation which is now typically done

12 endoscopically.  A large hawkish nose sometimes gives a

13 masculine appearance to a face, and the patient may be seeking

14 a more feminine appearing nose.  A very strong jaw, a box-like

15 jaw, lantern jaw on a woman often is a source of difficulty for

16 them, and a reduction of contour of the mandible, mandibular

17 re-contouring we call them.  These are common procedures.

18 Q     Would you classify these as aesthetic?

19 A     Yes.

20 Q     Have you ever performed breast augmentation?

21 A     Countless times.

22 Q     On a transgender individual?

23 A     I have not.

24 Q     But is it the same procedure for a transgender?

25 A     Exactly the same operation.

Lappert - Direct

1   Q      How does that procedure work?

2   A      Breast augmentation typically involves the use of a

3   prosthesis, and decisions about the type of prosthesis and the

4   placement of the prosthesis in the chest either behind the

5   muscle or behind the natal breast tissue, it's an outpatient

6   surgery typically done under very brief general anesthesia.

7   Recovery is a matter of weeks for full return to full function.

8   Q      Why would a nontransgender person usually seek breast

9   augmentation?

10  A      The most common patient is a woman in her 30s who's had

11  several children and she wants to restore her appearance having

12  breast fed her children.  Maybe there's a little asymmetry in

13  the size of the breasts.  This is probably the most common

14  reason for breast augmentation.

15  Q      Are there reconstructive reasons for breast augmentation?

16  A      Well, there are two different surgeries.  Breast

17  reconstruction versus cosmetic surgery.  What amounts to a

18  breast augmentation, I suppose if you had a congenital

19  asymmetry of the chest, for example, Poland syndrome where you

20  might have a very vestigial breast on one side and partial

21  absence of the muscle, that would be a reconstructive surgery,

22  which I suppose you could characterize as an augmentation of

23  one side, but it's really a reconstruction of a congenital

24  defect.  So generally cosmetic augmentation is not considered a

25  reconstructive operation.

1    Q    For the reconstructive augmentation for something like

2    Poland syndrome, are there diagnostic criteria that would need

3    to be met?

4    A    Right.  So Poland, because it's a reconstructive surgery,

5    the issues of diagnosis and submitting of the diagnosis to

6    insurance carriers is an important part of the process for the

7    patient, so the diagnostic criteria, for example, for Poland

8    syndrome is congenital absence or significant hypoplasia of the

9    breast with associated absence of the sternal head of the

10   pectoralis major muscle.  If those two criteria are met, then

11   the diagnostic criteria are met, then you can submit that to

12   the insurance company and they will give you a prior

13   authorization and then surgical planning would proceed from

14   there with a variety of different options for the patient.

15   Q    And just to clarify what you testified earlier, if a

16   teenage girl came in seeking a cosmetic breast augmentation,

17   would you perform that?

18   A    I would not.

19   Q    Does breast augmentation have any complications?

20   A    Yes.

21   Q    What are those?

22   A    The most common complication in breast augmentation

23   surgery is what's called capsular contracture where the tissues

24   surrounding the implant will thicken and contract and cause a

25   deformity and the deformity can be severe enough to even casual

Lappert - Direct

 1   observation and then it can get to the point of pain.  So
 2   capsular contracture is the most common thing and it most
 3   likely results from incidental infection with bacteria, maybe a
 4   failure of technique during surgery, maybe a failure of
 5   manufacture of the implant.  Sometimes it can become so severe
 6   that the implant has to be removed because of peri-implant
 7   infections.  So those are the two most common complications.
 8   And then you have less common things like failure of the wound
 9   closure.  Typically not a problem.
10   Q     Are there any special difficulties with performing breast
11   augmentation on a transgender individual?
12             MS. OSWELL:  Objection, Your Honor.  This is outside
13   the scope of the doctor's practice.
14             THE COURT:  Sustained.
15   BY MS. TEMPLIN:
16   Q     Have you ever performed a vaginoplasty?
17   A     No.
18   Q     Are there similar procedures you've performed on
19   nontransgender individuals that would utilize these techniques?
20   A     Yes.
21   Q     Can you explain?
22   A     Perineal reconstruction and vaginal reconstruction
23   following cancer care and trauma.  For example, in the
24   reconstruction, I had a patient who was one of the victims of
25   the bombing of the USS Cole when I was on active duty in the

1    Navy.   The Navy ship Cole was bombed in the Gulf of Aden, two

2    of the victims came to us at Portsmouth, both of them had lower

3    limb trauma, one of them had blast injury to the perineum and

4    the vaginal area required reconstruction not only of the limb

5    but reconstruction of the vaginal introitus as well, required

6    the use of local flaps to reconstruct as well as mucosal

7    grafts.

8    Q      Are there diagnostic criteria for when such

9    reconstructive surgery would be necessary?

10   A      Certainly in her case, the diagnosis was quite evident,

11   the blast injury.   And the more common one would be

12   reconstruction following cancer care.   So cancer management

13   would involve the removal of the affected tissues and result in

14   an observable measurable deficit.   And I use the term

15   "measurement" because you have to measure out the tissues that

16   you're going to transfer to reconstruct the vaginal canal.

17   Q      Do these procedures have any potential complications?

18   A      Donor morbidity like we talked about before, what is the

19   price the patient is going to pay for harvesting the tissue

20   from elsewhere on her body to reconstruct the injured part.   It

21   may be as simple as just a skin graft, what amounts to a burn

22   wound on the thigh to restore the lining of the vagina using

23   her own thigh skin.   That's a very low risk donor defect.   If

24   I'm transferring, say, gracilis muscle from her thigh to reline

25   that area, then she has the potential risk of infection of her

1  leg compromising function of movement, those sort of things.

2  Q      Have you ever performed a mastectomy?

3  A      Yes, many times.

4  Q      How is that procedure performed?

5  A      Well, the goal of mastectomy typically is the management

6  of cancer.  And over the years, the level of aggression in the

7  operation has decreased significantly, but generally the

8  operation involves making incisions across the chest to lift up

9  flaps of skin, the skin of the chest is lifted up off the

10 breast mound itself, the breast is removed sometimes with

11 associated lymph nodes.  Typically the nipple is removed at the

12 same time, although not always.  But if you're talking about

13 mastectomy, or complete removal of the breast, then the nipple

14 comes with it typically.  And then the skin flaps are closed on

15 the chest and drains are placed to prevent fluid from

16 accumulating behind the skin flaps.  The drains are typically

17 removed at a week.  Sutures are typically removed about the

18 same time.

19 Q      Why might a woman seek a mastectomy?

20 A      Generally those decisions are guided by typically a tumor

21 board.  In most hospitals if a patient is going to have a

22 mastectomy for cancer, it's sort of standard or it has been in

23 my lifetime of practice to discuss the cases with colleagues

24 because it's a multidisciplinary treatment for breast cancer,

25 it will involve oncologists who are going to be managing

1   chemotherapy and radiation oncologists.  Decisions will be made

2   regarding the size of the tumor, the aggressiveness of the

3   cancer, the likelihood that lymph nodes are involved.  There'll

4   be a collaborative decision made about what's the best course

5   of care.  If the decision for mastectomy is made, then

6   generally speaking, the discussions are usually about what the

7   adjuvant care is going to be, will the patient be on

8   chemotherapy.  The reason that's important is because it

9   affects how the reconstructive plan fits into this.

10      So if a patient is going to get radiation therapy, for

11  example, you don't put a breast prosthesis in there because

12  they're very likely to extrude it.  A patient who is going to

13  be getting aggressive chemotherapy, very often you don't do

14  elegant reconstructive operations because you're putting the

15  tissue at risk, and then you make decisions about later

16  reconstruction.  So it's a multifaceted, multidisciplinary

17  decision-making process and the patient is brought along in the

18  consent process in all of that.

19  Q    To clarify, you just testified here that the mastectomy

20  would be reconstructive; is that correct?

21  A    Actually the mastectomy is the destructive part of it,

22  right.  The reconstruction comes later.  But that's what my

23  article was about with Dr. Toth was that planning cycle making

24  the decision about when reconstruction is going to happen,

25  making decisions about how even the incision is made with the

Lappert - Direct

1   hope of getting a better result afterwards.

2   Q    Do mastectomies have potential complications?

3   A    Yes, they do.

4   Q    What are those?

5   A    The most common complication of mastectomy is loss of

6   blood flow in the skin flaps that were elevated when the skin

7   flaps are lifted up to expose the breast mound, you're reducing

8   the blood supply to that skin, what we call simplifying the

9   blood supply to that skin.  And when you close that skin, the

10  part that's most in jeopardy that's furthest from its blood

11  supply is the edge of the incision.  So you can get what's

12  called marginal flap loss, failure of the wound to heal,

13  dehiscence of the wound where the wound actually falls apart,

14  chronic seroma, fluid accumulating behind the skin flaps, the

15  need for chronic drainage, the need for sclerosis.  Even

16  sometimes the risk of a pneumothorax where the integrity of the

17  chest wall has been damaged by the operation.

18  Q    Is a breast reduction a similar procedure?

19  A    Well, no, it's not.  It's a different operation entirely.

20  Breast reductions are operations where you're trying to

21  decrease the volume, the mass of the breast mound in order to

22  correct an orthopedic complaint.  They're considered

23  reconstructive surgery because the patient has a functional

24  deficit when they present for breast reduction.  The deficit

25  that the patient has is typically -- well, it's orthopedic in

Lappert - Direct

1    the sense that they'll have chronic neck, back, and shoulder
2    pain that can be severe enough to affect their capacity for
3    work, even routine living sometimes.
4        So this is a very well studied problem and there's a lot
5    of actuarial data behind that that patients with large breasts
6    will have a very high likelihood of visits to the pain clinic,
7    visits to the orthopedic surgeon, to the back clinic getting
8    injections, and insurance companies are very cognizant of the
9    fact that they're paying a lot of money for the care of
10   somebody who has an objective orthopedic problem.  And they
11   have linked it to the actual mass of the breasts so that they
12   can make predictions, actuarial predictions, that if a person
13   of certain stature, if you remove X amount of breast tissue
14   from them, they have a higher than 90 percent probability of
15   resolving their back pain.
16       So you have an orthopedic problem with an objective
17   criteria and you have actuarial data to show you that the
18   operation will serve the patient.  So when I obtain consent
19   from that patient, I can say you have a greater than 90 percent
20   likelihood that your back pain is going to be resolved.
21   Q    Is this procedure then reconstructive or aesthetic?
22   A    It's reconstructive because there's a functional problem.
23   Q    Are all breast reductions necessarily reconstructive?
24   A    No.
25   Q    Would you perform a breast reduction on a teenage girl

Lappert - Direct

1  seeking one for cosmetic reasons because she didn't like the

2  size of her breasts?

3  A     That gets problematic because I'm relying on the

4  patient's subjective reporting, but if the only subjective

5  complaint is just dissatisfaction with her appearance, I would

6  not only not do the operation, but I would strongly discourage

7  the parents from seeking another consultation.

8  Q     Can breast reduction have any complications?

9  A     Yes, they can, and that's the reason for rejecting that

10 patient.  Among the goals of breast reduction is not only the

11 resolution of the orthopedic complaint of neck, back, and

12 shoulder pain, but the goal is to preserve function of the

13 breast, to preserve erotic sensibility in the nipple so that

14 they can have a hope of breast feeding as well.  And the

15 preservation of the relationship between the nipple and the

16 breast tissue so that they can breast feed, so those are among

17 the goals.  Sometimes that is what we would call the donor

18 defect where you do the very best you can and yet the patient

19 comes back with an insensate nipple.  In fact, that's about a

20 10 percent likelihood of unilateral loss of nipple sensation.

21      There's a possibility that they'll come back, and because

22 of scarring in the breast or even loss of sensibility, they

23 will be unable to breast feed.  That would be a potential

24 complication.  Not so much a complication, but an adverse

25 outcome really.  So that's one of the reasons for not offering

1    the operation to a teenage girl because she may not have the

2    capacity to decide that for herself yet.

3    Q    Might a biological male get a surgery that resembles

4    breast reduction or mastectomy?

5              MS. OSWELL:  Your Honor, again, we object.  This is

6    outside the scope of Dr. Lappert's expertise.

7              MS. TEMPLIN:  Your Honor, this is not about

8    transgender procedures.  Let me ask more -- rephrase the

9    question.

10             THE COURT:  Let me just ask the same question a

11   different way.  If a male comes in for breast reduction, is

12   there any different analysis?

13             THE WITNESS:  Yes, there is, Your Honor.  It's one

14   of the common diagnosis, one of the common complaints that

15   patients come to a plastic surgeon with.  It's what's called

16   gynecomastia.  Gynecomastia is a common condition in males and

17   it has two possible causes.  The most common cause of

18   gynecomastia in males is obesity where there's just a general

19   increase in subcutaneous fat, so the contour of the chest

20   appears to resemble a breast.

21        From the standpoint of reconstructive surgery, the

22   gynecomastia that's what we call glandular gynecomastia where

23   very typically it would be one side but sometimes both sides of

24   a male patient will have a female glandular tissue behind the

25   nipple and it's a mass, it's a lump that may resemble a breast

Lappert - Direct

1   depending on the size of the patient, often times painful, but

2   it also has objective pathological diagnostic criteria, meaning

3   that in the first case of the obese patient, all I submit to

4   the laboratory is fat and so that would be considered a

5   cosmetic operation.

6        In the second case, what gets submitted to the pathology

7   lab is fiber glandular tissue which when examined under the

8   microscope appears to be female breast tissue.  So that's why

9   the term "gynecomastia" is applied.  Gynecomastia basically

10  meaning breasts like a woman.  So they differ markedly.  One of

11  them has a objective problem there, the other one is a cosmetic

12  issue.

13  BY MS. TEMPLIN:

14  Q    I may be misremembering, but did you testify at the

15  beginning that you have performed breast reconstruction on a

16  transgender individual detransitioning?

17  A    Right, I did a breast implant removal and then

18  gynecomastectomy.

19  Q    Are there any complications -- in that experience, are

20  there any complications with the gynecomastectomy removal with

21  that particular patient?

22  A    Well, gynecomastectomy, one of the most common

23  complications in gynecomastectomy is post operative bleeding.

24  The male chest has larger caliber blood vessels supplying the

25  skin and so there's a higher likelihood of incidental damage to

1    a blood vessel that causes what's called a hematoma seroma.

2    They have a higher need for post operative drainage, potential

3    for loss of sensibility in the nipple because of the way you

4    have to lift the nipple away from the chest wall.

5    Q     Have you ever performed phalloplasty?

6    A     Phalloplasty?

7    Q     Yes.

8    A     I have done phalloplasty reconstruction on trauma and

9    cancer patients.

10   Q     What does that procedure entail?

11   A     It's a broad range of procedures.  Most common is what we

12   call local flap reconstruction where you're using skin and

13   sometimes muscle to transfer a viable tissue down to the

14   phallus to reconstruct the cylinder of flesh and reconstruct

15   the urethra that's within that as well.  So it involves the use

16   of local flaps, vascularized flaps, and skin grafts in the

17   operation I've performed.  More recently phalloplasty might be

18   what we would call a free tissue transfer where you actually

19   produce the phallus structure even in a remote location on the

20   patient's body I should say and then transfer the whole

21   construct to the genital area and attach blood vessels and

22   nerves.

23         I've never done that operation before, phallus

24   reconstruction.  I've done that operation for other

25   reconstructions, but not in the case of a phalloplasty.  But

1   that would be the more contemporary operation from being what

2   we call the prefabricated free flap.

3   Q     Is this a reconstructive or aesthetic surgery?

4   A     Phalloplasty can be either one depending on why it's

5   done.  The example I gave you of reconstruction of a cancer

6   patient, I think that was a cancer patient, yeah, versus for

7   gender transitioning, that would be a different one.

8   Q     Are there diagnostic criteria for a reconstructive

9   phalloplasty?

10  A     Sure, surgical or traumatic absence of the phallus with

11  associated urethral injury.

12  Q     Do these procedures have any complications?

13  A     Any time you transfer soft tissue from one place to

14  another, you risk losing that soft tissue because of inadequate

15  blood supply, you have the donor defects that we talked about

16  depending on where you're harvesting the tissue from, the

17  patient may be paying a price for the removal of that tissue

18  from its native area and it's transferred down to the genital

19  area.  So loss of the flap because of the loss of blood supply.

20  A very common one in phallus reconstruction is urethrocutaneous

21  fistula.  You've reconstructed the urethra and that

22  reconstruction involves suture lines and those sutures can fail

23  for the reasons we described earlier, lack of blood supply, and

24  when the suture lines fail, you have urine leaking out anywhere

25  along the length of the construct.

1          The same processes can cause stricture scarring, and that

2     scarring of the reconstructed or constructed urethra will cause

3     urinary obstruction and that urinary obstruction can cause

4     problems higher up in the urogenital tract including

5     obstructive injury to the kidney.

6               MS. TEMPLIN:  Your Honor, could I have a moment?

7               THE COURT:  You may.

8               MS. TEMPLIN:  One last question that I think I

9     forgot to ask earlier.

10    BY MS. TEMPLIN:

11    Q     Just to clarify, would there ever be a purely aesthetic

12    reason to perform a total mastectomy?

13    A     Well, mastectomy, because it involves the removal of the

14    breast tissue, it involves the destruction of a human function.

15    And so as we talked about earlier, that's one of the things

16    that is considered unacceptable in cosmetic surgery, the

17    destruction of function in pursuit of a cosmetic result.  So it

18    violates one of the most fundamental principles of plastic

19    surgery.  This is like plastic surgery 1A.  So for that reason,

20    I would say no.

21              MS. TEMPLIN:  We'll pass the witness.

22              THE COURT:  We're going to break for lunch.  We'll

23    be back at 1:00.

24         (Recess at 11:57 AM.)

25

1

2                              REPORTER'S CERTIFICATE

3          I certify that the foregoing is a correct transcript of

4     proceedings in the above-entitled matter.

5

6     /s/ Karen Dellinger, RDR, CRR, CCR

7     ------------------------------------        Date: December 4, 2022
      United States Court Reporter

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Karen Dellinger, RDR, CRR, CCR
United States Court Reporter
Karen_Dellinger@ARED.uscourts.gov (501)604-5125

LAPPERT - CROSS

```
 1          (Proceedings commenced in open court at 12:50 p.m.)
 2              THE COURT:   Ready when you're ready.
 3                         CROSS-EXAMINATION
 4   BY MS. OSWELL:
 5   Q.    Dr. Lappert, just a few questions for you.
 6         The American Society of Plastic Surgeons considers
 7   gender-affirming surgeries to be reconstructive not
 8   cosmetic, correct?
 9   A.    Right.
10   Q.    And changing topics, you attended two meetings in
11   Arizona on the subject of transgender organized by the
12   Alliance Defending Freedom.   Is that correct?
13   A.    That's correct.
14   Q.    It's an organization otherwise known as ADF for
15   short.
16   A.    I'm sorry?
17   Q.    Refer to that organization as ADF for short.
18   A.    That's correct.
19   Q.    The first meeting you attended took place in 2017.
20   A.    I think that's correct, yes.
21   Q.    And ADF is not a professional scientific
22   organization, is it?
23   A.    Not to my understanding.   I don't know them real
24   well, but my understanding is they're advocacy --
25   Christian-based advocacy legal organization.
```

LAPPERT - REDIRECT

1  Q.   Okay.  And at that meeting in 2017, there was a

2  fairly long discussion about the lack of people who are

3  willing to testify and the difficulty of finding expert

4  witnesses on transgender issues, wasn't there?

5  A.   I believe there was.

6  Q.   And people at that meeting were asked whether they

7  would be willing to participate as expert witnesses,

8  weren't they?

9  A.   Yes.

10  Q.   Both you and Dr. Hruz attended that meeting, correct?

11  A.   That's correct.

12         MS. OSWELL:  Pass the witness, thank you.

13              REDIRECT EXAMINATION

14  BY MS. TEMPLIN:

15  Q.   Just a couple follow-up questions, Dr. Lappert.

16     As you were just asked about, the association of

17  plastic surgeons classifies gender-transition surgery as

18  reconstructive.

19     Do you agree with that classification?

20  A.   I do not.  It's contrary to every other case that we

21  work on.  It's an exceptional case, I should say.

22  Q.   And is it common for you to attend professional

23  conferences with other people, other doctors, medical

24  professionals, to discuss medical issues?

25  A.   Yes, it is.

1    MS. TEMPLIN:  No further questions, Your Honor.

2    MS. OSWELL:  No follow-up.

3    THE COURT:  Free to go, Doctor.

4    THE WITNESS:  Thank you.

5    THE COURT:  As I said, I would have picked that

6  up before lunch had I known that's what was going to

7  happen.

8    THE WITNESS:  I would have bought you lunch.

9    THE COURT:  Well, it's not too late.

10    Call your next witness.

11    MR. JACOBS:  Our next two witness are traveling

12  in, will be here tomorrow.  So we don't have any further

13  witnesses for this afternoon, Your Honor.  We anticipate

14  that we won't go, I wouldn't imagine, any later today than

15  we will tomorrow with the two witnesses that are on tap

16  for tomorrow.

17    THE COURT:  Let me see if I understood you.  You

18  think we'll be done by lunch tomorrow.  Is that what you

19  meant to say?

20    MR. JACOBS:  We think that's likely.  Thursday

21  will be closer to a full day and then we'll be --

22    THE COURT:  That's contrary to what I thought

23  you said that we'd be done by noon on Thursday.  I'm

24  confused.  Why are we missing a couple half days to go all

25  day on Thursday?

1     MR. JACOBS:  On Thursday -- I apologize if I

2  misspoke.  We have -- it could be closer to a full day.  I

3  think we were discussing --

4     THE COURT:  Why are we losing two half days?

5     MR. JACOBS:  For travel.

6     THE COURT:  You had all week.  I'm trying to

7  figure out why you put them on Thursday when --

8     MR. JACOBS:  For -- for Dr. Hruz, that was his

9  availability.  That was the day.

10    THE COURT:  About what the others -- the others

11  or other?  I'm not sure.

12    MR. JACOBS:  Yeah.  Availability -- there is a

13  decent chance it will only be Dr. Hruz on Thursday.  And

14  then it could be like shortly after lunch, but we're sort

15  of making decisions about sort of the last witness,

16  whether we're going to call a last witness or not.

17    THE COURT:  Well, if you got local witnesses

18  that you're thinking about calling, you need to either

19  call them today or tomorrow because I'm not going to let

20  you wait and lose two half days.  I gave you the whole

21  week.  You acted like we were going to be going steady

22  through.

23    So I'm a little at a loss at -- at why we're looking

24  at a whole day Thursday with two half days or one --

25  excuse me.  We're on Tuesday.  We're talking about

1  Wednesday, Thursday, so a half day tomorrow.

2          MR. JACOBS:  Could I just confirm one thing,

3  Your Honor?

4          THE COURT:  Sure.

5          MR. JACOBS:  Okay.  We will -- we will confer

6  and the -- I think the -- the remaining witness for

7  Thursday we will -- that we had tagged for Thursday other

8  than Dr. Hruz, I think --

9          THE COURT:  Who would that be?

10          MR. JACOBS:  That would be Dr. Hyatt.  So either

11  -- we haven't made a final decision as whether we're

12  calling Dr. Hyatt at this point.

13          THE COURT:  Where is Dr. Hyatt?

14          MR. JACOBS:  He is local?  West Memphis area.

15  So I'll check on his availability.  It may be a moot point

16  because we may decide not to call him, and then -- but I

17  don't want to inconvenience the Court.

18      I apologize if I -- you know, sliding around the

19  schedule.  That wasn't clear.  I can't remember what his

20  schedule other than Thursday looked like, so I would need

21  to confirm that.

22          THE COURT:  My point is, he needs to be ready

23  tomorrow if he's local, there is no travel issues, because

24  it's usually my position, regardless of who I'm dealing

25  with, to call your next witness or rest, especially when

1    we're losing a half day today and half day tomorrow is

2    what you're telling me.

3              MR. JACOBS:  I understand.

4              THE COURT:  Let me know.  Let the other side

5    know who you plan to call tomorrow if you would.

6         Court will be in recess.

7         (Proceedings adjourned at 1:06 p.m.)

8                        *  *  *  *  *

9                   REPORTER'S CERTIFICATE

10        I, Valarie D. Flora, FCRR, TX-CSR, AR-CCR, certify

11   that the foregoing is a correct transcript of proceedings

12   in the above-entitled matter.

13        Dated this the 6th day of December, 2022.

14   /s/ Valarie D. Flora, FCRR

15   -------------------------

16   United States Court Reporter

17

18

19

20

21

22

23

24

25