### IN THE UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF ARKANSAS
### CENTRAL DIVISION

DYLAN BRANDT *et al.*,

                                                                    PLAINTIFFS,

v.                                    Case No. 4:21-CV-00450-JM

TIM GRIFFIN, in his official capacity as
Arkansas Attorney General, *et al.*

                                                                    DEFENDANTS.

### DEFENDANTS' POST-TRIAL BRIEFING

TABLE OF CONTENTS

Table of Contents ................................................................................................. i

Introduction ..................................................................................................... 1

I.   The "Affirmative" Model Has Known Risks and No Proven Benefits ........................... 1

II.  Providing a Roadmap: What Is and Isn't at Issue ............................................. 3

III. The SAFE Act Does Not Violate Equal Protection ............................................. 5

    A.  The SAFE Act classifies based on procedure, not sex ...................................... 7

    B.  Even if the SAFE Act classifies based on transgender identity,
        transgender individuals are not a suspect class triggering intermediate
        scrutiny ............................................................................. 11

        1.  The SAFE Act does not discriminate based on transgender status ...................... 11

        2.  Transgender individuals are not a suspect class. ................................. 13

    C.  The SAFE Act passes intermediate scrutiny ............................................. 15

        1.  Sex- and status- based classifications are permissible when based
            on biological reality. .......................................................... 15

        2.  Intermediate scrutiny does not give this Court *carte blanche* to
            revisit legislative policy decisions. .......................................... 18

IV.  The Parents Do Not Have a Substantive Right to Subject Their Children to
     Risky Medical Procedures ............................................................... 20

V.   Dr. Stambough Does Not Have a First Amendment Right  to Make
     Medical Referrals ...................................................................... 23

## INTRODUCTION

The Constitution does not require States to turn a blind eye to reality. States may not deny fundamental rights or classify their citizens based on outmoded stereotypes. But they may legislate to protect public health, especially concerning children. And where a health risk is tied to real, biological differences between individuals, their legislation may (and should) acknowledge those realities.

Here, a group of plaintiffs disagree with an Arkansas statute aimed at preventing children from risking life-altering consequences—including permanent sterility—by obtaining gender transition procedures prematurely. But the Constitution does not forbid Arkansas from weighing the risks and benefits of any medical procedure and regulating accordingly—and gender transition procedures are no exception to that rule. Arkansas can ban procedures it reasonably believes to be dangerous, even if its ban must target real, sex-based consequences and even if a child's parents and doctors disagree. This Court should grant judgment to the State.

## I.     The "Affirmative" Model Has Known Risks and No Proven Benefits

Recently, the number of children identifying as transgender has skyrocketed. Proposed Facts ¶ 9. And this larger transgender population looks different too. Previously, more males than females suffered from gender dysphoria; today, that gender ratio has flipped. *Id.* ¶ 6. Researchers don't know the reasons for these shifts, though they have many possible theories ranging from biology to mental illness, social encouragement, or abuse. *Id.* ¶¶ 11-16; *accord id.* ¶¶ 192-94, 196-99, 201-09. They can't say whether any given transgender person will persist in a transgender identity. *Id.* ¶¶ 24-31. And they've done little quality research into the best way to treat the new transgender-identified population. *Id.* ¶¶ 131-49.

With so many questions unanswered, the medical profession might be expected to exercise some caution before recommending drastic medical intervention.  Indeed, in other contexts, doctors would be hesitant to okay risky medical procedures to treat a psychological disorder—and an underexplored one at that.  *Id.* ¶¶ 50, 86, 91, 98, 107-08.

Yet for many doctors treating gender dysphoria, the usual caution goes out the window. *Id.* ¶ 52.  The "affirmative" model, which uses puberty blockers, cross-sex hormones, and surgeries to treat gender dysphoria, focuses on "what the patient wants"—for now, at least—over preventing known harms or reducing the risk of emerging harms.  *Id.* ¶¶ 38, 40-41.  Some "affirmative" practitioners, both nationally and in Arkansas, will prescribe gender-dysphoria patients cross-sex hormones on their first visit.  *Id.* ¶¶ 52, 168.  Some will let children get permanently altering surgeries. *Id.* ¶¶ 127, 191.  And many do not require their patients to even get mental health counseling before starting these treatments.  *Id.* ¶¶ 39, 167, 172.  There are zero studies providing reliable evidence that these procedures provide any benefit to children suffering from gender dysphoria.  *Id.* ¶¶ 136-38.

This rush is particularly concerning given the potential consequences—consequences that Plaintiffs don't dispute, except at the margins.  Puberty blockers and cross-sex hormones can render an individual infertile and impair sexual functioning—and surgeries to remove the sexual organs certainly will.  *Id.* ¶¶ 80-82, 123.  Leaving a child on puberty blockers for too long can suppress bone density growth or stunt social development, relative to his or her peers.  *Id.* ¶¶ 68-69. Administering exogenous testosterone can harm blood pressure and heart health; exogenous estrogen may increase the risk of stroke, arrest bone growth, and increase the risk of cancer.  *Id.* ¶¶ 90, 97.  Most gender transition surgeries risk significant "donor defects," such as pain or loss of range

of movement.  *Id.* ¶¶ 109-10, 113, 116, 120, 126, 130.  And those are just the consequences we do

know about; many potential consequences have not yet been investigated.  *Id.* ¶¶ 69, 145.

Acknowledging the significant potential harms inherent in the "affirmative" model—and

the lack of evidence establishing any benefits—experts in several European countries and the State

of Florida have moved away from that model.  *Id.* ¶¶ 159-66.  Rather than immediately provide

children with significant medical interventions, each says, doctors should start with psychotherapy

to determine why the child suffers from gender dysphoria and whether that dysphoria can be alle-

viated without life-altering consequences.  *Id.* ¶ 37.

Arkansas agrees.  After hearing testimony from a detransitioner and a doctor who success-

fully uses psychotherapy instead of the "affirmative" model, the General Assembly passed the

SAFE Act, which requires doctors to hold off on drastic medical intervention, at least until an

individual reaches adulthood and can fully consent to the consequences.  *Id.* ¶¶ 179-88; *see* Ark.

Code Ann. 20-9-1501 to -1504.

Though Plaintiffs raise several constitutional challenges to the Act, their claims boil down

to a policy dispute: they think that the "affirmative" model is safer and more effective than Arkan-

sas does.  But our Constitution leaves that policy decision in the "legislature's judgment"—partic-

ularly with the benefits and risks of the "affirmative" model so unclear.  *Dobbs v. Jackson*

*Women's Health Org.*, 142 S. Ct. 2228, 2284 (2022).  This Court should resist Plaintiffs' invitation

to "substitute their . . . beliefs for the judgment of the [legislature]" and grant judgment to the State.

*Id.* (internal quotation marks omitted).

## II.    Providing a Roadmap: What Is and Isn't at Issue

Because this case has gone through a preliminary injunction hearing, appeal, and merits

trial, it's helpful to frame this brief with an overview of (1) what is or isn't at issue in this case and

(2) what has or hasn't been resolved on appeal.

*1. Defining the Issues.*  Plaintiffs appear to ask for an injunction against the SAFE Act in its entirety.  *See* Compl. ¶¶ 171, 178, 187.  Yet they do not take issue with the Act's ban on the use of public funds and facilities for gender transition procedures.  *See* Ark. Code Ann. 20-9-1503. Understandably so: the Constitution does not create a right to put gender transition procedures on the taxpayer's dime.  *See, e.g.*, *Harris v. McRae*, 448 U.S. 297, 316 (1980); *Rust v. Sullivan*, 500 U.S. 173, 203 (1991).  Whatever the Court's rulings on the other provisions, it should not enjoin a provision Plaintiffs don't even challenge.

As for the Plaintiffs' challenges to the SAFE Act's ban on providing gender transition procedures, this Court must examine the Act's application to each type of procedure before declaring it invalid, whether facially or as applied to these Plaintiffs.  And it cannot enjoin any part of the Act that Plaintiffs have no standing to challenge.  *See Town of Chester v. Laroe Estates, Inc.*, 581 U.S. 433, 439 (2017).  None of the Plaintiffs here have standing to attack the ban as applied to surgeries.  Ark. Code Ann. 20-9-1501(7).  Dr. Kathryn Stambough, the only practitioner Plaintiff, does not perform gender-transition surgeries.  Proposed Facts ¶ 174.  And the minor Plaintiffs do not indicate that they plan to seek gender-transition surgeries before turning 18—or even that Arkansas providers offer such surgeries.  Because none of them has standing on that issue, this Court should decline to enjoin the Act as applied to surgeries.

*2. Clarifying the Eighth Circuit's Holding.*  When affirming this Court's preliminary injunction, the Eighth Circuit did not address the bulk of Plaintiffs' claims: not the parents' substantive-due-process claim, the doctor's First Amendment claim, or even the Plaintiffs' equal protection theory based on transgender status.  *See Brandt by and through Brandt v. Rutledge*, 47 F.4th 661, 670 n.4 (8th Cir. 2022).  Thus, this Court is not bound by any prior determinations on those

4

issues, including its own. *See U.S. SEC v. Zahareas*, 272 F.3d 1102, 1105 (8th Cir. 2001) ("[C]onclusions of law made by a court granting a preliminary injunction are not binding.").

The Eighth Circuit addressed only Plaintiffs' theory that the SAFE Act discriminates based on sex. And on that theory, the court held only that the Act classifies based on sex to the extent that, under the Act, "medical procedures that are permitted for a minor of one sex are prohibited for a minor of another sex." *Id.* at 669. Beyond that, it deferred to this Court's preliminary view of the factual record about each challenged procedure. *Id.* (applying clear error review). Now that this Court has held a full trial, it can make final factual findings based on a complete record about whether the SAFE Act prohibits certain procedures for one sex while allowing identical procedures for the other. *See Zahareas*, 272 F.3d at 1105 (reiterating that findings of fact made at the preliminary injunction stage are not binding after trial). Thus, the Eighth Circuit's opinion doesn't require this Court to find an equal protection violation, even if that result seemed likely at the preliminary injunction stage. *Cf. Brandt by and through Brandt v. Rutledge*, 2022 WL 16957734, at *1 (8th Cir. Nov. 16, 2022) (Colloton, J., concurring in the denial of rehearing en banc) (confirming that the panel's decision does not bar this Court from entering "judgment for the State" and "dissolv[ing] the preliminary injunction").

### III.    The SAFE Act Does Not Violate Equal Protection

Onto the merits. Public health regulations are generally subject only to rational-basis review and thus are "entitled to a strong presumption of validity." *Dobbs*, 142 S. Ct. at 2245, 2284 (internal quotation marks omitted). Under rational basis, the State plainly wins: it has a legitimate interest in ensuring the safety of its citizens. *Id.* at 2284; *see* 2021 Ark. Act 626.

The SAFE Act is no exception to that general rule. Plaintiffs do not have a fundamental right to receive gender transition procedures; nor do they claim such a right. So they try two other routes to get out of rational basis: (1) alleging that the SAFE Act classifies based on transgender

identity and that transgender individuals are a suspect class deserving intermediate scrutiny and (2) casting the Act as a sex-based classification, also triggering intermediate scrutiny.

Neither works.  For one, the SAFE Act classifies based on age and procedure, not transgender identity or sex: it proscribes doctors from providing certain "gender transition procedures" to "individual[s] under eighteen," without mentioning either sex or transgender identity. Ark. Code Ann. 20-9-1502(a), (b), (c), -1503(a), (b), (d), -1504(a).

And neither procedure nor age triggers heightened review.  Procedures aren't people entitled to equal protection, and people-seeking-particular-procedures isn't a class that triggers heightened review. *Vacco v. Quill*, 521 U.S. 793, 800 (1997).  Neither is age.  *Gregory v. Ashcroft*, 501 U.S. 452, 470 (1991).  States classify based on age all the time—for drinking, driving, voting, attending school, etc.—and may always do so when they have a rational reason.  And in this context, the State certainly has a rational reason for drawing a line between children and adults: children cannot fully appreciate the long-term consequences of medical procedures, so they cannot legally consent.  Proposed Facts ¶¶ 44-45.  (Plaintiffs do not disagree; thus, they bring a parental-rights claim rather than assert some fundamental right in the child's making his or her own choice.)

But even if the Plaintiffs could show that the Act distinguishes based on transgender-identity or sex, they would still lose.  Transgender individuals are not a suspect class, so distinguishing based on transgender identity does not trigger heightened review.  Besides, any classification centers around biological differences between the sexes, not stereotypes, so the SAFE Act passes intermediate scrutiny.

One final note before diving deeper into the merits of Plaintiffs' claims.  Plaintiffs may argue that *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020), provides guidance on how to resolve their equal protection claim, but that argument is sorely misguided.  *Bostock* interprets the meaning

of "sex" in the text of Title VII, but that "text is not similar in any way" to the Equal Protection Clause. *Brandt by and through Brandt*, 2022 WL 16957734, at *1 n.1 (8th Cir. Nov. 16, 2022) (Stras, J., joined by Gruender, Erickson, Grasz, & Kobes, J.J., dissenting from the denial of rehearing en banc). Indeed, *Bostock* itself disclaims the notion that its reasoning controls "other federal or state laws that prohibit sex discrimination." 140 S. Ct. at 1753. And for good reason: The Equal Protection Clause "predates Title VII by nearly a century, so there is reason to be skeptical that [their] protections" are coextensive. *Brandt*, 2022 WL 16957734, at *1 n.1 (Stras, J., dissenting); *accord Washington v. Davis*, 426 U.S. 229, 239 (1976) (declining to hold that Title VII's race discrimination standards are "identical" to the Fourteenth Amendment's).

But even if *Bostock* controls, the SAFE Act passes muster. For one, its restrictions do not operate based on sex: no minor, male or female, can receive gender transition procedures. *See infra* Section III.A. Thus, "[t]o use the *Bostock* formulation, it is not true that but for a child's sex he or she could be given sterilizing transitioning treatments under the Act." Amicus Br. of States at *8, *Brandt v. Rutledge*, No. 21-2875 (8th Cir. Oct. 13, 2022). And even if the Act did classify based on sex, that classification is tied to real biological differences, not stereotypes. *See infra* Section III.C; *Bostock*, 140 S. Ct. at 1749 (focusing on stereotypes, not biology). Such a classification is entirely permissible, and it does not implicate discrimination based on transgender status either. *Adams by and through Kasper v. Sch. Bd. of St. Johns Cnty.*, 2022 WL 18003879, at *11 (11th Cir. Dec. 30, 2022) (en banc) ("[A] policy can lawfully classify on the basis of biological sex without unlawfully discriminating on the basis of transgender status.").

## A.    The SAFE Act classifies based on procedure, not sex.

Start with the Plaintiffs' sex-classification argument: that the Act doesn't proscribe procedures across the board, but rather procedures when provided to one sex but not the other. Compl.

¶ 163.  That argument goes something like this: under the SAFE Act, males can receive testosterone and phalloplasties, but females can't.  Conversely, females can take estrogen, but males can't.  Thus, the Plaintiffs claim the Act discriminates based on sex, not based on procedure.

Whatever the superficial appeal of that argument, it breaks down entirely when one considers each of the procedures barred.  For this Court may not simply treat gender transition procedures as a class but rather must ask whether the SAFE Act's application to each of them impermissibly classifies based on sex.  *See Bucklew v. Precythe*, 139 S. Ct. 1112, 1127 (2019) (explaining that a court may not strike down a law as facially invalid unless it is "unconstitutional in all its applications").

Some of the SAFE Act's applications *can't* be sex-based.  The evidence at trial undisputedly showed that puberty blockers work the same way in males and females alike, and sex has no bearing on their prescription or dosage, whether for treating precocious puberty or for gender dysphoria.  Proposed Facts ¶ 59.  Thus, banning their use in gender transition procedures doesn't draw any lines between the sexes; girls and boys are treated identically under the Act as it applies to puberty blockers.

The same is true of chest surgeries.  The SAFE Act obviously doesn't prevent girls from undergoing a mastectomy to treat cancer, so the Act's ban on mastectomies for gender transition can't be sex-based.  *Id.* ¶ 116.  So regardless of what this Court thinks of the other procedures at issue, it should at least hold that the SAFE Act's restrictions on puberty blockers and mastectomies aren't equal protection problems.

In addition to that obvious flaw in Plaintiffs' argument, the facts indicate that the SAFE Act works much like other policies that permissibly distinguish between different uses of a treatment or drug, not between recipients based on their sex.  State policies often deny a particular drug

or procedure for one use but not another. *See, e.g.*, Ark. Code Ann. 5-64-101(3)(A) (classifying testosterone as a controlled substance for certain purposes); Proposed Facts ¶¶ 195, 200. And courts have recognized that patients seeking a procedure for different uses are not similarly situated because they're seeking different treatments. *See, e.g.*, *McMain v. Peters*, 2018 WL 3732660, at *4 (D. Ore. Aug. 2, 2018) (prisoner seeking testosterone for PTSD not similarly situated to prisoner with Klinefelter Syndrome); *Titus v. Aranas*, 2020 WL 4248678, at *6 (D. Nev. June 29, 2020) (prisoner seeking testosterone to treat low levels not similarly situated to biologically female prisoner taking testosterone to transition).

Similarly, a patient receiving hormones or surgeries to treat gender dysphoria is not similarly situated to a person receiving them for their traditional medical purposes. Indeed, the evidence at trial showed that they are entirely different medical procedures because they have (1) different diagnoses and diagnostic criteria, (2) different goals, and (3) different risks. Drawing the line between those uses distinguishes based on procedure, not sex.

Consider puberty blockers again. Other than treating gender dysphoria, puberty blockers are ordinarily prescribed to stop precocious puberty, in which a child begins puberty at an unusually early age. *Id.* ¶ 62. But precocious puberty is a physical abnormality that can be diagnosed through "objective biological measures," *id.* ¶¶ 62-63, not a subjective psychological disorder like gender dysphoria, *id.* ¶¶ 3-5. Indeed, the goal of using puberty blockers to treat precocious puberty is to "restore [children] to that natural state that they would normally have if they did not have" a disorder—the exact opposite goal as when doctors use them to halt normal development in children with gender dysphoria. *Id.* ¶¶ 66, 70. And using puberty blockers to treat precocious puberty poses fewer potential risks than using them to treat gender dysphoria. Because the goal of treating precocious puberty is to let children develop at the normal time, doctors stop the blockers when

the child hits the normal pubertal age.  *Id.* ¶ 67.  Conversely, doctors prescribe blockers to dys-phoric children well beyond the normal age, risking their bone growth and social development. *Id.* ¶¶ 68-69, 71.  While the medication used may be the same, one procedure is not like the other.

The same distinctions exist between uses of hormones barred by the SAFE Act and those that are not.  (Indeed, the very label "cross-sex hormones" hints at the difference.)  "It is not iden-tical to give testosterone to a male as it is to give it to a female, nor is it the same thing to give estrogen to a male versus female."  *Id.* ¶ 78.  Males and females normally have very different amounts of naturally occurring testosterone or estrogen.  *Id.*  And those hormones serve very dif-ferent purposes in the different sexes.  *Id.* ¶¶ 73, 78-79.

Thus, prescribing testosterone does not have the same effects on a female as it would for a male.  In females, excess testosterone can cause infertility.  *Id.* ¶ 81.  Indeed, endocrinologists frequently treat women who are infertile because their body has a disorder causing it to produce testosterone above the normal amount for females.  *Id.* ¶¶ 88-89.  Conversely, testosterone is ordi-narily prescribed to males to help alleviate problems with their fertility or sexual development.  *Id.* ¶¶ 93-95.  The inverse is true of estrogen.  When prescribed at an excess level to males, estrogen can cause infertility and sexual dysfunction.  *Id.* ¶ 80.  But for females, estrogen is usually pre-scribed to treat problems with sexual development.  *Id.* ¶ 100.  Providing cross-sex hormones to a child is not the same procedure as providing naturally occurring hormones.

Or take the proscribed surgeries.  As with all the other procedures, gender transition sur-geries have different diagnoses, different goals, and different risks from the permissible surgeries they superficially resemble.  Plastic surgeons can, of course, provide a mastectomy to children with cancer or repair damage to a child's genitals from trauma or disease.  *Id.* ¶¶ 102, 116, 125,

10

129.  And they might perform a breast augmentation on a female with one breast not fully developed, a breast reduction on a female with severe orthopedic pain, or a gynecomastia operation on a male with pain caused by abnormal glandular tissue.  *Id.* ¶¶ 114, 118, 121.

But aside from gender transition surgeries, surgeons are ethically discouraged from operating on a perfectly healthy body part to alleviate the patient's mental distress.  *Id.* ¶ 107.  They won't sacrifice the function of other body parts to achieve a purely cosmetic result.  *Id.* ¶¶ 109-10.  And they certainly won't provide risky cosmetic surgeries to children.  *Id.* ¶ 117.  Performing gender transition surgeries on children poses each of those ethical problems, and those ethical concerns make gender transition surgeries very different procedures from life-saving mastectomies or reconstructive phalloplasties.

In sum, the SAFE Act distinguishes between different procedures, not between different sexes.  And because that distinction is perfectly rational—the different treatments have different risks and ethical concerns, especially when provided to children—the SAFE Act is perfectly constitutional.  *See Dobbs*, 142 S. Ct. at 2284 (affirming a State's interest in safety and ethics).

**B.     Even if the SAFE Act classifies based on transgender identity, transgender individuals are not a suspect class triggering intermediate scrutiny.**

Next, Plaintiffs' transgender-classification theory.  Plaintiffs argue that the Act is separately subject to intermediate scrutiny because it discriminates based on transgender status.  It doesn't, but even if it did that would not matter.  Transgender people do not constitute a suspect class under the Fourteenth Amendment, and any distinctions the Act draws on that basis are subject to rational-basis review.

**1.     The SAFE Act does not discriminate based on transgender status.**

Plaintiffs' first argument is that the SAFE Act discriminates based on transgender status because it prohibits transgender children from receiving certain procedures while allowing non-

11

transgender children to access them.  But that argument makes the same mistake that Plaintiffs' sex-discrimination argument did: the SAFE Act distinguishes based on procedure, not status.  It allows transgender children the same access to medical procedures as non-transgender children: puberty blockers to treat precocious puberty, sex hormones to treat deficient hormone production, and surgeries performed for a legitimate medical purpose, rather than gender transition.  And it prohibits providing gender transition procedures to all children, transgender and non-transgender alike.  There is no status-based classification under the Act.

Second, Plaintiffs claim that targeting gender transition procedures *effectively* targets transgender people because only transgender people seek gender transition procedures.  *See* Compl. ¶ 162.  As a factual matter, that is not necessarily true: people who do not suffer from gender dysphoria may nevertheless seek gender transition procedures.  *See* Proposed Facts ¶ 177. But even if the procedures targeted by the SAFE Act were exclusively sought by transgender individuals, it would not help Plaintiffs—and not just because transgender status doesn't trigger heightened review.  *See infra* Section III.B.2.  That's because heightened scrutiny doesn't trigger simply because people seeking a procedure are disproportionately (or even uniformly) members of a suspect class.  *Vacco*, 521 U.S. at 800.  For instance, classifications based on sex receive intermediate scrutiny, but a classification of "people seeking abortions" does not, though those people are uniformly women.  *Dobbs*, 142 S. Ct. at 2245-46 ("The regulation of a medical procedure that only one sex can undergo does not trigger heightened constitutional scrutiny unless the regulation is a 'mere pretex[t] designed to effect an invidious discrimination against members of one sex or the other.'" (quoting *Geduldig v. Aiello*, 417 U.S. 484, 496 n.20 (1974))).

### 2.      Transgender individuals are not a suspect class.

In any event, transgender individuals do not constitute a suspect class that receives heightened scrutiny.  Aside from the obvious—race, sex, national origin, religion, etc.—the Supreme Court rarely designates suspect or quasi-suspect classes.  *See, e.g.*, *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 442-46 (1985).  Indeed, the Court has rejected suspect classification for disability, age, and poverty.  *Id.*; *Mass. Bd. of Retirement v. Murgia*, 427 U.S. 307, 313 (1976); *San Antonio Ind. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 28 (1973).  The fact that so few classifications rise to the level of "suspect" itself casts "grave doubt" on the assertion that transgender identity does.  *Adams*, 2022 WL 18003879, at *7 n.5.

Precedent explains why that is so.  Classifications are suspect when they single out "distinguishing characteristics" that have historically been divorced from "the interests the State has the authority to implement."  *Cleburne*, 473 U.S. at 441 (noting that classifications attain suspect status when they have historically "provided no sensible ground for differential treatment").  Sex classifications, for example, are suspect because they often "reflect outmoded notions of the relative capabilities of men and women," rather than real differences.  *Id.* at 441.  Same for racial classifications.  *Murgia*, 427 U.S. at 313-14.  Thus, to rise to the level of suspect, a classification must single out a so-called "immutable characteristic" that has historically been the basis for deep discrimination.  *See Lyng v. Castillo*, 477 U.S. 635, 638 (1986) (looking for (1) immutable characteristics that define (2) a discrete group, (3) historical discrimination, and (4) political powerlessness).

Transgender identity does not check these boxes.  For one, it is not "an immutable characteristic determined solely by the accident of birth."  *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973).  To the contrary, individuals identify as transgender when their internal perception of who they are departs from the "immutable characteristic" that is their biological sex.  Proposed Facts

¶¶ 1-3.  The evidence at trial (including from Plaintiffs' own experts) established that this perception can change over time: transgender individuals are not born identifying as transgender, and even after beginning to identify as transgender their gender identity may later switch to nonbinary or revert to align with their biological sex.  *Id.* ¶¶ 4, 24-31, 18-88, 193, 196-97.  And though researchers are still unsure of the cause of transgender identity, it may be influenced by personal trauma or social norms in addition to or rather than biological factors.  *Id.* ¶¶ 5-16.

Transgender identity falls short on the other suspect-classification factors too.  Plaintiffs have not shown that transgender individuals have experienced a history of purposeful unequal treatment under the law or that they are politically powerless.  *Id.* ¶ 23; *Murgia*, 427 U.S. at 313.  Nor could they.  Transgender individuals as a class look quite "unlike" those individuals who were long denied equal protection because of their race, national origin, or gender.  *Id.* at 314 (rejecting age as a suspect class because the elderly have not faced discrimination "akin to [suspect] classifications").  States enshrined purposeful race and sex discrimination into their laws for decades; conversely, as the Supreme Court has explained, transgender individuals have been protected by a "major piece" of federal civil rights legislation" for nearly a half-century.  *Bostock*, 140 S. Ct. at 1753.

Indeed, the laws (wrongly) described as discriminating against transgender individuals are *recent* enactments grappling with the policy questions and potential harms arising from the recent spike in transgender identification.  Any classification in these laws (and in the SAFE Act) is closely related to relevant State interests—a far cry from Jim Crow or coverture.  *Cleburne*, 473 U.S. at 441.  For example, the dangers inherent in taking cross-sex hormones arise when they are, by definition, administered to a person of the opposite sex—something that occurred very rarely in medicine until the advent of the "affirmative" model of treating gender dysphoria.  To the extent

that regulating to prevent those harms requires zeroing in on those individuals most likely to risk them, such a classification is a "sensible ground for differential treatment," not the sort of irrelevant grouping that warrants heightened review.  *Id.*

**C.     The SAFE Act passes intermediate scrutiny.**

Even if this Court says that the SAFE Act classifies by sex or that transgender individuals constitute a suspect class, the Act still does not have an equal protection problem.  For to explain the Act's classification as necessarily sex- or transgender-identity- based is to explain why it survives intermediate review: if the State's interests in safety and medical ethics are implicated only when a procedure is offered to one sex, a sex-based classification is necessarily related to those interests.  And a transgender identity doesn't obviate those sex-based harms.  *Accord Adams*, 2022 WL 18003879, at *8 (upholding single-sex bathroom policy); *B.P.J. v. W.V. State Bd. of Educ.*, 2023 WL 111875, at *7 (S.D.W.V. Jan. 5, 2023) (upholding single-sex sports policy).

**1.     Sex- and status- based classifications are permissible when based on biological reality.**

The Equal Protection Clause commands that "all persons *similarly situated* . . . be treated alike."  *Cleburne*, 473 U.S. at 439 (emphasis added).  But males and females are not similarly situated with respect to receiving sex hormones or obtaining certain surgeries.  The male body reacts differently to testosterone and estrogen than the female body does, and those physical differences mean that prescribing the same hormone to the different sexes has different consequences.  Same for surgeries—vaginoplasties, for example.  Surgery to reconstruct and return function to a female's damaged vagina is altogether different from surgery to create an artificial one in a male.  *See supra* Section I.A.  A law targeting the unique consequences and ethical problems inherent in providing cross-sex hormones to or operating on one sex can't help but acknowledge those biological realities.  *Dobbs*, 142 S. Ct. at 2245-46.

And the Constitution does not require States to ignore "[t]he truth . . . that the two sexes are not fungible." *Ballard v. United States*, 329 U.S. 187, 193 (1946).  To the contrary, "fail[ing] to acknowledge . . . basic biological differences . . . risks making the guarantee of equal protection superficial, and so disserving it."  *Nguyen v. INS*, 533 U.S. 53, 73 (2001).

Indeed, "the biological differences between males and females are the reasons intermediate scrutiny," not strict, "applies in sex-discrimination cases in the first place."  *Adams*, 2022 WL 18003879, at *12; *accord id.* at *7 n.6 (describing biological differences as "the driving force behind the Supreme Court's sex-discrimination jurisprudence").  Intermediate scrutiny exists to ensure that States do not legislate based on "overbroad generalizations about the different talents, capacities, or preferences or males or females"—generalizations that have no basis in biology. *United States v. Virginia*, 518 U.S. 515, 533 (1996).  Thus, the Supreme Court has struck down policies grounded in the presumption that women don't like competition, that they have less skill in managing or distributing property, or that they mature faster.  *See, e.g., id.* at 541 (single-sex military academy); *Kirchberg v. Feenstra*, 450 U.S. 455, 459-60 (1981) (husband solely controlled marital property); *Reed v. Reed*, 404 U.S. 71, 74 (1971) (mandatory preference for males as executor of an estate); *Craig v. Boren*, 429 U.S. 190, 192 (1976) (earlier drinking age for females); *Stanton v. Stanton*, 421 U.S. 7, 14 (1975) (child support requirement terminated earlier for female children).

But intermediate scrutiny, rather than strict, applies in sex-discrimination cases to ensure that courts don't throw the baby out with the bathwater.  Distinctions based on "enduring" and "[i]nherent differences" between the sexes are, by their nature, substantially related to the relevant governmental interest and have thus been upheld time and time again.  *Virginia*, 518 U.S. at 533

(internal quotation marks omitted). Take *Nguyen v. INS*, which upheld a citizenship statute requiring children born out-of-wedlock and abroad to U.S. citizen fathers to meet a different standard of proof than children with citizen mothers. 533 U.S. at 58. That distinction was permissible because "[f]athers and mothers are not similarly situated with regard to the proof of biological parenthood." *Id.* at 63. Or consider *Michael M. v. Superior Court*, which upheld a statutory-rape statute that prohibited sex with a minor female only. 450 U.S. 464, 466 (1981). The Court explained that that classification was permissible because "young men and young women are not similarly situated with respect to the problems and the risks of sexual intercourse. Only women may become pregnant. . . ." *Id.* at 471.

In short, biology matters, and legislatures aren't required to ignore difference rooted biology. Rather, when preventing harms unique to one sex, legislatures can and should take sexual differences into account. And when it is mostly (or even only) transgender individuals who risk those harms, legislatures can craft rules that single out those people for protection.

Indeed, two recent decisions demonstrate that classifications grounded in biological reality survive intermediate scrutiny, even in claims brought by transgender people. *Adams*, 2022 WL 18003879, at *7 n.5 (analysis about sex-based intermediate scrutiny would be the same if transgender individuals were a suspect class). In *Adams*, the Eleventh Circuit, sitting en banc, upheld a school's policy separating bathrooms by biological sex. *Id.* at *1. Because males and females are anatomically different, the school had a legitimate interest in "protecting the privacy interests of students" in "shielding one's body from the opposite sex." *Id.* at *7 n.6 & *8. Because that interest was grounded in real, physical differences between the sexes, classifying based on sex satisfied intermediate scrutiny. *Id.* at *8. And the school's interest didn't change even though the

transgender student identified as a member of the opposite sex.  That student retained the anatomical features of the student's natal sex—and indeed, could not change the "immutable characteristic of biological sex" that underpinned the school's real privacy interests.  *Id.* at *7 n.6, *10 (citing *Frontiero*, 411 U.S. at 686).

Similarly, in *B.P.J. v. West Virginia Board of Education*, a district court upheld West Virginia's law prohibiting biological males from playing girls' sports, whether or not they identify as transgender.  2023 WL 111875, at *7.  That's because "[w]hether a person has male or female sex chromosomes," not what gender he or she identifies as, "determines many of the physical characteristics relevant to athletic performance."  *Id.*  And "males [generally] outperform females because of inherent physical differences between the sexes."  *Id.*  To further its "interest in providing equal athletic opportunities for females," the State could "legislate sports rules" based on biological sex.  *Id.* at *7-8.  So too, Arkansas can legislate based on sex and transgender status to prevent sex- or status-based harms and pass intermediate scrutiny.

## 2.   Intermediate scrutiny does not give this Court *carte blanche* to revisit legislative policy decisions.

Notwithstanding the permissibility of a sex- or status-focused classification generally, Plaintiffs might attack the SAFE Act as insufficiently related to the State's asserted interest.  Plaintiffs don't dispute that Arkansas has an important interest in "protecting the health and safety of its citizens, especially vulnerable children."  2021 Ark. Act 626, sec. 2(1).  Instead, they attempt to recast that interest as "protecting minors from ineffective and harmful treatments," and attempt to show that the prohibited procedures are effective and safe (or that the State can't prove that they aren't).  *See, e.g.*, Pre-Trial Br. at 21.

That misconstrues both the aims of the Act as well as the State's burden under intermediate scrutiny.  The General Assembly made no definitive judgments about the safety or efficacy of the

procedures at issue.  Nor could it; the impetus of the Act is the early stage of the research in this field.  Rather, the legislature's judgment was that the "risks of gender transition procedures far outweigh any benefit at this stage of clinical study on these procedures." 2021 Ark. Act 626, sec. 2(15).  The evidence at trial showed that this conclusion was well-supported.  The harms of these procedures are well known, in many cases permanent and life-altering, and the research aiming to show their benefit is in its infancy and currently insufficient to justify the risks posed by the procedures.  *See supra* Section I.

The Court's role in resolving this dispute is not to decide whether Arkansas or the Plaintiffs are correct about whether the procedures at issue will ultimately turn out to be the best way of treating gender dysphoria in children.  Rather, the Court must examine whether the distinction drawn by the Act—whether sex or transgender status—is substantially related to the reason the legislature included the classification in the law.  To the extent that the SAFE Act may prohibit, for example, girls from receiving testosterone but not boys, it is because the serious risks identified by the General Assembly accrue to girls taking testosterone and not boys.  The State does not have to show that the Act was the best way to mitigate those harms.  "[T]he Equal Protection Clause does not demand a perfect fit between means and ends when it comes to sex." *Adams*, 2022 WL 18003879, at *5.  Nor does the reach of the law have to be precise.  After all, "[n]one of [the Supreme Court's] gender-based classification equal protection cases have required that the statute under consideration must be capable of achieving its ultimate objective in every instance." *Nguyen*, 533 U.S. at 70.

Finally, Plaintiffs might also retort that, whatever the permissibility of those classifications, Arkansas's policy is not sufficiently tailored because it does not allow for exceptions (such as controlled studies of childhood gender transition procedures).  But intermediate scrutiny is not

strict; Arkansas must show simply that its "classification serves [its] important governmental objectives," not that it has crafted the narrowest rule possible or the rule that would best serve its interests. *Virginia*, 518 U.S. 524 (internal quotation marks omitted); *accord B.P.J.*, 2023 WL 111875, at *8 (holding that West Virginia need not except from the single-sex sports policy biological males transitioning to female who'd taken puberty blockers or cross-sex hormones).

Besides, Plaintiffs provide no evidence of what a workable exception would be. They may perhaps point to policies in other countries allowing children to receive puberty blockers, cross-sex hormones, or gender transition surgeries within narrow controlled studies. Proposed Facts ¶ 162. But the Plaintiffs point to no such study in Arkansas, and Dr. Stambough, the one practitioner Plaintiff, has no plans to set up one. This Court should not strike down the SAFE Act for failing to provide a hypothetical exception that wouldn't change the Act's application in the real world.

At bottom, Plaintiffs ask this Court to second-guess the General Assembly's policy choices under the guise of conducting intermediate scrutiny. But that is not the role of the courts. Weighing risks and benefits of emerging and experimental areas of medicine is a core legislative function into which this Court may not intrude. To the extent the Act draws distinctions that are reviewed under heightened scrutiny, the General Assembly had good reasons for doing so. That is all that is required, and this Court must therefore uphold the Act's constitutionality.

## IV.     The Parents Do Not Have a Substantive Right to Subject Their Children to Risky Medical Procedures

The parents' substantive-due-process claim likewise fails. Gender transition procedures are a recent invention not deeply rooted in our nation's history and traditions, so the Constitution does not establish a right to obtain them. And Plaintiffs wisely do not argue that it does. Still,

they try to smuggle a right-to-gender-transition-procedures claim in through a backdoor: a nominally different substantive-due-process argument that parents have the right to make medical decisions for their children and thus to sign them up for gender transition procedures.

With even a moment's thought, the absurdity of this argument becomes clear.  If the State can permissibly ban abortion, parents don't have a separate substantive-due-process right to get their teenage daughter an abortion.  *Cf. Dobbs*, 142 S. Ct. at 2257 (no right to abortion).  If the State can ban euthanasia, parents can't ask a doctor to aid in their terminally ill son's suicide.  *Cf. Washington v. Glucksberg*, 521 U.S. 702, 710 (1997) (no right to assisted suicide).  And if substantive due process does not prevent States from barring dangerous gender transition procedures, parents have no right to put their preteen on puberty blockers.  Parents may have a (qualified) right to decide which lawful medical procedures their children receive; they do not have the right to expand the menu of legally available options.

No precedent suggests otherwise.  True, parents have a general substantive-due-process interest in raising their children.  *See, e.g.*, *Troxel v. Granville*, 530 U.S. 57, 65-66 (2000) (compiling cases).  A State cannot, for instance, strip a parent's custody of his children without due process, countermand a custodial parent's decisions about who visits her child, or bar parents from raising their children within a particular religious tradition.  *See, e.g.*, *id.* (visitation); *Stanley v. Illinois*, 405 U.S. 645, 649 (1972) (custody); *Wisconsin v. Yoder*, 406 U.S. 205, 231-32 (1972) (religious education).

Even so, "a [S]tate is not without constitutional control over parental discretion in dealing with children when their physical or mental health is jeopardized."  *Parham v. J.R.*, 442 U.S. 584, 603-04 (1979); *see also Prince v. Massachusetts*, 321 U.S. 158, 166 (1944) (noting that "the family itself" has never been "beyond regulation in the public interest").  "[T]he [S]tate as parens patriae

may restrict the parent's control . . . in many . . . ways." *Id.* Parents cannot exempt children from compulsory vaccination; they do not have a constitutional right to expose their child "to ill health or death." *Id.* at 166-67. They cannot deny their children medical treatment for serious illness or injury. *Application of Pres. & Directors of Georgetown College, Inc.*, 331 F.2d 1000, 1007 (D.C. Cir. 1964) (in chambers opinion). And under Arkansas law, they have historically been unable to consent to their teenager drinking alcohol. *State v. Jarvis*, 427 S.W.2d 531, 534 (Ark. 1968). If parents truly had a right to make health and medical decisions for their children notwithstanding state law, none of this could be true.

At most, the parents may possess a substantive-due-process right to stand in the shoes of their child and make medical choices children lack the legal capacity to make. *Parham*, 442 U.S. at 602. Where a State interferes with a parent's choice between otherwise legally permissible interventions, it interferes with that right. *But see id.* at 604 (noting that a parental decision to admit mentally ill children to mental hospitals was "in no sense . . . an absolute right" free from State intervention). But such a right cannot extend to vetoing State policy choices that apply to all its citizens.

The parents' claim really boils down to a policy disagreement with the State. *See* Compl. ¶ 174 (noting that the parents, child, and doctor all prefer the "affirmative" model); *id.* ¶ 175 (describing the "affirmative" model as "well-accepted"); *id.* ¶ 177 (describing the "affirmative" model as "medically accepted"). But Arkansas—like several European countries and the Florida medical board—weighs the (known) risks and (unproven) benefits very differently. And under our Constitution, that's Arkansas's call to make. *Dobbs*, 142 S. Ct. at 2284.

22

### V.    Dr. Stambough Does Not Have a First Amendment Right
### to Make Medical Referrals

Finally, Dr. Stambough claims that the SAFE Act restricts her freedom of speech by bar-ring referrals for gender transition procedures.  Ark. Code Ann. 20-9-1502(b), -1504(a).  But at trial, she did not put on evidence about the referral provision at all, let alone provide facts that it would chill her freedom of speech.

Nor could she.  For "refer" is not synonymous with "recommend."  In medical terms, a referral is a "written order from [a] primary care doctor" sending patients "to get certain medical services."  Centers for Medicare & Medicaid Services, *Referral*[1]; *accord "Referral*," Merriam-Webster Dictionary ("the process of directing or redirecting . . . to an appropriate specialist or agency for definitive treatment").  Thus, the SAFE Act prohibits ordering a patient to another doctor for cross-sex hormones or a mastectomy.  Ark. Code Ann. 20-9-1502(b) (barring referrals to another "healthcare professional").

And that treatment order is professional conduct subject to regulation, not speech.  True, ordering a child to see a particular specialist involves incidental speech and dissemination of in-formation: the words on the order and the doctor's signature are literal speech, and sending them to another doctor is a form of communication.  But "States may regulate professional conduct, even though that conduct incidentally involves speech." *Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2372 (2018).  For instance, States may require physicians to obtain informed consent because that is part of properly performing a medical procedure, even if inci-dentally speech. *Id.* at 2373.  Even more on point, States may regulate or ban certain prescriptions,

---

[1] https://www.healthcare.gov/glossary/referral (last visited Jan. 22, 2023).

*see, e.g.*, Ark. Code Ann. 5-64-308, even though a prescription—"a written direction for the preparation, compounding, and administration of a medicine"—involves incidental speech.  *"Prescription,"* Merriam-Webster Dictionary.  (Indeed, Dr. Stambough doesn't say that the SAFE Act violates her free speech rights by barring her from prescribing puberty blockers or cross-sex hormones.)  Referrals are no different: like an order to obtain a particular drug, an order to obtain a particular medical procedure is conduct that may be prohibited without running afoul of the First Amendment.

The SAFE Act's focus on conduct, not communication, is confirmed not only by a proper reading of "refer . . . to any healthcare professional" but also by the Act's structure, its purpose, and the whole of the Arkansas Code.  Start with structure.  When the SAFE Act proscribes referrals, it does so in the context of ensuring that conduct (provision of gender transition procedures) is banned: in the provision immediately preceding the bar on referrals, the Act proscribes doctors from providing the procedures themselves.  As that structure suggests, the ban on referrals is best read as covering all the bases to ensure that a doctor doesn't perform gender transition procedures on Arkansas children—whether by prescribing the hormones or operating herself or sending the child to someone else who would.  By contrast, nowhere does the Act target communication.

The Act's enacted purpose explains why it targets procedures but not speech: the "efficacy and safety" of gender transition procedures is doubtful, but doctors may be able to treat gender dysphoria without life-altering consequences by *talking*.  *See* 2021 Ark. Act 626, sec. 2(4) (legislative findings encouraging psychotherapy).  It would be counterproductive for a legislature encouraging doctors to start with psychotherapy—which requires doctors to dig into the reasons a

child might want to obtain gender transition procedures and to thoroughly discuss the risks, Proposed Facts ¶¶ 33-35—to ban any discussion of those procedures whatsoever.  To match that purpose, the best reading of "referral" must be "treatment order," not "speech."

Finally, reading "referral" to mean "treatment order" fits with how that term is used elsewhere in the Arkansas Code.  The Code consistently uses "refer" or "referral" to refer to formal orders for treatment, not to mean "speech."  *See, e.g.*, Ark. Code Ann. 20-15-1502(14); *id.* 20-16-1601(2); *id.* 20-47-803(17); *id.* 20-76-705(5)(C); *id.* 20-77-134; *id.* 20-77-146; *id.* 20-78-105.  When it wants to target speech too, it says so directly.  *See, e.g.*, *id.* 20-16-1602(b) (barring grant money from going to organizations that "provide[] abortion referrals" *or* "counsel[] in favor of elective abortions").  Because the SAFE Act mentions only referrals and not anything resembling speech, it doesn't violate the First Amendment.

* * * * *

Nothing in the Constitution creates a right to obtain gender transition procedures—and Plaintiffs don't deny that.  Yet because they disagree with Arkansas's ban on providing gender transition procedures to children, they ask this Court to implicitly recognize such a right anyway—by telling the State that it can't legislate on the subject because that legislation would account for biological realities, letting parents exempt their children from State law whenever they disagree, or allowing doctors to perform whatever procedures they'd like if they also talk about them.  But the Constitution isn't an obstacle course that States must climb when they want to legislate on a controversial public health issue, and this Court should not treat it as such.  *Dobbs*, 142 S. Ct. at 2245, 2284.  This Court should grant judgment to the State.

Dated:  February 1, 2023

Respectfully submitted,

TIM GRIFFIN
  Attorney General

DYLAN L. JACOBS (2016167)
  Deputy Solicitor General
MICHAEL A. CANTRELL (2012287)
HANNAH L. TEMPLIN (2021277)
  Assistant Solicitors General
OFFICE OF THE ARKANSAS
  ATTORNEY GENERAL
323 Center Street, Suite 200
Little Rock, Arkansas 72201
(501) 682-2007 (main)
Dylan.Jacobs@ArkansasAG.gov

*Counsel for Defendants*