**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION**

- - - - - - - - - - - - - - - - - - - - - - - - -     x

DYLAN BRANDT, et al.,

                Plaintiff,

          v.

TIM GRIFFIN, et al.,

             Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - -     x

:
:
:
:
:
:
:
:
:
:

Case No. 4:21-CV-00450-JM

**<u>PLAINTIFFS' REDACTED POST-TRIAL BRIEF</u>**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................1

ARGUMENT ..........................................................................................................4

I.     PLAINTIFFS HAVE ARTICLE III STANDING TO PURSUE THEIR CLAIMS. ..........4

II.     THE TRIAL RECORD SHOWS THAT THE ACT VIOLATES THE EQUAL PROTECTION CLAUSE. ...............................................................................7

     A.     The Act Is Subject to Heightened Scrutiny Because It Classifies Based on Transgender Status and Sex. ..............................................................8

         1.     The Act Classifies on the Basis of Transgender Status and Sex................. 8

         2.     Classifications Based on Sex and Transgender Status Each Independently Trigger Heightened Scrutiny............................................. 11

     B.     Defendants Failed to Carry Their Burden Under Heightened Scrutiny.................14

         1.     The Banned Care Improves Patient Health................................................. 15

         2.     The Arguments Underlying Defendants' Claim That the Act Advances an Interest in Protecting Children Are Unsupported by the Record and Do Not Justify the Act. ..................................................... 18

             a.     The Assertion That There Is a Lack of Evidence of Efficacy Does Not Justify the Act. ............................................................. 20

             b.     The Potential Risks of Treatment Do Not Justify the Act. ........... 23

             c.     The Claim That a Majority of Patients Will Desist in Their Gender Incongruence Does Not Justify the Act. ......................... 26

             d.     The Possibility That Patients Will Regret Irreversible Treatment Does Not Justify the Act.............................................. 27

             e.     Claims About Treatment Being Provided Without Appropriate Assessment or Informed Consent Do Not Justify the Act. .......................................................................... 288

     C.     The Act Does Not Survive Any Level of Scrutiny. ...............................................30

III.     THE TRIAL RECORD SHOWS THAT THE ACT VIOLATES THE DUE PROCESS CLAUSE...............................................................................33

IV.   THE TRIAL RECORD ESTABLISHES THAT THE ACT'S REFERRAL
      PROHIBITION VIOLATES THE FIRST AMENDMENT.................................34

      A.   The Referral Prohibition Prohibits Speech. ..........................................35

      B.   The Referral Prohibition Constitutes Content and Viewpoint
           Discrimination.........................................................................................37

      C.   The Evidence Confirmed that the Referral Prohibition Fails Strict
           Scrutiny...................................................................................................37

V.    A STATEWIDE PERMANENT INJUNCTION IS NECESSARY...............................388

      A.   Permanent Injunctive Relief Is Warranted............................................39

      B.   A Statewide Facial Injunction Is Necessary. ........................................42

CONCLUSION...............................................................................................................43

## INTRODUCTION[1]

When the State of Arkansas banned one and only one type of medical care for adolescents—care related to "gender transition"—it took away the only evidence-based treatment option for youth with gender dysphoria.  (*See* Pltfs' Proposed FOF ¶ 242.)  And by enacting this sweeping prohibition, the State took away medical care from a single group of Arkansans—transgender adolescents.

Transgender individuals have a gender identity that differs from their assigned sex at birth.  (*Id.* ¶ 126.)  A transgender male is a boy or man who was assigned female at birth.  A transgender female is a girl or woman who was assigned male at birth.  Many transgender individuals experience severe distress from the incongruence between their gender identity and assigned sex at birth.  The medical term for this distress is gender dysphoria.  (*Id.* ¶ 135.)  The American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders-5 ("DSM") has two diagnoses related to gender dysphoria, one for pre-pubertal children and one for adolescents and adults.  (*Id.* ¶ 137.)  The diagnostic criteria for gender dysphoria in adolescents and adults include incongruence between an individual's experienced or expressed gender and their sex assigned at birth lasting for at least six months and clinically significant distress or impairment in social or occupational function.  (*Id.* ¶ 138.)  Gender dysphoria is a serious condition that, if untreated, can have severe consequences for patients' health and well-being.  (*Id.* ¶ 140.)

When the State prohibited all medical care for adolescents related to "gender transition," it discriminated on the basis of transgender status and sex, violating the equal protection rights of transgender adolescents and their doctors; infringed upon the substantive due

---

[1]     Plaintiffs refer the Court to Plaintiffs' Proposed Findings of Fact (hereinafter, "Pltfs' Proposed FOF") for the full background and relevant facts.  (*See* ECF No. 259.)

process rights of their parents to make medical decisions for their children; and violated the First Amendment rights of the families who need to receive information about obtaining treatment and the clinicians who need to provide such information.

Though Defendants claim that Act 626, ARK. CODE ANN. § 20-9-1502 ("the Act"), was passed to protect children, the evidence presented at trial made clear that the law does just the opposite. Even Dr. Stephen Levine, one of Defendants' experts, testified that the law would have "shocking" and "devastating" psychological consequences for Arkansas youth if it were to go into effect. (Pltfs' Proposed FOF ¶ 390.) He went so far as to suggest that doctors would ultimately violate the law to continue providing care to their patients. (*Id.*)

These "shocking" and "devastating" consequences were well understood by the Plaintiff families and doctors who testified about the range of serious consequences of denying patients the care prohibited by the Act. When the General Assembly was considering passage of the Act, parent Plaintiff Donnie Saxton testified at trial that his transgender son, minor Plaintiff Parker Saxton, was "broken." (*Id.* ¶ 72.) Donnie testified, "I started sleeping on the couch, you know, as close to him as I could." (*Id.*) He was fearful that Parker would hurt himself. (*Id.*) Because of the preliminary injunction, Parker was able to continue the testosterone treatment he was receiving at the gender clinic at Arkansas Children's Hospital ("ACH"). (*Id.* ¶ 73.) Because of this treatment, Parker is a "new person, . . . a complete turnaround of the broken, depressed, anxious, shell that he was before testosterone. It's amazing. Truly amazing." (*Id.* ¶ 75.) The Plaintiff families testified that if the Act were to go into effect, they would be forced to uproot their lives and families, incurring significant personal and financial hardship, to ensure that they could provide their adolescent children with the medical treatment that they need. (*Id.* ¶¶ 28-30, 56-57, 79-84, 105-08.)

Meanwhile, Defendants presented no evidence explaining how the Act would protect the minor Plaintiffs, three of whom have come to rely on the prohibited treatments for their health and well-being.  (*Id.* ¶¶ 23, 54, 75-76.)  Nor did Defendants provide any evidence contesting the extensive clinical experience of five doctors—three expert witnesses and two Arkansas providers—explaining the many benefits of treatment observed clinically in patients over decades. (*See e.g.*, *id.* ¶¶ 218-20.)

Ultimately, the evidence at trial showed not only that decades of clinical experience but also scientific research demonstrate that the banned treatments are safe and effective and that they benefit many adolescents with gender dysphoria.  (*See e.g.*, *id.* ¶¶ 223-37.)  In the United States, the widely accepted treatment protocols for gender dysphoria are published by the Endocrine Society and the World Professional Association for Transgender Health ("WPATH"). (*Id.* ¶ 146.)  These guidelines were developed through a systematic review of available scientific evidence.  (*Id.* ¶ 152.)  Treatments that may be indicated for adolescents include puberty-delaying medication, gender-affirming hormone therapy, and less commonly, surgery—these treatments are sometimes referred to as "gender-affirming medical care."  (*Id.* ¶ 158.)  Prior to the initiation of any endocrine or surgical treatment for adolescents, the guidelines require comprehensive mental health evaluations and a thorough informed consent process.  (*Id.* ¶ 162.)  All major medical and mental health professional associations in the United States recognize these guidelines as authoritative, including the American Academy of Pediatrics, the American Medical Association, and the American Psychiatric Association.  (*Id.* ¶ 154.)  These guidelines are followed by doctors at the gender clinic at ACH, the main provider of gender-affirming medical care to adolescents in Arkansas.  (*Id.* ¶ 191.)

By cutting off this well-supported medical treatment to adolescents in Arkansas, the State did nothing to protect children. The evidence put forth at trial made crystal clear that the Act would cause severe and irreparable harms to Plaintiffs and many other families in Arkansas and to the doctors who care for them. (*See e.g.*, *id.* ¶¶ 314-345.) Defendants have failed to justify the State's sweeping and devastating intrusion into the constitutional rights of Arkansas adolescents, their parents, and their doctors.

## ARGUMENT

## I.     PLAINTIFFS HAVE ARTICLE III STANDING TO PURSUE THEIR CLAIMS.

The evidence presented at trial confirmed that Plaintiffs have standing to pursue their claims. "To show standing under Article III of the U.S. Constitution, a plaintiff must demonstrate (1) injury in fact, (2) a causal connection between that injury and the challenged conduct, and (3) the likelihood that a favorable decision by the court will redress the alleged injury." *Iowa League of Cities* v. *EPA*, 711 F.3d 844, 869 (8th Cir. 2013) (citations omitted). The undisputed evidence at trial established that, if the Act were to go into effect, (i) three of the minor Plaintiffs—Parker Saxton, Dylan Brandt, and Sabrina Jennen—would have to discontinue treatment that they, their parents, and their doctors all agree is medically indicated for them and benefitting their health and well-being, and minor Plaintiff Brooke Dennis would be unable to obtain treatment she will imminently need[2]; (ii) the parent Plaintiffs would have to watch their children suffer the loss of care or endure severe personal and financial hardship to access care for their children in other states, and (iii) the physician Plaintiff, Dr. Kathryn Stambough, would be unable to treat her patients who need care, leaving them to suffer, and unable to refer them to other

---

[2]     A party has suffered an injury in fact sufficient to confer Article III standing when "[a] threatened injury [is] certainly impending." *School of the Ozarks* v. *Biden*, 41 F.4th 992, 997 (8th Cir. 2022) (citing *Whitmore* v. *Arkansas*, 495 U.S. 149, 158 (1990)).

doctors to provide care when necessary. *Infra*, Section V.A. As this Court previously explained, those injuries are directly traceable to the Act and would be redressed by an injunction barring its enforcement. (ECF No. 64, at 2-3, 12.)

Prior to trial, Defendants offered a handful of objections to Plaintiffs' standing. Each lacks merit. *First*, Defendants argued that Plaintiffs did not have standing to challenge the Act's prohibition on puberty blockers because no patient was receiving that treatment. (Defs' Trial Br. 4.) This argument was already rejected by the Eighth Circuit, and that decision is binding on this Court. *See Brandt* v. *Rutledge*, 47 F.4th 661, 668-69 (8th Cir. 2022). The Act's operative language prohibits "gender transition procedures," not puberty blockers or any other specific treatment. *See* Ark. CODE ANN. § 20-9-1502. Because the testimony showed that three of the minor Plaintiffs were receiving (and the physician Plaintiff was providing) "gender transition procedures," Plaintiffs have standing to challenge the Act in its entirety. *See Brandt*, 47 F.4th at 669 ("[T]his court declines the State's invitation to modify well-established constitutional standing principles to require that a plaintiff demonstrate an injury traceable to every possible application of the challenged statute in order to satisfy the constitutional standing requirement."). Moreover, Dr. Stambough testified that she provides puberty blockers to patients, and the evidence showed that Brooke Dennis will imminently need such treatment, so the State's Ban on that treatment clearly harms Plaintiffs in this suit. (Pltfs' Proposed FOF ¶¶ 95, 98-99, 103, 115.)[3]

---

[3]     Defendants argued that "Plaintiffs . . . lack standing to challenge the SAFE Act's private right of action because Defendants have no 'methods of enforcement' of any such action." (Defs' Trial Br. 5 (quoting *Church* v. *Missouri*, 913 F.3d 736, 749 (8th Cir. 2019)). As the Eighth Circuit recognized, when a law includes both a private and a public enforcement mechanism, Plaintiffs have standing to enjoin the entire law. *Brandt*, 47 F.4th at 668-69. Moreover, this Court already rejected the same argument at the preliminary injunction stage. (ECF No. 60 at 61:2-63:2.)

*Second*, Defendants argued that Dr. Stambough lacks third-party standing to assert the rights of her patients.  (Defs' Trial Br. 6.)[4]  To establish third-party standing, a plaintiff must demonstrate (i) "a 'close' relationship with the person who possesses the right," and (ii) "a 'hindrance' to the possessor's ability to protect his own interests."  *Kowalski* v. *Tesmer*, 543 U.S. 125, 130 (2004) (citations omitted).

Although Dr. Stambough's third-party standing is not necessary for the Court to reach the merits of the minor Plaintiffs' equal protection claim, *see Brandt*, 47 F.4th at 669 n.3, the evidence at trial established Dr. Stambough's third-party standing.  She testified about her close relationship with her patients, explaining that she "get[s] to be on a journey" with each patient, which involves "learning about them" and "understanding their social support and who they have around them."  (Pltfs' Proposed FOF ¶ 120.)  Her patients often share important developments in their life, like achievements, or a piece of art, or even just regularly check in to share how they are doing.  (*Id.*)  She also testified about the burden many of her patients would face in asserting their own rights.  She told the Court that many of her patients are not open about being transgender, have faced harassment because of their gender identity, and would not be able to bring a lawsuit on their own behalf to challenge the constitutionality of the Act.  (*Id.* ¶¶ 121, 123.)  In this respect, her testimony aligned with many decisions that have permitted third-party standing by medical professionals seeking to assert the rights of their patients.  *See, e.g.*, *Pediatric Specialty Care, Inc.* v. *Arkansas Dep't of Transp.*, 293 F.3d 472, 478 (8th Cir. 2002).

---

[4]      Defendants also argued that Dr. Stambough lacks first-party standing to assert her claims because there is "no fundamental right to perform" the procedures prohibited by the Act.  (Defs' Trial Br. 6.)  That argument conflates standing with the merits of Dr. Stambough's constitutional claims.  *See Animal Legal Def. Fund* v. *Vaught*, 8 F.4th 714, 721 (8th Cir. 2021) (concluding that "[w]hether a plaintiff has a cause of action, however, goes to the merits of a claim and does not implicate the court's 'statutory or constitutional power to adjudicate the case.'") (citation omitted).

Defendants cannot point to any evidence in the record that contradicts Dr. Stambough's testimony.  Instead, Defendants have argued that Dr. Stambough cannot establish third-party standing because of a "financial" conflict between her and her patients.  (Defs' Trial Br. 6.)  The premise of this argument—that doctors and patients have an inherent financial conflict of interest—would mean that no doctor could ever have third-party standing to bring claims on behalf of their patients, which is in conflict with settled precedent.  *See, e.g.*, *Pediatric Specialty Care*, 293 F.3d at 478.  And Defendants have not identified any decision rejecting third-party standing on that basis and have not put forward any evidence demonstrating that Dr. Stambough does not act in the best interests of her patients when providing gender-affirming medical care.

## II.     THE TRIAL RECORD SHOWS THAT THE ACT VIOLATES THE EQUAL PROTECTION CLAUSE.

The Act classifies based on transgender status and sex, triggering at least heightened scrutiny, and requiring Defendants to prove that the law is "substantially related" to "important governmental objectives."  *United States* v. *Virginia*, 518 U.S. 515, 533 (1996).

Defendants have attempted to justify the Act by arguing that it is substantially related to the important government interests of protecting children and safeguarding medical ethics.  (Defs' Trial Br. 20.)  But the evidence presented at trial demonstrated that the Act does just the opposite, and that the State's asserted rationales for the Act were either factually baseless or fail to justify why only medical treatments "related to gender transition"—and all such medical treatments—are singled out for prohibition.  The evidence made clear that the State's alleged concerns apply to many other kinds of medical treatments that are not prohibited such that the Act's relationship to the asserted interests is "so attenuated as to render the distinction arbitrary or irrational" and, therefore, unconstitutional under any level of scrutiny.  *City of Cleburne* v. *Cleburne Living Ctr.*, 473 U.S. 432, 446 (1985) (citations omitted).

-7-

A.   **The Act Is Subject to Heightened Scrutiny Because It Classifies Based on Transgender Status and Sex.**

1.   **The Act Classifies on the Basis of Transgender Status and Sex.**

By its plain terms, the Act classifies on the basis of both transgender status and sex. "A facial inquiry is what it sounds like:  a review of the language of the policy to see whether it is facially neutral or 'deal[s] in explicitly racial [or gendered] terms.' " *Kadel* v. *Folwell*, 2022 WL 3226731, at *18 (M.D.N.C. Aug. 10, 2022).  Here, the text of the Act refers to both "sex" and "gender transition," thereby differentiating based on both transgender status and sex on its face.

*Transgender Status*.  The Act facially differentiates based on transgender status by prohibiting care related to "gender transition."  ARK. CODE ANN. § 20-9-1502.  A transgender person is someone with a gender identity that does not align with their sex assigned at birth.  (Pltfs' Proposed FOF ¶ 126.)  Only transgender people undergo "gender transition" (*id.* ¶ 144), and the Act singularly and explicitly prohibits any and all medical care prescribed to minors for this purpose, ARK. CODE ANN. § 20-9-1502.  The Act also creates a transgender status classification for the additional reason that non-transgender adolescents are able to receive puberty blockers, estrogen, testosterone suppression, or testosterone for any medically-indicated purpose, but transgender adolescents cannot.  (*See* Pltfs' Proposed FOF ¶¶ 246, 254, 261, 263-64 (discussing various uses of these medications).

Though Defendants claim that it is the *conduct* of undergoing "gender transition" that is being targeted, not the *status* of being transgender, the Supreme Court has "declined to distinguish between status and conduct" in analogous contexts.  *Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of the L.* v. *Martinez*, 561 U.S. 661, 689 (2010) (rejecting the idea that discrimination based on same-sex intimacy was not discrimination based on sexual orientation); *see also Lawrence* v. *Texas*, 539 U.S. 558, 583 (2003) (O'Connor, J., concurring)

-8-

(where "the conduct targeted by th[e] law . . . is closely correlated" with the status of being gay, a sodomy law "is targeted at more than conduct.  It is instead directed toward gay persons as a class.").

*Sex*.  The Act also classifies and discriminates based on sex in at least four ways. *First*, discrimination against someone because they are transgender is a form of sex discrimination. As the Supreme Court recognized, "it is impossible to discriminate against a person for being . . . transgender without discriminating against that individual based on sex."  *Bostock* v. *Clayton Cnty*., 140 S. Ct. 1731, 1741 (2020).  While *Bostock* addressed the nature of sex discrimination under Title VII of the Civil Rights Act, nothing about this aspect of Court's reasoning is limited to that statutory context.  *See*, *e.g*., *Kadel*, 2022 WL 3226731, at *19 (applying *Bostock*'s reasoning to the court's equal protection analysis), *appeal pending* No. 22-1721 (4th Cir.); *Eknes-Tucker* v. *Marshall*, 2022 WL 1521889, at *9 (M.D. Ala. May 13, 2022) (same), *appeal sub nom Boe* v. *Marshall*, No. 22-11707 (11th Cir.).

*Second*, where the state "intentionally penalizes a person identified as male at birth for . . . actions that it tolerates in [someone] identified as female at birth"—here, pursuing medical intervention to affirm a female identity—"sex plays an unmistakable and impermissible role." *Bostock*, 140 S. Ct. at 1741-42.  Put another way, whether care is prohibited turns explicitly on a person's sex assigned at birth—referred to in the law as "biological sex."  ARK. CODE ANN. § 20-9-1501(1).  For example, a person assigned female at birth can receive testosterone suppression to counter the virilization caused by polycystic ovarian syndrome, *see* Pltfs' Proposed FOF ¶¶ 263-64, 404, but a person assigned male at birth cannot be treated with testosterone suppression to counter virilization, because that is "gender transition."  As such, the plain terms of the Act create a sex-based distinction.

*Third*, because the Act's prohibition "cannot be stated without referencing sex . . . [o]n that ground alone, heightened scrutiny should apply." *Grimm* v. *Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 608 (4th Cir. 2020) (internal citation omitted).  As the Supreme Court explained in *Bostock*, "try writing out instructions" for which treatments are prohibited "without using the words man, woman, or sex (or some synonym).  It can't be done." *See Bostock*, 140 S. Ct. at 1746. The very nature of the prohibition as written out in the Act uses explicitly sex-based terms and on its face creates a sex-based classification.

*Fourth*, the Act prohibits care solely based on whether it comports with stereotypes about sex.  Treatment is prohibited when it "alter[s] . . . features" the State considers "typical" of a person's assigned sex at birth or when it "create[s] physiological or anatomical characteristics that resemble a sex different from the individual's biological sex."  ARK. CODE ANN. § 20-9-1501(4, 6).  This is a "form of sex stereotyping where an individual is required effectively to maintain his or her natal sex characteristics." *Boyden* v. *Conlin*, 341 F. Supp. 3d 979, 997 (W.D. Wis. 2018).  The Act goes so far as to make an explicit exemption for the same treatments for individuals with intersex conditions (referred to in the Act as disorders of sexual development), including surgery on infants to bring the appearance of their bodies into alignment with what is deemed typical of their assigned sex. *See* ARK. CODE ANN. § 20-9-1501(6)(B)(i); (Pltfs' Proposed FOF ¶¶ 300 & n.20 (describing feminizing genitoplasty surgery performed on infants and young children with differences of sexual development).)

The fact that one sex is not categorically treated worse than another does not change the fact that the law discriminates based on sex for purposes of equal protection.  "[T]he Equal Protection Clause, extending its guarantee to 'any person,' reveals its concern with rights of individuals, not groups." *J.E.B.* v. *Alabama ex rel. T.B.*, 511 U.S. 127, 152 (1994) (Kennedy, J.,

concurring); *see also Waters* v. *Ricketts*, 48 F. Supp. 3d 1271, 1282 (D. Neb. 2015) ("The 'equal application' of [bans on same-sex marriage] to men and women as a class does not remove them from intermediate scrutiny"), *aff'd on other grounds*, 798 F.3d 682 (8th Cir. 2015); *Loving* v. *Virginia*, 388 U.S. 1, 8 (1967) (rejecting "the notion that the mere 'equal application' of a statute containing racial classifications is enough to remove the classifications from the Fourteenth Amendment's proscription of all invidious racial discriminations").

Defendants have argued that the law does not facially classify on the basis of sex or transgender status, citing the Supreme Court's decision in *Geduldig* v. *Aiello*, 417 U.S. 484 (1974).  But Defendants' reliance on *Geduldig* is misplaced.  In *Geduldig*, the Supreme Court determined that discrimination based on pregnancy was not necessarily discrimination based on sex.  *Id.* at 494-95.  There, the policy at issue did not explicitly reference sex and the question was, in essence, whether pregnancy was a close enough proxy for sex to create a facial classification. *Id.* at 489-90.  Here, the statute at issue facially classifies based on sex and for that reason alone *Geduldig* is inapposite.  With respect to the question of whether a "gender transition" classification is a "transgender status" classification, *Geduldig* is likewise not controlling.  "Gender transition" is a close proxy for "transgender status" such that the prohibition is a facial classification.  And the more analogous cases are those holding that laws targeting same-sex relationships and intimacy are sexual orientation classifications.  *See, e.g.*, *Christian Legal Soc'y*, 561 U.S. at 689.

### 2.     Classifications Based on Sex and Transgender Status Each Independently Trigger Heightened Scrutiny.

When government differentiates, as the State has done here, based on sex and/or transgender status, its line-drawing triggers heightened scrutiny.

*Sex*.   "[A]ll gender-based classifications today warrant heightened scrutiny." *Virginia*, 518 U.S. at 555 (internal quotation marks omitted).  There is no exception for sex

discrimination based on physiological or biological characteristics.  *See Tuan Anh Nguyen* v. *INS*, 533 U.S. 53, 70, 73 (2001) (applying heightened scrutiny to different standard of establishing citizenship through fathers and mothers, which was based on biological differences related to procreation).

*Transgender status.*  As this Court previously held, transgender people satisfy all the indicia of a suspect class:  (1) they have historically been subject to discrimination; (2) they have a defining characteristic that bears no relation to their ability to contribute to society; (3) they may be defined as a discrete group by obvious, immutable, or distinguishing characteristics; and (4) they are a minority group lacking political power.  *See*, *e.g.*, *Windsor* v. *United States*, 699 F.3d 169, 181 (2d Cir. 2012) (identifying the four considerations used to identify a suspect classification), *aff'd on other grounds*, 570 U.S. 744, 770 (2013); *see also Grimm*, 972 F.3d at 611-13 (holding that transgender status is a quasi-suspect classification that requires such classifications to be tested under heightened scrutiny); *Karnoski* v. *Trump*, 926 F.3d 1180, 1200-01 (9th Cir. 2019) (same).[5]

*History of discrimination*.   "There is no doubt that transgender individuals historically have been subjected to discrimination on the basis of their gender identity, including high rates of violence and discrimination in education, employment, housing, and healthcare access."  *Grimm*, 972 F.3d at 611 (citation omitted).  As the Fourth Circuit detailed in *Grimm*, there is extensive data documenting the staggering discrimination that transgender people face in all aspects of life.  *Id.* at 611-12.  This pattern of discrimination is long-standing, including through

---

[5]      Although there is record evidence related to some of these factors, when courts decide the legal question of what level of equal protection scrutiny applies to a classification, they are not confined to record evidence presented by the parties.  *See, e.g., Frontiero v. Richardson*, 411 U.S. 677, 684-86 (1973) (referencing diverse sources including history books and law review articles in its analysis supporting its conclusion that classifications based on sex are inherently suspect); *Grimm*, 972 F.3d at 611-12 (referencing congressional records and law review articles).

formal governmental action.  Expression of a person's transgender identity was criminalized for much of the nineteenth and twentieth centuries through cross-dressing laws.  *See* Jennifer Levi & Daniel Redman, *The Cross-Dressing Case for Bathroom Equality*, 34 SEATTLE U. L. REV. 133, 152-53, 171 (2010).  More recently, Congress explicitly excluded transgender people from protection under four civil rights statutes over the past thirty years.  *See* Kevin M. Barry et al., *A Bare Desire to Harm:  Transgender People and the Equal Protection Clause*, 57 B.C. L. REV. 507, 556-57 (2016).  And state legislatures in Arkansas and across the country have introduced numerous bills targeting the transgender community in the past few years.  (Pltfs' Proposed FOF ¶ 309); Sam Levin, *Mapping the anti-trans laws sweeping America: 'A war on 100 fronts,'* GUARDIAN (June 14, 2021), https://www.theguardian.com/society/2021/jun/14/anti-trans-laws-us-map [https://perma.cc/9Z2L-T9V4].  Dylan Brandt and Dr. Stambough testified about the fear for one's safety and harassment experienced by transgender people in Arkansas.  (Pltfs' Proposed FOF ¶¶ 27, 122.)

> *Defining characteristic that bears no relation to the ability to contribute to society.*
Transgender people have a defining characteristic that "bears no relation to ability to perform or contribute to society."  *See Cleburne*, 473 U.S. at 441.  The relevant question is not whether every person in the class is the same but rather whether they share a characteristic that "tend[s] to be irrelevant to any proper legislative goal."  *Plyler* v. *Doe*, 457 U.S. 202, 216 n.14 (1982).  Transgender people share the defining characteristic of having a gender identity that does not align with their birth-assigned sex.  (Pltfs' Proposed FOF ¶ 126.)  And "[s]eventeen of our foremost medical, mental health, and public health organizations agree that being transgender implies no impairment in judgment, stability, reliability, or general social or vocational capabilities."  *Grimm*, 972 F.3d at 612 (internal quotation marks omitted).

*Obvious, immutable, or distinguishing characteristics*.  There is no requirement that a characteristic be immutable in a literal sense in order to trigger heightened scrutiny.  For example, heightened scrutiny applies to classifications based on alienage and "illegitimacy" even though both classifications are subject to change.  *Windsor*, 699 F.3d at 183 n.4; *see Nyquist* v. *Mauclet*, 432 U.S. 1, 9 n.11 (1977) (rejecting argument that alienage did not deserve strict scrutiny because it was mutable).  "Rather than asking whether a person *could* change a particular characteristic, the better question is whether the characteristic is something that the person *should* be required to change [in order to avoid government discrimination] because it is central to a person's identity."  *Wolf* v. *Walker*, 986 F. Supp. 2d 982, 1013 (W.D. Wis. 2014) (emphasis in original), *aff'd sub nom*, *Baskin* v. *Bogan*, 766 F.3d 648 (7th Cir. 2014); *see also Latta* v. *Otter*, 771 F.3d 456, 464 n.4 (9th Cir. 2014).  "A transgender person's awareness of themselves as male or female is no less foundational to their essential personhood and sense of self than it is for those [who are not transgender]."  *Grimm*, 972 F.3d at 624 (Wynn, J., concurring).  A person's gender identity is a core part of who they are.  (Pltfs' Proposed FOF ¶ 124.)  In any case, the evidence showed that gender identity is not something that can be changed voluntarily or by external forces.  (*Id.* ¶ 129.)  Efforts to try to change a transgender person's gender identity have been unsuccessful and harmful.  (*Id.* ¶¶ 130-32, 130 n.3.)

*Political powerlessness*.  The final factor concerns whether the class of persons is "in a position to adequately protect themselves from the discriminatory wishes of the majoritarian public."  *Windsor*, 699 F.3d at 185.  As the 2021 session of the Arkansas General Assembly made clear (*see* Pltfs' Proposed FOF ¶ 303), transgender people are not in such a position.

**B.    Defendants Failed to Carry Their Burden Under Heightened Scrutiny.**

Heightened scrutiny imposes a burden "rest[ing] entirely on the State" to demonstrate an "exceedingly persuasive" justification for the differential treatment.  *Virginia*, 518

-14-

U.S. at 533 (cleaned up).  Defendants "must show at least that the [challenged] classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives."  *Id*. (internal quotation marks and citations omitted).  And "[t]he justification must be genuine, not hypothesized or invented *post hoc* in response to litigation."  *Id*.

Defendants have claimed that the Act advances an interest in protecting children and safeguarding medical ethics, but after a two-week trial, they have failed to meet their demanding burden of showing how the Act advances these interests.  To the contrary, the evidence showed that the prohibited medical care improves the mental health and well-being of patients and that, by prohibiting it, the State undermined the interests it claimed to be advancing.  Further, the various claims underlying Defendants' arguments that the Act protects children and safeguards medical ethics are unsupported by the record and do not explain why *only* gender-affirming medical care—and *all* gender-affirming medical care—is singled out for prohibition.  See Section II(B)(2), *infra.*

### 1.    The Banned Care Improves Patient Health.

The evidence at trial showed that the prohibited medical care improves the health and well-being of many adolescents who need it.  That conclusion—which is supported by the testimony of well-credentialed experts, doctors who provide gender-affirming medical care in Arkansas, and families that rely on that care—directly refutes any claim by the State that the Act advances an interest in protecting children.

Three of Plaintiffs' experts and two Arkansas doctors detailed the significant mental health benefits of gender-affirming medical care for adolescents with gender dysphoria, which they have observed clinically.  Drs. Dan Karasic, Jack Turban, and Deanna Adkins have collectively treated thousands of patients with gender dysphoria and testified about their own

clinical experiences witnessing the positive, life-changing impact of gender-affirming medical interventions on their adolescent patients as well as the comparable experiences of their colleagues around the country. (*See* Pltfs' Proposed FOF ¶¶ 217, 220.) Drs. Stambough and Michele Hutchison similarly testified about the many positive impacts of gender-affirming medical interventions on the health and well-being of their adolescent patients in Arkansas. (*Id.* ¶¶ 77-78, 116, 217, 220.) And the testimony showed that the benefit of this care is long lasting. (*Id.* ¶ 222.) Defendants put forth no evidence contesting the extensive clinical experience of Plaintiffs' witnesses. In fact, Defendants' only expert witness to have ever treated patients for gender dysphoria, Dr. Levine, testified about his concern that removing care from patients currently receiving it would have "shocking" and "devastating" psychological consequences. (*Id.* ¶ 322.)[6]

This expert testimony was bolstered by the unrebutted testimony of the Plaintiff families who explained how gender-affirming medical care positively transformed the lives of their adolescent children with gender dysphoria. For adolescents, like minor Plaintiffs Parker Saxton, Dylan Brandt, and Sabrina Jennen, this care allowed them to grow from depressed, anxious, and withdrawn young people into happy and healthy teenagers who looked forward to their futures. (*See id.* ¶¶ 1-84.)

In addition to the uncontested testimony about the clinical benefits of treatment from clinicians and Plaintiff families, Plaintiffs' experts testified about the body of research demonstrating that the banned medical interventions improve patient health. (*Id.* ¶¶ 223-31.) Dr. Turban testified about the sixteen studies conducted in multiple countries over the past twenty

---

[6]    Dr. Levine made clear that he was not offering testimony in support of the law. (Pltfs' Proposed FOF ¶ 389.) In addition to expressing his concern that it will cause psychological harm to youth who would have to discontinue care, he testified that he would be concerned if the law resulted in doctors having their licenses taken away for providing care. (*Id.* ¶¶ 390-92.) Dr. Levine himself has written letters authorizing hormone therapy for minors with gender dysphoria and would consider doing so on a case-by-case basis going forward. (*Id.* ¶ 392.)

years that collectively show that use of pubertal suppression and gender-affirming hormones to treat adolescents with gender dysphoria improves patient health and prevents the worsening of distress upon the onset of puberty.  (*Id.* ¶ 224.)  He testified as well that the studies about the efficacy of hormone therapy show positive outcomes consistent with dozens of studies about the efficacy of such therapy to treat gender dysphoria in adults.  (*Id.* ¶ 226.).  Additionally, Dr. Turban testified about studies showing the benefits of chest masculinization surgery for adolescent transgender males.  (*Id.* ¶ 227.)

Defendants' proposed findings of fact do not even attempt to contend with Plaintiffs' experts' testimony regarding the benefits of the banned medical care.  All they offer is testimony from one of their experts critiquing the methodology and quality of the research studies demonstrating efficacy.  But even if the Court were to credit the remarkable suggestion that an entire body of research is meaningless—and it should not, *see* Section II(B)(2)(a), *infra*—Defendants offer no evidence to refute the decades of clinical experience demonstrating the efficacy of gender-affirming medical care.   Additionally, Defendants' experts offered no evidence-based treatment alternatives.   When asked at trial what would happen, as both a researcher and a clinician, if a law like the Act were to go into effect, Dr. Turban explained:

> It would be emotional to think about.  Because the reality is that we frequently in clinic have families that are coming to us with these young people who are really struggling with severe anxiety, depression, sometimes suicidal thoughts, sometimes their mental health is declining so dramatically that they can't go to school, and it's my job to tell families what the evidence-based approaches are to help their child.  So if these treatments were not an option, I'd be left without any evidence-based approaches to treat this young person's gender dysphoria.

(*Id.* ¶ 317.)

The evidence showed that based on the decades of clinical experience and scientific research, it is widely recognized in both the medical and mental health fields—including by major medical and mental health professional associations—that gender-affirming medical care can

relieve the clinically significant distress associated with gender dysphoria in adolescents.  (*Id.* ¶¶ 143, 154, 241, 304 n.21.)Defendants' claim that the Act can be justified because it advances an interest in protecting children cannot be squared with the evidence showing the substantial benefits of this treatment for the adolescents who need it.  Rather than protecting children or safeguarding medical ethics, the Act harms children and undermines the ethical duties of doctors to protect the health and well-being of their patients.

2.    **The Arguments Underlying Defendants' Claim That the Act Advances an Interest in Protecting Children Are Unsupported by the Record and Do Not Justify the Act.**

Throughout this litigation, Defendants have attempted to meet their heavy burden by offering the following assertions in support of banning gender-affirming medical care for adolescents:  (i) that there is a lack of evidence of efficacy of the banned care; (ii) that the banned treatment has risks and side effects; (iii) that many patients will desist in their gender incongruence; (iv) that some patients will later come to regret having received irreversible treatments; and (v) that treatment is being provided without appropriate evaluation and informed consent.  As explained below, none of those arguments are supported by the record; nor do these arguments explain why *only* gender-affirming medical care—and *all* gender-affirming medical care—is singled out for prohibition.

In an attempt to support their assertions, Defendants have offered proposed findings of fact that reflect an inaccurate and selective portrayal of the testimony presented at trial.  Those findings include several assertions about how gender-affirming medical care is provided in Arkansas that are not supported by the record.  For instance, Defendants claim that "[t]he Gender Spectrum Clinic would consider on a case-by-case basis prescribing puberty blockers or hormones to individuals who do not have gender dysphoria but request those treatments."  (*See* Defs' Proposed FOF ¶ 177 (citing Dr. Hutchison's testimony).)  But Dr. Hutchison's testimony was clear

-18-

that a gender dysphoria diagnosis was required prior to initiating gender-affirming medical treatments at the ACH gender clinic. (Pltfs' Proposed FOF ¶ 200; *see also* Vol. 3, at 527:13-20, 528:1-4 (Hutchison).) In the testimony cited by Defendants, Dr. Hutchison was discussing how the clinic would approach treatment for non-binary patients—that is, treatment would be considered on a case-by-case basis. (Vol. 3, at 570:2-12 (Hutchison).) Defendants' proposed findings of fact similarly say that Dr. Janet Cathey prescribes hormone therapy to minor patients without a gender dysphoria diagnosis. (*See* Defs' Proposed FOF ¶ 167 (citing Dr. Cathey's testimony).) But Dr. Cathey said the opposite. (Vol. 4, at 759:10-761:14 (Cathey).) And Defendants say that Dr. Stephanie Ho prescribes puberty blockers to patients with gender dysphoria. (*See* Defs' Proposed FOF ¶ 172 (citing Dr. Ho's testimony).) But she testified that she does not prescribe puberty blockers as gender-affirming medical care. (Vol. 4, at 749:3-5 (Ho).)

Other misrepresentations are made throughout Defendants' proposed findings of fact. For example, they claim that "[o]ther than for gender dysphoria, Plaintiff Dr. Katheryn [*sic*] Stambough does not administer medical treatments that will lead to infertility, outside of treating cancer." (Defs' Proposed FOF ¶ 84.) But Dr. Stambough offered that as one *example* of treatment that can affect fertility; she never suggested it was the only treatment. (Vol. 3, at 614:15-615:5.) And, astonishingly, Defendants claim that "[a]mong adults who medically transition, some studies show that over 20% later desist[]." (Defs' Proposed FOF ¶ 28.) They offer this proposed finding despite the fact that Dr. Levine acknowledged (after initially misrepresenting the figure as 30%) that the 20% figure represented the number who had "stop[ped] hormones," which can happen for

a variety of reasons apart from detransitioning.  (Vol. 5, at 949:24-954:19.)[7]  These are just some of the numerous misrepresentations of the record made by Defendants.

In addition to their misrepresentations of the testimony, Defendants simply failed to contend with the testimony of Plaintiffs' experts.  They make no argument challenging the qualifications of Plaintiffs' experts.  Nor do they offer any basis to challenge their credibility.

On an accurate view of the factual record, none of the State's asserted justifications support its ban on gender-affirming medical care for adolescents.  None of them justify the State's decision to single out for prohibition *only* gender-affirming medical care.  And none of them justify the State's decision to prohibit *all* gender-affirming medical care.

### a.  The Assertion That There Is a Lack of Evidence of Efficacy Does Not Justify the Act.

The Act's legislative findings and Defendants' experts assert that there is a lack of evidence of efficacy of the banned treatments.  That is incorrect.  As discussed above, the evidence presented at trial showed that there is substantial clinical and research evidence demonstrating the efficacy of the banned medical care.  *See* Part II.B.1, *supra*.  The defense experts did not even attempt to refute the clinical evidence.  Nor did they deny the existence of research showing benefits of gender-affirming medical care; rather, one of their experts, Dr. Paul Hruz, quarreled with the methodology of individual studies and the quality of the evidence.[8]

---

[7]  Defendants also made misrepresentations about the care of Plaintiff Sabrina Jennen. ███████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████  None of this is material to Plaintiffs' claims, but further illustrates the lack of trustworthiness of Defendants' representations in their proposed findings of fact.

[8]  Dr. Hruz failed to offer any evidence showing the banned treatments are ineffective.  Additionally, despite critiquing Plaintiffs' experts' reliance on studies with certain methodological limitations, he himself relied on one of those studies in his testimony.  (Pltfs' Proposed FOF ¶ 403(a).)  Ultimately, Dr. Hruz's testimony should be viewed with suspicion given some of the extreme statements he has signed onto regarding transgender people, *e.g.*, a brief

*Methodology*:  Dr. Hruz critiqued the methodology of the studies showing the effectiveness of gender-affirming medical care for minors, suggesting the entire body of research should be disregarded for this reason.  But, as Dr. Turban explained, all medical research has limitations (as Dr. Hruz conceded, Vol. 8, at 1273:1-2), which makes it necessary to consider the body of research as a whole.  (Pltfs' Proposed FOF ¶ 228.)  Here, the entire body of research on gender-affirming medical care, which uses a variety of methods, all points to the same result: Treatment is effective.  *See* Part II.B.1, *supra*.[9]

*Quality of evidence*:  Defendants' witnesses focused on the lack of randomized controlled trials in support of the banned treatment.[10]  But experts on both sides testified that medical care is often provided without the benefit of randomized controlled trials—generally considered the highest quality evidence—and is therefore based on lower quality evidence such as cross-sectional and longitudinal studies.  (Pltfs' Proposed FOF ¶¶ 232-40.)  That is necessary because it is often not feasible or ethical to have randomized controlled trials in support of a particular treatment.  (*Id.* ¶¶ 237-39.)  Banning medical treatment that is not supported by

---

that referred to support for transgender youth through social transition as "maintain[ing] his or her delusion" by "requiring others in the child's life to go along with the charade," and that his articles on gender-affirming medical care were published by a Catholic bioethics organization that takes the position that "[g]ender transitioning insists on affirming a false identity and, in many cases, mutilating the body in support of that falsehood."  (Pltfs' Proposed FOF ¶ 405; *see also* Vol. 8, at 1322:10-1324:16, 1326:11-21.)

[9]      Defendant's expert, Dr. Hruz, claimed that research studies from a clinic in the Netherlands cannot be relied upon because those studies' participants were a selective group and received mental health support in addition to medical interventions.  But that critique does not justify the ban.  As Dr. Turban testified, there is research from other clinics that likewise found that the care is effective, and many aspects of the Dutch protocols are mirrored in the WPATH and Endocrine guidelines.  (Vol. 2, at 306:2-308:25.)

[10]     Defendants' experts agree that more research on gender-affirming medical care in adolescents is needed, but if the Act were to go into effect, no such research could be conducted in Arkansas, including the randomized controlled trials that Defendants claim are necessary.  (Pltfs' Proposed FOF ¶ 331.)

randomized controlled trials would significantly limit treatments that are routinely administered and would ultimately have a substantial negative effect on patient welfare.  (*Id.* ¶ 239.)

Expert witnesses on both sides agreed that in medicine, clinicians do not always have the level of research that they would prefer in support of a particular intervention but, when patients are suffering, it is necessary to make treatment decisions based on the available evidence.  (*Id.*  ¶¶ 238-40.)[11]   Patients who are suffering cannot afford to wait until more research is accumulated.

The State's medical regulations apparently recognize that fact.  Arkansas does not limit medical care to treatments supported by a particular threshold level of evidence and allows care even in the absence of *any* evidence of a treatment being effective.  For example, even though the Arkansas Department of Health advised that there is no evidence that ivermectin is effective for the treatment of COVID-19, the State leaves it to doctors whether to prescribe the drug for this off-label purpose.  (PX 9, at 148:13-16 (Embry); PX 18, at 81:21-82:21 (Branman).)

Given the decades of clinical experience and scientific research showing the effectiveness of gender-affirming medical care, major medical professional organizations in the United States support this treatment[12] and strongly opposed the Act as undermining the well-being of adolescents with gender dysphoria.  (Pltfs' Proposed FOF ¶¶ 154, 304 n.21.)  This is relevant not because states must follow medical association guidelines—the straw man that Defendants

---

[11]      For example, one of the State's experts, Dr. Lappert, performs surgeries on patients that are supported only by his own anecdotal experience of the treatment being effective, which he recognizes is the lowest-level evidence. (Pltfs' Proposed FOF ¶ 238 n.13.)

[12]      Defendants suggest that some European countries have enacted treatment guidelines for minors with gender dysphoria that are consistent with the Act.  (Defs' Proposed FOF ¶ 37.)  While some countries have guidelines that urge greater caution in providing such care, none of them prohibit care and they all contemplate that gender-affirming medical care is appropriate for some minors.  (*See* Pltfs' Proposed FOF ¶¶ 381-82.)

attack—but rather because such widespread support undermines their claim that the care has not been shown to be effective.

Defendants urge the Court to disregard the major medical organizations' views about gender-affirming medical care for adolescents with gender dysphoria, claiming they are based on ideology rather than science. To support this claim, they offered the testimony of Professor Mark Regnerus, but his testimony did not offer any support for this assertion. (*See* Pltfs' Proposed FOF ¶ 383.) To accept this claim would require the Court to both credit Professor Regnerus' testimony and the notion that every major medical association in the United States is driven by ideology rather than science and patient well-being. There is no basis and no evidence supporting such a conspiratorial assessment of all of the major medical associations.

**b.      The Potential Risks of Treatment Do Not Justify the Act.**

The testimony at trial also undermined the claim that the potential risks of the banned treatments justify the Act. First, the testimony showed that adverse health consequences are rare when treatment is provided by a physician.[13] And witnesses on both sides testified that the potential risks of hormone therapy, with the exception of potential risks to fertility for hormonal interventions, are present regardless of whether (i) the treatment is provided for gender transition or for another medically indicated purpose or (ii) the treatment is provided to birth-assigned males or birth-assigned females.[14] Ultimately, as both sides' experts agree, all medical interventions involve weighing risks and benefits (Pltfs' Proposed FOF ¶ 243), but it is only for "gender

---

[13]      Dr. Hutchison testified about her concern that, if the Act takes effect, adolescents will find ways to get medications outside of the care of a physician and may suffer harm from doing so. (Pltfs' Proposed FOF ¶ 330.)

[14]      Drs. Hruz and Adkins testified that potential risks of hormone therapy, like risk of stroke from estrogen, for example, are present when the treatment is used to treat birth-assigned males for gender dysphoria or birth-assigned females for different indications. (Pltfs' Proposed FOF ¶ 265.) Dr. Adkins also testified that non-fertility related side effects of testosterone are the same when the treatment is used for other indications. (*Id.* ¶ 255.)

transition" treatments that the State has removed from adolescent patients and their families the ability to weigh the risks and benefits of care.

Defendants' experts focused on the potential risk of infertility, but not all of the banned treatments pose a risk to fertility, and the banned medical treatments are not the only pediatric medical interventions that can impair fertility. As Dr. Adkins testified, puberty blockers on their own do not affect fertility, and many patients treated with hormone therapy are able to biologically conceive children. (*Id.* ¶ 253.) Although fertility may be affected, that is not necessarily the case, and there are ways to adjust treatment to protect fertility if that is important to the patient and their family.[15] Chest masculinization, among treatments banned by the Act, also has no effect on fertility.

In addition to greatly overstating the risk of impaired fertility, Defendants cannot explain why only this treatment is banned given that it is not the only medical care that involves that risk. As Plaintiffs' experts testified, some treatments for pediatric patients with certain rheumatologic conditions, kidney diseases, and cancers can also cause infertility. (*Id.* ¶ 274.) Yet those treatments are not prohibited.

Defendants' expert, Dr. Hruz, also focused on the impact of pubertal suppression on the accrual of bone mineral density. This potential side effect is relevant only for pubertal suppression and does not justify a ban on all other forms of gender transition care. But even focusing on pubertal suppression, this is an expected effect of treatment, and once puberty is

---

[15] For the very small number of patients who go directly from pubertal suppression at the very beginning of puberty (Tanner Stage 2) to gender-affirming hormone therapy, the treatment can be sterilizing. That risk is discussed with families and there are options for adjusting treatment to maximize fertility preservation if that is a priority. Ultimately, as with other treatments that can impair fertility, the decision is made by the patient and their parents after weighing the risks and benefits. (Pltfs' Proposed FOF ¶ 252 & n.15.)

started, either through cross-sex hormone therapy or endogenous puberty, rapid bone mineral density accrual resumes. As Dr. Adkins testified, data shows that bone density accrual reaches normal levels "two to three years after [after a patient is] on either gender-affirming hormones or go[es] through their own puberty." (*Id.* ¶ 250.)[16]

The evidence at trial showed that there is nothing unique about the risks of the prohibited treatments that would justify a prohibition. As Dr. Antommaria testified—with no dispute from Defendants' experts—there are many forms of pediatric medical care that carry greater or comparable risks (*id.* ¶ 245), but only treatment related to "gender transition" is prohibited.[17] For other medical treatments that have risks, the State leaves it to patients and their parents and doctors to weigh the possible risks of treatment against the benefits of treatment. (Pltfs' Proposed FOF ¶ 288.) That is true even when there are known serious risks related to a particular treatment. (*Id.*) As Drs. Adkins, Stambough, and Hutchison all testified, under existing guidelines and in clinical practice around the country and in Arkansas, patients and parents are advised of the potential risks of treatment, including potential risks to fertility. And as with other medical interventions that can affect fertility, patients and their families are informed about fertility preservation. (*Id.* ¶¶ 211, 269, 274.) Despite this, the State has removed from patients, their families, and their doctors the ability to weigh the potential benefits and risks of treatment only for medical treatments related to "gender transition." Asserted concerns about risks related to

---

[16]     Dr. Levine also asserted that there are potential psychosocial harms of delaying puberty beyond when their peers are going through puberty. (Vol. 5, at 826:19-827:19.) But Dr. Adkins, the only expert witness who has treated gender dysphoria patients with puberty blockers, testified that when blockers are used to treat gender dysphoria, patients go through puberty within the normal age range, albeit within the latter part of that range. (Vol. 1, at 211:8-21.) At the ACH gender clinic, puberty blockers are provided in the same way and patients go through puberty within the same age range as their peers. (Vol. 3, at 538:15-19 (Hutchison).)

[17]     Dr. Antommaria testified that the risks of chest surgeries were comparable when provided for gender transition and other indications. (Vol. 2, at 391:10-392:16.)

treatment therefore do not justify the Act's singling out for prohibition only treatment related to "gender transition."

### c.     The Claim That a Majority of Patients Will Desist in their Gender Incongruence Does Not Justify the Act.

The Act's legislative findings state that "[f]or the small percentage of children who are gender nonconforming or experience distress at identifying with their biological sex, studies consistently demonstrate that the majority come to identify with their biological sex in adolescence or adulthood, thereby rendering most physiological interventions unnecessary."   Act 626, Section 2(3).   That claim is unsupported by the record at trial.

As Drs. Turban and Karasic testified, the research relied upon by the Arkansas General Assembly and by Defendants' experts regarding so-called desistence rates all focus on pre-pubertal children (for whom no gender-affirming medical interventions are indicated) and not the adolescent population affected by the Act.   (Pltfs' Proposed FOF ¶¶ 358-59.)   Additionally, these studies were older and tracked patients using diagnostic criteria that preceded the current gender dysphoria in childhood diagnosis.   In those older studies, many of the youth included were gender non-conforming children who never identified as a different sex in the first place because previous diagnoses did not require a cross-sex identification to meet the diagnostic criteria.   (*Id.* ¶ 359.)

The evidence presented at trial showed that once a patient reaches the start of puberty with persistent and consistent gender dysphoria, the likelihood that they will come to identify with their assigned sex is low.[18]   (Pltfs' Proposed FOF ¶ 361.)   Given that all the banned

---

[18]     Seemingly in an attempt to support the position that there is a high rate of desistance among adolescents, Defendants offered the testimony of a fact witness, Dr. Roger Hiatt, who testified that about 6 to 10 of the more than 200 youth with gender dysphoria who have been committed to the residential psychiatric facility where he works came to identify with their birth-assigned sex.  (Pltfs' Proposed FOF ¶ 362.)  But because Dr. Hiatt did not treat their gender

treatments are provided to patients only after the onset of puberty, the fact that some younger children may not ultimately persist in a transgender identity does not explain why adolescents who need medical intervention should have it banned by the State.

### d. The Possibility That Patients Will Regret Irreversible Treatment Does Not Justify the Act.

Defendants' expert witness, Dr. Levine also claimed that there is a high risk that minors will detransition later in life and come to regret irreversible[19] treatments that they have received. That claim is also unsupported by the trial record. The evidence showed that regret is rare for gender-affirming medical care and is possible for all medical interventions. (*Id.* ¶¶ 373, 380.) But it is only treatment related to "gender transition" that is categorically banned on this asserted basis.

In the decades of clinical experience of doctors who testified for both parties, it was rare for individuals who have received gender-affirming medical care to regret treatment because they have come to identify as their birth-assigned sex. In Dr. Karasic's clinical experience treating thousands of patients with gender dysphoria over 30 years, none of his patients who had received gender-affirming medical care later came to identify with their sex assigned at birth. (*Id.* ¶ 374.) Similarly, there have been no patients at the ACH gender clinic who received gender-affirming medical care and later indicated that they regretted treatment or detransitioned. This is true for both current patients and former patients who were contacted by the clinic into their twenties. (*Id.*

---

dysphoria—he only treated the other mental health conditions that prompted their hospitalization—and did not offer context that would allow conclusions to be drawn about this group of patients, his testimony does not support the claim that desistance among adolescents with gender dysphoria is common. (*Id.*)

[19]     Not all of the prohibited treatments are irreversible. As Dr. Adkins testified, pubertal suppression is just a pause on the progression of puberty and once the treatment is stopped, endogenous puberty resumes. (Pltfs' Proposed FOF ¶¶ 249, 253.)

¶ 375.)  And in his more than 50 years seeing patients with gender dysphoria, many of whom medically transitioned, Defendants' expert Dr. Levine was aware of only two patients who detransitioned.  (*Id.* ¶ 376.)[20]

There are few studies on rates of regret among those who received gender-affirming medical care but, like the clinical observations of the trial witnesses, these studies show very low rates of regret.  (*Id.* ¶ 377.)  On direct examination, Dr. Levine claimed that there were high rates of detransition, but ultimately could not support his claim with actual data.  (*See* Part II.B., *supra*; Pltfs' Proposed FOF ¶ 378 & n.34.)[21]

Ultimately, the fact that some patients come to regret treatment is also not unique to gender-affirming medical care.  (*Id.* ¶ 380.)  Concerns over a very small subset of patients regretting treatment cannot justify a categorical ban on the treatment for all those who need it.[22] If that were sufficient, then all medical treatments could be banned based on the outlier experiences of a minority of patients.

e.     **Claims About Treatment Being Provided Without Appropriate Assessment or Informed Consent Do Not Justify the Act.**

---

[20]     Defendants put on two witnesses who had detransitioned.  Their anecdotal experiences are especially irrelevant to this case because both had transitioned and detransitioned as adults, neither received treatment in Arkansas, and both testified that their detransition was prompted by a religious experience.  (Pltfs' Proposed FOF ¶ 379.)

[21]     While Defendants say the rate of detransitioning is increasing, citing Dr. Levine (*see* Defs' Proposed FOF ¶ 29), Dr. Levine offered nothing to support this assertion.  In fact, the evidence showed that the studies on detransitioning do not examine changing rates of detransition and regret.  (Pltfs' Proposed FOF ¶ 377.)  The studies show that detransition is a broad and inconsistent term in the literature and can be used to refer to things like pausing or discontinuing a particular medical intervention for a wide variety of reasons (*e.g.*, lack of insurance or harassment) or changing identification from transgender to non-binary but does not necessarily involve identifying with one's birth assigned sex or regretting treatment.  (*Id.* ¶ 378.)

[22]     Although the proportion of patients who detransition is small, the WPATH standards of care version 8 recognizes this population and discusses the need to provide them with effective treatment.  (Pltfs' Proposed FOF ¶ 372 & n.31.)

Defendants claim that gender-affirming medical treatment is provided to adolescents without appropriate mental health assessment and without properly informing families of the risks and evidence base of treatment.  (Defs' Proposed FOF ¶¶ 44, 52-53, 167, 172, 215.) That claim was not supported by evidence at trial; nor would it explain why a categorical ban on treatment would be the appropriate response.

Defendants' position is based on testimony from their expert, Dr. Levine, who offers a description of what he calls the "affirmative model" of care, where doctors provide hormones immediately without assessing patients and addressing other mental health conditions or informing patients and their parents of the risks and the limitations of the evidence regarding treatments.  (*See* Defs' Proposed FOF ¶¶ 32, 38-42, 52; *see also* Vol. 5, at 809:18-810:4; 811:21-812:10; 824:5-14 (Levine).)  And Defendants claim that the director of the ACH gender clinic, Dr. Stambough, provides care in accordance with that "model." (Defs' Proposed FOF ¶ 42.) But this so-called model of care bears no resemblance to the guidelines for care recommended by WPATH and the Endocrine Society, and the undisputed testimony showed that it is not how care is provided at ACH's gender clinic, the main provider of gender-affirming medical care to gender dysphoric adolescents in Arkansas.  (Pltfs' Proposed FOF ¶¶ 190-216.)

Plaintiffs' experts testified about the comprehensive mental health evaluations and thorough informed consent process that are recommended under the WPATH and Endocrine Society guidelines before medical interventions are initiated to treat gender dysphoria in adolescents.  (*Id.* ¶¶ 181-89.)  And Drs. Stambough and Hutchison testified that care at ACH is provided consistently with the guidelines.  (*Id.* ¶¶ 191, 200, 211-14.)

Though Dr. Levine claimed that care is being provided without appropriate evaluation and informed consent, he admitted to having no personal knowledge of how care is

provided in clinics across the United States or in Arkansas and did not contest the testimony of the Arkansas clinicians.  (*Id.* ¶ 369 n.30.)  In short, Dr. Levine's testimony amounted to nothing more than setting up and then attacking a straw man, all based on no actual evidence.

Even if there were individual doctors providing care in the way Dr. Levine describes, this would not justify a complete prohibition of care.  The Arkansas State Medical Board has mechanisms for addressing improper conduct by medical providers, including the authority to discipline doctors for unethical treatment—up to rescinding a license—and to enact regulations to address systemic problems.  (*Id.* ¶¶ 281-84.)  For example, when Arkansas faced a public health crisis caused by over-prescription of opioids, the Board enacted a regulation to monitor doctors' prescriptions and establish discipline for misconduct.  And when the State had concerns about the significant risks of gastric bypass surgery, the State enacted a regulation dictating a comprehensive informed consent requirement.   In neither case did the State ban care.  Any concerns about improper care of adolescents with gender dysphoria by specific health care providers can be addressed through these processes, without banning the care provided by responsible practitioners who are treating patients in need.  (*See id.* ¶¶ 281-89.)

### C.    The Act Does Not Survive Any Level of Scrutiny.

Although the Act is properly subject to heightened scrutiny, it ultimately fails any level of scrutiny for a number of independent reasons.

First, the stated justifications for banning gender-affirming medical care for minors "ma[k]e no sense in light of how" Arkansas treats medical care provided for purposes other than "gender transition."  *Bd. of Trustees of Univ. of Ala.* v. *Garrett*, 531 U.S. 356, 366 n.4 (2001) (citation omitted).  What the law does is "so far removed from [the asserted] justifications that . . . it [is] impossible to credit them."  *Romer* v. *Evans*, 517 U.S. 620, 635 (1996).

The Act is "at once too narrow and too broad." *Id.* at 633. If the object of the law, as Defendants suggest, is to ban care that can cause infertility, or that has potential risks, or that is not supported by particular types of evidence, or that is "irreversible," then the law is entirely too narrow, covering only a tiny subset of care that falls into each of those categories, and specifically authorizing irreversible surgical treatments to change the genital appearance of infants with intersex conditions. The law is likewise too broad for all of the State's alleged concerns. If the State were seeking to prevent treatment that can cause infertility or that is irreversible, that would not explain why it bans puberty blockers for transgender adolescents.

The evidence presented at trial showed that many of the State's criticisms of the banned care, in addition to being inaccurate, are not unique to treatments related to gender transition. Even indulging some of the State's critiques of the banned treatments, those criticisms apply to many medical treatments—including the use of the same hormone therapies to treat other conditions. Yet it is only care related to "gender transition" that is categorically banned.

Defendants cannot explain why the State bans only this medical care when other medical care that presents the same or greater risks or is supported by the same or less evidence of efficacy is not banned. In every other context, the State leaves medical decision-making to patients, their parents, and their doctors. Where there are concerns about a particular type of medical care, the Board enacts regulations to help ensure that patients are informed of risks and care is provided appropriately. (Pltfs' Proposed FOF ¶ 285.) Here, there was no such measured response to any purported concerns; just an anomalous, sweeping, categorical ban. There is no rational basis to conclude that allowing adolescents with gender dysphoria to receive gender-affirming medical care that they, their parents, and their doctors agree is medically necessary "would threaten legitimate interests of [Arkansas] in a way that" allowing other types of care

"would not."  *Cleburne*, 473 U.S. at 448; *see also Eisenstadt* v. *Baird*, 405 U.S. 438, 453 (1972) (health risks of birth control pills not a rational basis for banning access for unmarried people while allowing access for married people where risks are the same).

Act 626 also fails rational basis review because the text of the Act makes explicit that its purpose is not to protect minors by limiting care that lacks a certain level of evidence or that may cause particular harms, but rather to limit care that affirms their gender identity when it differs from their sex assigned at birth.  Under any level of scrutiny, laws with the "peculiar property of imposing a broad and undifferentiated disability on a single named group" are "invalid."  *Romer*, 517 U.S. at 632.  Unconstitutional discrimination "rises not from malice or hostile animus alone.  It may result as well from insensitivity caused by simple want of careful, rational reflection or from some instinctive mechanism to guard against people who appear to be different in some respects from ourselves."  *Bd. of Trustees of Univ. of Ala.*, 531 U.S. at 374 (Kennedy, J., concurring); *see also Romer*, 517 U.S. at 632-35.  And impermissible discrimination can arise from "profound and deep convictions."  *Lawrence*, 539 U.S. at 571.  Even on matters in which "[m]en and women of good conscience can disagree, [the] Court's obligation is to define the liberty of all, not to enforce a particular moral code."  *Planned Parenthood of Southeastern Pa.* v. *Casey*, 505 U.S. 833, 850 (1992), *overruled by Dobbs* v. *Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022); *see Lawrence*, 539 U.S. at 571.

Ultimately, the trial record also showed that the Act was passed based on negative attitudes about transgender people, likewise making it unconstitutional under any standard of review.  (Pltfs' Proposed FOF ¶¶ 306-09.)  The legislative record makes clear that the Act was reflective of lawmakers' views about transgender people.  The Act was part of a package of bills aimed at limiting the rights of transgender people, and proponents of the bill expressed their

disapproval of transgender people and gender transition.  (*Id..*)  But even if there were no evidence of negative attitudes towards transgender people in the legislative record, Act 626 would still fail rational basis review for the reasons addressed above.

### III.   THE TRIAL RECORD SHOWS THAT THE ACT VIOLATES THE DUE PROCESS CLAUSE.

The evidence presented at trial shows that the Act also violates the Due Process Clause, which "provides heightened protection against government interference with certain fundamental rights and liberty interests." *Washington* v. *Glucksberg*, 521 U.S. 702, 719-20 (1997). As this Court has recognized, " '[t]he liberty interest at issue in this case—the interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by th[e Supreme] Court' " (ECF No. 64 at 9 (quoting *Troxel* v. *Granville*, 530 U.S. 57, 65 (2000)),) and "includes the right to direct their children's medical care."  (ECF No. 64 at 10 (quoting *Kanuszewski* v. *Mich. Dep't of Health & Human Servs*, 927 F.3d 396, 419 (6th Cir. 2019)); *see also Parham* v. *J.R.*, 442 U.S. 584, 602 (1979) (substantive due process includes a "right . . . to recognize symptoms of illness and to seek and follow medical advice") (internal quotation marks and citations omitted).[23]

At trial, Plaintiffs presented substantial evidence, which Defendants did not contest, that the Act infringes the parent Plaintiffs' "fundamental right to seek medical care for their children and, in conjunction with their adolescent child's consent and their doctor's recommendation, make a judgment that medical care is necessary."  (*See* ECF No. 64 at 10.)  For example, each of the parent Plaintiffs testified that they routinely make medical decisions for their

---

[23]     The Due Process Clause protects *parents'* right to the care, custody, and control of their children, and is not derivative of a child's right—*i.e.*, it is its own right and not merely a right to assert one's child's rights. *See, e.g.*, *Michael H.* v. *Gerald D.*, 491 U.S. 110, 130 (1989) (comparing legal and biological parents' fundamental liberty interest in a relationship with their child while noting that "[w]e have never had occasion to decide whether a child has a liberty interest, symmetrical with that of her parent, in maintaining her filial relationship").

children, and that the Act would remove their ability to do so.  (Pltfs' Proposed FOF ¶¶ 20, 49, 74, 104.)

The parent Plaintiffs testified that their decision to pursue gender-affirming medical care for their minor children was considered and deliberate and included consultation with health care professionals to determine the best course of treatment.  (*See id.* ¶¶ 11-20, 37-38, 41-52, 64-71, 73-74, 95-104.)  If permitted to go into effect, the Act would deprive the parent Plaintiffs— and all parents of transgender adolescents in Arkansas—of their fundamental right to seek and follow medical advice and make medical decisions for their children.  (*See id.* ¶¶ 332-39.)

As this Court correctly held in its ruling granting the preliminary injunction, "[s]trict scrutiny is the appropriate standard of review for infringement of a fundamental parental right."  (ECF No. 64 at 10 (citing *Glucksberg*, 521 U.S. at 719-20).)  Because Defendants have not carried their burden to show that the Act satisfies heightened scrutiny (*see* Part II.B, *supra*), they necessarily have not met the more onerous strict scrutiny.  The Act's categorical prohibition of gender-affirming medical care for all adolescents is not "narrowly tailored," as even Dr. Levine conceded that gender-affirming medical care for adolescents is sometimes appropriate.  (Pltfs' Proposed FOF ¶ 392.)

## IV.   THE TRIAL RECORD ESTABLISHES THAT THE ACT'S REFERRAL PROHIBITION VIOLATES THE FIRST AMENDMENT.

The First Amendment prohibits states from "restrict[ing] expression because of its message, its ideas, its subject matter, or its content."  *Reed* v. *Town of Gilbert*, 576 U.S. 155, 163 (2015) (internal quotations and citation omitted).  Content-based regulations of speech are "presumptively unconstitutional" and are subject to strict scrutiny.  *Id.*  Regulations that additionally discriminate on the basis of viewpoint are a "more blatant" and "egregious form of content discrimination."  *Id.* at 168 (internal quotations and citation omitted).

The trial record established that the Act's prohibition on referrals (the "Referral Prohibition")—which bars healthcare professionals from "refer[ring] any individual under eighteen (18) years of age to any healthcare professional for gender transition procedures"— constitutes content and viewpoint discrimination, and cannot withstand the demanding scrutiny required by the First Amendment.  (Pltfs' Proposed FOF ¶¶ 297, 337-45.)

A.      **The Referral Prohibition Prohibits Speech.**

At the outset, the State cannot avoid First Amendment scrutiny of the Referral Prohibition by arguing that it regulates only conduct.  The Supreme Court has consistently held that the First Amendment protects the "dissemination of information," *Sorrell* v. *IMS Health Inc.*, 564 U.S. 552, 570 (2011), and applies even when speech is intertwined with conduct, *Spence* v. *State of Wash.*, 418 U.S. 405, 409-10 (1974).

As this Court already ruled, "Act 626's ban on referrals by healthcare providers is a regulation of speech," not professional conduct.  (ECF No. 64 at 11.)  By prohibiting healthcare professionals from "refer[ring] any individual under eighteen (18) years of age to any healthcare professional for gender transition procedures," the Act infringes protected speech on its face.  (*See* Pltfs' Proposed FOF ¶ 297.)  The context of the doctor-patient relationship only increases the importance of protecting such speech.  *See Wollschlaeger* v. *Governor, Fla.*, 848 F.3d 1293, 1328 (11th Cir. 2017) (Pryor, W., concurring) (holding that "the doctor-patient relationship provides more justification for free speech, not less").

The trial record established that the Referral Prohibition infringes Plaintiffs' right to engage in and receive protected speech.[24]  Dr. Stambough testified that, in the course of her

---

[24]     While Defendants claimed there was a lack of testimony about the Act's impact on provider referrals, as Defendants conceded, the Act is currently enjoined.  (Vol. 4 at 712:22-713:13.)

practice, she refers patients to other healthcare providers, which involves discussions with her patients and their families.  (Pltfs' Proposed FOF ¶ 118.)  Specifically, in making a referral, Dr. Stambough discusses with her patients where they can obtain the treatment they need.  (*Id.*)

Speech is afforded less protection in only two circumstances, neither of which applies here:  (1) when a law "require[s] professionals to disclose factual, noncontroversial information in their 'commercial speech'"; and (2) when a law regulates "conduct that incidentally involves speech."  *Nat'l Inst. of Fam. & Life Advoc.* v. *Becerra*, 138 S. Ct. 2361, 2366, 2372 (2018).

*First*, the Referral Prohibition does not require professionals to disclose any factual information.  Although Defendants have claimed that the Referral Prohibition requires medical professionals to "disclose that state law prohibits them from sending a child to another practitioner" (ECF 44 at 96), the Referral Prohibition does not require healthcare professionals to make any statement at all.  Rather, it *prohibits* them from making referrals for gender-affirming medical care.  *Second*, the Referral Prohibition is not a regulation of "conduct that incidentally involves speech."  Courts have found that regulations are subject to less scrutiny when, in the course of targeting some underlying conduct, they incidentally involve or burden speech.  *See Sorrell*, 564 U.S. at 567 (explaining that incidental burdens include regulations such as "a ban on race-based hiring [that] require[s] employers to remove 'White Applicants Only' signs'" or "an ordinance against outdoor fires [that] forbid[s] burning a flag") (internal quotations and citations omitted).  But "there is a real difference between laws directed at conduct sweeping up incidental speech on the one hand and laws that directly regulate speech on the other.  The government cannot regulate speech by relabeling it as conduct."  *Otto* v. *City of Boca Raton, Fla*., 981 F.3d 854, 865 (11th Cir. 2020).  As the Court has emphasized, "[s]peech is not unprotected merely because it is

uttered by 'professionals," and "a State may not, under the guise of prohibiting professional misconduct, ignore constitutional rights." (ECF No. 64 at 11 (quoting *NAACP* v. *Button*, 371 U.S. 415, 439 (1963)); *Becerra*, 138 S. Ct. at 2371-72. Here, the Referral Prohibition directly prohibits speech by healthcare providers who wish to make referrals for gender-affirming medical care.

**B.       The Referral Prohibition Constitutes Content and Viewpoint Discrimination.**

The Referral Prohibition discriminates based on content and viewpoint and is subject to strict scrutiny. A regulation is content-based when it "target[s] speech based on its communicative content," *Reed*, 576 U.S. at 163, or "exacts a penalty on the basis of the content of speech." *Telescope Media Grp.* v. *Lucero*, 936 F.3d 740, 753 (8th Cir. 2019) (internal quotations omitted). A regulation constitutes viewpoint discrimination "when the rationale for [the government's] regulation of speech is 'the specific motivating ideology or the opinion or perspective of the speaker.'" *Gerlich* v. *Leath*, 861 F.3d 697, 705 (8th Cir. 2017). This Court already observed that the Act "is a content and viewpoint-based regulation because it restricts healthcare professionals only from making referrals for 'gender transition procedures,' not for other purposes." (ECF No. 64 at 11.)

**C.       The Evidence Confirmed That the Referral Prohibition Fails Strict Scrutiny.**

Strict scrutiny imposes a heavy burden on Defendants, and, as the Supreme Court has emphasized, "it is rare that a regulation restricting speech because of its content will ever be permissible." *United States* v. *Playboy Ent. Grp.*, 529 U.S. 803, 818 (2000). Defendants must show that the speech restrictions were the "last—not first—resort." *Thompson* v. *W. States Med. Ctr.*, 535 U.S. 357, 373 (2002). Here, again, the State attempts to justify its Referral Prohibition on the ground that it is necessary to protect children and to regulate the medical profession. (Vol. 4, at 721:3-9.) But courts routinely strike down laws that regulate protected speech, including laws that, as here, prohibit the sharing of information, such as a healthcare professional's

recommendation.  *See, e.g.*, *Conant* v. *Walters*, 309 F.3d 629, 639 (9th Cir. 2002) (striking down regulation that prohibited doctors from providing patients with information about the benefits of medical marijuana); *see also Sorrell*, 564 U.S. at 557 (striking down regulation that prohibited the sale, disclosure, and use of pharmacy records).  And as this Court has emphasized, Arkansas's interest in protecting minors "does not include a free-floating power to restrict the ideas to which children may be exposed." (ECF No. 64 at 12 (quoting *Brown* v. *Ent. Merch. Ass'n*, 564 U.S. 786, 794 (2011).)  Speech "cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable." *Erznoznik* v. *City of Jacksonville*, 422 U.S. 205, 213 (1975).

For the same reasons that Defendants have not met their burden under heightened scrutiny on Plaintiffs' equal protection claim, *see* Part II.B, *supra*, Defendants also have not met their burden of showing that the Referral Prohibition is narrowly tailored to further a compelling government interest.  The evidence at trial confirmed that the Act does not advance the State's interest in protecting minors, and actually undermines that interest by harming adolescents with gender dysphoria.  (*See* Part II.B.1, *supra*; *see also, e.g.*, Pltfs' Proposed FOF ¶¶ 316, 314-31.) Additionally, Defendants have come nowhere close to carrying their burden of showing that the Referral Prohibition "could be replaced by no other regulation that could advance the [asserted] interest as well with less infringement of speech," and thus, have not shown, as they must, that the Referral Prohibition is the least restrictive alternative.  *281 Care Comm*. v. *Arneson*, 766 F.3d 774, 787 (8th Cir. 2014) (citations omitted).  As discussed above, the State routinely employs a number of mechanisms to regulate the medical profession that do not infringe speech at all.  *See* Part II.B.2.e, *supra*.

**V.     A STATEWIDE PERMANENT INJUNCTION IS NECESSARY.**

Substantial evidence at trial demonstrated that the Act violates Plaintiffs' constitutional rights and that, if the Act goes into effect, it would cause irreparable harm to

transgender minors, families, and healthcare providers throughout Arkansas.  A permanent injunction is warranted to address those constitutional violations.  And because there are no circumstances in which the Act would be lawful, facial relief is necessary.

      **A.**     **Permanent Injunctive Relief Is Warranted.**

To obtain a permanent injunction, Plaintiffs were required to "show actual success on the merits."  *Miller* v. *Thurston*, 967 F.3d 727, 735 (8th Cir. 2020).  As explained above, Plaintiffs have proven that the Act violates the Equal Protection Clause, Due Process Clause, and First Amendment.

Once success on the merits is established, courts must consider three additional factors to decide whether to issue a permanent injunction:  (1) "the threat of irreparable harm to the moving party"; (2) "the balance of harms with any injury an injunction might inflict on other parties"; and (3) "the public interest." *Id*. at 735-36.  The final two factors—"the balance of harms" and the "public interest"—"merge when the government is the opposing party." *Religious Sisters of Mercy* v. *Azar*, 513 F. Supp. 3d 1113, 1152 (D.N.D. 2021) (citing *Nken* v. *Holder*, 556 U.S. 418, 435 (2009)).  Each of those factors decisively favors an injunction here.

*Irreparable harm*:  Absent an injunction, the Act would cause serious and lasting harms to (i) transgender adolescents that need gender-affirming medical care to treat their gender dysphoria, (ii) parents who wish to obtain gender-affirming medical care for their children, and (iii) healthcare professionals who provide gender-affirming medical care in Arkansas.  Each of those harms is independently sufficient to support a permanent injunction.

For adolescents with gender dysphoria in Arkansas, discontinuing or delaying gender-affirming medical care when indicated puts patients at risk of worsening anxiety, depression, hospitalization, and suicidality.  (Pltfs' Proposed FOF ¶316.)  The State's expert, Dr. Levine, described the psychological impact of cutting off gender-affirming medical care for

those currently receiving it as "shocking" and "devastating."  (*Id.* ¶ 322.)  Plaintiffs' experts testified in detail that denying care to those who need it can lead to severe suffering, including self-harm and suicide attempts.  (*E.g.*, *id.* ¶¶ 316, 318-20, 327-29.)  Dr. Hutchison explained that, after Act 626 was introduced but before it was enacted into law, six or seven of the ACH gender clinic's patients were hospitalized for attempted suicide and additional patients were hospitalized at mental health facilities for suicidal ideation.  (*Id.* ¶ 328.)  She additionally expressed concern that transgender adolescents who are banned from receiving care through medical providers in Arkansas will find ways to access gender-affirming medical care outside of the care of a doctor, putting them at risk.  (*Id.* ¶ 330.)

   The parent Plaintiffs testified about their fears about having to stop gender-affirming medical treatment for their minor children given the dramatic benefits they have seen.  (*Id.* ¶¶ 23-24, 28-30, 52-53, 56, 75-77, 79-84.)  Dylan likewise testified about how difficult it would be for him to cut off the treatment that has transformed his life.  (*Id.* ¶ 28.)  Sabrina, who would not go to public restrooms, became visibly anxious about having her picture taken, and did not see the point of life, now is happy, loves taking selfies, and her gender dysphoria is almost entirely alleviated.  (*Id.* ¶¶ 39, 53-56.)  Dylan was distressed and anxious about his gender for many years and avoided seeing himself—it is hard to find pictures of him from before treatment and he is rarely seen smiling in them; now, his mom describes a confident, comfortable 17-year-old who has finally been able to relax.  (*Id.* ¶¶ 23-24.)  The parent Plaintiffs testified that stopping treatment is not an option for their children.  (*Id.* ¶¶ 28, 56, 84.)  They also testified about the burdens the Act would create for their families to continue their children's care.  Joanna Brandt explained that her family has discussed moving to another state where gender-affirming medical care was available.  (*Id.* ¶¶ 29-30.)  She also testified that leaving Arkansas would be emotionally

and financially difficult for her family, and would require uprooting Dylan and his brother from their community in Greenwood and leaving her business that supports the family.  (*Id.*)  Other parent Plaintiffs echoed those concerns.  Aaron Jennen testified that his family has discussed leaving Arkansas if the Act goes into effect, even though that decision could compromise his livelihood as a government attorney and would take the family out of the state they have called home all their lives.  (*Id.* ¶¶ 56-57.)  For the Dennis family, leaving Arkansas to get care for Brooke would have consequences not just for their immediate family but also for Brooke's grandfather, who has advanced Parkinson's and depends on care from her parents, Amanda and Shayne Dennis. (*Id.* ¶¶ 105-08.)

Dr. Stambough testified that the Act would prevent her from providing necessary medical care to her patients and from making the referrals they need to receive care from another provider.  (*E.g.*, *id.* ¶ 337; *see also id.* ¶¶ 117.)  Ms. Embry, the Director of the Arkansas State Medical Board, also shared her view that the Act conflicts with physicians' ethical duty to not abandon their patients.  (*Id.* ¶¶ 340-43; *see also id.* ¶ 338.)  And Defendants' expert Dr. Levine noted how the broader community would be harmed by physicians losing their medical licenses on account of the Act.  (*Id.* ¶ 339.)[25]

*Public interest*: the balance of harms and public interest factors also support an injunction.  As explained above, Defendants' evidence was wholly inadequate to justify their asserted interest in protecting minors or regulating the medical profession.  *See* Part II.B.2, *supra*.

---

[25]     Finally, the denial of constitutional rights is itself an irreparable harm.  *See Powell* v. *Noble*, 798 F.3d 690, 702 (8th Cir. 2015) ("[T]he loss of First Amendment freedoms, for even for minimal periods of time, unquestionably constitutes irreparable injury."); *Portz* v. *St. Cloud State Univ.*, 196 F. Supp. 3d 963, 973 (D. Minn. 2016) ("[W]hen the constitutional right at issue is protected by the Fourteenth Amendment, the denial of that right is an irreparable harm.").

Without any support in the record, Defendants are left to argue that the State is irreparably harmed any time a law is enjoined.  (*See, e.g.*, Def's Pre-trial Br. 30.)  But "[t]he public is served by the preservation of constitutional rights."  *D.M ex rel. Bao Xiong* v. *Minn. State High Sch. League*, 917 F.3d 994, 1004 (8th Cir. 2019).  Because the State has no interest in enforcing an unconstitutional law, s*ee Rodgers* v. *Bryant*, 942 F.3d 451, 457 (8th Cir. 2019), "it is always in the public interest to prevent the violation of a party's constitutional rights" by granting injunctive relief.  *D.M.*, 917 F.3d at 1004 (quoting *G&V Lounge, Inc*. v. *Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994)).).

**B.      A Statewide Facial Injunction Is Necessary.**

A facial injunction is warranted here.  Facial relief is appropriate when there is "no set of circumstances . . . under which the Act would be valid."  *United States* v. *Salerno*, 481 U.S. 739, 745 (1987).  In applying that test, "the proper focus of the constitutional inquiry is the group for whom the law is a restriction, not the group for whom the law is irrelevant."  *City of Los Angeles* v. *Patel*, 576 U.S. 409, 418 (2015) (quoting *Planned Parenthood of Southeastern Pa.* v. *Casey*, 505 U.S. 833, 894 (1992)).  The Act is a restriction for every transgender minor in Arkansas who needs gender-affirming medical care and whose parents and doctors support that care, and there is no set of facts under which denying those patients access to care would be constitutionally valid.

"The scope of injunctive relief is dictated by the extent of the violation established." *Rodgers*, 942 F.3d at 458 (quoting *Califano* v. *Yamasaki*, 442 U.S. 682, 702 (1979)).  Therefore, the Eighth Circuit has held that "injunctive relief should extend statewide [when] the violation established . . . impacts the entire state of Arkansas."  *Id*.  That is the case here, as the Act bars every transgender minor in Arkansas from obtaining care proscribed by the law, and bars every provider in the State from offering that care or referring patients to other providers.

## CONCLUSION

The trial record demonstrates that Plaintiffs should prevail on the merits of each of

their constitutional claims and are entitled to a permanent statewide facial injunction of Act 626.

*Gary L. Sullivan*

Leslie Cooper
Chase Strangio*
James Esseks*
American Civil Liberties Union Foundation
125 Broad St.
New York, NY  10004
Telephone: (917) 345-1742
lcooper@aclu.org
cstrangio@aclu.org
jesseks@aclu.org
*Attorneys for the Plaintiffs*

Beth Echols, Ark. Bar No. 2002203
Christopher Travis, Ark. Bar No. 97093
Drake Mann, Ark. Bar No. 87108
Gill Ragon Owen, P.A.
425 W. Capitol Avenue, Suite 3800
Little Rock, AR  72201
Telephone: (501) 376-3800
echols@gill-law.com
travis@gill-law.com
mann@gill-law.com
*On behalf of the Arkansas Civil Liberties Union
Foundation, Inc.
Attorneys for the Plaintiffs*

Breean Walas, Ark. Bar No. 2006077
Walas Law Firm, PLLC
P.O. Box 4591
Bozeman, MT  59772
Telephone: (501) 246-1067
breean@walaslawfirm.com
*On behalf of the Arkansas Civil Liberties
Union Foundation, Inc.
Attorneys for the Plaintiffs*

Sarah Everett, Ark. Bar No. 2017249
Gary Sullivan, Ark. Bar No. 92051
Arkansas Civil Liberties Union Foundation, Inc.
904 W. 2nd Street
Little Rock, AR  72201
Telephone: (501) 374-2842
sarah@acluarkansas.org
gary@acluarkansas.org
*Attorneys for the Plaintiffs*

Garrard R. Beeney*
Lauren M. Goldsmith*
Arun Bodapati*
Rebecca S. Kadosh*
Alexander S. Holland*
Sophia M. Matthew*
Jonathan G. Lester*
Sullivan & Cromwell LLP
125 Broad Street
New York, NY 10004
Telephone:  (212) 558-4000
beeneyg@sullcrom.com
goldsmithl@sullcrom.com
bodapatia@sullcrom.com
kadoshr@sullcrom.com

Laura Kabler Oswell*
Aviv S. Halpern*
Sullivan & Cromwell LLP
1870 Embarcadero Road
Palo Alto, CA  94303
Telephone: (650) 461-5600
oswelll@sullcrom.com
halperna@sullcrom.com
*Attorneys for the Plaintiffs*

*Admitted pro hac vice

-43-

hollanda@sullcrom.com
matthews@sullcrom.com
lesterj@sullcrom.com
*Attorneys for the Plaintiffs*

Daniel J. Richardson*
1700 New York Avenue NW
Suite 700
Washington, DC  20006
Telephone: 202-956-7500
richardsond@sullcrom.com

*Attorney for Plaintiffs*