**United States Court of Appeals**
*For The Eighth Circuit*
Thomas F. Eagleton U.S. Courthouse
111 South 10th Street, Room 24.329
**St. Louis, Missouri 63102**

Susan E. Bindler
*Clerk of Court*

VOICE (314) 244-2400
FAX (314) 244-2780
www.ca8.uscourts.gov

4:21-cv-00450-JM

August 12, 2025

Dylan L. Jacobs
KING STREET LEGAL, PLLC.
Suite 300
800 Connecticut Avenue, N.W.
Washington, DC  20006

RE:  23-2681  Dylan Brandt, et al v. Tim Griffin, et al

```
┌─────────────────────────────┐
│         FILED               │
│   U.S. DISTRICT COURT       │
│  EASTERN DISTRICT ARKANSAS  │
│       Aug 12, 2025          │
│  Tammy H. Downs, Clerk      │
│  By: JohnHibbs D.C.         │
│              DEP CLERK      │
└─────────────────────────────┘
```

Dear Counsel:

        The court has issued an opinion in this case. Judgment has been entered in accordance
with the opinion.

        Please review Federal Rules of Appellate Procedure and the Eighth Circuit Rules on post-
submission procedure to ensure that any contemplated filing is timely and in compliance with the
rules. Note particularly that petitions for rehearing and petitions for rehearing en banc <u>must</u> be
received in the clerk's office within 14 days of the date of the entry of judgment. Counsel-filed
petitions must be filed electronically in CM/ECF. Paper copies are not required. Except as
provided by Rule 25(a)(2)(iii) of the Federal Rules of Appellate Procedure, no grace period for
mailing is allowed. Any petition for rehearing or petition for rehearing en banc which is not
received within the 14 day period for filing permitted by FRAP 40 may be denied as untimely.

                                        Susan E. Bindler
                                        Clerk of Court

CRJ

Enclosure(s)

cc:     Steven J. Alagna
        Gabriel Arkles
        Aldo A. Badini
        Garrard R. Beeney
        Carmine D Boccuzzi Jr.
        Kathleen Boergers
        Alexander Barrett Bowdre
        J. Mark Brewer
        Nathaniel P. Bruhn
         Clerk, U.S. District Court, Eastern District of Arkansas
        James Clymer

Leslie Cooper
Andrew Rhys Davies
Joshua Divine
Sharon Elizabeth Echols
James D. Esseks
Sarah C. Everett
Sydney Foster
Kay Groneck
Aviv S. Halpern
Kathleen R. Hartnett
Zoe Helstrom
Alexander S. Holland
Kersten L. Holzhueter
Katelyn Kang
Andrew Kim
Edmund G. LaCour Jr.
Cortlin Hall Lannin
Peter Drake Mann
Maxime D. Matthew
Christopher Ernest Mills
Li Nowlin-Sohl
William Jeffrey Olson
Laura Kabler Oswell
Autumn Hamit Patterson
John Michael Patton
Marc Poissonnier
Elizabeth F. Reinhardt
Daniel J. Richardson
Bonnie I. Robin-Vergeer
Barbara Schwabauer
Chase B. Strangio
Hannah Lorraine Templin
Christopher L. Travis
Breean Walas
Cynthia Cheng-Wun Weaver

District Court/Agency Case Number(s):   4:21-cv-00450-JM

# United States Court of Appeals
### For The Eighth Circuit
Thomas F. Eagleton U.S. Courthouse
111 South 10th Street, Room 24.329
### St. Louis, Missouri 63102

**Susan E. Bindler**
*Clerk of Court*

**VOICE (314) 244-2400**
**FAX (314) 244-2780**
**www.ca8.uscourts.gov**

August 12, 2025

West Publishing
Opinions Clerk
610 Opperman Drive
Building D D4-40
Eagan, MN 55123-0000

RE:  23-2681  Dylan Brandt, et al v. Tim Griffin, et al

Dear Sir or Madam:

A published opinion was filed today in the above case.

Counsel who presented argument on behalf of the appellants, and appeared on the appellants' brief, was Dylan L. Jacobs, of Washington, DC.

Counsel who presented argument on behalf of the appellees and appeared on the appellees' brief, was Chase B. Strangio, of New York, NY.  The following attorney(s) also appeared on the appellees' brief;  Leslie Cooper, of New York, NY., James Esseks, of New York, NY., Beth Echols, of Little Rock, AR., Christopher Travis, of Little Rock, AR., Drake Mann, of Little Rock, AR., Garrard R. Beeney, of New York, NY., Lauren M. Goldsmith, of New York, NY., Alexander S. Holland, of New York, NY., Maxime D. Matthw, of New York, NY., Daniel J. Richardson, of Washington, D.C., Sarah Everett, of Little Rock, AR., Laura Kabler Oswell, of Palo Alto, CA., and Aviv S. Halpern, of Palo Alto, CA.

The following attorney appeared on the amicus brief of the Family Research Council in support of appellants: Christopher Mills, of Charleston, SC.

The following attorneys appeared on the amicus brief of the States of Alabama, Missouri, Tennessee, Florida, Georgia, Idaho, Indiana, Iowa, Louisiana, Kansas, Kentucky, Mississippi, Montana, Nebraska, Oklahoma, South Carolina, South Dakota, Texas, Utah, Virginia, and West Virigina in support of appellants and reversal: Edmund G. LaCour, Jr., of Montgomery, AL., Steven Griffin, of Nashville, TN., and Joshua M. Devine, of Jefferson City, MO.

The following attorneys appeared on the amicus brief of Public Advocate of the United States, America's Future, U.S. Constitutional Rights Legal Defense Fund, Fitzgerald Griffin Foundation, Center for Morality, the LONANG Institute, and Conservative Legal Defense and Education Fund, in support of appellants and reversal: William J. Olson, of Vienna, VA., and Jeremiah L. Morgan, of Vienna, VA.

The following attorneys appeared on the amicus brief of Biomedical Ethics and Public Health Scholars in support of appellees and affirmance: Katelyn Kang, of New York, NY., Elizabeth F. Reinhardt, of Washington, D.C., Kathleen Hartnett, of San Francisco, CA., and Zoe Helstrom, of San Francisco, CA.

The following attorneys appeared on the amicus brief of the States of California, Colorado, Connecticut, Delaware, Hawaii, Illinois, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, New York, Oregon, Rhode Island, Pennsylvania, Washington, Vermont, and the District of Columbia in support of appellees and affirmance: Kathleen Boergers, of Oakland, CA., Stephanie T. Yu, of Oakland, CA., Nimrod Pitsker Elias, of Oakland, CA., and Sean c. McGuire, of Oakland, CA.

The following attorneys appeared on the amicus brief of the Human Rights Campaign Foundation in support of appellees and affirmance: Cynthia Cheng-Wun Weaver, of Washington, D.C., JP Schnapper-Casteras, of Washington, D.C., and Steven J. Alagna, of St. Louis, MO.

Counsel who presented argument on behalf of the amicus party United States in support of appellees and affirmance and appeared on the brief was Barbara Schwabauer, of Washington, D.C.  The following attorney also appeared on the amicus brief of the United States: Bonnie I. Robin-Vergeer, of Washington, D.C.

The following attorneys appeared on the amicus brief of the American Academy of Pediatrics, Academic Pediatric Association, American Academy of Child and Adolescent Psychiatry, American Academy of Family Physicians, American Academy of Nursing, ACOP, American College of Physicians, AMA, APS, American Psychiatric Association, ARAAP, ACCAP, Arkansas Medical Society, Arkansas Psychiatric Society, Association of American Medical Colleges, AMSPDC, Endocrine Society, GLMA, NAPNAP, PES, SPU, Society for Adolescent Health and Medicine, SPR, SPN and World Professional Association for Transgender Health in support of appellees and affirmance: D. Jean Veta, of Washington, D.C., William Isasi, of Washington, D.C., Jose F. Giron, of Washington, D.C., and Cortlin Lannin, of San Francisco, CA.

The following attorneys appeared on the amicus brief of GLBTQ Legal Advocates & Defenders and National Center for Lesbian Rights in support of appellees and affirmance Justin D. Weitz, of Washington, D.C., Christopher M. Diffee, of New York, NY., Jordan D. Hershman, of Boston, MA., Nathaniel P. Bruhn, of Boston, MA., and L. Felipe Escobedo, of Boston, MA.

The following attorney appeared on the amicus brief of William Eskridge, Jr., Steven Calabresi, Naomi Cahn, June Carbone, Christopher Riano, Amanda Shanor, and Alexander Volokh in support of appellees and affirmance: Kersten L. Holzhueter, of Kansas City, MO.

The following attorneys appeared on the amicus brief Family Law and Constitutional Law Scholars in support of appellees and affirmance: Kevin Barry, of Hamden, CT., Maxine Eichner, of Chapel Hill, NC., and Aldo A. Badini, of New York, NY.

The following attorneys appeared on the amicus brief of Elliot Page and Fifty-Seven Other Individuals in support of appellees and affirmance: Carmine D. Boccuzzi, Jr., of New York, NY., Howard S. Zelbo, of New York, NY., JD Colavecchio, of New York, NY., Allison Caramico, of New York, NY, Adrian Gariboldi, of New York, NY., Madeline Hundley, of New York, NY., Nathaniel Reynold, of New York, NY., Gabirel Arkles, of New York, NY., Sydney Duncan, of New York, NY., and Seran Gee, of New York, NY.

The following attorneys appeared on the amicus brief of Conservative Legislators, Former Legislators, and Activists in support of appellees and affirmance: CJ Morrison, of San Francisco, CA., Andrew Kim, of Washington, DC., Brian T. Burgess, of Washington, D.C., and Jesse Lempel, of Boston, MA.

The following attorneys appeared on the amicus brief of Foreign Non-Profit Organizations Advocating for the Rights of Transgender People in support of appellees and affirmance: Andrew Rhys Davies, of New York, NY., Charles C. Bridge, of New York, NY., Emily Brody-Bizar, of New York, NY., Anna Mizzi, of New York, NY., and Duy Nguyen, of New York, NY.

The judge who heard the case in the district court was Honorable James M. Moody, Jr..

If you have any questions concerning this case, please call this office.

Susan E. Bindler
Clerk of Court

CRJ

Enclosure(s)

cc:  MO Lawyers Weekly

District Court/Agency Case Number(s):  4:21-cv-00450-JM

# United States Court of Appeals
## For the Eighth Circuit

_____

No. 23-2681

_____

Dylan Brandt, by and through his mother Joanna Brandt; Joanna Brandt; Sabrina
Jennen, by and through her parents Lacey and Aaron Jennen; Lacey Jennen; Aaron
Jennen; Brooke Dennis, by and through her parents Amanda and Shayne Dennis;
Amanda Dennis; Shayne Dennis; Parker Saxton, by and through his father Donnie
Saxton; Donnie Saxton; Michele Hutchison, on behalf of herself and her patients;
Kathryn Stambough, on behalf of herself and her patients

*Plaintiffs - Appellees*

v.

Tim Griffin, in his official capacity as the Arkansas Attorney General; Amy E.
Embry, in her official capacity as the Executive Director of the Arkansas State
Medical Board; Michael J. Birrer, in official capacity as member of the Arkansas
State Medical Board; Christopher D. Davis, in official capacity as member of the
Arkansas State Medical Board; John H. Scribner, in official capacity as member of
the Arkansas State Medical Board; Elizabeth Anderson, in official capacity as
member of the Arkansas State Medical Board; C. Wesley Kluck, in official
capacity as member of the Arkansas State Medical Board; Edward Gardner,
"Ward"; in official capacity as member of the Arkansas State Medical Board;
Rodney Griffin, in official capacity as member of the Arkansas State Medical
Board; Betty Guhman, in official capacity as member of the Arkansas State
Medical Board; Brian L. McGee, in official capacity as member of the Arkansas
State Medical Board; Timothy C. Paden, in official capacity as member of the
Arkansas State Medical Board; Don R. Philips, in official capacity as member of
the Arkansas State Medical Board; Matthew A. Sellers, in official capacity as
member of the Arkansas State Medical Board; Brad A. Thomas, in official
capacity as member of the Arkansas State Medical Board; Veryl D. Hodges, in
official capacity as member of the Arkansas State Medical Board

*Defendants - Appellants*

------------------------------

State of Missouri; State of Iowa; State of Nebraska; State of North Dakota; State of South Dakota; Family Research Council; State of Alabama; State of Tennessee; State of Florida; State of Georgia; State of Idaho; State of Indiana; State of Louisiana; State of Kansas; State of Kentucky; State of Mississippi; State of Montana; State of Oklahoma; State of South Carolina; State of Texas; State of Utah; State of Virginia; State of West Virginia; America's Future; Conservative Legal Defense and Education Fund; Public Advocate of the United States; U.S. Constitutional Rights Legal Defense Fund; Fitzgerald Griffin Foundation; Center for Morality; LONANG Institute

*Amici on Behalf of Appellant(s)*

Biomedical Ethics and Public Health Scholars; State of California; State of Colorado; State of Connecticut; State of Delaware; State of Hawaii; State of Illinois; State of Maine; State of Maryland; State of Massachusetts; State of Michigan; State of Minnesota; State of Nevada; State of New Jersey; State of New York; State of Oregon; State of Rhode Island; State of Pennsylvania; State of Washington; State of Vermont; District of Columbia; United States[1]; Human Rights Campaign Foundation; GLBTQ Legal Advocates & Defenders; National Center for Lesbian Rights; American Academy of Pediatrics; Academic Pediatric Association; American Academy of Child and Adolescent Psychiatry; American Academy of Family Physicians; American Academy of Nursing; Health Professionals Advancing LGBTQ Equality; American College of Osteopathic Pediatricians; American College of Physicians; American Medical Association; American Pediatric Society; American Psychiatric Association; Association of Medical School Pediatric Department Chairs; Association of American Medical Colleges; Arkansas Chapter of the American Academy of Pediatrics; Arkansas Council on Child and Adolescent Psychiatry; Arkansas Medical Society; Arkansas Psychiatric Society; Endocrine Society; National Association of Pediatric Nurse Practitioners; Pediatric Endocrine Society; Society for Adolescent Health and Medicine; Society for Pediatric Research; Society of Pediatric Nurses; Societies for Pediatric Urology; World Professional Association for Transgender Health; William Eskridge, Jr.; Steven Calabresi; Naomi Cahn; June Carbone; Christopher Riano; Amanda Shanor; Alexander Volokh; Conservative Legislators, Former

---

[1]After submission, the United States gave notice that it was withdrawing its brief as amicus curiae. *See* **Fed. R. App. P.** 29(a)(2) (stating that the United States may file an amicus brief without leave of court).

-2-

Legislators, and Activists; Family Law and Constitutional Law Scholars; Elliot Page and 57 Other Individuals; Foreign Non-Profit Organizations Advocating for the Rights of Transgender People

*Amici on Behalf of Appellee(s)*

————————

Appeal from United States District Court
for the Eastern District of Arkansas - Central

————————

Submitted: April 11, 2024
Filed: August 12, 2025

————————

Before COLLOTON, Chief Judge, LOKEN, SMITH, GRUENDER, BENTON, KELLY, ERICKSON, GRASZ, STRAS, and KOBES, Circuit Judges, En Banc.

————————

BENTON, Circuit Judge, with whom COLLOTON, Chief Judge, and SMITH, GRUENDER, ERICKSON, GRASZ, STRAS, and KOBES, Circuit Judges, join.

The Arkansas General Assembly prohibited healthcare professionals from providing gender transition procedures to minors. The Act also prohibited the professionals from referring minors for gender transition procedures. Four minors living in Arkansas, their parents, and two healthcare professionals practicing there sued to enjoin the Arkansas Attorney General and the members of the State Medical Board from enforcing the Act. Ruling that the Act violated the First Amendment and both the Fourteenth Amendment's Equal Protection Clause and Due Process Clause, the district court issued a permanent injunction. The Attorney General and the Board appeal. Having jurisdiction under 28 U.S.C. § 1291, this court reverses and remands.

-3-

I.

In 2021, the Arkansas legislature enacted, over the governor's veto, the Save Adolescents from Experimentation Act, Act 626.  It prohibited physicians and other healthcare professionals from providing "gender transition procedures to any individual under eighteen (18) years of age." **Ark. Code Ann. § 20-9-1502(a)**.  The Act also prohibited physicians and other healthcare professionals from referring minors to any healthcare professional for gender transition procedures.  **§ 20-9-1502(b)**.  The Act defined the provision of, or referral for, these procedures to minors as "unprofessional conduct . . . subject to discipline by the appropriate licensing entity or disciplinary review board." **§ 20-9-1504(a)**.  The Act also empowered the Attorney General to bring actions to enforce compliance.  **§ 20-9-1504(f)(1)**.

Four minors in Arkansas, their parents, and two healthcare professionals sued for declaratory and injunctive relief.[2]  They alleged that the Act violated the Fourteenth Amendment's Equal Protection Clause and Due Process Clause, as well as the First Amendment.  The district court granted a preliminary injunction against the enforcement of the Act.  On appeal, a panel of this court affirmed the district court, finding a likelihood of success on the merits that the Act violated the Equal Protection Clause.  ***Brandt ex rel. Brandt v. Rutledge***, 47 F.4th 661, 669–71 (8th Cir. 2022).

The case proceeded to trial on the merits.  After an eight-day bench trial, the district court concluded that the Act violated the Equal Protection Clause, the Due Process Clause, and the First Amendment.  The court permanently enjoined the Attorney General and the State Medical Board from enforcing the Act.  ***Brandt v. Rutledge***, 677 F.Supp.3d 877, 925 (E.D. Ark. 2023).

---

[2]Three of the four minor plaintiffs have reached age 18 and, thus, they and their parents are no longer impacted by Act 626.  The district court dismissed one healthcare professional, who does not appeal.  ***Brandt v. Rutledge***, 677 F.Supp.3d 877, 886 n.3 (E.D. Ark. 2023).

-4-

The Attorney General and the Board appeal. This court granted an initial hearing of the appeal en banc. **Fed. R. App. P.** 40(g). This court reviews permanent injunctions for abuse of discretion, including "where the district court rests its conclusion on clearly erroneous factual findings or erroneous legal conclusions." ***Oglala Sioux Tribe v. C & W Enterprises, Inc.***, 542 F.3d 224, 229 (8th Cir. 2008). "A permanent injunction requires the moving party to show actual success on the merits . . . . If a court finds actual success on the merits, it then considers . . . (1) the threat of irreparable harm to the moving party; (2) the balance of harms with any injury an injunction might inflict on other parties; and (3) the public interest." ***Id.*** "After a bench trial, this court reviews legal conclusions de novo and factual findings for clear error." ***Urban Hotel Dev. Co., Inc. v. President Dev. Group, L.C.***, 535 F.3d 874, 879 (8th Cir. 2008).

II.

The Act defines "gender transition procedures" as "any medical or surgical service" seeking to:

> (i) Alter or remove physical or anatomical characteristics or features that are typical for the individual's biological sex; or

> (ii) Instill or create physiological or anatomical characteristics that resemble a sex different from the individual's biological sex, including without limitation medical services that provide puberty-blocking drugs, cross-sex hormones, or other mechanisms to promote the development of feminizing or masculinizing features in the opposite biological sex, or genital or nongenital gender reassignment surgery performed for the purpose of assisting an individual with a gender transition.

**Ark. Code Ann. § 20-9-1501(6)(A)**.

-5-

A.

The minors argue that the Act classifies based on sex in violation of the Equal Protection Clause. They argue that a minor's sex determines whether he or she can receive certain medical treatments. According to the minors, a male minor can receive testosterone to masculinize his appearance, but a female minor cannot. *See* **§ 20-9-1501(2)(A)** (defining "Cross-sex hormones" to include "Testosterone or other androgens given to biological females in amounts that are larger or more potent than would normally occur naturally in healthy biological sex females"). The minors reason that because a minor's sex determines whether he or she may receive certain medical treatments, the Act classifies based on sex. They conclude that the Act warrants heightened scrutiny under the Equal Protection Clause.

To the contrary, as the Supreme Court explained about a similar Tennessee law, the Act classifies based only on age and medical procedure. *See **United States v. Skrmetti***, 145 S. Ct. 1816, 1829 (2025). Under the Act, just like the Tennessee law, healthcare professionals "may administer certain medical treatments to individuals ages 18 and older but not to minors." *Id.* Thus, the Act classifies based on age.

The Act also classifies based on medical procedure. Under the Act, healthcare professionals may provide puberty-blocking drugs, cross-sex hormones, or surgery for some purposes, but not "for the purpose of assisting an individual with a gender transition." **Ark. Code Ann. § 20-9-1501(6)(A)(ii)**. The Act exempts many services from its definition of "gender transition procedures," including:

(i) Services to persons born with a medically verifiable disorder of sex development . . . ;

(ii) Services provided when a physician has otherwise diagnosed a disorder of sexual development that the physician has determined through genetic or biochemical testing that the person does not have

-6-

normal sex chromosome structure, sex steroid hormone production, or sex steroid hormone action;

(iii) The treatment of any infection, injury, disease, or disorder that has been caused by or exacerbated by the performance of gender transition procedures . . . ; or

(iv) Any procedure undertaken because the individual suffers from a physical disorder, physical injury, or physical illness that would, as certified by a physician, place the individual in imminent danger of death or impairment of major bodily function unless surgery is performed.

**§ 20-9-1501(6)(B)**.  Thus, the Act classifies based on medical procedure, allowing some but prohibiting others.

The minors argue that the Act does not classify based on medical procedure because the Act does not prohibit any specific medication, medical intervention, or surgical treatment.  True, the Act prohibits "any" medical or surgical service that seeks to accomplish the goals described in the Act's definition of "gender transition procedures."  **§ 20-9-1501(6)(A)(i)**, **(ii)**.  Also, unlike the Tennessee law upheld by the Supreme Court, the Act does not mention the specific conditions "gender dysphoria, gender identity disorder, gender incongruence."  **Tenn. Code Ann. § 68-33-102(1)**.  But the Act allows healthcare professionals to address some medical concerns but not others.  Like the Tennessee law, the Act's exemptions to the definition of "gender transition procedures" do include specific conditions that healthcare professionals may treat without violating the Act.  **Ark. Code Ann. § 20-9-1501(6)(B)**; *cf.* **Tenn. Code Ann. § 68-33-103(b)**.  The Act allows healthcare professionals to provide drugs or surgical services to address some medical concerns, but it bars healthcare professionals from providing those drugs or surgeries for other purposes.  The Act thus classifies based on medical procedure, treating different medical procedures differently.

-7-

The Act does not classify based on sex. A minor male who receives testosterone in order to masculinize his appearance receives a different procedure than a minor female who receives testosterone as a gender transition procedure. *See Skrmetti*, 145 S. Ct. at 1830 (stating that an aspect of a "medical treatment" is "the underlying medical concern the treatment is intended to address"). "Both puberty blockers and hormones can be used to treat certain overlapping indications (such as gender dysphoria), and each can be used to treat a range of other conditions. These combinations of drugs and indications give rise to various medical treatments." *Id.* (internal citation omitted). In fact, the district court here found: "Testosterone is used to treat cisgender adolescent male patients for a number of conditions including delayed puberty, hypogonadism (where the brain does not tell the body to go through puberty), and micropenis." *Brandt*, 677 F.Supp.3d at 904. A minor male receiving testosterone for one of these conditions receives a different medical treatment than a minor female receiving testosterone as a gender transition procedure. *See Skrmetti*, 145 S. Ct. at 1830 ("When, for example, a transgender boy (whose biological sex is female) takes puberty blockers to treat his gender incongruence, he receives a different medical treatment than a boy whose biological sex is male who takes puberty blockers to treat his precocious puberty."). Because "*no* minor may be administered puberty blockers or hormones" as gender transition procedures, but "minors of *any* sex may be administered puberty blockers or hormones for other purposes," the Act does not classify based on sex. *Id.* at 1831. The Act classifies based on age and medical procedure, not sex.

Citing *Bostock v. Clayton County*, 590 U.S. 644, 660 (2020), the minors argue that prohibiting gender transition procedures inherently discriminates on the basis of sex because the Act punishes a minor for seeking to acquire sex characteristics "different from the individual's biological sex." **Ark. Code Ann. § 20-9-1501(6)(A)(ii)**. The minors reason that the Act must classify based on sex because it would otherwise be impossible to distinguish whether a drug or surgery for a minor was permitted or prohibited. However, the Supreme Court declined to decide "whether *Bostock*'s reasoning reaches beyond the Title VII context." *Skrmetti*, 145 S. Ct. at 1834. Regardless, the Court continued, the Tennessee law did not

-8-

discriminate on the basis of sex under the reasoning of *Bostock*. The Court explained that "changing a minor's sex . . . does not alter the application" of the law. *Id.* "If a transgender boy seeks testosterone to treat his gender dysphoria," the law "prevents a healthcare provider from administering it to him." *Id.* "If you change his biological sex from female to male," the law "would still not permit him the hormones he seeks because he would lack a qualifying diagnosis for the testosterone—such as a congenital defect, precocious puberty, disease, or physical injury." *Id.* "The transgender boy could receive testosterone only if he had one of those permissible diagnoses. And, if he had such a diagnosis, he could obtain the testosterone regardless of his sex." *Id.* Like the Tennessee law, the Act prohibits providing medical treatment for certain purposes, and these prohibitions apply even if one switches the sex of a hypothetical minor. Thus, the Act does not discriminate on the basis of sex. This court need not decide whether *Bostock*'s reasoning applies in Equal Protection Clause cases because applying *Bostock*'s reasoning does not change the outcome of this case.

The minors assert that the Act reinforces "fixed notions" about "roles and abilities" tied to an individual's sex, citing *Mississippi University for Women v. Hogan*, 458 U.S. 718, 724–25 (1982). According to them, the Act's prohibitions turn on what is "typical" for an individual's sex. *See* **Ark. Code Ann. § 20-9-1501(6)(A)(i)**. The minors conclude that the Act thus compels individual conformity to generalizations about sex. "True, a law that classifies on the basis of sex may fail heightened scrutiny if the classifications rest on impermissible stereotypes." ***Skrmetti***, 145 S. Ct. at 1832. But, as the Supreme Court explained, "where a law's classifications are neither covertly nor overtly based on sex . . . we do not subject the law to heightened review unless it was motivated by an invidious discriminatory purpose." *Id.* A discriminatory purpose "implies that the decisionmaker, in this case a state legislature, selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." ***Personnel Adm'r of Mass. v. Feeney***, 442 U.S. 256, 279 (1979). The minors do not allege that an invidious sex-based discriminatory purpose motivated the Arkansas General Assembly.

-9-

The Assembly expressed its concern that the "risks of gender transition procedures far outweigh any benefit at this stage of clinical study on these procedures." **Act 626**, **§ 2(15)**, 93rd Gen. Assemb., Reg. Sess. (Ark. 2021). The legislature found:

- "The prescribing of puberty-blocking drugs is being done despite the lack of any long-term longitudinal studies evaluating the risks and benefits of using these drugs for . . . gender transition";

- "Healthcare providers are also prescribing cross-sex hormones for children who experience distress at identifying with their biological sex, despite the fact that no randomized clinical trials have been conducted on the efficacy or safety of the use of cross-sex hormones in . . . children for the purpose of . . . gender transition";

- "The use of cross-sex hormones comes with serious known risks," including an increase in red blood cells, severe liver dysfunction, heart attacks, strokes, hypertension, gallstones, blood clots, irreversible infertility, and increased risks of certain cancers;

- "Genital gender reassignment surgery includes several irreversible invasive procedures for males and females and involves the alteration of biologically healthy and functional body parts";

- "The complications, risks, and long-term care concerns associated with genital gender reassignment surgery for both males and females are numerous and complex";

- "Nongenital gender reassignment surgery includes various invasive procedures for males and females and also involves the alteration of biologically healthy and functional body parts."

*Id.* at **§ 2(6)(B)**, **(7)**, **(8)**, **10(A)**, **(11)**, **(12)(A)**.   "A concern about potentially irreversible medical procedures for a child is not a form of stereotyping." ***L.W. ex rel. Williams v. Skrmetti***, 83 F.4th 460, 485 (6th Cir. 2023), *aff'd*, ***Skrmetti***, 145 S. Ct. at 1832.  The Act does not classify based on sex.

-10-

B.

The minors alternatively assert that the Act discriminates based on transgender status. The Act defines "gender transition" as "the process in which a person goes from identifying with and living as a gender that corresponds to his or her biological sex to identifying with and living as a gender different from his or her biological sex." **Ark. Code Ann. § 20-9-1501(5)**. This definition, the minors believe, is synonymous with being transgender. Because the Act prohibits "gender transition procedures," the minors reason that the act classifies based on transgender status, citing *Christian Legal Society Chapter of the University of California, Hastings College of the Law v. Martinez*, 561 U.S. 661, 689 (2010). Also, the minors argue that transgender status is a suspect class. Thus, the minors conclude that the Act triggers heightened scrutiny under the Equal Protection Clause.

To the contrary, the Act does not classify based on transgender status. Like the Tennessee law upheld by the Supreme Court, the Act effectively divides minors into two groups. In one group are minors seeking drugs or surgeries for the purposes that the Act prohibits. In the other group are minors seeking drugs or surgeries for purposes the Act does not prohibit. Although the first group may include only minors with transgender status, the second group "encompasses both transgender and nontransgender individuals." *See Skrmetti*, 145 S. Ct. at 1833. Thus, there is a "lack of identity" between transgender status and the prohibited class of medical procedures. *Id.* The Act, like the Tennessee law, regulates a class of procedures, not people. *See id.* at 1834 n.3. The Act does not classify based on transgender status.

C.

Classifications based on age or medical procedure are evaluated under rational basis review. *Id.* at 1829. Under rational basis review, a legislative classification will be upheld "so long as it bears a rational relation to some legitimate end." *Id.* at 1828. Here, the General Assembly found that the state "has a compelling

-11-

government interest in protecting the health and safety of its citizens, especially vulnerable children." **Act 626, § 2(1)**, 93rd Gen. Assemb., Reg. Sess. (Ark. 2021). Indeed, states have a "compelling" interest in "safeguarding the physical and psychological well-being of a minor." *New York v. Ferber*, 458 U.S. 747, 756–57 (1982).

The minors argue that the Act fails rational basis review under the Equal Protection Clause. They do not challenge the Act's age classification. However, the minors do claim that prohibiting gender transition procedures does not bear a rational relationship to the legislature's concerns. They emphasize that Arkansas does not prohibit other procedures that have similar risks and less supporting evidence. *See Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 366 n.4 (2001) (noting that the Court struck down an ordinance because "the city's purported justifications for the ordinance made no sense in light of how the city treated other groups similarly situated in relevant respects"). They stress that the Act permits minors to receive the same medications for purposes other than gender transition procedures, even though those medications still have risks. They also assert that the General Assembly's concerns cannot justify banning *all* gender transition procedures. According to the minors, only some gender transition procedures pose risks of infertility and irreversibility; puberty-blocking drugs do not. The minors conclude that the asserted justifications for the Act's ban on all gender transition procedures are "impossible to credit" and the Act fails rational basis review. *See Romer v. Evans*, 517 U.S. 620, 635 (1996).

Laws reviewed for rational basis receive a "wide latitude." *Skrmetti*, 145 S. Ct. at 1828. The "relatively relaxed standard" of rational basis review reflects "awareness that the drawing of lines that create distinctions is peculiarly a legislative task and an unavoidable one." *Id.* at 1835. "Where there exist plausible reasons for the relevant government action, our inquiry is at an end." *Id.* (internal quotation marks omitted). The legislature's findings in Act 626 parallel Tennessee's findings that the Supreme Court held supported the law in *Skrmetti*. There, "Tennessee concluded that there is an ongoing debate among medical experts regarding the risks

-12-

and benefits associated with administering puberty blockers and hormones to treat gender dysphoria, gender identity disorder, and gender incongruence." *Id.* at 1836. *Compare* **Tenn. Code Ann. § 68-33-101(b), (h)** (finding "it likely that not all harmful effects associated with these types of medical procedures when performed on a minor are yet fully known, as many of these procedures, when performed on a minor for such purposes, are experimental in nature and not supported by high-quality, long-term medical studies") (finding that "many individuals have expressed regret for medical procedures that were performed on or administered to them for such purposes when they were minors"), *with* **Act 626**, **§ 2(15)**, **(3)**, 93rd Gen. Assemb., Reg. Sess. (Ark. 2021) ("The risks of gender transition procedures far outweigh any benefit at this stage of clinical study on these procedures.") (finding that a majority "of children who are gender nonconforming or experience distress at identifying with their biological sex . . . come to identify with their biological sex in adolescence or adulthood, thereby rending most physiological interventions unnecessary").

However, the minors try to distinguish this case from *Skrmetti*. They argue that even under rational basis review the Act "must find some footing in the realities of the subject addressed by the legislation." ***Heller v. Doe***, 509 U.S. 312, 321 (1993). They quote the district court's factual findings that 1. "The evidence base supporting gender-affirming medical care for adolescents is comparable to the evidence base supporting other medical treatments"; and 2. "It is common for clinical practice guidelines in medicine to make recommendations based on low or very low-quality evidence such as cross-sectional and longitudinal studies." ***Brandt***, 677 F.Supp.3d at 901, 902. Because *Skrmetti* did not have such findings of fact, the minors conclude that the justifications that supported the Tennessee law do not support the Act. The minors also highlight that the district court did not consider their argument that legislators were motivated by negative attitudes about transgender people. Because the district court did not rule whether the Act survives rational basis review, the minors ask this court to remand this case to the district court to decide that question in light of *Skrmetti*. The dissent agrees.

-13-

To the contrary, this court can determine here that the Act survives rational basis review. *See **Bigelow v. Virginia***, 421 U.S. 809, 826–27 (1975) (declining to remand to apply the proper standard of review, because "the outcome is readily apparent"); ***United States v. Beck***, 140 F.3d 1129, 1131 (8th Cir. 1998) (holding that "because the relevant facts in this case are undisputed, we need not remand for further findings and may rule based on the record currently before us").

The district court here found that there were risks to minors from the prohibited gender transition procedures. The court found that low bone density is a risk for minors using puberty-blocking drugs. ***Brandt***, 677 F.Supp.3d at 903. The court found that risks for minors using cross-sex hormones include changes in cholesterol and blood thickness, blood clots (increasing stroke risk), and infertility. ***Id.*** at 904–05. The court found that the risk of infertility from using hormones is not "the same regardless of the condition for which they are being used and whether they are used to treat birth-assigned males or birth-assigned females." ***Id.*** at 903. The court acknowledged "surgical risks" of chest masculinization surgery. ***Id.*** at 905 (finding that the risks were "comparable to the risks related to other chest surgeries adolescents may undergo"). The court expressly found: "There are some individuals who undergo gender-affirming medical treatment who later come to regret that treatment and, for some, it was because they came to identify with their birth-assigned sex (sometimes referred to as detransitioning)." ***Id.*** (noting that regret "over a medical procedure is not unique to gender-affirming medical care and is common in medicine"). True, the district court highlighted that many medical associations in Arkansas and the United States support gender transition procedures for minors under certain conditions. ***Id.*** at 889. But the district court also acknowledged that many studies underlying the associations' guidelines for gender transition procedures for minors are not of the highest scientific quality. ***Id.*** at 901–02. The district court also acknowledged the policies of Sweden, Finland, and the United Kingdom, regulating access to gender transition procedures for minors. ***Id.*** at 916. *See also **Skrmetti***, 145 S. Ct. at 1825–26 (highlighting the policies of Sweden, Finland, and the United Kingdom). The undisputed facts found by the

-14-

district court demonstrate that there is a "reasonably conceivable state of facts that could provide a rational basis for the classification" in the Act. *Id.* at 1835.

Because a conceivable state of facts supports the Act, this court will not "second-guess the lines" that the Act draws between gender transition procedures and other medical procedures. *Skrmetti*, 145 S. Ct. at 1836. *See also Vance v. Bradley*, 440 U.S. 93, 108 (1979) ("Even if the classification involved here is to some extent both underinclusive and overinclusive, and hence the line drawn . . . imperfect, it is nevertheless the rule that in a case like this 'perfection is by no means required.'"); *Danker v. City of Council Bluffs*, 53 F.4th 420, 425 (8th Cir. 2022) ("While the resulting ordinance may be an imperfect fit, this court cannot second guess or judge the fairness of legislative choices on rational basis review."); *Birchansky v. Clabaugh*, 955 F.3d 751, 758 (8th Cir. 2020) ("States are not required to 'choose between attacking every aspect of a problem or not attacking a problem at all.'"), *quoting Dandridge v. Williams*, 397 U.S. 471, 486–87 (1970).

Indeed, the Supreme Court leaves wide discretion for medical legislation to the more politically accountable bodies, especially in areas of medical uncertainty. *See, e.g.*, *Skrmetti*, 145 S. Ct. at 1836 (reiterating that the Court affords states "wide discretion to pass legislation in areas where there is medical and scientific uncertainty"); *Jacobson v. Massachusetts*, 197 U.S. 11, 38 (1905); *Watson v. Maryland*, 218 U.S. 173, 180 (1910); *Marshall v. United States*, 414 U.S. 417, 427 (1974) (cautioning that "in areas fraught with medical and scientific uncertainties, legislative options must be especially broad and courts should be cautious not to rewrite legislation, even assuming, arguendo, that judges with more direct exposure to the problem might make wiser choices"); *Whalen v. Roe*, 429 U.S. 589, 603 n.30 (1977) (reaffirming the "broad" police powers that states have in "regulating the administration of drugs by health professionals"); *Gonzales v. Carhart*, 550 U.S. 124, 163 (2007) (collecting cases). Although the Act may be more restrictive than the policies of other countries, under rational basis review a policy need not be "the best-known" way to accomplish the state's goals. *Jacobson*, 197 U.S. at 30. *See also Skrmetti*, 145 S. Ct. at 1836 ("[T]he fact the line might have been drawn

-15-

differently at some points is a matter for legislative, rather than judicial, consideration."). The Act is rationally related to the state's legitimate interest in protecting the well-being of minors.[3] The Act passes rational basis review under the Equal Protection Clause.[4]

III.

The parents argue that the Act violates their right to provide appropriate medical care for their children. The Fourteenth Amendment "provides heightened protection against government interference with certain fundamental rights and liberty interests." *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997). Rights not mentioned in the Constitution are still protected by the Fourteenth Amendment if they are "deeply rooted in this Nation's history and tradition" and "implicit in the concept of ordered liberty." *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 231 (2022). According to the parents, it is the right of parents to, with the child's consent and a doctor's advice, make judgments about the medical care of their children.

The parents invoke several Supreme Court cases upholding the rights of parents against the regulations of states. A child is not "the mere creature of the

---

[3]Also, because the Act bears "a rational relationship to a legitimate governmental purpose," the minors' assertion about legislators' negative attitudes about transgender people fails. *Romer*, 517 U.S. at 635. This court has held that "a *Romer*-type analysis applies only where there is no other legitimate state interest for the legislation that survives scrutiny." *Gallagher v. City of Clayton*, 699 F.3d 1013, 1021 (8th Cir. 2012). Here, the Act is not "inexplicable by anything but animus." *Trump v. Hawaii*, 585 U.S. 667, 706 (2018), *quoting Romer*, 517 U.S. at 632. Because the Act "is not the product solely of animus," it does not "fall within the *Romer* ambit." *Gallagher*, 699 F.3d at 1021. *See Evans v. Dowd*, 932 F.2d 739, 742 (8th Cir. 1991) (declining to remand an unaddressed claim to the district court, because "review of the record" revealed that the claim "must fail on the merits").

[4]This court's opinion in *Brandt ex rel. Brandt v. Rutledge*, 47 F.4th 661 (8th Cir. 2022), is hereby abrogated.

-16-

state." ***Pierce v. Society of the Sisters of the Holy Names of Jesus and Mary***, 268 U.S. 510, 535 (1925).  Parents "have the right, coupled with the high duty, to recognize and prepare him for additional obligations." ***Id.***  The Supreme Court has reasoned that this duty surely "includes a 'high duty' to recognize symptoms of illness and to seek and follow medical advice." ***Parham v. J.R.***, 442 U.S. 584, 602 (1979).  In *Parham*, the Court held that its "precedents permit the parents to retain a substantial, if not the dominant, role in the decision" to voluntarily commit their child to a state mental health hospital. ***Id.*** at 604.  The Court emphasized that parents "retain plenary authority to seek such care for their children, subject to a physician's independent examination and medical judgment." ***Id.***  Many statements by the Court reflect "concepts of the family as a unit with broad parental authority over minor children." ***Id.*** at 602.  *See, e.g.*, ***Meyer v. Nebraska***, 262 U.S. 390, 399–400 (1923) (describing the right to "establish a home and bring up children" as a "liberty" guaranteed by the Fourteenth Amendment); *Pierce*, 268 U.S. at 534–35 (holding that mandating compulsory attendance at public schools "unreasonably interferes with the liberty of parents and guardians to direct the upbringing and education of children under their control"); ***Troxel v. Granville***, 530 U.S. 57, 65 (2000) (plurality opinion) ("The liberty interest at issue in this case—the interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by this Court.").

More recently, the Supreme Court has emphasized the requirement for "careful description" when discerning the unwritten rights protected by the Fourteenth Amendment. ***Glucksberg***, 521 U.S. at 721.  The "doctrine of judicial self-restraint requires us to exercise the utmost care whenever we are asked to break new ground in this field." ***Reno v. Flores***, 507 U.S. 292, 302 (1993).  The Court has rejected recognizing a more specific right as "an integral part of a broader entrenched right" when that broader right itself is not absolute. ***Dobbs***, 597 U.S. at 255–56.

The "rights of parenthood" are not "beyond limitation." ***Prince v. Massachusetts***, 321 U.S. 158, 166 (1944) (upholding the conviction of a parent for violating a state child labor law by allowing her children to sell and distribute

-17-

religious literature).  "Acting to guard the general interest in youth's well being, the state as parens patriae may restrict the parent's control by requiring school attendance, regulating or prohibiting the child's labor, and in many other ways."  ***Id.***

Parents do not have unlimited authority to make medical decisions for their children.  In *Parham* itself, the Supreme Court upheld the state's procedural prerequisites before a parent could commit his or her minor child.  ***Parham***, 442 U.S. at 604.  Every state, as well as the District of Columbia, allows some minors to receive some medical treatments without the consent of their parents.[5]  Every state, as well as the District of Columbia, includes failure to provide necessary medical

---

[5]*See, e.g.*, Ala. Code § 22-8-4; Alaska Stat. § 25.20.025(a)(1-2); Ariz. Rev. Stat. § 44-132.01; Ark. Code Ann. § 20-16-508; Cal. Fam. Code § 6920; Colo. Rev. Stat. § 13-22-103; Conn. Gen. Stat. Ann. § 19a-216; Del. Code Ann. tit. 13, § 710; D.C. Code § 7-1231.14(b); Fla. Stat. § 384.30; Ga. Code Ann. § 37-7-8; Haw. Rev. Stat. § 577A-2; Idaho Code § 39-3801; 410 Ill. Comp. Stat. 210/4; Ind. Code § 16-36-1-3; Iowa Code § 139A.35; Kan. Stat. Ann. §§ 38-123b, 65-2892; Ky. Rev. Stat. Ann. § 214.185; La. Stat. Ann. § 40:1079.1; Me. Stat. tit. 32, § 2595; Md. Code Ann., Health–Gen. § 20-102(c); Mass. Gen. Laws ch. 112, § 12E; Mich. Comp. Laws § 330.1264; Minn. Stat. § 144.343(1); Miss. Code Ann. § 41-41-13; § 431.061.1(4), RSMo; Mont. Code Ann. § 53-21-112(2); Neb. Rev. Stat. § 71-504; Nev. Rev. Stat. § 129.030; N.H. Rev. Stat. Ann. § 318-B:12-a; N.J. Stat. Ann. § 9:17A-4(b); N.M. Stat. Ann. §§ 24-1-9, 24-1-13.1; N.Y. Pub. Health Law § 2305; N.C. Gen. Stat. § 90-21.5; N.D. Cent. Code § 14-10-17; Ohio Rev. Code Ann. § 3709.241; Okla. Stat. tit. 63, § 2602; Or. Rev. Stat. § 109.640(4); 35 Pa. Stat. and Cons. Stat. § 10101.1(2); 23 R.I. Gen. Laws §§ 23-4.6-1, 23-8-1.1; S.C. Code Ann. § 63-5-340; S.D. Codified Laws § 34-23-17; Tenn. Code Ann. § 63-6-220; Tex. Fam. Code Ann. § 32.003(a)(3-5); Utah Code Ann. § 26B-7-214; Vt. Stat. Ann. tit. 18, § 4226; Va. Code Ann. § 54.1-2969; Wash. Rev. Code § 71.34.500; W. Va. Code § 16-4-10; Wis. Stat. Ann. § 252.11(1m); Wyo. Stat. Ann. § 14-1-101(b).  *See generally* Thomas A. Jacobs & Natalie C. Jacobs, Children and the Law: Rights and Obligations §§ 10:4–7 (2025); 3 Treatise on Healthcare Law §§ 19.02–04, 19.06 (Alexander M. Capron & Irwin M. Birnbaum eds., 2025); Abigail English & Rebecca Gudeman, Minor Consent and Confidentiality: A Compendium of State and Federal Laws (2024).

-18-

care as child neglect or abuse.[6]  *See also* **Wisconsin v. Yoder**, 406 U.S. 205, 233–34 (1972) (reiterating that "the power of the parent . . . may be subject to limitation under Prince if it appears that parental decisions will jeopardize the health and safety of the child").  Parents thus do not have an absolute right to make medical decisions for their children.  *Cf.* **Cruzan by Cruzan v. Director, Missouri Dep't of Health**, 497 U.S. 261, 286 (1990) (upholding state-imposed procedural safeguards that prevented an incompetent adult's parents from terminating her life-sustaining care because there was not "clear and convincing evidence" of her desire to terminate care).

---

[6]*See, e.g.*, Ala. Code § 26-16-2(6); Alaska Stat. § 47.17.290(11); Ariz. Rev. Stat. § 8-201(25)(a); Ark. Code Ann. § 9-35-102(38)(A); Cal. Penal Code § 11165.2; Colo. Rev. Stat. § 19-3-102(1)(d); Conn. Gen. Stat. Ann. § 46b-120(4); Conn. Dep't Child. & Fam., Pol'y 22-3; Del. Code Ann. tit. 10, § 901(18); D.C. Code § 4-1341.01(3); Fla. Stat. § 39.01(53); Ga. Code Ann. § 15-11-2(48)(A); Haw. Rev. Stat. § 350-1(1)(D); Idaho Code § 16-1602(31); 705 Ill. Comp. Stat. 405/2-3(1)(a); Ind. Code § 31-34-1-1; Iowa Code § 232.2(40); Kan. Stat. Ann. § 38-2202(z); Ky. Rev. Stat. Ann. § 600.020(1)(a)(8); La. Child. Code Ann. art. 502(5); Me. Stat. tit. 22, § 4002(1); Md. Code Regs. 07.02.07.02(b)(14), (42)(b)(i); 110 Mass. Code Regs. 2.00; Mich. Comp. Laws § 722.622(k)(i); Minn. Stat. § 609.378; Miss. Code Ann. § 43-21-105(l)(i); § 210.110(12), RSMo; Mont. Code Ann. § 41-3-102(4)(a); Neb. Rev. Stat. § 28-707(1); Neb. Dep't Health & Hum. Servs, Child Abuse, https://dhhs.ne.gov/Pages/Child-Abuse.aspx (last visited Aug. 1, 2025); Nev. Rev. Stat. § 432B.140; N.H. Rev. Stat. Ann. § 169-C:3(XIX); N.H. Dep't Health & Hum. Servs., Div. Child, Youth & Fams., Pol'y Manual, Standard Operating Proc. 1150.4(II)(G); N.J. Stat. Ann. § 9:6-8.21(c); N.M. Stat. Ann. § 30-6-1(A)(2); N.Y. Soc. Serv. Law § 371(4-a)(i)(A); N.C. Gen. Stat. § 7B-101(15)(c); N.D. Cent. Code Ann. § 50-25.1-02(20); Ohio Rev. Code Ann. § 2151.03(3); Okla. Stat. tit. 10A, § 1-1-105(49)(a)(1)(b); Or. Rev. Stat. § 419B.005(1)(a)(F); 11 Pa. Stat. and Cons. Stat. § 2233; 14 R.I. Gen. Laws § 14-1-3(8); S.C. Code. Ann. § 63-7-20(6)(iii); S.D. Codified Laws § 26-8A-2(4); Tenn. Code Ann. § 37-1-102(b)(13)(D); Tex. Fam. Code Ann. § 261.001(4)(A)(ii)(b); Utah Code Ann. § 80-1-102(59)(a)(iii); Vt. Stat. Ann. tit. 33, § 4912(6)(B); 22 Va. Admin. Code § 40-705-30(B); Wash. Admin. Code § 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(5)(e)(i); W. Va. Code § 49-1-201; Wis. Stat. § 948.21(2)(d); Wyo. Stat. Ann. § 14-3-202(a)(vii).  *See generally* Thomas A. Jacobs & Natalie C. Jacobs, Children and the Law: Rights and Obligations §§ 10:2, 10:8 (2025); 3 Treatise on Health Care Law § 19.05 (Alexander M. Capron & Irwin M. Birnbaum eds., 2025).

-19-

The question is whether this Nation's history and tradition, as well as its historical understanding of ordered liberty, support the right of a parent to obtain for his or her child a medical treatment that, although the child desires it and a doctor approves, the state legislature deems inappropriate for minors.  This court finds no such right in this Nation's history and tradition.  The Supreme Court has long recognized the power of a state to regulate the medical profession to "provide for the general welfare of its people." ***Dent v. West Virginia***, 129 U.S. 114, 122 (1889).  The Court has also recognized the power of Congress to prohibit certain medical treatments, despite a doctor finding them "both advisable and necessary." ***Lambert v. Yellowley***, 272 U.S. 581, 596 (1926) (holding that Congress, in enforcing the Eighteenth Amendment, could prohibit the prescription of alcohol for medicinal purposes).  *See **Gonzales***, 550 U.S. at 166 (upholding Congress's power to ban a medical procedure even when "some part of the medical community were disinclined to follow the proscription"); ***Abigail Alliance for Better Access to Dev'l Drugs v. Eschenbach***, 495 F.3d 695, 710 n.18 (D.C. Cir. 2007) (en banc) (collecting Supreme Court and appellate court cases upholding state or federal laws reasonably prohibiting or limiting access to particular medical treatments).

Generally, the Supreme Court has recognized that a state's "authority over children's activities is broader than over like actions of adults." ***Prince***, 321 U.S. at 168.  The consent of a parent does not automatically exempt a child from a regulation of minors. ***Id.*** at 169 ("What may be wholly permissible for adults therefore may not be so for children, either with or without their parents' presence.").  Given the two parallel currents in this Nation's history and tradition—first, states can prohibit medical treatments for adults and children, and second, parents cannot automatically exempt their children from regulations—this court does not find a deeply rooted right of parents to exempt their children from regulations reasonably prohibiting gender transition procedures.  *See **L.W. ex rel. Williams***, 83 F.4th at 472–79, *aff'd on other grounds, **Skrmetti***, 145 S. Ct. at 1837; ***Eknes-Tucker v. Governor of Alabama***, 80 F.4th 1205, 1220–24 (11th Cir. 2023); ***K.C. v. Individual Members of Medical Licensing Board of Indiana***, 121 F.4th 604, 625–27 (7th Cir. 2024).

-20-

Nor does the Act violate this Nation's "historical understanding of ordered liberty." *Dobbs*, 597 U.S. at 256. "Ordered liberty sets limits and defines the boundary between competing interests." *Id.* "But the people of the various States may evaluate those interests differently." *Id.* It does not violate this Nation's historical concept of ordered liberty for the people of Arkansas, through their legislature, to prohibit physicians from providing gender transition procedures for minors.

This court thus evaluates the Act under rational basis review. The Act is constitutional so long as it is "rationally related to legitimate government interests." *Glucksberg*, 521 U.S. at 728. "State legislation which has some effect on individual liberty or privacy may not be held unconstitutional simply because a court finds it unnecessary, in whole or in part. . . . States have broad latitude in experimenting with possible solutions to problems of vital local concern." *Whalen*, 429 U.S. at 597. For the same reasons described in Part II(C), the Act passes rational basis review under the Due Process Clause. *See Danker*, 53 F.4th at 425 ("A rational basis that survives equal protection scrutiny also satisfies substantive due process analysis").

IV.

The healthcare professional argues that the Act's provision forbidding her to "refer" minors for gender transition procedures violates the First Amendment. **Ark. Code Ann. § 20-9-1502(b)**. She emphasizes that the First Amendment protects the "dissemination of information." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011). She argues that the restriction on referrals is content based, as the Act prohibits referrals only for gender transition procedures, not for other medical services. Laws that "target speech based on its communicative content" are "presumptively unconstitutional." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015).

-21-

However, the Supreme Court recognizes that the First Amendment "does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech." *National Inst. of Family & Life Advocates v. Becerra*, 585 U.S. 755, 769 (2018). "States may regulate professional conduct, even though that conduct incidentally involves speech." *Id.* at 768. In *Planned Parenthood of Southeastern Pennsylvania v. Casey*, the Court upheld a provision compelling physicians to provide information to patients about the risks of abortion. The plurality opinion recognized that the requirement "implicated" a physician's First Amendment rights, "but only as part of the practice of medicine, subject to reasonable licensing and regulation by the State." *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833, 884 (1992) (joint opinion of O'Connor, Kennedy, and Souter, JJ.), *overruled on other grounds by Dobbs*, 597 U.S. at 231. *See also Planned Parenthood Minn., N.D., S.D. v. Rounds*, 686 F.3d 889, 893 (8th Cir. 2012) (en banc) (upholding a state law compelling physicians to provide certain truthful, relevant, non-misleading information).

The question here is whether the Act regulates speech, conduct, or both. "While drawing the line between speech and conduct can be difficult," the precedents of the Supreme Court have long drawn that line. *Becerra*, 585 U.S. at 769. The district court interpreted "refer" in the Act to include "informing their patients where gender transition treatment may be available." *Brandt*, 677 F.Supp.3d at 924. This court reviews de novo a district court's interpretations of state statutes. *Rounds*, 686 F.3d at 893.

This court "follows the state [supreme] court's interpretation, or if unavailable, uses that state court's rules of construction." *Metropolitan Omaha Prop. Owners Ass'n, Inc. v. City of Omaha*, 991 F.3d 880, 884 (8th Cir. 2021). According to the Supreme Court of Arkansas, "when the language of the statute is not ambiguous, the analysis need not go further, and we will not search for legislative intent; rather, the intent is gathered from the plain meaning of the language used." *Arkansas Dep't of Fin. & Admin. v. Trotter Ford, Inc.*, 685 S.W.3d 889, 895 (Ark. 2024). But a statute "is considered ambiguous if it is open to more than one

-22-

construction." ***Holbrook v. Healthport, Inc.***, 432 S.W.3d 593, 597 (Ark. 2014). Section 20-9-1502(b) of the Act is ambiguous because "refer" could be read broadly as informing patients about the availability of gender transition procedures, or narrowly as making a formal medical referral. "When a statute is ambiguous, this court must interpret it according to legislative intent and our review becomes an examination of the whole act. . . . In addition, this court must look at the legislative history, the language, and the subject matter involved." ***Id.*** The subject matter of the Act is the medical treatment of minors. Therefore, this court should read "refer" according to its medical definition: "to send or direct for diagnosis or treatment." *Refer: Medical Definition*, Merriam-Webster, https://www.merriam-webster.com/dictionary/refer#medicalDictionary (last visited July 31, 2025). The whole of the Act supports this reading. The Act makes "unprofessional conduct" any "referral for or provision of" gender transition procedures for minors. **Ark. Code Ann. § 20-9-1504(a)**. This language supports that "refer" in Section 1502(b) means a formal "referral for" treatment, not merely informing patients about the availability of procedures.

Whether the Act "proscribes speech, conduct, or both depends on the particular activity in which an actor seeks to engage." ***Ness v. City of Bloomington***, 11 F.4th 914, 923 (8th Cir. 2021). A referral for treatment is not part of the "speech process." ***Id.*** Rather, a referral is part of the treatment process for gender transition procedures. The Act does not focus on whether a healthcare professional is "*speaking* about a particular topic." ***Barr v. American Ass'n of Political Consultants, Inc.***, 591 U.S. 610, 620 (2020) (opinion of Kavanaugh, J., for four justices). Instead, the Act prohibits a "healthcare professional" from providing gender transition procedures to minors. **§ 20-9-1502(a)**. It also prohibits a "healthcare professional" from referring minors to "any health care professional for gender transition procedures." **§ 20-9-1502(b)**. The Act defines "healthcare professional" as "a person who is licensed, certified, or otherwise authorized by the laws of this state to administer health care in the ordinary course of the practice of his or her profession." **§ 20-9-1501(8)**. Thus, the Act prohibits a healthcare professional from referring minors to healthcare professionals for procedures that

-23-

the Act prohibits them from providing.  *See **United States v. Hansen***, 599 U.S. 762, 783 (2023) ("Speech intended to bring about a particular unlawful act has no social value; therefore, it is unprotected.").  To the extent the Act regulates speech, it does so only as an incidental effect of prohibiting the provision of gender transition procedures to minors.  *See **Giboney v. Empire Storage & Ice Co.***, 336 U.S. 490, 502 (1949) (emphasizing that "it has never been deemed an abridgement of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed").

The healthcare professional invokes *National Institute of Family and Life Advocates v. Becerra*.  There, the Supreme Court held that requiring healthcare professionals to provide information about contraception and abortion services provided by the state was a content-based regulation of speech.  ***Becerra***, 585 U.S. at 766.  But there, unlike in *Casey*, the compelled speech was not part of a medical procedure.  ***Id.*** at 770 (observing that the requirement to provide information applied "regardless of whether a medical procedure is ever sought, offered, or performed").  By contrast, a referral for treatment is "part of the practice of medicine."  *See **Casey***, 505 U.S. at 884.  *Becerra* is not helpful to the healthcare professionals, because the Act does not regulate "speech as speech."  ***Becerra***, 585 U.S. at 770.  This is not a case where "the only conduct which the State sought to punish was the fact of communication."  ***Otto v. Boca Raton***, 981 F.3d 854, 866 (11th Cir. 2020) (internal quotation marks omitted).  Rather, the Act seeks to prohibit the conduct of providing gender transition procedures to minors.  True, a referral includes "elements of speech," such as writing, typing, or verbal communication.  ***Rumsfeld v. Forum for Acad. & Inst. Rights, Inc.***, 547 U.S. 47, 61 (2006).  But any restriction on speech is "plainly incidental" to the Act's regulation of conduct.  ***Id.*** at 62.  *See **K.C.***, 121 F.4th at 629–30.

Referrals by healthcare professionals for prohibited gender transition procedures thus receive "less protection" under the First Amendment.  ***Becerra***, 585 U.S at 768.  Intermediate scrutiny applies when the burden a statute imposes on

-24-

protected speech is "only incidental to the statute's regulation of activity that is not protected by the First Amendment." *Free Speech Coal., Inc. v. Paxton*, 145 S. Ct. 2291, 2309 (2025); *see also Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 459 (1978) (holding that a lawyer's in-person solicitation of clients was "entitled to some constitutional protection . . . subject to regulation in furtherance of important state interests"). The Act "survives intermediate scrutiny if it 'advances important governmental interests unrelated to the suppression of free speech and does not burden substantially more speech than necessary to further those interests.'" *Free Speech Coal., Inc.*, 145 S. Ct. at 2317, *quoting Turner Broad. Sys., Inc. v. F.C.C.*, 520 U.S. 180, 189 (1997).

Arkansas has a "compelling interest" in protecting the physical and psychological health of minors. *See Ferber*, 458 U.S. at 756–57; **Act 626, § 2(1)**, 93rd Gen. Assemb., Reg. Sess. (Ark. 2021). This interest is greater than the "substantial state interest" required by intermediate scrutiny. *Becerra*, 585 U.S. at 773.

The Act is "adequately tailored" because "the government's interest would be achieved less effectively absent the regulation and the regulation does not burden substantially more speech than is necessary to further that interest." *Free Speech Coal., Inc.*, 145 S. Ct. at 2317 (internal quotation marks omitted). The Act's prohibition on referrals is "sufficiently drawn" to achieve the state's interest. *Becerra*, 585 U.S. at 773. By prohibiting healthcare professionals from referring "any" minors to "any healthcare professional for gender transition procedures," the Act prohibits the procedures that the state deems unsafe for minors. **Ark. Code Ann. § 20-9-1502(b)**. The Act subjects healthcare professionals to discipline for "[a]ny referral," **§ 20-9-1504(a)**, so it is not "wildly underinclusive." *Becerra*, 585 U.S. at 774. The Act survives intermediate scrutiny.

\* \* \* \* \*

-25-

Because the district court rested its permanent injunction on incorrect conclusions of law, it abused its discretion. *See **Oglala Sioux Tribe**, 542 F.3d at 229. The judgment is reversed and the case remanded for proceedings consistent with this opinion.

KELLY, Circuit Judge, with whom LOKEN, Circuit Judge, joins, concurring in part and dissenting in part.

After <u>United States v. Skrmetti</u>, 145 S. Ct. 1816 (2025), Plaintiffs concede in their supplemental briefing that intermediate scrutiny does not apply to assess whether Act 626 violates the Equal Protection Clause. But this case differs from <u>Skrmetti</u> in an important respect. Unlike <u>Skrmetti</u>, which took the State's justifications for its act at face value,[7] this case involves factual findings from a lengthy trial. And those findings—none of which the State disputes on appeal— reveal a startling lack of evidence connecting Arkansas' ban on gender-affirming care with its purported goal of protecting children. Accordingly, while I concur in

---

[7]<u>Skrmetti</u> was resolved at the preliminary injunction stage and relied on legislative findings. 145 S. Ct. at 1828, 1835–36.

-26-

the Court's disposition of the First Amendment claim,[8] I would remand for the district court to assess whether the Act survives rational basis review.[9]

## I.

After an eight-day trial, the district court made more than 300 factual findings about the relationship between Act 626's ban on gender-affirming care for minors and its ostensible aim of protecting children's safety. The State disputes none of these findings. I recount a subset of them here.

As the district court found, "[t]ransgender people have a gender identity that does not align with their birth-assigned sex," and gender dysphoria is the "significant distress" associated with "[t]he lack of alignment between one's gender identity and their sex assigned at birth." Brandt v. Rutledge, 677 F. Supp. 3d 877, 887–88 (E.D. Ark. 2023). The State does not dispute that "[g]ender dysphoria is a serious condition that, if left untreated, can result in . . . depression, anxiety, self-harm, suicidality, and impairment in functioning." Id. at 888. Among Arkansas adolescents in need of gender-affirming care, "[s]uicidal ideation and self-harm were common." Id. at 895. In general, gender-affirming care includes any of the following, alone or in combination: psychotherapy; puberty blockers, which "paus[e] the physical changes

---

[8]I read the Court's ruling in Section IV as narrow. The Court concludes only that a ban on formal medical referrals does not directly implicate the First Amendment. Under the Court's interpretation of Act 626, healthcare professionals remain free to discuss the possible treatments for gender dysphoria with their patients, as well as where such treatments are offered. Additionally, as the Court suggests, Slip Op. 23, the Act does not appear to prohibit doctors from referring patients to out-of-state providers for gender affirming care. See Ark. Code. Ann. § 20-9-1502(b) (prohibiting "[a] physician or other healthcare professional" from referring minors "to any healthcare professional for gender transition procedures"); id. § 20-9-1501(8) (defining a "[h]ealthcare professional" as "a person who is licensed, certified, or otherwise authorized by the laws of this state").

[9]I would similarly remand for the district court to apply rational basis review to Plaintiffs' substantive due process claim.

-27-

that come with puberty" and thus "provide[] the patient time to further understand their gender identity before initiating any irreversible medical treatments"; hormone therapy, which "align[s] the body to be more congruent with the individual's gender identity," but which is only recommended for those whose "gender incongruence has lasted for years"; and, rarely, surgery. Id. at 891–93. The district court found that every source of medical expertise[10] supports some form of this care. Id. at 889–91. And it expressly found: "Transgender care is not experimental care." Id. at 890.

The district court also found that the treatments Act 626 prohibits are the only "evidence-based treatments" available "to alleviate gender dysphoria." Id. at 902. "Decades of clinical experience" in Arkansas, and numerous longitudinal and cross-sectional studies, led to the undisputed finding "that adolescents with gender dysphoria experience significant" and "long-term" "positive benefits to their health and well-being from gender-affirming medical care." Id. at 901. "The evidence base supporting gender-affirming medical care" was, the district court found, "comparable to the evidence base supporting other medical treatments for minors." Id. And while "[t]here [we]re no randomized controlled clinical trials evaluating the efficacy of gender-affirming medical care for adolescents,"[11] "[i]t is common" to base medical guidelines on the type of longitudinal and cross-sectional studies available in this area. Id. at 901–02.

---

[10]This includes: "The Arkansas chapter of the American Academy of Pediatrics, the Arkansas Academy of Pediatrics, the American College of OB/GYN, the American Academy of Child Adolescent Psychologists, the American Academy of Child and Adolescent Psychiatry, the Arkansas Psychological Association, . . . . the American Academy of Pediatrics, the American Psychiatric Association, the American Psychological Association, the American Medical Association, and the American Academy of Child and Adolescent Psychology." Id. at 889–90.

[11]The district court found that such a study would be impossible "because it would not be ethical or feasible to have a study in which a control group is not provided treatment that is known from clinical experience and research to benefit patients." Id. at 902.

-28-

Nor did the district court find there to be "unique . . . risks of gender-affirming medical care . . . that warrant[] taking this medical decision out of the hands of adolescent patients, their parents, and their doctors." Id. at 902. The district court found that the effects of "[p]uberty blockers are fully reversible": once "an adolescent discontinues such treatment, endogenous puberty will resume." Id. at 903. And though puberty blockers can lower bone density, patients generally return to a normal range within a few years of stopping them. Id. Also, those who receive puberty blockers for gender dysphoria typically take the drugs for substantially fewer years than those who take them to treat precocious puberty—precocious puberty being a condition for which Arkansas permits the drugs' use. Id. at 903. Likewise, the district court found that "adverse health effects are rare" for hormone therapies, which treat numerous conditions beyond gender dysphoria that are not banned by the Act.[12] Id. at 904.

The Arkansas Children's Hospital Gender Clinic, which the district court found to be "the primary provider of gender-affirming medical care for adolescents . . . in Arkansas," has treated "more than 300 patients since it opened in 2018." Id. at 893. The district court found that Arkansas providers do not perform gender-transition surgeries on minors with gender dysphoria, but provide the other treatments discussed above, in accordance with applicable guidelines. Id. at 894, 921. The "Clinic has very rarely had patients who only recently discovered their gender incongruence"; instead, "[t]he average length of time between when Clinic patients first identify as transgender and when they first tell a parent is 6.5 years." Id. at 895. But for any patient at the Clinic, the district court found that "the average length of time between a patient's first visit . . . and the start of hormone therapy is about 10.5 months," during which they are tested for "maturity," "understand[ing

---

[12]The Court points to the fact that chest masculinization surgeries also carry certain risks. Slip Op. 13. But the district court found that in Arkansas, adolescents do not receive surgeries to treat gender dysphoria. Id. at 921. And in any case, chest masculinization surgery includes risks comparable to other similar procedures adolescents may lawfully receive in Arkansas, "including mastectomy or breast reduction . . . and gynecomastia surgery." Id. at 905.

-29-

of] the potential risks and benefits of treatment," and stability of gender identity and mood. Id. When Clinic physicians and therapists encountered patients lacking these necessary symptoms and traits, they were not considered for medical interventions, and according to the district court's undisputed findings, not all patients who have sought the Clinic's help have ultimately received gender-affirming treatment. Id. at 894–95. As for the interventions themselves, at the time of trial, the Clinic had treated only four adolescents with puberty blockers; additionally, hormone therapies were only administered to those over the age of 14, and even then, only after certain criteria were met, including "consistent and persistent gender identity," a "comprehensive" assessment by a psychologist, consultation and approval from a therapist, and lab work. Id. at 894–95.

According to the district court's findings, adolescents can generally "understand the risks[] [and] benefits" of treatment for gender dysphoria, and before any treatment begins, both they and their parents must provide informed consent. Id. at 890–91, 895. The district court found no evidence of an adolescent in Arkansas coming to regret their treatment for gender dysphoria, or "to identify with their sex assigned at birth after medically transitioning." Id. at 905. And the Arkansas State Medical Board "[wa]s not aware of any minors in Arkansas who have been harmed by gender-affirming care." Id. at 908.

Arkansas' complete prohibition of gender-affirming care for adolescents is unique when viewed alongside how the State regulates medical treatments for other conditions. According to the district court's findings, "Arkansas does not ban medical treatments" for other conditions, even where the treatments "lack . . . randomized controlled clinical trials" or have "a limited evidence base." Id. During the opioid epidemic, for example, Arkansas enacted a law that imposed "incremental sanctions for doctors who overprescribe[d] opioids," but the State did not ban the drugs outright. Id. at 907. Gastric bypass surgery, which carries "serious risks" but "no guarantee of weight loss or long-term weight management," is subject only to "informed consent requirements." Id. And during the COVID-19 pandemic, Arkansas continued to leave the decision to take hydroxychloroquine to "the

-30-

discretion of individual clinicians and their patients," despite the Arkansas Department of Health warning that hydroxychloroquine "should be avoided in hospital and outpatient settings." Id. (quotation omitted). Finally, the district court found that "Arkansas does not ban [other] medical treatments for minors on the rationale that minors cannot provide informed assent." Id. at 908. Rather, decisions concerning "whether to undergo [other] care" are left to "the physician and the parent and the minor patient." Id.

The district court found that Act 626's ban on gender-affirming care would exact serious and irreparable harm. Id. at 909. According to the district court's findings, "[n]ot all adolescents with gender dysphoria will live to age 18 if they are unable to get gender-affirming medical treatment." Id. For Arkansas adolescents presently undergoing "puberty blockers or hormone therap[ies] and who would be forced to discontinue treatment," the district court found "the harms are severe." Id. Indeed, the State's own expert—the only State expert who had any experience treating gender dysphoria, id. at 913—called such a result "shocking" and "devastating," and indicated that doctors might simply violate Arkansas law "to help those patients"—a result that could be required due to a doctor's ethical obligation not to abandon a patient,[13] id. at 910.

## II.

Applying rational basis review, "[a] court must uphold a classification so long as it is rationally related to any conceivable, legitimate state purpose." Doe, I v.

---

[13]The Court's decision today leaves open whether, under Arkansas law, adolescents currently undergoing gender-affirming care could avoid the undisputed severe harms of ending the care pursuant to the exemptions laid out in Act 626 for certain treatments of "infection, injury, disease, or disorder . . . exacerbated by the performance of gender transition procedures" or "[a]ny procedure undertaken because the individual suffers from a . . . physical illness that would, as certified by a physician, place the individual in imminent danger of death or impairment of major bodily function." Ark. Code. Ann. § 20-9-1501(6)(B)(iii)–(iv).

-31-

Peterson, 43 F.4th 838, 842 (8th Cir. 2022). But "even in the ordinary equal protection case calling for the most deferential of standards, we insist on knowing the relation between the classification adopted and the object to be attained." Romer v. Evans, 517 U.S. 620, 632 (1996). And when such an assessment reveals that a state's classification "rest[s] on an irrational prejudice against" an affected group, a law fails rational basis review. City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 450 (1985). This happens when a law's "sheer breadth is so discontinuous with the reasons offered for it that . . . [it] seems inexplicable by anything but animus toward the class it affects." Romer, 517 U.S. at 632.

The district court did not engage in rational basis analysis. But as I read its findings, Act 626 plausibly fails even this deferential test. The undisputed factual findings in this case show that Act 626 categorically removes the only treatment available for adolescents suffering from a recognized, serious health condition. The findings also show that at least some children—whose health Arkansas uses to justify this law—run the "risk of worsening anxiety, depression, hospitalization, and suicidality" because Arkansas denies them gender-affirming care, such that "[n]ot all . . . will live to age 18." Brandt, 677 F. Supp. 3d at 909. The Act prohibits this treatment indiscriminately, regardless of the method used or its concomitant risks. And the Act prohibits puberty blockers and hormone therapies only for treating gender dysphoria, despite these treatments carrying the same or higher risks when used for different conditions. Moreover, the district court found that there was no evidence of any children in Arkansas who regretted or were otherwise somehow uniquely harmed by the treatment as prescribed by physicians in the State. In my view, this record implies that the Act reflects "mere negative attitudes," or "unsubstantiated" "fear"—namely, a moral panic about gender dysphoria in adolescents. Cleburne, 473 U.S. at 447–48 (concluding city's requirement that a home for people with mental disabilities get a special use permit failed rational basis review because it did not require the same for other multi-person dwellings, and "the

-32-

record d[id] not reveal any rational basis for believing that the . . . home would pose any special threat to the" interests the city raised).[14]

Indeed, each of the State's purported justifications for the Act appears to crumble under the gentlest review. First, the State suggested "a lack of evidence of efficacy of the banned care." Brandt, 677 F. Supp. 3d at 918. But the State does not dispute the district court's finding that "decades of clinical experience demonstrat[ed] the efficacy of gender-affirming medical care," and that the State had offered "no evidence-based treatment alternatives." Id. at 919. Second, the State highlighted the "risks and side effects" of the banned treatments. Id. at 918. But "the evidence at trial showed the risks associated with gender-affirming care for adolescents are no greater than the risks associated with many other medical treatments that are not prohibited by Act 626," id. at 920–21, and the Arkansas State

_____

[14]It is true that the Supreme Court has at times suggested that "courtroom fact-finding" is not necessary when applying rational basis review. See FCC v. Beach Commc'ns, Inc., 508 U.S. 307, 315 (1993). And "[w]here there exist 'plausible reasons' for the relevant government action, 'our inquiry is at an end.'" Skrmetti, 145 S. Ct. at 1835 (quoting Beach Commc'ns, 508 U.S. at 313–14). Indeed, that was the case in Skrmetti, which relied solely on unevidenced legislative findings that, facially, seemed to be plausible reasons to ban gender-affirming care for minors. Id. at 1835–36. But this case presents a different, and unusual, situation: the district court presided over a long trial, where the State appears to have been unable to provide any evidence that its ban supported the goals it claimed the Act advanced, despite having every incentive to do so, as it was unclear at the time of trial what level of scrutiny would apply. The State's failure to proffer evidentiary support, even if not required in retrospect, suggests the Act's passage was inflected with irrational animus, and supports a remand for the district court to determine whether the Act survives rational basis review. See New Directions Treatment Servs. v. City of Reading, 490 F.3d 293, 312 (3d Cir. 2007) (remanding for trial on rational basis review for equal protection challenge, noting that it was "inexplicable that the City failed to offer any evidence to support the[] concerns" it raised as justifications for the law); Cleburne, 473 U.S. at 448 (concluding zoning decision failed rational basis review as applied, stressing that "the record" failed to demonstrate a reason for the city's classification); see also Heller v. Doe ex rel. Doe, 509 U.S. 312, 321 (1993) (noting that "even" under rational basis review, "the standard of rationality . . . must find some footing in the realities of the subject addressed by the legislation").

-33-

Medical Board "[wa]s not aware of any minors in Arkansas who have been harmed by gender-affirming care," id. at 908. Third and fourth, the State argued "that many patients will desist in their gender incongruence" and "that some patients will later come to regret" the treatments. Id. at 918. But at trial, the State could not point to a single instance of such desistance or regret among Arkansas adolescents who received gender-affirming care. Id. at 905–06. Fifth, the State argued "that treatment is being provided without appropriate evaluation and informed consent." Id. at 918. But the district court found "no evidence that doctors in Arkansas negligently prescribe puberty blockers or cross-sex hormones to minors," and "the evidence confirmed that doctors in Arkansas do not perform gender transition surgeries on any person under the age of 18." Id. at 921. As the district court found: "The testimony of well-credentialed experts, doctors who provide gender-affirming medical care in Arkansas, and families that rely on that care directly refutes any claim by the State that the Act advances an interest in protecting children." Id. at 922. What appears to be left is animus. See Skrmetti, 145 S. Ct. at 1853 (Barrett, J., concurring) ("To be sure, an individual law 'inexplicable by anything but animus' is unconstitutional." (quoting Trump v. Hawaii, 585 U.S. 667, 706 (2018))).

The record suggests that the State's "purported justifications for the [Act] ma[k]e no sense in light of how the [State] treat[s] other groups similarly situated in relevant respects." Bd. of Trs. of Univ. of Ala. v. Garrett, 531 U.S. 356, 366 n.4 (2001) (describing Cleburne's holding). But without knowing the proper level of scrutiny, the district court never "made th[e] vital inquiry" as to whether the Act survived rational basis review. Cornerstone Bible Church v. City of Hastings, 948 F.2d 464, 471–72 (8th Cir. 1991) (remanding for district court to apply rational basis review where zoning ordinance excluding churches appeared to reflect "unequal treatment of similarly situated entities" and lacked "any justification beyond the conclusory statements in . . . affidavits"). I would thus remand for the district court to explicitly address whether the Act "simply does not operate so as rationally to further" the protection of children's health. USDA v. Moreno, 413 U.S. 528, 535–37 (1973) (holding no rational basis where government offered only

-34-

"unsubstantiated assumptions concerning" "hippies" to justify federal statute that excluded households with unrelated occupants from accessing food stamps).

Respectfully, I dissent from the Court's resolution of the Plaintiffs' Equal Protection and Due Process claims.

_____

-35-